IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

_____
:
KARL FONTENOT,                          :
                                        :
            Petitioner,                 :
                                        :            CIVIL ACTION
        v.                              :            6:16-cv-00069-JHP-KEW
                                        :
HECTOR RIOS, Warden,                    :
                                        :
            Respondent.                 :
                                        :
_____:


_____

**PETITION FOR WRIT OF HABEAS CORPUS**
_____


Tiffany R. Murphy
Attorney at Law
Arkansas Bar No. 2015057
790 N. Cliffside Drive
Fayetteville, AR 72701
(479) 575-4573

# TABLE OF CONTENTS

TABLE OF CONTENTS------------------------------------------------------------------------- 1

TABLE OF AUTHORITIES------------------------------------------------------------------ 4

PROCEDURAL HISTORY -------------------------------------------------------------------- 7

STATEMENT OF FACTS -------------------------------------------------------------------- 11

PETITIONER'S CLAIMS ARE PROPERLY BEFORE THIS COURT---------------------13

**I.   NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT MR. FONTENOT IS ACTUALLY INNOCENCE SATISFYING THE GATEWAY REQUIREMENTS OF** *SCHULP V. DELO*. -------------------------------------------------------------------------------------- 15

   **A.   Newly Discovered Evidence Establishes Mr. Fontenot's Alibi.**------------------------------ 19

   **B.   Donna Denice Haraway was being Harassed by an Unknown Man.** -------------------------- 25

   **C.   The Only Eyewitness Mr. Fontenot at McAnally's around the Time of Mrs. Haraway's Disappearance Has Recanted His Identification.**---------------------------------------------------- 29

   **D.   Law Enforcement Pressured Karen Wise to Change Her Account of What Transpired in JP's Convenience Store.** ----------------------------------------------------------------------------- 31

   **E.   Numerous Inconsistent Statements about the Grey-Primered Truck Cast Doubts as to what Truck was Actually Involved in the Abduction if Any.**------------------------------------------------ 35

   **F.   Undisclosed Portions of the Medical Examiner's Report Showing Faulty Action in Preserving and Evaluating The Gerty Crime Scene Where The Decedent's Skeletal Remains Were Found And Showing The Decedent Gave Birth Prior To Her Death.** --------------------------- 38

**II.   MR. FONTENOT'S FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE STATE OF OKLAHOMA WITHELD EVIDENCE IN VIOLATION OF** *BRADY V. MARYLAND*. ---------------------------------------------------------------------------------------- 42

   **A.   The Pontotoc District Attorney's Office Did Not Receive All Exculpatory**---------------------- 46

   **And/Or Impeachment Evidence as a Matter Of Policy.**------------------------------------------ 46

      **1.   Pontotoc District Attorney's failure to ensure Brady materials were obtained from law enforcement.** ------------------------------------------------------------------------------------- 48

      **2.   Lack of training of law enforcement to understand what evidence constituted** *Brady* **material.**------------------------------------------------------------------------------------------- 49

   **B.   Mr. Fontenot's Defense Counsel Repeatedly Requested Exculpatory, Impeachment Evidence, And Evidence That Would Aid the Defense throughout Both Trials.** ---------------------- 54

   **C.   Material Evidence Was Withheld from Mr. Fontenot's Defense Counsel** ------------------------ 56

     1.   OSBI and Ada Police Department Reports establishing Mr. Fontenot's alibi-------------------- 57

     2.   Cash Register Tape and Relevant Witness Reports-------------------------------------------- 60

     a. Richard Holkum------------------------------------------------------------------------------- 60

     b. John McKinnis -------------------------------------------------------------------------------- 63

     c. Gary Haney & Guy Keys ---------------------------------------------------------------------- 67

1

d. Gene Whelchel ------------------------------------------------------------------------------ 68

3. Floyd DeGraw ------------------------------------------------------------------------- 70

4. Withheld interview reports and taped statements of Jeff Miller and Terri ---------------------- 74
Holland (McCarthy). ------------------------------------------------------------------------ 74

5. OSBI Reports of Mrs. Haraway's fear of being stalked. ------------------------------- 77

**D.   Prejudice from The Non-Disclosure Of Exculpatory Evidence** ------------------------------------- 80

**III.    MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO INVESTIGATE THE CASE AND PRESENT VIABLE EVIDENCE SUPPORTING HIS INNOCENCE** -------------------- 86

**A.   Trial Counsel Was Ineffective for Failing to Introduce Tommy Ward's Sworn Statement Made During the Preliminary Hearing Exculpating Mr. Fontenot from Involvement in Mrs. Haraway's Case.** ---------------------------------------------------------------------------- 87

**B.   Trial Counsel Was Ineffective for Failing To Investigate Evidence Of Denice** ------------------ 93

**Haraway Being Stalked and Evidence Establishing A Different Motive For The Crime.** ----------- 93

1. Defense investigation reports showing Denice Haraway's fear of obscene phone calls she received. ----------------------------------------------------------------------------------- 93

2. Register tape showing witnesses who were in McAnally's in short proximity to her disappearance ----------------------------------------------------------------------------------- 94

**IV.    MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WAS VIOLATED WHEN HIS APPELLATE COUNSEL FAILED TO PRESENT VIABLE CONSTITUTIONAL CLAIMS IN MR. FONTENOT'S DIRECT APPEAL PROCEEDINGS.** --------------------------------------------------------------------------------- 97

**V.    MR. FONTENOT'S DUE PROCESS RIGHTS WERE VIOLATED DUE TO POLICE MISCONDUCT WHEN TAKING A FALSE CONFESSION AND THE PROSECUTION KNOWINLY INTRODUCED FALSE TESTIMONY DURING HIS TRIAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.** ---------------- 99

**A.   Police Misconduct in The Interrogations of Mr. Fontenot** ------------------------------------- 99

**B.   Mr. Fontenot's Confession Is False and Unreliable.** -------------------------------------------- 106

**C.   The Pontotoc County District Attorney Office Knowing Admitted False** ------------------------ 110

**Testimony during Mr. Fontenot's Trial.** ----------------------------------------------------------- 110

**VI.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. FONTENOT BECAUSE THE STATE FAILED TO SHOW THE EXISTENCE OF THE CORPUS DELICTI OF THE CHARGED CRIMES OUTSIDE OF THE CONFESSION AND FAILED TO ESTABLISH THE TRUSTWORTHINESS OF THE CONFESSION IN VIOLATION OF THE FOURTEENTH AMENDMENT.** ------------------------------------------------------------------------------- 113

**A.   The State's Failure to Sufficiently Prove the Corpus Delicti of the Charged Crimes Independent of the Confession Requires Reversal.** ------------------------------------------------- 116

**B.   The State Failed to Establish Through "Substantial Independent Evidence" the Trustworthiness of Mr. Fontenot's Confession; The Confession Was Patently Unreliable and Thus Inadmissible.** ------------------------------------------------------------------------- 119

**C.  No Rational Trier of Fact Could Find Mr. Fontenot's Guilt Beyond a Reasonable Doubt on the Evidence at Trial, even if the Confession is Deemed to be Properly Admitted.**------------------ 124

**VII.  THE STATE'S INJECTION OF INADMISSIBLE HEARSAY FROM THE EXTRAJUDICIAL CONFESSION OF MR. WARD IN MR. FONTENOT'S TRIAL VIOLATED HIS CONSTITUTIONAL RIGHT OF CONFRONTATION.** ------------------------------------------- 127

**VIII.  MR. FONTENOT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOALTED DUE TO THE POLICE MISCONDUCT THAT PERMEATED THE INVESTIGATION INTO MRS. HARAWAY'S DISAPPERANCE.**------------------------------------- 135

**A.  The Ada Police Department's Complete Lack of Training to Handle Major**------------------- 135

**Crimes Resulted in an Incompetent Police Investigation.** ------------------------------------------- 135

**B.  The Ada Police Department's Primary Function Was To Investigate The Disappearance of Denise Haraway and They Failed That Role Because They Did Not Collect Information from Readily Available Witnesses.**---------------------------------------------------------------------- 137

**C.  Police Misconduct Involving Witness Interviews Resulted in Descriptions of**----------------- 142

**the Suspects That Have No Relevance to The Disappearance of Mrs. Haraway.** -------------------- 142

**D.  Law Enforcement Failed to Investigate Leads from other Jurisdictions.** ------------------------ 143

**E.  Law Enforcement Failed to Properly Preserve Evidence Connected with The** ---------------- 146

**Crime After Mrs. Haraway's Remains Were Found.** ----------------------------------------------------- 146

**F.  Conclusion**----------------------------------------------------------------------------------------------------- 150

**PRAYER FOR RELIEF**---------------------------------------------------------------------------------------- 151

# TABLE OF AUTHORITIES

<span style="text-align: center;">C<small>ASES</small></span>

*Ake v. Oklahoma*, 470 U.S. 68; 105 S.Ct. 1087, 1092 (1985) ------------------------------------------- 133

*Banks v. Dretke*, 540 U.S. 668, 691 (2004)------------------------------------------------------------------40, 82

*Berger v. U.S*, 295 U.S. 78 (1935) ------------------------------------------------------------------------------ 108

*Bowen v. Maynard*, 799 F.2d 593, (10th Cir. 1986)------------------------------------------ 41, 64, 71, 78

*Brady v. Dill*, 187 F.3d 104 (1ˢᵗ Cir. 1999) ------------------------------------------------------------------ 135

*Brady v. Maryland*, 373 U.S. 83 (1963) ----------------------------------------------------------------------- 40

*Britt v. State*, 1986 OK CR 99; 721 P.2d 812 (Ok. 1986) ---------------------------------------------- 89

*Carriger v. Stewart*, 132 F.3d 463 (9th Cir. 1997) ----------------------------------------------------- 13, 42

*Connick v. Thompson*, 131 S.Ct. 1350 (2011) ---------------------------------------------------------------- 44

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007)-------------------------------------------------- 136

*Crawford v. State*, 840 P.2d 627 (Ok 1992) ---------------------------------------------------------------- 108

*Cummings v. Sirmons*, 506 F.3d 1211 (10ᵗʰ Cir. 2007)------------------------------------------------- 13

*Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077 (1965) --------------------------126, 133

*Dunagan v. State*, 734 P.2d 291 (Ok. 1987)--------------------------------------------------------------- 129

*Fontenot v. State*, 742 P.2d 31, 32 (Ok.  1987)----------------------------------------------------125, 133

*Fontenot v. State*, 881 P.2d 69 (Okla. 1994) -----------------------------------------------------------------8

*Funkhouser v. State*, 1987 OK CR 44; 734 P.2d 815 (OK 1987)------------------------------------- 89

*Garcia v. State*, 639 P.2d 88 (Ok. 1981) ------------------------------------------------------------------- 129

*Giglio v. United States*, 405 U.S. 150 (1972) --------------------------------------------- 40, 41, 43, 111

*Glass v. Vaughn*,66 F.3d 13 (3ʳᵈ Cir. 1995) ---------------------------------------------------------------- 16

*Godwin v. State*, 625 P.2d 1262 (Ok. 1981)--------------------------------------------------------------- 129

*Goforth v. State*, 644 P.2d 114 (Ok. 1982) ---------------------------------------------------------------- 115

*Greer v. State*, 763 P.2d 106 (Ok. 1988) ------------------------------------------------------------------- 129

*Hager v. State*, 612 P.2d 1369 (Ok. 1980)----------------------------------------------------------------- 124

*House v. Bell*, 547 U.S. 518 (2006)---------------------------------------------------------------------- 14, 16

*In re Winship*, 397 U.S. 358; 90 S.Ct. 1068 (1970) ----------------------------------------------------- 124

*Jackson v. Virginia*, 443 U.S. 307; 99 S.Ct. 2781 (1979)-------------------------------------------- 124

*Jones v. State*, 555 P.2d 63 (Ok. 1976) --------------------------------------------------------------------- 117

*Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992) ----------------------------------------------------------------- 11

*Kingsland v. City of Miami*, 369 F.3d 1210 (11th Cir. 2004)--------------------------------------- 140

*Kuhlmann v. Wilson*, 477 U.S. 436 (1986) ------------------------------------------------------- 11

*Kyles v. Whitley*, 514 U.S. 419 (1995) ------------------------------------------------------- passim

*Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056 (1986)------------------------------------------ 126

*Lindsey v. King*, 769 F.2d 1034 (5th Cir. 1985) ----------------------------------------------- 64

*Lopez v. Trani*, 628 F.3d 1228 (10th Cir. 2010) ----------------------------------------------- 11

*Malloy v. Hogan*, 378 U.S. 1 (1964) --------------------------------------------------------- 108

*McCall v. State*, 539 P.2d 418 (Ok. 1975) --------------------------------------------------- 132

*McClesky v. Zant*, 499 U.S. 467 (1991) ------------------------------------------------------ 11

*McQuiggin v. Perkins*, __ U.S. __, 133 S.Ct. 1924, 1935, 185 L.Ed.2d 1019 (2013)------------- 11

*Miller-El v. Cockrell*, 537 U.S. 322 (2003)---------------------------------------------------- 44

*Miranda v. Arizona*, 384 U.S. 436 (1966) ---------------------------------------------------- 97

*Mooney v. Holohan*, 294 U.S. 103 (1935)---------------------------------------------------- 109

*Napue v. Illinois*, 360 U.S. 264 (1959) ------------------------------------------------ 40, 42, 43, 108

*Opper v. U.S.*, 348 U.S. 84 (1954)------------------------------------------------------ 115, 117, 122

*Pennsylvania v. Ritchie*, 480 U.S. 39; 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987)------------------- 40

*Rompilla v. Beard*, 545 U.S. 374 (2005) ---------------------------------------------------- passim

*Schlup v. Delo*, 513 U.S. 298 (1995) --------------------------------------------------------- 13, 16

*Sistrunk v. Armenakis*, 292 F.3d 669, 673 n. 4 (9th Cir. 2002)------------------------------- 13

*Smith v. Roberts*, 115 F.3d 818 (10th Cir. 1997) --------------------------------------------- 40

*Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801 (10th Cir. 1995)--------------- 41

*Smith v. United States*, 348 U.S. 147; 75 S.Ct. 194 (1954)--------------------------------- 112

*Spuehler v. State*, 709 P.2d 202 (Ok. 1985) ------------------------------------------------- 124

*State ex.rel. Peterson v. Ward*, 707 P.2d 1217 (Okl.Cr.1985)------------------------------- 115

*Strickland v. Washington*, 466 U.S. 668; 104 S.Ct. 2052; 80 L.Ed.2d 674 (1984)------------ 84, 90, 95, 96

*Strickler v. Greene*, 527 U.S. 263 (1999) --------------------------------------------------- 55

*Strickler*, 527 U.S. at 281-82 (1999) -------------------------------------------------------- 40, 42

*Thompson v. State*, 705 P.2d 188 (Ok. 1985) ----------------------------------------------- 129

*Thornburgh v. State*, 815 P.2d 186 (Ok. 1991) ---------------------------------------------- 117

*Tiscareno v. Anderson*, 639 F.3d 1016, (10th Cir. 2011) ------------------------------------ 41

*Trammell v. McKune*, 485 F.3d 546 (10th Cir. 2007)---------------------------------------- 76

*U.S. v. Agurs*, 427 U.S. 97 (1976)----------------------------------------------------------- 53, 55

*United States v. Bagley*, 473 U.S. 667 (1985) ---------------------------------------- 40, 42, 43, 54

*United States v. Brooks*, 296 U.S. App. D.C. 219; 966 F.2d 1500 (D.C. Cir. 1992)------------ 41

*United States v. Buchanan*, 891 F.2d 1436 (10th Cir. 1989)-------------------------------- 41

*United States v. Osorio*, 929 F.2d 753 (1st Cir. 1991)------------------------------------------------ 41

*United States v. Perdomo*, 929 F.2d 967 (3d Cir. 1991) -------------------------------------------- 42

*United States v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992)--------------------------------------- 42

*United States v. Starusko*, 729 F.2d 256  (3d Cir. 1984) ----------------------------------------- 55

*Ward v. Texas*, 316 U.S. 547 (1942) ---------------------------------------------------------------- 107

*Washington v. State*, 568 P.2d 301 (Ok. 1977) --------------------------------------------------- 129

*Wiggins v. Smith*, 539 U.S. 510 (2003); ----------------------------------------------- 84, 93, 95, 96

*Williams v. Taylor*, 529 U.S. 362 (2001). ----------------------------------------------- 84, 93, 96

*Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991) ------------------------------------------------ 41

*Williamson v. State*, 812 P.2d 384 (Ok. 1991), *cert. denied*, 112 S.Ct. 1592 (1992) -------------------------------------- 117

*Young v. State*, 89 OK. 395, 208 P.2d 1141 (1949) ------------------------------------------------- 124

## Oᴛʜᴇʀ Aᴜᴛʜᴏʀɪᴛɪᴇs

Ayling, *Corroborating Confessions: An Empirical Analysis of*----------------------------------- 112

*Corroboration of Confessions in the Theft by Receiving Context: Is Proof of Theft Enough*, ---------------------112, 114

Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, ------ 99

Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND------ 99, 100

*Legal Safeguard Against False Confessions*, 1984 Wisconsin L.R. 1121------------------------------ 112

Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE -------------------------------100, 108

Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA world. *North* ---- 106

Voluntary False Confessions: A Neglected Area in Criminal Administration, 28 Ind.L.J. 374 (1953) --- 111, 112, 114

## Rᴜʟᴇs

ABA Standards for Criminal Justice  (2d ed. 1982 Supp.) ------------------------------------------------ 85, 92, 109

Petitioner, Karl Fontenot, hereby files this petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.

## PROCEDURAL HISTORY[1]

On April 24, 1984, Donna Denice Haraway was last seen at McAnally's convenience store in Ada, Oklahoma.  A few customers arrived to find the store empty and called emergency services.  Several law enforcement agencies responded to the scene including the Ada Police Department and the Pontotoc County Sheriff's Office.  Later, the Oklahoma State Bureau of Investigations joined the local agencies in the investigation.

On October 12, 1984, with Mrs. Haraway still missing, the police contacted Thomas Ward in Norman, Oklahoma and interviewed him for more than two hours. (PH Tr. 506) Mr. Ward denied any involvement or knowledge of what happened to Mrs. Haraway. (F-85-769 Tr. 1336)  Mr. Ward returned to the Oklahoma State Bureau of Investigation to take a polygraph test the next day. After nine hours of interrogation, police videotaped Mr. Ward give a statement in which he described being with Odell Titsworth and Karl Fontenot the night of Mrs. Haraway's disappearance.  The three robbed McAnally's, kidnapped Haraway, raped, and stabbed her to

---

[1] There are several records cites within this Petition.  Abbreviations to the various court records, hearings, and trials will be as follows:

OR:  Original trial court record
P/H: Preliminary Hearing Transcript (there was only one preliminary hearing held in this case even after remand from the OCCA).
J/T date and page:  Joint trial of Thomas Ward and Karl Fontenot in 1986.
N/T date and page:  Fontenot's trial held over several days in 1988.
Ward N/T date and page:  Thomas Ward's trial held over several days in 1989.
State's Exhibit __ :  State exhibits from Mr. Fontenot's trial.

death.  Based solely on Mr. Ward's confession, police arrested Mr. Fontenot the next day.  He too was interrogated and confessed in similar fashion as Mr. Ward.

Nineteen days later, the Pontotoc District Attorney's Office filed charges against Mr. Fontenot and Mr. Ward in Case No. CRF-84-183 with Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; Count III, First-Degree Rape; and Count IV, First-Degree (Malice Aforethought) Murder. (O.R. 112)  On November 8, 1984, the State filed a Bill of Particulars against each defendant alleging these aggravating circumstances: 1) the murder was especially heinous, atrocious, or cruel; 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. (O.R. 591, 592) Mr. Fontenot was appointed counsel on November 29, 1984, 42 days after his arrest. (O.R. 30)

The Pontotoc District Court held a joint preliminary hearing on February 4, 1985.  Mr. Fontenot and Ward were bound over for to trial on Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; and Count IV, Murder in the First Degree. (O.R. 592A-592-B) The magistrate found insufficient evidence to order either defendant to trial on Count III, First-Degree Rape. P/H  1047. The State appealed to the District Court to reinstate Count III, but was overruled. (Rule 6 Tr. 26-27) The State appealed the ruling to the Oklahoma Court of Criminal Appeals.  On September 6, 1985, while the State's appeal on the rape charge was pending, the State dismissed the rape charge and amended the Information to allege Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; and Count III, First Degree (Malice Aforethought) Murder, and proceeded to trial. (O.R. 475).

8

Both Mr. Fontenot and Mr. Ward were convicted of all counts in a jury trial held on September 24, 1985.  The trial court sentenced both to twenty years imprisonment on Count I, ten years imprisonment on Count II.  During the penalty phase of the trial, the jury found the existence of three aggravating circumstances and no mitigation sentencing Mr. Fontenot and Mr. Ward to death.  An appeal was timely filed for both men to the Oklahoma Court of Criminal Appeals.

During the pendency of the appeal, a man found a skull in Hughes County commencing a search of the area.   Eighteen months after Mrs. Haraway's disappearance, her skeletal remains were recovered after several searches of the area.  The medical examiner found a bullet hole in the back of the skull was the only evidence of a probable cause of death. (N/T 6/9/1988 at 130) The medical examiner also found no evidence of any stabbing or burning of the remains. (N/T 6/14/1988 at 134, 136).  The Oklahoma Court of Criminal Appeals reversed both the conviction and sentence over *Bruton* violations in Fontenot v. State, 742 P.2d 31 (Okla. 1987).

After the remand, Mr. Fontenot was tried in Hughes County after a change of venue motion was granted by the trial court.  On June 7, 1988, the State filed an amended Information alleging Counts I, II and III, Robbery with a Dangerous Weapon, Kidnapping and Murder in the First Degree (malice aforethought), respectively, adding to Count IV that the cause of death by gunshot. (O.R.II 76) Another preliminary hearing was not held.   Mr. Fontenot's jury trial started on June 7, 1988, in Hughes County District Court before Judge Donald E. Powers. (N/T 6/6/1988 at 1).  On June 14, 1988, Mr. Fontenot was convicted of all counts. (N/T. 7/8/1988 at 104; O.R. II  at 165, 166, 167) The jury assessed punishments of twenty (20) and ten (10) years imprisonment on Counts I and II respectively. (O.R.II at 65, 166) Following the penalty phase, the jury found the existence of the three alleged aggravating circumstances and set Mr.

9

Fontenot's punishment at death. (June 14, 1988 at 165- 166; O.R II at 168, 169) Judgment and sentence in accordance with the jury's verdicts was imposed on July 8, 1988. Mr. Fontenot filed a timely notice of appeal to the Oklahoma Court of Criminal Appeals.

Mr. Ward went to trial in Pottawattamie County on the same charges almost a year after Mr. Fontenot was convicted.  Before the same trial court, Mr. Ward's trial began on May 31, 1989, and concluded on June 16, 1989.  The jury found Mr. Ward guilty on all charges. However, they imposed a sentence of life imprisonment with the possibility of parole.

On June 8, 1994, the Oklahoma Court of Criminal Appeals affirmed Mr. Fontenot's convictions, but overturned his death sentence due to a life without the possibility of parole jury instruction being omitted during the penalty phase. *Fontenot v. State*, 881 P.2d 69 (Okla. 1994). The Court remanded Mr. Fontenot's case for resentencing.  Mr. Fontenot was subsequently sentenced to life imprisonment without the possibility of parole.

An Application for Post-Conviction Relief was filed in the District Court of Pontotoc County on July 24, 2013.  It was assigned to the Honorable Thomas S. Landrith.  After requesting additional time to respond, the State filed its response on September 17, 2014. Without an evidentiary hearing, the district court issued its post-conviction findings on December 31, 2014, denying relief based on the Respondent's assertion of Laches.  Mr. Fontenot timely filed an appeal to the Oklahoma Court of Criminal Appeals on March 2, 2015.  He raised all claims from his state post-conviction proceedings and challenged the laches decision.  On November 2, 2015, the Oklahoma Court of Criminal Appeals affirmed the state post-conviction court's order denying relief finding the application was barred by laches.   Mr. Fontenot now files his Petition for Writ of Habeas Corpus seeking relief from his state court convictions.

## STATEMENT OF FACTS

At approximately 8:30 pm on April 24, 1984, Donna Denice Haraway disappeared from McAnally's convenience store where she worked.  What exactly happened to Mrs. Haraway in the days and months after her disappearance remains a mystery.  What is clear is that the Prosecution's case against Mr. Fontenot conflicts with all the physical or direct evidence that existed in this case.  Further, when Mrs. Haraway's remains were found over a year after her disappearance, it provided another illustration of the flaws that perpetuate the police investigation and the prosecution of Mr. Fontenot.   Due to the failing in the investigation by the Ada Police Department (APD), Oklahoma State Bureau of Investigation (OSBI), and Pontotoc County Sheriff's Office, many of the viable leads as to what truly happened on April 28, 1984, were ignored for months.  The investigation was headed up by the APD Detective Dennis Smith, and OSBI Agent Gary Rogers.  Along with these two officers, APD Detective Mike Baskins handled key parts of the investigation, like handling the McAnally's crime scene.  These law enforcement officers focused on misinformation provided by Jeff Miler.  Allegedly, Mr. Miller claimed he heard that Mr. Ward, Mr. Fontenot, Jeanette Roberts (Blood), and Odell Titsworth were fishing at Blue River on April 28, 1984, and that somehow Jeanette Roberts' pickup was involved in Haraway's disappearance.  Based on this uncorroborated conversation, police sought out Thomas Ward and then, Mr. Fontenot as their suspects.

The case against Mr. Fontenot rests primarily on his confession given in October 1984, where he, along with Odell Titsworth, and Tommy Ward robbed McAnallys, kidnapped and murdered Mrs. Haraway before burning her body.  After extensive investigation into various areas around Pontotoc County, Oklahoma, the OSBI and Ada Police Department were unable to locate Mrs. Haraway's remains or any physical evidence corroborating Mr. Fontenot's

11

confession.   In fact, not one detail of Mr. Fontenot's confession could ever be corroborated with any evidence in the case.

Along with the confessions, prosecution's case included the three witnesses who arrived at McAnally's after Mrs. Haraway's disappearance.  These three men testified as to what they witnessed upon arriving at the store.  According to their testimony, a man and a woman exited the front door and got in a pickup that was parked about 10 feet away, parallel to the door, facing east. (N/T 6/10/1988 at 60) The man had one arm around her waist. (N/T 6/9/1988 at 66) The pickup was light-colored, "late model, late '60s, early '70s," with an intact tailgate, "greenish, gray" with primering spots and "gray primer." (N/T 6/10/1988 at 40-41, 47, 59)   Not realizing anything was amiss, one of the witnesses entered the store finding it empty.  Soon afterwards, they called the Ada police after finding the cash register door open and all of Mrs. Haraway's belonging, including her purse and school books, still in the store.

While attempting to secure McAnally's, law enforcement received reports of two men who had been at a nearby convenience store earlier in the evening and also at McAnally's the same night.  Karen Wise, the convenience store clerk at J.P. 's Pak-To-Go, a half mile west of McAnally's, and James Paschal, a customer at J.P. 's, told police of two men who were in the store between 7 p.m. and 8:30 p.m.  Ms. Wise said the men made her nervous. Both Ms. Wise and Mr. Paschal described the pickup seen with the men at J.P. 's as a "red primered truck ... mostly red primer ... [with] grey primered spots," and an "older model" Chevrolet of uniform color with a tailgate that was either missing or painted a different color.  (N/T 6/9/1988 at 193, 214, 225) Ms. Wise positively identified Mr. Ward as one of the men she saw in J.P.' s. *Id.* at 185; State's Exhibit Nos. 5 and 51. The second man seen by Ms. Wise at J.P. 's was 6 feet to 6 feet and 2 inches tall, white male, sandy brown hair. (State's Exhibit No. 5).  Mr. Fontenot's

12

height is 5'9."   Neither Ms. Wise nor Mr. Paschal identified Mr. Fontenot as the second man.

Ms. Wise testified that the second man on April 28, 1984, had lighter hair than Mr. Fontenot and

that Mr. Fontenot was shorter than the man she had seen. (N/T 6/9/1988 at 194-195).  Ms. Wise

also testified that she had seen a man staring at her apartment while Mr. Fontenot was

incarcerated, and she believed this man resembled the second man at J.P. 's with Mr. Ward. (P/H

1063, N/T 6/9/1988 at 197-199) Ms. Wise said this same man was a spectator at the preliminary

hearing. (PH Tr. 161; F-85-769 Tr. 968-969, 981-982, 984-985; N/T 6/9/1988 at 200-202).

## PETITIONER'S CLAIMS ARE PROPERLY BEFORE THIS COURT

According to 28 U.S.C. § 2244(d)(1) a state petitioner challenging his felony conviction

must file his Petition for Writ of Habeas Corpus prior to the lapse of the one year statute of

limitations.  However, the U.S. Supreme Court has found this statute of limitations may be

waived upon a credible finding of actual innocence. *McQuiggin v. Perkins*, __ U.S. __, 133

S.Ct. 1924, 1935, 185 L.Ed.2d 1019 (2013).  Further, numerous jurisdictions, including the

Tenth Circuit Court of Appeals have found that to prevent a manifest injustice of continuing to

incarcerate one who is actually innocent, a number of procedural defects will be

waived.  *See Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)(allowing successive petitions with

rejected constitutional claims); *McClesky v. Zant*, 499 U.S. 467, 494-495 (1991)(excusing

"abusive petition" exception in federal habeas); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-

12(1992)(actual innocence trumps failure to develop facts in state court);  *Lopez v. Trani*, 628

F.3d 1228, 1230-31 (10th Cir. 2010)(actual innocence is an exception to procedural barriers in a

petitioner's case including statute of limitations); *see also Lee v. Lampert*, 653 F.3d 929, 932 (9th

Cir. 2011) (allowing actual innocence cases to receive substantive review despite being time-

barred); *Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005); *San Martin v. McNeil*, 633 F.3d

1257, 1267-68 (11th Cir. 2011); *Jones v. State*, 591 So.2d 911, 915-16 (Fla. 1991) (permitting

actual innocence based on new evidence in a writ of error *coram nobis*); *In re Clark*, 855 P.2d

729, 760 (Cal. 1993)(claims of factual innocence based on newly discovered evidence permitted

at any time regardless of delay or failure to raise claim previously); *Summerville v. Warden*, 229

Conn. 397, 244 (Conn. 1994)(allowing state habeas corpus petition on newly discovered

evidence of innocence even with other procedural problems); *People v. Washington*, 171 Ill. 2d

475, 489 (Ill. 1996)(procedural due process allows newly discovered evidence of innocence at

any time); *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996)(permitting a claim

of actual innocence action in the interest justice); *State ex rel Amrine v. Roper*, 102 S.W.3d 541,

547 (Mo. 2003)(permitting actual innocence to be raised in state habeas corpus proceedings

outside of the normal post-conviction avenue); *State v. Armstrong*, 2005 WI 119 (WI 2005)(state

supreme court could use its inherent power to remedy a miscarriage of justice); *Montoya v.

Ulibarri*, 142 N.M. 89,97 (N.M. 2007)(allowing actual innocence claims in state habeas petition

as an act of fundamental fairness).  While Mr. Fontenot is filing his habeas corpus petition

beyond the one year statute of limitations, he is actually innocent of his convictions and the

failure to file timely was through no fault of his own.

       In general, absent a showing of cause and prejudice, a habeas court will not entertain a

claim that has been defaulted in state court as a result of a procedural state court bar. *See Dretke*

*v. Haley*, 541 U.S. 386, 388 (2004).  However, there are several narrow, but critical, exceptions

to this general rule.  First, the Court requires that the rule must be adequate and independent –

that is, it was firmly established, regularly followed, and consistently applied at the time of the

alleged default.  *Ford v. Georgia*, 498 U.S. 411 (1991).  Second, there is "a narrow exception to

the general rule when the habeas applicant can demonstrate that the alleged constitutional error

has resulted in the conviction of one who is actually innocent of the underlying offense." *Id.*; *see*

*Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006).   Third, there is an

exception in claims of *Brady* error, where the elements of the substantive claim itself mirror the

cause and prejudice inquiry and proof of one is necessarily proof of the other. *Banks v. Dretke*,

540 U.S. 668 (2004).  Mr. Fontenot qualifies for substantive review under both the actual

innocence and the cause and prejudice exceptions.

**I.    NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT MR. FONTENOT IS ACTUALLY INNOCENCE SATISFYING THE GATEWAY REQUIREMENTS OF *SCHULP V. DELO*.**

> *Now, if we are going to hang a crime on somebody, ladies and gentlemen, you have never seen a better target than Odell Tittsworth [sic].  Prior felony convictions, tattoos from head to toe, tried to pull a policeman's gun out of his holster in a struggle. Obviously, a real friend of the police.  But, we are going to go out and clear him, let him go and then hang it on poor Karl Fontenot, who never, ever has been in trouble.  Who we don't know, who we have never seen.  Does that make sense to you? When we have got Odell Tittworth [sic], if we want to hang it on somebody, we have got a lulu.  I mean, you have heard the testimony about his record, his appearance.  We could have said, well, Odell confessed, wouldn't let us put it on tape.  But, he is guilty and here is what he told us.*
>
> *What motive would we have to hang a crime on a man that we know nothing about and then go out and clear a man that we know everything about?   What motive, ladies and gentlemen, would they have to do that. And, secondly, if they did it, why did they do it so poorly?*

N/T 6/14/1988 at 91-92 Rebuttal argument by prosecution in Mr. Fontenot's trial.

The underlying purpose of the procedural actual innocence standard is to prevent a

manifest injustice of the continued incarceration of one who is actually innocent.  When

asserting actual innocence in federal habeas corpus, a petitioner must provide newly discovered

evidence not provided to a jury consisting of "trustworthy eyewitness accounts" and "critical

15

physical evidence" in order to provide the factual basis for the gateway claim. *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *see also Cummings v. Sirmons*, 506 F.3d 1211,1223-1224 (10th Cir. 2007); *O'Boyle v. Ortiz*, 242 Fed. Appx. 529, 530-531 (10th Cir. 2007)(discussing that petitioner must demonstrate the newly discovered evidence was not available at trial); *Sistrunk v. Armenakis*, 292 F.3d 669, 673 n. 4 (9th Cir. 2002); *Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997). Once the factual grounds are present, the federal district court's review must assess whether "the petitioner [has shown] that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327; *see also House v. Bell*, 547 U.S. 518, 528 (2006). Within this framework, it is imperative to look to the prosecution's case at trial in weighing the strength of the newly discovered evidence. *See House*, 547 U.S. at 539-553 (assessing newly discovered evidence within the state's theory of the case at trial). Such an analysis is necessary because the state's theory of the case at trial guides a jury as they assess whether a defendant is guilty beyond a reasonable doubt. It emphasizes what evidence is significant in assessing guilt. More importantly, the state's theory of the case demonstrates the strength of the case against a defendant.

