# EXHIBIT 12

## AFFIDAVIT OF STACEY SHELTON

I, Stacy Shelton, being first sworn, do hereby attest to the following:

1. I was a reporter covering the January, 1985 preliminary hearings charging Tommy Ward and Karl Fontenot with the murder of Denice Haraway. I subsequently covered the original jury trial for the two suspects.

2. During the course of the preliminary hearing for the two defendants, a videotape was played of the interrogation of Tommy Ward. In the video, Ward denied any involvement with the crime and provided an alibi for the night of Saturday, April 28, 1984, the night Haraway disappeared. Specifically, Ward claimed that he had attended a party next door to the apartment of Janette Blood. Additional details that Ward recalled about the party included the that there was a guy named Gordon who was playing a drum set and another guy from Konawa who was playing a guitar. He also recalled that police came to the apartment and told the partygoers to reduce the noise level because there had been complaints that the music was too loud.

3. As I was watched the video, I realized that Ward was referring to a party I had attended at Gordon Calhoun's house. My brother, Bruce DePrater, was from Konawa and had been playing the guitar and Gordon had been playing the drums. Ward has also eluded to the fact that there were two other boys from Konawa at the party who were passed out on a bed. Those two boys were my childhood neighbors, Chris and Eric Thompson. I remembered them being at the party and indeed, they were passed out on a bed in an adjacent room to the livingroom.

4. I also remember Janette Blood being at the party with several of her friends. At the time, I did not know who she was or her name, but, I remembered her specifically because after I remarked that everyone needed to lower the noise because of the warning from the police, she came up to me and yelled in my face. She was easy to remember because of her flaming red hair and missing teeth. It was only at the trial, when she testified that I learned her name.

5. I specifically remember the night of the party as Saturday, April 28, 1984. First, my brother had invited me to the party after seeing me with my roommate Laura Ingram, and my date, Lyndel Gibson, at a local dance club. All three of us went to the party with the intent of only staying for a short while. It was the first time I had gone out with Lyndel, who I ended up dating for the next two years. It was the one and only time I went to Calhoun's house. I kept a calendar, almost like a diary, of everything I did. I wrote it in my calendar the following day. Also, during that time, I never went out on Friday nights because I worked on Saturday mornings and liked to go to bed early.

6. The police should have been aware of the date of the party since they arrived at the house a couple times to quiet the party. However, the police would not have been aware of everyone at the party. I know this because my friend, Laura and I were hidden in a different part of the house when the officers arrived and never interacted

1

directly with them.

7. After watching the video of Tommy Ward describing the April 28, 1984 party, I left the courtroom and approached Dennis Smith. I told him that there was no way Ward would know details about the party unless he was there. Smith told me that anyone could have told him about the party. I argued with him that Ward would not have known all the detail that he spoke about if someone had just told him about it. He said to me, "I don't want to hear it," and turned and walked away.

8. I later informed Mike Baskins about the accuracy of Ward's description of the party that night. I insisted that Ward and Fontenot couldn't have committed the crime since they were at the party that night. Baskins argued with me concerning the validity of the alibi, claiming that police logs showed that the party actually took place on a Friday night. I knew that could not have been correct and several years later, I discovered that the police log actually showed that the party was, in fact, on Saturday night.

9. At the second trial of the defendants, I testified for the defense, verifying that Tommy Ward's details matched what I had seen at the party.

10. After testifying at the trial, I was confronted by Bill Peterson who brought me into an office he and Chris Ross were using within the courthouse. Once I was there, Peterson told me I was to get back on the stand and recant my testimony. I told him I wouldn't do it because I had told the truth. He made me stay in the office for about half an hour and then came back in with what he told me were trial transcripts. He ordered me to read them. I did and then he yelled at me saying that I was lying because, he said, the transcripts didn't match my testimony. Again, he demanded that I return to the stand to recant my previous testimony and again, I refused telling him that while not everything I testified to was in the transcript he showed me, that I clearly remembered what took place that night and I clearly remembered seeing the tape sometime during the preliminary hearing or trial, although I could not recall exactly which one.

11. Peterson was extremely volatile during the course of this confrontation. He slammed his fist on the desk. He slammed the transcript on the desk. He was red-faced and yelling almost to the point of spitting. He insisted over and over again that I go "back on the stand and testify that everything you said was wrong."

12. Because I refused, he told me I was not to leave his office until I agreed to recant. I stayed in the office for several more hours while the trial continued. He would come into the office during breaks and again demand that I retake the stand, which I refused to do. At the end of the day, he let me go, but told me I was to return every day until I agreed to recant. He told me he was going to recall me and rip my testimony to shreds and although I returned each day of the trial and was made to sit on a bench in the hallway until the trial concluded, he never recalled me and I refused to go on the stand of my own accord and recant. Peterson left me with the impression that if I did not remain

in his office the first day or return the following days that I would be jailed. I missed several days of work because of it.

13. I interpreted all of the foregoing actions by Peterson as intimidating, although I continued to stand by my testimony.

*Stacy Shelton*
STACY SHELTON

Subscribed to and sworn before me this 4th day of November, 2009.

NOTARY PUBLIC
09004687

My commission expires: 6/2/2013

3



Sara Bonnell
120 N. Second
Purcell OK 73080