# EXHIBIT 1:

Case No. CIV 00-194-D

# IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA

**DENNIS L. FRITZ, RONALD K. WILLIAMSON, by and through his legal guardian, Annette Hudson and ELIZABETH FRITZ,**

**Plaintiffs,**

**v.**

**THE CITY OF ADA, THE STATE OF OKLAHOMA, et al**

**Defendants.**

## APPENDIX OF EXHIBITS FOR PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**VOLUME IV**

FILED

3:55 P.M.

JAN 0 8 2002

WILLIAM B. GUTHRIE
Clerk, U.S. District Court

By:_____
Deputy Clerk

BARRY SCHECK
PETER NEUFELD
JOHNNIE L. COCHRAN
Cochran, Neufeld, & Scheck
99 Hudson St, 8th Floor
New York, NY 10013
(212) 965-9380
(212) 965-9084 (fax)

CHERYL PILATE
CHARLES ROGERS
Wyrsch, Hobbs & Mirakian,
1101 Walnut, Suite 1300
Kansas City, MO 64106
(816) 221-0080
(816) 221-3280 (fax)

MARK BARRETT
P.O. 896
Norman, OK 73070
(405) 364-8367

PLAINTIFFS' DEPO
EXHIBIT NO. 19

PONTOTOC COUNTY SHERIFF'S OFFICE,  ADA, OKLAHOMA
# WITNESS — VOLUNTARY STATEMENT
### (NOT UNDER ARREST)

I, ___John B. Christian 446-68___ am not under arrest for, nor am I being detained for any criminal

offenses concerning the events I am about to make known to ___Gary Rogers - OSBI___

Without being accused of or questioned about any criminal offenses regarding the facts I am about to state, I volunteer the following
information of my own free will, for whatever purposes it may serve.

I am _____ years of age, and I live at _____

At 2115 hrs. Ron Williamson advised me that James _ Riggens
While being held in Cell Pod #5 Pontotoc County Jail had told
him that he would give Ron a written statement, that Glen
Gore had admitted to killing Debbie Carter. At 2115 Ron
Williamson advised me that he had the written statement
that James Riggens had promised him. He asked me
to let him call his sister Annette or Barney Ward so they
could come and get the statement before something happens
to it. At the time I contacted Gary Rodgers to see what
we should do about the statement. Gary contacted Bill
Peterson and advised me to get copy of statement
and advise him (Ron Williamson) that the statement would have to go through
the normal channels (mail or visiting day). I looked at
statement and read it. It said that on 7-15-87 was when
A Glen Gore made his statement to James Riggins. Glen Gore
was in Lexington A+R at this time making it impossible for
him to talk to James Riggins.
Note: At 2110 I let Ron Williamson call his sister Annette.
He advised her of the statement and she told him to S.G.C.
copy It in writing and she would come and get it for
Barney Ward.
          — SEE Attached Copy of Statement —

I have read each page of this statement consisting of __2 1__ page (s). each page of which bears my signature, and corrections, if any
bear my initials, and I certify that the facts contained herein are true and correct.

Dated at ___2145 hrs___ this ___2___ day of ___Sept___, 19 87

WITNESS: _____

WITNESS: _____
                                                    ___John B. Christian___
                                                    Signature of person giving voluntary statement

Federal Ptny. — Ada

9-2-87

To whom it Concern, I which this to be Considered a Sworn Statement.

On July 16-1987 I was brought back to the court Jail. Ada oklahoma, at this time after making a phone call to my people to let them know where I was, I came back to my cell in cell block 5, I had the opportunity to talk to a man that I took to be Ron williener and later found out it was Glen Gore, the man made statements that caused me to believe the man had killed someone, by the statements and action, that he made, I'm making this statement knowing that the D.A can make it harder on me, if he finds out before I plead guilty the 3rd of sept 1987, at 11:30 Am, But I'm willing to testify to this and all that was said by Glen Gore.

Jamie L Riggin
9-2-87

OKLAHOMA STATE BUREAU OF INVESTIGATION

Page . . 1 of 2

Title of Report ___INTERVIEW OF KENNETH WAYNE STEPP___

**PLAINTIFFS' DEPO
EXHIBIT NO. 14**

On January 25, 1988, KENNETH WAYNE STEPP, White Male, Date of Birth: October 29, 1965, Social Security Number: 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, Penitentiary Number: 166903, was interviewed at the Lexington A and R, in Lexington, Oklahoma, by Agent GARY ROGERS and he provided the following information:

STEPP was sentenced to the penitentiary out of Pontotoc County, Oklahoma, on a charge of Concealing Stolen Property and was assessed three years in the penitentiary.

Concering information that he had regarding the DEBBIE CARTER homicide, STEPP stated that on November 2, 1987, sentenced to eight years in the State Penitentiary and after sentencing was placed in the Pontotoc County Jail. When initially placed in jail, he was placed in the west bull pen.

Inmates DENNIS FRITZ and JAMES HARJO were both celled across the hallway in the Pontotoc County Jail east bull pen.

At about 2230 hours on November 2, 1987, STEPP was in the dining portion of the bull pen lying on a hammock that he had made out of a blanket stretched between two bars. He saw FRITZ and HARJO come out of FRITZ'S cell, but couldn't understand hardly any other conversation.

The first thing that he indicated that he heard was DENNIS FRITZ saying, "Are you telling me I'm guilty?"

FRITZ then went into his cell and got into his bed. According to STEPP, HARJO called him to come to the table several times, but FRITZ didn't come out of his cell. HARJO then went to FRITZ'S cell, but STEPP couldn't hear any conversation between the two. They stayed in FRITZ'S cell about ten minutes.

Lexington A and R
Investigation on _01-25-88_ At Lexington, Oklahoma_ By _GARY ROGERS·_ File_CR 82-502_
Offense_HOMICIDE_____ Subject RON WILLIAMSON
DENNIS FRITZ___ Case Agent_GARY ROGERS_
Office _ERO_ Date Reported _01-26-88_ Date Typed _02-03-88_ Typist _kc_ Approved_____ Ind. _kc_

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

INTERVIEW OF KENNETH WAYNE STEPP
Page 2

HARJO came back out to the table and called FRITZ again, but FRITZ told him that if he wanted to talk to him to come back to his cell.

HARJO went back into FRITZ'S cell and he heard HARJO ask FRITZ, "Did you kill that girl?", and FRITZ said no, and then HARJO said, "I think your guilty."

HARJO then came back to the bull pen table and said, "I'll get you back and make something up, pure as gold." HARJO then returned to his cell.

According to STEPP, he did not know FRITZ or HARJO until approximately one week after that incident.

STEPP told FRITZ that he heard HARJO'S statement the day that FRITZ was bound over for trial on the murder charges. According to STEPP, he was moved in to the cell with DENNIS FRITZ about two weeks after he heard HARJO'S statement.

STEPP also indicated that since he has been moved to Lexington A and R, he has been contacted by a private investigator out of Kansas City, Missouri, that is representing DENNIS FRITZ.

Concerning inmate RON WILLIAMSON, STEPP stated that WILLIAMSON was allowed to run up and down the hallways of the county jail and that he had several conversations with the female inmates who were incarcerated at the county jail, and would ask them to give him their panties. STEPP was told by trusty DAVID LANCASTER that on at least one occasion one of the female inmates gave WILLIAMSON her panties and he put the panties on in his cell and was wearing them.

0276

James A Johnson, Jr.

Know Debbie since May 1982 - hired as a waitress - later went to work as bar tender. good employee
Always on time -
Sometimes needed attention as job related matters.

had 3 Bar tenders that night but that night
Bud Marion - 5:30 Debbie on gone to train Louis McCarters   come on 9:30 p.m.
Told Debbie to take off duty but to stay in club and supervise McCarters.

Jeano (Jimmie) Vietta, Jail Lemons, Tammy Roark, Glen Gore, Ron West, (Robert Sharp) "Gib" was with Sharp and worked at O G & E Plant, Bobby Miller and a man Danny LNU with Bobby - Bill Lowison came in later, Mike Carpenter, Terry Carpenter, Sharlotte Alexander, Clifford Beach, Jimmy Glover - David Hanks,

[margin: and Marion not there nite's daughter at their]

Debbie drove a 1978 - 79 Olds Cutlass. Left club between 1:30 and 02:00 - Showed Louis how to "break bar down" and clean up before she left.

JJ.   Friend of Debbie - had had sep relations on two occasions, once in her apt and another time at the club.
   "Gib" told Debbie, the other night, Robert would have given anything to wake love to you - Later someone told JJ that Robert ask Gib if he said anything to Debbie. Gib then told Robert what

**PLAINTIFFS' DEPO**
**EXHIBIT NO. 161**

0276

Johnson Jr continued

Got home about 0200 or 0210 him stopped at Loves Country Store, main and Oak, st bought 2 sandwiches went home, heated them up etc. them & watched some TV then went to bed.

about 1630 Zed Ritter notified Jf of Debbie's death by tele at the Club.

Drove by and stopped at Debbie's apt — she was alone. asked her to be at work at 5:30 P.M. instead of 8:30 — 9:00 PM, because they had no other bartender.

DYK who kill

M

William Michael
~~Michael Hitt~~

Mike Carpenter  Rt. 7 Box 62 Ada. 332-8516
Terri Carpenter

Terri Carpenter said she was ~~supposed~~ to
go shopping with Debbie before noon
12-8-82 but Debbie didn't call her.
Mike was working Tuesday night as the
bouncer and Terri ~~went to the~~ and Mike
went to the club around 7:30 PM.
Said a guy 6-1 205 sat at the bar
watching Debbie. He would talk to
himself and watch her behind the bar
counter & on the dance floor. He followed
her to the dance floor and tried to dance
with her. ~~He~~ would talk to himself
then shake his head and take another
drink of beer. They left around 1:50 AM
and ~~they saw~~ his standing outside talking
to someone. They thought it was her
boyfriend from OG&E. He was a WM and didn't
wear a hat. It was someone Mike knew but
didn't pay any attention to them. They were
standing next to Debbie's car.

(margin notes, left side):
to 20's
dk brown
slight
build

A 0789

CR #82-502
OFFENSE:   HOMICIDE
SUBJECT:   UNKNOWN
VICTIM:    DEBBIE SUE CARTER
PAGE SIXTEEN /7

*Typed 10-13-86 /Kc*

On December 27, 1982, BRADLEY FRANK GIPSON, W.M., SSN:
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, home address, Route 2, Stonewall, Oklahoma, home
telephone number, 405/265-7792, an employed at the Little Warrior
Construction Company, the then telephone number, 405/777-2707,
was interviewed at the Ada Police Department, and provided the
following information:

GIPSON said that he started working at the Coachlight Club as a bouncer
Club approximately 1982. Two months ago about the year. He met last three months ago three
mother and dad, who also work at the Coachlight Club.

He stated that the only time he had any contact with
DEBBIE CARTER was at the club and he really didn't know that
much about her.

GIPSON saw Carter leave the club with Billy Loman.
The only person to ever saw her with was Billy Loman who GIPSON thought
was from Pittstown, Oklahoma, and that was approximately a month
and a half ago, and when they left the club he thought that they
left in LOMAN'S white Corvette.

GIPSON knew WES WILSON
only he is from the club as a
a trouble maker and about every time he came to the club, WILSON
appeared to be high on drugs, and GIPSON said that he never seen
sober when he came around the club.

GIPSON said that he had no idea who killed Debbie Carter. (End)
CARTER and could offer no further information.

_____

On December 8, 1982, NOEL CLEMENT, W.M., DOB: 11-04-56,
SSN: 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, home address: 1300 Kerlab Road, Apartment 23M,
home telephone number: 332-0358, business telephone number: 405/
436-2050, was interviewed at the Ada Police Department and provided
the following information:

CLEMENT is employed at the Ada Broadcasting Company, Incorporated as a disc jockey, on radio station KASX. He is also
employed as a disc jockey at the Coachlight Club, and had been in
that capacity for approximately two years.

**PLAINTIFFS' DEPO**
**EXHIBIT NO. 183**

0466M

CR #82-502
OFFENSE:  HOMICIDE
SUBJECT:  UNKNOWN
VICTIM:   DEBBIE SUE CARTER
PAGE ~~SEVENTEEN~~ /8

CLEMENT has known DEBBIE CARTER a little over eight months. He said that he does not know anyone who would want to harm her, or anyone that she was having any problems with.

CLEMENT said that he had went out with her one a couple of occasions, the last time being a couple of months ago.

The last time he saw her was on December 7, 1982, at the Coachlight Club.  He said that she had been drinking tequila and appeared to be feeling pretty good, and that she had not been too busy that night as a bar tender cause there were very few people at the club.

CLEMENT stated that he left the club around 0130 hours on December 8, and went home, and CARTER and several others were still at the club when he left.

CLEMENT said that he had heard that the assistant manager, J.J., had suspected CARTER in taking money from the club, but that was the only time he had heard that.

CLEMENT said that the assistant manager, J.J., whose real name was JAMES ARLEY JOHNSON Jr., was the only one of their group that he might suspect as far as being in any kind of trouble, he thought that JOHNSON might have been arrested on drug charges before.

CLEMENT further stated that J.J. was drinking quite a bit on the night of December 7.

When asked who some of the people were that hang out in DEBBIE'S group he named the following people:  NOEL CLEMENT, J.J., GLEN GORE, JIMO, VIETTA, KATHY, STEWART, BILL GIBSON, BOB SHARP.

CLEMENT could offer no further information at this time:

---

On March 9, 1983, NOEL CLEMENT, W.M., DOB: 11-04-56, home address: 723 N. Hickery, home phone number: 332-0158, was reinterviewed at the Ada Police Department and he provided the following information:

CLEMENT said that around January 1983, when he was living at the Rowling Meadows Apartments, during the evening hours around 1930 to 2000 hours, a person who identified hisself as RON WILLIAMSON came to his apartment looking for SHERRIE SCOTT.

WILLIAMSON knocked on CLEMENT'S door and asked for SHERRIE

0466N

CR #82-502
OFFENSE:  HOMICIDE
SUBJECT:  UNKNOWN
VICTIM:   DEBBIE SUE CARTER
PAGE ~~EIGHTEEN~~ /9

and CLEMENT said SHERRIE lived next door to him.

WILLIAMSON looked into CLEMENT'S apartment and saw
his guitar laying in there and asked him if that was his guitar
and he said that it was and WILLIAMSON asked if he played, which
CLEMENT said that he did.

CLEMENT said WILLIAMSON then just walked right into
his apartment without asking permission or anything, and picked
up the guitar and started playing with it.

WILLIAMSON introduced himself and asked him what he did
for a living.  CLEMENT told him that he worked for KASX Radio
Station as a disc jockey and also worked as a disc jockey at the
Coachlight Club.

WILLIAMSON told CLEMENT that "I guess it's been kinda
dead out there since that happened," and CLEMENT said, "the murder?"
and WILLIAMSON said, "yes."

WILLIAMSON then started telling CLEMENT that he lived
with his mother in the neighborhood where CARTER was killed and
when he got up the next morning he saw all those police cars and
thought that they were after him.

WILLIAMSON further told CLEMENT that he had been in trouble
in Tulsa, but that he was trying to stay out of trouble now.

A short time later, WILLIAMSON left CLEMENT'S apartment
and he did not see him again except for a brief moment ~~approximately~~
one week later when CLEMENT was doing a remote broad cast at Mr.
Steve's T.V. in Ada, and WILLIAMSON came up to him and talked to
him for just a short while and left.

The last time CLEMENT saw WILLIAMSON was a week or two
later at the Coachlight Club.  As CLEMENT was leaving he saw
WILLIAMSON talking to the cashier at the front door of the Club
WILLIAMSON did not see CLEMENT. ~~and so there was no conversation
between them.~~

---

On March 14, 1983, RONALD KEITH WILLIAMSON, W.M., DOB:
02-03-53, SSN:  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, 6' tall, 180 pounds, brown, brown,
home address:  829 East 7th Street, Ada, Oklahoma, was interviewed
at his residence by Ada Police Department Detectives DENNIS SMITH
and MIKE KIESEWETTER.

004660

# AFFIDAVIT OF TERRI CARPENTER LARNEY

STATE OF OKLAHOMA            )
                             )
                             )
COUNTY OF POTTAWATOMIE   )

I, Terri Carpenter Larney, being of sound mind and lawful age to testify state as follows:

1.  My name is Terri Carpenter Griffith Larney, and in December 1982, I was married to Mike Carpenter. To the best of my memory of about 19 years ago, on the evening of December 7, 1982 we were at the Coachlight Club, in Ada, Oklahoma. My husband Mike, was a bouncer at the club and we left the club around 1:50 AM on the morning of December 8, 1982.

2.  Within a very few days after Debbie Carter's death, my husband Mike and I went to the Ada Police Department and talked to Detective Dennis Smith about what we observed at the Coachlight Club on the night of Ms. Carter's murder.

3.  During that conversation, we told Dennis Smith that there was a white male, in his 40's or 50's, balding and heavy set, that was acting strange, bothering and following Debbie around the bar. I had never before seen this person who was staring and following Debbie.

4.  I also told Dennis Smith that as my husband and I were leaving the Coachlight Club, we saw Glen Gore in the parking lot talking to Debbie Carter at her car. Debbie was sitting in the driver's seat and Glen was standing outside her car door. This seemed normal as they were good friends.

5.  I believe (although I am not sure) that I also told Dennis Smith that Debbie Carter was selling some black mollies (amphetamines) at the Coachlight Club on the night of her murder. I have a very clear recollection that on the night of her murder, Debbie approaching me and asked me if I knew anyone that wanted to buy black mollies on the night of her murder.

6.  Dennis Smith told me to handwrite my statement, which I did, outlining all of the above information. I did not get a copy and I do not remember what date we talked to Dennis Smith. I have seen the handwritten notes reflecting some of the

Page 1 of 4

information we gave to Dennis Smith. These notes were not dated. These notes are not mine or Mike's handwriting. These notes are attached as Exhibit A. These notes do not include information we gave to Dennis Smith about Glen Gore talking to Debbie Carter in the Coachlight parking lot, and incorrectly state that we thought the man in the lot was one of Debbie Carter's boyfriends from OG & E. Also, the description of the man that was bothering Debbie inside the Coachlight was wrong and misleading. We told Dennis Smith this man's age range was in his 40's to 50's, that he was unattractive and very heavyset. We told Dennis Smith the man in the parking lot talking to Debbie Carter was Glen Gore.

7.  About three days after Debbie died, we were at a gathering at Gina James Vietta's residence with several other people that worked at the Coachlight who were friends of ours and Debbie Carter's. During the gathering, Wes Wilson and David Wisdom came in with several scratches on their arms and faces. Several of us noted this and sometime later, I told Dennis Smith about the scratches on Wes Wilson's and David Wisdom's faces and arms.

8.  Sometime later, I saw Jane Lacey at a store in Ada, OK, and she related to me that she and George "Bud" Marion had broken up. Lacey informed me that Marion had pressured her to give him an alibi on the night of Debbie Carter's death, telling police that Marion had spent the night with her, when he did not. Lacey did not want to be with Marion after that and told Marion to leave her alone. I also told Dennis Smith about George Marion's false alibi.

9.  After Debbie Carter's death, the people at the Coachlight and other friends of ours and Debbie's would sit around and talk about her murder; who could do this and brainstorm about the people she may have had a problem with. All during this time, the names of Dennis Fritz and Ronnie Williamson never came up in our group discussions. Since Mike worked as a bouncer five nights a week at the Coachlight, I was there as well, and I do not remember ever seeing either Ron Williamson or Dennis Fritz at the Coachlight.

10. In sometime in 1987, I was in the Pontotoc County District Attorney's office to complain about not receiving my child support payments. During that conversation, I heard Dennis Smith, Bruce Johnson and others, talk about getting Ron Williamson for Debbie Carter's murder. I asked them what about that strange man that was in the Coachlight that night. No one seemed to know what I was talking about. Another person was present, who may have been Gary Rogers, but I am not sure of this. I have reviewed a copy of an OSBI report by Gary Rogers that reflects some of what we discussed in the DA's office. I again related the above information that is described in paragraphs 1-9. I do not remember the part

Page 2 of 4

of the conversation relating to Brenda Summers or Carolin Schultz that was listed at the end of this report. I do not now remember talking about Debbie dating or associating with Ron Williamson. I do remember that I told Bruce Johnson, Dennis Smith and possibly Gary Rogers about seeing Glen Gore in the Coachlight parking lot with Debbie Carter. A copy of the OSBI report is attached as Exhibit B.

11.   Also during the conversation in the District Attorney's office, Bruce Johnson made a photo lineup which included Ron Williamson and Dennis Fritz. I did not recognize either Fritz or Williamson in this lineup. I told the investigators I was at the Coachlight nearly every night because my then-husband, Mike Carpernter who worked there. I told the investigators I have never seen Fritz or Williamson at the Coachlight. This lineup was not reflected in this OSBI report by Gary Rogers and dated June 9, 1987.

12.   On February 22, 2000, I gave a statement to John Jones of the OSBI, who was reinvestigating Debbie Carter's death. During this interview, I told John Jones the above information as stated in paragraphs 1-11, and the fact that I had handwritten my statement and given it to Dennis Smith during our initial interview in December 1982. I specifically told John Jones what I had told Dennis Smith in the earliest days of the investigation about Glen Gore being in the Coachlight parking lot with Debbie Carter just before her death.

13.   In addition to the above, I also told John Jones that my ex-husband, Mike, had either married or was just living with Wes Wilson's ex-wife, Linda Wilson. I told Jones that Mike had told me that Linda Wilson was very scared of Wes Wilson and she divorced him because of his rough sex with her. Linda Wilson told Mike that Wes would tie her up, beat and torture her and then have sex with her.

14.   In late July 2001, I received a letter from Bill Peterson, Pontotoc County District Attorney with an OSBI copy of the report by John Jones. As I reviewed the report, I noted that it was wrong and much of the information I told Jones was not in the report. The report made no reference to my earlier interview with Dennis Smith or the fact I told Dennis Smith after Debbie Carter's death about my observations of Gore, Wisdom and Wilson. A copy of the report with the letter is attached as Exhibit C. I called Mr. Peterson's office and talked to an assistant, Jennifer, and relayed my concerns. The woman told me to write my own statement and send it to them. I told them this report does not accurately reflect what I saw and they should rely on my hand-written 1982 statement as it was accurate.

15.  John Jones called me about September 2001, and I told him he left out 99 per cent of what I told him and to just use the statement I wrote in 1982.  John Jones told me he did not have it.

16.  I asked him who else he was interviewing and he said that he did not know who to interview.  I told him I felt like he was just interviewing Mike and I because in our 1982 hand-written statements, we were the last to see Glen Gore and Debbie Carter together.  I told him, I felt like they were not reopening the case but now trying to hang Glen Gore.


_____
Terri Carpenter Larney


I swear under the penalty of perjury, the foregoing statements are true and correct to the best of my memory.


_____        _____
Date                                                   Terri Carpenter Larney

William Michael
~~Michael Witt~~

Mike Carpenter   Rt. 7  Box 62  Ada.  332-8516
Terri Carpenter

Terri Carpenter said she was supposed to
go shopping with Debbie before noon
12-8-82 but Debbie didn't call her.
Mike was working Tuesday night at the
lounge and Terri ~~went to the~~ and Mike
went to the club around 7:30 PM.
Said a guy 6-1 205 sat at the bar
watching Debbie. He would talk to
himself and watch her behind the bar
counter & on the dance floor. He followed
her to the dance floor and tried to dance
with her. He would talk to himself
then shake his head and take another
drink of beer. They left around 1:30 AM
and ~~they saw~~ his standing outside talking
to someone. They thought it was her
boyfriend from O.G.&E.. He was a WM and didn't
wear a hat. It was someone Mike knew but
didn't pay any attention to them. They were
standing next to Debbie's car.

his 20's
dk brown
eyes light
du ight

A

PLAINTIFFS' DEPO
EXHIBIT NO. 193

OKLAHOMA STATE BUREAU OF INVESTIGATION

Title of Report ___INTERVIEW OF TERRI MICHELLE CARPENTER___

TERRI MICHELLE CARPENTER, White Female, Date of Birth: August 5, 1961, Social Security Number: 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, Home Address: Route Seven, Box Sixty-One, Ada, Oklahoma, Home Telephone: (405) 332-5432 (Mother's Phone), provided the following information:

CARPENTER worked as a bartender and waitress at the Coachlight Club in Ada, Oklahoma, from 1981 to 1983.  She had known DEBBIE CARTER since 1979 and worked with her at the Coachlight Club.  About two weeks before CARTER'S death, CARTER told CARPENTER and CARPENTER'S husband MIKE, and possibly another person, that she (CARTER) had a date with RON WILLIAMSON, and CARTER really did not want to go out with WILLIAMSON.

On the night of CARTER'S death, a man in the club attracted her attention by the way he acted. CARPENTER described the white male as about thirty-five years old, about six feet, three inches tall, weight about 200 pounds, medium length brown hair, thin on top with a standard haircut over his ears and was neatly dressed in shoes, slacks and sport coat.  He wore glasses and had a mustache to the corners of his mouth. One night in the club, the man almost got into a fight with TINY, a man who worked as a bouncer at Harold's Club and a bouncer at the Coachlight Club.  The man tried to dance with several people while he was at the club but he did not dance with anyone because they rejected him.

The unidentified man was at the club the night before CARTER'S death.  He was drinking, but CARPENTER did not know if he was drinking liquor.  The man went around sticking his finger in girls ears and asking them to dance.  Several times he asked CARTER to dance.  On the night CARTER was killed, he followed CARTER around and tried to get her to dance with him, but she refused.  The man was at the club for about three hours and he stood at the bar and looked into the mirror and shot himself the finger and cursed himself.

District Attorney's Office

| | | | |
|---|---|---|---|
| Investigation on _06-09-87_ | At _Ada, Oklahoma_ | By ___GARY ROGERS___ | File _CR 82-502_ |
| Offense _Homicide_ | | Subject _RON WILLIAMSON_ / _DENNIS FRITZ_ | Case Agent ___GARY ROGERS___ |
| Office _ERO_ | Date Reported _07-02-87_  Date Typed _07-08-87_ | Typist _kc_  Approved _BML_ | Ind. _kc_ |

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

0384

B

INTERVIEW OF TERRI MICHELLE CARPENTER
Page Two

When TERRI and her husband MIKE left the
club that night, they left at the same time CARTER
left, but CARPENTER did not remember if CARTER left
the parking lot first or if she and MIKE left first.
CARPENTER did not recall seeing anyone leave the
parking lot at the same time CARTER did.

