# EXHIBIT

# 21

1

V2

Summary of Scientific Research on Factors Affecting the

Accuracy of Eyewitness Memory, with Special Attention to Scientific

Information that was Available in 1984, the year of  trial,

in the Case of *State of Oklahoma v. Karl Fontenot*

John C. Brigham,  Ph.D.

June,  2013

The analysis of eyewitness memory has been the focus of a great deal of empirical research for the past 45 years.  This report provides an overview and summary of the major research questions and the findings of empirical studies that have investigated the factors that affect the accuracy of eyewitness memory.  After this general overview, the latter portion of this report focuses on the factors that could have been discussed in expert testimony by a witness who is an expert in memory, given the state of the scientific knowledge in 1984, the year in which Karl Fontenot was tried.

## Summary and Overview

Legal  observers  have  noted  that  far  more  cases  of  erroneous  convictions  have  been caused by mistaken eyewitness identifications than by *all other types of factors combined* (Wall, 1965), as noted in by the U. S. Supreme Court in *United States v. Wade* in 1967**.**  There has been a great deal of research on eyewitness memory in the past 45 years, stimulated in part by the

realization that incorrect eyewitness identifications account for over half of all the documented cases of "wrongful convictions" in which innocent persons have been convicted of felonies (see Huff, Rattner, & Sagarin, 1996). Further, recent studies of over 200 persons erroneously convicted of felonies who were later exonerated by DNA evidence, including a study conducted by the U.S. Department of Justice (Conners, Lundregan, Miller, & McEwen, 1996), have found that about 75% of these "wrongful convictions" involved erroneous eyewitness evidence (see Scheck, Neufeld, & Dwyer, 2001). Awareness of these findings led the U.S. Attorney General to establish a blue-ribbon committee of law enforcement personnel, attorneys, and research psychologists to study the problems with eyewitness evidence. The result was the U.S. Department of Justice's 1999 publication of *Guidelines for the Collection and Preservation of Eyewitness Evidence*.

These mistaken identifications highlight the fact that recognition of an unfamiliar human face is a complex process. While some features, such as hair color or eye color, are easy to describe, people do not widely share concepts for coding in memory many facial features (e.g., hairlines, foreheads, mouths, chins, cheeks). This makes it difficult to retrieve the memory when attempting to describe or identify the person. People are generally unaware of the difficulties in face recognition because most of the faces they recognize are familiar (friends, coworkers, family, etc.). Recognition of strangers is a far more difficult task.

Furthermore, when people make mistakes in identifying unfamiliar faces, they are often unaware of their mistake or later forget their error. The perception/memory difficulties are magnified for crime eyewitnesses, because many crimes take place under conditions that make

perception particularly difficult—the criminal may be seen only briefly, or under poor lighting, or while the witness is highly agitated. High motivation to be accurate, as when a witness tries especially hard to remember the face, is unlikely to help accuracy. Research results show that the problem is due to the difficulty of the perceptual situation, which makes it difficult or impossible to perceive, encode, and retain information accurately.

<u>Quality of the Extant Research</u>

Since about 1970, there has been an explosion of scientific research on factors that affect the accuracy of eyewitness memory. Two converging lines of research have provided scientific information on factors affecting eyewitness accuracy.  First, there is a 125-year accumulation of experimental research on general factors that affect human perception and memory, beginning with the work of Ebbinghaus, first published in 1885.  Second, many recent studies have directly investigated face recognition and eyewitness identifications.  As noted, researchers began these investigations in the early 1970s, and literally thousands of relevant studies have been carried out in the past several decades. These latter studies are generally of three types: face recognition studies, surveys, and "staged-event" experiments.

In face recognition studies, participants see photos of a number of faces and are later shown a larger group of facial photos; they are tested on their ability to recognize which faces they have seen before. Many of the studies in the early 1970s were of this sort. However, the relevance of these studies is limited, as they do not match the conditions facing a real eyewitness. For this reason, face recognition studies are currently conducted less frequently.  Surveys, such as our statewide surveys of defense attorneys, prosecutors, child protection workers, and law en-

4

forcement personnel in Florida (Brigham & Spier, 1992; Leippe, Brigham, Cousins, & Romanczyk, 1989), can yield important insights into the issues that are seen as most crucial by people who work directly with eyewitness evidence.

In staged-event studies, an incident (such as a theft or assault) is enacted in front of eyewitnesses who later attempt to identify the perpetrator from a photo lineup that may or may not contain his photo. Sometimes the incident is staged live in front of unsuspecting eyewitnesses. Other studies use filmed or videotaped incidents.  Live staged crimes are most similar to real-world eyewitness events, but there are practical and ethical limitations to this procedure. Researchers cannot duplicate the level of terror or abuse that crime witnesses often face. Nevertheless, though researchers must employ events of milder intensity, their findings can be valuable in the effort to understand what factors most affect eyewitness accuracy.

Several thousand research-based articles on eyewitness memory have been published in scientific journals.  These peer-reviewed journals are of top quality.  On average, after a detailed peer review process, about 80% of the manuscripts submitted are not accepted for publication, usually because of methodological concerns.  Hence, the studies that are eventually published represent the "cream of the crop", the most methodologically-sophisticated and important studies of these issues, all of which adhere carefully to the standards of the "scientific method."  The study of eyewitness memory has been the "hottest" area of psychology–law research since about 1975.  Presentations and discussions of studies of eyewitness memory have constituted a major topic at the meetings of major professional psychology organizations since then in the U. S. (e.g., the American Psychological Association, the American Psychological

Society, and the American Psychology-Law Society), and in Canada and Europe as well.  In addition, a number of research-based books have been published in this area (e.g., Cutler & Penrod, 1995; Lindsay, Ross, Read, & Toglia, 2007; Loftus, 1979; Ross, Read, & Toglia, 1994; Sporer, Malpass, & Koehnken, 1996; Wells & Loftus, 1984; Yarmey, 1979).

