# EXHIBIT

# 29

## OKLAHOMA STATE BUREAU OF INVESTIGATION

### INVESTIGATIVE REPORT

PAGE _____ OF_____

| Case: OK 6L4-03S | Reporting Date: MAY 11, 1984 | Reporting Agent(s): GARY ROGERS | | | Reviewed By: DB |
|---|---|---|---|---|---|
| **Offense:** KIDNAPPING/ROBBERY | | **Case Agent:** GARY ROGERS | **Office:** ADA | **Typed By:** BM | **Date:** |
| **Subject:** UNKNOWN | | **Activity:** Investigation and Interviews | | | |

VICTIM:   DONNA DENISE HARAWAY

On April 28, 1984, at approximately 9040 hours, DONNA DENISE HARAWAY, WF, 24yoa, DOB: 8/18/59, 5'5", 110 lbs., blonde hair, was robbed and abducted from McAnally's Convenience Store in Ada, Oklahoma.  Two white male subjects, possibly in a late '60 or early '70 Chevrolet pickup, rough condition, light color, with gray primer spots, are possible suspects in this abduction and robbery.

Suspect #1 is described as WM, early 20's, 6'-6'3", slender build, sandy brown hair, shoulder length, slightly wavy, green or blue eyes, fair complexion, noticeable dark hair, wearing a light blue t-shirt and blue jeans.

Suspect #2 is described as WM, early 20's, 5'8", medium athletic build, light blonde hair, collar length, straight, fair complexion, slight acne on cheeks, wearing white jersey type t-shirt and faded blue jeans.

On May 8, 1984, Deputy Inspector DEWALD LANGLEY contacted Special Agent GARY DAVIS and requested that Agent DAVIS contact Special Agent GARY ROGERS to receive information in regard to conducting an interview of a subject in custody in Amarillo, Texas.

On May 3, 1984, Agent GARY ROGERS informed Agent DAVIS that FLOYD LEE DEGRAW, WM, 6'2', 150 lbs., brown hair, hazel eyes, was in custody in Amarillo, Texas, after being arrested in a stolen car from Michigan, and at the time of arrest, DEGRAW had identification belonging to a lady in Ada, Oklahoma.  Agent ROGERS informed Agent DAVIS that Randall County, Texas, Deputy JOEL RICHARDSON, Telephone #(806)/358-3215, or #806/655-2573, would have the details and information in regard to the arrest of DEGRAW.  Agent ROGERS requested that Agent DAVIS interview DEGRAW and determine where DEGRAW was on Saturday, April 28, 1984, at approximately 1000 hours, and to obtain photographs, major case prints from DEGRAW, and to determine how DEGRAW came into possession of the lady's identification from Ada, Oklahoma.  The identification is of a

Leads:

FOR INTERNAL USE ONLY
NOT FOR DISSEMINATION

0900

CP #[illegible]
Investigation and Interview
Page 2

person unrelated to the victim in this case.

On May 4, 1984, Agent DAVIS traveled to Canyon, Texas, to interview FLOYD LEE DEGRAW. Agent DAVIS read DEGRAW his Miranda Rights from a card in possession of Agent DAVIS, and DEGRAW provided the following information after being advised of his rights:

DEGRAW identified himself as FLOYD LEE DEGRAW, WM, DOB: 9/13/63, 6'2", 175 lbs., hazel eyes, brown hair, with several tattoos. Some of the tattoos are as follows: "FL" right lower outside arm, "HJ" left outer lower arm, "GA" upper left arm; a drawing of an eagle on upper right arm; "JJMI" right groin area. His social security number is 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, PHN: Detroit Michigan. He is divorced and has one son. DEGRAW stated that his hair is normally a lighter brown than it is at this time. DEGRAW's father is FLOYD DEGRAW, deceased, mother is BARBARA JUANITA WHITE, 434 union Drive, Princeton, West Virginia. His ex-wife is PATTY AKERS; son is FLOYD RAY AKERS, age 2 years, 3 months. DEGRAW stated that he has felony charges in West Virginia, and has served three years for malicious wounding, and is not wanted at this time.

DEGRAW stated he left home (his mother's address in Princeton, West Virginia) on March 31, 1984, and traveled to Detroit, Michigan, by bus. DEGRAW started out hitchhiking and then decided to take a bus to Detroit, Michigan. DEGRAW stayed in Detroit for a few weeks, staying with a CAROL KINMAN on Heldon Avenue, which is located off of 2nd Street. DEGRAW also stayed with PAUL DUNN who was living at Howard Johnson Motor Lodge in Monroe, Michigan. DEGRAW then stayed with BENJAMIN DUNN in Detroit. DEGRAW described DUNN as being a "queer". DEGRAW took DUNN's 1984 Renault and drove it from Detroit toward Memphis, Tennessee.

DEGRAW picked up a hitchhiker at Toledo, Ohio, and the hitchhiker, JEFF JOHNSON, had a friend who lived in Memphis, Tennessee, by the name of GRANT, GORDY's telephone number, which DEGRAW had written down, is 683-6447. DEGRAW and JOHNSON stayed at GORDY's house most of the day on Friday, April 27, 1984. DEGRAW and JOHNSON left GORDY's house about midnight on that Friday.

DEGRAW stated that JOHNSON had been planning on going to Florida and DEGRAW was just driving around, possibly going to Florida, but they decided to go to California as JOHNSON had never been west and DEGRAW had never been to California.

From Memphis, Tennessee, DEGRAW and JOHNSON traveled I-40 all the way to California. DEGRAW was stopped by the

police somewhere in Arkansas, but MCGRAW did not receive a traffic ticket. The officer made the hitchhiker, JEFF JOHNSON, drive as JOHNSON has a Mississippi driver's license and MCGRAW did not have a driver's license as he had lost it on a DUI charge.

