# EXHIBIT

# 19

Richard A. Leo, Ph.D., J.D.
**RICHARD A. LEO & ASSOCIATES, INC.**
15 Ashbury Terrace
San Francisco, CA 94117

_____

(415) 661-0162 (Phone)
(415) 661-0172 (Fax)
Email: rleo@usfca.edu

June 4, 2013

Tiffany R. Murphy,
Director and Attorney at Law
Oklahoma Innocence Project
2501 Blackwelder
Oklahoma City, Oklahoma 73106-1493

**Re:   Karl Fontenot**

Dear Ms. Murphy,

This report is per your request in Karl Fontenot's above-referenced case of.

## I. Qualifications

I am a Professor of Law and Dean's Circle Research Scholar at the University of San Francisco and formerly an Associate Professor of Psychology and an Associate Professor of Criminology at the University of California, Irvine. My areas of research training and specialization include social psychology, criminology, sociology and law. For almost two decades, I have conducted extensive empirical research on police interrogation practices, *Miranda* requirements, the psychology of interrogation and confessions, psychological coercion, police-induced false confessions, and wrongful convictions. In this time, I have analyzed thousands of cases involving interrogations and confessions; I have researched, written and published numerous peer-reviewed articles on these subjects in scientific and

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 2

legal journals; and I have written several books on these subjects as well,
including *Police Interrogation and American Justice* (Harvard University
Press, 2008) and *Confessions of Guilt: From Torture to Miranda and
Beyond* (Oxford University Press, 2012).  I am regarded as a national and
leading expert on these topics, and I have won numerous awards for my
scholarship and publications.  My scholarship has often been featured in the
news media and cited by appellate courts, including the United States
Supreme Court on multiple occasions.  To date, I have consulted with
criminal and civil attorneys on more than fifteen hundred (1,500) cases
involving disputed interrogations and/or confessions, and I have been
qualified and testified as an expert witness two-hundred and fifty-eight (258)
times in state, federal and military courts in thirty-one (31) states, including
the State of Oklahoma.  I have given many lectures to judges, defense
attorneys, prosecutors and other criminal justice professionals, and I have
taught interrogation training courses and/or given lectures to police
departments in America, China and the Republic of Cypress.   I enclose a
current copy of my Curriculum Vitae.

## II. Materials Reviewed

To date, I have reviewed the following materials in this case:

- Medical Examiner's Report
- Police Reports
- Brief of Appellant (Including Exhibits) filed on 8/25/86
- Second Brief of Appellant filed on 10/6/1992
- Motion Hearings, Preliminary
- Dennis Smith Preliminary Testimony
- Karl Fontenot Preliminary Confession Transcript
- Karl Fontenot Psychiatric Report, Age 6
- Karl Fontenot Psychiatric Evaluation, 5/23/88, Age 23
- Motion Hearings, Pretrial
- Pretrial, Post-evaluation Competency Hearing
- In Camera Hearing to address whether Karl should testify
- Fontenot Trial Testimony of Dennis Smith from 1988

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 3

- Fontenot Trial Testimony of Gary Rogers from 1988
- Fontenot Trial Testimony of Mike Baskin from 1988
- Fontenot Trial Testimony of Dr. Joel Dreyer from 1988
- Fontenot Trial Testimony of Sandra Petrick, PhD from 1988
- Fontenot Polygraph Examination reports from OSBI

## III. Overview

In this report, I will first provide an overview of the relevant social science research on the phenomenon of police-induced false confessions, risk factors for false confession, physical and psychological coercion, police contamination and corroboration of confessions, and indicia of unreliability.

I will specifically discuss these issues and factors as they relate to the (unrecorded) interrogation and (recorded) confession statement of Karl Fontenot.  In my professional opinion, there were several risk factors for false confession present.  Numerous indicia of unreliability.

## IV. The Scientific Study of Police Interrogation and False Confessions

There is a well-established empirical field of research in the academic disciplines of psychology, criminology, and sociology on the subject of police interrogation practices, psychological coercion, and false confessions. This research dates back to 1908; has been the subject of extensive publication (hundreds of academic journal articles, stand-alone books, and book chapters in edited volumes); has been subjected to peer review and testing; is based on recognized scientific principles, methods, and findings; and is generally accepted in the social scientific community.  This research has analyzed several hundred cases of police-induced false confessions and identified the personal and situational factors associated with, and believed to cause, false confessions.[1]

---

[1] See Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard Leo and Allison Redlich). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38; Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press); and Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 4

    The subject of police interrogation and false confessions is beyond
common knowledge and therefore highly counter-intuitive.[2] Most people do
not know that police detectives receive highly specialized training in
psychological interrogation techniques, what these techniques are, or how
the techniques are designed to work (i.e., move a suspect from denial to
admission). In addition, most people also do not know what psychological
coercion is, why some techniques are regarded as psychologically coercive,
and what their likely effects are.  Moreover, most people do not know which
interrogation techniques create a risk of eliciting false confessions when
applied to innocent suspects or how and why the psychological process of
police interrogation can, and sometimes does, lead suspects to falsely
confess.  In fact, most people are skeptical that innocent suspects will give or
agree to false confessions to serious crimes in response to purely
psychological interrogation techniques in the absence of a physical torture or
mental illness.  This is because people view confessing falsely to a crime as
an irrational and self-destructive act.  Most people have no direct knowledge
of, or experience with, psychological police interrogation, and do not believe
that they themselves could be made to falsely confess unless tortured.  This
skepticism and relative ignorance causes most people to assume that
virtually all confessions are true and to presume that any defendant who has
confessed is therefore guilty.  Empirical studies have shown that confession
evidence (even confession evidence that is later proven false) is highly

