# EXHIBIT
# 20

# Investigative and Forensic Assessment
Abduction and Homicide of Donna "Denice" Haraway

*Last Seen*:
McAnally's convenience store (her place of work);
Saturday, April 28th, 1984, at approximately 8:30 P.M.



*Skeletonized Remains Found*:
West of Gerty off a county road;
Monday, January 20th, 1986;
Approx. 5:00 P.M. by Allan Tatum, Trapper

*Investigating Agencies*:
Ada Police Department, Oklahoma
Pontoc County Sheriff's Office
Oklahoma State Highway Patrol
Oklahoma State Bureau of Investigation

*Report by*:
Brent E. Turvey, Ph.D; Forensic Scientist
Forensic Solutions LLC
(907) 738-5121

*Date*:  June 2nd, 2013

*Report for*:
Tiffany R. Murphy, JD; Director, Oklahoma Innocence Project
Oklahoma City University School of Law
2501 N. Blackwelder
Oklahoma City, OK  73106
(405) 208-6805

# Purpose
This examiner (Turvey) was retained by Tiffany Murphy, JD, to conduct a post conviction review of the facts and evidence related to the abduction and murder of Donna "Denice" Haraway,  and the conviction of Karl A. Fontenot (*Fontenot v. State*, 1988). He was then asked to provide a professional assessment of the quality, competence, and thoroughness of the investigative and forensic efforts in this case. This assessment was conducted with the intent of determining whether sufficient investigative and forensic efforts have been undertaken to establish the facts of the case for use in related court proceedings.

# Duty of Care

The investigation of reported crime is the statutory and jurisdictional province of various local, state, and federal law enforcement agencies (Sullivan, 1977). The specific agencies responding to a criminal complaint, and ultimately in charge, depend on which laws have been reported to be broken and where. Whichever agency takes charge of a criminal complaint, they have the legal authority to respond to the scene, interview witnesses and suspects, collect evidence, and make arrests[1].

Any responding law enforcement agency also has a professional *duty of care*. This refers to the professional and legal obligation to be competent custodians of any victims that are encountered; any criminal investigations that are initiated; any evidence that supports or refutes allegations of criminal activity against accused suspects; and any suspects that they take into custody (see Bopp and Schultz, 1972; Gross, 1924; Hansen and Culley, 1973; Kappeler, 2006; SATF, 2009; and Savino and Turvey, 2011). Very often this duty of care is a matter of explicit statute and agency policy, wherein law enforcement officers are not allowed to turn a blind eye to crime and must respond to protect life and property. Very often it is also made part of the formal oath they take when being sworn in. If an agency, or its officers and investigators, do not hold or perceive a professional duty of care to their community, then they are not fit to serve it (Gross, 1924); let alone respond to criminal complaints and assume the responsibilities associated with the collection and testing of physical evidence.

The primary responsibilities of law enforcement, when responding to a criminal complaint, include (adapted from basic criminal investigation and crime scene processing guidelines found in Gross, 1924; O'Connell and Soderman, 1936; Rau, 2000; Snyder, 1944; Wade, 1999; and Weston and Wells, 1974):

1. Protect themselves; call for back-up when needed.
2. Establish who is involved.
3. Ensure that everyone involved is safe.
4. Get medical assistance for those that need it.
5. Determine what happened.
6. Establish who made the complaint and what it is about.
7. Identify any witnesses.
8. Seek out, identify, collect, and protect any physical evidence.
9. Ensure the objective forensic examination of all relevant evidence.
10. Determine whether or not a crime has taken place.
11. Identify any legitimate criminal suspects.
12. Establish whether probable cause exists for an arrest.
13. Arrest any criminal perpetrators.

---

[1] The section is adapted from Crowder and Turvey (2013).

