IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

_____

KARL FONTENOT,                                    :
                                                  :
              Petitioner,                         :
                                                  :              CIVIL ACTION
       v.                                         :          6:16-cv-00069-JHP-KEW
                                                  :
JOE ALLBAUGH, WARDEN,                             :
                                                  :
              Respondent.                         :
                                                  :
_____:

_____

**MOTION FOR EVIDENTIARY HEARING AND
MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT, THEREOF**
_____

Tiffany R. Murphy
Attorney at Law
Arkansas Bar No. 2015057
790 N. Cliffside Drive
Fayetteville, AR 72701
(479) 575-4573

Robert Ridenour
Assistant Federal Defender
OBA #16038
One West Third Street, Ste. 1225
Tulsa, OK  74103
(918) 581-7656

COMES NOW, Mr. Fontenot, by and through undersigned counsel and requests that this Court set an evidentiary hearing based on the Claims 1, 2, 3, 4, 5, and 8 in his Amended Petition for Writ of Habeas Corpus filed before this Court.   Based on the following Memorandum in Support, Mr. Fontenot explains why a hearing should be granted on each of his claims. Therefore, after briefing is done regarding the evidentiary hearing, Mr. Fontenot requests this Court set a hearing at its earlies convenience.

## MEMORANDUM IN SUPPORT

After counsel for Mr. Fontenot filed his original Petition for Writ of Habeas Corpus, this Court allowed discovery pursuant to Fed. R. of Civil Pro. 23 et seq. rather than Rule 6 of the Rules Governing Federal Habeas Corpus Proceedings.  In accordance with that scheduling conference, this Court issued a briefing schedule and then amended that briefing schedule on March 15, 2017.  Mr. Fontenot pursued discovery from OSBI, the Pontotoc County District Attorney's Office, the Pontotoc County Sheriff's Office, and the Ada Police Department. Several people with knowledge about the investigation and prosecution of Mr. Fontenot were deposed as well.  These people include Bill Peterson, Chris Ross, Gary Rogers, and George Butner.  Based upon newly discovered evidence during the discovery period, Mr. Fontenot filed an Amended Petition for Writ of Habeas Corpus at the same time as the instant Motion.  The additional exhibits supporting Mr. Fontenot's Amended Petition will be addressed herein.  All exhibits listed below are from the Amended Petition unless otherwise stated.

## STATEMENT OF FACTS

About 8:30 p.m. on April 28, 1984, Donna Denise Haraway, a clerk on duty at McAnally's convenience store in Ada, Oklahoma, disappeared.  According to the testimony of three men, she walked out of the store accompanied by a blond man and both got into a gray primer pickup. N/T 6/10/88 at 38, 40.  Five to ten minutes later, one of the men who saw Mrs. Haraway leave entered the store, realized it was unattended, and called police. *Id.* at 41-42 All of Mrs. Haraway's belongings including her purse and schoolbooks had been left behind the counter. *Id.* at 88.  Composite drawings of the man seen leaving with Mrs. Haraway and a second man were compiled based on descriptions of men given by the customers and a clerk at JP's convenience store, another business a short distance away.  They gave descriptions of the men,

3

who a clerk said had been acting suspiciously and had left her store shortly before Mrs. Haraway disappeared. P/H 295, 297, 361-62, 719-20. Ada police received calls naming Tommy Ward as the blond man in the sketches. N/T 6/13/88 at 157.

Mr. Ward was interviewed by Ada police on May 1, 1984. N/T 6/13/88 at 158.  He told police he and Mr. Fontenot had been fishing all day on April 28 and were together all night. P/H at 486.  Police then approached Mr. Fontenot on May 1.  P/H at 487-488, 531- 34; N/T 6/13/88 at 60-161.  Mr. Fontenot said he was late for work and would see them later. Neither Mr. Fontenot nor the police followed up on this contact. *Id.* at 161.

The police next focused on Mr. Ward and Mr. Fontenot in October of 1984, after Jeff Miller apparently claimed he heard that Ward, Mr. Fontenot, Jeanette Roberts (Blood) and Odell Titsworth had been fishing at Blue River on April 28, 1984, and that somehow Jeanette Roberts' pickup was involved in Haraway's disappearance. N/T 6-13-88 at 100-103; PH at 502, 712.  No statements from Mr. Miller were ever disclosed to any defense counsel for either Mr. Ward or Mr. Fontenot prior to any of their trials.  Additionally, Mr. Miller's statements were not provided to post-conviction or current counsel for Mr. Fontenot.

On October 12, 1984, based on the information from Jeff Miller, the police contacted Mr. Ward in Norman and interviewed him for more than two hours. P/H at 506.  He denied any involvement or knowledge of what happened to Mrs. Haraway. *Id.* at 769 J/T at 1336.  On October 18, 1984, Mr. Ward went back to the Oklahoma State Bureau of Investigation to take a polygraph test.  After nine hours of interrogation, he was videotaped giving a statement in which he described being with Odell Titsworth and Karl Fontenot. According to his statement, the three of them robbed McAnally's, kidnapped, raped, and stabbed Mrs. Haraway to death. P/H at 746-47, 748-51; State's Exhibit No. 30.

4

The following day, Mr. Fontenot was arrested and interviewed by OSBI Agents Gary Rogers and Rusty Featherstone, and Ada Police Detective Dennis Smith. N/T 6/14/88 at 22-24. After being told of Mr. Ward's confession, Mr. Fontenot confessed to similar circumstances as Mr. Ward and told the agents that the three men burned Mrs. Haraway's remains. *Id.* at 40-77; State's Exhibit No. 76. Mr. Titsworth was arrested, but was found not to be involved in Haraway's disappearance due to his arm being broken at the time.  N/T 6-13-88 at 86-87.  The police videotaped Mr. Fontenot's confession but omitted any interrogation preceding his confession.   Similarly to treatment of Mr. Ward, Mr. Fontenot was polygraphed by OSBI Agent Featherstone.  He said that Mr. Fontenot's polygraph results were inconclusive. Ex. 44 at 605, 628.

During his confession, Mr. Fontenot described Mr. Titsworth as 5'10" to 11" tall, weighing around 140 to 150 pounds, with black hair just below his ears with no tattoos or distinguishing marks. N/T 6/14/88 at 71 -72.  In April of 1984, Odell Titsworth had hair grown down to the middle of his waist, weighed 170 pounds, and had tattoos covering both arms from the wrists to the shoulders, inside and out, on his back, his stomach, and up and down both legs. P/H at 792-796, 795-97, 838; N/T 6/13/88 at 1-82.  On April 28, 1984, his arm was in a cast, after being broken by Ada police on April 26. N/T 6/13/88 at 184-85, N/T 6/14/88 at 88-89.  Mr. Fontenot could not identify pictures of Mr. Titsworth shown him by police. N/T 6/14/88 at 88. Further, he could not identify him when police brought Mr. Titsworth to Mr. Fontenot and stood him in front of him.  *Id.* at 88-90.  Shortly thereafter, Mr. Titsworth was cleared of any involvement in the case. N/T 6/13/88 at 86.

The State's case against Mr. Fontenot rested solely on that confession and the following evidence.  Jim Moyer testified that he saw both Tommy Ward and Mr. Fontenot in McAnally's

shortly before Mrs. Haraway's disappearance. P/H at 13-214. He is the only witness who placed Mr. Fontenot in McAnally's. While talking to Mrs. Haraway during his purchase of cigarettes, he recounted two men walking into the store; one man with dark hair while the other one was blond. *Id.* at 218-220.  During his conversations with police and during the trials, he testified the man who came to the counter was Mr. Ward, who closely resembled one of the police composites. He identified Mr. Fontenot in the courtroom as the dark-haired man who walked towards the back of the store. N/T 6/10/88 at 16.  When cross examined, Mr. Moyer was not sure Mr. Fontenot was the person at McAnally's. *Id.* at 26. Mr. Fontenot was substantially shorter than the person in McAnally's while a spectator in the courtroom gallery more closely resembled the second man. *Id.* at 197- 199.

While Mr. Fontenot's case was pending before the Oklahoma Court of Criminal Appeals on direct appeal, the remains of Mrs. Haraway were discovered in a location totally different than Mr. Fontenot had recounted in the confession.  On January 20, 1986, eighteen months after Mrs. Haraway's disappearance, Allen Tatum saw a skull and bones when he was setting traps in the countryside near Gerty, Oklahoma, a town east of Ada in adjacent Hughes County. N/T 6/10/88 at 38.  He told his brother-in-law, who contacted law enforcement. *Id.* at 39. A subsequent search of the area resulted in the discovery of skeletonized remains, identified through dental records as Mrs. Haraway's, and a variety of other items, including deteriorated clothing, shoes, and earrings. *Id.* at 130, 54-106; State's Ex. Nos. 1-14 (photograph s); 15A-15E; 16 (clothing fragments); 17 (animal hair); 18 (cups and beer cans); 19-20 (red and gold earrings); 21 (hair); 22A-22G (various items, 22F a portion of a red and white shirt); 23-49 (photographs); Defense Ex. Nos. 1-4 (OSBI reports and diagram).

