## IN THE UNITED STATES DISTRICT COURT FOR
## THE EASTERN DISTRICT OF OKLAHOMA

KARL FONTENOT,          )
          )
       Petitioner,   )
          )
v.           )     Case No. CIV-16-69-JHP-KEW
          )
JOE ALLBAUGH, Director,   )
          )
       Respondent.  )

## BRIEF IN SUPPORT OF MOTION TO DISMISS
## HABEAS CORPUS PETITION AS PROCEDURALLY BARRED
## BY THE STATUTE OF LIMITATIONS AND THE STATE BAR OF
## LACHES, AND BECAUSE IT INCLUDES UNEXHAUSTED CLAIMS

COMES NOW the Respondent and in support of his Motion to Dismiss Petition for Writ of Habeas Corpus as Procedurally Barred and Because it Includes Unexhausted Claims, files the following brief in support. For the reasons stated herein, Respondent respectfully asks this Court to dismiss the instant Petition pursuant to 28 U.S.C. § 2244(d)(1).

## INTRODUCTORY STATEMENT

Respondent has previously argued that Petitioner should never have been permitted to file a Motion for Evidentiary Hearing under the scheduling order originally in place after September 26, 2016, the initial expiration date for Petitioner to discover any additional evidence that would support either an amended petition or a motion for evidentiary hearing (*see* Dkt. 24). It is Respondent's position that an answer should be provided, if at all, to the original Petition for Writ of Habeas Corpus filed in this Court on February 24, 2016 (Dkt. 4). Respondent reaffirms all previous arguments and authorities objecting to discovery in this matter (*see* Dkt. 44, 63-1, 71, 73, 74). Hence, it is with respectful objection that Respondent answers this Amended Petition.

As explained in detail below, this Court may not grant the instant petition.  The amended petition was filed far beyond the expiration of the statute of limitations, and no tolling event occurred that might have extended it.   Thus, the petition is time-barred.   The amended petition is also procedurally barred from habeas review by an adequate and independent state-law bar.  Petitioner has not sufficiently demonstrated either "cause and prejudice" or that he is "actually innocent" of his crimes such that review of his claims, to the extent they have been exhausted, is currently possible. Moreover, at least one of Petitioner's substantive grounds for relief – ineffective assistance of appellate counsel – was entirely absent from his state court complaints, and Petitioner makes an underlying argument in this forum touching nearly all his grounds for relief – Oklahoma's laches bar prevented him from developing/discovering the proof necessary to develop his legal claims – that was never presented to the state court for consideration.  Both of these contentions could have, and should have, been presented to the state court for resolution in the first instance; however, Petitioner has skipped that necessary step in habeas litigation.   Respondent affirmatively does not waive exhaustion. 28 U.S.C. § 2254(b)(3).  Petitioner thus brings forth a mixed petition upon which this Court may not grant him habeas corpus relief.

With all of the above considerations in mind, Respondent now turns to the history of this case and the reasons why this Court must reject the instant Amended Petition.

## ARGUMENT AND AUTHORITY

Karl Fontenot, hereinafter referred to as Petitioner, has a case with a lengthy procedural history.  The following dates are relevant to the disposition of this Motion:

**April 28, 1984:**  Petitioner and his co-defendant Tommy Ward kidnaped Donna Denise Haraway from McAnally's convenience store in Ada and ultimately murdered her. *Fontenot v. State*, 742 P.2d 31, 32 (Okla. Crim. App. 1987).

2

**October 19, 1984:** Following his arrest, Petitioner confessed to the crimes in a videotaped statement. *Fontenot v. State*, 881 P.2d 69, 75 (Okla. Crim. App. 1994).

**September 1985:** Ward and Petitioner were tried together in Pontotoc County District Court Case No. CRF-1984-183.  Both co-defendants were convicted and sentenced to death. *Fontenot*, 742 P.2d at 32.

**August 11, 1987:**  The Oklahoma Court of Criminal Appeals (hereinafter referred to as "OCCA") reversed Petitioner's conviction, holding that the erroneous admission of a statement from Petitioner's non-testifying co-defendant was not harmless. *Fontenot v. State*, 742 P.2d 31 (Okla. Crim. App. 1987) (Exhibit 2, at 3).

**June 1988:** A change of venue was granted and Petitioner was retried in Hughes County District Court Case No. CRF-1988-43.  Petitioner was again convicted and sentenced to death. *Fontenot v. State*, 881 P.2d 69, 73-74 (Okla. Crim. App. 1994).

**December 1, 1992:**  During the pendency of Petitioner's direct appeal in OCCA Case No. D-1988-571, the OCCA granted Petitioner's Motion to Produce Documents and Things in the Possession, Custody or Control of the Oklahoma State Bureau of Investigation (OSBI) for inspection and copying (Exhibit 11).  Thus, Petitioner has been in possession of an order allowing inspection and copying of all records related to this case for nearly twenty-five years.

**June 8, 1994:**  The OCCA affirmed Petitioner's convictions for murder in the first degree, kidnaping, and robbery with a dangerous weapon, as well as Petitioner's ten year sentence for kidnaping and twenty year sentence for robbery.  The OCCA found that Petitioner's confession to murder was corroborated in nine separate ways.  However, Petitioner's case was remanded for resentencing because the trial judge refused to follow the State's request to instruct on the sentencing option of Life Without Parole. *Fontenot*, 881 P.2d at 86.

**September 18, 1995:**  Petitioner entered into a negotiated settlement in which he waived his right to jury re-sentencing in exchange for the prosecutor's recommendation of a sentence of life without parole. (Exhibit 1, Transcript of Negotiated Sentencing, at 4-11).

**April 24, 1996: Petitioner's one-year period to file a petition for writ of habeas corpus began to run**.[1]

---

[1] "Where a conviction became final before [the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA)] took effect, as is the case with Fisher, the one year limitation period for a federal habeas petition starts on AEDPA's effective date, April 24, 1996." *Fisher v. Gibson*, 262 F.3d 1135, 1142 (10th Cir. 2001) (citing *Preston v. Gibson*, 234 F.3d 1118, 1120 (10th Cir. 2000);

**April 25, 1997**: **Petitioner's one year statute of limitations period to file a petition for writ of habeas corpus expired under the AEDPA.**[2]

**July 24, 2013:** Petitioner filed his first and only Application for Post-Conviction Relief in Pontotoc County Case No. CRF-1984-183 (Exhibit 2). The State answered that Application (Exhibit 3).

**December 31, 2014:** Petitioner's post-conviction application was denied by the state district court (Exhibit 8, District Court Order Denying Post-Conviction Relief). Petitioner appealed that ruling to the OCCA (Exhibit 9).

**October 29, 2015:** The OCCA entered an Order Granting Motion to Associate Counsel and Affirming Denial of Post-Conviction Relief (Exhibit 10; OCCA Order Denying Post-Conviction Relief), in OCCA Case No. PC-2015-76.

**February 24, 2016:** Petitioner filed the instant petition for writ of habeas corpus in the United States District Court for the Eastern District of Oklahoma (Dkt. 4, at 1).

Before proceeding further, Respondent provides more explanation about what occurred in the most immediate state court proceedings because Petitioner's claims and arguments there are, with some exceptions, the same as those advanced in this forum.[3] Prior to filing his first (and only) state post-conviction application in the state district court, Petitioner's last time in *any* court was on September 18, 1995 (Exhibit 1). At that time, Petitioner himself – while represented by counsel – told the district court there was no legal reason why he should not be sentenced (Exhibit 1, at 11).

_____

*Hoggro v. Boone*, 150 F.3d 1223, 1225-1226 (10th Cir. 1998)).

[2] Petitioner's filing of a state post-conviction application in this case had no effect on the statute of limitations because it was filed after the limitations period had expired. "[Petitioner's] petitions cannot be tolled for time spent in state post-conviction proceedings because his applications for post-conviction relief were not filed until after April 24, 1997, the end of the limitations period for convictions . . . which became final before the effective date of AEDPA." *Fisher*, 262 F.3d at 1142-1143. *See also Clark v. Oklahoma*, 468 F.3d 711, 714 (10th Cir. 2006) ("Only state petitions for post-conviction relief filed within the one year allowed by AEDPA will toll the statute of limitations.").

[3] Grounds Four, Six, and Seven were not raised in state post-conviction proceedings, but they are here.

Moreover, the district court advised Petitioner of his rights to appeal his sentence (Exhibit 1, at 12-13).  Petitioner never directly appealed his conviction or his sentence again.  Nearly eighteen (18) years later, on July 24, 2013, Petitioner filed a post-conviction application; Petitioner filed an amended post-conviction application on April 18, 2014 (Exhibit 2).  That application raised nearly identical claims as are presently raised in this Court except for grounds four, six, and seven.  The State responded to Petitioner's amended application on September 17, 2014 (Exhibit 3).  The State argued Petitioner's claims were barred by laches, but also addressed the merits of each claim.

On October 8, 2014 – twenty-one (21) days after the State filed its response – Petitioner filed a reply to the State's response and a motion for summary judgment pursuant to Okla. Stat. tit. 22, § 1083 (2011) (Exhibit 4).  According to Petitioner, he was "entitled to summary judgment relief as there exists no genuine issue of material fact between both parties and he [was] entitled to judgment as a matter of law" (Exhibit 4, at 1).  The district court, on November 20, 2014, entered an order setting a hearing for December 2, 2014 (Exhibit 5).  On that date, December 2, 2014, the State filed a motion to strike Petitioner's motion for summary judgment on procedural grounds; namely, Petitioner had failed to follow district court rules requiring a movant for summary judgment to set forth the specific material facts he believed were no longer in dispute and upon which he was relying in support of his motion for summary judgment (Exhibit 6).  Further, and on the same day (December 2, 2014), the State filed a motion for specific discovery requesting that Petitioner identify and disclose the facts upon which he was relying both in support of his motion for summary judgment and reply brief (Exhibit 7).  This was because Petitioner had made factual statements in both pleadings that affected the State's ability to respond to them.  Of particular note, Petitioner's description of what happened to 860 pages of material from the Oklahoma State Bureau of

5

Investigation (OSBI) his appellate counsel received on his behalf in 1992 after that point was unclear. Because Petitioner was raising the prospect that another attorney at the Oklahoma Indigent Defense System (OIDS) representing his co-defendant Ward had simply taken them, the State wanted to know the basis for that accusation, as well as any other information verifying who had possession of Petitioner's legal materials since Petitioner's 1988 appeal (Exhibit 7, at 5-11).

On December 31, 2014, the state district court denied post-conviction relief. The district court agreed with Petitioner and determined there was no genuine issue of material fact; the district court also found that an evidentiary hearing was unnecessary (Exhibit 8, at 1). The post-conviction court further found Petitioner "has had possession of the 860 pages of OSBI documents since 1992[,]" and that he has "had access to [the] Medical Examiner report since 1986" (Exhibit 8, at 2). Finally, the district court found that Petitioner's claims of "actual innocence, ineffective assistance of counsel, prosecutorial misconduct, and *Brady* violation could have been submitted much earlier[,]" and for that reason barred the post-conviction application "based on doctrines [sic] of laches" (Exhibit 8, at 2). All of those claims are in the instant amended petition pending before this Court. Consequently, state post-conviction relief was denied.

Petitioner appealed the district court's denial of his post-conviction application to the OCCA (Exhibit 9). Deeming a response from the State unnecessary, the OCCA affirmed the district court's decision denying Petitioner relief (Exhibit 10). The OCCA determined there was no error by the district court's application of the laches bar to Petitioner's claims (Exhibit 10, at 3-4).

Petitioner is now appealing these state court conclusions to this Court.

# I.     THE AMENDED PETITION IS PROCEDURALLY BARRED FROM HABEAS CORPUS REVIEW.

## A.     The Amended Petition Is Time-Barred by the Statute of Limitations.

The petition is time-barred by the statute of limitations because Petitioner filed it either after April 24, 1997, or more than one year following "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1).  The AEDPA generally affords state prisoners one year during which they must file a Petition for Writ of Habeas Corpus.  Section 2244 of Title 22 of the United States Code provides, in pertinent part:

> **(d)(1)** A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
> > **(A)** the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review[.]

Pursuant to *Fisher*, 262 F.3d at 1142-1143, because Petitioner's conviction became final before the effective date of the AEDPA, that year started to run on April 24, 1996, and expired on April 25, 1997.  The instant petition is therefore filed well after the expiration of the statute of limitations. 28 U.S.C. § 2244(d)(1)(A).  And because Petitioner did not file his first Application for Post-Conviction Relief until July 24, 2013, or over sixteen years after the expiration of the statute of limitations, that filing had no tolling effect. *Clark v. Oklahoma*, 468 F.3d 711, 714 (10th Cir. 2006) ("Only state petitions for post-conviction relief filed within the one year allowed by AEDPA will toll the statute of limitations.").  The petition thus remains time-barred unless Petitioner can show that the statute of limitations was tolled some other way.

Petitioner makes no attempt to defend the lateness of his amended petition, as he offers no acceptable tolling event that would extend the statute of limitations further such that it would be otherwise timely filed.  Petitioner thus impliedly concedes that his amended petition is time-barred.  The amended petition must be dismissed unless Petitioner can demonstrate a credible showing of actual innocence to overcome the procedural bars in his case.  As discussed further below, Petitioner is unable to establish any of the excuses or exceptions to this and the other procedural obstacles that forbid review of his exhausted federal claims.[4]

## B.   The Amended Petition Is Procedurally Barred by the State Court's Application of Laches.

The procedural bar of laches applied by the OCCA in this case is also related to Petitioner's untimeliness.  In relevant part, the OCCA held:

> [Petitioner] raised five claims in his post-conviction application before the district court.[4]  The State filed a response to [Petitioner's] Application, asserting that because of his delay in seeking post-conviction relief, his claims should be barred from review under the doctrine of laches.[5]  The State contended that as best as could be discerned from [Petitioner's] pleadings, the primary information on which he relied for relief was available to him at the time of his trial or during the time of his second appeal.[6]  The State contended, "All of Petitioner's substantive claims could have been raised years ago." (O.R. 1315).  The District Court agreed and denied [Petitioner's] Application based solely on the State's laches defense.
>
> In *Thomas v. State*, this Court found the doctrine of laches, which had been applied in cases prior to enactment of the Post-Conviction Procedure Act, "continues to be applicable, in appropriate cases, to collateral attacks upon convictions . . . by means of an application for post-conviction relief" and that laches "may prohibit the consideration of an application for post-conviction relief where petitioner has forfeited that right through his own inaction." *Thomas*

---

[4] As explained further herein, not all of the claims Petitioner attempts to bring in this forum were ever even presented in the state courts and are thus unexhausted.

