IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KARL FONTENOT, | : |
| Petitioner, | : |
| | : CIVIL ACTION |
| v. | : 6:16-cv-00069-JHP-KEW |
| JOE ALLBAUGH, WARDEN, | : |
| Respondent. | : |

**SUR-REPLY TO RESPONDENT'S REPLY TO BRIEF IN OPPOSITION
TO RESPONDENT'S MOTION TO DISMISS AND BRIEF IN SUPPORT**

On October 2, 2018, this Court issued a minute order which stated that "Respondent is ordered to specifically address Petitioner's alleged *Brady*[1] violations and the newly discovered evidence outlined in Petitioner's Response." Docket No. 108. A substantial portion of Respondent's reply is spent addressing laches, an issue that is both outside the matters the Court specifically ordered further information on, and one that is negated by the *Schlup*[2] claim. When Respondent finally focused in on the topics the Court most wanted briefing on, he articulated a *Brady* standard that is at odds with the case law and misstated the newly discovered evidence requirement for proving actual innocence pursuant to *Schlup*.

Replying to Respondent's reply in full would require Mr. Fontenot to reiterate many of the points already made by Mr. Fontenot in his Reply to Response to Motion for an Evidentiary Hearing, Docket No. 105, and his Reply to Motion to Dismiss, Docket No. 106. It would also partially require Mr. Fontenot to prepare lengthy briefing on issues that are facially meritless. Because Mr. Fontenot's briefing already lays out the blueprint for why relief should be granted

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).
[2] *Schlup v. Delo*, 513 U.S. 298, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).

1

in this case, Mr. Fontenot need not reiterate herein the arguments that have previously been made.

**THE PETITION IS PROPERLY BEFORE THIS COURT**

Respondent begins by suggesting that the present Petition is time-barred by the Antiterrorism and Effective Death Penalty act of 1996 ("AEDPA"). Even were that true, Mr. Fontenot's entitlement to the *Schlup* gateway would circumvent that issue. Respondent then quickly asserts that Mr. Fontenot has not demonstrated cause and prejudice to overcome the state procedural bar, but Oklahoma has no statute of limitations on non-capital cases, so there is nothing to overcome. *Moore v. Gibson*, 27 P.3d 483, 484 (OK 2001). In Oklahoma, an application for post-conviction relief is considered timely when filed. *Id.*

> Any person who has been convicted of, or sentenced for, a crime and who claims: (a) that the conviction or the sentence was in violation of the Constitution of the United States or the Constitution or laws of this state . . . (d) that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence in the interest of justice . . . may institute a proceeding under this act in the court in which the judgment and sentence on conviction was imposed to secure the appropriate relief.

Okla. Stat. tit. 22, § 1080 (2018).

Even were Mr. Fontenot's federal habeas petition potentially untimely, he is entitled to equitable tolling upon a finding of actual innocence. *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1934 (2013). Given that Oklahoma's post-conviction scheme has never provided a statute of limitations for its non-capital cases and the evidence now before this Court presents a plethora of grounds to establish his actual innocence, Mr. Fontenot's constitutional claims are properly before this Court.

*Perkins* does require diligence, so Mr. Fontenot is obligated to address any delay in filing his post-conviction application. Contrary to Respondent's suggestion, Mr. Fontenot has never

pled nor alleged ineffective assistance of post-conviction counsel. The delay in filing was occasioned by an actual and constructive conflict that existed from Mr. Barrett's improper actions. Under Oklahoma Rules of Professional Conduct Rule 1.7:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
>
> (1) the representation of one client will be directly adverse to another client; or
>
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Notwithstanding subsection (a), subsection (b) regulates possible concurrent conflicts of interest by permitting a lawyer to engage in dual representation of clients if:

> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2) the representation is not prohibited by law;
>
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
>
> (4) each affected client gives informed consent, confirmed in writing.

As Mr. Fontenot has previously asserted, his innocence claims conflict with Mr. Ward's. Docket No. 4, pp. 87, 127. That conflict is one of the reasons why there has been a difference in the claims presented by Mr. Fontenot and Mr. Ward. Further, as Mr. Fontenot has previously explained, there is no release or authorization from Mr. Fontenot to Mr. Barrett to obtain his files or to co-representation.

