IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

_____
                                        :
KARL FONTENOT,                          :
                                        :
            Petitioner,                 :
                                        :          CIVIL ACTION
       v.                               :          6:16-cv-00069-JHP-KEW
                                        :
JOE ALLBAUGH, WARDEN,                   :
                                        :
            Respondent.                 :
                                        :
_____:


_____

**SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS**
_____

Tiffany R. Murphy
Attorney at Law
Arkansas Bar No. 2015057
790 N. Cliffside Drive
Fayetteville, AR 72701
(479) 575-4573

Robert Ridenour
Assistant Federal Defender
OBA #16038
One West Third Street, Ste. 1225
Tulsa, OK  74103
(918) 581-7656

# TABLE OF CONTENTS

TABLE OF CONTENTS------------------------------------------------------------------- 2

TABLE OF AUTHORITIES--------------------------------------------------------------- 5

PROCEDURAL HISTORY -------------------------------------------------------------- 7

STATEMENT OF FACTS ----------------------------------------------------------------11

PETITIONER'S CLAIMS ARE PROPERLY BEFORE THIS COURT--------------------------------14

I.    NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT MR. FONTENOT IS INNOCENCE SATISFYING THE GATEWAY REQUIREMENTS OF *SCHULP V. DELO*. -------16

   B.    Donna Denice Haraway was being Harassed by an Unknown Man. ------------------------------28

   D.    Law Enforcement Pressured Karen Wise to Change Her Account of What Transpired in JP's Convenience Store. --------------------------------------------------------35

   E.    Numerous Inconsistent Statements about the Gray-Primered Truck Cast Doubts as to what Truck was Involved in the Abduction if Any. ---------------------------------------38

   F.    Undisclosed Portions of the Medical Examiner's Report Showing Faulty Action in Preserving and Evaluating the Gerty Crime Scene Where The Decedent's Skeletal Remains Were Found And Showing The Decedent Gave Birth Prior To Her Death. ---------------------------42

II.    MR. FONTENOT'S FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE PONTOTOC COUNTY DISTRICT ATTORNEY'S OFFICE WITHELD EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*. -------------------------------------------46

   A.    The Pontotoc District Attorney's Office Did Not Disclose *Brady v. Maryland*   material as a Matter of Policy. ------------------------------------------------------------50

      1.    Pontotoc District Attorney's failure to ensure Brady materials were obtained from law enforcement. ------------------------------------------------------------52

      2.    Lack of training of law enforcement to understand what evidence constituted *Brady* material.------------------------------------------------------------55

   B.    Mr. Fontenot's Defense Counsel Repeatedly Requested Exculpatory, Impeachment Evidence, And Evidence That Would Aid the Defense throughout Both Trials. ---------------------60

   C.    Material Evidence Was Withheld from Mr. Fontenot's Defense Counsel ---------------------63

      1.    OSBI and Ada Police Department Reports establishing Mr. Fontenot's alibi------------------64

      2.    People at McAnally's the night of Mrs. Haraway's disappearance ----------------------------68

      a. Richard Holkum----------------------------------------------------------------72

      b. John McKinnis ----------------------------------------------------------------74

      c. Gary Haney & Guy Keys ----------------------------------------------------------79

      d. Gene Whelchel ----------------------------------------------------------------80

      3.    Floyd DeGraw -------------------------------------------------------------82

      4.    Withheld interview reports and taped statements of Jeff Miller and Terri -----------------87

      Holland (McCarthy). -------------------------------------------------------------87

      5.    OSBI Reports of Mrs. Haraway's fear of being stalked. -------------------------------93

2

**D.   Prejudice from The Non-Disclosure of Exculpatory Evidence** ---------------------------------96

**III.   MR. FONTENOT'S SIXTH AND FOURTHEENTH AMENDEMENT  FUNDAMENTAL RIGHT TO COUNSEL WAS VIOLATED BY THE ADA  POLICE DEPARTMENT'S INTERFERENCE WITH ATTORNEY-CLIENT  PRVILEGE** ------------------------------------- 103

**IV.   MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE  ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL  FAILED TO INVESTIGATE THE CASE AND PRESENT VIABLE EVIDENCE  SUPPORTING HIS INNOCENCE** ------------------ 108

**A.   Trial Counsel Was Ineffective for Failing to Introduce Tommy Ward's Sworn Statement Made During the Preliminary Hearing Exculpating Mr. Fontenot from Involvement in Mrs. Haraway's Case.** --------------------------------------------------------------------------------------- 109

**B.   Trial Counsel Was Ineffective for Failing to Investigate Evidence of Denice** ------------------ 115

**Haraway Being Stalked and Evidence Establishing a Different Motive for the Crime.** ------------ 115

1.   Defense investigation reports showing Denice Haraway's fear of obscene phone calls she received.---------------------------------------------------------------------------------------------------------- 115

2.   Register tape showing witnesses who were in McAnally's in short proximity to her disappearance -------------------------------------------------------------------------------------------------- 116

**V.   MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WAS VIOLATED WHEN HIS APPELLATE COUNSEL FAILED TO PRESENT VIABLE CONSTITUTIONAL CLAIMS IN MR. FONTENOT'S DIRECT APPEAL PROCEEDINGS.** ------------------------------------------------------------------------------------------------- 120

**VI.   MR. FONTENOT'S DUE PROCESS RIGHTS WERE VIOLATED DUE TO POLICE MISCONDUCT WHEN TAKING A FALSE CONFESSION AND THE PROSECUTION KNOWINLY INTRODUCED FALSE TESTIMONY DURING HIS TRIAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.** -------------- 121

**A.   Police Misconduct in The Interrogations of Mr. Fontenot** ------------------------------------- 121

**B.   Mr. Fontenot's Confession Is False and Unreliable.** ------------------------------------------- 128

**C.   The Pontotoc County District Attorney Office Knowingly Admitted False** -------------------- 133

**Testimony during Mr. Fontenot's Trial.** -------------------------------------------------------------- 133

**VII.   THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. FONTENOT BECAUSE THE STATE FAILED TO SHOW THE EXISTENCE OF THE CORPUS DELICTI OF THE CHARGED CRIMES OUTSIDE OF THE CONFESSION AND FAILED TO ESTABLISH THE TRUSTWORTHINESS OF THE CONFESSION IN VIOLATION OF THE FOURTEENTH AMENDMENT.** ---------------------------------------------------------------------------------------- 135

**A.   The State's Failure to Sufficiently Prove the Corpus Delicti of the Charged Crimes Independent of the Confession Requires Reversal.** ------------------------------------------------------ 138

**B.   The State Failed to Establish Through "Substantial Independent Evidence" the Trustworthiness of Mr. Fontenot's Confession; The Confession Was Patently Unreliable and Thus Inadmissible.** --------------------------------------------------------------------------------- 141

**C.   No Rational Trier of Fact Could Find Mr. Fontenot's Guilt Beyond a Reasonable Doubt on the Evidence at Trial, even if the Confession is Deemed to be Properly Admitted.** ----------------- 146

**VIII.    THE STATE'S INJECTION OF INADMISSIBLE HEARSAY FROM THE EXTRAJUDICIAL CONFESSION OF MR. WARD IN MR. FONTENOT'S TRIAL VIOLATED HIS CONSTITUTIONAL RIGHT OF CONFRONTATION.** -------------------------------------------- 149

**IX.    MR. FONTENOT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOALTED DUE TO THE POLICE MISCONDUCT THAT PERMEATED THE INVESTIGATION INTO MRS. HARAWAY'S DISAPPERANCE.** ------------------------------------------- 158

**A.    The Ada Police Department's Complete Lack of Training to Handle Major** ------------------ 158

**Crimes Resulted in an Incompetent Police Investigation.** -------------------------------------------- 158

**B.    The Ada Police Department's Primary Function Was To Investigate The Disappearance of Denise Haraway and They Failed That Role Because They Did Not Collect Information from Readily Available Witnesses.** ------------------------------------------------------------------- 159

**C.    Police Misconduct Involving Witness Interviews Resulted in Descriptions of** ------------------ 164

**the Suspects That Have No Relevance to The Disappearance of Mrs. Haraway.** -------------------- 164

**D.    Law Enforcement Failed to Investigate Leads from other Jurisdictions.** ------------------------ 165

**E.    Law Enforcement Failed to Properly Preserve Evidence Connected with The** ---------------- 168

**Crime After Mrs. Haraway's Remains Were Found.** -------------------------------------------------- 168

**F.    Conclusion** ------------------------------------------------------------------------------------------------- 172

**PRAYER FOR RELIEF** ------------------------------------------------------------------------------------------- 173

# TABLE OF AUTHORITIES

<u>CASES</u>

*Ake v. Oklahoma*, 470 U.S. 68, 74-75, 105 S.Ct. 1087, 1092 (1985) ...................................157

*Bagley*, 473 U.S. ...................................................................................................................50

*Banks v. Dretke*, 540 U.S. 668, 691 (2004) .................................................................47, 102

*Berger v. U.S*, 295 U.S. 78 (1935) ......................................................................................134

*Bowen v. Maynard*, 799 F.2d 593, 612-13 (10th Cir. 1986)..............................48, 79, 87, 97

*Brady v. Dill*, 187 F.3d 104, 114 .........................................................................................160

*Brady v. Maryland*, 373 U.S. 83, 87 (1963) .........................................................................47

*Britt v. State*, 1986 OK CR 99; 721 P.2d 812 (Ok. 1986)...................................................114

*Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997) .............................................18, 50

*Connick v. Thompson*, 131 S.Ct. 1350 (2011) ......................................................................53

*Cortez v. McCauley*, 478 F.3d 1108, 1117-18 (10th Cir. 2007) .........................................160

*Crawford v. State*, 840 P.2d 627 (Ok 1992) .......................................................................133

*Cummings v. Sirmons*, 506 F.3d 1211,1223-1224 (10th Cir. 2007) ......................................17

*Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077 (1965) ....................151, 157

*Dunagan v. State*, 734 P.2d 291 (Ok. 1987) .......................................................................154

*Fontenot v. State*, 742 ........................................................................................................150

*Fontenot v. State*, 742 P.2d 31, 32 (Ok.  1987)...................................................................157

*Fontenot v. State*, 881 P.2d 69 (Okla. 1994)........................................................................11

*Funkhouser v. State*, 1987 OK CR 44; 734 P.2d 815 (OK 1987) .......................................114

*Garcia v. State*, 639 P.2d 88 (Ok. 1981).............................................................................154

*Giglio v. United States*, 405 U.S. 150, 153-56 (1972) .............................................47, 48, 136

*Glass v. Vaughn*,66 F.3d 13, 16-17 (3rd Cir. 1995)..................................................................21

*Godwin v. State*, 625 P.2d 1262 (Ok. 1981) ......................................................................154

*Goforth v. State*, 644 P.2d 114 (Ok. 1982) .......................................................................141

*Greer v. State*, 763 P.2d 106 (Ok. 1988) ...........................................................................154

*Hager v. State*, 612 P.2d 1369 (Ok. 1980)..........................................................................149

*House v. Bell*, 547 U.S. 518, 528 (2006) ..............................................................................18

*In re Winship*, 397 U.S. 358, 90 S.Ct. 1068 (1970) ...........................................................149

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) ...................................................149

*Jones v. State*, 555 P.2d 63, 68 (Ok. 1976).........................................................................142

*Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-12(1992) ..............................................................16

*Kingsland v. City of Miami*, 369 F.3d 1210, 1219 (11th Cir. 2004) ...................................164

*Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986) ...................................................................15

*Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ................................................................. passim

*Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056 (1986) .........................................................151

*Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) .........................................................79

*Lopez v. Trani*, 628 F.3d 1228, 1230-31 (10th Cir. 2010) ...................................................16

*Malloy v. Hogan*, 378 U.S. 1 (1964)...................................................................................133

*McCall v. State*, 539 P.2d 418 (Ok. 1975)..........................................................................157

*McClesky v. Zant*, 499 U.S. 467, 494-495 (1991)..................................................................16

*McQuiggin v. Perkins*, __ U.S. __, 133 S.Ct. 1924, 1935, 185 L.Ed.2d 1019 (2013) .........15

*Miller-El v. Cockrell*, 537 U.S. 322 (2003) ..........................................................................53

*Miranda v. Arizona*, 384 U.S. 436 (1966) ..........................................................................123

*Mooney v. Holohan*, 294U.S. 103, 112 (1935)....................................................................135

*Napue v. Illinois*, 360 U.S. 264, 269 (1959) ............................................................48, 50, 134

*Opper v. U.S.*, 348 U.S. 84 (1954)...................................................................140, 142, 147

*Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987)................47

*Rodriguez v. Zavaras*, 42 F.Supp.29 1059, 1084 (DC Co 1999) ...................................................108
*Rompilla v. Beard*, 545 U.S. 374, 390 (2005) .................................................................... passim
*Schlup v. Delo*, 513 U.S. 298, 324 (1995) .....................................................................17, 21
*Shillinger v. Haworth*, 70 F.3d 1132, 1140 (10th Cir. 1995) .......................................105, 108
*Sistrunk v. Armenakis*, 292 F.3d 669, 673 n. 4 (9th Cir. 2002)...........................................18
*Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997).........................................................47
*Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 824 (10th Cir. 1995).............48
*Smith v. United States*, 348 U.S. 147, 153, 75 S.Ct. 194, 197 (1954).................................137
*Spuehler v. State*, 709 P.2d 202 (Ok. 1985)...................................................................149
*State ex.rel. Peterson v. Ward*, 707 P.2d 1217 (Okl.Cr.1985) ..........................................140
*Strickland v. Washington*, 466 U.S. 668, 690, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) .................109, 116, 121
*Strickler*, 527 U.S. at 281-82 (1999)..........................................................................47, 50
*Thompson v. State*, 705 P.2d 188 (Ok. 1985) ...............................................................154
*Thornburgh v. State*, 815 P.2d 186 (Ok. 1991)..............................................................142
*Tiscareno v. Anderson*, 639 F.3d 1016, 1022 (10th Cir. 2011)............................................48
*Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007)................................................96
*U.S. v. Agurs*, 427 U.S. 97, 107 (1976) ....................................................................63, 66
*U.S. v. Chaves*, 902 F.3d 259 (4th Cir. 1990) ................................................................105
*U.S. v. Cronic*, 466 U.S. 648, 658 (1984) ...................................................................108
*U.S. v. Danielson*, 325 F.3d 1054 (9th Cir. 2003)............................................................105
*U.S. v. Mastoianni*, 749 F.2d 900, 904-908 (1st Cir. 1984)...............................................105
*U.S. v. Shreck*, 2006 U.S. Dist. LEXIS 33158, 17 (ND OK 2006) ...................................107
*United States v. Bagley*, 473 U.S. 667, 676 (1985) ....................................................47, 63
*United States v. Brooks*, 296 U.S. App. D.C. 219, 966 F.2d 1500, 1500-04 (D.C. Cir. 1992) ...................................49
*United States v. Buchanan*, 891 F.2d 1436, 1442 (10th Cir. 1989) .......................................48
*United States v. Osorio*, 929 F.2d 753, 762 (1st Cir. 1991)................................................48
*United States v. Perdomo*, 929 F.2d 967, 97 (3d Cir. 1991) ...............................................50
*United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992) .........................................50
*United States v. Starusko*, 729 F.2d 256 260 (3d Cir. 1984) ..............................................66
*Ward v. Texas*, 316 U.S. 547, 555 (1942)....................................................................132
*Washington v. State*, 568 P.2d 301 (Ok. 1977)..............................................................154
*Wiggins v. Smith*, 539 U.S. 510 (2003);.......................................................109, 119, 121, 122
*Williams v. Taylor*, 529 U.S. 362 (2001).......................................................109, 119, 122
*Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991) ..........................................................49
*Williamson v. State*, 812 P.2d 384 (Ok. 1991), *cert. denied*, 112 S.Ct. 1592 (1992)..................142
*Young v. State*, 89 OK. 395, 208 P.2d 1141 (1949)..........................................................149

<u>OTHER AUTHORITIES</u>

Ayling, *Corroborating Confessions: An Empirical Analysis of* ...................................................137
*Corroboration of Confessions in the Theft by Receiving Context: Is Proof of Theft Enough,*............................137, 139
Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, ......125
Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND ......125, 126
*Legal Safeguard Against False Confessions*, 1984 Wisconsin L.R. 1121 ...................................137
Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE ......................126, 133
Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA world. *North*......131
Voluntary False Confessions: A Neglected Area in Criminal Administration, 28 Ind.L.J. 374 (1953) ....136, 137, 139

<u>RULES</u>

ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)...................................................110, 118, 135
Oklahoma Rules of Professional Conduct Rule 1.6...............................................................104

Despite three court orders, the Pontotoc County District Attorney's Office, numerous law enforcement agencies, and Respondent have repeatedly failed to disclose documents relevant to Mr. Fontenot's case for over twenty-five years.  At the same time, Respondent both in state post-conviction and in these proceeding argues laches as an affirmative defense to Mr. Fontenot's assertions of actual innocence and numerous constitutional violations.  The audacity of that argument in the face of newly "discovered" Ada Police Reports is astounding.  To present the additional grounds establishing his actual innocence and constitutional violations, Petitioner, Karl Fontenot, hereby files this second amended petition for writ of habeas corpus pursuant to 28 U.S.C. §2254.

## PROCEDURAL HISTORY[1]

On April 24, 1984, Donna Denice Haraway was last seen at McAnally's convenience store in Ada, Oklahoma.  A few customers arrived to find the store empty and called emergency services.  Several law enforcement agencies responded to the scene including the Ada Police Department and the Pontotoc County Sheriff's Office.  Later, the Oklahoma State Bureau of Investigations joined the local agencies in the investigation.

On October 12, 1984, with Mrs. Haraway still missing, the police contacted Thomas Ward in Norman, Oklahoma and interviewed him for more than two hours. (PH Tr. 506) Mr.

---

[1] There are several records cites within this Petition.  Abbreviations to the various court records, hearings, and trials will be as follows:

OR:  Original trial court record
P/H: Preliminary Hearing Transcript (there was only one preliminary hearing held in this case even after remand from the OCCA).
J/T date and page:  Joint trial of Thomas Ward and Karl Fontenot in 1986.
N/T date and page:  Fontenot's trial held over several days in 1988.
Ward N/T date and page:  Thomas Ward's trial held over several days in 1989.
State's Exhibit __ :  State exhibits from Mr. Fontenot's trial.

Ward denied any involvement or knowledge of what happened to Mrs. Haraway. (F-85-769 Tr. 1336).  Mr. Ward returned to the Oklahoma State Bureau of Investigation to take a polygraph test the next day. After nine hours of interrogation, police videotaped Mr. Ward give a statement in which he described being with Odell Titsworth and Karl Fontenot the night of Mrs. Haraway's disappearance.  The three robbed McAnally's, kidnapped Haraway, raped, and stabbed her to death.  Based solely on Mr. Ward's confession, police arrested Mr. Fontenot the next day.  He too was interrogated and confessed in similar fashion as Mr. Ward.

Nineteen days later, the Pontotoc District Attorney's Office filed charges against Mr. Fontenot and Mr. Ward in Case No. CRF-84-183 with Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; Count III, First-Degree Rape; and Count IV, First-Degree (Malice Aforethought) Murder. (O.R. 112).  On November 8, 1984, the State filed a Bill of Particulars against each defendant alleging these aggravating circumstances: 1) the murder was especially heinous, atrocious, or cruel; 2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and 3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. (O.R. 591, 592) Mr. Fontenot was appointed counsel on November 29, 1984, 42 days after his arrest. (O.R. 30)

The Pontotoc District Court held a joint preliminary hearing on February 4, 1985.  Mr. Fontenot and Ward were bound over for to trial on Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; and Count IV, Murder in the First Degree. (O.R. 592A-592-B) The magistrate found insufficient evidence to order either defendant to trial on Count III, First-Degree Rape. P/H 1047. The State appealed to the District Court to reinstate Count III, but was overruled. (Rule 6 Tr. 26-27) The State appealed the ruling to the Oklahoma Court of Criminal

8

Appeals.  On September 6, 1985, while the State's appeal on the rape charge was pending, the State dismissed the rape charge and amended the Information to allege Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; and Count III, First Degree (Malice Aforethought) Murder, and proceeded to trial. (O.R. 475).

Both Mr. Fontenot and Mr. Ward were convicted of all counts in a jury trial held on September 24, 1985.  The trial court sentenced both to twenty years imprisonment on Count I, ten years imprisonment on Count II.  During the penalty phase of the trial, the jury found the existence of three aggravating circumstances and no mitigation sentencing Mr. Fontenot and Mr. Ward to death.  An appeal was timely filed for both men to the Oklahoma Court of Criminal Appeals.

During the pendency of the appeal, a man found a skull in Hughes County commencing a search of the area.   Eighteen months after Mrs. Haraway's disappearance, her skeletal remains were recovered after several searches of the area.  The medical examiner found a bullet hole in the back of the skull was the only evidence of a probable cause of death. (N/T 6/9/1988 at 130) The medical examiner also found no evidence of any stabbing or burning of the remains. (N/T 6/14/1988 at 134, 136).  The Oklahoma Court of Criminal Appeals reversed both the conviction and sentence over *Bruton* violations in Fontenot v. State, 742 P.2d 31 (Okla. 1987).

After the remand, Mr. Fontenot was tried in Hughes County after a change of venue motion was granted by the trial court.  On June 7, 1988, the State filed an amended Information alleging Counts I, II and III, Robbery with a Dangerous Weapon, Kidnapping and Murder in the First Degree (malice aforethought), respectively, adding to Count IV that the cause of death by gunshot. (O.R.II 76) Another preliminary hearing was not held.   Mr. Fontenot's jury trial started on June 7, 1988, in Hughes County District Court before Judge Donald E. Powers. (N/T

6/6/1988 at 1).  On June 14, 1988, Mr. Fontenot was convicted of all counts. (N/T. 7/8/1988 at 104; O.R. II at 165, 166, 167) The jury assessed punishments of twenty (20) and ten (10) years imprisonment on Counts I and II respectively. (O.R.II at 65, 166) Following the penalty phase, the jury found the existence of the three alleged aggravating circumstances and set Mr. Fontenot's punishment at death. (June 14, 1988 at 165- 166; O.R II at 168, 169) Judgment and sentence in accordance with the jury's verdicts were imposed on July 8, 1988. Mr. Fontenot filed a timely notice of appeal to the Oklahoma Court of Criminal Appeals.

Mr. Ward went to trial in Pottawattamie County on the same charges almost a year after Mr. Fontenot was convicted.  Before the same trial court, Mr. Ward's trial began on May 31, 1989, and concluded on June 16, 1989.  The jury found Mr. Ward guilty on all charges. However, they imposed a sentence of life imprisonment with the possibility of parole.

On June 8, 1994, the Oklahoma Court of Criminal Appeals affirmed Mr. Fontenot's convictions, but overturned his death sentence due to a life without the possibility of parole jury instruction being omitted during the penalty phase. *Fontenot v. State*, 881 P.2d 69 (Okla. 1994). The Court remanded Mr. Fontenot's case for resentencing.  Mr. Fontenot was subsequently sentenced to life imprisonment without the possibility of parole.

An Application for Post-Conviction Relief was filed in the District Court of Pontotoc County on July 24, 2013.  It was assigned to the Honorable Thomas S. Landrith.  After requesting additional time to respond, the State filed its response on September 17, 2014. Without an evidentiary hearing, the district court issued its post-conviction findings on December 31, 2014, denying relief based on the Respondent's assertion of Laches.  Mr. Fontenot timely filed an appeal to the Oklahoma Court of Criminal Appeals on March 2, 2015.  He raised all claims from his state post-conviction proceedings and challenged the laches decision.  On

November 2, 2015, the Oklahoma Court of Criminal Appeals affirmed the state post-conviction court's order denying relief finding the application was barred by laches.   Mr. Fontenot then filed his Petition for Writ of Habeas Corpus seeking relief from his state court convictions.

Since Mr. Fontenot filed his Petition, he has engaged in discovery, served several subpoenas, and conducted depositions.  The Court authorized production and review of the Pontotoc County District Attorney's files, among other things.  During the process, Mr. Fontenot's counsel served a subpoena on the Ada Police Department and in response their organization stated no documents existed.  Within the District Attorney's files, counsel discovered reports never before disclosed to prior defense counsel.  Based upon that, Mr. Fontenot's counsel was allowed to file an Amended Petition.   Shockingly, within the last two months, documents were produced by Respondent and the Ada Police Department, but not to Mr. Fontenot.  Pursuant to Thomas Ward's subpoena during state post-conviction proceedings, Respondent received Ada Police Reports.  Once Mr. Fontenot's counsel discovered this, they requested records which were subsequently disclosed.  Based upon these events, this Court permitted Mr. Fontenot to file this Second Amended Petition.

## STATEMENT OF FACTS

On April 28, 1984, Donna Denice Haraway went to work as a convenience store clerk at McAnally's gas station and store.  Testimony presented at both of Mr. Fontenot's trials explained that Mrs. Haraway walked out of the store with a white male.  They both got into a pick-up truck and drove away.  What exactly happened to Mrs. Haraway in the days and months after her disappearance remains a mystery until her remains were found in Gerty, Oklahoma over a year and a half after her disappearance. Ex. 44.  Police found her skeletal remains spread across a large area that required a few searches to locate. *Id.*  The Oklahoma Medical Examiner's Office

determined the cause of death was a gunshot wound to her head.  Marks found on her ribs were found to be caused by animals instead of stab wounds. *Id.*

APD Detective Dennis Smith, and OSBI Agent Gary Rogers headed up the investigation into Mrs. Haraway's disappearance.  Along with these two officers, APD Detective Mike Baskins handled key parts of the investigation.  For example, he failed to properly handle the McAnally's crime scene.  From the period of late April until October 1984, OSBI and APD investigated many alternate suspects and leads.  Sometime in late September or October, Detectives Smith and Baskins interviewed Jeff Miller who provided information gleaned from other individuals that implicated Thomas Ward and Karl Fontenot.  Based on this uncorroborated conversation, police sought out Thomas Ward and then, Mr. Fontenot as their suspects.

The case against Mr. Fontenot rests primarily on his confession given in October 1984. The confession states that Mr. Fontenot, along with Odell Titsworth, and Tommy Ward robbed McAnallys, kidnapped and murdered Mrs. Haraway before burning her body.  After extensive investigation into various areas around Pontotoc County, Oklahoma, the OSBI and Ada Police Department were unable to locate Mrs. Haraway's remains or any physical evidence corroborating Mr. Fontenot's confession.   In fact, not one detail of Mr. Fontenot's confession could ever be corroborated with any evidence in the case.

Along with the confessions, the Pontotoc County District Attorney's case included the three witnesses who arrived at McAnally's after Mrs. Haraway's disappearance.  These three men testified as to what they witnessed upon arriving at the store.  The witnesses said a man and a woman exited the front door and got in a pickup that was parked about 10 feet away, parallel to the door, facing east. (N/T 6/10/1988 at 60) The man had one arm around her waist. (N/T 6/9/1988 at 66) The pickup was light-colored, "late model, late '60s, early '70s," with an intact

12

tailgate, "greenish, gray" with primered spots and "gray primer." (N/T 6/10/1988 at 40-41, 47, 59)  Not realizing anything was amiss, one of the witnesses entered the store finding it empty. Soon afterwards, they called the Ada police after finding the cash register door open and all of Mrs. Haraway's belonging, including her purse and school books, still in the store.

While attempting to secure McAnally's, law enforcement received reports of two men who had been at a nearby convenience store earlier in the evening.  Karen Wise, the convenience store clerk at  J.P. 's Pak-To-Go, a half mile west of McAnally's, and James Paschal, a customer at J.P. 's, told  police of two men who were in the store between 7 p.m. and 8:30 p.m.   Ms. Wise said the men made her nervous. Both Ms. Wise and Mr. Paschal described the pickup seen with the men at J.P. 's as a "red primered truck ... mostly red primer ... [with] grey primered spots," and an "older model" Chevrolet of uniform color with a tailgate that was either missing or painted a different color.  (N/T 6/9/1988 at 193, 214, 225)

Ms. Wise positively identified Mr. Ward as one of the men she saw in J.P.' s. *Id.* at 185; State's Exhibit Nos. 5 and 51. The second man seen by Ms. Wise at J.P. 's was 6 feet to 6 feet and 2 inches tall, white male, sandy brown hair. (State's Exhibit No. 5).  However, Mr. Fontenot's height is 5'9."   Neither Ms. Wise nor Mr. Paschal identified Mr. Fontenot as the second man. Ms. Wise testified that the second man on April 28, 1984, had lighter hair than Mr. Fontenot and that Mr. Fontenot was shorter than the man she had seen. (N/T 6/9/1988 at 194-195).  Ms. Wise also testified that she had seen a man staring at her apartment while Mr. Fontenot was incarcerated, and she believed this man resembled the second man at J.P. 's with Mr. Ward. (P/H 1063, N/T 6/9/1988 at 197-199) Ms. Wise said this same man was a spectator at the preliminary hearing. (PH Tr. 161; F-85-769 Tr. 968-969, 981-982, 984-985; N/T 6/9/1988 at 200-202).

Several other witnesses testified about pick-up trucks seen that night of similar description as seen at McAnally's and JP's.  However, the crux of the District Attorney's case rested on the confession and an identification by Jim Moyer, a customer in McAnally's that night. [2]  Based on this testimony, Mr. Fentenot was convicted in both trials and sentenced to death.  His death sentence was overturned after the second trial resulting in a re-sentencing to life without the possibility of parole.

## PETITIONER'S CLAIMS ARE PROPERLY BEFORE THIS COURT

According to 28 U.S.C. § 2244(d)(1) a state petitioner challenging his felony conviction must file his Petition for Writ of Habeas Corpus prior to the lapse of the one-year statute of limitations.  However, the U.S. Supreme Court has found this statute of limitations may be waived upon a credible finding of actual innocence. *McQuiggin v. Perkins*,  __ U.S. __, 133 S.Ct. 1924, 1935, 185 L.Ed.2d 1019 (2013).  Further, numerous jurisdictions, including the Tenth Circuit Court of Appeals have found that to prevent a manifest injustice of continuing to incarcerate one who is actually innocent, a number of procedural defects will be waived.  *See Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)(allowing successive petitions with

---

[2] The recent discovery of Ada Police Department reports contained confidential letters written by Mr. Fentenot to his trial attorney, George Butner.   In these letters, he provides names of people to corroborate his alibi. Additionally, he recanted his confession and detailed police attempts to make him confess while in custody.  Other newly discovered exculpatory reports include a previously undisclosed handwritten report taken from Gene Whelchel about his description of men he had seen in McAnally's. Ex. 96.  The report was made on April 30, 1984, two days after Mrs. Haraway went missing.  It provides extremely detailed descriptions of the men, down to Suspect #2 having a muscular arms, a narrow waist, and larger shoulders.  He describes acne scars on Suspect #2. He describes Suspect #1 as a "neat looking guy" with an athletic build and probably right handed. These details were never provided to defense counsel and would have been essential to cross examining Mr. Whelchel and other witnesses. Also found was an interview with James Boardman, an employee with the Ada newspaper. Ex. 93.  Mr. Boardman was in the McAnnally's store at 5 p.m. on April 28, 1984, and encountered two men that in his opinion were "acting funny."  He saw Mrs. Haraway there. Ada Police officers went back to Mr. Boardman after Mr. Fentenot was arrested in October 1984 and he could did not identify Mr. Fentenot as one of the men he saw. Additionally, two witness statements whose names were written on the McAnally's register tape provided almost the exact information to the Ada Police that they did to post-conviction investigators when they provided their affidavits. Ex. 94.

rejected constitutional claims); *McClesky v. Zant*, 499 U.S. 467, 494-495 (1991)(excusing

"abusive petition" exception in federal habeas); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-

12(1992)(actual innocence trumps failure to develop facts in state court); <u>*Lopez v. Trani*, 628</u>

<u>F.3d 1228, 1230-31 (10th Cir. 2010)</u>(actual innocence is an exception to procedural barriers in a

petitioner's case including statute of limitations); *see also Lee v. Lampert*, 653 F.3d 929, 932

(9th Cir. 2011) (allowing actual innocence cases to receive substantive review despite being

time-barred); *Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005); *San Martin v. McNeil*, 633 F.3d

1257, 1267-68 (11th Cir. 2011); *Jones v. State*, 591 So.2d 911, 915-16 (Fla. 1991) (permitting

actual innocence based on new evidence in a writ of error *coram nobis*); *In re Clark*, 855 P.2d

729, 760 (Cal. 1993)(claims of factual innocence based on newly discovered evidence permitted

at any time regardless of delay or failure to raise claim previously); *Summerville v. Warden*, 229

Conn. 397, 244 (Conn. 1994)(allowing state habeas corpus petition on newly discovered

evidence of innocence even with other procedural problems); *People v. Washington*, 171 Ill. 2d

475, 489 (Ill. 1996)(procedural due process allows newly discovered evidence of innocence at

any time); *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996)(permitting a claim

of actual innocence action in the interest justice); *State ex rel Amrine v. Roper*, 102 S.W.3d 541,

547 (Mo. 2003)(permitting actual innocence to be raised in state habeas corpus proceedings

outside of the normal post-conviction avenue); *State v. Armstrong*, 2005 WI 119 (WI 2005)(state

supreme court could use its inherent power to remedy a miscarriage of justice); *Montoya v.*

*Ulibarri*, 142 N.M. 89,97 (N.M. 2007)(allowing actual innocence claims in state habeas petition

as an act of fundamental fairness).  While Mr. Fontenot is filing his habeas corpus petition

beyond the one-year statute of limitations, he is actually innocent of his convictions and the

failure to file timely was through no fault of his own.

Likewise, in general, absent a showing of cause and prejudice, a habeas court will not entertain a claim that has been defaulted in state court because of a procedural state court bar. *See Dretke v. Haley*, 541 U.S. 386, 388 (2004).  However, there are several narrow, but critical, exceptions to this general rule.  First, the Court requires that the rule must be adequate and independent – that is, it was firmly established, regularly followed, and consistently applied at the time of the alleged default.  *Ford v. Georgia*, 498 U.S. 411 (1991).  Second, there is "a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense."  *Id.*; *see Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006).   Third, there is an exception in claims of *Brady* error, where the elements of the substantive claim itself mirror the cause and prejudice inquiry and proof of one is necessarily proof of the other. *See Banks v. Dretke*, 540 U.S. 668 (2004).  Mr. Fontenot qualifies for substantive review under both the actual innocence and the cause and prejudice exceptions.

## I.   NEWLY DISCOVERED EVIDENCE ESTABLISHES THAT MR. FONTENOT IS INNOCENCE SATISFYING THE GATEWAY REQUIREMENTS OF *SCHULP V. DELO*.

The purpose of the procedural actual innocence standard is to prevent a manifest injustice of the continued incarceration of one who is actually innocent.  When asserting actual innocence in federal habeas corpus, a petitioner must present newly discovered evidence that a jury did not consider during their deliberations. *See Schlup*, 513 U.S. at 327.  Specifically, newly discovered evidence consisting of "trustworthy eyewitness accounts" and "critical physical evidence" in order to provide the factual basis for the gateway claim. *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *see also Cummings v. Sirmons*, 506 F.3d 1211,1223-1224 (10th Cir. 2007); *O'Boyle v. Ortiz*, 242 Fed. Appx. 529, 530-531 (10th Cir. 2007)(discussing that petitioner must demonstrate

the newly discovered evidence was not available at trial); *Sistrunk v. Armenakis*, 292 F.3d 669, 673 n. 4 (9th Cir. 2002); *Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997). Once an actual innocence gateway is established, any procedural defects in Mr. Fontenot's constitutional claims are removed permitting this Court to evaluate each claim on its merits. *See Schlup* 513 at 315. The significance of the evidence presented below casts considerable doubt on the validity to Mr. Fontenot's convictions.

Once the factual grounds of actual innocence are present, a federal court's review must assess whether "the petitioner [has shown] that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup* at 327; *see also House v. Bell*, 547 U.S. 518, 528 (2006). The Supreme Court instructs federal courts to examine the strength of the prosecution's case at trial when weighing the significance of all newly discovered evidence. *See House*, 547 U.S. at 539-553 (assessing newly discovered evidence within the state's theory of the case at trial). The State's theory of the case shows what evidence is significant to the jury's determination of guilt.   More importantly, the state's theory of the case demonstrates the strength of the case against a defendant.

The Pontotoc County District Attorney's Office tried Mr. Fontenot twice for the robbery, kidnapping, and murder of Donna Denice Haraway.   In both trials, their case against Mr. Fontenot rested on his confession about the robbery of McAnally's, kidnapping her from the store and her subsequent murder. (N/T 6/14/88 at 34-36).  During trial, the prosecution acknowledged the plethora of inconsistencies between his confession and all the other evidence found in the case.  A key discrepancy was Mr. Titsworth's non-involvement in the crime.

> Well, what does Officer Rogers, and Officer Smith, and Officer Baskins say?  It is not unusual to have them tell you part lies.  I ask you to consider ladies and gentlemen, first of all, Odell Tittsorth[sic] was not there.  Therefore, part of the story had to be a lie.  Anytime he said Odell Tittsworth [sic] did anything, the rest

of the story had to be a lie, because Tommy and him, one of them had to do it, what Odell, what they said Odell did. So, of course, it is going to appear there are some lies and some mistruths and it is not going to match exactly to the fact as told by the Defendant.

N/T 6/14/1988 at 94. Evidence showed Mr. Fontenot was unable to describe or identify Mr. Titsworth when asked to do so by law enforcement. *See* J/T at 2074-75; P/H 968, 994-95. Both Ada Police Detectives Smith and Baskins admitted that nothing in Mr. Fontenot's confession was corroborated by their investigation. *See* P/H 546-547; N/T 6/10/1988 at 178-179. Once Mrs. Haraway's remains were found, the medical examiner's report further disproved the confession by showing the cause of death to be a gunshot wound to the head and refuting that there were any knife-marks on her ribs. *See* Ex. 46.

In addition to the confession, the prosecution relied on two witnesses who identified Mr. Fontenot as being both in McAnally's and hanging around J.P.'s convenience store. N/T 6/14/1988 at 21 and 70-71. Those witnesses were James "Jim" Moyer and Karen Wise, respectively. This is the crux of the evidence brought against Mr. Fontenot leading to his conviction.

The remainder of the evidence presented against Mr. Fontenot focused on his guilt by association with his co-defendant, Tommy Ward. Much of the prosecution's opening statement, closing argument, and rebuttal focused on Mr. Fontenot's guilt by association to his co-defendant, Thomas Ward. *See* N/T 6/8/1988 at 31-35; N/T 6/14/1988 at 17-19, 35-36, 70, 79. Instead of direct evidence inculpating Mr. Fontenot, the prosecution inferred his guilt because Mr. Ward must be guilty. In fact, much of the state's case focused on the witnesses who saw Mr. Ward in JP's or McAnally's, N/T 6/14/1988 at 20-21, 27, Mr. Ward's possible possession of the knife, *id.* at 17, and his family's access to a grey pick-up truck. *id.* at 17.

During Mr. Fontenot's second trial, the prosecution recounted the testimony of several witnesses who gave statements to law enforcement that were withheld from Mr. Fontenot's defense counsel.  Specifically, those witnesses were Janet Weldon (aka Lyon), who was Mrs. Haraway's mother; James Watt, who was Mrs. Haraway's co-worker at McAnally's; Richard Holkum, an Ada Police Officer; and Karen Wise, who was sales clerk at JP's convenience store. Without these witnesses' prior statements to police, defense counsel was unable to cross examine prosecution witnesses about critical evidence that either exonerated Mr. Fontenot or impeached the testimony of various police officers. While defense counsel presented some evidence challenging the confession,[3] he could not provide evidence establishing Mr. Fontenot's innocence along with showing the weaknesses in the police investigation.

All the evidence presented at trial must be evaluated along with the newly discovery evidence presented herein. *See House* 547 U.S. at 537-538.  The federal court must conduct a cumulative assessment of the prosecution's evidence at trial, along with the newly discovered evidence when considering whether actual innocence is proven.

> Our review in this case addresses the merits of the Schlup inquiry, based on a fully developed record, and with respect to that inquiry Schlup makes plain that the habeas court must consider "'all the evidence,'" old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial."

*See id.*

The investigation into Mr. Fontenot's case revealed both documents and witness statements that prove an alibi defense and substantiate proof of the ineptness of the police investigation.  The discussion below will highlight the newly discovered evidence that ndermines the prosecutor's scant evidence and provide solid proof that Mr. Fontenot is likely innocent.

---

[3] The confession is discussed in depth in Claim VI & VII.

These discussion points include evidence that Mrs. Haraway was being harassed and stalked by a man in the months and weeks leading up to her disappearance.   The sole eyewitness, Jim Moyer, placing Mr. Fontenot in McAnally's has recanted his identification. Karen Wise, the convenience store clerk at JP's was pressured by both the police and prosecution to change her description of the men she saw at her store to fit the police theory of the crime. Further, a medical examiner's report withheld by the prosecution shows not only a botched handling of the crime scene -- a pattern in this case but more importantly that Mrs. Haraway gave birth to a child sometime before her death (a striking fact given she was pregnant at the time of her abduction).  The totality of this newly discovered evidence establishes Mr. Fontenot's innocence. Once a cumulative assessment is done, it will be evident to this Court that, "more likely than not, no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327; *Glass v. Vaughn*,66 F.3d 13, 16-17 (3rd Cir. 1995).

### A.    Newly Discovered Evidence Establishes Mr. Fontenot's Alibi.

Investigators knew Mr. Fontenot had told them he was elsewhere when Mrs. Haraway was abducted.  Within the Oklahoma State Bureau of Investigation (OSBI) records are documents corroborating Mr. Fontenot's whereabouts the night of April 28, 1984.  The defense never got these documents.  The facts show Mr. Fontenot agreed to submit to a polygraph examination on October 21, 1984.  Within the OSBI prosecutorial[4] submitted to the Pontotoc County District Attorney's Office is a report of Mr. Fontenot's conversation with OSBI Agent Rusty Featherstone. Ex. 43, prosecutorial bates 142-143.   During that conversation, Agent Rusty Featherstone reported the following:

---

[4] The prosecutorial is a report created by the OSBI agents and given to the Pontotoc County District Attorney to review for charging decisions and prosecution.  It does not contain the entirety of the investigative documents from law enforcement. *See* Claim II for more explanation of the prosecutorial in this case.

> During the pretest interview, FONTENOT indicated he has never been in the McAnally's convenience store nor even having driven by it.  He has never seen DONNA DENICE HARAWAY before and does not believe he would recognize a picture of her if shown it now, although he recalls seeing a picture of a girl when she was first reported missing . . . FONTENOT recalls on the evening of Saturday, April 28, 1984, he went to the apartment of GORDON CALHOUN, arriving there at approximately dark or shortly after the kegs arrived.  CALHOUN lives adjacent to ROBERTSES, where FONTENOT was currently staying.   At the party FONTENOT recalls drinking and doing marijuana and then returning to the ROBERTS apartment where he slept on the floor all night. He believes he returned to the apartment between 2330 and 2400 hours that night. . ."

*Id.* [5]   Later in the statement, Agent Featherstone stated that Mr. Fontenot mentioned a man named Bruce who was also at the party along with a Michael Shane Lindsay. *See id.*

During the post-conviction investigation, it was determined the Bruce mentioned was Bruce DePrater who acknowledged being at the party and seeing Mr. Fontenot there the whole evening. Ex. 8.  Interestingly Agent Featherstone found Mr. Fontenot's polygraph results were inconclusive but bordering on deceptive. Ex. 44 at 605, 628 (explaining that the examiner cannot make definitive determinations on whether Mr. Fontenot was truthful or deceptive on questions about the disposal of Mrs. Haraway's body and whether he stuck her with a knife).

Mr. Fontenot also made a handwritten statement on October 21, 1984, recanting his confession.  In his letter, he said he had simply agreed with the story OSBI Gary Rogers told him and lied on the video. *See* Ex. 44 at 626.  He explained that he had never been to McAnally's or ever met Mrs. Haraway, and reaffirming his presence at the party. *See* Ex. 44 at 625-627.

What is significant is that both OSBI and Ada Police Department were aware of this party based upon several witness reports, dispatch records, and police reports.  Ada Police radio logs show several calls made in response to a loud party held at Gordon Calhoun's apartment.

---

[5] When Mr. Fontenot attempted to explain his whereabouts to Detective Smith and Agent Rogers, they interpreted it as confirmation of whatever Jeff Miller told them over the summer.  They failed to independently assess whether the party occurred as Mr. Fontenot stated rather than as confirmation of Mr. Miller's version of what occurred.  If they did investigate it, those documents have never been disclosed to any defense counsel including undersigned counsel.

One of the officers who responded to this call, Ada Police Officer Larry Scott, wrote a report specifically mentioning "Gordon Calhoun" party and warning the revelers to keep it down or go to court. Ex. 43, prosecutorial bates 98.

Other witnesses who knew about the party at Mr. Calhoun's apartment testified at Mr. Ward's trial but not at Mr. Fontenot's. One of these witnesses, Stacey Shelton, not only remembered the events of that night but remembered some of the other people present.  Stacey Shelton attended the party at Gordon Calhoun's apartment. She testified at Mr. Ward's trial[6] about the party and who else was there:

> Q Did you have occasion to attend a party at Gordon Calhoun's apartment on April 28th, 1984?
>
> A Yes, sir. It was the graduation party for my younger brother, Bruce.
>
> Q And how did you come to go to that party?
>
> A I was at a club called LaFraqua that night and I had seen my younger brother there, and Gordon, and they told me that they were having a party at his apartment and asked if wanted to come.
>
> Q. Now, do you recall who went to that party with you?
>
> A Yes, sir. My roommate, Laura Ingram, my boy -- a boy I knew who I ended up, I ended up dating for two years, that was our first date, and Lyndel Gibson and his roommate. I don't recall his name. I'm sorry, it wasn't his roommate, it was a friend.
>
> Q And did you see anyone at the party that you knew?
>
> A My brother, Bruce, was there, Gordon was there, my next door neighbors from my home in Konawa were there, Chris and Eric Thompson. And of course, I knew Laura and Lyndel and was familiar with the friend that Lyndel brought.
>
> Q Now, have you seen a lady in the hall today known as Janette Roberts?
>
> A Yes. They called her "Red". She was at that party, yes.
>
> Q. You saw her at the party also?

---

[6] Mr. Ward's trial took place in 1989, after Mr. Fontenot's trial and conviction on June 8-14, 1988.

A. Yes, I did.

Q. Now, do you recall about what time you got to the party?

A. It was late. The club didn't close until midnight, and I want to say that that is about the time we went, around that time, somewhere. I knew that it was late.

Q. All right. Did you see the Defendant, Tommy Ward, at that party?

A. I can't say positively that I did, no. There were probably twenty to twenty five people there and, like I said, the only ones I knew were about six or seven people.

Q. All right. Now at the time of the first trial of this case, who were you working for?

A. A radio station in Ada, KADA Radio.

Q. And what were you doing for them?

A. I was a news anchor and reporter.

Q. And did you attend that trial?

A. Yes, sir, I did.

Q. And did anything happen in that trial to surprise you?

A. Yes, sir. I viewed a videotape where Mr. Ward was talking to some detectives and he told them that the night that Denice Haraway was taken, he was at a party and he started describing in minute detail about the party. He told of my little brother playing the electric guitar and Gordon was playing on the drum set and of two guys from Konawa asleep in the bedroom and also told of the police coming about 1:00 o'clock in the morning telling us to quiet down. And the minute I saw that, I knew that he had been there to know that.

Q. Now, did you know who these people from Konowa were?

A. Yes. They were Chris and Eric Thompson. I grew up next door to them.

Q. Now, did you see them asleep at that party?

A. Yes, sir, I did.

Q. And where were they asleep?

A. In the bedroom. One was on the bed and one was on the floor.

(Ward Vol. 10 p. 193-195). Ms. Shelton had told the police and prosecution that she was at the party and knew who was there. Instead of notifying George Butner, counsel for Mr. Fontenot, of evidence supporting Mr. Fontenot's alibi, law enforcement's reaction to her information was to pressure her to recant.

> As I was watched the video, I realized that Ward was referring to a party I had attended at Gordon Calhoun's house. My brother, Bruce DePrater, was from Konawa and had been playing the guitar and Gordon had been playing the drums. Ward has also eluded to the fact that there were two other boys from Konawa at the party who were passed out on a bed. Those two boys were my childhood neighbors, Chris and Eric Thompson. I remembered them being at the party and indeed, they were passed out on a bed in an adjacent room to the living room.

> I also remember Janette Blood being at the party with several of her friends. At the time, I did not know who she was or her name, but, I remembered her specifically because after I remarked that everyone needed to lower the noise because of the warning from the police, she came up to me and yelled in my face.   She was easy to remember because of her flaming red hair and missing teeth. It was only at the trial, when she testified that I learned her name.

> I specifically remember the night of the party as Saturday, April 28, 1984. First, my brother had invited me to the party after seeing me with my roommate Laura Ingram, and my date, Lyndel Gibson, at a local dance club. All three of us went to the party with the intent of only staying for a short while. It was the first time I had gone out with Lyndel, who I ended up dating for the next two years. It was the one and only time I went to Calhoun's house. I kept a calendar, almost like a diary, of everything I did. I wrote it in my calendar the following day. Also, during that time, I never went out on Friday nights because I worked on Saturday mornings and liked to go to bed early.

> The police should have been aware of the date of the party since they arrived at the house a couple times to quiet the party. However, the police would not have been aware of everyone at the party. I know this because my friend, Laura and I were hidden in a different part of the house when the officers arrived and never interacted directly with them.  After watching the video of Tommy Ward describing the April 28, 1984, party, I left the courtroom and approached Dennis Smith. I told him that there was no way Ward would know details about the party unless he was there. Smith told me that anyone could have told him about the party. I argued with him that Ward would not have known all the detail that he spoke about if someone had just told him about it. He said to me, "I don't want to hear it," and turned and walked away.

**I later informed Mike Baskins about the accuracy of Ward's description of the party that night. I insisted that Ward and Fontenot couldn't have committed the crime since they were at the party that night. Baskins argued with me concerning the validity of the alibi, claiming that police logs showed that the party actually took place on a Friday night. I knew that could not have been correct and several years later, I discovered that the police log actually showed that the party was, in fact, on Saturday night.**

At the second trial of the defendants, I testified for the defense, verifying that Tommy Ward's details matched what I had seen at the party.

**After testifying at the trial, I was confronted by Bill Peterson who brought me into an office he and Chris Ross were using within the courthouse. Once I was there, Peterson told me I was to get back on the stand and recant my testimony. I told him I wouldn't do it because I had told the truth. He made me stay in the office for about half an hour and then came back in with what he told me were trial transcripts. He ordered me to read them. I did and then he yelled at me saying that I was lying because, he said, the transcripts didn't match my testimony. Again, he demanded that I return to the stand to recant my previous testimony and again, I refused telling him that while not everything I testified to was in the transcript he showed me, that I clearly remembered what took place that night and I clearly remembered seeing the tape sometime during the preliminary hearing or trial, although I could not recall exactly which one.**

Peterson was extremely volatile during the course of this confrontation. He slammed his fist on the desk. He slammed the transcript on the desk. He was redfaced and yelling almost to the point of spitting. He insisted over and over again that I go "back on the stand and testify that everything you said was wrong."

Because I refused, he told me I was not to leave his office until I agreed to recant. I stayed in the office for several more hours while the trial continued. He would come into the office during breaks and again demand that I retake the stand, which I refused to do. At the end of the day, he let me go, but told me I was to return every day until I agreed to recant. He told me he was going to recall me and rip my testimony to shreds and although I returned each day of the trial and was made to sit on a bench in the hallway until the trial concluded, he never recalled me and I refused to go on the stand of my own accord and recant.

Peterson left me with the impression that if I did not remain in his office the first day or return the following days that I would be jailed. I missed several days of work because of it.

I interpreted all of the foregoing actions by Peterson as intimidating, although I continued to stand by my testimony.

25

Ex. 12 (emphasis added). While Ms. Shelton could not remember specifically Mr. Fontenot being at the party, her knowledge of who else was present provided new evidence supporting Mr. Fontenot's alibi. Specifically, she named her brother, Bruce DePrater, Eric and Chris Thompson as being at Mr. Calhoun's apartment.

When interviewed, Mr. DePrater not only remembered the party but knew Mr. Fontenot.

Sometime prior to this party, I recall traveling to Texas with Gordon Calhoun to purchase one or two kegs of beer, and probably some cases of beer. The alcohol content for beer sold in Texas was higher than that of beer sold in Oklahoma, making 'Texas Beer' more desirable.

I recall Eric and Chris Thompson, from Konawa attended this party. I recall that Eric Thompson had passed out early that night; but, during the daylight hours I witnessed an incident between Eric Thompson and Karl Fontenot while they were both standing around talking at Gordon Calhoun's party.  Karl Fontenot was refilling a beer can from the keg's spout and joking to Eric that he (Karl) was only having one beer.

Later that same night, probably around 11 pm or shortly thereafter, I recall planning a trip to La Fragua, a college bar in Ada, with Chris Thompson. Chris and I wanted to visit the bar and invite women to come back to Gordon's keg party. On the way out, I recall mentioning this plan to Karl Fontenot, who responded by making an inappropriate gesture involving the tugging upward on his belt, while commenting verbally that he and Tommy had already been with an older woman that evening.

At La Fragua that night, I recall seeing my sister Stacy Deprater. She was with her friend Laura Ingram and on a date with Lyndel Gibson. Surprisingly, my sister Stacy and her friend and date came back to Gordon Calhoun's party that night, after La Fragua closed at midnight.

Later that same night, after my sister and her friends had gotten to Gordon Calhoun's party, I recall playing guitar while Gordon played his drums. While we were both playing loudly, someone announced that a police officer was coming up the stairs to Gordon's apartment.

Almost simultaneously, I recall Karl Fontenot running by me telling me to follow him, that he knew a good place to hide. I had no reason to hide, and to this day, I don't know why I followed Karl Fontenot into this strange hiding place, but I did. Karl showed me a hidden passageway, which seemingly connected Gordon Calhoun's kitchen with his neighbor Janette's apartment. This passageway was

> hidden behind Gordon's refrigerator. That is where Karl and I stayed until the police officer left.
>
> I believe each of these incidents occurred on the same night, during the same party at Gordon Calhoun's apartment sometime during the spring of 1984.

Ex. 8. Along with Mr. DePrater, Eric Thompson also remembers Mr. Fontenot being at the party that evening. Ex. 9. Such information was crucial to Mr. Fontenot's defense at trial because it established his whereabouts for the night; precluding him from involvement in Mrs. Haraway's abduction.

Mr. Fontenot recanted his confession shortly after he gave it. *See* Ex. 44 at 626. More importantly, in both his interview for the polygraph and afterwards he provides as much information as he can about a party he attended six months prior. Ex. 95. Given that the videotape confession of Mr. Fontenot only contains the confession and not the interrogation that occurred beforehand, his statements providing his whereabouts to law enforcement are critical new evidence. The prosecution failed to disclose these documents to Mr. Fontenot's trial attorney, George Butner.

The OSBI records that were withheld from defense counsel document Mr. Fontenot's alibi and his recantation and are important for two reasons. First, these documents provide independent corroboration of any conversations between Mr. Fontenot and his trial counsel. Given that he never testified at any hearing, these documents would impeach Agent Rogers' and Detective Dennis Smith's testimony about the veracity of the confession. Both law enforcement officers admitted that nothing in the confession could be substantiated. Therefore, OSBI reports that Mr. Fontenot denied any involvement and told officers about the party with specific names of people in attendance shows substantial flaws in their investigation.

Second, these reports provide new investigative leads for defense counsel to follow. Had Mr. Fontenot's defense been given this information, they could have investigated the people who attended Mr. Calhoun's the night of April 28th. These people remember seeing Mr. Fontenot from the very early part of the evening until much later into the night. Their accounts clearly show that at no time did Mr. Fontenot leave to participate in whatever transpired with Mrs. Haraway. Affidavits from party-goers, Eric Thompson, Bruce DePrater, and Stacey Shelton along with police reports from Janette Blood place Mr. Fontenot at the party for the entirety of the night.

### B.   Donna Denice Haraway was being Harassed by an Unknown Man.

The Pontotoc County District Attorney did not have most of the OSBI and other law enforcement records made during the investigation into Mrs. Haraway's disappearance and murder. Amongst those records not turned over to the prosecution or defense counsel includes OSBI reports about witness accounts detailing Mrs. Haraway's statements to them about how she received obscene telephone calls during her shifts while working at McAnally's. According to a co-worker, these calls had stopped for a period in the early months of 1984 but began again in the weeks leading up to her disappearance. Ex. 62. Mrs, Haraway told the witness that the male caller telephoned the store during her shifts in the evenings from Thursday to Sunday. *Id.*

Mrs. Haraway's mother, Janet Lyon, also told police that Mrs. Haraway had told her about the calls and thus said that she feared these calls and did not like working at McAnally's. These calls, greatly distressed Mrs. Haraway, her family, and co-workers.

> According to Janet, Donna told her on the phone she hated working at the store because it did not have an alarm and a lot of weirdo's come in and out of the store. She told Janet that she was going to look for another job because she felt uneasy working at the store alone at night. She told Janet that the phone calls had started again but didn't go into the whole story. **Janet said that earlier Donna had been receiving calls at work from a man that said he was going to come out to the**

> **store some night and wait outside while she was working. She said that Donna**
> **was upset because she had asked for the night off and a guy refused to work**
> **and she had to work anyway.**

Ex. 43, prosecutorial bates 20, 109) (emphasis added). OSBI Agents received similar information

from the store manager, Monroe Atkeson, about a conversation he had with Steve Haraway, Mrs.

Haraway's husband.

Mrs. Haraway's husband, Steve, also told police about the harassing phone calls his wife

received.  On the night of her disappearance, the police spoke with Steve Haraway who told

them: "Steve received a phone call from the police who told him that his wife was missing. He

knew of no one that Donna was having problems with at the store, other than she had received

two to three obscene phone calls at the store. The last phone call was two or three weeks prior to

her disappearance." Ex. 43, prosecutorial bates 20.

OSBI Agents received similar information from the store manager, Mr. Atkeson when

agents interviewed him on April 30, 1984.  He recounted a conversation with Steve Haraway

about how a Vietnam Veteran had been harassing Mrs. Haraway. Ex. 44, OSBI 0006. She

received several obscene telephone calls during her shifts. *Id.*   Mr. Atkeson told police he had

seen the veteran that Steve spoke of who was described as a white male, six feet, 190 pounds,

black hair, brown eyes, mustache, light complexion, who usually drove a white Chevrolet

Chevette and bought a soft drink. *Id.*  Mr. Atkeson believed that the veteran attended a

rehabilitation school in Okmulgee. *Id.*

James D. Watts, a co-worker of Mrs. Haraway's from McAnally's also had given police a

statement about the obscene phone calls that Mrs. Haraway had received, a statement that

likewise was not produced to the defense.  Mr. Watts gave a statement to Pontotoc County

District Attorney's Office investigator Lloyd Bond on July 25, 1985.   Mr. Watt explained that

"Denise had told me of some obscene phone [calls] she had received at the store for a while, these calls upset her a great deal. She could not recognize the voice over the phone the calls stopped about one month before she disappeared." Ex. 62.

Other individuals not interviewed by police or who testified had knowledge about the impact these calls had on Mrs. Haraway.   Anthony Johnson, a frequent customer at McAnally's, remembered a conversation he had with her a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Haraway's disappearance he was in the McAnally's convenience store when Haraway asked him where she could buy a gun. Haraway referenced the need for a gun with some funny calls she had recently been receiving. Haraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making these calls and said that in Johnson's opinion, she knew who was making the calls but did not seem to want to indicate who it was.

Ex. 22. Further, just two days before Mrs. Haraway went missing, she spoke with Darlene Adams, another customer at McAnally's. Mrs. Haraway explained she was afraid working at night at the store but her schedule would not be changed. Ex. 1.

It is unclear whether the Ada police or the OSBI ever investigated who was making these calls to McAnally's. No telephone records were obtained of incoming calls to the convenience store according to the disclosed OSBI reports. No witnesses were interviewed regarding men who may have hung around the store or watched Mrs. Haraway in the months and weeks leading up to her disappearance. Obviously, whomever was making these calls knew her work schedule because the telephone calls occurred only during her shifts. *See* Exs. 15 & 44, OSBI 0006. The man making these calls targeted Mrs. Haraway and had been doing so for an extended period of time before her abduction. *Id.*

This newly discovered evidence was not presented to either of Mr. Fontenot's juries because the prosecution failed to disclose it to defense counsel.  Beyond the failure to disclose, this evidence illustrates the defects in police investigation into Mrs. Haraway's disappearance. This evidence should have been investigated in 1984, given this evidence was willingly provided by those closest to Mrs. Haraway either on the night of her disappearance or within a day or so of it. This is not a situation where only one person made a side comment about a few weird telephone calls. Instead, numerous people including her husband, manager, co-worker, customers, and siblings were aware of this conduct and recognized its obvious relevance to the case. They immediately shared this information with police in the hopes that it would assist in their investigation into her mysterious disappearance. Instead, the police ignored it and the prosecution withheld it from Mr. Fontenot's defense.

### C.   The Only Eyewitness Who Identified Mr. Fontenot at Recants His Identification.

Jim Moyer is the only witness who placed Mr. Fontenot in McAnally's the night of Mrs. Haraway's disappearance.  Mr. Moyer's account of that night changed over time.  From his first interviews with the Ada police to his testimony at the preliminary hearing and trial, he was not consistent.  Ex. 102.  He testified that he saw both Tommy Ward and Mr. Fontenot in McAnally's shortly before Mrs. Haraway's disappearance. P/H p. 213-214.  He testified that while talking to Mrs. Haraway during his purchase of cigarettes, he saw two men walking into the store; one man with dark hair while the other one was blond. P/H p. 218-220.  However, this testimony is not what he originally told police in 1984.   He was interviewed twice by the Ada Police.  The first time was on April 30, 1984, by Ada Police Officer Barrett:

> MOYER advised he went to McAnally's at 7:30 pm, Saturday, 4-28-84.  A pick-up pulled in faceing [sic] the building between the door and the ice machine.  A dark haired guy came in the store first, then a blond haired guy came in later.

> MOYER left approximately one minute after they came in.  the pickup was about a 67-69 Chevrolet, light gray, rough looking.  MOYER glanced at the tag but cannot remember it.  The pickup may have had a trailer hitch on it.

Ex. 102.  His second interview with Ada Police Officers D.W. Barret and Fox, he told a

completely different story.

> On 11-6-84 Dets Barrett and Fox went to Martins Phillip 66 station on Arlington and talked to Jim Moyer.  Mr. Moyer said he went to McAnally's on Arlington about 7:30 pm on 4-28-84.  Mr. Moyer said there was a dark haired male at the back of the store, but he did not get a very good look at him.  While Moyer was at the counter talking with Denise Haraway a second male came in the door and walked past him.  This person he described as being blond headed and of average height and weight.  Moyer said he stayed in the store only a minute or two after the second subj. came in.  As he was leaving he saw a pickup parked into the curb facing the store. He only knew it was prior to a 1971 model and was a Ford or a Chevy.  Moyer looked at the picture lineups and said the pictures that most resembled the men he saw was #1 in the Ward folder and #2 in the Titsworth folder.

Ex. 102.[7]    Not only was the sequence of events from the men being in the store different than

his testimony, but he was not shown Mr. Fontenot's photospread.  As the prosecution relied upon

him to put Mr. Fontenot in the store, it is interesting that he was not asked to identify him during

his interview.  Mr. Moyer's account of his time in McAnally is widely inconsistent from his

original interview, through his preliminary hearing and trial testimony.

   Mr. Moyer identified Mr. Fontenot in the courtroom as the dark-haired man who walked

towards the back of the store. N/T 6/9/1988 p.16.  But during his cross examination, Mr. Moyer

admitted doubts about his identification of Mr. Fontenot.

> Q. All right. You have had an opportunity at Preliminary Hearing to stand next to and look at the height of Karl Fontenot, didn't you?
> A. Yes.
> Q. And as I recall that, Mr. Fontenot was two to three inches shorter than you were. Is that correct?
> A. Yes.

---

[7] These Ada Police Reports should have been made available to defense counsel during pretrial proceeding in both 1984-1985 and prior to Mr. Fontenot's second trial in 1988.  As such, it is a *Brady* violation for failure to disclose impeachment evidence and prior inconsistent statement.  Further, this report was just made available in these proceedings in 2019.

Q. Okay. so, if you were, in fact, five ten, Mr. Fontenot would be five seven to five eight. Is that correct?

A. Yes.

Q. Okay. And, in fact, then to be taller than you, he would have to have heels on his boots about three to four inches tall, but even to reach a six foot, six foot height, the composite reflects he would have to have five to seven inch boots then.

Is that correct?

A. To match that height, yes.

\* \* \*

Q. And after you came up here to Preliminary Hearing, had an opportunity to look at the height of Mr. Fontenot, had an opportunity to look around the courtroom, sometime after the Preliminary Hearing you became convinced that Karl Fontenot was not the man, didn't you?

A. I became confused about it.

Q. You became so confused or convinced that you attempted to contact the District Attorney's Office and say that Karl Fontenot was not the second man, didn't you?

A. At a time, yes.

Q. Okay. All right. In fact, you tried to get a hold of the District Attorney all summer to tell him that, didn't you?

A. Yes.

Q. Okay. The District Attorney wouldn't return your telephone calls would he?

A. Well, I never left my name.

Q. Okay. so, you just called the District Attorney's Office for a couple of months during the summer and never left your name. Is that right?

A. Yes.

Q. All right. You believed, Mr. Moyer, that there was someone sitting in the back of the courtroom that was more familiar to you that evening as being in McAnally's on April 28th, 1984, didn't you?

A. Yes.

Q. Okay. And you did that because of the fact that this gentlemen was wearing boots, you saw those out in the hall, didn't you?

A. Yes.

Q. His hair was longer than Mr. Fontenot's?

A. Yes.

Q. He was much taller than Mr. Fontenot?

A. Yes.

Q. Okay. And, in fact, you became convinced that that was, in fact, the second man, didn't you?

A.  Well, I don't know if I was convinced about it.

N/T 6/9/1988 at 24-26.   His doubts make sense in the context of his initial interview where he never was asked to identify Mr. Fontenot and his time of actually viewing either man in the store was seconds at the most.

33

However, Mr. Moyer clarified his position from Mr. Fontenot's trial in 1988. When interview during post-conviction he now asserts:

> While at the courthouse testifying in the preliminary hearing, I saw a man in the back of the courtroom I had seen before. I also saw him downstairs, where I had been waiting to testify. I also saw this man speak to Tommy Ward during the preliminary hearing. It came to me that this was the same man I had seen in McAnally's with Tommy Ward. He looked more familiar to me. I was no longer one hundred percent sure about my identification of Karl Fontenot.

> After that, I tried to call Mr. Peterson, the District Attorney, to tell him I was no longer one hundred percent sure that Karl Fontenot was the man I had seen in McAnally's that night. In fact, I was leaning more in the direction of Steve Bevel, the man I saw at the courthouse. While I was never able to speak with Mr. Peterson, I did speak with someone else in the district attorney's office. I told this person of my concern. This person said to me, "It was not him (Bevel)."

> After that, I was afraid to change my story. I felt pressure from both sides. I overheard the lawyers argue about the content of the story I had given to Richard Kerner, an investigator working for Mr. Wyatt, while I was on the stand. On one hand, I felt betrayed by Mr. Kerner, as he tape-recorded our conversation without my consent. On the other hand, I felt like it was Steve Bevel that I had seen with Tommy Ward that night. I felt conflicted. I chose to then state that I was confused about the identity of the man with Tommy Ward.

> I am now convinced that my assessment, at the time of the preliminary hearing, that Steve Bevel was the man with Tommy Ward, was correct. I am confident that Karl Fontenot was not the man I saw at McAnally's. The man I saw at McAnally's was definitely taller than Karl Fontenot and had much more intimidating look about him. At this time, I am about 95% sure that it was Steve Bevel, not Karl Fontenot, that I saw in McAnally's on April 28, 1984.

Ex.14.

When Mr. Moyer told the prosecution, he was unsure about his identification of Mr. Fontenot, he was told that his identification of Mr. Bevel was incorrect. *See also* Ward Vol. 3 p. 97-99 ("Not positive about the dark haired person.").  Mr. Moyer's ambivalence as to whom he saw in McAnally's with Mr. Ward casts further doubt off Mr. Fontenot's involvement in this crime. Without Mr. Moyer's identification, no evidence places Mr. Fontenot in McAnally's besides the false confession.

**D.     Law Enforcement Pressured Karen Wise to Change Her Account of What Transpired in JP's Convenience Store.**

Karen Wise was a crucial witness not only for the investigation into Mrs. Haraway's disappearance, but for the prosecution of Mr. Fontenot. After going to McAnally's in response to the initial report that Mrs. Haraway was gone, Ada Police Detective Mike Baskins travelled to JP's to inquire about the men who had been reported as rowdy earlier in the evening. When Detective Baskins arrived, Ms. Wise told him how two men were in the store that night harassing her. Both men came up to the counter several times to get change for the video game machines and buy alcohol. N/T 6/8/1988 at 161-162.  She described the two men as follows: a blond male 5'8" tall dressed in a white t-shirt and jeans with his hair parted in the middle.  The second man was a bit shorter than the blond with dark, shoulder length hair also dressed in a t-shirt and jeans. *Id.* at 165-166.  Law enforcement, with no indication that the men seen in JP's were connected in any way with McAnally's, decided to construct composite of the two men from Ms. Wise's description. *Id.* at 167; *see also* Ex. 76-77.  These composites became the suspects for the crux of law enforcement's investigation.

However, despite the composite and descriptions, Ms. Wise never identified Mr. Fontenot as one of the men she saw at JP's on April 28, 1984. N/T 6/8/1988 at 177 & 193-194; . Mr. Fontenot was both shorter and had lighter hair than the man accompanying Mr. Ward. Further, when shown Mr. Fontenot's line-up, she was unable to identify him. Ex. 43, prosecutorial bates 138, 0377. While the Ada Police Detective Dennis Smith testified that Ms. Wise called him after the line-up and identified Mr. Fontenot, there was no police report supporting the subsequent identification.

Creating more doubt is Wise's affidavit that she saw four men in JP's on April 28, 1984, rather than two men that became the center of the prosecution's theory of the case.

That evening, after reports that Denice Haraway was missing, I was interviewed by the police. They asked me to help them construct composite drawings of two young men who were in J.P's that night. At first, I didn't want to help with the drawings. I told police that just because they were in J.P's didn't mean they had hurt Ms. Haraway or taken her anywhere. I said they were just kids.

Another reason I didn't want to help with the drawings at first was that there were four men who were at J.P.'s at the same time. The police wanted drawings of only two men. I told police that there were two other men present, **but police insisted that there were only two men**.

* * *

I was particularly nervous because of two other men in the store that evening. I knew them. They were in the store that night during approximately the same time as the men who were later reported to be Tommy Ward and Karl Fontenot. I told police - on April 28, 1984 - that there were four men hanging out around the store for an extended period of time, instead of two. I told police that I recognized two of the men and knew their names and did not know the names of the other two.

**Prior to the first trial (the trial at which Tommy Ward and Karl Fontenot were tried together), I met with Bill Peterson, at his request, to discuss the case with him in preparation for my testimony. l told Bill Peterson that the other two men were in J.P's at the same time as the two persons in the sketches. I told him I was afraid of the other two men because of the way they were behaving in the store. Bill Peterson said he already had the "ones who did it." I told him the names of the two men I knew were in the store. Those two men were Bubba Daggs and Jim Bob Howard. Bill Peterson said that Jim Bob Howard couldn't have committed the murder because he "didn't have the I.Q. of a grub worm."**

**Bill Peterson said that I couldn't bring up in Court that Jim Bob Howard and Bubba Daggs were with the other two men. He said it couldn't be mentioned because it wasn't relevant. I was not at all comforted by that because I didn't think Peterson had all of the people that might have been involved.**

**It bothers me that I couldn't discuss the other two men, because I don't think all of the truth came out. I never mentioned to the defense directly anything about the other two men, except to the extent my June 8, 1988 testimony made reference to them. (See paragraph 10). I got the impression from law enforcement that I wasn't supposed to talk about the other two men. It was not until a number of years after all the trials were over that I finally mentioned the other two men to representatives of Ward and Fontenot.**

Ex. 13 (emphasis added). The police investigation focused on the wrong suspects from the beginning in both number and description. That four rambunctious men were in JP's on a Saturday night in no way connects to the events of McAnally's where eyewitnesses repeatedly told police that they saw one man walking out of the store with Ms. Haraway. (N/T 6/9/1988 p. 38, 40, 47-48, 51, 59-60. Like Mr. Moyer's attempts, when Ms. Wise tried to clarify the misperception about what she saw, she was pressured to change her story to conform to what the State sought to present. This pattern of police and prosecutorial misconduct permeated the case against Mr. Fontenot. *See infra* Claim VII &VIII.

Ms. Wise shared her frustrations over the improper tactics of law enforcement. She told her best friend, Vickie Jenkins, what she truly saw and her interactions with the state:

> She advised that Wise was sure Ward was in J.P.'s this evening along with three other males. Wise said Ward kept watching her all the while he was in the store which made Wise uneasy. Jenkins believes that another J.P.'s employee, one Jack W. Paschall, East of City, telephone 436-1611, pointed out the suspect truck to Wise. **Jenkins further related that Wise was upset about the composite drawings because the police just weren't doing them right. She did not know what was being done wrong with these drawings. Jenkins and the owner of J.P.'s related that Wise was very upset with the Ada Police over this investigation because they have harassed her over and over and made promises to her that were broken.** Jenkins knew nothing about Wise saying that the two guys she observed coming into the store after Ward was arrested.

Ex. 23 and Ex. 3, pgs. 2, 10-11, (emphasis added). Both Ms. Wise and Ms. Jenkins further substantiate the lawlessness of law enforcement in dealing with witnesses in this case.  Like Ms. Shelton and Mr. Moyer, Ms. Wise was pressured to conform her true account of what transpired to an improbable theory with no connections to reality and no evidentiary support. Instead of focusing on the facts and evidence gleaned from McAnally's, the actual crime scene, police, almost immediately, generated two suspects matching descriptions of two of the four individuals in JP's with no evidence that these men were seen at the crime scene.

E.     **Numerous Inconsistent Statements about the Gray-Primered Truck Cast Doubts as to what Truck was Involved in the Abduction if Any**.

The prosecution's theory of the case rested on both Mr. Ward and Mr. Fontenot forcing Mrs. Haraway into a gray primered pick-up truck and driving off with her. *See* N/T 6/8/88 at 32-33.  During closing arguments, the prosecution recounted several witnesses' testimony about seeing the gray pick-up the night of April 28th. *See* N/T 6/14/88 at 17, 22, 27, 68, 75, 85, & 93-95.  However, there was little consistency between witnesses as to what type of truck was supposedly seen. Specifically, there was considerable differences in the size, color, body type and tire size depending on the person questioned. Mr. Fontenot's defense counsel was unable to cross examine many prosecution witnesses about their inconsistent statements about what the gray pick-up truck looked like.

The official OSBI description of the pick-up was an early model "Chevy pick-up truck w/light gray primer color, narrow bed w/oversized tires on rear; rear end was jacked up." Ex. 44, OSBI 0004. This description was distributed to the FBI and numerous counties and states on April 29, 1984. *Id.*  One problem with this description is that it does not provide the specific year of the pick-up truck.  For example, Chevrolet pick-ups from the early 60's to 80's body styles changed greatly. *See* Ex. 82-84.   Because of the numerous types of Chevrolet pickups on the road during that time, and likely being driven in Ada during that time, specificity was critical to identifying the correct pick-up seen by witnesses.  Instead, there were conflicting reports of the pick-up described by the three witnesses who first saw the suspect and victim leave McAnally's.

Lenny Timmons described the truck as a green and gray, older Chevy pick-up that was not well maintained. Ex. 44, OSBI 0842.  Further, the rear wheels or tires were plain. *Id.*  David Timmons thought the pick-up was blue, rough, dents on the side. The rear bumper was white, possibly raised in the rear. Ex. 44, OSBI 0851. Gene Whelchel said the pick-up was full sized

and light colored. He suggested it might be an early 1970s, model, he was sure it was not a narrow bed. Ex. 44, OSBI 0060. These three men reported seeing Mrs. Haraway get into the pick-up truck with a white male. Ex. 44, OSBI 0061-0063.  However, their description not only conflict with each other but with the official description used by OSBI. Ex. 21 (explaining the difficulties encoding memories for various events).

The prosecution's theory relied on other witnesses who supposedly saw the same pickup truck driving around town the night of Mrs. Haraway's disappearance.  OSBI reports state that James Moyer, described the pick-up truck as light gray, rough looking 1967 to 1969 Chevy pick-up. Ex. 44, OSBI 0245; Ex. 82.  However, his trial testimony was not nearly as specific.

Q. Okay. And did you see what kind of vehicle these two people drove up in?

A.  Yes. It was a Chevy pickup, gray primered.

Q. Okay. And do you have any way of knowing what year it was?

A.  I'm not too good on years on Chevy pickups. It was . . .

Q.  Okay. That's fine. Do you recall whether it was a painted pickup or a primered pickup?

A.  It was primered. It was a flat color, not a glossy color.

Q.  Okay. It was a gray primered Chevrolet pickup?

A.  Yes, sir.

N/T 6/9/1988 at 16.  Defense counsel was unable to cross examine Moyer on his inconsistent statements concerning the truck that was a critical part of the prosecution's case.

The descriptions of the pick-up truck from JP's employees conflict with those from McAnally's witnesses. For example, Karen Wise told the police the truck was an older model, short bed, with maybe a step side, "light color spots" on the driver's side door and bed, with a

darker color – possibly reddish brown primer on it. Most of the pick-up was "primered." Ex. 44, OSBI 0058-0059); Ex. 82 & 83 (examples of possible truck body styles). The truck had wide back tires and possibly a loud exhaust. *Id.*  At trial, she testified:

> Q. And do you recall how these two individuals arrived at your store, how they got there?
>
> A. I didn't really realize until the customers kind of let up some, until I saw what cars was still there. There was a pickup truck parked out front.
>
> Q. And do you recall the color of it?
>
> A. It was red and gray primered colored.
>
> *       *       *
>
> Q.  Okay. The entire driver's side or just from the door back or from the back door back or --
>
> A. well, all I can basically remember is from the driver's side door back, because that was where it was real spotty, it was some red and some gray and that is the only reason I remember that.

N/T. 6/8/1988 at 162.  As in Mr. Moyer's testimony, Ms. Wise's police report varies in details that would have aided a jury in assessing whether these people were talking about the same truck.

Jack Paschal, who was in JP's that evening, saw the men in the back of the store. He also described the pick-up truck. He told police it was an older model, maybe a mid-60's to early 70s Chevy with primer paint on it. Ex. 43 pg. 10, 63. He thought the tailgate was either bent badly or missing. *Id.*  His trial testimony is mostly consistent with the description provided to the police including his inability to make out the truck's color due to the lighting at the store. N/T 6/8/88 at

40

214-215.  However, it does coincide with the description provided by OSBI, or McAnally witnesses.

The conflicting accounts of the pick-up truck are critical evidence casting doubt on whether these prosecution witnesses saw the same truck or many trucks that happen to look alike.  The prosecution's theory of the case focused on a gray primered truck being used in the abduction.  If the defense had the opportunity to point out the numerous police reports of these witnesses providing conflicting description of the truck, it cast significant doubt on whether the truck was used as all since it was never located.

As exhibits 82-84 illustrate, Chevrolet manufactured several body styles, cab sizes, and bed sizes from the 60's up to the early 80's.  At no time did law enforcement show these witnesses potential pictures of trucks to make sure they were looked for the correct pick-up truck.  Failure to glean cohesion in a crucial piece of evidence in the police's investigation demonstrates another example of the poor quality of the police investigation in this case.  There was no connection between a truck seen at McAnally's and the one seen at JP's earlier that evening.  Yet, the lead detectives and prosecution insisted that such a connection existed regardless of the numerous versions of what the truck looked like.  Had a jury known about the high number of inconsistencies in truck descriptions, it decreases the significance the prosecution put on witnesses who testified that they saw several men in grey pick-up trucks near the power plant. *See* N/T 6/8/1988 at 33-35. Jurors could also conclude that alternate suspects may have had more motive to commit this crime than Mr. Fontenot who had no interaction with the police until October of 1984.

**F.** **Undisclosed Portions of the Medical Examiner's Report Showing Faulty Action in Preserving and Evaluating the Gerty Crime Scene Where The Decedent's Skeletal Remains Were Found And Showing The Decedent Gave Birth Prior To Her Death.**

The skeletal remains of Donna Denice Haraway were found in Gerty, Oklahoma in January 1986, while Mr. Fontenot's initial direct appeal was pending. Ex. 46, p. 1. The location where the body was found is on the opposite side of the county from where Mr. Fontenot confessed to leaving the body.  Further, how the bones were found, ultimate determination of the cause and manner of death did not match any details of his confession. The State's theory, based solely on Mr. Fontenot's confession, argued that Mrs. Haraway was robbed, kidnapped, and murdered with a knife. N/T 6/8/1988 at 33-35. She was supposedly stabbed numerous times, her remains were burned and left at a power station west of Ada. J/T 2593-94, 2735-36, 2742-43. However, both the location of her remains and the medical examiner's report disproved his confession. A full review of the medical examiner's report documents the cause of death as a single gunshot wound to the head. Ex. 46, pgs. 1, 3, 12, 40.  There are no knife wounds on any of the bones uncovered at the Gerty crime scene. Ex. 46, pgs. 20, 36, 40.

While certain parts of the medical examiner's file were released to Mr. Fontenot's initial direct appeal counsel, the full 43-page report was not. See Ex. 46) and Ex. 11.  Specifically, two key pages of the report were not provided despite the fact the trial court ordered full disclosure of the ME's Report. *See* Ex. 59. The initial page not disclosed describes the improper procedure followed by OSBI agents and other law enforcement personnel who were tasked to properly document and preserve evidence from the Gerty crime scene.

1-21-86, 1650 I returned a call to Hughes County District Attorney Bill Peterson concerning some bones that were found. Mr. Peterson didn't know anything, about the discovery but they are thought to be the remains of a missing store clerk -- Donna Hariway.[sic] **No ME was notified**. He stated that the OSBI was notified out of McAlister.[sic] That some people from the OKC office had come down. [sic]

42

OSBI Lab people out of OKC did photo. The scene and they just had a field day picking up bones. **No diagrams.** The OSBI agent out of McAlister never showed up at the scene. Mr. Peterson believes that the bones are en route to OKC but didn't know for sure. The sheriff didn't know where the bones were but thought that the OSBI had them. Notified the OSBI in OKC & spoke with Rick Spense. He didn't have the bones but thought that the lab man David Dixon had them. I spoke with the Sheriff Orvall Rose who didn't know where they were. Finally the OSBI found them in their lab and delivered them at 2040 by Ann Reed. Come to find out the bones were found by a trapper.

Several problems with this case:
#1 No one notified a county medical examiner which would've been more than happy to go to the scene.
#2 Since no one notified a medical examiner or the DA they had no legal authority to remove the body.
#3 This is Tulsa's jurisdiction so therefore the remains should've been transported to Tulsa.
#4 If this is not Donna Haraway, they've screwed up the crime scene.
#5 No one seems to give a "shit" and provide OCME with any information on Ms. Haraway.

Ex. 46, p. 10) (emphasis added).

The incompetence in processing and handling the Gerty crime scene is a critical failure by law enforcement given that very little physical evidence was found besides the skeletal remains. It continues a pattern of general disregard demonstrated by the police involved in this case from the initial call at McAnally's to the Gerty crime scene.[8] Ex.20. More importantly, no evidence of the flowered blouse described in Mr. Fontenot's confession was found at the scene further discrediting his already weak and baseless confession. *See infra* Claim VI. Due to the improper processing of the Gerty crime scene, it cannot be determined if Mrs. Haraway was murdered at this location or her body was dumped there. Further, no bullet or casing was found potentially leading to the actual perpetrator. The medical examiner investigator's report

---

[8] The police failed to properly secure McAnally's after Mrs. Haraway's disappearance. They allowed customers to continue to use the store and allowed Mr. Atkeson to wipe down the counter and dispose of trash destroying valuable evidence. N/T 6/10/1988 at 156; J/T p. 1239-1240, 1422-23, 1439, 1441, 1447-48. Further, Ada Police Officers failed to follow-up on witnesses who called in about what they saw in the store prior to Mrs. Haraway's disappearance. *See* Claim II.

detailing the shoddy and unprofessional scene processing was withheld from the defense.  The investigator opined that any ability to determine what happened to Mrs. Haraway was lost by virtue of law enforcement's incompetence.  Such sloppy police work coincides with the processing of the scene at McAnally's where evidence was destroyed rather than collected. *See* N/T 6/9/1985 p. 103-110-111; J/T 1259-1240, 1422-23, 1439, 1441, 1447-1448.

Another part of the original medical examiner's file not disclosed was the forensic anthropology report about the skeletal remains evaluated by Dr. Richard McWilliams.[9]  His report indicates that the skeletal remains are of a woman who gave birth.  There is no evidence that Mrs. Haraway had given birth at any time before her abduction.

> Skeletal remains examined this date revealed partial skeletal remains of an Indian white female less than 35 years of age and more likely 25 years of age. Marks on the pelvis indicated she had given birth to at least one child.
>
> INJURIES:
>> 1. Bullet entrance wound at the left lambdoidal suture and exit wound at the right coronal suture.
>>
>> 2. A scalloped cut wound on the superior rim of the left 6th or 7th rib.

Ex. 46, p. 12. Dr. McWilliams, a forensic anthropologist, wrote a text book regarding the evaluation of human bones for the purposes of identification. Ex. 25. *Forensic Anthropology: The Structure, Morphology, and Variation of Human Bone and Dentition*, Mahmoud El-Najjar and K. Richard McWilliams, (1978). Per both doctors' research, the evaluation of skeletal remains permit not only the determination of gender, but whether a woman has experienced childbirth.

> Another kind of pitting occurring in the innominate is parturition or postpubic pits. This is one or usually more deep pits found on the posterior surface of the pubic

---

[9] The ME's Office states that all photographs, x-rays, bench notes, and any further documentation other that the report itself is missing pertaining to Denice Haraway's case. Without these documents, it is impossible for undersigned counsel to present the specific findings of Dr. McWilliams related to the marks he saw on Mrs. Haraway's pelvis to make his findings.

> bone roughly parallel to the edge of the pubic symphysis. Angel (1969) and Stewart (1957, 1970) agree that these pits are associated with childbirth trauma and therefore are diagnostic of female pelvis.
>
> Nemeskeri (1972) has published a five-stage scheme for estimation of the number of pregnancies a female has experienced. The method is based upon observed degenerative changes in pubic symphyses in adult female innominates which are assumed to be attributable to pregnancy. Nemeskeri observed that the number of pregnancies he attributed to each stage remained to be verified by control investigation in autopsy material.

*Id.* at 81-82. Further, according to the Smithsonian Institute, the back pelvic bones would show marks where the ligaments tore during natural childbirth. *See* Smithsonian National Museum of Natural History, http://anthropology.si.edu/writteninbone/difficult_births.html (last visited 2013). Clearly, anthropologists consistently evaluate the pelvic bones not only to ascertain gender, but to tell more about the skeletal remains of the person.

This previously undisclosed evidence is a bombshell in this case. If Mrs. Haraway was three months pregnant at the time of her abduction, which the evidence indicated, then it was impossible for Mr. Fontenot to have killed Mrs. Haraway on April 28, 1984. Such information is crucial not only in determining what caused the person's death but, equally important, what happened to the person prior to her death. Combined with the newly obtained evidence that the APD and OSBI botched the evidence collection in both crime scenes, it is apparent that law enforcement deprived Mr. Fontenot of the ability to argue an alternate suspect and motive for Mrs. Haraway's abduction and murder.

That Mrs. Haraway's pelvic bones showed indications of natural childbirth is newly discovered evidence of innocence. Her friends and family are adamant that she did not have a child prior to her disappearance. However, shortly before her disappearance, Mrs. Haraway informed Karen Wise, convenience store clerk at JP's, that she was three months pregnant. Ex. 2. Ms. Wise shared this information with her best friend, Vickie Blevins. Ex. 2. Given the clear

evidence of natural childbirth from the marks on the pelvis, Mrs. Haraway had a child sometime before her skeletal remains were found in Gerty, Oklahoma over a year and a half after her disappearance and, months after Mr. Fontenot was in custody.

Such evidence destroys the state's entire theory in every aspect as to the motive of Mrs. Haraway's kidnapping and what happened to her in the months leading up to her death. The State's failure to disclose the entirety of the medical examiner's report deprived the defense of meaningful avenues of investigation regarding the motive of Mrs. Haraway's abductor along with impeachment evidence regarding the processing of the Gerty crime scene.  Had a jury been presented with such evidence, there is a reasonable probability of a different result due to the weakness in the prosecution's theory of the case.

## II.    MR. FONTENOT'S FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE PONTOTOC COUNTY DISTRICT ATTORNEY'S OFFICE WITHELD EVIDENCE IN VIOLATION OF *BRADY V. MARYLAND*.

The Due Process Clause of the Fourteenth Amendment requires prosecutors to disclose to the defense all evidence favorable to the accused concerning guilt and penalty. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).  This duty extends to, "extends to all stages of the judicial process." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987); *see also Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997).  There are three elements of a Brady violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) *quoting Strickler*, 527 U.S. at 281-82 (1999).  Due process also places upon the prosecutor a corresponding duty to correct

false or misleading evidence that is harmful to the defendant. *Napue v. Illinois*, 360 U.S. 264,

269 (1959).

A prosecutor has an independent obligation to locate *Brady* materials within the

possession of law enforcement.

> Third, the "prosecution" for Brady purposes encompasses not only the individual prosecutor handling the case, **but also extends to the prosecutor's entire office**, . . . as well as law enforcement personnel and other arms of the state . . . to the text of the note involved in investigative aspects of a particular criminal venture. Logically, then, it follows that because """**investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure.**"'

*Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 824 (10th Cir. 1995); *see also*

*United States v. Buchanan*, 891 F.2d 1436, 1442 (10th Cir. 1989)(discussing the failure on the

part of law enforcement to disclose *Brady* materials falls upon the prosecutor).  The

prosecution's failure to disclose police reports of alternate suspects with connections to the

victim is a *Brady* violation as that evidence is potentially exculpatory, impeachment of the

quality of a police investigation, and aids a defense investigation. *See Smith*, 50 F.3d. 801 at 829-

830; *see also Bowen v. Maynard*, 799 F.2d 593, 612-13 (10th Cir. 1986).  Given that multiple

police agencies often investigate a criminal matter, it is incumbent upon the prosecutor to ensure

that *Brady* materials are obtained for disclosure to defense counsel in accordance with the

Fourteenth Amendment. *See Smith* at 824; *see also United States v. Thornton*, 1 F.3d 149, 158

(3d Cir. 1993), holding that prosecutors are obligated to conduct "thorough inquiry" of police for

*Brady* materials); *United States v. Osorio*, 929 F.2d 753, 762 (1st Cir. 1991); *see generally*

*Tiscareno v. Anderson,* 639 F.3d 1016, 1022 (10th Cir. 2011) (discussing other state actors who

worked on a criminal matter that would fall within *Brady's* obligations).

The U.S. Supreme Court holds that a prosecutor fails his *Brady* obligation when he does not obtain exculpatory, impeachment, or evidence that aids a defense during the pretrial process and disclose to the defense. *See U.S. v. Bagley*, 473 U.S. 667, 675 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991); *United States v. Brooks*, 296 U.S. App. D.C. 219, 966 F.2d 1500, 1500-04 (D.C. Cir. 1992) holding a prosecution's duty to learn of *Brady* evidence includes files of the police department's homicide and internal affairs divisions).   That a state court rule or law excused a prosecutor from having to disclose any evidence to defense counsel does not supersede that prosecutor's obligations under the United States Constitution.

A prosecutor who adopts and open-file policy of discloser does not remove his obligations under the Due Process Clause of the Fourteenth Amendment.

> We certainly do not criticize the prosecution's use of the open file policy. We recognize that this practice may increase the efficiency and the fairness of the criminal process. We merely note that, if a prosecutor asserts that he complies with Brady through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.

*Strickler v. Greene*, 527 U.S. 263, 283 fn. 23; *see also Banks v. Dretke*, 540 U.S. 668, 693 (2004) (defense counsel may rely on the prosecution's assertion that *Brady* evidence will be disclosed). Therefore, if a prosecutor utilized an open-file policy, the defense and courts will rely on that assertion as an assurance that all exculpatory, impeachment, and evidence that aids the defense will be within the file.   That reliance extends to a defendant's post-conviction counsel. *See Strickler*, 527 at 284.

The prosecution is obligated to disclose impeachment evidence as well.   For evidence to be considered material, it does not have to "reflec[t] upon the culpability of the defendant.

Exculpatory evidence includes impeachment evidence that is material to the case against the accused." *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). Impeachment evidence is evidence that can be used to challenge the credibility of a prosecution witness or that can be used to challenge the prosecution's case. *Bagley*, 473 U.S. at 676 (*Brady*'s disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness). There is no distinction between exculpatory and impeachment evidence under the Due Process Clause of the Fourteenth Amendment. *See Kyles*, 514 U.S. at 433.

Evidence is material under *Brady* when it could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. at 290. "A 'reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 at 434, *quoting Bagley*, 473 U.S. at 678. Withheld evidence is material whenever it would have affected the course of the defense investigation or the strategy defense counsel would have employed at trial. *See Bagley*, 473 U.S. at 683; *United States v. Perdomo*, 929 F.2d 967, 97 (3d Cir. 1991) "[T]he Bagley inquiry requires consideration of the totality of the circumstances, including possible effects of nondisclosure on the defense's trial preparation." *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992); *see also Smith*, 50 F.3d at 827. (*Brady* violation found when withheld evidence affected defense preparation or presentation).

In determining the merits of Mr. Fontenot's claim under Brady, "[t]he question is not whether [Mr. Fontenot] would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 437. The Court should not evaluate the evidence item-by-item, but in terms of its cumulative effect on the fairness of the trial. *Id.* at 436.

For Mr. Fontenot to be entitled to a new trial, he does not have to present evidence that would have sent him home – although that very well might have been the result here. The standard is only whether it would have affected the judgment of the jury.

In this case, *Brady's* materiality prong is satisfied by the fact that the prosecution withheld evidence on several key points. Had Mr. Fontenot's defense counsel been provided with the evidence presented below, he would have shown an alibi defense clearly establishing his whereabouts when Mrs. Haraway disappeared. Further, substantial impeachment and exculpatory evidence suppressed or ignored by the prosecution would have certainly affected the jury's judgment of guilt of all the charges against Mr. Fontenot.

### A.   The Pontotoc District Attorney's Office Did Not Disclose *Brady v. Maryland* material as a Matter of Policy.

The Pontotoc County District Attorney's Office had a pattern and practice of not divulging documents gathered from a variety of law enforcement agencies.   This pattern began during Mr. Fontenot's 1985 pretrial proceedings, his 1987 retrial proceedings, his 1992 resentencing, his 2014 post-conviction proceedings, and continued in the current proceedings. Despite assurances of open file policies or full compliance with *Brady v. Maryland*, made by both Mr. Peterson and Mr. Ross, documents that were and continue to be exculpatory, impeachment, and aid defense counsel remained in their custody.[10]  Ex. 78 pg. 14, 37; 79 pg. 21, 25, 52-53.  Despite the prosecution's claim of ignorance about the police investigation and reports, the DA's investigator, Lloyd Bond assisted in the investigation of the disappearance of Mrs. Haraway alongside Ada Police Detectives Smith and Baskins.  Ex. 62, 88.   Because of the

---

[10] The entirety of the Pontotoc County District Attorney's Office file concerning the prosecution of Mr. Fontenot, and his co-defendant, Mr. Ward, was copied pursuant to a federal subpoena.  Within that file were Ada Police Reports and DA investigative files of witness statements and reports along with other documents that should have been made available to either Mr. Fontenot's or Mr. Ward's defense attorneys prior to trial.

prosecution's alleged "hands off" approach to obtaining *Brady* materials, the likelihood that *Brady* materials would not be made available to defense counsel was all but assured.

The practice of the District Attorney's Office was to rely wholly on a "prosecutorial" when engaged in the charging and prosecution of a defendant. A prosecutorial was compiled through an OSBI regional office located in McAlester, OK. According to OSBI Agent Gary Rogers, all his interviews and reports were sent directly to the regional office and stored there. Ex. 80, pg. 10. He explained how his regional supervisor edited and compiled the reports that became the prosecutorial. *Id.* at 10-11. Once completed, it was sent directly from the regional office to the District Attorney's Office. *Id.* Mr. Peterson testified that the prosecutorial was the only document he used to charge Mr. Fontenot. Ex. 78 pg. 15.

The District Attorney's reliance on law enforcement bringing files to them rather than actively engaging to ensure their compliance created a culture where volumes of documents were never seen by prosecutors or if they were, they were pushed aside as irrelevant to the case they were building against Mr. Fontenot despite evidence to the contrary. *See* Ex. 78 pg. 4-5. What resulted was a haphazard investigation where evidence in police custody was destroyed, interviews were mishandled, and proper police procedure was neglect. The consistent thread in Mr. Fontenot's collateral proceedings has been that OSBI conducted the investigation and whatever documentation was gathered was housed by OSBI. The OSBI compiled a "prosecutorial" summary of police reports, witness interviews, and relevant evidence on the suspect(s) they believed involved in the criminal offense. *See* Ex. 78 pgs. 10-12.

Even more egregious was the pattern of not disclosing the prosecutorial or any other discovery to defense counsel.[11] *See* Ex. 78 pg. 48-49. This pattern and practice resulted in a systemic due process violation of Mr. Fontenot's constitutional rights. *See Miller-El v. Cockrell*, 537 U.S. 322 (2003)(explaining how the use of policy and practice of the prosecution to strike minority jurors supports a Batson constitutional violation), *Connick v. Thompson*, 131 S.Ct. 1350 (2011)(holding that deliberate indifference to the need for *Brady* training could result in a 42 USC § 1983).  The only disclosures made to defense counsel during trial were court ordered and extremely limited in nature.

### 1.      Pontotoc District Attorney's failure to ensure Brady materials were obtained from law enforcement.

The OSBI and Ada Police Department conducted the investigation into Mrs. Haraway's disappearance and murder. The two primary law enforcement officers responsible were OSBI Agent Gary Rogers and Ada Police Detective Dennis Smith.[12]  The Ada Police Department and OSBI kept separate files of all interviews conducted, evidence collected, and other aspects of the investigations, OSBI Agent Rogers was ultimately responsible for the case. Ex. 53, p.33), P/H p. 533-36, 947-948.   The newly discovered Ada Police Reports confirm this as many of the reports contain information not found in the OSBI Reports.  Ex. 91.  The preparation of the "prosecutorial" was done by OSBI Agents. Ex. 80 pgs. 11-12, 19-20.  The prosecutorial was comprised of the relevant police reports, witness statements, and documents that the OSBI deemed relevant for the district attorney's review. Ex. 55, p. 13, 56.  These documents were edited and culled internally by other OSBI agents prior to the final prosecutorial report's release

---

[11] During Assistant District Attorney Chris Ross' deposition testimony, he said that he would only discuss documents with Mr. Fontenot's counsel that were in the open file. Ex. 79, pg. 34-39.
[12] These two officers led the investigation into the Debbie Carter homicide which occurred prior to Mrs. Haraway's abduction from McAnally's.

to the district attorney's office. Ex. 29 at 968-978.  Based on the evidence presented in the prosecutorial, and only that evidence, would the district attorney pursue charges. Ex. 55, p. 13, 56. The prosecutorial generated by OSBI, from the police investigation into the abduction and homicide of Donna Denice Haraway, consisted of approximately 146 pages. Ex. 43. However, there were hundreds of police reports from the various law enforcement agencies that investigated the case that were not included in the prosecutorial by the OSBI and ultimately not available to Mr. Fontenot's defense counsel.

Pontotoc County District Attorney Peterson testified that relied solely on OSBI Agent Roger's prosecutorial report to charge and prosecute Mr. Fontenot. Ex. 78 pgs. 11-12.  His reliance on the prosecutorial would not be problematic if he ensured his officers provided him with the evidence necessary for his compliance with his *Brady* obligations.  In a prior deposition taken on this very issue, Mr. Peterson admitted understanding his obligations under *Brady* and its progeny, but failed to actively pursue such evidence from the various law enforcement agencies investigating cases in his jurisdiction.[13] Ex. 55, pgs. 142-143.  Mr. Peterson took very little active measures to ensure evidence that must be disclosed to defense, was, in fact, given to him by his law enforcement agencies so that he would comply with his constitutional obligations.

> Q. And isn't it your responsibility as the prosecutor to make sure that exculpatory evidence is disclosed to you from police?
> A. Well, I would hope that they would do that.
> Q. Well, in your 20 or so years as a prosecutor in Ada, haven't you tried to direct, first, Ada police officials about the need to disclose exculpatory material?
> **A. They are aware that they need to give me all the evidence in a case. All of it, not just portions of it, but, all of it.**
> Q. How have you communicated ---
> A. Exculpatory –
> Q. How have you communicated that to the Ada police?
> A. I've told them over and over again.
> Q. Have you had training courses?
> A. I haven't given them training courses.

---

[13] The depositions referenced were taken from the Ron Williamson and Dennis Fritz civil suit.

Q. Have you directed anybody to give them training courses?
A. No, sir.

Ex. 54, pgs. 351-352) and Ex. 53, pgs. 214-216) (emphasis added).  Mr. Peterson recognized his

obligation to obtain evidence but made no effort to receive the material or to inform law

enforcement of its obligations to turn over evidence.  Similar to the facts in the Ron Williamson

case, the defense was denied critical evidence that was exculpatory or impeachment while it

remained in the custody of law enforcement. Ex. 61.  There is no proof this crucial evidence was

ever made available to Mr. Fontenot's trial counsel.  George Butner, Mr. Fontenot's trial

counsel, testified that he did not receive the prosecutorial. Ex. 81 at 23-27.  Rather, Mr. Peterson

fought to keep such evidence from ever being given to defense counsel during either the joint or

separate trials of Mr. Ward and Mr. Fontenot.

Further, Mr. Peterson's own understanding of what evidence must be disclosed was

dubious at best. His misunderstanding of his obligation to disclose exculpatory and impeachment

evidence hampered not only the actions of his office but led to his willful ignorance of evidence

that challenged the state's case. "Exculpatory evidence is . . . all fact-based, whether it is

exculpatory or not, and it has to be material." Ex. 54, pgs. 371, 368.  Mr. Peterson's failure to

grasp that exculpatory evidence shows that defendant did not commit the crime and is material to

the case at hand is the clearest indication of his ability to discern what evidence should be

disclosed. Further, it demonstrates his inability to properly instruct not only those assistant

district attorneys assisting him in the prosecution of Mr. Fontenot, but to direct the police

officers' compliance in giving him "all the evidence in the case."

Mr. Peterson attempted to satisfy his disclosure obligations by instituting an open file

policy within the Pontotoc County District Attorney's Office.  Under that policy, all

documentation that was not work product was available for defense counsel to review pretrial.

Ex. 78 pg.14-15, 90.  As the Haraway investigation concluded, the only documentation the prosecution had was the prosecutorial. Ex. 78 pg. 11-12; 79 pg. 11-12.  An open file policy is a good step towards ensuring compliance under *Brady* and its progeny, but it does not absolve a prosecutor's obligation to turn over exculpatory, impeachment, or evidence that aids a defense investigation. *See Kyles*, 514, U.S. at 421 ("and we hold that the prosecutor remains responsible for gauging that effect regardless of any failure by the police to bring favorable evidence to the prosecutor's attention").  Once alerted to the specific needs and requests of defense counsel, the district attorney is on notice that such evidence is necessary for a defendant's case. *See Bagley*, 473 U.S. at 682; Ex. 81 pg. 12-15.  However, the Pontotoc County District Attorney's Office never even asked the Ada Police Department or the OSBI as to whether they had obtained all the law enforcement reports.

## 2.   Lack of training of law enforcement to understand what evidence constituted *Brady* material.

Similarly, to the lapse in understanding demonstrated by the Pontotoc County District Attorney's Office, both OSBI and the APD lacked any training of what evidence obtained during a police investigation must be disclosed. Under the custom, policy, and practice of the Ada Police Department, the captain determined who was assigned to handle a specific investigation. Ex. 51, p. 71. The captain supervised the other investigator on the case, but no one directly supervised his work on a case. It is the responsibility of the lead investigator to determine what reports to include in the prosecutorial report or case report, which is sent to the district attorney's office. Ex. 51, p. 71) and Ex. 18, p. 52.  However, officers within the department did not understand what evidence they were required to provide the district attorney or when it must be disclosed. Mr. Peterson said in deposition that he did not have a policy with law enforcement

about the providing him with exculpatory material. He testified that he believed they'd been to "police school" and knew about Brady. Ex. 78 at 100-101

The Ada Police Department did not have its own internal training program in the 1980s based on APD Assistant Chief Richard Carson's testimony. Ex. 49, pgs. 10-11. Police officers did not receive any training on exculpatory evidence. *Id.* Ex. 49, p. 68. Carson did not know of any training programs on exculpatory evidence Ex. p. 68.   Even decades later, there are no internal training programs in the Ada Police Department that address exculpatory evidence. Ex. 49, p. 68; Ex. 18, p. 51-52. He further explained the lack of training or systematic way to ensure such evidence ever made its way to the Pontotoc County District Attorney's Office. Ex. 48 pg. 67-69.

Ada Police Department Chief Fox[14] explained that it was APD policy to give total discretion to the detectives or any individual officer to determine what information to turn over to the district attorney. Ex. 48, pgs. 59-60); *see also* Ex. 65, pgs. 79-81.   However, when asked what exculpatory evidence meant, Chief Fox said he was unfamiliar with the term "exculpatory evidence."   He said there was no policy in Ada Police Department regarding evidence favorable to a defendant that might indicate innocence. Ex. 48, pgs. 67, 76.   The current director of training, Carl Allen, a director of training for police officers, stated in his deposition that he was familiar with the term "exculpatory evidence," but that the meaning of it "elude[d] him right now." Ex.50, pgs. 30-310.   Further, he could recall no internal training in the Ada police department on exculpatory evidence being covered in the mandated, statewide law enforcement training (CLEET). Ex. 50, p. 31; Ex. 18, p. 52)

While the Ada Police Department obviously lacked any institutional training or

---

[14] Chief Fox assisted in the investigation of Tommy Ward's January 1985, testimony. Ex. 88.

organizational structure to ensure that exculpatory evidence made its way to the prosecution, OSBI's policy did little to ensure its compliance with *Brady*. Agent Rogers understood that any evidence uncovered that was beneficial to a defendant should be turned over. Ex. 52, p. 92. OSBI's mandate that all reports and evidence come from its central repository limited his ability to give information directly to Mr. Peterson.

> Q In other words, it was -- as far as you understood it, it was the custom, policy, and practice of the OSBI that you only give the prosecutor the documents in the prosecutorial report, going through the regional office?
>
> A That's correct, yes, sir.
>
> Q And if you were to give them any other document, you would route that through the regional office the way you did the prosecutorial summary?
>
> A Yes, sir.
>
> Q And did you deviate in your personal custom, policy, or practice and give Mr. Peterson, in the course of this investigation, any documents other than the ones that went through the regional office, which include this prosecutorial summary?
>
> A None that I recall, sir.
>
> Q And did you ever tell Mr. Peterson that you had a practice of tape-recording witness interviews and then erasing them?
>
> A No, sir.

Ex. 52, pgs. 90-91) Even when confronted with exculpatory evidence, Agent Rogers did not deviate to disclose this to the prosecutor unless the prosecutor specifically sought such evidence from the OSBI repository. Ex. 52, p. 96. However, even if Agent Rogers did want to provide evidence beneficial to a defendant in his prosecutorial report, his immediate supervisor had wide latitude to edit his reports before providing them to Mr. Peterson.

> Q. And you were the person that made the decision as to what you were going to include in the prosecutorial summary . . . documents sent over the course of time to the regional office and were in the OSBI file.

A. Well, I'll have to clarify that to a degree. My supervisor, B.G. Jones would have quite a bit of input, as far as what would be included and what is not, as far as when you put the prosecutorial together.

* * *

Q. And between you and Mr. Jones, you would decide what to put in and what not to put in.

A. Well, the bottom line, sometimes was Mr. Jones would either include or exclude stuff that I may or may not think should be in the report.

Q. Well, before the prosecutorial summary was submitted, did you review it?

A. Yes, sir. I believe I did.

Q. And would it be your ordinary practice to review it, not just in this case, but in any case?

A. Yes, sir.

Q. And it you found that certain reports or interviews in the prosecutorial report left out information that might be exculpatory, beneficial to a defendant, you would make sure that they got put in.

A.  If I was aware of it.

Ex. 52. p. 212, 213. The lack of any organizational structure or policy ensuring the proper disclosure of exculpatory and impeachment evidence from the APD and OSBI to the Pontotoc County District Attorney's Office resulted in systemic *Brady* violations not only in Mr. Fontenot's case but others as well. The misunderstanding of the law and its requirements demonstrated by the Pontotoc County District Attorney made certain that vital evidence favorable to the defense would never be disclosed in accordance with state and federal law.

Documents uncovered after Mr. Fontenot's convictions and direct appeals show exculpatory, impeachment, and evidence which would have furthered his defense investigation

were never turned over to defense counsel prior to trial.  The OSBI had over 860 pages of police

reports, witness statements, criminology reports, and polygraphs – all detailing their

investigation into the events leading to Mrs. Haraway's murder. Ex. 44.  Of the 860 pages of

OSBI, APD, and various other law enforcement reports within the State's custody, the Pontotoc

County District Attorney's Office relied only on the 160 pages of the prosecutorial. Ex. 43. In

January 2014, an additional 263 pages of OSBI reports were disclosed pursuant to an agreement

between post-conviction counsel and the Oklahoma Attorney General's Office.[15] Of these

additional reports, approximately forty-five have never been disclosed either at the time of trial

or under the OCCA's order.[16]  In May 2017, the Pontotoc County District Attorney's entire file

was disclosed pursuant to a federal subpoena.  Within those files were DA investigative reports

along with Ada Police reports that should have been disclosed. Ex. 85 – 90.  More recently, on

February 6, 2019, hundreds of pages of Ada Police reports were disclosed for the first time based

on a state court subpoena from Thomas Ward's state post-conviction litigation.

That long withheld law enforcement documentation pertaining to the investigation of

Denice Haraway's disappearance and murder continues to surface clearly demonstrates that all

the necessary records related to this case were not disclosed during post-conviction proceedings.

This has continued through the instant action. Because *Brady* violations are evaluated

---

[15] The 263 pages of discovery were disclosed to post-conviction counsel pursuant to an agreement between parties concerning Mr. Fontenot's post-conviction request for discovery filed in October 2013.  Specifically, Mr. Fontenot sought disclosure of documents mentioned in the original OSBI Reports that were not included.  According to these OSBI reports, these investigative reports were witness statements, taped recorded, or other reports from key witnesses in the State's investigation leading to the arrest and prosecution of Mr. Fontenot. While some of these documents are duplicates of some of the information provided in the original 860 pages of material, there are several new or altered documents that have never been disclosed to any defense attorney for Mr. Fontenot.  The post-conviction discovery remained unresolved at the time the post-conviction court denied Mr. Fontenot's application based on laches.

[16] The Oklahoma Court of Criminal Appeals ordered the full disclosure of all OSBI records to Mr. Fontenot's second direct appeal counsel during the pendency of that appeal.  Clearly, OSBI did not fully comply with that order as further reports were only given to post-conviction counsel in 2014.

cumulatively of all undisclosed evidence and the evidence presented at trial, the continual failure

of the state to fully disclose all exculpatory, impeachment or evidence that aids a defense makes

it difficult for Mr. Fontenot to fully articulate the actual prejudice he suffered due to the State's

actions. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995).

The State's failure to properly gather and disclose such crucial information in a timely

fashion continues to derogate Mr. Fontenot's state and federal constitutional rights to substantive

due process. The police or prosecution had most, if not all, of this evidence prior to Mr.

Fontenot's first trial in 1985.  All the while, the defense filed discovery requests and the trial

court ordered the production of exculpatory evidence that the prosecutor never delivered.  Even

after the Oklahoma Court of Criminal Appeals ordered the full disclosure of all OSBI records in

the Haraway case, files referenced in the investigate reports show non-compliance with the

Court's order. Ex. 38 & 59. This blatant disregard for court precedent and ordered discovery has

continued throughout Mr. Fontenot's case and demonstrates a clear pattern of police and

prosecutorial misconduct that requires reversal of his conviction.

**B.     Mr. Fontenot's Defense Counsel Repeatedly Requested Exculpatory, Impeachment Evidence, And Evidence That Would Aid the Defense throughout Both Trials.**

George Butner represented Mr. Fontenot throughout both of his trials. During the pretrial

proceedings in both cases, he filed numerous discovery motions and made requests on the record

for discovery of police and interview reports within the possession of the APD and OSBI. Mr.

Butner specifically alerted the prosecution to the following pieces of evidence he required:

1) The identities of alternate suspects Ex. 72.
2) **All statements of witnesses in the case Ex. 73.**
3) Production of witnesses and how the investigation led to Ward and Fontenot (P/H p. 769).
4) **Statements of Jeff Miller (P/H pp. 496, 502-208, 710-712).**
5) Criminal records of any prosecution witness. Ex. 74.

6) Exculpatory evidence. Ex. 74.

7) Any and all medical, forensic, or chemical report made, or completed in the future, regarding the angle and location of purported or actual knife wound upon the remains of Donna Denise Haraway, regarding the location and comparison of any fibers or hairs located upon either the remains or the clothing of Donna Denice Haraway, regarding the caliber of the projectile which did or may have caused the bullet wound to the back of the skull of Donna Denise Haraway, in the now or future control or possession of any Federal, State, County, or Municipal governmental agency, or any agent or member thereof. Ex. 72.

8) **Written or taped statements of any witness concerning any alternate suspects or those providing information involving the investigation of Donna Denice Haraway.** Ex. 72.

9) Moyer's statement not disclosed P/H at 246-247.

10) The criminal record of any person the State intends to call as a witness in its case-in-chief or in rebuttal. Ex. 75.

11) Any sworn statements that the State has in its file regarding this particular case. Ex. 75.

12) All information of whatever form, source or nature, which tends to **exculpate the Defendant either through an indication of his innocence or through the potential impeachment of any state witness, and all information of whatever form, source or nature which might lead to evidence which tends to exculpate the Defendant whether by indicating his innocence or impeaching the credibility of any potential state's witness, and all information which may become of benefit to the Defendant in preparing or presenting the merits of his defense of innocence at trial. This request includes all facts and information of whatever form, source or nature which the District Attorney or his assistants or the police and sheriff's departments has or knows about, which is or may be calculated to become of benefit to the Defendant either on the merits of the case or on the question of the credibility of witnesses.**

Ex. 75) (emphasis added).

Mr. Butner repeatedly requested discovery from the Pontotoc County District Attorney's Office for disclosure of evidence necessary to formulate a viable defense against the serious charges his client faced. Instead, Bill Peterson, Pontotoc County District Attorney made scant disclosures and stonewalled against providing any evidence to defense counsel in both trials. *See* P/H at 82-89, 96-99, 406, 502-503, & 769-771. This left defense counsel flailing in the dark for evidence he clearly was entitled to have.

The requested evidence was extremely helpful, clearly fitting within the defense's theory of the case and would have been used if provided. At the very least, the information gleaned

from these police reports would have aided in providing witnesses to Mr. Fontenot's alibi,

establish that alternate suspects had both motive and opportunity to kidnap Mrs. Haraway, and

that – because of an apparent stalker -- Mrs. Haraway feared being at McAnally's.   These viable

defense theories would have created reasonable doubt in the minds of the jury had the

prosecution wrongfully tipped the scales in its own favor.   "When the prosecutor receives a

specific and relevant request, the failure to make any response is seldom, if ever, excusable."

*U.S. v. Agurs*, 427 U.S. 97, 107 (1976). As the Supreme Court explained further,

> The more specifically the defense requests certain evidence, thus putting the
> prosecutor on notice of its value, the more reasonable it is for the defense to assume
> from the nondisclosure that the evidence does not exist, and to make pretrial and
> trial decisions on the basis of this assumption . . . **[T]he reviewing court may
> consider directly and adverse effect that the prosecutor's failure to respond
> might have had on the preparation or presentation of the defendant's case.**

 *Bagley*, 473 U.S. at 682-83 (emphasis added); *see also Davis v. Cline*, 277 Fed.Appx. 833, 839-

840 (10th Cir. 2008). Because the prosecution either thwarted or failed to disclose evidence that it

requested, Mr. Butner's reliance on those assertions was reasonable given the circumstances. *See*

*Banks*, 540 U.S. at 693.

The prosecution's willful ignorance and refusal to seek out evidence that the defense

notified him was important, heightens the violation. "The individual prosecutor has a duty to

learn of any favorable evidence known to the others acting on the government's behalf in the

case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation

(whether, that is, a failure to disclose is in good faith or bad faith,) the prosecution's

responsibility for failing to disclose known, favorable evidence rising to a material level of

importance is inescapable." *Kyles*, 514 U.S. at 437-438-9 (citations omitted).  Whether anyone in

the Pontotoc County District Attorney's Office knew about the evidence within the custody of

the OSBI, APD, or Pontotoc Sheriff's Office[17] or any agency assisting in the Haraway investigation, their obligation was evident and replete in the law: Locate the evidence and disclose to defense. Mr. Peterson and his staff failed to do so which resulted in numerous *Brady* violations.

### C.        Material Evidence Was Withheld from Mr. Fontenot's Defense Counsel

The Pontotoc County Prosecutor's Office failed to disclose exculpatory, impeachment, and evidence that aided the defense from various sources.  Those agencies include its own files, the OSBI, the ME's Office, the Pontotoc County Sheriff's Office, and the Ada Police Department.   A consistent pattern has been the constant drip of documents during the course of appellate review, post-conviction, and federal habeas corpus.  Because *Brady* claims are evaluated cumulatively, the failure of the Pontotoc County District Attorney's Office and Respondent to ensure the complete disclosure of these documents as mandated by the Fourteenth Amendment resulted in an incomplete assessment of their materiality by the state courts.  The state's actions resulted in the state post-conviction proceedings not being the full and fair proceedings contemplated by the AEDPA. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9-10 (1992).

The APD reports were first uncovered during the disclosure of the Pontotoc County District Attorney's Offices files pursuant to this Court's subpoena.  Ex.87.  In the Amended Petition, undersigned conceded that these files were not material to Mr. Fontenot's case, however, they demonstrated a consistent pattern and practice of state actors failing to review their files and disclose document they had a continuing obligation to disclose. *See Pennsylvania*

---

[17] Undersigned, appellate, and trial counsel for Mr. Fontenot have yet to receive any police reports from the Pontotoc County Sheriff's Office, and the Oklahoma Highway Patrol to this day.

*v. Ritchie,* 480 U.S. 39, 60, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987); *Douglas v. Workman,* 560

F.3d 1156, 1173 (10th Cir. 2004) *citing Smith v. Roberts,* 115 F.3d 818, 820 (10th Cir. 1997).

In February 2019, despite both a state court order and a subpoena issued by this Court,

another chunk of hundreds of pages of Ada Police Reports were "discovered" pursuant to

Thomas Ward's state court subpoena.  This set of police reports contains numerous documents

that are both exculpatory and impeachment evidence against the prosecution's witnesses at trial.

As Mr. Fontenot pled previously and continues to assert, the totality of these documents

eviscerate the Prosecution's theory of the case making it untenable that Mrs. Haraway

disappeared in the manner suggested and further support Mr. Fontenot's assertions that he was

not present at McAnally's because he was at a party.  There is no doubt that this evidence, had it

been disclosed, would have been instrumental in establishing a viable defense for Mr. Fontenot

showing a reasonable probability of a different result.

### 1.    OSBI and Ada Police Department Reports establishing Mr. Fontenot's alibi

OSBI reports establishing that Mr. Fontenot was at a party the night of April 28, 1984,

during the time, the police and prosecution believed that Mrs. Haraway disappeared.  According

to the prosecution's theory, Mrs. Haraway left from McAnally's with a White male between 8:30

pm and 8:45 pm. N/T 6/14/88 at 25-26.   Because the first APD officer arrived close to 9 pm.

N/T 6/9/88 at 86.  The prosecution argued that Mr. Fontenot and his co-defendant were with

Mrs. Haraway from the time Mrs. Haraway was taken until they supposedly killed her later that

evening. N/T 6/3/88 at 51-55; 6/14/88 at 35-36.

However, Mr. Fontenot told OSBI agents that he attended a party the night of Mrs.

Haraway's disappearance.  This statement was not divulged to the defense by the prosecution

prior to any of his trials.  Mr. Fontenot was arrested on October 19, 1984 and polygraphed by

OSBI Agent Rusty Featherstone. When asked where Mr. Fontenot was on the night in question,

Mr. Fontenot explained:

> He went to the apartment of Gordon Calhoun, arriving there at approximately dark or shortly after the kegs arrived. Calhoun lives adjacent to the ROBERTS, where FONTENOT was currently staying. At the party, FONTENOT recalls drinking and doing marijuana and then returning to the ROBERTS apartment where he slept on the floor all night. He believes he returned to the apartment between 2330 and 2400 hours that night and recalled that later that night Tommy Ward also ended up spending the night at the ROBERTS apartment.

Ex. 43, prosecutorial bates 142.[18]

Furthermore, because the entirety of Mr. Fontenot's interrogation was not recorded, there

is no indication of what exculpatory evidence he provided prior to the video camera being turned

on.  Therefore, any statement made by him in which he refutes the confession was paramount to

the defense.  Likewise, on October 21, 1984, in a handwritten statement, Mr. Fontenot recanted

his confession.  In his letter, which he gave to law enforcement, Mr. Fontenot said he had agreed

with the story OSBI Gary Rogers told him and had lied on the video. Ex. 44 at 626.  He

explained that he had never been to McAnally's or ever met Mrs. Haraway, and reaffirmed his

presence at the party. Ex. 44 at 625-627.

This undisclosed evidence would aid a defense theory that Mr. Fontenot was innocent,

pressured to confess, and fed key details by the police.  Defense counsel requested such evidence

several times pretrial. Exs. 73-75.  Had these documents been disclosed, defense counsel could

have interviewed Agent Featherstone and questioned him about Mr. Fontenot's statements prior

to polygraph examination.[19]  Mr. Fontenot's recantation within days of his confession and that

---

[18] At the very minimum, the prosecution was obligated to turn over any statements made by a defendant to his counsel.  The State did disclose Mr. Fontenot's recorded confession, but not his prior alibi statement.  The statement clearly is exculpatory under *Brady*.  "If the exculpatory evidence 'creates a reasonable doubt' as to the defendant's culpability, it will be held to be material." *United States v. Starusko*, 729 F.2d 256 260 (3d Cir. 1984) *quoting United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

[19] According to Agent Featherstone, Mr. Fontenot's polygraph was inconclusive but bordering on deceptive. Ex. 44 at 605, 628.

the handwritten note was in OSBI's custody drastically undercuts the reliability of the confession and would have aided defense counsel in proving Mr. Fontenot's confession was false. Ex. 44 at 626); N/T 6/14/88 at 51-62.

Additionally, the statement would have been essential impeachment evidence to use in cross examining Detective Smith and Agent Rogers about their interrogation, investigation, and lack of any corroborating evidence of the confession.  This violation was compounded by the fact that this was not the only evidence placing Mr. Fontenot in another location when the crime occurred. Both OSBI and Ada Police Department were aware of this party that Mr. Fontenot was at when Mrs. Haraway disappeared based upon several witness reports, dispatch records, and police reports.  Instead of investigating the information, the prosecution and police did it one better, by withholding the information from the defense.

Janette Roberts, when interviewed, confirmed Mr. Fontenot's presence at the party. Ex. 44, OSBI 0139. Had police looked at the radio dispatched logs for April 28th, they would have seen the neighbor complaints about the loud party at the Calhoun residence. Ex. 41, 42, & 89. Calls came in at 9:20 pm[20] and 12:40 am about the loud music. *Id.*  One of the officers who responded to the second call, Ada Police Officer Larry Scott,[21] wrote a report specifically mentioning "Gordon Calhoun" party and warning the revelers to keep it down or go to court. Ex. 43, pg. 98 & 89. This report was also not provided to defense counsel.[22]

Further, Stacey Shelton, (FKA Deprater-Brashier) testified, at Mr. Ward's trial, that she

---

[20] The radio dispatch log shows the call to McAnally's occurred at 8:50 pm. Ex. 41.S

[21] While Officer Scott testified in Ward's trial on June 13, 1989, he did not testify in Mr. Fontenot's trial.

[22] While the State focused on Mr. Fontenot's miraculous ability to both be at the Calhoun party and participate in Mrs. Haraway's abduction and murder, this theory becomes hard to believe given that no witness identified him at either McAnally's or JP's, he had no access to a truck, and people remember him being at the party for the entire night.  The prosecution lacks any evidence to the contrary besides the dubious confession.

knew about Mr. Calhoun's party because she attended it. *See supra* Claim I. She told Ada Police Chief of Detectives Dennis Smith and Detective Mike Baskins that she knew of the party and knew the people who attended the party. Ex. 12. They disregarded her information, failed to take a formal statement, did not investigate further into her account, and did not inform Mr. Fontenot's counsel about the information.

Even more shocking, Ms. Shelton also told Pontotoc District Attorney Bill Peterson that she knew about the party and its attendees. She explained her knowledge of the party. Mr. Peterson not only dismissed her information and did not tell the defense about the crucial fact, he threatened Mrs. Shelton and held her against her will in an attempt to get her to recant after she testified in Mr. Ward's trial. Ex. 12, *see supra* Claim I. While Ms. Shelton acknowledged not knowing many people at the party, she did list people she did know at the party. *Id.* Amongst those people were Bruce DePrater and Eric Thompson who also recall Mr. Fontenot's attendance at the party and provided essential details to prove Mr. Fontenot was there instead of kidnapping and murdering Mrs. Haraway. *See supra* Claim I; *see also* Ex. 95.

An alibi irrefutably shows a defendant could not commit a crime because he was elsewhere when the crime was committed. This is manna from heaven for a defense attorney, and any defense attorney, who had independent knowledge of his client's alibi, would have presented it during a capital trial. "I was trying to pursue that at trial, that some other dude did it, and anything that would have pointed me in any direction other than Karl, I would have appreciated it." Ex. 81 pg. 35.

To recap, Mr. Fontenot told police of his whereabouts during his interrogation at OSBI. Police collected several statements from witnesses able to corroborate Mr. Fontenot's whereabouts. Yet this evidence was not included in the prosecutorial. The only conclusion is

that the exculpatory alibi evidence was intentionally kept from the prosecution's knowledge as Mr. Peterson considered charging Mr. Fontenot.

The party attendees, whom police knew and had identified, had no impetus to lie and could have been interviewed by defense counsel and later testified about the timing of this party, who else was present, and whether Mr. Fontenot was present the entire night. These essential witnesses remember seeing Mr. Fontenot from the very early part of the evening until much later into the night. This makes it impossible for him to be involved in Mrs. Haraway's disappearance. Their accounts – willfully kept from the defense -- clearly show that at no time did Mr. Fontenot leave to participate in whatever transpired with Mrs. Haraway. Affidavits from party-goers, Eric Thompson, Bruce DePrater, and Stacey Shelton along with police reports from Janette Blood place Mr. Fontenot at the party for the entirety of the night.

### 2.    People at McAnally's the night of Mrs. Haraway's disappearance

According to the prosecution's opening statement in Mr. Fontenot's 1988 trial, both Thomas Ward and Mr. Fontenot drove to McAnally's in a grey pick-up truck, robbed the store, abducted Mrs. Haraway and then drove away. N/T 6/8/1988 at 35. The witnesses to these events were Gene Whechel and his nephews David and Lenny Timmons. N/T 6/9/1988 at 34 - 69. However, in the Ward trial, Lenny Timmons mentions that there were other people coming to the store while they were there. Ward N/T 6/2/1989 p. 160.

In response to Mrs. Haraway's disappearance, Ada Police Detective Dennis Smith asked people who shopped in McAnally's the night of Mrs. Haraway's disappearance, to contact the APD. Ex. 28. Police theorized the last purchase before Mrs. Haraway's disappearance was a tallboy beer.[23] Ex. 44, OSBI 0496. In response to the APD request, numerous people contacted

---

[23] The register tape from the day's purchases was collected by Detective Baskins and placed into evidence by the state at all three trials. (J/T 1160 State's Exhibit 16, N/T 6/9/1988 p. 197 State's Exhibit 60, Ward N/T 6/12/1989

the police department to explain their purchases and the time they were in the store.  Police

interviewed many of those people who provided numerous details of people, cars, and trucks

around McAnally's on April 28, 1984. Exs. 93, 94, & 99.  These reports refute the prosecution's

theory that Mrs. Haraway left the store with Mr. Ward and Mr. Fontenot as the Timmons

brothers and Gene Whechel went into the store.

Found in the most recent Ada Police Department reports finally produced was a report by

Carrie McClure who says she saw Mrs. Haraway at the store on April 28 around 8-8:30 p.m. Ex.

103.  She was interviewed by Ada Police but her name was never turned over to Mr. Fontenot.

She says that based on her contact with Ada Police that she thinks she was the last person to see

Mrs. Haraway at the store before her disappearance. Other witnesses provided more detailed

information calling into question the district attorney's case.

Jimmy Simpson told Ada Police Officer D.W. Barrett that he was in the store when no

clerk was at the counter.

> Jimmy parked ten or fifteen feet west of the Ice box. Jimmy went into the store and
> there was no one there.  Jimmy went to the pop box and got a coke and walked back
> to the counter. Jimmy then walked to the back of the store to the door going to the
> back room and said" there is someone up front." No one ever came out of the back
> room so Jimmy left the store.  There was a car possibly a GM w/gr at the gas pumps
> with three or four people around it. There was a pickup on the east side of the store
> with a man in the driver side and a woman next to him.  It was dark and Jimmy
> could not identify them. Jimmy did not see a car on the east side of the building
> (haraway's vehicle). Jimmy saw a man standing outside the store as he want in [sic]
> he thought was Odell Titsworth.  Jimmy had gone to school with Titsworth at Byng
> several years earlier. Jimmy was unable to pick Titsworth out of a picture lineup.

Ex. 100.  Officer Barrett assumed Mr. Simpson arrived while Timmons and Whechel waited for

the police.  However, this conflicts with their accounts that the man and woman in the pick-up

---

p. 6, State's Ex. 60). While the entire roll was placed into evidence, it is unclear whether it was ever unrolled
during the trial by any of Mr. Fontenot's attorneys during trial or direct appeal.  It was ineffectiveness for defense
counsel not to examine the entire roll. *See supra* p. Claim III.

truck drove away when they were in the store.  Other witnesses mention this pick-up truck being

at the store along with many other men around the time that Mrs. Haraway's disappearance.  Mr.

Simpson's account would impeach the state's theory of the case and focus of their investigation.

Also interviewed by police was James Boardman, an Ada newspaper employee.  In

another report taken by Ada Police Officer Barrett, he reported:

> A few days after Denise Haraway disappeared Mr. Boardman called the police dept.
> And advised he was at the McAnally store on Arlington about 5 pm on 4-28-84
> there were two men in the store that in his opinion were acting funny.
> Subj. #1 6 ft.brn hair, brn shirt. blue jeans.
> Subj.#2 6 ft.blond hair blue plaid flannel shirt.
>
> He thought they were in a light colored pickup. Boardman was pretty sure Denise
> was wearing a blue short sleeve t shirt
>
> Around the first of November 1984.  James Boardman came to the police dept. And
> was shown a picture lineup. Boardman picked #1 out of the Ward folder and could
> not identify anyone from the Fontenot and Titsworth folders.  Agent Rogers and
> Lloyd Bond were present at this lineup.

Ex. 93.   Mr. Boardman's interview report is exculpatory evidence for Mr. Fontenot.   OSBI

Agent Rogers though Mr. Boardman's account was significant enough that he asked him to view

photospreads of all three suspects **after** Mr. Fontenot had been arrested.  After the description

originally provided fit within the police investigation, he could not identify Mr. Fontenot as

being at the store.[24]  Mr. Boardman's report should have been disclosed as exculpatory evidence.

Mr. Butner could have interviewed and called him as a witness refuting not only the confession

but establishing other witnesses who could not place him there. Further, it deprived the defense

of arguing inconsistent factual accounts as to what happened at the convenience store.

---

[24] Further, Pontotoc County District Attorney investigator Lloyd Bond's presence makes it much more likely that District Attorney Peterson or Ross were aware of this witness and his report.

Another witness police interviewed was Duney Alford who came to the store closer in time to Mrs. Haraway's disappearance.   He told police,

> On 11-28-84, I talked with Duney Alford by telephone about the Haraway case. Duney said that on the day she was taken, he had went to McAnalley's [sic] to get some soap. He pulled up to the front of the store and got out and went inside. He said there was a guy standing by the front door on the inside of the store, Duney spoke to him but the guy did not speak back.  Duney said about the only thing he remembers about the guy was that he was dark haired, kind of slick downed, and that his hair was parted on the side. Duney said that when he walked outside the store he noticed a pickup parked on the outside of the store and that he remembers that it was a chalky gray colored. He said that he knows Donna Haraway because he shopped at the store and she worked there. Duney said as for as he can remember Donna Haraway was wearing blue jeans and a light blue pull over blouse that day.

Ex. 101.   These witnesses provide significant insight into the people coming into and out of the store.  Several people remember seeing the pick-up truck at the store for a much longer period from what the prosecution presented.  That the pick-up truck was there refutes the theory that the events at JP's convenience store had anything to do with those at McAnally's because the truck was seen at least an hour before Mrs. Haraway was last seen.  Therefore, these reports should have been made available for Mr. Fontenot's defense counsel to raise the reasonable doubt that whomever was involved was at the store for longer that police believed.  Additionally, the description of the men and other people around the store create more doubt on whom may have been involved and the motive for it.  For all the descriptions, these witnesses do not put Mr. Fontenot at the crime scene.

Beyond the list of people directly interviewed in the fall of 1984, were the people Ada Police Detective noted on April 28, 1984 while at the store.  He wrote the names, times, and, contact information on the register tape for only 5 people, the last of whom was Gene Whechel. Exs. 32-38. Each of these people discussed with the APD what they witnessed in McAnally's. However, none of these reports were disclosed to defense counsel. Richard Holkum, John

McKinnis, Gary Haney, and Guy Keyes provided evidence that was patently exculpatory and impeachment evidence. Police never followed-up on their information. This information provided critical information as to an alternate suspect in a grey pick-up truck, Mrs. Haraway's frame of mind that evening, and the thoroughness of the police investigation in the hours after she was reported missing.

### a. Richard Holkum

Richard Holkum was an off-duty Ada police officer who had went into McAnally's on the night of April 28th. Notations on the McAnally's register tape show his purchases occurring between 7:45 pm to 8:00 pm, thirty minutes before Mrs. Haraway supposedly walked out of the store with an unknown man. N/T 6/9/1988 p. 34-35, 67-68. The crux of his trial testimony focused solely on the clothing he saw Mrs. Haraway wearing the night of her disappearance. N/T 6/9/1988 p.143-145. Further, he testified that he told lead Detectives Dennis Smith and Mike Baskins immediately about being in the store that evening after he learned of the abduction. N/T 6/9/1988 p. 144.

The clothing description was not all that Mr. Holkum witnessed in McAnally's. The omitted details reveal he gave his fellow Ada police significant information about the pick-up truck Mrs. Haraway supposedly left in thirty minutes later.

> That night, I recall stopping at McAnally's when it was still barely light out. I parked my vehicle, near the west corner of the building. I believe I bought a six-pack of beer, a loaf of bread and maybe some other things. I knew Denice Haraway and spoke to her inside McAnally's that night. There was no one else in the store when I stopped at McAnally's, however, one woman did step in and laid a penny on the counter, telling Denice that she had given her too much change back for a previous gas purchase. Both Denice and I thought that was odd, for the woman to bring back a penny.

> Everything in the store, including Denice, seemed normal. I did not detect any tension or anything wrong. While standing at the counter making small talk with Denice, **I recall seeing two vehicles sitting on the eastern edge of the pavement**

**outside, just to the east of the gas pumps. These vehicles were parked parallel with the driver's side facing each other and the drivers were apparently talking. One vehicle was a green Ford Torino or Mercury Montego. The other vehicle was a Chevy or GMC pickup truck painted primer gray. This pick-up had a straight, conventional bed. I believe these vehicles were still parked next to each other when I left McAnally's to drive home.**

Based on my own memory, and knowing that civil twilight ended at 7:36pm that night, I believe I was probably at McAnally's somewhere between 7:30pm and 7:45pm. The next morning, April 29, 1984, I first heard about the disappearance of Denice Haraway when I got to work.

That day, I approached Det Dennis Smith and Det Mike Baskins about my visit to McAnally's the night before. Neither Smith nor Baskins were interested in talking to me about the Haraway disappearance. Neither formally interviewed me about what I saw or when I was there.  My recollection of both of these detectives was that they were not interested in talking to me about my visit to McAnally's. I remember thinking that they "just blew me off."

Sometime later that day or that week, Det. Smith or Det. Baskins showed me the register tape from McAnally's and asked me if I could ID my purchase on the tape. I recall that this tape only had the prices, which made it difficult for me to find my purchases. I'm not sure if I ever found my purchase at McAnally's that night. I recall that both detectives were very condescending toward me for not being able to immediately identify my purchases from the Saturday night.

I recall some time right before the trial of Tommy Ward and Karl Fontenot, OSBI Agent Gary Rogers informally interviewed me about my stop at McAnally's on 4/28/1984. **I recall that he was mainly interested in my recollection of what Denise Haraway was wearing that night. I don't believe he took down any information about the two vehicles I saw sitting outside the building.**

Ex. 6) (emphasis added).

Mr. Holkum's description of a gray-primered pickup truck parked in the exact location

witnesses testified to seeing it when Mrs. Haraway departed.  The State's theory was that

whomever left the store with Mrs. Haraway got into a gray-primered pick-up truck and drove off

when David Timmons entered the store that night at approximately 8:30 pm based on testimony

and the dispatch logs. N/T.6/15/1988 at 39. That Mr. Holkum saw a truck remarkably similar in

appearance to that described by the Timmons brothers and Gene Whelchel at the store for at least

half an hour before Mrs. Haraway's disappearance changes the motive for the abduction and suggests an alternate suspect(s). Because she was fearful about working the night shift given the obscene and harassing phone calls, it creates a reasonable doubt as to Mr. Fontenot's involvement. *See* Claim I part B. Such evidence would have been something police and defense counsel should have pursued. That the truck was driven by one man is also interesting because, clearly, it was not two people as police and prosecution theorized and argued in their case against Mr. Fontenot. Further, the total lack of interest in the eyewitness testimony of a fellow law enforcement officer shown by the lead detectives would have been important impeachment on the quality of the investigation. His treatment and testimony about the APD bolsters the proof of a lack of training into serious crimes that existed amongst its officers. *See* Ex. 53, pgs.10, 12 (Detective Smith discussing his level of training and the intuitiveness of police investigation).

### b. John McKinnis

Mr. McKinnis grew up in Ada, Oklahoma and frequented McAnally's convenience store. The police interviewed him on 4-29-1984 at 3:20 pm. According to Ada police notes, he told police much of what he recounting to an investigator during state post-conviction proceedings. Ex. 94. "John McKinnis 8:05 PM bought pop. Man standing at counter. Large guy with full beard. He purchased Liter bottle of Pepsi. $ .50 - $1.69 + tax. WM 5'11", 195-200, 26-30 years old. Dark jeans, buttoned up shirt. Didn't see any other vehicles parked outside." *Id.* The register tape documents him in the store between 7:50 pm to 8:00 pm on April 28th.[25] Ex. 35. Mr. McKinnis, recalled his visit:

> In April of 1984, I was 22 years old and I lived in a trailer about 7 miles east of Ada, Oklahoma. I worked in the oil field business for an Ada company. I often stopped at McAnally's on East Arlington, which was on the eastern edge of town. From my many stops at McAnally's I became familiar with Donna Denice

---

[25] To the extent that the register tape was shown to defense counsel, Mr. Butner's failure to follow-up on such leads is a violation of the Sixth Amendment right to effective assistance of counsel. *See* Claim III.

Haraway, who worked behind the counter in that store at night. I recalled Haraway as being a happy and nice looking woman with a bubbly personality. Whenever I stopped at McAnally's it was enjoyable to see her behind the counter. I knew she was teaching, or studying to be a teacher. I was not aware that she was married.

On the night of April 28, 1984, a Saturday night, I stopped at McAnally's on my way home and purchased a couple of items and paid with a twenty dollar bill. I lived about 10 minutes east of McAnally's. I know that I got home that night sometime after 8 pm, between 8 pm and 8:10pm.

While watching the local TV news that night, I learned that Denice Haraway had disappeared while working at McAnally's. I recalled that when I had stopped in at McAnally's earlier that night, there was a man I did not recognize standing behind the counter a few feet from Haraway. He appeared to be someone Haraway knew, an acquaintance, like a boyfriend or a husband or someone like that. He appeared to be unhappy, or concerned about something. Denice Haraway appeared to be her normal, happy self.

I also recalled the lone vehicle parked in front of McAnally's when I drove up, presumably belonging to the man I saw behind the counter. It was a 1978 Chevy pick-up truck, light colored, maybe white, with gray primer spots painted on the body. I immediately wondered if this man I saw behind the counter might have had something to do with Haraway's disappearance. I called the Ada Police.

The dispatcher, or whoever I talked to said someone would call me back. Sometime later that night, I received a call, apparently from a police investigator at McAnally's. I believe I spoke to Mike Baskin. As I described my visit to McAnally's a few hours earlier, and was able to determine the probable time of that visit as being between 7:50pm and 8 pm, this police officer, said to me, "Here you are. I'm looking at the cash register tape (at McAnally's) and see your purchase right here with the twenty dollar bill." I described to this police officer, Mike Baskin, the man I saw behind the counter with Haraway during my visit. This man was bigger than me, standing about 5'10' to 6'1", 210 lbs., with light colored hair, not very long. This man was about my age or a little older, about 22 to 25 years old. He wore a white t-shirt, and some type of work pants, maybe khaki or blue jeans. This man looked clean, not rough-looking. He was not dirty, but appeared to have been out working that day. He looked more like a construction worker, than a college student.

I also described the truck that I saw parked outside McAnally's to the police officer, Baskin. I knew it was a 1978 or maybe 1977 model, because it was the new body style, which had changed for Chevy pick-ups around 1975 or 1976. I told him that this truck had a short, conventional bed with lots of primer paint prep spots. I recall that either during that call with Police Officer Baskin, or on a call back to him later that night or the next day, this officer told me that what I had seen wasn't relevant to their investigation into Haraway's disappearance. I recall the police officer telling

me that the guy I saw behind the counter, was someone police knew. I recall him saying specifically, "Oh yeah, we know who that was."

I recall being told that whatever happened to Haraway happened later in the evening, so that anything I saw was not relevant to their investigation. After that last phone call with the police officer, after that weekend, no one with the Ada Police or any other police agency ever contacted me regarding Denice Haraway. I never spoke to any police officer or investigator face-to-face, only by phone.
I knew both Tommy Ward and Karl Fontenot by face, from growing up in Ada. That man I saw standing with Denice behind the counter at McAnally's about 8 pm on April 28, 1984, was neither Tommy Ward nor Karl Fontenot.  At the time I believe I could have identified that person by his photograph.   I never spoke to anyone else about the Haraway case in an official capacity, until recently, when I spoke to Dan Grothaus, an investigator with the Oklahoma Innocence Project. He showed me a photo of what he believes is the register tape from McAnally's on April 28, 1984. The photo of that register tape shows my name and phone number hand-written next to a purchase of $2.61, paid for with a twenty dollar bill.

I was able to tell Mr. Grothaus what I told that police officer that night. It was fairly easy for me to remember that conversation with the police officer that Saturday night, because I was so concerned about Haraway's disappearance, and wondered what significance this man I saw behind the counter might have played in her disappearance.

Ex. 5.

Ada police interviewed him the day after Mrs. Haraway was reported missing.  The sparse notes from the police could have been followed up on in much the same manner as was done in state post-conviction.  Mr. McKinnis' detailed account of the man he saw behind the counter with Mrs. Haraway is exculpatory evidence that defense counsel should have been given to present to the jury. Ex. 81 p. 35.  This man was seen talking to another individual in a Torino type car from when police officer Holkum stopped.  Mr. McKinnis, who was familiar with Mr. Fontenot, stated Mr. Fontenot was not the man behind the counter with Mrs. Haraway.  Without the benefit of the Ada police notes, key questions about Mr. McKinnis' recollection could have been developed further.   Considering Mr. McKinnis' information in conjunction with the new

evidence about Mrs. Haraway's potential stalker presents a very different picture of the abduction and the motive for it.

Further, whomever this man was stayed at the store for a much longer period than suggested during Mr. Fontenot's trial.  The longer this man stayed around McAnally's decreases the likelihood that it could be Mr. Fontenot.  Evidence such as this strengthens Mr. Fontenot's alibi defense and dovetails with the fact that the other testimony proved the abductor's description does not match with Mr. Fontenot's.

Additionally, Mr. McKinnis' discussions with Detective Mike Baskins were extremely important both to impeach the thoroughness of the investigation and to establish an alternate suspect with whom the APD seemed familiar with. First, Mr. McKinnis provided a clear description of a man in the store standing next to Mrs. Haraway.  While Detective Baskins told Mr. McKinnis that the police were aware of that individual, there are no disclosed police reports that identify whom this man was, how the APD knew him, what his connection with Mrs. Haraway was, why he was behind the counter that night, and why he was eliminated as a person of interest.[26]

Another interesting flaw involves the lack of follow-up investigation into those who stopped in the store.  Based on several witness accounts, the APD failed to document leads from witnesses they requested to call the police.  From the prosecution's theory of the case, it made no sense to ignore those present in McAnally's shortly before Mrs. Haraway disappeared. N/T 6/14/1988 p. 25-26[27]  Since the APD were aware of this individual, his identity should have been

---

[26] The haphazard way the police investigation transpired is important to Mr. Fontenot's defense because of the six-month delay in making an arrest, the specious information that led to his arrest, and he cumulative evidence establishing both an alternative motive and suspect from the crime scene.

[27] "Ladies and gentlemen, around 8:30 on April 28th, 1984, death drove up in front of McAnally's in a gray primered Chevrolet pickup, parked facing east in the drive. . . "

disclosed to defense counsel as a potential witness to what else happened in the store while he was present, what his conversation with Mrs. Haraway was about, and if he owned the pick-up truck seen by Officer Holkum and Mr. McKinnis. The APD's continued apathy to vital evidence was a pattern that permeated several murder investigations and displayed the agency's inability to properly handle cases of that magnitude. Ex. 46 & 61.

Further, Mr. McKinnis' interview with police continued their leads into the gray-primered pick-up truck that Mrs. Haraway departed with an unknown White male. Officer Holkum and Mr. McKinnis describe a Chevy pick-up truck that conflicts with the ones provided by David and Lenny Timmons, and their uncle, Gene Whelchel. In those witnesses' statements to OSBI (also withheld from counsel), the men describe the pickup as being "late 60's – 70's," "'72 pick-up possible dull dark blue with grey primer spots and a conventional straight bed," and "light colored full size pick-up possibly early '70's, not a narrow bed." Ex. 44, OSBI 0060-0063. The fact that the truck was seen at the store as early as forty-five minutes before Mrs. Haraway's abduction, changes the profile of who may have taken her. Clearly, that person could not have been Mr. Fontenot since he did not have access to such a truck and Mr. McKinnis who was a long-time acquaintance, said Mr. Fontenot was not the man behind the counter.

Law enforcement's failure to investigate the witness accounts they had in hand demonstrates a consistent pattern of failing to develop evidence to solve the case rather than simply to push a theory a pet theory that no evidence supported. *See Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986)(explaining that a *Brady* violation may occur because, "A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation."); *see also Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985).

c. Gary Haney & Guy Keys

Both Gary Haney and Guy Keys contacted police in response to Detective Dennis Smith's request for information carried in local television and newspapers. Ex. 94. Mr. Haney states he was in McAnally's with his son about 8 pm and stayed about ten to twelve minutes. Ex. 4. He said nothing unusual transpired during their time in the store. *Id.* The register tape does not give a time for his arrival at the store. His purchase which took place after both Officer Holkum and Mr. McKinnis. Ex. 35. Mr. Keys also recalled being in the store on that day and telling the police the same facts. Ex. 7. He is noted as arriving at McAnally's at 8:25 pm. Ex. 32. For both gentlemen, no police reports document how they had responded to Detective Smith's request for information, what, if any details they provided the APD, and whether that information was developed by police in some meaningful fashion.

The timing of Mr. Key's visit to McAnally's is critical because it is five minutes before David and Lenny Timmons arrived at McAnally's with their uncle. If their account of arriving close to 8:30 pm is true, then three other purchases must have been made in quick succession to allow for the last transaction of a tallboy beer. Ex. 33) (highlighted in yellow).

Other evidence casts doubt regarding the timing of Mrs. Haraway's disappearance. Witnesses who arrived at McAnally's only to find it empty prior to the Timmons' arrival. A family coming to get gas entered the store to find that Mrs. Haraway was not there. Ex. 56. Such witness accounts place further doubt about when precisely Mrs. Haraway went missing and the circumstances surrounding her disappearance. Establishing the timing of Mrs. Haraway's departure from the convenience store is essential to proving to the jury that Mr. Fontenot was at a party with numerous people during this timeframe.

Whether the APD received other calls, which may have filled in the missing transactions is unknown as no reports concerning who was in the store were provided to defense counsel. This information would have been extremely helpful to narrow down the time of when Mrs. Haraway went missing which supported Mr. Fontenot's alibi, the possible people who had motive to abduct her, and the pick-up truck present around the store for thirty minutes prior to her abduction. None of this evidence was ever presented at any of the three trials, was not given to the prosecution via the OSBI prosecutorial was not provided in post-conviction, and continues to be withheld from Mr. Fontenot's counsel.

d. Gene Whelchel

The last notation on the register tape lists a transaction with Gene Whelchel at 9:00 pm. Ex. 37. Mr. Whelchel testified that he arrived at McAnally's around 8:30 pm. N/T 6/9/1988 p. 57. After realizing there was no clerk in the store, he called the owner of the store, the manager, and the Ada Police. N/T 6/9/1988 p. 63. The dispatch logs from the APD show the call at 8:50 pm. Ex. 41. The police responded to the scene shortly thereafter. N/T 6/9/1985 p. 85-86. After the initial APD patrol arrived, Detective Mike Baskins arrived at McAnally's to start the investigation. (P/H p. 462, 464). At the time this transaction was rung, the crime scene should have been secured to preserve evidence, e.g. fingerprints, cigarette butts, beer cans, Mrs. Haraway's purse, all of which was found on the counter where Mrs. Haraway stood. N/T 6/9/1985 p. 103-110-111; J/T 1259-1240, 1422-23, 1439, 1441, 1447-1448. Instead, the police failed to secure the crime scene. Ex. 20. At the very minimum, had defense counsel known about the 9:00 pm transaction, numerous lines of cross-examination and impeachment would have been pursued not only for law enforcement but for Mr. Whelchel and the Timmons brothers, the prosecution's sole eyewitnesses. Police malfeasance that caused loss or degradation of evidence

was something defense counsel was entitled to use to investigate and pursue through direct and

cross examination. *See Kyles*, 514 U.S. at 445 (discussing how evidence can be material if its

disclosure helps defense counsel attack the thoroughness of law enforcement investigations).

Challenging the timing of events and the convenience store was a key issue to Mr.

Fontenot's defense.  Uncertainty about the timing casts further doubt on Mr. Fontenot's

confession and the quality of the police investigation.  Specifically, defense counsel could have

asked what Mr. Whelchel knew about why his purchase was rung up after the police arrived and

by whom.  Mr. Butner could have asked Monroe Atkeson, McAnally's manager, who was there

when police arrived, whether he rung up the transaction, and if he knew any details of the sales

that night.

Defense counsel would have examined witnesses about the names, dates, and purchases

from the police reports collected along with the register tape.  Their testimony cast serious

doubts about the testimony of Mr. Whelchel and the Timmons brothers during the preliminary

hearing and both trials.  Further, the defense would have had the information necessary to cross

examine detectives about proper procedure for securing the scene and why the procedure was not

followed during a robbery and abduction.  The continued pattern by the APD of failing to

properly document witness contacts and other crucial evidence underscores the credibility and

reliability of their investigation and casts significant doubt in their ability to properly determine

what happened at McAnally's between 8:25 pm and 8:30 pm. *See infra* Claim VII & VIII. Such

inept investigation cost not only the Mr. Fontenot a viable defense but Mrs. Haraway's family a

true understanding of what transpired that evening.

Additionally, knowing the accounts of people in McAnally's in the moments leading up

to Mrs. Haraway's disappearance supports Mr. Fontenot's undisclosed alibi in two regards.

First, it would have been of utmost importance to the defense to inquire if anyone saw Mr.

Fontenot at the store.  The withheld reports provide more people who were interviewed, shown

line-ups, and did not inculpate Mr. Fontenot.  They provide descriptions of men seen in the store

which supports the possibility that either the man was known to Mrs. Haraway or it could have

been someone staking her beforehand.  Without the benefits of these reports, defense counsel

was deprived of the opportunity of developing these defenses.

Second, it provides a profile of a suspect who did commit this crime.  Several witnesses

who did not testify saw the primered truck at McAnally's.   These witnesses also remember a

gray pick-up truck being at McAnally's for much longer than the prosecution asserts.   The truck

did not belong to Mrs. Haraway nor anyone who was employed at the store.  Whomever owned

the truck either abducted Mrs. Haraway or had knowledge of what transpired in the store.  In

either situation, the police failed to investigate this obvious lead and deprived Mr. Butner of the

opportunity to do the same for his client.

### 3.      Floyd DeGraw

Shortly after Mrs. Haraway's disappearance, the APD focused their attention on a

suspect arrested in Texas for assaulting another woman named Donna. Ex. 24.  Police mentioned

to the press that Floyd DeGraw was a possible suspect in the Haraway case. Ex. 26) This was the

extent of information given by law enforcement into Mr. DeGraw's potential involvement.

However, the APD and OSBI extensively investigated Mr. DeGraw involving both APD and

OSBI. Their investigation took place from shortly after April 28th until after December 1984,

two months after Mr. Fontenot was charged with Mrs. Haraway's abduction and murder. Ex. 44,

OSBI 0747-0750, 0751, 0754-0759. What is unclear is why these agencies, so focused in finding

Mrs. Haraway, stopped investigating Mr. DeGraw when his statements continued to implicate himself in her abduction and his behavior raised more questions than answers.

Mr. DeGraw came to the attention of Pontotoc County law enforcement as a suspect when he was arrested in Amarillo, Texas on May 3, 1984, for raping Donna Ellis and leaving her naked in a field. Ex. 24. Mr. DeGraw had several other prior convictions including serving three years for malicious wounding and is currently serving life imprisonment for stabbing a woman to death. (Exs. 44, OSBI 0014 & 47. When arrested in Amarillo, police searched his car finding jewelry and other belongings of women from several Oklahoma cities along with a stolen driver's license from a woman in Ada. Ex. 24, pgs. 16-18. Police also found pornographic materials depicting violence against women. Ex. OSBI 0713-0722.  While in custody in Texas, Detective Dennis Smith relayed information to OSBI Agent Gary Davis who was tasked with interviewing Mr. DeGraw for the OSBI. Ex. 44, OSBI 0014. Agent Davis took along an OSBI criminalist to document and examine the contents of Mr. DeGraw's car.

OSBI Reports show Mr. DeGraw, he left Detroit in a friend's car heading west sometime in April 1984. *Id.*  During his drive, he picked up a hitchhiker, Jeffrey Johnson, and they journeyed to Johnson's friend in Memphis, Tennessee. *Id.*  While in Memphis, they stayed several hours at Gordon Elliott's house before continuing west on April 27th. *Id.*  When asked if the men drove through Oklahoma, specifically stopping in Ada, Oklahoma, DeGraw was adamant that he slept through his entire drive through the state; if they had stopped, it was not in Ada. Ex. 44, OSBI 0027.  However, most, if not all of Mr. DeGraw's story turned out to be a lie as shown by OSBI's later investigation.

Not only did the OSBI send agents to interview Mr. DeGraw and search his car, a polygraph examination was arranged.  On May 10, 1984, DeGraw was polygraphed by Amarillo

Detective Jimmy Stevens. During the examination, Detective Stevens asked several questions pertaining to the Haraway case.

> Concerning the kidnapping of the girl in Ada, Oklahoma, do you intend to be truthful about?" DeGraw was very deceptive on this question. Also on question #6, which was "About ten days ago did you participate in a kidnapping in Ada, Oklahoma? Lieutenant Stevens stated that DeGraw was deceptive in this. Also question #10 which was, "Have you ever seen the girl whose pictures is on the wall in front of you now?, was deceptive, but other questions that were asked, the response was very flat and Lieutenant Stevens felt that overall DeGraw was not involved in the kidnapping of this girl from Ada.

Ex. 44, OSBI 0024.

Reports show Detective Lieutenant Stevens had invited the OSBI to evaluate the polygraph data for themselves.  However, the results, if any, of OSBI's assessment of the polygraph are unknown to defense because it was not included in the disclosed OSBI reports. Further, OSBI files do not contain either the raw data received from Amarillo Police or any other parts of their investigation. Ex. 24, p. 16-18. Whatever the OSBI's opinion of DeGraw, this did not end their investigation or eliminate him as a suspect.

OSBI Agent Davis, along with the Amarillo police, showed Mr. DeGraw pictures of Denice Haraway during their interrogation. While police pointed out numerous inconsistencies in his story about traveling from Detroit, Mr. Degraw claimed the reason he had problems with questions related to Mrs. Haraway was because his cousin was kidnapped and raped when he was twelve. Ex. 44, OSBI 0024. Mr. DeGraw continued that his sister looked like Mrs. Haraway. *Id.* When pressed further about Mrs. Haraway,

> At one time during the conversation and as Agent Davis put the picture of the victim from Ada before DeGraw, DeGraw held his head in his hands and appeared about to break down, but after recomposing himself, lifted his head with his eyes very red and stated that he did not know anything about the woman who was abducted in Ada, but hoped we would find her alive. DeGraw then became irritable, pacing the floor, saying he did not want to answer any more questions and continued doing

> this while Agent Davis continued talking. DeGraw then insisted on being taken back to his cell and not answering any more questions. . .

Ex. 44, OSBI 0027. Mr. DeGraw admitted stealing money for his journey and insinuated about a robbery several years prior. Ex. 44, OSBI 0025. He discussed his institutionalization for mental health issues including his tendency to, "fly off the handle." Ex. 44, OSBI 0026.

Agent Davis investigated DeGraw's story and quickly found several flaws. He obtained court files from Missouri showing that Jeff Johnson who Mr. DeGraw claimed to have travelled with was incarcerated on murder charges when he was supposedly traveling with DeGraw. Ex. 45.  Agent Davis reached out to the Calloway Police Department in Missouri for Jeffrey Johnson's murder investigation file. Ex. 85.  The first page of notes detail that the file was mailed to Agent Davis on May 22nd. *See id.*

Also, Gordon Elliott, who was supposedly Johnson's longtime friend, spoke more familiarly with Mr. DeGraw after his arrest in Texas. Ex. 44, OSBI 0021 & 0023. OSBI recorded the call between Elliott and Mr. DeGraw regarding the Haraway case, but that tape, or a transcript of the conversation was not provided to defense counsel and has yet to be disclosed. Ex. 44, OSBI 0023.  Very little of Mr. DeGraw's story checked out once investigated by OSBI. These discrepancies in Mr. DeGraw's version of events were troubling given his past violence towards women, his lies to police about his activities in Oklahoma, the timing of the rape in Amarillo, and his incriminating statements and conduct when interviewed by OSBI.

Why OSBI and Ada PD eliminated DeGraw as a suspect remains a mystery given his story was completely fabricated. Even his acknowledged deception during the polygraph, emotional breakdown when questioned further about Haraway, his proximity to Ada, mental health issues, and his consistent violence towards women made Mr. DeGraw a likely suspect.

His booking photograph shows a striking similarity to the composite drawings released by police. Ex. 24, p. 23; 76; & 77.

Mr. DeGraw certainly was a ripe target for even a neophyte defense attorney.  It is unclear why the police investigation into DeGraw stopped when his story as to who DeGraw traveled with proved a complete fabrication. Defense counsel was entitled to know the extent to which the OSBI and APD investigated DeGraw in the week after Mrs. Haraway's disappearance continuing even after Mr. Fontenot was charged with her abduction and murder. Ex. 44, pgs. 0747-0750, 0751, 0754-0759.  The withheld evidence not only provided a viable alternative suspect for defense, but it was ripe ground for impeachment of law enforcement, based upon its failure to fully explore Mr. DeGraw's lies or to competently explain why he was apparently cleared as a suspect.  The prosecution's willful failure to disclose this valuable evidence to the defense is a grievous violation of the trust placed in the prosecutor to "do justice."

The failure of the district attorney to disclose such important exculpatory evidence is a violation of Mr. Fontenot's constitutional rights. *See Kyle*, 514 at 446 (finding the cross examination into flaws in the police investigation a viable avenue regarding Brady evidence); *see also Bowen v. Maynard*, 799 F.2d 593, 612 (10th Cir. Okla. 1986) (granting habeas relief because withheld evidence of a different suspect created a "reasonable doubt" and "in the hands of the defense, it could have been used to uncover other leads and defense theories and to discredit the police investigation of the murders"); *Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d. 801, 830 (10th Cir. 1995)(failure to disclose alternate suspect police report was a *Brady* violation because, "dramatically altered and limited the effectiveness of Mr. Smith's defense at trial. . .would have been useful in 'discrediting the caliber of the investigation or the decision to charge the defendant'"). That the State continues to withhold taped conversations

between DeGraw and Elliott, polygraph data, and other evidence pertaining to the DeGraw investigation continues to deprive Mr. Fontenot of his Fourteenth Amendment constitutional rights.

> 4.    Withheld interview reports and taped statements of Jeff Miller and Terri Holland (McCarthy).

The OSBI Prosecutorial contains a table of contents of evidence collected during the investigation which was not provided to the defense. Ex. 43, pgs. 7-8. Included in the list is all physical evidence supporting the OSBI's case against Mr. Fontenot and his codefendant, Tommy Ward. This table of contents reveal three specific items that were not disclosed to defense counsel:

1. The audio recorded interview Jeffrey Miller;

2. The video tape interview of Jeffrey Miller and;

3. The audio tape of Terri Holland.

Jeff Miller was the person Detective Smith testified had given police the information that led to both Mr. Ward and Mr. Fontenot being questioned and later arrested. P/H p. 502. Detective Smith testified that Mr. Miller provided information against O'Dell Titsworth prior to October 12, 1984, in a statement to police. P/H p. 710.

Given that Mr. Titsworth could not have been involved in any crimes related to Mrs. Haraway's death because he was in police custody at the time, any statements made by Mr. Miller were suspect.  Whatever Mr. Miller said became the bedrock of the law enforcement investigation against Mr. Fontenot.  However, it is unknown exactly what Jeff Miller said to the Ada Police because no report or statements detailing what Mr. Miller said have ever been disclosed to the defense even though the police have acknowledged possessing such information. Jeff Miller never testified at any hearing or trial about what information he provided inculpating

Mr. Fontenot. Further, it is unclear what investigation, other than the interrogations of Mr. Fontenot and Mr. Ward, law enforcement took to verify any of the information Mr. Miller provided.

The police investigation into what happened to Mrs. Haraway had stalled prior to whatever information Mr. Miller provided. The police investigation rested completely on whatever information Mr. Miller provided to Detectives Baskins and Smith. The State opposed any action to disclose the information gleaned from Mr. Miller based on the work product doctrine.[28] P/H p.765-771.

The disclosure of Mr. Miller's statements and recordings were specifically and repeatedly requested by defense counsel. P/H pp. 496, 501-508, 710-712**.**  Mr. Butner sought to understand why, after six months, the police focused on Mr. Ward which led them to Mr. Fontenot.

> A.     We interviewed everyone and then we had some additional information that came in.
> Q.     From whom?
> A.     Jeff Miller.
> Q.     When did that come in, approximately?
> A.     Prior to October 12th, I'm not sure of the exact date.
> Q.     Who is Jeff Miller?
> A.     He lives here in Ada, that's about all I know about him.
> Q.     Did you interview Mr. Miller?
> A.     Yes, we did.
> Q.     Where?
> A.      In the Police Department.
>                                    *       *       *
> Q.     The District Attorney has advised that he is not among the list of witnesses in this case.  Did you feel his information in this case was pertinent, that it was informative and useful?
> A.     Yes.

---

[28] The work product doctrine does not excuse a prosecutor's obligation to disclose *Brady* materials. *See generally Castleberry v. Crisp*, 414 F. Supp. 945 (N.D. OK 1976).  While a prosecutor's thoughts and impressions are protected, if there is exculpatory or impeachment evidence, that must be disclosed to a defendant prior to trial. *See United States v. Armstrong, 517 U.S. 456, 474-75, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)* (Breyer, J., concurring in part and concurring in the judgment) (presupposing *Brady* overrides work-product doctrine)

Q.      Do you have knowledge as to why he's not being used as a witness?
A.      No, I don't.
Q.      And it's from his statement that you went back to Ward, is that correct?
A.      Well, it's from his – what he told us, but the information that he had was from someone else.
Q.      From whom?
A.      Several people I ---
Q.      Let me have their names please.
A.      I can't think of them right off.

Ada Police Detective Mike Baskins P/H 1/14/85 pg. 501-502.

Defense counsel repeatedly requested Mr. Miller's statements or the people he mentioned leading to Mr. Ward and Mr. Fontenot. *Id.* However, the district attorney fought any disclosure of this evidence. "Judge, Mr. Wyatt doesn't have any right to any more discovery than he had before, and by standing up here and saying "they may be exculpatory" has nothing to do with whether they are or not. And this police officer does not have to turn him over -- what he's trying to find out, Judge, is [work] product, and he can't do that through this mechanism or through a motion for discovery or anything else." *Id.* at 503.  The trial court did order the disclosure of any of the names Jeff Miller provided to police or his statements to police.

Terri (McCarthy) Holland testified during the preliminary hearing about hearing both Mr. Fontenot and Mr. Ward confess to participating in the murder of Mrs. Haraway.  She told a jail trustee of her conversation with Mr. Fontenot. P/H at 878-879.  Afterwards, DA investigator Lloyd Bond came to interview them concerning her statement. *Id.* at 883-884.  Ms. Holland was serving three years for hot checks. *Id.* at 888-889.  She claimed to have heard Mr. Fontenot's incriminating statements while being held at the Pontotoc County Jail.  Strategically, she had been placed by the Pontotoc County Sheriff in a cell across from him for nine days. *Id.* at 901.

A.  Yeah, I hollered at Karl.  Well, see, Ron Scott told us not to talk to each other.
Q.  And who is Ron Scott?
A.  The jailer.

Q.  Okay.

A.  The head jailer over there.

Q.  And he told you not to talk to each other, is that correct?

A.  Right.  So, when he left the room and locked the big door, the first thing I do was holler at Karl.  Well, at first he wouldn't answer me, and I guess it was about ten minutes and he hollered at me, and he wanted a cigarette.  And as the conversation went, I asked him what he was in there for, and he told me.

Q.  What did he tell you he was in for?

A.  he told me that they – He asked me if I knew Donna Haraway; and I told him no, I didn't.  And it just went from there, he told me about what had happened.

Q.  Would you tell the Court what he told you, please.

A.  He told me that him and Odell and Tommy went to the store; that Tommy and Odell went in and got her; they took her out to an old house; there Odell raped her and then Tommy; she run from Tommy; Tommy caught her.  In the process, somehow, he cut her down the arm and bit her on the titty, and Odell stabbed her to death, he killed her; then Karl raped her.  Uh – yeah, they kicked her off in a rotty part of the floor and poured gasoline on her and burned her.

*Id*. at 890-891.[29]  During her cross examination, she acknowledged being interviewed by deputy Tom Turner and videotaped by OSBI Agent Rogers a month after hearing Mr. Fontenot's supposed confession. *Id.* at 897-898.  Mr. Butner requested access to her videotape statement which both Mr. Peterson and Mr. Ross objected. *Id.* at 907-908.[30]  The trial court overruled the defense request for the video. *Id.*

After the trial court found probable cause to hold Mr. Fontenot over for trial, Ms. Holland testified during the joint trial. J/T. 1824.  Ms. Holland admitted getting married in between the preliminary hearing and her trial testimony on September 18, 1985.  J/T. 1823.  Her trial

---

[29] Ms. Holland's cell was across from Mr. Fontenot's even though he was moved to a juvenile section at one point. P/H 854, 872, 890-891.  She then admitted she was trustee allowing her access to other area of the jail. *Id.* at 891.

[30] Belying the DA's office statement of open file discovery and disclosure, they fought any release of information concerning witnesses. Regarding Ms. Holland, who had a history of providing such testimony, Mr. Peterson stated: MR. PETERSON: First of all, Your Honor -- May, we approach the bench? They're entitled to sworn statements of the Defendant. Okay? Sworn statements of any witness, that they're getting right now; and any statements by the Defendant to law enforcement. Now, I fail to see where this woman is a law enforcement officer. (P/H 907-908).

Mr. Ross countered a defense counsel request for inconsistent statements:

MR. ROSS: Your Honor, in that these are right along the line of a prior written statement, they don't have a right to see that. If there's an inconsistency -- only if we bring out an inconsistency, do they have a right to view it. We have not done that with Ms. McCartney. I don't think they have a right to see the video tape until after the Defendants have been bound over for trial. *Id.* at 909.

testimony was consistent with her preliminary hearing testimony. J/T 1823-1854.  However, the

district attorney still had not and has never divulged the videotape or any police reports

concerning Ms. Holland's statements about the jailhouse confession.

Ms. Holland was a known snitch[31] who had previously served the district attorney in

another case in which she had claimed to have heard similar incriminating comments from

another inmate. Ex. 61 (discussing her testimony in the Williamson case where she supposedly

overheard him confess to a murder).

A written version of her statement to Deputy Turner was included in the 860 plus pages

of OSBI Reports.  Ex. 44 at 282-289. Again, none of these documents had been provided to the

---

[31] When she came forward claiming to have heard Mr. Fontenot's confess, she also heard Ron Williamson confess at the same time. The United States District Court found this problematic in Mr. Williamson's habeas corpus litigation. (pgs. 33-35, 61-62). During the Williamson & Fritz 42 USC §1983 civil litigation, Bill Peterson, Pontotoc County District Attorney at the time of these trials, was asked about Terri Holland's testimony in other cases and the Haraway murder was discussed:
"Q All right. Did you know Terri Holland before this case?
A I knew of her.
Q Had you ever put her on as a witness before?
A Boy, I think she's-- as I'm sitting here, my memory is that she's testified, that I know of, in two different cases, two homicides.
Q All right. One was the Haraway case?
A Yes.
Q That's the book that was called-- written about it called "The Dreams of Ada"?
A Yeah. That's a book that was written about his idea of what the case was yeah.
Q And the Haraway murder case, Dennis Smith and Gary Rogers were also lead investigators?
A They were part of the investigative team, yes.
Q And were there also confessions in that case from some of the defendants that involved their statements that they dreamed about the crime?
A No, sir. That's not how it happened at all.
Q Were there any such statements from defendants?
A There was videotaped statements of both Fritz and -- excuse me -- Fontenot and Ward making statements that were very incriminatory, and at the end of Mr. Ward's statement, Mike-- excuse me—Dennis Smith asked him the question, "is there anything else you would like to add to this?" And he said "It all seems like a dream now."
Q Okay. Now—
A So there's where we get "Dreams of Ada."
Q So other than the Haraway case and this case, was there any other time that you had used Terri Holland as a witness?
A Not to my memory.
Q And in both cases you used her as a jailhouse informant?
A. She happened to be in the jail at the same time these people, all these people were in jail. Yeah.
Q. All right. Now I'm showing you page ---
A She was not the entire case against Tommy Ward and Karl Fontenot."
(Peterson Vol II, p. 360-362; Rogers Vol II, p. 415 similar testimony).

defense until long after all trials and well into the post-conviction process. The withheld statement was taken on November 6, 1984, and contradicts several statements made by Ms. Holland during her preliminary hearing testimony and trial testimony. *Id*. at 282.  She interweaved conversations with Mr. Ward, Mr. Titsworth, and Mr. Fontenot while also explaining how all of this was relayed to other officers or jail personnel. *Id.*  One commonality in Ms. Holland's withheld report was the inconsistencies in the statements she attributes Mr. Fontenot supposedly making to her

Because the District Attorney failed to turn over this statement, Mr. Butner was unable to impeach Ms. Holland's inconsistent testimony during the preliminary hearing and joint trial. P/H. p. 888-927.  Just as important, it is unknown what transpired during the taped statement that could have further undermined her credibility or shed light on the benefits received for her testimony.  Her conduct in this case mirrors her testimony in the Williamson-Fritz wrongful convictions, for which Ms. Holland received substantial benefits for her role in assisting the district attorney. It appears that Ms. Holland did get rewarded for her testimony by the prosecutor, though it has never been admitted by the prosecution.  Randy Holland, Ms. Holland's husband during the time of Mr. Fontenot's trial, explained the extent of her deals for her testimony:

> I was formerly married to Terri Holland, now deceased. Terri and I got married while I was an inmate at the Pontotoc County Jail, on September 4, 1985.

> I was facing up to forty years, but Terri made a deal with Bill Peterson, the district attorney in Pontotoc County. She agreed to testify for him in the state's case against Tommy Ward and Karl Fontenot. In exchange for her testimony, I was to receive seven years on my pending case and we were given permission to marry while I was in jail.

> I only found out about the deal Terri made with Bill Peterson when Terri and I got

> into an argument. We were living near the dam on Ft. Gibson Lake, in about 1992.
> This was a very intense argument, and she let me know at that time what she had
> done for me.

Ex. 10, 86. Clearly, any benefits conferred on a witness for the state, must be disclosed to

defense counsel. *See U.S. v. Bagley*, 473 U.S. 667 (1985); *Douglas v. Workman*, 560 F.3d 1156

(10th Cir. 2009). That the State failed to do so for a witness who only testified during the

preliminary hearing, does not remove the constitutional obligation to disclose impeachment

evidence.


### 5.     OSBI Reports of Mrs. Haraway's fear of being stalked.

Several withheld interview reports indicate Mrs. Haraway was scared about working at

McAnally's not only due to the clientele, but more importantly because of the harassing

telephone calls she received during her shifts. Whomever this man was knew her work schedule.

Many of Mrs. Haraway's friends, family, and co-workers knew this, and told police, but the

prosecution disclosed none of their statements to the defense.

James Watt, a co-worker, explained that Mrs. Haraway told him these calls had stopped

for a period in the early months of 1984, but began again in the weeks leading up to her

disappearance. Exs. 15 & 62.  Mrs. Haraway only worked at McAnally's in the evenings from

Thursday to Sunday. Ex. 15.  All the witnesses agreed that these calls, always from a man,

greatly distressed her, her family, and her co-workers. Mrs. Haraway's sister, Janet, stated the

fact that Haraway was afraid of someone and did not like to work at McAnally's.

> According to Janet, Donna told her on the phone she hated working at the store
> because it did not have an alarm and a lot of weirdo's come in and out of the store.
> She told Janet that she was going to look for another job because she felt uneasy
> working at the store alone at night. **She told Janet that the phone calls had started
> again but didn't go into the whole story. Janet said that earlier Donna had
> been receiving calls at work from a man that said he was going to come out to**

> **the store some night and wait outside while he was working. She said that Donna was upset because she had asked for the night off and a guy refused to work and she had to work anyway.**

Ex. 43, prosecutorial bates 20, 109) (emphasis added). This information was also relayed to police by the store manager, Monroe Atkeson, about a conversation he had with Steve Haraway, the victim's husband.

> Steve told Atkeson that a Vietnam Veteran had been harassing Donna and Donna had received several obscene telephone calls. Atkeson had seen the veteran that Steve spoke of and Atkeson described the veteran as a white male, six feet, 190 pounds, black hair, brown eyes, mustache, light complexion, usually drove a white Chevrolet Chevette and bought a soft drink. Atkeson believed that the veteran attended a rehabilitation school in Okmulgee.

Ex. 44, OSBI 0006. The police also spoke with Steve Haraway who confirmed the calls his wife received while working at McAnally's. "Steve received a phone call from the police who told him that his wife was missing. He knew of no one that Donna was having problems with at the store, other than she had received two to three obscene phone calls at the store. The last phone call was two or three weeks prior to her disappearance." Ex. 43, prosecutorial bates 20. Clearly, the people closest to Mrs. Haraway were aware of a potential threat that continued for months and weeks prior to April 28th.

Another withheld document was a report from co-worker James D. Watts who testified for the State at Mr. Fontenot's trial. In an interview with the Pontotoc County Sheriff's Office on July 25, 1985, Mr. Watt explained that "Denise had told me of some obscene phone calls she had received at the store for a while, these calls upset her a great deal. She could not recognize the voice over the phone the calls stopped about one month before she disappeared." Ex. 62.[32]

---

[32] The duplicate version found in the District Attorney's files pursuant to this Court's subpoena shows notes from one of the trials illustrating the prosecution's awareness of this document despite his statements to the contrary. Ex. 78 at 50-51.

The State did not turn over any of these vital reports to the defense. Information related to potential suspects falls within the evidence a prosecutor must disclose to defense counsel. *See Kyles*, 514 U.S. at 446 (evidence of alternative suspects allows the defense to attack "the reliability of the investigation" if it shows that investigators were less than energetic in exploring other potential suspects . . . After all, a "common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant . . .."); *Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007) (suppressing evidence of alternative suspects "could also have been used to cast doubt on police officers' decision to focus their attention . . . on [the defendant] rather than" the other suspects).

Had reports from OSBI and the Sheriff's office been disclosed, they would have aided Mr. Fontenot's defense to investigate alternate suspects who had intent along with motive and opportunity to harm Mrs. Haraway. It is obvious from these statements that a likely suspect existed that had been stalking Ms. Haraway for months, and provided a much more likely suspect than Mr. Fontenot.

These statements tied in with the interview report of Anthony Johnson. Mr. Johnson, a frequent customer at McAnally's, remembered a conversation he had with Mrs. Haraway a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Harraway's disappearance he was in the McAnally's convenience store when Harraway asked him where she could buy a gun. Harraway referenced the need for a gun with some funny calls she had recently been receiving. Harraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making these call and said that Johnson the opinion that she knew who was making the calls but did not seem to want to indicate who it was.

Ex. 22. Mrs. Haraway was so afraid of the stalker that she wanted a gun to keep at the store as protection.  With such evidence, the defense could have pursed other witnesses who would have known of Mrs. Haraway's fears and potentially identified the alternate suspect.  Further, just two days before Mrs. Haraway went missing, she spoke with Darlene Adams, another customer at McAnally's. Mrs. Haraway explained to Ms. Adams she was afraid working at night at the store but her schedule would not be changed.[33] Ex. 3.

The State failed in two regards concerning this information. First, this evidence should have been investigated in 1984, given the information willingly provided by those closest to Mrs. Haraway. This is not a situation where only one person made a side comment about a few weird telephone calls. Instead, numerous people including her husband, manager, co-worker, customers, and mother were aware of this conduct. They immediately shared this information with police in the hopes that it would assist in their investigation into her mysterious disappearance. Instead, the police ignored it completely.  At the time, it would have been possible for law enforcement to pull McAnally's telephone records to see who called the store. Further, OSBI and APD could have cross-referenced callers with customers.

Second, despite their obligations, the police or prosecution kept this information from defense counsel. This evidence should have been disclosed because it clearly points to another person who watched and threatened the victim and could have generated additional exculpatory evidence if investigated. *See Bowen*, 799 F.2d at 613.

### D.    Prejudice from The Non-Disclosure of Exculpatory Evidence

---

[33] Another line of inquiry could have been to Monroe Atkeson, McAnally's store manager, about his awareness of Mrs. Haraway's fear about working in the store.  Mr. Butner could have cross-examined about the obscene phone calls during her shift or why he refused to change her schedule given her statements about the weird men in the store.

No one in Mr. Fontenot's defense had access to the OSBI or APD reports showing any the new witnesses accounts from McAnally's, witnesses who were shown line-ups and were unable to identify Mr. Fontenot, alternate suspects—including Floyd DeGraw, witnesses supporting Mr. Fontenot's alibi, the stalker of Mrs. Haraway, and the reports of Jeff Miller's statements and Terri Holland's deal.  Despite both trial and appellate counsel's repeated requests and attempts to gain access to such crucial information, exculpatory and vital impeachment evidence was squelched. The withheld evidence clearly fell within the gambit of the defense discovery pleadings and would have been vital to a defense.

Mr. Fontenot's trial counsel, the Honorable George Butner received none of the evidence discussed above as "newly discovered evidence of innocence" or "Brady" material.  During his deposition, he explained the flaws in the District Attorney's open file policy and law enforcement's withholding of evidence from them.

> You-- you go in. You sit down. I -- I want everything you've got. I want your discovery. And if they -- if they  mean that they're -- you're (sic) going to give you the case file and let you go through it, then that's -- if the policy, the open file policy, is appropriate, all of the things from 8 law enforcement should, in fact, be in it, but we have discovered in other cases that not   everything from law enforcement is available and it seems to be more likely than not something that may be classified as a Brady – Brady matter, because I'm -- I'm only speculating, but I figure that law enforcement, if they went out and talked to George Butner about the Donna Denise Haraway killing and I was in Zambia at the time, that it -- it was not disclosed, okay. I mean, I just don't think that the law enforcement gathered everything that they did to allow proper examination in the open file policy by defense counsel.

Ex. 81 at 44.

> And Mr. Peterson's position was that law enforcement was the integral part of his being district attorney. Keep law enforcement happy, he stays with it a long time. And, so, he -- I don't think -- to be perfectly honest with you, my opinion is that he did not exercise appropriate professional supervision in requiring law enforcement to get him the appropriate stuff. I mean – and Bill takes a lot of heat for this, but I

think they try it like the law enforcement officers want it tried and so law
enforcement officers sometimes just give him what they think he needs and so --

*Id.* at 16. Further, in his statement, Judge Butner explained that he did not receive the OSBI

reports during his representation of Mr. Fontenot. As is now clear, these files were not in the

District Attorney's open file by their own admission.

I represented Karl Fontenot from late 1984 through 1988, for Karl's first and second
trials. I did not represent Karl during his appeals. I handled all pre-trial and trial
matters for both trials including the preliminary hearing. During the scope of my
representation, I filed numerous pretrial motions requesting discovery and
disclosures of records, physical evidence, investigation reports, witness statements,
records, and other evidence pertaining to the disappearance and homicide of Donna
Denice Haraway. Additionally, I made numerous motions on the record during the
preliminary hearing and at various points in the trial asking for access to evidence,
police reports, and other evidence within the custody of law enforcement and
Pontotoc District Attorney's Office. In most cases, these requests were denied.

Tiffany Murphy, Director of the Oklahoma Innocence Project, provided me with
860 pages of Oklahoma State Bureau of Investigation reports (OSBI) of their
investigation of Donna Denice Haraway's disappearance, Central Office of the
Chief Medical Examiner's file, and photographs of McAnally's register tape from
4/28/1984. After reviewing these materials, I did not receive any of the OSBI
Reports from the Pontotoc District Attorney's Office or from OSBI prior to either
of Mr. Fontenot's trials. Additionally, I do not believe I received the whole 44 pages
of ME's Office files. While I know the McAnally's register tape was admitted at
trial as a state's exhibit, I received no police reports about the names, telephone
numbers, and times of the men mentioned on the tape regarding any interviews
related to the events of April 28, 1984.

During both trials, my main focus was proving Mr. Fontenot's innocence. Any
evidence which would support proving his innocence was paramount. Evidence
that the law enforcement investigation strongly considered alternate suspects for
Ms. Haraway's abduction and murder would have been evidence that fit in the
defense's innocence case. I was unaware of the extensive investigation done into
Floyd DeGraw by Ada Police Detective Dennis Smith, OSBI Agents Gary Rogers
and Gary Davis. I did not know he was poly-graphed by Agent Davis and that
DeGraw showed indications of deception when asked about Ms. Haraway. Further,
when DeGraw was interrogated by Davis and Texas law enforcement, he grew
agitated when asked about Mrs. Haraway and abruptly ended the interview. Police
reports related to DeGraw's investigation, his rape conviction in Texas, and the
possessions of belonging from Oklahoma women would have been extremely
important to Mr. Fontenot's case.

Further, I was unaware that Ms. Haraway received obscene phone calls while at work during the months and weeks leading up to her disappearance. I never saw reports from various people like Monroe Atkeson, Janet Lyons, James David Watts and others describing Ms. Haraway's great concern about a man making obscene phone calls only while she worked at McAnally's. Janet's report providing the names of all of Ms. Haraway's ex-boyfriends would have been extremely helpful to determine if they were the source of these calls or had motive to cause her harm. Also, Janet's comment that Ms. Haraway hated working at McAnally is because it did not have an alarm, her knowledge that the obscene phone calls continued to occur, and the bizarre people who came into the store at night would have been helpful to establish Karl's innocence. These OSBI reports would have been extremely helpful to further the defense investigation into alternate suspects or people around McAnally's who were watching Ms. Haraway.

I was unaware of the numerous OSBI reports supporting Mr. Fontenot's alibi of attending Gordon Calhoun's party during the time Mrs. Haraway went missing. Impeachment evidence from the OSBI reports regarding Gordon Calhoun's interview that the party could have been the weekend of April 27th or 28th was vital. This information ·would have helped substantiate Karl's alibi during the time Ms. Haraway disappeared. Janette Roberts' report about the party and Karl's attendance was important because I would have called her to testify during the defense case-in-chief. I was unaware that Ada Police Officer Larry Scott responded to one of the dispatch calls listed on the state's radio log exhibit.  Officer Scott's police report about responding to Gordon Calhoun's party supported the alibi that the police were aware of the party. Finally, I was not provided Karl's poly-graphed statement were he admits being at the party. Such evidence would have been extremely useful to build a viable defense that Karl had nothing to do with Mrs. Haraway's disappearance and homicide.

Ex. 16.

The impact this evidence would have had on either of Mr. Fontenot's trials or how Mr. Butner would have utilized such evidence is uncalculatable. P/H. p. 496, 502-503, 769; J/T p. 1816-1817; Ex. 81.  Instead, defense counsel during both trials lacked the necessary evidence to provide not only a viable defense to the state's charges, but an alternative theory of the crime, several alternate suspects, along with impeachment evidence for many of the State's witnesses. It is evident, that the absence of such exculpatory evidence, Mr. Fontenot did not, "received a

fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

The egregious conduct by the State extends beyond trial through Mr. Fontenot's direct appeal when the state discovered the remains of the victim. Appellate counsel properly through written motions sought discovery of relevant evidence including the medical examiner's reports, police reports, crime scene information, and other related evidence. Ex. 57 & 58. The trial court granted her access to such evidence; the State continued to withhold the full medical examiner's report, photographs of the crime scene and other relevant evidence that would assist in her appeal. Ex.59.

> During my representation of Mr. Fontenot in his first direct appeal, skeletal remains later identified as Donna Denice Haraway were discovered on approximately January 20 or 21, 1986, near Gerty in Hughes County, Oklahoma. Due to the timing of this discovery and the unique circumstances of the case, and in anticipation of filing a motion for new trial based on newly discovered evidence, I filed a Motion to Disclose and Produce in Pontotoc County District Court on January 30, 1986, regarding the discovery of the remains, the condition of the remains and the Hughes County crime scene, and any interviews, reports, or investigations in connection therewith. I further requested all material which was exculpatory or favorable to Mr. Fontenot, which might be used to impeach prosecution witnesses who had testified at his trial, or which might lead to the discovery of same. At a hearing on this motion conducted March 3, 1986, I made a supplemental discovery request asking for all statements placing or tending to place any other suspect or suspects at or near the location of the discovery of Ms. Haraway's remains.

> On March 3, 1986, the Pontotoc County District Court entered an Order granting all of my discovery requests excepting only oral statements never reduced to writing. In granting my motion, the district court ordered, inter alia, that reports, medical examiner findings and photographs pertaining to the discovery of the remains, the examination of the remains, the analysis of the remains and any other physical evidence uncovered at the crime scene be produced. Based upon this Order the Pontotoc County District Attorney's Office disclosed to me two pages of Oklahoma State Bureau of Investigation (OSBI) Criminalistics Examination Reports and three pages of reports from the Office of the Chief Medical Examiner for the State of Oklahoma. These five documents were appended to the Motion for New Trial on Newly Discovered Evidence I filed with the Oklahoma Court of Criminal Appeals on August 8, 1986. These five documents were the entirety of the records disclosed to me by the State.

In the fall of 2012, Tiffany Murphy contacted me regarding the Oklahoma Innocence Project's (OIP) review of Mr. Fontenot's case. We discussed what law enforcement reports and records were disclosed to me in connection with the above-described discovery proceedings. Ms. Murphy questioned me concerning approximately 860 pages of Bates stamped OSBI reports, which I did not recall ever having seen. In March of 2013, I reviewed approximately 860 pages of Bates-stamped OSBI reports, apparently obtained by OIDS after I left employment there. After I reviewed these documents, I confirmed to Ms. Murphy that I do not recall ever having seen them before, although I had seen the two OSBI documents and three medical examiner documents described in the previous paragraph when they were disclosed to me by the Pontotoc County District Attorney's office but without Bates stamps on them. In April of 2013, the OIP sent me additional police reports, witness statements and other documents for my review to ascertain whether they were disclosed to me during my representation of Mr. Fontenot.

During litigation of Mr. Fontenot's direct appeal and his motion for new trial based on newly discovered evidence, my main focus was his innocence. To that end, any evidence which would support proving his innocence was paramount. Evidence that law enforcement strongly considered alternate suspects for Ms. Haraway's abduction and murder would have fit into the defense's case for innocence.

Ex. 11. Neither counsel for Mr. Fontenot was required to continue to seek such evidence. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that defense counsel is not required to scavenge for evidence the State was obligated to disclose). Instead they are entitled to rely on the prosecution to do its job in meeting its constitutional obligations to disclose such evidence.

"Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed. As we observed in *Strickler*, defense counsel has no 'procedural obligation to assert constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.'" *Id.* at 695-696.

This Court's evaluation of Mr. Fontenot's Brady claim rests on whether the evidence puts the case within an entirely different light concerning the evidence presented at trial and that

which was impermissibly withheld. When evaluating the evidence withheld, the Court must

conduct a cumulative evaluation of the evidence.

> While the definition of Bagley materiality in terms of the cumulative effect of
> suppression must accordingly be seen as leaving the government with a degree of
> discretion, it must also be understood as imposing a corresponding burden. On the
> one side, showing that the prosecution knew of an item of favorable evidence
> unknown to the defense does not amount to a Brady violation, without more. **But
> the prosecution, which alone can know what is undisclosed, must be assigned
> the consequent responsibility to gauge the likely net effect of all such evidence
> and make disclosure when the point of "reasonable probability" is reached.
> This in turn means that the individual prosecutor has a duty to learn of any
> favorable evidence known to the others acting on the government's behalf in
> the case, including the police.**

*Kyles v. Whitley*, 514 U.S. at 437 (emphasis added). A cumulative assessment of the evidence

presented cases clear doubt on an already weak case against Mr. Fontenot. *See id.* at 436.  There

was no physical evidence connecting him to McAnally's, Mrs. Haraway, or her abduction and

murder.

Further, the only witness who claims he saw Mr. Fontenot at McAnally's, on the night in

question, tried to recant his identification at Mr. Fontenot's second trial and has affirmatively

done so now. Ex. 14. The evidence of Mr. Fontenot's presence at Gordon Calhoun's party for the

entirety of the night and the investigative leads that evidence led to clearly show a reasonable

probability of a different result had this evidence been made available. The only evidence

remaining in the State's arsenal is Mr. Fontenot's confession; a confession which lacks any

factual support and caused the State's own detectives to doubt its veracity as of the preliminary

hearing.[34] The State's failure to disclose these records and its resistance to disclosing the

---

[34] Q. Okay, And so you didn't believe anything they had said previously, did you? You didn't believe that, did
you?
A I believed part of it.
Q You believed part of it, but you don't believe all of it. What part do you believe? What parts do you believe?
A Well, I believe that they're the ones that did kidnap her.
Q Okay. But you didn't believe the part about Odell Titsworth, you proved that to be wrong, didn't you?
A That's correct.

remainder of the outstanding evidence resulted in a Fourteenth Amendment Due Process

violation.

### III. MR. FONTENOT'S SIXTH AND FOURTHEENTH AMENDEMENT FUNDAMENTAL RIGHT TO COUNSEL WAS VIOLATED BY THE ADA POLICE DEPARTMENT'S INTERFERENCE WITH ATTORNEY-CLIENT PRVILEGE

The attorney-client privilege is the bedrock of any attorney's ability to ensure honest and

open communication between lawyer and client. The Oklahoma Rules of Professional Conduct

Rule 1.6 mandate the confidentiality of information between a lawyer and client. The comments

to Rule 1.6 explain the importance of this rule as

> [2] A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation. See Rule 1.0(e) for the definition of informed consent. This contributes to the trust that is the hallmark of the client-lawyer relationship. The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Almost without exception, clients come to lawyers in order to determine their rights and what is, in the complex maze of law and regulations deemed to be legal and correct. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld.

---

Q. Didn't believe the part about the pickup, you proved that to be wrong, didn't you?
A Yes.
Q And you didn't believe the part about where the body is, because you went and looked. You don't believe that, do you?
A No, sir,
Q So you want this Judge to pick and choose what you're picking and choosing, is that right? What to believe, is that right? Now, Detective, I didn't hear the response, was there a response?
A (No audible response)
P/H p. 538-539 (George Butner cross examination of Detective Mike Baskins).

The Supreme Court recognized that interference by the state in a defense counsel's privileged communications with their client can unduly impair the effectiveness of that counsel under the Sixth Amendment. *See Weatherford v. Bursey*, 429 U.S. 545, 554 (1977).

For a petitioner to establish a *per se* violation of the right to counsel, he must show an, "intentional prosecution intrustion[] lack[s] a legitmate purpose." *Shillinger v. Haworth*, 70 F.3d 1132, 1140 (10th Cir. 1995). The Tenth Circuit Court of Appeals found that a fundamental denial of counsel occurred when, "its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed." *Shillinger*, 70 F.3d at 1142. Other Circuit Courts of Appeal have found similar grounds for *per se* Sixth and Fourteenth Amendment violations where the prosecution retained records and memorandums about trial strategy from privileged information from the defense. *See e.g. U.S. v. Danielson,* 325 F.3d 1054 (9th Cir. 2003); *U.S. v. Chaves*, 902 F.3d 259 (4th Cir. 1990); *U.S. v. Mastoianni*, 749 F.2d 900, 904-908 (1st Cir. 1984) (Sixth Amendment violation analyzed when an informant attended defense meetings and law enforcement debriefed him).

The Ada Police Department violated and trampled upon Mr. Fontenot's Sixth Amendment fundamental right to counsel when they seized letters he wrote to his defense counsel. Found in the Ada police reports, and only recently disclosed were original letters written by Mr. Fontenot addressed to his defense attorney "George" Butner. From other documents discussed in this Petition, Mr. Fontenot was incarcerated by the Pontotoc County Sheriff. *See* pg. 89 *supra*. While in custody, his only means to communicate with counsel were likely visits and letters. Mr. Fontenot wrote these letters while in custody awaiting trial. In those letters, he asked questions about past legal visits, frustrations about the delay in his trial,

questions as to his absence from Thomas Ward's court hearing, and, most significantly, leads

and witnesses who could testify about his innocence and alibi. Ex.95.   One of the people Mr.

Fontenot discussed was his ex-girlfriend, Dottie Edwards who he dated around April 28, 1984.

The Ada Police Department interviewed Dorothy Edwards on November 27, 1984, **after**

Mr. Fontenot was in custody.   The interview conducted by Ada Police Office D.W. Barrett

consisted of the following:

> Det. Barrett talked to Dorothy Edwards by telephone on 11-27-84 at 8:00 PM, while
> she was at work.  She said she dated Karl Fontenot about three or four times around
> the first of May 1984.  She said they went in her Ford Torino.  When they went to
> the River they went in Jannette's Pickup.  Jannette and Mike Roberts, she and Karl
> and Tommy Ward all went to the river together.  Dorothy said, she dated Karl two
> and a half or three weeks at the most.  She said one of the reasons she stopped
> dating Karl was when he told her that the OSBI had come and talked to him about
> Denise Haraway.  She said she talked to Karl right after he talked to the OSBI.  Karl
> told her he was not in on it and had no knowledge of it.  Dorothy does not remember
> if she was dating Karl on 4-28-84.  She did go with him while he was living with
> Janette.  She moved to Perry the last part of May 1984.
> Dorothy said she never saw Karl or Tommy in a pickup other than Jannette's.  She
> said she went to school with Brian Cox, but didn't know if he owns a pickup.  She
> said she has heard of Odell Titsworth but does not know him.  She went to school
> at Ada High with his sister Kathy.  Dorothy said she did not know of a Ronald
> Tisdale.  She said she did not go to any parties at Jannette's.
>
> Dorothy said she met Karl through Jannette when she worked at Taco Tico.  She
> said he seemed friendly, he had his own problems, his parents were dead and he
> was still copeing [sic] with that, he was down because he couldn't find a job, she
> said "he was just a sweet guy".
>
> Dorothy said she went to school with Tommy Ward and never liked him.  She tried
> not to go around Karl if Tommy was there.  She was round him the day they went
> to the river but she did not like him at all.

Ex.92. [35]  Ms. Edwards' report demonstrates that the police intercepted original letters from Mr.

Fontenot to his attorney, retained them, and investigated based on those letters.  These letters,

---

[35] Ada police officers went to interview Mr. Fontenot shortly after 4-28-84, but he did not speak with them because
he had to go to work. N/T 6/10/1988 at 160-161. He was not interviewed again until he confessed in October 1984.
*Id.* at 59-63.

beyond being the crucial thread of communication between Mr. Fontenot and his counsel, would have provided helpful information that Mr. Butner could have developed further for trial and gained insight into Mr. Fontenot's behavior that would have helped his mitigation against the death penalty.  Along with Ms. Edwards, Mr. Fontenot tried to give a list of names of people who knew he was at Jannette's on April 28, 1984, i.e. witnesses crucial to his alibi.  These people include:  Jannette Blood Roberts, Amy Blood, Bruce Self, Johnny Duck Konawa, Gordon Calhoun, Joe Youngblood, and Regina Youngblood.[36] Ex. 95.

Mr. Fontenot expected these letters to be seen or delivered only to his defense counsel. However, these letters were never mailed or delivered to Mr. Butner.   Mr. Butner reviewed these letters and explained he was never made aware of them prior to either trial. Ex. 98.  Further, Terri Hull, who represented Mr. Fontenot during the first direct appeal and when Ms. Haraway's remains were found, also confirmed that she never saw these letters. Ex. 97.   There can be no legitimate law enforcement reason for why the Pontotoc County Sheriff's Office did not deliver these letters or, more significantly, how these letters diverted to the custody of the Ada Police Department. *See U.S. v. Shreck*, 2006 U.S. Dist. LEXIS 33158, 17 (ND OK 2006) (discussing per se violations of the Sixth Amendment where there are "affirmative actions on the part of the government which compromised the attorney-client relationship.")  What is clear is that police investigated several of the witnesses Mr. Fontenot had tried to tell his attorney about as a means to undercut his alibi defense.  Not only did they commit the egregious act of withholding of exculpatory and impeachment evidence that was favorable to Mr. Fontenot's defense, they denied him even the ability to ensure his attorney knew of his defenses.

A fundamental violation under the Sixth Amendment occurs when, "[t]here are,

---

[36] OSBI interviewed many of these people, but as pled in Claim II, these reports were also not disclosed to defense counsel.

however, circumstances that are so likely to prejudice the accused that the cost of litigating their

effect in a particular case is unjustified." *U.S. v. Cronic*, 466 U.S. 648, 658 (1984).  When law

enforcement interferes with the attorney-client relationship in a criminal context, that

interference may result in a fundamental violation *per se*.  Here, Ada Police Officers gained

possession of original letters from Mr. Fontenot, investigated the witnesses he mentioned, and

withheld evidence helpful to his defense.   By keeping the original letters, it crippled the

privileged relationship between Mr. Fontenot and Mr. Butner.

However, if this Court believes the actions of the Pontotoc County Sheriff or the Ada

Police was legitimate requiring a proof of prejudice to substantiate this Sixth Amendment

violation, Mr. Fontenot meets that burden as well. Mr. Fontenot, "must present 'proof of a

realistic possibility of injury or benefit to the State' in order to constitute a violation of Sixth

Amendment rights." *Rodriguez v. Zavaras*, 42 F.Supp.29 1059, 1084 (DC Co 1999) quoting

*Shillinger*, 20 F.3d at 1142.  Both options are present here.  The affect on the attorney-client

relationship is the use of confidential letters from the client to his counsel.

Amazingly, these stolen letters reveal key information about an affirmative defense to

murder, mitigating evidence to the death penalty and other useful information both to the trial

and penalty phases.  As mentioned above, defense counsel never saw these letters.  Mr. Butner

did not have evidence proving Mr. Fontenot's alibi. Ex. 81 at 34-37.  The possibility that

everything mentioned in these letters could have been relayed in a visit a remote possibility at

best given the lack of any defense presented at trial, the failure of Mr. Butner to call any of the

witnesses mentioned here during the trial, or appellate counsel seeing any indication in Mr.

Butner's files of interviews with the people mentioned. Conversely, the benefit to the

prosecution and law enforcement is crushing – they prevented the defense attorney from

knowing about helpful witnesses. And their actions foreclosed a fair trial by interviewing these people themselves and failing to disclose those interviews. Such a violation of attorney-client privilege strikes at the heart of the right to effective assistance of counsel guaranteed by the Sixth Amendment. The interference by the state in the most sacred relationship is both a *per se* unconscionable and prejudicial infringement of Mr. Fontenot's right to counsel.

IV.    **MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO INVESTIGATE THE CASE AND PRESENT VIABLE EVIDENCE SUPPORTING HIS INNOCENCE**

A trial counsel's function "is to make the adversarial testing process work in the particular case." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). To prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that counsel's representation fell below an objective standard of reasonableness, and that the deficient performance prejudiced the defendant, *Strickland*, 466 U.S. at 693, 104 S.Ct. 2067 and thus create a "reasonable probability" of a different result. *Id.* at 694. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2001).

Deficient performance is "measured against an objective standard of reasonableness under prevailing professional norms." *Rompilla*, 545 U.S. at 380. Courts "long have referred" to the American Bar Association standards on the performance of counsel "as guides to determining what is reasonable." *Id.*; *Wiggins*, 539 U.S. at 524; *Strickland*, 466 U.S. at 688. [T]he American Bar Association Standards for Criminal Justice in circulation at the time of [Mr. Fontenot's] trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always

108

include efforts to secure information in the possession of the prosecution and law enforcement authorities. **The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty**.

ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)(emphasis added); *see also Rompilla*, 466 U.S. at 400.  Counsel's performance fell below an objective standard of reasonableness in this case for several reasons. First, counsel failed to present evidence showing Mr. Fontenot's innocence of the charged actions when his co-defendant made statements exculpating him of the crime. Second, counsel neglected to investigate evidence showing that Mrs. Haraway was being stalked by someone familiar to her. Finally, defense counsel failed to impeach numerous State witnesses about their inconsistent statements.

> **A.**     **Trial Counsel Was Ineffective for Failing to Introduce Tommy Ward's Sworn Statement Made During the Preliminary Hearing Exculpating Mr. Fontenot from Involvement in Mrs. Haraway's Case.**

On January 5, 1984, Tommy Ward testified in a closed hearing about his involvement in Mrs. Haraway's disappearance.  This hearing took place in the middle of the only preliminary hearing in this case.   Different from Mr. Ward's confession in October 2014, this testimony occurred under oath with both defense counsels present along with several representatives for the prosecution and law enforcement.  Specifically, the trial judge, court reporter. Don Wyatt, Mr. Ward's defense counsel; George Butner, Mr. Fontentot's defense counsel; Bill Peterson and Chris Ross for the District Attorney's Office; Ada Detectives Dennis Smith and Mike Baskins; and several members of the Pontotoc County Sheriff's Office. *See* Ex. 60 at 27.

Mr. Ward's statement consisted of the following:

Defendant: And then we went from there [JP's] to McAnally's.
Mr. Wyatt: You stopped at McAnally's?
Defendant: Uh-huh.
Mr. Wyatt: Did you go in?

Defendant: Yeah.

Mr. Wyatt: Did Discus – or Ashley go in?

Defendant: yeah.

Mr. Wyatt: Why did you stop there?

Defendant: To get a beer.

Mr. Wyatt: What happened when you got inside?

Defendant: I walked back towards the back to get a beer, and Marty started talking to Donna (Denice Haraway), and-- Mr. Wyatt: Did Marty know Donna?

Defendant: Yeah.

Mr. Wyatt: How long had he known her?

Defendant: I don't know.

Mr. Wyatt: But they knew each other?

Defendant: Yeah. They, you know, acquainted each other when he come in.

Mr. Wyatt: What happened?

Defendant: He started flirting with her and she told him that he was married – I mean she was married. And then after she told him that she was married he goes, "You must not be happily married because if you was happily married you wouldn't have to be working." And then he starting hinting around to her about saying, "Well, if you marry me, and everything, you wouldn't have to do nothing, like this or anything."

Mr. Wyatt: Okay. Now, where were you when this conversation took place?

Defendant: I was getting ready to walk on back towards the back. And then I was kind of listening to them, you know, because I thought it was kind of funny, you know, after her saying that she was already married and everything, and then – so then I went on back to the back and then when I come on back up to the front he bent over the counter and kissed her. And then he walked out the door. And then I walked on up and payed for the beer. Then after I payed [sic] for the beer she come around the counter and went out the door and I walked out behind her. And then I walked out to the pickup, and then she – when I opened the door she goes, she was talking to Marty, and she goes, "Are you serious about what you're talking about?" And he goes, "Yeah." And so she jumped in the pickup with him. And then we drove from there to my house, and that's when he let me out. It was about 9:00 when I got back to my house.

Ex. 60.  Mr. Ward said he made this statement under oath because he felt it would help his case

and the police investigation into this case. *Id.* at 6.  He testified that Mr. Fontenot did not

participate in these events or have knowledge that they occurred. *Id.* at 25.   In fact, Mr. Ward

only told Mr. Fontenot about these events the morning of the hearing.[37] *Id.* at 36.  Further, Mr.

---

[37] Mr. Ward's statement would have been admissible during Mr. Fontenot's trial under under Okla. Stat. tit. 12 § 2408(B)(3) given that any statement made by Mr. Ward placing himself at McAnally's around the time of Ms. Haraway disappeared is clearly against his penal interest.  To the extent that Mr. Butner failed to prove Mr. Ward was unavailable to testify is part of his ineffectiveness in failing to present this evidence.

Ward testified the only reasons he implicated O'Dell Titsworth and Karl Fontenot in his October

1984 confession is because of Detective Smith's suggestion of what to say.[38] *Id.* at 27.

Mr. Ward's testimony closely coincided with details from the crime scene.  He explained

his purchase of a beer in the cooler at McAnally's, drinking some of it and leaving it on the

counter after Mr. Ashley and Mrs. Haraway exited the store. *Id.* at 30. The last transaction on the

McAnally's register tape shows $.80 for a Tallboy beer. Ex. 34), Ex. 43, prosecutorial bates 22),

Ex. 44, OSBI 0495. According to Mr. Ward's statement, the cigarette Lenny Timmons saw in the

store belonged to Mr. Ward. Ex. 60 at 30); J/T p.1089. All three, Mr. Ashley, Mr. Ward, and

Mrs. Haraway, drove away in a gray, Chevy pickup truck that belonged to Mr. Ashley. J/T p.

1682.

Lenny Timmons testified that he entered McAnally's around 8:30 pm on April 28, 1984.

He described passing a man and woman leaving the store, getting into a pickup truck, and

driving away. N/T 6-9-88 p. 34. At the time, he paid little mind to the couple until he realized the

store clerk was missing. After alerting his brother, David, and uncle, Gene Whelchel, they

continued to search the store before calling police. All three men described a man climbing into

the pick-up truck with a woman they believed to be Mrs. Haraway. P/H p. 269-270, 308-313;

N/T 6-9-88 p. 38, 47-48, 56. During Mr. Ward's statement, he explained that he was the man

walking Mrs. Haraway out of the store that evening. Ex. 60, p. 9.

After Mr. Ward's statement, the police interviewed Marty Ashley and several other

people Mr. Ward mentioned in his testimony.  Many of these people testified during the joint

trial but not in Mr. Fontenot's trial.[39]   As the pattern continues to show, these interviews were

---

[38] In Mr. Fontenot's recantation letter, he too stated that Detective smith suggested much of the story in his
confession. *See* Ex. 44 at 626.
[39] These people include Marty Ashley, Shelly Mattzke, Theresa Mantzk, Jackie Mantzke, and Jay Dicus.  J/T 1646-
1742.

not disclosed at any trial or through post-conviction proceedings.  The sole exception was the

taped statement of Marty Ashley found during post-conviction.[40] Ex. 66. Detective Smith, along

with Chief of Police Fox interviewed Mr. Ashley at the Paul's Valley Police Station on January

10, 1985, the day after Mr. Ward's testimony.  The police asked him his whereabouts on April

28, 1984, to which he said he did not know. *Id.*

On cross examination during the joint trial, Mr. Ashley admitted that the police

interviewed him only one time even after telling them he could not remember where he was on

April 28, 1984.[41] Ex. 66; J/T 1678.  Mr. Ashley, along with this girlfriend Theresa Mantzke,

acknowledged living in Ada at the time of Mrs. Haraway's disappearance but moving to

Ardmore very early in May 1984. J/T 1720. She also could not recount where Mr. Ashley was on

April 28, 1984, but he was not with her. J/T 1724. The police failed to inquire whether Mr.

Ashley owned or had access to a pick-up truck, which he did. J/T at 658, 1682.

The undisclosed interviews took place on the days following Mr. Ward's testimony and

were conducted by Ada Police Detective Mike Baskins, Ada Police Detective Dennis Smith, or

DA Investigator Lloyd Bond. Ex.  88.  These reports were individual interviews with little

purpose other than to disprove Mr. Ward's testimony.  There is no investigation into the

discrepancies provided by Mr. Ashley or his girlfriend's testimony or into where Mr. Ashley was

when Mr. Ward said Mr. Ashley drove off with Mrs. Haraway.  Detective Baskins interviewed

Anthony Norman at the Ada Police Department about his knowledge of "Tommy Ward and

---

[40] The Ada Police interviewed Marty Ashley, Jay Dicus, Shelly Mantzke, Theresa Mantzke, and Jackie Mantzke to investigate all or part of Mr. Ward's testimony.  Many of these individuals testified for the prosecution during the joint trial and Mr. Butner attempted to examine them without the benefit of knowing what prior statements they made to police. *See* N/T 9-17-1985 at 1646-1740.

[41] The police took a photograph of Marty Ashley during their interview. Ex. 39,40). It is unknown whether police received any calls as to whether Mr. Ashley resembled the composite drawing or if they showed any other witnesses Mr. Ashley's photograph.

Jackie Mantzke." Ex. 88.  Mr. Norman provided character evidence about Mr. Ward and said he

did not remember Mr. Ashley being at the Mantzke household when Mr. Norman was there. *Id.*

Detective Baskins concluded his report by stating, "Tony did not seem sure about his answers.

He had to think before answering questions.  He answered slowly and would not definitely

commit himself to questions."  *Id.*  Clearly, the police investigation was committed to its theory

of the case despite the weaknesses and contradictory evidence that continued to emerge.

Mr. Ward's statement should have been used by Mr. Fontenot's defense counsel during

his trial. Clearly, this statement would have been admissible under Title 12 § 2804(B)(3)

Admission Against Penal Interest.[42] *See generally Funkhouser v. State*, 1987 OK CR 44; 734

P.2d 815 (OK 1987)(outlining the procedure for declaring a witness unavailable and explaining

that there is no confrontation clause issue when there has been an opportunity to cross-examine

the witness); *see also Britt v. State*, 1986 OK CR 99; 721 P.2d 812 (Ok. 1986).  It exculpated Mr.

Fontenot.  That Mr. Butner failed to move the statement into evidence, establish that Mr. Ward

was unavailable to testify in Mr. Fontenot's trial given that his own trial was scheduled after Mr.

Fontenot's, and address any other evidentiary objections exacerbates his ineffectiveness on this

issue.  Defense counsel knew Marty Ashley had no alibi, his girlfriend was adamant he was not

with her the day of the kidnapping, and both moved out of Ada days after Mrs. Haraway

disappeared.  Not only does this evidence corroborate Mr. Ward's statement, it creates

reasonable doubt as to Mr. Fontenot's involvement in anything related to the crimes against Mrs.

Haraway.

---

[42] The State introduced Mr. Ward's statement against him during his separate trial in 1989, through Detective Dennis Smith who was present and could testify to what occurred during the hearing. (Ward Vol. 6 p. 127-132). Since, Detective Smith testified in Mr. Fontenot's trial, defense counsel had the opportunity to introduce such crucial exculpatory evidence in similar fashion.

Further, this was evidence that strongly supported the defense's case. He repeatedly requested in discovery motions, in motions in limine, and on the record his desire for exculpatory evidence and any evidence showing Mr. Fontenot's lack of knowledge and participation in the crimes against Mrs. Haraway. Ex. 81 pg. 35-36. What better evidence to present but Mr. Fontenot's co-defendant explaining not only that his client was unaware of his criminal actions but that Mr. Fontenot was only told about such criminal activity the morning of January 9, 1985. There could be no strategic or tactical reason for such ineffective actions that deprived Mr. Fontenot of valuable evidence showing his innocence. Mr. Butner concedes his ineffectiveness for failing to present this evidence:

> During the preliminary hearing, Tommy Ward made a sworn statement during a closed hearing. I was present at the hearing along with Mr. Wyatt, counsel for Mr. Mr. Ward, Pontotoc County District Attorney Bill Peterson, Assistant District Attorney Chris Ross, and law enforcement. Mr. Ward gave a detailed statement about being present at JP's convenience store and McAnally's with Marty Ashley. Mr. Ward stated that Mr. Fontenot was not present having nothing to do with the events of April28, 1984. This statement was very helpful to Mr. Fontenot's case because it proved crucial evidence from his co-defendant that he had no involvement in Mrs. Haraway's disappearance. **While I used this statement in Mr. Fontenot's joint trial with Tommy Ward, I did not introduce it into evidence during Mr. Fontenot's second trial. I had no strategic reason for not using it. It clearly fit within my trial strategy to show Mr. Fontenot had nothing to do with Mrs. Haraway's homicide.**

Ex. 16) (emphasis added); Ex. 81.  Mr. Butner's performance was deficient performance for failing to include this exculpatory piece of evidence during his trial.

In determining whether a defendant has been prejudiced by his trial counsel's deficient performance, a court must consider whether a defendant has suffered actual prejudice from his attorney's actions. Similar to *Brady*'s materiality standard, a defendant must establish those deficiencies were prejudicial, defined as errors that collective "undermine confidence in the outcome," and thus create a "reasonable probability" of a different result, *Strickland*, 466 U.S at

694. As a court assesses whether a defendant suffered prejudice, it must assess the totality of the evidence before the factfinder. *Id.* at 695. Given the absence of any independent physical evidence connecting Mr. Fontenot to the crimes against Mrs. Haraway, a cumulative evaluation of the evidence not presented to the jury including: the exculpatory statements by the co-defendant, along with the *Brady* materials not presented during trial including the alibi testimony, would have impacted the jury's deliberation and verdict. Failure to introduce Mr. Ward's statement resulted in ineffective assistance of counsel in violation of Mr. Fontenot's state and Sixth Amendment rights.

> **B.** **Trial Counsel Was Ineffective for Failing to Investigate Evidence of Denice Haraway Being Stalked and Evidence Establishing a Different Motive for the Crime.**
>
> > **1.** Defense investigation reports showing Denice Haraway's fear of obscene phone calls she received.

The trial court granted limited funds for investigation for Mr. Fontenot's second trial. Richard Kerner, who assisted Mr. Wyatt during the investigation for Tommy Ward worked for Mr. Butner prior to trial. During the course of his investigation, he found an important witness who would have provided not only an alternate motivation for the abduction of Mrs. Haraway but potential alternate suspects as well. Mr. Kerner interviewed Anthony Johnson, a frequent customer at McAnally's. Mr. Johnson remembered a conversation he had with Mrs. Haraway a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Harraway's disappearance he was in the McAnally's convenience store when Harraway asked him where she could buy a gun. **Harraway [sic] referenced the need for a gun with some funny calls she had recently been receiving. Harraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making**

**these call and said that Johnson the opinion that she knew who was making the calls but did not seem to want to indicate who it was.**

Ex. 22. (emphasis added). Defense counsel submitted a subpoena for Mr. Johnson's appearance for Mr. Fontenot's trial, but it was never served. Ex. 71. Clearly Mr. Johnson was a witness that defense counsel sought to present during Mr. Fontenot's defense-in-chief, but Mr. Johnson never testified. There was no strategic or tactical reason not to present such evidence showing that Mrs. Haraway not only received obscene phone calls showing someone watching her and harassing her over a longer period of time prior to her disappearance, but also demonstrated true fear of this individual that she inquired about buying a gun. Not only should Mr. Johnson have testified at trial, but defense counsel should have pursued such leads further. The failure to do so resulted in ineffective assistance of counsel for failing to call Mr. Johnson as a witness and for not developing such evidence.

The cumulative effect of this evidence along with what was presented in Claims I and II regarding Mrs. Haraway's harassment while at work demonstrate actual prejudice.  The totality of the evidence not presented to a jury paint a picture of alternate suspects having more motive to harm Mrs. Haraway.  Given the weakness of the prosecution's case against Mr. Fontenot, the impact of the unknown and unpresented evidence puts the case in an entirely different light meriting a new trial.

> 2. Register tape showing witnesses who were in McAnally's in short proximity to her disappearance

Detective Dennis Smith made numerous requests for people who were in McAnally's the night of Denise's disappearance to contact the APD with information about the time they were in the store and the purchases made. Ex. 27. In response to the APD request, at least four people contacted the police department to explain what purchases they made and what time they

recalled being in the store. Their names, times, and, on occasion, contact information was included on the register tape. Exs. 32-38. The State introduced the register tape into evidence at both trials and it was available to Mr. Fontenot's first direct appeal counsel. J/T at 1160 State's Ex. 16); N/T 6/9/1988 at 197; State's Trial Ex. 60. That neither defense counsel, at trial or appeal, reviewed the entirety of the register tape was ineffective performance.

Defense counsel's obligation to evaluate and investigate not only the factual witnesses the prosecution intended to call at trial but also the physical evidence supporting the case is a basic tenant of providing effective assistance of counsel. "Apart from any formal processes of discovery that are available, prosecutors and law enforcement officers have in their possession facts that defense counsel must know. Prosecutors will often reveal facts freely in the hope of inducing a guilty plea. If defense counsel can secure information known to the prosecutor, it will obviously facilitate investigation." ABA Standards for Criminal Justice 4-4.1 Commentary (2d ed. 1982 Supp.). Counsel's failure to fully evaluate the State's evidence introduced at trial resulted in crucial evidence which challenged the State's theory of the case going undeveloped.

Not only the four people who provided testimony as to what they witnessed in the store that night was extremely helpful, but the timing of their purchases along with the other transactions establish a very narrow window in which Mrs. Haraway could have disappeared. Exs. 67 & 68. The State's theory rested largely on the testimony of David and Lenny Timmons and Gene Whelchel about the man and woman walking out of McAnally's were Mr. Ward and Mrs. Haraway. P/H at 349, 351, 368 & N/T 6/14/1988 at 26-28. All three men describe seeing only one man in the truck. N/T 6/9/1988 p. 38, 40, 47-48, 51, 59-60. The description they provided resembled Mr. Ward. P/H at 341. Had the defense utilized the information gleaned from the register tape, exculpatory evidence would have been presented to the jury. First, the

witnesses would have narrowed down the window of her disappearance based on Mr. Keyes'
transaction at 8:25 pm and the four purchases immediately after his.  Additionally, it lent
credence to Mr. Ward's statement of kidnapping Mrs. Haraway with Mr. Ashley.

In the alternative, defense counsel could have used the information presented by Mr.
Haney of a man seen in McAnally's behind the counter with Mrs. Haraway. The gray primered
truck described by several witnesses was in the McAnally's parking lot at least thirty minutes
before Mrs. Haraway's abduction. Exs. 6 & 4. However, this evidence was not developed by the
defense. This evidence considered cumulatively with the records impermissibly withheld by the
State presents a viable defense that the man harassing Mrs. Haraway for months and weeks
leading up to April 28th, was involved in her disappearance. *See supra* Claim II; *Williams v.
Taylor*, 529 U.S. 362, 399, 120 S. Ct. 1495, 1516, 146 L. Ed. 2d 389, 421 (2000) (holding that a
cumulative review of ineffective assistance of counsel claims requires both evidence presented at
trial and not presented); *Wiggins v. Smith*, 539 U.S. 510, 538, 123 S. Ct. 2527, 2544, 156 L. Ed.
2d 471, 495 (2003); *Rompilla v. Beard*, 545 U.S. 374, 393, 125 S. Ct. 2456, 2469, 162 L. Ed. 2d
360, 379 (2005).

Finally, defense counsel could have interviewed Gene Whelchel about the 9:00 pm
transaction. An investigator could have inquired who rang up the purchase, what the purchase
was, and why the crime scene was not immediately closed down upon the arrival of Officer
Harvey Philips and Detective Mike Baskins at approximately 8:55 pm. Ex. 41. (dispatch was
logged at 8:50 pm). This line of investigation could establish how vital the evidence was lost due
to improper police procedure. J/T at 1239-1240, 1422-23, 1439, 1441, 1447-48. Defense counsel
could have impeached Mr. Whelchel about the timing of events, inquired more specifically as to
those present in McAnally's after his initial call, and whether the State's timing was off given the

details provided on the register tape. Evidence presented at trial showed the police failed to close the store to process the scene as other customers bought gas and items from the store. N/T 6/9/1985 at 92-93. Since it is clear the police seized the register tape, their documentation of the times of transaction goes to the thoroughness of their investigation. Solidifying the timing of the only eyewitness accounts and the immediate actions of the police in response to this evidence was crucial for the defense. The defense's failure to pursue this evidence deprived Mr. Fontenot of numerous means to challenge the State's case.

It is the defense counsel's duty of to investigate all aspects of the State's case including the physical evidence introduced in trial. "The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense," is an obligation set forth in the ABA Standards regarding the baseline of representation a defense attorney must provide his client. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). Defense counsel failed to investigate viable leads and build such evidence into a defense he sought to pursue. Ex. 16. Further, appellate counsel, likewise, should have pursued this evidence in building a defense for Mr. Fontenot. Ex. 11. It is not enough that the defense reviewed this evidence in court, but prior to the proceedings.

Defense counsel's failure to investigate Mr. Fontenot's case due to limited funding does not negate his constitutional obligation. *See Hinton v. Alabama*, 134 S.Ct. 1081, 1088-1089 (2014) (ineffective assistance of counsel was found when defense counsel failed to ask for further investigative funds for an expert). This Court must determine the impact of the absence of this evidence on the totality of his case. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known

to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S 510, 527 (2003).

All the evidence mentioned was available to defense counsel pretrial, but none of it was presented to the jury. Had it been, there is a reasonable probability of a different result due to the weakness of the State's case against Mr. Fontenot. *See Strickland*, 466 U.S. at 694. The prosecution's case rested on Mr. Fontenot's confession which did not coincide with any evidence they presented, including the cause of Mrs. Haraway's death, the location of her remains, and the details of how he supposedly killed her. Exs. 18, 45, & 68.  Further, the sole eyewitness at McAnally's who places Mr. Fontenot at the scene recanted his testimony after the preliminary hearing and attempted to tell the State the same. J /T at 1042, 1051-52, 1056-1057; Ex.14. But for defense counsel's failure to challenge the evidence the State clearly would present, Mr. Fontenot would not have been convicted of these crimes. The failure to investigate this evidence deprived Mr. Fontenot of his Sixth Amendment right to effective assistance of counsel.

## V.   MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WAS VIOLATED WHEN HIS APPELLATE COUNSEL FAILED TO PRESENT VIABLE CONSTITUTIONAL CLAIMS IN MR. FONTENOT'S DIRECT APPEAL PROCEEDINGS.

The claims and factual allegations set forth elsewhere in this Petition and in the attachments hereto are incorporated by reference and re-alleged as if set forth in their entirety herein.  Under *Strickland v. Washington*, 466 U.S. 668 (1984) counsel provides ineffective assistance whenever (1) counsel's performance is deficient, i.e., that the attorney's performance fell below "an objective standard of reasonableness," *id.* at 688; and (2) those deficiencies were prejudicial, defined as errors that collective "undermine confidence in the outcome," and thus create a "reasonable probability" of a different result, *Id.* at 694.  *See Rompilla v. Beard*, 545

U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2001).

Mr. Fontenot suffered ineffective assistance of counsel on direct appeal because appellate counsel failed to raise substantial and cognizable state and federal constitutional issues, and failed not raise all available grounds, on his direct appeal to the Oklahoma Court of Criminal Appeals. These substantial and cognizable constitutional issues are raised as claims herein, and Mr. Fontenot would incorporate by reference the factual allegations, allegations of prejudice, and arguments as set forth here in full.

There was no strategic or tactical reason for not presenting these claims in Mr. Fontenot's second direct appeal brief. Had appellate counsel raised these issues, it is likely that the Oklahoma Court of Criminal Appeals would have reversed his conviction and ordered a new trial. Because appellate counsel's failure to raise substantial and cognizable constitutional claims deprived Mr. Fontenot of appellate review of the constitutional errors inherent in his trial, the reliability of the judgment and sentence, and sentence in this case is questioned.

## VI. MR. FONTENOT'S DUE PROCESS RIGHTS WERE VIOLATED DUE TO POLICE MISCONDUCT WHEN TAKING A FALSE CONFESSION AND THE PROSECUTION KNOWINLY INTRODUCED FALSE TESTIMONY DURING HIS TRIAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.

### A.   Police Misconduct in The Interrogations of Mr. Fontenot

On October 19, 1984, at the OSBI office in Ada, Oklahoma, detectives videotaped the Mr. Fontenot's "confession" to the murder of Denice Haraway. However, before the video machine was turned on, Agent Gary Rogers and Detective Dennis Smith conducted a one hour and forty-five-minute interrogation that was not included on the videotape. P/H. at 960-61; J/T at 2034, 2047. Prior to the interrogation, Detective Smith acknowledged that Mr. Rogers read Mr.

Fontenot his rights, but no *Miranda* form was ever presented to him nor did Mr. Fontenot ever

sign a form. P/H at 956-957; *Miranda v. Arizona*, 384 U.S. 436 (1966). Although Mr. Fontenot's

interrogators deny ever having threatened or coerced him,[43] it is indisputable that during the time

prior to turning on the video recorder, the interrogators supplied Mr. Fontenot with the

information that Tommy Ward had confessed to the murder of Mrs. Haraway and inculpated Mr.

Fontenot in his confession.[44] P/H at 960. Even though. Mr. Fontenot denied knowing anything

about Mrs. Haraway's disappearance or what Mr. Ward's confession involved, both interrogators

ignored his denials and continued to tell him he knew about the crimes. P/H at 961-962. Agent

Rogers and Detective Smith began feeding Mr. Fontenot information about the crime to aid in

his confession.

> A. Well before his story changed, I think Agent Rogers mentioned to him that we knew that he and Tommy Ward and Odell Titsworth were at a party on South Townsend.
> Q. Okay.
> A. And we knew that they had left the party and where they had gone.
> Q. Okay. All right. What else did you tell him, or Agent Rogers tell him?
> A. I think that was basically the extent of it and ---
> Q. Was the name Odell Titsworth mentioned prior to Agent Rogers mentioning it?
> A. I don't think so.

P/H. at 964; Ex. 44 at 626. Telling Mr. Fontenot details of Mr. Ward's confession and feeding

Mr. Fontenot O'Dell Titsworth's name, not only planted information in Mr. Fontenot's mind that

became part of his confession, but resulted in the creation of completely incredible evidence that

---

[43] This statement is dubious at best given the other witnesses who admit being pressured to alter their accounts: Stacy Shelton, Karen Wise, and Jim Moyer.

[44] Mr. Ward's confession was the product of hours of interrogation. After police repeatedly insisted it was in Mr. Ward's self-interest to admit to the murder of Denice Haraway, even after he denied any involvement, he told police that he had a dream about the murder. Mr. Ward's description of the dream was considered a confession by police, but was not corroborated by any credible evidence.

supported nothing else in the case nor did it lead to new evidence inculpating either co-defendant in the crime.[45]

The confession included several facts that could not be corroborated with any evidence. According to his confession, Mr. Fontenot attended a party with his co-defendant, Tommy Ward, and Odell Titsworth.[46] Exs. 19 & 69. The three men drove to McAnally's in Mr. Titsworth's truck, where they abducted Denice Haraway and subsequently took her out behind a power plant in Ada. The three men took turns raping the victim before transporting her in Mr. Titsworth's truck to a house off of a country road near the power plant. At the house, Haraway was stabbed to death, and burned. See Ex. 69, pgs. 1-21. Finally, Mr. Fontenot did not know Mr. Titsworth prior to being shown his picture and presenting Mr. Titsworth to Mr. Fontenot's jail cell. P/H at 968, 994-995.

After investigating these claims, police discovered that nothing in Mr. Fontenot's confession could be verified. First, the police eliminated Mr. Titsworth as suspect due to his broken arm on the night in question. Furthermore, neither Mr. Titsworth nor his family owned a truck like the one described in Karl's statement. P/H at 965. The medical examiner's report established that Mrs. Haraway was not stabbed, but died from a single gunshot wound to the head. *See* Ex. 46, pgs. 1, 3, 12, 40. Mrs. Haraway's body was found a county over from where Mr. Fontenot had said it would be found. Finally, the house Mr. Fontenot claimed had been burned with Mrs. Haraway's body inside, was burned a year before the murder occurred. P/H at 977. These discrepancies, along with the fact that the details of Mr. Fontenot's confession changed several times before the police recorded it, leaves questions about how such a

---

[45] False confessions occurred in 13% of the 1,730 known exonerations in this country. *See* https://www.law.umich.edu/special/exoneration/Pages/about.aspx (last visited 1/22/16).

[46] It is interesting that police disclosed the videotaped confession to Mr. Butner, but failed to include the polygraphed and handwritten statement where he detailed being at the party and people he was present with.

confession could be made, much less considered reliable. *See* P/H at 973-74, 1372, 1420-1421.

Most importantly, Mr. Fontenot recanted his confession shortly after giving it -- but that

evidence was withheld from his defense attorney. See Ex. 44 at 626.

Police interrogations, by their very nature are coercive. However, police are trained to

investigate a case before interrogating suspects to ensure only the strongest suspects in are

subjected to the process.

> There are three important decision points in the interrogation process to analyze when trying to understand the causes of a false confession. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big difference between interrogation and interviewing: unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime. **False confessions only occur when police misclassify an innocent suspect as guilty and then subject him to a custodial interrogation. This is one reason why interrogation training manuals implore detectives to adequately investigate their cases before subjecting any potential suspect to an accusatorial interrogation**.[47]

> The second important decision point in the process occurs when the police interrogate the suspect. As mentioned above, the goal of police interrogation is to elicit a voluntary incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically persuasive, manipulative and deceptive interrogation techniques.  As described in detail in the previous section, police interrogators use these techniques to accuse the suspect of committing a crime, persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then induce him to confess by suggesting it is the best course of action for him. **Properly trained police interrogators do not use physically or psychologically coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions and/or confessions.**

---

[47] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 3 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case."). *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate.").

To understand how and why police-induced false confessions occur, one must first understand how interrogation is intended to influence and manipulate a suspect's perceptions, reasoning and decision-making. **Police interrogation is designed for the guilty, not the innocent. Police are trained only to interrogate suspects whom they believe to be guilty,[48] and the purpose of interrogation of suspects unlike the interviewing of witnesses or victims is to elicit an incriminating statement, admission and/or confession that confirms the interrogator's belief in the suspect's guilt and assists the state in prosecuting the suspect**. Because police expect the suspect to deny his guilt, interrogation is intended to break down the suspect's resistance and move him to admission. As discussed above, police typically achieve this by accusing a suspect of committing the crime, attacking the suspect's alibi, cutting off a suspect's denials and confronting the suspect with seemingly irrefutable (whether real or non-existent) evidence of his guilt. The point of these techniques is to break down a suspect's confidence in his denials by convincing him that he is caught, that no one will believe his assertions of innocence, and that objective evidence of his guilt is so overwhelming that it will inevitably lead to his arrest and conviction regardless of what he says or does during interrogation.

Ex. 19, p. 11) (emphasis added).

Here, Detective Smith admitted Mr. Fontenot was unknown to the police prior to his arrest. P/H at 948. He had never been involved in any crimes or interrogated prior to the events of October 19, 1984. J/T at 1607-1608. The only reason Mr. Fontenot was arrested and subjected to this interrogation is because Mr. Ward mentioned him during his interrogation the day before based on a suspect lead provided by Jeff Miller. Prior to being arrested, no other individual provided any inculpatory evidence connecting Mr. Fontenot to Mrs. Haraway other than Mr. Ward. Law enforcement is trained to conduct a thorough investigation into the suspects prior to commencing the interrogation of to ensure the evidence given is valid. Ex. 19.

The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. **If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously**

---

[48] *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

**undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt.**

Ex. 19, pgs. 15-16.

No investigation was done into the possibility of Mr. Fontenot being involved other than police taking as true Mr. Ward's confession the day prior. Such lax police investigation prior to the interrogations led to the wild goose chase which followed in the days and weeks after these confessions where nothing either defendant said could be verified.

If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. **Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence.** Assuming that neither the investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

*Id.* at 19-20 (emphasis added.). At every turn, law enforcement uncovered absolutely no evidence from the "confession." Mr. Fontenot described Mr. Titsworth as 5'10" to 5'11' and weighing approximately 140-150 pounds. He said his hair length was just below his ears and Mr. Titsworth had no distinguishing marks or tattoos. J/T at 2074-75. In actuality, Mr. Titsworth's hair fell to mid-waist, he weighed 170 lbs. and had sleeve tattoos from his shoulders to his wrists, tattoos along his back, stomach and both legs. Further, the Ada police broke Mr. Titsworth's arm during

his arrest two days prior to Mrs. Haraway's disappearance. P/H at 792-793, 795797, 838. When Mr. Fontenot was shown pictures of Mr. Titsworth, he was unable to identify him. P/H at 968, 994-995.

Police interrogated Mr. Titsworth along with seizing his mother's truck. After the police searched the truck and after Mr. Titsworth's repeated denials and verification of his broken arm, they realized neither he nor his property had anything to do with the crime. P/H. at 520, 522. Police repeatedly tried to locate Mrs. Haraway's remains at the power plant and surrounding areas with no success despite seventy-five to eighty people being involved in the search. P/H at 599-600; N/T 6/10/1988 at 83-85, 89-90.

During the preliminary hearing, defense counsel asked Detective Baskins if he was able to corroborate any parts of Mr. Fontenot's confession.

> Q. Has he told you anything that you have been able to ascertain is the truth? You personally?
> A. No.
> Q. No fact in his statement, you have been able to prove right or wrong have you?
> A. No.
> Q. To the best of your knowledge, Detective Baskins, has any statement that Karl Fontenot made to you been – any fact, at all, been proven true or false? Any fact?
> A. To me personally, no.
> Q. Now, what about Tommy Ward? Any fact that Tommy Ward has told you, have you proven or disproven any fact that he's told you?
> A. The ones he's told me personally, disproved.
> Q. So the ones he's told you personally and the facts about this case and the statements he's made, no facts have you been able to prove. Is that right?
> A. That he's made to me personally?
> Q. Yes, sir.
> A. That's correct.

P/H at 546-547. Detective Baskins attempted to locate the crime scene based on the claims in Mr. Ward's and Mr. Fontenot's confessions. He received a series of telephone calls from Agent Rogers and Detective Smith on possible locations based on the "evidence" given in the confessions. However, after numerous searches, only animal bones were recovered. N/T

6/10/1988, at 169. In the totality of their investigation, the police lacked any evidence or eyewitness accounts support Mr. Fontenot's confession. *Id.* at 178-179.

Due to the inability of law enforcement to support their confessions with any meaningful evidence, they resorted to several improper actions to garner viable evidence from Mr. Fontenot. After the confession, but before he was arraigned, Detectives Smith and Baskins **took a sack of human bones to his cell** to coerce Mr. Fontenot to tell them the whereabouts of the victim's body. N/T. 6/10/1988 at 172 (emphasis added). Police showed Mr. Fontenot a human skull stating that they had found Mrs. Haraway, and wanted to find the rest of her remains, so that her family could proceed with giving her a Christian burial. P/H at 537, 559, 981-82. These bones were obtained from a science lab at East Central University in Ada and used improperly as a tool to scare more information out of Mr. Fontenot. P/H at 975-76.

Although this tactic was used after a confession had already been obtained, it is illustrative of the coercion surrounding Mr. Fontenot's confession and the desperation of the police. The police were on a mission for any evidence with no regard for the truth. The idea that Mr. Fontenot was innocent, therefore he could provide no accurate details, never entered the detectives' mind. The actions of the Ada Police and OSBI agents involved in the interrogations of Mr. Fontenot engaged in police misconduct in violation of known police procedure and Mr. Fontenot's constitutional rights.

   **B.     Mr. Fontenot's Confession Is False and Unreliable.**

Based on the detective's own admissions, there is no reliable information provided in Mr. Fontenot's confession. Police did not learn one detail as to what occurred to Mrs. Haraway on the night of April 28, 1984, that they did not already know. No new leads were developed or witnesses found. Every attempt by the Ada police and OSBI to substantiate Mr. Fontenot's

confession resulted in dead ends. Instead of acknowledging that Mr. Fontenot did not know anything about the case, police and the prosecution continued to blindly pursue a defendant with no involvement in these crimes.

Dr. Richard Leo, a renowned psychologist who studies interrogations and confessions has reviewed the evidence in Mr. Fontenot's case concerning the validity and reliability of Mr. Fontenot's confession:

> In my professional opinion, Karl Fontenot's confession statement to abducting, raping, murdering, and burning the body of Denice Haraway with Tommy Ward and Odell Titsworth contains *numerous* and *substantial* indicia of unreliability and no – zero – corresponding indicia of reliability. Karl Fontenot's confession statement possesses all of the hallmarks of a false and unreliable confession in spades. In the thousands of confessions I have analyzed in the last three decades, I have rarely seen a post-admission narrative that is so thoroughly contradicted by the underlying crime facts, that fails so completely to demonstrate the lack of any personal knowledge of the crime facts, and that contains so many alleged crime scene details that were not merely erroneous but physically impossible and provably false. In my professional opinion, Karl Fontenot's confession statement is almost certainly, if not certainly, false.

> The numerous and substantial indicia of unreliability include:

> 1) Karl Fontenot's confession statement contains the wrong method of killing: Fontenot confessed that Haraway was stabbed to death when, in fact, she was murdered by a single gunshot to the head. There is no evidence that Fontenot ever owned a gun. Significantly, Fontenot's confession statement did not mention that Haraway (whose body had not been discovered until more than a year after the murder) had been shot in the head or even that a gun was involved in the crime. Additionally, there is no evidence that Haraway was ever stabbed nor is there any evidence that she was raped or that her body was burned, contrary to Fontenot's confession statement.

> 2) In Fontenot's confession statement, the body had been burned in an abandoned house near the power plant and then Titsworth, Ward and Fontenot burned down the house. Not only is there no evidence that Haraway's body was burned, but the abandoned house had been torn down and burned in June 1983 – 10 months before the murder of Denice Haraway in April 1984 – and so did not exist at the time of the crime. It was therefore physically impossible for Fontenot, Ward and Titsworth to have burned down the house in April 1984 because it no longer existed at that time. Nor had there been any fire reported on that property on April 28, 1984.

3)    Fontenot's confession statement claims that Odell Titsworth physically forced Haraway to get into a pick-up truck, carried Haraway, raped her, stabbed her, and set her on fire. Because Titsworth's arm had been broken by the Ada Police Department on April 26, 1984 (two days before the murder of Denice Haraway on April 28, 1984), he had a very painful spiral fracture that would have made it impossible for him to have physically forced Haraway to get into a truck and thereafter carry Haraway and put her over a fence, much less rape, stab or set her on fire. Indeed, Titsworth was eventually cleared of the crime altogether, making his presence in Fontenot's confession statement a major red flag for a false confession. Fontenot makes no mention of Titsworth's injury in his confession.

4)    Remarkably, Fontenot could neither correctly describe nor even identify Titsworth. Fontenot described Titsworth as 5'10-5'11, 140-150 lbs., with black hair below his ears, and as having no tattoos or distinguishing marks. In fact, Titsworth was 170 lbs., had hair down to the middle of his waist, and was covered in visible tattoos on both arms and both legs. Obviously Fontenot did not know who Odell Titsworth was. Not surprisingly, Fontenot could not identify pictures of Titsworth shown to him by police nor could he identify Titsworth in person when Titsworth was brought to Fontenot's jail cell and standing right in front of him, though Titsworth would have been easily recognizable to anyone who had ever seen him up close because of his numerous visible tattoos. In addition, Fontenot's confession statement claimed that Odell Titsworth's pick-up truck had been used to kidnap and transport Denice Haraway to the crime scene, but Titsworth did not own a pick-up truck.  A pickup truck owned by Titsworth's mother was searched and no evidence was found implicating Fontenot or Titsworth.

5)    As occurs in so many false confessions to murder, Fontenot could not identify the location of the crime or lead police to Denice Haraway's body, which was found over a year after Fontenot's confession statement in a different county in a completely different direction than his confession states.

6)    Fontenot's confession statement contains an erroneous description of the time of the day in which the crime occurred. Fontenot's confession statement stated that it was almost dark when Denice Haraway had been kidnapped, but that would have occurred around 8:30 p.m. when it had already been dark for some time.

7)    As in so many multiple false confession cases,[49] Fontenot's confession statement to the murder of Denice Haraway contradicts, on numerous details, Tommy Ward's statement a day earlier, which itself led to Fontenot's arrest and interrogation. The two confession statements contradict one another regarding the number of perpetrators who allegedly raped Denice Haraway (even though there is no evidence that she was even raped); whether she was stabbed by her assailant(s) (even though there is no evidence that she was stabbed) as well as the number and location the alleged stab wounds; whether she was able to temporarily break free

---

[49] *See* Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA world. *North Carolina Law Review*, 82, 891-1007.

of her assailant(s); how she died; when she died; and where the assailant(s) disposed of her body.

8)     Other than Tommy Ward's discredited, factually false confession, there is no evidence at all linking Karl Fontenot to the murder of Denice Haraway. Only one witness identified him as being present at McAnally's on April 28, 1984, when Donna Denice Haraway left the store. That witness, who underwent hypnosis prior to the preliminary hearing, recanted his identification of Fontenot at trial. Additionally, Fontenot did not match the eyewitness descriptions that led to the composite picture posted by Ada police following Ms. Haraway's disappearance.

Without the assistance of information fed to him by Agent Rogers and Detective Smith, nothing Mr. Fontenot said was reliable. Knowing how susceptible Mr. Fontenot was to suggestion in an interrogation makes it understandable why he would agree with information given to him by the police.

Mr. Fontenot was particularly susceptible to making a false confession. The Supreme Court recognizes that a suspect's mental incapacities could render a confession involuntary if obtained because of "persistent and protracted questioning," and furthermore that "the use of a confession obtained under such circumstances is a denial of due process and the judgment of conviction must be reversed." *Ward v. Texas*, 316 U.S. 547, 555 (1942).

A psychological evaluation of Mr. Fontenot performed by Dr. Joel Dreyer, M.D. around the time of trial indicates that he has "an abnormally low intelligence" and, at the time of the interrogation, was "suffering from Post-Traumatic Stress Disorder," related to guilt associated with the death of his mother.[50] These psychological infirmities made Karl particularly vulnerable to police coercion.[51] In Dr. Dreyer's medical opinion, Mr. Fontenot's guilt over his mother's death is ultimately responsible for his willingness to accept blame for the murder of the

---

[50] In 1984, Mr. Fontenot witnessed the death of his mother as she was hit by a car while walking across a 4-lane highway in order to join Mr. Fontenot inside of a restaurant. Mr. Fontenot was inside the restaurant attempting to make a phone call for assistance with their broken-down vehicle. In Dr. Dreyer's opinion, Mr. Fontenot believes

[51] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

131

victim in this case. According to Dr. Dreyer, "[Fontenot] believes in his own mind in some talion

law, an eye for an eye, a tooth for a tooth, that even though he never met Denice Haraway and

had never been at McAnally's East Confectionery, that he was willing to take the rap for her

murder and willing to repeat….the story given to him from the dream of Tommy Ward." *See*

(Exs. 63 & 64,

p. 3.

Additionally, Dr. Sandra Petrick, a psychiatrist at Eastern State Hospital, evaluated Mr.

Fontenot in order to determine his competency to stand trial. Dr. Petrick determined that Mr.

Fontenot had great difficulty in understanding legal terminology along with the adversarial

nature of criminal proceedings. N/T 6/13/1988 at 30-31, 36. Of particular importance is Dr.

Petrick's opinion from her report that "[Fontenot] did not understand the implications of his

confession." Specifically, he referred to his confession as a "confessment" and said he did not

know he was admitting that he did something. N/T 6/13/1988 at 33.

Under the standard outlined in *Crawford v. State*, 840 P.2d 627 (Ok 1992), and *Malloy v.*

*Hogan*, 378 U.S. 1 (1964), Mr. Fontenot's confession was neither the product of a free, nor

unconstrained choice of its maker.

> In addition, as discussed above, there were several factors present in this case that
> elevated the risk of eliciting a false and unreliable confession from Mr. Fontenot.
> These included Mr. Fontenot's abnormally low I.Q., which suggests he would have
> been highly suggestible, compliant and easily manipulated into making or agreeing
> to a false confession; and the interrogation pressure and high-end inducements he
> describes occurring during the largely unrecorded interrogation, that if he had been
> capable of repairing the car, or making the phone call more quickly, his mother
> never would've felt the need to come help him inside the restaurant, and would
> therefore, be alive.

> In addition to these mental instabilities, Mr. Fontenot lived in poverty from birth to
> adolescence with an alcoholic father, and then with strangers who picked him up

off the street after his mother's death, which, as substantial social science research has demonstrated, are known to lead to false and unreliable confessions.[52]

Ex. 19. Because Mr. Fontenot's psychological conditions rendered him incapable of reasoning the way a mentally healthy interrogation subject would have, his ability to voluntarily provide a statement to police in the face of their insistence on his guilt, should not be considered trustworthy.

### C.      The Pontotoc County District Attorney Office Knowingly Admitted False Testimony during Mr. Fontenot's Trial.

The prosecution, as a representative of the people, must zealously prosecute cases while also upholding justice. *See Berger v. U.S*, 295 U.S. 78 (1935). In that endeavor, the prosecution must not present evidence it knows to be false but must ensure that the record is corrected when a prosecutor learns the evidence is false. *See Napue v. Illinois*, 360 U.S. 264 (1959). The reason is to ensure a fair verdict from the factfinder, whether judge or jury; one worthy of reliability and finality. "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.' " *Id.* at 269-270. The district attorney's obligation is ensure the evidence presented has an indicia of reliability. The source of that evidence is irrelevant if the evidence is wrong, even if that evidence is a confession.

The ABA Standards for Criminal Justice advise prosecutors to ensure the evidence presented at trial is worthy of reliability and credibility.

Standard 3-5.6 Presentation of Evidence

---

[52] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

(a) A prosecutor should not knowingly offer false evidence, whether by documents,

tangible evidence, or the testimony of witnesses, or fail to seek withdrawal

thereof upon discovery of its falsity.

ABA Standards for Criminal Justice (Prosecution Function) 3-5.6; *Mooney v. Holohan*, 294

U.S. 103, 112 (1935)( It is a requirement that cannot be deemed to be satisfied by mere notice

and hearing if a State has contrived a conviction through the pretense of a trial which in truth is

but used as a means of depriving a defendant of liberty through a deliberate deception of court

and jury by the presentation of testimony known to be perjured. Such a contrivance by a State

to procure the conviction and imprisonment of a defendant is as inconsistent with the

rudimentary demands of justice as is the obtaining of a like result by intimidation).

After Agent Rogers presented the prosecutorial to Mr. Peterson, he was obligated to vet

the case and determine whether charges should be brought and what those charges should be.

The absence of any corroboration for Mr. Fontenot's confession should have alerted him of the

serious flaws in this case.  Instead, Mr. Peterson continued to pursue charges against Mr.

Fontenot on the flimsiest of evidence.  Even after his sole eyewitness to Mr. Fontenot's

involvement recanted his testimony **after the preliminary hearing**, he continued to move

forward knowing that evidence against Mr. Fontenot rested largely on his guilt by association

with Mr. Ward. *See* N/T 6/9/1988 at 24-26; Ex. 14.   The sole evidence the State presented was

Mr. Fontenot's false confession knowing it had not a shred of truth or credibility.

The State's continued presentation of Mr. Fontenot's confession, in the absence of any

corroboration, when all the evidence presented conflicted with that confession was not only a

violation of the prosecution's professional obligation but violated Mr. Fontenot's constitutional

rights. Prior to finding Mrs. Haraway's remains, Mr. Fontenot's confession failed to point law

enforcement to where she may be and what might have happened to her. Instead, a year and a half after the confession, her remains were found in a completely different location with a cause of death different from what is described in the confession. Exs. 17& 46. The discovery of Mrs. Haraway's remains debunks whatever shreds of validity Mr. Fontenot's confession retained.  However, instead of dismissing the case, Mr. Peterson remained staunch. "When asked if the discovery of the body would affect Ward's and Fontenot's conviction, Peterson said, 'Why would it? We convicted them without a body and now we have one.'" Ex. 70.

The State's comments, in a vacuum, would seem innocuous, but given the extent to which the undisclosed evidence provided a viable defense for Mr. Fontenot, presented viable alternate suspects, and other key pieces of evidence show the extent the state went to present false evidence under the guise of a valid "confession." "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotations omitted). The actions of the state resulted in the presentation of evidence the police knew to be false at the preliminary hearing. That the prosecutor, with numerous years of experience, failed to grasp the incredible confession of a defendant with no connection with the victim or the case other than through the misguided association with a man who admitted being involved on two separate occasions is a due process violation under the Fourteenth Amendment. Mr. Fontenot is entitled to a vacation of his conviction.

**VII.   THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. FONTENOT BECAUSE THE STATE FAILED TO SHOW THE EXISTENCE OF THE CORPUS DELICTI OF THE CHARGED CRIMES OUTSIDE OF THE CONFESSION AND FAILED TO ESTABLISH THE TRUSTWORTHINESS OF THE CONFESSION IN VIOLATION OF THE FOURTEENTH AMENDMENT.**

Exclusionary rules relating to criminal confessions find their basis in a single premise, insulation of the adversary system of jurisprudence from introduction of false and unreliable evidence. Such false testimony, when undetected, can only result in a fraud upon society -- conviction of the innocent and freedom for the guilty.

Note, Voluntary False Confessions: A Neglected Area in Criminal Administration, 28 Ind.L.J. 374 (1953).

Despite vast inconsistencies between Mr. Fontenot's confession and the evidence, the prosecution tried desperately to force the evidence to fit Mr. Fontenot's story; claiming in essence that it would be inconceivable for any person to confess to crimes he had not committed. In closing argument, the prosecutor contended:

I ask, you, ladies and gentlemen, when you are deciding who to believe and who not to believe I ask you to consider, first of all, is it reasonable to believe that you could convince a man in fifteen minutes to confess to a crime like this? Now, we are not talking about any crime here, we are not talking cutting tires or whatever. We are talking robbery, kidnapping and murder. Could you confess, get a man to confess to that, especially a murder so heinous and brutal and cruel where he his saying - could you get a man to say, well, she was screaming help and crying and begging and there wasn't no one there to help her, we weren't going for what she was saying. Could you get someone to say that if they really hadn't done that? In fifteen minutes?

I don't care how stupid, stupidity is not a lack of morality. A stupid person would still know he was saying bad things about himself. Could you get a man to do that?

N/T 6/14/1988 at 73-74.

Yet, false confessions are not new to legal history. As stated in *Smith v. United States*, 348 U.S. 147, 153, 75 S.Ct. 194, 197 (1954), the "experience of the courts, the police and the medical profession recounts a number of false confessions voluntarily made." *See also* Note, *Corroboration of Confessions in the Theft by Receiving Context: Is Proof of Theft Enough*, 44 Ark.L.R. 805 (1991); Ayling, *Corroborating Confessions: An Empirical Analysis of Legal Safeguard Against False Confessions*, 1984 Wisconsin L.R. 1121; Note, *Voluntary False Confessions, supra*, 28 Ind.L.J. 374 (1953).

Among the reasons legal scholars and courts cite for false confessions are psychological factors including two substantiated by the evidence in this case: guilt feelings over unrelated acts and a desire for notoriety. Ayling, *Corroborating Confessions*, *supra* at 1158-59; *Voluntary False Confessions*, *supra*, at 379-382.

Psychiatrist Joel Dreyer, who examined Mr. Fontenot before retrial, found that Mr. Fontenot felt extreme personal guilt over the death of his mother who just a few years before his confession died in an auto-pedestrian accident as she crossed a four-lane highway to find him. A teenage Mr. Fontenot watched helplessly as his mother came to find him and was hit and killed by a car.[53] N/T 6/13/1988 at 193-94. Dr. Dreyer's testimony was that "he [Mr. Fontenot] felt responsible for her death and feels he should take the responsibility for this other person's death, for the death of his mother..." N/T 6/13/1988 at 193-94.

Dr. Dreyer also noted Mr. Fontenot:

> ... saw this as an opportunity to be important, to have notoriety, to have a claim, to be written up, to be in the papers, to have friends, to have people interested in him. And so he did like a lot of people do, all of the way from the Son of Sam to other people who go and say, 'I'm the Son of Sam.' but only one was the Son of Sam. Those other hundred and eleven couldn't have all been the Son of Sam. He is like those hundred and eleven people, willing to gain some claim (sic), because he is not bright and because he was just wandering the street.

N/T 6/13/1988 at 199.[54]

Other evidence showed Mr. Fontenot sought attention and often made false claims.

---

[53] Dr. Dreyer related that Mr. Fontenot's mother bad been involved in a minor traffic accident and had sent Karl across the highway to telephone for assistance, but "[h]e didn't have any money when be got there and be couldn't figure out how to call the police . . . So be had taken so long talking to the people in that little restaurant, that finally his mother crossed that four-lane highway to find out what he was doing." N/T 6/13/1988 at 193-94.

[54] Dr. Dreyer testified: " . . . he was a vagrant, he was like a bum in a way, I mean be was wandering the streets. First of all his dad bad left him six years before his mother left him and his dad left him to go somewhere and he hadn't had contact with him since. His dad was a proverbial ubiguitous [sic] alcoholic and his mom then, of course, died in this pedestrian auto accident. And so he is just wandering the streets and doing some pot and drinking some booze and talking to some people and doing what he has to do, primarily drinking from time to time, not doing too much with his life and wandering the streets, not knowing what this world is going to hold for him and feeling responsible for his mother's death and thinking death for himself and suicide." N/T 6/13/1988 at 199.

Gordon Calhoun, who testified for the State that Mr. Fontenot claimed to know something about Haraway's disappearance, agreed Mr. Fontenot "kind of likes spinning yarns and, that is how he got his attention." N/T 6/9/1988 at 145-146, 149. Mr. Calhoun did not believe Mr. Fontenot's claims about Mrs. Haraway's disappearance. *Id.* at 151. He agreed Mr. Fontenot "would downright lie to you if he thought it would get your attention." *Id.* at 154.

The development of legal safeguards to ensure the reliability of confessions relates directly to the very real experiences of the judiciary with false confessors to crimes, even to crimes that never occurred. The fact that Mr. Fontenot confessed to a crime does not make his confession a reliable one, for false confessions to real crimes are just as likely as those to imaginary ones. *See Corroboration of Confessions*, *supra*, at 832. The goal of the legal safeguards for confessions is not just to protect the confessor from unjust imprisonment, but to ensure that society is protected from the actual wrongdoer. *Voluntary False Confessions*, *supra*, at 374.

A.    **The State's Failure to Sufficiently Prove the Corpus Delicti of the Charged Crimes Independent of the Confession Requires Reversal.**

The State, before extracting confessions from Mr. Ward and Mr. Fontenot, had little accurate information about what happened to Mrs. Haraway. She had been missing for six months and the State presumed she had been the victim of foul play despite its inability to locate her remains or to properly secure the scene of Mrs. Haraway's disappearance. The State's evidence before Mr. Ward's October 18, 1984, confession, consisted of a description of varying pickup trucks, a composite drawing of the man with whom Mrs. Haraway had been seen leaving McAnally's, and descriptions of two men who had aroused the suspicion of a clerk at completely

different convenience store shortly before Mrs. Haraway's disappearance.[55]   Although police

denied they had a clothing description before the confessions, evidence showed that APD

Detectives Smith and Baskins were given the description of a blouse a day or two after she

disappeared - the same description that was incorporated first into Mr. Ward's and then into Mr.

Fontenot's confessions six months later. N/T 6/10/1988 at 144, N/T 6/13/1988 at 116.

In *State ex.rel. Peterson v. Ward*, 707 P.2d 1217 (Okl.Cr.1985), the Oklahoma Court of

Criminal Appeals stated:

> It is a fundamental rule of law in this jurisdiction, and most others, that "no criminal
> conviction can be based upon a defendant's extrajudicial confession or admission,
> although otherwise admissible, unless there is other evidence tending to establish
> the **corpus delicti**." We have defined corpus delicti "as the substantial and
> fundamental fact or facts necessary to the commission of a crime, and means when
> applied to any particular offense, the actual commission by someone of particular
> offense charged."

*Id.*, 707 P.2d at 1219; *see also Opper v. U.S.*, 348 U.S. 84 (1954).

Here, the State failed to sufficiently show independent evidence of the corpus delicti of

the charged crimes of kidnapping and first-degree murder in order to admit of Mr. Fontenot's

confessions into evidence.

The elements of kidnapping given to the jury were: 1) unlawful; 2) forcible seizure and

confinement; 3) of another; 4) with intent to confine secretly; 5) against the person's will. (O.R.II

161) The evidence showed Mrs. Haraway calmly left the convenience store accompanied by a

man with his arm around her waist. She said nothing to a bystander entering the store as she was

leaving. She indicated no distress and the customer was in the store about ten minutes before he

realized the clerk was gone. Although the State claimed circumstantial evidence showed it was

out of character for Mrs. Haraway to leave the store unattended and disappear, the objective

---

[55] This is the evidence made available to Mr. Fontenot's defense counsel.  As discussed previously, the police had much more evidence at their disposal that they ignored.  *See supra* Claims I & II.

evidence was that she left the store with a man without protest to available rescuers.  The

evidence outside of Mr. Fontenot's confession failed to show Mrs. Haraway was taken

unlawfully, by force or against her will and thus the corpus delicti of the crime of kidnapping

was not established outside the confession.

Ordinarily, the discovery of Mrs. Haraway's remains with a bullet hole in the skull would

suffice to show the corpus delicti of murder. *See Goforth v. State*, 644 P.2d 114 (Ok. 1982) (the

corpus delicti of a murder may be shown by evidence that a body was found under circumstances

indicating a violent death). The only evidence indicating a violent death caused by the acts of

another in this case was a bullet hole in the skull.  However, the medical examiner testified that

he could not determine whether the bullet wound was inflicted before or after Mrs. Haraway's

death. N/T 6/9/1988 at 132. When Mr. Fontenot sought a new trial while awaiting a decision on

appeal after the 1985 trial, the State contended the bullet was not the cause of death, but was

merely a post-mortem injury:

> The State maintains its trial theory that Denise Haraway died due to extensive stab
> wounds. Moreover, the skeletal remains would not adequately reflect stab wounds
> to an individual's body. As the remains were found approximately 1-1/2 years after
> her death, the areas of the stab wounds were long ago decomposed. This is not to
> say that the incised-type injuries to the ribs could not be evidence of animal activity.
> It would be highly unlikely that a body exposed to the elements for any length of
> time would not exhibit some type of animal activity.  Further, the evidence of a
> gunshot wound to the head does not dispel the State's theory of death. In a
> newspaper clipping attached to the defendant's appeal brief, it is stated that a man
> came across the skeletal remains while hunting in the woods. It is not unreasonable
> to theorize that the bullet wound to the skull came from a hunter's stray bullet.

(F-85-769, Brief of Appellee in Response to Mr. Fontenot's Motion for New Trial on Newly

Discovered Evidence, at p. 5.

The State failed to show the corpus delicti of murder, because, as the State previously

argued and the medical examiner's testimony substantiates, the evidence failed to show an

unnatural cause of death. No stab wounds were found and the evidence of the gunshot wound

would not definitely be determined to be the cause of death. N/T 6/9/1988 at 130. In a case

squarely on-point with Mr. Fontenot's, the Oklahoma Court of Criminal Appeals reversed and

dismissed a first-degree murder conviction where there was no evidence of stabbing as the cause

of death even though the defendant had confessed to stabbing the victim (and, unlike Mr.

Fontenot, had accurately told the police where the body was located). *Thornburgh v. State*, 815

P.2d 186 (Ok. 1991). The State's failure to independently show the corpus delicti of murder in

this case likewise requires reversal of Mr. Fontenot's conviction. To find that the gunshot wound

adequately established the corpus delicti of murder, this Court must find Mr. Fontenot's

confession materially false and insufficiently corroborated by independent evidence to support

his convictions. To find that the stabbing adequately established the corpus delicti of murder, this

Court must disregard all independent evidence and rely solely on Mr. Fontenot's confession.

**B.     The State Failed to Establish Through "Substantial Independent Evidence" the Trustworthiness of Mr. Fontenot's Confession; The Confession Was Patently Unreliable and Thus Inadmissible.**

Even if this Court determines the evidence was sufficient to show the corpus delicti of the

crimes alleged, Mr. Fontenot's confession lacked any independent indicia of reliability or

trustworthiness. The United States Supreme Court, in *Opper v. United States*, 348 U.S. 84, 75

S.Ct. 158 (1954), stated:

> It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense.

348 U.S. at 93, 75 S.Ct. at 164, adopted by Oklahoma in *Jones v. State*, 555 P.2d 63, 68 (Ok. 1976). The *Opper* standard requires a confession actually have some resemblance to the known facts of the crime to show that the confession is trustworthy.

In *Williamson v. State*, 812 P.2d 384 (Ok. 1991), *cert. denied*, 112 S.Ct. 1592 (1992), the Oklahoma Court of Criminal Appeals found that "factual errors and omissions" do not necessarily render a confession unreliable. The OCCA recited the discrepancies in the Williamson confession as:

> Specifically, these errors and omissions are that the decedent had a washcloth in her mouth and not her panties, and that a lid to a catsup bottle and not a coke bottle was discovered inside her rectum, and that no mention was made of the ligature, the writing on the wall or the presence of another person.

*Id.* at 397. Relying on the language in *Opper* that it was "sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth," the Oklahoma Court of Criminal Appeals found that the essential facts of the murder described by Williamson were sufficiently consistent with the physical evidence found at the crime scene, despite the minor inconsistencies described above. *Id., quoting Opper*, 348 U.S. at 93, 75 S.Ct. at 164.

Here, the chasm between Mr. Fontenot's confession and the known facts of the case are hardly minor. The State alleged the kidnapping was accomplished by force or fear, yet the witnesses seeing Mrs. Haraway leave the convenience store saw no weapon or any apparent distress or signs of struggle. The prosecution alleged the murder was committed by repeated stabbing and by gunshot, yet they could offer no independent evidence that a stabbing had occurred and no evidence linking Mr. Fontenot or his codefendant to a firearm. The confession said Mrs. Haraway was stabbed; she had a bullet hole in her skull.  The confession is replete with other factual errors, not the least of which include Mr. Fontenot's naming of Mr. Titsworth.  The police proved irrefutably Mr. Titsworth had not been involved.

The other contradictions between the evidence and the confession are the location of the body in another county rather than where Mr. Fontenot claimed; the evidence of death a gunshot wound, which the State even contended was post-mortem, while no evidence supported Mr. Fontenot's claim of stabbing the victim; no evidence of rape described by Mr. Fontenot; and evidence that the body was not burned, which was contrary to Mr. Fontenot's story.

The only "facts" in the confessions supported by independent evidence were those known to the police and public before the confessions. Mr. Fontenot correctly described using an older-model pickup truck, which had been widely publicized as the perpetrator's vehicle. Mr. Fontenot knew about how much money had been taken from the convenience store in the alleged robbery, an amount that was published within days of Mrs. Haraway's disappearance. The blouse description was given to police by Mr. Ward the day before Mr. Fontenot was interrogated, but also had been given to investigating officers long before their interviews with either Ward or Mr. Fontenot. Even this description is disputed by the evidence subsequently discovered at the site where Mrs. Haraway's remains were found.

The following portions of Mr. Fontenot's confession and subsequent statements were factually disproved, primarily by the State's own evidence at trial.

|  Mr. Fontenot's Statement<br>October 19, 1984 | Evidence<br>June 7-14, 1988 |
| --- | --- |
| 1. Mr. Fontenot knew Odell Titsworth and was at a party with Titsworth and Tommy Ward on the evening of April 28, 1984. Ex. 69 at 690. | 1. Mr. Fontenot had never seen Odell Titsworth until police brought Mr. Titsworth to his cell after the confession; Mr. Fontenot could not identify Mr. Titsworth in a photographic lineup or in person. N/T 6/13/1988 at 86-88. |

2. Mr. Fontenot described Mr. Titsworth as 5 feet 10 to 11 inches tall, weighing around 140 to 150 pounds, with black hair just below his ears and having no tattoos or distinguishing marks about him. Mr. Fontenot's description of Mr. Titsworth was markedly incorrect. Ex. 69 at 689.

2. In April, 1984, Odell Titsworth had hair down to the middle of his waist, weighed 175 pounds, and had very noticeable tattoos covering both harms from the wrists to the shoulders, inside and out, on his back, his stomach, and up and down both legs. On April 28, 1984, his arm was in a cast, having been broken by the Ada Police Department on April 26, 1984. P/H at 792-796, 795-97, 838; N/T 6/13/1988 at 81-82; N/T 6/10/1988 at 184-85, N/T 6/14/1988 at 88-89.

3. Odell Titsworth was a participant in robbing, kidnapping, raping and stabbing Mrs. Haraway. The lock-blade knife and the pickup truck used in the commission of the crimes belonged to Mr. Titsworth. Ex. 69 at 664, 676-678.

3. The police eliminated Odell Titsworth from being in any way involved in the Mr. Haraway case. Mr. Titsworth's truck was searched and no evidence relating to this case was found. The State presented evidence to show that Mr. Ward owned a lockblade Buck knife, but the actual weapon was never recovered. N/T 6/10/1988 at 23-24.

4. After the party, the trio "went out from north of town." Ex. 69 at 664.

4. Ada has two McAnally' s convenience stores, one north, and one east. N/T 6/9/1988 at 91 Haraway disappeared from the McAnally's in east Ada.

5. Mr. Titsworth went into McAnally's and brought Mrs. Haraway out to the pickup truck while Mr. Fontenot and Ward waited outside by the gas pumps. Mr. Fontenot and Mr. Ward got into the truck after Mrs.Haraway was forced in. Ex. 69 at  664)

5. Eyewitnesses at the convenience store when Mrs. Haraway left saw only one man with Mrs. Haraway and no others standing outside the truck. This man's description did not remotely match Odell Titsworth. N/T 6/9/1988 at 34-68.

6. Four people drove away in the pickup to the power plant (west of McAnally's). Ex. 69 at 664-665)

6. Eyewitnesses at McAnally's saw only one man with Mrs. Haraway, no other person around or near the pickup and no other person in the store. Mary Scroggins reported seeing a gray pickup with three persons in it speeding toward the power plant on night of Mrs. Haraway's disappearance, but could identify any of them. N/T 6/9/1988 at 80.

7. It was "almost dark" twenty minutes after the rapes began. Ex. 69 at 673.

7. Mr. Welchel testified it was dark when he arrived at the McAnally's at 8:30 p.m. and saw Mrs. Haraway leaving. N/T 6/9/1988 at 64.

8. Mr. Titsworth stabbed Mrs. Haraway to death, stabbing her in the chest "[h]ard enough to get the full blade in. Ex. 69 at 682.

8. There was no evidence of stabbing and no indication of nick marks or broken ribs that would signify a stabbing. N/T 6/8/1988 at 134. Further, the State's evidence showed the only apparent cause of death was a gunshot wound and Mr. Fontenot never mentioned a gun in his confession or in subsequent statements.

9. Mrs. Haraway was placed in a rotted out hole in the floor of a house behind the power plant, gasoline poured on her and the house set afire. Ex. 688.

9. The house located near the power station had been completely torn down to its concrete foundation and burned by its owner in June of 1983, ten months before Mrs. Haraway disappeared. There was no fire reported on the owner's property on April 28, 1984.   Mrs. Haraway's remains were found in a brushy countryside area near Gerty, Oklahoma. Her body had not been burned. N/T 6/14/1988 at 136.

On January 20, 1986, physical evidence was discovered substantially disproving Mr. Fontenot's confession. A farmer setting traps near Gerty, Oklahoma, east of Ada in adjacent Hughes County, found what appeared to be a human skull. A subsequent search of the area uncovered human remains that were identified as those of Mrs. Haraway. The medical examiner found no evidence indicating Mrs. Haraway had been stabbed,[56] but a bullet hole was found in the back of the skull. Mr. Fontenot had never mentioned the use of a firearm in his confessions. The body had not been burned. N/T 6/13/1988 at 136.

---

[56] The testimony was that since the only remains of Mrs. Haraway were skeletonized, it would have been possible for her to have been stabbed, and the bones not reflect it. *See Thornburgh v. State*, 815 P.2d 186 (Ok. 1991).

The State contended the blouse description in the confession was corroborated by the evidence that Mrs. Haraway had such a blouse and testimony describing her clothing before she disappeared. But this "corroboration" must be viewed considering the evidence that police previously had been given the description of this blouse; the suggestive interrogation techniques used with Mr. Ward and most likely with Mr. Fontenot; and the evidence of red and gold earrings and the back of a red and white shirt found near Mrs. Haraway's remains (State's Trial Exhibits 19, 20, 22F.

The State had no real theory of this case and certainly no evidence until obtaining the confessions of Mr. Ward and Mr. Fontenot. Rather than showing the reliability of Mr. Fontenot's statement, the State's evidence showed its unreliability and untrustworthiness. Uncorroborated and untrustworthy confessions are not competent evidence. *Opper*, 348 U.S. at 93, 75 S. Ct. at 164.

### C. No Rational Trier of Fact Could Find Mr. Fontenot's Guilt Beyond a Reasonable Doubt on the Evidence at Trial, even if the Confession is Deemed to be Properly Admitted.

At the close of the State's case, Mr. Fontenot moved for a directed verdict of acquittal because of insufficient corroboration of the confession and the failure of the State to prove each element of the charged crimes beyond a reasonable doubt. The motion was overruled. N/T 6/13/1988 at 127. The motion was renewed after the defense case and was overruled. N/T 6/14/1988 at 11.

Outside of the false confession, no evidence linked Mr. Fontenot to Mrs. Haraway's disappearance. At trial, not one witness identified Mr. Fontenot as being at McAnally's on April 28, 1984. Although Ms. Wise and Mr. Moyer identified his Mr. Ward, neither could identify Mr. Fontenot as Mr. Ward's companion. Both saw a man in the courtroom at preliminary hearing

who was more familiar to them as that man than Mr. Fontenot. N/T 6/8/1988 at 194-95, 197-99;

N/T 6/9/1988 at 26.

Likewise, the police had no physical evidence placing Mr. Fontenot at McAnally's on

April 28, 1984. Significantly, the crime scene at McAnally's went unpreserved despite the

presence of an Ada police officer and detective shortly after Mrs. Haraway' s disappearance. N/T

6/9/1988 at 92-93. Fingerprints from the counter, cash register and the glass doors of

McAnally's, as well as a still-burning cigarette (Mrs. Haraway did not smoke) were destroyed

because the manager wanted to clean up the store. N/T 6/9/1988 at 92-93.  Police investigated

numerous individuals who looked like the composites and at least 28 pickup trucks like those

reported seen at J.P. 's and McAnally's in the six months between Mrs. Haraway's disappearance

and Mr. Fontenot's arrest, but they found nothing. N/T 6/14/1988 at 30-33.

Likewise, there was no evidence of Mr. Fontenot in the area where Mrs. Haraway's

remains were found.

Detective Smith testified:

> Q. . . . there is absolutely no physical evidence whatsoever to tell us what happened
> at the scene, nothing, right? I mean, you can't tell who did what, when and where
> or anything. Is that correct?
> A. **Well, to me the strongest evidence is the confession.**
> Q. Okay. Fine. Okay. Other than the statements of Karl Fontenot, okay, as to what
> transpired at the scene, do you have any other physical evidence?
> A. From the scene?
> Q. Yes. And we - The Jury has already seen the remains of Donna Denise Haraway.
> Okay. All right. But, at the scene, I'm talking about what was said, what happened,
> you have no other, you have no physical evidence. All we have is, according to you,
> Karl's statement. Right?
> A. And the body.

N/T 6/10/1988 at 106-107.  Compare this with OSBI Agent Gary Roger's testimony at Mr.

Fontenot's first trial, before the body was found:

> Q. Aside from these two statements [Ward's and Fontenot's] do you have any proof, separate from these statements, that Donna Denise Haraway was kidnapped, raped or murdered? Aside from these statements?
> A. We have proof that she has not been seen or heard from in a year and a half.
> Q. All right. So, basically if we say -- if we take the statements aside, the only thing you can prove is Donna Haraway is gone?
> A. That's correct.

J/T 86-769 Tr. 2048-85.

Federal constitutional law requires as a matter of due process that any criminal conviction stand only upon proof beyond a reasonable doubt as to each and every essential element of the crime or crimes charged. U.S. Const. Amend XIV; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068 (1970). Speculation and guesswork are fundamentally antagonistic to the constitutional requirement of proof beyond a reasonable doubt, and a conviction cannot stand where the evidence establishes no more than speculation or suspicion. *Hager v. State*, 612 P.2d 1369 (Ok. 1980). Yet, the mere issuance of an instruction charging the jury with its duty to find proof beyond a reasonable doubt is not enough. As the United States Supreme Court stated in *Jackson v. Virginia*, 443 U.S. at 316-17, 99 S.Ct. at 2788:

> The *Winship* doctrine requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A 'reasonable doubt,' at a minimum, is one based upon 'reason.' Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, . . . .

The U.S. and Oklahoma Constitutions guarantee that no person shall be deprived of liberty or life without due process of the law, encompassing the right to be free from convictions except upon proof beyond a reasonable doubt of guilt. Fourteenth Amendment; Okla.Const. Art.II, §7; *Young v. State*, 89 OK. 395, 208 P.2d 1141 (1949). The federal and state constitutions are in accord on the requirement of proof beyond a reasonable doubt and on the test to be applied when examining the record for absence or existence of such proof. The test for determining whether

148

proof is sufficient to support a criminal conviction is whether, in the light most favorable to the State, a rational trier of fact could find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra*; *Spuehler v. State*, 709 P.2d 202 (Ok. 1985).

In the light most favorable to the State, the evidence at trial established beyond a reasonable doubt that Mrs. Haraway disappeared on April 28, 1984, and was found dead on January 20, 1986. Beyond these basic facts, the evidence introduced to establish the cause of death, criminal agency and the identity of the person responsible for her death was unreliable, contradictory, uncorroborated or simply nonexistent. None of the eyewitnesses identified Mr. Fontenot as the man who left the store with Mrs. Haraway, and they saw only one man with her in the truck as they left. None of the physical evidence, including the body, linked Mr. Fontenot to Mrs. Haraway's disappearance or death. At best, the evidence established Mrs. Haraway died from a gunshot wound to the head or was struck by a bullet after she died from unknown causes. In either case, there was no independent evidence tending to suggest she was raped, stabbed or burned, or ever taken to any location other than where her remains were found.

No rational juror who was able to set aside the tragedy of Mrs. Haraway's death could find beyond a reasonable doubt that Mr. Fontenot should be convicted on his own words. Given the uncontroverted evidence of Mr. Fontenot's mental and psychological impairments, which led him to confess to crimes he did not commit; the material discrepancies between the physical evidence and the story Mr. Fontenot told the police; the absence of evidence to corroborate his version of the events; and the circumstances surrounding his coerced confession, no reasonable juror would have convicted Mr. Fontenot.

## VIII.   THE STATE'S INJECTION OF INADMISSIBLE HEARSAY FROM THE EXTRAJUDICIAL CONFESSION OF MR. WARD IN MR. FONTENOT'S TRIAL VIOLATED HIS CONSTITUTIONAL RIGHT OF CONFRONTATION.

In its opinion reversing Mr. Fontenot's previous convictions for these crimes, the Oklahoma Court of Criminal Appeals (OCCA) held it was reversible error for the trial court to admit the inculpatory statements of the non-testifying codefendant at the joint trial of Mr. Fontenot and Mr. Ward. *Fontenot v. State*, 742 P.2d 31, 32 (Ok. 1987). The OCCA found Mr. Fontenot's Sixth Amendment right to confront the witnesses against him was damaged beyond repair by the admission of the non-testifying codefendant's statement. *Id.* Further, the appellate court found that Mr. Ward's statement "did not have sufficient indicia of reliability as it relates to Mr. Fontenot to overcome the presumption of unreliability to permit its direct admission .... " *Id.; see also Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056 (1986).

Yet, at retrial the State injected key portions of the codefendant's extrajudicial statements into the evidence presented at trial for the purpose of corroborating Mr. Fontenot's confession. The State then inferred and argued Mr. Fontenot's guilt from this inadmissible evidence. Mr. Fontenot was not given the opportunity to confront Mr. Ward to test the truthfulness of his extrajudicial statements. The denial of the fundamental right of confrontation, the prejudicial weight of the particular portions of the codefendant's statements used by the State, and the weakness of the State's case without the improper corroboration of Mr. Fontenot's statement require reversal of these convictions. U.S. Const., amends. VI and XIV, Okla. Const., Art. II, §7, *Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077 (1965).

The State did not introduce the entirety of Mr. Ward's statements, which includes Mr. Ward's preliminary hearing testimony -- but injected cherry picked inculpatory information gathered from his statements. Most prejudicial was the hearsay testimony of Detective Smith, who stated that Mr. Ward's description of a blouse purportedly worn by Mrs. Haraway matched the description given in Mr. Fontenot's confession, and placed the two together at the crime

scene. From Detective Smith and OSBI Agent Gary Rogers, the jury learned Mr. Ward

confessed and described details of the crime in a similar fashion to Mr. Fontenot.

Both Detective Smith and Agent Rogers were specifically admonished not to repeat

anything told him by Mr. Fontenot's codefendant. N/T 6/10/1988 at 52, N/T 6/13/1988 at 19-20.

Nonetheless, Detective Smith made the following statements:

> Q. [Defense Counsel] You had a description of the blouse prior to interviewing Karl
> Fontenot?
>
> A. [Smith] **From Tommy Ward**.

N/T 6/10/1988 at 116 (emphasis added).  Defense counsel did not invite the reference to Mr.

Ward, but asked a question to which an answer of "yes" or "no" was necessary. The cross-

examination was not to establish from whom Detective Smith learned the blouse description, but

that he had been given a similar blouse description by Richard Holkum[57] within days of Mrs.

Haraway's disappearance.

The importance - and prejudice - of Mr. Ward's extrajudicial statements regarding the

blouse was elicited by the State on re-direct examination:

> Q. And I believe you started to testify it was more important for another reason and
> that was because it matched Tommy Ward's description.
>
> A. Yes, it did. The two descriptions of the blouse were very close and that is what
> made it important. If one of them said, well, she had a light colored blouse with
> flowers on it and the other one had said, well, she had a striped blouse on, then the
> importance of the blouse would not be an issue. **But, they both described the
> blouse nearly identically, close enough that you knew or we would know that
> they had seen it**. We didn't place the importance on it until later, much later after
> they were arrested, in fact.

*Id.* at 132 (emphasis added).  Other hearsay testimony improperly admitted told jurors Mr. Ward

confessed, implicated Mr. Fontenot, and gave similar details about the crime as had Mr.

---

[57] *See supra* Claim II detailing the totality of Mr. Holkum's statements to Detective Smith and that the exculpatory
evidence was withheld from defense counsel.

Fontenot. Detective Smith's additional references to the plurality of confessions and their content

inculpated Mr. Fontenot:

> Q. What did Agent Rogers tell him exactly or you tell him exactly in order for him [Fontenot] to stop denying that he was involved?
>
> A. What he said was: "Karl, we have already talked to Tommy and we have a confession from him."
>
> Q. Okay. And did you go on and tell him that we knew that he was involved, we wanted him to tell the truth and give you a statement?
>
> A. That is ... usually what we tell people that we are interrogating, yes.

*Id.* at 104; and

> Q. [Butner] The pickup was in Ada and was driven by Tommy Ward .... and Karl Fontenot. You never saw that personally?
>
> A. No, Tommy Ward said that.

*Id.* at 146; and

> Q. [Butner]: Detective Smith, I'm not talking about the confessions. I'm asking you, would, in fact, the ease with which an article of clothing came off a body due to animal activity, wouldn't that have some effect as to how long it lasted, if you know or have an opinion?
>
> A. Well, in the confessions they said the clothes were taken off and it was my opinion that they weren't even on.

*Id.* at 153.

Agent Rogers, purportedly testifying about the actions taken as a result of Mr. Ward's

confession, injected information showing correlations with Mr. Fontenot's confession. After he

was admonished not to state anything told him by Mr. Ward N/T 6/13/1988 at 19-20, he related

that during his conversation with Mr. Ward, Agent Rogers had directed Detective Baskin to

search a power plant located off Richardson Loop west of Ada for Mrs. Haraway's remains.

Another call directed Detective Baskin to a burned-out house and a third directed him even

further west from the power station to Sandy Creek to locate "a concrete citron or bunker, ...

basically a large hole in the ground that had concrete walls." (Tr. V 20-21) This testimony

assured jurors that Mr. Ward's statements corroborated those of Mr. Fontenot concerning crimes

at the power plant and attempts to dispose of the body.

The testimony of Detective Smith and Agent Rogers about portions of Mr. Ward's

extrajudicial statements was hearsay, offered to prove the truth of the matter asserted: in this

case, that the confessions of Mr. Fontenot and Mr. Ward corroborated each other, and that the

only explanation for this was their guilt. The prosecution succeeded in doing indirectly what the

OCCA had rule it could not do directly - using Mr. Ward's confession to inculpate Mr. Fontenot

in this crime.

It is well settled that the hearsay rule does not preclude testimony to show that a

statement was made or that certain actions resulted from a conversation with a third person.

*Greer v. State*, 763 P.2d 106 (Ok. 1988); *Thompson v. State*, 705 P.2d 188 (Ok. 1985); *Godwin v.

State*, 625 P.2d 1262 (Ok. 1981). *Garcia v. State*, 639 P.2d 88 (Ok. 1981); *Dunagan v. State*, 734

P.2d 291 (Ok. 1987). However, in *Washington v. State*, 568 P.2d 301 (Ok. 1977), the Oklahoma

Court of Criminal Appeals held that the State cannot circumvent the hearsay rule and effectively

place into evidence the inculpatory substance of a conversation with a third party through the

ruse of relating the information in terms of the actions resulting from the conversation. In

*Washington, supra*, 568 P.2d at 311 a police officer had spoken with a young boy who was a

witness to a crime. The police officer testified that after his conversation with the boy, he

directed his investigation at the defendant. The Oklahoma Court of Criminal Appeals stated:

> The recitation of the preceding cases makes it apparent that it is permissible for an
> officer to testify that he received information from a third party which led to the
> defendant's arrest; provided, however, that the information received shows that the
> arrest was for a crime other than the one charged or provided that the information

received was just a description of the criminal and not an extrajudicial identification
of the defendant as the perpetrator of the crime charged.

*Id.*  In *Washington*, had the officer repeated the boy's statement that the defendant had committed

the crime, this would have been inadmissible hearsay. The court found evidence is

no less inadmissible hearsay when the jury is made aware of the substance of the third-party

statement through indirect testimony.

The same is true here. The prosecution elicited sufficient testimony to tie together the

statements of Mr. Fontenot and Mr. Ward as if they contained the same inculpatory information,

i.e., that Mr. Ward, too, claimed Mr. Fontenot was guilty of the offenses charged.  Detective

Smith's testimony that Mr. Ward had given a description of the blouse "very close" to Mr.

Fontenot's was a clear signal to the jury that Mr. Ward's confession corroborated that of Mr.

Fontenot and inculpated Mr. Fontenot. N/T 6/10/1988 at 132.  The prosecution drew direct

inferences of Mr. Fontenot's guilt through this testimony. Detective Smith testified:

> The two descriptions of the blouse were very close and that is what made it
> important. If one of them said, well, she had a light colored blouse with flowers on
> it and the other one had said, well, she had a striped blouse on, then the importance
> of the blouse would not be an issue. But, **they both described the blouse nearly**
> **identically, close enough that you knew or we would know that they had seen**
> **it.**

N/T 6/10/1988 at 132 (emphasis added).  Prosecutor Ross contended in closing argument:

> Mr. Butner, Mr. Smith, Mr. Rogers, Mr. Gridner (sic), have all agreed that it would
> be impossible for someone to make up that description of the blouse. Doubly
> impossible for two and that leaves us with only one alternative, and that is that this
> Defendant was there, just like he confessed he was.

N/T 6/14/1988 at 79.

Significantly, had the prosecution presented Mr. Ward as a witness to testify concerning

his statements and had Mr. Fontenot been afforded his constitutionally guaranteed right of

confrontation, another light would have been cast on this evidence. After Mr. Fontenot's

154

conviction, Mr. Ward was tried again for the same crimes and testified. His testimony revealed

the following:

> Q. Did anybody tell you what the Haraway girl was supposed to be wearing when she disappeared?
>
> A. Yes, sir. Dennis Smith did.
>
> Q. What did he tell you?
>
> A. Well, they told me that she either had a white blouse with blue roses on it or a red and white striped shirt.
>
> Q. And did he tell you which one to select or to –
>
> A. No.
>
> Q. -- put in your statement?
>
> A. No, I just took a guess. And at that time, when I guessed, saying the white shirt with blue roses, he kept on trying to - which I thought that he was trying to get me to change my mind and say a white shirt with red stripes -- a white -- yea, a white shirt with red stripes on it.
>
> Q. What did you think would happen when they checked this all out and found out the things you were telling them weren't true?
>
> A. Like I said before, I thought that they would run me out for lying to them.

(Ward-90-17 Tr.9 139-140).

The introduction of portions of Mr. Ward's statements circumvented this Court's ruling in

*Fontenot v. State*, 742 P.2d 31, 32 (Ok. 1987), where the Oklahoma Court of Criminal Appeals

found the introduction of Mr. Ward's confession violated Mr. Fontenot's constitutional right to

confront his accusers. Here, had Mr. Ward testified about his confession, Mr. Fontenot could

have cross-examined him about his repudiations of that statement.  He could have cross

examined him on the preliminary hearing testimony he had given exculpating Mr. Fontenot. The

State used the most damning portions of Mr. Ward's confession to show similarities to Mr. Fontenot's statement and reach the conclusion both were guilty.

Before Detective Smith's testimony, defense counsel objected to any reference to statements made by Mr. Ward and Detective Smith was warned by the trial court to not repeat anything he had heard from Mr. Ward. N/T 6/10/1988 at 52. Before cross-examination, defense counsel requested Detective Smith be admonished again. *Id.* at 94-95. The same was done with Agent Rogers. N/T 6/13/1988 at 19-20. As these admonitions repeatedly were ignored, additional objections would have exacerbated the damage by calling attention to the prejudicial hearsay. Defense counsel was left in the untenable position of focusing the jury's interest on the issue of the matching descriptions by objecting. Although generally a contemporaneous objection is necessary to preserve error, 12 O.S. 1981, §2104(A)(l), the Evidence Code provides for review of "plain errors affecting substantial rights" when no objection is made. 12 O.S. 1991, §2104(D). Defense counsel did everything he could reasonably do to prevent the errors from occurring ahead of time, and all attorneys, relevant witnesses, and the trial court were clearly on notice of his objections to any testimony relating to the substance of Mr. Ward's extrajudicial statements.

Mr. Fontenot's objections to the admission of Ward's statements and the admonitions specifically warning witnesses not to relate Mr. Ward's statements preserved this error. The denial of Mr. Fontenot's constitutional right of confrontation was "plain error" and affected "substantial rights," and thus is subject to review of this Court. 12 O.S., 1991, §2104(D); *McCall v. State*, 539 P.2d 418 (Ok. 1975). As the United States Supreme Court has said:

> This case cannot be characterized as one where the prejudice in the denial of the right of cross-examination constituted a mere minor lapse. The alleged statements [extrajudicial confession of separately tried, nontestifying accomplice] clearly bore on a fundamental part of the State's case against petitioner.

*Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077 (1965) The denial of Mr.

Fontenot's constitutional right of confrontation was fundamental error leading to conviction and

not subject to waiver. *Ake v. Oklahoma*, 470 U.S. 68, 74-75, 105 S.Ct. 1087, 1092 (1985).  The

prejudice of ignoring the appellate court's holding in *Fontenot v. State*, 742 P.2d 31, 32 (Ok.

1987), is that the only arguable evidence of guilt independent of Mr. Fontenot's confession was

the blouse description. Absent Mr. Ward's live testimony, this "evidence" was already greatly

weakened by the fact that no such blouse material was found with the remains; that the police

insisted on denying they had been given a similar blouse description long in advance of the

confessions despite the fact they clearly had; and that a different shirt found with the remains in

fact matched the earrings Mrs. Haraway wore. These problematic facts demonstrate why it was

so important for the State to inject Mr. Ward's extrajudicial statements concerning the blouse as

"corroboration" at every opportunity, as well as the impact Mr. Ward's statements must have had

on the jury. The "corroborative" value of Ward's statements and the impact they must have had

on Mr. Fontenot's jury would have been greatly diminished, if not destroyed, by Mr. Ward's live

testimony - which we now know would have disputed the veracity of his description and

explained how he came to give that description. Mr. Ward's explanation at his retrial was

consistent with statements he made to his attorney long in advance of the discovery of Mrs.

Haraway's remains and consistent with the existence of a red and white striped shirt having been

found with her remains while no evidence of the described blouse was found. Mr. Ward

ultimately received a life sentence while Mr. Fontenot was sentenced to death[58] for convictions

of the same crimes. Mr. Fontenot respectfully requests his convictions be overturned in light of

this denial of his federal constitutional right of confrontation.

IX.   **MR. FONTENOT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS WERE VIOALTED DUE TO THE POLICE MISCONDUCT THAT PERMEATED THE INVESTIGATION INTO MRS. HARAWAY'S DISAPPERANCE.**

A.   **The Ada Police Department's Complete Lack of Training to Handle Major Crimes Resulted in an Incompetent Police Investigation.**

The Ada Police Department (APD) is the sole law enforcement agency responsible for

investigating crimes in the City of Ada. As such, officers are required to be trained on the

preservation of evidence, witness interviewing, report drafting and other investigative procedures

to ensure the proper handling of criminal activity within their jurisdiction. Because they are the

only agency investigating major crimes in Ada, their failure to follow proper protocol results in

the ineffective evaluation and collection of evidence. At the time of Mrs. Haraway's abduction

and through the investigation of her case, the APD lacked the requisite training to properly

secure potential evidence and evaluate the evidence collected in the case.

The only substantial training in investigative techniques by the lead APD detective,

Dennis Smith, was inadequate on-the-job training. Detective Smith testified police officers were

"intuitively investigators" and got investigative experience through investigating traffic stops and

domestic abuse cases Ex. 53, pgs.10, 12) and that personally, he "received on-the-job training,

which was probably the most beneficial." Ex. 53, p.12. Prior to Mrs. Haraway's abduction,

Detective Smith had only been involved with two homicide investigations in his numerous years

on the police force. *Id.* at 126. One of them remained unsolved during the investigation of the

---

[58] Mr. Fontenot's death sentence was overturned on his second direct appeal.  He was later resentenced to life imprisonment without the possibility of parole.

Haraway case.[59]

OSBI's involvement in the Haraway case came only at the request of the local police agency, APD. Ex. 43, prosecutorial bates 3. While OSBI's documentation of the investigation does show more thorough reporting than the APD, there are still questions concerning the Haraway investigation that remain unclear. It is evident both agencies received numerous witness reports in close proximity to the crime providing information of alternate suspects and former boyfriends who many have had a hand in Mrs. Haraway's disappearance. APD's and OSBI's inability to pursue such leads, vet the information, and make reasonable investigative decisions is clear from the actions of both agencies in this case.

**B.      The Ada Police Department's Primary Function Was To Investigate The Disappearance of Denise Haraway and They Failed That Role Because They Did Not Collect Information from Readily Available Witnesses.**

Starting from the first call to emergency services, the police failed to properly preserve the crime scene, evaluate evidence and follow investigative leads. When law enforcement fails in this endeavor, it places the district attorney in a precarious position of evaluating evidence without a full understanding of crucial facts of the crime. *See Brady v. Dill,* 187 F.3d 104, 114 (1st Cir. 1999) (A valuable role and standard police function is to provide information to the prosecutor and the courts). Detectives in this case failed to properly preserve evidence creating a ripple effect limiting the investigative avenues detectives could consider and develop further.

The Court has admonished police behavior that relies on flimsy information. When witnesses are readily available for interviews, physical evidence is available, and medical diagnosis is forthcoming, yet the police do not conduct appropriate interviews, inspect the evidence for signs of the crime, or wait for preliminary reports from the medical technician, the

---

[59] The second homicide investigation involved Debbie Carter's murder which occurred in 1983. Ronald Williamson and Dennis Fritz were convicted of that murder, then later exonerated.

Tenth Circuit Court of Appeals has concluded the police failed to conduct an investigation. *See*

*Cortez v. McCauley*, 478 F.3d 1108, 1117-18 (10th Cir. 2007).

> The investigation of reported crime is the statutory and jurisdictional province of various local, state, and federal law enforcement agencies (Sullivan, 1977). The specific agencies responding to a criminal complaint, and ultimately in charge, depend on which laws have been reported to be broken and where. Whichever agency takes charge of a criminal complaint, they have the legal authority to respond to the scene, interview witnesses and suspects, collect evidence, and make arrests.

> Any responding law enforcement agency also has a professional duty of care. This refers to the professional and legal obligation to be competent custodians of any victims that are encountered; any criminal investigations that are initiated; any evidence that supports or refutes allegations of criminal activity against accused suspects; and any suspects that they take into custody (see Bopp and Schultz, 1972; Gross, 1924; Hansen and Culley, 1973; Kappeler, 2006; SATF, 2009; and Savino and Turvey, 2011). Very often this duty of care is a matter of explicit statute and agency policy, wherein law enforcement officers are not allowed to turn a blind eye to crime and must respond to protect life and property. Very often it is also made part of the formal oath they take when being sworn in. If an agency, or its officers and investigators, do not hold or perceive a professional duty of care to their community, then they are not fit to serve it (Gross, 1924); let alone respond to criminal complaints and assume the responsibilities associated with the collection and testing of physical evidence.

> The primary responsibilities of law enforcement, when responding to a criminal complaint, include (adapted from basic criminal investigation and crime scene processing guidelines found in Gross, 1924; O'Connell and Soderman, 1936; Rau, 2000; Snyder, 1944; Wade, 1999; and Weston and Wells, 1974):

> 1. Protect themselves; call for back-up when needed.
> 2. Establish who is involved.
> 3. Ensure that everyone involved is safe.
> 4. Get medical assistance for those that need it.
> 5. Determine what happened.
> 6. Establish who made the complaint and what it is about.
> 7. Identify any witnesses.
> 8. Seek out, identify, collect, and protect any physical evidence.
> 9. Ensure the objective forensic examination of all relevant evidence.
> 10. Determine whether or not a crime has taken place.
> 11. Identify any legitimate criminal suspects.
> 12. Establish whether probable cause exists for an arrest.
> 13. Arrest any criminal perpetrators.

These tactical issues also reflect an ethical responsibility. Investigators may not

assume what happened based on the statements of one party. They may not assume that any crime has actually occurred until the facts have been established by a thorough investigation. They must be sufficiently educated to understand what the elements of each crime are and what probable cause is. They must also impartially place the cuffs on anyone they determine has broken the law. For example, as explained in Bryden and Lengnick (1997; pp. 1230- 1231):

> As with all crimes, the police decide whether a reported rape actually occurred, and attempt to determine who committed it. If they want the case to go forward, they "found" the complaint and transmit the file to the prosecutor's office ... The police must investigate, a task that cannot easily be combined with offering the emotional support that the victim needs. The detective presumably wishes to avoid an injustice to a wrongly accused individual. In addition, for reasons of professional pride, he does his best to avoid looking naive by falling for a story that turns out to be false.

Meeting these responsibilities is best accomplished with a thorough, diligent, and comprehensive investigation. By comprehensive investigation, the examiner means a detailed review of the complainant and their statements; the careful consideration of witness and suspect statements; and the diligent collection and examination of any physical evidence. All of this must be attended prior  to making final determinations regarding whether a crime has been committed and whether probable cause exists to arrest any suspects. See generally Bopp and Schultz (1972); Gross (1924); Kappeler (2006); Leonard (1969); O'Connell and Soderman (1936); Sullivan (1977); Savino and Turvey (20 11 ); and Weston  and Wells (1974).

Ex. 20, pgs. 2-3. The investigation conducted by the APD and OSBI failed to follow even the basic duty of care owed in the disappearance and murder of Mrs. Haraway. Such disregard at the beginning of the investigation allowed valuable information to be destroyed or completely ignored, including potentially exculpatory evidence for Mr. Fontenot.

When Mr. Whelchel contacted APD at approximately 8:50 pm on April 28th, 1984, Ada Police Officer Harvey Philips responded first shortly followed by Detective Baskins. N/T 6/9/1988 at 86, 91. Upon Officer Phillips arrival, he neglected to close the store to preserve the scene, "because there were several people that had already been in the store and I don't know how many had been there before they got there." *Id.* at 93. When Detective Baskins arrived, he

observed "there was Sergeant Phillips, who was the sergeant on duty at the time. He was there, the manager of the store was there, and there were a couple of other people there, there was a lady there and some children."[60] N/T 6/10/1988 at 156. Clearly, the crime scene had not been secured for the police to properly evaluate the evidence.

Both officers acknowledge that a cigarette in the ashtray, a beer on the counter, and Mrs. Haraway's purse were not properly preserved as evidence. *Id.*; J/T p. 1239-1240, 1422-23, 1439, 1441, 1447-48. This allowed for evidence to be mishandled, misplaced, or destroyed entirely. Consequently, valuable information that could have led to the actual perpetrator was lost forever. *See* N/T 6/9/1988 at 87-93, 102-103; N/T 6/10/1988 at 155-157.

The failure to preserve this evidence deprived the defense of viable evidence, but equally important, it limited what evidence the police possessed to determine what happened to Mrs. Haraway. J.D. Watts, the store clerk who was on duty prior to Mrs. Haraway's shift returned to the store at the behest of Mr. Atkeson, store manager. When he arrived he noted the following:

> When I arrived at McAnally's later that **night I recall seeing a lot of police, more than I could count. I recall seeing Ada police, Pontotoc County Sheriff's Deputies and Oklahoma Highway Patrolman. Inside the store, I recall seeing police officers standing at the counter and looking at the register tape. I remember hearing one of those officers saying that the last purchase made on the register tape was a tallboy can of beer.**

Ex. 15. (*emphasis added*). Not only did the APD not properly secure the scene, their allowance of numerous other officers inside the store demonstrates a blatant disregard for proper police procedure. Further, the failure for all of these officers to document their involvement in the investigation continues to show a failure to properly record the investigation and those taking part in it.

---

[60] As a continuing pattern of non-disclosure, the APD never turned over or made known the list of people who were in McAnally's that evening, what they saw, and if they also saw a grey truck.

Detective Baskins collected the McAnally's register tape while at the store, receiving telephone calls from customers that very evening. As presented earlier, Officer Richard Holkum, John McKinnis, Gary Haney and Guy Keys all provided information crucial to the investigation of Mrs. Haraway's abduction but were disregarded. *See supra* Claim I and II. These witnesses explain seeing a pick-up truck believed possibly to be involved at the scene thirty minutes before Mrs. Haraway's disappearance. Exs. 5 & 6.  Mr. McKinnis provided evidence showing a man in the store behind the counter with Mrs. Haraway. Ex. 5. However, not only did the APD and OSBI never document their interviews, they never followed up on these leads. Police found no signs of forced entry, a physical confrontation or any obvious signs of violence. J/T 1087-1088, 115-116-, 1135, 1139, 1143. With no indication of violence, the possibility that Mrs. Haraway may have been familiar with her abductor was clearly a possibility based not only on Mr. McKinnis' interview but also the obscene telephone calls made repeatedly to Mrs. Haraway while she was on duty. This was all evidence the police received by their own request. They sought out witnesses who made purchases in the store; those witnesses responded. They asked family members about anything odd involving Mrs. Haraway; they gave numerous reports of harassing behavior from an unknown assailant. Either these leads were blatantly ignored by APD and OSBI whose duty it was to accurately investigate the case, or they lacked training, which created an inability to recognize the obvious evidentiary value of that evidence. Whatever the reason excuse, the failings of the Ada Police Department and the OSBI to collect, preserve and evaluate the evidence generated in the hours following Mrs. Haraway's disappearance violated Mr. Fontenot's right to a fair trial with a reliable result.

The Ada Police Department investigators turned a blind eye to many important pieces of evidence relying instead on witness statements that fit their off the cuff theory of the case while

disregarding much stronger evidence of alternate suspects. This caused the police department to only look at limited facts and witness statements as opposed to getting all the facts and statements from witnesses and letting that define the scope of the investigation. "[A]n officer may not choose to ignore information that has been offered to him or her…Nor may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts." *Kingsland v. City of Miami*, 369 F.3d 1210, 1219 (11th Cir. 2004). This reliance on flimsy and limited information is the type of investigation which resulted in botched investigation. *See generally Kyles v. Whitley*, 514 U.S. at 445.

C.   **Police Misconduct Involving Witness Interviews Resulted in Descriptions of the Suspects That Have No Relevance to The Disappearance of Mrs. Haraway.**

The police created a profile of two suspects within four hours of Ms. Haraway's disappearance without a proper evaluation of the facts in the case. Ex. 41.; *supra* Claim II. The police then focused on Karen Wise's description of two men, even though she was not present at McAnally's. Ms. Wise worked at J.P.'s, another convenience store down the road from McAnally's, and did notice four patrons that evening who made her feel uncomfortable. *See* N/T 6/ 8/1988 at 163; *see also* Ex. 13. However, at no time during the evening of April 28, 1984, did Ms. Wise visit McAnally's where Ms. Haraway worked. It is unclear how the police learned of the four men in J.P.'s or why they focused on Ms. Wise's account as the basis of the two suspects, that later became two composites, when Ms. Wise saw four men in her store that night. *Id.* Ms. Wise admitted police pressure caused her to change her account to conform with evidence with no connection to the crime. *Id.*

This pattern of pressuring witnesses to change their statements to match the police's hypothesis permeated the police investigate causing truthful information to get lost in the

process. James Moyer, the sole eyewitness placing Mr. Fontenot in McAnally's, also recounted his attempts to alert the State of his uncertainty of his identification only to be told he too was incorrect. *See* Ex. 14.  Stacey Shelton went to Detective Baskins to explain how she knew about the party held at Gordon Calhoun's apartment was correct because she was there. Ward Vol. 10 p. 93-195; Ex. 12. Instead of investigating her account, she was disregarded as complication to the State's case. *Id.* Such improper handling of witnesses includes Mr. Fontenot himself, who gave a false confession after being told not only that his alibi was wrong but that Mr. Ward had implicated him in the crime with Odell Titsworth. *See supra* Claim V. Such action by the police handling this case demonstrates a disregard not only for the properly development of factual information in a criminal investigation but a blatant abuse of power for those witnesses who do voice concerns.

### D.     Law Enforcement Failed to Investigate Leads from other Jurisdictions.

Throughout the investigation into Mrs. Haraway's disappearance, both the Ada Police Department and the OSBI interviewed numerous people regarding alternate suspects, potential leads, and other vital information related to the case. *See supra* Claim II.  Maintaining proper documentation of these various contacts and their substantive interviews was paramount to discern what happened. However, the report writing and records keeping by both the OSBI and APD was flawed throughout the investigation of this case. Contained within OSBI reports are numerous leads for alternate suspects fitting the composite sketch description with little to no documentation as to what happened to these potential leads. *See id.*  It is unclear why certain suspects were or were not interviewed or why a person was eliminated as a suspect.

For example, agents interviewed Jerry East and several of his family members to ascertain whether he was in Ada around the time of Mrs. Haraway's disappearance. Ex. 29, at

1104-1106. The report states Mr. East was arrested for burglary in Ada, OK in May 1983 and

was on probation at the time. *Id.* When asked his whereabouts on April 28th, he believed he was

with his sister and her family at the lake.  *Id.* The Agent's notes on the interview states, "EAST is

very poor in remembering times and dates. EAST matches the description of the number two

suspect in the Haraway disappearance being fair complexed [sic] with blond hair and green eyes.

EAST also has a small amount of acne around his face. However, EAST's hair is cut, left long in

the back and the front in the middle of the ear. It is light blond in color." *Id.* OSBI continues to

investigate Mr. East as potential suspect before dropping the investigation for no clear reason

provided in any reports. This pattern continues for numerous other potential suspects.

Police from Beaumont, Texas contacted OSBI concerning three Caucasian men arrested

for attempting to steal a woman's purse from her car and then attempting to run over the owners

when they were caught.

> On June 29, 1984, Detective Barrow, Beaumount Police Department . . . advised
> Deputy Insp., Roberts his department had taking into custody on June 28, 1984 at
> 1935 hours a while male who resembled one of the suspects in the composite. The
> suspect and the two other individuals attempted to steal a purse from a car but the
> owners caught the subjects.  Subjects then attempted to run over the owners. The
> subjects were in a '70's blue Chevrolet pickup with primer spots, bearing Oklahoma
> License ATF1975, which was impounded by Beaumount P.D.  Before Det. Barrow
> could check the pick-up for evidence the pick-up and subjects were released.

Ex. 44, OSBI 0125. The full names and dates of birth were provided for all three suspects:

Denver Russell Davis, Daryl Patrick Robins, and Christopher Lynn Hammock. *Id.* Photographs

of these three men were provided along with their criminal histories which included robbery,

burglary, larceny, dangerous drugs, and assault.[61] Ex. 29, p. 1149-1160. For all the vital

information provided by the Beaumont Police Department on these three criminals who fit not

---

[61] The photographs of these three suspects were disclosed in the January 2014 discovery during the state post-
conviction for the first time.

only the description, but a truck strikingly similar to the one seen by the only eyewitnesses,[62] nothing was done by either OSBI or the APD to follow-up on this lead. These men obviously had ties to Oklahoma, including working within the state. *See* Exs. 33 & 44, OSBI 0125. It would have been relatively easy to track the license number to find out whether these men or one of them was involved in Mrs. Haraway's disappearance. Yet inexplicably, no further investigation is shown as to what transpired with this information.

Further, OSBI received information regarding two men arrested in Tulsa for attempting to rob and kidnap a female convenience store clerk in a very similar manner to the description in the Haraway case. Not only were these two men arrested in August 1984, three months after Mrs. Haraway's disappearance, but they also matched the composite description used by police.

> During the early morning hours of August 9, 1984, ORVEL REEVES drove a silver, 1984 Datsun passenger car to a Circle "K" Convenience Store in Tulsa. DENNIS REEVES entered the store, robbed the female clerk at knife point and then abducted the clerk from the store. A Tulsa Police Department Patrolman was sitting across the street from the store and saw DENNIS REEVES walk out of the store arm and arm with the female clerk. The patrolman became suspicious and followed the car a short distance, then stopped it. As the patrolman was approaching the car, the female convenience store clerk alerted the patrolman to the fact that she had been robbed and abducted. Patrolman then took DENNIS and ORVEL REEVES into custody.

Ex. 29, p. 1111. Tulsa County prosecuted and convicted both men for these events resulting in fifteen year prison sentences. Ex. 30. Because they remained in custody, OSBI Agent Gary Rogers or APD Detective Dennis Smith could have interviewed these men given that the facts of this robbery/kidnapping mirror those described in Mrs. Haraway's case. However, no further follow-up, witness interviews, or police reports provided demonstrate whether anyone developed such a critical lead in this investigation. These three examples are not anomalies but a consistent pattern of a lax and incompetent investigation that repeatedly ignored assistance of various

---

[62] David Timmons described the primered truck he saw as blue in color. *See* Ex. 44, OSBI 0851.

jurisdictions. The OSBI reports disclosed pursuant to the OCCA's order and those recently released continue provide additional alternate suspects and viable leads that were dropped by law enforcement. Given the singular role that law enforcement plays in investigating criminal activity, the failure of those leading the investigation into what happened to Denice Haraway utterly failed in their obligation resulted in numerous alternate suspects being ignored in favor of "suspects" who not only had alibis but clearly not motive for these crimes.

### E.    Law Enforcement Failed to Properly Preserve Evidence Connected with The Crime After Mrs. Haraway's Remains Were Found.

Given that law enforcement are the only agencies that may collect physical evidence, the proper storage and cataloging of that evidence is paramount. However, the OSBI and APD failed to conduct a proper search of the Gerty crime scene where Denice Haraway's remains were discovered. Allen Tatum found the skull while laying traps on his property. N/T 6/08/1988 at 37-38. He then contacted the police who began searching for other bones over the course of a few days. N/T 06/08/1988 at 40-44. However, the search conducted by several OSBI agents did not provide a comprehensive list of what bones were found, the exactly location of those bones, what other items may have been found with the bones, and over how far an area were bones uncovered. Ex. 44, OSBI 0185-0201, 0203-0204, 0211-0212. Ex. 29 at 0932-0933, 0936-0951, 1124-1145.

> The investigative and forensic efforts of law enforcement at the location where Haraway's remains were found (West of Gerty, off a county road; Monday, January 20th, 1986) were inadequate rising to the level of abandonment. This prevented the recognition, preservation, collection, and testing specific items of evidence, as well as an untold volume of evidence that would have been missed.  This is based on at least the following facts and evidence:
>
> A. The First Officer on site did not secure crime scene or provide for scene integrity in any reasonable or effective fashion. This is standard practice even when remains have been in place for extended periods of time, to prevent further evidence loss, damage, or obliteration (Chisum and Turvey, 2011).

• No security tape deployed.
• No security log kept re: personnel/witnesses/ patrons entering and exiting the scene.

B. It is unclear from the record whether scene was "processed" on 1120/86 or 1121186

C. Scene photos lacked sufficient quantity, quality, context and measurements.

D. Some bones appeared to be improperly piled together for photos, and were then packaged together in a sack.

E. There is no written investigative or forensic report on who found what or where at the scene.

F. There is no scene diagram.

G. There was no directed or deliberate forensic excavation for other evidence concealed by brush or beneath soil.

H. According to a supplemental MEs report, some victim bones and a watch were found in a rat's nest by a farmer some 30' away from the original site on 1-30-96. There is no evidence that the watch put under a clear chain of custody or submitted for forensic analysis (e.g., fingerprinting; now DNA testing).

I. Additionally, there is no evidence that anyone in authority investigated or confirmed whether the watch or the earrings found with these remains actually belonged to the victim.

J. The ME's office was not notified; bones were therefore removed without proper legal authority by the police, the OSBI and the Sheriff's Department.

K. The scene was vacated and left unsecured before investigators returned on 1/24/86: the OSBI, the prosecutor, the sheriff and the ME went out there and found more bones.

L. In late February of 1986, law enforcement investigators returned to search this scene with both ECU college students and victim family members. Either group being involved with formal search efforts at this scene is highly inappropriate.

M. There were, in effect, multiple searches on multiples dates by multiples agencies with no reports of search activity or chain of custody regarding evidence collected.

N. Based on a review of the documentation, it is likely that evidence still exists at that location, to include more bones and perhaps even the victim's engagement ring, which was not recovered.

Ex. 20. Without this information, it was impossible for trial counsel, appellate, or post-conviction counsel to properly understand exactly what happened to Mrs. Haraway prior to her death. These difficulties did not only impact the defense but the ability of the Medical Examiner's Office to properly evaluate and identify the remains they were provided. The ME's Office investigator noted the poor investigation and evidence collection destroyed any ability of that office to fully understand what happened to Mrs. Haraway.

> 1-21-86, 1650 I returned a call to Hughes County District Attorney Bill Peterson concerning some bones that were found. Mr. Peterson didn't know anything, about the discovery but they are thought to be the remains of a missing store clerk -- Donna Hariway.[sic] No ME was notified. He stated that the OSBI was notified out of McAlister.[sic] That some people from the OKC office had come down. OSBI Lab people out of OKC did photo. **The scene and they just had a field day picking up bones. No diagrams. The OSBI agent out of McAlister never showed up at the scene. Mr. Peterson believes that the bones are en route to OKC but didn't know for sure.** The sheriff didn't know where the bones were but thought that the OSBI had them. Notified the OSBI in OKC & spoke with Rick Spense. He didn't have the bones but thought that the lab man David Dixon had them. I spoke with the Sheriff Orvall Rose who didn't know where they were. Finally the OSBI found them in their lab and delivered them at 2040 by Ann Reed. Come to find out the bones were found by a trapper.

Ex. 46, pg. 10) (emphasis added). Because no systematic approach was taken to properly collect evidence, not all of the viable evidence related to the case was uncovered in the January 1986 search. Instead, family members, university students, friends of the victim, and unrelated people found critical evidence and brought it to police during a much larger search conducted at the end of February that same year. N/T 6/08/1988, at 82-95. These searches also occurred without proper evidence collecting practices clearly showing the lack of a proper search done by police in January 1986. Further, yet other people found evidence missed by the OSBI and APD. Shelia Desoto and her daughter, Sandi Mantzske found a grey sweatshirt at the Gerty crime

scene.

> Several months after Karl Fontenot and Tommy Ward were convicted of Denice Haraway's murder, I saw news reports that Denice Haraway's remains had been found in an isolated location near Gerty, Okl. Those remains were discovered on Jan 21, 1986.

> Several weeks later, mom's sister, Hazel Faulkner, was visiting from Texas. She was interested in the [sic] the Denice Haraway case. On Friday, March 7, 1986, I went with my Aunt Hazel Faulkner and my mom, Sheila Desoto, and drove over to Gerty to look at the site where Denice Haraway's remains had been discovered. We were there out of curiosity. After viewing the trial, this was just one more fact which didn't make sense. We were walking around this site when we literally stumbled over three large flat rocks, which appeared to have been placed carefully over a large cloth object. We carefully removed the rocks, and found a nearly intact gray sweatshirt with a hood and a zippered front. We placed this sweatshirt into a paper sack in order to preserve any possible evidence. We thought this might have been the sweatshirt worn by Denice Haraway the night she disappeared.

> We also took photographs of the sweatshirt and where we found this sweatshirt. Copies of those photographs are attached. By the time we got to a payphone it was late on Friday afternoon. We called, but were unable to reach Dennis Smith or Gary Rodgers. We put the paper bag with the sweatshirt into the trunk of my mom's car where it stayed all weekend.

> On Monday, March 10, 1986, my mom and I personally handed this gray sweatshirt to Ada Police Chief Gray in his office. Chief Gray told us he would put this sweatshirt with the other evidence related to the Denice Haraway case, in the property room. No investigators, including Dennis Smith and Gary Rogers has ever interviewed me or asked me where or how we found that sweatshirt.

Ex. 31.

The problem with the failure to collect, document, and store the evidence related the Gerty crime scene and what has transpired to that evidence is that crucial information which explains what happened on April 28th is lost. Further, records pertaining to the evaluation of this evidence is also missing. Dr. Fred Jordan, a former Medical Examiner who knew of the evaluation conducted by Drs. Glass and Balding have explained their practices at the time to photograph all remains given to them along with x-ray any bones. *See* Ex. 36) This was standard practice for the office who handled the bones and evidence brought to them from the Gerty crime

scene. However, none of this evidence can now be found. Such evidence is crucial to the understanding of the events that transpired from the time Mrs. Haraway left McAnally's on April 28, 1984, until her skeletal remains were discovered almost a year and a half later. The fact that almost every state agency who investigated, analyzed, or prosecuted this case have lost the lion's share of the evidence and documentation in this case not only deprives Mr. Fontenot of his ability to properly prove his innocence, it makes it almost impossible to answer the question, "What happened?" The inept handling of reports, evidence, and all other vital documentation from this case clearly falls within the known pattern of police misconduct that the lead detectives and agents working on this case were known to commit.

### F.     Conclusion

The failure to properly train officers with the Ada Police Department to investigate a case like this one resulted in the numerous errors that are raised in this petition. If the police investigating this case had collected available evidence, investigated leads of other potential suspects, listened to witnesses even if their information was contrary to APD's theory of the case, and followed up on the information people were giving them, it is likely Mr. Fontenot would have never been convicted. Regardless of how "intuitive" a detective is, the detective is still duty bound to build a case not on gut feeling, but on evidence. Additionally, the detective is duty bound to consider all available evidence instead of only considering evidence his intuition tells him is important.  Finally, the detective must make all evidence available to the prosecution so a proper assessment of discoverable materials can be timely made pretrial.  Based on the numerous constitutional violations that occurred in this case, there can be no question that Mr. Fontenot did not receive a fair trial to which he was entitled both under the laws of the state of Oklahoma and the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, based upon the foregoing, Petitioner, KARL FONTENOT, respectfully

prays that the Court grant him the following relief:

A)      That, because the state courts afforded no evidentiary hearing in state court
        proceedings in this matter, an evidentiary hearing be granted on all claims
        involving disputed issues of fact, including Claims I-IX;

B)      That Respondents be Ordered to respond to this Second Amended Petition;

C)      That this Court find that Mr. Fontenot is actually innocent and entitled to removal
        of all procedural defects on his constitutional claims; and

D)      That Petitioner's convictions be vacated.

Respectfully submitted,

Dated: March 15, 2019

_/S/ Tiffany R. Murphy_
Tiffany R. Murphy
Arkansas Bar No. 2015057
790 N. Cliffside Drive.
Fayetteville, AR 72701
(479) 575-4573

_/S/ Robert Ridenour_
Robert Ridenour
Assistant Federal Defender
OBA #16038
One West Third Street, Ste. 1225
Tulsa, OK  74103
(918) 581-7656

**CERTIFICATE OF SERVICE**

I hereby certify that on March 15, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Oklahoma by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: /S/ *Tiffany R. Murphy*
TIFFANY R. MURPHY