The Pontotoc County District Attorney's Office tried Mr. Fontenot twice for the robbery, kidnapping, and murder of Donna Denice Haraway. In both trials, their case against Mr. Fontenot was incredibly weak resting almost entirely on Mr. Fontenot's false confession, Mr. Fontenot's off-hand remark to Gordon Calhoun, and shaky identifications by Karen Wise and Jim Moyer that were later recanted. *See* N/T 6/14/1988 at 21, 34-36, and 70. Much of the prosecution's opening statement, closing argument, and rebuttal focused on Mr. Fontenot's guilt by association to his co-defendant, Thomas Ward. *See* N/T 6/8/1988 at 31-35; N/T 6/14/1988 at 17-19, 35-36, 70, 79). Instead of direct evidence inculpating Mr. Fontenot, the prosecution

inferred his guilt because Mr. Ward must be guilty.  In fact, much of the state's case focused on

the witnesses who saw Mr. Ward in JP's or McAnally's, N/T 6/14/1988 at 20-21, 27, Mr. Ward's

possible possession of the knife, *id.* at 17, his family's access to a grey pick-up truck. *id.* at 17.

The prosecution acknowledged the numerous lies in Mr. Fontenot's confession while

asking the jury to focus only on the truth in it.

> Well, what does Officer Rogers, and Officer Smith, and Officer Baskins say?  It is
> not unusual to have them tell you part lies.  I ask you to consider ladies and
> gentlemen, first of all, Odell Tittsorth[sic] was not there.  Therefore, part of the
> story had to be a lie.  Anytime he said Odell Tittsworth [sic] did anything, the rest
> of the story had to be a lie, because Tommy and him, one of them had to do it, what
> Odell, what they said Odell did.  So, of course, it is going to appear there are some
> lies and some mistruths and it is not going to match exactly to the fact as told by
> the Defendant.

N/T 6/141988 at 94.  However, both Ada Police Detectives Smith and Baskins admitted that

nothing in Mr. Fontenot's confession could be corroborated during their investigation. *See* P/H

546-547; N/T 6/10/1988 at 178-179.  Beyond the lack of any corroborating evidence in Mr.

Fontenot's confession, he was unable to describe or identify Mr. Titsworth when asked to do so

by law enforcement. *See* J/T at 2074-75; P/H 968, 994-95.  This is the strongest, inculpating

evidence the state has in supporting its convictions against Mr. Fontenot.

All the evidence presented at trial must be evaluated along with the newly discovery

evidence presented herein. *See House* 547 U.S. at 537-538. The majority of the newly discovered

evidence remained in the State's custody throughout the pretrial investigation, prosecution, and

appeals of Mr. Fontenot during both of his trials without being disclosed to any of his defense

counsel.  The failures to disclose this evidence not only substantiates his gateway innocence

claim but several constitutional violations as well. *See* Claims II, VI-VIII.  Over 860 pages of

Oklahoma State Bureau of Investigation (OSBI) reports were ordered disclosed by the Oklahoma

Court of Criminal Appeals during the pendency of Mr. Fontenot's second direct appeal.[2]  During

state post-conviction, additional OSBI documents were given to post-conviction counsel

pursuant to a discovery agreement.  However, there has never been disclosure from the Ada

Police Department or the Pontotoc County Sheriff's Office to any defense counsel despite

repeated requests.

The investigation into Mr. Fontenot's case revealed both documents and witness

statements that substantiated not only an alibi defense, but other new evidence that changes the

entire landscape of this case.  The focal point of Mr. Fontenot's innocence claim rests on

evidence showing that Mrs. Haraway was being harassed and stalked by a man in the months and

weeks leading up to her disappearance.   Additionally, the sole eyewitness placing Mr. Fontenot

in McAnally's recanted his identification.  Karen Wise, the convenience store clerk at JP's

explained the pressure both the police and prosecution placed on her to change her description of

the men seen at JP's convenience store to fit the police theory of the crime.  Further, the withheld

medical examiner's report shows not only a botched handling of the crime scene, a pattern in this

case, but more importantly that Mrs. Haraway gave birth to a child sometime before her death.

As this Court evaluates the impact of this evidence, it must consider "all the evidence," old and

new, incriminating and exculpatory, without regard to whether it would necessarily be admitted

under "rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006).

The totality of this newly discovered evidence establishes Mr. Fontenot's innocence.

Additionally, it shows the prosecution's efforts to manufacture a case against him on the

flimsiest evidence.  Once a cumulative assessment is done, it will be evident to this Court that,

_____

[2] The entirety of the OSBI records ordered disclosed by the OCCA and the state post-conviction court were never provided to defense counsel pretrial.  This includes the prosecutorial report generated by OSBI for the Pontotoc County District Attorney's review. *See infra* Claim II.

"more likely than not, no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327; *Glass v. Vaughn*, 66 F.3d 13, 16-17 (3rd Cir. 1995).

### A.    Newly Discovered Evidence Establishes Mr. Fontenot's Alibi.

Oklahoma State Bureau of Investigation records improperly withheld from Mr. Fontenot's trial and appellate counsel clearly show that Mr. Fontenot had an alibi for his whereabouts on April 28, 1984. Mr. Fontenot told police prior to his polygraph that he attended a party thrown by Gordon Calhoun in the apartment next door to where he resided with Janette Blood Roberts.[3] (Ex. 43, prosecutorial bates 142-143). Further, a handwritten statement by Mr. Fontenot recanting his confession, saying that he had never been to McAnally's or ever met Mrs. Haraway, and reaffirming his presence at the party and those in attendance was also not disclosed to his attorney. *See* Ex. 44 at 625-627.  Both OSBI and Ada Police Department were aware of this party based upon several witness reports, dispatch records, and police reports. This evidence eliminated Mr. Fontenot as a suspect.  The prosecution failing to disclose it deprived his attorney, George Butner, to build his defense to these serious charges.  Ada Police radio logs show several calls made in response to a loud party held at Gordon Calhoun's apartment. (Ex. 41) and (Ex. 42). One of the officers who responded to this call, Ada Police Officer Larry Scott, wrote a report specifically mentioning "Gordon Calhoun" party and warning the revelers to keep it down or go to court. (Ex. 43, prosecutorial bates 98).

Other witnesses who knew about the party at Mr. Calhoun's apartment testified at Mr. Ward's trial but not at Mr. Fontenot's. One of these witnesses, Stacey Shelton, not only remembered the events of that night but remembered some of the other people present.  Stacey

---

[3] When Mr. Fontenot attempted to explain his whereabouts to Detective Smith and Agent Rogers, they interpreted it as confirmation of whatever Jeff Miller told them over the summer.  They failed to independently assess whether the party occurred as Mr. Fontenot stated rather than as confirmation of Mr. Miller's version of what occurred.

Shelton attended the party at Gordon Calhoun's apartment. She testified at Mr. Ward's trial[4] about the party and who else was there:

> Q Did you have occasion to attend a party at Gordon Calhoun's apartment on April 28th, 1984?
>
> A Yes, sir. It was the graduation party for my younger brother, Bruce.
>
> Q And how did you come to go to that party?
>
> A I was at a club called LaFraqua that night and I had seen my younger brother there, and Gordon, and they told me that they were having a party at his apartment and asked if wanted to come.
>
> Q. Now, do you recall who went to that party with you?
>
> A Yes, sir. My roommate, Laura Ingram, my boy -- a boy I knew who I ended up, I ended up dating for two years, that was our first date, and Lyndel Gibson and his roommate. I don't recall his name. I'm sorry, it wasn't his roommate, it was a friend.
>
> Q And did you see anyone at the party that you knew?
>
> A My brother, Bruce, was there, Gordon was there, my next door neighbors from my home in Konawa were there, Chris and Eric Thompson. And of course, I knew Laura and Lyndel and was familiar with the friend that Lyndel brought.
>
> Q Now, have you seen a lady in the hall today known as Janette Roberts?
>
> A Yes. They called her "Red". She was at that party, yes.
>
> Q. You saw her at the party also?
>
> A. Yes, I did.
>
> Q. Now, do you recall about what time you got to the party?
>
> A. It was late. The club didn't close until midnight, and I want to say that that is about the time we went, around that time, somewhere. I knew that it was late.
>
> Q. All right. Did you see the Defendant, Tommy Ward, at that party?

---

[4] Mr. Ward's trial took place in 1989, after Mr. Fontenot's trial and conviction on June 8-14, 1988.

A. I can't say positively that I did, no. There were probably twenty to twenty five people there and, like I said, the only ones I knew were about six or seven people.

Q. All right. Now at the time of the first trial of this case, who were you working for?

A. A radio station in Ada, KADA Radio.

Q. And what were you doing for them?

A. I was a news anchor and reporter.

Q. And did you attend that trial?

A. Yes, sir, I did.

Q. And did anything happen in that trial to surprise you?

A. Yes, sir. I viewed a videotape where Mr. Ward was talking to some detectives and he told them that the night that Denice Haraway was taken, he was at a party and he started describing in minute detail about the party. He told of my little brother playing the electric guitar and Gordon was playing on the drum set and of two guys from Konawa asleep in the bedroom and also told of the police coming about 1:00 o'clock in the morning telling us to quiet down. And the minute I saw that, I knew that he had been there to know that.

Q. Now, did you know who these people from Konawa were?

A. Yes. They were Chris and Eric Thompson. I grew up next door to them.

Q. Now, did you see them asleep at that party?

A. Yes, sir, I did.

Q. And where were they asleep?

A. In the bedroom. One was on the bed and one was on the floor.

(Ward Vol. 10 p. 193-195). Ms. Shelton alerted both the police and prosecution about her presence at the party and those who were in attendance. Their reaction to her information was not to forward it along to Mr. Fontenot's defense counsel but to pressure her to recant.

As I was watched the video, I realized that Ward was referring to a party I had attended at Gordon Calhoun's house. My brother, Bruce DePrater, was from Konawa and had been playing the guitar and Gordon had been playing the drums. Ward has also eluded to the fact that there were two other boys from Konawa at the party who were passed out on a bed. Those two boys were my childhood neighbors, Chris and Eric Thompson. I remembered them being at the party and indeed, they were passed out on a bed in an adjacent room to the living room.

I also remember Janette Blood being at the party with several of her friends. At the time, I did not know who she was or her name, but, I remembered her specifically because after I remarked that everyone needed to lower the noise because of the warning from the police, she came up to me and yelled in my face.   She was easy to remember because of her flaming red hair and missing teeth. It was only at the trial, when she testified that I learned her name.

I specifically remember the night of the party as Saturday, April 28, 1984. First, my brother had invited me to the party after seeing me with my roommate Laura Ingram, and my date, Lyndel Gibson, at a local dance club. All three of us went to the party with the intent of only staying for a short while. It was the first time I had gone out with Lyndel, who I ended up dating for the next two years. It was the one and only time I went to Calhoun's house. I kept a calendar, almost like a diary, of everything I did. I wrote it in my calendar the following day. Also, during that time, I never went out on Friday nights because I worked on Saturday mornings and liked to go to bed early.

The police should have been aware of the date of the party since they arrived at the house a couple times to quiet the party. However, the police would not have been aware of everyone at the party. I know this because my friend, Laura and I were hidden in a different part of the house when the officers arrived and never interacted directly with them.  After watching the video of Tommy Ward describing the April 28, 1984, party, I left the courtroom and approached Dennis Smith. I told him that there was no way Ward would know details about the party unless he was there. Smith told me that anyone could have told him about the party. I argued with him that Ward would not have known all the detail that he spoke about if someone had just told him about it. He said to me, "I don't want to hear it," and turned and walked away.

**I later informed Mike Baskins about the accuracy of Ward's description of the party that night. I insisted that Ward and Fontenot couldn't have committed the crime since they were at the party that night.  Baskins argued with me concerning the validity of the alibi, claiming that police logs showed that the party actually took place on a Friday night. I knew that could not have been correct and several years later, I discovered that the police log actually showed that the party was, in fact, on Saturday night.**

22

At the second trial of the defendants, I testified for the defense, verifying that Tommy Ward's details matched what I had seen at the party.

**After testifying at the trial, I was confronted by Bill Peterson who brought me into an office he and Chris Ross were using within the courthouse. Once I was there, Peterson told me I was to get back on the stand and recant my testimony. I told him I wouldn't do it because I had told the truth. He made me stay in the office for about half an hour and then came back in with what he told me were trial transcripts. He ordered me to read them. I did and then he yelled at me saying that I was lying because, he said, the transcripts didn't match my testimony. Again, he demanded that I return to the stand to recant my previous testimony and again, I refused telling him that while not everything I testified to was in the transcript he showed me, that I clearly remembered what took place that night and I clearly remembered seeing the tape sometime during the preliminary hearing or trial, although I could not recall exactly which one.**

Peterson was extremely volatile during the course of this confrontation. He slammed his fist on the desk. He slammed the transcript on the desk. He was redfaced and yelling almost to the point of spitting. He insisted over and over again that I go "back on the stand and testify that everything you said was wrong."

Because I refused, he told me I was not to leave his office until I agreed to recant. I stayed in the office for several more hours while the trial continued. He would come into the office during breaks and again demand that I retake the stand, which I refused to do. At the end of the day, he let me go, but told me I was to return every day until I agreed to recant. He told me he was going to recall me and rip my testimony to shreds and although I returned each day of the trial and was made to sit on a bench in the hallway until the trial concluded, he never recalled me and I refused to go on the stand of my own accord and recant.

Peterson left me with the impression that if I did not remain in his office the first day or return the following days that I would be jailed. I missed several days of work because of it.

I interpreted all of the foregoing actions by Peterson as intimidating, although I continued to stand by my testimony.

(Ex. 12) (emphasis added). While Ms. Shelton could not remember specifically Mr. Fontenot being at the party, her knowledge of who else was present provided new evidence supporting Mr. Fontenot's alibi. Specifically, she named her brother, Bruce DePrater, Eric and Chris Thompson as being at Mr. Calhoun's apartment.

Mr. DePrater not only remembered the party but knew Mr. Fontenot.

Sometime prior to this party, I recall traveling to Texas with Gordon Calhoun to purchase one or two kegs of beer, and probably some cases of beer. The alcohol content for beer sold in Texas was higher than that of beer sold in Oklahoma, making 'Texas Beer' more desirable.

I recall Eric and Chris Thompson, from Konawa attended this party. I recall that Eric Thompson had passed out early that night; but, during the daylight hours I witnessed an incident between Eric Thompson and Karl Fontenot while they were both standing around talking at Gordon Calhoun's party.  Karl Fontenot was refilling a beer can from the keg's spout and joking to Eric that he (Karl) was only having one beer.

Later that same night, probably around 11 pm or shortly thereafter, I recall planning a trip to La Fragua, a college bar in Ada, with Chris Thompson. Chris and I wanted to visit the bar and invite women to come back to Gordon's keg party. On the way out, I recall mentioning this plan to Karl Fontenot, who responded by making an inappropriate gesture involving the tugging upward on his belt, while commenting verbally that he and Tommy had already been with an older woman that evening.

At La Fragua that night, I recall seeing my sister Stacy Deprater. She was with her friend Laura Ingram and on a date with Lyndel Gibson. Surprisingly, my sister Stacy and her friend and date came back to Gordon Calhoun's party that night, after La Fragua closed at midnight.

Later that same night, after my sister and her friends had gotten to Gordon Calhoun's party, I recall playing guitar while Gordon played his drums. While we were both playing loudly, someone announced that a police officer was coming up the stairs to Gordon's apartment.

Almost simultaneously, I recall Karl Fontenot running by me telling me to follow him, that he knew a good place to hide. I had no reason to hide, and to this day, I don't know why I followed Karl Fontenot into this strange hiding place, but I did. Karl showed me a hidden passageway, which seemingly connected Gordon Calhoun's kitchen with his neighbor Janette's apartment. This passageway was hidden behind Gordon's refrigerator. That is where Karl and I stayed until the police officer left.

I believe each of these incidents occurred on the same night, during the same party at Gordon Calhoun's apartment sometime during the spring of 1984.

24

(Ex. 8). Along with Mr. DePrater, Eric Thompson also remembers Mr. Fontenot being at the party that evening. (Ex. 9). Such information was crucial to Mr. Fontenot's defense at trial because it established his whereabouts for the night; precluding him from involvement in Mrs. Haraway's abduction.

Had Mr. Fontenot's defense been given this information, they could have investigated the people who were in attendance at Mr. Calhoun's the night of April 28th. These people remember seeing Mr. Fontenot from the very early part of the evening until much later into the night. Their accounts clearly show that at no time did Mr. Fontenot leave to participate in whatever transpired with Mrs. Haraway. Affidavits from party-goers, Eric Thompson, Bruce DePrater, and Stacey Shelton along with police reports from Janette Blood place Mr. Fontenot at the party for the entirety of the night.

### B.   Donna Denice Haraway was being Harassed by an Unknown Man.

Within the 860 pages of OSBI reports that were never disclosed to Mr. Fontenot's defense counsel are witness reports of Mrs. Haraway receiving obscene telephone calls only during her shifts at McAnally's. According to a co-worker, these calls had stopped for a period of time in the early months of 1984, but began again in the weeks leading up to her disappearance. (Ex. 62). Mrs. Haraway only worked at McAnally's in the evenings from Thursday to Sunday. *Id.* These calls, always from a man, greatly distressed Mrs. Haraway, her family, and co-workers. Mrs. Haraway's sister, Janet, stated the fact that Mrs. Haraway was afraid of someone and did not like to work at McAnally's.

> According to Janet, Donna told her on the phone she hated working at the store because it did not have an alarm and a lot of weirdo's come in and out of the store. She told Janet that she was going to look for another job because she felt uneasy working at the store alone at night. She told Janet that the phone calls had started again but didn't go into the whole story. **Janet said that earlier Donna had been**

25

**receiving calls at work from a man that said he was going to come out to the store some night and wait outside while she was working. She said that Donna was upset because she had asked for the night off and a guy refused to work and she had to work anyway.**

(Ex. 43, prosecutorial bates 20, 109) (emphasis added). Similar information was relayed to police by the store manager, Monroe Atkeson, about a conversation he had with Steve Haraway, Mrs. Haraway's husband.

Steve told Mr. Atkeson that a Vietnam Veteran had been harassing Donna and Donna had received several obscene telephone calls. Atkeson saw the veteran that Steve spoke of and Atkeson described the veteran as a white male, six feet, 190 pounds, black hair, brown eyes, mustache, light complexion, usually drove a white Chevrolet Chevette and bought a soft drink. (Ex. 44, OSBI 0006).  Atkeson believed that the veteran attended a rehabilitation school in Okmulgee. *Id.* The police also spoke with Steve Haraway who confirmed the calls his wife received while working at McAnally's. "Steve received a phone call from the police who told him that his wife was missing. He knew of no one that Donna was having problems with at the store, other than she had received two to three obscene phone calls at the store. The last phone call was two or three weeks prior to her disappearance." (Ex. 43, prosecutorial bates 20).  It is unclear whether Ada police or the OSBI ever investigated who was making these calls to McAnally's. No telephone records were obtained of incoming calls to the convenience store according to the disclosed OSBI reports. No witnesses were interviewed regarding men who may have hung around the store or watched Mrs. Haraway in the months and weeks leading up to her disappearance. Obviously, whomever was making these calls knew her work schedule because the telephone calls occurred only during her shifts. *See* Exs. 15 & 44, OSBI 0006. The man

making these calls targeted Mrs. Haraway and had been doing so for an extended period of time before her abduction. *Id.*

Also withheld from Mr. Fontenot's defense was a report from co-worker James D. Watts who testified for the State at Mr. Fontenot's trial. In an interview with the Pontotoc County Sheriff's Office on July 25, 1985, Mr. Watt explained that "Denise had told me of some obscene phone [calls] she had received at the store for a while, these calls upset her a great deal. She could not recognize the voice over the phone the calls stopped about one month before she disappeared." (Ex. 62). Had reports from the OSBI and the Sheriff's office been disclosed, they would have aided Mr. Fontenot's defense to investigate alternate suspects who had a motive and opportunity to harm Mrs. Haraway. These calls upset her to the extent she inquired about buying a gun. Anthony Johnson, a frequent customer at McAnally's, remembered a conversation he had with her a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Haraway's disappearance he was in the McAnally's convenience store when Haraway asked him where she could buy a gun. Haraway referenced the need for a gun with some funny calls she had recently been receiving. Haraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making these calls and said that in Johnson's opinion, she knew who was making the calls but did not seem to want to indicate who it was.

(Ex. 22). Further, just two days before Mrs. Haraway went missing, she spoke with Darlene Adams, another customer at McAnally's. Mrs. Haraway explained she was afraid working at night at the store but her schedule would not be changed. (Ex. 1).

The State failed in two regards concerning this information. First, this evidence should

have been investigated in 1984, given the information willingly provided by those closest to Mrs. Haraway. This is not a situation where only one person made a side comment about a few weird telephone calls. Instead, numerous people including her husband, manager, co-worker, customers, and siblings were aware of this conduct and recognized its obvious relevance to the case. They immediately shared this information with police in the hopes that it would assist in their investigation into her mysterious disappearance. Instead, the police ignored it completely. This is but one area concerning a pattern of disregarding obvious leads in the Haraway case resulted in a botched investigation and a rush to incriminate an innocent man. When Mr. Fontenot was arrested after police interrogated his co-defendant over a two day span, nothing about those confessions could be verified by police. *See infra* Claim V. Instead of focusing on viable leads found throughout the case, the police disregarded key information at every turn.

> The investigative efforts of law enforcement subsequent to Haraway's abduction were inadequate rising to the level of abandonment. This is based on at least the following facts and evidence:
>
> Basic investigative procedure in a missing persons case requires interviews with immediate family (e.g., husband, mother, sister, and stepfather) for pertinent background and potential suspect information or development. There is no evidence that this was done, other than a single interview with the mother by the OSBI.
>
> Basic investigative procedure in any felony crime scene would require checking phone records of incoming and outgoing calls with respect to the scene itself (e.g., McAnally's), the victim's home, and any friends or family. There is no evidence that this was done.
>
> Basic investigative procedure in a missing persons case requires interviews with recent romantic or sexual partners (e.g., ex-husbands and ex-boyfriends) for pertinent background and potential suspect information or development. There is no evidence that this was done.

(Ex. 20).

Second, the police or prosecution never shared this information with defense counsel. This evidence should have been disclosed because it clearly points to another person who watched and threatened the victim. It established impeachment evidence of the APD's handling of the case, the thoroughness of investigation and whatever evidence from the crime lead to Mr. Fontenot's arrest.  Clearly, there was an ongoing threat to Mrs. Haraway that provides exculpatory evidence to Mr. Fontenot.  *See infra* Claim II.

### C.     The Only Eyewitness Mr. Fontenot at McAnally's around the Time of Mrs. Haraway's Disappearance Has Recanted His Identification.

Jim Moyer testified that he saw both Tommy Ward and Mr. Fontenot in McAnally's shortly before Mrs. Haraway's disappearance. P/H p. 213-214. He is the only witness who placed Mr.  Fontenot in McAnally's. While talking to Mrs. Haraway during his purchase of cigarettes, he recounted two men walking into the store; one man with dark hair while the other one was blond. P/H p. 218-220. During his conversations with police and during the trials, he testified the man who came to the counter was Mr. Ward, who closely resembled one of the police composites.  He identified Mr. Fontenot in the courtroom as the dark-haired man who walked towards the back of the store. N/T 6/9/1988 p.16.  During his cross examination, Mr. Moyer admitted doubts about his identification of Mr. Fontenot.

> Q. All right. You have had an opportunity at Preliminary Hearing to stand next to and look at the height of Karl Fontenot, didn't you?
> A. Yes.
> Q. And as I recall that, Mr. Fontenot was two to three inches shorter than you were. Is that correct?
> A. Yes.
> Q. Okay. so, if you were, in fact, five ten, Mr. Fontenot would be five seven to five eight. Is that correct?
> A. Yes.
> Q. Okay. And, in fact, then to be taller than you, he would have to have heels on his boots about three to four inches tall, but even to reach a six foot, six foot height, the composite reflects he would have to have five to seven inch boots then.

29

Is that correct?

A. To match that height, yes.

\* \* \*

Q. And after you came up here to Preliminary Hearing, had an opportunity to look at the height of Mr. Fontenot, had an opportunity to look around the courtroom, sometime after the Preliminary Hearing you became convinced that Karl Fontenot was not the man, didn't you?

A. I became confused about it.

Q. You became so confused or convinced that you attempted to contact the District Attorney's Office and say that Karl Fontenot was not the second man, didn't you?

A. At a time, yes.

Q. Okay. All right. In fact, you tried to get a hold of the District Attorney all summer to tell him that, didn't you?

A. Yes.

Q. Okay. The District Attorney wouldn't return your telephone calls would he?

A. Well, I never left my name.

Q. Okay. so, you just called the District Attorney's Office for a couple of months during the summer and never left your name. Is that right?

A. Yes.

Q. All right. You believed, Mr. Moyer, that there was someone sitting in the back of the courtroom that was more familiar to you that evening as being in McAnally's on April 28th, 1984, didn't you?

A. Yes.

Q. Okay. And you did that because of the fact that this gentlemen was wearing boots, you saw those out in the hall, didn't you?

A. Yes.

Q. His hair was longer than Mr. Fontenot's?

A. Yes.

Q. He was much taller than Mr. Fontenot?

A. Yes.

Q. Okay. And, in fact, you became convinced that that was, in fact, the second man, didn't you?

A. Well, I don't know if I was convinced about it.

N/T 6/9/1988 at 24-26. However, Mr. Moyer clarified his position from Mr. Fontenot's trial in

1988. He now asserts:

While at the courthouse testifying in the preliminary hearing, I saw a man in the back of the courtroom I had seen before. I also saw him downstairs, where I had been waiting to testify. I also saw this man speak to Tommy Ward during the preliminary hearing. It came to me that this was the same man I had seen in McAnally's with Tommy Ward. He looked more familiar to me. I was no longer one hundred percent sure about my identification of Karl Fontenot.

30

After that, I tried to call Mr. Peterson, the District Attorney, to tell him I was no longer one hundred percent sure that Karl Fontenot was the man I had seen in McAnally's that night. In fact, I was leaning more in the direction of Steve Bevel, the man I saw at the courthouse. While I was never able to speak with Mr. Peterson, I did speak with someone else in the district attorney's office. I told this person of my concern. This person said to me, "It was not him (Bevel)."

After that, I was afraid to change my story. I felt pressure from both sides. I overheard the lawyers argue about the content of the story I had given to Richard Kerner, an investigator working for Mr. Wyatt, while I was on the stand. On one hand, I felt betrayed by Mr. Kerner, as he tape-recorded our conversation without my consent. On the other hand, I felt like it was Steve Bevel that I had seen with Tommy Ward that night. I felt conflicted. I chose to then state that I was confused about the identity of the man with Tommy Ward.

I am now convinced that my assessment, at the time of the preliminary hearing, that Steve Bevel was the man with Tommy Ward, was correct. I am confident that Karl Fontenot was not the man I saw at McAnally's. The man I saw at McAnally's was definitely taller than Karl Fontenot and had much more intimidating look about him. At this time, I am about 95% sure that it was Steve Bevel, not Karl Fontenot, that I saw in McAnally's on April 28, 1984.

(Ex.14). Not only did Mr. Moyer tell the prosecution of his doubts about his identification of Mr. Fontenot, but he was then instructed that his identification of Mr. Bevel was incorrect. *See also* Ward Vol. 3 p. 97-99 ("Not positive about the dark haired person.") No one in the District Attorney's Office relayed this conversation to defense counsel as impeachment evidence. Not only was the action of the District Attorney's Office improper, it demonstrated the extent the prosecution was willing to go to secure an improper conviction. Clearly, Mr. Moyer's ambivalence as to whom he saw in McAnally's with Mr. Ward casts further doubt off Mr. Fontenot's involvement in this crime. Without Mr. Moyer's identification, no evidence places Mr. Fontenot in McAnally's besides the false confession.

### D.   Law Enforcement Pressured Karen Wise to Change Her Account of What Transpired in JP's Convenience Store.

Karen Wise was a crucial witness not only for the investigation into Mrs. Haraway's

disappearance, but for the prosecution of Mr. Fontenot. After Ada Police Detective Mike Baskins arrived at McAnally's in response to the initial report of Mrs. Haraway's disappearance, he travelled to JP's to inquire about the men who had been rowdy earlier in the evening. When Detective Baskins arrived, Ms. Wise explained how two men were in the store that night harassing her. Both men came up to the counter several times to get change for the video game machines and buy alcohol. N/T 6/8/1988 at 161-162. She described the two men as follows: a blond male 5'8" tall dressed in a white t-shirt and jeans with his hair parted in the middle. The second man was a bit shorter than the blond with dark, shoulder length hair also dressed in a t-shirt and jeans. (*Id.* at 165-166). Law enforcement, with no indication that the men seen in JP's were connected in any way with McAnally's, decided to construct composite of the two men from Ms. Wise's description. *Id.* at 167; *see also* (Ex. 76-77).  These composites were the suspects for the crux of law enforcement's investigation.

However, despite the composite and descriptions, Ms. Wise never identified Mr. Fontenot as one of the men she saw at JP's on April 28, 1984. N/T 6/8/1988 at 177 & 193-194. Mr. Fontenot was both shorter and had lighter hair than the man accompanying Mr. Ward. Further, when shown Mr. Fontenot's line-up, she was unable to identify him.[5] (Ex. 43, prosecutorial bates 138). While the Ada Police Detective Dennis Smith stated Ms. Wise called him after the line-up and identified Mr. Fontenot, there was no police report supporting the subsequent identification.

Creating more doubt that anything which occurred at JP's correlated with the events at McAnally's is Wise's affidavit that she saw four men in JP's on April 28, 1984, rather than two

---

[5] This OSBI Report is part of the 860 pages of reports withheld from defense counsel.

men that became the center of the prosecution's theory of the case.

That evening, after reports that Denice Haraway was missing, I was interviewed by the police. They asked me to help them construct composite drawings of two young men who were in J.P's that night. At first, I didn't want to help with the drawings. I told police that just because they were in J.P's didn't mean they had hurt Ms. Haraway or taken her anywhere. I said they were just kids.

Another reason I didn't want to help with the drawings at first was that there were four men who were at J.P.'s at the same time. The police wanted drawings of only two men. I told police that there were two other men present, **but police insisted that there were only two men**.

\* \* \*

I was particularly nervous because of two other men in the store that evening. I knew them. They were in the store that night during approximately the same time as the men who were later reported to be Tommy Ward and Karl Fontenot. I told police - on April 28, 1984 - that there were four men hanging out around the store for an extended period of time, instead of two. I told police that I recognized two of the men and knew their names and did not know the names of the other two.

**Prior to the first trial (the trial at which Tommy Ward and Karl Fontenot were tried together), I met with Bill Peterson, at his request, to discuss the case with him in preparation for my testimony. l told Bill Peterson that the other two men were in J.P's at the same time as the two persons in the sketches. I told him I was afraid of the other two men because of the way they were behaving in the store. Bill Peterson said he already had the "ones who did it." I told him the names of the two men I knew were in the store. Those two men were Bubba Daggs and Jim Bob Howard. Bill Peterson said that Jim Bob Howard couldn't have committed the murder because he "didn't have the I.Q. of a grub worm."**

**Bill Peterson said that I couldn't bring up in Court that Jim Bob Howard and Bubba Daggs were with the other two men. He said it couldn't be mentioned because it wasn't relevant. I was not at all comforted by that because I didn't think Peterson had all of the people that might have been involved.**

**It bothers me that I couldn't discuss the other two men, because I don't think all of the truth came out. I never mentioned to the defense directly anything about the other two men, except to the extent my June 8, 1988 testimony made reference to them. (See paragraph 10). I got the impression from law enforcement that I wasn't supposed to talk about the other two men. It was not until a number of years after all the trials were over that I finally mentioned the other two men to representatives of Ward and Fontenot.**

(Ex. 13) (emphasis added). The police investigation focused on the wrong suspects from the beginning in both number and description. That four rambunctious men were in JP's on a Saturday night in no way connects to the events of McAnally's where eyewitnesses repeatedly told police that they saw one man walking out of the store with Ms. Haraway. (N/T 6/9/1988 p. 38, 40, 47-48, 51, 59-60). Similar to Mr. Moyer's attempts, when Ms. Wise tried to clarify the misperception about what she actually saw, she was pressured to change her story to conform to what the State sought to present. This pattern of police and prosecutorial misconduct permeated the case against Mr. Fontenot. *See infra* Claim VII &VIII.

Ms. Wise shared her frustrations over the improper tactics of law enforcement. She told her best friend, Vickie Jenkins, what she truly saw and her interactions with the state:

> She advised that Wise was sure Ward was in J.P.'s this evening along with three other males. Wise said Ward kept watching her all the while he was in the store which made Wise uneasy. Jenkins believes that another J.P.'s employee, one Jack W. Paschall, East of City, telephone 436-1611, pointed out the suspect truck to Wise. **Jenkins further related that Wise was upset about the composite drawings because the police just weren't doing them right. She did not know what was being done wrong with these drawings. Jenkins and the owner of J.P.'s related that Wise was very upset with the Ada Police over this investigation because they have harassed her over and over and made promises to her that were broken.** Jenkins knew nothing about Wise saying that the two guys she observed coming into the store after Ward was arrested.

(Ex. 23) and (Ex. 3, pgs. 2, 10-11), (emphasis added). Both Ms. Wise and Ms. Jenkins further substantiate the improper actions of law enforcement in dealing with witnesses in this case.  Like Ms. Shelton and Mr. Moyer, Ms. Wise was pressured to conform her true account of what transpired to an improbable theory with no connections to reality and no evidentiary support. Instead of focusing on the facts and evidence gleaned from McAnally's, the actual crime scene, police, almost immediately, generated two suspects matching descriptions of two of the four individuals in JP's with no evidence that these men were seen at the crime scene.

**E.      Numerous Inconsistent Statements about the Grey-Primered Truck Cast Doubts as to what Truck was Actually Involved in the Abduction if Any**.