CARPENTER thought BRENDA SUMMERS, Home
Telephone Number: 265-4293, saw RON WILLIAMSON with
DEBBIE CARTER.  BRENDA SUMMERS may now be BRENDA
SUTTERFIELD, who worked in the lab at Valley View
Regional Hospital in Ada, Oklahoma.  BRENDA
SUTTERFIELD worked in the lab during the 1500 to
2100 hour shift.  CARPENTER asserted CAROLIN SCHULTZ,
who worked at the Coachlight Club and now worked at
TG&Y in Ada, may also have seen RON WILLIAMSON with
DEBBIE CARTER.

# WILLIAM N. PETERSON
## DISTRICT ATTORNEY

TWENTY-SECOND DISTRICT ATTORNEY DISTRICT
STATE OF OKLAHOMA
PONTOTOC, SEMINOLE AND HUGHES COUNTIES

July 24, 2001



**PONTOTOC COUNTY**
NANCY M. SHEW
Assistant District Attorney
CHRIS L. ROSS
Assistant District Attorney

**SEMINOLE COUNTY**
TIMOTHY L. OLSEN
Assistant District Attorney
PAUL B. SMITH
Assistant District Attorney
KAY L. HARGRAVE
Assistant District Attorney

**HUGHES COUNTY**
LINDA G. EVANS
Assistant District Attorney
CLAY B. PETTIS
Assistant District Attorney

Terry Michelle Griffith
500 South Bryan
Shawnee, OK  74801

Re:  Debbie Carter Murder

Dear Ms. Griffith,

Enclosed is a copy of your statement from the O.S.B.I. investigation of Debbie Carter's murder.  Carefully review your statement for accuracy, and please notify me of any changes or deletions.

Should you have any questions, please feel free to contact my office.

Sincerely,

William N. Peterson
District Attorney

WNP/pt

Enclosure

PONTOTOC COUNTY COURTHOUSE
P.O. BOX 146
ADA, OKLAHOMA 74820
1-580-332-0341
VICTIM WITNESS CENTER: 332-8306
BOGUS CHECK OFFICE: 332-0378
FAX: 332-7393

SEMINOLE COUNTY COURTHOUSE
P.O. BOX 1300
WEWOKA, OKLAHOMA 74884
1-405-257-3368
VICTIM SERVICES OFFICE: 257-3343
BOGUS CHECK OFFICE: 257-3318
CHILD SUPPORT OFFICE: 257-6601
FAX: 257-6965

HUGHES COUNTY COURTHOUSE
P.O. BOX 350
HOLDENVILLE, OKLAHOMA 74848
1-405-379-5459
FAX: 379-6930

# OKLAHOMA STATE BUREAU OF INVESTIGATION

PAGE ____1__ of ___1__

TITLE OF
REPORT ___INTERVIEW OF TERRI GRIFFITH_____

**TERRI MICHELLE GRIFFITH**, WF, DOB: 08/05/61, SSN: 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, 500 South Bryan, Shawnee, Oklahoma, 405/275-6814, provided the following information:

In December 1982, GRIFFITH was a bartender at the Coach Light Club, Ada, Oklahoma. GRIFFITH knew DEBBIE CARTER and GLEN GORE. CARTER worked at the Coach Light. GORE frequented the club as a patron.

On December 7, 1982, GRIFFITH was at the Coach Light. She saw GORE and CARTER there.

When the bar closed, GRIFFITH and her husband at the time, MICHAEL CARPENTER, left the bar. They went out to the parking lot. GRIFFITH saw CARTER and GORE together at CARTER'S car. CARTER sat in the driver's seat while GORE stood outside the car. There didn't seem to be any problems between GORE and CARTER. Shortly thereafter, GRIFFITH and CARPENTER left the bar. They went home.

GRIFFITH last saw GORE in either 1988 or 1989 at the Pontotoc County Courthouse. GORE was waiting to testify in the FRITZ and WILLIAMSON trial. GORE told GRIFFITH that he didn't want to testify because that would make him a snitch. GRIFFITH thought GORE should testify, especially since he knew CARTER.

## END NOTE:

GRIFFITH couldn't remember if she saw DENNIS FRITZ or RON WILLIAMSON at the bar that night. She couldn't remember seeing CARTER and GORE together inside the club.

---

.ESTIGATION ON ___02/22/00_____ AT __SHAWNEE, OKLAHOMA_____ BY __JOHN JONES_____ FILE __CR 82-502__

.ENSE ____HOMICIDE_____ VICTIM___DEBBIE CARTER___ CASE AGENT _K. P. LARSH____

FICE __ERO__ DATE REPORTED __02/24/00__ DATE TYPED__02/28/00___ TYPIST __ke__ APPROVED _____ IND __107__

: document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its content are not to be distribute. ;ide your agency.

# OKLAHOMA STATE BUREAU OF INVESTIGATION

INVESTIGATIVE REPORT                    PAGE __1__ OF __2__

| CR 82-502 | Reporting Date:<br>JULY 7, 1986 | Reporting Agent(s):<br>GARY ROGERS | | | Reviewed By: |
|---|---|---|---|---|---|
| Offense:<br>HOMICIDE | | Case Agent:<br>GARY ROGERS | Office:<br>ERO | Typed By:<br>kc | Date:<br>07-11-86 |
| Subject:<br>(S)   UNKNOWN SUBJECT(S) | | Activity:<br>INTERVIEW OF TERRI DENISE McCARTNEY HOLLAND | | | |
| (V)   DEBBIE SUE CARTER | | | | | |
| W.F., DOB: FEBRUARY 16, 1961 | | | | | |

On June 25, 1986, TERRI DENISE McCARTNEY HOLLAND, White Female, Date of Birth: October 7, 1958, Social Security Number: 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, Home Address: 600 West Twelfth, Ada, Oklahoma, Home Telephone: (405) 332-2459, Business Telephone: (405) 436-0582, was interviewed by Agent ROGERS and she provided the following information:

HOLLAND was arrested October 1, 1984, on a check charge and was held in the Pontotoc County Jail until January 24, 1985, then she was transferred to Lexington Assessment and Reception.

While in the Pontotoc County Jail, HOLLAND had several conversations with inmate RONALD WILLIAMSON about the death of DEBBIE CARTER. WILLIAMSON told HOLLAND that he had asked CARTER to go out with him, but apparently CARTER refused and HOLLAND thought from the way WILLIAMSON talked CARTER must have rejected WILLIAMSON and possibly even made fun of him.

WILLIAMSON told HOLLAND that he shoved something, possibly her panties down her throat and also shoved something up inside her. WILLIAMSON told HOLLAND that he even strangled CARTER with her own panties.

HOLLAND first became aware of WILLIAMSON'S information about CARTER after three days of incarceration of WILLIAMSON. WILLIAMSON was allowed to call his mother to see if she would make his bond. His mother refused and WILLIAMSON got violently mad at his mother, cursed her and said he was going to kill her (his mother) just like he killed DEBBIE CARTER.

During their stay in jail, HOLLAND and BILLY CHARLEY were trusties, CHARLEY told HOLLAND that WILLIAMSON asked CHARLEY to get WILLIAMSON a knife so when WILLIAMSON was let out on visiting day, he was going to kill HOLLAND.

Leads:

PLAINTIFFS' DEPO
EXHIBIT NO. 200

FOR INTERNA
NOT FOR DISSEMINATION

D0571

CR #82-502
OFFENSE - HOMICIDE
SUBJECT - UNKNOWN SUBJECT(S)
VICTIM   - DEBBIE SUE CARTER
PAGE TWO

      The following inmates were incarcerated in the County Jail at about the same time WILLIAMSON made those comments to HOLLAND about CARTER'S death:

JIMMY WILLIAMS

DEBBIE CAVANAUGH

VICKIE OWENS

LaJUANA McDOWELL

DENISE GREENLY

BILLY CHARLIE

WALTER (SNAKE) GRANT

MIKE COLLINGS

JIM ALLEN

RONNIE HOLLAND

## AGENT'S NOTE

      JIM ALLEN told ROGERS that he did not remember any specific incident concerning WILLIAMSON other than ALLEN thought WILLIAMSON was wierd and strange acting, but ALLEN really did not pay that much attention to WILLIAMSON.

      ROGERS will attempt to interview those persons named as inmates to make inquiry about WILLIAMSON.

00572

# OKLAHOMA STATE BUREAU OF INVESTIGATION

## INVESTIGATIVE REPORT

PAGE __1__ OF __3__

| Case: CR 82-502 | Reporting Date: JULY 24, 1986 | Reporting Agent(s): GARY ROGERS | | | Reviewed [signature] |
|---|---|---|---|---|---|
| Offense: HOMICIDE | | Case Agent: GARY ROGERS | Office: ERO | Typed By: kc | Date: 07-24- |
| Subject: (S) UNKNOWN SUBJECT(S) | | Activity: INTERVIEW OF LAVIETA SUE BREWER | | | |
| (V) DEBBIE SUE CARTER | | | | | |

PLAINTIFFS' DEPO
EXHIBIT NO. 44

On July 23, 1986, LAVIETA SUE BREWER, White Female, Date of Birth: August 14, 1952, Social Security Number: 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, Home Address: 1428 Northwest Ninety Fifth Street, Oklahoma City, Home Telephone: (405) 751-7493, Business Telephone: (405) 947-2874, was interviewed at the office of the Oklahoma State Bureau of Investigation, Oklahoma City, Oklahoma, by Agent GARY ROGERS and RUSTY FEATHERSTONE, and she provided the following information:

BREWER was interviewed for the purposes of finding out if in 1982, she had been abducted from the Holiday Inn Club in Norman, Oklahoma.

During the interview, BREWER indicated that possibly around May or June of 1982, she had went to the Holiday Inn Club in Norman, Oklahoma, to see the band that was playing there, which was Lyndel East and East Country. She knew several members of the band real well and was just recently going through a divorce, and did not feel like staying at home by herself, so she decided to go listen to the band awhile.

BREWER arrived at the club between 2100 and 2130 hours. Shortly after arriving there a man she described as being a white male, with dark hair medium length and being of medium build, wearing possibly a blue jeans and long sleeve western type shirt, ask her to dance several times, and then ended up sitting down at her table. The subject kept talking to her about he had lost his wife and that he had a young daughter who lived with his parents.

BREWER indicated that that was just about all this individual could talk about was the wife that he had lost for about forty-five minutes to an hour. He continually talked about what vertues he was looking for in other girls and that he wanted the same virtues in the girls he dated as the one that his wife possessed. The individual finally started to bug BREWER and so she would get up and leave the table, and stay away for long periods of time talking to members of the

eods:

CR 82-502
OFFENSE - HOMICIDE
SUBJECT - UNKNOWN SUBJECT(S)
VICTIM  - DEBBIE SUE CARTER
PAGE TWO

band and according to her this apparently bothered the subject.

He was with another white male, who BREWER described as being six feet tall, medium build, brown hair, medium hair cut, possibly in his mid-thirties.

After the club had closed, she had made arrangements with one of the band members to have breakfast with him and his pickup was parked in the back of the club and so she was going to drive around behind the club and meet him, and then go to the restaurant from there.

After she was going out the front door of the club, after it closed, the individual, who had been sitting with her earlier, and his friend, drove up to the door in a rust orange, four door, smaller type car, possibly Toyota type, with black interior, and the exterior of the car had gray primer spots possibly on the front fender and truck.

The smaller subject, who was sitting with her earlier, was driving and his friend was sitting in the passenger front seat.  They told her that they had a hidden bar in the back seat and told her to look at it, and just to get rid of them, she opened the door and sat down to look at the bar and that's when they immediately took off with her.  They drove back behind the club and acted like they were going to stop, but they then took off again at a high rate of speed.  This occurred at approximately 0130 hours.

They were driving recklessly, running red lights, driving through residential areas at a high rate of speed and all the time telling her they were going to take her back to the Holiday Inn, and then they would take off in another direction.

The smaller subject was becoming very upset with her because she couldn't remember his name.  She was becoming hysterical and the larger subject kept telling the smaller subject to shut her up.  She kept pleading with them to take her back to the club, but they just kept driving.  This incident last approximately one-half hour.

The subjects started having car trouble and it died on him, and when it rolled to about five miles an hour, she jumped out of the car and ran in between some houses and in the process lost her car keys that she had had in her hand.  She ran down an alley in a residential area and that was the last time she saw them after she escaped from them.  They had

CR 82-502
OFFENSE - HOMICIDE
SUBJECT - UNKNOWN SUBJECT(S)
VICTIM - DEBBIE SUE CARTER
PAGE THREE

stopped the car and got out and appeared to be looking for her.

She finally made it to a pay telephone and called her friends who lived in north Oklahoma City and told them what had happened, and her friends called the Norman Police Department and just a matter of a minute or two later, the police department dispatcher called her back on the pay phone and told her to stay on the line until officers arrived. Approximately two minutes after the dispatcher got on the line, a police car showed up and took her to the station and filled out a report.

She could not remember the name of the officer who picked her up, but she did remember that night that it had been raining and she was soaking wet, and that she was wearing a dress and sandles.

BREWER felt that her abduction was possibly a planned deal because of the talk about the bar in his car. After the club closed the smaller subject had stopped by her table and talked with her, but she told him that she had already had other plans and he left.

After this incident occurred, BREWER contacted LOUISE WOODS who at that time was the President of the East Country Band Fan Club and told her what had happened, and after that arrangements were made to have escorts for the single ladies to escort them to their cars at that club.

BREWER was also told by WOOD the suspects may have been the ones that had written a hot check at the club a short time prior to this incident happening.

### AGENT'S NOTE

BREWER was shown a photograph of DENNIS FRITZ and RON WILLIAMSON, but she could not identify either photographs as being the subjects that she had contact with the club that night, but her interview coincides with information related to Agent RUSTY FEATHERSTONE by DENNIS FRITZ during a polygraph examination.

BREWER said that the police report, filed with the Norman Police Department, was possibly under the name of LAVIETA SUE BACHELOR. Agent SALMON was contacted regarding contact with Norman Police Department to try and obtain a copy of the police report.

BREWER indicated a willingness to testify in court if needed.

*Typed 09-19-86/kc*

# OKLAHOMA STATE BUREAU OF INVESTIGATION

## INVESTIGATIVE REPORT

PAGE _1_ OF _3_

| Case: | Reporting Date: | Reporting Agent(s): | | | Reviewed By |
|---|---|---|---|---|---|
| CR 82-502 | JULY 24, 1986 | GARY ROGERS | | | |
| **Offense:** | | **Case Agent:** | **Office:** | **Typed By:** | **Date:** |
| HOMICIDE | | GARY ROGERS | ERO | kc | 07-24-86 |
| **Subject:** | | **Activity:** | | | |
| (S) UNKNOWN SUBJECT(S) | | INTERVIEW OF LAVIETA SUE BREWER | | | |
| (V) DEBBIE SUE CARTER | | | | | |

PLAINTIFFS' DEPO
EXHIBIT NO. 45

~~On July 23, 1986,~~ LAVIETA SUE BREWER, White Female, Date of Birth: August 14, 1952, Social Security Number: 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, Home Address: 1428 Northwest Ninety Fifth Street, Oklahoma City, Home Telephone: (405) 751-7493, Business Telephone: (405) 947-2874, ~~was interviewed at the office of the Oklahoma State Bureau of Investigation, Oklahoma City, Oklahoma, by Agent GARY ROGERS and RUSTY FEATHERSTONE, and she provided the following information:~~

BREWER's ~~was~~ interview *was conducted to determine if she was* ~~for the purpose of finding~~ out if ~~in 1982,~~ she ~~had~~ been abducted from the Holiday Inn Club in Norman, Oklahoma ~~in 1982.~~

~~During the interview, BREWER indicated that possibly~~ Around May or June of 1982, ~~she her~~ went to the Holiday Inn Club in Norman, Oklahoma, to see the ~~band that was played~~ ~~there, which was~~ Lyndel East ~~only~~ East Country ~~She knew~~ *She and several* members of the band, ~~she was and was~~ just recently ~~went going~~ through a divorce, ~~and did~~ not feel like staying at home by herself, ~~so she decided to go listen to the band awhile.~~

BREWER arrived at the club between 2100 and 2130 hours *the evening time late a white male dark brown hair brown eyes cut out of Meyers tall. He was medium* ~~the a white male with~~ dark, ~~hair~~ medium length *hair, medium* ~~medium build, wore~~ ~~a~~ blue jeans and long sleeve western type shirt, ~~ask her to dance several times, and then ended up sitting down at her table.~~ The ~~subject kept talking~~ *talked* to ~~her~~ about ~~he had~~ lost his wife and that he had a young daughter who lived with his parents. *He man talked about his wife for at least an hour.*

~~BREWER indicated that that was just about all this individual could talk about was the wife that he had lost for about forty-five minutes to an hour.~~ He ~~continually~~ talked about what virtues he was looking for in other girls and that he wanted the same virtues in the girls he dated as the ~~virtues~~ ~~that~~ his wife possessed. *He continually talked* ~~to BREWER and so she~~ ~~would be able to excuse herself~~ ~~leave the table and~~ ~~stay away for long periods of time talking to members of the~~

**Leads:** *and talk to the band members for long periods of time.*

FOR INTERNAL USE ONLY
NOT FOR DISSEMINATION

CR 82-502
OFFENSE - HOMICIDE
SUBJECT - UNKNOWN SUBJECT(S)
VICTIM  - DEBBIE SUE CARTER
PAGE TWO

band and according to her this apparently bothered the subject.

He  was with another white male, who BREWER described
as six feet tall, medium build, brown hair, medium hair
cut, possibly in his mid thirties.

After the club had closed, Brewer made arrangements
with one of the band members to have breakfast with him, the band member's
pickup was parked in the back of the club, so she planned
to drive around behind the club and meet him, and then go to
the restaurant.

After she was going out the front door of the club, the man who sat
after and his friend, drove up to the door in a rusty orange, small
four door car, possibly Toyota, black
interior and gray primer spots
on the front fender and trunk.

They told Brew that they had a hidden bar in the back
seat and told her to look at it, just to get rid of them,
she opened the door and sat down to look at the bar and that's
when they immediately drove off with her. They drove
the club and acted like they were going to stop, but they
then took off again at a high rate of speed.

They were driving recklessly, running
through residential areas at a high rate of speed and
all the time telling her they were going to take her back to
the Holiday Inn, then in another direc-
tion.

The driver became very upset with Brewer
because she couldn't remember his name. She became
hysterical and to shut her up. She kept pleading with them to take
her back to the club, but they kept driving. After about 30 minutes of travel

The subjects started having car trouble and
and when it rolled to about five miles an hour,
jumped out of the car and ran in between some houses.
ran down an alley in a residential area and that was the last
she saw of the two cars.

CR 82-502
OFFENSE – HOMICIDE
SUBJECT – UNKNOWN SUBJECT(S)
VICTIM – DEBBIE SUE CARTER
PAGE THREE

stopped ~~the car and got out and appeared to be looking for her.~~
Brewer went
~~She~~ to a pay telephone and called and
~~her~~ friends who lived in ~~nether~~ Oklahoma City and told them what
had happened, ~~and her~~ friends called the Norman Police Department and ~~just a~~ a minute or two later, the police
department dispatcher called ~~her back~~ on the pay phone and told
her to stay on the line until officers arrived. ~~Approximately~~
about two minutes after the dispatcher got on the line, a police car arrived and
~~showed up and~~ took ~~them~~ to the station ~~and~~ filled out a report.

~~Brewer could~~ not remember the name of the officer who
picked her up, but she ~~did~~ remember ~~she and another girl were~~ and would go ~~seeking~~
~~ stag~~
~~her clothing and she was soaking wet, and that she was getting~~
a dress ~~for parties.~~

BREWER ~~thought~~ ~~that~~ her abduction was ~~probably~~ planned because
~~drew because~~ of the talk about the bar in ~~the~~ car. After the
club closed the smaller ~~stopped~~ stopped by her table and ~~talked and~~
talked ~~with her, but~~ she told him that ~~she~~ had ~~already had~~
other plans ~~that~~ he left.

~~last, two line ago later,~~
~~After the incident happened,~~ BREWER ~~indicated~~ LOUISE
WOODS, who at that time was the president of the East Country
Band Fan Club, ~~stated that arrangements of the club that time~~ and after that
arrangements were made ~~to have escorts~~ for the single ladies to be escorted
~~to escort them~~ to their cars at that club.

would told
BREWER ~~that the two men could have been the two men who write~~
~~that the subjects~~ ~~need the suspects~~
~~been the ones that had written~~ a hot check at the club a ~~short~~
~~ short time earlier.~~
~~time prior to this incident happening.~~

~~agents note~~
~~agent Report ahead~~
BREWER was shown a photograph of DENNIS FRITZ and
RON WILLIAMSON, but she could not identify either photograph
as being the subjects ~~the abduction her Norman Police Department of the invited~~ ~~of the invited~~
~~ night, but her interview conjuring with information related~~ other the
~~by~~ Agent RUSTY FEATHERSTONE by DENNIS FRITZ during a polygraph
examination.

BREWER ~~thought~~ ~~the~~ police report filed with the
Norman Police Department, ~~which carry~~ the name of LAVIETA
SUE ~~Bradshaw~~ ~~Agent SALMON was contacted regarding contact~~
~~with Norman Police Department to try~~ and obtain a copy of the
~~police report.~~

~~BREWER indicated a willingness to testify in court if~~
~~needed.~~

OKLAHOMA STATE BUREAU OF INVESTIGATION

Date of Transcription  September 19, 1986/kc

PLAINTIFFS' DEPO
EXHIBIT NO. 4

LAVIETA SUE BREWER, White Female, Date of Birth: August 14, 1952, Social Security Number: 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, Home Address: 1428 Northwest Ninety-Fifth Street, Oklahoma City, Home Telephone Number: (405) 751-7493, Business Telephone: (405) 947-2874, provided the following information:

BREWER'S interview was conducted to determine if she was abducted from the Holiday Inn Club in Norman, Oklahoma, in 1982.

Around May or June of 1982, BREWER went to the Holiday Inn Club in Norman, Oklahoma, to see the Lyndel East and the East Country band play. She was acquainted with several members of the band, and she had just recently went through a divorce, so she did not feel like staying at home by herself.

9:30  BREWER arrived at the club between ~~2100~~ 9:00 and ~~2130~~ hours, then a short time later, a white male danced several times with her and sat at BREWER'S table. The man was medium built, had dark, medium length hair and wore blue jeans and long sleeve western type shirt. The man talked to BREWER about the loss of his wife and that he had a young daughter who lived with his parents. The man talked about his wife for at least an hour. He continously talked about what virtues he was looking for in other girls and that he wanted the same virtues in the girls he dated as the virtues his wife possessed. The man's conversation "bugged" BREWER and so she left the table several times and talked to band members for long periods of time.

~~The man was~~ at the club with another white male, who BREWER described as six feet tall, medium build, brown hair, medium hair cut, possibly in his mid thirties.

Interviewed on  July 23, 1986  at  OSBI  Oklahoma City, Okla.  File # CR 82-502

by  Agents GARY ROGERS and RUSTY FEATHERSTONE  Date dictated  July 24, 1986

This document contains neither recommendations nor conclusions of the OSBI. It is the property of the OSBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

16

CR 82-502
INTERVIEW OF LAVIETA SUE BREWER, 07/23/86/kc
PAGE TWO

After the club had closed, BREWER made arrangements with one of the band members to have breakfast with him. The band members' pickup was parked in the rear of the club, so she planned to drive around behind the club and meet him, and then go to the restaurant and eat.

At about ~~0130~~ *1:36* hours, as she left the front door of the club, the man who sat at her table, and his friend, drove up to the door in a rust orange, small four door car, possibly a Toyota. The car had a black interior and there were gray primer spots on the front fender and trunk.

The small man, with whom she danced, was driving and his friend sat in the front passenger seat. They told BREWER that they had a hidden bar in the back seat and told her to look at it, so just to get rid of them, she opened the door and sat down to look at the bar and that's when they immediately drove off with her. They drove to the rear of the club and acted like they were going to stop, but they then took off again at a high rate of speed. The driver drove recklessly, ran red lights and drove through the residential district at a fast speed. During that time they told her they were going to take her back to the Holiday Inn, but they drove in another direction.

The driver became very upset with BREWER because she couldn't remember his name. She became hysterical and the male passenger told the driver to shut her up. She pleaded with them to take her back to the club, but they kept driving. After about thirty minutes of traveling, the car engine stopped running and when the car rolled to about five miles an hour, BREWER jumped out of the car and ran in between some houses. BREWER had her car keys in her hand and when she jumped she lost her keys. BREWER ran down an alley in a residential area and that was the last she saw of the two men. ~~The driver stopped the car and the two men reached for her.~~

BREWER went to a pay telephone and called some friends who lived in northern Oklahoma City and told them what had happened. Her friends called the Norman Police Department and a minute or two later, the police department dispatcher called BREWER on the pay phone and told her to stay on the line until officers arrived. About two minutes after the dispatcher got on the line, a police

**17**

CR 82-502
INTERVIEW OF LAVIETA SUE BREWER, 07/23/86/kc
PAGE THREE


car arrived and took BREWER to the police station where
she filled out a report.

BREWER did not remember the name of the
officer who picked her up, but she remembered it rained
that night and her dress and sandles got "soaking" wet.

BREWER thought her abduction was planned be-
cause of the talk about the bar in the car.  After the
club closed the smaller man stopped by her table and
talked, and she told him that she had other plans then
he left.

Some days later, BREWER told LOUISE WOODS,
who at that time was the President of the East Country
Band Fan Club, what happened to BREWER at the club.
From then on arrangements were made for the single ladies
to be escorted to their cars at that club.

WOOD told BREWER that the two men could have
been the two men who wrote a hot check at the club a
short time earlier.

*Photo I.D.*

18

# Criminal Justice Training & Consulting Services
**2306 Camino Artista**
**Santa Fe, New Mexico 87505**
**505.473.9843**
**Fax 505.473.5371**

Ms. Cheryl A. Pilate, Esq.
Wyrsch, Hobbs & Mirakian, P.C.
1101 Walnut, Suite 1300
Kansas City, Missouri 64106

Mr. Barry Scheck, Esq.
Cochran, Neufeld, Scheck, P.C.
99 Hudson St.
New York, NY

Mr. Mark Barrett, Esq.
111 N. Peters, Suite 200
Norman, Oklahoma 73069

      RE:    Fritz, et al. v. City of Ada, Oklahoma, et al.