The scientific research on factors that affect eyewitness accuracy, which will be reviewed briefly below, most certainly meets any reasonable criterion of "good science".  This is the case today, and it was the case in 1984, the year in which Fontenot went to trial.  As already noted, the research is published in highly selective, peer-reviewed scientific journals, most of which reject (usually on methodological grounds) about 80% of the manuscripts that are submitted to them, thus assuring the high quality of the studies that are published.  Research findings have been shown to be outside of the "common knowledge" of most jurors (e.g., see Benton, Ross, Bradshaw, Thomas, & Bradshaw, 2005; Brigham & Bothwell, 1983; Kassin, Hosch, & Memon, 2001; Schmechel, O'Toole, Easterly, & Loftus, 2006) and have also been shown to be valuable and useful to jurors in their decision-making process   (Brigham & Hyme, 2001; Brigham, Wasserman, & Meissner, 1999).  Studies have shown that expert testimony about eyewitness memory has a beneficial effect on jury deliberations. Not only does it cause jurors to more carefully evaluate the eyewitness evidence, it also stimulates them to study *all of the other evidence* more closely and carefully as well (Hosch, Beck, & McIntyre, 1980).

Central Findings of Scientific Research

Scientific research has demonstrated that eyewitness memory involves three perception and memory stages: acquisition, retention, and retrieval.  During the **acquisition** phase, a

stimulus (in this case, the crime) is perceived, encoded, and stored in memory.  Contrary to common stereotype, human perception does not work like a camera or video recorder.  In contrast, what is perceived and stored is often incomplete or distorted as a result of the perceiver's state of mind and/or the nature of the event observed.  People's perceptions are distorted by their expectations and attitudes; research has shown that we tend to see and remember what we expect to see.

The conditions under which an event is observed also affect perception and memory. Research has shown that memory is better for faces seen under good observational conditions (e.g. good lighting, close distance, no disguise, longer event duration).  With regard to event duration, however, research has shown that most people remember a stressful event as taking about 2 or 3 times as long as it actually did (Yarmey, 1979; Yarmey & Tressillian Jones, 1983).  In many crime situations, the only estimation of event duration comes from a witness's estimation, which is likely to provide misleading information, asserting that the event was viewed for longer than was actually the case.  ***Stress/arousal*** is another important factor.  The Yerkes-Dodson Law (Yerkes & Dodson, 1908) in psychology asserts that performance of complex tasks is poorer under high levels of stress.  Recognizing a face (a complex task) will be particularly difficult if the face was initially seen in a high-stress situation, as crimes often are (Deffenbacher, 1983; Deffenbacher, Bornstein, Penrod, & McGorty, 2004).  Stress has recently been studied in U. S. Army personnel who were undergoing survival school training that included high-stress interrogations (which included "real physical confrontation), and low-stress interrogations carried out under realistic conditions in a mock prisoner of war camp.  A day later,

the participants were significantly less able to identify the interrogator from the high-stress situation than the low-stress interrogator (Morgan, Hazlett, Doran, Garrett, Hoyt, Thomas, Baranoski, & Southwick, 2004).   Researchers are investigating stress hormones such as catecholamines and glucocortoids that may enhance memory at moderate levels but disrupt memory at higher levels (e.g., see Kirchbaum, Wolf, May, Wippich, & Hellhammer, 1996; Morgan, Wang, Hazlett, Rassmusson, Anderson, & Charney, 2001).

The perceptual situation is made even more difficult if a weapon is involved, for two reasons.  First, research shows that the perceiver is likely to focus his or her attention on the weapon (**weapon focus**), rather than the face of the person holding it.  Second, the presence of a weapon is likely to raise the witness's level of stress/arousal to an even higher level.  Hence, the person does not acquire a strong memory trace for the face, making subsequent identifications more difficult still (e.g., Loftus, 1979; Steblay, 1992).  Another important factor is **age**. Research shows that children may have a difficult time communicating their perceptions and observations accurately to adults.  Children also tend to be more suggestible than adults are, and are more easily swayed by what adults suggest or imply.  In addition, research indicates that elderly persons do more poorly at face recognition than do younger adults (e.g., Brigham & Williamson, 1979).

**Race** is also important, as most people show a "**cross-race effect**" (also known as the "own-race bias").  People are generallly better at identifying members of their own race than identifying members of a different race (for reviews of the research, see:  Bothwell, Brigham, & Malpass, 1989;  Brigham, Bennett, Meissner, & Mitchell, 2007; and Meissner & Brigham,

2001).  This effect is particularly strong for "false alarms", that is, when people incorrectly remember that they have seen a face before (e.g., at the crime scene), when actually they have not seen it before.