JOHNSON had told MCGRAW that he had just gotten out of prison in Michigan approximately a month ago. While enroute to Los Angeles, California, MCGRAW stated that they never got off I-40. MCGRAW also stated that he had received a traffic ticket in California for speeding on April 30, 1994. MCGRAW stated that as he traveled from Memphis to Los Angeles, he had picked up a man and woman hitchhiker who were coming from Florida. The man and woman were picked up on I-40 and MCGRAW believes he picked them up around the Fargo, Texas, area. MCGRAW stated that prior to leaving Arkansas they had stopped at Little Rock, Arkansas to buy gasoline and MCGRAW was asleep before they got into Oklahoma and did not wake until they were leaving Oklahoma. JOHNSON was driving the car at this time and when MCGRAW woke up, he asked JOHNSON where they were and JOHNSON said they were just leaving Oklahoma. MCGRAW stated that the Renault they were driving could travel about 300 miles on one tank of gas, and MCGRAW stated that he was not sure where they bought gasoline in Oklahoma. MCGRAW further stated that it took four days to drive from Detroit to California, and the route they took they drove across Texas to Gallup, New Mexico, and at a big truckstop in Gallup, New Mexico, along I-40, MCGRAW let the man and woman off. The man and woman were both white and in their mid 40's and were not carrying any luggage. They were going to Las Vegas, Nevada as the female had a brother who lived in Las Vegas and they were going to get work. MCGRAW denies ever being in Oklahoma before and stated that JOHNSON said he had never been west before. MCGRAW stated that he and JOHNSON stayed in rest areas for a few minutes at a time and that they were stopped at "little stores" to get sandwich makings. MCGRAW is sure JOHNSON never left I-40 because of the way JOHNSON drove, that when he took the exit ramp off the interstate, he would go at a high speed, and MCGRAW knew this would have woken him up, therefore, he is sure they did not leave I-40 at any time in Oklahoma.

MCGRAW denies that he or JOHNSON had any weapons and they both carried their personal clothing in the same bag which was a brown "satchel". MCGRAW described the satchel as being like a brown gym bag that belonged to JOHNSON. MCGRAW also stated that after he and JOHNSON split in Los Angeles, California, he (MCGRAW) took his clothing out of JOHNSON's bag and put it in a box in the trunk of the car. MCGRAW stated that he and JOHNSON split in California because he and JOHNSON got into a fight and JOHNSON hit MCGRAW in

After being turned by the Blacks, at which time DECRAW stated that they took everything he had and even tried to rummage his boots, DECRAW stated, "Well, I received my tax refund the day after I was robbed, and an ex-girlfriend of mine named MARY JANE MILLER said she tax refund to me." Upon questioning, DECRAW stated that MARY JANE MILLER lived in Connecticut, but is did not know her address nor even what town she lives in. DECRAW stated that actually it was her that refund, but that she had visited MILLER as a dependent as he had been living with her in Florida and in Georgia,  . . . and it was the money that she had received from her tax return by claiming him as a dependent that she sent to MILLER. DECRAW described her as being approximately five, and also said that she mailed the money to his general delivery in Detroit.

Upon questioning MILLER as to how she would have known where he was, DECRAW stated that MILLER had called his mother and found out where he was. Then Agent DAVIS informed DECRAW that he had stated his mother did not have a telephone, then DECRAW stated that MILLER wrote a letter to his mother and his mother wrote a letter back to MILLER telling her that he was in Detroit.

DECRAW also stated that JEFF JOHNSON had approximately 50 dollars with him as they traveled from Memphis to the state of California. DECRAW denies ever committing any robberies along the way and stated that he had the money with him when he left the Detroit area.

On May 4, 1984, at approximately 1410 hours, DECRAW signed a consent to obtain samples of hair and blood. Samples of head hair and pubic hair were received from DECRAW and Deputy RICHARDSON took DECRAW to a clinic and had blood drawn which was later turned over to Agent DAVIS.

Also on May 4, 1984, the 1984 Renault which was being held by the Shamrock, Texas, Police Department, was processed by OSBI personnel JAMIE ENOS. This 1984 silver AMC Renault 4-door, with 1985 Michigan license plate #726-BXO, VIN #1XMDC8250MK187082, was registered to American Motors Sales Corporation, 1406 Plymouth Road, Detroit, Michigan. The Shamrock Police Department recovered this automobile at the time they arrested DECRAW on rape charges out of Randall County, Texas, on May 3, 1984. The Renault was reported stolen from BENJAMIN BLAU to the Detroit Police Department. The Detroit Police Department refused to enter it in NCIC or make a stolen report as BLAU had given the keys to DECRAW and allowed him to drive the car and DECRAW failed to return the car.

As OSBI personnel JAMIE processed the car in Shamrock, Texas, the following items were discovered and taken

as evidence:

1. One red and white plaid flannel shirt, size 16.
2. Blood on the back window.
3. Woman clothing.
4. An unused tampon.
5. Pubic hair.
6. A Diamond Shamrock credit card which was found on the front floor.
7. A brown wallet with the following identification in it: TAMI STAN WILETT, SSN: 44?-7?-?77?, Rt. #1, Ada, Oklahoma, 74820. Telephone ???-????. Checking account-Oklahoma State Bank, Ada, Oklahoma, account #??????7. The last check written out of the checkbook was #?40.
?. A brown purse with the following items in it: a Continental Convenience card in the name of REBECCA SCOTT, and a Fillaris credit card in the name of HAMILTON D. SCOTT. Oklahoma driver's license, #????????, in the name of REBECCA LYNN SCOTT, female, DOB: 10/1/62, 4'11", 125 lbs., brown eyes, address-??07 "A", East ??th Place, Tulsa, Oklahoma, 74133.
8. Two gym bag with a prescription on the tag from the Veterans Administration Medical Center, Oklahoma City, Oklahoma, 73104, Telephone #??6/272-?878, ext. 53?. A prescription #?????6 dated 1/30/?6 in the name of J. BUTLER for the drug ????? prescribed by DR. BARKER.
10. Green military coffee bag with the name stenciled on it, e.g. WANDKA. Inside the bag in the name WDAN. Also stenciled on the bag was SSN 36?-74-77?3. Inside the bag among the items was a cigarette lighter with the inscription of "USS JAMES BUTLER, DRIAN WALSH, and KIMBERLY."