---

CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).
[2]See Danielle Chojnacki, Michael Cicchini and Lawrence White (2008), "An Empirical
Basis for the Admission of Expert Testimony on False Confessions," *Arizona State Law
Journal*, 40, 1-45; Richard Leo and Brittany Liu (2009).  "What Do Potential Jurors
Know About Police Interrogation and False Confessions?" *Behavioral Sciences and the
Law*, 27, 381-399; Linda Henkel, Kimberly Coffman, and Elizabeth Dailey (2008).  "A
Survey of People's Attitudes and Beliefs About False Confessions," *Behavioral Sciences
and the Law*, 26, 555-584; Iris Blandon-Gitlin, Kathryn Sperry, and Richard Leo (2011)
"Jurors Believe Interrogation Tactics Are Not Likely to Elicit False Confessions: Will
Expert Witness Testimony Inform Them Otherwise?" in *Psychology, Crime and Law*, 17,
239-260; and Mark Costanzo, Netta Shaked-Schroer and Katherine Vinson (2010), "Juror
Beliefs About Police Interrogation, False Confession and Expert Testimony" in *The
Journal of Legal Empirical Studies,* 7, 231-247.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 5

prejudicial in the sense that once a confession is introduced into evidence against a suspect at trial it almost inevitably leads to a suspect's conviction.[3]

## V. The Social Psychology of Police Interrogation

Once patrol officers promote to the rank of detective, they typically receive intensive training in the practice and law of interrogation and thereafter learn to apply, refine and hone their interrogation skills through extensive case experience, supervision, and/or additional training. Police interrogation is a cumulative, structured, and time-sequenced process in which detectives draw on an arsenal of psychological techniques in order to overcome a suspect's denials and elicit incriminating statements, admissions and/or confessions. This is the sole purpose of custodial interrogation. To achieve this purpose, interrogators use techniques -- all of which are generally legal -- that seek to influence, persuade, manipulate and deceive suspects into believing that their situation is hopeless and that their best interest lies in confessing. Sometimes, however, interrogators cross the line and employ techniques and methods of interrogation that are coercive and thus regarded as legally impermissible.

Contemporary American interrogation methods are structured to persuade a rational person who knows he is guilty to rethink his initial decision to deny culpability and choose instead to confess. Police interrogators know that it is not in any suspect's rational self-interest to confess. They expect to encounter resistance and denials to their allegations, and they know that they must apply a certain amount of interpersonal pressure and persuasion to convince a reluctant suspect to confess. As a result, interrogators have, over the years, developed a set of subtle and sophisticated interrogation techniques whose purpose is to alter a suspect's perceptions such that he eventually comes to see the act of confessing as being in his self-interest. Interrogators accomplish this by persuading a

---

[3]Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496; and Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA world. *North Carolina Law Review*, 82, 891-1007.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 6

suspect to view his immediate situation differently, by focusing his attention
on a limited set of choices and alternatives, and by convincing him of the
likely consequences that attach to each of these choices.  If successful, this
process unfolds in two steps: first, the interrogator causes the suspect to view
his situation as hopeless; and, second, the interrogator persuades the suspect
that only by confessing will the suspect be able to improve his otherwise
hopeless situation.

       The first step or stage of successful interrogation consists of causing a
suspect to view his situation as hopeless.  If the interrogator is successful at
this stage, he will undermine the suspect's self-confidence and cause the
suspect to reason that there is no way for him to escape the interrogation
without incriminating himself.  To accomplish this, interrogators accuse the
suspect of having committed the crime; they attack and try to undermine a
suspect's assertion of an alibi or verbalization of innocence (pointing out or
inventing logical and factual inconsistencies, implausibilities and/or
impossibilities); they exude unwavering confidence in their assertions of the
suspect's guilt; they refuse to accept the possibility of the suspect's denials;
and, most importantly, they confront the suspect with incontrovertible
evidence of his guilt, whether real or non-existent.  Because interrogation is
a cumulative and time-sequenced process, interrogators often draw on these
techniques repeatedly and/or in succession, building on their earlier
accusations and representations at each step in the interrogation process.

       Through the use of these techniques, the interrogator communicates to
the suspect that he has been caught, that there is no way he will escape the
interrogation without incriminating himself, and that his future is determined
-- that regardless of the suspect's denials or protestations of innocence, he is
going to be arrested, prosecuted, convicted and eventually incarcerated.  The
interrogator seeks to convince the suspect that this is a fact that has been
established beyond any doubt, and thus that any objective person must
necessarily reason to this conclusion.  By persuading the suspect that he has
been caught, that the existing evidence or case facts objectively prove his
guilt, and that it is only a matter of time before he will be prosecuted and
convicted, the interrogator seeks to alter the suspect's perceptions such that

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 7

he comes to view his situation as hopeless and comes to perceive that
resisting the interrogator's demands is futile.

Once the interrogator has caused the suspect to understand that he has
been caught and that there is no way out of this predicament, he seeks to
convince the suspect that the only way to improve his otherwise hopeless
situation is by confessing to the offense(s) of which he is accused.  The
second step of successful interrogation thus consists of offering the suspect
inducements to confess -- reasons or scenarios that suggest the suspect will
receive some personal, moral, communal, procedural, material or other
benefit if he confesses to some version of the offense.  Researchers have
classified the types of inducements investigators use during the second step
of interrogation into three categories: *low-end* inducements, *systemic*
inducements, and *high-end* inducements.  *Low-end* inducements refer to
interpersonal or moral appeals the interrogator uses to convince a suspect
that he will feel better if he confesses.  For example, an interrogator may tell
a suspect that the truth will set him free if he confesses, or that confessing
will relieve his anxiety or guilt, or that confessing is the moral or Christian
thing to do, or that confessing will improve his standing in the eyes of the
victim or the eyes of the community.

*Systemic* inducements refer to appeals that the interrogator uses to
focus the suspect's attention on the processes and outcomes of the criminal
justice system in order to get the suspect to come to the conclusion that his
case is likely to be processed more favorably by all actors in the criminal
justice system if he confesses.  For example, an interrogator may tell a
suspect that he is the suspect's ally and will try to help him out -- both in his
discussions with the prosecutor as well as in his role as a professional
witness at trial -- but can only do so if the suspect first admits guilt.  Or the
interrogator may ask the suspect how he expects the prosecutor to look
favorably on the suspect's case if the suspect does not cooperate with
authorities. Or the interrogator may ask the suspect what a judge and jury are
really going to think, and how they are likely to react, if he does not
demonstrate remorse and admit his guilt to authorities.  Interrogators often
couple the use of systemic incentives with the assertion that this is the
suspect's one and only chance -- now or never -- to tell his side of the story;

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 8

if he passes up this opportunity, all the relevant actors in the system (police, prosecutor, judge and jury) will no longer be open to the possibility of viewing his actions in their most favorable light. Interrogators rely on *systemic* inducements to persuade the suspect to reason to the conclusion that the justice system naturally confers rewards for those who admit guilt, demonstrate remorse, and cooperate with authorities, whereas it inevitably metes out punishment for those who do not.