These tactical issues also reflect an ethical responsibility. Investigators may not assume what happened based on the statements of one party. They may not assume that any crime has actually occurred until the facts have been established by a thorough investigation. They must be sufficiently educated to understand what the elements of each crime are and the what probable cause is. They must also impartially place the cuffs on anyone they determine has broken the law. For example, as explained in Bryden and Lengnick (1997; pp. 1230–1231):

> As with all crimes, the police decide whether a reported rape actually occurred, and attempt to determine who committed it. If they want the case to go forward, they "found" the complaint and transmit the file to the prosecutor's office... The police must investigate, a task that cannot easily be combined with offering the emotional support that the victim needs. The detective presumably wishes to avoid an injustice to a wrongly accused individual. In addition, for reasons of professional pride, he does his best to avoid looking naive by falling for a story that turns out to be false.

Meeting these responsibilities is best accomplished with a thorough, diligent, and comprehensive investigation. By comprehensive investigation, the examiner means a detailed review of the complainant and their statements; the careful consideration of witness and suspect statements; and the diligent collection and examination of any physical evidence. All of this must be attended prior to making final determinations regarding whether a crime has been committed and whether probable cause exists to arrest any suspects. See generally Bopp and Schultz (1972); Gross (1924); Kappeler (2006); Leonard (1969); O'Connell and Soderman (1936); Sullivan (1977); Savino and Turvey (2011); and Weston and Wells (1974).

## Materials Examined

This examiner made a directed request for all available investigative and forensic materials (e.g., police reports, forensic reports, witness reports, and court testimony) related to this case to the Office of Tiffany Murphy. Materials were provided as they became available up until the time that this report was written. The relevant case materials included, but were not limited to, the following:

1. Various Oklahoma State Bureau of Investigation (OSBI) investigative reports, e.g.;
   - Inv. Hogan Report dated May 7, 1984;
   - Inv. Featherstone Report dated January 31, 1986;
2. Various Oklahoma State Bureau of Investigation evidence examination reports;
3. Various Medical Examiner reports and logs (e.g., Larry Balding, MD - Deceased);
4. Report from Richard McWilliams, Phd, Forensic Anthropologist, January 23, 1986;
5. APD crime scene photos of McAnally's convenience store (exterior only);
6. APD crime scene photos re: skeletonized remains of Haraway;
7. Richard Kerner's report of Investigation, May 19, 1988 (K-Mar Legal Investigations, Inc.);
8. "Haraway Case, Background on Haraway" report from Mr. Ross, Prosecutor;
9. Testimony from various investigators and witnesses from original trials, e.g.
   - Monroe Atkeson, Manager, McAnally's convenience store (Haraway's boss);
   - Witness Lenny Timmons;
   - Witness Gene Welchel;
   - Chief of Detectives Dennis Smith, APD;
   - Det. Mike Baskin, APD;
   - Officer harvey Phillips, APD;
   - Inv. Gary Rogers, OSBI;
   - David Dixon, Criminologist, OSBI;

- Ann Reed, Criminologist, OSBI;
- DA's Investigator Bruce Johnson;
- DA's Investigator George Bond;

10. Investigator Dan Grothaus interview report: Wesley Edens, January 25, 2013;
11. Investigator Dan Grothaus interview report: Jess Stott, May 10, 2013;
12. Signed affidavit of Vickey Jenkins re: Karen Wise;
13. Gene Geitzen, Forensic Consulting, LLC, Report dated April 3, 2013;
14. Gene Geitzen photos of evidence exhibits from Box labelled "88-571; Fontenot v. State".

# Background

According to police interviews and victimology based on the above-cited reports and evidence, Donna Denice Haraway was eight months into her marriage with Steven Haraway. She was considered a very attractive woman, though shy and a bit awkward. By all accounts she was also a dedicated student who was working towards a teaching degree at a local college. She had been employed at McAnally's for approximately nine months prior to her abduction. She was known to study at the store, behind the counter, when things were slow. She had also been receiving harassing phone calls while work. There is also one report that she talked about acquiring a firearm out of concern for her personal safety.

According to law enforcement reports, Donna "Denice" Haraway (24, WF) was last seen at her place of work, McAnally's convenience store, at approximately 8:30 P.M. on Saturday, April 28th, 1984. Haraway was the lone clerk on duty that evening.