Based on the autopsy, it was found that Mrs. Haraway had a single bullet wound in her skull.  Ex. 46.  The medical examiner determined that the gunshot wound to her head was her cause of death. *Id.* The report notes that marks found on the skeletal ribs were due to "small animal activity" rather than knife wounds. *Id.*  Nothing in Mr. Fontenot's confession mentions a gun, Mrs. Haraway being shot, or her remains being placed in Gerty, Oklahoma.  He had said she had been stabbed, but no evidence corroborated that.  All these things contradicted what Mr. Fontenot had confessed to.

### The Standard for Evidentiary Hearings

Mr. Fontenot diligently pursued both the constitutional claims and their factual basis in his state court proceedings. Under Oklahoma post-conviction law, a petitioner is entitled to an evidentiary hearing if there is a genuine issue of material fact. *See* 22 O.S.2011, § 1084 ("If an application cannot be disposed of on the pleadings and record, or there exists a material issue of fact, the court shall conduct an evidentiary hearing at which time a record shall be made and preserved"); *see also Logan v. State*, 293 P.3d 969, 978-979 (Okla. 2013).  Petitioner filed a post-conviction application and amended that application after receiving discovery from Respondent.  Based on the collateral pleadings and court records, there exists unresolved issues of material fact by both parties.  After post-conviction proceedings, the state court summarily denied all claims based on laches without resolving any of the constitutional claims raised.

Therefore, Mr. Fontenot is entitled to an evidentiary hearing in accordance with 28 U.S.C. § 2254(e)(2). Nothing within the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") precludes further factual development in federal habeas corpus once Mr. Fontenot's diligence is established. Further, Mr. Fontenot's actual innocence claim, raised in Claim One, must be given full factual development in an evidentiary hearing given that, in and of itself, that

claim will remove any procedural obstacles preventing this Court's substantive analysis of all constitutional claims. *See Schlup v. Delo*, 513 U.S. 298, 315-316 (1994).

It is only through an evidentiary hearing that Mr. Fontenot can factually establish the newly discovered evidence of his innocence as it relates to what he presented at trial. *See Schlup v. Delo*, 513 U.S. 298, 332 (1995) (A Petitioner "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial.") Because this Court must make a cumulative assessment of evidence, both newly discovered and presented at trial, an evidentiary hearing is the only means by which Mr. Fontenot can factually establish his innocence. *See U.S. v. Cervini*, 379 F.3d 987, 992 (10th Cir. 2004) (discussing the burden on a petitioner to present newly discovered evidence before allowing the procedural bar to be lifted).

The Supreme Court analyzed the AEDPA's limitation on the scope of evidentiary hearings in *(Michael) Williams v. Taylor*, 529 U.S. 420, 429, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000). The Court explained that "[b]y the terms of its opening clause the statute applies only to prisoners who have 'failed to develop the factual basis of a claim in State court proceedings.'" *Id.* at 429. The Court held that a "failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Id.* at 432. Diligence rests upon a showing of "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court." *Id.* at 435.

Mr. Fontenot must show that he sought an evidentiary hearing in his state collateral proceedings regardless of whether that state court granted his request. All he must establish is his good faith attempt to comply with the state court procedure. *See id.* at 437; *see also Barkell v. Crouse*, 468 F.3d 684, 694-95 (10th Cir. 2006).   Mr. Fontenot's amended petition presents

several constitutional claims warranting careful review and the resolution of factual disputes, many of which were rejected by the state court without benefit of full discovery or an evidentiary hearing.[1] The minimal process Mr. Fontenot received in the state court counsels in favor of providing opportunities for factual development in these federal proceedings. *Wellons v. Hall*, 558 U.S. 220, 130 S. Ct. 727, (2010); *Townsend v. Sain*, 372 U.S. 293 (1963). Even if it did not, habeas law is built on the premise that factual development of well pleaded claims is a necessary component of the adjudication of the writ. *Harris v. Nelson*, 394 U.S. 286, 300, 89 S. Ct. 1082, 22 L. Ed. 2d 281 (1969) (holding that "it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry" into colorable claims); *see (Michael) Williams v. Taylor*, 529 U.S. at 437 (holding that if there has been "no lack of diligence at the relevant stages in the state proceedings," habeas petitioners are entitled to an evidentiary hearing under the AEDPA).

A federal habeas petitioner is tasked with pleading what he has reason to believe may be true as well as what he knows to be true and then "pursu[ing] the matter through the habeas process . . . ." *McCleskey v. Zant*, 499 U.S. 467, 498, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991) (*citing* 28 U.S.C. § 2254, Rules Governing Section 2254 Cases in the United States District Courts, Rule 6 (Discovery); Rule 7 (Expansion of Record); and Rule 8 (Evidentiary Hearing)). *McCleskey* expressly recognizes that this requirement will necessitate the pleading of insufficiently developed claims, and expressly provides that the federal proceeding is the mechanism by which such claims are developed. Although *McCleskey* was decided before the AEDPA was passed in 1996, it is still good law. *See Stanko v. Davis*, 617 F.3d 1262, 1270 (10th Cir. 2010) (noting that the AEDPA's amendment to § 2244(a) did not change the law previously

---

[1] There continue to be disclosures of exculpatory and impeachment evidence starting during Mr. Fontenot's second appellate process and continuing through these proceedings.

set forth in *McCleskey*).  Accordingly, it is still true that federal habeas petitioners are required to

plead claims for which a sufficient factual basis can be obtained through "reasonable means,"

including the use of discovery and factual development contemplated by the statutes and rules

governing the federal habeas process. *McCleskey*, 499 U.S. at 498.

The petition is a "fact pleading" which functions much like a complaint in any civil

action.  *See Browder v. Director, Dept. of Corrections*, 434 U.S. 257, 269-71, 98 S. Ct. 556, 54

L. Ed. 2d 521 (1978) (superseded by statute on other grounds); *Riddle v. Dyche*, 262 U.S. 333,

335-36, 43 S. Ct. 555, 67 L. Ed. 2d 1009 (1923) ("The writ of habeas corpus is not a proceeding

in the original criminal prosecution, but an independent civil suit."). Thus, the habeas corpus

statutes and the rules promulgated thereunder only require a petitioner to allege facts stating a

cognizable claim for violation of his constitutional rights. Moreover, at the pleading stage, the

facts asserted by the petitioner must be accepted as true. *Futch v. Dugger*, 874 F.2d 1483, 1486

(11th Cir. 1989).

Mr. Fontenot's Amended Petition presents many complex claims which will require fact-

finding proceedings including an evidentiary hearing to further develop facts. *See Blackledge v.

Allison*, 431 U.S. 63, 81-83, 97 S. Ct. 1621, 52 L. Ed. 2d 136 (1977) (petitioner is "'entitled to

careful consideration and plenary processing of [his claim,] including full opportunity for

presentation of the relevant facts'") (brackets in original).   Moreover, because a win on claim

one would allow Mr. Fontenot to overcome the procedural bars imposed by the Oklahoma Court

of Criminal Appeals, a win on Claim One would reduce the other claims herein to claims that

were presented to, but never decided on the merits by the state courts, and thus open them up to

pre-AEDPA analysis.

**I.      Mr. Fontenot Is Entitled to An Evidentiary Hearing on His Claim of Actual Innocence as It Was Never Adjudicated in State Court And Is Necessary to Remove Any Procedural Hurdles To Substantive Review of All Other Claims.**

As federal courts consider the actual innocence gateway, an analysis of the facts presented during trial along with newly discovered evidence must be done.   As in *House v. Bell*, a court may look to the opening statement and closing arguments of the prosecution to ascertain the weight the state gives evidence. 547 U.S. 518, 540-541 (2006).  The prosecution's case against Mr. Fontenot rested on his uncorroborated confession and his guilt by association with his co-defendant, Tommy Ward.  *See* P/H 546-547; N/T 6/10/1988 at 178-179; N./T 6/8/1988 at 31-35; N/T 6/14/1988 at 17-19, 35-36, 70, 79.  Then, while the joint trial was overturned on appeal, the prosecution's case against Mr. Fontenot was further weakened by the new evidence showing a gunshot as the cause of Mrs. Haraway's death. *See* Ex. 46. This evidence, and the other attendant inconsistencies, undermined the confession and weakened the prosecution's case as to how Mr. Fontenot could be involved.  Considering the prosecution's case rested on such flimsy evidence to begin with, the additional evidence produced at an evidentiary hearing will allow Mr. Fontenot to show that a reasonable juror would not convict him in light of the new evidence. *Id*. at 538.  As discussed below, the newly discovered evidence found after Mr. Fontenot was sentenced to life without the possibility of parole casts the entirety of the State's case into a different light.