*v. State*, 1995 OK CR 47, ¶ 15, 903 P.2d 328, 332. *Thomas* also noted that when the State invokes laches as a defense, it is not required to demonstrate that it has suffered actual prejudice because of the delay in the filing of the post-conviction claim. *Id.*, ¶ 14, 903 P.2d at 332. We FIND that [Petitioner] has not shown the District Court erred in finding laches applicable to his post-conviction claims. As [Petitioner] has failed to demonstrate any abuse of discretion in the District Court's decision, its order denying post-conviction relief is affirmed.

> [4] [Petitioner] argued: (1) newly discovered evidence of actual innocence required post-conviction relief; (2) his Fourteenth Amendment rights were violated when the State of Oklahoma withheld evidence in violation of *Brady v. Maryland*; (3) his Sixth Amendment right to effective assistance of counsel was violated when his trial counsel failed to investigate the case and present viable evidence supporting his innocence; (4) his due process rights were violated because police misconduct induced a false confession and the prosecution knowingly introduced false testimony during his trial in violation of the Fourteenth Amendment to the U.S. Constitution; and (5) his Fourteenth Amendment due process rights were violated because of police misconduct that permeated the investigation into the victim's disappearance.

> [5] The State argued further that Fontenot's claims were procedurally barred under the Post-Conviction Procedure Act.

> [6] [Petitioner] was previously convicted and his convictions reversed in *Fontenot v. State*, 1987 OK CR 170, 742 P.2d 31.

(Exhibit 10, at 3-4).[5] Thus, the state court procedurally barred, under the doctrine of laches, Petitioner's claims in the instant amended petition – to the extent they have been exhausted – because of his longstanding inaction in this case.

---

[5] Petitioner raises three more grounds for relief in this Court than those he raised before the OCCA in his state post-conviction application.

The instant petition is thus time-barred under the AEDPA and also barred by an adequate and independent state procedural rule.

## II.     PETITIONER HAS FAILED TO DEMONSTRATE CAUSE AND PREJUDICE, NOR HAS HE SUFFICIENTLY PROVED HIS "ACTUAL INNOCENCE," TO OVERCOME APPLICATION OF THE TIME AND STATE PROCEDURAL BARS TO HIS CLAIMS TO THE EXTENT THEY WERE EXHAUSTED IN THE STATE COURTS.

A federal court may not consider a claim that has been procedurally defaulted on adequate and independent state procedural grounds "unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Byrd v. Workman*, 645 F.3d 1159, 1167 (10th Cir. 2011) (citing *Matthews v. Workman*, 577 F.3d 1175, 1195 (10th Cir. 2009)); *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998).  Petitioner sets forth three (3) reasons why he believes his procedurally defaulted and time-barred claims, to the extent they are even exhausted, may still be heard in this Court:

> First, the Court requires that the [state procedural] rule must be adequate and independent – that is, it was firmly established, regularly followed, and consistently applied at the time of the alleged default.  Second, there is "a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense."  Third, there is an exception in claims of *Brady* error, where the elements of the substantive claim itself mirror the cause and prejudice inquiry and proof of one is necessarily proof of the other.

(Amended Petition, 15-16 (internal citations omitted)).  Hence, Petitioner contends that any and all procedural barriers have been cleared away because his case fits within the "actual innocence" gateway exception that would permit federal habeas review of his procedurally defaulted federal

claims, and alleged "*Brady* error" serves as the "cause and prejudice" sufficient to serve the same function.  Although Petitioner mentions the "adequate and independent" requirement regarding state procedural rules, nowhere does he discuss those components as they relate to the bar applied in his case – laches – or argue why it was insufficient to preclude habeas review in his case.  As shown below, insofar as Petitioner has properly exhausted his federal claims, they may not be heard here because he cannot establish cause and prejudice for his time-barred petition and procedural default, nor can he slide through the exceptionally narrow – and the rarest applied – "actual innocence gateway" exception afforded habeas petitioners whose claims would be otherwise barred from habeas review.  This Court may not review Petitioner's federal claims in the instant amended petition even if they were all exhausted, which they are not.

> ### A.   Oklahoma's Laches Bar Is Adequate and Independent to Preclude Federal Habeas Review of His Properly Exhausted Claims.

Petitioner notes, correctly, in his amended petition that a state procedural bar must be "adequate and independent" to deny federal habeas review (Amended Pet., at 15).  Anticipating that Respondent would again rely upon the state-law bar of laches, Petitioner lists as the "first" of his "exceptions to [the] general rule" that "absent a showing of cause and prejudice, a habeas court will not entertain a claim that has been defaulted in state court because of a procedural state court bar" Amended Petition, p. 15.  Petitioner offers no argument regarding the adequacy or independence of Oklahoma's procedural bar of laches.  Petitioner has thus impliedly conceded the issue, *i.e.*, the state procedural bar was both adequate and independent in this case, as he makes no attack on those features of Oklahoma's procedural bar of laches.  Instead, he goes directly to the cause and prejudice he must establish to overcome that bar and the time bar.  Petitioner therefore expends all of his effort

on alleged "*Brady* error" and "actual innocence" to show why his time bar and procedural default

should be overlooked and his federal claims entertained. Petitioner's failure to address the adequacy

or independence of Oklahoma's laches bar in the context of his case (or in any context), even if he

has not conceded the point, results in forfeiture of that argument in this Court. *Lockett v. Trammel*,

711 F.3d 1218, 1230 (10th Cir. 2013) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir.

2007) ("'[W]e routinely have declined to consider arguments that are not raised, or are inadequately

presented, in an appellant's opening brief.'"); *Hooks v. Workman*, 689 F.3d 1148, 1173 n.12 (10th

Cir. 2012) (same); *Fox v. Ward*, 200 F.3d 1286, 1294 (10th Cir. 2000) (habeas petitioner's failure to

support summary claim with developed argument and relevant authority "effects a forfeiture of the

claim"); *Femedeer v. Haun*, 227 F.3d 1244, 1255 (10th Cir. 2000) ("[P]erfunctory complaints [that]

fail to frame and develop an issue [are not] sufficient to invoke appellate review." (quoting *Murrell*

*v. Shalala*, 43 F.3d 1388, 1389 n.2. (10th Cir. 1994))); *see also* Fed. R. App. P. 28(a)(8) (argument

must contain "contentions and the reasons for them, with citations to the authorities and parts of the

record on which the appellant relies"). Even so, Respondent will establish below that Oklahoma's

laches bar is both an adequate and independent state bar to Petitioner's exhausted federal claims.

There is no specific time limit under Oklahoma law governing the filing of an original, or

even a subsequent, non-capital state post-conviction relief application. *Moore v. Gibson*, 27 P.3d

483, 484 n.1 & 487 (Okla. Crim. App. 2001). So, "an application for post-conviction relief in a non-

capital case is always deemed to be timely filed." *Moore*, 27 P.3d at 484 n.1. Petitioner therefore

had the right for many years – at least two decades or more – to collaterally attack his jury trial

conviction and the sentence he ultimately agreed to serve following the OCCA's last remand for

resentencing. That did not insulate Petitioner from state-law-grounded doctrines that might be

imposed if – as in this case – he waited too long to do so.  It has been over thirty years since Donna Denice Haraway's murder; similarly, nineteen (19) years have passed between the time Petitioner's state direct appeal was decided by the OCCA and when Petitioner filed his first application for post-conviction relief.  It was because Petitioner had "forfeited that right [to have his post-conviction claims heard] through his own inaction" that the Oklahoma courts determined he could no longer pursue them (Exhibit 10, at 3-4).  That reason, laches, was sufficient to bar further review in this Court because it is an adequate and independent state procedural bar.

A state ground will be considered adequate if it is "strictly or regularly followed" and applied "evenhandedly to all similar claims." *Smallwood v. Gibson*, 191 F.3d 1258, 1268 (10th Cir. 1999). Oklahoma's procedural bar of laches is both independent and adequate.  However, the state court must still apply any governing state procedural default rules like waiver and *res judicata, Moore,* 27 P.3d at 487 n.4, and the doctrine of laches. *See Thomas v. State,* 903 P.2d 328, 332 (Okla. Crim. App. 1995) (discussing doctrine of laches).  In Oklahoma, "the doctrine of laches may prohibit the consideration of an application for post-conviction relief where petitioner has forfeited that right through his own inaction." *Thomas*, 903 P.2d at 332.  Indeed,  for at least seventy years, the OCCA has applied the doctrine of laches to deny relief numerous times, even when the delay was shorter than in Petitioner's case, and continues to do so up to the present day. *Thomas v. State*, 675 P.2d 1016 (Okla. Crim. App. 1984), *cert. denied*, 466 U.S. 942 (1984) (nineteen years); *In re O'Neill*, 359 P.2d 619 (Okla. Crim. App. 1961) (seventeen years); *Ex parte French*, 240 P.2d 818 (Okla. Crim. App. 1952) (almost fifteen years); *Ex parte Paul*, 227 P.2d 422 (Okla. Crim. App. 1951) (twenty-seven years); *Ex parte Workman*, 207 P.2d 361 (Okla. Crim. App. 1949) (eight years); *Ex parte Motley*, 193 P.2d 613 (Okla. Crim. App. 1948) (eleven years); *Ex parte Ray*, 198 P.2d 756 (Okla.

13

Crim. App. 1948) (eight years); and *Ex parte Matthews*, 186 P.2d 840 (Okla. Crim. App. 1947), *cert. denied*, 333 U.S. 858 (1948) (almost seventeen years); *see also Williams v. State*, Case No. PC-2017-347 (Okl. Cr. Jun 26, 2017) (more than twenty-three years) (unpublished); *McLaurin v. State*, Case No. PC-2017-583 (Okl. Cr. Aug. 1, 2017) (twenty-one years) (unpublished).[6]  The OCCA has also applied the doctrine of laches to deny relief when the delay was comparable to that in this case.  *See Paxton v. State*, 903 P.2d 325 (Okla. Crim. App. 1995) (the defendant sought post-conviction relief approximately thirty years after his conviction for manslaughter was affirmed on direct appeal); *Berryhill v. Page*, 391 P.2d 909 (Okla. Crim. App. 1964), *cert. denied*, 379 U.S. 883 (1964) (petition filed twenty-four years after crime and sixteen years after first petition).  Clearly, Oklahoma has regularly and even-handedly followed this rule.  It is thus an adequate state procedural bar to claims brought in habeas proceedings. *Smallwood*, 191 F.3d at 1268.

The state bar is also independent.  "To be independent, the procedural ground must be based solely on state law." *Cole v. Trammell*, 755 F.3d 1142, 1159 (10th Cir. 2014).  Laches, as the case law above demonstrates, is a state-law doctrine.  The Tenth Circuit Court of Appeals has in fact already found Oklahoma's bar of laches to be an adequate state law ground that is independent of federal law.  In *Smith v. Addison*, No. 09-5147, 373 Fed. Appx. 886 (10th Cir. Apr. 20, 2010) (unpublished),[7] Judge Gorsuch, writing for the Court, reasoned:

---

[6] Pursuant to Rule 3.5(C)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2017), these decisions are offered to assist the Court because no published case of which counsel is aware serves as well the purpose for which counsel cites them; they are attached Exhibit 18.

[7] Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

> In this case, the district court correctly held that it was barred from reviewing Mr. Smith's habeas petition because the OCCA resolved his claim on an independent and adequate state law ground. The OCCA's decision was independent because it was based on the state law doctrine of laches, not on any federal law. And the doctrine of laches is adequate because it is both firmly established and regularly followed by the OCCA. *Thomas v. State*, 903 P.2d 328, 332 (Okla. Crim. App. 1995) ("[T]he doctrine of laches has been and continues to be applicable, in appropriate cases, to collateral attacks upon convictions . . . where petitioner has forfeited that right through his own inaction.").

*Smith*, 373 Fed. Appx. at 888. *See also Doe v. Jones*, 762 F.3d 1174, 1183 (10th Cir. 2014) ("With respect to the possibility that a laches determination could be a procedural bar as an adequate and independent state ground for dismissal of the post-conviction application, this is a hurdle petitioner would have to overcome whether or not a stay is granted.").

Therefore, because Oklahoma's laches bar is both adequate and independent to deny relief, and Petitioner presents no serious dispute as to that fact, Petitioner's claims remain procedurally barred in habeas proceedings unless Petitioner can demonstrate cause and prejudice in failing to present these issues on direct appeal or that a fundamental miscarriage of justice would result if this Court did not consider the claims. *Demarest v. Price*, 130 F.3d 922, 941 (10th Cir. 1997). He can show neither.

### B.  Petitioner Has Failed to Demonstrate Cause and Prejudice Sufficient to Overcome His Procedurally Barred Exhausted Claims.