3

Accordingly, Respondent is wrong in his assertion that a strong assumption could be made that Mr. Barrett's actions helped Mr. Fontenot. Most of the factual development of Mr. Fontenot's innocence claims occurred while he was represented by the Oklahoma Innocence Project and undersigned counsel. At no time did Mr. Barrett obtain authorization from Mr. Fontenot to get his trial and appellate files from the Oklahoma Indigent Defense System ("OIDS"). OIDS informed counsel that the files were taken by Mr. Barrett and could provide no authorization for their disclosure to him. Further, undersigned counsel requested a copy of the release directly from Mr. Barrett, which he could not provide. That is also why Mr. Fontenot did not know about the OSBI Records.

Respondent seeks to make assumptions that may be fairly attributable to a petitioner with proper representation, but Mr. Barrett was actually conflicted in representing Mr. Fontenot while diligently representing Mr. Ward's interests. That is why Respondent's suppositions that, "[i]t would be odd for Petitioner's direct appeal counsel to so vigorously seek something so large in 1992 that Petitioner knew nothing about" (Reply at 4) and "[b]ecause Barrett was representing Petitioner as well on the same case, it can be strongly presumed this work was dedicated toward Petitioner as well for that period" (Reply at 5), are flawed.[3] As Mr. Fontenot has pled in prior pleadings, his claims of actual innocence and constitutional violations differ from Mr. Ward's. *See* Docket No. 4, pp. 8, 127.

---

[3] Although impertinent to this Court's decision, Petitioner seeks to aide Respondent by refreshing his memory. In Reply footnote 3, Respondent stated that "[t]he only "questions" Respondent recalls raising having to do with any "conflict" were those raised after Petitioner filed his Motion for Summary Judgment (Exhibit 2)." Throughout the state post-conviction process, Respondent represented the state in the stead of the Pontotoc County District Attorney's Office. Because Respondent had questions regarding Mr. Barrett's representation, during several conversations and hearings Respondent attempted to contact and interview Mr. Barrett concerning his actions in this case.

**LACHES IS NOT RESPONDENT'S GOLDEN PARACHUTE**

There are numerous problems with Respondent's laches argument. First, excluding all other matters, even the strongest laches argument is defeated by the *Schlup* gateway. In fact, Respondent's reliance on laches, combined with some of the other arguments made, such as timeliness, reinforce the need for an evidentiary hearing in this case.

Respondent is correct that laches has been found to be an adequate and independent procedural bar. However, that does not negate that a finding of either a *Brady* violation or actual innocence would remove any procedural defects in Mr. Fontenot's Amended Petition and entitle him to *de novo* review by this Court. *See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Lebere v. Abbott*, 732 F.3d 1224, 1229 (10th Cir. 2013). Mr. Fontenot requested an evidentiary hearing to refute Respondent's laches argument. Docket No. 86, p. 22. In the Court's wisdom, the motion for evidentiary hearing was denied without prejudice, permitting this Court to easily revisit that decision. *See* Docket No. 107.

Mr. Fontenot has sought an evidentiary hearing for some time, but Respondent's Reply highlights the absolute necessity of such a hearing. Respondent repeatedly discusses what Petitioner has not proven, but Mr. Fontenot cannot reasonably be expected to meet the high burden of proof required by *Schlup* without an evidentiary hearing.

The reasons for and expectations at a hearing have been well articulated by another Federal District Court in the Tenth Circuit, in its order granting a *Schlup* hearing:

> If a habeas petitioner has defaulted a claim of constitutional error, he may excuse the default by establishing that "he falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup*, 513 U.S. at 314–15 (citation and internal quotations omitted) (ellipsis in original).
>
> Because this "fundamental miscarriage" exception must be "rare" and applied only in the "extraordinary case," the Supreme Court has tied it