The supposed connection that the police drew between JP's and McAnally's rested on a grey primered pick-up truck believed to be the vehicle that the suspect and victim drove away from McAnally's. *See* N/T 6/8/1988 at 33-34. The problem with the described pick-up truck is the wide variations of its size, color, and tires given depending on the person being asked. For example, the official OSBI description of the pick-up was an early model "Chevy pick-up truck w/light gray primer color, narrow bed w/oversized tires on rear; rear end was jacked up". (Ex. 44, OSBI 0003). This description was distributed to the FBI and numerous counties and states on April 29, 1984. *Id.*  However, this description conflicts with the pick-up descriptions of the three witnesses who saw the suspect and victim leave McAnally's as they arrived. Throughout the withheld OSBI reports are several inconsistencies regarding the description of the pick-up truck.

Lenny Timmons described it as a green and gray, older Chevy pick-up that was not well maintained.  Further, the rear wheels or tires were plain. (Ex. 44, OSBI 0842). David Timmons thought the pick-up was blue, rough, dents on the side. The rear bumper was white, possibly raised in the rear. (Ex. 44, OSBI 0851). Gene Whelchel said the pick-up was full sized and light colored. He suggested it might be an early 1970s, model, he was pretty sure it was not a narrow bed. (Ex. 44, OSBI 0060). These three men were all witnesses to the same event at the same time. (Ex. 44, OSBI 0061-0063). (Ex. 21). (explaining the difficulties encoding memories for various events).  However, each describes the truck in very different ways giving concrete proof that there was no consensus on what the pick-up truck looked like or if it was even involved in Mrs. Haraway's kidnapping.

James Moyer who tentatively identified Mr. Fontenot in McAnally's before he recanted,

described the truck he saw to be very consistent with initial descriptions: light gray, rough looking 1967 to 1969 Chevy pick-up. (Ex. 44, OSBI 0245). But further investigations by OSBI showed even more inconsistencies over the getaway pick-up truck. On May 1, 1984, Gerald Donald Lynch was interviewed about the truck he saw the day after Mrs. Haraway's disappearance Lynch left his house for church and saw a late 60s early 70s Chevy gray primer pick-up. (Ex. 44, OSBI 0067). Several months later, police gained a search warrant for a pickup owned by O'Dell Titsworth's family. On October 19, 1984, the police seized the truck described as a white 1968 Chevy pick-up, having a short wheel base and a narrow step side bed with a spare tire mounted on the driver's side. The front windshield was cracked along with severe body damage on the passenger side. (Ex. 43, prosecutorial bates 102). After searching the Titsworth truck, and realizing APD broke his arm two days prior, police eliminated him as a suspect.

The descriptions of the pick-up truck coming from employees at JP's also conflicts with those provided from McAnally's and in other parts of the police investigation. Karen Wise told the police the truck was an older model, short bed, with maybe a step side, "light color spots" on the driver's side door and bed, with a darker color – possibly reddish brown primer on it. Most of the pick-up was "primered." The truck had wide back tires and possibly a loud exhaust. (Ex. 44, OSBI 0058-0059). Jack Paschal, who was called in by Ms. Wise to JP's that evening, saw the men in the back of the store. He also saw the pick-up truck. He told police it was an older model, maybe a mid-60's to early 70s Chevy with primer paint on it. He thought the tailgate was either bent badly or missing altogether. (Ex. 43, prosecutorial 63, 10). Such inconsistencies do not lead investigators to narrow down the suspects who could possibly know about the events that occurred at McAnally's. These variances make it nearly impossible for viable leads into the kidnapping to occur. While the police focused on trucks with no relevance to the case, they

36

failed to follow the actual viable leads numerous people provided of the man harassing Mrs.

Haraway. (Ex. 20).

Conversely, if the lead investigators were certain that the pick-up was critical to the case,

then a lead from Beaumont Police Department in Texas would have taken heightened

significance.  In response to the APD's BOLO on this case, sent the following police reports to

OSBI:

> On June 29, 1984, Detective Barrow, Beaumount Police Department . . . advised Deputy Insp., Roberts his department had taking into custody on June 28, 1984 at 1935 hours a while male who resembled one of the suspects in the composite. The suspect and the two other individuals attempted to steal a purse from a car but the owners caught the subjects.  **Subjects then attempted to run over the owners. The subjects were in a '70's blue Chevrolet pickup with primer spots, bearing Oklahoma License ATF1975,** which was impounded by Beaumount P.D.  Before Det. Barrow could check the pick-up for evidence the pick-up and subjects were released.

(Ex. 44, OSBI 0125) (emphasis added). The full names and dates of birth were provided for all

three suspects: Denver Russell Davis, Daryl Patrick Robins, and Christopher Lynn Hammock.

*Id.* Photographs of these three men were provided along with their criminal histories which

included robbery, burglary, larceny, dangerous drugs, and assault. (Ex. 29, p. 1149-1160).  While

the Beaumont police released the suspects, the APD and OSBI took no known action to

investigate this truck with suspects who not only match the composite description, but have a

truck similar to the only eyewitnesses in the case, with Oklahoma connections, and involved in

criminal activity.  Given the amount of time Agent Rogers and Detective Smith spent

investigating Floyd Degraw, it would make sense to, at the very minimum, conduct a license

plate search on an Oklahoma licensed pick-up truck. *See infra* Claim II.

The conflicting accounts of the pick-up truck are key because it demonstrates the poor

quality of the police investigation from the beginning.  There was no connection between a truck

seen at McAnally's and the one seen at JP's earlier that same evening.  Yet, the lead detectives

and prosecution insisted that such a connection existed regardless of the numerous versions of

what the truck looked like.  Had a jury known about the high number of inconsistencies in truck

descriptions, it decreases the significance the prosecution put on witnesses who testified that they

saw several men in grey pick-up trucks in the vicinity of the power plant. *See* N/T 6/8/1988 at

33-35. Jurors could also conclude that alternate suspects may have had more motive to commit

this crime than Mr. Fontenot who had no interaction with the police until October of 1984.

> **F.**     **Undisclosed Portions of the Medical Examiner's Report Showing Faulty Action in Preserving and Evaluating The Gerty Crime Scene Where The Decedent's Skeletal Remains Were Found And Showing The Decedent Gave Birth Prior To Her Death.**

The skeletal remains of Donna Denice Haraway were found in Gerty, Oklahoma in

January 1986, while Mr. Fontenot's initial direct appeal proceedings were pending. (Ex. 46, p.

1). Not only was the crime scene in a completely different location from what Mr. Fontenot

mentioned in his confession, but how the bones were found, and the cause and manner of death

also varied greatly. The State's theory, based solely on Mr. Fontenot's confession, argued that

Mrs. Haraway was robbed, kidnapped, raped, and murdered with a knife. N/T 6/8/1988 at 33-35.

She was supposedly stabbed numerous times, her remains were burned and left at a power station

west of Ada. J/T 2593-94, 2735-36, 2742-43.  However, both the location of her remains and the

medical examiner's report disproved his confession. A full review of the medical examiner's

report documents the cause of death as a single gunshot wound to the head. (Ex. 46, pgs. 1, 3, 12,

40).  There are no knife wounds on any of the bones uncovered at the Gerty crime scene. (Ex. 46,

pgs. 20, 36, 40).

While certain parts of the medical examiner's file were released to Mr. Fontenot's initial

direct appeal counsel, the full forty-three page report was not. See (Ex. 46) and (Ex. 11).

Specifically, two key pages of the report were not provided even though the trial court ordered

full disclosure of the ME's Report. *See* (Ex. 59). The initial page not disclosed documents the

improper procedure followed by the OSBI agents and other law enforcement personnel who

were tasked to properly document and preserve evidence from the Gerty crime scene.

> 1-21-86, 1650 I returned a call to Hughes County District Attorney Bill Peterson
> concerning some bones that were found. Mr. Peterson didn't know anything, about
> the discovery but they are thought to be the remains of a missing store clerk --
> Donna Hariway.[sic] **No ME was notified**. He stated that the OSBI was notified
> out of McAlister.[sic] That some people from the OKC office had come down. [sic]
> OSBI Lab people out of OKC did photo. The scene and they just had a field day
> picking up bones. **No diagrams.** The OSBI agent out of McAlister never showed
> up at the scene. Mr. Peterson believes that the bones are en route to OKC but didn't
> know for sure. The sheriff didn't know where the bones were but thought that the
> OSBI had them. Notified the OSBI in OKC & spoke with Rick Spense. He didn't
> have the bones but thought that the lab man David Dixon had them. I spoke with
> the Sheriff Orvall Rose who didn't know where they were.  Finally the OSBI found
> them in their lab and delivered them at 2040 by Ann Reed. Come to find out the
> bones were found by a trapper.
>
> Several problems with this case:
> #1 No one notified a county medical examiner which would've been more than
> happy to go to the scene.
> #2 Since no one notified a medical examiner or the DA they had no legal
> authority to remove the body.
> #3 This is Tulsa's jurisdiction so therefore the remains should've been
> transported to Tulsa.
> #4 If this is not Donna Haraway, they've screwed up the crime scene.
> #5 No one seems to give a "shit" and provide OCME with any information on
> Ms. Haraway.

(Ex. 46, p. 10)(emphasis added). The incompetence in processing and handling the Gerty crime

scene is important given that very little physical evidence was found besides the skeletal

remains. Additionally, it continues a pattern of general disregard demonstrated by the police

involved in this case from the initial call to the Gerty crime scene. (Ex.20) More importantly, no

evidence of the flowered blouse described in Mr. Fontenot's confession was found at the scene

further discrediting his already weak and baseless confession. *See infra* Claim VI.  Due to the improper processing of the Gerty crime scene, it cannot be determined if Mrs. Haraway was murdered at this location, left there, or whether a bullet or casing was found potentially leading to the actual perpetrator. Such sloppy police work coincides with the processing of the scene at McAnally's where evidence was destroyed rather than collected. *See* N/T 6/9/1985 p. 103-110-111; J/T 1259-1240, 1422-23, 1439, 1441, 1447-1448.

Another part of the original medical examiner's file not disclosed was the forensic anthropology report about the skeletal remains evaluated by Dr. Richard McWilliams.[6]  His report indicates that the skeletal remains are of a woman who gave birth.

> Skeletal remains examined this date revealed partial skeletal remains of an Indian white female less than 35 years of age and more likely 25 years of age. Marks on the pelvis indicated she had given birth to at least one child.
>
> INJURIES:
> > 1. Bullet entrance wound at the left lambdoidal suture and exit wound at the right coronal suture.
> >
> > 2. A scalloped cut wound on the superior rim of the left 6th or 7th rib.

(Ex. 46, p. 12). Dr. McWilliams, a forensic anthropologist, wrote a text book regarding the evaluation of human bones for the purposes of identification. (Ex. 25). *Forensic Anthropology: The Structure, Morphology, and Variation of Human Bone and Dentition*, Mahmoud El-Najjar and K. Richard McWilliams, (1978). According to both doctors' research, the evaluation of skeletal remains permit not only the determination of gender, but whether a woman has experienced childbirth.

---

[6] The ME's Office states that all photographs, x-rays, bench notes, and any further documentation other that the report itself is missing pertaining to Denice Haraway's case. Without these documents, it is impossible for undersigned counsel to present the specific findings of Dr. McWilliams related to the marks he saw on Mrs. Haraway's pelvis to make his findings.

> Another kind of pitting occurring in the innominate is parturition or postpubic pits. This is one or usually more deep pits found on the posterior surface of the pubic bone roughly parallel to the edge of the pubic symphysis. Angel (1969) and Stewart (1957, 1970) agree that these pits are associated with childbirth trauma and therefore are diagnostic of female pelvis.
>
> Nemeskeri (1972) has published a five-stage scheme for estimation of the number of pregnancies a female has experienced. The method is based upon observed degenerative changes in pubic symphyses in adult female innominates which are assumed to be attributable to pregnancy. Nemeskeri observed that the number of pregnancies he attributed to each stage remained to be verified by control investigation in autopsy material.

*Id.* at 81-82. Further, according to the Smithsonian Institute, the back pelvic bones would show marks where the ligaments tore during natural childbirth. *See* Smithsonian National Museum of Natural History, http://anthropology.si.edu/writteninbone/difficult_births.html (last visited 2013). Clearly, anthropologists consistently evaluate the pelvic bones not only to ascertain gender, but to tell more about the skeletal remains of the person. Such information is crucial not only in determining what caused the person's death but, equally important, what happened to the person prior to her death.  Because the APD and OSBI botched the evidence collection in both crime scenes, it deprived Mr. Fontenot of the ability to argue an alternate suspect and motive for Mrs. Haraway's abduction and murder.

That Mrs. Haraway's pelvic bones showed indications of natural childbirth is newly discovered evidence of innocence given that her friends and family are adamant that she did not have a child prior to her disappearance. However, shortly before her disappearance, Mrs. Haraway informed Karen Wise, convenience store clerk at JP's, that she was three months pregnant. (Ex. 2). Ms. Wise shared this information with her best friend, Vickie Blevins. (Ex. 2). Given the clear evidence of natural childbirth from the marks on the pelvis, Mrs. Haraway had a child sometime before her skeletal remains were found in Gerty, Oklahoma over a year and

a half after her disappearance and, months after Mr. Fontenot was in custody. Such evidence

challenges the state's entire theory in every aspect as to the motive of her kidnapping and what

happened to her in the months leading up to her death. The State's failure to disclose the entirety

of the medical examiner's report deprived the defense of meaningful avenues of investigation

regarding the motive of Mrs. Haraway's abductor along with impeachment evidence regarding

the processing of the Gerty crime scene.  Had a jury been presented with such evidence, there is

a reasonable probability of a different result due to the weakness in the prosecution's theory of

the case.

II.    **MR. FONTENOT'S FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE STATE OF OKLAHOMA WITHELD EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*.**

The Due Process Clause of the Fourteenth Amendment requires prosecutors to disclose to

the defense all evidence favorable to the accused concerning guilt and penalty. *Brady v.

Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *United

States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).   This

duty extends to, "extends to all stages of the judicial process." *Pennsylvania v. Ritchie*, 480 U.S.

39, 60, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987); *see also Smith v. Roberts*, 115 F.3d 818, 820 (10th

Cir. 1997).  There are three elements of a Brady violation: "[t]he evidence at issue must be

favorable to the accused, either because it is exculpatory, or because it is impeaching; that

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) *quoting Strickler*, 527 U.S. at

281-82 (1999).  Due process also places upon the prosecutor a corresponding duty to correct

false or misleading evidence that is harmful to the defendant. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

A prosecutor has an independent obligation to locate *Brady* materials within the possession of law enforcement.

> Third, the "prosecution" for Brady purposes encompasses not only the individual prosecutor handling the case, **but also extends to the prosecutor's entire office,** . . . as well as law enforcement personnel and other arms of the state . . . to the text of the note involved in investigative aspects of a particular criminal venture. Logically, then, it follows that because """**investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure."**"

*Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 824 (10th Cir. 1995); *see also United States v. Buchanan*, 891 F.2d 1436, 1442 (10th Cir. 1989)(discussing the failure on the part of law enforcement to disclose *Brady* materials falls upon the prosecutor). The prosecution's failure to disclose police reports of alternate suspects with connections to the victim is a *Brady* violation as that evidence is potentially exculpatory, impeachment of the quality of a police investigation, and aids a defense investigation. *See Smith*, 50 F.3d. 801 at 829-830; *see also Bowen v. Maynard*, 799 F.2d 593, 612-13 (10th Cir. 1986). Given that multiple police agencies often investigate a criminal matter; it is incumbent upon the prosecutor to ensure that *Brady* materials are obtained for disclosure to defense counsel in accordance with a defendant's due process rights. *See Smith* at 824; *see also United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993), holding that prosecutors are obligated to conduct "thorough inquiry" of police for *Brady* materials); *United States v. Osorio*, 929 F.2d 753, 762 (1st Cir. 1991); *see generally Tiscareno v. Anderson,* 639 F.3d 1016, 1022 (10th Cir. 2011) (discussing other state actors who worked on a criminal matter that would fall within *Brady's* obligations). The U.S. Supreme Court and almost every federal circuit court of appeals holds that a prosecutor fails

under the *Brady* standard when it does not obtain exculpatory, impeachment, or evidence that aids a defense during the pretrial. *See id.*; *see also Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991); *United States v. Brooks*, 296 U.S. App. D.C. 219, 966 F.2d 1500, 1500-04 (D.C. Cir. 1992) holding a prosecution's duty to learn of *Brady* evidence includes files of the police department's homicide and internal affairs divisions).  That a state court rule or law excused a prosecutor from having to disclose any evidence to defense counsel does not supersede that prosecutor's obligations under the United States Constitution.

Evidence is material under *Brady* when it could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. 263, 290 (1999). Furthermore, for evidence to be considered material, it does not have to reflec[t] upon the culpability of the defendant. Exculpatory evidence includes impeachment evidence that is material to the case against the accused. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). Impeachment evidence is evidence that can be used to challenge the credibility of a prosecution witness or that can be used to challenge the prosecution's case. *Bagley*, 473 U.S. at 676 (*Brady*'s disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness).

Withheld evidence is material whenever it would have affected the course of the defense investigation or the strategy defense counsel would have employed at trial. *See Bagley*, 473 U.S. at 683; *United States v. Perdomo*, 929 F.2d 967, 97 (3d Cir. 1991) "the Bagley inquiry requires consideration of the totality of the circumstances, including possible effects of nondisclosure on the defense's trial preparation."; *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992) (*Brady* violation found when withheld evidence "could have" affected defense strategy). In determining the merits of Mr. Fontenot's claim under Brady, "[t]he question is not whether [Mr.

44

Fontenot] would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 437. The Court should not evaluate the evidence item-by-item, but in terms of its cumulative effect on the fairness of the trial. *Id.* at 436.

Significantly, Mr. Fontenot need not "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 435. Relief must be granted if there is "any reasonable likelihood" that the non-disclosure could have "affected the judgment of the jury." *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Giglio v. United States*, 405 U.S. 150, 154 (1972).  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (*quoting Bagley*, 473 U.S. at 678).

In plain English, for Mr. Fontenot to be entitled to a new trial, he does not have to present evidence that would have sent him home – although that very well might have been the result here. The standard is only whether it would have "affected the judgment of the jury." In this case, *Brady's* materiality prong is satisfied in multiple respects because there is a reasonable likelihood that had Mr. Fontenot's trial counsel been provided with the evidence explained below, he would have presented an alibi defense clearly establishing his whereabouts when Mrs. Haraway disappeared. Further, substantial impeachment and exculpatory evidence would have greatly affected the jury's judgment of guilt or innocence of all of the charges against Mr. Fontenot.

A.     **The Pontotoc District Attorney's Office Did Not Receive All Exculpatory And/Or Impeachment Evidence as a Matter Of Policy.**

The policy and practice of the Pontotoc District Attorney's Office, during the early to mid-1980's, involved receiving only a limited amount of law enforcement censored investigative materials upon which to base their decisions to prosecute any defendant. The investigation of a major felony rested largely on local or state law enforcement agencies absent any supervision by the Pontotoc County District Attorney's Office. What resulted in this case and others was a haphazard investigation where evidence in police custody was destroyed, interviews were mishandled, and proper police procedure was neglected. Further exacerbating the communication problems between law enforcement and the district attorney was the policy of providing the district attorney a small subset of the police investigative materials upon which a suspect would be charged. The OSBI compiled a "prosecutorial" summary of police reports, witness interviews, and relevant evidence on the suspect(s) they believed involved in the criminal offense.  The OSBI hierarchy determined not only what information would be included in the prosecutorial, but edited police reports and statements prior to delivery to the district attorney.

This policy of only receiving a small subset of the entirety of a police investigation resulted in exculpatory, impeachment, and other valuable evidence being withheld from the district attorney as they evaluated charging and prosecuting a case.  Even more egregious was the pattern of not disclosing the prosecutorial or any other discovery to defense counsel. This pattern and practice resulted in a systemic due process violation of Mr. Fontenot's constitutional rights. *See Miller-El v. Cockrell*, 537 U.S. 322 (2003)(explaining how the use of policy and practice of the prosecution to strike minority jurors supports a Batson constitutional violation), *Connick v. Thompson*, 131 S.Ct. 1350 (2011)(holding that deliberate indifference to the need for *Brady*

training could result in a 42 USC § 1983).  The only disclosures made to defense counsel during

trial were court ordered and extremely limited in nature.

The OSBI and Ada Police Department conducted the investigation into Mrs. Haraway's

case. The two primary law enforcement officers responsible were OSBI Agent Gary Rogers and

Ada Police Detective Dennis Smith.[7] While the Ada Police Department and OSBI kept separate

files of any and all interviews conducted, evidence collected, and other aspects of the

investigations, OSBI Agent Rogers was ultimately responsible for the case. (Ex. 53, p.33), P/H p.

533-36, 947-948. The preparation of the "prosecutorial" ultimately fell to Agent Rogers as the

lead detective on the case. His prosecutorial comprised of the relevant police reports, witness

statements and documents he believed important for the district attorney's review. (Ex. 55, p. 13,

56).  These documents were edited internally by other OSBI agents prior to Agent Rogers

completing the final prosecutorial report. *See* (Ex. 29 at 968-978.  Based on the evidence

presented in the prosecutorial, and only that evidence, would the district attorney pursue charges.

(Ex. 55,p. 13, 56). The prosecutorial generated by OSBI, from the police investigation into the

abduction and homicide of Donna Denice Haraway, consisted of approximately 146 pages.

However, the total number of police reports from the various law enforcement agencies that

worked on the case were hundreds of pages more than the prosecutorial report.[8] Pontotoc County

District Attorney Peterson relied solely on OSBI Agent Roger's prosecutorial report to charge

and prosecute Mr. Fontenot.[9]

---

[7] These two officers led the investigation into the Debbie Carter homicide which occurred prior to Mrs. Haraway's abduction from McAnally's.

[8] The exact number of police reports is unknown given that discovery in the state post-conviction proceedings was incomplete when the state post-conviction court denied Mr. Fontenot's application on procedural grounds.

[9] Mr. Fontenot requested the exhibits listed in the prosecutorial during state post-conviction proceedings but did not receive any of these documents or physical evidence.

**1.     Pontotoc District Attorney's failure to ensure Brady materials were obtained from law enforcement.**

Pontotoc District Attorney Peterson's reliance on the prosecutorial would not be problematic if he ensured his officers provided him with the evidence necessary for his compliance with his *Brady* obligations.  In a prior deposition taken on this very issue, Mr. Peterson admitted understanding his obligations under *Brady* and its progeny, but failed to actively pursue such evidence from the various law enforcement agencies investigating cases in his jurisdiction.[10] (Ex. 55, pgs. 142-143).  Mr. Peterson took very little active measures to ensure evidence that must be disclosed to defense, was, in fact, given to him by his law enforcement agencies so that he would comply with his constitutional obligations.

> Q. And isn't it your responsibility as the prosecutor to make sure that exculpatory evidence is disclosed to you from police?
> A. Well, I would hope that they would do that.
> Q. Well, in your 20 or so years as a prosecutor in Ada, haven't you tried to direct, first, Ada police officials about the need to disclose exculpatory material?
> **A. They are aware that they need to give me all the evidence in a case. All of it, not just portions of it, but, all of it.**
> Q. How have you communicated ---
> A. Exculpatory –
> Q. How have you communicated that to the Ada police?
> A. I've told them over and over again.
> Q. Have you had training courses?
> A. I haven't given them training courses.
> Q. Have you directed anybody to give them training courses?
> A. No, sir.

(Ex. 54, pgs. 351-352) and (Ex. 53, pgs. 214-216) (emphasis added).  Mr. Peterson recognized his obligation to obtain evidence but made no assurances that he received this material.  Similar to the facts in the Williamson and Fritz case, critical evidence that was exculpatory or impeaching remained in the custody of law enforcement with no indication either by pleadings or

---

[10] The depositions referenced were taken from the Ron Williamson and Dennis Fritz civil suit.

outside communication that it was ever made available to Mr. Fontenot's trial counsel.  Rather,

Mr. Peterson fought to keep such evidence from ever being given to defense counsel during

either the joint or separate trials of Mr. Ward and Mr. Fontenot.

Further, Mr. Peterson's own understanding of what evidence must be disclosed was

dubious at best. His misunderstanding of his obligation to disclose exculpatory and impeachment

evidence hampered not only the actions of his office but led to his willful ignorance of evidence

that challenged the state's case. "Exculpatory evidence is . . . all fact-based, whether it is

exculpatory or not, and it has to be material." (Ex. 54, pgs. 371, 368).  Mr. Peterson's failure to

grasp that exculpatory evidence shows that defendant did not commit the crime, and by

definition, is material to the case at hand is the clearest indication of his ability to discern what

evidence should be disclosed. Further, it demonstrates his inability to properly instruct not only

those assistant district attorneys assisting him in the prosecution of Mr. Fontenot, but to direct

the police officers' compliance in giving him "all the evidence in the case."

## 2.    Lack of training of law enforcement to understand what evidence constituted *Brady* material.

Similar to the lapse in understanding demonstrated by the Pontotoc County District

Attorney's Office, both OSBI and the APD lacked any training of what evidence within a police

investigation must be disclosed. Under the custom, policy, and practice of the Ada Police

Department, the captain determined who was assigned to handle a specific investigation. (Ex. 51,

p. 71). The captain supervised the other investigator on the case, but no one directly supervised

his work on a case. It is the responsibility of the lead investigator to determine what reports to

include in the prosecutorial report or case report, which is sent to the district attorney's office.

(Ex. 51, p. 71) and (Ex. 18, p. 52).  However, officers within the department did not understand what evidence they were required to provide the district attorney or when it must be disclosed.

The Ada Police Department did not have its own internal training program in the 1980s, according to the APD Assistant Chief Richard Carson. (Ex. 49, pgs. 10-11). Police officers did not receive any training on exculpatory evidence. Id. (Ex. 49, p. 68). Carson did not know of any training programs on exculpatory evidence (Ex. p. 68).   Even decades later, there are no internal training programs in the Ada Police Department that address exculpatory evidence. (Ex. 49, p. 68). (Ex. 18, p. 51-52). He further explained the lack of training or systematic way to ensure such evidence ever made its way to the Pontotoc County District Attorney's Office. (Ex. 48, at 67-69.

Ada Police Department Chief Fox explained the APD policy of allowing total discretion to the detectives or any individual officer to determine what information to turn over to the district attorney. (Ex. 48, pgs. 59-60); *see also* (Ex. 65, pgs. 79-81).  However, when asked what exculpatory evidence meant, Chief Fox said he was unfamiliar with the term "exculpatory evidence" and there was no policy in Ada Police Department regarding evidence favorable to a defendant that might indicate innocence. (Ex. 48, pgs. 67, 76).  The current director of training, Carl Allen, a director of training for police officers, stated in his deposition that he was familiar with the term "exculpatory evidence," but that the meaning of it "elude[d] him right now." (Ex.50, pgs. 30-310).  Further, he could recall no internal training in the Ada police department on exculpatory evidence being covered in the mandated, statewide law enforcement training (CLEET). (Ex. 50, p. 31). (Ex. 18, p. 52)

While the Ada Police Department obviously lacked any institutional training or organizational structure to ensure that exculpatory evidence made its way to the prosecution, OSBI's policy did little to ensure its compliance with *Brady*. Agent Rogers understood that any

50

evidence uncovered that was beneficial to a defendant should be turned over. (Ex. 52, p. 92). OSBI's mandate that all reports and evidence come from its central repository limited his ability to give information directly to Mr. Peterson.

> Q In other words, it was -- as far as you understood it, it was the custom, policy, and practice of the OSBI that you only give the prosecutor the documents in the prosecutorial report, going through the regional office?
>
> A That's correct, yes, sir.
>
> Q And if you were to give them any other document, you would route that through the regional office the way you did the prosecutorial summary?
>
> A Yes, sir.
>
> Q And did you deviate in your personal custom, policy, or practice and give Mr. Peterson, in the course of this investigation, any documents other than the ones that went through the regional office, which include this prosecutorial summary?
>
> A None that I recall, sir.
>
> Q And did you ever tell Mr. Peterson that you had a practice of tape-recording witness interviews and then erasing them?
>
> A No, sir.

(Ex. 52, pgs. 90-91) Even when confronted with exculpatory evidence, Agent Rogers did not deviate to disclose this to the prosecutor unless the prosecutor specifically sought such evidence from the OSBI repository. (Ex. 52, p. 96). However, even if Agent Rogers did want to provide evidence beneficial to a defendant in his prosecutorial report, his immediate supervisor had wide latitude to edit his reports before providing them to Mr. Peterson.

> Q. And you were the person that made the decision as to what you were going to include in the prosecutorial summary . . . documents sent over the course of time to the regional office and were in the OSBI file.
>
> A. Well, I'll have to clarify that to a degree. My supervisor, B.G. Jones would have quite a bit of input, as far as what would be included and what is not, as far

51

as when you put the prosecutorial together.

* * *

Q. And between you and Mr. Jones, you would decide what to put in and what not to put in.

A. Well, the bottom line, sometimes was Mr. Jones would either include or exclude stuff that I may or may not think should be in the report.

Q. Well, before the prosecutorial summary was submitted, did you review it?

A. Yes, sir. I believe I did.

Q. And would it be your ordinary practice to review it, not just in this case, but in any case?

A. Yes, sir.

Q. And it you found that certain reports or interviews in the prosecutorial report left out information that might be exculpatory, beneficial to a defendant, you would make sure that they got put in.

A.  If I was aware of it.

(Ex. 52. p. 212, 213). The lack of any organizational structure or policy ensuring the proper

disclosure of exculpatory and impeachment evidence from the APD and OSBI to the Pontotoc

County District Attorney's Office resulted in systemic *Brady* violations not only in Mr.

Fontenot's case but others as well. The misunderstanding of the law and its requirements

demonstrated by the Pontotoc County District Attorney made certain that vital evidence

favorable to the defense would never be disclosed in accordance with state and federal

law.

Documents uncovered after Mr. Fontenot's conviction and direct appeal show

exculpatory, impeachment, and evidence which would have furthered his defense investigation

were never turned over to defense counsel prior to trial.  Over 860 pages of police reports,

52

witness statements, criminology reports, and polygraphs were in the custody of OSBI detailing their investigation into the events leading to Mrs. Haraway's murder. (Ex. 44). Of the plethora of OSBI, APD, and various other law enforcement reports within the State's custody, 160 pages consisted of the prosecutorial given to the Pontotoc County District Attorney's Office from Agent Rogers. (Ex. 43). In January 2014, an additional 263 pages of OSBI reports were disclosed pursuant to an agreement between post-conviction counsel and the Oklahoma Attorney General's Office.[11] Of these additional reports, approximately forty-five have never been disclosed either at the time of trial or under the OCCA's order.[12] That new law enforcement documentation pertaining to the investigation of Denice Haraway's disappearance and murder continues to surface clearly demonstrates that the totality of records related to this case have not been disclosed even during post-conviction proceedings. Because *Brady* violations are evaluated cumulatively of all undisclosed evidence and that presented at trial, the continual failure of the state to fully disclose all exculpatory, impeachment or evidence that aids a defense makes it difficult for Mr. Fontenot to fully articulate the actual prejudice he suffered due to the State's actions. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995).

The State's failure to properly gather and disclose such crucial information in a timely fashion continues to demonstrate the substantive due process violations of Mr. Fontenot's state

---

[11] The 263 pages of discovery were disclosed to post-conviction counsel pursuant to an agreement between parties concerning Mr. Fontenot's post-conviction request for discovery filed in October 2013.  Specifically, Mr. Fontenot sought disclosure of documents mentioned in the original OSBI Reports that were not included.  According to these OSBI reports, these investigative reports were witness statements, taped recorded, or other reports from key witnesses in the State's investigation leading to the arrest and prosecution of Mr. Fontenot. While some of these documents are duplicates of some of the information provided in the original 860 pages of material, there are several new or altered documents that have never been disclosed to any defense attorney for Mr. Fontenot.  The post-conviction discovery remained unresolved at the time the post-conviction court denied Mr. Fontenot's application based on laches.

[12] The Oklahoma Court of Criminal Appeals ordered the full disclosure of all OSBI records to Mr. Fontenot's second direct appeal counsel during the pendency of that appeal.  Clearly, OSBI did not fully comply with that order as further reports were only given to post-conviction counsel in 2014.

and federal constitutional rights. Most, if not all, of this evidence was within the custody of

either the police or prosecution prior to Mr. Fontenot's first trial in 1985.  None of this evidence

was disclosed to his defense counsel despite repeatedly requesting it in pleadings and in court

hearings. Even after the Oklahoma Court of Criminal Appeals ordered the full disclosure of all

OSBI records in the Haraway case, files referenced in the investigate reports show non-

compliance with the Court's order. (Exs. 38 & 59). Such blatant disregard for court precedent

and ordered discovery throughout Mr. Fontenot's case demonstrates a clear pattern of police and

prosecutorial misconduct warranting reversal of his conviction.

> **B.     Mr. Fontenot's Defense Counsel Repeatedly Requested Exculpatory, Impeachment Evidence, And Evidence That Would Aid the Defense throughout Both Trials.**

George Butner represented Mr. Fontenot throughout both of his trials. During the pretrial

proceedings in both cases, he filed numerous discovery motions and made requests on the record

seeking discovery of police and interview reports within the possession of the APD and OSBI.

Mr. Butner specifically alerted the prosecution to the following pieces of evidence he required:

1) The identities of alternate suspects (Ex. 72).
2) **All statements of witnesses in the case (Ex. 73).**
3) Production of witnesses and how the investigation led to Ward and Fontenot (P/H
   p. 769).
4) **Statements of Jeff Miller (P/H pp. 496, 502-208, 710-712).**
5) Criminal records of any prosecution witness. (Ex. 74).
6) Exculpatory evidence. (Ex. 74).
7) Any and all medical, forensic, or chemical report made, or completed in the future,
   regarding the angle and location of purported or actual knife wound upon the remains of
   Donna Denise Haraway, regarding the location and comparison of any fibers or hairs
   located upon either the remains or the clothing of Donna Denice Haraway, regarding the
   caliber of the projectile which did or may have caused the bullet wound to the back of the
   skull of Donna Denise Haraway, in the now or future control or possession of any
   Federal, State, County, or Municipal governmental agency, or any agent or member
   thereof. (Ex. 72).
8) **Written or taped statements of any witness concerning any alternate suspects or
   those providing information involving the investigation of Donna Denice Haraway.**

54

(Ex. 72).

9) Moyer's statement not disclosed P/H at 246-247.

10) The criminal record of any person the State intends to call as a witness in its case-in-chief or in rebuttal. (Ex. 75).

11) Any sworn statements that the State has in its file regarding this particular case. (Ex. 75).