Dear Ms. Pilate, Mr. Scheck and Mr. Barrett:

At your request, I have reviewed the conduct of the investigation of Debra Sue Carter homicide, which led ultimately to the arrests, charges, and convictions of Ronald K. Williamson and Dennis L. Fritz.

The following report contains my opinions of the law enforcement investigation and the basis for those opinions. As additional discovery is completed in this action, I reserve the right to update, revise and supplement these opinions to ensure they are accurate.

The following opinions are based on my review and analysis of the materials and documents provided to me as of November 16, 2001, as well as my experience, education and training as a police officer, police supervisor, police chief, state law enforcement training director and director of investigations for the State of New Mexico Attorney General's Office. I have additionally attached a copy of my curriculum vitae (attachment A) and a listing of cases in which I have been retained as an expert during the past four years in compliance with Rule 26 (see attachment B).

I was retained in this matter to review and evaluate the conduct of the City of Ada (Oklahoma), Dennis Smith, James Fox, Rusty Featherstone and Gary Rogers.

**DEFENDANT'S EXHIBIT**
3
PENGAD-Bayonne, N. J.

1

## SUMMARY OF OPINIONS:

Mr. Gary Rogers and Mr. Rusty Featherstone, investigators for the Oklahoma State Bureau of Investigation (OSBI) and Mr. Dennis Smith, investigator for the City of Ada, repeatedly failed to disclose and/or turn over to the prosecutor exculpatory and impeaching evidence that was material to the guilt or innocence of Mr. Fritz and Mr. Williamson. It would be obvious to a reasonable police officer during the period of this investigation that this undisclosed material was exculpatory and/or impeaching and the failure to disclose it by Smith and/or Rogers and/or Featherstone was clearly done deliberately or recklessly.

The City of Ada, Oklahoma, by and through James Fox, police chief (1987 – 1989) and other police officials of the department, failed to train and/or supervise its officers as to the necessity of documenting and turning over to the prosecutor exculpatory evidence.  The documentation and disclosure of exculpatory evidence is a recurring situation where it is obvious that severely deficient or non-existent training and supervision will lead to the suppression of exculpatory and/or impeaching evidence in violation of a defendant's constitutional rights.  The training and supervision with respect to the documentation and disclosure of exculpatory and impeaching evidence by the City of Ada was severely deficient or non-existent and demonstrates that the city was deliberately indifferent or reckless as to these obligations.

The City of Ada, Oklahoma, by and through James Fox, police chief (1987 – 1989) and other police officials of the department, had a custom, policy and practice within the department that permitted the arbitrary and unchecked exclusion of exculpatory evidence from case files sent for prosecutorial review to the district attorney's office.

OSBI training and supervision of agents with respect to disclosure of exculpatory and/or impeaching evidence was so severely deficient it was obvious and highly predictable that suppression of exculpatory and impeaching information would occur.

The investigation of the Debbie Carter homicide was steered away from Glen Gore as a suspect in ways that are gross departures from standard police practice and which suggest that actions of investigators were not merely negligent, but were reckless and indifferent with regard to the truth.

Mr. Rogers, Mr. Featherstone, and Mr. Smith engaged in gross departures from standard police practices for the documentation of witness statements. These gross departures create an unacceptably high risk for the fabrication and/or misrepresentation of evidence.

2

## SUMMARY OF ITEMS REVIEWED:

In preparing this report, I examined numerous documents, including Plaintiffs' Third Amended Complaint, the opinion in <u>Williamson v. Reynolds</u> granting Mr. Williamson habeas corpus relief, the preliminary hearing transcript and trial transcripts in the criminal prosecutions of Mr. Fritz and Mr. Williamson, the OSBI and Ada Police Department Investigative files, the depositions in <u>Fritz v. City of Ada</u>, and the exhibits from those depositions. I also reviewed a Dateline segment on the case that I had earlier viewed on television. A complete list of documents and items reviewed is included in Attachment C.

1. **MR. GARY ROGERS AND MR. RUSTY FEATHERSTONE, INVESTIGATORS FOR THE OKLAHOMA STATE BUREAU OF INVESTIGATION (OSBI) AND MR. DENNIS SMITH, INVESTIGATOR FOR THE CITY OF ADA (OK) POLICE DEPARTMENT, REPEATEDLY FAILED TO DISCLOSE AND/OR TURN OVER TO THE PROSECUTOR EXCULPATORY AND IMPEACHING EVIDENCE THAT WAS MATERIAL TO THE GUILT OR INNOCENCE OF MR. FRITZ AND MR. WILLIAMSON. IT WOULD BE OBVIOUS TO A REASONABLE POLICE OFFICER DURING THE PERIOD OF THIS INVESTIGATION THAT THIS UNDISCLOSED MATERIAL WAS EXCULPATORY AND/OR IMPEACHING AND THE FAILURE TO DISCLOSE IT BY SMITH AND/OR ROGERS AND/OR FEATHERSTONE WAS CLEARLY DONE DELIBERATELY OR RECKLESSLY.**

   **THE EVIDENCE THAT WAS SUPRESSED AND SHOULD HAVE BEEN PROVIDED TO THE PROSECUTOR SUGGESTED OR ESTABLISHED THE FOLLOWING:**

   A. **THE LACK OF VERACITY OF GLEN GORE, WHO, AT AN UNKNOWN DATE, CONTRADICTED HIS ORIGINAL ACCOUNT, WHICH DID NOT NAME RON WILLIAMSON AND WHICH STATED THAT MS. CARTER DID NOT MENTION HAVING PROBLEMS WITH ANYONE.**

   B. **THE GUILT OF GLEN GORE, AS SUGGESTED BY: (1) THE SUSPICIOUS CHANGE IN HIS RECOLLECTION WHEN HE CLAIMED THAT RON WILLIAMSON WAS AT THE**

3

COACHLIGHT ON 12/7/82 BOTHERING DEBBIE CARTER AND (2) HIS LATER INCULPATORY STATEMENT TO JAIL INMATE JAMES RIGGINS.

C. THAT RON WILLIAMSON WAS NOT IDENTIFIED BY ANYONE OTHER THAN GLEN GORE AS BEING PRESENT AT THE COACHLIGHT LOUNGE ON 12/7/82, INCLUDING PEOPLE WHO GORE SAID HE WAS WITH AND KNEW WILLIAMSON; IN FACT, WILLIAMSON WAS NEVER IDENTIFIED BY ANY OTHER INDIVIDUAL AS BOTHERING DEBBIE SUE CARTER ON THAT NIGHT.

D. THE LACK OF VERACITY OF TERRI HOLLAND, WHOSE ACCOUNT REGARDING WILLIAMSON'S ALLEGED JAILHOUSE CONFESSION WAS NOT CORROBORATED BY ANY OTHER INMATE PRESENT WHEN WILLIAMSON ALLEGEDLY CONFESSED.

E. THE LACK OF VERACITY OF JAMES HARJO, WHO WAS IDENTIFIED BY KEN STEPP AS PLANNING TO MAKE UP A STORY ABOUT DENNIS FRITZ.

F. THE POSSIBLE INVOLVEMENT OF SEVERAL OTHER SUSPECTS, INCLUDING BOYFRIENDS OR ASSOCIATES OF DEBBIE CARTER WHO HAD THREATENED MS. CARTER IN THE PAST OR HAD ENGAGED IN ACTS OF VIOLENCE.

G. THE EXISTENCE OF SUBSTANTIAL INFORMATION CONCERNING ILLEGAL DRUG USE BY MS. CARTER AND THE POSSIBILITY OF DRUG-RELATED MOTIVES AS A FACTOR IN THE HOMICIDE.

H. THAT WITNESSES WHO DID NOT POINT TO THE GUILT OF RON WILLIAMSON OR DENNIS FRITZ WOULD NOT BE CONTACTED OR INTERVIEWED.

BASIS FOR OPINION #1:

A. In Glen Gore's initial statement to police on 12/8/82, he never mentioned that Debbie Sue Carter was being bothered by anyone in the bar or that Ron Williamson was at the Coachlight Lounge on the evening of December 7, 1982.

4

B. In Glen Gore's second statement to the police, which is *undated*, he implicates Ron Williamson by stating that Williamson asked Carter to dance with him and that she turned him down. Significantly, Gore is the *only* person in the entire investigation that placed Ron Williamson at the Coachlight on the evening of December 7, 1982. The mention of Mr. Williamson is significant not only because Gore is the only one to claim Mr. Williamson was present, but also because he portrays Williamson as pursuing Carter, then being rebuffed by her. This fact was never mentioned in Gore's first interview of 12/8/82, in which he stated Carter did not mention having problems with anyone. Gore also states in the second interview that he was accompanied to the Coachlight by "Ron" who worked at K-Dem. In the first statement, he is more specific and identifies someone named Ron West, who apparently was never interviewed by the police. The second, undated statement was the only statement that was provided to the prosecution and was a critical piece of evidence used to place Ron Williamson at the Coachlight on the evening of December 7, 1982, and to establish Williamson knew and was bothering her. The prosecutor apparently never learned that Gore's initial statement on December 8, 1982, completely contradicted his later, undated statement.

The non-disclosure of this report was clearly deliberate or reckless. Smith admitted in his deposition the second, undated report was a "redo" by him of the first statement taken by Danny Barrett and witnessed by Gary Rogers. Since Smith knew the second undated report was "redo," he was undeniably aware of the first inconsistent statement and the decision not to turn it over to the prosecutor in either the Ada prosecutor's report or the OSBI prosecutor's report was a deliberate or reckless act. Rogers was listed as a witness to the first Gore interview but claims he does not remember it and he could not have been a witness to the Gore statement on 12/8/82 or the other 12/8/82 interviews of Louise McArthur and Billy Ray Gibson because he takes a better statement than Barrett and would insist on doing the interview himself. Even accepting Rogers statement at face value, he had access to the Ada file and, at least in 1986 when he was preparing the Prosecutor's report, would have known from Smith that the undated second Gore interview was a "redo" of the first, or that a first interview existed. Rogers had to know that the second undated Gore interview was a gross departure from standard police practice and it was important to date the interview. Moreover, the fact that the signature of Dennis Smith was removed from the bottom of the undated report before it was included in the OSBI prosecutorial report suggests awareness that the report deviated from standard police

5

practice and was not a document that a competent law enforcement officer wanted to take responsibility for.

It is this expert's opinion that the failure of investigators to provide a date for Gore's second statement or to include the identity of the interviewer, or to write a report establishing the date of Gore's second statement, is strong evidence of a deliberate effort to ensure that no one could, or wanted to, determine the time frame in which this statement was given. There is no other explanation for such gross irregularities in a document of this importance, which was used to link the accused (Williamson) to the victim on the night of the crime. The failure to date the statement suggests that the investigator was well aware that Gore's account changed years after his original statement. It allowed Rogers to say nothing to the prosecutors when Gore lied at the preliminary hearing and said that he told police on 12/8/82 the story of Ron Williamson bothering Debbie Carter at the Coachlight on the evening of 12/7/82. The original Glen Gore interview, along with the information that *no one else* at the Coachlight placed Mr. Williamson at the bar, was powerful exculpatory evidence that should have been provided to the prosecutor. It is difficult to think of any facts that would be more impeaching of Mr. Gore or with a greater tendency to exonerate Mr. Williamson.

In their depositions, Mr. Smith and Mr. Rogers stated that they do not recall when the second statement was taken or when they first learned Glen Gore was saying Ron Williamson bothered Debbie Carter on the night of 12/7/82. Smith says the second, undated interview was "most likely" December 1982 or sometime in 1983 (depo. page 53). In fact, a review of the 12/8/82 statement and the undated statement reveal that Gore reported different addresses when the statements were given – 824 E. Corona in December 1982 and 618 N. Ash at the time of the undated statement. Jail book-in sheets and a presentence report of Mr. Gore in another case establish that Mr. Gore *lived at 618 N. Ash in 1986. Thus, the undated statement, viewed in light of the evidence at hand, was likely written three years after Carter's death and three years after Gore's initial statement of 12/8/82.* The belated acquisition of this statement casts doubt on the veracity of Gore's account concerning Williamson. It also casts suspicion on Gore's motives and suggests the possibility of his own guilt or his knowledge of the crime. This is something that had to be apparent to Smith and Rogers in 1986 because it was during this period (April of 1986) that an interview with Tommy Glover was documented where Glover places Glen Gore as the last person to see Carter alive in the parking lot of the Coachlight and observes Carter pushing Gore away from her car.

6

Gore's initial statement to the investigators on 12/8/82 was not turned over to the prosecution and was therefore improperly excluded from examination, investigation and the impeachment of Gore by defense counsel. There is no piece of exculpatory evidence in this case, examined by this expert, that is more powerful and, at the same time, more troubling.

C. During the investigation into the murder of Debbie Sue Carter, Mr. Smith and Mr. Rogers located no witnesses to corroborate Mr. Gore's statement that placed Ron Williamson at the Coachlight Lounge during the evening and early morning hours of December 7 and 8, 1982. None of the 23 persons identified as being present at the Coachlight on this evening stated that Ron Williamson was at the Coachlight, except Mr. Gore. (See Appendix A, chart of persons present at Coachlight). In fact one witness, Tommy Glover, stated that he saw Mr. Gore talking to Debbie Sue Carter at her vehicle, on the night of 12/8/82, in the parking lot as she was about to leave. Additionally, none of the individuals present at the Coachlight Lounge placed Ron Williamson at the bar or bothering Debbie Sue Carter. The failure to turn over the statements of each and every person at the Coachlight constituted a gross departure from standard police practices and constituted reckless and/or deliberate conduct.

Investigators Smith and Rogers received statements from J.J. Johnson, Noel Clement, Cliff Beach, Terri and Mike Carpenter, Billy Ray Gibson who were all at the Coachlight on 12/7/82 – 12/8/82, and none reported seeing Ron Williamson at the bar. Billy Ray Gibson told investigators that Debbie never said anything about anyone bothering her. The Carpenters reported seeing a man in the Coachlight parking lot talking to Ms. Carter just before she left. The case file indicates no follow up to this report. None of these statements were turned over to the prosecutor, and therefore could not be turned over to defense counsel for examination, investigation and impeachment.

One good example of deliberate elimination of plainly impeaching and exculpatory Coachlight witness statements is Noel Clement. In the original OSBI investigative report Gary Rogers documents two interviews with Noel Clement, one on 12/8/82 concerning his observations at the Coachlight on 12/7/82 and a second one concerning an odd encounter he had with Ron Williamson. In the Rogers' Prosecutorial Report, only the encounter with Ron Williamson is included, and Clement's interview about 12/7/82 is deliberately suppressed. This is significant because Clement obviously knew Ron

7

Williamson, said he was with Glen Gore and Debbie Carter all evening, and did not corroborate Glen Gore's story that Ron Williamson was present in the Coachlight bothering Carter.

D. Ms. Terri Holland provided a statement to investigators, in particular Rogers, that Ron Williamson told her in the jail that he had strangled Carter, shoved panties down her throat and "something" up inside her. The second page of the Holland report contains a listing of 10 witnesses (also inmates in the jail) who were in a position to corroborate her story. One of them was interviewed and reported that he did not remember the statements described by Holland. The second page of the report, which lists the names of the other jailhouse witnesses, was completely removed and was not part of the document provided to the prosecutor's office. This page was improperly withheld from the prosecutor and was not therefore provided for examination, investigation and impeachment by defense counsel. It was obviously exculpatory

E. In Mr. Ken Stepp's statement to Mr. Rogers (OSBI), he stated that he overheard Mr. James Harjo, a key witness for the prosecution of Mr. Fritz, swear to make up something as good as gold to implicate Mr. Fritz. This statement from Mr. Stepp was improperly excluded from the prosecutor's file and was therefore not available to the defense counsel for examination, investigation and impeachment

F. Mr. James Riggins, an inmate in the jail, made a statement on September 2, 1987, *naming Mr. Glen Gore as the person he heard confessing to the murder of Debbie Sue Carter, rather than Ron Williamson.* That statement and a subsequent report by Pontotoc County jailer John G. Christian were never turned over to the prosecutor. A jail book-in sheet confirms that Gore was in the jail near the date (July 16, 1987) that Riggins recalled hearing the statement. Further, an OSBI interview with Riggins in July 1987 states that Riggins heard inculpatory statements from someone. At the time of that report, Riggins believed the "someone" was Ron Williamson. When he realized two months later that person was Glen Gore, not Ron Williamson, investigators were no longer interested. Neither Smith nor Rogers followed up by re-interviewing Riggins after his 9/2/87 statement. None of these documents were turned over to the prosecutor, and thus were not available to be turned over to the defense for examination, investigation, and impeachment.

8

G. There were numerous statements and tips provided to investigators concerning other possible suspects and persons who had threatened Ms. Carter. These statements and tips were improperly excluded and not provided to the prosecutor and therefore were not available to the defense counsel for examination, investigation or impeachment. Those tips and statements are provided below:

- Ms. Leona Gould, Ms. Carter's sister, provided a lead to investigators that Keith Finch had threatened to kill Debbie Sue Carter with a gun.

- Mr. Cliff Beach told investigators that a man had tried to rape Debbie two years ago.

- Mr. George Marion told investigators about a boyfriend of Debbie's named Mark.

- Ms. Susie Johnson reported that Mark Gantt made a scene when Debbie was dating her brother, Keith Weaver.

- Lori Weaver stated that Debbie was afraid of Mark Gantt.

- Mr. Mark Gantt gave investigators a statement that he had dated Debbie and they had broken up. He told investigators "I loved her in a special way."

- Ms. Angie Roberson reported that Ms. Carter was being bothered at Harold's Club.

- Ms. Tammy Roark provided information that Bruce Leddy was violent.

- An anonymous tip that Dean Musser was violent and rapes women.

- Ms. Charlotte Alexander, doorperson at the Coachlight, reported that she was threatened by some men the same night Debbie was murdered.

- Ms. Geraldine Young, manager of the Trails West Motel, reported that a cleaning lady had found a paper that some men had left in a room with the name of "Debbie—Coachlight" and a phone number.

- A tip that Duke Dorough hangs out at the Coachlight.

9

- A tip that Bruce Leddy beats girlfriend, has mental problem and takes pills.

- There was information provided to investigators concerning drug use and drug trafficking involving Ms. Carter that was improperly excluded from the prosecutor and therefore not offered to defense counsel for examination or investigation. The information was:

- Ms. Marcia Carter told investigators that Debbie Carter went to Houston to buy drugs one week before her murder with her boyfriend and that a Gregory Paul Wood sold drugs to her.

- F. Eulich, w/f, from Fittstown, OK, provided a tip that she was at a "dope" party with Ms. Carter a couple of nights before her death and she (Carter) was very depressed.

- Mr. Duke Graham told investigators that Debbie told him she had to stop taking so many pills—and that she had taken drugs with Mark Gantt and that he had beat her up before.

- John Christian, a jailer in the Pontotoc County jail, wrote a report in October 1987 concerning statements made by Mr. Williamson at the jail. In the statements, Williamson complains that "all of these people [were] lying about him." He specifically stated that Gary Rogers had misinterpreted statements he made about a dream, and was trying to use the dream to suggest that he was guilty of killing Debbie Carter. There is no evidence that these exculpatory statements by Mr. Williamson were ever provided to the prosecutor, and thus were not available to be turned over to the defense for examination, investigation or impeachment.

- LaVieta Sue Brewer, a penalty phase witness against Mr. Fritz and Mr. Williamson, was unable to identify either one of them from photographs. Her inability to identify the men in photos was mentioned in the draft OSBI report, but was edited out of the final version. This information was not provided to the prosecutor, and thus was not available to be turned over to the defense for examination, investigation, and impeachment.

10

2. **THE CITY OF ADA, OKLAHOMA, BY AND THROUGH JAMES FOX, POLICE CHIEF (1987 – 1989) AND OTHER POLICE OFFICIALS OF THE DEPARTMENT, FAILED TO TRAIN AND/OR SUPERVISE ITS OFFICERS AS TO THE NECESSITY OF DOCUMENTING AND TURNING OVER TO THE PROSECUTOR EXCULPATORY EVIDENCE. THE DOCUMENTATION AND DISCLOSURE OF EXCULPATORY EVIDENCE IS A RECURRING SITUATION WHERE IT IS OBVIOUS THAT SEVERELY DEFICIENT OR NON-EXISTENT TRAINING AND SUPERVISION WILL LEAD TO THE SUPPRESSION OF EXCULPATORY AND/OR IMPEACHING EVIDENCE IN VIOLATION OF A DEFENDANT'S CONSTITUTIONAL RIGHTS. THE TRAINING AND SUPERVISION WITH RESPECT TO THE DOCUMENTATION AND DISCLOSURE OF EXCULPATORY AND IMPEACHING EVIDENCE BY THE CITY OF ADA WAS SEVERELY DEFICIENT OR NON-EXISTENT AND DEMONSTRATES THAT THE CITY WAS DELIBERATELY INDIFFERENT OR RECKLESS AS TO THESE OBLIGATIONS.**

3. **THE CITY OF ADA, OKLAHOMA, BY AND THROUGH JAMES FOX, POLICE CHIEF, (1987 – '89) AND OTHER POLICE OFFICIALS OF THE DEPARTMENT, HAD A CUSTOM, POLICY and PRACTICE WITHIN THE DEPARTMENT THAT PERMITTED THE ARBITRARY AND UNCHECKED EXCLUSION OF EXCULPATORY EVIDENCE FROM CASE FILES SENT FOR PROSECUTORIAL REVIEW TO THE DISTRICT ATTORNEYS OFFICE.**

   **THESE POLICIES, CUSTOMS, AND PRACTICES OF THE CITY OF ADA, MR. FOX AND OTHER POLICY MAKERS PERMITTING THE WITHOLDING, FABRICATING, OMITTING AND SUPRESSING OF EXCULPATORY AND/OR IMPEACHING EVIDENCE WAS A GROSS DEPARTURE FROM ACCEPTED POLICE STANDARDS AND PRACTICES.**

4. **OSBI TRAINING AND SUPERVISION OF AGENTS WITH RESPECT TO DISCLOSURE OF EXCULPATORY AND/OR IMPEACHING EVIDENCE WAS SO SEVERELY DEFICIENT IT WAS OBVIOUS AND HIGHLY PREDICTABLE THAT SUPPRESSION OF EXCULPATORY AND IMPEACHING INFORMATION WOULD OCCUR.**

BASIS FOR SUPPORT OF OPINIONS #2, #3, #4.

A. The Ada Police Department did not have its own internal training program in the 1980s, according to current Assistant Chief Richard Carson (depo. page 10-11). Police officers did not receive any training on exculpatory evidence, stated Mr. Carson (depo. page 68). Carson

11

did not know of any training programs on exculpatory evidence. (depo. page 68). Even at present, there are no internal training programs in the Ada Police Department that address exculpatory evidence. (Carson depo. page 68).

B. The current director of training, Carl Allen, stated in his deposition, page 30-31, that he was familiar with the term "exculpatory evidence," but that the meaning of it "elude[d] him right now."   Mr. Allen stated that he could recall no internal training in the Ada police department on exculpatory evidence and that he had no recollection of the topic of exculpatory evidence being covered in the mandated, statewide law enforcement training (CLEET). (Depo. p. 31).

C. Under the custom, policy and practice of the Ada Police Department, the captain determines who is assigned to handle a specific investigation. (Kiesewetter depo. page 71) The captain is the "boss." (Kiesewetter depo. page 71).   The captain supervises other investigators, but no one directly supervises his work on a case. It is the responsibility of the lead investigator to determine what reports to include in the prosecutorial report or case report, which is sent to the district attorney's office.

D. Ada, OK Police Chief James Fox stated in his deposition, page 76, that there was a policy of not requiring detectives to include exculpatory evidence in the case report.

E. Chief Fox stated that there was a policy of not requiring detectives to turn over exculpatory evidence to the prosecutor (Fox depo. Page 76). Chief Fox went on to say in his deposition, page 78, that there was a policy of allowing total discretion to the detectives or any individual officer to determine what information to turn over to the district attorney.

F. Chief Fox, in his deposition, page 67, said he was not familiar with the term "exculpatory evidence" and stated that there was no policy in Ada Police Department regarding evidence favorable to criminal that might indicate innocence.

G. Mr. Richard Carson, Assistant Police Chief, Ada, OK Police Department, stated in his deposition, page 69, that he couldn't recall there ever being a policy on exculpatory evidence in the Ada Police Department.

H. Mr. Michael E. Kiesewetter, a former police officer and police detective with the Ada, OK police department, stated in his deposition that he was not familiar with the term exculpatory evidence and never

12

received training in the legal obligation to document and preserve evidence that tended to show the a suspect was innocent.

I. Carl Allen stated in his deposition, page 40, that there was no specific policy in the Ada Police Department requiring a prosecutor or a defense lawyer to get a report about a case.

J. Mr. Mike Miller, current Ada, OK police chief, in his deposition on page 46, agreed that there was never a written policy to inform the district attorney of everything.

K. Chief Miller then explained what the term "exculpatory evidence" was in his deposition responded, "I know nothing about it. You could tell me that, and I'd believe you."

L. The policy of not requiring Ada police detectives or other officers to properly submit all exculpatory evidence for prosecutorial review and evaluation resulted in a December 8, 1982 statement made by a key witness, Glen Gore, not being turned over to the prosecutor, and subsequently to the defense, as well as the other items of exculpatory and impeaching evidence itemized as the basis for Opinion #1.

M. The severely deficient training and supervision of Ada police detectives and officers regarding the meaning of "exculpatory evidence" and the legal obligations associated with it made it obvious that violation of a defendant's constitutional rights could easily occur and was highly predictable.

N. The training and supervision of OSBI agents during the period of this investigation were severely deficient with regard to exculpatory evidence. The OSBI had no written policies regarding report writing until the 1990s. (Tommy Graham depo. page 40). The current policy tells agents how to write a prosecutorial report, which should exhibit "accuracy, completeness, brevity, impartiality, and proper form." While all relevant facts should be included, the word "relevant" is not defined. (Graham depo. page 43). Reports that may not have any materiality or relevance should be included in the "miscellaneous" section, under current policy. Before the present policy, which was instituted in 1990s, there was no requirement that the prosecutorial report contain a "miscellaneous" section. It was left up to the agent's discretion as to what should be included in the report. (Graham depo. page 47).