The second stage in the recognition process is **retention**, that period between the perceived event and the attempted identification.  Longer retention intervals (e.g., a week or more) lead to more identification errors than do shorter intervals (e.g., hours).  What happens during the retention interval is very important.  Memories are not stored intact like photographs or files, but rather can be modified and changed by events that occur during the retention interval.  During this period witnesses are highly ***susceptible to suggestions*** regarding their memory for the previously-viewed event.  Postevent suggestions may come from overhearing the recall of other witnesses, from media reports, or from questioning by law enforcement personnel, attorneys, or social workers (Loftus & Ketcham, 1983; Shaw et al., 1997).  For example, several studies have demonstrated that if witnesses are made aware of another eyewitness's description of the suspect, they will be biased toward selecting the member of the photo lineup who most closely matches the other witness's description, even to the extreme of selecting a lineup member who has a mustache, when the perpetrator did not have one (Jenkins & Davies, 1985; Loftus & Greene, 1980)!  This ***postevent misinformation effect*** has been shown to be quite powerful across a vast number of studies, stimuli, and situations.  Overall, it appears that individuals tend to "commit" to the postevent misinformation by accepting it as if it were a veridical account.  Researchers are not certain whether this new information changes the original memory or instead creates a new memory that "overlies" the original memory, thus making the

original memory temporarily inaccessible (for a review, see Fruzzetti et al., 1992).  But regardless of which process occurs, the result is the same—the witness's original memory is unavailable.

A phenomenon that may begin during the retention phase and then affect behavior at the retrieval phase is ***unconscious transference***.  In this instance, different memory images may become combined or confused with one another.  One outcome, sometimes termed the *bystander effect*, occurs when a witness misidentifies an individual as the actual suspect when, in reality, the witness previously saw the individual either as a bystander at the event or in a completely different context (Loftus, 1976; Ross, Ceci, Dunning, & Toglia, 1994).  And once a person has selected an incorrect person from a showup or lineup, this strongly increases the likelihood that the same individual will be selected again, in future lineups or in-court identifications, despite the inaccuracy of the original identification.  As with other misinformation, once witnesses commit to a response, even an incorrect one, they tend to respond the same way in subsequent situations.  The possibility of unconscious transference becomes stronger as the original memory trace becomes weaker.

When a witness is exposed to many faces and asked whether each is the criminal, as with mug books or repeated lineups, or exposure to the defendant at pretrial hearings or via the media, this can interfere with memory accuracy.  Each time one attempts to compare one's mental image of the criminal with a new stimulus (the photographed face) this increases the likelihood that the original memory image (of the criminal's face) will be degraded, that is, become more vague and less accurate.  Brigham and Cairns (1988) found, for example, that exposure to just 12 photos in

a mug book format substantially decreased witnesses' ability to identify the real culprit two days

later.   (See Deffenbacher, Bornstein, & Penrod [2006] for a review of this research.).

Several theoretical explanations for these phenomena have been put forth.  Some

researchers believe them to be the result of *source confusion*, a common memory error that

occurs when a person knows that a face seems familiar, but incorrectly recalls the source of that

familiarity (Lindsay, 1994).  We know from research that source information is the hardest type

of memory information to keep straight.  Virtually everyone has experienced source confusion in

everyday life, but usually the result is merely harmless embarrassment. However, when the

confusion involves the suspect in a criminal case, this error is no longer trivial.  Another

possibility involves *memory blending*, when two mental images (e.g., the criminal and a similar-

looking person seen in a showup or lineup) are mentally combined into a single memory

representation.  As a result of this "blending," the original memory of the criminal's appearance

may no longer be accessible (Brigham & Cairns, 1988; Deffenbacher et al., 2006; Gorenstein &

Ellsworth, 1981).

Still another potential problem during the retention stage occurs when a witness is asked

to construct a facial composite of the criminal, using a facial composite system (e.g.,  the FACES

program; Identi-Kit; Photofit Kit) wherein the witness selects individual facial features presented

on a computer or plastic overlays, and combines them to create an image of a face.  Research has

consistently shown that the resulting composites are seldom very accurate representations of the

target person (see Davies & Valentine, 2007, for a summary of these findings).  Indeed when

shown a facial composite of a target person, developed by an eyewitness via one of these

systems, on average people can correctly pick out the target person from a photo lineup at a rate

that is only slightly above a chance level of performance, or not above chance at all (e.g.,

Kovera, Penrod, Pappas, & Thill, 1997).  Apparently, the way that faces are represented (or

encoded) in our memories makes it very difficult to extract accurate information about specific

facial features.

      There is another problem with having someone create a facial composite, one that is

related to the general inaccuracy of such composites.  Research has shown that people who build

a facial composite of a person they have seen, are later more likely to be *unable to correctly

identify the target person from a lineup (*Wells, Charman, & Olson, 2005).  This appears to be

the result of two factors.  First, building a facial composite forces the witness to focus on

individual facial features, as they are combined to create the face.  Memory research has

consistently shown that when faces are encoded in memory using a "feature-based" encoding

system, memory for those faces is poorer than when faces are encoded as a single unit, using a

"holistic" encoding process (Brigham, 2002).  Hence, the feature-based composite systems force

people into using a relatively inefficient encoding process, creating a less-accurate memory.

      The second problem is that, because the facial composites that are created are usually

very inaccurate representations of the target person, this "new" (inaccurate) facial image may

overwhelm or change whatever facial memory previously existed.  That is, this "new" facial

memory, created through the composite process, may replace or degrade the original facial

memory, making it more unlikely that the witness would be able to correctly identify the

      The third stage in the recognition process **is <u>retrieval</u>**, wherein witnesses attempt to

retrieve their facial memory in order to make an identification.  Research has shown that the

speed at which an eyewitness makes an identification (known in psychology as *response latency*)

is related to likelihood of accuracy (Brewer, Caon, Todd, & Weber, 2006; Dunning & Peretta,

2002).  There are two reasons why this factor is difficult to apply in a specific case, however.