On May 7, 1984, Agent DAVIS transported the following evidence to the OSBI Laboratory in Oklahoma City:

1. One pair of blue jeans with blood on them, brand name Sta-Prest by Levis.
2. Head hair from suspect FLOYD LEE DEGRAW and pubic hair from suspect DEGRAW.
3. The set of major case prints of the suspect's left and right hands.
4. Box which contained one vial of serum which was extracted from DEGRAW's blood by the clinic in Canton, Texas, one vial of blood from DEGRAW which had anti-coagulant in it, and two vials of blood which were extracted from suspect DEGRAW in Canton, Texas.

On May 8, 1984, Agent DAVIS contacted the FBI in Oklahoma City and made a written request for OSBI assistance in identifying DEGRAW. Agent DAVIS took copies of fingerprints from the major case prints to FBI Headquarters in Oklahoma City and via FBI photo-faxed the fingerprints and sent them to Washington D.C. The return from Washington D.C.

0906

SF 7-61-804
Investigative Report Inventions
Page 5

as given to Agent DAVIS by FBI Agent JIM MOALA reflected
that the fingerprints did belong to FLOYD LEE MCGRAW, DOB:
#8117382, DOB: 2/13/53, POB: Michigan, SEX: M72-49-8755.
FBI records reflect that on 9/21/79 MCGRAW was arrested
by Detroit P.D., their case #1452189, state #264756, charging
MCGRAW with fugitive from justice, and disposition showed
that he was transported to Charleston, West Virginia.

On 7/15/81 Princeton, West Virginia, Police
Department, case #303, charging MCGRAW with transferring
stolen property, no disposition. April 24, 1983, Jacksonville,
Florida, Sheriff's Office, case #P85531, Florida state case
#1873641, charging MCGRAW with disorderly intoxication, no
disposition.

A telephone record check of MCGRAW in the state
of Michigan reflects MCGRAW as having Michigan #M101(30)709
and Florida #G0715441.

On May 4, 1984, while OSBI Agent HESS was processing
the stolen 1966 Renault, HESS located a Gulf credit card and
a Texas driver's license which was seen stuck down behind the
back seat in the automobile. The Gulf credit card was issued
to Williams Exploration, Telephone #713/658-5100. The credit
card number was 908909933 Tex 180), expires 5/86. The
Texas driver's license was #07290575, issued to BRAD CHARLES
BLACKWOOD, 8114 Crystal Bay, Houston, Texas, 77084, DOB:
6/23/51, 5'8", hazel eyes.

On May 4, 1984, Agent DAVIS called Williams
Exploration in Houston, Texas. Upon making inquiry about
the Gulf credit card, Agent DAVIS was directed to PAM. PAM
stated that they did have an employee who reported their
Gulf credit card lost and that the employee was BRAD BLACKWOOD.
PAM put BRAD BLACKWOOD on the telephone and BLACKWOOD stated
to Agent DAVIS that his wallet was lost three or four months
ago and that he had placed his wallet on top of his automobile
while putting some items in his automobile while he was
parked at Exxon parking garage in Houston, Texas. BLACKWOOD
stated that he drove home and then realized that he left his
wallet on top of his car and upon missing the wallet, returned
to the parking garage. The attendant at the parking garage
denied seeing the wallet, but BLACKWOOD had the impression
that the way he was acting he had, in fact, seen his wallet
and possibly taken the money out of it and thrown the wallet
away. BLACKWOOD stated that he did not report his wallet as
being lost to any law enforcement agency, but that along
with the Shell credit card, and Exxon credit card was also
lost.

On May 11, 1984, Agent DAVIS again contacted BRAD
BLACKWOOD in Houston, Texas. BLACKWOOD stated that he had
also lost a Visa credit card which he had purchased through
the First City Bank in Houston, Texas, and at the time he lost

Interview of
forwarded on said interview
Page 10

took a shower at ELLIOTT's house and ELLIOTT washed their
clothing for them. INGRAM's clothing was in the same
suitcase as was JOHNSON's. Both JOHNSON and INGRAM were
broke when they arrived at ELLIOTT's place and they were
wanting a bottle, so ELLIOTT took INGRAM to a liquor store
and bought them a bottle. INGRAM had to move his Renault
out of the driveway so ELLIOTT could get his car out, then
when they returned to ELLIOTT's residence from getting the
bottle, INGRAM asked ELLIOTT if it would be okay for him
to park his car back in the driveway as he did not want
someone to steal the hubcaps or something. ELLIOTT stated
that at this time he thought something was funny that as
he lived by this cove and there wasn't but about six houses
in this cove and never had any problems with anyone
bothering the automobiles there, but INGRAM did park his
car back in the driveway at ELLIOTT's house.

JOHNSON was acquainted with a guy named MIKE and
a girl named KATHY. MIKE worked at a bar in Memphis and
JOHNSON had become acquainted with MIKE and KATHY when he
was in Memphis at a prior time. ELLIOTT does not know anything
about the individual named MIKE, but KATHY is a WF, mid-30's,
who works at Charles Corners bar at 5411 Raleigh Road, Memphis,
Tennessee, Telephone _____.