Finally, *high-end* inducements refer to appeals that directly communicate the message that the suspect will receive less punishment, a lower prison sentence and/or some form of police, prosecutorial, judicial or juror leniency if he complies with the interrogator's demand that he confess, but that the suspect will receive a higher sentence or greater punishment if he does not comply with the interrogator's demand that he confess. *High-end* inducements may either be implicit or explicit: the important question is whether the interrogation technique communicates the message, or is understood to communicate the message, that the suspect will receive a lower criminal charge and/or lesser punishment if he confesses as opposed to a higher criminal charge and/or greater amount of punishment if he does not. For example, interrogators sometimes try to persuade suspects that their behavior was merely an accident, or a reasonable response to the victim's provocation or an act of self defense.  By portraying the suspect's behavior as an accident or reasonable response to provocation, the interrogator communicates the message that the suspect did not intend to harm the victim, that the act was therefore not a crime or a significantly lower lever of crime, and that the suspect will therefore receive little or no punishment if he agrees to this version of what happened.  By portraying the suspect's behavior as self-defense, the interrogator communicates that no crime at all even occurred and that the suspect will receive no punishment at all if he agrees to this version of what happened (since self-defense is not a crime, but a legally excused response to physical aggression).

Sometimes interrogators use more explicit *high-end* incentives, such as telling a suspect that there are several degrees of the alleged offense, each of which carry different amounts of punishment, and asking the suspect which version he would like to confess to.  Or the interrogator may

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 9

explicitly tell the suspect that he will receive a long prison sentence, or perhaps even the death penalty, if he does not confess, and/or may point out what happens to men of his age, or men accused of crime, in prison if he does not confess to the interrogator's minimized account.  Sometimes interrogators who rely on *high-end* inducements will present the suspect with a simple two choice situation (good vs. bad): if the suspect agrees to the good choice (a minimized version of the offense, such as involuntary manslaughter or self-defense), he will receive a lower amount of punishment or no punishment at all; but if does not confess, criminal justice offices will impute to him the bad choice (a maximized version of the offense, such as pre-meditated first degree murder), and he will receive a higher level of punishment or perhaps the harshest possible punishment.  (This technique is sometimes referred to in the academic literature as the maximization/minimization technique).  The point of *high-end* inducements is to communicate to a suspect that it is in his rational self-interest to confess to the minimized or non-incriminating version of the offense that the interrogator is suggesting because if he does so, he will receive a lower charge, a lesser amount of punishment and/or no time in prison, but if he fails to do so, he will receive a higher charge, a greater amount of punishment and more time in prison, perhaps even the death penalty (although it is rare that interrogators these days ever threaten a suspect with receiving the death penalty if he does not confess).

To evaluate whether a particular interrogation is coercive, experts must first determine the facts of the case and then analyze these facts in light of the extensive social science research literature on the social psychology of interrogation and confession.  The expert must evaluate whether any of the interrogator's techniques, methods or strategies were coercive by applying the generally accepted findings of the social science research literature on the subject of interrogation, coercive influence techniques and false confessions to the specific facts of the case.  In particular, the expert looks to whether the interrogator used any techniques that communicated, either implicitly or explicitly, that the suspect would receive a lower sentence, a lesser amount or type of punishment or perhaps no punishment at all if he complied with the interrogator's demands and/or receive a higher amount or type of punishment or perhaps the harshest punishment possible if he did not

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 10

comply with the interrogator's demands.  Social science research has repeatedly demonstrated that some *systemic* inducements (depending on the content of the inducement, how explicitly or vaguely it is stated, and the message that it communicates) and all *high-end* inducements are coercive because they rely on implicit and/or explicit promises of leniency and threats of harm to induce compliance.  Such promises of leniency and threats of harm are not only regarded as coercive in the social science literature because of the messages they convey and their demonstrated impact on the decision-making of individuals, but they are also regarded as legally impermissible by courts.  The expert may also evaluate whether the interrogation techniques, either individually or cumulatively, had the effect of causing a suspect to perceive he had no choice but to comply with the demands of the interrogator and thus, the interrogation, in effect, overbore his will.

## VI. The Three Sequential Errors That Lead to
## False (But Sometimes Detailed and Persuasive) Confessions

There are three important decision points in the interrogation process to analyze when trying to understand the causes of a false confession. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims.  There is a big difference between interrogation and interviewing: unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime.  False confessions only occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation.  This is one reason why interrogation training manuals implore detectives to adequately investigate their cases before subjecting any potential suspect to an accusatorial interrogation.[4]

---

[4] Fred Inbau, John Reid and Joseph Buckley (1986).  CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 3 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case.").  See also

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 11

The second important decision point in the process occurs when the police interrogate the suspect.  As mentioned above, the goal of police interrogation is to elicit a voluntary incriminating statement from the suspect by moving him from denial to admission.  To accomplish this, police use psychologically persuasive, manipulative and deceptive interrogation techniques.  As described in detail in the previous section, police interrogators use these techniques to accuse the suspect of committing a crime, persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then induce him to confess by suggesting it is the best course of action for him. Properly trained police interrogators do not use physically or psychologically coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions and/or confessions.

To understand how and why police-induced false confessions occur, one must first understand how interrogation is intended to influence and manipulate a suspect's perceptions, reasoning and decision-making.  Police interrogation is designed for the guilty, not the innocent.  Police are trained only to interrogate suspects whom they believe to be guilty,[5] and the purpose of interrogation of suspects unlike the interviewing of witnesses or victims is to elicit an incriminating statement, admission and/or confession that confirms the interrogator's belief in the suspect's guilt and assists the state in prosecuting the suspect.  Because police expect the suspect to deny his guilt,

---

Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate.").