A customer, Gene Whelchel, made three calls that evening: first to Mr. McAnally, the owner of the store; second, he notified the store manager, Monroe Atkeson; and third, he notified the Ada Police Department. Mr. Whelchel explained that the clerk was not in the store and that the cash register drawer was open. The manager then drove from his home to the store. Additionally, Ada PD responded to the scene.

Other relevant background is taken directly from the court's decision in *Fontenot v. State* (1988):

> [Karl Fontenot] and Tommy Ward were tried for the crimes during September, 1985. In October of 1984, Tommy Ward made a statement to law enforcement officers which inculpated Fontenot, an individual named Odell Titsworth, and to a slighter degree, himself. Fontenot and Titsworth were arrested as a result and Fontenot gave a statement substantially in agreement with Ward's except that it more clearly inculpated Ward. In each Ward's and Fontenot's statements, the instigator and ringleader in the criminal acts was said to be Titsworth. However, Titsworth was eliminated as a suspect within a few days of his arrest because of clear proof the police had that he had not been an accomplice.

> According to the statements of Ward and Fontenot, Haraway was robbed of approximately $150.00, abducted, and taken to the grounds behind a power plant in Ada where she was raped. According to appellant's version, she was then taken to an abandoned house behind the plant where Titsworth stabbed her to death. She was then burned along with the house. When Haraway's remains were found in Hughes County, there was no evidence of charring or of stab wounds, and there was a single bullet wound to the skull.

On Monday, January 20th, 1986, a trapper found partial skeletal remains of Denice Haraway; these were later identified through her dental records. The remains were located approximately 1

mile south, and 3 ½ miles west, of Gerty, Oklahoma off a county road. The remains were found scattered in a wooded area.

The few crime scene photographs that were taken depict a skull, various scattered bones, and a conspicuous pile of bones placed on a rock. Bits and pieces of clothing and jewelry were also found at the scene, but not photographed or otherwise documented. According to Mrs. Haraway's autopsy report, a gunshot wound to the head was reported as the probable cause of death. There was no evidence that the victim was stabbed, burned, or sexually assaulted. In short, every detail alleged to be provided by Fontenot and Ward to investigators about the abduction and murder of Denice Haraway turned out to be either unsubstantiated or completely false.

# Findings - Summary

The following is a summary of major findings related to this assessment.

1. The investigative and forensic efforts of law enforcement at the location of Haraway's abduction (McAnally's convenience store; April 28, 1984) were inadequate rising to the level of *abandonment*[2]. This prevented the recognition, preservation, collection, and testing specific items of evidence, as well as an untold volume of evidence that would have been missed.

2. The investigative efforts of law enforcement subsequent to Haraway's abduction were inadequate rising to the level of abandonment.

3. The investigative and forensic efforts of law enforcement at the location where Haraway's remains were found (West of Gerty, off a county road; Monday, January 20th, 1986) were inadequate rising to the level of abandonment. This prevented the recognition, preservation, collection, and testing specific items of evidence, as well as an untold volume of evidence that would have been missed.

4. It is unclear from the case record that anyone, whether prosecution or defense, fully understood that the victim had given birth to at least one child, and what that must have meant for the investigation. There is no evidence whatsoever that they focused on or followed up on this forensic finding, which is perhaps the single most important finding in this case.

# Findings - Discussion

The following is a discussion of the major findings related to this assessment, already summarized in the previous section.

1. The investigative and forensic efforts of law enforcement at the location of Haraway's abduction (McAnally's convenience store; April 28, 1984) were inadequate rising to the level of abandonment. This prevented the recognition, preservation, collection, and testing specific items of evidence, as well as an untold volume of evidence that would have been missed. This is based

---

[2] As discussed in Crowder and Turvey (2013), and Gershman (1997), professional *abandonment* refers to incompetence and negligence to the point of effective professional absence causing harm to the client. In effect, it also refers to the abandonment of one's professional duty of care.

on at least the following facts and evidence (see testimony of officers and investigators from Ada PD):

  A. The First Officer on site did not secure crime scene or provide for scene integrity in any reasonable or effective fashion.
   - No security tape deployed.
   - No security log kept re: personnel/witnesses/ patrons entering and exiting the scene.
   - Did not keep the manager out of the scene.
   - Did not shut down McAnally's to business (e.g., continued to sell gas).
   - This is further demonstrated by the register tape, which shows customers paying for items in the store after law enforcement arrived on scene.