**A.  An evidentiary hearing will establish Mr. Fontenot's alibi during the time of Mrs. Haraway's disappearance**.

A key piece of evidence that the jury did not hear involved Mr. Fontenot's alibi the night of April 28, 1984.  The prosecution presented evidence that Mrs. Haraway's disappearance occurred between 8:30 pm and 8:45 pm. N/T 6/13/88 at 51-55; 6/14/88 at 35-36.  Mr. Fontenot's alibi accounts for his whereabouts from before that time until the early morning hours of April

29th.  At an evidentiary hearing, Mr. Fontenot will establish his whereabouts through witness testimony and withheld documents that should have been presented during his trial.  As explained in his amended habeas petition, Mr. Fontenot told OSBI Agents details of his whereabouts on April 28, 1984.  As both Mr. Peterson and Mr. Ross confirmed in their depositions, these documents were not in the Pontotoc County District Attorney's Office and therefore were unavailable to Mr. Fontenot's defense attorney, George Butner, during Mr. Fontenot's trial. Mr. Butner confirmed during his deposition that he did not know of or have access to Mr. Fontenot's statements concerning his alibi.

Additionally, Mr. Fontenot agreed to a polygraph examination that took place on October 21, 1984.  OSBI Agent Rusty Featherstone interviewed Mr. Fontenot both prior to and after the polygraph.  He memorialized Mr. Fontenot's statement as follows:

> During the pretest interview, FONTENOT indicated he has never been in the McAnally's convenience store nor even having driven by it.  He has never seen DONNA DENICE HARAWAY before and does not believe he would recognize a picture of her if shown it now, although he recalls seeing a picture of a girl when she was first reported missing . . . FONTENOT recalls on the evening of Saturday, April 28, 1984, he went to the apartment of GORDON CALHOUN, arriving there at approximately dark or shortly after the kegs arrived.  CALHOUN lives adjacent to ROBERTSES, where FONTENOT was currently staying.  At the party FONTENOT recalls drinking and doing marijuana and then returning to the ROBERTS apartment where he slept on the floor all night. He believes he returned to the apartment between 2330 and 2400 hours that night. . ."

(Ex. 43, 142-143).  Agent Featherstone added that Mr. Fontenot mentioned a man named Bruce and Michael Shane Lindsay who attended the party as well.

At an evidentiary hearing, Mr. Fontenot will be able to provide testimony of the people who attended the party the night of April 28, 1984.  These witnesses include Bruce DePrater, Stacy Shelton, Eric Johnson, Jannette Roberts, and others.  As described in the amended petition, each of these witnesses verify the party occurred the night of Mrs. Haraway's disappearance and

confirm that Mr. Fontenot was there for the entirety of the evening.  Supporting their testimony

is evidence introduced at trial showing the dispatch logs of noise complaints about the party

along with Ada Police Officer Larry Scott's response to the complaints. Ex. 41, 42, & Ex. 43, 98.

The totality of this evidence demonstrates that there is no way Mr. Fontenot could have been

involved in the events that occurred across town at McAnally's convenience store.

### B.  An evidentiary hearing will show that others had a motive and opportunity to harm Mrs. Haraway.

Beyond the alibi evidence previously unavailable to Mr. Fontenot, there is considerable

evidence demonstrating other individuals had motive, opportunity, or both to harm Mrs.

Haraway.  These individuals were known to law enforcement through documents in their

possession at the time of Mrs. Haraway's disappearance.  However, the Ada Police Department

and the OSBI did nothing to track down these alternative suspects.  The defense was not

informed of their existence.  An evidentiary hearing is necessary to develop evidence

surrounding this error.  One, it supports Mr. Fontenot's claim that he did not commit these

crimes, and had no reason or means to do so.  Second, it provides exculpatory evidence that other

individuals did have the motive, means and opportunity to harm Mrs. Haraway.[2]  Finally, it

provides impeachment evidence about the quality of the investigation into the Haraway case.

1.    Harassment

Mr. Fontenot will present evidence about a stalker who had been harassing Mrs. Haraway

for months leading up to her disappearance from McAnally's.  This evidence consists of

documents and witnesses who knew Mrs. Haraway's fears of her stalker and the extent that the

harassment affected her. Within the OSBI records that the prosecution withheld were statements

---

[2] As such, much of this section overlaps with Claim II concerning the *Brady* violations committed in this case.

from Mrs. Haraway's husband, mother, and co-workers who provided details of her worries about working at McAnally's.

> According to Janet, Donna told her on the phone she hated working at the store because it did not have an alarm and a lot of weirdo's come in and out of the store. She told Janet that she was going to look for another job because she felt uneasy working at the store alone at night. She told Janet that the phone calls had started again but didn't go into the whole story. Janet said that earlier Donna had been receiving calls at work from a man that said he was going to come out to the store some night and wait outside while she was working. She said that Donna was upset because she had asked for the night off and a guy refused to work and she had to work anyway.

Ex. 43, 20, 109.  Police had this report from Mrs. Haraway's husband:  "Steve received a phone call from the police who told him that his wife was missing. He knew of no one that Donna was having problems with at the store, other than she had received two to three obscene phone calls at the store. The last phone call was two or three weeks prior to her disappearance." *Id.*

Two of Mrs. Haraway's co-workers also provided information about a person who may have wanted to harm her. Monroe Atkeson recounted to police a conversation he had with Steve Haraway about a Vietnam Veteran who harassed Mrs. Haraway during her shifts. Ex. 44, 0006. The veteran was a white male, 6' tall, 190 lbs., with black hair and brown eyes, driving a white Chevrolet Chevette. *Id.*  Another co-worker, James Watt, was interviewed by Pontotoc County District Attorney Investigator Lloyd Bond. Ex. 62, 91. Mr. Watt told the district attorney's investigator:  "Denise had told me of some obscene phone [calls] she had received at the store for a while, these calls upset her a great deal. She could not recognize the voice over the phone the calls stopped about one month before she disappeared."

These harassing telephone calls scared Mrs. Haraway to the point that she said she felt physically threatened by them.  Anthony Johnson, a frequent customer at McAnally's recounted a conversation with Mrs. Haraway before she was abducted:

Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Haraway's disappearance he was in the McAnally's convenience store when Haraway asked him where she could buy a gun. Haraway referenced the need for a gun with some funny calls she had recently been receiving. Haraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making these calls and said that in Johnson's opinion, she knew who was making the calls but did not seem to want to indicate who it was.

(Ex. 22).  Two days before Mrs. Haraway went missing, she spoke with Darlene Adams, another customer at McAnally's. Mrs. Haraway explained she was afraid working at night at the store but her schedule would not be changed. (Ex. 1).

The unknown stalker went uninvestigated by law enforcement.  As a continuing theme, viable leads of a person Mrs. Haraway feared were disregarded by APD and OSBI.  From these undisclosed statements, it is obvious that Mr. Fontenot could not be the individual who made these phone calls and caused Mrs. Haraway's fright.  Therefore, at an evidentiary hearing, this testimony will provide newly discovery evidence of Mr. Fontenot's innocence along with substantiating his *Brady* claim.

2.  Alternate Suspects

Along with the person harassing Mrs. Haraway while she worked, there were other alternate suspects known to the law enforcement agencies investigating this case.   At an evidentiary hearing, Mr. Fontenot will explain how these alternate suspects were important for his innocence claim and to further substantiate his *Brady* claim of evidence withheld by the prosecution. While Mr. Fontenot is not required to prove who was involved in Mrs. Haraway abduction and murder, evidence of alternative suspects is important for considering his innocence. *See House v. Bell,* 547 U.S. at 548 (where House presented evidence that the victim's husband had motive to kill his wife); *see also Smith v. Secretary of N.M. Dep't of* Corrections, 50

F.3d at 810-811 (discussing the *Brady* violation of police investigation into an alternate suspect). Thus, documentary proof that both the APD and OSBI considered Floyd DeGraw a suspect in Mrs. Haraway's case relates both to his gateway innocence claim and due process constitutional violation.

The ADP told local newspapers of their investigation into Mr. DeGraw days after Mrs. Haraway's disappearance. Ex.26.   Specifically, Ada Police Department was quoted as saying, "Degraw's description fits that of one of the two suspects in the abduction of Donna Haraway from a local convenience store Saturday night." *Id.*  The development was a significant investigative lead that law enforcement put resources to develop.