To establish "cause" to excuse a procedurally defaulted claim, a habeas petitioner must show that "some objective factor external to the defense impeded . . . [his] efforts to comply with the state procedural rules." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The "cause" for procedural default must therefore be an act or omission that cannot be attributable to Petitioner. Thus, to satisfy this

requirement for overcoming the procedural bar of laches, Petitioner must demonstrate that some force untraceable to himself prevented him from filing his application for post-conviction relief sooner. Petitioner must also prove "actual prejudice resulting from the error of which he complains." *Carrier*, 477 U.S. at 488. That is, Petitioner must show he was actually prejudiced from whatever it was that prevented him from filing that application. Put another way, to overcome Oklahoma's laches bar by showing "cause and prejudice," Petitioner must demonstrate that a constitutional violation completely outside his control is what kept him – for nearly two decades – from raising the claims in his initial application for post-conviction relief in state court, and that constitutional violation actually prejudiced him. *Maples*, 132 S. Ct. at 922 (quoting *Coleman*, 501 U.S. at 753) ("Cause for a procedural default exists where 'something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule.'"); *Coleman*, 501 U.S. at 750 ("prejudice" requires a showing of "actual prejudice as a result of the alleged violation of federal law"). There are two major problems with the types of "cause," and to some extent "prejudice," Petitioner attempts to put forward in this case: first, the factors upon which he relies are not external to him; and/or, second, the "cause" he cites in this Court to overcome his procedural obstacles now was either never raised or different from that which he raised in the state court. Either way, Petitioner may not have his exhausted federal claims heard here.

Petitioner cannot demonstrate requisite "cause" because he was responsible for not only the long delay in his claims being raised, but also any further development of those allegations in the state court. As shown above in the description of what occurred in the state courts, Petitioner formally informed the state post-conviction court that the proof he needed to establish his claims – the same ones he wants heard here – was complete at that time and in no need of further

development, investigation, or hearing (*see* Exhibit 4). Petitioner was therefore totally responsible for, or at least greatly contributed to, any inability to demonstrate in the state courts that the facts of his case justified an exception to the laches bar. Thus, to the extent Petitioner attempts to establish cause for his procedural defaults by arguing the state courts deprived him of the opportunity to fully develop his federal claims – including his "actual innocence" gateway claim – before barring them by laches, he cannot do so because it is not a factor external to him. *Maples*, 132 S. Ct. at 922.

As Respondent has reminded during the course of these proceedings, in state post-conviction proceedings, Petitioner replied to Respondent's response to his application with a motion for summary judgment. By doing so, Petitioner represented to the state court that his claims could be resolved, in his favor, with no further hearing, argument, or discovery. This action is significant for at least two reasons relevant to Petitioner's attachment to his own proposed "cause" – and thus divorces him from the ability to use it as an excuse to overcome a procedural default. First, Petitioner has never adequately explained why it took him so long to file a state post-conviction application in the first place. Petitioner gained a blanket order from the OCCA allowing him access to all OSBI information on his case (Exhibit 11). Those documents, 860 pages of them and upon which Petitioner has built his present claims, have been available to him since at least 1992. Petitioner, in fact, admits in his second ground for relief that it was the OSBI that was the central depository for all the information pertaining to his case regardless of the entity that initially generated it (*see* Amended Petition, pp. 51-52). Petitioner also had access to the Medical Examiner's report since 1986 (Exhibits 8, 14). Consequently, Petitioner's "[c]laim of actual innocence, ineffective assistance of counsel, prosecutorial misconduct, and *Brady* violation could have been submitted much earlier" (Exhibit 8, at 2). Further, based upon what Petitioner submitted in post-conviction

proceedings, the state district court concluded that "too much time has elapsed due to Petitioner's own inaction" (Exhibit 8, at 2).  These facts were expressly found by the state district court and entitled to deference absent Petitioner rebutting it with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Frost v. Pryor*, 749 F.3d 1212, 1215 (10th Cir. 2014); *see also Sharpe v. Bell*, 593 F.3d 372, 379-81 (4th Cir. 2010) (applying 28 U.S.C. § 2254(e) deference to state post-conviction court findings of fact).

Petitioner has never denied obtaining 860 pages of documents from OSBI in 1992, and it is this discrete fact upon which all of Petitioner's claims are built to at least some degree.  Yet despite having those documents for two decades, Petitioner raised not a single complaint about his conviction, much less that he was actually innocent of a murder.  That Petitioner so easily got such a large amount of material shows how easily he might have gotten more – before memories faded, witnesses died, and when the most thorough investigations were most possible – had he taken any action at all.  Petitioner did nothing and now blames Oklahoma officials because he asked for nothing even though for at least four (4) years after receiving this information from OSBI, he had counsel.  This is a particularly important point considering Petitioner voluntarily agreed to be sentenced, in 1995, for crimes he now says he did not commit and cannot deny that he had access to the bulk of information he says will prove his claims at the time he agreed to that sentence. Petitioner was partially, if not totally, responsible for the delay in his case and the later difficulties in piecing some of it back together.  It is simply not true that the delay between the time OSBI complied with the OCCA order in 1992 and Petitioner's first attempt to collaterally attack his conviction and sentence was solely the fault of any prosecutorial entity.

Second, even if Petitioner had some sort of an excuse for his lengthy delay in bringing forth his state post-conviction claims, he surely cannot explain why he unilaterally cut off those proceedings by informing the state court that the issues in his case could be decided solely on the briefs alone – without further discovery or hearing – by filing a motion for summary judgment. More importantly, at no time did Petitioner complain to the OCCA that the defense of laches asserted by Respondent and adopted by the post-conviction court precluded him from discovering evidence to further develop any federal claim.  When he appealed the state district court's denial of his post-conviction application, Petitioner's description to the OCCA of how those proceedings occurred was the following:

> An Application for Post-Conviction Relief was filed in the District Court of Pontotoc County on July 24, 2013.  It was assigned to the Honorable Thomas S. Landrith.  After requesting additional time to respond the State filed its response on September 17, 2014.[1]  Without a hearing the district court issued its Post-Conviction Findings on December 31, 2014, denying relief based on the State's assertion of Laches.
>
> [1]     The Order denying post-conviction relief incorrectly shows that the State's Response was filed on September 17, 2013.  However, the Response was filed a year later in 2014.

(Exhibit 9, at 2).  Petitioner failed to admit to the state appellate court from the outset that the reason the district court could decide his case "[w]ithout a hearing" is because he expressly informed the district court that it could do so.  The State responded to Petitioner's motion for summary judgment with a motion to strike it and a motion for specific discovery because Petitioner had not followed state procedural rules requiring him to set forth the genuine issues of material fact he believed had been resolved by the pleadings (Exhibit 6).  The State also requested specific discovery of the new facts upon which he was relying to support his motion (Exhibit 7).  Petitioner never withdrew his

19

motion for summary judgment, modified it, nor replied to the State's motion.  Thus, by the close of litigation in the state district court proceedings, Petitioner still believed that all issues of material fact had been resolved and his case could be decided based upon what he had submitted without a hearing.  And the state district court ultimately agreed with Petitioner, finding in its order that there was no genuine issue of material fact and that an evidentiary hearing was unnecessary: "Petitioner having stipulated to have decision heard on briefs and motions and responses" (Exhibit 8, at 1).

Petitioner has represented to this Court that the discovery process was still ongoing in the state court at the time he filed his motion for summary judgment (Dkt. 66, at 4).  If that were true, however, Petitioner never informed the state courts of that and allowed the OCCA to decide if that indeed occurred.  Instead, the state court record reflects that Petitioner wanted his post-conviction application decided *without* further discovery or even a hearing.  Petitioner could have, but did not, allowed the post-conviction proceeding to run its course such that the state court could make that decision.  Petitioner's motion for summary judgment, under Oklahoma law, formally notified the state court that there was no longer any genuine issue of material fact that needed to be decided and the post-conviction court could decide Petitioner's issues at that time on the merits without further discovery or hearing (Exhibit 4). Okla. Stat. tit. 22, § 1083 (2011).  Petitioner's actions – not the state court and not Respondent – are what effectively shut down any further efforts to discover and use any other potential information that might be useful to his legal claims.  Moreover, this action seems to expose not only Petitioner's confidence that he had all he needed to make what he believed to be viable claims, but an apparent hurry to exit the state courts as quickly as possible toward this forum to complain he was denied federal rights.  Petitioner cannot on the one hand inform the state courts that his litigation was concluded but for a judicial decision based on facts set forth in the

20

briefs, and on the other come to this Court and paint that same litigation in the opposite light. And Petitioner surely should not be permitted to blame the imposition of a state procedural bar (laches) as the "cause" to excuse the application of that bar in this Court when he never gave the state courts an opportunity to pass on the question first. This type of strategy is directly contrary to the comity between sovereign governments the AEDPA is designed to promote. *Edwards v. Carpenter*, 529 U.S. 446, 451-452 (2000). As Petitioner never argued in the OCCA that the application of laches prevented him from developing any legal claim, he may not use that as his "cause" to overcome the adequate and independent procedural bar here. This defect, as with Petitioner's attempt to now use alleged "*Brady*" violations as cause to excuse his procedural default, renders the instant Amended Petition unreviewable in a habeas court.

Just as Petitioner cannot claim the cutoff of discovery in state court as "cause," where he never presented this cause to the OCCA, so too, Petitioner cannot rely upon alleged *Brady* violations as his cause, either, because this issue was never cited as "cause" to overcome the procedural default in state court. *Edwards*, 529 U.S. at 451-452. In his Amended Petition, Petitioner alleges that "there is an exception in claims of *Brady* error, where the elements of the substantive claim itself mirror the cause and prejudice inquiry and proof of one is necessarily proof of the other" (Amended Petition, at 16 (citing *Banks v. Dretke*, 540 U.S. 668 (2004)). Petitioner alleges that he "qualifies for substantive review under both the actual innocence and the cause and prejudice exceptions" (Amended Petition, at 16). Thus, it appears that Petitioner is arguing a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) as "cause" to overcome the State's procedural bar of laches. The problem with Petitioner's argument is that, again, he never presented it to the OCCA on post-conviction review. While Petitioner alleged a substantive *Brady* claim, Petitioner never argued to

the state courts below that the district court had improperly applied the doctrine of laches specifically on account of a *Brady* violation.   In Petitioner's "Reply to Respondent's Response and Brief in Support of Motion for Summary Judgment" (hereinafter referred to as "Brief in Support of Motion for Summary Judgment") filed in Pontotoc County District Court on October 8, 2014, Petitioner did not rely upon *Brady* to overcome the procedural bar; rather, Petitioner asserted a conflict of interest regarding one of his former attorneys. (*See* Exhibit 4, at 9 ("To be clear, [Petitioner] does not assert the conflict of interest claim as a substantive constitutional violation, but rather to overcome Respondent's assertion of the laches defense.").   Now, in his federal habeas petition, Petitioner has completely switched his legal theory as to why the doctrine of laches should not apply to his stale claims.   However, to the extent that Petitioner attempts to allege any particular "cause" to excuse his procedural default, that claim must also be exhausted before it is asserted on federal habeas review. *Edwards*, 529 U.S. at 451-452.   The *Edwards* Court reasoned:

> [T]he principles of comity and federalism that underlie our longstanding exhaustion doctrine–then as now codified in the federal habeas statute, *see* 28 U.S.C. §§ 2254(b), (c) – require *that* constitutional claim, like others, to be first raised in state court.

*Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 489 (1986)) (emphasis by the *Edwards* Court).  *See Jones v. State*, 704 P.2d 1138, 1140 (Okla. Crim. App. 1985) (recognizing certain exceptions to the procedural bar rule in cases where "sufficient reason" prevented assertion of the error on direct appeal or where an issue is bypassed on direct appeal due to a procedural error of counsel). Petitioner's assertion of "cause" for his state procedural default in this Court may thus not be used. Because Petitioner must satisfy *both* the "cause" and "prejudice" components to overcome a procedural bar, his claims – to the extent they are even exhausted – may not be heard. *Klein v. Neal*,

45 F.3d 1395, 1400 (10th Cir. 1995) ("The 'cause and prejudice' exception is conjunctive, requiring proof of both cause *and* prejudice") (emphasis in original) (citing *Murray*, 477 U.S. at 496 and *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)).

Petitioner cannot rely on one "cause" to overcome the state bar in state court and a different "cause" to overcome the state bar in federal court. By doing so, Petitioner has "effectively transformed" the claim he presented in state court into a "new claim." *Fairchild v. Workman*, 579 F.3d 1134, 1155 (10th Cir. 2009). In *Fairchild*, the petitioner argued in his state court proceedings that trial counsel was ineffective but in his habeas petition, he presented "a very different, far more specific claim," of ineffective assistance of counsel. The Circuit concluded that the new evidence significantly altered the ineffective assistance of counsel claim, placing it in a different legal posture than in state court. *Fairchild*, 579 F.3d 1134 at 1150. Therefore, the Circuit Court found that before it could pass on the merits, the petitioner would first be required to exhaust all available state court remedies. *Fairchild*, 579 F.3d at 1151. The *Fairchild* Court cited to the pre-AEDPA case of *Demarest*, wherein the Circuit held that when the petitioner produced new evidence of trial counsel ineffectiveness, "our respect for the state courts requires us to remand this case to the district court for a determination of whether this new evidence could now be presented in those courts." *Fairchild*, 579 F.3d at 1152 (citing *Demarest*, 130 F.3d at 943). The Circuit in *Fairchild* found that the Court of Criminal Appeals was never provided the evidence that Fairchild attempted to present in federal court to prove ineffective assistance of counsel at trial and, therefore, he did not satisfy the exhaustion requirement. *Fairchild*, 579 F.3d at 1152. The Tenth Circuit recognized that if the state court resolves the claim on the merits, the AEDPA deference would apply and if the state court found the claim to be barred, the federal court would review that disposition applying the appropriate

standard of review under the circumstances. *Fairchild*, 579 F.3d at 1153. The *Fairchild* Court concluded that the petitioner had not "presented a potentially meritorious claim of ineffective assistance of counsel . . . before the state courts [which] was predicated on new profound evidence that [the petitioner] never presented to the OCCA." *Fairchild*, 579 F.3d at 1155. *See also Demarest*, 130 F.3d at 932 (requiring exhaustion despite the fact that the constitutional issue of ineffective assistance of counsel had been presented but the evidence presented in federal court differed somewhat from the evidence presented in state court; the Court reasoned that "fair presentation" means that the substance of the claim must be raised giving the state courts a fair opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim).