5

> to a petitioner's actual innocence. *Id.* "[I]n rare cases, an assertion of innocence may allow a petitioner to have his accompanying constitutional claims heard despite a procedural bar." *Rivas v. Fischer*, 687 F.3d 514, 540 (2d Cir. 2012) (citing *Schlup*, 513 U.S. at 315). The term "[a]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). Accordingly, an actual-innocence claim is a "gateway" through which a habeas petitioner may pass to have his otherwise-barred constitutional claims heard on the merits. *Schlup*, 513 U.S. at 316.
>
> To establish actual innocence, a petitioner bears the burden of establishing that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. This standard requires courts to determine what "reasonable, properly instructed jurors would do." *Id.* at 329. And the new evidence must be reliable—"whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Id.* at 324.
>
> Because a petitioner's actual-innocence claim must be based on new evidence, district courts often require evidentiary hearings so they can weigh that evidence. And district courts have broad discretion on whether to hold an evidentiary hearing on a petitioner's actual-innocence claim. *Johnson v. Medina*, 547 F. App'x 880, 886 (10th Cir. 2013). A court should exercise its discretion and hold an evidentiary hearing if the hearing has "'the potential to advance the petitioner's claim.'" *Lopez v. Miller*, 906 F. Supp. 2d 42, 53 (E.D.N.Y. 2012) (quoting *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d Cir. 2000)). In other words, a court should grant an evidentiary hearing "if it could enable a habeas applicant to prove his petition's factual allegations, which, if true, would entitle him to federal habeas relief." *Coleman v. Hardy*, 628 F.3d 314, 319–20 (7th Cir. 2010).

*Taylor v. Crowther*, Case 2:07-cv-00194-TC, Docket No. 264, pp. 4-5 (D. Utah, January 17, 2017).

### MR. FONTENOT'S ACTUAL INNOCENCE REMOVES ANY PROCEDURAL DEFECTS IN HIS AMENDED PETITION FOR WRIT OF HABEAS CORPUS

Respondent argues that some claims are not exhausted, but Mr. Fontenot responded to this in the initial Response to the Motion to Dismiss. Docket No. 106, pp. 14-15. Moreover, *Schlup* forgives exhaustion as well because *Schlup* makes it impossible for an innocent person to abuse the writ.

6

As Mr. Fontenot pled previously, newly discovered evidence is utilized to establish the actual innocence gateway. *See Schlup*, 513 U.S. at 324. Federal habeas corpus has and continues to be an equity action that seeks to remedy the continued incarceration of one who is actually innocent. *See Holland v. Florida*, 560 U.S. 631, 644, 646 (2010); *see also McQuiggin v. Perkins*, 133 S. Ct. at 1934. Therefore, any procedural defects including statute of limitation problems, laches, and others are removed if this Court finds that Mr. Fontenot is a victim of a manifest injustice. *See generally Schlup; see also Doe v. Jones*, 762 F.3d 1174, (10th Cir. 2014), *Perkins*, 133 S. Ct. 1924.

Mr. Fontenot has provided voluminous newly discovered evidence which demonstrates his actual innocence. That evidence includes his alibi that he was at a party at the time of the crime, the names of party witnesses, his recantation of his confession, the names of alternate suspects, evidence undermining the time and manner of Mrs. Haraway's disappearance, and medical examiner reports that refute both the State's theory and Mr. Fontenot's confession. Much like Mr. Fontenot's *Brady* and ineffective assistance of counsel claims, this Court must assess the newly discovered evidence cumulatively with that which was presented at trial. *Schlup*, 513 U.S. at 331-332. This evidence proves no reasonable juror would have convicted Mr. Fontenot. What this Court needs to determine is not whether Mr. Fontenot has proven all the above, but whether proving them would prove his innocence. If so, a hearing must be held.

**MR. FONTENOT HAS ESTABLISHED HIS BRADY CLAIM AND IS ENTITLED TO RELIEF**

Respondent argues that Mr. Fontenot's *Brady* evidence fails materiality. However, this analysis is wrong for two reasons. First, *Brady* evidence must be evaluated cumulatively, not item by item. *See Kyles v. Whitley*, 514 U.S. 419, 421, 436 (1995); *Gonzales v. McKune*, 247 F.3d 1066 (10th Cir. 2001). In truth, the Respondent's reply glosses over why the Court

shouldn't believe the Petitioner's evidence is material.  Regardless, **t**his Court's assessment must evaluate the impact of both the evidence presented and withheld in determining whether there is a reasonable probability of a different result.  *See Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009) (The standard of materiality for *Brady* claims such as those presented here "is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' *Banks*, 540 U.S. at 698").  Petitioner has addressed the cumulative impact of the *Brady* evidence in his initial Petition for Writ of Habeas Corpus, Docket No 4; his Amended Petition for Writ of Habeas Corpus, Docket No. 77; his Motion for Evidence Hearing, Docket No. 86, pp. 24-30; and his Reply to Motion to Dismiss, Docket No. 106, p. 14.