12) All information of whatever form, source or nature, which tends to **exculpate the Defendant either through an indication of his innocence or through the potential impeachment of any state witness, and all information of whatever form, source or nature which might lead to evidence which tends to exculpate the Defendant whether by indicating his innocence or impeaching the credibility of any potential state's witness, and all information which may become of benefit to the Defendant in preparing or presenting the merits of his defense of innocence at trial. This request includes all facts and information of whatever form, source or nature which the District Attorney or his assistants or the police and sheriff's departments has or knows about, which is or may be calculated to become of benefit to the Defendant either on the merits of the case or on the question of the credibility of witnesses.**

(Ex. 75) (emphasis added). Mr. Butner repeatedly requested information from the Pontotoc County District Attorney's Office for disclosure of evidence necessary to formulate a viable defense against the serious charges his client faced. Instead, Bill Peterson, Pontotoc County District Attorney made scant disclosures and stonewalled against providing any evidence to defense counsel in both trials. *See* P/H at 82-89, 96-99, 406, 502-503, & 769-771. This left defense counsel flailing in the dark for evidence he clearly was entitled to have.

The requested evidence clearly fit within the defense's theory of the case and would have been used if provided. At the very least, the information gleaned from these police reports would have aided in providing witnesses to Mr. Fontenot's alibi, establish that alternate suspects had both motive and opportunity to kidnap Mrs. Haraway, and that Mrs. Haraway feared being at McAnally's. All of these viable defense theories would have created reasonable doubt in the minds of the jury had the prosecution not improperly tipped the scales in their favor. "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if

ever, excusable." *U.S. v. Agurs*, 427 U.S. 97, 107 (1976). As the Supreme Court explained further,

> The more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption . . . [T]he reviewing court may consider directly and adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.

*Bagley*, 473 U.S. at 682-83. Yet, little to no discovery was provided to the defense over the three times his case appeared in the state court.

The prosecution's willful refusal to seek out evidence that the defense notified him was important heightens the violation. "The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith,) the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 437-438-9 (citations omitted).  Whether anyone in the Pontotoc County District Attorney's Office knew about the evidence within the custody of the OSBI, APD, or Pontotoc Sheriff's Office[13] or any agency assisting in the Haraway investigation, their obligation was evident: locate the evidence and disclose to defense. Mr. Peterson and his staff failed to do so result in numerous Brady violations.

### C.      Material Evidence Was Withheld from Mr. Fontenot's Defense Counsel

Amongst the 860 plus pages of OSBI records, the state withheld numerous other items of

---

[13] Undersigned, appellate, and trial counsel for Mr. Fontenot have yet to receive any police reports from the APD, Pontotoc County Sheriff's Office, and the Oklahoma Highway Patrol to this day.

evidence that makes Mr. Fontenot's trial unconstitutional.  Each of the documents mentioned

below falls clearly within the requested discovery disclosures made by Mr. Butner prior to both

of Mr. Fontenot's trials.  Further, federal law calls for the disclosure of impeachment or

exculpatory evidence.  While a prosecutor is not required to disclose his entire file, he is

mandated to disclose evidence that ensured a fair trial. *See Strickler v. Greene*, 527 U.S. 263

(1999).   There is no doubt that this evidence, had it been disclosed, would have been

instrumental in establishing a viable defense for Mr. Fontenot showing his innocence of these

charges.

1.      OSBI and Ada Police Department Reports establishing Mr. Fontenot's
        alibi

OSBI reports establishing that Mr. Fontenot was a party on the night of April 28, 1984,

during the time period is believed that Mrs. Haraway went missing were improperly withheld

from Mr. Fontenot's defense counsel. Mr. Fontenot was arrested on October 19, 1984, and

polygraphed by OSBI Agent Rusty Featherstone. When asked where Mr. Fontenot was on the

night in question, Mr. Fontenot explained:

> He went to the apartment of Gordon Calhoun, arriving there at approximately dark
> or shortly after the kegs arrived. Calhoun lives adjacent to the ROBERTS, where
> FONTENOT was currently staying. At the party, FONTENOT recalls drinking and
> doing marijuana and then returning to the ROBERTS apartment where he slept on
> the floor all night. He believes he returned to the apartment between 2330 and 2400
> hours that night and recalled that later that night Tommy Ward also ended up
> spending the night at the ROBERTS apartment.

(Ex. 43, prosecutorial bates 142).[14]  Because the entirety of Mr. Fontenot's interrogation was not

recorded, there is no indication of what exculpatory evidence he provided prior to the video

---

[14] At the very minimum, the prosecution was obligated to turn over any statements made by a defendant to his
counsel.  The State did disclose Mr. Fontenot's recorded confession, but not his prior alibi statement.  The statement
clearly is exculpatory under *Brady*.  "If the exculpatory evidence 'creates a reasonable doubt' as to the defendant's

camera being turned on.  Therefore, any statement made by him where he refutes the confession was paramount to the defense.  It would aid a defense theory that Mr. Fontenot was innocent, pressured to confess, and fed key details by the police.   Additionally, the statement was impeachment evidence for Detective Smith and Agent Rogers about their interrogation, investigation, and lack of any corroborating evidence of the confession.

This was not the only evidence placing Mr. Fontenot in another location when the crime occurred. Both OSBI and Ada Police Department were aware of this party based upon several witness reports, dispatch records, and police reports, but ignored the evidence in favor of a confession corroborated by nothing. Janette Roberts, when interviewed, confirmed Mr. Fontenot's presence at the party. (Ex. 44, OSBI 0139). Had police looked at the radio dispatched logs for April 28th, they would have seen the neighbor complaints about the loud party at the Calhoun residence. (Ex. 41& 42). Calls came in at 9:20 pm[15] and 12:40 am about the loud music. *Id.*  One of the officers who responded to the second call, Ada Police Officer Larry Scott,[16] wrote a report specifically mentioning "Gordon Calhoun" party and warning the revelers to keep it down or go to court. (Ex. 43, prosecutorial bates 98). This report was also not provided to defense counsel.[17]

Further, Stacey Shelton, (FKA Deprater-Brashier) testified, at Mr. Ward's trial, that she

---

culpability, it will be held to be material." *United States v. Starusko*, 729 F.2d 256 260 (3d Cir. 1984)  *quoting United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

[15] The radio dispatch log shows the call to McAnally's occurred at 8:50 pm. Ex. 41.S

[16] While Officer Scott testified in Ward's trial on June 13, 1989, he did not testify in Mr. Fontenot's trial.

[17] While the State focused on Mr. Fontenot's miraculous ability to both be at the Calhoun party and participate in Mrs. Haraway's abduction and murder, this theory becomes hard to believe given that no witness identified him at either McAnally's or JP's, he had no access to a truck, and people remember him being at the party for the entire night.  The prosecution lacks any evidence to the contrary besides the dubious confession.

knew about Mr. Calhoun's party because she attended it. *See supra* Claim I. She informed Ada Police Chief of Detectives Dennis Smith and Detective Mike Baskins of her awareness of the party that evening and those in attendance. (Ex. 12). They disregarded her information, failed to take a formal statement, investigate further into her account, or alert Mr. Fontenot's counsel of her information. Ms. Shelton also spoke with Pontotoc District Attorney Bill Peterson explaining her knowledge of the party. Not only did he dismiss her information, fail to disclose it to defense counsel as exculpatory evidence, but threatened her when she testified in Mr. Ward's trial. Ex. 12, *see supra* Claim I. Ms. Shelton acknowledged not knowing many people at the party, she did list off the people she did know at the party. *Id.* Those people included Bruce DePrater and Eric Thompson who also recall Mr. Fontenot's attendance at the party. *See supra* Claim I.

An alibi irrefutably shows a defendant could not commit a crime because he was elsewhere when the crime was committed. There would be no reason for a defense attorney, who had independent knowledge of his client's alibi not to present it during a capital trial. Mr. Fontenot told police of his whereabouts during his interrogation at OSBI. They recorded this information including the witnesses who would be able to corroborate his whereabouts. Further, people who attended the party, with no impetus to lie, could have been interviewed by defense counsel and testify about the timing of this party, who else was present, and whether Mr. Fontenot was present the entire night. These people remember seeing Mr. Fontenot from the very early part of the evening until much later into the night. Their accounts clearly show that at no time did Mr. Fontenot leave to participate in whatever transpired with Mrs. Haraway. Affidavits from party-goers, Eric Thompson, Bruce DePrater, and Stacey Shelton along with police reports from Janette Blood place Mr. Fontenot at the party for the entirety of the night.

59

<u>2.      Cash Register Tape and Relevant Witness Reports</u>

In response to Mrs. Haraway's disappearance, Ada Police Detective Dennis Smith asked

people who shopped in McAnally's the night of Mrs. Haraway's disappearance to contact the

APD. (Ex. 28). Police theorized the last purchase before Mrs. Haraway's disappearance was a

tallboy beer.[18] (Ex. 44, OSBI 0496). In response to the APD request, four people contacted the

police department to explain their purchases and the time they were in the store.  Police

documented their names, times, and, on occasion, contact information was included on the

register tape. (Exs. 32-38). Each of these people discussed with the APD what they witnessed in

McAnally's. However, none of these reports were disclosed to defense counsel. Richard

Holkum, John McKinnis, Gary Haney, and Guy Keyes provided vital information to law

enforcement which was never followed-up by either APD or OSBI in their investigation.  This

information provided critical information as to an alternate suspect in a grey pick-up truck, Mrs.

Haraway's frame of mind that evening, and the thoroughness of the police investigation in the

hours after she was reported missing.

a. Richard Holkum

Richard Holkum, an off-duty Ada police officer, went into McAnally's on the night of

April 28th. Notations on the McAnally's register tape show his purchases occurring between

7:45 pm to 8:00 pm; thirty minutes before Mrs. Haraway supposedly walked out of the store with

an unknown man. N/T 6/9/1988 p. 34-35, 67-68. The crux of his trial testimony focused solely

on the clothing he saw Mrs. Haraway wearing the night of her disappearance. N/T 6/9/1985

---

[18] The register tape from the day's purchases was collected by Detective Baskins and placed into evidence by the
state at all three trials. (J/T 1160 State's Exhibit 16, N/T 6/9/1988 p. 197 State's Exhibit 60, Ward N/T 6/12/1989
p. 6, State's Ex. 60). While the entire roll was placed into evidence, it is unclear whether it was ever unrolled
during the trial by any of Mr. Fontenot's attorneys during trial or direct appeal.  It was ineffectiveness for defense
counsel not to examine the entire roll. *See supra* p. Claim III.

p.143-145. Further, he testified that he told lead Detectives Dennis Smith and Mike Baskins

immediately upon learning of the abduction about being in the store that evening. N/T 6/9/1988

p. 144. However, he did not discuss the details of what else he saw at McAnally's with the

detectives until after Mr. Fontenot was arrested in October 1984. *Id.* at 147.

Moreover, Mr. Holkum's clothing description was not the whole story about what she

witnessed in McAnally's.  The omitted details reveal significant information about the pick-up

truck she left the store in thirty minutes later.

> That night, I recall stopping at McAnally's when it was still barely light out. I parked my vehicle, near the west corner of the building. I believe I bought a six-pack of beer, a loaf of bread and maybe some other things. I knew Denice Haraway and spoke to her inside McAnally's that night.  There was no one else in the store when I stopped at McAnally's, however, one woman did step in and laid a penny on the counter, telling Denice that she had given her too much change back for a previous gas purchase. Both Denice and I thought that was odd, for the woman to bring back a penny.

> Everything in the store, including Denice, seemed normal. I did not detect any tension or anything wrong.  While standing at the counter making small talk with Denice, **I recall seeing two vehicles sitting on the eastern edge of the pavement outside, just to the east of the gas pumps. These vehicles were parked parallel with the driver's side facing each other and the drivers were apparently talking. One vehicle was a green Ford Torino or Mercury Montego. The other vehicle was a Chevy or GMC pickup truck painted primer gray. This pick-up had a straight, conventional bed. I believe these vehicles were still parked next to each other when I left McAnally's to drive home.**

> Based on my own memory, and knowing that civil twilight ended at 7:36pm that night, I believe I was probably at McAnally's somewhere between 7:30pm and 7:45pm. The next morning, April 29, 1984, I first heard about the disappearance of Denice Haraway when I got to work.

> That day, I approached Det Dennis Smith and Det Mike Baskins about my visit to McAnally's the night before. Neither Smith nor Baskins were interested in talking to me about the Haraway disappearance. Neither formally interviewed me about what I saw or when I was there.  My recollection of both of these detectives was that they were not interested in talking to me about my visit to McAnally's. I remember thinking that they "just blew me off."

Sometime later that day or that week, Det. Smith or Det. Baskins showed me the register tape from McAnally's and asked me if I could ID my purchase on the tape. I recall that this tape only had the prices, which made it difficult for me to find my purchases. I'm not sure if I ever found my purchase at McAnally's that night. I recall that both detectives were very condescending toward me for not being able to immediately identify my purchases from the Saturday night.

I recall some time right before the trial of Tommy Ward and Karl Fontenot, OSBI Agent Gary Rogers informally interviewed me about my stop at McAnally's on 4/28/1984. **I recall that he was mainly interested in my recollection of what Denise Haraway was wearing that night. I don't believe he took down any information about the two vehicles I saw sitting outside the building.**

(Ex. 6) (emphasis added). Mr. Holkum's description of a gray-primered pickup truck parked in

the exact location witnesses testified to seeing it when Mrs. Haraway departed.  The State's

theory was that whomever left the store with Mrs. Haraway got into a gray-primered pick-up

truck and drove off when David Timmons entered the store that night at approximately 8:30 pm

according to testimony and the dispatch logs. N/T.6/15/1988 at 39. That Mr. Holkum saw a truck

remarkably similar in appearance to that described by the Timmons brothers and Gene Whelchel

at the store for at least half an hour before Mrs. Haraway's disappearance changes the motive for

the abduction and suggests an alternate suspect(s).  Because she was fearful about working the

night shift given the obscene and harassing phone calls, it creates a reasonable doubt as to Mr.

Fontenot's involvement.  Such evidence would have been something police and defense counsel

should have pursued. That the truck was driven by one man is also interesting because, clearly, it

was not two people as police and prosecution theorized and argued in their case against Mr.

Fontenot.  Further, the lack of importance APD Officer Holkum witnessed by lead detectives is

important impeachment on the quality of the investigation.  His knowledge about the APD

supports the lack of training into serious crimes that existed amongst its officers. *See* Ex. 53,

pgs.10, 12 (Detective Smith discussing his level of training and the intuitiveness of police

investigation).

b. John McKinnis

Mr. McKinnis grew up in Ada, Oklahoma and frequented McAnally's convenience store.

The register tape documents him in the store between 7:50 pm to 8:00 pm on April 28th.[19] (Ex.

35).  According to an interview conducted with Mr. McKinnis recently, he recalls his visit in

stark detail.

> In April of 1984, I was 22 years old and I lived in a trailer about 7 miles east of
> Ada, Oklahoma. I worked in the oil field business for an Ada company. I often
> stopped at McAnally's on East Arlington, which was on the eastern edge of town.
> From my many stops at McAnally's I became familiar with Donna Denice
> Haraway, who worked behind the counter in that store at night. I recalled Haraway
> as being a happy and nice looking woman with a bubbly personality. Whenever I
> stopped at McAnally's it was enjoyable to see her behind the counter. I knew she
> was teaching, or studying to be a teacher. I was not aware that she was married.

> On the night of April 28, 1984, a Saturday night, I stopped at McAnally's on my
> way home and purchased a couple of items and paid with a twenty dollar bill. I
> lived about 10 minutes east of McAnally's. I know that I got home that night
> sometime after 8 pm, between 8 pm and 8:10pm.

> While watching the local TV news that night, I learned that Denice Haraway had
> disappeared while working at McAnally's. I recalled that when I had stopped in at
> McAnally's earlier that night, there was a man I did not recognize standing behind
> the counter a few feet from Haraway. He appeared to be someone Haraway knew,
> an acquaintance, like a boyfriend or a husband or someone like that. He appeared
> to be unhappy, or concerned about something. Denice Haraway appeared to be her
> normal, happy self.

> I also recalled the lone vehicle parked in front of McAnally's when I drove up,
> presumably belonging to the man I saw behind the counter. It was a 1978 Chevy
> pick-up truck, light colored, maybe white, with gray primer spots painted on the
> body. I immediately wondered if this man I saw behind the counter might have had
> something to do with Haraway's disappearance. I called the Ada Police.

---

[19] To the extent that the register tape was shown to defense counsel, Mr. Butner's failure to follow-up on such leads
is a violation of the Sixth Amendment right to effective assistance of counsel.

The dispatcher, or whoever I talked to said someone would call me back. Sometime later that night, I received a call, apparently from a police investigator at McAnally's. I believe I spoke to Mike Baskin. As I described my visit to McAnally's a few hours earlier, and was able to determine the probable time of that visit as being between 7:50pm and 8 pm, this police officer, said to me, "Here you are. I'm looking at the cash register tape (at McAnally's) and see your purchase right here with the twenty dollar bill." I described to this police officer, Mike Baskin, the man I saw behind the counter with Haraway during my visit. This man was bigger than me, standing about 5'10' to 6'1'", 210 lbs, with light colored hair, not very long. This man was about my age or a little older, about 22 to 25 years old. He wore a white t-shirt, and some type of work pants, maybe khaki or blue jeans. This man looked clean, not rough-looking. He was not dirty, but appeared to have been out working that day. He looked more like a construction worker, than a college student.

I also described the truck that I saw parked outside McAnally's to the police officer, Baskin. I knew it was a 1978 or maybe 1977 model, because it was the new body style, which had changed for Chevy pick-ups around 1975 or 1976. I told him that this truck had a short, conventional bed with lots of primer paint prep spots. I recall that either during that call with Police Officer Baskin, or on a call back to him later that night or the next day, this officer told me that what I had seen wasn't relevant to their investigation into Haraway's disappearance. I recall the police officer telling me that the guy I saw behind the counter, was someone police knew. I recall him saying specifically, "Oh yeah, we know who that was."

I recall being told that whatever happened to Haraway happened later in the evening, so that anything I saw was not relevant to their investigation. After that last phone call with the police officer, after that weekend, no one with the Ada Police or any other police agency ever contacted me regarding Denice Haraway. I never spoke to any police officer or investigator face-to-face, only by phone.

I knew both Tommy Ward and Karl Fontenot by face, from growing up in Ada. That man I saw standing with Denice behind the counter at McAnally's about 8 pm on April 28, 1984, was neither Tommy Ward nor Karl Fontenot. At the time I believe I could have identified that person by his photograph. I never spoke to anyone else about the Haraway case in an official capacity, until recently, when I spoke to Dan Grothaus, an investigator with the Oklahoma Innocence Project. He showed me a photo of what he believes is the register tape from McAnally's on April 28, 1984. The photo of that register tape shows my name and phone number hand-written next to a purchase of $2.61, paid for with a twenty dollar bill.

I was able to tell Mr. Grothaus what I told that police officer that night. It was fairly easy for me to remember that conversation with the police officer that Saturday night, because I was so concerned about Haraway's disappearance, and wondered what significance this man I saw behind the counter might have played in her disappearance.

64

(Ex. 5). Mr. McKinnis' account of the man he saw behind the counter with Mrs. Haraway, the continued description of the gray-primered pick-up truck still at the scene for much longer than suggested during Mr. Fontenot's trial.  Additionally, his discussions with Detective Mike Baskins were extremely important both for the thoroughness of the investigation but establishing an alternate suspect with whom the APD seemed familiar with.

First, Mr. McKinnis provided a clear description of a man in the store standing next to Mrs. Haraway.  His close proximity along with Mrs. Haraway's signs of distress were critical pieces of information that should have been investigated by the APD.   Even though Detective Baskins told Mr. McKinnis that the police were aware of that individual, no disclosed police reports identify whom this man was, how the APD knew him, his connection with Mrs. Haraway, why he was behind the counter that night, and why he was eliminated as a person of interest.[20]

In another interesting turn, no further investigation occurred into those who stopped in the store was done even after the police requested it.  Based on several witness accounts, the APD failed to document leads from witnesses.  From the prosecution's theory of the case, it made no sense to ignore those present in McAnally's shortly before Mrs. Haraway disappeared. Since the APD were aware of this individual, his identity should have been disclosed to defense counsel as a potential witness to what else happened in the store while he was present, what his conversation with Mrs. Haraway was about, and if he owned the pick-up truck seen by Officer Holkum and Mr. McKinnis. The APD's continued apathy to vital evidence was a pattern that

---

[20] The haphazard way the police investigation transpired is important to Mr. Fontenot's defense because of the six-month delay in making arrest, the specious information that led to his arrest, and he cumulative evidence establishing both an alternative motive and suspect from the crime scene.

permeated several murder investigations displaying an inability to properly handle cases of that magnitude.

Further, Mr. McKinnis' interview with police continued their leads into the gray-primered pick-up truck that Mrs. Haraway departed with an unknown White male. Officer Holkum and Mr. McKinnis describe a Chevy pick-up truck which matches the description provided by David and Lenny Timmons, and their uncle, Gene Whelchel. In their OSBI Reports (also withheld from counsel), they describe the pickup as being "late 60's – 70's," "'72 pick-up possible dull dark blue with grey primer spots and a conventional straight bed," and "light colored full size pick-up possibly early '70's, not a narrow bed." (Ex. 44, OSBI 0060-0063). That the truck was seen at the store as early as forty-five minutes before Mrs. Haraway's abduction, changes the profile of who may have taken her. Clearly, that person could not have been Mr. Fontenot as he did not have or have access to such a truck nor could he have been present for that duration without being identified by Mr. McKinnis.

Additionally, the description of the sole man in the store does not match Mr. Fontenot according to Mr. McKinnis who was familiar with Mr. Fontenot; he was not the man behind the counter with Mrs. Haraway. Considering Mr. McKinnis' information in conjunction with the new evidence about Mrs. Haraway's potential stalker presents a very different picture of the abduction and the motive for it. Law enforcement's failure to investigate the witness accounts they sought out demonstrates a consistent pattern of failing to develop evidence that solved the case rather than push a theory that no evidence supported. *See Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986)(explaining that a *Brady* violation may occur because, "A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge

the defendant, and we may consider such use in assessing a possible Brady violation."); *see also Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985).

c. Gary Haney & Guy Keys

Both Gary Haney and Guy Keys remember contacting police in response Detective Dennis Smith's request via television or newspaper requests for information. Mr. Haney recalls his visit to the store with his son sometime around 8 pm and remembers staying ten to twelve minutes. (Ex. 4). Nothing unusual transpired during their time in the store. *Id.* The register tape does not give a time for his arrival at the store. However, he did convey to APD his purchase which took place after both Officer Holkum and Mr. McKinnis. (Ex. 35). Mr. Keys also recalled being in the store on that day and telling the police the same. (Ex. 7). He is noted arriving at McAnally's at 8:25 pm. (Ex. 32). For both gentlemen, no police reports document their response to Detective Smith's request for information, the details they provided the APD, and whether that information was developed in some meaningful fashion.

The timing of Mr. Key's visit to McAnally's is critical because it is five minutes before David and Lenny Timmons arrived at McAnally's with their uncle. If their account of arriving close to 8:30 pm is true, then three other purchases must have been made in quick succession to allow for the last transaction of a tallboy beer. (Ex. 33) (highlighted in yellow). Other evidence casts doubt regarding the timing of Mrs. Haraway's disappearance according to witnesses who arrived at McAnally's only to find it empty prior to the Timmons' arrival. A family coming to get gas entered the store to find that Mrs. Haraway was not there. (Ex. 56). Such witness accounts place further doubt about when precisely Mrs. Haraway went missing and the

circumstances surrounding her disappearance.  Understanding the timing of her disappearance is critical when considering that Mr. Fontenot was at a party with numerous people during this timeframe.

Whether the APD received other calls filling in the missing transactions is unknown as no reports concerning those in the store were provided to defense counsel. This information would have been extremely helpful to narrow down the time of when Mrs. Haraway went missing which supported Mr. Fontenot's alibi, the possible people who had motive to abduct her, and the pick-up truck present around the store for thirty minutes prior to her abduction. None of this evidence was ever presented at any of the three trials, was not given to the prosecution via the OSBI prosecutorial, not provided in post-conviction, and continues to be withheld from Mr. Fontenot's counsel.

d. Gene Whelchel

The last notation on the register tape lists a transaction with Gene Whelchel at 9:00 pm. (Ex. 37). Mr. Whelchel testified that he arrived at McAnally's around 8:30 pm. (N/T 6/9/1988 p. 57). After realizing there was no clerk in the store, he called the owner of the store, the manager, and the Ada Police. (N/T 6/9/1988 p. 63). The dispatch logs from the APD show the call at 8:50 pm. (Ex. 41). The police responded to the scene shortly thereafter. (N/T 6/9/1985 p. 85-86). After the initial APD patrol arrived, Detective Mike Baskins arrived at McAnally's to start the investigation. (P/H p. 462, 464). At the time this transaction was rung, the crime scene should have been secured to preserve evidence, e.g.  fingerprints, cigarette butts, beer cans, Mrs. Haraway's purse, all of which was found on the counter where Mrs. Haraway stood. N/T 6/9/1985 p. 103-110-111; J/T 1259-1240, 1422-23, 1439, 1441, 1447-1448. Instead, the police failed to secure the crime scene. (Ex. 20). At the very minimum, had defense counsel known

68

about the 9:00 pm transaction, numerous lines of impeachment and inquiry could have been opened up not only for law enforcement but for Mr. Whelchel and the Timmons brothers, the sole eyewitnesses.  Police malfeasance was the cause of the loss of evidence was something defense counsel was entitled to follow up on through direct and cross examination. *See Kyles*, 514 U.S. at 445 (discussing how evidence can be material if its disclosure helps defense counsel attack the thoroughness of law enforcement investigations).

Challenging the timing of events and the convenience store was important for the defense because it continued to cast doubt on Mr. Fontenot's confession and the quality of the police investigation.  Specifically, defense counsel could have asked what Mr. Whelchel knew about why his purchase was rung up after the police arrived and by whom.  Mr. Butner could have asked Monroe Atkeson, McAnally's manager, who was there when police arrived, whether he rung up the transaction, and if he knew any details of the sales that night.  An entire line if inquiry and impeachment could have derived from the names, dates, and purchases from the register tape from Mr. Whelchel and the Timmons brothers as to the accuracy of their account.  Further, detectives could have been asked about proper procedure for securing the scene and why the procedure was disregarded during a robbery an abduction.  The continued pattern by the APD of failing to properly document witness contacts and other crucial evidence underscores the credibility of their investigation and casts significant doubt in their ability to properly determine what happened at McAnally's between 8:25 pm and 8:30 pm resulting in eventual Mrs. Haraway's death. *See infra* Claim VII & VIII. Such inept investigation cost not only the Mr. Fontenot a viable defense but Mrs. Haraway's family a true understanding of what transpired that evening.

Additionally, knowing the accounts of people in McAnally's in the moments leading up to Mrs. Haraway's disappearance supports Mr. Fontenot's alibi in two regards. First, it would have been of utmost importance to the defense to inquire if anyone saw Mr. Fontenot at the store. Clearly, Mr. McKinnis answered this question but having additional witnesses answering similarly eliminates Mr. Fontenot from the crime scene and supports his alibi witnesses about the party he attended. Second, it provides a profile of a suspect who did commit this crime. At least two witnesses who did not testify saw the primered truck at McAnally's. The truck did not belong to Mrs. Haraway nor anyone who was employed at the store. Whomever owned the truck either abducted Mrs. Haraway or had knowledge of what transpired in the store. In either situation, the police failed to investigate this obvious lead and deprived Mr. Butner of the opportunity to do the same for his client.

### 3.   Floyd DeGraw

Immediately after Mrs. Haraway's disappearance, the APD focused their attention on a suspect arrested in Texas for assaulting another woman named Donna. Police mentioned to the press that Floyd DeGraw was a possible suspect in the Haraway case. (Ex. 26) This was the extent of information given by law enforcement into Mr. DeGraw's potential involvement. However, the APD and OSBI extensively investigated Mr. DeGraw involving both APD and OSBI. Their investigation took place from shortly after April 28th until after December 1984, two months after Mr. Fontenot was charged with Mrs. Haraway's abduction and murder. (Ex. 44, OSBI 0747-0750, 0751, 0754-0759). What is unclear is why these agencies, so focused in finding Mrs. Haraway, stopped investigating Mr. DeGraw when his statements continued to implicate himself in her abduction and his behavior raised more questions than answers.

Mr. DeGraw was arrested in Amarillo, Texas on May 3, 1984, for raping Donna Ellis and

70

leaving her naked in a field. (Ex. 24). He had several other prior convictions including serving three years for malicious wounding and is currently serving life imprisonment for stabbing a woman to death. (Exs. 44, OSBI 0014 & 47). When arrested in Amarillo, police searched his car finding jewelry and other belongings of women from several Oklahoma cities along with a stolen driver's license from a woman in Ada. (Ex. 24, pgs. 16-18). While in custody in Texas, Detective Dennis Smith relayed information to OSBI Agent Gary Davis who was tasked with interviewing Mr. DeGraw for the OSBI. (Ex. 44, OSBI 0014). According to Mr. DeGraw, he left Detroit in a friend's car heading west. *Id.* During his drive, he picked up a hitchhiker, Jeffrey Johnson, and they journeyed to Johnson's friend in Memphis, Tennessee. *Id.* While in Memphis, they stayed several hours at Gordon Elliott's house before continuing west. *Id.* When asked if the men drove through Oklahoma, specifically stopping in Ada, Oklahoma, DeGraw was adamant that he slept through his entire drive through the state; if they had stopped, it was not in Ada. (Ex. 44, OSBI 0027). However, most, if not all of Mr. DeGraw's story was a lie based on OSBI's later investigation.

On May 10, 1984, DeGraw was polygraphed by Amarillo Detective Jimmy Stevens. During the examination, Detective Stevens asked several questions pertaining to the Haraway case.

> Concerning the kidnapping of the girl in Ada, Oklahoma, do you intend to be truthful about?" DeGraw was very deceptive on this question. Also on question #6, which was "About ten days ago did you participate in a kidnapping in Ada, Oklahoma? Lieutenant Stevens stated that DeGraw was deceptive in this. Also question #10 which was, "Have you ever seen the girl whose pictures is on the wall in front of you now?, was deceptive, but other questions that were asked, the response was very flat and Lieutenant Stevens felt that overall DeGraw was not involved in the kidnapping of this girl from Ada.

(Ex. 44, OSBI 0024). While Detective Lieutenant Stevens invited the OSBI to evaluate the

polygraph data for themselves, along with providing them copies of all their materials, the results of OSBI's assessment of the polygraph are unknown because it was not included in court ordered materials provided by OSBI.   Further, OSBI files do not contain either the raw data received from Amarillo Police or any other parts of their investigation. (Ex. 24, p. 16-18). Whatever the OSBI's opinion of DeGraw, this did not end their investigation or eliminate him as a suspect.

OSBI Agent Davis, along with the Amarillo police, showed DeGraw pictures of Denice Haraway during their interrogation. While pointing out numerous inconsistencies in his story about traveling from Detroit, Degraw said the reason he had problems with the Haraway questions is his cousin was kidnapped and raped when he was twelve. (Ex. 44, OSBI 0024). According to DeGraw, his sister looked like Mrs. Haraway. *Id.* When pressed further about Mrs. Haraway,

> At one time during the conversation and as Agent Davis put the picture of the victim from Ada before DeGraw, DeGraw held his head in his hands and appeared about to break down, but after recomposing himself, lifted his head with his eyes very red and stated that he did not know anything about the woman who was abducted in Ada, but hoped we would find her alive. DeGraw then became irritable, pacing the floor, saying he did not want to answer any more questions and continued doing this while Agent Davis continued talking. DeGraw then insisted on being taken back to his cell and not answering any more questions. . .

(Ex. 44, OSBI 0027). DeGraw admitted stealing money for their journey and insinuated about a robbery several years prior. (Ex. 44, OSBI 0025). He discussed his institutionalization for mental health issues including his tendency to, "fly off the handle." (Ex. 44, OSBI 0026).

Agent Davis investigated DeGraw's story and quickly found several flaws. He obtained court files from Missouri showing that Jeff Johnson was incarcerated on murder charges when he was supposedly traveling with DeGraw. (Ex. 45). Also Gordon Elliott, who was supposedly Johnson's longtime friend, spoke more familiarly with DeGraw after his arrest in Texas. (Ex. 44,

OSBI 0021 & 0023). OSBI recorded the call between Elliott and DeGraw regarding the Haraway case, but that tape, or a transcript of the conversation was not provided to defense counsel and has yet to be disclosed. (Ex. 44, OSBI 0023).   These discrepancies in DeGraw's version of events is troubling given his past criminal history involving violence towards women, the timing of the rape in Amarillo, and his incriminating statements and conduct when interviewed by OSBI.

Why OSBI and Ada PD eliminated DeGraw as a suspect remains a mystery given his story was completely fabricated. Even his acknowledged deception during the polygraph, emotional breakdown when questioned further about Haraway, his proximity to Ada, mental health issues, and his consistent violence towards women made Mr. DeGraw a likely suspect. His booking photograph shows a striking similarity to the composite drawings released by police. (Ex. 24, p. 23; 76; & 77). It is unclear why the police investigation into DeGraw stopped when his story as to who DeGraw traveled with proved a complete fabrication. Defense counsel was entitled to know the extent to which the OSBI and APD investigated DeGraw in the week after Mrs. Haraway's disappearance continuing even after Mr. Fontenot was charged with her abduction and murder. (Ex. 44, pgs. 0747-0750, 0751, 0754-0759).

The failure of the district attorney to disclose such important exculpatory evidence is a violation of Mr. Fontenot's constitutional rights. *See Kyle*, 514 at 446 (finding the cross examination into flaws in the police investigation a viable avenue regarding Brady evidence); *see also Bowen v. Maynard*, 799 F.2d 593, 612 (10th Cir. Okla. 1986) (granting habeas relief because withheld evidence of a different suspect created a "reasonable doubt" and "in the hands of the defense, it could have been used to uncover other leads and defense theories and to discredit the police investigation of the murders"). That the State continues to withhold taped

conversations between DeGraw and Elliott, polygraph data, and other evidence pertaining to the DeGraw investigation continues to deprive Mr. Fontenot of his Fourteenth Amendment constitutional rights.

> ### 4. Withheld interview reports and taped statements of Jeff Miller and Terri Holland (McCarthy).