O. Rusty Featherstone, formerly an agent and deputy director of the OSBI, stated that he was not aware during the 1980s that the OSBI

13

had any policy that governed the distribution of exculpatory evidence or directed that exculpatory evidence be brought to the attention of the prosecutor (Rusty Featherstone depo. page 39-40).

P. Tommy Graham, currently an inspector with the OSBI, stated that he does not recall any training that he had received on what constitutes exculpatory evidence. (Graham depo. page 55).

Q. Gary Rogers said in his deposition that there was no training or general policy, custom, or practice as to what OSBI agents should do with their original notes or tape recordings of interviews. Rogers said it was his general policy, custom, and practice to destroy his original written notes or original tape recordings of witness statements before dictating or writing a report that was sent to the regional office. It is obvious Rogers' practice of destroying original notes and tapes could result in the suppression of impeaching and/or exculpatory evidence.

R. Rogers admitted he had some training on the meaning of exculpatory evidence and his responsibility to disclose it. When confronted with the elimination from an interview he produced in his Prosecutor's Report of a page in the Terri Holland interview that contained the names of inmates who were in a position to corroborate Terri Holland's claim Ron Williamson confessed and one inmate who contradicted Holland, Rogers agreed this information is what he understood to be exculpatory but claimed he didn't know why it had been eliminated. He also said he didn't know why Noel Clement's observations from 12/7/82 were eliminated from the Prosecutor's report. He blamed his supervisor B.G. Jones for eliminating the information that LaVieta Brewer could not identify the photographs of Fritz and Williamson. Rogers was responsible for submitting and reviewing the Prosecutor's Report with the plain and deliberate elimination of exculpatory and impeaching evidence. These eliminations were a gross departure from standard practice and done with deliberate indifference to a clearly established constitutional obligation. The responsibility lies with Rogers, as indicated in Opinion #1, as well as his supervisor Jones or whatever other unknown supervisors reviewed and approved these eliminations. Any approval or direction to make these eliminations would be a gross departure from standard practice.

S. The OSBI's severely deficient training and supervision as to the disclosure of exculpatory and/or impeaching evidence created a situation in which the violation of a defendant's constitutional rights could easily occur and was therefore highly predictable.

14

T. The policy, custom, and practice of not requiring OSBI agents involved in this case to properly submit all exculpatory and/or impeaching evidence for prosecutorial review and evaluation resulted in substantial evidence not being turned over to the prosecutor and thus not being turned over to the defense. (See list of suppressed exculpatory evidence outlined in Opinion #1 – bullets).

U. The policy, custom, and practice of not requiring OSBI agents to properly submit all exculpatory evidence for prosecutorial review and evaluation resulted in the creation of "street files," – a separate set of files containing all tips, leads and reports, no matter what direction they pointed in – along with a separate prosecutorial file, which was often cleansed of exculpatory evidence.

## 5. THE INVESTIGATION OF THE DEBBIE CARTER HOMCIDE WAS STEERED AWAY FROM PURSUING GLEN GORE AS A SUSPECT IN WAYS THAT WERE GROSS DEPARTURES FROM STANDARD POLICE PRACTICE.

Basis of Support for Opinion #5:

A. The failure to pursue the statement of James Riggins that Gore confessed to him is a gross departure from standard practice and reflects deliberate indifference by the lead investigators that Gore might be guilty and plaintiffs were innocent. The fact that Riggins was off by a day or two in his recollections months later as to the precise day Gore confessed to him certainly did not justify a complete failure to follow up.

B. Gore's claim that Ron Williamson was in the Coachlight on 12/7/82 obviously lacked credibility because it was uncorroborated by anyone else there and is directly contradicted by his original statement on 12/8/82. The fact that he would lie, and try to implicate someone the investigators already suspected, is obvious evidence he might guilty or hiding something with respect to the murder. If, as the address on the undated report suggests, Gore first came up with this story in 1986, there was even greater reason for investigators to suspect and pursue him because this was the first time Tommy Glover's assertion that Gore was the last person to see Debbie Carter alive was documented (4/86) and Gore was observed being pushed away from Carter's car. There is no record in the file indicating that Gore was ever confronted with the implausibility of his accusation against Williamson or his failure

15

to mention that Carter pushed him away from her car in their encounter in the parking lot the very night she was found murdered.

C. There is no record that investigators ever interviewed Ron West, who was named by Gore in his 12/8/82 statement as accompanying him to the Coachlight on the night of Carter's death. Gary Rogers, in his deposition, said he did not interview West because he only knew him as "Ron" from "K-Dem" – the description Gore gave in the second interview. It is hard to understand how Rogers could fail to be aware of the identity of Ron West when his full name is contained in the 12/8/82 report and that he was also named by JJ Johnson in an interview that is documented in the Ada police files. It was imperative that investigators interview Mr. West to establish the credibility of Mr. Gore's alibi on the evening of Ms. Carter's murder and it was not done.

D. There is no record Gore was ever asked to take a polygraph examination although other suspects with less potential evidence against them were.

E. Gore's hair was not submitted for examination until 1986 and no final report was received until 1988 during the trial of Dennis Fritz.

F. Gore had a criminal history involving violence against women that was never sought or examined by lead investigators, even after he was arrested in a hostage situation involving his ex-wife where he shot an Ada police officer.

G. Even if the lead investigators assumed or believed that Gore had a relationship with other Ada officers as a narcotics informant, it would still be a gross departure from standard practice to steer a homicide investigation away from him.

6.   **MR. ROGERS, MR. SMITH AND MR. FEATHERSTONE ENGAGED IN GROSS DEPARTURES FROM STANDARD POLICE PRACTICES IN THE DOCUMENTATION OF WITNESS STATEMENTS.   THESE DEPARTURES ARE CONDUCIVE TO**

16

## THE FABRICATION AND/OR MISREPRESENTATION OF EVIDENCE.

Basis for Opinion #6:

### A. Undated report of Glen Gore:

The undated report of the second interview of Glen Gore is a gross departure from standard practice that is conducive to the fabrication and/or misrepresentation of evidence. Obviously if the affidavit of Glen Gore is true that he was induced by police to say that Ron Williamson was bothering Debbie Carter on 12/7/82 that is a clear fabrication of evidence.

### B. Claimed dream confession of Ron Williamson:

The manner in which Rogers and Featherstone documented the confession they claimed Ron Williamson made to them during their interrogation after his arrest was a gross departure from standard practice that is conducive to fabrication or misrepresentation.

A confession in a murder case, particularly after a defendant is in custody, should be properly obtained and recorded. At a minimum the confession should be written out or typed, reviewed and signed by the accused. As a backup to this procedure, it is common law enforcement investigative practice, in order to preserve the confession for review by the prosecutor, to video and/or audio tape the confession/statement. Video taping and audio taping equipment were available to the investigators in this matter, yet only rough notes were taken by Mr. Featherston, over a 33-minute period in which Mr. Williamson is claimed to have confessed to the murder of Ms. Carter.

### C. Account of Gary Allen:

According to an OSBI report and the testimony of Gary Allen at the preliminary hearing and trials of Dennis Fritz and Ron Williamson, Allen was not interviewed until July 1987 and claimed at that point to remember a middle-of-the-night water hose incident allegedly involving Dennis Fritz and another man in December 1982. Mr. Allen's claimed ability to recall this event 4½ years after it occurred (when he supposedly had not been questioned about it before) is

17

certainly unusual.   Moreover, Allen's claim that he was able to determine approximately when the incident occurred based on the dates he was paid by his father's business should have been something investigators attempted to corroborate, particularly since the claimed pay days – the 10th and 20th of each month – represented uneven pay day intervals and the timing of the hose event was crucial to the relevance of Mr. Allen's account. The failure to seek corroboration of the timing represented a gross departure from standard police practice. This expert has also reviewed an affidavit dated 11/14/01 by Gary Allen in which he describes being pressured and coerced by investigators. Obviously, if the affidavit is true, it is clear that the lead investigators, Mr. Smith and Mr. Rogers, engaged in the fabrication of evidence.

18

## APPENDIX A – COACHLIGHT CHART

THIS DOCUMENT REPRESENTS A BREAKDOWN OF PERSONS THAT WERE IDENTIFIED AT THE COACHLIGHT LOUNGE ON THE EVENING OF DECEMBER 7, 1982.

A REVIEW OF THE RESULTS DEMONSTRATES THAT OF THE 23 PERSONS IDENTIFICATION BY INVESTIGATORS AS BEING PRESENT AT THE COACHLIGHT, SEVEN (7) PEOPLE WERE NEVER INTERVIEWED BY INVESTIGATORS AND THAT EIGHT (8) REPORTS OF PERSONS THAT WERE INTERVIEWED WERE NEVER TURNED OVER TO THE DISTRICT ATTORNEYS OFFICE.

FOUR (4) OF THE PEOPLE WHOSE REPORTS WERE NOT TURNED OVER TO THE PROSECUTOR MENTION GLEN GORE BY NAME AS BEING AT THE CLUB OR MENTION A MAN IN THE PARKING LOT AT THE COACHLIGHT.

ONLY ONE (1) OF THE TWENTY-THREE (23) – THAT PERSON BEING GLEN GORE – IMPLICATES RON WILLIAMSON AS BEING AT THE COACHLIGHT ON 12/7/82.

19

# PERSONS IDENTIFIED AT COACHLIGHT LOUNGE ON EVENING OF DECEMBER 7, 1982

| | Witness Name | Inter-viewed | Ada PD | OSBI | Turned Over | Comments |
|---|---|---|---|---|---|---|
| 1 | Charlotte Alexander | No | No | No | N/A | Worked front door, let people in & out. |
| 2 | Gary Allen | Yes | | Yes | Yes | 7/87 interview, no interview about being at Coachlight, just hose incident. |
| 3 | Clifford Beach | Yes | Yes | | No | Bouncer at Coachlight on 12/7/82, notes of interview only. |
| 4 | Mike Carpenter | Yes | Yes | | No | With wife Terri when interviewed. |
| 5 | Terri Carpenter | Yes | Yes | Yes | OSBI-Yes Ada-No | Told OSBI about man bothering DSC not RKW@ Tiny Jackson. Told Ada PD saw someone in parking lot-not turned over. |
| 6 | Noel Clement | Twice | | Yes | 1 rpt. only | Mentions Glen Gore, friend of DSC, not turned over. |
| 7 | Rebecca Dysart | Yes | Yes | | Yes | Names people at Coachlight, DSC problems with Mark Gantt. |
| 8 | David Hanks | No | | | | Bouncer at Coachlight. Took fingerprints, no reports of interview. |
| 9 | Billy Ray Gibson | Yes | Yes | | No | DSC-never said anything about problems at Coachlight. |
| 10 | Tommy Glover | Yes | 4/4/86 | | Yes | Describes encounter between DSC and Glen Gore in parking lot of Coachlight, DSC rebuffs Glen Gore. |
| 11 | Glen Gore | Twice | 12/8/82 Unknow | | 1-No 2-Yes | Not aware of any problems, never been to DSC apartment. Contradicts 1st report, only person to name RKW at Coachlight. |
| 12 | J.J. Johnson | Twice | Yes | Yes | No | Notes only, given and passed polygraph. Lists people at Coachlight, no RKW. |
| 13 | Bruce Leddy | Yes | | Yes | Yes | At Coachlight with Gary Allen. |
| 14 | Jill Lemons | Twice | Yes | | Yes | Mentions Mark Gantt as only person to have problems with DSC. |
| 15 | Danny LNU | No | | | | |
| 16 | Bill Loman | No | | | | Only mention was Glen Gore's second interview. |

| 17 | Louise McArthur | Yes | Yes |  | Yes | Worked Coachlight, friend with DSC, JJ, Johnson, Gina and Rebecca; DSC may have smoked marijuana. |
|---|---|---|---|---|---|---|
| 18 | Bobby Miller | No |  |  |  | Only mention was in Glen Gore's second interview. |
| 19 | Toni Ramsey | No |  |  |  | Never interviewed. Named as witness in Glen Gore prosecution. |
| 20 | Tammy Roark | No |  |  | No | Worked Coachlight, Called in and left a tip, Bruce Leddy is violent. |
| 21 | Robert Sharp | Yes |  | Yes | Yes | Did not know RKW. |
| 22 | Gina James Vietta | Yes | Yes | Yes | Yes | Mentions Mark Gantt. Discloses 3 AM phone call from DSC in 1987. |
| 23 | Ron West | No |  |  |  | Named by Glen Gore as accompanying him to Coachlight on 12/7/82, and leaving around 1:15 AM. |

19 Interviews
 8 People not interviewed.
 7 People interviewed that reports were not turned over to the defense.

# APPENDIX B – SUSPECT LAB TESTING

THIS DOCUMENT REPRESENTS A BREAKDOWN OF SUSPECTS KNOWN TO POLICE PRIOR TO THE ARREST OF MR. WILLIAMSON AND MR. FRITZ IN 1987.

A REVIEW AND PLOTTING OF OKLAHOMA STATE BUREAU OF INVESTIGATION LAB TESTS FOR EACH SUSPECT PROVIDES THE FOLLOWING INFORMATION:

- THAT OF THE 23 KNOWN SUSPECTS, ONLY MR. GLEN GORE'S HAIR SAMPLES WERE *NOT* TAKEN; ONLY MR. GORE'S SECRETOR STATUS WAS *NOT* TESTED AND ONLY MR. GORE'S FINGERPRINTS WERE *NOT* TAKEN.

11/19/01
Date

Signed _____
Thomas T. Gillespie

20

## SUSPECTS LISTED PRIOR TO ARREST OF
## FRITZ AND WILLIAMSON

|   | Name | Hair Samples 82/83 | Hair Samples After 83 | Secretor Status Determined | Fingerprints Compared |
|---|------|--------------------|-----------------------|----------------------------|----------------------|
| 1 | Cliff Beach | Yes | No | Non Secretor | Yes |
| 2 | Tommy Joe Butner | Yes | No | Not tested | Yes |
| 3 | Mike Carpenter | Yes | No | Ant. A&H | Yes, matched rear view mirror on Carter vehicle |
| 4 | Noel Clement | Yes | No | Non-secretor | Yes |
| 5 | James Donaghey | Yes | No | Ant. H | Yes |
| 6 | Dennis Fritz | Yes | No | Non-Secretor | Yes |
| 7 | Mark Gantt | Yes | No | Not tested | Yes |
| 8 | Bill Gibson | Yes | No | Non-secretor | Yes |
| 9 | Brad Gipson | Yes | No | Ant. A & H | Yes |
| 10 | Russell Gordon | Yes | No | Non-secretor | Yes |
| 11 | Glen Gore | No | Yes | Not tested | No |
| 12 | Paul "Duke" Graham | Yes | No | Non-secretor | Yes |
| 13 | David Hanks | Yes | No | Non-secretor | Yes |
| 14 | JJ Johnson | Yes | No | Non-secretor | Yes |
| 15 | Bruce Leddy | Yes | No | Secretor | Yes |
| 16 | Jack Lemons | Yes | No | Not tested | Yes |
| 17 | George "Bud" Marion | Yes | No | Non-secretor | Yes |
| 18 | Ernest Schultz | Yes | No | Ant. H | Yes |
| 19 | Robert Sharp | Yes | No | Ant. A & H | Yes |

11/19/01  MON 18:24  [TX/RX NO 8664]

| 20 | Russ Weaver | Yes | No | Not tested | Yes |
| 21 | Robert Whittington | Yes | No | Ant. H | Yes |
| 22 | Ron Williamson | Yes | No | Non-secretor | Yes |
| 23 | Wesley Wilson | Yes | No | Non-secretor | Yes |
| 24 | David Wisdom | Yes | No | Secretor | Yes |

Summary suspects testing results:

11    Non-Secretors

## Attachment C
### List of Items Relied Upon in Forming Opinions in *Fritz v. City of Ada*


**Plaintiffs' Third Amended Complaint**
**Opinion in Williamson v. Reynolds**
**Preliminary Hearing Transcript in State v. Williamson and Fritz**
**Trial Transcript in State v. Williamson**
**Trial Transcript in State v. Fritz**
**The complete investigative file of the OSBI, as produced to Plaintiffs in**
       **Fritz v. City of Ada**
**The complete investigative file of the Ada Police Department, as**
       **produced to Plaintiffs in Fritz v. City of Ada**
**All forensic reports by the OSBI during the Carter murder investigation,**
       **as produced to Plaintiffs**
**All depositions for which transcripts were available in Fritz v. City of**
       **Ada as of November 16, 2001**
**Items from Personnel files of Gary Rogers and Dennis Smith**
**All deposition exhibits, available as of November 16, 2001, including**
       **But not limited to police reports, witness statements and agency**
       **Policies**
**The affidavits of Gary Allen and Glen Gore**
***Dateline* segment on Fritz and Williamson case**

# Criminal Justice Training & Consulting Services

2306 Camino Artista
Santa Fe, New Mexico 87505
(505) 473-9843
FAX (505) 473-5371
email: CJTCTTG@aol.com
www.PoliceUseofForce.com

## CV: THOMAS T. GILLESPIE

EMPLOYMENT:

## 1990 – 2001:   Owner, Criminal Justice Training & Consulting Services

In 1987 Mr. Gillespie began conducting training and consulting services on a part-time basis. Since 1990 Mr. Gillespie has operated CJTC as his full-time business.

CJTC provides a full range of training and management services for public, as well as private sector organizations. CJTC conducts agency management audits, policy and procedure development, management of the investigative function programs, entry level and promotional process, strategic and project planning seminars and executive and supervisory training programs. CJTC has provided training for the US Department of Justice and the US Department of State. Programs have been conducted in several countries in Central and South America and Europe.

In 1990 Mr. Gillespie entered into a partnership with Mr. John McNall, BowMac Educational Services, to conduct "**Critical Incident Management**" training programs throughout the United States and abroad. Over 350 Critical Incident training programs, in 36 states have been provided. Over 7,000 law enforcement, fire and paramedic personnel have attended the first line supervisory and executive management program.

CJTC provides expert witness services in the areas of: Use of Force, Emergency Vehicle Operations, Hiring, Retention and Supervision, Training, Police Policy and Procedures Development, Criminal Investigative Techniques and Personnel Actions. Mr. Gillespie in collaboration with Darrel Hart and John Boren developed the Reactive Control Model (RCM)™, a copyrighted use of force training program that has been adopted by the State of New Mexico training academy as a the standardized use of force instruction. It was also recently adopted by the State of Connecticut as their primary use of force training program.

A textbook, *Police Use of Force: A Line Officer's Guide*, author's Gillespie, Hart and Boren, was published in December 1998 by Varro Press. The book is available for purchase on the web at **AMAZON.com** or through the publisher Varro Press [.com] or at 1-800-732-3659.

**Attachment A**                    1

Mr. Gillespie has been qualified as a law enforcement expert in both State and Federal Court and has been retained in over 200 civil and criminal actions.

| | |
|---|---|
| 1988 – 1990 | Director of Investigations, NM Attorney General's Office |
| 1987 – 1988 | Director of NM Department of Public Safety Training and Recruiting Division |
| 1984 – 1988 | Director of the New Mexico Law Enforcement Academy & Director New Mexico Department of Public Safety Training & Recruiting Division |
| 1984 (Mar-Sep) | Interim City Manager, City of Las Vegas, NM |
| 1979 – 1984 | Police Chief, City of Las Vegas, New Mexico |
| 1970 – 1979 | Police Sergeant and Police Officer, Wayne State University, Department of Public Safety, commissioned Detroit Police Officer. |
| 1971 – 1974 | US Army Criminal Investigator (CID) and Military Police Officer, assigned US Army Pacific Command (USARPAC) |

EDUCATION:

| | |
|---|---|
| 1969 | Bachelor of Arts, NM Highlands University, Las Vegas, NM. |
| 1976 | Masters of Public Administration, Wayne State University, Detroit, MI. |

SPECIALIZED TRAINING:

Accumulated over 5,000 hours of basic police, advanced and specialized law enforcement and management training.

Served as adjunct faculty member for Northwestern University's School of Staff and Command, Evanston, IL.

Attended FBI Academy, Law Enforcement Executive Development program (LEEDS), US Secret Service, Executive Protection School and the US Department of State, Executive Development program.

BASIC POLICE TRAINING AND CERTIFICATIONS:

Detroit Police Academy, 1970, leading to commissioning as a Detroit Police Officer, with the Wayne State University, Department of Public Safety. State of Michigan police officer certification issued by the Michigan Law Enforcement Officers Training Council (MLEOTC).

US Army Military Police School, 1971, Ft. Gordon, GA.

US Army Criminal Investigation School, 1973, Ft. Gordon, GA.

New Mexico Police Officer Certification, 1981, Santa Fe, NM.

Police Instructor Certifications in New Mexico, Illinois and Florida and Connecticut.

## PROFESSIONAL AND FRATERNAL ORGANIZATIONS:

φPast President of New Mexico Police Chiefs Association, 1982.
φRegional Chairman, National Association of State Directors of Law Enforcement Training, (1985-86).
φMember, International Association of Chiefs of Police
φMember, American Society of Law Enforcement Trainers.

## PUBLICATIONS, VIDEOS AND FILMS:

"Police Surveillance Training", a handbook for planning, preparation and technical procedures. Harper-Row Media, 1978. Served as technical consultant for production of video and accompanying handbook.

"Maximizing Witness Cooperation", training manual and video training program, Harper-Row Media, 1975.

"Manual for Municipal Chiefs", consultant and contributor, New Mexico Municipal League, 1981. Preparation of a model departmental manual for adoption by New Mexico Municipal Police Chiefs.

*"The Table Top – A New Dimension in the Promotional Process"*, published in September 1991, Police Chiefs magazine, ppg. 49 – 51.

*"Police Use of Force: A Line Officer's Guide"*, a textbook featuring the Reactive Control Model™, an instructional text for teaching police officers the proper and reasonable use of force. Published December 1998, by Varro Press, Shawnee Mission, KS. ISNB: 1-888644-82-6, 120 pages. Gillespie, Hart and Boren.

**Manual of Instruction,** *"Critical Incident Management – Training for the First Responding Supervisor"*, **copyrighted 1990 – 2000, BowMac Educational Services, Inc.**

**Manual of Instruction,** *"Critical Incident Management – Command Post Operations for Law Enforcement Commander's"*, **copyrighted 1992 – 2000, BowMac Educational Services, Inc.**

**PRESENTATIONS:**

### CRITICAL INCIDENT MANAGEMENT TRAINING PROGRAMS:

**Panelist, "Forum on Mass Violence in America—The Columbine School Tragedy". American Society of Law Enforcement Trainers Conference, January 2000, Richmond, VA.**

**Since 1990 as the 'lead instructor', Mr. Gillespie has presented over 350 initial response and command post critical incident training programs in over 31 states and abroad. Over 6,000 police, fire, paramedics and elected officials have attended this training program.**

**Seminar presentation: TREXPO (East) Conference on Special Tactics & Security, Washington, D.C., August 1999. Topic, "Critical Incident Management Training – A Team Approach."**

### POLICE USE OF FORCE:

**Use of Force training programs, featuring the Reactive Control Model; have been provided by Mr. Gillespie in New Mexico, Connecticut, Colorado, Illinois, Oklahoma, Florida, Kansas and Texas. Over 30 such programs have been conducted for City, County and State law enforcement agencies.**

**Mr. Gillespie presented Use of Force training instruction at the American Society of Law Enforcement Trainers (ASLET) conference in Grapevine, Texas (1997) and Albuquerque, New Mexico (1996).**

**Seminar presentation: TREXPO (West) Conference on Special Weapons Tactics & Security, Burbank, CA, March 1998. Topic, "How to Train Officer's to Make the Right Use of Force Decisions".**

# Criminal Justice Training & Consulting Services

**2306 Camino Artista**
**Santa Fe, New Mexico 87505**
**(505) 473-9843**
**FAX (505) 473-5371**
email: CJTCTTG@aol.com

## EXPERT WITNESS SERVICES

**Mr. Thomas T. Gillespie, Owner, Criminal Justice Training & Consulting Services (CJTC) provides consultation and expert witness services in the following areas:**

❶ **Proper and Reasonable Use of Force**
❷ **Police Policies and Procedures Issues**
❸ **Hiring, Retention or Supervision Issues**
❹ **Personnel Actions: Promotion, Termination and Discipline**
❺ **False Arrest and/or Malicious Prosecution**
❻ **Police Certification and Training Issues**
❼ **Failure to Act or Protect**
❽ **Emergency Vehicle Operations**
❾ **Criminal Investigative Matters and Management of Critical Incidents**
❿ **Private Police and Security Operations**

**Services provided include: case review, consultation and evaluation, written reports setting forth official opinions, depositions and trial testimony.**

**FEE SCHEDULE:**

**Case Review Fee:**   $2,500. is charged for initial case review, evaluation, consultation meetings and preliminary opinions. This fee is to be received prior to initiating the case review, unless prior arrangements are made.

An initial case review and a verbal or written agreement must be completed prior to Mr. Gillespie being identified as an expert witness for litigation purposes. **Each individually captioned matter will be separately invoiced.**

**Hourly Fee:**   $150.00 per hour is charged after case review and preparation of preliminary opinions. Deposition preparation and court attendance and testimony will be billed at $175. per hour. Travel time will be billed at $25. per hour.

**Deposition Fee:**   Depositions are billed at $1,800. for a full day—$900 for any portion of a morning deposition (9am – 1pm) and 900 for any portion of an afternoon deposition (1pm – 5pm).