First, the line between what is  "fast" or "slow" apparently varies across situations, depending on

other characteristics of the situation (Brewer et al., 2006).  Secondly, in real cases there is

seldom, if ever, an independent, objective measure of response latency.  Rather, all that is

available is an estimate made by the witness or the officer who was present.  There is the

possibility of error or bias in such estimates.

On average, identifications made more rapidly are more likely to be accurate.  The

conditions surrounding the retrieval attempt strongly affect the accuracy of the resulting

identification.  The most basic step is that law enforcement should conduct an unbiased lineup,

rather than a "showup" or a biased lineup.  A showup, which involves showing a single suspect

or suspect's photo to witnesses, is inherently suggestible, since the witness has reason to believe

that the suspect is likely to be the culprit, or else the police wouldn't be showing him to the

witness.  Research has shown that a showup dramatically increases the likelihood of false

identifications, and courts have generally ruled that showup identifications are inherently

suggestive and should be avoided except in "exigent circumstances" when it is impossible to

have a lineup (e.g., United States v. Wade, , 388 U.S. 218, 1967:  Stovall v. Denno, 1967, 388

U.S. 293, 1967).

When a lineup is conducted, the composition of the lineup is critically important,

especially in terms of the suggestibility of the lineup and the way it is administered,  and the distinctiveness of lineup members.  Ideally, a lineup containing one suspect and five or more foils (other members) should be used.  In theory, a <u>fair</u> lineup is one in which the suspect is not <u>distinctive</u>, that is, does not stand out from the other lineup members in any way (Doob & Kirschenbaum, 1973; Wells, Leippe, & Ostrom, 1975).  One aspect of distinctiveness is whether the other members of the lineup fit the general description of the criminal to the same degree that the suspect does.  If this is not the case, that is, if the suspect fits the description more closely, then the witness may pick the suspect from the lineup only because he is the one who looked <u>most</u> <u>similar</u> to the criminal.

Another type of distinctiveness is when the suspect's appearance, or the appearance of his photo, differs in some <u>other</u> way (i.e., is distinctive) from all of the other lineup members. Witnesses may use this distinctiveness as a cue to who is the "odd man out" and focus their attention on the suspect, leading to a positive identification. Research clearly shows that lineups that are biased (unfair) in these ways produce substantially higher rates of mistaken identifications than do fair lineups (Brigham, Meissner, & Wasserman, 1999; Brigham & Pfeifer, 1994; Brigham, Ready, & Spier, 1990).

Research has shown that biased instructions that imply that the perpetrator is in the lineup produce a greater probability of false identifications (Clark, 2005; Steblay, 1997).  Hence, recommended procedures for the proper administration of lineups stress that it should be made clear to witnesses that the criminal <u>may or may not be present</u> in the lineup, so that the witness does not feel compelled to select someone from the lineup.  This is explicitly recommended in

the *National Guidelines for the Collection and Preservation of Eyewitness Evidence* (U. S. Department of Justice, 1999). This is to ensure that witnesses do not treat the lineup situation like a "multiple-choice test" ("Which one is the criminal?"), but instead treat it like a "true/false test" ("Is the criminal in the lineup?").

Intentional or unintentional verbal and nonverbal cues given by others in the situation (law enforcement personnel, attorneys, other witnesses) can also significantly bias recognition accuracy. Further, many witnesses feel strong pressure to make a positive identification, whether the pressure comes from law enforcement officials, others (e.g. concerned friends, other witnesses, or family members), or from themselves (e.g., a desire to be a "good witness" and help the police). These pressures increase the chances of false positive identifications if the perpetrator is not present in the lineup.

A particularly troublesome instance is when someone witnesses a crime and then identifies a suspect in a biased identification situation. Even if the biased identification is later suppressed, any identification that occurs after the biased identification is no longer valid, scientifically speaking. The problem is that no-one, not even the witness himself or herself, can know, from the point of the biased identification situation onward, whether any subsequent identification of the suspect occurs because that is the criminal, or because that is the suspect's face that was seen at the earlier biased lineup up or showup. Even though the witness may try very hard to forget or ignore the earlier biased identification situation and remember only the crime, this is an impossible task--the human perceptual system does not function this way. In cases where the suspect was not the criminal, there is a strong likelihood of unconscious

transference - the witness may mentally transfer the suspect's face to his memory of the crime and the criminal.

Consequences of making an identification can change one's memory of the entire situation. Recent research has shown that once an eyewitness has been told that he or she picked the suspect from the lineup (i.e., that his/her lineup choice was "correct" in the eyes of law enforcement), this both (a) increases the eyewitness's certainty about the identification, and (b) causes the eyewitness to remember the witnessing conditions (e.g. opportunity to observe the criminal) as having been more favorable than was previously remembered (Wells & Bradfield, 1998).  Indeed, just telling someone that "You appear to have a good memory" can cause them to think that they had a better opportunity to see the perpetrator (Coddington & Brigham, 2000).

One might think that the witnesses' degree of certainty about his or her identification would be a good indication how likely it is that the identification was correct.  However, results of over 35 staged-event research studies that have examined this question show that there is only a very weak relationship between witnesses' degree of certainty and their identification accuracy (Bothwell, Deffenbacher, & Brigham, 1987).  On the average, a witness who is very certain of his identification is only slightly more likely to be accurate than is a witness who is unsure of his identification.  Hence, the U.S. Supreme Court's 1972 recommendation in Neil v. Biggers (409 U.S. 188, 93 S.Ct. 375, 34 L.Ed. 401) that level of certainty should be used as an indicator of probable accuracy is **not** supported by research findings.