JOHNSON and INGRAM left ELLIOTT's house at about
2200 hours and at the time they left they said they were going
to find someone to get them another bottle. ELLIOTT told them
that the door would be locked as he was going to bed and they
would not be able to get back in. That is the last ELLIOTT
saw of INGRAM and JOHNSON.

ELLIOTT described JOHNSON as being JOHNSON WAYNE,
WM, DOB _____, age 30, 6'5", black curly hair, 180 lbs.,
well built, and large hands, "WM is in proportion with the
size of his body. JOHNSON was wearing cowboy boots, a western
type shirt which was solid color, and blue jeans which were
slightly faded. JOHNSON is left-handed, but is a 'Lloyd's man
with an ego thing."

ELLIOTT described INGRAM as at the time when he
saw him was wearing green khaki pants, a white shirt with
some kind of a name on it, either INGRAM's name or some company
name, and was wearing black boots, and INGRAM is also bi-sexual.
INGRAM had mentioned that he had lost his driver's license
from a DWI charge or something.

Since INGRAM and JOHNSON left ELLIOTT's house,
ELLIOTT has received a telephone call from JOHNSON and INGRAM
stated that he was calling from Albuquerque, Arizona. But
ELLIOTT was sure that he meant Albuquerque, New Mexico. INGRAM
stated that he had arrived in Albuquerque the following
Tuesday after they had left ELLIOTT's residence which was

0909

CI 88-...(B)
Investigation and Interview
Page 12

Officer DARWIN SMITH also stated that the wallet which belonged to TRAI WILLETT had been lost February 5, 1984, in Ada, Oklahoma. WILLETT had been riding around with a friend named FAY COLLINS in STORMER's automobile and WILLETT had left her purse in the automobile and it came up missing from there.

A Driver's License check of WILLETT reflects that TRAI JEAN WILLETT, Oklahoma DL #643042773, expires 2/86, Rt. #1, Ada, Oklahoma, 74820, DOB: 9/14/67, WF, 5'4", 130 lbs., brown eyes.

The victim that DEGRAW is charged with raping is DONNA VIVIAN ELLIS, WF, Age 25, R.R. #1, Wilson, Amarillo, Texas, Telephone #806/351-1706.

On May 10, 1984, DEGRAW was run on polygraph by Amarillo Police Detective Lieutenant JIMMY R. STEVENS. Lieutenant STEVENS stated that if he were to grade the polygraph that he would have to grade it as inconclusive, but he had a gut feeling that DEGRAW did not run and steal the victim from Ada, Oklahoma. Lieutenant STEVENS stated that he thought that if this polygraph examiner should check the charts over and determine the results of the charts. He did state that questions #3, which was "Considering the kidnapping of the girl in Ada, Oklahoma, do you intend to be truthful about?", DEGRAW was very deceptive on this question. Also on question #6, which was, "About ten days ago did you participate in a kidnapping in Ada, Oklahoma?", Lieutenant STEVENS stated that DEGRAW was deceptive in this. Also, question #10 which was, "Have you ever seen the girl whose picture is on the wall in front of you now?", was deceptive, but other questions that were asked, the response was very flat and Lieutenant STEVENS felt that overall DEGRAW was not involved in the kidnapping of this girl from Ada. A copy of the polygraph charts, the questions, and the data sheet, along with the polygraph examination warning, was received by Agent DAVIS to be transferred to Deputy Inspector LEVAND LANGLEY for his evaluation.

After conferring with Deputy Inspector LANGLEY, it was determined that Agent DAVIS should interrogate DEGRAW. During this interrogation on May 10, 1984, at approximately 1715 hours, Agent DAVIS read DEGRAW a Miranda Warning from a card carried by Agent DAVIS and DEGRAW stated that he understood what his rights were.

During this interrogation, Agent DAVIS inquired of DEGRAW why he had told previously that he had left Detroit, Michigan, with $1100 dollars in his possession, when in fact, he did not have that kind of money with him. DEGRAW stated that he told a lie because he did not want or get in trouble over the credit cards used. DEGRAW stated that he actually had

CR #00-00\
Investigation and Interview\
Page 14

has he heard of a J. PAULSON. McGRAW states that BLACKWOOD
is a guy out of Texas and that the deputy in Canyon, Texas,
had said that his driver's license was gotten out from
under the seat of the automobile, which McGRAW had. McGRAW
stated that he did not know where the driver's license came
from and that he did not know BLACKWOOD. McGRAW admitted
that he had made a telephone call from Albuquerque to COTTON
ELLIOTT, and McGRAW stated that he had picked up a hitchhiker
in Arizona and that the hitchhiker was with McGRAW in
Albuquerque, but that McGRAW does not know his name. This
came from questioning by Agent DAVIS about McGRAW telling
ELLIOTT that the hitchhiker was with him and they had about
75 dollars to get back on.

McGRAW stated that he has been in a mental institution
which was the Harper County, West Virginia, Mental Health
Center. McGRAW stated that he did not know what the diagnosis
was, but that he was put in there because he would "fly off
the handle."

McGRAW also stated that the credit cards, a Visa
credit, a Gulf credit card, and a Texas driver's license, which
belonged to BLACKWOOD were in the possession of a hitchhiker
that JOHNSON and McGRAW had picked up at the same location
where they had let the man and woman hitchhikers out. (McGRAW
previously had pointed out on the map that he had let the
man and woman hitchhikers out in Gallup, New Mexico, and that
they were enroute to Las Vegas, Nevada.)

McGRAW admits that he did not leave with 1100 dollars
as he had previously stated, and that he only had a few bucks,
and when he got to Memphis, Tennessee, he had approximately 12
dollars with him. McGRAW stated that as he and JOHNSON
traveled from Memphis, Tennessee, toward California that they
had stopped at a church in Arkansas and had gotten gasoline
from them and that JOHNSON had sold blood in Arkansas for
money. McGRAW could not sell blood because he did not have
any identification with him except for his birth certificate.