[5] See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain").  For empirical support for this observation, see Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 12

interrogation is intended to break down the suspect's resistance and move him to admission.  As discussed above, police typically achieve this by accusing a suspect of committing the crime, attacking the suspect's alibi, cutting off a suspect's denials and confronting the suspect with seemingly irrefutable (whether real or non-existent) evidence of his guilt.  The point of these techniques is to break down a suspect's confidence in his denials by convincing him that he is caught, that no one will believe his assertions of innocence, and that objective evidence of his guilt is so overwhelming that it will inevitably lead to his arrest and conviction regardless of what he says or does during interrogation.

       To elicit an admission or confession, however, it is often not sufficient simply to break down a suspect's resistance.  Interrogators also try to persuade the suspect that given the circumstances in which he now finds himself that he is caught, all the evidence is against him, and there is no way out of his predicament -- there are positive reasons for confessing that will improve his otherwise hopeless situation.  In other words, interrogators seek not only to overcome a suspect's denials, but also to convince him of the positive benefits of compliance and confession.[6]  Interrogators sometimes do this by using appeals to morality, religion, catharsis or simply doing the right thing.  Interrogators sometimes do this by focusing the suspect's attention on the processing of his case in the criminal justice system and implying or stating the benefits of cooperation and confession versus the disadvantages of continued denial and resistance.  Interrogators sometimes do this by trying to focus the suspect's attention on how certain actors in the criminal justice system (police, prosecutors, judges, juries) can either help or hurt the suspect depending on what he says in the interrogation room or how they will react to his unsympathetic and implausible denials versus a confession that demonstrates remorse and accepts responsibility for the offense.  Sometime interrogators do this by trying to persuade the suspect that the alleged crime will be framed in a way that minimizes the suspect's culpability if he admits to the underlying act (e.g., a murder may be portrayed as a complete accident or a willful act of self-defense), but that it

---

[6]See Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 13

will be framed in a way that maximizes his culpability if he does not admit to the underlying act during the interrogation (e.g., a murder may be portrayed as intentional and premeditated). And sometimes interrogators do this by using explicit promises of prosecutorial leniency in exchange for a confession and explicit threats of harsher treatment or punishment in the absence of a confession.

Involuntary false confessions to police typically occur when detectives use inappropriate, improper and/or coercive interrogation techniques that cause a suspect to feel hopeless and perceive that he has no choice but to comply with the detectives' demands if he wishes to put an end to the interrogation.[7] False confessions, of course, will occur in response to traditionally coercive methods of interrogation such as the use of physical violence, threats of physical harm, excessively long or incommunicado interrogation, or deprivation of essential necessities such as food, water and/or sleep. However, these types of traditionally coercive techniques no longer appear to be common in America. The psychological techniques of interrogation that cross the line and sometimes cause false confessions typically involve one of two patterns: (1) either the interrogator communicates to the suspect, implicitly or explicitly, that he will receive a higher charge and harsher sentence or punishment if he does not comply with the detective's request for confession but that he will receive a lesser charge or sentence, or perhaps no punishment at all, if he complies with the detective's request for confession; or (2) the interrogator wears down and distresses the suspect to the point that he subjectively feels that he has no choice but to comply with the interrogator's demand for confession if he is to put an end to the intolerable stress of continued interrogation and/or escape the oppressive interrogation environment.

Whether a police-induced false confession is caused primarily by coercive interrogation techniques or by a suspect's pre-existing vulnerabilities to interrogation or some combination of both, there are three fundamental types of false confession: a *voluntary* false (i.e., a false confession knowingly given in response to little or no police pressure); a

[7]See Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 14

*coerced-* or *stress-compliant* false confession (a false confession knowingly given to put an end to the interrogation or to receive an anticipated benefit or reward in exchange for confession); and a *coerced-* or *non-coerced-persuaded* false confession (a confession given by a suspect who comes to doubt the reliability of his memory and thus comes to believe that he may have committed the crime despite no actual memory of having done so).[8] These different types of false confession typically involve different levels of police pressure, psychological logics of influence and decision-making, and different beliefs about the likelihood of one's guilt. Regardless, false confessors typically recant their confessions shortly after they are removed from the pressures and reinforcements of the interrogation environment.

The third important decision point in the interrogation process occurs after the police have elicited an "I did it" statement or admission from a suspect. This is referred to as the post-admission phase of the interrogation. The post-admission phase of the interrogation is important because it is here that the police can acquire information and evidence that will either support or not support the accuracy of the suspect's admission. Properly trained police interrogators should know that innocent people sometimes falsely confess to crimes they did not commit.[9] Properly trained police will therefore seek to elicit information (that is not generally known and cannot likely be guessed by chance) from the suspect that either demonstrates, or fails to demonstrate, independent knowledge of the crime scene details and case facts. Properly trained police interrogators will therefore not ask leading or suggestive questions and will not educate the suspect about the

---

[8]See Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251.

[9]Although the "Reid" Manual (CRIMINAL INTERROGATION AND CONFESSIONS by Fred Inbau et al.) did not include a full chapter on false confessions until the 4th Edition in 2001, the need for police interrogators to be diligent to avoid false confessions has been present for decades. From the very first manual in 1942 and in all subsequent editions (1948, 1953, 1962, 1967, 1986, 2001 and 2013), it has repeatedly implored interrogators not to use any methods that are "apt to make an innocent person confess to a crime he did not commit," implicitly, if not explicitly, suggesting that police interrogator do know that suspects can be made to falsely confess to crimes they did not commit.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 15

details of the victim's allegations or alleged crime, but, instead, will let the suspect independently supply the details of the case. Properly trained police interrogators will also seek to test the suspect's post-admission account against the physical and other credible evidence. Truthful confessions are typically corroborated by solid physical evidence and independent knowledge of underlying case facts that have not been suggested to the suspect; false confessions are not.[10]

## VII. Evaluating the Reliability of Incriminating Statements, Admissions and Confessions

In addition to studying the psychology of police interrogation and the correlates and causes of false confessions from the innocent, scientific researchers have also analyzed the patterns, characteristics and indicia of reliability in true and false confession cases. To evaluate the likely reliability or unreliability of an incriminating statement, admission or full confession from a suspect, scientific researchers analyze the fit between the suspect's post-admission narrative and the crime facts and/or corroborating evidence derived from the confession (e.g., location of the missing murder weapon, loot from a robbery, the victim's missing clothing, etc.).[11]

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. If the suspect's post-

---

[10]Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496. This observation has been made in the police interrogation training literature as well. See also Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

[11] See Richard Ofshe and Richard A. Leo (1997) "The Social Psychology of Police Interrogation: The Theory and Classification of True and False Confessions." *Studies in Law, Politics & Society*, Vol. 16. Pp. 189-251; and Richard A. Leo and Richard Ofshe (1998). "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation" *The Journal of Criminal Law and Criminology*. Vol. 88, No. 2. Pp. 429-496.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 16

admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt.