  B. The responding investigators failed to secure, investigate, and collect potential evidence at the crime scene.
   - Once on scene, they did not immediately address and correct the lack of security.
   - No efforts were made to preserve the physical evidence.
   - Investigators did not instruct anyone to engage in crime scene processing efforts.
   - No independent count of the money present at the scene was conducted; investigators relied on the manager for this information.
   - Investigators failed to collect Haraway's purse from the crime scene.
   - Haraway's driver's license was provided that evening to investigators from her purse by the manager.
   - The manager gave Haraway's purse to her husband, Steve; Steve Haraway apparently gave the purse to police investigators a year later, in May of 1985, violating any reasonable or effective chain of custody.
   - While the investigators were on scene, the manager disposed of a cigarette butt that he found burning in an ashtray on the counter and an open beer can which is believed to be the last item purchased, preventing their collection as evidence.
   - Law enforcement investigators left the scene unsecured and allowed the manager lock up in their absence.

  C. The responding investigators failed to identify, secure, investigate, and collect potential evidence from Ms. Haraway's vehicle, which was reported to be parked at the crime scene that evening. They did acknowledge it existed at the scene, as this was pointed out by the manager, but it was not opened, the registration was not verified, and potential evidence relating to potential suspects could easily have been missed.

2. The investigative efforts of law enforcement subsequent to Haraway's abduction were inadequate rising to the level of abandonment. This is based on at least the following facts and evidence:

  A. Missing person report was filed by Haraway's sister, mother, and step-father containing detailed descriptive information.

B. A telex was sent out by law enforcement investigators with no description of victim clothing because they thought clothing was not important. This is investigatively unsound.

C. Law enforcement investigators sent out Haraway's dental records to other agencies, in lieu of a physical description. This suggests that they presumed she was actually dead (this would be the only reason other agencies would need or have use for dental records). Such an assumption so early on, with no indication of violence or injury at the scene, is investigatively irresponsible.

D. Basic investigative procedure in a missing persons case would dictate getting witness statements of the victim's description, and victim photos from the family, for regional distribution. There is no evidence that this was done.

E. Basic investigative procedure in a missing persons case would dictate running the victim's name and home address through <u>criminal</u> databases to establish any history of criminal activity by the victim, any known criminal associates, or any prior victimization. There is no evidence that this was done.

F. Basic investigative procedure in a missing persons case requires interviews with immediate family (e.g., husband, mother, sister, and stepfather) for pertinent background and potential suspect information or development. There is no evidence that this was done, other than a single interview with the mother by the OSBI.

G. Basic investigative procedure in any felony crime scene would require checking phone records of incoming and outgoing calls with respect to the scene itself (e.g., McAnally's), the victim's home, and any friends or family. There is no evidence that this was done.

H. Basic investigative procedure in a missing persons case requires interviews with recent romantic or sexual partners (e.g., ex-husbands and ex-boyfriends) for pertinent background and potential suspect information or development. There is no evidence that this was done.

I. Defense investigator interview efforts revealed information regarding Wes Weissinger, Haraway's jealous and reportedly drug-addicted ex-fiancé with whom she lived with for a time. They further have revealed that Haraway became apparently pregnant while engaged to Weissinger, and had at least one abortion, all prior to her marriage with Steve Haraway. The police and prosecution knew of Haraway's prior relationship with Weissinger, but there is no evidence that they followed up on or investigated the extent of it - let alone any potential relevance to her abduction.

J. Basic investigative procedure in a missing persons case requires interviews with close personal friends for pertinent background and potential suspect information or development. There is no evidence that this was done.

K. A defense investigator interview with Karen Wise, Haraway's best friend at the time, revealed that Haraway was believed to be pregnant at the time of her abduction. The police and prosecution should have been aware of this, as Karen Wise testified at trial and there was ample opportunity to elicit this and other related information.