Agent Rogers sent Agent Gary Davis to Texas to conduct an extensive investigation into Mr. DeGraw.  Ex. 44, OSBI 0014.  Agent Gary Davis along with a criminology team went to Texas to interview Floyd DeGraw, evaluate his story, and process the evidence from his car. Once completed, Agent Davis reported his findings to Agent Rogers extensively in a multi-page report.

Mr. DeGraw was arrested in Amarillo, Texas on May 3, 1984, for raping Donna Ellis and leaving her naked in a field. Ex. 24.  When arrested in Amarillo, police searched his car and discovered jewelry and other belongings of women from several Oklahoma cities including a stolen driver's license from a woman in Ada. (Ex. 24, pgs. 16-18).  Mr. DeGraw's prior convictions included serving three years for malicious wounding a woman, and he is currently serving life imprisonment for stabbing a woman to death. (Exs. 44, OSBI 0014 & 47).

Mr. DeGraw told the following story to police:  He left Detroit in a friend's car heading west sometime in April 1984. Ex. 44, OSBI 0014.  He picked up a hitchhiker, Jeffrey Johnson, and they journeyed to Johnson's friend in Memphis, Tennessee. *Id.*  While in Memphis, they

16

stayed several hours at Gordon Elliott's house before continuing west on April 27th. *Id.* When asked if the men drove through Oklahoma, specifically stopping in Ada, Oklahoma, Mr. DeGraw was adamant that he slept through his entire drive through the state. If they had stopped, it was not in Ada. Ex. 44, OSBI 0027. However, law enforcement soon learned that most, if not all of Mr. DeGraw's story, was lies.

Agent Davis investigated Mr. DeGraw's story and quickly found several flaws. He obtained court files from Missouri showing that Jeff Johnson was incarcerated on murder charges when he was supposedly traveling with DeGraw. Ex. 45. Agent Davis reached out to the Calloway Police Department in Missouri for Jeffrey Johnson's murder investigation file. Ex. 85. The first page of notes detail that the file was mailed to Agent Davis on May 22nd. *See id.*

Also, Gordon Elliott, who was supposedly Johnson's longtime friend, spoke more familiarly with Mr. DeGraw after his arrest in Texas. (Ex. 44, OSBI 0021 & 0023). OSBI recorded the call between Mr. Elliott and Mr. DeGraw regarding the Haraway case, but that tape, or a transcript of the conversation was not provided to defense counsel and has yet to be disclosed. Ex. 44, OSBI 0023.

On May 10, 1984, Mr. DeGraw was polygraphed by Amarillo Detective Jimmy Stevens. During the examination, Detective Stevens asked several questions about the Haraway case.

> Concerning the kidnapping of the girl in Ada, Oklahoma, do you intend to be truthful about?" DeGraw was very deceptive on this question. Also on question #6, which was "About ten days ago did you participate in a kidnapping in Ada, Oklahoma? Lieutenant Stevens stated that DeGraw was deceptive in this. Also question #10 which was, "Have you ever seen the girl whose pictures is on the wall in front of you now?, was deceptive, but other questions that were asked, the response was very flat and Lieutenant Stevens felt that overall DeGraw was not involved in the kidnapping of this girl from Ada.

Ex. 44, OSBI 0024. While Detective Lieutenant Stevens invited the OSBI to evaluate the polygraph data for themselves, along with providing them copies of all their materials, the results

of OSBI's assessment of the polygraph are unknown because it was not included in the disclosed OSBI reports.   Further, OSBI files do not contain either the raw data received from Amarillo police or any other parts of their investigation. Ex. 24, p. 16-18.

OSBI Agent Davis, along with the Amarillo police, showed Mr. DeGraw pictures of Mrs. Haraway during their interrogation. Both officers pointed out the Mr. Degraw's numerous inconsistencies in his story about traveling from Detroit.  Mr. Degraw responded that the reason he had problems with questions related to Mrs. Haraway was that his cousin was kidnapped and raped when he was twelve. Ex. 44, OSBI 0024. Mr. DeGraw said that his sister looked like Mrs. Haraway. *Id.* When pressed further about whether he had been involved in the abduction of Mrs. Haraway, Degraw reacted in this telling manner:

> At one time during the conversation and as Agent Davis put the picture of the victim from Ada before DeGraw, DeGraw held his head in his hands and appeared about to break down, but after recomposing himself, lifted his head with his eyes very red and stated that he did not know anything about the woman who was abducted in Ada, but hoped we would find her alive. DeGraw then became irritable, pacing the floor, saying he did not want to answer any more questions and continued doing this while Agent Davis continued talking. DeGraw then insisted on being taken back to his cell and not answering any more questions. . .

Ex. 44, OSBI 0027. Mr. DeGraw admitted stealing money for his journey and insinuated about involvement in a robbery several years prior. Ex. 44, OSBI 0025.  He discussed his institutionalization for mental health issues including his tendency to, "fly off the handle." Ex. 44, OSBI 0026.

From the totality of the investigation into Mr. DeGraw, most of his story did not add up with the hard facts from the investigation.  He had been arrested by Texas police for victimizing and raping a woman just days after Mrs. Haraway had disappeared.  The work of Agent Davis demonstrated that Mr. DeGraw had a long criminal record beforehand of victimizing women, he had been in in Oklahoma around the time of Mrs. Haraway's disappearance, and he lied and

reacted strangely when confronted with information about Mrs. Haraway.  At an evidentiary hearing, Mr. Fontenot will present documentary evidence supporting this evidence as exculpatory, along with additional documents demonstrating Mr. DeGraw had the opportunity and disposition to harm Mrs. Haraway.

### C.  Recantation of identification

Jim Moyer was the only witness who testified that Mr. Fontenot was in McAnally's on April 28, 1984. P/H p. 213-214, N/T 6/9/1988 p.16.  During Mr. Fontenot's trial, Jim Moyer waivered in his identification of Mr. Fontenot being in McAnally's the night of Mrs. Haraway's disappearance.

> Q. And after you came up here to Preliminary Hearing, had an opportunity to look at the height of Mr. Fontenot, had an opportunity to look around the courtroom, sometime after the Preliminary Hearing you became convinced that Karl Fontenot was not the man, didn't you?
> A. I became confused about it.
> Q. You became so confused or convinced that you attempted to contact the District Attorney's Office and say that Karl Fontenot was not the second man, didn't you?
> A. At a time, yes.
> Q. Okay. All right. In fact, you tried to get a hold of the District Attorney all summer to tell him that, didn't you?
> A. Yes.
> Q. Okay. The District Attorney wouldn't return your telephone calls would he?
> A. Well, I never left my name.
> Q. Okay. so, you just called the District Attorney's Office for a couple of months during the summer and never left your name. Is that right?
> A. Yes.
> Q. All right. You believed, Mr. Moyer, that there was someone sitting in the back of the courtroom that was more familiar to you that evening as being in McAnally's on April 28th, 1984, didn't you?
> A. Yes.
> Q. Okay. And you did that because of the fact that this gentlemen was wearing boots, you saw those out in the hall, didn't you?
> A. Yes.
> Q. His hair was longer than Mr. Fontenot's?
> A. Yes.
> Q. He was much taller than Mr. Fontenot?
> A. Yes.

Q. Okay. And, in fact, you became convinced that that was, in fact, the second man, didn't you?

A. Well, I don't know if I was convinced about it.

N/T 6/9/1988 at 24-26.   At an evidentiary hearing, Mr. Moyer will testify that he affirmatively

did not see Mr. Fontenot that night.   As stated in the Amended Petition, Mr. Moyer explains the

following:

> While at the courthouse testifying in the preliminary hearing, I saw a man in the back of the courtroom I had seen before. I also saw him downstairs, where I had been waiting to testify. I also saw this man speak to Tommy Ward during the preliminary hearing. It came to me that this was the same man I had seen in McAnally's with Tommy Ward. He looked more familiar to me. I was no longer one hundred percent sure about my identification of Karl Fontenot.
>
> After that, I tried to call Mr. Peterson, the District Attorney, to tell him I was no longer one hundred percent sure that Karl Fontenot was the man I had seen in McAnally's that night. In fact, I was leaning more in the direction of Steve Bevel, the man I saw at the courthouse. While I was never able to speak with Mr. Peterson, I did speak with someone else in the district attorney's office. I told this person of my concern. This person said to me, "It was not him (Bevel)."
>
> After that, I was afraid to change my story. I felt pressure from both sides. I overheard the lawyers argue about the content of the story I had given to Richard Kerner, an investigator working for Mr. Wyatt, while I was on the stand. On one hand, I felt betrayed by Mr. Kerner, as he tape-recorded our conversation without my consent. On the other hand, I felt like it was Steve Bevel that I had seen with Tommy Ward that night. I felt conflicted. I chose to then state that I was confused about the identity of the man with Tommy Ward.
>
> I am now convinced that my assessment, at the time of the preliminary hearing, that Steve Bevel was the man with Tommy Ward, was correct. I am confident that Karl Fontenot was not the man I saw at McAnally's. The man I saw at McAnally's was definitely taller than Karl Fontenot and had much more intimidating look about him. At this time, I am about 95% sure that it was Steve Bevel, not Karl Fontenot, that I saw in McAnally's on April 28, 1984.