Just as in *Fairchild*, the instant Amended Petition presents a "cause" for procedural default which was not "fairly presented" to the State court. In the Motion for Summary Judgment, Petitioner argued that "any delay in presenting [Petitioner's] claims was not of his own personal failings but those of an attorney whom he believed was working towards filing a petition on his behalf but who allegedly harbored a conflict of interest that interfered with his representation of [Petitioner]" (Exhibit 4, at 7). Petitioner explained in the state courts:

> Respondent's contention with [Petitioner] deals with the lack of any case activity after his plea in 1994. *That delay resulted in the actual conflict of interest between [Petitioner] and attorney Mark Barrett.* Mr. Barrett began reviewing [Petitioner's] case in 2003 shortly after his representation of Ron Williamson ended as a result of Mr. Williamson's exoneration. As a former employee of the Oklahoma Indigent Defense System (OIDS), Mr. Barrett was aware of OIDS' [sic] file management and records keeping systems. *Mr. Barrett, without authorization from [Petitioner], took his entire file, comprised of eleven (11) boxes, from the OIDS office. When questioned by undersigned counsel as to the scope of records taken and what records remained, only a potential review as to post-conviction DNA testing remained within OIDS'* [sic] *files. No*

24

> *correspondence, trial attorney files, appellate files, discovery, or other case materials remained. [Petitioner] was unaware of this situation until it came to light in 2012.*
>
> At the time undersigned counsel began working on [Petitioner's] case, Mr. Barrett explained how he had been representing both [Petitioner] and Mr. Ward, and investigating their cases, since 2003. Mr. Barrett was provided with a release signed by [Petitioner] in 2012 for all of his case files. The trial transcripts, OSBI reports, appellate briefing, videotapes of the confession, and some correspondence between appellate counsel and [Petitioner] was disclosed by Mr. Barrett. However, this material in no way constitutes the eleven boxes originally within OIDS' possession and taken by Mr. Barrett in 2003.

(Exhibit 4, at 7-8) (emphasis added). Thus, according to Petitioner's representations in the state courts, another OIDS lawyer (Barrett) took his case materials in OIDS' possession at some point after 2003. Petitioner then made clear the legal basis for why the state bar of laches should not be applied in his case:

> [Petitioner] asserts that Mr. Barrett was operating under a conflict of interest because his representation of Tommy Ward placed him in a compromised position in representing [Petitioner]. *[Petitioner] asserts that his conflict of interest defeats Respondent's assertion of laches because it was not until conflict free counsel was involved in the case that anyone had access to the information that serves as the basis of [Petitioner's] factual innocence claim.* To be clear, [Petitioner] does not assert the conflict of interest claim as a substantive constitutional violation, but rather to overcome Respondent's assertion of the laches defense.

(Exhibit 4, at 8-9) (emphasis added). Petitioner's position in the state courts was thus unambiguous: an alleged conflict of interest held by Mr. Barrett was the cause that prevented him from developing his factual innocence claim. And it was the removal of that alleged conflict that finally, according to Petitioner, cleared the way for "conflict-free counsel" to bring his claim forward. Laying aside the legal defect in Petitioner's theory – that the timeliness of his claims was dependent upon when

25

his post-conviction counsel learned of the information rather than when it was available to him – this was a different argument than the one he presents in this Court.

As the above passages from Petitioner's state post-conviction filings establish, Petitioner did not allege to the state court that laches should not apply because the *State* withheld evidence, which is the gravamen of a *Brady* claim. It was for that reason, as noted in the State's Motion for Specific Discovery filed in response to Petitioner's Motion for Summary Judgment, the State understandably responded to a conflict of interest claim as Petitioner's alleged "cause" to overcome laches, not to a *Brady* claim, by noting the following:

> In sum, Petitioner's Reply now alleges that (a) OIDS direct appeal attorneys had amassed at least eleven (11) boxes of materials relating to this case during their representations of him on direct appeal; (b) one of his direct appeal counsel, Cindy Brown Danner, who completed Petitioner's direct appeal brief and all direct appeal proceedings thereafter on his behalf, filed a motion with the Court of Criminal Appeals while Petitioner's case was still pending, requiring OSBI to release what apparently amounted to approximately 860 pages of material; Ms. Danner states she has no independent recollection as to why she filed the motion in Petitioner's case, except that such requests were seemingly routine at that time; (c) Mr. Barrett either was given permission by OIDS to take, or simply stole, nearly all of these 11 boxes of Petitioner's case materials; and (d) Petitioner should not be held accountable for any delay in raising his current claims, even though he was represented by counsel for at least two years before he accepted a life without parole sentence for a murder he now says he did not commit.

(Exhibit 7, at 4-5). The State further noted that Petitioner's lack of diligence in pursuing his claims extended back to 1992, when the OCCA awarded him an extremely broad discovery order and his counsel obtained the 860 pages of material from the OSBI, yet there was no further case activity after that date (Exhibit 7, at 4 n.1; Exhibit 11, 1992 OCCA Order; Exhibit 12, Affidavit of Cindy Brown Danner). The State further showed in its Motion for Specific Discovery that Petitioner's defense

counsel was in possession of material from the OSBI at the latest, by December 3, 1993, as evidenced by an OSBI document entitled "Release of Hypnosis Tape to David Timmons" indicating that a second copy of that tape had to be provided on January 7, 1994, after the first copy was broken by the defense team while in the process of listening to the tape (Exhibit 7, attached Exhibit 2). Under these facts and circumstances, where Petitioner has alleged a "cause" in his federal petition which differs substantially from anything he presented to the state courts, "it is AEDPA that requires . . . remand without addressing these claims on the merits." *Fairchild*, 579 F.3d at 1156. As the Tenth Circuit noted, the Supreme Court "has made it abundantly clear that 'before you bring any claims to federal court, be sure that you first have taken each one to state court.'" *Fairchild*, 579 F.3d at 1156 (citing *Rose v. Lundy*, 455 U.S. 509, 520 (1982)).

Petitioner could have alleged *Brady* as his cause to overcome the procedural bar in his first application for post-conviction relief, but did not. It is possible that the reason for Petitioner's change of legal theory is Petitioner's realization that the allegations which he made against Mr. Barrett in state court do not suffice as a showing for "cause" to overcome the procedural bar in federal court. As the Tenth Circuit Court of Appeals observed in *Berry v. Cody*, Case No. 94-6253, 1994 WL 596878 (10th Cir. Nov. 2, 1994)[8] (unpublished), relying on *Coleman v. Thompson*, 501 U.S. 722 (1991) as well as *Murray*:

> Berry's arguments in support of "cause" to overcome his state court procedural bar relate to his attorney's alleged neglect or failure to follow instructions. Those arguments are insufficient. "Cause" must be something external to the petitioner, not fairly attributable to him. *Coleman*, 501 U.S. at 752; *Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Rodriguez v. Maynard*, 948 F.2d 684, 687 (10th Cir. 1991),

---

[8]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

> and since there is no right to counsel in post-conviction proceedings,
> an unappealed decision on the merits of ineffective assistance claims
> in such proceedings cannot constitute cause because of counsel error.
> *Coleman*, 501 U.S. at 752-53.

*Berry*, 1994 WL 596878, *3; *see also Pennsylvania v. Finley*, 481 U.S. 551, 555 (1990) (there is no general constitutional right to post-conviction counsel); *Fleming v. Evans*, 481 F.3d 1249, 1255 (10th Cir. 2007) ("[t]here is no constitutional right to an attorney in state post-conviction proceedings") (quoting *Coleman*, 501 U.S. at 752); *Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003) ("Cause excusing a procedural default must be some objective factor external to the habeas petitioner, not fairly attributable to him, that impeded his efforts to comply with the procedural rule in question."); *Smallwood v. Gibson*, 191 F.3d 1257, 1269 (10th Cir. 1999) (holding there is no constitutional right to the assistance of post-conviction counsel in Oklahoma, and as such ineffective post-conviction counsel may not be used as "cause" to excuse a procedural default).  Petitioner has not shown such an "external" factor where the evidence was available to, and investigated by, Petitioner's prior trial and direct appeal attorneys, but they simply chose not to take any further action concerning Petitioner's case following the reversal of his case for his resentencing in 1995 and up to and including Petitioner's agreement to be sentenced to life without parole in 1995.

Because the issue of exhaustion is extremely problematic in this federal habeas petition due to an ineffective assistance of appellate counsel claim never raised in the state courts as well as the unusual way in which this case has proceeded in federal court, and the additional evidence which has been generated since this case has been in federal court, exhaustion of the issues will be further considered in a separate section below.  Respondent affirmatively does not waive the issue of exhaustion. 28 U.S.C. § 2254(b)(3).  As discussed immediately below, Petitioner also alleges "actual

28

innocence" to overcome both the time bar of the AEDPA and the State's procedural bar of laches. This claim fails as well.

### C.    Petitioner Has Not Produced New and Reliable Evidence Establishing He Is Actually Innocent Sufficient to Review His Federal Claims to the Extent They Were Properly Exhausted.

Petitioner opens his Amended Petition with a heading announcing that his "claims are properly before this Court" (Amended Pet. 14).  Petitioner alleges, as he did in the state courts, that "newly discovered evidence" shows that he is actually innocent, which he believes removes "any procedural defects" in his habeas petition, pursuant to *Schlup v. Delo*, 513 U.S. 298, 324 (1995).[9] Petitioner thus seeks to overcome the AEDPA's prohibition on time-barred claims, OCCA's procedural bar of laches, and presumably every other conceivable procedural default he has caused by waiting decades to raise his substantive allegations.  Petitioner's actual innocence claim fails because none of the alleged evidence upon which he relies is either new or reliable when considered under the proper standards applicable to habeas petitions.  The "gateway" Petitioner has tried to open thus remains closed and his claims are barred from review in this Court.

Time-barred federal claims may be nonetheless reviewed by a habeas court upon a credible showing of "actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 133 S. Ct. 1924, 1931-33 (2013).  A claim of "actual innocence" provides a "gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Schlup*, 513 U.S. at 315.  Moreover, if unable to demonstrate sufficient cause and prejudice, a habeas petitioner may also overcome a procedural bar to his defaulted claims by establishing a fundamental miscarriage

---

[9] Petitioner contends that "[o]nce an actual innocence gateway is established, *any procedural defects* in [Petitioner's] constitutional claims are removed permitting this Court to evaluate each claim on its merits (Amended Pet., 16) (citing *Schlup*, 513 U.S. at 315) (emphasis added).

of justice will result if his claims are not heard in federal court. *Magar v. Parker*, 490 F.3d 816, 819 (10th Cir. 2007). "Cases involving a fundamental miscarriage of justice 'are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'" *Gilbert v. Scott*, 941 F.2d 1065, 1068 n.2 (10th Cir. 1991) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991), and citing *Murray*, 477 U.S. at 496)); *see also Herrera v. Collins*, 506 U.S. 390, 403-404 (1993); *Larson v. Leyba*, 507 F.3d 1230, 1232 (10th Cir. 2007); *Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998) (equitable tolling may be appropriate upon a showing of actual innocence). The Court of Appeals has explained this "very narrow exception" of "actual innocence" that would permit habeas review of otherwise procedurally barred claims:

> The petitioner must supplement his habeas claim with a colorable showing of factual innocence. Such a showing does not in itself entitle the petitioner to relief but instead serves as a "gateway" that then entitles the petitioner to consideration of the merits of his claims. In this context, factual innocence means that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."

*Demarest v. Price*, 130 F.3d 922, 941-42 (10th Cir. 1997) (citations omitted). In *Schlup*, the case primarily relied upon by Petitioner, the Supreme Court held that "to be credible [a claim of actual innocence requires] new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . ." *Schlup*, 513 U.S. at 324. Petitioner must present "'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Perkins*, 569 U.S. 383, 133 S. Ct. at 1936 (quoting *Schlup*, 513 U.S. at 316). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324; *see also House v. Bell*, 547 U.S. 518, 538

30

(2006) (reasoning, "[t]he *Schlup* standard is demanding and permits review only in the 'extraordinary case'").  In *Frost*, the Tenth Circuit Court of Appeals succinctly stated the standard Petitioner must meet to break open the door to habeas review:

> To make a credible showing of actual innocence, a "petitioner must 'support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" This new evidence "must be sufficient to 'show that it is more likely than not that no reasonable juror would have convicted the petitioner in the light of the new evidence.'  This standard is "demanding and permits review only in the extraordinary case."

*Frost*, 749 F.3d at 1231-32 (internal citations omitted).  Further, the new evidence must "affirmatively demonstrate[ ] [the petitioner's] innocence," rather than simply "undermine the finding of guilt against him."  *Phillips v. Ferguson*, 182 F.3d 769, 774 (10th Cir. 1999).  *Compare McElhaney v. Bear*, Case No. 17-7026, 700 Fed. Appx. 872, 875 (10th Cir. Aug. 17, 2017) (unpublished)[10] ("[P]risoners asserting innocence . . . must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" (citing *House*, 547 U.S. at 536-537)); *Smith v. Addison*, No. 09-5147, 373 Fed. Appx. 886, 889 (10th Cir. April 20, 2010)[11] (unpublished) (where the defendant presented a legal justification for his conduct in committing a homicide – duress – his argument went to legal innocence as opposed to factual innocence, and therefore, it could not satisfy the fundamental miscarriage of justice exception).  "Simply maintaining one's innocence, or even casting some doubt

---

[10]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

[11]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

on witness credibility, does not necessarily satisfy this standard." *Frost*, 749 F.3d at 1232; *Bousley v. United States*, 523 U.S. 614, 623 (1998) ( explaining that "actual innocence" must be based upon new evidence of "factual innocence, not mere legal insufficiency"); *see also Prost v. Anderson*, 636 F.3d 578, 600 (10th Cir. 2011).  Hence, it is not enough to simply show the weight of the evidence at trial might have been different or viewed more in Petitioner's favor in some respects.  Petitioner must prove – with evidence – a greater likelihood that *no* reasonable juror would have found a reasonable doubt as to his guilt. *Schlup*, 513 U.S. at 324.  The Supreme Court has emphasized that "tenable actual-innocence gateway pleas are rare." *Perkins*, 133 S. Ct. at 1933.  Petitioner has failed to "affirmatively demonstrate" his innocence in this case. *Phillips*, 182 F.3d at 774.  "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing [of actual innocence]." *Perkins*, 133 S. Ct. at 1935.  Thus, Petitioner's diligence in bringing his "actual innocence" gateway claim forward is a relevant factor in determining the credibility of his overall claim. *Doe v. Jones*, 762 F.3d 1174, 1182-83 (10th Cir. 2014) (citing *Perkins*, 133 S. Ct. at 1935-36).  The problems with Petitioner's contention are two-fold:  (1) he does not credibly explain why he waited so long so raise any of those claims in the state courts; and, (2) none of the evidence upon which he relies to make those claims is new and/or reliable.