In short, the State's evidence against Mr. Fontenot consisted of his videotaped confession, a recanted identification of Mr. Fontenot, and the accounts of Jeff Miller who implicated Mr. Fontenot and his co-defendant, Mr. Ward, but never testified.  The confession was always suspect given that the third-party mentioned by both Mr. Ward and Mr. Fontenot could never have participated in these events as he was in police custody at the time of Mrs. Haraway's disappearance.  *See* Petition, Docket No. 4, p. 101.  Further, the Medical Examiner's report about Mrs. Haraway's death being attributed to a single gunshot wound negates the flawed confession, which was the crux of the State's case.  Accordingly, the State's case against Mr. Fontenot was extremely weak.  A cumulative assessment demonstrates that withheld evidence along with that presented at trial prove there is a reasonable probability of a different result.

Second, Respondent's argument concerning Mr. Fontenot's *Brady* evidence fails to account for the impact of this evidence at trial.  Respondent simply seeks to shift the blame, arguing that Mr. Fontenot should have told his counsel about the party, and that Floyd Degraw

was mentioned in the paper. In both instances, the Pontotoc County District Attorneys William Peterson or Chris Ross and the Ada Police Department and Oklahoma State Bureau of Investigation knew about this information, but it was not provided to Mr. Fontenot's trial attorney. *See* Docket No. 109, pp. 19-20.

The critical import of Mr. Fontenot telling OSBI Agents about the party and those in attendance is corroboration. Mr. Fontenot told OSBI Agents prior to his polygraph about the party and those present. Once the police were made aware of his alibi, Mr. Butner could have asked the officers whether they investigated his alibi, how it conflicted with this confession, and that the polygraph was inconclusive, casting doubt on the confession. At its core, the alibi evidence is not only about Mr. Fontenot**'s** actual location at the time of the crime, but even more importantly about the quality of investigation conducted by OSBI and the Ada Police Department. *See Kyles* at 446. Also, Mr. Butner could have found the people at the party who could corroborate that Mr. Fontenot was there the entire evening and did not leave. Whether Mr. Fontenot provided this evidence to his attorney does not wash away the *Brady* violation that the police and prosecutors knew about the alibi and prosecuted him anyway.

It is reckless and myopic for Respondent to assert that because Floyd DeGraw's name was in the Ada newspaper, *Brady* could not apply. Having the police reports of the extensive investigation done into Floyd DeGraw would have helped the defense in many ways. First, Mr. Butner could have cross-examined the OSBI Agents about their investigation, including Mr. DeGraw's presence in Ada around the time of Mrs. Haraway's abduction. Second, Mr. Butner could have questioned the same officers about Mr. DeGraw's incriminating reactions when questioned about Mrs. Haraway and his deceptiveness on his polygraph examination. Finally, Mr. Butner could have asked about the circumstances of Mr. DeGraw's arrest in Texas regarding

the abduction and rape of a woman.  All these areas of questioning fit within the defense's theory at the time of trial.  These reports clearly qualify as both newly discovered evidence the jury did not consider and *Brady* evidence.

Respondent gives the Court no answer for why prosecutors withheld exculpatory evidence demonstrating Mr. Fontenot's innocence by not providing exculpatory reports about his alibi, impeachment evidence that there were alternate suspects with motives and patterns that mirrored the abduction and murder of Mrs. Haraway, and evidence that could have aided the defense in casting serious doubts on the credibility of the confession.   Viewed cumulatively, this is compelling evidence for acquittal.