The OSBI Prosecutorial contains a table of contents of evidence collected during the investigation but not provided within the paper document. (Ex. 43, pgs. 7-8). Included in the list is all physical evidence supporting the OSBI's case against Mr. Fontenot and his codefendant, Tommy Ward. Three specific items that were not disclosed to defense counsel were:

    1. The audio recorded interview Jeffrey Miller;

    2. The video tape interview of Jeffrey Miller and;

    3. The audio tape of Terri Holland.

According to Detective Smith, information provided by Jeff Miller led to both Mr. Ward and Mr. Fontenot being questioned and later arrested. P/H p. 502. Detective Smith testified that Mr. Miller provided information against O'Dell Titsworth prior to October 12, 1984, in a statement to police. P/H p. 710. Given that Mr. Titsworth could not have been involved in any crimes related to Mrs. Haraway's death because he was in police custody at the time, any statements made by Mr. Miller are suspect. Whatever Mr. Miller said became the bedrock of the law enforcement investigation against Mr. Fontenot. However, it is unknown exactly what Jeff Miller said to the Ada Police because no report or statements detailing Mr. Miller said have ever been disclosed to the defense even though the police acknowledged possessing such information. Jeff Miller never testified at any hearing or trial about what information he provided inculpating Mr. Fontenot. Further, it is unclear what investigation, other than the interrogations of Mr.

Fontenot and Mr. Ward, law enforcement took to verify any of the information Mr. Miller provided.

The disclosure of Mr. Miller's statements and recordings were specifically and repeatedly requested by defense counsel.  Mr. Butner sought to understand why, after six months, the police focused on Mr. Ward which led them to Mr. Fontenot.   No other evidence supported the shift in attention to these two men.  In fact, much of the police investigation stalled prior to whatever information Mr. Miller provided. The police investigation rested completely on whatever information Mr. Miller provided to Detectives Baskins and Smith. The State opposed any action to disclose the information gleaned from Mr. Miller based on the work product doctrine.[21] P/H p.765-771.

Further, it is unclear the substance of what Terri Holland, a known jail-house informant,[22]

---

[21] The work product doctrine does not excuse a prosecutor's obligation to disclose *Brady* materials. *See generally Castleberry v. Crisp*, 414 F. Supp. 945 (N.D. OK 1976).   While a prosecutor's thoughts and impressions are protected, if there is exculpatory or impeachment evidence, that must be disclosed to a defendant prior to trial. *See United States v. Armstrong, 517 U.S. 456, 474-75, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)* (Breyer, J., concurring in part and concurring in the judgment) (presupposing *Brady* overrides work-product doctrine)

[22] When she came forward claiming to have heard Mr. Fontenot's confess, she also heard Ron Williamson confess at the same time. The United States District Court found this problematic in Mr. Williamson's habeas corpus litigation. (pgs. 33-35, 61-62). During the Williamson & Fritz 42 USC §1983 civil litigation, Bill Peterson, Pontotoc County District Attorney at the time of these trials, was asked about Terri Holland's testimony in other cases and the Haraway murder was discussed:
"Q All right. Did you know Terri Holland before this case?
A I knew of her.
Q Had you ever put her on as a witness before?
A Boy, I think she's-- as I'm sitting here, my memory is that she's testified, that I know of, in two different cases, two homicides.
Q All right. One was the Haraway case?
A Yes.
Q That's the book that was called-- written about it called "The Dreams of Ada"?
A Yeah. That' s a book that was written about his idea of what the case was yeah.
Q And the Haraway murder case, Dennis Smith and Gary Rogers were also lead investigators?
A They were part of the investigative team, yes.
Q And were there also confessions in that case from some of the defendants that involved their statements that they dreamed about the crime?
A No, sir. That's not how it happened at all.
Q Were there any such statements from defendants?

75

said to police to implicate Mr. Fontenot in this crime. (Ex. 61)(discussing her testimony in the Williamson case where she supposedly overheard him confess to a murder). Within the 860 plus pages of OSBI Reports, her interview with the Pontotoc County Sheriff's Office where Mr. Fontenot supposedly confessed to her shortly after being arrested. *See* (Ex. 44 at 282-289). Defense counsel was unaware of that statement and was unable to use it when Ms. Holland testified during the preliminary hearing. P/H. p. 888-927.  Similar to her conduct in the Williamson-Fritz wrongful convictions, Ms. Holland received substantial benefits for her role in assisting the state in building its case against Mr. Fontenot. Randy Holland, her husband during the time of Mr. Fontenot's trial, explained the extent of her deals for her testimony:

> I was formerly married to Terri Holland, now deceased. Terri and I got married while I was an inmate at the Pontotoc County Jail, on September 4, 1985.
>
> I was facing up to forty years, but Terri made a deal with Bill Peterson, the district attorney in Pontotoc County. She agreed to testify for him in the state's case against Tommy Ward and Karl Fontenot. In exchange for her testimony, I was to receive seven years on my pending case and we were given permission to marry while I was in jail.
>
> I only found out about the deal Terri made with Bill Peterson when Terri and I got into an argument. We were living near the dam on Ft. Gibson Lake, in about 1992. This was a very intense argument, and she let me know at that time what she had done for me.

---

A There was videotaped statements of both Fritz and -- excuse me -- Fontenot and Ward making statements that were very incriminatory, and at the end of Mr. Ward's statement, Mike-- excuse me—Dennis Smith asked him the question, "is there anything else you would like to add to this?" And he said "It all seems like a dream now."
Q Okay. Now—
A So there's where we get "Dreams of Ada."
Q So other than the Haraway case and this case, was there any other time that you had used Terri Holland as a witness?
A Not to my memory.
Q And in both cases you used her as a jailhouse informant?
A. She happened to be in the jail at the same time these people, all these people were in jail. Yeah.
Q. All right. Now I'm showing you page ---
A She was not the entire case against Tommy Ward and Karl Fontenot."
(Peterson Vol II, p. 360-362; Rogers Vol II, p. 415 similar testimony).

(Ex. 10). Clearly, any benefits conferred on a witness for the state, must be disclosed to defense counsel. *See U.S. v. Bagley*, 473 U.S. 667 (1985); *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009). That the State failed to do so for a witness who only testified during the preliminary hearing, does not remove the constitutional obligation to disclose impeachment evidence.

5.     OSBI Reports of Mrs. Haraway's fear of being stalked.

Several withheld interview reports indicate Mrs. Haraway's reticence about working at McAnally's due to the clientele, but more importantly because of the harassing telephone calls she received. These calls occurred only during her shifts, demonstrating her stalker's knowledge of her work schedule.  None of the statements from family, friends, and co-workers, who knew of the calls, were disclosed. According to a co-worker, these calls had stopped for a period of time in the early months of 1984, but began again in the weeks leading up to her disappearance. (Exs. 15 & 62). Haraway only worked at McAnally's in the evenings from Thursday to Sunday. (Ex. 15).  These calls, always from a man, greatly distressed her, her family, and her co-workers. Mrs. Haraway's sister, Janet, stated the fact that Haraway was afraid of someone and did not like to work at McAnally's.

> According to Janet, Donna told her on the phone she hated working at the store because it did not have an alarm and a lot of weirdo's come in and out of the store. She told Janet that she was going to look for another job because she felt uneasy working at the store alone at night. **She told Janet that the phone calls had started again but didn't go into the whole story. Janet said that earlier Donna had been receiving calls at work from a man that said he was going to come out to the store some night and wait outside while he was working. She said that Donna was upset because she had asked for the night off and a guy refused to work and she had to work anyway.**

(Ex. 43, prosecutorial bates 20, 109)(emphasis added). This information was also relayed to police by the store manager, Monroe Atkeson, about a conversation he had with Steve Haraway, the victim's husband.

77

> Steve told Atkeson that a Vietnam Veteran had been harassing Donna and Donna had received several obscene telephone calls. Atkeson had seen the veteran that Steve spoke of and Atkeson described the veteran as a white male, six feet, 190 pounds, black hair, brown eyes, mustache, light complexion, usually drove a white Chevrolet Chevette and bought a soft drink. Atkeson believed that the veteran attended a rehabilitation school in Okmulgee.

(Ex. 44, OSBI 0006). The police also spoke with Steve Haraway who confirmed the calls his wife received while working at McAnally's. "Steve received a phone call from the police who told him that his wife was missing. He knew of no one that Donna was having problems with at the store, other than she had received two to three obscene phone calls at the store. The last phone call was two or three weeks prior to her disappearance." (Ex. 43, prosecutorial bates 20). Clearly, the people closest to Mrs. Haraway were aware of a potential threat that continued for months and weeks prior to April 28th.  Also withheld from Mr. Fontenot's defense was a report from co-worker James D. Watts who testified for the State at Mr. Fontenot's trial. In an interview with the Pontotoc County Sheriff's Office on July 25, 1985, Mr. Watt explained that "Denise had told me of some obscene phone calls she had received at the store for a while, these calls upset her a great deal. She could not recognize the voice over the phone the calls stopped about one month before she disappeared." (Ex. 62). Mr. Watt's interview report falls within the same scope of evidence the defense needed showing not only an alternate suspect but a completely different motive of the perpetrator.  Such evidence is exculpatory when considered in light of the prosecution's weak evidence against Mr. Fontenot.

The State failed to turn over to defense counsel any of these reports. Information related to potential suspects falls within the evidence a prosecutor must disclose to defense counsel. *See Kyles*, 514 U.S. at 446 (evidence of alternative suspects allow the defense to attack "the reliability of the investigation" if it shows that investigators were less than energetic in exploring

other potential suspects . . . After all, a "common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant . . .."); *Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007) (suppressing evidence of alternative suspects "could also have been used to cast doubt on police officers' decision to focus their attention . . . on [the defendant] rather than" the other suspects).

Had reports from OSBI and the Sheriff's office been disclosed, they would have aided Mr. Fontenot's defense to investigate the alternate suspects who had intent along with motive and opportunity to harm Mrs. Haraway.  This evidence fit within the defense theory of the case that Mr. Fontenot could not have committed this crime because of his alibi and false confession. Having these statements would have tied in with the interview report of Anthony Johnson. These calls upset her to the extent where she inquired about buying a gun. Mr. Johnson, a frequent customer at McAnally's, remembered a conversation he had with her a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Haraway's disappearance he was in the McAnally's convenience store when Haraway asked him where she could buy a gun. Haraway referenced the need for a gun with some funny calls she had recently been receiving. Haraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making these call and said that Johnson the opinion that she knew who was making the calls but did not seem to want to indicate who it was.

(Ex. 22). With such evidence, the defense could have pursed other witnesses who would have known of Mrs. Haraway's fears and potentially identified the alternate suspect.  Further, just two days before Mrs. Haraway went missing, she spoke with Darlene Adams, another customer at

McAnally's. Mrs. Haraway explained she was afraid working at night at the store but her schedule would not be changed.[23] (Ex. 3).

The State failed in two regards concerning this information. First, this evidence should have been investigated in 1984, given the information willingly provided by those closest to Mrs. Haraway. This is not a situation where only one person made a side comment about a few weird telephone calls. Instead, numerous people including her husband, manager, co-worker, customers, and sibling were aware of this conduct. They immediately shared this information with police in the hopes that it would assist in their investigation into her mysterious disappearance. Instead, the police ignored it completely.  At the time, it would have been possible for law enforcement to pull McAnally's telephone records to see who called the store. Further, OSBI and APD could have cross-referenced callers with customers.

Second, the police or prosecution never shared this information with defense counsel. This evidence should have been disclosed because it clearly points to another person who watched and threatened the victim and could have generated additional exculpatory evidence if investigated. *See Bowen*, 799 F.2d at 613.

### D.      Prejudice from The Non-Disclosure Of Exculpatory Evidence

Neither defense counsel nor their investigators had access to the OSBI or APD reports showing any alternate suspects, witnesses supporting Mr. Fontenot's alibi, the original identification of Karen Wise, the stalker of Mrs. Haraway, and the inconsistent statements of Gene Whelchel, the Timmons, etc. during either the joint or second trial. Despite both trial and

---

[23] Another line of inquiry could have been to Monroe Atkeson, McAnally's store manager, about his awareness of Mrs. Haraway's fear about working in the store.  Mr. Butner could have cross-examined about the obscene phone calls during her shift or why he refused to change her schedule given her statements about the weird men in the store.

appellate counsel's repeated requests and attempts to gain access to such crucial information, little to no evidence was disclosed. The withheld evidence clearly fell within the requested pleadings of defense that would have been used had it been provided. Mr. Fontenot's trial counsel, the Honorable George Butner received none of the evidence discussed above as "newly discovered evidence of innocence" or "Brady" material.

I represented Karl Fontenot from late 1984 through 1988, for Karl's first and second trials. I did not represent Karl during his appeals. I handled all pre-trial and trial matters for both trials including the preliminary hearing. During the scope of my representation, I filed numerous pretrial motions requesting discovery and disclosures of records, physical evidence, investigation reports, witness statements, records, and other evidence pertaining to the disappearance and homicide of Donna Denice Haraway. Additionally, I made numerous motions on the record during the preliminary hearing and at various points in the trial asking for access to evidence, police reports, and other evidence within the custody of law enforcement and Pontotoc District Attorney's Office. In most cases, these requests were denied.

Tiffany Murphy, Director of the Oklahoma Innocence Project, provided me with 860 pages of Oklahoma State Bureau of Investigation reports (OSBI) of their investigation of Donna Denice Haraway's disappearance, Central Office of the Chief Medical Examiner's file, and photographs of McAnally's register tape from 4/28/1984. After reviewing these materials, I did not receive any of the OSBI Reports from the Pontotoc District Attorney's Office or from OSBI prior to either of Mr. Fontenot's trials. Additionally, I do not believe I received the whole 44 pages of ME's Office files. While I know the McAnally's register tape was admitted at trial as a state's exhibit, I received no police reports about the names, telephone numbers, and times of the men mentioned on the tape regarding any interviews related to the events of April 28, 1984.

During both trials, my main focus was proving Mr. Fontenot's innocence. Any evidence which would support proving his innocence was paramount. Evidence that the law enforcement investigation strongly considered alternate suspects for Ms. Haraway's abduction and murder would have been evidence that fit in the defense's innocence case. I was unaware of the extensive investigation done into Floyd DeGraw by Ada Police Detective Dennis Smith, OSBI Agents Gary Rogers and Gary Davis. I did not know he was poly-graphed by Agent Davis and that DeGraw showed indications of deception when asked about Ms. Haraway. Further, when DeGraw was interrogated by Davis and Texas law enforcement, he grew agitated when asked about Mrs. Haraway and abruptly ended the interview. Police reports related to DeGraw's investigation, his rape conviction in Texas, and the

possessions of belonging from Oklahoma women would have been extremely important to Mr. Fontenot's case.

Further, I was unaware that Ms. Haraway received obscene phone calls while at work during the months and weeks leading up to her disappearance. I never saw reports from various people like Monroe Atkeson, Janet Lyons, James David Watts and others describing Ms. Haraway's great concern about a man making obscene phone calls only while she worked at McAnally's. Janet's report providing the names of all of Ms. Haraway's ex-boyfriends would have been extremely helpful to determine if they were the source of these calls or had motive to cause her harm. Also, Janet's comment that Ms. Haraway hated working at McAnally is because it did not have an alarm, her knowledge that the obscene phone calls continued to occur, and the bizarre people who came into the store at night would have been helpful to establish Karl's innocence. These OSBI reports would have been extremely helpful to further the defense investigation into alternate suspects or people around McAnally's who were watching Ms. Haraway.

I was unaware of the numerous OSBI reports supporting Mr. Fontenot's alibi of attending Gordon Calhoun's party during the time Mrs. Haraway went missing. Impeachment evidence from the OSBI reports regarding Gordon Calhoun's interview that the party could have been the weekend of April 27th or 28th was vital. This information ·would have helped substantiate Karl's alibi during the time Ms. Haraway disappeared. Janette Roberts' report about the party and Karl's attendance was important because I would have called her to testify during the defense case-in-chief. I was unaware that Ada Police Officer Larry Scott responded to one of the dispatch calls listed on the state's radio log exhibit.  Officer Scott's police report about responding to Gordon Calhoun's party supported the alibi that the police were aware of the party. Finally, I was not provided Karl's poly-graphed statement were he admits being at the party. Such evidence would have been extremely useful to build a viable defense that Karl had nothing to do with Mrs. Haraway's disappearance and homicide.

(Ex. 16). There is no doubt the impact this evidence would have had on either of Mr. Fontenot's trials or how Mr. Butner would have utilized such evidence. P/H. p. 496, 502-503, 769; J/T p. 1816-1817. Instead, defense counsel during both trials lacked the necessary evidence to provide not only a viable defense to the state's charges, but an alternative theory of the crime, several alternate suspects, along with impeachment evidence for many of the State's witnesses. It is

evident, that the absence of such exculpatory evidence, Mr. Fontenot, "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. The egregious conduct by the State extends beyond trial through Mr. Fontenot's direct appeal when the state discovered the remains of the victim. Appellate counsel properly sought discovery of relevant evidence including the medical examiner's reports, police reports, crime scene information, and other related evidence. (Ex. 57 & 58). The trial court granted her access to such evidence; the State continued to withhold the full medical examiner's report, photographs of the crime scene and other relevant evidence that would assist in her appeal. (Ex.59).

> During my representation of Mr. Fontenot in his first direct appeal, skeletal remains later identified as Donna Denice Haraway were discovered on approximately January 20 or 21, 1986, near Gerty in Hughes County, Oklahoma. Due to the timing of this discovery and the unique circumstances of the case, and in anticipation of filing a motion for new trial based on newly discovered evidence, I filed a Motion to Disclose and Produce in Pontotoc County District Court on January 30, 1986, regarding the discovery of the remains, the condition of the remains and the Hughes County crime scene, and any interviews, reports, or investigations in connection therewith. I further requested all material which was exculpatory or favorable to Mr. Fontenot, which might be used to impeach prosecution witnesses who had testified at his trial, or which might lead to the discovery of same. At a hearing on this motion conducted March 3, 1986, I made a supplemental discovery request asking for all statements placing or tending to place any other suspect or suspects at or near the location of the discovery of Ms. Haraway's remains.

> On March 3, 1986, the Pontotoc County District Court entered an Order granting all of my discovery requests excepting only oral statements never reduced to writing. In granting my motion, the district court ordered, inter alia, that reports, medical examiner findings and photographs pertaining to the discovery of the remains, the examination of the remains, the analysis of the remains and any other physical evidence uncovered at the crime scene be produced. Based upon this Order the Pontotoc County District Attorney's Office disclosed to me two pages of Oklahoma State Bureau of Investigation (OSBI) Criminalistics Examination Reports and three pages of reports from the Office of the Chief Medical Examiner for the State of Oklahoma. These five documents were appended to the Motion for New Trial on Newly Discovered Evidence I filed with the Oklahoma Court of Criminal Appeals on August 8, 1986. These five documents were the entirety of the records disclosed to me by the State.

In the fall of 2012, Tiffany Murphy contacted me regarding the Oklahoma Innocence Project's (OIP) review of Mr. Fontenot's case. We discussed what law enforcement reports and records were disclosed to me in connection with the above-described discovery proceedings. Ms. Murphy questioned me concerning approximately 860 pages of Bates stamped OSBI reports, which I did not recall ever having seen. In March of 2013, I reviewed approximately 860 pages of Bates-stamped OSBI reports, apparently obtained by OIDS after I left employment there. After I reviewed these documents, I confirmed to Ms. Murphy that I do not recall ever having seen them before, although I had seen the two OSBI documents and three medical examiner documents described in the previous paragraph when they were disclosed to me by the Pontotoc County District Attorney's office but without Bates stamps on them. In April of 2013, the OIP sent me additional police reports, witness statements and other documents for my review to ascertain whether they were disclosed to me during my representation of Mr. Fontenot.

During litigation of Mr. Fontenot's direct appeal and his motion for new trial based on newly discovered evidence, my main focus was his innocence. To that end, any evidence which would support proving his innocence was paramount. Evidence that law enforcement strongly considered alternate suspects for Ms. Haraway's abduction and murder would have fit into the defense's case for innocence.

(Ex. 11). Neither counsel for Mr. Fontenot was required to continue to seek such evidence. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that defense counsel is not required to scavenge for evidence the State was obligated to disclose). Instead they are entitled to rely on the prosecution to do its job in meeting its constitutional obligations to disclose such evidence. "Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed. As we observed in *Strickler*, defense counsel has no 'procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.'" *Banks*, 540 U.S. at 695-696.

This Court's evaluation of Mr. Fontenot's Brady claim rests on whether the evidence puts the case within an entirely different light concerning the evidence presented at trial and that

which was impermissibly withheld. When evaluating the evidence withheld, the Court must

conduct a cumulative evaluation of the evidence.

> While the definition of Bagley materiality in terms of the cumulative effect of
> suppression must accordingly be seen as leaving the government with a degree of
> discretion, it must also be understood as imposing a corresponding burden. On the
> one side, showing that the prosecution knew of an item of favorable evidence
> unknown to the defense does not amount to a Brady violation, without more. **But
> the prosecution, which alone can know what is undisclosed, must be assigned
> the consequent responsibility to gauge the likely net effect of all such evidence
> and make disclosure when the point of "reasonable probability" is reached.
> This in turn means that the individual prosecutor has a duty to learn of any
> favorable evidence known to the others acting on the government's behalf in
> the case, including the police.**

*Kyles v. Whitley*, 514 U.S. at 437 (emphasis added). A cumulative assessment of the evidence

presented cases clear doubt on an already weak case against Mr. Fontenot. *See id.* at 436.  There

was no physical evidence connecting him to McAnally's, Mrs. Haraway, or her abduction and

murder.

Further, the only witness who claims he saw Mr. Fontenot at McAnally's, on the night in

question, tried to recant his identification at Mr. Fontenot's second trial and has affirmatively

done so now. (Ex. 14). The evidence of Mr. Fontenot's presence at Gordon Calhoun's party for

the entirety of the night and the investigative leads that evidence led to clearly show a reasonable

probability of a different result had this evidence been made available. The only evidence

remaining in the State's arsenal is Mr. Fontenot's confession; a confession which lacks any

factual support and caused the State's own detectives to doubt its veracity as of the preliminary

hearing.[24] The State's failure to disclose these records and its resistance to disclosing the

---

[24] Q. Okay, And so you didn't believe anything they had said previously, did you? You didn't believe that, did you?
A I believed part of it.
Q You believed part of it, but you don't believe all of it. What part do you believe? What parts do you believe?
A Well, I believe that they're the ones that did kidnap her.

remainder of the outstanding evidence resulted in a Fourteenth Amendment Due Process violation.

### III.    MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO INVESTIGATE THE CASE AND PRESENT VIABLE EVIDENCE SUPPORTING HIS INNOCENCE

A trial counsel's function "is to make the adversarial testing process work in the particular case." *Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). To prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that counsel's representation fell below an objective standard of reasonableness, and that the deficient performance prejudiced the defendant, *Strickland*, 466 U.S. at 693, 104 S.Ct. 2067 and thus create a "reasonable probability" of a different result. *Id.* at 694. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2001).

Deficient performance is "measured against an objective standard of reasonableness under prevailing professional norms." *Rompilla*, 545 U.S. at 380. Courts "long have referred" to the American Bar Association standards on the performance of counsel "as guides to determining what is reasonable." *Id.*; *Wiggins*, 539 U.S. at 524; *Strickland*, 466 U.S. at 688.

---

Q Okay. But you didn't believe the part about Odell Titsworth, you proved that to be wrong, didn't you?
A That's correct.
Q. Didn't believe the part about the pickup, you proved that to be wrong, didn't you?
A Yes.
Q And you didn't believe the part about where the body is, because you went and looked. You don't believe that, do you?
A No, sir,
Q So you want this Judge to pick and choose what you're picking and choosing, is that right? What to believe, is that right? Now, Detective, I didn't hear the response, was there a response?
A (No audible response)
P/H p. 538-539 (George Butner cross examination of Detective Mike Baskins).

[T]he American Bar Association Standards for Criminal Justice in circulation at the time of [Mr. Fontenot's] trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. **The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty**.

ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)(emphasis added); *see also Rompilla*, 466 U.S. at 400.  Counsel's performance fell below an objective standard of reasonableness in this case for several reasons. First, counsel failed to present evidence showing Mr. Fontenot's innocence of the charged actions when his co-defendant made statements exculpating him of the crime. Second, counsel neglected to investigate evidence showing that Mrs. Haraway was being stalked by someone familiar to her. Finally, defense counsel failed to impeach numerous State witnesses about their inconsistent statements.

A.     **Trial Counsel Was Ineffective for Failing to Introduce Tommy Ward's Sworn Statement Made During the Preliminary Hearing Exculpating Mr. Fontenot from Involvement in Mrs. Haraway's Case.**

During the preliminary hearing, Tommy Ward made a statement during a closed court hearing where he admitted being at both JP's and McAnally's the night of April 28, 1984. Present during the hearing, besides the trial judge and court reporter were: Tommy Ward, Don Wyatt, Mr. Ward's defense counsel; Bill Peterson and Chris Ross for the District Attorney's Office, along with Ada Detectives Dennis Smith and Mike Baskins, and several members of the Pontotoc County Sheriff's Office. Mr. Butner was also present, although Mr. Fontenot was not at

this hearing.  He had the opportunity to cross-examine Mr. Ward during the closed session and

availed himself of this opportunity. *See* (Ex. 60 at 27).  Mr. Wyatt advised Mr. Ward of the

repercussions of making this statement. Mr. Ward's testimony detailed how he and Marty Ashley

left Jay Dicus' apartment together in Mr. Ashley's truck travelling to both convenience stores

before speaking with Mrs. Haraway.

> Defendant: And then we went from there [JP's] to McAnally's.
> Mr. Wyatt: You stopped at McAnally's?
> Defendant: Uh-huh.
> Mr. Wyatt: Did you go in?
> Defendant: Yeah.
> Mr. Wyatt: Did Discus – or Ashley go in?
> Defendant: yeah.
> Mr. Wyatt: Why did you stop there?
> Defendant: To get a beer.
> Mr. Wyatt: What happened when you got inside?
> Defendant: I walked back towards the back to get a beer, and Marty started talking to Donna (Denice Haraway), and-- Mr. Wyatt: Did Marty know Donna?
> Defendant: Yeah.
> Mr. Wyatt: How long had he known her?
> Defendant: I don't know.
> Mr. Wyatt: But they knew each other?
> Defendant: Yeah. They, you know, acquainted each other when he come in.
> Mr. Wyatt: What happened?
> Defendant: He started flirting with her and she told him that he was married – I mean she was married. And then after she told him that she was married he goes, "You must not be happily married because if you was happily married you wouldn't have to be working." And then he starting hinting around to her about saying, "Well, if you marry me, and everything, you wouldn't have to do nothing, like this or anything."
> Mr. Wyatt: Okay. Now, where were you when this conversation took place?
> Defendant: I was getting ready to walk on back towards the back. And then I was kind of listening to them, you know, because I thought it was kind of funny, you know, after her saying that she was already married and everything, and then – so then I went on back to the back and then when I come on back up to the front he bent over the counter and kissed her. And then he walked out the door. And then I walked on up and payed for the beer. Then after I payed [sic] for the beer she come around the counter and went out the door and I walked out behind her. And then I walked out to the pickup, and then she – when I opened the door she goes, she was talking to Marty, and she goes, "Are you serious about what you're talking about?" And he goes, "Yeah." And so she jumped in the pickup with him. And then we

drove from there to my house, and that's when he let me out. It was about 9:00 when I got back to my house.

(Ex. 60). When asked whether Mr. Fontenot knew about Mr. Ward traveling with Mr. Ashley to the store, he testified that Mr. Fontenot did not participate in these events at all. *Id.* at 25. Further, Mr. Ward did not tell Mr. Fontenot of his involvement with Mr. Ashley until the very morning of the hearing, January 9, 1985.[25] *Id.* at 36. The sole reason he implicated both O'Dell Titsworth and Karl Fontenot during his confession came from Detective Smith's suggestion to do so. *Id.* at 27.

Mr. Ward's statement provided a stunning amount of detail involving who he was with, what he and Mr. Ashley did and bought at both stores, along with evidence coinciding with details from the case. He explained his purchase of a beer in the cooler at McAnally's, drinking some of it and leaving it on the counter after Mr. Ashley and Mrs. Haraway exited the store. *Id.* at 30. The last transaction on the McAnally's register tape shows $.80 for a Tallboy beer. (Ex. 34), (Ex. 43, prosecutorial bates 22), (Ex. 44, OSBI 0495). According to his statement, the cigarette Lenny Timmons saw in the store belonged to Mr. Ward. (Ex. 60 at 30); J/T p.1089. All three, Mr. Ashley, Mr. Ward, and Mrs. Haraway, drove away in a gray, Chevy pickup truck that belonged to Mr. Ashley. J/T p. 1682.

When Lenny Timmons entered the store around 8:30 pm on April 28, 1984, he described passing a man and woman leaving the store, getting into a pickup truck, and driving away. N/T 6-9-88 p. 34. At the time, he paid little mind to the couple until he realized the store clerk was missing. After alerting his brother, David, and uncle, Gene Whelchel, they continued to search

---

[25] Mr. Ward's statement would have been admissible during Mr. Fontenot's trial under under Okla. Stat. tit. 12 § 2408(B)(3) given that any statement made by Mr. Ward placing himself at McAnally's around the time of Ms. Haraway disappeared is clearly against his penal interest. To the extent that Mr. Butner failed to prove Mr. Ward was unavailable to testify is part of his ineffectiveness in failing to present this evidence.

the store before calling police. All three men described a sole man climbing into the pick-up truck with a woman they believed to be Mrs. Haraway. P/H p. 269-270, 308-313; N/T 6-9-88 p. 38, 47-48, 56. During Mr. Ward's statement, he explained that he was the man walking Mrs. Haraway out of the store that evening. (Ex. 60, p. 9).

After Mr. Ward's statement, the police interviewed Marty Ashley and several other people Mr. Ward mentioned. All of these interviews have yet to be disclosed other than the taped statement of Marty Ashley.[26] (Ex. 66). Detective Smith, along with Chief of Police Fox interviewed Mr. Ashley at the Paul's Valley Police Station on January 10, 1985, the day after the closed session. When asked both during the interview and on cross examination during the joint trial where he was on April 28, 1984, he could provide no answer.[27] (Ex. 66; J/T 1678).  Mr. Ashley, along with this girlfriend Theresa Mantzke, acknowledged living in Ada at the time of Mrs. Haraway's disappearance but moving to Ardmore very early in May 1984. J/T at 1720. She also could not recount where Mr. Ashley was on April 28, 1984, but he was not with her. J/T at 1724. The police failed to inquire whether Mr. Ashley owned or had access to a pick-up truck, which he did. J/T at 658, 1682.

Mr. Ward's statement should have been used by Mr. Fontenot's defense counsel in his trial. Clearly, this statement would have been admissible under Title 12 § 2804(B)(3) Admission

---

[26] The Ada Police interviewed Marty Ashley, Jay Dicus, Shelly Mantzke, Theresa Mantzke, and Jackie Mantzke to investigate all or part of Mr. Ward's statement, those reports should have been disclosed to Mr. Fontenot's defense counsel. The failure to do so by the State was a *Brady* violation if there was any impeachment or exculpatory evidence presented in these statements.  Given the nature of Mr. Ward's statement and the efforts the APD went into refuting it because of its significant impact on Mr. Fontenot's case, these interview statements are critical evidence. *See supra* Claim II.  Many of these individuals testified for the prosecution during the joint trial and Mr. Butner attempted to examine them without the benefit of knowing what prior statements they made to police. *See* N/T  9-17-1985 at 1646-1740.

[27] The police took a photograph of Marty Ashley during their interview. (Ex. 39,40). It is unknown whether police received any calls as to whether Mr. Ashley resembled the composite drawing or if they showed any other witnesses Mr. Ashley's photograph.

Against Penal Interest.[28] *See generally Funkhouser v. State*, 1987 OK CR 44; 734 P.2d 815 (OK 1987)(outlining the procedure for declaring a witness unavailable and explaining that there is no confrontation clause issue when there has been an opportunity to cross-examine the witness); *see also Britt v. State*, 1986 OK CR 99; 721 P.2d 812 (Ok. 1986).  That Mr. Butner failed to move the statement into evidence, address whether Mr. Ward was unavailable to testify in Mr. Fontenot's trial, and address any other evidentiary objections only exacerbates his ineffectiveness on this issue.  Defense counsel knew Marty Ashley had no alibi, his girlfriend was adamant he was not with her the day of the kidnapping, and both moved out of Ada days after Mrs. Haraway disappeared.  Not only does this evidence corroborate Mr. Ward's statement, it creates reasonable doubt as to Mr. Fontenot's involvement in anything related to the crimes against Mrs. Haraway.

Further, this was evidence that strongly supported the defense's case. He repeatedly requested in discovery motions, in motions in limine, and on the record his desire for exculpatory evidence and any evidence showing Mr. Fontenot's lack of knowledge and participation in the crimes against Mrs. Haraway. What better evidence to present but Mr. Fontenot's co-defendant explaining not only that his client was unaware of his criminal actions but that Mr. Fontenot was only told about such criminal activity the morning of January 9, 1985. There could be no strategic or tactical reason for such ineffective actions that deprived Mr. Fontenot of valuable evidence showing his innocence. Mr. Butner concedes his ineffectiveness for failing to present this evidence:

---

[28] The State introduced Mr. Ward's statement against him during his separate trial in 1989, through Detective Dennis Smith who was present and could testify to what occurred during the hearing. (Ward Vol. 6 p. 127-132). Since, Detective Smith testified in Mr. Fontenot's trial, defense counsel had the opportunity to introduce such crucial exculpatory evidence in similar fashion.

> During the preliminary hearing, Tommy Ward made a sworn statement during a closed hearing. I was present at the hearing along with Mr. Wyatt, counsel for Mr. Mr. Ward, Pontotoc County District Attorney Bill Peterson, Assistant District Attorney Chris Ross, and law enforcement. Mr. Ward gave a detailed statement about being present at JP's convenience store and McAnally's with Marty Ashley. Mr. Ward stated that Mr. Fontenot was not present having nothing to do with the events of April28, 1984. This statement was very helpful to Mr. Fontenot's case because it proved crucial evidence from his co-defendant that he had no involvement in Mrs. Haraway's disappearance. **While I used this statement in Mr. Fontenot's joint trial with Tommy Ward, I did not introduce it into evidence during Mr. Fontenot's second trial. I had no strategic reason for not using it. It clearly fit within my trial strategy to show Mr. Fontenot had nothing to do with Mrs. Haraway's homicide.**

(Ex. 16)(emphasis added).  Mr. Butner gave Mr. Fontenot deficient performance by failing to include this exculpatory piece of evidence during his trial.