**Attachment C**

# THOMAS T. GILLESPIE (re: file 0044)

The following listing represents cases in which Thomas T. Gillespie has been retained as an expert witness and provided case review, affidavit preparation, deposition or court testimony. This listing does not include cases in which Mr. Gillespie was requested to review a matter and either declined or was unable to serve as an expert. The listing covers the period of 1997 – 2001.

| | CASE CAPTION | ATTORNEY(S) |
|---|---|---|
| 1. | NEWSOME v. SANTA FE COUNTY SHERIFF'S DEPT.<br>Deposition | (J. Bienvenu) P |
| 2. | MACCIONI v. CITY OF SANTA FE, et al.<br>Report | (J. Bienvenu) P |
| 3. | AGUILAR v. NMSP, et al.<br>Report | (M. Marlowe) P |
| 4. | GREANEY v. CITY OF AZTEC, et al.<br>Affidavit | (R. Rosenstock) P |
| 5. | CHEE v. CITY OF FARMINGTON, et al. | (Strother) P |
| 6. | TORRES v. NMDPS, et al.<br>Courtroom Testimony | (Kilgore) D |
| 7. | DYKES v. CITY OF ALAMOGORDO, et al.<br>Report | (Ewart) D |
| 8. | LOPEZ v. CITY OF ALBUQUERQUE, et al. | (Cade) D |
| 9. | WERENKO v. NMSP, et al. | (P. Casey) P |
| 10. | SCOTT v. NMSP, et al. | (Rothstein) P |
| 11. | JAMES v. GREIECHEN, et al.<br>Courtroom Testimony | (Schwarz) P |
| 12. | MAESTAS v. VIGIL, SFCSO, et al.<br>Affidavit | (Rosenstock) P |
| 13. | TABET v. BARRETT, CITY OF BELEN | (Bierman) P |
| 14. | SCOTT v. GARCIA, COUNTY OF LOS ALAMOS<br>Report | (Hardwick) P |

| | | |
|---|---|---|
| 15. | MARTINEZ v. CORNELL, et al. | (E. Casey) D |
| 16. | RICHARD v. ROBB, CITY OF BELEN<br>Report | (Bierman) P |
| 17. | WEINSTEIN v. CITY OF SANTA FE, et al.<br>Deposition | (Tinkler/Bennett) P |
| 18. | HOLMES v. NM DEPT. OF GAME & FISH<br>Report | (Lucero) P |
| 19. | J.D. STAYTON v. COUNTY OF SANTA FE, et al.<br>Report | (Bienvenu) P |
| 20. | OTERO v. CITY OF ALBUQUERQUE, et al. | (Hirsch) D |
| 21. | QUINTANA v. TEG SECURITY, et al.<br>Affidavit | (Rothstein) D |
| 22. | SANCHEZ v. CITY OF LAS VEGAS, NM, et al. | (Donatelli) P |
| 23. | MONTOYA v. NM DEPT. OF GAME & FISH | (P. Casey) P |
| 24. | GARCIA v. CITY OF SOCORRO, et al.<br>Courtroom Testimony | (Clark) P |
| 25. | ZAMORA v. CITY OF SANTA FE POLICE DEPT., et al.<br>Courtroom Testimony | (Rothstein) P |
| 26. | GARDNER v. DIAZ, COUNTY OF McKINLEY,<br>Courtroom Testimony | (Enfield) P |
| 27. | LUCERO v. GONZALES, CITY OF LAS VEGAS, et al.<br>Deposition | (Valencia) P |
| 28. | KELLER v. VILLAGE OF RUIDOSO,<br>Report | (Olson) D |
| 29. | LISEWSKI v. CAPITAN, et al. | (Olson) D |
| 30. | STATE OF NM v. MADRID [criminal]<br>Grand Jury Testimony | (DA Sandoval) P |
| 31. | SEGURA v. CITY OF SANTA FE | (Allen) personnel |
| 32. | LEYBA v. KOLAR, VILLAGE OF CHAMA<br>Deposition | (Clark) P |
| 33. | JARAMILLO v. CITY OF ALBUQUERQUE, et al.<br>Report | (Sandoval, R) D |

**Attachment B**                                                 2

| | | |
|---|---|---|
| 34. | PORTILLO v. CITY OF ALBUQUERQUE, et al.<br>Report | (Levy) D |
| 35. | PEREA v. CITY OF ARTESIA, et al.<br>Report | (Olson) D |
| 36. | THOMPSON v. CITY OF LAS CRUCES, et al.<br>Report | (Holt) D |
| 37. | LERMA v. CITY OF SUNLAND PARK, et al. | (Olson) D |
| 38. | JOHNSON v. CITY OF HOBBS, et al. | (Biehler) D |
| 39. | HODGE / MACKEY v. CITY OF HOBBS, et al.<br>Courtroom Testimony | (Harris) D |
| 40. | MUNIZ v. SANTA FE COUNTY S.O., et al.<br>Affidavit | (Bienvenu) P |
| 41. | WARD v. CITY OF LAS CRUCES, et al.<br>Report | (Lilley) P |
| 42. | GABALDON v. CITY OF ESPANOLA & SFCSO<br>Deposition | (Thompkins) P |
| 43. | TELLES v. COUNTY OF DONA ANA<br>Deposition | (Proper) P |
| 44. | HEYWARD v. CAPPON<br>Report | (Sandoval, R) D |
| 45. | STATE OF NEW MEXICO v. J. MANTELLI [criminal]<br>Courtroom Testimony | (Baca/Romero) D |
| 46. | COPPLER v. BECK, et al.<br>Deposition | (Mannick) P |
| 47. | KASPAR v. CITY OF HOBBS, et al.<br>Deposition | (Biehler) D |
| 48. | GILES v. KANSAS CITY POLICE DEPT.<br>Deposition | (Lombardi) P |
| 49. | GARCIA v. CITY OF ALBUQUERQUE, et al.<br>Report | (Hahs) D |
| 50. | UNITED STATES v. PERRY [criminal]<br>Report | (Ogden) D |
| 51. | UNITED STATES v. MIRANDA-AYALA [criminal]<br>Courtroom Testimony | (D. Montoya) D |

**Attachment B**                    3

| | | |
|---|---|---|
| 52. | MONTOYA v. WALMART & CITY OF SANTA FE, et al.<br>Deposition | (Ewing / Garcia) P |
| 53. | STATE OF NM v. GARDUNO [criminal]<br>Courtroom Testimony | (Robbenhaar) D |
| 54. | MARTINEZ v. CRESPIN, et al.<br>Deposition | (Clark) P |
| 55. | ESTATE OF M. CORPENING v. CITY OF LAS CRUCES<br>Deposition | (Saenz) P |
| 56. | ESTATE OF G. GUILEZ v. ALAMOGORDO DPS | (Saenz) P |
| 57. | FERGUSON V. CITY OF FARMINGTON | (Titus) P |
| 58. | TORREZ v. NM DEPARTMENT OF PUBLIC SAFETY | (P. Casey) P |
| 59. | SUMNER v. OSKINS, et al.<br>Deposition | (Herrera) P |
| 60. | TURNER v. CITY OF ALAMOGORDO, et al.<br>Report | (Buck) P |
| 61. | BERNAL, et al. v. COUNTY OF DONA ANA, et al.<br>Report | (Coronado) P |
| 62. | MARTINEZ v. NM DEPT. OF PUBLIC SAFETY, et al.<br>Report | (Castille) D |
| 63. | ALARCON v. ALAMOGORDO DPS, et al.<br>Report | (Forbes) P |
| 64. | GONZALES v. ALLSTATE INSURANCE<br>Courtroom Testimony | (Guest) D |
| 65. | VIGIL v. CITY OF SANTA FE, et al. | (Fine) P |
| 66. | HOLMES v. EIDSON, et al.<br>Report as of 10/01 | (Olson) D |
| 67. | N. CHAVEZ v. CITY OF ALBUQUERQUE POLICE DEPT., et al.<br>Report as of 10/01 Deposition scheduled | (Montoya) P |
| 68. | PETTES v. CITY OF LAS CRUCES, et al.<br>Report as of 10/01 | (B. Byrnes) P |
| 69. | DIAZ v. CITY OF HOBBS, et al.<br>Report as of 10/01 | (J. Harris) D |

70.     FRITZ, et al. v. CITY OF ADA, OK, et al.                          (Scheck, Pilate, Barrett) P
        Report as of 11/00

# DOCUMENTS AND MATERIALS REVIEWED BY MR. GILLESPIE IN FRITZ, et al. v. ADA, et al.:

**DEPOSITIONS**:

1. DENNIS SMITH
2. TOMMY GRAHAM
3. RUSTY FEATHERSTONE
4. RON SCOTT
5. JAMES FOX
6. JERRY PETERS
7. BRUCE JOHNSON
8. RICHARD CARSON'
9. MELVIN HETT
10. DON KAISER
11. JOHN CHRISTIAN
12. RICKY JAMAR
13. MIKE MILLER
14. CARL ALLEN
15. MIKE BASKIN
16. MIKE KIESEWETTER
17. DANNY BARRETT
18. MICHAEL TENNEY
19. B.G. JONES
20. JEFF CROSBY

**OTHER MATERIALS & DOCUMENTS**:

1. THIRD AMENDED COMPLAINT; FRITZ v. CITY OF ADA, et al.
2. FRITZ DISCOVERY; OSBI NOTEBOOKS 1 & 2; CITY OF ADA NOTEBOOKS 1 &2.
3. VOLUME 1 & 2 PLAINTIFFS DEPOSITION EXHIBITS.
4. ORDER GRANTING HABEAS CORPUS.
5. STATE OF OKLAHOMA v. DENNIS FRITZ – TRANSCRIPT OF JURY TRIAL, VOLUMES I & II.
6. STATE OF OKLAHOMA v. WILLIAMSON/FRITZ – TRANSCRIPT OF PRELIMINARY HEARING.
7. STATE OF OKLAHOMA v. WILLIAMSON – TRANSCRIPT OF JURY TRIAL, VOLUMES I & II.

_ emailed to
Cheryl

```
 1                  IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE EASTERN DISTRICT OF OKLAHOMA

 3   DENNIS L. FRITZ,                )
     RONALD K. WILLIAMSON,           )
 4   by and through his legal        )
     guardian, Annette Hudson,       )
 5   and ELIZABETH FRITZ,            )
                                     )
 6                        Plaintiffs, )
                                     )
 7   v.                              )    Case No. CIV-00-194-B
                                     )
 8   THE CITY OF ADA, OKLAHOMA,      )
     et al.,                         )
 9                                   )
                          Defendants. )
10

11

12

13
                          *  *  *  *  *
14
                    DEPOSITION OF B.G. JONES
15
              TAKEN ON BEHALF OF THE PLAINTIFFS
16
                      ON OCTOBER 4, 2001
17
                    IN McALESTER, OKLAHOMA
18
                          *  *  *  *  *
19

20

21

22

23

24

25   REPORTED BY:  BRENDA J. GOODE, CSR
```

**Page 2**

1  APPEARANCES:

2  MS. CHERYL A. PILATE, Attorney at Law, of the firm
WYRSCH, HOBBS, MIRAKIAN & LEE, 1300 Mercantile Tower,
3  1101 Walnut, Kansas City, Missouri 64106, 816/221-0080,
appearing as co-counsel on behalf of the Plaintiffs.

4

MR. ERIC D. JANZEN, Attorney at Law, of the firm
5  STEIDLEY & NEAL, 100 East Carl Albert Parkway, Post
Office Box 1165, McAlester, Oklahoma 74502,
6  918/423-4611, appearing on behalf of the Defendant City
of Ada and Defendants Fox and Smith.

7

MR. WELLON B. POE, Assistant Attorney General,
8  OFFICE OF ATTORNEY GENERAL, 4545 North Lincoln
Boulevard, Suite 260, Oklahoma City, Oklahoma
9  73105-3498, 405/521-4274, appearing on behalf of the
Defendants Peterson, Hett, Mullins, Peters, Rogers,
10  Featherstone, Reynolds, Saffle, Fields, and Morgan.

11  MR. JIMMY BUNN, Chief Legal Counsel, of the
OKLAHOMA STATE BUREAU OF INVESTIGATION, 6600 North
12  Harvey, Suite 300, Oklahoma City, Oklahoma 73116,
405/848-6724, appearing on behalf of the Witness.

13

14                  EXAMINATION INDEX

                                              Page
15  Stipulations.................................. 3
Direct Examination by Mr. Barrett........3
16  Cross-Examination by Mr. Poe..............90
Jurat................................................. 92
17  Errata................................................ 93
Certificate........................................ 94
18

19                    EXHIBIT INDEX
                                              Page
20  Plaintiffs Exhibit No. 162..................... 44
Plaintiffs Exhibit No. 163..................... 61
21  Plaintiffs Exhibit No. 164..................... 66
Plaintiffs Exhibit No. 165..................... 81
22

EXHIBITS REFERRED TO:
23                                            Page
Plaintiffs Exhibit No. 42..................... 24
24  Plaintiffs Exhibit No. 43..................... 28
Plaintiffs Exhibit No. 44..................... 28
25  Plaintiffs Exhibit No. 74..................... 45

**Page 3**

1                    STIPULATIONS

2      It is hereby stipulated and agreed by and between

3  the parties hereto, through their respective attorneys,

4  that the deposition of B.G. JONES may be taken on behalf

5  of the Plaintiffs by BRENDA J. GOODE, Certified

6  Shorthand Reporter within and for the State of Oklahoma,

7  pursuant to Notice and Agreement.

8      It is further stipulated and agreed by and between

9  the parties hereto, through their respective attorneys,

10  that all objections except as to the form of the

11  questions or the responsiveness of the answers are

12  reserved until the time of trial, at which time they may

13  be made with the same force and effect as if made at the

14  time of the taking of this deposition.

15                    B.G. JONES,

16  having been duly sworn, testified as follows:

17              DIRECT EXAMINATION

18      Q  (By Ms. Pilate)  Good morning, Mr. Jones.

19      A  Good morning.

20      Q  My name is Cheryl Pilate.  I'm one of the

21  attorneys for Dennis Fritz, Ron Williamson, and

22  Elizabeth Fritz in a lawsuit entitled Fritz v. City of

23  Ada.  You probably have some idea of why you're here.

24      A  That's correct.

25      Q  And Jimmy Bunn is sitting next to you to your

**Page 4**

1  left, and to his left is Wellon Poe, and at the end of

2  the table is Eric Janzen.  My two co-counsel are not

3  here.  They're Mark Barrett and Barry Scheck, and you

4  might see them at some other point, but for now we're

5  just going to go forward with those present.  Have you

6  ever given a deposition before, sir?

7      A  Yes, ma'am.

8      Q  And when was that?

9      A  I can't remember.  It's -- I've given it, but

10  I can't remember when that was.

11      Q  Okay.  It's been some time?

12      A  Yeah.  Many years.

13      Q  Are you retired now?

14      A  Yes, ma'am.

15      Q  Okay.  And how long have you been gone from

16  the OSBI?

17      A  Eleven years June 1st.

18      Q  So you've probably been enjoying your

19  retirement for a while and haven't thought about any of

20  the things I'm going to ask you about for a while.

21      A  I'm sure of that.

22      Q  Okay.  Well, you understand that a deposition

23  is a statement given under oath in front of a court

24  reporter and counsel, and I'll be asking you questions,

25  and you'll be answering them.  If there's anything that

**Page 5**

1  I ask you that you don't understand or the question

2  seems ambiguous to you for whatever reason, just let me

3  know and I'll restate it, and we'll try and go from

4  there.  Okay?

5      A  Okay.

6      Q  Where do you live, sir?

7      A  811 East Pierce, McAlester.

8      Q  I think you stated you've been retired for

9  eleven years.  Is that correct?

10      A  Yeah.  June 1, 1990.

11      Q  So that's a date that probably stands out in

12  your mind, right?

13      A  Yes, it does.

14      Q  Okay.  How long were you with the OSBI?

15      A  Twenty-three years and three months.

16      Q  Did you work at any law enforcement agency

17  before that?

18      A  Yes, ma'am.

19      Q  And what agency was that?

20      A  Muskogee Police Department.

21      Q  And what years were you there?

22      A  January 1, 1947, until March 15, 1967.

23      Q  You put in a lot of time in law enforcement,

24  didn't you, sir?

25      A  Yes.  Yes, I have.

Page 6

1   Q   Were you at any agency before Muskogee?
2   A   Well, other than military.
3   Q   In the military?  And what branch of the
4   military were you in?
5   A   Navy.
6   Q   How long were you in the navy?
7   A   Twenty-eight months.
8   Q   Where are you originally from?
9   A   Born in Broken Arrow, Oklahoma.
10  Q   Is that where you went to high school?
11  A   No.  I graduated from Council Hill High
12  School.
13  Q   Which?  I'm sorry.
14  A   Council Hill.
15  Q   And where is that?
16  A   It's northeast of -- northwest of Checotah.
17  Do you know where Checotah is?
18  Q   No.
19  A   Okay.
20  Q   That's okay.  That's the name of the town as
21  well, Council Hill?
22  A   Yes.
23  Q   So Council Hill High School is in Council
24  Hill?
25  A   Well, it's Midway now.  It was Council Hill

Page 7

1   when I graduated.
2   Q   Did you attend college?
3   A   Yes, ma'am.
4   Q   And where was that?
5   A   I got an A.A. at Connors College, and I have
6   a B.S. at Tahlequah.
7   Q   And when did you obtain your B.S.?
8   A   I can't remember.  It's -- it was while I was
9   working at the Bureau.
10  Q   At the OSBI?
11  A   Uh-huh.
12  Q   Was it after you had been there for a period
13  of time?
14  A   Yes.  Uh-huh.
15  Q   And where were you located for the OSBI at
16  that point?
17  A   In McAlester.
18  Q   In McAlester.  And so you commuted to
19  Tahlequah?
20  A   Yes.
21  Q   What did you do at the Muskogee Police
22  Department?
23  A   Well, I began as a patrolman, and I worked
24  inside the jail as a jail guard on relief.
25  Q   Uh-huh.

Page 8

1   A   And as also relief in a scout car for about a
2   year-and-a-half until an opening occurred, and they
3   hired new people, and they took my place, and I moved up
4   to a patrol car.
5   Q   Did you have your A.A. degree at the time you
6   worked in Muskogee?
7   A   No.  I attended Muskogee Junior College and
8   had 18 hours while I was on the police department at
9   Muskogee.
10  Q   Were any of those 18 hours in law enforcement
11  subjects?
12  A   I don't remember.  I don't remember.
13  Q   Did you obtain any training, either before or
14  during your tenure at the Muskogee Police Department?
15  A   Yes.  I attended FBI National Academy in 1954
16  in Washington, D.C.
17  Q   And refresh my recollection.  You started at
18  Muskogee, again, in --
19  A   January 1, 1947.
20  Q   So you had been in Muskogee for a number of
21  years when you attended school at the FBI?
22  A   About seven years.
23  Q   Okay.  Did you have any law enforcement
24  training prior to going to work at Muskogee?
25  A   No.  I was 21 years old.

Page 9

1   Q   Okay.  Between the time you started at the
2   Muskogee Police Department and attended school at the
3   FBI, did you have any law enforcement training?
4   A   Yes.
5   Q   And what was that training?
6   A   We would have several short courses that was
7   conducted by the FBI there at the -- usually at the
8   courthouse in Muskogee.
9   Q   Okay.  Was there any training that you
10  attended that was put on by some agency of the State of
11  Oklahoma?
12  A   I don't remember.  I just can't remember.
13  Q   I understand this is all a long time ago, so
14  just do the best you can.  When you went to the FBI,
15  where was that, and what did you study?
16  A   Went to -- that was in Washington, D.C.  Part
17  of it was at Quantico, Virginia, and we studied just
18  about all aspects of law enforcement.
19  Q   And how long did that last?
20  A   Three months.
21  Q   Three months?
22  A   Uh-huh.
23  Q   Did you take classes in things like
24  interviewing techniques and --
25  A   Yes.

Page 10

1   Q  Okay. Seizing evidence?
2   A  Yes.
3   Q  Preserving evidence?
4   A  Yes.
5   Q  Writing reports?
6   A  Yes.
7   Q  Anything else you remember?
8   A  Firearms training, crime scene
9   investigations, photography, fingerprinting.
10  Q  Were you a patrol officer in Muskogee when
11  you obtained that training?
12  A  Yes.
13  Q  When you returned to Muskogee did your --
14  A  I'm sorry. Let me back up. No, I was a
15  sergeant in charge of identification and records.
16  Q  Okay. What did that involve?
17  A  That involved keeping the records, court
18  records, fingerprint records, and criminal investigation
19  records, payroll records, budgeting records,
20  photography, crime scene investigations.
21  Q  Did you take any courses in fingerprint
22  examination?
23  A  Yes. I had two weeks of that.
24  Q  And was that at the FBI?
25  A  Yes.

Page 11

1   Q  Okay. And did you use those skills in
2   Muskogee?
3   A  Yes.
4   Q  Okay. What did you do in Muskogee related to
5   fingerprints?
6   A  I fingerprinted everyone that came through
7   the jail that required fingerprinting. We had federal
8   prisoners there, and I also fingerprinted them and took
9   photographs of them. Went to crime scenes and examined
10  crime scenes for evidence, photographs, maintained
11  records on the prisoners, maintained court records, both
12  municipal and federal, on the prisoners, responsible for
13  the monies collected for the police department.
14  Q  Okay. When you say that you examined crime
15  scenes, does that mean you lifted latent prints from
16  crime scenes?
17  A  I went to crime scenes, yes, ma'am.
18  Q  And you had training in lifting latent prints
19  from crime scenes?
20  A  Yes, ma'am.
21  Q  Was that a regular part of your duties in
22  Muskogee?
23  A  Yes. Yes, it was.
24  Q  Okay. Did you examine latent prints for the
25  purpose of comparing them with known prints?

Page 12

1   A  Yes, I did.
2   Q  In what years did you do that in Muskogee?
3   A  From about '54 to maybe -- well, up until the
4   time that I retired from the police department.
5   Q  So you retired from Muskogee?
6   A  Yes.
7   Q  And then the OSBI was your retirement job?
8   A  Well, I looked at it differently than that,
9   but I looked at it as career advancement.
10  Q  It sounds like it was. I'm just observing
11  your retirement doesn't appear to be much of one, and
12  your tenure at the OSBI certainly lasted a long time.
13  A  Well, I had the job sewed up before I
14  retired, put it like that. I was hired by the OSBI
15  before I retired from the P.D.
16  Q  Is that right?
17  A  Yeah. I wouldn't have left the P.D. without
18  being employed somewhere else.
19  Q  And, again, you went to the OSBI in what
20  year?
21  A  March 15, 1967.
22  Q  When you left Muskogee, were you a sergeant
23  or had you --
24  A  No. I was assistant chief.
25  Q  Okay. And what position were you hired into

Page 13

1   at the OSBI in '67?
2   A  As an agent.
3   Q  Any particular level agent or just an agent?
4   A  Well, back then, it was just agent. What
5   they call special agent, I think.
6   Q  Okay. And where were you geographically
7   located?
8   A  I was assigned at Muskogee. I lived in
9   Muskogee.
10  Q  Okay. Was there an OSBI office in Muskogee?
11  A  No. I worked out of my home.
12  Q  You worked out of your home?
13  A  Uh-huh.
14  Q  And what were your duties?
15  A  Well, to assist other law enforcement
16  agencies in the investigation of crimes.
17  Q  Between the time of your attendance at the
18  FBI school and your being hired at the OSBI, did you
19  obtain any other law enforcement training?
20  A  I'd say a hundred.
21  Q  A lot of different courses?
22  A  Yes. Yes.
23  Q  Okay. Generally speaking, where were those
24  courses?
25  A  Well, some were conducted at OU university,

Page 14

1   some at the Tulsa Police Department, some at the
2   training center at the University of Oklahoma, I forget
3   the name, what they call it. It's a regular law
4   enforcement training.
5       Q   And were those training courses required as
6   part of your yearly certification?
7       A   At the police department?
8       Q   Yes.
9       A   Not required, but it was offered and tended
10  to improve you in your job. If you didn't have the
11  training, you couldn't do the job.
12      Q   Did you obtain any specialized or advanced
13  certificates?
14      A   Yes. I had a bunch of them.
15      Q   At that time was there an advanced CLEET
16  certificate?
17      A   Yes.
18      Q   Did you obtain that?
19      A   Yes.
20      Q   And do you know what year that was?
21      A   No, ma'am, I don't.
22      Q   Was that before you came to the OSBI?
23      A   I just don't remember that.
24      Q   That's all right. Do you remember roughly
25  how long you were stationed in Muskogee for the OSBI?

Page 15

1       A   From March 15th to September of '67.
2       Q   So just a few months?
3       A   Yes. Uh-huh.
4       Q   Okay. And where were you transferred to
5   after that?
6       A   Here in McAlester.
7       Q   Okay. So September of '67 you came to
8   McAlester --
9       A   Right.
10      Q   -- to work for the OSBI. Did you remain
11  there the rest of your career with the OSBI?
12      A   Here? Yes, ma'am.
13      Q   And what was your position when you initially
14  came to McAlester in '67?
15      A   An agent.
16      Q   And were your duties any different than they
17  were in Muskogee?
18      A   No. Let me back up on that. Well, we had
19  the penitentiary here, which involved different duties.
20      Q   Uh-huh. And how did your work involve the
21  penitentiary?
22      A   Crimes out there.
23      Q   Okay. So did you investigate crimes out
24  there?
25      A   Yes. Uh-huh.