Taken together these factors, and others, illustrate why an eyewitness to a crime faces such a difficult task when later attempting to make an identification.  The task is already a

difficult one, and in many crimes there are additional factors (e.g. stress, presence of a weapon, intervening exposure to the suspect or his photo, suggestibility of the lineup) that make the task even more difficult.  Detailed information on all of these factors can be found in several books (Cutler & Penrod, 1995; Loftus, 1979; Ross et al., 1994; Sporer et al., 1996; Wells & Loftus, 1984, and Yarmey, 1979); and review articles by Brigham (1989), Brigham and Hyme (2001), and Brigham, Wasserman, and Meissner (1999).

Research has shown that knowledge about such factors is *not* within the "common knowledge" of witnesses or jury members (Benton et al, 2005; Brigham & Bothwell, 1983; Schmechel et al, 2006).  Although people are aware that eyewitness identifications can be wrong, research indicates that most people seriously underestimate how frequently eyewitnesses make incorrect identifications (Brigham & Bothwell, 1983; Loftus, 1979).  Furthermore, jurors are not aware of the ways that specific factors are related to eyewitness accuracy.  Scientific research has found out a great deal in the past three decades about factors affecting the accuracy of eyewitness identifications.  Expert testimony by a researcher can be extremely helpful to jurors who must evaluate eyewitness evidence in the trial context.  The denial of such expert testimony can seriously detract from the likelihood that jurors will evaluate eyewitness evidence in the most fair and appropriate manner.

### Factors of particular relevance to the 1984 *Fontenot* case

There were several eyewitnesses in the *Fontenot* case, each of whom faced a situation, that included several factors that would have made it difficult for them to encode an accurate facial memory of the men that they encountered.  My analysis of these situational factors is

17

based upon study of the following materials supplied to me by Tiffany R. Murphy, Professor and

Director of the Oklahoma Innocence Project: Investigative Reports from the Ada, Oklahoma

Police Department and the Oklahoma State Bureau of Investigation; Supplemental Memos from

the Ada Police Department; Black-and-white photos that were included in the photo lineups that

were shown to witnesses; Color photos of the 7-person physical (live) lineup employed;

Prosecutorial Summary from the Oklahoma State Bureau of Investigation; Composite sketch and

flier; Transcripts of hypnosis sessions with witnesses David Timmons and Lenny Timmons;

Lineup Reports and Physical Lineup Supplemental Memo from the Ada Police Department; and

transcripts of testimony at a hearing and at trial by agent Richard Holkum, and by witnesses

Karen Wise, James Moyer, Gene Whechel, David Timmons, and Lenny Timmons.

On April 28, 1984, Witnesses Whechel and David and Lenny Timmons saw a man and a

woman leave a convenience store, McAnally's, as they were approaching the store. The man

and woman got in the passenger door of a nearby pickup truck, which then drove away. These

witnesses had no reason to pay any particular attention to the facial appearance of the two

people, since they were not yet aware that an abduction was occurring. Witness James Moyer

was inside McAnally's, having purchased cigarettes, and saw two men enter the store. He

looked at them briefly, thought that one of them was acting suspiciously, and then left the store.

Moyer called the police some days later after he saw a composite sketch  on television and

thought that it looked similar to one of the men he had seen inside McAnally's.  Witness Karen

Wise worked at J. P.'s Pak-To-Go, a combination convenience store and pool hall about 0.3

miles away from McAnally's.  She observed two men playing pool at the establishment on the

same day.  The authorities believed that the same two men, Karl Fontenot and Tommy Ward, had been playing pool and had also abducted and later raped and murdered Donna Haraway, a clerk at McAnally's.

There were several factors that would have made it difficult for these witnesses to encode a strong and accurate facial memory of the men that they saw.  Whechel and the Timmons brothers saw the man and woman for only a brief period of time as they exited McAnally's and walked to the truck.   The man and woman were in motion the whole time, and it is more difficult to encode an accurate facial image of a person who is in motion than of a person who is standing still.  Moyer also saw two people who were in motion, inside the store.  Additionally, the fact that there were two people would produce a situation of divided attention, since the witnesses would have had to divide whatever brief time they observed the two people between looking at the face of one and at the face of the other.

The conditions under which Fontenot was identified are problematic.  Witnesses Moyer, and David and Lenny Timmons were unable to identify Fontenot in a 7-person physical (live) lineup that they were shown more than *six months* after the crime.  This is a very long retention interval, leaving time not only for forgetting to occur, but also time for other factors to bias witnesses' memories.  As an example of significant bias, witness Whechel was shown photos of the two suspects, and also watched the police photograph the suspects, ***before*** he saw the lineup.  Even under these very suggestive, biasing conditions, Whechel was not able to identify the suspects.  Karen Wise did pick Fontenot from the live lineup as one of the men she had seen playing pool over six months before.  I did not encounter any information on what instructions

were given to each witness before he or she viewed a photograph lineup and/or a live lineup.  As noted earlier, the type of instructions given (or not given) can be a significant source of bias and error in eyewitness identifications.