The first place McGRAW recalls that a credit card
was used was the Visa credit card which belonged to BLACKWOOD
and it was used in a small town in Texas at a small store.
JOHNSON used the Visa credit card because the hitchhiker
stated that he did not want to use it because BLACKWOOD would
be able to identify him. JOHNSON could use credit cards
easily because he looked good and everyone trusted him.
McGRAW stated that the hitchhiker did end up using the Visa
credit card at a liquor store by the beach in Los Angeles,
California. McGRAW describes the hitchhiker as about his
(McGRAW's) size, wearing a hat, a beard, and sunglasses,
and that he said his name was POE. POE told JOHNSON and
McGRAW to sell his POE something. On questioning McGRAW
about the automobile and items which are in his personal property

0913

at the Haskell County Sheriff's Department, DeGRAW first denied having possession of a necklace and ring. When Agent DAVIS informed him that the officers had taken it off of him in Checotah, Texas, DeGRAW then stated that he does not know where it came from. "It could be RANNA's in Amarillo or Tina's." DeGRAW stated that TINA could have left it on the front seat and he pushed it up and put it in his pocket as TINA was riding in the front seat.

DeGRAW denies ever being involved in any robberies on the trip from Detroit to Los Angeles and back, denies being in Ada, Oklahoma, although he had originally insisted that they had never left Lodi in the state of Oklahoma. But at that time, DeGRAW never inquired as to where Ada, Oklahoma, was, not knowing whether it was located on I-40 or away from I-40. At one time during the conversation and as Agent DAVIS put the picture of the victim from Ada before DeGRAW, DeGRAW held his head in his hands and appeared about to break down, but after recomposing himself, lifted his head with his eyes very red and stated that he did not know anything about the woman who was abducted in Ada, but wished he would find her alive. DeGRAW thus became very irritable, pacing the floor, saying he did not want to answer any more questions and continued doing this while Agent DAVIS continued talking. DeGRAW then insisted on being taken back to his jail cell and not answering any more questions, which at that time, the conversation with DeGRAW was terminated at approximately 2000 hours.

On May 10, 1984, Agent DAVIS received copies of a traffic ticket which DeGRAW had received in California, and registration papers for the 1984 Renault, vehicle certificate of title for the Renault, a Michigan driver's license for BENJAMIN NUNN, and a business card for BENJAMIN NUNN. The traffic ticket was issued on April 30, 1984, at 4:03 p.m. which was on a Monday, to FLOYD LEE DEGRAW, 410 Union Drive, Lilly, West Virginia. The Michigan registration for the 1984 Renault was in the name of American Motors Sales Corporation in Detroit, Michigan. The Michigan driver's license was in the name of BENJAMIN F. NUNN, 3105 Coleman, Dearborn, Michigan, Michigan 11, MD 500 885 845 887, expiration on birth date of 1957. The business card was for BEN NUNN, manager, Production Technical Communications, Public Relations Department, American Motors Corporation, 14250 Plymouth Road, Detroit, Michigan, 48232, Telephone #313/493-1557. The vehicle certificate of title had an issue date of 11/7/83, title #1208031-80631, for a 1984 Renault, VIN #1XMXXXFXGDKA17GH3, body style-4-door, Renault sedan, American Motors Sales Corporation, same address in Detroit, Michigan.

0914

# OKLAHOMA STATE BUREAU OF INVESTIGATION

## INVESTIGATIVE REPORT

PAGE _____ OF __

| Case: | Reporting Date: | Reporting Agent(s): | | | Reviewed By: |
|---|---|---|---|---|---|
| Offense: | | | | | |
| Subject: | | Case Agent: | Office: | Typed By: | Date: |
| (S)  ROBBY WARD | | GARY ROGERS | AZO | kc | |
| KARL FONTENOT | | Activity: | | | |
| (V) | | INTERVIEW OF JIMMY MARLIN COLVIN | | | |

On July 17, 1986, JIMMY MARLIN COLVIN, White Male, Date of birth: July 4, 1965, Social Security Number: 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, Home Address: Route One, Box 155, Ada, Oklahoma, Home Telephone Number: 405-436-4915, was interviewed at the Ada Police Department by Agent GARY ROGERS and he provided the following information:

COLVIN just became acquainted with ROBBY WARD around September 1985. He met him through his girl friend, who was a good friend of WARD'S sister, KAY.

On Friday, April 27, 1984, COLVIN, WARD'S mother, KAY'S husband, KARL GARRETT, KAY and KIM DAVIS, went to a Tupperware party in Lawton, Oklahoma. ROBBY WARD and KARL FONTENOT were at the house, along with another one of his sisters and her two children. They drove the WARD'S blue Datsun to Lawton and spent the night there, returning to Ada the following evening at about 1700 hours.

When asked if he knew of any problems the WARDS might have been having at the residence with the plumbing or water leaks, COLVIN knew of none.

COLVIN saw ROBBY WARD that night as he was leaving the WARD residence and he was with someone, but he couldn't remember who. WARD and FONTENOT told COLVIN that they were going fishing that Friday evening the 27th at a pond located west of the WARD residence.

COLVIN came back over to the WARD'S house on Sunday evening the 29th and KAY asked him if he would go with her to pick up TOMMY at a yellow apartment house on Townsend Street. When they arrived, COLVIN stayed in his 1982 Brown Chevrolet pickup and KAY went upstairs to the apartment door. TOMMY WARD answered the door, opening it just open, but not enough for COLVIN to see two other male subjects get back out of the

pads:

CR 84-01□
OFFENSE - HOMICIDE
SUBJECT - TOMMY WARD
          KARL FONTENOT
VICTIM  - DONNA HARAWAY
PAGE TWO


way and appear to hide.  He could see, what he thought was
smoke in the house, and when TOMMY came out and got into
the pickup, COLVIN could smell marihuana on him.  They left
the apartment and dropped KAY off at her sister PATRICIA'S
house at about Seventh and Oak Street and COLVIN took TOMMY
on to his mother's house.