This, of course, assumes that the suspect's knowledge of the crime has not been contaminated by the media, community gossip, the police or some other source with inside knowledge about crime details.  If a suspect has learned unique or non-public crime facts from one of these sources, then the fact that his confession contains these details is, of course, not indicative of pre-existing knowledge or probative of guilt. One problem with contemporary American police interrogation in practice is that police detectives often describe crime facts to suspects, lead or direct them to infer correct answers, and sometimes even suggest plausible motives for committing the crime.[12]  Because they are trained to presume the guilt of those whom they interrogate, American police assume that they are interrogating suspects who already know the correct crime facts.  But this is not true when they are mistakenly interrogating an innocent person.  When the entirety of an interrogation is not electronically recorded, there may be a dispute about whether the interrogator(s) first suggested a non-public fact to the suspect or whether the suspect independently volunteered it.  Without an electronic recording, there is typically no way of objectively resolving this swearing contest.

Contamination by police, however, regularly occurs in interrogation-induced false confession cases.  And after police interrogators have contaminated the suspect with non-public crime facts, they often attribute "guilty knowledge" to the suspect when he repeats back and incorporates into his confession the very facts that they first educated him about.  One researcher has called these contaminated details "misleading specialized

---

[12]Richard A. Leo (2008), POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 17

knowledge."[13]  In many false confessions cases, police and prosecutors
argue that the suspect's confession corroborates his guilt because he "knows
facts only the true perpetrator would know," even though the suspect first
learned these facts from his interrogators.  In a recent study of the first two-
hundred and thirty two (250) DNA exonerations of innocent prisoners in the
American criminal justice system, Brandon Garrett has shown that this
pattern was present in more than 95% of the false confession cases in this
data set (38 of 40 cases).  In other words, in the overwhelming majority of
these proven false confession cases, police interrogators fed the suspect
unique non-public facts that "only the true perpetrator would know," but the
prosecutor erroneously alleged that the suspect volunteered these facts and
that the suspect thereby corroborated the reliability of his confession.  But
because the jury in each case mistakenly believed the prosecutor rather than
the defense, each of the confessors was convicted, and in each of these cases
the defendant's innocence (and the falsity of the confession) was only
proven many years later by DNA.[14]

       Absent contamination, the fit between the suspect's post-admission
narrative and both the crime scene facts and the derivative crime evidence
therefore provides an objective basis for evaluating the likely reliability of
the suspect's incriminating statements.  If the suspect cannot provide police
with the actual details of the crime, fails to accurately describe the crime
scene facts, cannot lead the police to new or derivative crime evidence,
and/or provides an account that is full of gross errors and disconfirmed by
the independent case evidence, then the suspect's post-admission narrative
demonstrates that he fails to possess the actual knowledge that would be
known only by the true perpetrator and is therefore strongly consistent with
innocence.

       The well-established and widely accepted social science research
principle of using the fit standard to evaluate the validity of a confession
statement is also a bedrock principle of criminal investigation within law

---

[13]Gisli Gudjonsson (2003), THE PSYCHOLOGY OF INTERROGATIONS AND
CONFESSIONS: A HANDBOOK (John Wiley & Sons Inc).
[14]Brandon Garrett (2010).  "The Substance of False Confessions."  62 *Stanford Law
Review*, 62, 1051-1110.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 18

enforcement.  Properly trained police detectives realize that an "I did it" statement is not necessarily evidence of guilt and may, instead, turn out to be evidence of innocence.  For example, in high profile murder cases, police regularly screen out volunteered confessions by seeing whether or not the person can tell the police details known only to the perpetrator or lead the police to derivative crime evidence that either corroborates, or fails to demonstrate, the person's guilty knowledge.  If an element of a crime is particularly heinous or novel, police often keep this fact from the press so that it can be used to demonstrate a confessor's guilty knowledge.  Police sometimes deliberately include an error in media releases or allow incorrect statements to go uncorrected so that a true perpetrator will be able to demonstrate his personal knowledge of the crime.  In other types of cases, police detectives regularly rely upon the fit standard to identify a true admission that might be mixed in with a collection of volunteered statements.

Using the fit standard to evaluate the validity of a suspect's incriminating statements, admissions or confessions is a bedrock principle of law enforcement because police detectives realize that seeking corroboration during the post-admission phase of interrogation is essential to proper investigative work.[15]  This is because it is a fundamental principle of police investigation that true explanations can be supported and false explanations cannot be supported (assuming no contamination has occurred), and because false explanations won't fit the facts of the crime, lead to derivative evidence or be corroborated by independent evidence.

Moreover, post-admission narrative analysis and the fit standard are central to proper criminal investigation because properly trained detectives should realize that the purpose of detective work is not to clear a crime or get a conviction, but to carefully collect evidence in a way that will lead to the arrest, prosecution and conviction of the guilty while at the same time

---

[15]Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013).  CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 354-360.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 19

insuring that no innocent individual is wrongfully arrested, prosecuted or convicted.

A suspect's post-admission narrative therefore provides a gold mine of potential evidence to the unbiased, properly trained detective who is seeking to ferret out the truth.  For if the suspect is guilty, the collection of a detailed post-admission narrative will allow the detective to establish the suspect's guilt beyond question, both by demonstrating the suspect's actual knowledge and by corroborating the suspect's statements with derivative evidence. Properly trained detectives realize that the strongest form of corroboration comes through the development of new evidence using a suspect's post-admission narrative.  While it is not possible to verify every post-admission narrative with the crime facts, a skillful interrogator will seek as much verifiable information about the crime as he can elicit.  The more verifiable information elicited from a suspect during the post-admission period and the better it fits with the crime facts, the more clearly the suspect demonstrates his responsibility for the crime.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence.  Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot.  The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime.  His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence. Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance.  Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large.  If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 20

inaccurately describes verifiable crime facts, then the post-admission
narrative provides evidence of innocence.