L. The prosecution misplaced a box of exhibits labelled "88-571; Fontenot v. State". This box was recently discovered by accident in a closet at a Sheriff's Office. It contained, among other things, a gray shirt, long sleeved; a brown leather purse, labeled "purse belonging to Denice Haraway, given to D. Smith by Steve Haraway, 5-24-85" - State's Exhibit 61



(the purse contained numerous items, not all of which are mentioned here); a piece of blue jean material from the zipper area of a pair of jeans (found inside the purse); An "Office of the State's Medical Examiner" envelope labeled "Metal fragment found in skull of Donna Haraway, State's Exhibit 15B"; a small blue manila envelope labeled "Blue jean material found 25' NW of skull"; an unsealed evidence bag, labelled "strand of hair" State's Exhibit 17; the victim's earrings; a blue and white pocket book; a SW Bell calling card for Donna Haraway, no. 405-332-8957 - loose in the box; rolled up adding machine tape from the McAnally's register, State's Exhibit 60; a cigarette butt, loose in the box; a blue card with a "Family Planning Clinic" appoint time and date: "November 16, @ 1P.M."; microscope slide with hair, loose in the box; a piece of paper with a name a phone number on it; and the victim's driver's license, loose in the box.

M. The cash register tape did not appear to have been previously unravelled or examined subsequent to being collected and boxed by law enforcement investigators. Unravelling it revealed that it had been used by law enforcement investigators to associate and record the names of customers who purchased items at McAnally's on the night of of Haraway's abduction. There is no evidence that these customers were interviewed by law enforcement investigators.



Turvey Report
Haraway case: Page 8 of 13

N. There is no evidence that law enforcement investigators researched the calls associated with the SW Bell calling card for Donna Haraway.

O. There is no evidence that police investigators followed up on the blue card with a "Family Planning Clinic" appoint time and date: "November 16, @ 1P.M." from Haraway's purse. This becomes investigatively relevant with respect to her reported history of abortion, reported pregnancy, and the finding that she gave birth subsequent to her abduction (see finding No. 4 in this report).

3. The investigative and forensic efforts of law enforcement at the location where Haraway's remains were found (West of Gerty, off a county road; Monday, January 20th, 1986) were inadequate rising to the level of abandonment. This prevented the recognition, preservation, collection, and testing specific items of evidence, as well as an untold volume of evidence that would have been missed. This is based on at least the following facts and evidence:

A. The First Officer on site did not secure crime scene or provide for scene integrity in any reasonable or effective fashion. This is standard practice even when remains have been in place for extended periods of time, to prevent further evidence loss, damage, or obliteration (Chisum and Turvey, 2011).
   - No security tape deployed.
   - No security log kept re: personnel/witnesses/ patrons entering and exiting the scene.

B. It is unclear from the record whether scene was "processed" on 1/20/86 or 1/21/86

C. Scene photos lacked sufficient quantity, quality, context and measurements.

D. Some bones appeared to be improperly piled together for photos, and were then packaged together in a sack.

E. There is no written investigative or forensic report on who found what or where at the scene.

F. There is no scene diagram

G. There was no directed or deliberate forensic excavation for other evidence concealed by brush or beneath soil.

H. According to a supplemental MEs report, some victim bones and a watch were found in a rat's nest by a farmer some 30' away from the original site on 1-30-96. There is no evidence that the watch put under a clear chain of custody or submitted for forensic analysis (e.g., fingerprinting; now DNA testing).

I. Additionally, there is no evidence that anyone in authority investigated or confirmed whether the watch or the earrings found with these remains actually belonged to the victim.

J. The ME's office was not notified; bones were therefore removed without proper legal authority by the police, the OSBI and the Sheriff's Department.

K. The scene was vacated and left unsecured before investigators returned on 1/24/86: the OSBI, the prosecutor, the sheriff and the ME went out there and found more bones.

L. In late February of 1986, law enforcement investigators returned to search this scene with both ECU college students and victim family members. Either group being involved with formal search efforts at this scene is highly inappropriate.

M. There were, in effect, multiple searches on multiples dates by multiples agencies with no reports of search activity or chain of custody regarding evidence collected.