(Ex.14).  Mr. Moyer's testimony corroborates Mr. Fontenot's assertion of actual innocence.  An

evidentiary hearing is necessary so that Mr. Moyer may testify before this Court explaining why

his testimony equivocated and why he affirmatively asserts that Mr. Fontenot was not in

McAnally's the night of Mrs. Haraway's disappearance.  Mr. Moyer's testimony along with the other newly discovered evidence establishes that Mr. Fontenot is entitled to relief.

## II.     Mr. Fontenot Is Entitled to an Evidentiary Hearing Because His Fourteenth Amendment Due Process Rights Were Violated Under *Brady V. Maryland.*

Mr. Fontenot requests an evidentiary hearing to establish his due process challenge under the Fourteenth Amendment resulting from the Pontotoc County District Attorney's Office failure to comply with *Brady v. Maryland*.   Throughout Mr. Fontenot's trials and resentencing, the prosecutors utterly failed to comply with their obligation to gather and disclose exculpatory, impeachment, and evidence that aided the defense.  *Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 829-830 (10th Cir. 1995); *Bowen v. Maryland*, 799 F.2d 593, 612-613 (10th Cir. 1986). This constitutional violation was exacerbated by the repeated requests by Mr. Fontenot's defense attorney for the specific documents that the prosecution didn't disclose; ones that would establish his alibi, the falsity of his confession, alternative suspects, and his non-involvement in the events of Mrs. Haraway's disappearance and murder. Ex. 72-75; P/H 769.  At a hearing, Mr. Fontenot will establish the legal basis for each of the elements required under *Brady v. Maryland* and satisfy cause and prejudice to excuse any procedural defects within this constitutional claim.

### A.     Cause and Prejudice

Mr. Fontenot is entitled to an evidentiary hearing on his *Brady* claim as it provides a constitutional basis in habeas corpus for relief.  The Supreme Court has found that establishing the elements of a *Brady* violation will also satisfy any cause and prejudice for any procedural defects from state court proceedings. *See Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Strickler v. Greene*, 527 U.S. 263, 282 (1999); *see generally Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  An evidentiary hearing is permissible for a

petitioner to establish both cause and prejudice to remove any procedural hurdles preventing the federal court from substantive review. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-12 (1992); *Banks v. Dretke,* 540 U.S. 668, 690-691 (2004); *Cristin v. Brennan*, 281 F.3d 404, 416-417 (3rd Cir. 2002). Respondent in state post-conviction proceedings has argued laches as a ground for denying Petitioner relief and the state court adopted such finding. Mr. Fontenot requires a hearing to refute this finding. Mr. Fontenot will demonstrate the continuing constitutional violations by the prosecution in failing to disclosure *Brady* materials.

Mr. Fontenot pursued discovery in both state post-conviction and in the current proceedings. Throughout those processes, exculpatory and impeachment evidence continues to be discovered and pried from the prosecution. The repeated pattern of new disclosures discredits Respondent's assertion of laches as a viable affirmative defense. The prosecution should not now be allowed to claim harm from undue delay when it was the prosecution's and state's failure to properly disclose evidence that Mr. Fontenot was constitutionally entitled to over thirty years ago that caused this circumstance. An evidentiary hearing is necessary to provide evidence to this Court of the documents located in the law enforcement and prosecution files that prove the three elements of a *Brady* violation and give a basis for finding cause and prejudice as well.

**B.     The Pontotoc County District Attorney's Office possessed evidence favorable to the defense.**

As discussed in depth in Mr. Fontenot's Amended Petition, the Pontotoc District Attorney's Office had in their possession evidence that would have radically changed the scope of the trial against Mr. Fontenot. Such evidence included the following: alibi evidence, police interviews of McAnally's customers, alternate suspects, impeachment statements concerning Jeff Miller and Terri Holland, investigation into Mr. Ward's testimony, the medical examiner's report, and evidence of Mrs. Haraway's harasser. Much of this evidence is in documents

procured during collateral and habeas corpus proceedings.   They are attached as exhibits to the amended petition.   Both Mr. Peterson and Mr. Ross acknowledged in their depositions in the instant proceedings that their open file discovery consisted only of the "prosecutorial," a compilation of some law enforcement reports that were culled and disclosed to the District Attorney by the Oklahoma State Bureau of Investigation (OSBI).[3] Ex. 78 at 15.   Neither prosecutor took affirmative steps to ensure the full disclosure to their office of records from the various state agencies investigating the Haraway case. Ex. 78 at 48-49.

C.    **The Pontotoc County District Attorney's Office failed to disclose *Brady* material during pretrial proceedings of any of Mr. Fontenot's trials or resentencing.**

As proven in the depositions of Bill Peterson and Chris Ross, both men relied on an open file discovery policy to ensure compliance with *Brady v. Maryland*.   Ex. 78 at 14-15; 79 at 21. The problem with the policy as implemented is that the file consisted only of the law enforcement records contained in the 156-page prosecutorial prepared by OSBI. Ex. 78 at 11-12; 79 at 11-12.   Because Mr. Peterson claims that was the only evidence he used to determine charges and to prosecute the case, it was also the only evidence made available to a defense attorney.   However, the preliminary hearing transcripts and trial docket refute this assertion. P/H 907-909.   Both Mr. Peterson and Mr. Ross, though aware of their obligations, consistently fought the disclosure of documents and records.   Furthermore, the deposition of George Butner, defense counsel for Mr. Fontenots shows real doubt as to whether requested discovery was made available to pretrial. Ex. 81 at 44.

---

[3] A review of the Pontotoc County District Attorney file belies the prosecutors' assertion of only having the prosecutorial.  Extensive OSBI reports, Ada Police Reports, and investigative reports from Loyd Bond, the DA's investigator, were found in the District Attorney's file as a result of the subpoena granted by this Court.

Because the District Attorney's file had just a fraction of the records and evidence referenced in Mr. Fontenot's amended petition, the prosecution failed in its obligation to comply with the due process mandates of the Fourteenth Amendment.  An evidentiary hearing will demonstrate the number of documents and testimony not made available to Mr. Butner.

> **D.**      **The failure to disclose *Brady* materials materially impacted Mr. Fontenot's ability to challenge the prosecution's case at trial.**

The materiality standard requires Mr. Fontenot to demonstrate to this Court the actual harm or prejudice he suffered from the state's failure to grant access to the documents and records that were within the state's possession during his trial.  The standard of materiality for Brady claims such as those presented here, "is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Banks*, 540 U.S. at 698 *quoting Kyles*, 514 U.S. at 435.  Because Mr. Fontenot bears the burden of establishing the harm suffered because the evidence not disclosed, a hearing is necessary.

During an evidentiary hearing, Mr. Fontenot will present both witness testimony and documentary evidence establishing the materiality of his *Brady* violation.  The prosecution's case rested on Mr. Fontenot's confession along with circumstantial evidence.  There was no physical evidence that connected him to McAnally's or Mrs. Haraway's murder.  Therefore, a cumulative assessment must be done of all the evidence, both presented and withheld. *Kyles*, 514 U.S. at 436.

> 1.  Confession and Alibi

The prosecution's opening statement and its closing argument and rebuttal focus heavily on the confession as the justification for Mr. Fontenot's conviction of kidnapping and murder.

N/T 6/14/88 at 34-36, 73-74.  Such weight on the confession makes the documents that support Mr. Fontenot refuting his own confession paramount to his defense.   Documents showing that he denied the crux of the story of that confession, told OSBI agents his true whereabouts at the time of the crime, and then wrote his recantation within his first few days in custody is significant. Ex. 43 at 142-143; 44 at 626. These documents were within the OSBI records that were not provided in the prosecutorial and therefore, not available to the defense.  These documents provide details about the party, those in attendance, and allows a defense attorney the opportunity to pursue those leads and impeach law enforcement.

Post-conviction counsel conducted the investigation that Mr. Butner could have done in 1985 or in 1988.  This investigation consisted of statements from Stacy Shelton, Bruce Deprater, Jannette Roberts, and Eric Johnson who corroborated Mr. Fontenot's attendance at a party the night of April 28, 1984.  These witnesses and other will testify about the party, their memory of Mr. Fontenot, and possible interactions with police. *See Claims I and II.*  As discussed above and in the Amended Petition, these individuals' statements provide the basis of their testimony.