But it is important to first note that Petitioner does not challenge the voluntariness or validity of his agreement to accept a sentence of life imprisonment without the possibility of parole for crimes he now says he never committed.  And it is equally important to remember the timing of when Petitioner acquired what he now considers "newly discovered evidence" of his "actual innocence" in relation to that event.  As the state post-conviction court found, Petitioner had some of this material in 1986 and the rest of it by 1992 (Exhibit 8, at 2).  Three years later, on September

18, 1995, Petitioner – while represented by counsel – then stood before an Oklahoma court and accepted a sentence for the crime he now says he did not commit (Exhibit 1). Moreover, Petitioner was personally asked by the judge if he had "any just cause at [that] time to show why he should not be sentenced" (Exhibit 1, at 11). Under similar circumstances, the fact of a guilty plea has not easily been cast aside by the Court of Appeals in the context of an "actual innocence" gateway claim. For instance, in *Johnson v. Medina*, Case No. 13-1324, 547 Fed. Appx. 880 (10th Cir. Dec. 4, 2013) (unpublished),[12] the Court considered the case of a habeas petitioner who had pleaded guilty, then later asserted actual innocence as a gateway to have his procedurally barred claims heard. Despite Johnson's claim that his guilty plea had been coerced and was involuntary, the Court observed that "his plea of guilty simply undermines his claim that another individual committed the crime to which he pled guilty." *Johnson*, 547 Fed. Appx. at 885 (citing *Goosby v. Trammell*, Case No. 13-6074, 515 Fed. Appx. 776, 777 (10th Cir. May 30, 2013) (unpublished)[13] (rejecting actual innocence argument, stating "[g]iven [petitioner's] guilty plea and his failure to address other evidence that contributed to his plea, he fails to carry the heavy burden of 'show[ing] it is more likely than not that no reasonable juror would have convicted him'") (quoting *Perkins*, 133 S. Ct. at 1935); *see also Chestang v. Sisto*, Case No. 09-17621, 522 Fed. Appx. 389, 390 (9th Cir. Jun. 11, 2013) (unpublished)[14] (rejecting petitioner's "actual innocence" claim and noting that he "specifically

---

[12]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

[13]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

[14]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

pleaded guilty to shooting the gun" which "seriously undermine[d] the notion" that he had no direct involvement in the shootings); *United States v. Lemaster*, 403 F.3d 216, 221-22 (4th Cir. 2005) ("[I]n the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 [plea] colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements."); *Buie v. McAdory*, 341 F.3d 623, 626 (7th Cir. 2003) ("[I]t is hard to see how one who has confessed can assert actual innocence.").

Of the several claims Petitioner makes against his former counsel, not one of them is that he was coerced or misled in any way about the consequences of being sentenced to life without parole for the murder of Haraway. Similarly, Petitioner makes no substantive claim that his choice to waive jury sentencing and be sentenced by the trial court was a voluntary and intelligent one. Petitioner is thus placed in the odd position of claiming he is actually innocent of a crime long after he voluntarily and intelligently agreed to be sentenced for it. Equally relevant, though, is that he has done nothing with this alleged "newly discovered" evidence of his actually innocence for more than two decades. In the context of evaluating an "actual innocence" gateway claim, this legal juxtaposition – especially considering how long it took Petitioner to come forward with it – seriously weakens from the outset the credibility of Petitioner's present assertion that he committed no crime at all and is being imprisoned in violation of the federal Constitution.

Even if Petitioner could untie this Gordian knot, as shown below, Petitioner still does not present newly discovered evidence of his alleged "actual innocence" because he had all, or at least nearly all, of the very information he points to now either at the time of his second trial in 1988, at the time he agreed to be sentenced in 1995, or both.

### 1. Petitioner's Delay.

As the state post-conviction court found, Petitioner has had access to some of what he now considers to be "new" evidence of his innocence since 1986, and the bulk of the rest of it since 1992 (Exhibit 8, at 2). Despite his voluminous habeas filing, Petitioner still provides no credible accounting for his long delay in raising his issues in state court, wherein he waited over eighteen years after he accepted a plea deal in 1995 to a sentence of life without parole, to file his post-conviction application in the state court in 2013. That Petitioner has waited so long to present any evidence to support his claims, and the claims themselves, is relevant to whether he has met the requirements of the "actual innocence" gateway. *Perkins*, 133 S. Ct. at 1935. Thus, that Petitioner delayed presenting his claims in any forum – and why – plays a part in the analysis of whether Petitioner has met the threshold showing necessary to have his claims heard. And Petitioner cannot escape it by weaving in and out of facts, legal theories, transcript block quotations, and time frames. The fact remains that Petitioner waited nearly two decades after the OCCA last affirmed his convictions in 1994 to raise *any* challenge to his conviction and, even though he still had counsel until he agreed to be sentenced in 1995, still did nothing for eighteen (18) more years. "[A]ctual innocence operates as an equitable *exception* to § 2244(d)(1)[,]" and though it is not an absolute barrier to relief, unjustifiable delay on a habeas petitioner's part is still "a factor in determining whether actual innocence has been reliably shown." *Perkins*, 133 S. Ct. at 1928, 1931 (internal quotes omitted). It is therefore consequential that Petitioner did nothing for years, even decades, before trying to assert the claims he attempts to raise now. That fact weighs heavily against the credibility of his current contention that he is innocent of his crime and the evidence he proffers in support of it. If anything, Petitioner's total inaction over such a long period of time suggests – very

strongly – that he is rightly being punished for a crime he actually committed.  And even though Petitioner maintains his actual innocence in this Court, that claim has never gotten any stronger since it was raised in state post-conviction proceedings, despite the fact Petitioner has been granted an almost unprecedented (and, so far as Respondent has been made aware, still unexplained) amount of discovery, given that this is a federal habeas corpus petition stemming from a final state court conviction.

The only clearly apparent reason Petitioner offers for his delay is "a medical examiner's report withheld by the prosecution . . . ." (Amended Pet., at 20).  The state post-conviction court found that "Petitioner has had possession of the 860 pages of OSBI documents since 1992 . . . Petitioner has had access to [the] Medical Examiner report since 1986 [and that] [s]imply,[sic] too much time has elapsed due to Petitioner's own inaction" (Exhibit 8, at 2).  These findings are entitled to deference, and Petitioner has failed to rebut them with clear and convincing proof to the contrary. 28 U.S.C. § 2254(e)(1); *Frost*, 749 F.3d at 1215; *see also Sharpe*, 593 F.3d at 379-81.

Petitioner does not provide all the known facts about that medical examiner's report and his counsel's direct contacts with the medical examiner's office, nor does he account for those facts as they relate to his long delay or the reliability of the competing evidence he later justifies to support one of his allegations.  This is likely because the information was never suppressed at all.  The state court record reflects that before Petitioner's retrial in 1988, Petitioner's trial counsel, George Butner, visited the Medical Examiner's Office and reviewed the case file for the Haraway murder on May 27, 1988, and had discussions with Dr. Larry Balding concerning stab wounds as well as his other findings (Exhibit 13, Medical Examiner Notes Re: Butner).  According to Dr. Balding's notes:

> Mr. Butner [was] here to discuss case representing [Petitioner] as
> court appt. defense.  I showed him our file & we discussed my
> findings.  I told him it was possible she was stabbed but was no
> evidence of it on skeleton remains.

(Exhibit 13).  Thus, Petitioner's trial defense counsel had personal access to both the Medical

Examiner and the file, and he utilized that opportunity to go over the details therein.  Even before

that, Petitioner's first direct appellate counsel, Terry Hull, had also visited the Medical Examiner's

Office, and reviewed the case file for the Haraway murder after at least one (1) documented phone

conversation with Dr. Balding that occurred on July 15, 1986 (Exhibit 14, Medical Examiner Notes

and Letters Re: Hull).  On July 30, 1986, Hull personally examined the case file, took notes about

it, and inquired into the means by which she could obtain a copy of the file (Exhibit 14).  There is

nothing to indicate that during any of these visits or the correspondence between Petitioner's

attorneys and the Medical Examiner, both Butner and Hull were provided anything less than full

access to everything in the possession of that office concerning the case – including the complete

medical examiner's report.  That Hull now cannot recall seeing a few pages of the medical

examiner's report is evidence only of the consequences of Petitioner's giant delay, not that he was

denied access to information he could have used nearly a quarter century ago had he wished.  And

Petitioner's present assertion that "a medical examiner's report [was] withheld by the prosecution,"

as tenuous as it is in light of these facts, still does not explain why it took him so long to take any

action on it.  The only reasonable explanation is the most obvious one supported by the record:

nothing from the Medical Examiner's office was ever "withheld" from Petitioner or his attorneys

by anyone, much less "the prosecution."  He has held that information now for three (3) decades.

Petitioner's former direct appellate counsel confirms that she received and had access to the "860

pages" of OSBI material following a December 1, 1992, Order from the OCCA (Exhibit 12). Hence, Petitioner had that information for approximately three (3) years before he agreed to be sentenced for the Haraway murder in 1995 and eighteen (18) years before he made his first move toward challenging his conviction in any court. The "newest" information upon which Petitioner relies is therefore now approximately twenty-one (21) years old, and he had the material for three (3) more years while still represented by counsel, and despite having it, still told an Oklahoma judge there was no just reason he should not be sentenced for Haraway's murder. The age of the rest of what Petitioner points to is nearly twice that.

Respondent will now turn to Petitioner's alleged evidence of his "actual innocence."

### 2.     Petitioner's Evidence of His "Actual Innocence" Is Neither New Nor Reliable.

To demonstrate his "actual innocence," the gateway through which he must pass to receive review under the above standards, Petitioner identifies several categories of what he believes to be proof of that assertion. Close examination of what Petitioner has to offer reveals none of it to be new or reliable evidence within the meaning of *Perkins*, *Schlup*, *House*, or *Frost*.

As stated above, the Supreme Court and the Court of Appeals have made clear that the proffered evidence of "actual innocence" for these purposes must be "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . ." *Schlup*, 513 U.S. at 324; *Frost*, 749 F.3d at 1231-32; *see also Perkins*, 133 S. Ct. at 1933 ("The miscarriage of justice exception, we underscore applies to a severely confined category: cases in which *new evidence* shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" (quoting *Schlup*, 513 U.S. at 329 (emphasis added; brackets in

original)).  "Newly discovered" evidence in this context means "relevant evidence that was either excluded or unavailable at trial." *Schlup*, 513 U.S. at 327-28.  Such evidence does not include "facts that would have been known . . . at the time of trial." *United States v. Foy*, Case No. 13-3157, Fed. Appx. 828, 832-33 (10th Cir. Sep. 30, 2013) (unpublished)[15] (affidavit by co-conspirator allegedly exonerating petitioner was not "newly discovered evidence" because "the nature and extent of his relationship" with petitioner would have been known to petitioner at the time of trial); *Johnson*, 547 Fed. Appx. at 885 (finding petitioner's pre-guilty-plea knowledge of discrepancies in DNA evidence and potential alternative suspects at time of trial failed to make newly-fashioned allegations on those same subjects "newly discovered evidence" for actual innocence gateway purposes).  Thus, if the information alleged to be "new" was or could have been within the defendant's knowledge at the time of trial, or in this case, before Petitioner affirmatively agreed to be sentenced for a crime he now claims he never committed, it is not "newly discovered evidence" within the realm of *Perkins* and *Schlup*.

Most of Petitioner's claims rely upon what he believes to be recantations or merely inconsistent evidence.  And, as already noted, none of what Petitioner offers is "new" and/or "reliable" under the correct standard, thus removing it entirely from the sphere of evidence the law considers compelling enough to permit a habeas petitioner to break through firmly-rooted procedural default rules.  What matters is that this information has been available to Petitioner for many years (and in some cases for several years while he still had trial and appellate counsel) and he has simply never used it to bring a claim in any court, including this one.

---

[15]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

**Relevant Facts Concerning Petitioner's Alleged "New" Evidence:**  Conspicuously absent from Petitioner's allegations that there is new reliable evidence establishing his actual innocence is any accurate indication of when any of this evidence exactly became "new" to him, much less a coherent explanation as to how it meets the standard he must meet to have his claims reviewed in this Court.  Because Petitioner apparently believes, mistakenly, that all evidence is new – no matter how it relates to his trials or when he personally gained access to it – the task falls upon Respondent to set forth as clearly as can be gleaned from this record when the information upon which Petitioner relies came into his hands.  It falls into three (3) rough categories: the "860 pages" of OSBI documents; the Medical Examiner's Report/File; and evidence regarding alternate suspects. Petitioner also supports his "actual innocence" gateway claim with testimony from his previous trial proceedings and affidavits from witnesses who testified during his 1988 trial.