Further, Respondent is aware of the continuing efforts to deprive Mr. Fontenot of a fair trial through the disclosures of more exculpatory and impeachment evidence during the collateral proceedings.  As Mr. Fontenot has argued previously, Respondent cannot argue laches as an affirmative defense for undue delay when their own actions continue to subvert Mr. Fontenot's ability to litigate his claims in a timely manner.  Laches is an equity defense based upon the premise that the undo delay penalizes the state.  However, their unclean hands have attributed to this delay.  *Yeager v. Fort Knox Sec. Products*, 602 F. App'x 423, 429 (10th Cir. 2015).  Respondent does not deny that law enforcement and the Pontotoc County District Attorney's Office continued to release *Brady* materials even through this proceeding**.**  As described in Docket No. 105, pp. 5-7, documents that the prosecution claimed they had no knowledge of were found in their files during the pendency of this proceeding, not some time long ago.[4]

Respondent thrice references the "alleged dust on Respondent's hands."  Docket 109 pg. 14, 16, 32.  Respondent misunderstands: Mr. Fontenot is not alleging that Respondent's hands

---

[4] These documents establish both alternate suspects and the threats Mrs. Haraway received while at work.

are dusty, he is alleging that there is grime and oil under his fingernails.  Of course, time has shown this to be par for the course for the cadre in Pontotoc County.  *Williamson vs. Reynolds*, 904 F.Supp. 1529 (E.D. Okla. 1995).  Respondent did not begin the practice of withholding exculpatory documents from Mr. Fontenot, but he has continued and furthered the effort by withholding evidence and then arguing that Respondent is harmed by delays caused by the actions Respondent and his prosecutorial predecessors have taken.

Records within the Pontotoc County District Attorney's Office belie Respondent's "equity" argument because they prove the State had knowledge about many of the documents Mr. Fontenot requested and asserted support his claims of actual innocence, ineffective assistance of counsel, and *Brady*.  *See* Docket 105, pp. 5-8; *see also Banks v. Dretke*, 540 U.S. 668, 696 (2004) ("A rule thus declaring "prosecutor may hide, defendant must seek," is not tenable in a system constitutionally bound to accord defendants due process.  'Ordinarily, we presume that public officials have properly discharged their official duties.'" (citing *Bracy v. Gramley*, 520 U.S. 899, 909 (1997). citations omitted)).

Respondent argues that the alleged delay has deprived him of the ability to address the claims in this case using the Medical Examiner's files.  That cannot be so because the records speak for themselves, as do the transcripts, police reports, and witness statements.  The Medical Examiner's report details a cause and manner of death that refutes every piece of evidence the prosecution had against Mr. Fontenot, including his dubious confession.

As the Attorney General, Respondent could seek access to the Medical Examiner's files on this case if they truly wanted to review the claims asserted; yet, they have not done so to refute the factual allegations argued regarding these records at any point in these proceedings.  Instead, they blithely argue they are prejudiced without a clear explanation as to how they have

been prejudiced.  The truth is that Respondent cannot challenge the cause and manner of death because the records are clear.  Mrs. Haraway was murdered by a single gunshot wound the head and found in the opposite direction from the county where the state's theory of the case was argued.

**CONCLUSION**

In his Motion for Evidentiary Hearing, Mr. Fontenot explained why an evidentiary hearing may be necessary to prove the claims pled in the Amended Petition, as well as subsequent pleadings.  Records withheld during Mr. Fontenot's second trial deprived his counsel of the ability to prepare an effective defense and unfairly stacked the deck against Mr. Fontenot.  Mr. Fontenot has sought records from the State for decades.  That Respondent disputes Mr. Fontenot's innocence and his diligent attempts to obtain documents in support of his claims, establishes why a hearing is necessary.

Mr. Fontenot requests that this Court deny the Respondent's motion to dismiss and that the Court either issue a Writ of Habeas Corpus on the grounds provided in Mr. Fontenot's Amended Petition for Writ of Habeas Corpus, or at least order an evidentiary hearing so that Mr. Fontenot can prove his entitlement to the innocence gateway.

/S/ *Tiffany R. Murphy*
Tiffany R. Murphy
Attorney at Law
Arkansas Bar No. 2015057
790 N. Cliffside Drive
Fayetteville, AR 72701
(479) 575-5036

/S/ *Robert Ridenour*
Robert Ridenour
Assistant Federal Defender
OBA #16038
One West Third Street, Ste. 1225
Tulsa, OK  74103

(918) 581-7656

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Oklahoma by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


By: /S/ Robert Ridenour
ROBERT RIDENOUR