In determining whether a defendant has been prejudiced by his trial counsel's deficient performance, a court must consider whether a defendant has suffered actual prejudice from his attorney's actions. Similar to *Brady*'s materiality standard, a defendant must establish those deficiencies were prejudicial, defined as errors that collective "undermine confidence in the outcome," and thus create a "reasonable probability" of a different result, *Strickland*, 466 U.S at 694.  As a court assesses whether a defendant suffered prejudice, she must assess the totality of the evidence before the factfinder. *Id.* at 695.  Given the absence of any independent physical evidence connecting Mr. Fontenot to the crimes against Mrs. Haraway, a cumulative evaluation of the evidence not presented to the jury including: the exculpatory statements by the co-defendant, along with the *Brady* materials not presented during trial including the alibi testimony, would have impacted the jury's deliberation and verdict. Failure to introduce Mr. Ward's statement resulted in ineffective assistance of counsel in violation of Mr. Fontenot's state and federal constitutional rights.

**B.    Trial Counsel Was Ineffective for Failing To Investigate Evidence Of Denice Haraway Being Stalked and Evidence Establishing A Different Motive For The Crime.**

1.    Defense investigation reports showing Denice Haraway's fear of obscene phone calls she received.

The trial court granted limited funds for investigation for Mr. Fontenot's second trial. Richard Kerner, who assisted Mr. Wyatt during the investigation for Tommy Ward worked for Mr. Butner prior to trial. During the course of his investigation, he found an important witness who would have provided not only an alternate motivation for the abduction of Mrs. Haraway but potential alternate suspects as well. Mr. Kerner interviewed Anthony Johnson, a frequent customer at McAnally's. Mr. Johnson remembered a conversation he had with Mrs. Haraway a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Harraway's disappearance he was in the McAnally's convenience store when Harraway asked him where she could buy a gun. **Harraway [sic] referenced the need for a gun with some funny calls she had recently been receiving. Harraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making these call and said that Johnson the opinion that she knew who was making the calls but did not seem to want to indicate who it was.**

(Ex. 22). (emphasis added). Defense counsel submitted a subpoena for Mr. Johnson's appearance for Mr. Fontenot's trial, but it was never served. (Ex. 71). Clearly Mr. Johnson was a witness that defense counsel sought to present during Mr. Fontenot's defense-in-chief, but Mr. Johnson never testified. There was no strategic or tactical reason not to present such evidence showing that Mrs. Haraway not only received obscene phone calls showing someone watching her and harassing her over a longer period of time prior to her disappearance, but also demonstrated true fear of this individual that she inquired about buying a gun. Not only should Mr. Johnson have

testified at trial, but defense counsel should have pursued such leads further. The failure to do so resulted in ineffective assistance of counsel for failing to call Mr. Johnson as a witness and for not developing such evidence.

**2.**  <u>Register tape showing witnesses who were in McAnally's in short proximity to her disappearance</u>

Detective Dennis Smith made numerous requests for people who were in McAnally's the night of Denise's disappearance to contact the APD as to the time they were in the store and the purchases made. (Ex. 27). In response to the APD request, at least four people contacted the police department to explain what purchases they made and what time they recalled being in the store. Their names, times, and, on occasion, contact information was included on the register tape. (Exs. 32-38). The State introduced the register tape into evidence at both trials and it was available to Mr. Fontenot's first direct appeal counsel. J/T at 1160 State's Ex. 16; N/T 6/9/1988 at 197; State's Trial Ex. 60. That neither defense counsel, at trial or appeal, reviewed the entirety of the register tape was ineffective.

Defense counsel's obligation to evaluate and investigate not only the factual witnesses the prosecution intended to call at trial but also the physical evidence supporting the case is a basic tenant of providing effective assistance of counsel. "Apart from any formal processes of discovery that are available, prosecutors and law enforcement officers have in their possession facts that defense counsel must know. Prosecutors will often reveal facts freely in the hope of inducing a guilty plea. If defense counsel can secure information known to the prosecutor, it will obviously facilitate investigation." ABA Standards for Criminal Justice 4-4.1 Commentary (2d ed. 1982 Supp.). Counsel's failure to fully evaluate the State's evidence introduced at trial resulted in crucial evidence which challenged the State's theory of the case going undeveloped.

94

Not only the four people who provided testimony as to what they witnessed in the store that night was extremely helpful, but the timing of their purchases along with the other transactions establish a very narrow window in which Mrs. Haraway could have disappeared. (Exs. 67 & 68). The State's theory rested largely on the testimony of David and Lenny Timmons and Gene Whelchel about the man and woman walking out of McAnally's were Mr. Ward and Mrs. Haraway. P/H at 349, 351, 368 & N/T 6/14/1988 at 26-28. All three men describe seeing only one man in the truck. N/T 6/9/1988 p. 38, 40, 47-48, 51, 59-60. The description they provided resembled Mr. Ward. P/H at 341. Had the defense utilized the information gleaned from the register tape new areas of inquiry could have been developed at trial. First, the witnesses would have narrowed down the window of her disappearance based on Mr. Keyes' transaction at 8:25 pm and the four purchases immediately after his.  Additionally, it lent credence to Mr. Ward's statement of kidnapping Mrs. Haraway with Mr. Ashley.

In the alternative, defense counsel could have used the information presented by Mr. Haney of a man seen in McAnally's behind the counter with Mrs. Haraway. The grey primered truck described by several witnesses was in the McAnally's parking lot at least thirty minutes before Mrs. Haraway's abduction. (Exs. 6 & 4). However, this evidence was not developed by the defense. This evidence considered cumulatively with the records impermissibly withheld by the State presents a viable defense that the man harassing Mrs. Haraway for months and weeks leading up to April 28th, was involved in her disappearance. *See supra* Claim II; *Williams v. Taylor*, 529 U.S. 362, 399, 120 S. Ct. 1495, 1516, 146 L. Ed. 2d 389, 421 (2000)(holding that a cumulative review of ineffective assistance of counsel claims requires both evidence presented at trial and not presented); *Wiggins v. Smith*, 539 U.S. 510, 538, 123 S. Ct. 2527, 2544, 156 L. Ed. 2d 471, 495 (2003); *Rompilla v. Beard*, 545 U.S. 374, 393, 125 S. Ct. 2456, 2469, 162 L. Ed. 2d

95

360, 379 (2005).

Finally, defense counsel could have interviewed Gene Whelchel about the 9:00 pm transaction. An investigator could have inquired who rang up the purchase, what the purchase was, and why the crime scene was not immediately closed down upon the arrival of Officer Harvey Philips and Detective Mike Baskins. This line of investigation could establish how vital the evidence was lost due to improper police procedure. J/T at 1239-1240, 1422-23, 1439, 1441, 1447-48. Defense counsel could have impeached Mr. Whelchel about the timing of events, inquired more specifically as to those present in McAnally's after his initial call, and whether the State's timing was off given the details provided on the register tape. Evidence presented at trial showed the police failed to close the store to process the scene as other customers bought gas and items from the store. N/T 6/9/1985 at 92-93. Since it is clear the police seized the register tape, their documentation of the times of transaction goes to the thoroughness of their investigation. Solidifying the timing of the only eyewitness accounts and the immediate actions of the police in response to this evidence was crucial for the defense. Their failure to pursue this evidence deprived Mr. Fontenot of numerous means to challenge the State's case.

It is the defense counsel's duty of to investigate all aspects of the State's case including the physical evidence introduced in trial. "The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense," is an obligation set forth in the ABA Standards regarding the baseline of representation a defense attorney must provide his client. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). Defense counsel failed to investigate viable leads and build such evidence into a defense he sought to pursue. (Ex. 16). Further, appellate counsel, likewise, should have pursued this

evidence in building a defense for Mr. Fontenot. (Ex. 11). It is not enough that the defense reviewed this evidence in court, but prior to the proceedings.

Defense counsel's failure to investigate Mr. Fontenot's case due to limited funding does not negate his constitutional obligation. This Court must determine the impact of the absence of this evidence on the totality of his case. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S 510, 527 (2003). All of the evidence mentioned was available to defense counsel pretrial, but none of it was presented to the jury. Had it been, there is a reasonable probability of a different result due to the weakness of the State's case against Mr. Fontenot. *See Strickland*, 466 U.S. at 694. The State's case rested on Mr. Fontenot's confession which did not coincide with any evidence the State presented, including the cause of Mrs. Haraway's death, the location of her remains, and the details of how he supposedly killed her. (Exs. 18, 45, & 68). Further, the sole eyewitness at McAnally's who places Mr. Fontenot at the scene recanted his testimony after the preliminary hearing and attempted to tell the State the same. J /T at 1042, 1051-52, 1056-1057; Ex.14. But for defense counsel's failure to challenge the evidence the State clearly would present, Mr. Fontenot would not have been convicted of these crimes. The failure to investigate this evidence deprived Mr. Fontenot of his Sixth Amendment right to effective assistance of counsel.

**IV.   MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WAS VIOLATED WHEN HIS APPELLATE COUNSEL FAILED TO PRESENT VIABLE CONSTITUTIONAL CLAIMS IN MR. FONTENOT'S DIRECT APPEAL PROCEEDINGS.**

The claims and factual allegations set forth elsewhere in this Petition and in the attachments hereto are incorporated by reference and re-alleged as if set forth in their entirety herein.  Under *Strickland v. Washington*, 466 U.S. 668 (1984) counsel provides ineffective assistance whenever (1) counsel's performance is deficient, i.e., that the attorney's performance fell below "an objective standard of reasonableness," *id.* at 688; and (2) those deficiencies were prejudicial, defined as errors that collective "undermine confidence in the outcome," and thus create a "reasonable probability" of a different result, *Id.* at 694.  *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2001).

Mr. Fontenot suffered ineffective assistance of counsel on direct appeal because appellate counsel failed to raise substantial and cognizable state and federal constitutional issues, and failed not raise all available grounds, on his direct appeal to the Oklahoma Court of Criminal Appeals.  These substantial and cognizable constitutional issues are raised as claims herein, and Mr. Fontenot would incorporate by reference the factual allegations, allegations of prejudice, and arguments as set forth here in full.

There was no strategic or tactical reason for not presenting these claims in Mr. Fontenot's second direct appeal brief.  Had appellate counsel raised these issues, it is likely that the Oklahoma Court of Criminal Appeals would have reversed his conviction and ordered a new trial.  Because appellate counsel's failure to raise substantial and cognizable constitutional claims deprived Mr. Fontenot of appellate review of the constitutional errors inherent in his trial, the reliability of the judgment and sentence, and sentence in this case is questioned.

98

## V.   MR. FONTENOT'S DUE PROCESS RIGHTS WERE VIOLATED DUE TO POLICE MISCONDUCT WHEN TAKING A FALSE CONFESSION AND THE PROSECUTION KNOWINLY INTRODUCED FALSE TESTIMONY DURING HIS TRIAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

### A.   Police Misconduct in The Interrogations of Mr. Fontenot

On October 19, 1984, at the OSBI office in Ada, Oklahoma, detectives videotaped the Mr. Fontenot's "confession" to the murder of Denice Haraway. Agent Gary Rogers and Detective Dennis Smith conducted a one hour and forty-five minute interrogation that was not included on the videotape. P/H. at 960-61; J/T at 2034, 2047. Prior to the interrogation, Detective Smith acknowledged that Mr. Rogers read Mr. Fontenot his rights, but no *Miranda* form was ever presented to him nor did Mr. Fontenot ever sign a form. P/H at 956-957; *Miranda v. Arizona*, 384 U.S. 436 (1966). Although Mr. Fontenot's interrogators deny ever having threatened or coerced him,[29] it is indisputable that during the time prior to turning on the video recorder, the interrogators supplied Mr. Fontenot with the information that Tommy Ward had confessed to the murder of Mrs. Haraway and inculpated Mr. Fontenot in his confession.[30] P/H at 960. Even though. Mr. Fontenot denied knowing anything about Mrs. Haraway's disappearance or what Mr. Ward's confession involved, both interrogators ignored his denials continuing to assert his knowledge of committing the crimes. P/H at 961-962. Agent Rogers and Detective Smith began feeding Mr. Fontenot information about the crime to aid in his confession.

> A. Well before his story changed, I think Agent Rogers mentioned to him that we knew that he and Tommy Ward and Odell Titsworth were at a party on South Townsend.

---

[29] This statement is dubious at best given the other witnesses who admit being pressured to alter their accounts: Stacy Shelton, Karen Wise, and Jim Moyer.

[30] Mr. Ward's confession was the product of hours of interrogation. After police repeatedly insisted it was in Mr. Ward's self-interest to admit to the murder of Denice Haraway, even after he denied any involvement, he told police that he had a dream about the murder. Mr. Ward's description of the dream was considered a confession by police, but was not corroborated by any credible evidence.

Q. Okay.
A. And we knew that they had left the party and where they had gone.
Q. Okay. All right. What else did you tell him, or Agent Rogers tell him?
A. I think that was basically the extent of it and ---
Q. Was the name Odell Titsworth mentioned prior to Agent Rogers mentioning it?
A. I don't think so.

P/H. at 964. Telling Mr. Fontenot details of Mr. Ward's confession and feeding Mr. Fontenot

O'Dell Titsworth's name, not only planted information in Mr. Fontenot's mind that became part

of his confession, but resulted in the creation of completely incredible evidence that supported

nothing else in the case nor did it lead to new evidence inculpating either co-defendant in the

crime.[31]

The confession included several facts that could not be corroborated with any evidence.

According to his confession, Mr. Fontenot attended a party with his co-defendant, Tommy Ward,

and Odell Titsworth.[32] (Exs. 19 & 69). The three men drove to McAnally's in Mr. Titsworth's

truck, where they abducted Denice Haraway and subsequently took her out behind a power plant

in Ada. The three men took turns raping the victim before transporting her in Mr. Titsworth's

truck to a house off of a country road near the power plant. At the house, Haraway was stabbed

to death, and burned. See (Ex. 69, pgs. 1-21). Finally, Mr. Fontenot did not know Mr. Titsworth

prior to being shown his picture and presenting Mr. Titsworth to Mr. Fontenot's jail cell. P/H at

968, 994-995.

After investigating these claims, police discovered that nothing in Mr. Fontenot's

confession could be verified. First, the police eliminated Mr. Titsworth as suspect due to his

broken arm on the night in question. Furthermore, neither Mr. Titsworth nor his family owned a

---

[31] False confessions occurred in 13% of the 1,730 known exonerations in this country. *See* https://www.law.umich.edu/special/exoneration/Pages/about.aspx (last visited 1/22/16).
[32] It is interesting that police disclosed the videotaped confession to Mr. Butner, but failed to include the polygraphed and handwritten statement where he detailed being at the party and people he was present with.

truck similar to the one described in Karl's statement. P/H at 965. The medical examiner's report

shows Mrs. Haraway was not stabbed as Mr. Fontenot said, but died from a single gunshot

wound to the head. *See* (Ex. 46, pgs. 1, 3, 12, 40). Finally, the house Mr. Fontenot claimed had

been burned with Mrs. Haraway's body inside, actually was burned a year before the murder

occurred. P/H at 977. These discrepancies, along with the fact that the details of Mr.

Fontenot's confession changed several times before the police recorded it, leaves one to question

how such a confession could be made, much less considered reliable. *See* P/H at 973-74, 1372,

1420-1421.

Police interrogations, by its very nature are coercive. However, police are trained to

investigate a case before interrogating suspects so as to ensure only the strongest suspects in are

subjected to the process.

> There are three important decision points in the interrogation process to analyze
> when trying to understand the causes of a false confession. The first decision point
> is the police decision to classify someone as a suspect. This is important because
> police only *interrogate* individuals whom they first classify as suspects; police
> *interview* witnesses and victims. There is a big difference between interrogation
> and interviewing: unlike interviewing, an interrogation is accusatory, involves the
> application of specialized psychological interrogation techniques, and the ultimate
> purpose of an interrogation is to get an incriminating statement from someone
> whom police believe to be guilty of the crime. **False confessions only occur when
> police misclassify an innocent suspect as guilty and then subject him to a
> custodial interrogation. This is one reason why interrogation training manuals
> implore detectives to adequately investigate their cases before subjecting any
> potential suspect to an accusatorial interrogation**.[33]

---

[33] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS,
Third Edition (Baltimore, MD: Williams & Wilkins) at 3 ("Prior to the interrogation, and preferably before any
contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case."). *See
also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND
CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there
must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation
conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors
suggest, therefore, that a good guideline to follow is "investigate before you interrogate".").

The second important decision point in the process occurs when the police interrogate the suspect. As mentioned above, the goal of police interrogation is to elicit a voluntary incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically persuasive, manipulative and deceptive interrogation techniques.  As described in detail in the previous section, police interrogators use these techniques to accuse the suspect of committing a crime, persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then induce him to confess by suggesting it is the best course of action for him. **Properly trained police interrogators do not use physically or psychologically coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions and/or confessions.**

To understand how and why police-induced false confessions occur, one must first understand how interrogation is intended to influence and manipulate a suspect's perceptions, reasoning and decision-making. **Police interrogation is designed for the guilty, not the innocent. Police are trained only to interrogate suspects whom they believe to be guilty,[34] and the purpose of interrogation of suspects unlike the interviewing of witnesses or victims is to elicit an incriminating statement, admission and/or confession that confirms the interrogator's belief in the suspect's guilt and assists the state in prosecuting the suspect**. Because police expect the suspect to deny his guilt, interrogation is intended to break down the suspect's resistance and move him to admission. As discussed above, police typically achieve this by accusing a suspect of committing the crime, attacking the suspect's alibi, cutting off a suspect's denials and confronting the suspect with seemingly irrefutable (whether real or non-existent) evidence of his guilt. The point of these techniques is to break down a suspect's confidence in his denials by convincing him that he is caught, that no one will believe his assertions of innocence, and that objective evidence of his guilt is so overwhelming that it will inevitably lead to his arrest and conviction regardless of what he says or does during interrogation.

(Ex. 19, p. 11) (emphasis added). Here, Detective Smith admitted Mr. Fontenot was unknown to

the police prior to his arrest. P/H at 948. He had never been involved in any crimes or

interrogated prior to the events of October 19, 1984. J/T at 1607-1608. The only reason Mr.

---

[34] *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Fontenot was arrested and subjected to this interrogation is because Mr. Ward mentioned him during his interrogation the day before based on a suspect lead provided by Jeff Miller. Prior to being arrested, no other individual provided any inculpatory evidence connecting Mr. Fontenot to Mrs. Haraway other than Mr. Ward. Law enforcement is trained to conduct a thorough investigation into the suspects prior to commencing the interrogation of to ensure the evidence given is valid. (Ex. 19).

> The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. **If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt.**

(Ex. 19, pgs. 15-16).

No investigation was done into the possibility of Mr. Fontenot being involved other than Mr. Ward's confession the day prior. Such lax police investigation prior to the interrogations led to the wild goose chase which followed in the days and weeks after these confessions where nothing either defendant said could be verified.

> If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. **Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence.** Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes

as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

*Id.* at 19-20 (emphasis added.). At every turn, law enforcement uncovered absolutely no evidence from the "confession." Mr. Fontenot described Mr. Titsworth as 5'10" to 5'11' and weighing approximately 140-150 pounds. His hair length was just below his ears and Mr. Titsworth had no distinguishing marks or tattoos. J/T at 2074-75. In actuality, Mr. Titsworth's hair fell to mid-waist, he weighed 170 lbs. and had sleeve tattoos from his shoulders to his wrists, tattoos along his back, stomach and both legs. Further, the Ada police broke his arm during his arrest two days prior to Mrs. Haraway's disappearance. P/H at 792-793, 795797, 838. When Mr. Fontenot was shown pictures of Mr. Titsworth, he was unable to identify him. P/H at 968, 994-995. Police interrogated Mr. Titsworth along with seizing his mother's truck. After the police searched the truck and after Mr. Titsworth's repeated denials and verification of his broken arm, they realized neither he nor his property had anything to do with the crime. P/H. at 520, 522. Police repeatedly tried to locate Mrs. Haraway's remains at the power plant and surrounding areas with no success despite seventy-five to eighty people being involved in the search. P/H at 599-600; N/T 6/10/1988 at 83-85, 89-90.

During the preliminary hearing, defense counsel asked Detective Baskins if he was able to corroborate any parts of Mr. Fontenot's confession.

Q. Has he told you anything that you have been able to ascertain is the truth? You personally?
A. No.
Q. No fact in his statement, you have been able to prove right or wrong have you?
A. No.
Q. To the best of your knowledge, Detective Baskins, has any statement that Karl Fontenot made to you been – any fact, at all, been proven true or false? Any fact?

A. To me personally, no.

Q. Now, what about Tommy Ward? Any fact that Tommy Ward has told you, have you proven or disproven any fact that he's told you?

A. The ones he's told me personally, disproved.

Q. So the ones he's told you personally and the facts about this case and the statements he's made, no facts have you been able to prove. Is that right?

A. That he's made to me personally?

Q. Yes, sir.

A. That's correct.

P/H at 546-547. Detective Baskins attempted to locate the crime scene based on the evidence proffered by Mr. Ward's and Mr. Fontenot's confessions. He received a series of telephone calls from Agent Rogers and Detective Smith on possible locations based on the "evidence" given in the confessions. However, after numerous searches, only animal bones were recovered. N/T 6/10/1988, at 169. In the totality of their investigation, the police lacked any evidence or eyewitness accounts support Mr. Fontenot's confession. *Id.* at 178-179.

Due to the inability of law enforcement to support their confessions with any meaningful evidence, they resorted to several improper actions to garner viable evidence from Mr. Fontenot. After the confession, but before he was arraigned, Detectives Smith and Baskins took a sack of human bones to his cell in an attempt to coerce Mr. Fontenot to tell them the whereabouts of the victim's body. N/T. 6/10/1988 at 172. Police showed Mr. Fontenot a human skull stating that they had found Mrs. Haraway, and wanted to find the rest of her remains, so that her family could proceed with giving her a Christian burial. P/H at 537, 559, 981-82. These bones were actually obtained from a science lab at East Central University in Ada and used improperly as a tool to scare more information out of Mr. Fontenot. P/H at 975-76. Although this tactic was used after a confession had already been obtained, it is illustrative of the coercion surrounding Mr. Fontenot's confession and the desperation of the police. The police were on a mission for any evidence with no regard for the truth.  The idea that Mr. Fontenot was innocent, therefore he

could provide no accurate details, never entered the detectives' mind. The actions of the Ada Police and OSBI agents involved in the interrogations of Mr. Fontenot engaged in police misconduct in violation of known police procedure and Mr. Fontenot's constitutional rights.

### B. Mr. Fontenot's Confession Is False and Unreliable.

Based on the detective's own admissions, there is no reliable information provided in Mr. Fontenot's confession. Police did not learn one detail as to what occurred to Mrs. Haraway on the night of April 28, 1984, they did not already know. No new leads were developed or witnesses found. Every attempt by the Ada police and OSBI to substantiate Mr. Fontenot's confession resulted in dead ends. Instead of acknowledging that Mr. Fontenot did not know anything about the case, police and the prosecution continued to blindly pursue a defendant with no involvement in these crimes. Dr. Richard Leo, a renowned psychologist who studies interrogations and confessions has reviewed the evidence in Mr. Fontenot's case concerning the validity and reliability of Mr. Fontenot's confession:

> In my professional opinion, Karl Fontenot's confession statement to abducting, raping, murdering, and burning the body of Denice Haraway with Tommy Ward and Odell Titsworth contains *numerous* and *substantial* indicia of unreliability and no – zero – corresponding indicia of reliability. Karl Fontenot's confession statement possesses all of the hallmarks of a false and unreliable confession in spades. In the thousands of confessions I have analyzed in the last three decades, I have rarely seen a post-admission narrative that is so thoroughly contradicted by the underlying crime facts, that fails so completely to demonstrate the lack of any personal knowledge of the crime facts, and that contains so many alleged crime scene details that were not merely erroneous but physically impossible and provably false. In my professional opinion, Karl Fontenot's confession statement is almost certainly, if not certainly, false.

> The numerous and substantial indicia of unreliability include:

> 1)   Karl Fontenot's confession statement contains the wrong method of killing: Fontenot confessed that Haraway was stabbed to death when, in fact, she was murdered by a single gunshot to the head. There is no evidence that Fontenot ever owned a gun. Significantly, Fontenot's confession statement did not mention that

Haraway (whose body had not been discovered until more than a year after the murder) had been shot in the head or even that a gun was involved in the crime. Additionally, there is no evidence that Haraway was ever stabbed nor is there any evidence that she was raped or that her body was burned, contrary to Fontenot's confession statement.

2)    In Fontenot's confession statement, the body had been burned in an abandoned house near the power plant and then Titsworth, Ward and Fontenot burned down the house. Not only is there no evidence that Haraway's body was burned, but the abandoned house had been torn down and burned in June 1983 – 10 months before the murder of Denice Haraway in April 1984 – and so did not exist at the time of the crime. It was therefore physically impossible for Fontenot, Ward and Titsworth to have burned down the house in April 1984 because it no longer existed at that time. Nor had there been any fire reported on that property on April 28, 1984.

3)    Fontenot's confession statement claims that Odell Titsworth physically forced Haraway to get into a pick-up truck, carried Haraway, raped her, stabbed her, and set her on fire. Because Titsworth's arm had been broken by the Ada Police Department on April 26, 1984 (two days before the murder of Denice Haraway on April 28, 1984), he had a very painful spiral fracture that would have made it impossible for him to have physically forced Haraway to get into a truck and thereafter carry Haraway and put her over a fence, much less rape, stab or set her on fire. Indeed, Titsworth was eventually cleared of the crime altogether, making his presence in Fontenot's confession statement a major red flag for a false confession. Fontenot makes no mention of Titsworth's injury in his confession.

4)    Remarkably, Fontenot could neither correctly describe nor even identify Titsworth. Fontenot described Titsworth as 5'10-5"11, 140-150 lbs., with black hair below his ears, and as having no tattoos or distinguishing marks. In fact, Titsworth was 170 lbs., had hair down to the middle of his waist, and was covered in visible tattoos on both arms and both legs. Obviously Fontenot did not know who Odell Titsworth was. Not surprisingly, Fontenot could not identify pictures of Titsworth shown to him by police nor could he identify Titsworth in person when Titsworth was brought to Fontenot's jail cell and standing right in front of him, though Titsworth would have been easily recognizable to anyone who had ever seen him up close because of his numerous visible tattoos. In addition, Fontenot's confession statement claimed that Odell Titsworth's pick-up truck had been used to kidnap and transport Denice Haraway to the crime scene, but Titsworth did not own a pick-up truck.  A pickup truck owned by Titsworth's mother was searched and no evidence was found implicating Fontenot or Titsworth.

5)    As occurs in so many false confessions to murder, Fontenot could not identify the location of the crime or lead police to Denice Haraway's body, which was found over a year after Fontenot's confession statement in a different county in a completely different direction than his confession states.

6)   Fontenot's confession statement contains an erroneous description of the time of the day in which the crime occurred. Fontenot's confession statement stated that it was almost dark when Denice Haraway had been kidnapped, but that would have occurred around 8:30 p.m. when it had already been dark for some time.

7)   As in so many multiple false confession cases,[35] Fontenot's confession statement to the murder of Denice Haraway contradicts, on numerous details, Tommy Ward's statement a day earlier, which itself led to Fontenot's arrest and interrogation. The two confession statements contradict one another regarding the number of perpetrators who allegedly raped Denice Haraway (even though there is no evidence that she was even raped); whether she was stabbed by her assailant(s) (even though there is no evidence that she was stabbed) as well as the number and location the alleged stab wounds; whether she was able to temporarily break free of her assailant(s); how she died; when she died; and where the assailant(s) disposed of her body.

8)   Other than Tommy Ward's discredited, factually false confession, there is no evidence at all linking Karl Fontenot to the murder of Denice Haraway. Only one witness identified him as being present at McAnally's on April 28, 1984, when Donna Denice Haraway left the store. That witness, who underwent hypnosis prior to the preliminary hearing, recanted his identification of Fontenot at trial. Additionally, Fontenot did not match the eyewitness descriptions that led to the composite picture posted by Ada police following Ms. Haraway's disappearance.

Without the assistance of information fed to him by Agent Rogers and Detective Smith, nothing Mr. Fontenot said was reliable. Knowing how susceptible Mr. Fontenot was to suggestion in an interrogation makes it understandable why he would agree with information given to him by the police.

Mr. Fontenot was particularly susceptible to making a false confession. The Supreme Court recognizes that a suspect's mental incapacities could render a confession involuntary if obtained as a result of "persistent and protracted questioning," and furthermore that "the use of a

---

[35] *See* Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA world. *North Carolina Law Review*, 82, 891-1007.

confession obtained under such circumstances is a denial of due process and the judgment of

conviction must be reversed." *Ward v. Texas*, 316 U.S. 547, 555 (1942).

A psychological evaluation of Mr. Fontenot performed by Dr. Joel Dreyer, M.D. around

the time of trial indicates that he has "an abnormally low intelligence" and, at the time of the

interrogation, was "suffering from Post-Traumatic Stress Disorder," related to guilt associated

with the death of his mother.[36]  These psychological infirmities made Karl particularly

vulnerable to police coercion.[37]  In Dr. Dreyer's medical opinion, Mr. Fontenot's guilt over his

mother's death is ultimately responsible for his willingness to accept blame for the murder of the

victim in this case. According to Dr. Dreyer, "[Fontenot] believes in his own mind in some talion

law, an eye for an eye, a tooth for a tooth, that even though he never met Denice Haraway and

had never been at McAnally's East Confectionery, that he was willing to take the rap for her

murder and willing to repeat….the story given to him from the dream of Tommy Ward." *See*

(Exs. 63 & 64,

p. 3).

Additionally, Dr. Sandra Petrick, a psychiatrist at Eastern State Hospital, evaluated Mr.

Fontenot in order to determine his competency to stand trial. Dr. Petrick determined that Mr.

Fontenot had great difficulty in understanding legal terminology along with the adversarial

nature of criminal proceedings. N/T 6/13/1988 at 30-31, 36. Of particular importance is Dr.

Petrick's opinion from her report that "[Fontenot] did not understand the implications of his

---

[36] In 1984, Mr. Fontenot witnessed the death of his mother as she was hit by a car while walking across a 4-lane highway in order to join Mr. Fontenot inside of a restaurant. Mr. Fontenot was inside the restaurant attempting to make a phone call for assistance with their broken-down vehicle. In Dr. Dreyer's opinion, Mr. Fontenot believes
[37] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

confession." Specifically, he referred to his confession as a "confessment" and said he did not

know he was admitting that he actually did something. N/T 6/13/1988 at 33.

Under the standard outlined in *Crawford v. State*, 840 P.2d 627 (Ok 1992), and *Malloy v.*

*Hogan*, 378 U.S. 1 (1964), Mr. Fontenot's confession was neither the product of a free, nor

unconstrained choice of its maker.

> In addition, as discussed above, there were several factors present in this case that
> elevated the risk of eliciting a false and unreliable confession from Mr. Fontenot.
> These included Mr. Fontenot's abnormally low I.Q., which suggests he would have
> been highly suggestible, compliant and easily manipulated into making or agreeing
> to a false confession; and the interrogation pressure and high-end inducements he
> describes occurring during the largely unrecorded interrogation, that if he had been
> capable of repairing the car, or making the phone call more quickly, his mother
> never would've felt the need to come help him inside the restaurant, and would
> therefore, be alive.
>
> In addition to these mental instabilities, Mr. Fontenot lived in poverty from birth to
> adolescence with an alcoholic father, and then with strangers who picked him up
> off the street after his mother's death, which, as substantial social science research
> has demonstrated, are known to lead to false and unreliable confessions.[38]

(Ex. 19). Because Mr. Fontenot's psychological conditions rendered him incapable of reasoning

the way a mentally healthy interrogation subject would have, his ability to voluntarily provide a

statement to police in the face of their insistence on his guilt, should not be considered

trustworthy.

### C.   The Pontotoc County District Attorney Office Knowing Admitted False Testimony during Mr. Fontenot's Trial.

The prosecution, as a representative of the people, must zealously prosecute cases while

also upholding justice. *See Berger v. U.S*, 295 U.S. 78 (1935). In that endeavor, the prosecution

---

[38] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

must not present evidence it knows to be false but must ensure that the record is corrected when a prosecutor learns the evidence is false. *See Napue v. Illinois*, 360 U.S. 264 (1959). The reason is to ensure a fair verdict from the factfinder, whether judge or jury; one worthy of reliability and finality. "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.' " *Id.* at 269-270. The district attorney's obligation is ensure the evidence presented has a indicia of reliability. The source of that evidence is irrelevant if the evidence is wrong, even if that evidence is a confession.

The ABA Standards for Criminal Justice advise prosecutors to ensure the evidence presented at trial is worthy of reliability and credibility.

Standard 3-5.6 Presentation of Evidence

(a) A prosecutor should not knowingly offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses, or fail to seek withdrawal thereof upon discovery of its falsity.

ABA Standards for Criminal Justice (Prosecution Function) 3-5.6; *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)( It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation). After Agent

111

Rogers presented the prosecutorial to Mr. Peterson, he was obligated to vet the case and determine whether charges should be brought and what those charges should be. The absence of any corroboration for Mr. Fontenot's confession should have alerted him of the serious flaws in this case.  Instead, he continued to pursue charges against Mr. Fontenot on the flimsiest of evidence.  Even after his sole eyewitness to Mr. Fontenot's involvement recanted his testimony **after the preliminary hearing**, he continued to move forward knowing that evidence against Mr. Fontenot rested largely on his guilt by association with Mr. Ward. *See* N/T 6/9/1988 at 24-26; (Ex. 14).   The sole evidence the State presented was Mr. Fontenot's false confession knowing it had not a shred of truth or credibility.

The State's continued presentation of Mr. Fontenot's confession, in the absence of any corroboration, when all the evidence presented conflicted with that confession was not only a violation of the prosecution's professional obligation but violated Mr. Fontenot's constitutional rights. Prior to finding Mrs. Haraway's remains, Mr. Fontenot's confession failed to point law enforcement to where she may be and what might have happened to her. Instead, a year and a half after the confession, her remains were found in a completely different location with a cause of death different from what is described in the confession. (Exs. 17& 46). The discovery of Mrs. Haraway's remains destroys whatever shreds of validity Mr. Fontenot's confession retained.  However, instead of dismissing the case for lack of any credible evidence against Mr. Fontenot, Mr. Peterson remained staunch regarding the case. "When asked if the discovery of the body would affect Ward's and Fontenot's conviction, Peterson said, 'Why would it? We convicted them without a body and now we have one.'" (Ex. 70).