Page 16

1       Q   And what other types of investigations did
2   you undertake when you started here in McAlester?
3       A   Just about whatever happened, I guess,
4   criminals. Whatever crime that occurred.
5       Q   Was your task primarily assisting local
6   departments with investigations?
7       A   It was -- we worked on request from other
8   agencies, we became involved in crimes. Unless it was
9   requested by the governor or attorney general.
10      Q   Right. What agencies did you primarily work
11  with when you were initially stationed in McAlester?
12      A   Well, probably all over the eastern section
13  of Oklahoma.
14      Q   Okay.
15      A   It wasn't unusual to -- we received requests
16  from Idabel or as far north as Muskogee, or Adair
17  County, Pontotoc County. I have been as far as Cordell,
18  Oklahoma City, Woodward, just wherever I was needed.
19      Q   When you first came to McAlester, was there
20  an OSBI office here?
21      A   No, ma'am.
22      Q   And did you again work out of your home?
23      A   Yes, ma'am.
24      Q   And how many years did that last?
25      A   We had an office -- I believe the office

Page 17

1   opened here in '74, I believe.
2       Q   Prior to '74, were there any other OSBI
3   employees in McAlester other than you?
4       A   I don't think so.
5       Q   And who worked at the office when it opened
6   in approximately 1974?
7       A   Well, we had a secretary, Cathy Cook. I
8   can't remember who was there.
9       Q   Were there any other agents?
10      A   Yes.
11      Q   Okay. How many?
12      A   I don't know, because we had a -- we had a
13  riot at the penitentiary in 1973, and that involved a
14  lot of agents. And as a result of that, the director
15  decided to open up an office here, and some of the -- it
16  seemed like we had an Agent Bill Sparks, Sam Sparks. He
17  wasn't at this office. Sam was in Poteau, and Gary
18  Rogers, now, I don't know when he came on.
19      Q   Did he work out of the McAlester office?
20      A   He worked under the supervision of the
21  McAlester office, yes. Uh-huh.
22      Q   Was he stationed in McAlester?
23      A   No. He was -- I'm not exactly sure. At some
24  time he was at Durant, and I'm trying to think who was
25  with him. That's been so long ago, I have difficulty

**Page 18**

1 with that.
2    Q  You did you become a supervisor at some
3 point?
4    A  1974.
5    Q  And that coincided --
6    A  I'm sorry. Let me back up. I became
7 supervisor during the riot of 1973. I was case agent of
8 the riot.
9    Q  Okay. And in '73 when you became a
10 supervisor, what was your title?
11    A  I was still agent in charge of the McAlester
12 office or in charge of investigation, which involved
13 supervising other agents that come into the penitentiary
14 to perform investigations.
15    Q  So is it different being an agent in charge
16 than just being an agent?
17    A  Well, usually they -- when you assign -- I
18 got an assignment to a case, if you required additional
19 personnel, the chief agent would assign other agents to
20 that investigation, and they would work under that
21 supervision, my supervision there in this particular
22 case.
23    Q  So you entered a supervisory capacity in
24 1973. Would that be correct?
25    A  Yes, but the promotion came in -- I believe,

**Page 19**

1 in 1974. I'm not exactly sure, but I believe that's
2 right.
3    Q  So did it roughly coincide with the opening
4 of the McAlester office?
5    A  That probably was the catalyst for it.
6    Q  Okay. And how many agents were you
7 supervising in 1974?
8    A  That changed all the time, anywhere from five
9 six, seven, somewhere in there.
10    Q  Do you remember who some of them were?
11    A  Sam Sparks, Gary Rogers, Kiki Larsh. I don't
12 know that these people come in and worked in 1974. I
13 don't know when they come. I don't remember when they
14 come to work.
15    Q  But at some point you supervised --
16    A  Well, we had a lot of people that were
17 working that no longer -- they left the Bureau. They're
18 no longer there. We had quite a turnover of agents
19 coming and going, find other jobs.
20    Q  So people coming into the OSBI and then
21 leaving the OSBI?
22    A  Yeah. Or being transferred to other areas of
23 the state. To pin it down onto the exact personnel
24 there is --
25    Q  How many of them actually worked in the

**Page 20**

1 McAlester office with you and how many were stationed
2 elsewhere?
3    A  Well, let's see. At times we had about five
4 here, two agents at Durant, an agent at Idabel, an agent
5 at Poteau, and we could have had some somewhere else. I
6 can't remember. And the offices changed after that.
7 They were wherever, you know -- wherever the activity
8 was seems to be what drew the assignments for agents.
9    Q  So a number of agents were out in the field?
10    A  Yes.
11    Q  And there might be another one or two who
12 would be in the McAlester office with you?
13    A  Yeah. They'd come and go. I mean they were
14 hired and sent to McAlester, some of them, and after the
15 -- well, I don't know, whoever hired them up there. And
16 sometimes those people that wanted to transfer to
17 McAlester, they were transferred, and at one time
18 Ardmore was under the supervision of McAlester, and they
19 would redistrict. That's about it.
20    Q  What were your tasks as a supervisor?
21    A  Well, there were many. It's general
22 operation of the office, make sure the agents were
23 assigned to certain specific cases, to make sure that
24 the investigations were conducted, properly conducted,
25 make sure that, you know, they were on duty if they were

**Page 21**

1 on duty, or where they were, what was their status, on
2 leave or sick or whatever.
3    Q  How much contact did you maintain with the
4 agents?
5    A  Probably on a daily basis.
6    Q  What did you talk to them about?
7    A  About cases, and sometimes maybe it was
8 personal, sick leave or whatever, vehicle problems, the
9 direction in which their investigations were going.
10    Q  How closely did you monitor the
11 investigations?
12    A  Well, it was pretty close. All
13 investigations came through me. I'll put it like that.
14    Q  On a big investigation did you talk to the
15 agent daily to find out what was going on?
16    A  Probably not daily, no, because I also had
17 case assignments that I performed, and --
18    Q  How often would you talk to the agent about
19 the case?
20    A  That varied, and the length of the talk
21 varied, depending on how -- what the progress was on the
22 case. But, no, I couldn't pin it down as to how long I
23 talked or who I talked to or -- I just don't remember
24 that.
25    Q  Do you think you talked to the agent probably

## Page 22

1 on the average of maybe weekly? Would that sound
2 reasonable?
3     A   More than that. Yeah. More than that. I
4 probably talked to the agent within I'd say two days
5 would be the longest that I wouldn't have contact with
6 him.
7     Q   Would you be aware of who the agent was
8 interviewing?
9     A   Probably not. That time --
10     Q   What would you talk to the agent about when
11 you would talk to them about the investigation?
12     A   Let me back up on that. I'd talk to the
13 agent about who he was interviewing, depending on the
14 case, and, yeah, we would just about -- under certain
15 circumstances that you would, and they'd maybe call and
16 say they arrested so-and-so, or, you know, we
17 interviewed so-and-so, and this is where we're going
18 with this case, and --
19     Q   Would you know what leads they were pursuing?
20     A   Sometimes, sometimes. Sometimes they would
21 pursue the leads and, you know, I wouldn't know about
22 it, but most of the time I would. They would tell me
23 where they were going and what they were doing.
24     Q   If things were kind of stuck, would they talk
25 to you about that?

## Page 23

1     A   Kind of what?
2     Q   Stuck. If the investigation was stuck and
3 they didn't know what to pursue, would they talk to you
4 about that?
5     A   Yeah. Yeah, they would.
6     Q   If they were coming across evidence that was
7 contrary to the theory they were pursuing, would they
8 talk to you about that?
9     A   Yeah.
10     Q   Did you ask about things like that?
11     A   Sometimes. If I -- if it was called to my
12 attention or if I read about it, yeah.
13     Q   Did you review all the reports?
14     A   All of them.
15     Q   So whenever an agent under your supervision
16 generated a report, you would read it?
17     A   Yes.
18     Q   At what point did you read the report?
19     A   That varied. Sometimes they would send in
20 just an interview of someone that I would read and have
21 it typed up, and we'd hold it until we received other
22 interviews and other information from the case so that
23 it could be assembled together and made a distribution
24 on it. And before we made distribution, we always sent
25 copies to Oklahoma City.

## Page 24

1     Q   And who would the reports go to in Oklahoma
2 City?
3     A   To the chief inspector.
4     Q   Was there a system of generating draft
5 reports first and then final reports?
6     A   I don't quite follow you.
7     Q   Was there a system when reports were
8 generated that the initial draft that would be done was
9 regarded as an initial draft?
10     A   There was an initial information sheet that
11 was sent in which gave you a case assignment on it. In
12 other words, showing the subject matter, who was the
13 subject of the investigation, briefly what it was about,
14 what the -- describing what type of crime and who
15 requested the investigation. And that give the agent
16 that case assignment on it, and then he was to -- he
17 performed from there. Sometimes he sent it in, and
18 other times it was sent from this office or the Oklahoma
19 City office.
20     Q   You'll have to pardon me for just a second.
21 I'm looking for an exhibit I want to ask you about. Mr.
22 Jones, I'm going to show you a document that has been
23 previously marked as Plaintiffs' Deposition Exhibit
24 No. 42 and ask you if you've ever seen that document
25 before.

## Page 25

1     A   It's got my initials on it, so I'm assuming I
2 did see it.
3     Q   Do you want to take a moment and look at it,
4 because I'm going to ask you a few questions?
5     A   Do you want me to read the whole thing?
6     Q   No. Well, you could skim it. I mean, I'm
7 not going to ask you line-by-line about it. I just want
8 you to be generally familiar with it. Okay. You can
9 keep it in front of you.
10     A   (Witness complies.)
11     Q   Okay. We can get started again. Now that
12 you've taken a little time to review that document, Mr.
13 Jones, do you recognize it?
14     A   No.
15     Q   So there's nothing in there that rings a bell
16 for you?
17     A   I don't -- not -- I haven't read all of it.
18     Q   Okay. Is there anything else in there that
19 you want to look at to see if it refreshes your
20 recollection?
21     A   I don't know anything. I wouldn't remember
22 it anyhow.
23     Q   Okay. I'll go ahead and ask --
24     A   What I did read, I don't -- it doesn't ring a
25 bell with me at all.

Page 26

1    Q  Okay.  That's fine.  I understand it was a
2  long time ago.  Is that form familiar to you?
3    A  Yeah.
4    Q  Okay.  Is that a form you've seen before?
5    A  Well, or something like it.  I'm assuming
6  this is a copy of it.  I don't know.  It's got my
7  initials on it.
8    Q  Okay.  Do you recognize the format at the top
9  of the form where there are spaces for case and
10  reporting date and reporting agent and --
11    A  Uh-huh.
12    Q  -- case agent office, all of that?
13    A  Yes.
14    Q  Okay.  So all of that looks familiar to you?
15    A  No.
16    Q  No?
17    A  Huh-uh.  I don't remember any of that.
18    Q  Okay.  So you don't remember this?
19    A  No.
20    Q  Okay.  What about at the bottom of the form
21  where it says "For internal use only, not for
22  dissemination," does that look familiar to you?
23    A  We had a policy like that, yeah.
24    Q  Okay.  Tell me about that policy.
25    A  I believe it was state law that we couldn't

Page 27

1  give anybody a copy of this.  They had to go through
2  OSBI, had to go to the headquarters.
3    Q  Okay.  Could anyone outside the OSBI see this
4  form?
5    A  No.
6    Q  Okay.  Was there a specific policy that
7  prohibited that?
8    A  Yeah.  We were given instructions that that
9  -- not to make a distribution of this to anyone.
10    Q  Okay.  Was this form or something like it
11  used to put initial reports on, to the best of your
12  recollection?
13    A  No.  Initial reports?
14    A  Right.  Was that form used for OSBI reports?
15    A  This form?
16    Q  Yes.
17    A  Yeah.
18    Q  Okay.
19    A  These were interview reports and
20  investigation reports.
21    Q  Okay.  What was the purpose of that form?
22  Was it for the initial draft report, or was it for any
23  type of report?
24    A  I don't remember that.  I don't remember.
25    Q  Okay.  So you don't -- I'm going to go ahead

Page 28

1  and show you a couple of other documents, and that might
2  refresh your recollection.  Okay?
3    A  All right.
4    Q  I'm going to show you something that's
5  previously been marked as Plaintiffs' Deposition Exhibit
6  43 and ask you to take a moment and look at that, and
7  I'm also going to hand you something that's been
8  previously marked as Plaintiffs' Deposition Exhibit 44.
9        MS. PILATE: And why don't we just -- what do
10  you think, Mr. Bunn, would ten minutes be all right,
11  take -- just a little time?
12        MR. BUNN: Well, what are you going to ask
13  him to do?
14        MS. PILATE: I'm going to ask him some
15  questions about those documents, and he'll probably need
16  a little time to look at them.
17        MR. BUNN: Do you want him to read them all?
18  I mean, it will take him however long he needs to read
19  them, if you're going to ask him questions about it.  I
20  don't know how long it will take him.
21        MS. PILATE: We'll try for ten minutes.  How
22  about if I check back with you in about ten minutes and
23  see where we are?
24        MR. BUNN: Just whenever he gets through.  If
25  he's through in five, then --

Page 29

1        THE WITNESS: Yeah.  I'm going to have to use
2  the restroom too.
3        MS. PILATE: Okay.  That's fine.  We'll just
4  -- why don't we take a ten, fifteen minute break here.
5  You can use the restroom and sit down and read those at
6  your leisure, and we'll go from there.
7        (A recess was had.)
8    Q  (By Ms. Pilate) Mr. Jones, you've now had a
9  few moments to look at exhibits that are marked as
10  Plaintiffs' Deposition Exhibits 42, 43, and 44.  Now
11  that you've spent some time looking at those exhibits,
12  do any of them look familiar to you?
13    A  I can't remember those reports.  I can't
14  remember them at all.
15    Q  Okay.  Looking at Exhibit 43, what does that
16  appear to you to be?
17    A  Well, it's just some typewritten information
18  or interview.  It says interview.
19    Q  Okay.  Do you recognize any handwriting on
20  that document?
21    A  No, I don't.
22    Q  Is this handwriting here that appears to be
23  editing of the typewritten portion, does that appear to
24  be your handwriting?
25    A  I don't know whether that's my writing or

Page 30

1 not. I just can't remember this.
2   Q  You have no recollection of it at all?
3   A  No, I sure don't.
4   Q  Okay. Do these three exhibits appear to
5 concern the same subject matter?
6   A  Well, I don't know. I didn't study them that
7 good. I read through them. I mean, if they do, they
8 just do. I'd have to rely on what's in there. I
9 don't --
10   Q  Okay. Do they appear to concern a woman
11 named Laveta Sue Brewer?
12   A  Well, that's what's the name on it.
13   Q  Okay. Looking at these, can you tell if
14 Exhibit 42 represents an initial draft of a report,
15 Exhibit 43 reflects some editing of that report, and
16 Exhibit 44 is a later version?
17   A  I have no idea.
18   Q  So you can't tell by looking at that?
19   A  No.
20   MR. BUNN: The documents speak for
21 themselves. If you introduce them into evidence, we
22 want to --
23   MS. PILATE: I realize that, but I'm just
24 asking this witness some questions to test his knowledge
25 and recollection.

Page 31

1   MR. BUNN: Well, you're asking him to read
2 the documents and --
3   THE WITNESS: I don't remember the reports.
4 I just --
5   MS. PILATE: That's all right. If you don't,
6 that's fine. Just tell me you don't.
7   THE WITNESS: I don't.
8   MR. BUNN: Objection. Asked and answered.
9 He says he doesn't remember them.
10   MS. PILATE: That's fine.
11   MR. BUNN: I'm just making an objection for
12 the record.
13   MS. PILATE: Okay. Mr. Bunn, I'm allowed to
14 ask him these questions.
15   MR. BUNN: And I'm allowed to make my
16 objections for the record.
17   Q  (By Ms. Pilate) Then go ahead. Okay.
18 Turning to page 3 of the report, do you see anything
19 written under "Agent's Note"?
20   MR. POE: Which exhibit?
21   MS. PILATE: I'm sorry. Exhibit 42.
22   THE WITNESS: I see it typewritten.
23   Q  (By Ms. Pilate) Okay. Have you read those
24 two paragraphs that appear under "Agent's Note" on
25 Exhibit 42?

Page 32

1   A  A little bit ago, yeah.
2   Q  Can you tell me what they concern?
3   A  I don't remember what's in them.
4   Q  Okay. Looking at them, do they appear to
5 concern a photograph shown to Laveta Sue Brewer?
6   A  If that's what it says, whatever it says in
7 there.
8   Q  Okay. Do you remember an agent named Rusty
9 Featherstone?
10   A  I know Rusty Featherstone.
11   Q  Okay. Do you see anything there about him
12 showing photographs to a Laveta Sue Brewer?
13   A  It says Brewer was shown a photograph of
14 Dennis Fritz and Ron Williamson.
15   Q  Okay.
16   A  But she could not identify either of the
17 photographs being the subjects that had contact with the
18 club that night.
19   Q  Okay. And this appears in the section of the
20 report that's headlined "Agent's Note," correct?
21   A  That's what's down there.
22   Q  Okay. What was the purpose of a section
23 called "Agent's Note" in a report?
24   A  I don't know.
25   Q  You don't remember?

Page 33

1   A  I don't know.
2   Q  Okay. So it appears to you that that
3 concerns an effort to get Ms. Brewer to look at
4 photographs to see if she could identify them, correct?
5   A  I don't know what it refers to. It's
6 "Agent's Note." That's all I know it is.
7   Q  But it says -- would you agree it says there
8 that she could not identify photographs of Dennis Fritz
9 and Ron Williamson?
10   A  Whatever it says there, I'll agree to it.
11 That's what it says.
12   Q  "Brewer was shown a photograph of Dennis
13 Fritz and Ron Williamson, but she could not identify
14 either photographs as being the subjects she had contact
15 with the club that night." Okay? Okay.
16   A  That's what the report says.
17   Q  I understand that.
18   A  Now, I didn't write the report. I just --
19   Q  I understand that. I understand that. Okay.
20 That's fine. That's fine. I know that you didn't write
21 that. Okay. At least I know the report reflects that.
22 Okay. Now, turning to Plaintiffs' Deposition Exhibit
23 44, do you recognize this form?
24   A  Well, we used similar forms at the OSBI.
25   Q  Does that appear to you to be an OSBI form?

Page 34

1   A  That's what it appears, yes.
2   Q  Okay.  And does this report also concern
3  Laveta Sue Brewer?
4   A  That's the name on it.
5   Q  Okay.  Is there anything different about this
6  form, which is Exhibit 44, as compared with the form
7  that appears in Exhibits 42 and 43?
8      MR. POE: Object to the form.
9      THE WITNESS: Yeah, it's a different form.
10   Q  (By Ms. Pilate)  Okay.  So you see a
11  difference between the form that's used in Exhibit 44 --
12   A  Sure.
13   Q  -- and the form that's used in 42 and 43?
14   A  Uh-huh.
15   Q  What appear to you to be the differences?
16   A  Well, one is an interview form, and the other
17  one is an investigative report.
18   Q  Okay.  Did those forms have different
19  purposes at the OSBI?
20   A  Yes.
21   Q  Okay.  What were the different purposes of
22  those forms?
23   A  This identifies what case.  This is an
24  interview of an individual.  This identifies the case --
25   Q  Okay.

Page 35

1   A  -- along with -- now, why this is put on a
2  different form, I don't know.
3   Q  Okay.  Can you tell by looking at these
4  documents whether the report on Laveta Sue Brewer that
5  is reflected in Exhibit 44 is an edited version of what
6  initially appeared in Exhibit 42?
7   A  I don't know that.
8   Q  You don't know that.  Okay.  Turning to page
9  3 of Exhibit 44, do you see any section there at the end
10  of the report entitled "Agent's Note"?
11   A  No, I don't.
12   Q  Okay.  Turning to Exhibit 43 and looking at
13  the third page, do you see a section at the bottom that
14  looks like the "Agent's Note" that we looked at in
15  Exhibit 42 -- and I'll let you look at that
16  simultaneously -- and does that appear to be crossed out
17  in Exhibit 43?
18   A  There's lines draw through something that
19  says "Agent's Note."  It looks like it might be "Agent's
20  Notes."
21   Q  Okay.  Looking at page 3 of Exhibits 42 and
22  43, does it appear to you to be that the section of page
23  3 that is crossed out is the agent's note that appears
24  at the bottom of page 3 in Exhibit 42?
25   A  I don't know.  I can't -- I've never seen

Page 36

1  that before, I think.
2   Q  Okay.  Well, could you just take a moment and
3  look at it?
4   A  Well, I've read through it.
5      MR. POE: I'm going to object.  He says he
6  doesn't know, and --
7      THE WITNESS: And I don't recognize seeing
8  that at all.
9   Q  (By Ms. Pilate)  Okay.  But you see a section
10  at the bottom of page 3 in Exhibit 43 that appears to
11  you to be crossed out?
12      MR. POE: I'm going to object to the
13  question.  It's been asked and answered, and I think the
14  record will speak for itself, the documents do.
15      MR. BUNN: I'll join in that objection.  It's
16  self-evident if you introduce the two.
17   Q  (By Ms. Pilate)  Do you know who crossed that
18  paragraph out --
19   A  No, I don't.
20   Q  -- Mr. Jones?
21   A  No, I don't.
22   Q  Okay.  Do you have any recollection of ever
23  reading a report concerning a Laveta Sue Brewer?
24   A  Just now.
25   Q  Other than what I've asked you to look at

Page 37

1  today, do you have any recollection?
2   A  No.
3   Q  Okay.  Can you determine by looking at page 3
4  of Exhibit 43 whether that is your handwriting on that
5  page?
6   A  No, I can't.  I've never seen that before.  I
7  don't remember ever seeing that before.  That's just too
8  long ago.
9   Q  Looking at page 3 of Exhibit 43, is there
10  anything that is not completely obliterated at the
11  bottom that you can read?  Can you see any of those
12  words?  Can you see the word "Brewer" here?
13   A  Yeah.
14   Q  Okay.  Does it appear to be "Brewer was shown
15  a photograph of Dennis Fritz"?  Can you see that much?
16   A  Well, I'll let that stand for itself.  It's
17  whatever is down there is whatever it is.
18   Q  Okay.  I'm just asking if you can see that.
19   A  Yeah, I can see it.
20   Q  And "Ron Williamson," do you see that?
21   A  Yeah.
22   Q  Okay.  "But she could not identify either
23  photograph."  Okay.  Can you --
24   A  That's what that says, yes.
25   Q  Okay.  And that is the portion that is

**Page 38**

1 crossed out?
2      MR. POE: I'm going to object to the form.  I
3 think the record speaks for itself.
4      MS. PILATE: You can go ahead.  You can go
5 ahead and answer the question.  They can make objections
6 for the record, but you --
7      THE WITNESS: I don't know what the portion
8 is.  I don't remember seeing this.  You're trying to get
9 me to say that something is down there that I didn't
10 see.
11     Q   (By Ms. Pilate)  No.  I'm not asking you
12 whether you saw it or not.
13     A   I didn't see it.  I don't know.
14     Q   Okay.  All I'm doing is trying to --
15     A   Now, I understand.
16     Q   -- identify the document and ask you if the
17 first two lines --
18     A   What you're pointing out is what I can read
19 there, but I don't know where that come from.
20     Q   I understand.
21     A   I haven't seen -- as far as I know, I haven't
22 seen it before.  I just don't know.  I can't remember
23 it.
24     Q   I understand, Mr. Jones.  I know I'm asking
25 you about things that occurred a long time ago.

**Page 39**

1     A   Yeah.
2     Q   Okay.  And we agreed on the words that were
3 in the first two lines here.  And does this one, this
4 paragraph at the bottom of Exhibit 42, "Brewer was shown
5 a photograph of Dennis Fritz and Ron Williamson, but
6 could not identify either photographs" --
7     A   Well, you're reading that.
8     Q   Okay.
9     A   I don't know what -- that's what that says,
10 if you say that's what it says.
11     Q   I'm asking you is that what it says.
12     A   I don't know.
13     Q   Well, can you look at it?
14     A   Let it stand for whatever it is.  If you can
15 read, what that says, then that's fine, but I don't
16 remember anything about it.
17     Q   I'm not asking if you remember it, Mr. Jones.
18 I'm asking you if that's what that says.  Now, I can ask
19 the question over and over again.  I'm entitled to ask
20 the question.  I'm being as slow and careful and gentle
21 as I can be.  I'm not trying to --
22     MR. POE: And --
23     MS. PILATE: -- trick you or trap you.
24 Wellon, please let me finish and don't interrupt.  I
25 have a right to ask these questions.  I'm trying to

**Page 40**

1 determine what happened with this report, and I'm
2 entitled to ask these questions.
3      THE WITNESS: I don't know.
4      MR. BUNN: He's already answered that
5 question.  He doesn't know what's --
6      THE WITNESS: I don't know that.
7      MS. PILATE: I asked him a question that --
8      MR. BUNN: What you're now doing is asking
9 him whether -- look out the window and ask whether
10 the sky is blue.  The document speaks for itself.
11 You're asking him to confirm --
12     MS. PILATE: Mr. Bunn
13     MR. BUNN: -- whether or not words --
14     MS. PILATE: -- I'm entitled --
15     MR. BUNN: -- words that are on the paper are
16 actually on the paper.  That is self-evident.
17     MS. PILATE: Mr. Bunn, I'm entitled to ask
18 him the question.  I'm not asking him if he remembers
19 it.  I'm not asking if he wrote the document.  I'm
20 asking him about what is on the page here.
21     Q   (By Ms. Pilate)  Okay.  Now, would you agree,
22 Mr. Jones, that what is in the first two lines here
23 appears to be similar to what is in the first two lines
24 here?
25     A   No, I won't agree.

**Page 41**

1     Q   Okay.  So you -- I'm going to read this again
2 to you.
3     A   All right.
4     Q   Okay.  This is the bottom of the third page
5 of Exhibit 42, "Brewer was shown a photograph of Dennis
6 Fritz and Ron Williamson, but she could not identify
7 either photographs," and that's just the first two
8 lines.  And then I think we agreed earlier when we went
9 over these words at the bottom of Exhibit 43, Brewer was
10 shown a photograph of Dennis Fritz and Ron Williamson,
11 but she could not identify either photograph."  It looks
12 like something is crossed out on the end of the word
13 "photograph."  Okay.  Do those two things I read to you
14 concern the same subject matter?  Do you see any
15 differences between those two sentences?
16     A   I can't make the comparison on that.  I
17 haven't seen these before, and I'm not going to make the
18 comparison on it.  If you think that's what it says,
19 then that's your version of it.  It's not mine.  I don't
20 know.
21     MR. POE: Ms. Pilate, let me --
22     Q   (By Ms. Pilate)  Mr. Jones, do you have any
23 trouble -- are these -- is the typing here difficult for
24 you to read?  I'm just trying to get to the bottom of
25 what the difficulty is.

Page 42

1     MR. POE: Let's not belittle Mr. Jones. Let
2 me ask it and see if we can clarify it.
3     MS. PILATE: I'm not belittling. There are
4 people, including myself, who sometimes have difficulty
5 reading small print. That is not a belittling comment.
6     MR. POE: Let me ask and see if this will
7 help clear it up. Are you asking Mr. Jones to say that
8 what's on the paper is what's on the paper, or are you
9 asking Mr. Jones to say that what's on the paper is true
10 and correct?
11     MS. PILATE: No. I'm not asking him to
12 say --
13     MR. POE: I think that's where part of the
14 confusion is.
15     MS. PILATE: No.
16     MR. POE: You're just asking that -- the
17 paper says that and it means nothing more than that's
18 what written. It doesn't have any other --
19     MS. PILATE: What I'm trying to get at is,
20 I'm trying to determine whether what's at the bottom of
21 this page in Exhibit 43 appears to be the same as what's
22 at the bottom of Exhibit 42, except for what's at the
23 bottom of 43 is crossed out. That's all I'm trying to
24 get at.
25     MR. POE: The documents speak for themselves.