In my professional judgment, it would have been appropriate for the defense to call an eyewitness memory expert to explain to the jury why these factors are important in evaluating the likely accuracy of someone's facial memory.  The expert would not have commented directly on the memories of these particular witnesses, since to do so would invade the province of the jury.  But as noted above, research has shown that knowledge about the factors that usually influence the accuracy of a person's facial memory is not within the "common knowledge" of most witnesses or jury members.  Although people are aware that eyewitness identifications can be wrong, research indicates that most people seriously underestimate how frequently eyewitnesses make incorrect identifications.  Furthermore, as noted, most jurors are not aware of the ways that specific factors are related to eyewitness accuracy.  After scientific research-based information on eyewitness memory has been provided in the expert testimony, the jurors can then decide how relevant it is to the present case, and what use they wish to make of it.  In this manner, expert testimony by a researcher can be extremely helpful to jurors who must evaluate eyewitness evidence in the trial context.

Scientific research has found out a great deal in the past several decades about factors that affect the accuracy of eyewitness identifications.  The state of the science in 1984, the date of the trial, was still evolving, but there had already been published several scientific books on eyewitness memory that summarized the empirical research up to that point in time.  These

include research-based books on eyewitness memory by Loftus (1979), Yarmey (1979), Clifford and Bull (1978), and Lloyd-Bostock and Clifford (1983).  The legal system was becoming increasingly aware of the serious problems with eyewitness memory, as evidenced in an early book by Borchard (1932) and later books by Wall (1965) and Judge Nathan Sobel (1972; 1975).  As noted earlier, legal observers in the 1960s had pointed out that far more cases of erroneous convictions had been caused by mistaken eyewitness identifications than by *all other types of factors combined.*  In 1967, the U. S. Supreme Court repeated this assertion in its **United States v. Wade** decision.

In my professional judgment, expert testimony in this case, testimony that would provide jurors with the most important research findings about the above factors, would have given them useful information.  This information can give jurors a valid  "frame of reference", one that is based on accurate scientific knowledge, which provides an appropriate basis for evaluating the eyewitness evidence and deciding how much weight to give to it.  As far as I am aware, the defense did not seek to call an eyewitness expert in the *Fontenot* case, although such expert witnesses were being called with increasing frequency in the U. S. by 1984.  (As a case in point, I  first testified before a jury as an eyewitness expert in 1982).  Failure to call such an expert witness indicates, in my professional judgment, that the defense was unaware of, or chose not to pursue, a step that could have been very important in providing a complete defense, one in which the jurors would apply the appropriate level of scrutiny to  questionable eyewitness evidence.

## Works Cited

Benton, T. R., Ross, D. F., Bradshaw, E., Thomas, W. N., & Bradshaw, G.  (2005).  Eyewitness memory is still not common sense:  Comparing jurors, judges, and law enforcement to eyewitness experts. *Applied Cognitive Psychology, 20,* 115-129.

Borchard, E. M. (1932), *Convicting the innocent:  Errors of criminal justice*.  New Haven: Yale University Press.

Bothwell, R. K., Brigham, J. C., & Malpass, R. S. (1989).  Cross-racial identifications. *Personality and Social Psychology Bulletin, 15,* 19-25.

Bothwell, R. K., Deffenbacher, K. A., & Brigham, J. C. (1987).  Correlation of eyewitness accuracy and confidence: Optimality hypothesis revisited.  *Journal of Applied Psychology, 72,* 691-695.

Brewer, N., Caon, A., Todd, C., & Weber, N.  (2006).  Eyewitness identification accuracy and response latency.  *Law & Human Behavior, 30,* 31-50.

Brigham, J. C. (1989).  Disputed eyewitness identifications: Can experts help?  *The Champion, 8(5)*, 10-18.

Brigham, J. C. (2002).  Face identification: Basic processes and developmental changes.  In M. L. Eisen, J. A. Quas, & G.S. Goodman (Eds.), *Memory and suggestibility in the forensic interview* (pp. 115-140).  Mahwah, NJ: Lawrence Erlbaum.

Brigham, J. C., Bennett, L. B., Meissner, C. A., & Mitchell, T. L. (2007). The influence of race on eyewitness memory.  In R. C. L. Lindsay, D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *Handbook of eyewitness psychology.  Volume 2: Memory for people* (pp. 257-281).  Hillsdale, NJ: Lawrence Erlbaum.

Brigham, J. C., & Bothwell, R. K. (l983).  The ability of prospective jurors to estimate the accuracy of eyewitness identifications.  *Law and Human Behavior, 7,* 19-30.

Brigham, J. C., & Brandt, C. C. (1992).  Measuring lineup fairness: Mock witness responses vs. direct evaluations of lineups.  *Law and Human Behavior, 16,* 475-489.

Brigham, J. C., & Cairns, D. (1988).   The effect of mugshot inspections on eyewitness identification accuracy. *Journal of Applied Social Psychology, 16*, 1394-1410.

Brigham, J. C., & Hyme, H. S. (2001).   Dealing with fallible eyewitness evidence: How scientific research and expert testimony can help, Part I.  *The Trial Lawyer, 24,* 301-307.

Brigham, J. C., Meissner, C. A., & Wasserman, A. W. (1999).  Applied issues in the construction and expert assessment of photo lineups.  *Applied Cognitive Psychology, 13,* S73-S92.

Brigham, J. C., & Pfeifer, J. E. (1994).  Evaluating the fairness of lineups.  In D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (pp. 201-222).  Cambridge: Cambridge University Press.