     On the way back to WARD'S, TOMMY told COLVIN that
the police had talked to him about HARAWAY'S kidnapping.
COLVIN believes that WARD had long hair at the time and
didn't remember him having a mustache.  COLVIN also
remembered a gray primered 1975 to 1980 Chevrolet pickup
being parked in the driveway at the apartment, when he picked
TOMMY up that night.  He described it as having no tail gate,
bumper or license plate and he believed it had large tires.
It was parked on the east side of the apartment pointing
toward the north.

     COLVIN saw the same pickup on the Saturday evening
before, when they returned from Lawton.  It dropped TOMMY
off at his mother's house.  He could not tell who the driver
was.

     COLVIN further related that on the drive back from
the apartment to his mother's, WARD acted very nervous and
scared, smoking one cigarette after another.  That was the
last time that COLVIN saw TOMMY WARD.

## OKLAHOMA STATE BUREAU OF INVESTIGATION

### INVESTIGATIVE REPORT

PAGE_____ OF_____

| Case: | Reporting Date: | | Reporting Agent(s): | | | Reviewed By: |
|---|---|---|---|---|---|---|
| OSI 85-084 | September 30,1985 | | GARY BOGGES | | | |
| Offense: HOMICIDE / ROBBERY KIDNAPPING and RAPE | | Case Agent: GARY BOGGES | Office: ADO | Typed By: mh | Date: 09/24/85 | |
| Subject: (S) RONNY JESSE WARD KARL KELLY FONTENOT (V) DONNA DENICE HARAWAY | | Activity: REPORTING DISPOSITION AND CLOSING OF CASE | | | | |

## CLOSING OF CASE

On September 25, 1985, a jury in Pontotoc County, Oklahoma found defendants RONNIE JESSE WARD and KARL KELLY FONTENOT guilty of Robbery with a Dangerous Weapon, their punishment was assert at 30 years each; guilty of Kidnapping, 10 years each and guilty of Murder in the First Degree, for which they assert death for both. The trial was conducted before retired Judge RON JONES of Chandler, Oklahoma. He set a formal sentencing date of October 25,1985.

~~It also appears that this case has closed.~~

On October 25, 1985, Judge JONES sentenced WARD and FONTENOT each to 30 years for Robbery, 10 years for Kidnapping and Death for Murder First Degree.

I recommend this case be closed

0917

## OKLAHOMA STATE BUREAU OF INVESTIGATION

### INVESTIGATIVE REPORT

PAGE _____ OF _____

| Case: | Reporting Date: | Reporting Agent(s): | | | Reviewed By: |
|---|---|---|---|---|---|
| 18164-084 | JANUARY 21, 1996 | RUBEN FEATHERSTONE CY | | | |
| Offense: | | Case Agent: | Office: | Typed By: | Date: |
| HOMICIDE | | ROGERS | ERO | CC | 2/27/96 |
| Subject: | | Activity: | | | |
| (V) DONNA HARAWAY (S) TOMMY WARD KARL FONTENOT | | AGENT'S RECEIPT OF POSSIBLE HUMAN REMAINS | | | |

On January 30, 1996, MIKE EVETT, a private investigator
employed through Professional Investigations, P. O. Box
1704, Oklahoma City, Oklahoma, business phone 341-1793,
residence phone 341-4439, office address 315 West Edmond
Road, Edmond, Oklahoma, came to the headquarters building of
the OSBI carrying articles found east of Ada, Oklahoma on
January 29.

EVETT and his father, W. S. EVETT, of Route 1,
Allen, were on the older EVETT'S property east of Ada. The
EVETT property abuts the property previously owned by BUD
CULLEY, who is now deceased. The property is believed to be
owned now by CULLEY'S daughters, who have leased the property
to ALLEN TATUM. EVETT believes it is TATUM who found the
remains recently identified as DONNA HARAWAY on his property.
On the 28th, EVETT and his father were walking across their
property when they made a decision to go on to TATUM'S
leased land to look at the area where the remains had been
found. The EVETTS were accompanied by a cattle dog, which
as they entered the TATUM property, jumped up a "pack rat."
The rat was seen to run and jump into a hollow tree and
later was run out of the tree by the dog. EVETT walked over
and looked into the hollowed out portion of the tree and
observed a pack rat's nest. Based on personal experience,
EVETT knows that pack rats will retrieve anything of a shiny
nature or unusual nature and return it to their nest. Based
on this, EVETT began to probe the nest and quickly found
what appeared to be a human bone. EVETT removed the bone
from the nest and continued to dig further in the paper,
straw, nuts, and other debris of the nest. EVETT soon found
a gold ladies' wrist watch with a leather band and upon
probing a little deeper, found another bone which appeared
to be a bone similar to a part of a human spine. EVETT
secured these articles along with bits of remnant paper
found in the nest into a sack and brought it to the Oklahoma
City office of the OSBI.

EVETT described the location of the pack rat nest
to be about six feet off of a path that runs behind a pond
generally southwest of where he believes the HARAWAY remains

eads:

FOR INTERNAL USE ONLY
NOT FOR DISSEMINATION

0918

to have been found.  EVETT estimates the distance from where
the remains had previously been found as thirty to fifty
feet southwesterly.  EVETT indicated he was using as a
reference point an area that appeared to have been raked and
also where a used rubber glove was left behind, apparently
by crime scene investigators.

EVETT said that his father could be reached at
405/857-2696 if investigators needed to return to the scene
for any reason.  If investigators attempt to contact the
father at that number, they should be aware that this is
EVETT'S grandmother's number, and she is somewhat reclusive.
If they do not find themselves successful in reaching the
father very quickly after contacting the grandmother, investigators
should then contact EVETT at his place of employment.