## VIII. The Problem of Contamination

The post-admission narrative process is about more than merely
eliciting information from the suspect.  Investigators in practice have been
observed to shape the suspect's narrative to make the confession as
persuasive as possible and to enhance the chances of conviction.[16]  In this
way, confessions are scripted or constructed by interrogators.  A persuasive
crime narrative requires an explanation of why the crime happened – the
motives and explanations of the suspect for committing the crime.  It also
should contain a statement of the suspect's emotions, not only his or her
emotions at the time of committing the crime, but also the shame, regret, or
remorse the suspect now feels for having committed the crime.  Interrogators
are also trained to get the suspect to cleanse the interrogation process,
usually by providing statements to the effect that the confession was
voluntary.  Interrogators will ask the suspect, usually after the suspect's
resistance has been broken down and he has been made to believe that it is in
his best interests to confess, whether the suspect was treated well, given food
and drink, bathroom breaks, and other comforts, and whether any promises
or threats were made to the suspect.  Finally, and perhaps most importantly,
the confession must contain both general and specific crime knowledge – the
details of the crime that only the true perpetrator should know.

The problem of contamination in false confession cases arises when
the interrogator pressures a suspect during the post-admission narrative
phase to accept a particular account of the crime story – one that usually
squares with the interrogator's theory of how the crime occurred – and then
suggests, deliberately or inadvertently, crime facts to the suspect.  The
presence of these facts in the suspect's confession gives the suspect's
narrative credibility and the appearance of corroboration.  If the
interrogation process is not electronically recorded, the interrogator is free to
assert that these crime facts were volunteered by the suspect and the trial

---

[16]Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE
(Harvard University Press) at 165-194.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 21

devolves into a swearing contest between the suspect and the interrogators over who was the source of the details in the confession.  If the entire process is recorded, however, then it may be possible to trace the contamination.

Contamination by interrogators is only one of several possible sources of contamination.  Suspects can learn crime facts from the media, from conversations with others in the community, from the rumor mill, or may simply possess knowledge of the crime facts because they live at or near the crime scene or were present at the crime scene shortly after the crime occurred.

In applying the *fit* test to assess the reliability of the confession, therefore, it essential to separate out the contaminated facts from the facts that unquestionably were provided by the defendant.

## IX. The Interrogation and Confession Statement of Karl Fontenot

We know very little about what actually occurred during the interrogation of Karl Fontenot on October 19, 1984. Though the Ada Police Dept had video recording equipment available for Mr. Fontenot's interrogation, they chose not to turn it on until after he had confessed and after Agents Smith, Rogers and Baskin had, it appears, rehearsed the confession statement with him.  According to police records, Mr. Fontenot arrived at the police station at 1:30 p.m., but the video recorder was not turned on until 3:15, one hour and forty five minutes later.  The recorded confession lasts 35 minutes until 3:50 p.m. The entire time Mr. Fontenot's custodial interview and interrogation was therefore two hours and twenty minutes (1:30-3:50 p.m.), though Agents Smith, Rogers and Baskin all testified that Mr. Fontenot had confessed to the rape, burning and murder of Denice Haraway within 10-15 minutes of arriving at the police station (i.e., between 1:40 and 1:45 pm).  If this is true, it is not clear why it took another hour and a half (until 3:15 p.m.) for Agents Smith, Rogers and Baskin to successfully turn on their recording equipment and take a statement from Karl Fontenot.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 22

Since the recording (at 3:15 p.m.) begins with Agent Rogers stating, "Let's start from the beginning and just go back to the date of April 28th in the later afternoon and early evening hours, when you and Tommy Ward and Odell Titsworth were at a party," it would appear that Agents Rogers, Smith and Baskin had been going over the facts of the case and Mr. Fontenot's confession with him in the hour and a half (1:40 or 1:45 p.m. to 3:15 p.m.) prior to his formal recorded statement.  The 35 minute recorded confession (from 3:15-3:50 p.m.) is what is known as a "recap" – i.e., a restatement of the confession elicited in the pre-recorded portion of the interrogation. However, the agents denied questioning Mr. Fontenot for very long prior to the recorded statement, and they denied providing Mr. Fontenot with any facts of the case, except that on  April 28th in the later afternoon and early evening hours, Mr. Fontenot, Ward and Odell Titsworth were allegedly at a party together.  In my professional opinion, these assertions strain credulity.

According to the official narrative given by Agents Smith, Rogers and Baskin, they accused Mr. Fontenot of being involved in the murder of Denice Haraway, he repeatedly denied any involvement, they told him they already knew what happened, confronted him with Tommy Ward's confession statement implicating him and Odell Titsworth, urged Mr. Fontenot to tell the truth.  Then Mr. Fontenot stopped denying his involvement in the murder of Denice Haraway and admitted to abducting, raping, murdering and torching her with Tommy Ward and Odell Titsworth. In my professional opinion, based on having studied and analyzed thousands of interrogations and confessions for more than two decades, it is extremely unlikely that Agents Smith, Rogers and Baskin's interrogation of Mr. Fontenot could have lasted merely 10-15 minutes of the two hours and twenty minutes.

Although Agents Smith, Rogers and Baskin have testified on numerous occasions about what they say occurred during Mr. Fontenot's alleged 10-15 minute pre-admission interrogation, Mr. Fontenot has never testified in a court setting. As best I can tell, Mr. Fontenot alleges that he was repeatedly accused of participating in the murder of Denice Haraway during his interrogation; repeatedly told he was lying when he denied knowing or murdering Denice Haraway; threatened with the death penalty

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 23

(like Mr. Ward) if he did not confess to participating in the murder of Denice Haraway; educated about the facts of Tommy Ward's "dream" confession implicating him and Odell Titsworth in the rape, murder, abduction and burning of Denice Haraway; and ultimately confessed only because he wanted to put an end to what was for him intolerable interrogation pressure and be left alone by interrogators Smith, Rogers and Baskin.  While there is no way of objectively verifying Mr. Fontenot's account (since the agents failed to record the interrogation, even though they had the means to do so and recorded his confession statement), it is consistent with what we know from decades of social science research about why some suspects give *compliant* false confessions in response to police interrogation pressures and techniques.  Mr. Fontenot describes an interrogation that is guilt-presumptive (i.e., whose goal from the start was to get a confession); involved psychologically coercive interrogation techniques (e.g., death penalty threat) and has a psychologically coercive effect on Mr. Fontenot (i.e., caused him to perceive that he had no meaningful choice but to comply with the demands of his interrogators in order to terminate and escape the aversive interrogation); and that the agents educated – i.e., contaminated – Mr. Fontenot about the confession, or, to be more specific, about Tommy Ward's dream confession and Agents Smith, Rogers and Baskin's theory of how and why the Haraway murder had occurred in the absence of a body or proof of a homicide. In other words, the three sequential errors leading to a false confession that were described above – misclassification, coercion and contamination – were all present here if one credits Mr. Fontenot's account.