N. Based on a review of the documentation, it is likely that evidence still exists at that location, to include more bones and perhaps even the victim's engagement ring, which was not recovered.

4. It is unclear from the case record that anyone, whether prosecution or defense, fully understood that the victim had given birth to at least one child, and what that must have meant for the investigation. There is no evidence whatsoever that they focused on or followed up on this forensic finding, which is perhaps the single most important finding in this case. This is based on at least the following facts and evidence:

A. There is no evidence that the victim gave birth prior to her abduction.

B. There is strong forensic evidence that the remains found, which are conclusively identified as those of Donna "Denice" Haraway, belong to an adult female that has given birth to at least one child through her birth canal. As stated in the Report from Richard McWilliams, Phd, Consulting Forensic Anthropologist to the ME's Office, January 23, 1986: "Marks on the pelvis indicate she had given birth to at least one child."

C. There is no evidence that investigators, prosecutors, or the defense understood the significance of this information: the victim would need to have been held in captivity for up to as many as nine months in order to give birth. Any suspects generated would need to be physically capable of this. In addition, this means there would necessarily be another crime scene where the victim was held - which has yet to be acknowledged let alone identified by law enforcement efforts.

D. No skeletal remains of an infant were found in association with the remains of Donna "Denice" Haraway. This means that either scene search efforts were inadequate to the

task of finding them; that the child was killed subsequent to its birth and disposed of elsewhere; or that the child was not killed and may yet be alive. None of these possibilities have been investigated, or excluded, by investigative efforts to date.

Please do not hesitate to contact me with any questions regarding these findings.

Brent E. Turvey, PhD
Forensic Scientist

# References

Bopp, W. and Schultz, D. (1972) *Principles of American Law Enforcement and Criminal Justice*, Charles C. Thomas, Springfield, IL.

Bryden, D. and Lengnick, S. (1997) "Rape in the criminal justice system," *The Journal of Criminal Law and Criminology,* Vol. 87, Summer; 1194–1384.

Chisum, J. and Turvey, B. (2011) *Crime Reconstruction, 2nd ed.*, San Diego: Elsevier Science.

Crowder, S. and Turvey, B. (2013) *Ethical Justice: Applied Issues for Criminal Justice Students and Professionals*, San Diego: Elsevier Science.

*Fontenot v. State* (1988) OK CR 170, 742 P.2d 31, Case Number: F-85-769.

Gershman, B. (1997) *Trial Error and Misconduct*, Lexis Law, Charlottesville, VA.

Gross, H. (1924) *Criminal Investigation,* London: Sweet & Maxwell.

Hansen, D. and Culley, T. (1973) *The Police Training Officer*, Charles C. Thomas, Springfield, IL.

Kappeler, V. (2006) *Critical Issues in Police Civil Liability, 4th ed.*, Waveland Press, Long Grove, IL.

Leonard, V. (1969) *The Police, The Judiciary, and the Criminal*, Charles C. Thomas, Springfield, IL.

O'Connell, J. and Soderman, H. (1936) *Modern Criminal Investigation,* New York: Funk & Wagnalls.

Rau, R. (2000) *Crime Scene Investigation: A Guide for Law Enforcement*, Washington DC: National Institute of Justice, Technical Working Group on Crime Scene Investigation, NCJ 178280, January.

Savino, J. and Turvey, B. (2011) *Rape Investigation Handbook, 2nd ed.*, Elsevier, San Diego, CA.

SATF (2009) "False reports and case unfounding," *Attorney General's Sexual Assault Task Force*, State of Oregon, Position Paper, January 22.

Snyder, L. (1944) *Homicide Investigation,* Springfield, IL: Charles C. Thomas.

Sullivan, J. (1977) *Introduction to Police Science*, *3rd ed.*, McGraw-Hill, , New York.

Wade, C. (1999) *Handbook of Forensic Services,* Washington, DC: U.S. Department of Justice, Federal Bureau of Investigation.

Weston, P., and Wells, K. (1974) *Criminal Investigation: Basic Perspectives, 2nd ed.*, Englewood Cliffs, NJ: Prentice-Hall.