Their testimony, along with Mr. Fontenot's handwritten letter recanting his confession, further weaken the prosecution's case.  Mr. Fontenot explained that his confession was based on the story police told him. Ex. 44 at 646.  During the preliminary hearing, Detective Baskins acknowledged that nothing in Mr. Fontenot's confession could be verified.

> Q. Has he told you anything that you have been able to ascertain is the truth? You personally?
> A. No.
> Q. No fact in his statement, you have been able to prove right or wrong have you?
> A. No.
> Q. To the best of your knowledge, Detective Baskins, has any statement that Karl Fontenot made to you been – any fact, at all, been proven true or false? Any fact?
> A. To me personally, no.
> Q. Now, what about Tommy Ward? Any fact that Tommy Ward has told you, have you proven or disproven any fact that he's told you?

> A. The ones he's told me personally, disproved.
> Q. So the ones he's told you personally and the facts about this case and the statements he's made, no facts have you been able to prove. Is that right?
> A. That he's made to me personally?
> Q. Yes, sir.
> A. That's correct.

P/H at 546-547; *see also* N/T 6/10/1988 at 178-179.  The lack of any corroboration of this confession along with Mr. Fontenot's recantation makes the withholding of such documentation extremely prejudicial to the defense.  A key consideration is this distinction: "[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. 419, 453 (1995).

      2. <u>Alternate Suspects</u>

      As discussed in the newly discovered evidence section above, the withholding of records of alternative suspects also falls with the scope of *Brady* violations.  While not every record within the prosecution's custody or control is *Brady* material, it is material when it casts doubt on the prosecution's case in a critical way.  The Pontotoc County District Attorney's case against Mr. Fontenot rested on baseless and inconsistent evidence.   The weakness of the prosecution's case makes the withholding of the Floyd DeGraw documents even more egregious.

      Comparing Mr. DeGraw with Mr. Fontenot, it is clear why the former's reports are important.  First, Mr. DeGraw's criminal history fits more in line with what is known about Mrs. Haraway's disappearance.  Mr. DeGraw's history involves extreme violence towards women.  Prior to 1984 and afterwards, he victimized a series of women including the woman he raped in Texas within a week of Mrs. Haraway's disappearance.  That crime triggered an extensive investigation by Oklahoma authorities and resulted in his interrogation by an OSBI Agent. Ex. 44 at 14, 16-18, 47, 713-722.

Second, Mr. DeGraw lied to the OSBI about his whereabouts, his traveling companions, and had admitted to committing crimes on his cross country trip. When police began investigating his story, it was clear he lied about the man he travelled with, and his associate in Memphis, Tennessee. The purpose in Mr. DeGraw's lies makes it apparent he's hiding something. His lies, the emotional reaction when confronted by police, and the deception shown by the polygraph make it not only likely but convincing that Mr. DeGraw was in Ada, Oklahoma close in time to Mrs. Haraway's disappearance. He could not tell police where he was after leaving Memphis, but police clearly had evidence placing him in Ada, Oklahoma. *Id.*

The withholding of these records deprived Mr. Butner of the opportunity to investigate this case in real time. Post-conviction counsel sought records related to Mr. DeGraw but Mr. Butner's investigation would have been timely if it had been done in 1985 or even 1988 when the documents were created. During an evidentiary hearing, Mr. Fontenot will present all the OSBI DeGraw documents along with the additional documents from the Amarillo, Texas investigation and the Missouri Department of Correction's documents concerning Jeffrey Johnson.

These documents show both the additional investigation done by OSBI and illustrate how defense counsel could have used this information in challenging the investigation into and prosecution of Mr. Fontenot. Further, Mr. Butner will testify on what he would have done with this evidence. Ex. 81 at 29-32.

> 3.   Investigation into McAnally's customers

The prosecution failed to gather the Ada Police Department reports of the customers who shopped at McAnally's the night of Mrs. Haraway's disappearance. While the prosecution at both trials introduced the McAnally's register tape as an exhibit, what was not obtained from the

27

Ada Police Department or disclosed were the interviews Detective Mike Baskins had with these

witnesses. N/T 6/9/1988 at 197; Ex 60; *See Claim II* in the Amended Petition.  Based on the

names and times written on the register tape, it is clear customers contacted the Ada Police

Department as requested by television and newspaper requests. (Ex. 28).   These witnesses would

have provided exculpatory evidence of the vehicles in the parking lot and other individuals in the

store that night.  It could have debunked the time frame of when Mrs. Haraway went missing.

Ada Police Officer Richard Holkum stopped by the store and witnessed the following:

> Everything in the store, including Denice, seemed normal. I did not detect any
> tension or anything wrong.  While standing at the counter making small talk with
> Denice, I recall seeing two vehicles sitting on the eastern edge of the pavement
> outside, just to the east of the gas pumps. These vehicles were parked parallel with
> the driver's side facing each other and the drivers were apparently talking. One
> vehicle was a green Ford Torino or Mercury Montego. The other vehicle was a
> Chevy or GMC pickup truck painted primer gray. This pick-up had a straight,
> conventional bed. I believe these vehicles were still parked next to each other when
> I left McAnally's to drive home.

Ex. 6. Besides the car and truck in the McAnally's parking lot, Mr. Holkum recounted the poor

police investigation and the time of his purchases. *Id.*

John McKinnis' potential testimony will focus on the man he saw behind the counter

with Mrs. Haraway while she rang up his purchases. Ex. 5.  Because he was acquainted with Mr.

Fontenot and Mr. Ward, he explained how the man he saw behind the counter could not have

been either man. *Id.*  Mr. McKinnis also remembered his conversation with Ada Police Detective

Baskins and can testify about telling the detective what he saw.  Both Guy Keyes and Gary

Haney remember their conversations with the Ada Police Department and how they had told the

officer about the timing and circumstances of their purchases. Ex. 4 &7.   At an evidentiary

hearing, Mr. Fontenot will produce Richard Holkum, Gary Haney, John McKinnis and Guy

Keys, along with trial exhibit to provide more proof of the defense Mr. Fontenot could have

presented had this evidence been made available to him.[4]  Further, Mr. Fontenot anticipates that

Mr. Butner will testify in similar fashion to his deposition testimony that all the described

evidence would have been helpful evidence that he would have developed and used at trial had it

been disclosed. Ex. 81.

### 4.   Jeff Miller and Terri (McCarthy) Holland

Both Ada Police Detectives Dennis Smith and Mike Baskins testified during the

preliminary hearing of their interviews with Jeff Miller, whose information lead to the

interrogation and arrest of Mr. Ward and arrest of Mr. Fontenot. P/H p. 502.  Though the police

investigation rested completely on whatever information Mr. Miller provided to Detectives

Baskins and Smith, the State resisted providing any of his information to the defense.  The State

claimed it didn't have to disclose the information gleaned from Mr. Miller based on the work

product doctrine. P/H p.765-771. However, importantly, Mr. Miller provided statements

implicating Odell Titsworth, who later was cleared entirely of involvement in Mrs. Haraway's

abduction or murder. P/H p. 710.

In the prosecutorial's table of contents, Jeff Miller statements were included and had been

made available to the Pontotoc County District Attorney's Office. Ex.  43.  However, the

prosecution never called Mr. Miller to testify and his statements were not included in discovery

from their files. At an evidentiary hearing, Mr. Fontenot expects to call former Ada Police

Detective Mike Baskins and former Pontotoc County District Attorney Bill Peterson concerning

their knowledge of Mr. Miller's statements.  This evidence is material to impeach the quality of

---

[4] This evidence may also satisfy the ineffective assistance of counsel claim raised as Claim III in the Amended
Petition.  To the extent that Mr. Butner had access to the state's exhibit but did not review it, it would be deficient
performance. (J/T 1160 State's Exhibit 16, N/T 6/9/1988 p. 197 State's Exhibit 60, Ward N/T 6/12/1989
p. 6, State's Ex. 60).  The prejudice inquiry under *Brady v. Maryland* is similar to that required under *Strickland v.
Washington*.

law enforcement's investigation; it is relevant to understanding the reason to arrest Mr. Fontenot in light of the other evidence within the possession of the police and prosecution.

An evidentiary hearing would show that Terri Holland, a jail house informant, received a benefit that went undisclosed by the prosecution to Mr. Fontenot for her testimony against Mr. Fontenot in his preliminary hearing and joint trial. She claimed to have heard Mr. Fontenot speak about his involvement in Mrs. Haraway's abduction and murder. P/H 890-891. Ms. Holland had a history of being a snitch. At the same time she claimed to have heard Mr. Fontenot confess, she also claimed to have heard Ron Williamson make incriminating comments about his involvement in Debbie Carter's murder. Ex. 61.