As far as Respondent can discern, though it is not his burden to demonstrate, Petitioner received the "860 pages" of OSBI documents in 1992 pursuant to an Order of the OCCA while his second direct appeal was pending (Exhibits 11-12).  The OSBI documents gained in 1992 were received after a December 1, 1992, request for an Order by the OCCA by Petitioner's direct appellate counsel, Cindy Brown Danner (Exhibit 12).  Thus, it is a recorded fact, provided by Petitioner during state post-conviction proceedings, that his direct appeal counsel did take custody of this material (*see* Exhibit 4; attached Exhibit 1).  In his argument supporting why he has established "the gateway requirements of *Schlup v. Delo*," Petitioner often cites to the "prosecutorial" and "OSBI" followed by Bates stamped page numbers.  Although Petitioner makes no clear or consistent distinction between the two, information in the "prosecutorial" (Petitioner's Exhibit 43) is included within the "860 pages" of OSBI material (Petitioner's Exhibit 44) that he received in 1992.  As Respondent has

40

shown above, factual findings regarding Petitioner's receipt of the Medical Examiner's report (that Petitioner has had access to it "since 1986") and the "860 pages" of OSBI documents (that Petitioner has had possession of them since 1992) were made by the state post-conviction court; those findings are entitled to deference pursuant to 28 U.S.C. § 2254(e)(1) (Exhibit 8, at 2). Importantly, Petitioner's "actual innocence" gateway claim relies solely upon this, and other, information. It does *not* rely upon any material gained from the "263 pages of discovery" disclosed pursuant to agreement during state post-conviction proceedings in 2013 (*see* Amended Pet., 58 n.12 & Exhibits 85-90). As Petitioner has obviously found nothing therein to support his claim of "actual innocence," anything about that event is irrelevant to whether he has satisfied the exceptionally stringent requirements to open the gateway for habeas review of his procedurally barred and defaulted claims. Therefore, the facts supporting Petitioner's "actual innocence" gateway claim fall within the following contours: information from the Medical Examiner that Petitioner and his attorneys had as early as 1986, OSBI material Petitioner and his counsel received in 1992 and continued to possess up until and including the moment he voluntarily and intelligently decided to have the state trial court sentence him for the Haraway murder in 1995, and testimony from his 1988 trial and/or affidavits related to that trial testimony.

### a. "Alibi" Evidence.

Petitioner first alleges an "alibi" in the form of witnesses who allegedly saw him at a party on the night Mrs. Haraway was kidnaped from the convenience store (Amended Pet., 20). This evidence is neither "new" nor "reliable" within the meaning of *Schlup*. Petitioner builds his complaint upon evidence in the prosecutorial, all of which was also contained within the 860 pages of documents he received in 1992, and those 860 pages themselves, which he has identified as

separate exhibits in this proceeding (*see* Petitioner's Exhibits 43-44).  Petitioner then combines this material with testimony from Ward's testimony in 1989 about a party at Gordon Calhoun's in an attempt to establish an "alibi" for the night/time Haraway was abducted.  To the extent Petitioner relies upon this material to support his "actual innocence" gateway claim, it is not "newly discovered evidence" that is reliable enough to overcome the procedural bars he faces.

This is not new evidence.  Most obviously, Petitioner has never explained how the prosecution or investigators could have prevented him from telling defense counsel of his alibi, if he really had one.  Petitioner has always known where he was on the night Haraway was abducted and subsequently killed; information from the prosecution has never been required to investigate or substantiate that fact.  Moreover, the notion of a party was always present in this case, and if Petitioner were there, he certainly was capable of identifying other people there who could have verified his presence.  Petitioner said in his confession that he and Ward had been at a party, and, after the party, they left in Odell Titsworth's truck (*see* Exhibit 3, at 31, citing P.H. Tr. IV 664).  Moreover, Detective Dennis Smith testified that Petitioner told him: "Okay, I'm telling you the truth this time.  Me and Tommy were at a party on South Townsend . . . we met a guy named Odell Titsworth and we left with him and went riding around" (*see* Exhibit 3, at 31, quoting P.H. Tr. V 969).  As this was information that would have been within Petitioner's knowledge at the time of his trial, it is not "new" for purposes of establishing an "actual innocence" gateway claim. *Foy*, 540 Fed. Appx. at 832 (citing *United States v. Maestas*, 523 F.2d 316, 320 (10th Cir. 1975) evidence of defendant's previous relationship with witness was not "newly discovered" because it was clearly within defendant's knowledge before the trial)).  Even if this Court were to accept this type of evidence as "new," it has little reliability.  To reiterate, Petitioner agreed to be sentenced for this

murder in 1995. By this time, the OSBI materials upon which Petitioner so heavily relies had already been provided to his counsel. Thus, Petitioner – while still represented – had access to all of it by the time he accepted his sentence. That Petitioner now claims he is innocent of a crime for which he agreed to be sentenced after gaining this information (and waiting so long to present it) weighs heavily against him in terms of the credibility of that assertion when all the facts are considered. And to the extent Petitioner relies upon anything within the 860 pages OSBI documents – material to which he has had access since at least 1992 – such proof fails for the same reason. Nothing prevented Petitioner from using anything within those documents for the two decades it took him to file an application for post-conviction relief in the state court except for the will to do so.

This type of evidence is also incapable of affirmatively demonstrating Petitioner's actual innocence. To be entitled to the defense of alibi, the evidence must show that at the very time of the crime, the accused was at another place and he could not, with ordinary exertion, have reached the place where the crime was committed. *James v. State*, 731 P.2d 1384, 1387 (Okla. Crim. App. 1987); *Goodwin v. State*, 654 P.2d 643, 644 (Okla. Crim. App. 1982). In *Hickman v. Mahaffey*, No. 01-5073, 28 Fed. Appx. 856 (10th Cir. Nov. 29, 2001)[16] (unpublished), the Tenth Circuit considered Hickman's claim that if one Chris Brown had been interviewed, he would have corroborated the petitioner's alibi, thereby strengthening his trial testimony. The Court reasoned: "This is an insufficient showing because it would be merely corroborating evidence and it is entirely speculative." *Hickman*, 28 Fed. Appx. at 858. *See also Woodward v. Cline*, 693 F.3d 1289, 1294 (10th Cir. 2012) ("Although Applicant refers to alleged weaknesses in the evidence . . . and points

---

[16]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

to affidavits by his sons that assert an alibi, it requires only a brief review of the preliminary-hearing evidence, including his confession, to see that he has failed to meet the demanding standard for establishing actual innocence."); *Stafford v. Saffle*, 34 F.3d 1557, 1561-1562 (10th Cir. 1994) (holding that corroborative or speculative evidence was insufficient to meet the high threshold for actual innocence in evaluating whether actual innocence claim warranted leave to amend the habeas petition). Petitioner admits that Shelton "could not remember specifically [Petitioner] being at the party," and thus her memory three decades later would hardly be reliable at this point. Moreover, Shelton is recalling Petitioner's possible presence at a party; as discussed below, Petitioner would know where he was that night and be capable of identifying witnesses to that effect had it been true. Hence, where Petitioner was – specifically whether he was at this particular party and the others there with him who could support that fact – was within his knowledge prior to trial. Finally, Petitioner has had this information since at least 1992 – prior to his agreement to be sentenced for this crime – and has never attempted to use it in 1995 or at any point thereafter until 2013. It is therefore neither new nor reliable evidence. Petitioner's evidence of alleged "alibi" is insufficient to demonstrate "actual innocence."

### b. Alleged Harassment of Haraway By Unknown Man.

Petitioner alleges Haraway was being harassed by someone else and, for this reason, he meets the standard for an "actual innocence" gateway claim. Petitioner points to phone calls Haraway allegedly received at work that made her uncomfortable. First, Petitioner does not discount the fact that he (or Ward) could have been the person who made the phone calls. In this respect, that Haraway was receiving such calls does not exonerate him.

Second, this is not new information. As discussed in the State's Response to Petitioner's

Application for Post-Conviction Relief, Petitioner's trial counsel was aware before Petitioner's second jury trial that the victim had received disturbing phone calls at McAnally's; he was also aware that the victim had expressed a desire to obtain a gun.  In Petitioner's Exhibit 22 (on post-conviction), counsel's investigator reported to George Butner concerning an interview with Anthony W. Johnson:

> Johnson admitted . . . that one week before Harraway's [sic] disappearance, he was in McAnaly's [sic] convenience store when Harraway asked him where she could buy a gun.  Harraway referenced the need for a gun with some funny phone calls she had recently been receiving.  Harraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing.

(Exhibit 2, attached Exhibit 22, at 3).  This report is dated May 19, 1988, prior to Petitioner's 1988 jury trial.  The statement James Watts provided to Lloyd Bond, (Exhibit 2, attached Exhibit 62), a year later, adds nothing to what defense counsel learned from his investigator.  Furthermore, Darlene Adams' affidavit, Exhibit 1, does not add any weight to this claim, portraying as it does the victim's general uneasiness of working at the store. This is nothing different than what Anthony Johnson related to the defense.

Petitioner cannot argue that if he had Watts and Adams and other witnesses to testify about the victim getting obscene calls, that he has shown actual innocence.  What he is arguing is that if counsel had more witnesses to testify about evidence he already possessed, then counsel might have raised a reasonable doubt of Petitioner's guilt.  His burden in a claim of actual innocence is not satisfied by raising speculative notions of doubt of guilt; rather, he must "affirmatively demonstrate[] [his] innocence," rather than simply "undermine the finding of guilt against him." *Phillips*, 182 F.3d at 774.

45

### c. Eyewitness Identification "Recantation."

Petitioner claims that "the only eyewitness who identified [him] recant[ed] his identification" (Amended Pet., 31). Although this witness, Jim Moyer, testified at Petitioner's preliminary hearing that Petitioner was the man with Ward at JP's, he was decidedly less sure of that identification at Petitioner's trial. According to Petitioner, Moyer later "clarified his position" regarding his identification during state post-conviction proceedings, and this amounts to a recantation that makes a difference in his case. Petitioner omits highly relevant facts that show why that is not so. The end result is the failure to establish any new or credible evidence.

As the Tenth Circuit Court of Appeals cautioned in *Case v. Hatch*, "recanted testimony is notoriously unreliable, 'easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial.'" *Case v. Hatch*, 731 F.3d 1015, 1044 (10th Cir. 2013) (citing *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) and *In re Davis*, 565 F.3d 810, 825 (11th Cir. 2009)). The *Davis* court, cited by the Court of Appeals, reasoned: "[W]e repeatedly have noted that recantations are viewed with extreme suspicion by the courts . . . because . . . recantation testimony upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Davis*, 565 F.3d at 825. That unreliability is illustrated here.

As Petitioner admits in this Court, Moyer had "doubts about his identification of [Petitioner]" before the jury (Amended Pet., 31-32). At trial Moyer testified on cross-examination at Petitioner's 1988 trial that he "[did not] know if [he] was convinced about [whether Petitioner was the man with Ward]" (Exhibit 17, Tr. 6/9/88 26). Petitioner believes that Moyer – who provided an affidavit more

than twenty-four years later – now provides a degree of "uncertainty" in his identification that cannot be ignored.  Petitioner's problem with Moyer's affidavit is that it establishes nothing that was not already known in 1988 and, worse, it is inconsistent with Moyer's trial testimony.  Moyer's "uncertainty" in his identification of Petitioner was on full display at the 1988 trial.  Moyer admitted he had become "confused" about the second man he saw with Ward after seeing Petitioner during the preliminary hearing (Exhibit 17, Tr. 6/9/88 25).  Defense counsel also elicited from Moyer, just as Moyer states in his affidavit, that this uncertainty prompted him to call the District Attorney's office to report his concern (Exhibit 17, Tr. 6/9/88 25-26).  But what Petitioner fails to mention here is that on redirect examination, Moyer testified that he did not believe at that time that the District Attorney was trying to avoid his calls in any way (Exhibit 17, Tr. 6/9/88 32-33).  In fact, there is no mention – as Moyer now seems to recall – of having spoken to anyone in that office and having been advised that the person he now believes he saw with Ward nearly a quarter century after-the-fact "was not him" (Amended Pet., p. 33).  Nor is there any sense of the type of "betrayal" Moyer now seems to feel over the matter; Moyer testified that he simply did not reach anyone (Exhibit 17, Tr. 6/9/88 32-33).

Moyer's affidavit is not a "recantation," as he had doubts about Petitioner's identification at trial and apparently still holds them today.  Further, this evidence is certainly not "new" because it was not only known to Petitioner at the time of his trial, but was used to undermine Moyer's identification as the man with Ward.  Just because Moyer's doubt level may have risen over many years does not mean Petitioner's claim of actual innocence is strengthened.  If anything, Moyer's affidavit demonstrates the giant pitfalls of waiting so long, as Petitioner did, to challenge a final state conviction in federal court. The story changed and was different from that presented by the witness

earlier. *Case*, 731 F.3d at 1044. The above defects render Moyer's affidavit as neither reliable nor credible evidence of Petitioner's "actual innocence" because it is not new, the embellishments favorable to Petitioner come so long after the fact, and the information is inconsistent with previous trial testimony. Hence, it should be entirely rejected.

### d. Karen Wise Testimony and Affidavit.

Similar to the failings in Moyer's affidavit, Petitioner's claim that law enforcement pressured Karen Wise to change her account of what happened does not amount to new and reliable evidence of his actual innocence. Again, this is not new evidence. First, and inexplicably, Wise's affidavit was executed in 2009 – four years before he filed his state post-conviction application and while his case still lay dormant. Second, this is not new information. As Petitioner admits through his use of transcript citations from his 1988 trial, it was already known that Wise "never identified [Petitioner] as one of the men she saw at JP's on April 28, 1984" (Amended Pet., at 34). That Wise now apparently desires to embellish her testimony does not change the most important part about it. Wise states that as of 2009 she cannot identify Petitioner as one of the men; as Petitioner admits, she testified to the same facts at Petitioner's 1988 trial (*see* Amended Pet., at 34) ("Wise never identified [Petitioner] as one of the men she saw at JP's on April 28, 1984"). This is not newly discovered evidence of Petitioner's "actual innocence."