The State's comments, in a vacuum, would seem innocuous, but given the extent to which the undisclosed evidence provided a viable defense for Mr. Fontenot, presented viable

112

alternate suspects, and other key pieces of evidence show the extent the state would go to

present false evidence under the guise of a valid "confession." "[D]eliberate deception of a

court and jurors by the presentation of known false evidence is incompatible with rudimentary

demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotations

omitted). The actions of the state resulted in the presentation of evidence the police knew to be

false at the preliminary hearing. That the prosecutor, with numerous years of experience, failed

to grasp the incredible confession of a defendant with no connection with the victim or the case

other than through the misguided association with a man who admitted being involved on two

separate occasions is a due process violation under the Fourteenth Amendment. Mr. Fontenot is

entitled to a vacation of his conviction.

## VI.    THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. FONTENOT BECAUSE THE STATE FAILED TO SHOW THE EXISTENCE OF THE CORPUS DELICTI OF THE CHARGED CRIMES OUTSIDE OF THE CONFESSION AND FAILED TO ESTABLISH THE TRUSTWORTHINESS OF THE CONFESSION IN VIOLATION OF THE FOURTEENTH AMENDMENT.

Exclusionary rules relating to criminal confessions find their basis in a single premise, insulation of the adversary system of jurisprudence from introduction of false and unreliable evidence. Such false testimony, when undetected, can only result in a fraud upon society -- conviction of the innocent and freedom for the guilty.

Note, Voluntary False Confessions: A Neglected Area in Criminal Administration, 28 Ind.L.J. 374 (1953).

Despite vast inconsistencies between Mr. Fontenot's confession and the evidence, the

prosecution tried desperately to force the evidence to fit Mr. Fontenot's story; claiming in

essence that it would be inconceivable for any person to confess to crimes he had not committed.

In closing argument, the prosecutor contended:

I ask, you, ladies and gentlemen, when you are deciding who to believe and who not to believe I ask you to consider, first of all, is it reasonable to believe that you could convince a man in fifteen minutes to confess to a crime like this? Now, we are not talking about any crime here, we are not talking cutting tires or whatever. We are talking robbery, kidnapping and murder. Could you confess, get a man to confess to that, especially a murder so heinous and brutal and cruel where he his saying - could you get a man to say, well, she was screaming help and crying and begging and there wasn't no one there to help her, we weren't going for what she was saying. Could you get someone to say that if they really hadn't done that? In fifteen minutes?

I don't care how stupid, stupidity is not a lack of morality. A stupid person would still know he was saying bad things about himself. Could you get a man to do that?

N/T 6/14/1988 at 73-74.

Yet, false confessions are not new to legal history. As stated in *Smith v. United States*, 348 U.S. 147, 153, 75 S.Ct. 194, 197 (1954), the "experience of the courts, the police and the medical profession recounts a number of false confessions voluntarily made." *See also* Note, *Corroboration of Confessions in the Theft by Receiving Context: Is Proof of Theft Enough*, 44 Ark.L.R. 805 (1991); Ayling, *Corroborating Confessions: An Empirical Analysis of Legal Safeguard Against False Confessions*, 1984 Wisconsin L.R. 1121; Note, *Voluntary False Confessions, supra*, 28 Ind.L.J. 374 (1953).

Among the reasons legal scholars and courts cite for false confessions are psychological factors including two substantiated by the evidence in this case: guilt feelings over unrelated acts and a desire for notoriety. Ayling, *Corroborating Confessions*, *supra* at 1158-59; *Voluntary False Confessions*, *supra*, at 379-382.

Psychiatrist Joel Dreyer, who examined Mr. Fontenot before retrial, found that Mr. Fontenot felt extreme personal guilt over the death of his mother who just a few years before his confession died in an auto-pedestrian accident as she crossed a four-lane highway to find him. Mr. Fontenot watched helplessly as his mother came to find him and was stricken and killed by a

car.[39] N/T 6/13/1988 at 193-94. Dr. Dreyer's testimony was that "he [Mr. Fontenot] felt

responsible for her death and feels he should take the responsibility for this other person's death,

for the death of his mother..." N/T 6/13/1988 at 193-94.

Dr. Dreyer also noted Mr. Fontenot:

> ... saw this as an opportunity to be important, to have notoriety, to have a claim, to
> be written up, to be in the papers, to have friends, to have people interested in him.
> And so he did like a lot of people do, all of the way from the Son of Sam to other
> people who go and say, 'I'm the Son of Sam.' but only one was the Son of Sam.
> Those other hundred and eleven couldn't have all been the Son of Sam. He is like
> those hundred and eleven people, willing to gain some claim (sic), because he is
> not bright and because he was just wandering the street.

N/T 6/13/1988 at 199.[40]

Other evidence showed Mr. Fontenot sought attention and often made false claims.

Gordon Calhoun, who testified for the State that Mr. Fontenot claimed to know something about

Haraway's disappearance, agreed Mr. Fontenot "kind of likes spinning yams and, that is how he

got his attention." N/T 6/9/1988 at 145-146, 149. Mr. Calhoun did not believe Mr. Fontenot's

claims about Mrs. Haraway's disappearance. *Id.* at 151. He agreed Mr. Fontenot "would

downright lie to you if he thought it would get your attention." *Id.* at 154.

The development of legal safeguards to ensure the reliability of confessions relates

directly to the very real experiences of the judiciary with false confessors to crimes, even to

---

[39] Dr. Dreyer related that Mr. Fontenot's mother bad been involved in a minor traffic accident and had sent Karl across the highway to telephone for assistance, but "[h]e didn't have any money when be got there and be couldn't figure out how to call the police . . . So be had taken so long talking to the people in that little restaurant, that finally his mother crossed that four-lane highway to find out what he was doing." N/T 6/13/1988 at 193-94.

[40] Dr. Dreyer testified: " . . . he was a vagrant, he was like a bum in a way, I mean be was wandering the streets. First of all his dad bad left him six years before his mother left him and his dad left him to go somewhere and he hadn't had contact with him since. His dad was a proverbial ubiguitous [sic] alcoholic and his mom then, of course, died in this pedestrian auto accident. And so he is just wandering the streets and doing some pot and drinking some booze and talking to some people and doing what he has to do, primarily drinking from time to time, not doing too much with his life and wandering the streets, not knowing what this world is going to hold for him and feeling responsible for his mother's death and thinking death for himself and suicide." N/T 6/13/1988 at 199.

crimes that never occurred. The fact that Mr. Fontenot confessed to a crime does not make his confession a reliable one, for false confessions to real crimes are just as likely as those to imaginary ones. *See Corroboration of Confessions*, *supra*, at 832. The goal of the legal safeguards for confessions is not just to protect the confessor from unjust imprisonment, but to ensure that society is protected from the actual wrongdoer. *Voluntary False Confessions*, *supra*, at 374.

### A.   The State's Failure to Sufficiently Prove the Corpus Delicti of the Charged Crimes Independent of the Confession Requires Reversal.

The State, before extracting confessions from Mr. Ward and Mr. Fontenot, had little accurate information about what happened to Mrs. Haraway.  She had been missing for six months and the State presumed she had been the victim of foul play despite its inability to locate her remains or to properly secure the scene of Mrs. Haraway's disappearance. The State's evidence before Mr. Ward's October 18, 1984, confession, consisted of a description of varying pickup trucks, a composite drawing of the man with whom Mrs. Haraway had been seen leaving McAnally's, and descriptions of two men who had aroused the suspicion of a clerk at completely different convenience store shortly before Mrs. Haraway's disappearance.[41]  Although police denied they had a clothing description before the confessions, evidence showed that APD Detectives Smith and Baskins were given the description of a blouse a day or two after she disappeared - the same description that was incorporated first into Mr. Ward's and then into Mr. Fontenot's confessions six months later. N/T 6/10/1988 at 144, N/T 6/13/1988 at 116.

---

[41] This is the evidence made available to Mr. Fontenot's defense counsel.  As discussed previously, the police had much more evidence at their disposal that they ignored.  *See supra* Claims I & II.

In *State ex.rel. Peterson v. Ward*, 707 P.2d 1217 (Okl.Cr.1985), the Oklahoma Court of Criminal Appeals stated:

> It is a fundamental rule of law in this jurisdiction, and most others, that "no criminal conviction can be based upon a defendant's extrajudicial confession or admission, although otherwise admissible, unless there is other evidence tending to establish the **corpus delicti**." We have defined corpus delicti "as the substantial and fundamental fact or facts necessary to the commission of a crime, and means when applied to any particular offense, the actual commission by someone of particular offense charged."

*Id.*, 707 P.2d at 1219; *see also Opper v. U.S.*, 348 U.S. 84 (1954).

Here, the State failed to sufficiently show independent evidence of the corpus delicti of the charged crimes of kidnapping and first-degree murder before admitting the confession of Mr. Fontenot's confessions into evidence.

The elements of kidnapping given to the jury were: 1) unlawful; 2) forcible seizure and confinement; 3) of another; 4) with intent to confine secretly; 5) against the person's will. (O.R.II 161) The evidence showed Mrs. Haraway calmly left the convenience store accompanied by a man with his arm around her waist. She said nothing to a bystander entering the store as she was leaving. She indicated no distress and the customer was in the store about ten minutes before he realized the clerk was gone. Although the State claimed circumstantial evidence showed it was out of character for Mrs. Haraway to leave the store unattended and disappear, the objective evidence was that she left the store with a man without protest to available rescuers. The evidence outside of Mr. Fontenot's confession failed to show Mrs. Haraway was taken unlawfully, by force or against her will and thus the corpus delicti of the crime of kidnapping was not established outside the confession.

Ordinarily, the discovery of Mrs. Haraway's remains with a bullet hole in the skull would suffice to show the corpus delicti of murder. *See Goforth v. State*, 644 P.2d 114 (Ok. 1982) (the

117

corpus delicti of a murder may be shown by evidence that a body was found under circumstances indicating a violent death). The only evidence indicating a violent death caused by the acts of another in this case was a bullet hole in the skull.  However, the medical examiner testified that he could not determine whether the bullet wound was inflicted before or after Mrs. Haraway's death. N/T 6/9/1988 at 132. When Mr. Fontenot sought a new trial while awaiting a decision on appeal after the 1985 trial, the State contended the bullet was not the cause of death, but was merely a post-mortem injury:

> The State maintains its trial theory that Denise Haraway died due to extensive stab wounds. Moreover, the skeletal remains would not adequately reflect stab wounds to an individual's body. As the remains were found approximately 1-1/2 years after her death, the areas of the stab wounds were long ago decomposed. This is not to say that the incised-type injuries to the ribs could not be evidence of animal activity. It would be highly unlikely that a body exposed to the elements for any length of time would not exhibit some type of animal activity.  Further, the evidence of a gunshot wound to the head does not dispel the State's theory of death. In a newspaper clipping attached to the defendant's appeal brief, it is stated that a man came across the skeletal remains while hunting in the woods. It is not unreasonable to theorize that the bullet wound to the skull came from a hunter's stray bullet.

(F-85-769, Brief of Appellee in Response to Mr. Fontenot's Motion for New Trial on Newly Discovered Evidence, at p. 5).

The State failed to show the corpus delicti of murder, because, as the State previously argued and the medical examiner's testimony substantiates, the evidence failed to show an unnatural cause of death. No stab wounds were found and the evidence of the gunshot wound would not definitely be determined to be the cause of death. N/T 6/9/1988 at 130. In a case squarely on-point with Mr. Fontenot's, the Oklahoma Court of Criminal Appeals reversed and dismissed a first-degree murder conviction where there was no evidence of stabbing as the cause of death even though the defendant had confessed to stabbing the victim (and, unlike Mr. Fontenot, had accurately told the police where the body was located). *Thornburgh v. State*, 815

P.2d 186 (Ok. 1991). The State's inability to independently show the corpus delicti of murder in

this case likewise requires reversal of Mr. Fontenot's conviction. To find that the gunshot wound

adequately established the corpus delicti of murder, this Court must find Mr. Fontenot's

confession materially false and insufficiently corroborated by independent evidence to support

his convictions. To find that the stabbing adequately established the corpus delicti of murder, this

Court must disregard all independent evidence and rely solely on Mr. Fontenot's confession.

> **B.     The State Failed to Establish Through "Substantial Independent Evidence" the Trustworthiness of Mr. Fontenot's Confession; The Confession Was Patently Unreliable and Thus Inadmissible.**

Even if this Court determines the evidence was sufficient to show the corpus delicti of the

crimes alleged, Mr. Fontenot's confession lacked any independent indicia of reliability or

trustworthiness. The United States Supreme Court, in *Opper v. United States*, 348 U.S. 84, 75

S.Ct. 158 (1954), stated:

> It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense.

348 U.S. at 93, 75 S.Ct. at 164, adopted by Oklahoma in *Jones v. State*, 555 P.2d 63, 68 (Ok.

1976). The *Opper* standard requires a confession actually have some resemblance to the known

facts of the crime to show that the confession is trustworthy.

In *Williamson v. State*, 812 P.2d 384 (Ok. 1991), *cert. denied*, 112 S.Ct. 1592 (1992), the

Oklahoma Court of Criminal Appeals found that "factual errors and omissions" do not necessarily

render a confession unreliable. The OCCA recited the discrepancies in the Williamson confession as:

> Specifically, these errors and omissions are that the decedent had a washcloth in her mouth and not her panties, and that a lid to a catsup bottle and not a coke bottle was

> discovered inside her rectum, and that no mention was made of the ligature, the writing on the wall or the presence of another person.

*Id.* at 397. Relying on the language in *Opper* that it was "sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth," the Oklahoma Court of Criminal Appeals found that the essential facts of the murder described by Williamson were sufficiently consistent with the physical evidence found at the crime scene, despite the minor inconsistencies described above. *Id., quoting Opper*, 348 U.S. at 93, 75 S.Ct. at 164.

Here, the discrepancies between Mr. Fontenot's confession and the known facts of the case are hardly minor. The State alleged the kidnapping was accomplished by force or fear, yet the witnesses seeing Mrs. Haraway leave the convenience store saw no weapon or any apparent distress or signs of struggle. The prosecution alleged the murder was committed by repeated stabbing and by gunshot, yet they could offer no independent evidence that a stabbing had occurred and no evidence linking Mr. Fontenot or his codefendant to a firearm. The confession is replete with other factual errors, not the least of which include Mr. Fontenot' s naming of Mr. Titsworth who was proven not to be involved; the location of the body in another county rather than where Mr. Fontenot claimed; the evidence of death a gunshot wound, which the State even contended was post-mortem, while no evidence supported Mr. Fontenot's claim of stabbing the victim; no evidence of rape described by Mr. Fontenot; and evidence that the body was not burned, which was contrary to Mr. Fontenot's story.

The only "facts" in the confessions supported by independent evidence were those known to the police and public before the confessions. Mr. Fontenot correctly described using an older-model pickup truck, which had been widely publicized as the perpetrator's vehicle. Mr. Fontenot knew about how much money had been taken from the convenience store in the alleged robbery,

an amount that was published within days of Mrs. Haraway's disappearance. The blouse

description was given to police by Mr. Ward the day before Mr. Fontenot was interrogated, but

also had been given to investigating officers long before their interviews with either Ward or Mr.

Fontenot. Even this description is disputed by the evidence subsequently discovered at the site

where Mrs. Haraway's remains were found.

The following portions of Mr. Fontenot's confession and subsequent statements were

factually disproved, primarily by the State's own evidence at trial.

| Mr. Fontenot's Statement<br>October 19, 1984 | Evidence<br>June 7-14, 1988 |
|---|---|
| 1. Mr. Fontenot knew Odell Titsworth and was at a party with Titsworth and Tommy Ward on the evening of April 28, 1984. (Ex. 69 at 690). | 1. Mr. Fontenot had never seen Odell Titsworth until police brought Mr. Titsworth to his cell after the confession; Mr. Fontenot could not identify Mr. Titsworth in a photographic lineup or in person. N/T 6/13/1988 at 86-88. |
| 2. Mr. Fontenot described Mr. Titsworth as 5 feet 10 to 11 inches tall, weighing around 140 to 150 pounds, with black hair just below his ears and having no tattoos or distinguishing marks about him. Mr. Fontenot's description of Mr. Titsworth was markedly incorrect. (Ex. 69 at 689). | 2. In April, 1984, Odell Titsworth had hair down to the middle of his waist, weighed 175 pounds, and had very noticeable tattoos covering both harms from the wrists to the shoulders, inside and out, on his back, his stomach, and up and down both legs. On April 28, 1984, his arm was in a cast, having been broken by the Ada Police Department on April 26, 1984. P/H at 792-796, 795-97, 838; N/T 6/13/1988 at 81-82; N/T 6/10/1988 at 184-85, N/T 6/14/1988 at 88-89. |
| 3. Odell Titsworth was a participant in robbing, kidnapping, raping and stabbing Mrs. Haraway. The lock-blade knife and the pickup truck used in the commission of the crimes belonged to Mr. Titsworth. (Ex. 69 at 664, 676-678). | 3. The police eliminated Odell Titsworth from being in any way involved in the Mr. Haraway case. Mr. Titsworth's truck was searched and no evidence relating to this case was found. The State presented evidence to show that Mr. Ward owned a lockblade Buck knife, but the actual weapon was never recovered. N/T 6/10/1988 at 23-24. |

| | |
|---|---|
| 4. After the party, the trio "went out from north of town." (Ex. 69 at 664). | 4. Ada has two McAnally's convenience stores, one north, and one east. N/T 6/9/1988 at 91 Haraway disappeared from the McAnally's in east Ada. |
| 5. Mr. Titsworth went into McAnally's and brought Mrs. Haraway out to the pickup truck while Mr. Fontenot and Ward waited outside by the gas pumps. Mr. Fontenot and Mr. Ward got into the truck after Mrs.Haraway was forced in. (Ex. 69 at  664) | 5. Eyewitnesses at the convenience store when Mrs. Haraway left saw only one man with Mrs. Haraway and no others standing outside the truck. This man's description did not remotely match Odell Titsworth. N/T 6/9/1988 at 34-68. |
| 6. Four people drove away in the pickup to the power plant (west of McAnally's). (Ex. 69 at 664-665) | 6. Eyewitnesses at McAnally's saw only one man with Mrs. Haraway, no other person around or near the pickup and no other person in the store. Mary Scroggins reported seeing a gray pickup with three persons in it speeding toward the power plant on night of Mrs. Haraway's disappearance, but could identify any of them. N/T 6/9/1988 at 80. |
| 7. It was "almost dark" twenty minutes after the rapes began. (Ex. 69 at 673). | 7. Mr. Welchel testified it was dark when he arrived at the McAnally's at 8:30 p.m. and saw Mrs. Haraway leaving. N/T 6/9/1988 at 64. |
| 8. Mr. Titsworth stabbed Mrs. Haraway to death, stabbing her in the chest "[h]ard enough to get the full blade in. (Ex. 69 at 682). | 8. There was no evidence of stabbing and no indication of nick marks or broken ribs that would signify a stabbing. N/T 6/8/1988 at 134. Further, the State's evidence showed the only apparent cause of death was a gunshot wound and Mr. Fontenot never mentioned a gun in his confession or in subsequent statements. |
| 9. Mrs. Haraway was placed in a rotted out hole in the floor of a house behind the power plant, | 9. The house located near the power station had been completely torn down to its concrete foundation and burned by its owner in June of |

| | |
|---|---|
| gasoline poured on her and the house set afire. (Ex. 688). | 1983, ten months before Mrs. Haraway disappeared. There was no fire reported on the owner's property on April 28, 1984. Mrs. Haraway's remains were found in a brushy countryside area near Gerty, Oklahoma. Her body had not been burned. N/T 6/14/1988 at 136. |

On January 20, 1986, physical evidence was discovered substantially disproving Mr.

Fontenot's confession. A farmer setting traps near Gerty, Oklahoma, east of Ada in adjacent

Hughes County, found what appeared to be a human skull. A subsequent search of the area

uncovered human remains that were identified as those of Mrs. Haraway. The medical examiner

found no evidence indicating Mrs. Haraway had been stabbed,[42] but a bullet hole was found in

the back of the skull. Mr. Fontenot had never mentioned the use of a firearm in his confessions.

The body had not been burned. N/T 6/13/1988 at 136.

The State contended the blouse description in the confession was corroborated by the

evidence that Mrs. Haraway had such a blouse and testimony describing her clothing before she

disappeared. But this "corroboration" must be viewed in light of the evidence that police

previously had been given the description of this blouse; the suggestive interrogation techniques

used with Mr. Ward and most likely with Mr. Fontenot; and the evidence of red and gold earrings

and the back of a red and white shirt found near Mrs. Haraway's remains belie this corroboration.

(State's Trial Exhibits 19, 20, 22F).

The State had no real theory of this case and certainly no evidence until obtaining the

confessions of Mr. Ward and Mr. Fontenot. Rather than showing the reliability of Mr. Fontenot's

---

[42] The testimony was that since the only remains of Mrs. Haraway were skeletonized, it would have been possible for her to have been stabbed, and the bones not reflect it. *See Thornburgh v. State*, 815 P.2d 186 (Ok. 1991), for this Court's analysis of the failure of the State to show corpus delicti when the medical examiner cannot determine the cause of death.

statement, the State's evidence showed its unreliability and untrustworthiness. Uncorroborated and untrustworthy confessions are not competent evidence. *Opper*, 348 U.S. at 93, 75 S. Ct. at 164.

> ### C.    No Rational Trier of Fact Could Find Mr. Fontenot's Guilt Beyond a Reasonable Doubt on the Evidence at Trial, even if the Confession is Deemed to be Properly Admitted.

At the close of the State's case, Mr. Fontenot moved for a directed verdict of acquittal due to insufficient corroboration of the confession and the failure of the State to prove each element of the charged crimes beyond a reasonable doubt, but was overruled. N/T 6/13/1988 at 127. The motion was renewed after the defense case and was overruled. N/T 6/14/1988 at 11.

Outside the confession, no evidence linked Mr. Fontenot to Mrs. Haraway's disappearance.  At trial, not one witness identified Mr. Fontenot as being at McAnally's on April 28, 1984. Although Ms. Wise and Mr. Moyer identified his Mr. Ward, neither could positively identify Mr. Fontenot as Mr. Ward's companion and both saw a man in the courtroom at preliminary hearing who was more familiar to them as that man than Mr. Fontenot. N/T 6/8/1988 at 194-95, 197-99; N/T 6/9/1988 at 26.

Likewise, the police did not have any physical evidence placing Mr. Fontenot at McAnally's on April 28, 1984. Significantly, the crime scene at McAnally's was allowed to be destroyed despite the presence of an Ada police officer and detective shortly after Mrs. Haraway's disappearance. N/T 6/9/1988 at 92-93. Fingerprints most probably present on the counter, cash register and the glass doors of McAnally's, as well as a still-burning cigarette (Mrs. Haraway did not smoke) were destroyed because the manager wanted to clean up the store. N/T 6/9/1988 at 92-93.  Police investigated numerous individuals who looked like the composites and at least 28 pickup trucks similar to those reported seen at J.P. 's and McAnally's in the six months between

Mrs. Haraway's disappearance and Mr. Fontenot's arrest, but they produced nothing. N/T

6/14/1988 at 30-33.  Likewise, there   was no evidence inculpating Mr. Fontenot in the area

where Mrs. Haraway's remains were found.

Detective Smith testified:

> Q. . . . there is absolutely no physical evidence whatsoever to tell us what happened
> at the scene, nothing, right? I mean, you can't tell who did what, when and where
> or anything. Is that correct?
> A. **Well, to me the strongest evidence is the confession.**
> Q. Okay. Fine. Okay. Other than the statements of Karl Fontenot, okay, as to what
> transpired at the scene, do you have any other physical evidence?
> A. From the scene?
> Q. Yes. And we - The Jury has already seen the remains of Donna Denise Haraway.
> Okay. All right. But, at the scene, I'm talking about what was said, what happened,
> you have no other, you have no physical evidence. All we have is, according to you,
> Karl's statement. Right?
> A. And the body.

N/T 6/10/1988 at 106-107.  Compare this with OSBI Agent Gary Roger's testimony at Mr.

Fontenot's first trial, before the body was found:

> Q. Aside from these two statements [Ward's and Fontenot's] do you have any proof,
> separate from these statements, that Donna Denise Haraway was kidnapped, raped
> or murdered? Aside from these statements?
> A. We have proof that she has not been seen or heard from in a year and a half.
> Q. All right. So, basically if we say -- if we take the statements aside, the only thing
> you can prove is Donna Haraway is gone?
> A. That's correct.

J/T 86-769 Tr. 2048-85.

Federal constitutional law requires as a matter of due process that any criminal conviction

stand only upon proof beyond a reasonable doubt as to each and every essential element of the

crime or crimes charged. U.S. Const. Amend XIV; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct.

2781 (1979); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068 (1970). Speculation and guesswork are

fundamentally antagonistic to the constitutional requirement of proof beyond a reasonable doubt,

and a conviction cannot stand where the evidence establishes no more than speculation or suspicion. *Hager v. State*, 612 P.2d 1369 (Ok. 1980). Yet, the mere issuance of an instruction charging the jury with its duty to find proof beyond a reasonable doubt is not enough. As the United States Supreme Court stated in *Jackson v. Virginia*, 443 U.S. at 316-17, 99 S.Ct. at 2788:

> The *Winship* doctrine requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A 'reasonable doubt,' at a minimum, is one based upon 'reason.' Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, . . . .

The U.S. and Oklahoma Constitutions guarantee that no person shall be deprived of liberty or life without due process of the law, encompassing the right to be free from convictions except upon proof beyond a reasonable doubt of guilt. Fourteenth Amendment; Okla.Const. Art.II, §7; *Young v. State*, 89 OK. 395, 208 P.2d 1141 (1949). The federal and state constitutions are in accord on the requirement of proof beyond a reasonable doubt and on the test to be applied when examining the record for absence or existence of such proof. The test for determining whether proof is sufficient to support a criminal conviction is whether, in the light most favorable to the State, a rational trier of fact could find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra*; *Spuehler v. State*, 709 P.2d 202 (Ok. 1985).

   In the light most favorable to the State, the evidence at trial established beyond a reasonable doubt the that Mrs. Haraway disappeared on April 28, 1984, and was found dead on January 20, 1986. Beyond these basic facts, the evidence introduced to establish the cause of death, criminal agency and the identity of the person responsible for her death was unreliable, contradictory, uncorroborated or simply nonexistent. None of the eyewitnesses identified Mr. Fontenot as the man who left the store with Mrs. Haraway, and they saw only one man with her in the truck as

126

they left. None of the physical evidence, including the body, linked Mr. Fontenot to Mrs. Haraway's disappearance or death. At best, the evidence established Mrs. Haraway died from a gunshot wound to the head or was struck by a bullet after she died from unknown causes.  In either case, there was no independent evidence tending to suggest she was raped, stabbed or burned, or ever taken to any location other than where her remains were found.

No rational juror who was able to set aside the tragedy of Mrs. Haraway's death could find beyond a reasonable doubt that Mr. Fontenot should be convicted on his own words given the uncontroverted evidence of Mr. Fontenot's mental and psychological impairments, which led him to confess to crimes he did not commit; the material discrepancies between the physical evidence and the story Mr. Fontenot told the police; the absence of evidence to corroborate his version of the events; and the circumstances surrounding his coerced confession.

## VII.   THE STATE'S INJECTION OF INADMISSIBLE HEARSAY FROM THE EXTRAJUDICIAL CONFESSION OF MR. WARD IN MR. FONTENOT'S TRIAL VIOLATED HIS CONSTITUTIONAL RIGHT OF CONFRONTATION.

In its opinion reversing Mr. Fontenot's previous convictions for these crimes, this Court held it was reversible error for the trial court to admit the inculpatory statements of the non-testifying codefendant at the joint trial of Mr. Fontenot and Mr. Ward. *Fontenot v. State*, 742 P.2d 31, 32 (Ok. 1987). The Oklahoma Court of Criminal Appeals found Mr. Fontenot's Sixth Amendment right to confront the witnesses against him was damaged beyond repair by the admission of the non-testifying codefendant's statement. *Id.* Further, the appellate court found that Mr. Ward's statement "did not have sufficient indicia of reliability as it relates to Mr. Fontenot to overcome the presumption of unreliability to permit its direct admission .... " *Id.; see also Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056 (1986).

127

Yet, at retrial the State injected key portions of the codefendant's extrajudicial statements into the evidence presented at trial for the purpose of corroborating Mr. Fontenot's confession. The State then inferred and argued Mr. Fontenot's guilt from this inadmissible evidence. Mr. Fontenot was not given the opportunity to confront Mr. Ward to test the truthfulness of his extrajudicial statements. The denial of the fundamental right of confrontation, the prejudicial weight of the particular portions of the codefendant's statements used by the State, and the weakness of the State's case without the improper corroboration of Mr. Fontenot's statement require reversal of these convictions. U.S. Const., amends. VI and XIV, Okla. Const., Art. II, §7, *Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077 (1965).

The State did not introduce the entirety of Mr. Ward's statements, but injected key inculpatory information gathered from his statements. Most prejudicial was the hearsay testimony of Detective Smith, who stated that Mr. Ward's description of a blouse purportedly worn by Mrs. Haraway matched the description given in Mr. Fontenot's confession, and placed the two together at the crime scene. From Detective Smith and OSBI Agent Gary Rogers, the jury learned Mr. Ward confessed and described details of the crime in a similar fashion to Mr. Fontenot.

Both Detective Smith and Agent Rogers were specifically admonished not to repeat anything told him by Mr. Fontenot's codefendant. N/T 6/10/1988 at 52, N/T 6/13/1988 at 19-20. Nonetheless, he made the following statements:

Q. [Defense Counsel] You had a description of the blouse prior to interviewing Karl Fontenot?

A. [Smith] **From Tommy Ward**.

128

N/T 6/10/1988 at 116 (emphasis added).  Defense counsel did not invite the reference to Mr.

Ward, but asked a question to which an answer of "yes" or "no" was necessary. The cross-

examination was not to establish from whom Detective Smith learned the blouse description, but

that he had been given a similar blouse description by Richard Holkum[43] within days of Mrs.

Haraway's disappearance.

> The importance - and prejudice - of Mr. Ward's extrajudicial statements regarding the

blouse was elicited by the State on re-direct examination:

> Q. And I believe you started to testify it was more important for another reason and that was because it matched Tommy Ward's description.

> A. Yes, it did. The two descriptions of the blouse were very close and that is what made it important. If one of them said, well, she had a light colored blouse with flowers on it and the other one had said, well, she had a striped blouse on, then the importance of the blouse would not be an issue. **But, they both described the blouse nearly identically, close enough that you knew or we would know that they had seen it**. We didn't place the importance on it until later, much later after they were arrested, in fact.

*Id.* at 132 (emphasis added).  Other hearsay testimony told jurors Mr. Ward confessed,

implicated Mr. Fontenot, and gave similar details about the crime as had Mr. Fontenot. Detective

Smith's additional references to the plurality of confessions anti their content inculpated Mr.

Fontenot:

> Q. What did Agent Rogers tell him exactly or you tell him exactly in order for him [Fontenot] to stop denying that he was involved?

> A. What he said was: "Karl, we have already talked to Tommy and we have a confession from him."

> Q. Okay. And did you go on and tell him that we knew that he was involved, we wanted him to tell the truth and give you a statement?

---

[43] *See supra* Claim II detailing the totality of Mr. Holkum's statements to Detective Smith and that the exculpatory evidence was withheld from defense counsel.

A. That is ... usually what we tell people that we are interrogating, yes.

*Id.* at 104; and

Q. [Butner] The pickup was in Ada and was driven by Tommy Ward .... and Karl Fontenot. You never saw that personally?

A. No, Tommy Ward said that.

*Id.* at 146; and

Q. [Butner]: Detective Smith, I'm not talking about the confessions. I'm asking you, would, in fact, the ease with which an article of clothing came off a body due to animal activity, wouldn't that have some effect as to how long it lasted, if you know or have an opinion?

A. Well, in the confessions they said the clothes were taken off and it was my opinion that they weren't even on.

*Id.* at 153.

Agent Rogers, purportedly testifying about the actions taken as a result of Mr. Ward's confession, injected information showing correlations with Mr. Fontenot's confession. After he was admonished not to state anything told him by Mr. Ward N/T 6/13/1988 at 19-20, he related that during his conversation with Mr. Ward, he directed Detective Baskin to search a power plant located off Richardson Loop west of Ada for Mrs. Haraway's remains. Another call directed Detective Baskin to a burned out house and a third directed him even further west from the power station to Sandy Creek to locate "a concrete citron or bunker, ... basically a large hole in the ground that had concrete walls." (Tr. V 20-21) This testimony assured jurors that Mr. Ward's statements corroborated those of Mr. Fontenot concerning crimes at the power plant and attempts to dispose of the body.

The testimony of Detective Smith and Agent Rogers about portions of Mr. Ward's extrajudicial statements was hearsay, offered to prove the truth of the matter asserted: in this

case, that the confessions of Mr. Fontenot and Mr. Ward corroborated each other, and that the

only explanation for this was their guilt. The prosecution succeeded in doing indirectly what it

could not do directly - using Mr. Ward's confession to inculpate Mr. Fontenot in this crime. It is

well settled that the hearsay rule does not preclude testimony to show that a statement was made

or that certain actions resulted from a conversation with a third person. *Greer v. State*, 763 P.2d

106 (Ok. 1988); *Thompson v. State*, 705 P.2d 188 (Ok. 1985); *Godwin v. State*, 625 P.2d 1262

(Ok. 1981). *Garcia v. State*, 639 P.2d 88 (Ok. 1981); *Dunagan v. State*, 734 P.2d 291 (Ok. 1987).

However, in *Washington v. State*, 568 P.2d 301 (Ok. 1977), the Oklahoma Court of Criminal

Appeals held that the State cannot circumvent the hearsay rule and effectively place into

evidence the inculpatory substance of a conversation with a third party through the ruse of

relating the information in terms of the actions resulting from the conversation. In *Washington,*

*supra*, 568 P.2d at 311 a police officer had spoken with a young boy who was a witness to a

crime. The police officer testified that after his conversation with the boy, he directed his

investigation at the defendant. The Oklahoma Court of Criminal Appeals stated:

> The recitation of the preceding cases makes it apparent that it is permissible for an
> officer to testify that he received information from a third party which led to the
> defendant's arrest; provided, however, that the information received shows that the
> arrest was for a crime other than the one charged or provided that the information
> received was just a description of the criminal and not an extrajudicial identification
> of the defendant as the perpetrator of the crime charged.