Page 43

1 You've got both documents into --
2     MS. PILATE: I understand that, but I'm
3 entitled to ask these questions, Mr. Poe. I'm entitled
4 to --
5     MR. POE: Well, I think it's bordering on
6 badgering.
7     MS. PILATE: No, it's not. And we'll move
8 on. I'm not asking if this is true. I'm not asking if
9 you had anything to do with this report, Mr. Jones. All
10 I'm trying to determine is whether it appears to you to
11 be the same. That's all I'm trying to determine. I
12 accept that what you're saying is you don't recall these
13 reports and don't believe you had any responsibility for
14 them, at least that you can remember. I understand
15 that.
16     THE WITNESS: And I'm not going to say. If I
17 wrote it, it would be a different situation. I didn't
18 write it. I didn't write what's down there. I haven't
19 seen that document to my knowledge before, and I'm not
20 going to expand on what's on it.
21     MR. BUNN: He's already indicated he's going
22 to refuse to answer the question.
23     MS. PILATE: Okay.
24     MR. BUNN: If you want to certify it, we'll
25 deal with that.

Page 44

1     Q  (By Ms. Pilate) Okay. Let me ask you a
2 different question then, Mr. Jones. Are your initials
3 at the top of this report?
4     A  I don't know whether that's my initials or
5 not. It's got a B and a J. I don't know what the other
6 one is.
7     Q  Okay. Do you recognize that at all? Does
8 that look like your handwriting?
9     A  It -- I don't know whether that's my
10 handwriting or not.
11     Q  Okay. Let me show you a different document.
12     MS. PILATE: What exhibit are we on, Brenda?
13     (Plaintiffs' Exhbit No. 162 was marked.)
14     Q  (By Ms. Pilate) Okay. I'm going to hand to
15 you what I've just marked as Plaintiffs' Deposition
16 Exhibit 162. I'm going to ask to you take a look at
17 this document and tell me if it looks familiar to you.
18     A  No, it doesn't. No. I don't know that I've
19 ever seen it before.
20     Q  Okay. Looking in the upper right-hand
21 corner, are those your initials?
22     A  I'm not sure if that's my initials or not.
23     Q  Okay. Do you recognize this form?
24     A  It's a similar form to what the OSBI used.
25     Q  You don't think it's the same form as the

Page 45

1 OSBI?
2     A  I don't know. I don't know.
3     Q  Okay. Let me ask you to take a look at
4 something else. Mr. Jones, I'm going to ask you to take
5 a look at a document that has previously been referred
6 to as Exhibit 74, Plaintiffs' Deposition Exhibit 74. Is
7 that a document you recognize?
8     A  No.
9     Q  Okay.
10     A  I know what's on it, but I don't recognize
11 it.
12     Q  Okay. Looking in the upper right-hand corner
13 next to the name of Gary Rogers, are those your
14 initials?
15     A  It's got "B.G.J.," but I don't know whether
16 that's my initials or not.
17     Q  You don't know whether you wrote that or not?
18     A  No.
19     Q  Okay. Do you -- take just a minute and kind
20 of skim that page and tell me if there's anything there
21 that you have an independent recollection of.
22     A  It don't mean anything. I don't recognize
23 any of it.
24     Q  Okay. Looking at this, can you tell me what
25 this document is?

Page 46

1   A   No, I can't tell you, other than what's in
2   there. If it -- whatever the docket says is in there is
3   all I know what it is.
4   Q   Okay. Have you ever referred to a document
5   like this as a prosecutorial report?
6   A   It's similar to what we have referred to as a
7   prosecutorial report.
8   Q   Okay. What are any differences between what
9   you see here and what you know to be a prosecutorial
10  report?
11  A   I don't know.
12  Q   Do you have any reason for not believing that
13  this is a prosecutorial report?
14  A   Whatever that is, whatever it stands for,
15  that's agreeable to me.
16  Q   Have you ever seen this document before?
17  A   Not to my knowledge.
18  Q   Okay. Do you remember what a prosecutorial
19  report was when you were at the OSBI?
20  A   I know what the purpose was.
21  Q   Okay. What was the purpose of a
22  prosecutorial report?
23  A   To put information on -- documentation of
24  facts of an investigation.
25  Q   Okay. What went in a prosecutorial report?

Page 47

1   A   The facts of the report, what specific report
2   you -- or a specific investigation.
3   Q   Was there a cover sheet on one?
4   A   What do you mean cover sheet?
5   Q   Was there a cover sheet on the prosecutorial
6   report, kind of an introduction?
7   A   There was always a first sheet on there.
8   Q   Okay. What did that first sheet look like?
9   A   There were -- they were similar to this.
10  Q   Okay. Mr. Jones, I will simply represent to
11  you no one is trying to trick you. These documents that
12  I'm showing you I obtained through what's called civil
13  discovery, and I don't think either Mr. Poe or Mr. Bunn
14  would disagree they came from the OSBI. These are not
15  documents that anyone, to my knowledge, has made up or
16  dummied up. These are documents I got from the other
17  side, because we're entitled to have them. I'm not
18  trying to trick you, and, you know, I understand that
19  you don't know me. You've never seen me before. But
20  I'm not trying to trick you.
21      I'm showing you things that were given to me
22  by Mr. Poe and Mr. Bunn, and I'm asking you questions
23  about those documents. All I'm trying to do is
24  understand the documents. I'm not trying to put
25  anything in front of you that is not what it appears to

Page 48

1   be. Okay?
2   A   Okay.
3   Q   And maybe you can feel a little more relaxed
4   about that. This document I will represent to you I
5   obtained actually from Mr. Poe sometime last November.
6   Okay. And Mr. Poe is sitting right there, and if he has
7   any reason to disagree with me, I think he'd say that.
8   And it appears to be the first sheet of a longer
9   document, and there are many pages in it. Is there
10  anything here that as you look through the first two or
11  three pages of Plaintiffs' Deposition Exhibit 74, does
12  any of this look familiar to you?
13  A   No.
14  Q   Okay. So you don't recall --
15      MR. BUNN: Do you mean in a general sense or
16  in a specific sense? I mean, does it look like a
17  prosecutor's report, or are you talking about the
18  particular case involved? I'm asking for a point of
19  clarification.
20  Q   (By Ms. Pilate) Mr. Jones, is there anything
21  about this document, looking at it, that rings a bell in
22  terms of -- it says to you I've seen this before?
23  A   No.
24  Q   Okay. So you don't remember this specific
25  document?

Page 49

1   A   No, I don't.
2   Q   Okay. That's fine. Does this look to you
3   like the beginning of a prosecutorial report?
4   A   There's some similarity, yes.
5   Q   Okay. Is there anything here that's
6   dissimilar?
7   A   I don't know.
8   Q   Okay. What to you looks similar?
9   A   The form.
10  Q   Okay.
11  A   When you say the form, are you referring to
12  the fact that at the top of the page there's a place to
13  identify the case, and then there is some other
14  information in the right-hand column, case agent name.
15  There's a date up there. Does that look familiar to you
16  in terms -- just in terms of the format?
17  A   The Oklahoma State Bureau of Investigation is
18  on it, and I base that on that's what it is.
19  Q   Okay.
20  A   If that's what it is, that's what it is.
21  Q   Okay. Well, I don't have any --
22  A   I -- as far as I know, I have never seen that
23  report. It's just been too long ago. I can't remember
24  it.
25  Q   That's fine. That's fine.

## Page 50

1      MR. POE: Ms. Pilate, if I can, just to kind
2 of help him. As far as OSBI report, you're not saying
3 just these few pages, but actually a document that's
4 got --
5      MS. PILATE: Right. We're going to go
6 through --
7      MR. POE: That's that thick. I mean, that
8 might help, instead of just limiting it to a couple of
9 pages that he's looked at so far.
10      MS. PILATE: Yeah. Well, I'm going to ask
11 him about the tabbed pages.
12      MR. POE: But you said the report, then show
13 him the entire report.
14    Q  (By Ms. Pilate) The entire exhibit, Mr.
15 Jones, is this whole chunk here I'm holding, and I'll
16 represent to you, to the best of my recollection, is
17 about 200 pages, and it's a collection of shorter
18 reports. Now, are you familiar with that format where
19 there's a cover sheet like we're looking here at the
20 beginning of Exhibit 74, and then there's a collection
21 of reports that follow. Are you familiar with that?
22    A  Uh-huh.
23    Q  Okay. Great. Now, turning the page after
24 the cover page we see something that's called "Table of
25 Contents." Was that usually included in a prosecutorial

## Page 51

1 report?
2    A  Uh-huh.
3      MR. BUNN: You've got to answer out loud yes
4 or no.
5      THE WITNESS: Yes.
6      MR. BUNN: Sometimes uh-huhs and huh-uhs are
7 hard to take.
8      THE WITNESS: I'm sorry.
9    Q  (By Ms. Pilate) Okay. And after that
10 there's something called "Descriptive Data," and then
11 there's something called "Prosecutorial Summary," and it
12 looks like there's a stamped number at the bottom of the
13 page, right? Do you see the 2 there?
14    A  Yeah.
15    Q  Okay. Was it typical to have a prosecutorial
16 summary in a prosecutorial report?
17    A  Yes.
18    Q  Okay. And what was the purpose of the
19 prosecutorial report?
20    A  A summary of the report.
21    Q  Okay. Was it to provide information to the
22 prosecutor about the case?
23    A  Yes.
24    Q  Okay. What kinds of documents were included
25 in the prosecutorial report?

## Page 52

1    A  All of them that pertains to the case.
2    Q  Okay. Who decides what pertains to the case?
3    A  Investigator.
4    Q  Okay. Are there any guidelines that tell the
5 investigator what to include in the prosecutorial
6 report?
7    A  I don't remember.
8    Q  Okay. Do you remember if there are any
9 policies that told the investigator what to include?
10    A  I don't remember that either.
11    Q  Okay. That's fine. Do you have any
12 recollection of the Debbie Carter murder investigation?
13    A  No. I remember one thing about the Debbie
14 Carter.
15    Q  Okay.
16    A  And that's some writing on the wall.
17    Q  Uh-huh.
18    A  I was told that.
19    Q  Uh-huh.
20    A  And something about writing on the stomach,
21 some catsup or a little blood or something. That's it.
22    Q  That's the kind of thing that would tend to
23 stick in someone's memory, isn't it?
24    A  It stuck in mine.
25    Q  Yeah. It's more of an unusual feature at a

## Page 53

1 crime scene, isn't it, to have that kind of writing?
2    A  Well, you don't see it in every one of them,
3 no.
4    Q  Yeah. Do you remember seeing pictures of the
5 crime scene?
6    A  Many of them.
7    Q  Okay. What do you remember about those
8 photos?
9    A  I don't even remember seeing any photos.
10    Q  Okay. I thought you said you saw pictures of
11 the crime scene. Did I misunderstand you?
12    A  No. I remember somebody talking about it.
13    Q  Okay. Who did you talk to about the case?
14    A  I don't remember. Who did I talk about --
15    Q  Who did you talk to about the Debbie Carter
16 case?
17    A  Well, I know I've talked to Gary Rogers about
18 it.
19    Q  What did Gary tell you about it?
20    A  Gee whiz, I don't remember that. Eighteen
21 years ago, I don't remember anything about that.
22    Q  Do you remember anything Mr. Rogers said to
23 you about the investigation?
24    A  No, I sure don't. I sure don't.
25    Q  Are you familiar with the name Dennis Fritz?

Page 54

1   A   I've heard of that name, yes.
2   Q   What have you heard about Dennis Fritz?
3   A   Just Dennis Fritz, what you said. I've heard
4 it being talked about, Dennis Fritz.
5   Q   Do you know if he was ever charged in
6 connection with Debbie Carter's murder?
7   A   I read that in the newspaper.
8   Q   You read it in the newspaper?
9   A   Uh-huh. Well, it's been two or three weeks
10 ago, maybe a little longer, a month ago.
11   Q   Okay. Do you remember Dennis Fritz being
12 charged while you were at the OSBI?
13   A   Yes, I remember that.
14   Q   Okay. What do you remember about that?
15   A   That's -- that he was charged with homicide.
16   Q   Do you remember anything about the evidence
17 in the Debbie Carter case?
18   A   No, ma'am, I don't. I can't -- I just can't
19 recall it.
20   Q   Okay. What about Ron Williamson? Is that a
21 name that's familiar to you?
22   A   That's not as familiar as Fritz. Fritz is an
23 unusual name, and that's what stuck with me.
24   Q   Okay. Do you remember anything about someone
25 named Ron Williamson?

Page 55

1   A   No.
2   Q   Do you know if he was charged in connection
3 with the Debbie Carter murder?
4   A   I do now, yes. I remember now.
5   Q   Okay. Do you know if he was charged while
6 you were at the OSBI?
7   A   I don't remember that.
8   Q   Okay. That's fine.
9   A   I don't remember that.
10   Q   Have you ever heard of an individual named
11 Robert Deatherage?
12   A   I don't remember. I don't remember it,
13 huh-uh.
14   Q   Okay. Have you ever heard of an individual
15 named Glen Gore?
16   A   No, ma'am.
17   Q   I'm going to ask you to take a look at what's
18 on page 28 of Plaintiffs' Deposition Exhibit 74, just
19 ask you if you could take a quick look at that page and
20 see if there's anything there that rings a bell.
21   A   No. I can't remember that either.
22   Q   So the name Glen Gore doesn't stimulate any
23 recollection in you?
24   A   No.
25   Q   Okay. I'm going to ask you to look at this

Page 56

1 page here that is numbered No. 57. Is that a form
2 that's familiar to you?
3   A   It looks similar to what we used.
4   Q   Okay. Is there anything about it that looks
5 dissimilar to anything you remember?
6   A   I don't know. It could be. I don't see
7 there right now just by glancing at it.
8   Q   Okay. Was this a form that was used to
9 submit evidence?
10   A   A similar form, yeah.
11   Q   Okay. Did you ever talk to Gary Rogers about
12 the physical evidence in the Debbie Carter case?
13   A   I don't remember talking to him. I'm sure I
14 did, but I don't remember.
15   Q   Okay.
16   A   I always did talk to the agents about it.
17   Q   Okay. I'm going to ask you to look at page
18 107 of Exhibit 74 and see if there's anything in that
19 letter that stimulates your recollection.
20   A   No, ma'am, I don't remember that.
21   Q   Is that your signature at the bottom of the
22 letter?
23   A   It looks like it, but I don't remember this.
24   Q   Do you have any reason to question whether
25 that's your signature?

Page 57

1   A   No.
2   Q   But you can't say for sure whether it is?
3   A   No. It looks like my signature, but I can't
4 say that is my signature.
5   Q   Do you have any recollection of the reports
6 that that letter refers to?
7   A   No, ma'am, I sure don't.
8   Q   You know, let's see. Just looking at this
9 form here, does this look like a form that you
10 recognize? You don't have to concern yourself with the
11 content. We're looking at page 180 of Exhibit 74.
12   A   Yeah, it looks like it.
13   Q   Okay. Does this look like an OSBI form?
14   A   It looks like a copy of one.
15   Q   Okay. A photocopy. Okay. Is there anything
16 on this form that looks dissimilar to anything you
17 remember?
18   A   I don't know.
19   Q   Okay. Looking back at Exhibit 162, do you
20 see the words at the bottom of the page "for internal
21 use only, not for dissemination"?
22   A   Uh-huh.
23   Q   Okay. Do you see those same words on the
24 bottom of this form that's reflected on page 180?
25   A   "Not to be distributed outside our agency,"

Page 58

1 yes. Uh-huh.
2    Q  Okay. It looks like it says, "This document
3 contains neither recommendations nor conclusions of the
4 OSBI. It is the property of the OSBI and is loaned to
5 your agency. It and its contents are not to be
6 distributed outside your agency."
7    A  Uh-huh.
8    Q  Okay. What I'm trying to determine is if
9 there is a difference in the use of this form that's
10 reflected in Exhibit 162 as compared with this form,
11 which is on page 180 of Exhibit 74. Now, looking at
12 Exhibit 162 where it says "For internal use only," does
13 that mean that this document was not to go outside the
14 OSBI?
15    A  I don't know. I would assume that's what
16 it's for.
17    Q  Okay. As you recall, was that your
18 understanding at that time?
19    A  Yeah.
20    Q  Okay. That's fine.
21    A  That's by law. We couldn't make a
22 distribution on it. Everything we did went to our
23 headquarters.
24    Q  Okay. Now, this form is contained within the
25 document that we've referred to as the prosecutorial

Page 59

1 report, and by this form I'm referring to page 180. Did
2 this form go to the prosecutor's office?
3    A  I don't know. I didn't make the distribution
4 to them.
5    Q  Okay. Do you know if the purpose of this
6 type of form was for dissemination to the prosecutor's
7 office?
8    A  The purpose of that form was to document
9 information of the report or the case.
10    Q  Uh-huh.
11    A  Now, who made the distribution of it, I don't
12 know.
13    Q  Okay. Was the purpose of the prosecutorial
14 report to have a document to give to the prosecutor that
15 would contain investigative information about the case?
16    A  I would suppose so.
17    Q  Okay. Do you remember if reports like this
18 one here -- and when I say this one here, I'm referring
19 to page 180 of Exhibit 74 -- did documents like this go
20 to the prosecutor's office?
21    A  That type form, yeah.
22    Q  Okay. So this looks to you like a form that
23 would be sent to the prosecutor's office?
24    A  That looks like. It may be a copy of a form
25 that went to them.

Page 60

1    Q  Okay. Not the original. We'll agree it's
2 not the original, but does it look like a photocopy of a
3 type of report that would be sent to the prosecutor's
4 office?
5    A  Well, it could be sent to the prosecutor or
6 whoever was designated as the -- requesting having the
7 investigation done.
8    Q  Okay. So it would be the prosecutor's office
9 or the requesting agency?
10    A  Yes.
11    Q  Okay. But this other form here that we
12 looked at in Exhibit 162, was this purely for the use of
13 the OSBI?
14    A  I don't know what they -- I don't know why
15 there's differences. I don't know.
16    Q  Okay. Was it your understanding that this
17 form, which is reflected in Exhibit 162, was sent to
18 central headquarters?
19    A  I don't know. I don't know.
20    Q  Okay. We talked earlier about these words at
21 the bottom "For internal use only," and you said what
22 that meant to you is that was for the use of the OSBI?
23    A  That's what it says on it, yeah.
24    Q  Okay. Is that your recollection?
25    A  My recollection, yes, that everything was

Page 61

1 sent to the OSBI headquarters.
2    Q  Okay. And that this report was for the use
3 of the OSBI?
4    A  Yeah, I guess. It went up there. I don't
5 know what else they use it for.
6    Q  Okay. I'm going to show you another document
7 that I'm going to mark as Plaintiffs' Deposition Exhibit
8 163 and ask if you could take a quick look at that.
9        (Plaintiffs' Exhbit No. 163 was marked.)
10       THE WITNESS: I don't recall ever seeing it.
11    Q  (By Ms. Pilate) Okay. Does this appear to
12 be a memorandum to an Al Abernathy?
13    A  Whatever that says on it, I'll agree to it,
14 whatever it appears to be.
15    Q  Okay. Well, do you remember someone named --
16    A  No.
17    Q  -- Al Abernathy?
18    A  Oh, yeah.
19    Q  You do? Okay.
20    A  Yeah. He was my supervisor.
21    Q  Okay. And just looking at this, you would
22 agree that appears to be a memorandum to Al Abernathy,
23 correct? It says "To Al Abernathy."
24    A  Yeah. That's what it says.
25    Q  Okay. And then it says from B.G. Jones,

Page 62

1  Inspector.
2      A   Uh-huh.
3      Q   And would that be you?  There was no one else
4  named B.G. Jones, was there?
5      A   That's right.
6      Q   Okay.  I'm going read this out loud, and you
7  can follow along with me and correct me if I'm wrong.
8  "On October 10, 1986, Captain Dennis Smith, police
9  department, Ada, Oklahoma, requested a copy of report
10  CR82-502 be disseminated to the Pontotoc County District
11  Attorney's Office, Ada, Oklahoma," and this was from you
12  to Al Abernathy.  To your recollection, was that the
13  procedure for disseminating a report?
14      A   I don't know.  I wouldn't know why that was
15  in there.  There is some reason, but I don't know what
16  it was for.
17      Q   Do you remember asking that the report be
18  disseminated to the Pontotoc County District Attorney's
19  Office?
20      A   I can speculate, but I don't know why.
21      Q   Why do you think the report would be
22  disseminated to Pontotoc County?
23      A   Because he's the prosecutor.
24      Q   Okay.  So it was typical for reports to go to
25  the prosecutor?

Page 63

1      A   No.
2      Q   No?
3      A   No.
4      Q   What was typical?
5      A   The requesting agency got a copy of the
6  report.
7      Q   Okay.
8      A   And that was not always made either.
9      Q   Okay.  So would the requesting agency
10  sometimes be a police department?
11      A   Yes.
12      Q   Okay.  And the requesting agency could get a
13  copy of the report, correct?
14      A   As far as I know.
15      Q   Okay.  And the report sometimes would go to
16  the prosecutor's office, but sometimes would not.  Would
17  that be correct?
18      A   That would be right.
19      Q   Okay.  Did the requesting agency, under OSBI
20  policies, have to request that the prosecutorial report
21  go to the prosecutor's office before such a report could
22  be sent?
23      A   I don't know.  That was handled by the
24  administration at the headquarters.
25      Q   Okay.  Were you ever involved in sending out

Page 64

1  prosecutorial reports to prosecutors' offices?
2      A   No, we couldn't do that.
3      Q   Okay.  So to your recollection, reports could
4  go only to requesting agencies?
5      A   Our reports only went to headquarters at
6  Oklahoma City.
7      Q   Okay.
8      A   We didn't send them out anywhere else.  That
9  was very specific.
10      Q   Okay.  Do you know if OSBI reports ever went
11  to defense attorneys?
12      A   I have been shown copies like you've got
13  here.
14      Q   Okay.  We're in a civil case here.  I'm not
15  -- I will represent to you I'm not litigating a criminal
16  case.  I'm asking you, during your tenure at the OSBI,
17  do you remember if OSBI reports ever went to criminal
18  defense attorneys?
19      A   I really don't know.  I've never had the
20  occasion to be confronted with that, I don't think.
21      Q   Do you know if that issue ever came up?
22      A   I don't know.
23      Q   Do you know if there was any policy about
24  whether reports could go to a defense attorney?
25      A   I don't know that either.

Page 65

1      Q   Do you remember any OSBI policies from the
2  period of time that you worked there that applied to the
3  dissemination of reports?
4      A   I believe state law.
5      Q   Okay.  So to your recollection, there was a
6  state law that governed dissemination of reports?
7      A   Yes.  I haven't read it, but I was told that
8  it was, and I have read it in the newspaper, that they
9  could not be disseminated to others other than the
10  persons that requested the investigation.
11      Q   Okay.  So that was your understanding, was
12  that OSBI reports could only go to a requesting agency?
13      A   Yeah.
14      Q   Do you have any knowledge as to whether it
15  was necessary for the requesting agency to request that
16  the report be forwarded to a prosecutor's office before
17  such a report could be sent to a prosecutor's office?
18      A   I don't know.  I don't have -- I didn't
19  handle that.
20      Q   Okay.  Are you familiar with the term
21  "exculpatory evidence"?
22      A   Yes.
23      Q   Okay.  What does that mean to you?
24      A   That's evidence that can be obtained to use
25  for the defense of someone or others.

Page 66

1    Q   Where did you learn about that term?
2    A   Well, I've had -- I've got a degree in
3    criminal justice.
4    Q   Okay. To your knowledge, did the OSBI have
5    any policy about documenting exculpatory evidence?
6    A   I don't recall. I don't recall.
7    Q   Do you recall if you ever received any
8    training at the OSBI on exculpatory evidence?
9    A   I don't recall that either.
10   Q   Did you do polygraphs at the OSBI?
11   A   Yes.
12   Q   How often did you do polygraphs?
13   A   That varied. Sometimes every day when I went
14   to work there, other times, depending on the area, when
15   I first went to work for the Bureau, I was assigned
16   there at headquarters, and I had polygraphs about every
17   day.
18   Q   Do you recall doing any polygraphs in
19   connection with the Debbie Carter murder investigation?
20   A   No.
21   Q   Do you recall ever doing a polygraph with a
22   Ronald Williamson?
23   A   No.
24       (Plaintiffs' Exhbit No. 164 was marked.)
25   Q   (By Ms. Pilate)  I'm going to hand to you

Page 67

1    what I've marked as Plaintiffs' Deposition Exhibit 164
2    and ask you to take a look at that.
3    A   I can't recall that either. I'm sorry.
4    Q   That's all right. Mr. Jones, I've asked you
5    to look at Plaintiffs' Deposition Exhibit 164, which
6    appears to be a report of a polygraph examination of a
7    Ronald Williamson, correct?
8    A   Uh-huh. Yes. I'm sorry.
9    Q   Okay. Is that your signature there on
10   page 3?
11   A   It appears to be, but I can't swear that
12   that's my signature.
13   Q   Okay. Is there anything about it that
14   appears dissimilar to your signature?
15   A   No.
16   Q   Okay. Do you have any reason to disbelieve
17   that's your signature?
18   A   No.
19   Q   Okay. But what you're telling me is, you
20   have no recollection of conducting a polygraph of a
21   Ronald Williamson, correct?
22   A   No, I don't.
23   Q   Okay. Did you give polygraphs like this a
24   number of times?
25   A   Yes, ma'am.

Page 68

1    Q   Okay.
2    A   Like that one?
3    Q   Yeah. And when I say like that one, I mean
4    did you give polygraphs frequently in cases where
5    investigators were looking at serious violent crimes?
6    A   Yes.
7    Q   Okay. So it wouldn't be unusual for you to
8    do a polygraph like this?
9    A   For that specific crime, no.
10   Q   Did you do most of the polygraphs in this
11   part of the state?
12   A   No. We had several polygraph examiners.
13   Q   Okay. How was it determined who got to take
14   a particular polygraph?
15   A   I would, because there wasn't but two of us.
16   Q   Who were they?
17   A   I think the other one was Tom Puckett.
18   Q   Tom Puckett?
19   A   Yeah.
20   Q   Do you remember anybody else having the
21   training to administer polygraph exams?
22   A   Frank Brady. I don't know whether Rusty
23   Featherstone was a polygraph examiner then or not.
24   Q   Do you recall whether he ever gave polygraph
25   exams?