Brigham, J. C., Ready, D. J., & Spier, S. A. (1990).  Standards for evaluating the fairness of photograph lineups. *Basic and Applied Social Psychology, 11*, 149-163.

Brigham, J. C., &  Spier, S. A. (1992).  Opinions held by professionals who work with child witnesses.  In H. R. Dent and R. Flin (Eds.), *Children as witnesses* (pp. 93-111). Chichester, England: Wiley.

Brigham, J. C., Wasserman, A. W., & Meissner, C. A. (1999).  Disputed eyewitness identification evidence:  Important legal and scientific issues. *Court Review, 36(2),* 12-25.

Brigham, J. C., & Williamson, N. L. (l979).  Cross-racial recognition and age: When you're over 60, do they still "all look alike"? *Personality and Social Psychology Bulletin, 5,* 2l8-222.

Clark, S. E.  (2005).  A re-examination of the effects of biased lineup instructions in eyewitness identification. *Law & Human Behavior, 29,* 575-604.

Clifford, B. R., & Bull, R. (1978).  *The psychology of  person identification*.  Boston: Routledge & Kegan.

Coddington, K. A., & Brigham, J. C.  *The malleability of  eyewitness metamemory judgments: The effect of question difficulty*.  Poster presentation, American Psychology-Law Society meeting, New Orleans, LA, March 2000.

Connors, E., Lundregan, T., Miller, N., & McEwan, T. (1996).  *Convicted by juries, exonerated by science: Case studies in the use of DNA evidence to establish innocence after trial.* Alexandria, VA: National Institute of Justice.

Cutler, B. L., & Penrod, S. D. (1995).  *Mistaken identification: The eyewitness, psychology, and the law*.  Cambridge: Cambridge University Press.

Davies, G. M., & Valentine, T. (2007). Facial composites:  Forensic utility and psychological research.  In R. C. L. Lindsay, D. F. Ross, J. D. Read, & M. P. Toglia (Eds.), *Handbook of eyewitness psychology.  Volume 2:  Memory for people* (pp. 59-83).  Mahwah NJ: Lawrence Erlbaum.

Deffenbacher, K. A. (1983). The influence of arousal on relaiability of testimony.  In S. M. A. Lloyd-Bostock & B. R. Clifford (Eds.), *Evaluating witness evidence* (pp. 235-251). New York: Wiley.

Deffenbacher, K. A., Bornstein, B. H., & Penrod, S. D. (2006).  Mugshot exposure effects: Retroactive interference, mugshot commitment, source confusion, and unconscious transference.  *Law and Human Behavior, 30*, 309-328.

Deffenbacher, K. A., Bornstein, B. H., Penrod, S. D., & McGorty, E. K. (2004).  A meta-analytic review of the effects of high stress on memory.  *Law and Human Behavior, 28*, 687-706.

Doob, A. N., & Kirschenbaum, H. M. (1973).  Bias in police lineup – partial remembering.  *Journal of Police Science and Administration, 1,* 287-293.

Dunning, D., & Perretta, S. (2002).  Automaticity and eyewitness accuracy:  A 10- to 12-second rule for distinguishing accurate from inaccurate positive identifications.  *Journal of Applied Psychology, 87,* 951-962.

Fruzzetti et al. (1992).  Memory and eyewitness testimony.  In M. M. Gruneberg & P. E. Morris (Eds.), *Aspects of memory: The practical aspects* (pp. 18-35).  Chichester: Wiley.

Gorenstein, G. W., & Ellsworth, P. (1980).  Effect of choosing an incorrect photograph on a later identification by an eyewitness.  *Journal of Applied Psychology, 65*, 616-622.

Hosch, H. M., Beck, E. L., & McIntyre, P. (1980).  Influence of expert testimony regarding eyewitness accuracy on jury decisions.  *Law and Human Behavior, 4,* 287-296.

Huff, R., Rattner, A., & Sagarin, E. (1996).  *Convicted but innocent: Wrongful conviction and public policy*. Thousand Oaks, CA: Sage.

Jenkins, F., & Davies, G.  (1985).  Contamination of facial memory through exposure to misleading composite pictures.  *Journal of Applied Psychology, 70,* 164.

Kassin, S. M., Hosch, H. M., & Memon, A.  (2001).  On the "general acceptance" of eyewitness testimony research.  *American Psychologist, 56*, 405-416.

Kirchbaum, C., Wolf, O. T., May, M., Wippich, W., & Hellhammer, D. H. (1996).  Stress and treatment induced elevations of cortisol levels associated with impaired declarative memory in healthy adults.  *Life Sciences, 58*, 1475-1483.

Kovera, M. B., Penrod, S. D., Pappas, C., & Thill, D. L.  (1997).  Identification of computer-generated facial composites.  *Journal of Applied Psychology, 82*, 235-246.

Leippe, M. R., Brigham, J. C., Cousins, C., & Romanczyk, A. (1989).  The opinions and practices of criminal attorneys regarding child eyewitnesses:  A survey.  In S. J. Ceci, D. F. Ross, & M. P. Toglia (Eds.), *Perspectives on children's testimony* (pp. 100-130).  New York: Springer-Verlag.

24

Lindsay, D. S. (1994).  Memory source monitoring and eyewitness testimony. In D. F. Ross, D. J. Read, & M. P. Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (pp. 27-55).  Cambridge: Cambridge University Press.

Lindsay, R. C. L., Ross, D. F.,. Read, J. D, & Toglia, M. P (Eds.).  *Handbook of eyewitness psychology.  Volume II: Memory for people.*  Hillsdale, NJ: Lawrence Erlbaum.