On January 30, 1986, FEATHERSTONE took the two
bones submitted by EVETT to the Office of the Chief Medical
Examiner, where they were turned over to Medical Examiner
Field Investigative Agent NICK GRAHAM.  GRAHAM quickly looked
at the bones and described the two bones as definitely human
and believed them to have been part of the clavicle and what
he described as a c-spine joint.  GRAHAM signed a property
receipt showing reception of the bones turned over to his
office. This receipt is attached to this report.

FEATHERSTONE took the watch to ANN REED, OSBI
Serologist, who upon examining the watch, suggested that
there'd be very little value in examining the remains for
any type of serology comparison due to the time of exposure
of the watch and the fact that it is believed that when pack
rats drag new items to the area of their nest, the nest is
continually urinated on in order to drive off other rats in
the area.  This would cause confusing antigen results in a
serology study.

REF. OSBI-074

OKLAHOMA STATE BUREAU OF INVESTIGATION

PROPERTY RECEIPT

DATE: _____1-30-86_____

TIME: _____1521 HRS._____

LOCATION: _____901 N. STONEWALL_____

The below described property was received by

_____OFFICE OF CHIEF MEDICAL EXAMINER_____,

address: _____901 N. STONEWALL_____, City of

_____OKLAHOMA CITY_____, State of _____OKLAHOMA_____,

telephone _____239-7141_____, from Agent _____RUSTY_____

_____FEATHERSTONE_____ of the OSBI.

DESCRIPTION OF PROPERTY:

2  BLEACHED BONES   IN BROWN PAPER SACK
   UNK. SOURCE

RECEIVED BY: _____

RELEASED BY: _____

WITNESS: _____

# OKLAHOMA STATE BUREAU OF INVESTIGATION

## INVESTIGATIVE REPORT

PAGE _____ OF _____

| Case: | Reporting Date: | | Reporting Agent(s): | | Reviewed By: |
|---|---|---|---|---|---|
| | | | | | |

| Offense: | Case Agent: | Office: | Typed By: | Date: |
|---|---|---|---|---|
| | | | | |

| Subject: | Activity: |
|---|---|
| | |

On 1/22/86, at the request of Agent ROGERS, dental charts on TONER WILLSEY were taken to NTOH OK. DEV, Medical Examiner's office, for comparison to the unidentified remains, located in Pushan County, Oklahoma. If points of similarities exist the original charts will be obtained from our dentist, Dr. BARNEY.

ads:

FOR INTERNAL USE ONLY
NOT FOR DISSEMINATION

0921

# CENTRAL OKLAHOMA PSYCHIATRIC CENTER

### Clinical, Forensic, Child, and Adolescent Psychiatry

Nolen L. Armstrong, M.D., Inc.
Harold J. Binder, M.D., Inc.
Bal G. Vad, M.D., Inc.
Jerry P. Troyer, MSW, ACSW
Ron Marlatt, MSW, LSW

May 23, 1988

Mr. George Butner
Attorney-at-Law
121½ South Wewoka Avenue
Wewoka, Oklahoma   74884

Re:   Karl Allen Fontenot

Dear Mr. Butner:

In regards to your client, my patient, Karl Allen Fontenot.  Date of
first conversation with you on May 18, 1988, when you, Mr. Butner,
myself and Dr. Nolen Armstrong, President of Central Oklahoma Psychi-
atric Center and President of Oklahoma Psychiatric Association, elected
by his peers, and I all conversed about Karl Fontenot.  At the time you
gave me three things to read and the assignment of interviewing Mr.
Fontenot on Monday, May 23, 1988, which I did for two hours and came
to the following conclusions:

First, let it be known that prior to seeing Mr. Fontenot I had the
opportunity to talk to you Mr. Butner his attorney for the first
trial and his attorney for the second trial where Mr. Fontenot is
charged with murder in the 1st degree.  Mr. Fontenot was already
scheduled for execution by the State when a re-trial was ordered
because of conflicting evidence and new evidence ordered by the
Court of Appeals.

The second thing I had was a book by Robert Mayer called the "Dreams
of Ada", 370-pages, took me 6-hours to read and I read it like a text-
book.  I would say that page 81 was the most important page in the whole
book.

Third, I had an opportunity to see a one-hour video tape of Karl Fontenot'
alleged confessional taken in the basement of the City of Ada's Police
Department, detective's office with three other men present which we will
talk about later. Watching the tape took an hour, including reviewing it.

Fourth, I spent about two hours reviewing 150 pages of deposition and
rewrite of video tape including some details by a Terri Holland, although
her previous name was McCartney.

Fifth, I had a twelve-page summary paper which only took minutes to
review of a psychological report done on Karl Fontenot including his
I.Q. testing when he was only 6-years-old.

0922

.e:  Karl Allen Fontenot
May 23, 1988
Page 2

Last but not least, after my two hour interview when Deputy Ken Moule
and Deputy Intern Danny Verbele brought me Karl Fontenot, they stepped
out of the interview room after seeing the room and I spent the time
alone with Karl until I dictated my report to George Butner with Karl
present for the dictation, as well as both the deputy and intern.

First, let it be known that Karl Fontenot has implicated three men while
in prison whose names I will put into the report but whose names will be
removed at the time of trial to protect them from harm as well as to pro-
tect Karl Fontenot in case he's found guilty again and possibly forced
back into prison.

First, I will record the history of Karl Fontenot not from the book,
the deposition paper or other people's conversation but only from
Karl Fontenot's mouth, then I will record the mental status examina-
ton, which in essence are thoughts, feelings and distinquishing organic
mental disease. Having done that I will then give my expert opinion, my
recommendation and a conclusionary statement.