Although there is no objective record of what occurred during Mr. Fontenot's two hour and twenty minute (1:30-3:50 p.m.) interrogation session, there is objective evidence that Mr. Fontenot was at an elevated risk for breaking in response to sustained interrogation and making or agreeing to a false and unreliable confession.  It is now well-established in the empirical social science research that individuals with low IQ's and cognitive handicaps are at greater risk for shifting their answers, yielding to misleading information and giving a false confession for a number of reasons.  Such individuals are highly suggestible and compliant; slow-thinking and slow acting, often trying to mask their disability by pretending to know and understand more than they actually do; are often motivated by a

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 24

desire to please authority figures; have a limited attention span; do not always understand the consequences of their actions; and are often highly averse to conflict and/or stress. In this case, Karl Fontenot's IQ was tested at 78 (putting him in the bottom 5-10% of the population) during his childhood, and he has been described by mental health professionals as having "abnormally low intelligence," in the dull normal range of intelligence, and in some areas as being "borderline mentally retarded," so much so that he did not understand the nature of the legal system or adversarial proceedings against him. Mr. Fontenot has maintained that he did not know what a confession was or even that he was admitting guilt until it was explained to him, an assertion that makes sense in light of what we know about individuals in Mr. Fontenot's range of subnormal intelligence and impaired cognitive capacity.

In sum, the interrogation that Mr. Fontenot describes, as well as Mr. Fontenot's cognitive and intellectual deficits, placed him at a high risk of making or agreeing to a false confession in response to police interrogation pressure.

## X. Indicia of Unreliability

In my professional opinion, Karl Fontenot's confession statement to abducting, raping, murdering, and burning the body of Denice Haraway with Tommy Ward and Odell Titsworth contains *numerous* and *substantial* indicia of unreliability and no – zero – corresponding indicia of reliability. Karl Fontenot's confession statement possesses all of the hallmarks of a false and unreliable confession in spades. In the thousands of confessions I have analyzed in the last three decades, I have rarely seen a post-admission narrative that is so thoroughly contradicted by the underlying crime facts, that fails so completely to demonstrate the lack of any personal knowledge of the crime facts, and that contains so many alleged crime scene details that were not merely erroneous but physically impossible and provably false. In my professional opinion, Karl Fontenot's confession statement is almost certainly, if not certainly, false.

The numerous and substantial indicia of unreliability include:

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 25

1) Karl Fontenot's confession statement contains the wrong method of killing: Fontenot confessed that Haraway was stabbed to death when, in fact, she was murdered by a single gunshot to the head.  There is no evidence that Fontenot ever owned a gun.  Significantly, Fontenot's confession statement did not mention that Haraway (whose body had not been discovered until more than a year after the murder) had been shot in the head or even that a gun was involved in the crime. Additionally, there is no evidence that Haraway was ever stabbed nor is there any evidence that she was raped or that her body was burned, contrary to Fontenot's confession statement.

2) In Fontenot's confession statement, the body had been burned in an abandoned house near the power plant and then Titsworth, Ward and Fontenot burned down the house. Not only is there no evidence that Haraway's body was burned, but the abandoned house had been torn down and burned in June 1983 – 10 months before the murder of Denice Haraway in April 1984 – and so did not exist at the time of the crime.  It was therefore physically impossible for Fontenot, Ward and Titsworth to have burned down the house in April 1984 because it no longer existed at that time. Nor had there been any fire reported on that property on April 28, 1984.

3) Fontenot's confession statement claims that Odell Titsworth physically forced Haraway to get into a pick-up truck, carried Haraway, raped her, stabbed her, and set her on fire.  Because Titsworth's arm had been broken by the Ada Police Department on April 26, 1984 (two days before the murder of Denice Haraway on April 28, 1984), he had a very painful spiral fracture that would have made it impossible for him to have physically forced Haraway to get into a truck and thereafter carry Haraway and put her over a fence, much less rape, stab or set her on fire.  Indeed, Titsworth was eventually cleared of the crime altogether, making his presence in Fontenot's confession statement a major red flag for a false confession. Fontenot makes no mention of Titsworth's injury in his confession.

4) Remarkably, Fontenot could neither correctly describe nor even identify Titsworth.  Fontenot described Titsworth as 5'10-5'11, 140-150 lbs,

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 26

with black hair below his ears, and as having no tattoos or distinguishing marks. In fact, Titsworth was 170 lbs, had hair down to the middle of his waist, and was covered in visible tattoos on both arms and both legs. Obviously Fontenot did not know who Odell Titsworth was. Not surprisingly, Fontenot could not identify pictures of Titsworth shown to him by police nor could he identify Titsworth in person when Titsworth was brought to Fontenot's jail cell and standing right in front of him, though Titsworth would have been easily recognizable to anyone who had ever seen him up close because of his numerous visible tattoos. In addition, Fontenot's confession statement claimed that Odell Titsworth's pick-up truck had been used to kidnap and transport Denice Haraway to the crime scene, but Titsworth did not own a pick-up truck. A pickup truck owned by Titsworth's mother was searched and no evidence was found implicating Fontenot or Titsworth.

5) As occurs in so many false confessions to murder, Fontenot could not identify the location of the crime or lead police to Denice Haraway's body, which was found over a year after Fontenot's confession statement in a different county in a completely different direction than his confession states.