Ms. Holland was interviewed by Pontotoc County District Attorney Investigator Lloyd Bond and Pontotoc County Sheriff Deupty Tom Turner. P/H 883-884, 897-898. Deputy Turner's interview report was included in the OSBI reports that Counsel obtained which were not a part of the prosecutorial report and had not been given to the defense. Ex. 44 at 282-289. Ms. Holland's statement as recounted by Deputy Turner in his report has numerous inconsistencies with her preliminary hearing and trial testimony. As with Mr. Miller, though the prosecutorial table of contents references Ms. Holland's videotaped statements, the State divulged no such videotaped statement to defense counsel.

Because of Ms. Holland's history as a snitch, her testimony was used by the prosecution to bolster an uncorroborated confession. She was placed in a cell near Mr. Fontenot for this very purpose. Proof of the benefits Ms. Holland received are included in the amended petition's exhibits. Specifically, the statement of Randall Holland, Ms. Holland's husband, explains the scope of the benefits his wife and he received from her testimony. Furthermore, Mr. Holland's charges and plea agreement were found in the Pontotoc County District Attorney's file made

available during the instant proceedings; the remainder of which were pulled from court records. These documents support Mr. Holland's statement of the benefits received and the timing of when he received them.  At an evidentiary hearing, Mr. Fontenot will present testimony and records demonstrating the undisclosed deal.

## III.  MR. FONTENOT IS ENTITLED TO AN EVIDENTIARY HEARING TO ESTABLISH HIS INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS BOTH DURING TRIAL AND ON DIRECT APPEAL.

Mr. Fontenot requires an evidentiary hearing to establish both the deficient performance and actual prejudice suffered by his defense and appellate counsel's ineffectiveness in these proceedings.   Mr. Fontenot's trial counsel, Mr. Butner, failed to mount an effective defense by neglecting to investigate Mr. Fontenot's case and by not presenting evidence to challenge the prosecution's evidence.   Then, after Mr. Fontenot's conviction and death sentence, appellate counsel failed to raise valid challenges to the prosecution's case and raise viable constitutional violations raised in the Amended Petition.  For the following reasons, Mr. Fontentot is entitled to an evidentiary hearing on this claim.

### A.  Defense and Appellate Counsel's Ineffectiveness Regarding Mr. Ward's Exculpatory Testimony.

Mr. Butner's representation during the trial fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. 668, 693 (1984).  Mr. Ward had given sworn testimony exculpating Mr. Fontenot.  Defense counsel failed to present this evidence of Mr. Ward's exculpation of Mr. Fontenot during Mr. Fontenot's trial.   This testimony consisted of Mr. Ward explaining his involvement in the abduction of Mrs. Haraway with Marty Ashley, not Mr. Fontenot. Ex. 60.  Mr. Ward gave this testimony after being advised by his defense counsel, Mr. Wyatt, and being subject to cross examination by the prosecution and Mr. Butner. *Id.*

31

Most importantly for Mr. Fontenot's defense, Mr. Ward admitted that Mr. Fontenot was not involved in Mrs. Haraway's abduction and had not known such events would take place. *Id.* Mr. Ward continued that he only told Mr. Fontenot the morning Mr. Ward took the stand of the true course of events leading to Mrs. Haraway's abduction and murder. *Id.*  Clearly, this is exculpatory evidence that would have strengthened Mr. Butner's defense case-in-chief.  His failure to present this evidence is inexplicable and falls below the standard of representation he owed to Mr. Fontenot.

Several law enforcement agents tracked down and interviewed the individuals mentioned in Mr. Ward's statements. The written reports were only revealed to Mr. Fontenot during a review of the Pontotoc County District Attorney's file. *See Claim III* Amended Petition; Ex. 66 & 88.  When the police interviewed Marty Ashley, he did not know his whereabouts the night of April 28, 1984. *Id.*   He reiterated this testimony in the joint trial, but did not testify during Mr. Fontenot's trial. J/T 1678.  His girlfriend, Theresa Mantzke confirmed that they lived in Ada at the end of April 1984, and that Marty was not with her the night of April 28th. J/T 1724.

Mr. Butner acknowledged that Mr. Ward's statement was exculpatory to Mr. Fontenot's case and he had no basis not to use it. Ex. 16. His goal at trial was to show that Mr. Fontenot was not involved in the events at McAnally's and that the crime was committed by someone else. Ex. 81 pg. 35-36.  During an evidentiary hearing, Mr. Fontenot will provide testimony from Mr. Butner confirming his lack of any strategic or tactical reason for not using such evidence. Further, Mr. Fontenot will introduce the Ada Police Department and Pontotoc County District Attorney's Office investigative reports detailing their interviews about Mr. Ward's statement. This evidence along with the testimony itself will demonstrate both trial and appellate counsel's deficient performance and the prejudice for not presenting such evidence at trial.

**B.      Ineffective Assistance of Counsel for Failing to Investigate the Case and Appellate Counsel for Not Raising the Constitutional Claim on Appeal.**

After Mr. Fontenot's first conviction was overturned, Mr. Butner was appointed to represent Mr. Fontenot a second time.  However, the facts of the case had drastically changed in the interim between the first and second trials, due to the discovery of Mrs. Haraway's remains. The discovery of Mrs. Haraway's remains in the wooded area in Gerty, Oklahoma, along with the fact her cause of death was a gunshot wound, dealt the reliability of Mr. Fontenot's confession a large blow. Ex. 46, pgs. 1, 3, 12, 40.  The defense could now conclusively show that nothing in the confession was accurate.  There was no evidence of stab wounds, the actual cause of death was different, and her remains had been found on the opposite area of the county from what the confession states.  Because of these new facts, investigation of the case was critical to demonstrate Mr. Fontenot's innocence.

1.      Anthony Johnson interview

The first lead in unraveling the wrongs done to Mr. Fontenot came from an investigative report from Richard Kerner detailing an interview with Anthony Johnson. Ex. 22.  Mr. Johnson told the investigator about a conversation with Mrs. Haraway where she had asked Mr. Johnson about buying a gun. *Id.*  She had told Mr. Johnson about her fear from receiving harassing calls at McAnally's. *Id.*  Given the scope of what this investigation led to under a cumulative assessment, this is vital evidence that went undeveloped. During an evidentiary hearing, Mr. Fontenot will present all the investigative avenues that should have been pursued by defense counsel.  These are leads that were within the Mr. Butner's ambit and duty to investigate, but were not developed.

2.      Register Tapes

Another investigative lead that went neglected was interviewing or investigating the McAnally's customers listed on the register tape.  The prosecution introduced the register tape into evidence at every trial. J/T at 1160 State's (Ex. 16); N/T 6/9/1988 at 197; State's Trial Ex. 60.  The names were written by police right there on the tape; there was no strategic or tactical reason for any defense counsel for not unrolling the tape and pursuing the obvious exculpatory leads.  The names and times included on the register tape contained not only impeachment but exculpatory evidence had any of Mr. Fontenot's defense or appellate counsel looked at it.  Had counsel done so, it would have provided valuable evidence to use during cross examination of both OSBI and APD officers, as well as questioning the Timmons brothers and Gene Whechel about the timeframe of Mrs. Haraway's disappearance. *See Claims I and II.*

The four people documented on the register tape were Gary Haney, John McKinnis, Guy Keyes, and Richard Holkum.  As described in the Amended Petition, the statements provided from these four people show that the gray truck was at McAnally's for over a half hour prior to Mrs. Haraway's disappearance. Ex. 6.  Further, whomever was driving it was seen talking with another driver in a Grand Torino or similar build style of car. *Id.*  Inside the store, a man was seen behind the counter standing near Mrs. Haraway shortly before her disappearance. Ex. 5.  Further, these individuals explain the lackluster response from the Ada Police Detective Mike Baskins to their information.  All this evidence fell within the type of evidence Mr. Butner wanted to present.

During an evidentiary hearing, Mr. Fontenot will produce testimony from the people listed on the register tape to testify about the events they witnessed and Ada Police Detective

34

Mike Baskins.  As seen in their Amended Petition statements listed as exhibits, each person confirms their interactions with the Ada Police Department and relaying the information told to them.  Mr. Fontenot will also present the register tape and documents supporting this claim.