### e. Gray-Primered Truck – Inconsistent Statements.

Petitioner next points to "inconsistent statements" regarding the truck into which Haraway was seen getting with her apparent killers as new and reliable evidence of his innocence. The citations to the transcripts of Petitioner's trials betray any inconsistency in this area as anything new. Even so, such information does not demonstrate any probability that someone else besides Petitioner

must have been one of Haraway's murderers.  Again, this is not newly discovered evidence, and Petitioner proves it by referring to the inconsistent testimony about the truck that was presented to his jury in 1988.  It is not enough, to satisfy the "actual innocence" gateway, to merely cast doubt on the credibility of witnesses. *Frost*, 749 F.3d at 1232.

> **f.  Alleged "Undisclosed" Portions of Medical Examiner Report – Claim That Victim Had Given Birth.**

Petitioner attempts to show that the Medical Examiner's report – allegedly improperly withheld from him – demonstrates his actual innocence.  As noted above, nothing about the Medical Examiner's report or findings is new evidence.  Petitioner's trial counsel, Butner, personally met with Dr. Balding in 1988 prior to Petitioner's second trial and reviewed the Medical Examiner's file; thus, all of this information was available to Petitioner (and his counsel) at that time.  Moreover, Petitioner's direct appeal counsel had taken the same course, but two years earlier, again prior to Petitioner's second trial.  Finally, Petitioner had access to information collected by the Medical Examiner long before his agreement to a life sentence in 1995, nearly a decade after the first documented disclosure of the Medical Examiner's file to Petitioner's trial counsel in 1986.  Nothing about the Medical Examiner's file was "undisclosed," nor is it "newly discovered evidence."  Hull's affidavit demonstrates the problem with Petitioner having waited so long to bring his claims forward.  Hull now avers (in 2013) that she did not see portions of the Medical Examiner's report (Exhibit 15).  However, the contemporaneous notes taken by Dr. Balding in 1986 and other correspondence from that time indicate that Hull not only saw the entire file, but that she took notes about it and personally visited with Dr. Balding about issues in the Petitioner's case (Exhibit 15).  That Hull mentions nothing about having visited the Medical Examiner's office or her perusal of the entire file

49

concerning the Haraway murder illustrates well why such late-timed affidavits are not reliable vehicles for the facts. *See Perkins*, 133 S. Ct. at 1935 ([A] court may consider how the timing of the submission and the likely credibility of a petitioner's affiants bear on the probable reliability of . . . evidence of actual innocence.").

Petitioner also attempts to rely on a claim that Haraway was three months pregnant at the time of her disappearance, yet notches on her pelvis allegedly showed she had given birth. This is actually a wild theory that would suggest that Haraway was not murdered right away following her kidnaping and disappearance but was secretly confined for several months (the full term of her pregnancy), gave birth, and only then murdered and her body dumped in a field. This theory does not account for the baby to which Haraway allegedly gave birth, begging the obvious question as to whatever happened to this child as there is no evidence s/he ever existed. Perhaps more conclusive for this Court's purpose, however, is Petitioner's admission that Haraway's pregnancy cannot ever be proven with any degree of certainty (*see* Amended Pet., at 43 n.7). It would be difficult for this Court to find an allegation that is now, according to Petitioner, "impossible" to present to also meet the extremely high burden placed on Petitioner to produce new and reliable evidence to have his federal claims heard in this Court. This allegation does not advance Petitioner's claim he is actually innocent.

For the foregoing reasons, Petitioner is not entitled to statutory tolling because his post-conviction application was filed over sixteen years past the deadline under the AEDPA. Nor is Petitioner entitled to equitable tolling where Petitioner has provided this Court no evidence which affirmatively demonstrates his actual innocence. Finally, for the same reasons, Petitioner has not opened the tight gateway necessary to overcome his procedural bars.

III.   **THE AMENDED PETITION CONTAINS UNEXHAUSTED CLAIMS RENDERING IT A "MIXED" PETITION REQUIRING DISMISSAL.**

In addition to the other inadequacies in the instant petition previously discussed, there is another.  The Amended Petition is a "mixed petition," that is, it contains one or more claims that were not properly exhausted in the state courts.   There are two main issues which prevent Petitioner's Amended Petition from being fully exhausted.  First, Petitioner's claim of ineffective assistance of appellate counsel – his fourth ground for relief – was never properly presented to the state courts. (Amended Pet., 110-11.)   Second, to the extent Petitioner contends that the imposition of the laches bar prevented him from developing any of his federal claims, he never presented that argument to the state courts either.

Under 28 U.S.C. § 2254(b)(1):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

Petitioner makes no claim in these proceedings that there were no state corrective measures available to him, nor does he argue any circumstances that rendered any available process ineffective at protecting his federal rights.  Petitioner instead merely complains that the state process that he used for some of his claims did not grant him his desired result, and he asks this forum to change that outcome.  Despite the propriety of his claims, Petitioner may not even have them considered here before demonstrating that he first exhausted those claims in the state courts. 28 U.S.C. § 2254(B)(1)(A).

"A threshold question that must be addressed in every habeas case is that of exhaustion." *Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994). Petitioner bears the burden of showing state court remedies have been exhausted as required by 28 U.S.C. § 2254(b). *See Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011); *Olson v. McKune*, 9 F.3d 95, 95 (10th Cir. 1993); *Clonce v. Presley*, 640 F.2d 271, 273 (10th Cir. 1981); *Bond v. Oklahoma*, 546 F.2d 1369, 1377 (10th Cir. 1976). A claim has been exhausted when it has been "fairly presented" to the state courts. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Brown v. Shanks*, 185 F.3d 1122, 1124 (10th Cir. 1999) (internal quotation marks omitted) ("The exhaustion requirement is satisfied if the issues have been properly presented to the highest state court, either by direct review of the conviction or in a post-conviction attack."). "Fair presentation" requires more than presenting "all the facts necessary to support the federal claim" to the state court or articulating a "somewhat similar state-law claim." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (citing *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). A petitioner need not "invoke 'talismanic language' or cite 'book and verse on the federal constitution.'" *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (quoting *Nichols v. Sullivan*, 867 F.2d 1250, 1252 (10th Cir. 1989). But he may not assert entirely different arguments from those raised before the state court. *Bland*, 459 F.3d at 1011. "[T]he crucial inquiry is whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." *Prendergast*, 699 F.3d at 1184 (quoting *Picard*, 404 U.S. at 278). "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief" filed in that court to be made aware of the federal claim. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Petitioner's ability to exhaust his claims is particularly important here considering the highly unusual circumstances of this federal habeas petition: Petitioner has been granted an unprecedented amount of discovery prior to ever filing his Amended Petition, and without ever having made a showing (of which Respondent is aware) of how the state courts interfered with his ability to develop his claims or how the imposition of the state laches bar prevented him from doing so. For these additional reasons, the presence of apparently exhausted and clearly unexhausted claims, this Court may not grant the petition and it must be dismissed.

"The exhaustion requirement is designed to avoid the 'unseemly' result of a federal court 'upset[ting] a state court conviction without' first according the state courts an 'opportunity to . . . correct a constitutional violation." *Davila v. Davis*, __ U.S. __, 137 S. Ct. 2058 (2017) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). Furthermore, 28 U.S.C. § 2254(b)(3) provides: "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." For exhaustion purposes, it is not sufficient merely that Petitioner has been through the state courts, "rather he must have given the state's highest court a 'fair opportunity' to address his claims." *Picard*, 404 U.S. at 275-276. *See also Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994) (holding that fair presentation requires that the federal issue be "properly presented to the highest state court, either by direct review or in a postconviction attack"). As the United States Supreme Court held in *Harrington v. Richter*, 562 U.S. 86, 103 (2011), "[u]nder the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court." *Richter*, 562 U.S. at 103 (citing 28 U.S.C. § 2254(b)). The Court reasoned that the deference provision of 28 U.S.C. § 2254(d), "complements the exhaustion requirement and the doctrine of

53

procedural bar to ensure that *state proceedings are the central process,* not just a preliminary step for a later federal habeas corpus proceeding." *Richter*, 562 U.S. at 103 (emphasis added).  Ordinarily, a federal court presented with a habeas petition containing any unexhausted claims must dismiss the petition. *Rose*, 455 U.S. at 510; *Harris v. Champion*, 48 F.3d 1127, 1131 (10th Cir. 1995).  The Tenth Circuit has held that a petitioner can meet the exhaustion requirement if at the time of filing the habeas petition, there are no available state avenues of redress available to the petitioner. *Miranda v. Cooper*, 967 F.2d 392, 398 (10th Cir. 1992).  However, "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).  Petitioner has raised at least one ground for relief, and one apparent claim/argument underlying all of his claims, that were never presented to the state courts.  Because Petitioner has an available mechanism for having those claims heard via successive state court post-conviction proceedings, they are not exhausted; hence, this is a "mixed petition" that must be dismissed.

A.   **Non-Exhaustion of Ground Four – Ineffective Assistance of Appellate Counsel.**

Petitioner's fourth ground for relief – ineffective assistance of appellate counsel – is not exhausted.  In state post-conviction proceedings, Petitioner raised only a claim of ineffective assistance of trial counsel (Exhibit 2, at 15).  The only reference Petitioner made to the possibility of appellate counsel ineffectiveness was one word: "that neither defense counsel, at trial or *appeal*, reviewed the entirety of the register tape was ineffective" (Exhibit 2, at 67) (emphasis added). Petitioner, in fact, titled his Proposition III in the following manner:

54

> [Petitioner's] Sixth Amendment right to Effective Assistance of Counsel Was Violated Whin His *Trial* Counsel Failed to Investigated[sic] the Case and Present Viable Evidence Supporting His Innocence.

(Exhibit 2, at 59) (emphasis added). And both of Petitioner's subpropositions referred only to "Trial Counsel" (*see* Exhibit 2, at 61, 65). There was nothing in Petitioner's state court filings that "fairly presented" a claim of ineffective assistance of appellate counsel.[17] Just as Baldwin's generic "ineffective assistance of appellate counsel" language failed to adequately distinguish between a state- and federal-based claim, Petitioner's sterile references to appellate counsel without any concomitant argument failed to fairly advise the state courts that he was properly raising a federal claim of ineffective assistance of counsel. *Baldwin*, 541 U.S. at 33; *see also Glossip v. Trammell*, Case No. 10-6244, 530 Fed. Appx. 708, 720, n.1 (10th Cir. Jul. 25, 2013) (unpublished)[18] (finding use of the word "due process" in state court brief, but omitting any specific claim of ineffective assistance of appellate counsel, was insufficient to allege a violation of a federal right to effective assistance of appellate counsel). A state court must "be alerted to the fact that [a prisoner is] asserting claims under the United States Constitution." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995) (*per curiam*). Even if it could be said that Petitioner raised a claim of ineffective assistance of appellate counsel, which he did not, there is nothing inherent in the use of the words "or appeal" that showed the state courts that Petitioner was raising both a claim arising under both the state and federal constitutions. *See* Okla. Const. art. 2, § 7 (guaranteeing right to counsel under state

---

[17] Petitioner's bold attempt to raise this claim in this Court is even more disconcerting in light of Respondent's warning to Petitioner in state district court proceedings that he was not properly or adequately raising such a claim (*see* Exhibit 3, at 92 n.13).

[18] Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

constitutional law).  Petitioner's attempted claim of ineffective assistance of appellate counsel in ground four is unexhausted.

### B. Imposition of the Bar of Laches by the State Courts Did Not Prevent, Or In Any Way Cause, Petitioner From Fully Developing His Actual Innocence, *Brady*, or Any Other Federal Claim In the State Courts.

To the extent Petitioner claims that the imposition of laches or a "*Brady* violation" in the state courts was the reason he was unable to fully develop his federal claims, that too is unexhausted. If, as Petitioner tells this Court now, discovery "still remained an open issue before the state court," he never informed the state courts of that, nor did he complain that imposition of the laches bar curtailed his discovery – or denied any other federal right attached to it – in any way (*see* Dkt 66, p. 4).  Petitioner, in fact, told the state courts the opposite:  that no issue of fact remained to be developed and his issues could be decided on the briefs (Exhibit 4)  Petitioner must either admit in this forum that any and all discovery and need for a hearing necessary to resolve his claims was fully completed at the time he filed his motion for summary judgment in the state district court and that no federal right was impaired in the process (and thus exhausted to that extent), or concede that any complaint here built upon such an argument was never presented to the state courts.  He may not have it both ways.  If it is the latter (that Petitioner was somehow denied a full and fair opportunity to develop his federal claims in the state courts by the imposition of laches), any claims built upon that argument are not yet exhausted because Petitioner has identified no federal right that was violated through the imposition of laches. *See*, *e.g.*, *Duncan*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that a[ ] . . . ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").  In a similar way, as pointed out above, Petitioner never argued in the state courts – as he does here – that

alleged "*Brady* violations" were part of the reason (in addition to his "actual innocence") that he should have his claims reviewed despite a procedural bar; instead, Petitioner claimed it was a conflict of interest that arose from an attorney who now represents Ward.

After the State filed its Response to Petitioner's Application for Post Conviction Relief in Pontotoc County District Court Case No. CRF-1984-183, on September 17, 2014, Petitioner filed a Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment on October 8, 2014. In that supporting brief, Petitioner informed the Pontotoc County District Court:

> [Petitioner] also submits this brief establishing that he is entitled to summary judgment relief as there exists no genuine issue of material fact between both parties and he is entitled to judgment as a matter of law. *See* O.S. § 1083. Based upon the following arguments, it is evident from Respondent's statements both within pleadings and in the public forum, there exists no conflict regarding the claims presented in both [Petitioner's] initial and amended briefs for post-conviction relief and in the State's response. Therefore, only legal issues remain which is within the complete purview of this Court.