*Id.* In *Washington*, had the officer repeated the boy's statement that the defendant had committed

the crime, this would have been inadmissible hearsay. The court found evidence is

no less inadmissible hearsay when the jury is made aware of the substance of the third-party

statement through indirect testimony.

The same is true here. The prosecution elicited sufficient testimony to tie together the statements of Mr. Fontenot and Mr. Ward as if they contained the same inculpatory information, i.e., that Mr. Ward, too, claimed Mr. Fontenot was guilty of the offenses charged.  Detective Smith's testimony that Mr. Ward had given a description of the blouse "very close" to Mr. Fontenot's was a clear signal to the jury that Mr. Ward's confession corroborated that of Mr. Fontenot and inculpated Mr. Fontenot. N/T 6/10/1988 at 132.  The prosecution drew direct inferences of Mr. Fontenot's guilt through this testimony. Detective Smith testified:

> The two descriptions of the blouse were very close and that is what made it important. If one of them said, well, she had a light colored blouse with flowers on it and the other one had said, well, she had a striped blouse on, then the importance of the blouse would not be an issue. But, **they both described the blouse nearly identically, close enough that you knew or we would know that they had seen it.**

N/T 6/10/1988 at 132 (emphasis added).  Prosecutor Ross contended in closing argument:

> Mr. Butner, Mr. Smith, Mr. Rogers, Mr. Gridner (sic), have all agreed that it would be impossible for someone to make up that description of the blouse. Doubly impossible for two and that leaves us with only one alternative, and that is that this Defendant was there, just like he confessed he was.

N/T 6/14/1988 at 79.

Significantly, had the prosecution presented Mr. Ward as a witness to testify concerning his statements and had Mr. Fontenot been afforded his constitutionally guaranteed right of confrontation, another light would have been cast on this evidence. After Mr. Fontenot's conviction, Mr. Ward was tried again for the same crimes and testified. His testimony revealed the following:

> Q. Did anybody tell you what the Haraway girl was supposed to be wearing when she disappeared?
>
> A. Yes, sir. Dennis Smith did.

132

Q. What did he tell you?

A. Well, they told me that she either had a white blouse with blue roses on it or a red and white striped shirt.

Q. And did he tell you which one to select or to –

A. No.

Q. -- put in your statement?

A. No, I just took a guess. And at that time, when I guessed, saying the white shirt with blue roses, he kept on trying to - which I thought that he was trying to get me to change my mind and say a white shirt with red stripes -- a white -- yea, a white shirt with red stripes on it.

Q. What did you think would happen when they checked this all out and found out the things you were telling them weren't true?

A. Like I said before, I thought that they would run me out for lying to them.

(Ward-90-17 Tr.9 139-140).

The introduction of portions of Mr. Ward's statements circumvented this Court's ruling in *Fontenot v. State*, 742 P.2d 31, 32 (Ok. 1987), where the Oklahoma Court of Criminal Appeals found the introduction of Mr. Ward's confession violated Mr. Fontenot's constitutional right to confront his accusers. Here, had Mr. Ward testified about his confession, Mr. Fontenot could have cross-examined him about his repudiations of that statement. The State used the most damning portions of Mr. Ward's confession to show similarities to Mr. Fontenot's statement and reach the conclusion both were guilty.

Before Detective Smith's testimony, defense counsel objected to any reference to statements made by Mr. Ward and Detective Smith was warned to not repeat anything he had heard from Mr. Ward. N/T 6/10/1988 at 52.  Before cross-examination, defense counsel requested Detective Smith be admonished again. *Id.* at 94-95.  The same was done with Agent

Rogers. N/T 6/13/1988 at 19-20. As these admonitions repeatedly went unheeded, additional

objections would have exacerbated the damage by calling attention to the prejudicial hearsay.

Defense counsel was left in the untenable position of focusing the jury's interest on the issue of

the matching descriptions by objecting. Although generally a contemporaneous objection is

necessary to preserve error, 12 O.S. 1981, §2104(A)(l), the Evidence Code provides for review

of "plain errors affecting substantial rights" when no objection is made. 12 O.S. 1991, §2104(D).

Defense counsel did everything he could reasonably do to prevent the errors from occurring

ahead of time, and all the relevant parties and the trial court was clearly on notice of his

objections to any testimony relating to the substance of Mr. Ward's extrajudicial statements.

Mr. Fontenot's objections to the admission of Ward's statements and the admonitions

specifically warning witnesses not to relate Mr. Ward's statements preserved this error. The

denial of Mr. Fontenot's constitutional right of confrontation was "plain error" and affected

"substantial rights," and thus is subject to review of this Court. 12 O.S., 1991, §2104(D); *McCall*

*v. State*, 539 P.2d 418 (Ok. 1975). As the United States Supreme Court has said:

> This case cannot be characterized as one where the prejudice in the denial of the
> right of cross-examination constituted a mere minor lapse. The alleged statements
> [extrajudicial confession of separately tried, nontestifying accomplice] clearly bore
> on a fundamental part of the State's case against petitioner.

*Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077 (1965) The denial of Mr.

Fontenot's constitutional right of confrontation was fundamental error leading to conviction and

not subject to waiver. *Ake v. Oklahoma*, 470 U.S. 68, 74-75, 105 S.Ct. 1087, 1092 (1985).  The

prejudice of ignoring the appellate court's holding in *Fontenot v. State*, 742 P.2d 31, 32 (Ok.

1987), is that the only arguable evidence of guilt independent of Mr. Fontenot's confession was

the blouse description. Absent Mr. Ward's live testimony, this "evidence" was already greatly

weakened by the fact that no such blouse material was found with the remains; that the police insisted on denying they had been given a similar blouse description long in advance of the confessions despite the fact they clearly had; and that a different shirt actually found with the remains in fact matched the earrings Mrs. Haraway wore. These problematic facts demonstrate why it was so important for the State to inject Mr. Ward's extrajudicial statements concerning the blouse as "corroboration" at every opportunity, as well as the impact Mr. Ward's statements must have had on the jury. The "corroborative" value of Ward's statements and the impact they must have had on Mr. Fontenot's jury would have been greatly diminished, if not destroyed, by Mr. Ward's live testimony - which we now know would have disputed the veracity of his description and explained how he came to give that description. Mr. Ward's explanation at his retrial was consistent with statements he made to his attorney long in advance of the discovery of Mrs. Haraway's remains and consistent with the existence of a red and white striped shirt having been found with her remains while no evidence of the described blouse was found. Mr. Ward ultimately received a life sentence while Mr. Fontenot was sentenced to death[44] for convictions of the same crimes. Mr. Fontenot respectfully requests his convictions be overturned in light of this denial of his federal constitutional right of confrontation.

## VIII.   MR. FONTENOT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOALTED DUE TO THE POLICE MISCONDUCT THAT PERMEATED THE INVESTIGATION INTO MRS. HARAWAY'S DISAPPERANCE.

### A.      The Ada Police Department's Complete Lack of Training to Handle Major Crimes Resulted in an Incompetent Police Investigation.

---

[44] Mr. Fontenot's death sentence was overturned on his second direct appeal.  He was later resentenced to life imprisonment without the possibility of parole.

The Ada Police Department (APD) is the sole law enforcement agency responsible for investigating crimes in the City of Ada. As such, officers are required to be trained on the preservation of evidence, witness interviewing, report drafting and other investigative procedures to ensure the proper handling of criminal activity within their jurisdiction. Because they are the only agencies investigating major crimes in Ada, their failure to follow proper protocol results in the ineffective evaluation and collection of evidence. At the time of Mrs. Haraway's abduction and through the investigation of her case, the APD lacked the requisite training to properly secure potential evidence and evaluate the evidence collected in the case.

The only substantial training in investigative techniques by the lead APD detective, Dennis Smith, was inadequate on-the-job training. Detective Smith testified police officers were "intuitively investigators" and got investigative experience through investigating traffic stops and domestic abuse cases (Ex. 53, pgs.10, 12) and that personally, he "received on-the-job training, which was probably the most beneficial." (Ex. 53, p.12). Prior to Mrs. Haraway's abduction, Detective Smith had only been involved with two homicide investigations in his numerous years on the police force. *Id.* at 126. One of them remained unsolved during the investigation of the Haraway case.[45]

OSBI's involvement in the Haraway case came only at the request of the local police agency, APD. (Ex. 43, prosecutorial bates 3). While OSBI's documentation of the investigation does show more thorough reporting than the APD, there are still questions concerning the Haraway investigation that remain unclear. It is evident both agencies received numerous witness reports in close proximity to the crime providing information of alternate suspects and

---

[45] The second homicide investigation involved Debbie Carter's murder which occurred in 1983. Ronald Williamson and Dennis Fritz were convicted of that murder, then later exonerated.

former boyfriends who many have had a hand in Mrs. Haraway's disappearance. APD's and OSBI's inability to pursue such leads, vet the information, and make reasonable investigative decisions is clear from the actions of both agencies in this case.

**B.     The Ada Police Department's Primary Function Was To Investigate The Disappearance of Denise Haraway and They Failed That Role Because They Did Not Collect Information from Readily Available Witnesses.**

Starting from the first call to emergency services, the police failed to properly preserve the crime scene, evaluate evidence and follow investigative leads. When law enforcement fails in this endeavor, it places the district attorney in a precarious position of evaluating evidence without a full understanding of crucial facts of the crime. *See Brady v. Dill,* 187 F.3d 104, 114 (1st Cir. 1999) (A valuable role and standard police function is to provide information to the prosecutor and the courts). Detectives in this case failed to properly preserve evidence creating a ripple effect limiting the investigative avenues detectives could consider and develop further.

The Court has admonished police behavior that relies on flimsy information. When witnesses are readily available for interviews, physical evidence is available, and medical diagnosis is forthcoming, yet the police do not conduct appropriate interviews, inspect the evidence for signs of the crime, or wait for preliminary reports from the medical technician, some courts have concluded the police failed to conduct an investigation. *See Cortez v. McCauley*, 478 F.3d 1108, 1117-18 (10th Cir. 2007).

> The investigation of reported crime is the statutory and jurisdictional province of various local, state, and federal law enforcement agencies (Sullivan, 1977). The specific agencies responding to a criminal complaint, and ultimately in charge, depend on which laws have been reported to be broken and where. Whichever agency takes charge of a criminal complaint, they have the legal authority to respond to the scene, interview witnesses and suspects, collect evidence, and make arrests.
>
> Any responding law enforcement agency also has a professional duty of care. This refers to the professional and legal obligation to be competent custodians of any

137

victims that are encountered; any criminal investigations that are initiated; any evidence that supports or refutes allegations of criminal activity against accused suspects; and any suspects that they take into custody (see Bopp and Schultz, 1972; Gross, 1924; Hansen and Culley, 1973; Kappeler, 2006; SATF, 2009; and Savino and Turvey, 2011). Very often this duty of care is a matter of explicit statute and agency policy, wherein law enforcement officers are not allowed to turn a blind eye to crime and must respond to protect life and property. Very often it is also made part of the formal oath they take when being sworn in. If an agency, or its officers and investigators, do not hold or perceive a professional duty of care to their community, then they are not fit to serve it (Gross, 1924); let alone respond to criminal complaints and assume the responsibilities associated with the collection and testing of physical evidence.

The primary responsibilities of law enforcement, when responding to a criminal complaint, include (adapted from basic criminal investigation and crime scene processing guidelines found in Gross, 1924; O'Connell and Soderman, 1936; Rau, 2000; Snyder, 1944; Wade, 1999; and Weston and Wells, 1974):

1. Protect themselves; call for back-up when needed.
2. Establish who is involved.
3. Ensure that everyone involved is safe.
4. Get medical assistance for those that need it.
5. Determine what happened.
6. Establish who made the complaint and what it is about.
7. Identify any witnesses.
8. Seek out, identify, collect, and protect any physical evidence.
9. Ensure the objective forensic examination of all relevant evidence.
10. Determine whether or not a crime has taken place.
11. Identify any legitimate criminal suspects.
12. Establish whether probable cause exists for an arrest.
13. Arrest any criminal perpetrators.

These tactical issues also reflect an ethical responsibility. Investigators may not assume what happened based on the statements of one party. They may not assume that any crime has actually occurred until the facts have been established by a thorough investigation. They must be sufficiently educated to understand what the elements of each crime are and what probable cause is. They must also impartially place the cuffs on anyone they determine has broken the law. For example, as explained in Bryden and Lengnick (1997; pp. 1230- 1231):

As with all crimes, the police decide whether a reported rape actually occurred, and attempt to determine who committed it. If they want the case to go forward, they "found" the complaint and transmit the file to the prosecutor's office ... The police must investigate, a task that cannot easily be combined with offering the

emotional support that the victim needs. The detective presumably wishes to avoid an injustice to a wrongly accused individual. In addition, for reasons of professional pride, he does his best to avoid looking naive by falling for a story that turns out to be false.

Meeting these responsibilities is best accomplished with a thorough, diligent, and comprehensive investigation. By comprehensive investigation, the examiner means a detailed review of the complainant and their statements; the careful consideration of witness and suspect statements; and the diligent collection and examination of any physical evidence. All of this must be attended prior to making final determinations regarding whether a crime has been committed and whether probable cause exists to arrest any suspects. See generally Bopp and Schultz (1972); Gross (1924); Kappeler (2006); Leonard (1969); O'Connell and Soderman (1936); Sullivan (1977); Savino and Turvey (20 11 ); and Weston and Wells (1974).

Ex. 20, pgs. 2-3). The investigation conducted by the APD and OSBI failed to follow even the basic duty of care owed in the disappearance and murder of Mrs. Haraway. Such disregard at the beginning of the investigation allowed valuable information to be destroyed or completely ignored, including potentially exculpatory evidence for Mr. Fontenot.

When Mr. Whelchel contacted APD at approximately 8:50 pm on April 28th, 1984, Ada Police Officer Harvey Philips responded first shortly followed by Detective Baskins. N/T 6/9/1988 at 86, 91. Upon Officer Phillips arrival, he neglected to close the store to preserve the scene on the grounds that, "because there were several people that had already been in the store and I don't know how many had been there before they got there." *Id.* at 93. When Detective Baskins arrived, he observed "there was Sergeant Phillips, who was the sergeant on duty at the time. He was there, the manager of the store was there, and there were a couple of other people there, there was a lady there and some children."[46] N/T 6/10/1988 at 156. Clearly, the crime scene had not been secured for the police to properly evaluate the evidence.

---

[46] As a continuing pattern of non-disclosure, the APD never turned over or made known the list of people who were in McAnally's that evening, what they saw, and if they also saw a grey truck.

Both officers acknowledge that a cigarette in the ashtray, a beer on the counter, and Mrs. Haraway's purse were not properly preserved as evidence. *Id.*; J/T p. 1239-1240, 1422-23, 1439, 1441, 1447-48. This allowed for evidence to be mishandled, misplaced, or destroyed entirely. Consequently, valuable information that could have led to the actual perpetrator was lost forever. *See* N/T 6/9/1988 at 87-93, 102-103; N/T 6/10/1988 at 155-157.

The failure to preserve this evidence deprived the defense of viable evidence, but equally important, it limited what evidence the police possessed to determine what happened to Mrs. Haraway. J.D. Watts, the store clerk who was on duty prior to Mrs. Haraway's shift returned to the store at the behest of Mr. Atkeson, store manager. When he arrived he noted the following:

> When I arrived at McAnally's later that **night I recall seeing a lot of police, more than I could count. I recall seeing Ada police, Pontotoc County Sheriff's Deputies and Oklahoma Highway Patrolman. Inside the store, I recall seeing police officers standing at the counter and looking at the register tape. I remember hearing one of those officers saying that the last purchase made on the register tape was a tallboy can of beer.**

(Ex. 15). (*emphasis added*). Not only did the APD not properly secure the scene, their allowance of numerous other officers inside the store demonstrates a blatant disregard for proper police procedure. Further, the failure for all of these officers to document their involvement in the investigation continues to show a failure to properly record the investigation and those taking part in it.

Detective Baskins collected the McAnally's register tape while at the store, receiving telephone calls from customers that very evening. As presented earlier, Officer Richard Holkum, John McKinnis, Gary Haney and Guy Keys all provided information crucial to the investigation of Mrs. Haraway's abduction but were disregarded. *See supra* Claim I and II. These witnesses explain seeing a pick-up truck believed possibly to be involved at the scene thirty minutes before

Mrs. Haraway's disappearance. (Exs. 5 & 6).  Mr. McKinnis provided evidence showing a man in the store behind the counter with Mrs. Haraway. (Ex. 5). However, not only did the APD and OSBI never document their interviews, they never followed up on these leads. Police found no signs of forced entry, a physical confrontation or any obvious signs of violence. J/T 1087-1088, 115-116-, 1135, 1139, 1143. With no indication of violence, the possibility that Mrs. Haraway may have been familiar with her abductor was clearly a possibility based not only on Mr. McKinnis' interview but also the obscene telephone calls made repeatedly to Mrs. Haraway while she was on duty. This was all evidence the police received by their own request. They sought out witnesses who made purchases in the store; those witnesses responded. They asked family members about anything odd involving Mrs. Haraway; they gave numerous reports of harassing behavior from an unknown assailant. Either these leads were blatantly ignored by APD and OSBI whose duty it was to accurately investigate the case, or their lack of training, created an inability to recognize the obvious evidentiary value of that evidence. Whatever the reason excuse, the failings of the Ada Police Department and the OSBI to collect, preserve and evaluate the evidence generated in the hours following Mrs. Haraway's disappearance violated Mr. Fontenot's right to a fair trial with a reliable result.

The Ada Police Department turned a blind eye to many important pieces of evidence relying instead on witness statements that fit their off the cuff theory of the case while disregarding much stronger evidence of alternate suspects. This caused the police department to only look at limited facts and witness statements as opposed to getting all the facts and statements from witnesses and letting that define the scope of the investigation. "[A]n officer may not choose to ignore information that has been offered to him or her…Nor may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts."

*Kingsland v. City of Miami*, 369 F.3d 1210, 1219 (11th Cir. 2004). This reliance on flimsy and limited information is the type of investigation which resulted in botched investigation. *See generally Kyles v. Whitley*, 514 U.S. at 445.

      **C.**    **Police Misconduct Involving Witness Interviews Resulted in Descriptions of the Suspects That Have No Relevance to The Disappearance of Mrs. Haraway.**

The police created a profile of two suspects within four hours of Ms. Haraway's disappearance without a proper evaluation of the facts in the case. (Ex. 41).; *supra* Claim II. The police then focused on Karen Wise's description of two men, even though she was not present at McAnally's. Ms. Wise worked at J.P.'s, another convenience store down the road from McAnally's, and did notice four patrons that evening who made her feel uncomfortable. *See* N/T 6/ 8/1988 at 163; *see also* Ex. 13. However, at no time during the evening of April 28, 1984, did Ms. Wise visit McAnally's where Ms. Haraway worked. It is unclear how the police learned of the four men in J.P.'s or why they focused on Ms. Wise's account as the basis of the two suspect, that later became two composites, when Ms. Wise saw four men in her store that night. *Id.* Police pressure on Ms. Wise caused her to change her account to conform with evidence with no connection to the crime. *Id.*

This pattern of pressuring witnesses to change the information provided permeated the police investigate causing truthful information to get lost in the process. James Moyer, the sole eyewitness placing Mr. Fontenot in McAnally's, also recounted his attempts to alert the State of his uncertainty of his identification only to be told he too was incorrect. *See* Ex. 14.  Stacey Shelton went to Detective Baskins to explain how she knew about the party held at Gordon Calhoun's apartment was correct because she was there. Ward Vol. 10 p. 93-195; Ex. 12. Instead of investigating her account, she was disregarded as complication to the State's case. *Id.* Such

improper handling of witnesses includes Mr. Fontenot himself, who gave a false confession after being told not only that his alibi was wrong but that Mr. Ward had implicated him in the crime with Odell Titsworth. *See supra* Claim V. Such action by the police handling this case demonstrates a disregard not only for the properly development of factual information in a criminal investigation but a blatant abuse of power for those witnesses who do voice concerns.

### D.    Law Enforcement Failed to Investigate Leads from other Jurisdictions.

Throughout the investigation into Mrs. Haraway's disappearance, both the Ada Police Department and the OSBI interviewed numerous people regarding alternate suspects, potential leads, and other vital information related to the case. *See supra* Claim II.  Maintaining proper documentation of these various contacts and their substantive interviews was paramount to discern what happened. However, the report writing and records keeping by both the OSBI and APD was flawed throughout the investigation of this case. Contained within OSBI reports are numerous leads for alternate suspects fitting the composite sketch description with little to no documentation as to what happened to these potential leads. *See id.*  It is unclear why certain suspects were or were not interviewed or why a person was eliminated as a suspect.

For example, agents interviewed Jerry East and several of his family members to ascertain whether he was in Ada around the time of Mrs. Haraway's disappearance. (Ex. 29, at 1104-1106). The report states Mr. East was arrested for burglary in Ada, OK in May 1983 and was on probation at the time. *Id.* When asked his whereabouts on April 28th, he believed he was with his sister and her family at the lake.  *Id.* The Agent's notes on the interview states, "EAST is very poor in remembering times and dates. EAST matches the description of the number two suspect in the Haraway disappearance being fair complexed [sic] with blond hair and green eyes. EAST also has a small amount of acne around his face. However, EAST's hair is cut, left long in

143

the back and the front in the middle of the ear. It is light blond in color." *Id.* OSBI continues to

investigate Mr. East as potential suspect before unceremoniously dropping the investigation for

no clear reason provided in any reports. This pattern continues for numerous other potential

suspects.

Beaumont, Texas Police contacted OSBI concerning three Caucasian men arrested for

attempting to steal a woman's purse from her car and then attempting to run over the owners

when they were caught.

> On June 29, 1984, Detective Barrow, Beaumount Police Department . . . advised
> Deputy Insp., Roberts his department had taking into custody on June 28, 1984 at
> 1935 hours a while male who resembled one of the suspects in the composite. The
> suspect and the two other individuals attempted to steal a purse from a car but the
> owners caught the subjects.  Subjects then attempted to run over the owners. The
> subjects were in a '70's blue Chevrolet pickup with primer spots, bearing Oklahoma
> License ATF1975, which was impounded by Beaumount P.D.  Before Det. Barrow
> could check the pick-up for evidence the pick-up and subjects were released.

(Ex. 44, OSBI 0125). The full names and dates of birth were provided for all three suspects:

Denver Russell Davis, Daryl Patrick Robins, and Christopher Lynn Hammock. *Id.* Photographs

of these three men were provided along with their criminal histories which included robbery,

burglary, larceny, dangerous drugs, and assault.[47] (Ex. 29, p. 1149-1160). For all the vital

information provided by the Beaumont Police Department on these three criminals who fit not

only the description, but a truck strikingly similar to the one seen by the only eyewitnesses,[48]

nothing was done by either OSBI or the APD to follow-up on this lead. These men obviously

had ties to Oklahoma, including working within the state. *See* (Exs. 33 & 44, OSBI 0125). It

would have been relatively easy to track the license number to find out whether these men or

one of them was involved in Mrs. Haraway's disappearance. Yet inexplicably, no further

---

[47] The photographs of these three suspects were disclosed in the January 2014 discovery during the state post-conviction for the first time.
[48] David Timmons described the primered truck he saw as blue in color. *See* Ex. 44, OSBI 0851.

investigation is shown as to what transpired with this information.

Further, OSBI received information regarding two men arrested in Tulsa for attempting to rob and kidnap a female convenience store clerk in a very similar manner to the description in the Haraway case. Not only were these two men arrested in August 1984, three months after Mrs. Haraway's disappearance, but they also matched the composite description used by police.

> During the early morning hours of August 9, 1984, ORVEL REEVES drove a silver, 1984 Datsun passenger car to a Circle "K" Convenience Store in Tulsa. DENNIS REEVES entered the store, robbed the female clerk at knife point and then abducted the clerk from the store. A Tulsa Police Department Patrolman was sitting across the street from the store and saw DENNIS REEVES walk out of the store arm and arm with the female clerk. The patrolman became suspicious and followed the car a short distance, then stopped it. As the patrolman was approaching the car, the female convenience store clerk alerted the patrolman to the fact that she had been robbed and abducted. Patrolman then took DENNIS and ORVEL REEVES into custody.

(Ex. 29, p. 1111). Tulsa County prosecuted and convicted both men for these events resulting in fifteen year sentences. (Ex. 30). Because they remained in custody, OSBI Agent Gary Rogers or APD Detective Dennis Smith could have interviewed these men given that the facts of this robbery/kidnapping mirror those described in Mrs. Haraway's case. However, no further follow-up, witness interviews, or police reports provided demonstrate whether anyone developed such a critical lead in this investigation. These three examples are not anomalies but a consistent pattern of a lax and incompetent investigation that repeatedly ignored assistance of various jurisdictions. The OSBI reports disclosed pursuant to the OCCA's order and those recently released continue provide additional alternate suspects and viable leads that were dropped by law enforcement. Given the singular role that law enforcement plays in investigating criminal activity, the failure of those leading the investigation into what happened to Denice Haraway utterly failed in their

obligation resulted in numerous alternate suspects being ignored in favor of "suspects" who not only had alibis but clearly not motive for these crimes.

### E. Law Enforcement Failed to Properly Preserve Evidence Connected with The Crime After Mrs. Haraway's Remains Were Found.

Given that law enforcement are the only agencies that may collect physical evidence, the proper storage and cataloging of that evidence is paramount. However, the OSBI and APD failed to conduct a proper search of the Gerty crime scene where Denice Haraway's remains were discovered. Allen Tatum found the skull while laying traps on his property. N/T 6/08/1988 at 37-38. He then contacted the police who began searching for other bones over the course of a few days. N/T 06/08/1988 at 40-44. However, the search conducted by several OSBI agents did not provide a comprehensive list of what bones were found, the exactly location of those bones, what other items may have been found with the bones, and over how far an area were bones uncovered. (Ex. 44, OSBI 0185-0201, 0203-0204, 0211-0212). (Ex. 29 at 0932-0933, 0936-0951, 1124-1145).

The investigative and forensic efforts of law enforcement at the location where Haraway's remains were found (West of Gerty, off a county road; Monday, January 20th, 1986) were inadequate rising to the level of abandonment. This prevented the recognition, preservation, collection, and testing specific items of evidence, as well as an untold volume of evidence that would have been missed. This is based on at least the following facts and evidence:

A. The First Officer on site did not secure crime scene or provide for scene integrity in any reasonable or effective fashion. This is standard practice even when remains have been in place for extended periods of time, to prevent further evidence loss, damage, or obliteration (Chisum and Turvey, 2011 ).

• No security tape deployed.
• No security log kept re: personnel/witnesses/ patrons entering and exiting the scene.

B. It is unclear from the record whether scene was "processed" on 1120/86 or 1121186

C. Scene photos lacked sufficient quantity, quality, context and measurements.

D. Some bones appeared to be improperly piled together for photos, and were then packaged together in a sack.

E. There is no written investigative or forensic report on who found what or where at the scene.

F. There is no scene diagram.

G. There was no directed or deliberate forensic excavation for other evidence concealed by brush or beneath soil.

H. According to a supplemental MEs report, some victim bones and a watch were found in a rat's nest by a farmer some 30' away from the original site on 1-30-96. There is no evidence that the watch put under a clear chain of custody or submitted for forensic analysis (e.g., fingerprinting; now DNA testing).

I. Additionally, there is no evidence that anyone in authority investigated or confirmed whether the watch or the earrings found with these remains actually belonged to the victim.

J. The ME's office was not notified; bones were therefore removed without proper legal authority by the police, the OSBI and the Sheriff's Department.

K. The scene was vacated and left unsecured before investigators returned on 1/24/86: the OSBI, the prosecutor, the sheriff and the ME went out there and found more bones.

L. In late February of 1986, law enforcement investigators returned to search this scene with both ECU college students and victim family members. Either group being involved with formal search efforts at this scene is highly inappropriate.

M. There were, in effect, multiple searches on multiples dates by multiples agencies with no reports of search activity or chain of custody regarding evidence collected.

N. Based on a review of the documentation, it is likely that evidence still exists at that location, to include more bones and perhaps even the victim's engagement ring, which was not recovered.

(Ex. 20). Without this information, it was impossible for trial counsel, appellate, or post-

conviction counsel to properly understand exactly what happened to Mrs. Haraway prior to her

death. These difficulties did not only impact the defense but the ability of the Medical

Examiner's Office to properly evaluate and identify the remains they were provided. The ME's

Office investigator noted the poor investigation and evidence collection destroyed any ability of

that office to fully understand what happened to Mrs. Haraway.

> 1-21-86, 1650 I returned a call to Hughes County District Attorney Bill Peterson
> concerning some bones that were found. Mr. Peterson didn't know anything, about
> the discovery but they are thought to be the remains of a missing store clerk --
> Donna Hariway.[sic] No ME was notified. He stated that the OSBI was notified out
> of McAlister.[sic] That some people from the OKC office had come down. OSBI
> Lab people out of OKC did photo. **The scene and they just had a field day picking
> up bones. No diagrams. The OSBI agent out of McAlister never showed up at
> the scene. Mr. Peterson believes that the bones are en route to OKC but didn't
> know for sure.** The sheriff didn't know where the bones were but thought that the
> OSBI had them. Notified the OSBI in OKC & spoke with Rick Spense. He didn't
> have the bones but thought that the lab man David Dixon had them. I spoke with
> the Sheriff Orvall Rose who didn't know where they were. Finally the OSBI found
> them in their lab and delivered them at 2040 by Ann Reed. Come to find out the
> bones were found by a trapper.

(Ex. 46, pg. 10) (emphasis added). Because no systematic approach was taken to properly

collect evidence, not all of the viable evidence related to the case was uncovered in the January

1986 search. Instead, family members, university students, friends of the victim, and unrelated

people found critical evidence and brought it to police during a much larger search conducted at

the end of February that same year. N/T 6/08/1988, at 82-95. These searches also occurred

without proper evidence collecting practices clearly showing the lack of a proper search done by

police in January 1986. Further, yet other people found evidence missed by the OSBI and APD.

Shelia Desoto and her daughter, Sandi Mantzske found a grey sweatshirt at the Gerty crime

scene.

> Several months after Karl Fontenot and Tommy Ward were convicted of Denice
> Haraway's murder, I saw news reports that Denice Haraway's remains had been
> found in an isolated location near Gerty, Okl. Those remains were discovered on
> Jan 21, 1986.

Several weeks later, mom's sister, Hazel Faulkner, was visiting from Texas. She was interested in the [sic] the Denice Haraway case. On Friday, March 7, 1986, I went with my Aunt Hazel Faulkner and my mom, Sheila Desoto, and drove over to Gerty to look at the site where Denice Haraway's remains had been discovered. We were there out of curiosity. After viewing the trial, this was just one more fact which didn't make sense. We were walking around this site when we literally stumbled over three large flat rocks, which appeared to have been placed carefully over a large cloth object. We carefully removed the rocks, and found a nearly intact gray sweatshirt with a hood and a zippered front. We placed this sweatshirt into a paper sack in order to preserve any possible evidence. We thought this might have been the sweatshirt worn by Denice Haraway the night she disappeared.

We also took photographs of the sweatshirt and where we found this sweatshirt. Copies of those photographs are attached. By the time we got to a payphone it was late on Friday afternoon. We called, but were unable to reach Dennis Smith or Gary Rodgers. We put the paper bag with the sweatshirt into the trunk of my mom's car where it stayed all weekend.

On Monday, March 10, 1986, my mom and I personally handed this gray sweatshirt to Ada Police Chief Gray in his office. Chief Gray told us he would put this sweatshirt with the other evidence related to the Denice Haraway case, in the property room. No investigators, including Dennis Smith and Gary Rogers has ever interviewed me or asked me where or how we found that sweatshirt.

(Ex. 31).

The problem with the failure to collect, document, and store the evidence related to the evidence from the Gerty crime scene and what has transpired to that evidence is that crucial information which explains what happened on April 28th are lost. Further, records pertaining to the evaluation of this evidence is also missing. Dr. Fred Jordan, a former Medical Examiner who knew of the evaluation conducted by Drs. Glass and Balding talked about their practices at the time to photograph all remains given to them along with x-ray any bones. *See* (Ex. 36) This was standard practice for the office who handled the bones and evidence brought to them from the Gerty crime scene. However, none of this evidence can now be found. Such evidence is crucial to the understanding of the events that transpired from the time Mrs. Haraway left McAnally's

on April 28, 1984, until her skeletal remains were discovered almost a year and a half later. That almost every state agency who investigated, analyzed, or prosecuted this case have lost the lion's share of the evidence and documentation in this case not only deprives Mr. Fontenot of his ability to properly prove his innocence, it makes it almost impossible to answer the question, "What happened?" The inept handling of reports, evidence, and all other vital documentation from this case clearly falls within the known pattern of police misconduct that the lead detectives and agents working on this case where known to commit.

### F.  Conclusion

The failure to properly train officers with the Ada Police Department to investigate a case like this one resulted in the numerous errors that are raised in this petition. If the police investigating this case had collected available evidence, investigated leads of other potential suspects, listened to witnesses even if their information was contrary to APD's theory of the case, and followed up on the information people were giving them, it is likely Mr. Fontenot would have never been convicted. Regardless of how "intuitive" a detective is, the detective is still duty bound to build a case not on gut feeling, but on evidence. Additionally, the detective is duty bound to consider all available evidence instead of only considering evidence his intuition tells him is important.  Finally, the detective must make all evidence available to the prosecution so a proper assessment of discoverable materials can be timely made pretrial.  Based on the numerous constitutional violations that occurred in this case, there can be no question that Mr. Fontenot did not receive a fair trial to which he was entitled both under the laws of the state of Oklahoma and the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing, Petitioner, KARL FONTENOT, respectfully

prays that the Court grant him the following relief:

A)    That Petitioner be granted such discovery as is necessary for full and fair
resolution of the claims contained in this Petition;

B)    That leave to amend this Petition be granted;

C)    That, because the state courts afforded no evidentiary hearing in state court
proceedings in this matter, an evidentiary hearing be granted on all claims
involving disputed issues of fact, including Claims I-VIII;

D)    That Respondents be Ordered to respond to this Petition; and

E)    That Petitioner's convictions be vacated.

Respectfully submitted,

__/S/ *Tiffany R. Murphy*_____

Tiffany R. Murphy
Arkansas Bar No. 2015057
790 N. Cliffside Drive.
Fayetteville, AR 72701
(479) 575-4573

Dated: February 24, 2016

151

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Oklahoma by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


By: /S/ Tiffany R. Murphy
TIFFANY R. MURPHY