Page 69

1    A   I never have seen him. I think he went to a
2    polygraph school. I'm pretty sure he did. I don't
3    know.
4    Q   Were you one of the more experienced
5    polygraph examiners?
6        MR. POE: Object to the form, but go ahead.
7        THE WITNESS: A probability I was, yes.
8    Q   (By Ms. Pilate)  What determined who was
9    assigned to a particular polygraph exam?
10   A   My boss.
11   Q   And who was your boss?
12   A   Tom Puckett.
13   Q   Don Puckett?
14   A   Tom.
15   Q   Tom? Okay.
16   A   I don't know if Tom -- you're talking about a
17   lot of time here. A lot of people come and went that
18   was in charge of -- or what we call chief inspector.
19   And I don't know. I just can't recall who was my boss
20   at that time, direct supervisor. I had -- I had many.
21   Q   Was your boss in Oklahoma City?
22   A   Yes. Yes.
23   Q   Was your boss usually someone who is skilled
24   in giving polygraph examinations as well?
25   A   At the beginning, yes, but as time went

Page 70

1 along, no.
2 Q Was Mr. Puckett skilled in giving polygraph
3 examinations?
4 A Yes.
5 Q Did you ever discuss with him how to properly
6 conduct a polygraph examination?
7 A Yes.
8 Q What's the most difficult part of conducting
9 a polygraph?
10 A Well, all of it is difficult. It is the time
11 factors involved and getting the individual adjusted to
12 the necessary attachments and of the questions.
13 Q How did you go about drafting the questions?
14 A You have to determine what the subject matter
15 was, what you wanted to question them about, what was
16 the most important question. You just can't go in and
17 randomly ask a bunch of questions. You have to ask
18 specific questions about the crime, why the person is
19 there.
20 Q Were there particular criteria or techniques
21 that you relied on in drafting polygraph questions?
22 A They have to be short and straight to the
23 point, have to be answered with either yes or no.
24 Q Okay. I'm going to read to you a couple of
25 questions off of Exhibit 164, which is the polygraph of

Page 71

1 Mr. Williamson that you don't recall. One of the
2 questions, which appears on page 2, "Do you know for
3 sure who killed Debbie?" Does that sound to you like a
4 short, to-the-point question?
5 A Uh-huh.
6 MR. BUNN: Is that a yes?
7 THE WITNESS: Yes. I'm sorry.
8 Q (By Ms. Pilate) Okay. Another question was,
9 "Last December 8th, did you kill Debbie Carter?" Does
10 that sound to you, again, like a short, to-the-point
11 question?
12 A Yes.
13 Q Okay. Here's another one, "Last December
14 8th, did you go into Debbie Carter's apartment and have
15 sex with her?"
16 A Yeah.
17 Q These questions ask single thoughts, don't
18 they?
19 A Yes.
20 Q And --
21 A They're designed to elicit a response from
22 the individual.
23 Q And they directly concern the guilt or
24 innocence of the individual being polygraphed, correct?
25 A That's the purpose of it, yes, or knowledge

Page 72

1 of who did.
2 Q Okay. And what you tried to avoid was
3 extraneous material, correct?
4 A Some, yes.
5 Q Okay. Can you give me an example of what a
6 less well-drafted polygraph question would be? Can you
7 think of something that wouldn't be short and to the
8 point like these questions?
9 A Well, the ones I always used was "did you,"
10 or "do you know? Were you there?"
11 Q That's kind of right to the heart of the
12 matter?
13 A That's -- you have to understand, you can't
14 answer a slew of questions on a polygraph at a time,
15 because you have a cuff around the arm, and that can get
16 very painful after about two minutes, and there's
17 usually about 15 seconds between questions.
18 Q Does a polygraph get physically
19 uncomfortable?
20 A After three minutes, yes.
21 Q And what happens after three minutes?
22 A Well, you can start having pain in the arm,
23 whichever arm -- whichever the cuff is around, the arm,
24 or whichever arm has got the cuff on it.
25 Q Does the cuff compress the arm?

Page 73

1 A It's just like taking blood pressure.
2 Q So it feels like a blood pressure cuff?
3 A Yes. Uh-huh.
4 Q Which can be momentarily uncomfortable.
5 Would that be correct?
6 A If it's on there for an extended time, yes.
7 Q Okay. I'm going to read to you another
8 polygraph question and ask you what you think of that
9 question. This question appears in Plaintiffs'
10 Deposition Exhibit 76. "About the statements regarding
11 Debbie Carter's death made here today, have you lied to
12 me in any way?" Is that question different than the
13 types of questions you asked him?
14 A No. I --
15 MR. POE: I'm going to object to the form of
16 the question, if you're asking for an expert opinion,
17 but go ahead, Mr. Jones.
18 THE WITNESS: I've used that same question.
19 Q (By Ms. Pilate) Okay. Is there anything
20 wrong with using a question like that?
21 A No.
22 Q Is it possible to get a deceptive response on
23 a question like that and still have a situation where
24 the person being polygraphed is innocent of the crime?
25 MR. POE: Object to the form.

## Page 74

1  THE WITNESS: Anything is possible. Some
2  people respond differently to questions than others.
3  Q  (By Ms. Pilate) Is the question "Have you
4  lied to me in any way," short and to the point?
5  A  It's short and to the point, and if anybody
6  says no, they have lied to me. Not necessarily to me,
7  but to someone. That question should be -- can be
8  altered a little bit for it -- "have you lied to
9  anyone?"
10  Q  Isn't it true that people sometimes lie about
11  small things, but aren't guilty of the crime?
12  A  Absolutely.
13  Q  So it's possible that that question wouldn't
14  necessarily get to the guilt or innocence of the person
15  being polygraphed. Would that be correct?
16  A  That question is designed to elicit a
17  response from the person, either an honest person or a
18  deceptive person, either one. It makes you think about
19  it.
20  Q  Well, would it be correct to view someone as
21  being guilty of a crime simply because they supposedly
22  showed up as deceptive in their answer to a question
23  like that?
24  MR. POE: Object to the form.
25  MS. PILATE: You can go ahead and answer.

## Page 75

1  THE WITNESS: Say that again.
2  Q  (By Ms. Pilate) Have you ever had any --
3  A  In other words, shorten the question.
4  Q  Okay. I think you agreed earlier it would be
5  possible for an individual to show up as deceptive on a
6  question like that but not guilty of the crime,
7  correct?
8  A  It's possible, because they may be guilty of
9  a similar crime that you don't know about, and they're
10  afraid you're going to find out about it.
11  Q  Okay. But that -- their concern about
12  something else wouldn't necessarily relate to the murder
13  in question, would it?
14  A  True. But still you're thinking about it.
15  Q  What about the question, "Have you made up
16  any part of your story to protect someone involved?"
17  Have you ever asked a question like that?
18  A  Possibly, yes.
19  Q  Do you think that's a well-drafted polygraph
20  question?
21  A  Yes, it could be, depending on the
22  circumstances, how deceptive the individual is, or are
23  you seeking -- you understand, you're seeking
24  information from an individual, as well as determining
25  whether they're deceptive or not.

## Page 76

1  Q  So what you're saying is, the purpose of a
2  polygraph is to elicit information and not necessarily
3  just to get at whether they were guilty or innocent of
4  the crime in question?
5  A  No. The purpose of the polygraph is to
6  determine whether they're deceptive or not about the
7  material at hand, what you're questioning them about.
8  Once you determine that, then you can design other
9  questions to be asked.
10  Q  Is that a good relevant question?
11  A  Well, it all depends on -- it can be used,
12  yeah. I don't know what questions had been asked prior
13  to that. And in all probability, he went to a different
14  school than I went to, and there's different techniques
15  taught at different schools.
16  Q  Okay. Well, I'll represent to you that's not
17  a question you asked.
18  A  Well, I know that.
19  Q  How do you know that?
20  A  I don't ask those questions.
21  Q  Okay. And why don't you ask those questions?
22  A  Because I was trained in a different school.
23  Q  What school were you trained in?
24  A  Texas A & M.
25  Q  Are you familiar with Baxter training?

## Page 77

1  A  Yes.
2  Q  Did you attend that type of training?
3  A  No. No.
4  Q  Is that similar to what you received at Texas
5  A & M?
6  A  I don't know. There's similarity between all
7  of them.
8  Q  What did your training tell you about the
9  type of questions to ask?
10  A  Short and to the point.
11  Q  Okay. And so it would be unusual for you to
12  ask questions like the ones I read to you?
13  A  No.
14  Q  You're saying you would ask those questions?
15  A  Yes, you can.
16  Q  You can. But would you ask those as relevant
17  questions?
18  A  Depending on the circumstances.
19  Q  Okay. I thought you said a minute ago that
20  that -- you knew that wasn't your question because that
21  wasn't the type of question you would ask.
22  A  That's right. I want to know did you or do
23  you know.
24  Q  Okay. So you think that's a better polygraph
25  question?

Page 78

1    A   It's the one I use.  You get results with it.
2    Q   Okay.  So you wouldn't ask questions like the
3 ones I read to you?
4    A   No, I didn't say that.  Depend on the
5 circumstances.  It's possible.  I have asked questions
6 about certain crimes.  You can.  You can ask different
7 questions on it.  It goes back to his training.
8    Q   In the training that you received, would the
9 people teaching the courses in polygraph technique have
10 presented questions like the ones I read to you as
11 examples of relevant questions to ask?
12    A   Yes.
13    Q   And that's what you would have learned at
14 Texas A & M?
15    A   Well, you have different professors that come
16 in and teach, and they instruct you that you also can
17 formulate your own techniques as time passes on,
18 whichever is suitable for you.  And that's what a lot of
19 examiners do.
20    Q   Okay.  Let's go back to working with other
21 agencies.  You mentioned a requesting agency, in terms
22 of the OSBI going in and providing assistance.  When you
23 were an OSBI agent, did you work in joint
24 investigations?
25    A   Just about all the time, yes.

Page 79

1    Q   Okay.  How was a joint investigation
2 operated?
3    A   You met with persons that had requested you
4 to assist in the investigation, and most generally they
5 would assign an investigator or a deputy or a patrol
6 officer, whoever they had available.  Some didn't have
7 anybody available, and I have worked by myself,
8 depending on the size of the department.  Some, you're
9 talking about a two-man department.
10    Q   Who would be in charge of the investigation,
11 the local agency or the OSBI?
12    A   I don't know that -- you worked jointly on
13 things like that.  You discuss it and talk with one
14 another.  It's not who would be in charge, really.
15    Q   Who would have ultimate responsibility?
16        MR. POE:  Object to the form to anywhere that
17 may call for a legal conclusion.
18        THE WITNESS:  Yeah.  It all depends on what
19 kind of responsibility you're talking about.
20        MS. PILATE:  I'm not asking for a legal
21 conclusion, Mr. Poe.  I'm asking what agency would have
22 ultimate responsibility for the conduct of the
23 investigation, the OSBI or the local agency.
24        THE WITNESS:  Well, I'm not -- I'm not in a
25 position to answer that.  I don't know.  I've never had

Page 80

1 that to come up.
2    Q   (By Ms. Pilate)  When you worked on an
3 investigation, were you accountable to the OSBI for your
4 conduct, or were you accountable to the local agency?
5    A   To the OSBI.
6    Q   So even though you were working with a local
7 agency, you still had to abide by OSBI policies and
8 regulations?
9    A   Yes.
10    Q   Okay.  And if the local agency invited you in
11 to work with them, the local agency had to accept that
12 you would be governed by your OSBI policies and
13 regulations.
14    A   I suppose so.  I don't -- you don't inquire
15 about their regulations.  You go in and do what's right,
16 what has to be done and done properly.  There's no
17 question arises about it.  I've never had that to come
18 up.
19    Q   Well, what I'm asking you is whether you were
20 still governed by the policies of your agency when you
21 stepped into the role of helping a local agency --
22    A   Well, you're always ----
23    Q   -- do its investigation.
24    A   You're always -- anything you do, you're
25 governed by OSBI policy, and that's it.

Page 81

1    Q   Okay.  So what that would mean is that when
2 the local agency invited you to participate or requested
3 that you participate in their investigation, what they
4 got was an OSBI agent who followed the policies and
5 regulations of his agency.  Would that be correct?
6    A   Well, yeah.  He's not going to go outside of
7 his policy.
8    Q   Okay.  I'm not trying to trick you, sir.
9    A   Or he shouldn't, no.
10    Q   I'm just asking you basic questions.  I'm
11 trying to figure out how it worked.
12    A   I'm answering the questions on what I would
13 do.
14    Q   Okay.
15    A   What somebody else does, I can't answer for.
16        MR. POE:  Cheryl, is this a good time to take
17 a break?
18        MS. PILATE:  I'm going to be done pretty
19 soon.  I mean if you want to take a break, that's fine.
20 Would you like a break, Mr. Jones?
21        THE WITNESS:  Yeah.
22        (A recess was had, and Exhbit No. 165 was
23 marked.)
24    Q   (By Ms. Pilate)  Mr. Jones, I'm going to show
25 you what I've marked as Plaintiffs' Deposition Exhibit

Page 82

1 165 and ask you if you recognize that document.
2   A  I don't recognize it, no, but I do understand
3 what -- portions of it about the distribution on the
4 report.
5   Q  Okay.  Does that appear to you to be a policy
6 of the OSBI?  Is the document -- does it state a policy
7 of the OSBI?
8   A  I really don't know.
9   Q  Okay.
10   A  I don't know.  It could be their policy,
11 but --
12   Q  Does the policy look familiar to you?
13   A  You're talking about 18 years.  That's
14 difficult.
15   Q  Okay.  If you don't remember it, that's fine.
16 I will represent to you that that's a document I
17 obtained from Mr. Bunn.  As I've said before, I'm not
18 trying to -- okay.
19   A  Just let it -- you know, let the document
20 stand for whatever it is.
21   Q  I understand what you're saying, that you
22 don't remember this, but what I want to ask you is about
23 the content of the policy here.  The policy says --
24 let's start at the top of the page.  See up here where
25 it says "Subject" underneath "Oklahoma State Bureau of

Page 83

1 Investigation" it says, "Communications with defendants,
2 defense attorneys, and their employees," and then under
3 Roman numeral I, it says "Policy," and it reads --
4   A  I don't remember it.  I don't remember.
5   Q  Okay.  It says, "The OSBI charter makes
6 investigations by the Bureau confidential.  Also case
7 law in Oklahoma creates a privilege of the prosecutor
8 against disclosure of his or her work product to the
9 defense.  Therefore the OSBI shall limit communications
10 regarding the subject matter of investigations to only
11 those communications allowed by law."
12   A  Yeah.  I'll agree with that.  That was our
13 policy.  We were told that many times, many times.
14   Q  Okay.  So you recall that policy?
15   A  Yes.
16   Q  Okay.  And you recall being told that many
17 times?
18   A  Yes.
19   Q  Who told you that?
20   A  Well, the chief agent.  It's also been in the
21 newspaper many, many times about it, people trying to
22 get copies of the OSBI report and couldn't because of
23 the law prohibited it.
24   Q  Okay.  Who was the chief agent?
25   A  Tom Puckett.

Page 84

1   Q  Okay.  So this is something that you learned
2 from your supervisors, that this was the policy of the
3 agency and, of course, it's written down as well?
4   A  Also we have copies of state statutes in the
5 office that we're familiar with.
6   Q  Okay.  Did you have a copy of OSBI
7 policies --
8   A  Yes.
9   Q  -- that you had access to?
10   A  Yes.
11   Q  Okay.  So you were familiar with it --
12   A  Yes.
13   Q  -- this policy?
14   A  Yeah.
15   Q  Okay.  All right.  Let's turn briefly to
16 another topic, and then we'll be done.  When you were at
17 the OSBI, Mr. Jones, did you involve yourself in the
18 task of promoting good report writing?
19   A  Yes.
20   Q  Okay.  How did you think a good report should
21 be written?
22   A  It should be thorough, concise, and
23 understandable, leave out difficult words that the
24 average person won't know what you're talking about, and
25 contain all the information about the investigation.

Page 85

1   Q  What did you do to help promote good report
2 writing while you were at the OSBI?
3   A  I counseled with them, each officer, by
4 telephone, and about pronouns, which was difficult in
5 learning what they were talking about, and just general
6 information that is required for the report.
7   Q  Did you ever edit agents' reports?
8   A  Add?
9   Q  Edit.  Edit, e-d-i-t.  Edit their reports.
10   A  Yeah.
11   Q  Was that a common thing that you did?
12   A  Yes.
13   Q  Okay.
14   A  That was common in the Bureau with other --
15 with my boss.
16   Q  Okay.  Why were reports edited?
17   A  Verbiage in them, excess verbiage, data that
18 didn't mean anything in the sentence.  Some sentences
19 would be 30-40 words long.  I'd try to cut it to less
20 than 20, make two sentences instead of one.  I've seen
21 one paragraph a full page, reduce that to a maximum of
22 20 lines, new paragraph to make it interesting, where
23 you read it and if it gets monotonous you're not going
24 to pay any attention to what's in it.
25       You try to make it interesting, short, to the

Page 86

1  point, what it's about, and that's it. I don't take any
2  content out. Everything is in there. One of the
3  examples was he or she, them and they. That's difficult
4  in a report when you've got several names that you're
5  talking about.
6     Q   Those exhibits that I showed you earlier
7  about Laveta Sue Brewer and the photographs -- and I
8  realize you said you didn't have any recollection of
9  that -- have you ever seen a situation where information
10 about what a witness said was edited out of a report?
11    A   Not through my office, no.
12    Q   Okay. So if information was taken out of a
13 report about a witness' ability to identify photographs,
14 you would have no idea how that occurred?
15    A   No.
16    Q   That isn't something you would support?
17    A   Absolutely not.
18    Q   Would you think that would be wrong?
19        MR. POE: Object to the form. Go ahead and
20 answer, Mr. Jones.
21        THE WITNESS: If it was a deliberate
22 deletion, maybe, but then I don't know if it was
23 harmful, not harmful.
24    Q   (By Ms. Pilate) Is that something you would
25 leave in a report, whether or not a witness could

Page 87

1  identify photographs of a suspect?
2     A   Yeah. You know, it's part of the
3  investigation.
4     Q   Would you know of any reason for deleting
5  that information?
6     A   No.
7     Q   What about basic information that a report
8  should contain? What are the essentials that should be
9  in a report?
10    A   That which pertains to the crime, to the
11 guilt or innocence of the accused.
12    Q   Certainly you should have the name of the
13 witness in there that was being interviewed, correct?
14    A   Sure.
15    Q   And probably some information about where the
16 witness lives so you could contact him or her again if
17 you needed to, correct?
18    A   Yeah.
19    Q   How about a telephone number? Is that basic
20 information that should be in there?
21    A   Personal notes, maybe.
22    Q   Personal what?
23    A   Personal notes. You know, originally made at
24 the time of the interview you sit down, well, give me
25 your telephone number so I can contact you in the

Page 88

1  future.
2     Q   Okay. Would you put that in a report?
3     A   Some officers did, and some officers didn't.
4     Q   Okay. Would there generally be some
5  information in a report that would indicate how to get
6  ahold of the witness again?
7     A   It had an address, yes.
8     Q   Okay. And sometimes would date of birth or
9  Social Security number be included?
10    A   Yes.
11    Q   What about the name of a person making a
12 report, the agent or the officer? Should that always be
13 included?
14    A   I believe it was, yeah.
15    Q   Okay. Can you think of any circumstance
16 where the name of the officer or agent making the report
17 should not be included?
18    A   Should not be?
19    Q   Should not be included.
20    A   No.
21    Q   Okay. What about the date a report is made?
22 Is that something that should be included?
23    A   Yeah. I like to see it, yeah.
24    Q   Okay. And what about the date that an
25 interview occurs. Is that something that an agent or

Page 89

1  officer generally should include in a report?
2     A   I think they all do.
3     Q   Okay. So you think that's one of the basics,
4  the date an interview occurs?
5     A   Well, I always did, and I always liked to see
6  it. I can see where you could do without it.
7     Q   Would the date an interview occurred be
8  important in a lot of cases?
9     A   It might be in some cases, yes, but not a lot
10 of cases. You could get by without it.
11    Q   But should that be regarded as basic
12 information that should be included by the agent?
13    A   I always had mine in there.
14    Q   Okay. And is that what you instructed the
15 agents who worked with you to do?
16    A   I can't recall whether I told them that or
17 not.
18    Q   If an agent came to you with a report that
19 didn't have a date on it, would you give it back to him
20 and tell him to put the date on it?
21    A   No, I wouldn't give it back to him. I might
22 call and ask him about it.
23    Q   So you could include the date?
24    A   Yes.
25        MS. PILATE: You know, I think I'm done.

| | |
|---|---|
| **Page 90** | **Page 92** |

**Page 90**

1 It's 12:30.

2     MR. BUNN: For the record, it's 12:33.

3         CROSS-EXAMINATION

4     Q   (By Mr. Poe) I have a couple of questions

5 for you, Mr. Jones. How many homicides did you work

6 while you were with the Bureau?

7     A   Well, at my retirement party they had

8 documentation that I investigated, I was the case agent

9 on 55.

10     Q   That doesn't include those that you would

11 have assisted on, just those that you were --

12     A   No. That's just ones that I was assigned.

13     Q   And was there anything about this murder that

14 we have discussed today that stands out in your mind

15 other than the two things you've already mentioned?

16     A   It's just such a heinous crime, it's -- you

17 know, the picture that -- of that body and what's

18 written on the wall. That's --

19     Q   Well, would it be fair to say that the --

20 this murder has kind of rolled into all your other

21 murders? I mean, there's nothing here that makes you

22 remember this specific crime. Is that correct?

23     A   No. I didn't know when it first -- when I

24 received the call about the deposition, I didn't know

25 whether it was -- it just seemed like there's so many of

**Page 91**

1 them, they just all run together. Not all, but many of

2 them run together, particularly those that I did not

3 work on.

4     Q   How many reports would you say that you --

5 would it be fair to say you have had to review hundreds

6 of reports, OSBI prosecutorial reports, during your

7 time?

8     A   Yes, many hundreds.

9     Q   And in regards to the reports you have been

10 discussing today, it's your testimony that you might

11 have seen it, but you don't recall seeing it, this

12 report. Is that correct?

13     A   I don't recall. There's factors here that

14 involve the brain, 76 years old. You know, I can't

15 remember people's names now, let alone reports back

16 then.

17     MR. POE: I don't have anything further.

18     MR. BUNN: I don't have anything.

19     MR. JANZEN: I have no questions.

20     MR. BUNN: We'll read and sign. He's already

21 indicated that's what he wants.

22

23

24

25

**Page 92**

1         J U R A T

2     I, B.G. JONES, state under oath that I have read

3 the above and foregoing deposition in its entirety and

4 that the same is a full, true, and correct transcription

5 of my testimony so given except for the corrections

6 noted.

7

8     _____

9         B.G. JONES

10

11

12

13

14

15   SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned

16 Notary Public in and for the State of _____,

17 on the _____ day of _____, 2001.

18

19     _____

20         NOTARY PUBLIC

21

22 My Commission Expires: _____

23

24

25 REPORTED BY: BRENDA J. GOODE, CSR

**Page 93**

Errata Sheet

1         Errata Sheet

2 Re: FRITZ, et al., vs. CITY OF ADA, et al.
  Case No. CIV-00-194-B

3 Witness: B.G. JONES
  Taken: OCTOBER 4, 2001

4 Reporter: Brenda J. Goode, CSR

5 Page   Line         Correction & Explanation

6 ___ ____ _____

7 ___ ____ _____

8 ___ ____ _____

9 ___ ____ _____

10 ___ ____ _____

11 ___ ____ _____

12 ___ ____ _____

13 ___ ____ _____

14 ___ ____ _____

15 ___ ____ _____

16 ___ ____ _____

17 ___ ____ _____

18 ___ ____ _____

19 ___ ____ _____

20 ___ ____ _____

21 ___ ____ _____

22 ___ ____ _____

23 ___ ____ _____

24         SIGNATURE

25

Page 94

```
 1              C E R T I F I C A T E
    State of Oklahoma      )
 2                         ) ss:
 3  County of Oklahoma )
 4      I, Brenda J. Goode, Certified Shorthand Reporter
 5  within and for the State of Oklahoma, do hereby certify
 6  that the above-named B.G. JONES was by me first duly
 7  sworn to testify to the truth, the whole truth, and
 8  nothing but the truth in the case aforesaid; that the
 9  above and foregoing deposition was by me taken in
10  shorthand and thereafter transcribed; and that the same
11  was taken on October 4, 2001, in the City of McAlester,
12  County of Pittsburg County, State of Oklahoma, pursuant
13  to Agreement and Notice and under the stipulations set
14  out herein; and that I am neither an attorney for nor
15  relative of either of said parties nor otherwise
16  interested in the event of said action.
17      IN WITNESS WHEREOF, I have hereunto set my hand and
18  official seal this day, October 12, 2001.
19
20
21          _____
                   BRENDA J. GOODE
22          Oklahoma Certified Shorthand Reporter
                   Certificate No. 01518
23              Exp. Date: December 31, 2002
24
25
```

Page 95

```
 1
 2
 3
 4  October 12, 2001
 5
 6  Mr. Jimmy Bunn, Chief Legal Counsel
    Oklahoma State Bureau of Investigation
    6600 North Harvey, Suite 300
 7  Oklahoma City, Oklahoma 73116
 8
    In re:  FRITZ, et al., vs. CITY OF ADA, et al.
 9          Case No. CIV-00-194-B
10
    Dear Sir:
11
        Please have B.G. JONES read the enclosed copy of
12  his deposition taken on OCTOBER 4, 2001, in the
    above-styled case and sign the jurat page before a
13  notary public. Also, any needed corrections should be
    made on the enclosed errata sheet and not directly on
14  the transcript.
15      Please return the signed jurat page and errata
    sheet to my office within 30 days of the date of this
16  letter so that I can forward the original deposition
    transcript to the attorney who took the deposition.
17
        Thank you for your attention and cooperation in
18  this matter.
19  Sincerely,
20
21
    Brenda J. Goode, CSR
22
23  xc:Ms. Pilate, Mr. Poe, Mr. Janzen
24
25
```