Lloyd-Bostock, S. M. A., & Clifford, B. R. (Eds.) (1983). *Evaluating witness evidence: Recent psychological research and new perspectives.* Chichester: Wiley.

Loftus, E. F. (1976).  Unconscious transference. *Law and Human Behavior, 2,* 93-98.

Loftus, E. F. (1979).  *Eyewitness testimony*. Cambridge, MA: Harvard University Press.

Loftus, E. F., & Greene, E.  (1980).  Warning: Even memory for faces may be contagious. *Law and Human Behavior, 4,* 323-334.

Loftus, E. F., & Ketcham, K. (1983).  The malleability of eyewitness accounts.  In S. Lloyd-Bostock & B. Clifford (Eds.), *Evaluating witness evidence: Recent psychological research and new perspectives* (pp. 159-171).  Chichester, Wiley.

Malpass, R. S., & Kravitz, J.  (1969).  Recognition for faces of own and other race.  *Journal of Personality and Social Psychology, 13,* 330-334.

Meissner, C. A., & Brigham, J. C. (2001).  Thirty years of investigating the own-race bias in memory for faces: A meta-analytic review. *Psychology, Public Policy, and Law,  7,* 3-35.

Morgan, C. A. III, Hazlett, G., Doran, A., Garrett, S., Hoyt, G., Thomas, P., Baranoski, M., & Southwick, S. M. (2004).  Accuracy of eyewitness memory for persons encountered during exposure to highly intense stress.  *International Journal of Law and Psychiatry, 27,* 265-279.

Morgan, C. A. III, Wang, S., Hazlett, G., Rassmusson, A., Anderson, G., & Charney, D. S. (2001).  Relationships among cortisol, catecholamines, neuropeptide Y and human performance during uncontrollable stress.  *Psychosomatic Medicine, 63,* 412-442.

*Neil v. Biggers.*  409 US 188 (1972).

Ross, D. F., Ceci, S. J., Dunning, D., & Toglia, M. P. (1994).  Unconscious transference and lineup identification: Toward a memory blending approach.  In D. F. Ross, D. J. Read, & M. P. Toglia (Eds.), *Adult eyewitness testimony: Current trends and developments* (pp. 80-100).  Cambridge: Cambridge University Press.

Ross, D. F., Read, D. J., & Toglia, M. P. (Eds.) (1994). *Adult eyewitness testimony: Current trends and developments.* Cambridge: Cambridge University Press.

Scheck, B., Neufeld, P., & Dwyer, J. (2001). *Actual innocence: When justice goes wrong and how to make it right.* New York: Signet.

Schmechel, R. S., O'Toole, T. P., Easterly, C., & Loftus, E. F. (2006). Beyond the ken? Testing jurors' understanding of eyewitness reliability evidence. *Jurimetrics, Winter,* 177-214.

Shaw, J. S. III, Garven, S., & Wood, J. M. (1997). Co-witness information can have immediate effects on eyewitness memory reports. *Law and Human Behavior, 21,* 503-524.

Sobel, N. R. (1972). *Eye-witness identification: Legal and practical problems.* New York: Clark Boardman.

Sobel, N. R. (1975). *1976 supplement to Eye-witness identification: Legal and practical problems.* New York: Clark Boardman

Sporer, S. L., Malpass, R. S., & Koehnken, G. (1996) (Eds.). *Psychological issues in eyewitness identification.* Mahwah, NJ: Lawrence Erlbaum Associates.

Steblay, N. M. (1992). A meta-analytic review of the weapon focus effect. *Law and Human Behavior, 16,* 413-424.

Steblay, N. M. (1997). Social influence on eyewitness recall: A meta-analytic review of lineup instructions effects. *Law and Human Behavior, 21*, 283-297.

U. S. Department of Justice (1999). *National Guidelines for the Collection and Preservation of Eyewitness Evidence.* Washington, DC: National Institute of Justice.

*United States v. Wade* (1967), 388 U.S. 218.

Wall, P. C. (1965). *Eyewitness identification in criminal cases.* Springfield, IL: Charles C. Thomas.

Wells, G. L., & Bradfield, A. L. (1998). "Good, you identified the suspect": Feedback to eyewitnesses distorts their reports of the witnessing experience. *Journal of Applied Psychology, 83*, 360-376.

Wells, G. L., Charman, S. D., & Olson, E. A. (2005). Building face composites can harm lineup identification performance. *Journal of Experimental Psychology: Applied, 11*, 147-156.

Wells, G. L., Leippe, M. R., & Ostrom, T.M.  (1975).  Guidelines for empirically assessing the fairness of a lineup.  *Law and Human Behavior, 3,* 285-293.

Wells, G.L., & Loftus, E.F. (Eds.) (1984).  *Eyewitness testimony: Psychological perspectives.* Cambridge: Cambridge University Press.

Yarmey, A. D. (1979).  *The psychology of eyewitness testimony*.  New York: Free Press.

Yarmey, A. D., & Tressillion Jones, H. P. (1983).  Is the psychology of eyewitness identification a matter of common sense?  In S. M. A. Lloyd-Bostock & B. R. Clifford (Eds.), *Evaluating witness evidence: Recent psychological research and new perspectives* (pp. 13-40).  New York: Wiley.

Yerkes, R. M., & Dodson, J. D. (1908).  The relation of strength of stimulus to rapidity of habit formation.  *Journal of Comparitive Neurology and Psychology, 18*, 459-482.