HISTORY:   Name:  Karl Allen Fontenot
           Attorney:  George Butner
           Residing At:  Pontotoc County Jail
                         131 Court Street
                         Ada, Oklahoma 74820
           Sex:  Male
           Height:  5'8" (looks 5'7")
           Weight:  128 (actual weight 130)
           Age:  23
           Birthdate:  8/10/64
           Alleged Crime:  4/28/84
           Picked up:  10/29/84
           Incarcerated:  10/29/84 and continuing
           Confession:  October 19, 1984
           Interrogated By:  OSBI Agent Gary Rogers
                             Captain of Ada Police Department, Detective
                                Dennis Smith and Sgt. of Ada Police Dept.
                                Mike Baskin
           Information for Interrogation:  from a dream on the previous
              day of the investigation from a Tommy Ward, best friend of
              Karl Fontenot.  Karl Fontenot's version of his confession:
              He was fed  the information that had been fed to these
              three men:

              1) He felt worthless and like a piece of shit and wanted
                 to die and join his dead mother, whose death he feels
                 responsible for, so that even though he never met the
                 victim, Donna Denise Haraway, he was willing to die as
                 her killer because he saw himself as the killer of his
                 own mother because of the following incident:

                    INCIDENT:  1982, sometime in October when his mother
                    and a local cop picked him up in his brother's car

0923

Re:  Karl Allen Fontenot
May 23, 1988
Page 3

to take him, because he knows how to work on cars
or at least he knew about cars more than his mother to
try and jump start her car sitting on the service
road of a 4-lane highway, going toward the
Saddle Club of Chickasha, Oklahoma.  What actually
happened on that infamous day, was his mother was
sitting in the car, the cop had left, he got out
of the Gremlin to get a jump starter cable and
someone absolutely rear-ended their car in a minor
collision.  This caused their car to pin-ball affect
a car in front of them.  Karl Fontenot in October of
1982 walked across a 4-lane highway to call the police
to report the accident.  He didn't have any money,
he was trying to get somebody to help and he's not
very bright.  He didn't know how to make this phone
call so he spent a lot of time in this restaurant.
That time spent in that restaurant becomes the
reason he gives a false confession.  He gave that
later to the three men in the basement of the Ada
police station only as an interconnection killer-
to-killer, death-to-death, responsible party to
responsible party and here's why:  While taking
a long time in the restaurant, his mother, con-
fused and already injured in the first accident,
crosses the 4-lane highway to get her son and
was struck and killed by an oncoming car.  Karl
Fontenot believes that if he was a better mechanic
and could've jump started her Gremlin the first
accident would've never have happened and she would
be alive.  Karl Fontenot believes that if he hadn't
have been so stupid and couldn't figure out how to
make a phone call his mother wouldn't have had to
come looking for him and would still be alive.
He believes in his own mind in some talion law,
an eye for an eye, a tooth for a tooth, that even
though he never met Denise Haraway and had never
been at McAnaly's East Confectionery that he was
willing to take the rap for her murder and willing
to repeat like a parrot with the same I.Q. as a
parrot, about 70, the story given to him from the
dream of Tommy Ward to the mouths and ears of
three men who wanted the killer found.

Phone:  1-405-436-2755
        Sister-in-Law's mother, Christine Nickerson
Race:  Caucasion
Born and Raised:  Ada, Oklahoma

re: Karl Allen Fontenot
May 23, 1988
Page 4

Mother:      dead in her 40's in a civilian car pedestrian accident
             in 1982
Father:      Stoned, alcoholic living somewhere in Pampa, Texas who
             Karl describes as often crawling on his knees drunk, who
             abandoned his mother and the kids often and for the last
             time when he was 12 or so.
Sib-ship:    Fourth of five.  He, the fourth youngest with all five
             from the same mother and Dennis, the oldest, age 28, from
             a different father, the other four from the same father,
             the drunk in Texas.  Kevin, age 25, Renita, age 24, him-
             self, Karl, age 23 and Elissa, age 19.
Girls Pregnant:  None he knows about.
Sex Partners:  Women only (20-30 of them in his lifetime).
Girlfriend Presently:  Now, pay attention to this, he describes
             his present girlfriend as a woman he's never seen, Louise
             Sutherland, his penpal.
Hobbies:     Writing letters to people, but the only people that write
             them back, I'm sad to say, is his one sister, Elissa and
             his one penpal, Louise.
Visits in Jail over 4-years:  Two friends from Ada, who happen to
             be young women his age and one in her 40's and over a
             4-year period not one family member, not one human being
             because they all accepted his guilt or at least he believes
             that's why they haven't visited him.
Drug History:  Pot, otherwise known as marijuana or maryjane and
             lots of it up until his jail sentence.
Employment Record:  Lots of steakhouses where he did just about
             everything for a little while.
Past Medical/Surgical History:  None.
Past Criminal Record:  None.
Past Trouble with the Law:  None.
Past Psychiatric History:  None.
Scheduled Trial:  June 6, 1988, Hughes County in the Holdenville
             Court House.  He's up for 1st degree murder, robbery with
             a dangerous weapon, kipnapping and rape, which may be
             dropped.
Past Living History:  From the time of his mother's death, which he
             feels responsible for he became suicidal everyday with no
             overt suicide attempt, drowned himself in street walking
             and pot abuse.  Finally, picked up in the streets September
             1983 and taken to the home of Nickie Lindsey, age 19 now
             approximately and Janet Roberts, age 38 now approximately.
             I guess Nickie thought he was cute and they had some money
             and they gave him a home.

Alibi:       The night of the alleged murder and rape he was in his home
             where he had resided from September 1983 until the alleged
             incident of April 28, 1984 on a Saturday night at approxi-
             mately 8:00 p.m. when he was supposed to be at this McAnaly's
             Confectionery molesting Donna Denise Haraway that he's never
             met.