6) Fontenot's confession statement contains an erroneous description of the time of the day in which the crime occurred. Fontenot's confession statement stated that it was almost dark when Denice Haraway had been kidnapped, but that would have occurred around 8:30 p.m. when it had already been dark for some time.

7) As in so many multiple false confession cases,[17] Fontenot's confession statement to the murder of Denice Haraway contradicts, on numerous details, Tommy Ward's statement a day earlier, which itself led to Fontenot's arrest and interrogation. The two confession statements contradict one another regarding the number of perpetrators who allegedly raped Denice Haraway (even though there is no evidence that she was even raped); whether she was stabbed by her assailant(s) (even though there is no

---

[17]See Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA world. *North Carolina Law Review*, 82, 891-1007.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 27

evidence that she was stabbed) as well as the number and location the alleged stab wounds; whether she was able to temporarily break free of her assailant(s); how she died; when she died; and where the assailant(s) disposed of her body.

8) Other than Tommy Ward's discredited, factually false confession, there is no evidence at all linking Karl Fontenot to the murder of Denice Haraway.  Only one witness identified him as being present at McAnally's on April 28, 1984, when Donna Denice Haraway left the store.  That witness, who underwent hypnosis prior to the preliminary hearing,  recanted his identification of Fontenot at trial. Additionally, Fontenot did not match the eyewitness descriptions that led to the composite picture posted by Ada police following Ms. Haraway's disappearance.

## XI. Contamination

The State of Oklahoma has contended that Karl Fontenot's confession statement contained non-public facts not likely guessed by chance that could only have been known by the true perpetrator.  In my professional opinion, this is not true.  First, the fact that Mr. Fontenot's interrogation was not recorded in its entirety – even though the Ada Police had the capacity and equipment to do so – means that there is no objective record of who said what.  It is important to note that studies of contaminated false confessions indicated that the police who contaminate those confessions always deny doing so.[18]  If Mr. Fontenot's confession statement contains non-public facts, in the absence of an objective recording we cannot know whether those facts were independently volunteered by Mr. Fontenot or suggested, whether implicitly or explicitly, by Agents Smith, Rogers and Baskin.

Second, in the recorded portion of the interrogation (the 35 minute recap that follows the previous 1 hour and 45 minutes of interrogation) contains clear evidence of contamination, namely that Mr. Fontenot is told that Ward and Titsworth were allegedly at a party on South Townsend, which was then incorporated into Fontenot's confession statement.

---

[18]See, for example, Brandon Garrett (2010).  "The Substance of False Confessions."  62 *Stanford Law Review*, 62, 1051-1110.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 28


Third, although Mr. Fontenot gave a description of the blouse that Denice Haraway was wearing at the time of her murder, Agents Smith and Baskins were given this very same description within a day or two of Ms. Haraway's disappearance. Again, without an objective recording of the entire interrogation, we do not know whether Mr. Fontenot volunteered that fact independently or, more likely in light of the numerous and substantial indicia of unreliability in Mr. Fontenot's confession statement, was (inadvertently or advertently) fed this detail by Agents Smith, Rogers or Baskin, as Mr. Fontenot asserts. Additional facts known to the police prior to the interrogation of Mr. Fontenot and subsequently incorporated into his confession include that the alleged perpetrator's vehicle was an older model pick-up truck and roughly the amount of money that had been taken from McAnally's convenience store, which had also been reported in the newspapers.

It is clear that Agents Smith, Rogers and Baskin were the first to mention Odell Titsworth, whose presence or involvement in the murder of Donna Haraway, despite extensive detailing in Fontenot's confession statement, turned out to be entirely false. Along with the numerous and substantial indicia of unreliability present in Mr. Fontenot's confession statement, this gives additional credence to Mr. Fontenot's assertion that he was educated about Tommy Ward's "dream" confession and then pressured into supplying a confession narrative that conformed to it, however erroneously.

In sum, Mr. Fontenot's confession statement contains no non-public facts not known to the police or previously reported in the media prior to Mr. Fontenot's (mostly unrecorded) interrogation. Although it is replete with indicia of unreliability, Mr. Fontenot's confession statement contains no indicia of reliability. There is no reason to believe any of it is true or accurate.

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 29

## XII. Conclusion

In my professional opinion, the confession statement of Karl Fontenot is almost certainly, if not certainly, false because it contains numerous and substantial indicia of unreliability.  Most of the interrogation that produced Mr. Fontenot's confession statement was unrecorded, and therefore there is a classic "swearing contest" about whether Agents Smith, Rogers and Baskin used certain interrogation techniques known to cause false confessions and whether they contaminated Fontenot's post-admission narrative.  All of the non-public facts contained in Mr. Fontenot's confession statement were previously known to the police investigators who interrogated him or reported in the media.  While it is replete with indicia that it is false and unreliable, Mr. Fontenot's confession statement contains no indicia of reliability or corroboration. Based on the extensive social science research on interrogation and confessions,[19] there is no reason to believe that Mr. Fontenot's confession statement is either true or reliable and every reason to conclude that it is completely false and unreliable. It bears all the hallmarks of a false and unreliable confession.

In addition, as discussed above, there were several factors present in this case that elevated the risk of eliciting a false and unreliable confession from Mr. Fontenot.  These included Mr. Fontenot's abnormally low I.Q., which suggests he would have been highly suggestible, compliant and easily manipulated into making or agreeing to a false confession; and the interrogation pressure and high-end inducements he describes occurring during the largely unrecorded interrogation, which, as substantial social science research has demonstrated, are known to lead to false and unreliable confessions.[20]

The opinions I expressed in this report are based in part on the case-specific information that has been provided to me.  Should any additional

---

[19]See Saul Kassin, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard Leo and Allison Redlich). "Police-Induced Confessions: Risk Factors and Recommendations" in *Law and Human Behavior*, 34, 3-38
[20]Richard A. Leo (2008).  POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press)

Tiffany Murphy, Director
Oklahoma Innocence Project
June 4, 2013
Page 30


information or testimony come to my attention, I reserve the right to modify
accordingly any opinions expressed herein.

      If you have any questions or if I can be of any further assistance,
please do not hesitate to contact me.

Sincerely,

*Richard Leo*

Richard A. Leo, Ph.D., J.D.
Professor of Law of Law and
Dean's Circle Research Scholar
University of San Francisco