**IV.   MR. FONTENOT IS ENTITLED TO AN EVIDENTIARY HEARING TO PROVE HIS CONFESSION WAS FALSE AND A VIOLATION OF HIS CONSTITUTIONAL RIGHTS.**

Mr. Fontenot's confession was flawed for several reasons.  First, it is meritless.  Not one aspect of the confession is accurate or able to be corroborated.  Second, the confession is a product of police misconduct by OSBI Agent Gary Rogers and Ada Police Detective Dennis Smith when they induced Mr. Fontenot into giving a confession based on suggestive and coercive techniques.  Third, the prosecution knew the confession was false but presented it anyway.  During an evidentiary hearing, Mr. Fontenot will provide expert testimony along with documents to establish the numerous constitutional violations surrounding his false confession.

**A.   Mr. Fontenot's Confession Is Meritless and Uncorroborated.**

Mr. Fontenot was interrogated for almost two hours prior to his confession being recorded. P/H. at 960-61; J/T at 2034, 2047.   There is no record of what he said to police or what police said to him during that time.  His confession implicated Odell Titsworth, Tommy Ward and himself in the robbery of McAnally's, kidnapping and murder of Mrs. Haraway.  But from the beginning, the confession began to fall apart.  Mr. Titsworth was exonerated almost immediately by police reports showing he had a broken arm at time of Mrs. Haraway's disappearance which made it impossible for him to be involved. P/H 520-22. Law enforcement was unable to find the pick-up truck supposedly used in the abduction.  And, the OSBI and APD were unable to find the crime scene from information supposedly provided by Mr. Fontenot. P/H 599-600; N/T 6/10/1988 at 83-85, 89-90.  These inconsistencies should have signaled to law

enforcement that the confession was flawed and false.  Even the discovery of the actual location of Mrs. Haraway's remains and the revelation of the true cause of her death did not shake either the police or prosecutors involved in the case from their dogged belief in Mr. Fontenot's claims. Ex. 46.

Agent Rogers and Detective Smith had created a story of what happened to Mrs. Haraway based on Mr. Ward's statement and the agents' suppositions and fed that information to Mr. Fontenot.  Because the officers failed to follow-up on solid leads, they instead relied on confessions that were complete fabrications.  Knowing how susceptible Mr. Fontenot was to suggestion in an interrogation makes why he agreed with information fed to him by the police more understandable.  During an evidentiary hearing, Mr. Fontenot will present expert testimony from Richard Leo who assessed the video of Mr. Fontenot's confession along with all trial testimony concerning the interrogation and confession.  He will explain why Mr. Fontenot's confession is false and will describe the errors and impropriety showed by the involved officers during the interrogation.

### B.    Mr. Fontenot Is Entitled to an Evidentiary Hearing to Show That His Confession a Product Of Police Misconduct.

Prior to the interrogation, Detective Smith acknowledged that OSBI Agent Rogers read Mr. Fontenot his rights, but no *Miranda* form was ever presented to him nor did Mr. Fontenot ever sign a form. P/H at 956-957; *Miranda v. Arizona*, 384 U.S. 436 (1966). Although Mr. Fontenot's interrogators deny ever having threatened or coerced him, it is indisputable that during the time prior to turning on the video recorder, the interrogators supplied Mr. Fontenot with the information that Tommy Ward had confessed to the murder of Mrs. Haraway and inculpated Mr. Fontenot in his confession.[5] P/H at 960.

---

[5] Mr. Ward's confession was the product of hours of interrogation. After police repeatedly insisted it was in Mr.

Once OSBI Agent Rogers and Ada Police Detective Smith realized that Mr. Fontenot could not provide any information corroborating his confession, they resorted to other means to get him to implicate himself. When he was moved to the Pontotoc County Jail, a snitch was placed near his cell for nine days. *See Claim II.* Terri Holland told several different officers of various inculpatory statements Mr. Fontenot made to her. P/H 890-891. The statements Ms. Holland gave police mirrored the uncorroborated confession. *Id.*

The intimidation of Mr. Fontenot by law enforcement continued in the agents' other attempts to get him to incriminate himself. Ada Police Detectives Smith and Baskins took a sack of human bones to his cell to coerce Mr. Fontenot to tell them the whereabouts of the victim's body. N/T. 6/10/1988 at 172. Police showed Mr. Fontenot a human skull explaining that they had found Mrs. Haraway, and wanted to find the rest of her remains, so that her family could proceed with giving her a Christian burial. P/H at 537, 559, 981-82. This was law enforcement lies; the detectives had gotten these bones from the East Ada University. P/H at 975-76. However, such action traumatized Mr. Fontenot who repeatedly told police that he was not involved in Mrs. Haraway's disappearance or murder. Ex. 43, pg.142; 44, pg. 626.

Such conduct by law enforcement crossed the line of what is permissible under the Constitution. With an evidentiary hearing, Mr. Fontenot will establish how police misconduct deprived him of his Fourteenth Amendment due process rights. He will present evidence consisting of expert testimony outlining the proper conduct of law enforcement in this type of investigation and why Mr. Fontenot had been improperly led to a false confession. Further, with

---

Ward's self-interest to admit to the murder of Denice Haraway, even after he denied any involvement, he told police that he had a dream about the murder. Mr. Ward's description of the dream was considered a confession by police, but was not corroborated by any credible evidence.

documentary evidence used in Claim V and VI of the Amended Petition Mr. Fontenot will be able to adduce evidence to support the factual basis of his Constitutional claim.

C.    **Mr. Fontenot Requires an Evidentiary Hearing to Show that The Pontotoc County District Attorney Office Knowingly Admitted False Testimony during Mr. Fontenot's Trial**

The prosecution must not present evidence it knows to be false and must ensure that the record is corrected when a prosecutor learns the evidence is false. *See Napue v. Illinois*, 360 U.S. 264 (1959). The constitutional basis is to ensure a fair verdict from the factfinder, whether judge or jury; a verdict worthy of reliability and finality. "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.' " *Id.* at 269-270. The district attorney's obligation is to ensure the evidence presented has sufficient indicia of reliability.

Mr. Fontenot's confession did not possess such indicia of reliability.  In fact, it conflicted with every piece of evidence the Pontotoc County District Attorney knew or had reason to know during Mr. Fontenot's trial.   Instead of re-evaluating the entirety of the case after Mrs. Haraway's remains were discovered, Mr. Peterson continued to pursue a case with evidence he knew to be incredible. (Exs. 17& 46). The discovery of Mrs. Haraway's remains debunks whatever shreds of validity Mr. Fontenot's confession retained.  However, instead of dismissing the case or re-evaluating the evidence, Mr. Peterson remained staunch. "When asked if the discovery of the body would affect Ward's and Fontenot's conviction, Peterson said, 'Why would it? We convicted them without a body and now we have one.'" (Ex. 70)  During

38

an evidentiary hearing, Mr. Fontenot will demonstrate with expert testimony and documents that the Pontotoc County District Attorney's Office violated the Fourteenth Amendment by presenting knowingly false testimony to the trial court and jury.

## IV.    CONCLUSION

There are a few claims from the Amended Petition that are not mentioned in this Motion because they are record based claims.  Although Mr. Fontenot does not request a hearing on those claims, Mr. Fontenot believes it is appropriate for this Court to reserve ruling on those issues until after the evidentiary hearing and post-hearing briefing.  At that time, this Court will be able to analyze all of Mr. Fontenot's claims, including the record based claims, and his claims of cumulative error, and determine whether he is entitled to relief from his conviction and sentence.  *See, e.g., United States v. Rivera*, 900 F.2d 1462, 1469, 1470 (10th Cir. 1990); *Cargle v. Mullin*, 317 F.3d 1196, 1220 (10th Cir. 2003); *Thornburg v. Mullin*, 422 F.3d 1113, 1137 (10th Cir. 2005) (errors that might be harmless individually, when aggregated cumulatively, so infect the trial with unfairness as to make the resulting conviction a denial of due process) (*citing Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 94 S. Ct. 1868 (1974)); *United States v. Wood*, 207 F.3d 1222, 1237 (10th Cir. 2000) ("[w]hether [the] cumulative effect [of the errors] on the outcome of the trial is such that collectively they can no longer be determined to be harmless.").

For the foregoing reasons, the Court should grant an evidentiary hearing on Amended Petition Claims 1, 2, 3, 4, 5 & 8.

Respectfully submitted,


_____ /S/ *Tiffany R. Murphy* _____
Tiffany R. Murphy
Arkansas Bar No. 2015057
790 N. Cliffside Drive.
Fayetteville, AR 72701
(479) 575-4573

_____ /S/ *Robert Ridenour* _____
Robert Ridenour
Assistant Federal Defender
OBA #16038
One West Third Street, Ste. 1225
Tulsa, OK  74103
(918) 581-7656

**CERTIFICATE OF SERVICE**

I hereby certify that on August 18, 2017, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court for the Eastern District of Oklahoma by

using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the CM/ECF system.


By: /S/ Rob Ridenour
Rob Ridenour