(Exhibit 4, at 1). Petitioner did not allege that his *Brady* claim was "cause" to overcome the State's asserted procedural bar of laches. Instead, Petitioner alleged conflict of interest with one of his former attorneys, stating unambiguously: "To be clear, [Petitioner] does not assert the conflict of interest claim as a substantive constitutional violation, but rather to overcome Respondent's assertion of the laches defense." (Exhibit 4, at 9). However, regarding Petitioner's substantive *Brady* claim, Petitioner alleged "[Petitioner] is entitled to summary judgment relief on his *Brady* claim as Respondent has not proved these records were disclosed prior to [Petitioner's] trial and he is entitled to relief as a matter of law" (Exhibit 4, at 10). Petitioner concluded his supporting brief with the claim, "He is entitled to relief as a matter of law" (Exhibit 4, at 23). Thus, Petitioner argued in state court that his *Brady* claims should be decided based upon the existing factual record.

The District Court of Pontotoc County subsequently issued its Post Conviction Findings on December 31, 2014. Answering the question, "Is an evidentiary hearing necessary," the district court answered "No" and explained, parenthetically, "Petitioner having stipulated to have decision heard on briefs and motions and responses" (Exhibit 8, at 1). The court went on to find that Petitioner had possession of the 860 pages of OSBI documents since 1992 and access to the Medical Examiner report since 1986, and that Petitioner's claims of actual innocence, ineffective assistance of counsel, prosecutorial misconduct, and *Brady* violations could have been submitted much earlier. Thus, it found that too much time had elapsed due to Petitioner's own inaction (Exhibit 8, at 2).

A few months later, when Petitioner filed his Brief in Support of Petition in Error of Application for Post-Conviction Relief (hereinafter referred to as Post-Conviction Brief of Appellant), Petitioner scarcely acknowledged the Motion for Summary Judgment which he had urged so strenuously in the District Court of Pontotoc County. Petitioner summarized the procedural history of the post-conviction case as follows: "After requesting additional time to respond the State filed its response on September 17, 2014. Without a hearing the district court issued its Post-Conviction Findings on December 31, 2014, denying relief based on the State's assertion of Laches. [Petitioner] now appeals the denial of post-conviction relief" (Exhibit 9, at 2). Petitioner only acknowledged that he filed a Motion and Brief for Summary Judgment down in footnote 2 on page 10 of his post-conviction appellate brief. Petitioner complained in that footnote that the post-conviction court did not hold an evidentiary hearing, while failing to acknowledge his assertion made to the district court that "there exists no genuine issue of material fact" (*see* Exhibit 4, at 1).

Petitioner claimed in the state courts that he overcame Oklahoma's laches bar by showing his "actual innocence" and an alleged conflict of interest by Ward's attorney Barrett; in this Court,

Petitioner argues he has overcome the state procedural bar by showing his "actual innocence" and alleged *Brady* violations. These are two completely different claims based upon separate sets of facts, the latter of which was never fairly presented to the Oklahoma courts. Within his state post-conviction brief, Petitioner did argue that under *Perkins*, 133 S. Ct. at 1935, a claim of actual innocence can overcome the doctrine of laches (Exhibit 9, at 6). However, while Petitioner raised a substantive claim pursuant to *Brady v. Maryland*, Petitioner never argued to the state court that there is Supreme Court law holding that "there is an exception [to application of a state procedural bar] in claims of *Brady* error" as he does in his Amended Petition (*Compare* Exhibit 9, at 15 with Amended Petition, at 16). While Petitioner did cite *Banks v. Dretke*, 540 U.S. 668, 691 (2004) to the State court as he was setting out the elements of a *Brady* claim ("Petitioner must clearly show that the evidence was suppressed by the State"), Petitioner never gave the OCCA the opportunity to consider whether *Brady* was a recognized exception to the doctrine of laches which prevented the imposition of laches. Petitioner instead focused on his claims of "actual innocence" and the conflict of interest he believes Mr. Barrett operated under as the means by which his procedural bars were pierced.

Moreover, Petitioner never explained to the OCCA why the district court was incorrect to apply the doctrine of laches in light of his admission that "there exists no genuine issue of material fact" and that only legal issues remained (Exhibit 4, at 1). In other words, Petitioner did not complain to the OCCA, as he does now on federal habeas review, that the district court's issuance of its Post Conviction Findings prematurely cut off discovery. Petitioner would have been hard pressed to make this argument, considering his strong assertion in the district court that there was no genuine issue of material fact and that only legal issues remained. Simply put, if Petitioner

believed that there was still a genuine issue of material fact, he should not have represented otherwise to the district court. But the conundrum which Petitioner created for himself by filing the Motion for Summary Judgment asserting there was no genuine issue of material fact did not relieve Petitioner of his burden of complaining to the OCCA that discovery was prematurely cut off or that laches somehow obstructed his ability to develop legal claims, or for that matter, his burden of explaining how the district court had somehow misconstrued the assertions made in his Motion for Summary Judgment.

A further exhaustion problem has been created by the extensive discovery which has been granted in federal court in this case. Prior to filing his Amended Petition, Petitioner was granted leave to conduct discovery by this Court. After an extensive discovery period, which was extended by this Court beyond an initial 60-day period, Petitioner issued subpoenas *duces tecum* under seal with no scheduling order in place and without proper notice to Respondent, deposed four (4) individuals with respect to his actual innocence and *Brady* claims, and now Petitioner attempts to use this to explain why he should be permitted to overcome the time bar, the state's procedural bar, and beef up his substantive claims. Instead of following the ordinary procedure when a state prisoner files a federal habeas petition of entering an order for response by Respondent, the following procedure happened. On June 27, 2016, a Status and Scheduling Conference was held, at which counsel for Petitioner, Tiffany R. Murphy, and counsel for Respondent were both present (Dkt. 23). Petitioner's counsel was to notify Respondent's counsel in writing of any items desired in discovery; any objections Respondent's counsel had to discovery were to be taken up with the magistrate. Remarkably, this Court directed Respondent not to file any response to the petition pending a discovery period and the possible filing of an amended petition (Dkt. 23). Petitioner has also

previously represented to this Court and Respondent: "Respondent asserts that under 28 U.S.C. § 2254 Petitioner is not entitled to discovery unless a showing of good cause. However, this Court,[sic] explained that discovery in this case would not be governed by . . . Rule 6 of the Rules Governing 2254 Proceedings" (Dkt. 66, at 3). Respondent has still not been provided further details regarding when this Court allegedly "explained" this (or why, if such occurred, Respondent was excluded from the discussion) even though Respondent has repeatedly inquired into the authority upon which Petitioner was being permitted to act and the veracity of Petitioner's representations (*see* Dkt 42, pp. 4-7; 63-1, pp. 14-15; 71; 72).

The failure to follow regular habeas corpus procedure in this case has created an exhaustion problem for Petitioner. Petitioner no doubt seeks to rely on additional evidence obtained in discovery through the deposition of the four witnesses, and he even requests an evidentiary hearing at which he hopes further evidence can be adduced that was never before presented in state court. This highly irregular procedure creates a situation wherein, although Petitioner essentially told the State court to end discovery through the filing of a Motion for Summary Judgment saying there was no genuine issue of material fact, Petitioner has now been granted the opportunity to supplement the record in federal court in spite of the assertions he made in state court.

Petitioner's assertion that there was no genuine issue of material fact and that the state district court should go ahead and rule on his post-conviction application based on the briefs and responses presents a serious problem for him. This is because under the AEDPA, state proceedings are "the central process, not just a preliminary step for a later federal habeas corpus proceeding." *Richter*, 562 U.S. at 183. However, Petitioner has told this Court something different than he did the state courts, and that difference matters. Apparently based upon representations regarding the circumstances

61

surrounding the imposition of the state bar of laches, Petitioner seems to have persuaded this Court that he was denied the opportunity to fully develop legal claims, and he has been granted subpoenas (nearly all of which were under seal and without notice to Respondent) and depositions of witnesses. Respondent continues to object to the initial granting of discovery in this federal habeas case and the apparent suspension of Rule 6 of the Rules Governing Section 2254 Proceedings, as well as any "new" evidence discovered as a result of that discovery.  While that bell unfortunately cannot be unrung, it is still possible to avoid compounding Petitioner's exhaustion problem at this stage.

An instructive case is *Beverly Michelle Moore v. Warden Millicent Newton-Embry*, Western District Court Case No. CIV-09-985-C.  In that case, the Western District Court held an evidentiary hearing, and both the Magistrate Judge and the District Court concluded that Petitioner had met the "actual innocence" gateway to overcome the time bar of the AEDPA. (Exhibit 16, *Moore v. Embry*, Case No. CIV-09-985-C, 2011 WL 5143080 (W.D. Okla. Sept. 7, 2011) (Bacharach, M.J.), Order Adopting Report & Recommendation, 2011 WL 5156836 (W.D. Okla. Oct. 28, 2010)). Subsequently, the state filed a Motion to Dismiss for Failure to Exhaust State Remedies.  Although the Magistrate Judge recommended the State's objection be overruled, the Western District Court declined to adopt the Magistrate Judge's recommendation that exhaustion would be futile with respect to evidence which had been adduced in a federal evidentiary hearing in light of Oklahoma's prohibition of filing second and subsequent post-conviction proceedings in non-capital cases.  The Western District Court reasoned:

> Setting aside, for now, the correctness of Judge Bacharach's findings, the Court instead focuses on the substantial newfound evidence developed in federal court regarding the Petitioner's actual innocence, the state attorneys' persistence that this matter be presented in state court before continuing with federal habeas proceedings, and the

> importance of comity and federalism.  Considering these factors, the Court concludes that the state courts should be given an opportunity to address this matter in the first instance.  *See Granberry v. Greer*, 481 U.S. 129, 134-35 (1987) ("If . . . the case presents an issue on which an unresolved question of fact or of state law might have an important bearing, both comity and judicial efficiency may make it appropriate for the court to insist on complete exhaustion to make sure that it may ultimately review the issue on a fully informed basis.").

*Beverly Michelle Moore v. Warden Millicent Newton-Embry*, Western District Court Case No. CIV-09-985-C, at 2-3 (Order) (Cauthron, D.J.) (W.D. Okla. April 6, 2012)[19] (unpublished).

Just as in *Moore*, Respondent insists that any "newfound evidence developed in federal court" must be presented in state court before continuing with federal habeas corpus proceedings. If there is an unresolved question of fact based on Petitioner's assertion that the state courts ruled before discovery in State court was complete (in spite of his insistence that there was no genuine issue of material fact) or if there is an unresolved question of law (whether a *Brady* claim is sufficient to overcome the State's procedural bar of laches), both comity and judicial efficiency make it appropriate to insist on complete exhaustion in state court. *Granberry v. Greer*, 481 U.S. 129, 134-35 (1987).  As Petitioner's Amended Petition stands now, based as it is in part on unexhausted evidence resulting from a federal discovery process not conducted in accordance with Rule 6, this Court cannot grant relief on this Amended Petition.  As the Tenth Circuit Court of Appeals reasoned in *Moore v. Schoeman*, 288 F.3d 1231 (10th Cir. 2002):

> The plain language of § 2254(b)(2), as well as its legislative history and prior case law, point to a conclusion that a district court faced with a habeas petition containing unexhausted claims may either (1) dismiss the entire petition without prejudice in order to permit

---

[19] Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

> exhaustion of state remedies, or (2) deny the entire petition on the
> merits.

*Moore*, 288 F.3d at 1235.  While a denial of the Amended Petition would certainly be appropriate

based on the fact it is time-barred, contains procedurally defaulted claims, and Petitioner has failed

to demonstrate a fundamental miscarriage of justice, if this Court is not prepared to deny the

Amended Petition based on the procedural defects present in this case without further consideration

of Petitioner's actual innocence claim, then Petitioner must go back and fully exhaust the alleged

"newfound evidence" adduced in the federal habeas proceedings as a result of the discovery order.

Respondent affirmatively does not waive the issue of exhaustion with respect to any evidence

adduced for the first time in federal habeas proceedings that has not been presented to the OCCA,

which would include the four depositions conducted in this case. 28 U.S.C. § 2254(b)(3).  Like the

Respondent in *Moore*, Respondent in this case is persistent that there must be total exhaustion of

state court remedies, and that state court proceedings must remain "the central process, not just a

preliminary step for a later federal habeas corpus proceeding." *Richter*, 562 U.S. at 183.

　　In addition to the other impediments to this Court reviewing the Amended Petition explained

above, review is prohibited because it contains unexhausted claims; thus, it must be dismissed. *Rose*,

455 U.S. at 510; *Harris*, 48 F.3d at 1131.

## CONCLUSION

　　The petitioner has failed to file the instant petition within the one-year period of limitations

pursuant to 28 U.S.C. § 2244(d)(1).  All of Petitioner's claims are also barred by the independent and

adequate state procedural bar of laches.   Petitioner has failed to present any evidence which

affirmatively demonstrates his actual innocence.  Moreover, Petitioner's Amended Petition contains

unexhausted claims which are based on evidence and legal arguments never before presented to the

state court.  Therefore, for the foregoing reasons Respondent respectfully asks this Court to dismiss

the instant Petition for Writ of Habeas Corpus.

Respectfully submitted,

**MIKE HUNTER**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ MATTHEW D. HAIRE**
**MATTHEW D. HAIRE, OBA #14916**
**ASSISTANT ATTORNEY GENERAL**

313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 Fax
Service email:  fhc.docket@oag.ok.gov

**s/ THEODORE M. PEEPER**
**THEODORE M. PEEPER, O.B.A. #19909**
**ASSISTANT ATTORNEY GENERAL**

313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (Fax)

**Service email: fhc.docket@oag.state.ok.us**
**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of December, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Robert Ridenour, OBA # 16038
Assistant Federal Defender
One West Third Street, Ste. 1225
Tulsa, OK 74103

Tiffany R. Murphy, Arkansas Bar # 2015057
790 N. Cliffside Drive
Fayetteville, AR 72701

**s/ MATTHEW D. HAIRE**
**s/ THEODORE M. PEEPER**