No. CIV-16-69-JHP

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

KARL FONTENOT,

Petitioner,

-vs-

JOE ALLBAUGH, DIRECTOR,

Respondent.

**BRIEF IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED HABEAS
CORPUS PETITION AS PROCEDURALLY BARRED BY THE STATUTE OF
LIMITATIONS AND THE STATE BAR OF LACHES, AND BECAUSE IT INCLUDES
UNEXHAUSTED CLAIMS**

MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA
MATTHEW D. HAIRE, OBA #14916
ASSISTANT ATTORNEY GENERAL
AND
THEODORE M. PEEPER, O.B.A. #19909
ASSISTANT ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, OK  73105
(405) 521-3921; (405) 522-4534 (FAX)
Service emails:  fhc.docket@oag.ok.gov
ATTORNEYS FOR RESPONDENT

APRIL 29, 2019

## TABLE OF CONTENTS

Page

**INTRODUCTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**ARGUMENT AND AUTHORITY.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

     **I.**    **THE AMENDED PETITION IS PROCEDURALLY BARRED FROM HABEAS CORPUS REVIEW...** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

     **II.**    **PETITIONER HAS FAILED TO DEMONSTRATE CAUSE AND PREJUDICE, NOR HAS HE SUFFICIENTLY PROVED HIS "ACTUAL INNOCENCE," TO OVERCOME APPLICATION OF THE TIME AND STATE PROCEDURAL BARS TO HIS CLAIMS TO THE EXTENT THOSE CLAIMS WERE EXHAUSTED IN THE STATE COURTS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

     **III.**    **THE SECOND AMENDED PETITION CONTAINS UNEXHAUSTED CLAIMS RENDERING IT A "MIXED" PETITION.** . . . . . . . . . . . . . . . . . . . **76**

**CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **93**

**CERTIFICATE OF SERVICE..** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **94**

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Anderson v. Harless,*
     459 U.S. 4 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Baldwin v. Reese,*
     541 U.S. 27 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 80

*Banks v. Dretke,*
     540 U.S. 668 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 84

*Berry v. Cody*,
     Case No. 94-6253, 1994 WL 596878 (10th Cir. Nov. 2, 1994) . . . . . . . . . . . . . . . . 30, 31

*Bland v. Sirmons,*
     459 F.3d 999 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Bond v. Oklahoma,*
     546 F.2d 1369 (10th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Bousley v. United States,*
     523 U.S. 614 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Brady v. Maryland,*
     373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Bronson v. Swensen,*
     500 F.3d 1099 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Brown v. Shanks,*
     185 F.3d 1122 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Byrd v. Workman,*
     645 F.3d 1159 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cannon v. Mullin,*
     383 F.3d 1152 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Carriger v. Stewart,*
     132 F.3d 463 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Case v. Hatch*,
731 F.3d 1015 (10th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Clark v. Oklahoma*,
468 F.3d 711 (10th Cir. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

*Clonce v. Presley*,
640 F.2d 271 (10th Cir. 1981).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Cole v. Trammell*,
755 F.3d 1142 (10th Cir. 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Coleman v. Thompson*,
501 U.S. 722 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 30, 31

*Davila v. Davis*,
__ U.S. __, 137 S. Ct. 2058 (2017). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Demarest v. Price*,
130 F.3d 922 (10th Cir. 1997).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Dever v. Kan. State Penitentiary*,
36 F.3d 1531 (10th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Doe v. Jones*,
762 F.3d 1174 (10th Cir. 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 61

*Duncan v. Henry*,
513 U.S. 364 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80, 81

*Edwards v. Carpenter*,
529 U.S. 446 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Engle v. Isaac*,
456 U.S. 107 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*English v. Cody*,
146 F.3d 1257 (10th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Fairchild v. Workman*,
579 F.3d 1134 (10th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 30

iii

*Femedeer v. Haun*,
    227 F.3d 1244 (10th Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Fisher v. Gibson*,
    262 F.3d 1135 (10th Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 9

*Fleming v. Evans*,
    481 F.3d 1249 (10th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Fox v. Ward*,
    200 F.3d 1286 (10th Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Frost v. Pryor*,
    749 F.3d 1212 (10th Cir. 2014).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Gilbert v. Scott*,
    941 F.2d 1065 (10th Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Glossip v. Trammell*,
    Case No. 10-6244, 530 Fed. Appx. 708, 7(10th Cir. Jul. 25, 2013). . . . . . . . . . . . . . . . 80

*Granberry v. Greer*,
    481 U.S. 129 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Harrington v. Richter*,
    562 U.S. 86 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78, 79, 85, 87

*Harris v. Champion*,
    15 F.3d 1538 (10th Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Harris v. Champion*,
    48 F.3d 1127 (10th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 87

*Harris v. Kuba*,
    486 F.3d 1010 (7th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Herrera v. Collins*,
    506 U.S. 390 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Hoggro v. Boone*,
    150 F.3d 1223 (10th Cir. 1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hooks v. Workman*,
    689 F.3d 1148 (10th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*House v. Bell*,
    547 U.S. 518 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Howell v. Trammell*,
    728 F.3d 1202 (10th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*In re Davis*,
    565 F.3d 810 (11th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Johnson v. Medina*,
    Case No. 13-1324, 547 Fed. Appx. 880 (10th Cir. Dec. 4, 2013). . . . . . . . . . . . . . . . . . 64

*Klein v. Neal*,
    45 F.3d 1395 (10th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Larson v. Leyba*,
    507 F.3d 1230 (10th Cir. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Lockett v. Trammel*,
    711 F.3d 1218 (10th Cir. 2013).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Maples v. Thomas*,
    565 U.S. 266 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Matthews v. Workman*,
    577 F.3d 1175 (10th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*McCleskey v. Zant*,
    499 U.S. 467 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*McElhaney v. Bear*,
    Case No. 17-7026, 700 Fed. Appx. 872 (10th Cir. Aug. 17, 2017). . . . . . . . . . . . . . . . . 62

*McQuiggin v. Perkins*,
    569 U.S. 383 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Miranda v. Cooper*,
    967 F.2d 392 (10th Cir. 1992).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79, 88

*Moore v. Schoeman,*
    288 F.3d 1231 (10th Cir. 2002).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Murray v. Carrier,*
    477 U.S. 478 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Murrell v. Shalala,*
    43 F.3d 1388 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Nichols v. Sullivan,*
    867 F.2d 1250 (10th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Olson v. McKune,*
    9 F.3d 95 (10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Pennsylvania v. Finley,*
    481 U.S. 551 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Phillips v. Ferguson,*
    182 F.3d 769 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 63

*Picard v. Connor,*
    404 U.S. 270 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77, 78

*Prendergast v. Clements,*
    699 F.3d 1182 (10th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Preston v. Gibson,*
    234 F.3d 1118 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Prost v. Anderson,*
    636 F.3d 578 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Rodriguez v. Maynard,*
    948 F.2d 684 (10th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Rodriguez v. Zavares,*
    42 F. Supp. 2d 1059 (D. Colo. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Romero v. Furlong,*
    215 F.3d 1107 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Rose v. Lundy,*
     455 U.S. 509 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 78,  87

*Schlup v. Delo,*
     513 U.S. 298 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Passim**

*Selsor v. Workman,*
     644 F.3d 984 (10th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Sharpe v. Bell,*
     593 F.3d 372 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Smallwood v. Gibson,*
     191 F.3d 1258 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 31

*Smith v. Addison,*
     No. 09-5147, 373 Fed. Appx. 886 (10th Cir. Apr. 20, 2010). . . . . . . . . . . . . . . . . 17

*Snow v. Sirmons,*
     474 F.3d 693 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Spears v. Mullin,*
     343 F.3d 1215 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Strickland v. Washington,*
     466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Strickler v. Greene,*
     527 U.S. 263 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Passim**

*United States v. Cronic,*
     466 U.S. 648 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*United States v. Lee,*
     399 F.3d 864 (7th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Watson v. Howard,*
     No. 04-6074, 123 Fed. Appx. 910 (10th Cir. Feb. 17, 2005). . . . . . . . . . . . . . . . . 89

## STATE CASES

*Baxter v. State*,
364 P.2d 705 (Okla. Crim. App. 1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Berryhill v. Page*,
391 P.2d 909 (Okla. Crim. App. 1964). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ex parte French*,
240 P.2d 818 (Okla. Crim. App. 1952). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ex parte Matthews*,
186 P.2d 840 (Okla. Crim. App. 1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ex parte Motley*,
193 P.2d 613 (Okla. Crim. App. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ex parte Paul*,
227 P.2d 422 (Okla. Crim. App. 1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ex parte Ray*,
198 P.2d 756 (Okla. Crim. App. 1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ex parte Workman*,
207 P.2d 361 (Okla. Crim. App. 1949). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fontenot v. State*,
742 P.2d 31 (Okla. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 11

*Fontenot v. State*,
881 P.2d 69 (Okla. Crim. App. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

*Giles v. State*,
104 P.2d 975 (Okla. Crim. App. 1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re O'Neill*,
359 P.2d 619 (Okla. Crim. App. 1961). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jones v. State*,
704 P.2d 1138 (Okla. Crim. App. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Moore v. Embry*,
Case No. CIV-09-985-C, 2011 WL 5143080 (W.D. Okla. Sept. 7, 2011). . . . . . . . 85, 86

*Moore v. Gibson*,
    27 P.3d 483 (Okla. Crim. App. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Paxton v. State*,
    903 P.2d 325 (Okla. Crim. App. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Thomas v. State*,
    1995 OK CR 47, 903 P.2d 328. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15, 16, 17

*Thomas v. State*,
    675 P.2d 1016 (Okla. Crim. App. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Trissell v. State*,
    737 P.2d 1228 (Okla. Crim. App. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## FEDERAL STATUTES

28 U.S.C. § 2244(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 9, 93

28 U.S.C. § 2254(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

28 U.S.C. § 2254(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 79

28 U.S.C. § 2254(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

28 U.S.C. § 2254(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 67

## FEDERAL RULES

Fed. R. App. P. 28(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. App. P. 32.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## STATE RULES

Rule 3.5(C)(3), *Rules of the Oklahoma Court of Criminal Appeals*,
    Title 22, Ch. 18, App. (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF OKLAHOMA

KARL FONTENOT,                          )
                                        )
                        Petitioner,     )
                                        )
v.                                      )       Case No. CIV-16-69-JHP
                                        )
JOE ALLBAUGH, Director,                 )
                                        )
                        Respondent.     )

**BRIEF IN SUPPORT OF MOTION TO DISMISS**
**SECOND AMENDED HABEAS CORPUS PETITION AS PROCEDURALLY BARRED**
**BY THE STATUTE OF LIMITATIONS AND THE STATE BAR OF LACHES, AND**
**BECAUSE IT INCLUDES UNEXHAUSTED CLAIMS**

COMES NOW the Respondent and in support of his Motion to Dismiss Second Amended

Petition for Writ of Habeas Corpus as Procedurally Barred and Because it Includes Unexhausted

Claims, files the following brief in support.   For the reasons stated herein, Respondent respectfully

asks this Court to dismiss the instant Second Amended Petition pursuant to 28 U.S.C. § 2244(d)(1),

28 U.S.C. § 2254(b), and the State's procedural bar.

**INTRODUCTION**

Respondent filed his original motion to dismiss this habeas action on December 8, 2017, and

in his supporting brief argued that Petitioner's amended petition was filed far beyond the expiration

of the statute of limitations governing federal habeas proceedings, and that no tolling event occurred

that might have extended it (Dkt. 99).  Respondent also previously argued that the amended petition

was procedurally barred from habeas review by an adequate and independent state-law bar, and that

Petitioner failed to sufficiently demonstrate either "cause and prejudice" or that he was "actually

innocent" of his crimes in order to overcome these procedural bars.   Moreover, at least one of

Petitioner's substantive grounds for relief, ineffective assistance of appellate counsel, had never been developed or properly presented in state court. Moreover, Petitioner made an underlying argument in this forum touching nearly all his grounds for relief, that Oklahoma's laches bar prevented him from developing/discovering the proof necessary to develop his legal claims. That argument was also never presented to the state court for consideration. Both of these contentions could have, and should have, been presented to the state court for resolution in the first instance; however, Petitioner skipped that necessary step in his habeas litigation. Petitioner thus previously brought forth a mixed petition upon which this Court could not grant habeas corpus relief, and Respondent affirmatively did not waive the exhaustion requirement. 28 U.S.C. § 2254(b)(3).

On March 15, 2019, Petitioner filed a Second Amended Petition for Writ of Habeas Corpus, presenting one new claim-that his Sixth and Fourteenth Amendment right to counsel was violated by the Ada Police Department's alleged interference with attorney-client privilege-and small additions to a couple of existing claims (Dkt. 123; Dkt. 124). These amendments were based on approximately 300 pages of documents which were recently produced in response to a subpoena in state court from Petitioner's co-defendant, Tommy Ward. Respondent did not object to Petitioner being allowed to file his Second Amended Petition for Writ of Habeas Corpus. Nevertheless, Petitioner filed a Motion for Sanctions, Leave to Amend Petition for Writ of Habeas Corpus and Request for a Hearing seeking a protective order against several entities, bond for Petitioner, and the removal of the procedural bars previously asserted by Respondent (Dkt. 114).

On April 9, 2019, a hearing was held on Petitioner's sanctions motion, with the Honorable United States Magistrate Judge Steven Shreder presiding, and the court granted Petitioner's motion in part and denied Petitioner's motion in part. The Court entered an order preserving any records

relating to the subject matter of this proceeding in the possession of the Ada Police Department or the Ada City Attorney. The Court also noted that Petitioner was already allowed to amend his petition (*see* Dkt. 123). However, the Court denied Petitioner's request to be released on bond, as the extraordinary circumstances required to justify such relief were not found to be present in this case. The Court also denied Petitioner's request that the laches defense or any other defense asserted by Respondent be waived, finding that such issues went to the merits of the petition (Dkt. 142).

As set forth more fully herein, Respondent still asserts all of the procedural bars previously raised. However, Respondent acknowledges that Petitioner's third proposition is new and is based on material which was recently provided to Petitioner and not previously available to him. Respondent will not assert the federal time bar or the laches bar with respect to that claim only. Exhaustion of that claim is a more complicated question which will be addressed in that section below. Respondent does not waive the issue of exhaustion with respect to Petitioner's third proposition; however, as discussed more fully below, Respondent believes that this claim can be denied on the merits as Petitioner has not demonstrated a violation of the attorney/client privilege.

With all of the above considerations in mind, Respondent now turns to the history of this case and the reasons why this Court must reject the instant Second Amended Petition.

## ARGUMENT AND AUTHORITY

Karl Fontenot, hereinafter referred to as Petitioner, has a case with a lengthy procedural history. The following dates are relevant to the disposition of this Motion:

**April 28, 1984:** Petitioner and his co-defendant Tommy Ward kidnaped Donna Haraway from McAnally's convenience store in Ada and ultimately murdered her.

**October 19, 1984:** Following his arrest, Petitioner confessed to the crimes in a videotaped statement. *Fontenot v. State*, 881 P.2d 69, 75 (Okla. Crim. App. 1994).

3

**September 1985:** Ward and Petitioner were tried together in Pontotoc County District Court Case No. CRF-1984-183. Both co-defendants were convicted and sentenced to death. *Fontenot v. State*, 742 P.2d 31, 32 (Okla. Crim. App. 1987).

**August 11, 1987:** The Oklahoma Court of Criminal Appeals (hereinafter referred to as "OCCA") reversed Petitioner's conviction, holding that the erroneous admission of a statement from Petitioner's non-testifying co-defendant was not harmless. *Fontenot v. State*, 742 P.2d 31 (Okla. Crim. App. 1987).

**June 1988:** A change of venue was granted and Petitioner was retried in Hughes County District Court Case No. CRF-1988-43. Petitioner was again convicted and sentenced to death. *Fontenot*, 881 P.2d at 73-74.

**December 1, 1992:** During the pendency of Petitioner's direct appeal in OCCA Case No. D-1988-571, the OCCA granted Petitioner's Motion to Produce Documents and Things in the Possession, Custody or Control of the Oklahoma State Bureau of Investigation (OSBI) for inspection and copying (Exhibit 11). Thus, Petitioner has been in possession of an order allowing inspection and copying of all records related to this case for nearly twenty-five years.

**June 8, 1994:** The OCCA affirmed Petitioner's convictions for murder in the first degree, kidnaping, and robbery with a dangerous weapon, as well as Petitioner's ten year sentence for kidnaping and twenty year sentence for robbery. The OCCA found that Petitioner's confession to murder was corroborated in nine separate ways. However, Petitioner's case was remanded for resentencing because the trial judge had not followed the State's request to instruct on the sentencing option of Life Without Parole. *Fontenot*, 881 P.2d at 86.

**September 18, 1995:** Petitioner entered into a negotiated settlement in which he waived his right to jury re-sentencing in exchange for the prosecutor's recommendation of a sentence of life without parole (Exhibit 1, Transcript of Negotiated Sentencing, at 4-11).

**April 24, 1996: Petitioner's one-year period to file a petition for writ of habeas corpus began to run**.[1]

---

[1]Where a conviction became final before [the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA)] took effect, as is the case with Fisher, the one year limitation period for a federal habeas petition starts on AEDPA's effective date, April 24, 1996." *Fisher v. Gibson*, 262 F.3d 1135, 1142 (10th Cir. 2001) (citing *Preston v. Gibson*, 234 F.3d 1118, 1120 (10th Cir. 2000); *Hoggro v. Boone*, 150 F.3d 1223, 1225-1226 (10th Cir. 1998)).

4

**April 25, 1997:** **Petitioner's one year statute of limitations period to file a petition for writ of habeas corpus expired under the AEDPA.**[2]

**July 24, 2013:** Petitioner filed his first and only Application for Post-Conviction Relief in Pontotoc County Case No. CRF-1984-183 (Exhibit 2). The State answered that Application (Exhibit 3).

**December 31, 2014:** Petitioner's post-conviction application was denied by the state district court (Exhibit 8, District Court Order Denying Post-Conviction Relief). Petitioner appealed that ruling to the OCCA (Exhibit 9).

**October 29, 2015:** The OCCA entered an Order Granting Motion to Associate Counsel and Affirming Denial of Post-Conviction Relief (Exhibit 10; OCCA Order Denying Post-Conviction Relief), in OCCA Case No. PC-2015-76.

**February 24, 2016:** Petitioner filed the instant petition for writ of habeas corpus in the United States District Court for the Eastern District of Oklahoma (Dkt. 4, at 1). Petitioner was subsequently allowed to amend his petition twice, most recently filing his Second Amended Petition for Writ of Habeas Corpus on March 15, 2019 (Dkt. 123).

Before proceeding further, Respondent provides more explanation about what occurred in the most immediate state court proceedings because Petitioner's claims and arguments there are, with some exceptions including his third and fifth propositions, the same as those advanced in this forum. Prior to filing his first (and only) state post-conviction application in the state district court, Petitioner's last time in *any* court was on September 18, 1995 (Exhibit 1). At that time, Petitioner himself – while represented by counsel – told the district court there was no legal reason why he should not be sentenced (Exhibit 1, at 11). Moreover, the district court advised Petitioner of his

---

[2] Petitioner's filing of a state post-conviction application in this case had no effect on the statute of limitations because it was filed after the limitations period had expired. "[Petitioner's] petitions cannot be tolled for time spent in state post-conviction proceedings because his applications for post-conviction relief were not filed until after April 24, 1997, the end of the limitations period for convictions . . . which became final before the effective date of AEDPA." *Fisher*, 262 F.3d at 1142-1143. *See also Clark v. Oklahoma*, 468 F.3d 711, 714 (10th Cir. 2006) ("Only state petitions for post-conviction relief filed within the one year allowed by AEDPA will toll the statute of limitations.").

rights to appeal his sentence (Exhibit 1, at 12-13).  Petitioner never directly appealed his conviction or his sentence again.  Nearly eighteen (18) years later, on July 24, 2013, Petitioner filed a post-conviction application; Petitioner filed an amended post-conviction application on April 18, 2014 (Exhibit 2).  That application raised nearly identical claims as are presently raised in this Court except for his ineffective assistance of appellate counsel claim (now his fifth proposition), his claim of insufficient evidence because the State allegedly failed to prove the corpus delicti (now his seventh proposition), and his claim that the State injected inadmissible hearsay from the confession of co-defendant Ward (now his eighth proposition).[3]  The State ultimately responded to Petitioner's amended application for post-conviction relief on September 17, 2014 (Exhibit 3).  The State argued Petitioner's claims were barred by laches, but also addressed the merits of each claim.

On October 8, 2014 – twenty-one (21) days after the State filed its response – Petitioner filed a reply to the State's response and a motion for summary judgment pursuant to Okla. Stat. tit. 22, § 1083 (2011) (Exhibit 4).  According to Petitioner, he was "entitled to summary judgment relief as there exists no genuine issue of material fact between both parties and he [was] entitled to judgment as a matter of law" (Exhibit 4, at 1).  The district court, on November 20, 2014, entered an order setting a hearing for December 2, 2014 (Exhibit 5).  On that date, December 2, 2014, the State filed a motion to strike Petitioner's motion for summary judgment on procedural grounds; namely, Petitioner had failed to follow district court rules requiring a movant for summary judgment to set forth the specific material facts he believed were no longer in dispute and upon which he was relying

---

[3]As further explained below, Petitioner's ineffective assistance of appellate counsel claim was never properly presented to the State courts, either on direct appeal or on post-conviction review. Petitioner's claim concerning sufficiency of the evidence and his claim concerning hearsay are claims which he raised on direct appeal, and which the OCCA denied on the merits in 1994.

in support of his motion for summary judgment (Exhibit 6).   Further, and on the same day (December 2, 2014), the State filed a motion for specific discovery requesting that Petitioner identify and disclose the facts upon which he was relying both in support of his motion for summary judgment and reply brief (Exhibit 7).   This was because Petitioner had made factual statements in both his reply and Motion for Summary Judgment that affected the State's ability to respond to them. Of particular note, Petitioner's description of what happened to 860 pages of material from the Oklahoma State Bureau of Investigation (OSBI) his appellate counsel received on his behalf in 1992 was unclear.   Because Petitioner was raising the prospect that another attorney at the Oklahoma Indigent Defense System (OIDS) representing his co-defendant Ward had simply taken them, the State wanted to know the basis for that accusation, as well as any other information verifying who had possession of Petitioner's legal materials since Petitioner's 1988 appeal (Exhibit 7, at 5-11).

On December 31, 2014, the state district court denied post-conviction relief.   The district court agreed with Petitioner and determined there was no genuine issue of material fact; the district court also found that an evidentiary hearing was unnecessary (Exhibit 8, at 1).   The post-conviction court further found Petitioner "has had possession of the 860 pages of OSBI documents since 1992[,]" and that he has "had access to [the] Medical Examiner report since 1986" (Exhibit 8, at 2). Finally, the district court found that Petitioner's claims of "actual innocence, ineffective assistance of counsel, prosecutorial misconduct, and *Brady*[4] violation could have been submitted much earlier[,]" and for that reason barred the post-conviction application "based on doctrines [sic] of laches" (Exhibit 8, at 2).   Consequently, state post-conviction relief was denied.   All of those claims are in the instant second amended petition pending before this Court.

---

[4]*See Brady v. Maryland*, 373 U.S. 83 (1963).

Petitioner appealed the district court's denial of his post-conviction application to the OCCA (Exhibit 9). Deeming a response from the State unnecessary, the OCCA affirmed the district court's decision denying Petitioner relief (Exhibit 10). The OCCA determined there was no error by the district court's application of the laches bar to Petitioner's claims (Exhibit 10, at 3-4).

Petitioner is now appealing these state court conclusions to this Court.

## I.   THE AMENDED PETITION IS PROCEDURALLY BARRED FROM HABEAS CORPUS REVIEW.

### A.   The Amended Petition Is Time-Barred by the Statute of Limitations.

The petition is time-barred by the statute of limitations because Petitioner filed it either after April 24, 1997, or more than one year following "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1). The AEDPA generally affords state prisoners one year during which they must file a Petition for Writ of Habeas Corpus. Section 2244(d) of Title 22 of the United States Code provides:

(1) A 1-year period of limitations shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of reasonable diligence.[5]

28 U.S.C. § 2244(d).

Pursuant to *Fisher*, 262 F.3d at 1142-1143, because Petitioner's conviction became final before the effective date of the AEDPA, that year started to run on April 24, 1996, and expired on April 25, 1997. The instant petition is therefore filed well after the expiration of the statute of limitations. 28 U.S.C. § 2244(d)(1)(A). And because Petitioner did not file his first Application for Post-Conviction Relief until July 24, 2013, or over sixteen years after the expiration of the statute of limitations, that filing had no tolling effect. *See Clark*, 468 F.3d at 714 ("Only state petitions for post-conviction relief filed within the one year allowed by AEDPA will toll the statute of limitations."). The petition thus remains time-barred unless Petitioner can show that the statute of limitations was tolled some other way.

Petitioner makes no attempt to defend the lateness of his second amended petition, as he offers no acceptable tolling event that would extend the statute of limitations further such that it would be otherwise timely filed. Petitioner thus impliedly concedes that his second amended petition is time-barred. The petition must be dismissed unless Petitioner can demonstrate cause and prejudice or make a credible showing of actual innocence to overcome the procedural bars in his case. As discussed further below, Petitioner is unable to establish any of the excuses or exceptions

---

[5] Because Petitioner's third proposition raises a claim based on documentation which was produced in 2019, the discussion in this section does not apply to Petitioner's third proposition. The time bar discussion does, however, apply to claims which Petitioner already had notice of which he now seeks to bolster with small pieces of additional information, such as his *Brady* claims.

9

to this and the other procedural obstacles that forbid review of his exhausted federal claims.[6]

**B.   The Amended Petition Is Procedurally Barred by the State Court's Application of Laches.**

The procedural bar of laches applied by the OCCA in this case is also related to Petitioner's

untimeliness.  In relevant part, the OCCA held:

> [Petitioner] raised five claims in his post-conviction application before the district court.[4]  The State filed a response to [Petitioner's] Application, asserting that because of his delay in seeking post-conviction relief, his claims should be barred from review under the doctrine of laches.[5]  The State contended that as best as could be discerned from [Petitioner's] pleadings, the primary information on which he relied for relief was available to him at the time of his trial or during the time of his second appeal.[6]  The State contended, "All of Petitioner's substantive claims could have been raised years ago." (O.R. 1315).  The District Court agreed and denied [Petitioner's] Application based solely on the State's laches defense.
>
> In *Thomas v. State*, this Court found the doctrine of laches, which had been applied in cases prior to enactment of the Post-Conviction Procedure Act, "continues to be applicable, in appropriate cases, to collateral attacks upon convictions . . . by means of an application for post-conviction relief" and that laches "may prohibit the consideration of an application for post-conviction relief where petitioner has forfeited that right through his own inaction." *Thomas v. State*, 1995 OK CR 47, ¶ 15, 903 P.2d 328, 332.  *Thomas* also noted that when the State invokes laches as a defense, it is not required to demonstrate that it has suffered actual prejudice because of the delay in the filing of the post-conviction claim.  *Id.*, ¶ 14, 903 P.2d at 332.  We FIND that [Petitioner] has not shown the District Court erred in finding laches applicable to his post-conviction claims.  As [Petitioner] has failed to demonstrate any abuse of discretion in the District Court's decision, its order denying post-conviction relief is affirmed.
>
> [4] [Petitioner] argued: (1) newly discovered evidence

---

[6] As explained further herein, not all of the claims Petitioner attempts to bring in this forum were ever presented in the state courts and thus those claims are unexhausted, rendering this a mixed petition.

10

of actual innocence required post-conviction relief; (2) his Fourteenth Amendment rights were violated when the State of Oklahoma withheld evidence in violation of *Brady v. Maryland*; (3) his Sixth Amendment right to effective assistance of counsel was violated when his trial counsel failed to investigate the case and present viable evidence supporting his innocence; (4) his due process rights were violated because police misconduct induced a false confession and the prosecution knowingly introduced false testimony during his trial in violation of the Fourteenth Amendment to the U.S. Constitution; and (5) his Fourteenth Amendment due process rights were violated because of police misconduct that permeated the investigation into the victim's disappearance.

[5] The State argued further that Fontenot's claims were procedurally barred under the Post-Conviction Procedure Act.

[6] [Petitioner] was previously convicted and his convictions reversed in *Fontenot v. State*, 1987 OK CR 170, 742 P.2d 31.

(Exhibit 10, at 3-4).[7]  Thus, the state court procedurally barred, under the doctrine of laches, Petitioner's claims in the instant amended petition – to the extent they have been exhausted – because of his longstanding inaction in this case.

The instant petition is thus time-barred under the AEDPA and also barred by an adequate and independent state procedural rule.  Petitioner has alleged in his Second Amended Petition that he should not be subject to the doctrine of laches due to the recent production of additional materials from the Ada Police Department in response to his co-defendant's 2018 subpoena.  As will be discussed more fully below when addressing Petitioner's *Brady* claims, however, the fact that this

---

[7] Petitioner raises four more grounds for relief in this Court than those he raised before the OCCA in his state post-conviction application.

material was recently produced does not prove that Petitioner's defense was not aware of this material in the 1980s, when Petitioner's trial took place.  Any suggestion that defense counsel was unaware of any of this material is speculation and guessing at this point.  The fact these documents were recently produced in spite of prior diligent searches is a symptom of the laches problem.  The documents simply became misplaced because so much time had elapsed.

## II.   PETITIONER HAS FAILED TO DEMONSTRATE CAUSE AND PREJUDICE, NOR HAS HE SUFFICIENTLY PROVED HIS "ACTUAL INNOCENCE," TO OVERCOME APPLICATION OF THE TIME AND STATE PROCEDURAL BARS TO HIS CLAIMS TO THE EXTENT THOSE CLAIMS WERE EXHAUSTED IN THE STATE COURTS.

A federal court may not consider a claim that has been procedurally defaulted on adequate and independent state procedural grounds "unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Byrd v. Workman*, 645 F.3d 1159, 1167 (10th Cir. 2011) (citing *Matthews v. Workman*, 577 F.3d 1175, 1195 (10th Cir. 2009)); *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998).  To overcome the procedural bars, Petitioner has variously alleged that the state procedural rule of laches is not adequate and independent, that there is "a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense" and that there is an exception in claims of *Brady* error, where the elements of the substantive claim mirror the cause and prejudice inquiry and proof of one is necessarily proof of the other (Dkt. 123, at 16).

Hence, Petitioner contends that any and all procedural barriers have been cleared away because his case fits within the "actual innocence" gateway exception that would permit federal

12

habeas review of his procedurally defaulted federal claims, and alleged "*Brady* error" serves as the "cause and prejudice" sufficient to serve the same function. Although Petitioner mentions the "adequate and independent" requirement regarding state procedural rules, nowhere does he discuss those components as they relate to the bar applied in his case – laches – or argue why it was insufficient to preclude habeas review in his case. As shown below, insofar as Petitioner has properly exhausted some of his federal claims, such claims may not be heard here because he cannot establish cause and prejudice for his time-barred petition and procedural default, nor can he slide through the exceptionally narrow – and the rarest applied – "actual innocence gateway" exception afforded habeas petitioners whose claims would be otherwise barred from habeas review. This Court may not review Petitioner's federal claims in the instant second amended petition even if they were all exhausted, which they are not.

**A.      Oklahoma's Laches Bar Is Adequate and Independent to Preclude Federal Habeas Review of His Properly Exhausted Claims.**

> **i. Petitioner never exhausted his *Brady* claim as his "cause" to overcome the laches bar before the OCCA, even though Petitioner was aware of his *Brady* claim at the time of his post-conviction proceedings.**

Petitioner notes, correctly, in his amended petition that a state procedural bar must be "adequate and independent" to deny federal habeas review (Dkt. 123, at 16). Anticipating that Respondent would again rely upon the state-law bar of laches, Petitioner lists as the "first" of his "exceptions to [the] general rule" that "absent a showing of cause and prejudice, a habeas court will not entertain a claim that has been defaulted in state court because of a procedural state court bar" (Dkt. 123, at 16).

13

Petitioner offers no argument regarding the adequacy or independence of Oklahoma's procedural bar of laches, even in his Second Amended Petition for Writ of Habeas Corpus. Petitioner has thus impliedly conceded the issue, *i.e.*, the state procedural bar was both adequate and independent in this case, as he makes no attack on those features of Oklahoma's procedural bar of laches. Instead, he goes directly to the cause and prejudice he must establish to overcome that bar and the time bar. Petitioner therefore expends all of his effort on alleged "*Brady* error" and "actual innocence" to show why his time bar and procedural default should be overlooked and his federal claims entertained. Petitioner's failure to address the adequacy or independence of Oklahoma's laches bar in the context of his case (or in any context), even if he has not conceded the point, results in forfeiture of that argument in this Court. *Lockett v. Trammel*, 711 F.3d 1218, 1230 (10th Cir. 2013) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("'[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.'"); *Hooks v. Workman*, 689 F.3d 1148, 1173 n.12 (10th Cir. 2012) (same); *Fox v. Ward*, 200 F.3d 1286, 1294 (10th Cir. 2000) (habeas petitioner's failure to support summary claim with developed argument and relevant authority "effects a forfeiture of the claim"); *Femedeer v. Haun*, 227 F.3d 1244, 1255 (10th Cir. 2000) ("[P]erfunctory complaints [that] fail to frame and develop an issue [are not] sufficient to invoke appellate review." (quoting *Murrell v. Shalala*, 43 F.3d 1388, 1389 n.2. (10th Cir. 1994))); *see also* Fed. R. App. P. 28(a)(8) (argument must contain "contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). Even so, Respondent will establish below that Oklahoma's laches bar is both an adequate and independent state bar to Petitioner's exhausted federal claims.

14

There is no specific time limit under Oklahoma law governing the filing of an original, or even a subsequent, non-capital state post-conviction relief application. *Moore v. Gibson*, 27 P.3d 483, 484 n.1 & 487 (Okla. Crim. App. 2001). So, "an application for post-conviction relief in a non-capital case is always deemed to be timely filed." *Moore*, 27 P.3d at 484 n.1. Petitioner therefore had the right for many years – at least two decades or more – to collaterally attack his jury trial conviction and the sentence he ultimately agreed to serve following the OCCA's last remand for resentencing. That did not insulate Petitioner from state-law-grounded doctrines that might be imposed if – as in this case – he waited too long to do so. It has been thirty-five years since Donna Haraway's murder; similarly, nineteen (19) years passed between the time Petitioner's state direct appeal was decided by the OCCA and when Petitioner filed his first application for post-conviction relief. It was because Petitioner "forfeited that right [to have his post-conviction claims heard] through his own inaction" that the Oklahoma courts determined he could no longer pursue them (Exhibit 10, at 3-4). That reason, laches, was sufficient to bar further review in this Court because it is an adequate and independent state procedural bar.

A state ground will be considered adequate if it is "strictly or regularly followed" and applied "evenhandedly to all similar claims." *Smallwood v. Gibson*, 191 F.3d 1258, 1268 (10th Cir. 1999). Oklahoma's procedural bar of laches is both independent and adequate. However, the state court must still apply any governing state procedural default rules like waiver and *res judicata, Moore,* 27 P.3d at 487 n.4, and the doctrine of laches. *See Thomas v. State,* 903 P.2d 328, 332 (Okla. Crim. App. 1995) (discussing doctrine of laches). In Oklahoma, "the doctrine of laches may prohibit the consideration of an application for post-conviction relief where petitioner has forfeited that right through his own inaction." *Thomas*, 903 P.2d at 332. Indeed, for at least seventy years, the OCCA

15

has applied the doctrine of laches to deny relief numerous times, even when the delay was shorter than in Petitioner's case, and continues to do so up to the present day. *Thomas v. State*, 675 P.2d 1016 (Okla. Crim. App. 1984), *cert. denied*, 466 U.S. 942 (1984) (nineteen years); *In re O'Neill*, 359 P.2d 619 (Okla. Crim. App. 1961) (seventeen years); *Ex parte French*, 240 P.2d 818 (Okla. Crim. App. 1952) (almost fifteen years); *Ex parte Paul*, 227 P.2d 422 (Okla. Crim. App. 1951) (twenty-seven years); *Ex parte Workman*, 207 P.2d 361 (Okla. Crim. App. 1949) (eight years); *Ex parte Motley*, 193 P.2d 613 (Okla. Crim. App. 1948) (eleven years); *Ex parte Ray*, 198 P.2d 756 (Okla. Crim. App. 1948) (eight years); and *Ex parte Matthews*, 186 P.2d 840 (Okla. Crim. App. 1947), *cert. denied*, 333 U.S. 858 (1948) (almost seventeen years); *see also Williams v. State*, Case No. PC-2017-347 (Okl. Cr. Jun 26, 2017) (more than twenty-three years) (unpublished); *McLaurin v. State*, Case No. PC-2017-583 (Okl. Cr. Aug. 1, 2017) (twenty-one years) (unpublished).[8]   The OCCA has also applied the doctrine of laches to deny relief when the delay was comparable to that in this case.  *See Paxton v. State*, 903 P.2d 325 (Okla. Crim. App. 1995) (the defendant sought post-conviction relief approximately thirty years after his conviction for manslaughter was affirmed on direct appeal); *Berryhill v. Page*, 391 P.2d 909 (Okla. Crim. App. 1964), *cert. denied*, 379 U.S. 883 (1964) (petition filed twenty-four years after crime and sixteen years after first petition).   Clearly, Oklahoma has regularly and even-handedly followed this rule.  It is thus an adequate state procedural bar to claims brought in habeas proceedings. *Smallwood*, 191 F.3d at 1268.

---

[8] Pursuant to Rule 3.5(C)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2019), these decisions are offered to assist the Court because no published case of which counsel is aware serves as well the purpose for which counsel cites them; they are attached as Exhibit 18.

The state bar is also independent.   "To be independent, the procedural ground must be based solely on state law." *Cole v. Trammell*, 755 F.3d 1142, 1159 (10th Cir. 2014).   Laches, as the case law above demonstrates, is a state-law doctrine.   The Tenth Circuit Court of Appeals has in fact already found Oklahoma's bar of laches to be an adequate state law ground that is independent of federal law.   In *Smith v. Addison*, No. 09-5147, 373 Fed. Appx. 886 (10th Cir. Apr. 20, 2010) (unpublished),[9] Judge Gorsuch, writing for the Court, reasoned:

> In this case, the district court correctly held that it was barred from reviewing Mr. Smith's habeas petition because the OCCA resolved his claim on an independent and adequate state law ground.   The OCCA's decision was independent because it was based on the state law doctrine of laches, not on any federal law.   And the doctrine of laches is adequate because it is both firmly established and regularly followed by the OCCA.   *Thomas v. State*, 903 P.2d 328, 332 (Okla. Crim. App. 1995) ("[T]he doctrine of laches has been and continues to be applicable, in appropriate cases, to collateral attacks upon convictions . . . where petitioner has forfeited that right through his own inaction.").

*Smith*, 373 Fed. Appx. at 888.   *See also Doe v. Jones*, 762 F.3d 1174, 1183 (10th Cir. 2014) ("With respect to the possibility that a laches determination could be a procedural bar as an adequate and independent state ground for dismissal of the post-conviction application, this is a hurdle petitioner would have to overcome whether or not a stay is granted.").

Therefore, because Oklahoma's laches bar is both adequate and independent to deny relief, and Petitioner presents no serious dispute as to that fact, Petitioner's claims remain procedurally barred in habeas proceedings unless Petitioner can demonstrate cause and prejudice in failing to present these issues on direct appeal or that a fundamental miscarriage of justice would result if this

---

[9]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

Court did not consider the claims. *Demarest v. Price*, 130 F.3d 922, 941 (10th Cir. 1997).  He can show neither.

**B.      Petitioner Has Failed to Demonstrate Cause and Prejudice Sufficient to Overcome His Procedurally Barred Exhausted Claims.**

Petitioner has alleged that he qualifies for substantive review under both the actual innocence and the cause and prejudice exceptions.  Respondent will address Petitioner's cause and prejudice argument first.  Petitioner has alleged a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) as his "cause" to overcome his procedurally defaulted claims.  He further alleges in his Second Amended Petition that the production of a handful of additional materials from the Ada Police Department in response to co-defendant Ward's subpoena bolsters his claim of a *Brady* violation.

To establish "cause" to excuse a procedurally defaulted claim, a habeas petitioner must show that "some objective factor external to the defense impeded . . . [his] efforts to comply with the state procedural rules." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The "cause" for procedural default must therefore be an act or omission that cannot be attributable to Petitioner.  Thus, to satisfy this requirement for overcoming the procedural bar of laches, Petitioner must demonstrate that some force untraceable to himself prevented him from filing his application for post-conviction relief sooner.  Petitioner must also prove "actual prejudice resulting from the error of which he complains." *Carrier*, 477 U.S. at 488.  That is, Petitioner must show he was actually prejudiced from whatever it was that prevented him from filing that application.  Put another way, to overcome Oklahoma's laches bar by showing "cause and prejudice," Petitioner must demonstrate that a constitutional violation completely outside his control is what kept him – for nearly two decades – from raising the claims in his initial application for post-conviction relief in state court, and that constitutional

violation actually prejudiced him. *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (quoting *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) ("Cause for a procedural default exists where 'something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . impeded [his] efforts to comply with the State's procedural rule.'"); *Coleman*, 501 U.S. at 750 ("prejudice" requires a showing of "actual prejudice as a result of the alleged violation of federal law").   There are two major problems with the types of "cause," and to some extent "prejudice," Petitioner attempts to put forward in this case:  first, the factors upon which he relies are not external to him; and/or, second, the "cause" he cites in this Court to overcome his procedural obstacles now was either never raised or different from that which he raised in the state court.   Either way, Petitioner may not have his exhausted federal claims heard here.

Petitioner cannot demonstrate the requisite "cause" because he was responsible for not only the long delay in his claims being raised, but also any further development of those allegations in the state court.   As shown above in the description of what occurred in the state courts, Petitioner formally informed the state post-conviction court that the proof he needed to establish his claims – the same ones he wants heard here – was complete at that time and in no need of further development, investigation, or hearing (*see* Exhibit 4).   Petitioner was therefore totally responsible for, or at least greatly contributed to, any inability to demonstrate in the state courts that the facts of his case justified an exception to the laches bar.   Thus, to the extent Petitioner attempts to establish cause for his procedural defaults by arguing the state courts deprived him of the opportunity to fully develop his federal claims – including his "actual innocence" gateway claim – before barring them by laches, he cannot do so because it is not a factor external to him. *Maples*, 565 U.S. at 280.

19

As Respondent has reminded during the course of these proceedings, in state post-conviction proceedings, Petitioner replied to Respondent's response to his application with a motion for summary judgment. By doing so, Petitioner represented to the state court that his claims could be resolved, in his favor, with no further hearing, argument, or discovery. Even in his Second Amended Petition, Petitioner does not claim that he would have foregone filing a motion for summary judgment if Ada had produced the additional documents in 2014, and the procedural history of this case suggests Petitioner would have filed that motion regardless. By filing this motion, Petitioner represented to the state court that his claims could be resolved, in his favor, with no further hearing, argument, or discovery. In 1992, Petitioner gained a blanket order from the OCCA allowing him access to all OSBI information on his case (Exhibit 11). Those were the 860 pages of documents upon which Petitioner built his present claims, which have been available to him since at least 1992. Petitioner admits that it was the OSBI which was the central repository for all the information pertaining to his case regardless of the entity that initially generated it (Dkt. 123, at 57). Petitioner also had access to the Medical Examiner's report since 1986 (Exhibits 8, 14). Consequently, Petitioner's "[c]laim of actual innocence, ineffective assistance of counsel, prosecutorial misconduct, and *Brady* violation could have been submitted much earlier" (Exhibit 8, at 2). Further, based upon what Petitioner submitted in post-conviction proceedings, the state district court concluded that "too much time has elapsed due to Petitioner's own inaction" (Exhibit 8, at 2). These facts were expressly found by the state district court and entitled to deference absent Petitioner rebutting it with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Frost v. Pryor*, 749 F.3d 1212, 1215 (10th Cir. 2014); *see also Sharpe v. Bell*, 593 F.3d 372, 379-81 (4th Cir. 2010) (applying 28 U.S.C. § 2254(e) deference to state post-conviction court findings of fact).

Petitioner has never denied obtaining 860 pages of documents from the OSBI in 1992, and it is this discrete fact upon which nearly all of Petitioner's claims are built to at least some degree. While it is true that Petitioner now touts Ada police reports pertaining to Mr. Moyer, Karen Wise, and James Boardman as additional support for his *Brady* claims, the fact remains that as the State court found, Petitioner's "[c]laim of actual innocence, ineffective assistance of counsel, prosecutorial misconduct, and *Brady* violation could have been submitted much earlier" (Exhibit 8, at 2). Yet despite having the documents from the OSBI for two decades, Petitioner raised not a single complaint about his conviction, much less that he was actually innocent of a murder. That Petitioner so easily got such a large amount of material from the OSBI shows how easily he might have gotten more – before memories faded, witnesses died, and old reports were stored deep in several decades' worth of material – had he taken any timely action at all. Petitioner did nothing for two decades and now blames Oklahoma officials because he asked for nothing at the time, even though for at least four (4) years after receiving this information from OSBI, he had counsel. This is a particularly important point considering Petitioner voluntarily agreed to be sentenced, in 1995, for crimes he now says he did not commit and cannot deny that he had access to the bulk of information he says will prove his claims at the time he agreed to that sentence. Petitioner was partially, if not totally, responsible for the delay in his case and the later difficulties in piecing some of the documentation back together. It is simply not true that the delay between the time the OSBI complied with the OCCA order in 1992 and Petitioner's first attempt to collaterally attack his conviction and sentence was the fault of any prosecutorial entity. Nor does the recent production of approximately 300 pages of material in the Ada Police Department's evidence room change that analysis.

21

Second, even if Petitioner had some sort of an excuse for his lengthy delay in bringing forth his state post-conviction claims, he surely cannot explain why he unilaterally cut off those proceedings by informing the state court that the issues in his case could be decided solely on the briefs alone – without further discovery or hearing – by filing a motion for summary judgment. More importantly, at no time did Petitioner complain to the OCCA that the defense of laches asserted by Respondent and adopted by the district court precluded him from discovering evidence to further develop any federal claim.   When he appealed the state district court's denial of his post-conviction application, Petitioner's description to the OCCA of how those proceedings occurred was the following:

> An Application for Post-Conviction Relief was filed in the District Court of Pontotoc County on July 24, 2013. It was assigned to the Honorable Thomas S. Landrith. After requesting additional time to respond the State filed its response on September 17, 2014.[1]   Without a hearing the district court issued its Post-Conviction Findings on December 31, 2014, denying relief based on the State's assertion of Laches.
>
> [1]    The Order denying post-conviction relief incorrectly shows that the State's Response was filed on September 17, 2013. However, the Response was filed a year later in 2014.

(Exhibit 9, at 2).   Petitioner failed to admit to the state appellate court from the outset that the reason the district court could decide his case "[w]ithout a hearing" is because he expressly informed the district court that it could do so.   The State responded to Petitioner's motion for summary judgment with a motion to strike it and a motion for specific discovery because Petitioner had not followed state procedural rules requiring him to set forth the genuine issues of material fact he believed had been resolved by the pleadings (Exhibit 6).   The State also requested specific discovery of the new facts upon which he was relying to support his motion (Exhibit 7).   Petitioner never withdrew his

motion for summary judgment, modified it, nor replied to the State's motion. Thus, by the close of litigation in the state district court proceedings, Petitioner still believed that all issues of material fact had been resolved and his case could be decided based upon what he had submitted without a hearing. And the state district court ultimately agreed with Petitioner, finding in its order that there was no genuine issue of material fact and that an evidentiary hearing was unnecessary: "Petitioner having stipulated to have decision heard on briefs and motions and responses" (Exhibit 8, at 1).

While Petitioner has alleged that the discovery process was still ongoing in the state court at the time that he filed his motion for summary judgment, if that were true, Petitioner never informed the state courts of that and allowed the OCCA to decide if that indeed occurred. Instead, the state court record reflects that Petitioner wanted his post-conviction application decided *without* further discovery or even a hearing. Petitioner could have, but did not, allow the state post-conviction proceeding to run its course such that the state court could make that decision. Petitioner's motion for summary judgment, under Oklahoma law, formally notified the state court that there was no longer any genuine issue of material fact that needed to be decided and the post-conviction court could decide Petitioner's issues at that time on the merits without further discovery or hearing (Exhibit 4). Okla. Stat. tit. 22, § 1083 (2011). Petitioner's actions – not the state court and not Respondent – are what effectively shut down any further efforts to discover and use any other potential information that might be useful to his legal claims. Moreover, this action seems to expose not only Petitioner's confidence that he had all he needed to make what he believed to be viable claims, but an apparent hurry to exit the state courts as quickly as possible toward this forum to complain he was denied federal rights. Petitioner cannot on the one hand inform the state courts that his litigation was concluded but for a judicial decision based on facts set forth in the briefs, and on

the other come to this Court and paint that same litigation in the opposite light.  And Petitioner surely should not be permitted to blame the imposition of a state procedural bar (laches) as the "cause" to excuse the application of that bar in this Court when he never gave the state courts an opportunity to pass on the question first.  This type of strategy is directly contrary to the comity between sovereign governments the AEDPA is designed to promote. *Edwards v. Carpenter*, 529 U.S. 446, 451-452 (2000).  As Petitioner never argued in the OCCA that the application of laches prevented him from developing any legal claim, he may not use that as his "cause" to overcome the adequate and independent procedural bar here.  This defect, as with Petitioner's attempt to now use alleged "*Brady*" violations as cause to excuse his procedural default, renders the instant Second Amended Petition unreviewable in a habeas court.

Just as Petitioner cannot claim the cutoff of discovery in state court as "cause," where he never presented this cause to the OCCA, so too, Petitioner cannot rely upon alleged *Brady* violations as his cause, either, because this issue was never cited as "cause" to overcome the procedural default in state court. *Edwards*, 529 U.S. at 451-452.  In his Amended Petition, Petitioner alleges that "there is an exception in claims of *Brady* error, where the elements of the substantive claim itself mirror the cause and prejudice inquiry and proof of one is necessarily proof of the other." (Dkt. 123, at 16) (citing *Banks v. Dretke*, 540 U.S. 668 (2004)).  Petitioner alleges that he "qualifies for substantive review under both the actual innocence and the cause and prejudice exceptions" (Dkt. 123, at 16).  Thus, it appears that Petitioner is arguing a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) as "cause" to overcome the State's procedural bar of laches.

The problem with Petitioner's argument is that, again, he never presented it to the OCCA on post-conviction review.  While Petitioner alleged a substantive *Brady* claim, Petitioner never argued

24

to the state courts below that the district court had improperly applied the doctrine of laches specifically on account of a *Brady* violation.   In Petitioner's "Reply to Respondent's Response and Brief in Support of Motion for Summary Judgment" (hereinafter referred to as "Brief in Support of Motion for Summary Judgment") filed in Pontotoc County District Court on October 8, 2014, Petitioner did not rely upon *Brady* to overcome the procedural bar; rather, Petitioner asserted a conflict of interest regarding one of his former attorneys. (*See* Exhibit 4, at 9 ("To be clear, [Petitioner] does not assert the conflict of interest claim as a substantive constitutional violation, but rather to overcome Respondent's assertion of the laches defense.").   Now, in his federal habeas petition, Petitioner has completely switched his legal theory as to why the doctrine of laches should not apply to his stale claims.   However, to the extent that Petitioner attempts to allege any particular "cause" to excuse his procedural default, that claim must also be exhausted before it is asserted on federal habeas review. *Edwards*, 529 U.S. at 451-452.   The *Edwards* Court reasoned:

> [T]he principles of comity and federalism that underlie our longstanding exhaustion doctrine–then as now codified in the federal habeas statute, *see* 28 U.S.C. §§ 2254(b), (c) – require *that* constitutional claim, like others, to be first raised in state court.

*Id.* (quoting *Murray*, 477 U.S. at 489) (emphasis by the *Edwards* Court).  *See Jones v. State*, 704 P.2d 1138, 1140 (Okla. Crim. App. 1985) (recognizing certain exceptions to the procedural bar rule in cases where "sufficient reason" prevented assertion of the error on direct appeal or where an issue is bypassed on direct appeal due to a procedural error of counsel).  Petitioner's assertion of "cause" for his state procedural default in this Court may thus not be used.  Because Petitioner must satisfy *both* the "cause" and "prejudice" components to overcome a procedural bar, his claims – to the extent they are even exhausted – may not be heard. *Klein v. Neal*, 45 F.3d 1395, 1400 (10th Cir.

1995) ("The 'cause and prejudice' exception is conjunctive, requiring proof of both cause *and* prejudice") (emphasis in original) (citing *Murray*, 477 U.S. at 496 and *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982)).

Petitioner cannot rely on one "cause" to overcome the state bar in state court and a different "cause" to overcome the state bar in federal court. By doing so, Petitioner has "effectively transformed" the claim he presented in state court into a "new claim." *Fairchild v. Workman*, 579 F.3d 1134, 1155 (10th Cir. 2009). In *Fairchild*, the petitioner argued in his state court proceedings that trial counsel was ineffective but in his habeas petition, he presented "a very different, far more specific claim," of ineffective assistance of counsel. The Circuit concluded that the new evidence significantly altered the ineffective assistance of counsel claim, placing it in a different legal posture than in state court. *Fairchild*, 579 F.3d 1134 at 1150. Therefore, the Circuit Court found that before it could pass on the merits, the petitioner would first be required to exhaust all available state court remedies. *Fairchild*, 579 F.3d at 1151. The *Fairchild* Court cited to the pre-AEDPA case of *Demarest*, wherein the Circuit held that when the petitioner produced new evidence of trial counsel ineffectiveness, "our respect for the state courts requires us to remand this case to the district court for a determination of whether this new evidence could now be presented in those courts." *Fairchild*, 579 F.3d at 1152 (citing *Demarest*, 130 F.3d at 943). The Circuit in *Fairchild* found that the Court of Criminal Appeals was never provided the evidence that Fairchild attempted to present in federal court to prove ineffective assistance of counsel at trial and, therefore, he did not satisfy the exhaustion requirement. *Fairchild*, 579 F.3d at 1152. The Tenth Circuit recognized that if the state court resolves the claim on the merits, the AEDPA deference would apply and if the state court found the claim to be barred, the federal court would review that disposition applying the appropriate

26

standard of review under the circumstances. *Fairchild*, 579 F.3d at 1153. The *Fairchild* Court concluded that the petitioner had not "presented a potentially meritorious claim of ineffective assistance of counsel . . . before the state courts [which] was predicated on new profound evidence that [the petitioner] never presented to the OCCA." *Fairchild*, 579 F.3d at 1155. *See also Demarest*, 130 F.3d at 932 (requiring exhaustion despite the fact that the constitutional issue of ineffective assistance of counsel had been presented but the evidence presented in federal court differed somewhat from the evidence presented in state court; the Court reasoned that "fair presentation" means that the substance of the claim must be raised giving the state courts a fair opportunity to apply controlling legal principles to the facts bearing upon the constitutional claim).

Just as in *Fairchild*, the instant Second Amended Petition presents a "cause" for procedural default which was not "fairly presented" to the State court. In the Motion for Summary Judgment, Petitioner argued that "any delay in presenting [Petitioner's] claims was not of his own personal failings but those of an attorney whom he believed was working towards filing a petition on his behalf but who allegedly harbored a conflict of interest that interfered with his representation of [Petitioner]" (Exhibit 4, at 7). Petitioner explained in the state courts:

> Respondent's contention with [Petitioner] deals with the lack of any case activity after his plea in 1994. *That delay resulted in the actual conflict of interest between [Petitioner] and attorney Mark Barrett.* Mr. Barrett began reviewing [Petitioner's] case in 2003 shortly after his representation of Ron Williamson ended as a result of Mr. Williamson's exoneration. As a former employee of the Oklahoma Indigent Defense System (OIDS), Mr. Barrett was aware of OIDS' [sic] file management and records keeping systems. *Mr. Barrett, without authorization from [Petitioner], took his entire file, comprised of eleven (11) boxes, from the OIDS office. When questioned by undersigned counsel as to the scope of records taken and what records remained, only a potential review as to post-conviction DNA testing remained within OIDS'* [sic] *files. No*

27

> *correspondence, trial attorney files, appellate files, discovery, or other case materials remained. [Petitioner] was unaware of this situation until it came to light in 2012.*
>
> At the time undersigned counsel began working on [Petitioner's] case, Mr. Barrett explained how he had been representing both [Petitioner] and Mr. Ward, and investigating their cases, since 2003. Mr. Barrett was provided with a release signed by [Petitioner] in 2012 for all of his case files. The trial transcripts, OSBI reports, appellate briefing, videotapes of the confession, and some correspondence between appellate counsel and [Petitioner] was disclosed by Mr. Barrett. However, this material in no way constitutes the eleven boxes originally within OIDS' possession and taken by Mr. Barrett in 2003.

(Exhibit 4, at 7-8) (emphasis added). Thus, according to Petitioner's representations in the state courts, another OIDS lawyer (Barrett) took his case materials in OIDS' possession at some point after 2003. Petitioner then made clear the legal basis for why the state bar of laches should not be applied in his case:

> [Petitioner] asserts that Mr. Barrett was operating under a conflict of interest because his representation of Tommy Ward placed him in a compromised position in representing [Petitioner]. *[Petitioner] asserts that his conflict of interest defeats Respondent's assertion of laches because it was not until conflict free counsel was involved in the case that anyone had access to the information that serves as the basis of [Petitioner's] factual innocence claim.* To be clear, [Petitioner] does not assert the conflict of interest claim as a substantive constitutional violation, but rather to overcome Respondent's assertion of the laches defense.

(Exhibit 4, at 8-9) (emphasis added). Petitioner's position in the state courts was thus unambiguous: an alleged conflict of interest held by Mr. Barrett was the "cause" that prevented him from developing his factual innocence claim. And it was the removal of that alleged conflict that finally, according to Petitioner, cleared the way for "conflict-free counsel" to bring his claim forward. Laying aside the legal defect in Petitioner's theory – that the timeliness of his claims was dependent

upon when his post-conviction counsel learned of the information rather than when it was available to him – this was a different argument than the one he presents in this Court.

As the above passages from Petitioner's state post-conviction filings establish, Petitioner did not allege to the state court that laches should not apply because the *State* withheld evidence, which is the gravamen of a *Brady* claim. It was for that reason, as noted in the State's Motion for Specific Discovery filed in response to Petitioner's Motion for Summary Judgment, the State understandably responded to a conflict of interest claim as Petitioner's alleged "cause" to overcome laches, not to a *Brady* claim, by noting the following:

> In sum, Petitioner's Reply now alleges that (a) OIDS direct appeal attorneys had amassed at least eleven (11) boxes of materials relating to this case during their representations of him on direct appeal; (b) one of his direct appeal counsel, Cindy Brown Danner, who completed Petitioner's direct appeal brief and all direct appeal proceedings thereafter on his behalf, filed a motion with the Court of Criminal Appeals while Petitioner's case was still pending, requiring OSBI to release what apparently amounted to approximately 860 pages of material; Ms. Danner states she has no independent recollection as to why she filed the motion in Petitioner's case, except that such requests were seemingly routine at that time; (c) Mr. Barrett either was given permission by OIDS to take, or simply stole, nearly all of these 11 boxes of Petitioner's case materials; and (d) Petitioner should not be held accountable for any delay in raising his current claims, even though he was represented by counsel for at least two years before he accepted a life without parole sentence for a murder he now says he did not commit.

(Exhibit 7, at 4-5). The State further noted that Petitioner's lack of diligence in pursuing his claims extended back to 1992, when the OCCA awarded him an extremely broad discovery order and his counsel obtained the 860 pages of material from the OSBI, yet there was no further case activity after that date (Exhibit 7, at 4 n.1; Exhibit 11, 1992 OCCA Order; Exhibit 12, Affidavit of Cindy Brown Danner). The State further showed in its Motion for Specific Discovery that Petitioner's defense

29

counsel was in possession of material from the OSBI at the latest, by December 3, 1993, as evidenced by an OSBI document entitled "Release of Hypnosis Tape to David Timmons" indicating that a second copy of that tape had to be provided on January 7, 1994, after the first copy was broken by the defense team while in the process of listening to the tape (Exhibit 7, attached Exhibit 2). Under these facts and circumstances, where Petitioner has alleged a "cause" in his federal petition which differs substantially from anything he presented to the state courts, "it is AEDPA that requires . . . remand without addressing these claims on the merits." *Fairchild*, 579 F.3d at 1156. As the Tenth Circuit noted, the Supreme Court "has made it abundantly clear that 'before you bring any claims to federal court, be sure that you first have taken each one to state court.'" *Fairchild*, 579 F.3d at 1156 (citing *Rose v. Lundy*, 455 U.S. 509, 520 (1982)).

Petitioner could have alleged *Brady* as his cause to overcome the procedural bar in his first application for post-conviction relief, but did not. It is possible that the reason for Petitioner's change of legal theory is Petitioner's realization that the allegations which he made against Mr. Barrett in state court do not suffice as a showing for "cause" to overcome the procedural bar in federal court. As the Tenth Circuit Court of Appeals observed in *Berry v. Cody*, Case No. 94-6253, 1994 WL 596878 (10th Cir. Nov. 2, 1994)[10] (unpublished), relying on *Coleman v. Thompson*, 501 U.S. 722 (1991) as well as *Murray*:

> Berry's arguments in support of "cause" to overcome his state court procedural bar relate to his attorney's alleged neglect or failure to follow instructions. Those arguments are insufficient. "Cause" must be something external to the petitioner, not fairly attributable to him. *Coleman*, 501 U.S. at 752; *Murray v. Carrier*, 477 U.S. 478, 492 (1986); *Rodriguez v. Maynard*, 948 F.2d 684, 687 (10th Cir. 1991),

---

[10]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

> and since there is no right to counsel in post-conviction proceedings,
> an unappealed decision on the merits of ineffective assistance claims
> in such proceedings cannot constitute cause because of counsel error.
> *Coleman*, 501 U.S. at 752-53.

*Berry*, 1994 WL 596878, *3; *see also Pennsylvania v. Finley*, 481 U.S. 551, 555 (1990) (there is no general constitutional right to post-conviction counsel); *Fleming v. Evans*, 481 F.3d 1249, 1255 (10th Cir. 2007) ("[t]here is no constitutional right to an attorney in state post-conviction proceedings") (quoting *Coleman*, 501 U.S. at 752); *Spears v. Mullin*, 343 F.3d 1215, 1255 (10th Cir. 2003) ("Cause excusing a procedural default must be some objective factor external to the habeas petitioner, not fairly attributable to him, that impeded his efforts to comply with the procedural rule in question."); *Smallwood v. Gibson*, 191 F.3d 1257, 1269 (10th Cir. 1999) (holding there is no constitutional right to the assistance of post-conviction counsel in Oklahoma, and as such ineffective post-conviction counsel may not be used as "cause" to excuse a procedural default). Petitioner has not shown such an "external" factor where the evidence was available to, and investigated by, Petitioner's prior trial and direct appeal attorneys, but they simply chose not to take any further action concerning Petitioner's case following the reversal of his case for resentencing in 1994 and up to and including Petitioner's agreement to be sentenced to life without parole in 1995.

Because the issue of exhaustion is extremely problematic in this federal habeas petition due to an ineffective assistance of appellate counsel claim never raised in the state courts as well as the unusual way in which this case has proceeded in federal court, and the additional evidence which has been generated since this case has been in federal court, exhaustion of the issues will be further considered in a separate section below. Such a failure by Petitioner to exhaust his *Brady* claims in the OCCA as "cause" to overcome the district court's procedural bar of laches is an issue noted

31

within the State's first motion to dismiss in this case and supporting brief (Dkt. 99).   It is independent of the fact that some additional reports were recently produced by the Ada Police Department in response to co-defendant Ward's subpoena, a fact which does not substantially alter the *gravamen* of Petitioner's *Brady* claims.

> **ii.  While Petitioner did not exhaust *Brady* as his "cause" to overcome the procedural bar in his post-conviction appeal to the OCCA, Petitioner's *Brady* claims, including his recent addendums to those claims nevertheless lack merit as Petitioner has not shown how he was prejudiced by any of the allegedly withheld material.**

While the question of whether Petitioner ever properly exhausted *Brady* as his "cause" is problematic, Respondent acknowledges that Petitioner did attempt to raise *Brady* as a substantive claim on post-conviction review, in spite of his changing legal theories.   However, even when reviewed on the merits, Petitioner has not shown that any of the allegedly withheld material creates a reasonable probability of a different result at trial.   The United States Supreme Court has held, "There are three components of a true *Brady* violation.   The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).   In *Strickler*, the Supreme Court found that "cause and prejudice" paralleled two of the three components of the alleged *Brady* violation itself in that the suppression of certain documents was one of the causes for failing to assert a *Brady* claim in the state courts.   However, the Court went on to reason, "unless those documents were 'material' for *Brady* purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default." *Strickler*, 527 U.S. at 282.   It concluded that although the petitioner had shown cause, he had not shown a reasonable probability that his conviction or sentence would have been

32

different had the materials been disclosed and therefore, he could not show materiality under *Brady* or prejudice from his failure to raise the claim earlier. *Strickler*, 527 U.S. at 296. Notably, this "reasonable probability" language is essentially the same as the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984).

Thus, even assuming that Petitioner has shown "cause" in this case, and that "cause" is somehow deemed exhausted in spite of the fact that Petitioner alleged a wholly separate "cause" in state court (conflict of interest with his former post-conviction counsel), he has failed to show materiality or prejudice within the meaning of *Brady* and *Strickler* to overcome the procedural bars. The facts in support of Petitioner's *Brady* claims are essentially the same facts which he also alleged in support of his "actual innocence" gateway claim, which will be discussed more fully below. For the reasons set forth below, Petitioner's *Brady* claims do not establish a reasonable probability of a different outcome of Petitioner's trial. *Strickler*, 527 U.S. at 296.

### a. "Alibi" Evidence

Petitioner first alleges an "alibi" in the form of witnesses who allegedly saw him at a party on the night Mrs. Haraway was kidnaped from the convenience store. In a very real sense, this is the only aspect of Petitioner's allegations which even attempts to account for his whereabouts on the evening that Mrs. Haraway was killed. All of the rest of Petitioner's claims consist of vague allegations that "some other dude did it" which is problematic for Petitioner since this crime involved more than one perpetrator, including a co-defendant who implicated him. Petitioner has sought to build his alibi upon evidence in the prosecutorial, all of which was contained within the 860 pages of documents he received in 1992, and those 860 pages themselves, which he has

identified as separate exhibits in this proceeding (*see* Petitioner's Exhibits 43-44).[11]    Petitioner then combines this material with testimony from Ward's trial in 1989 about a party at Gordon Calhoun's place in an attempt to establish an "alibi" for the night and time Haraway was abducted.

However, Petitioner has not shown a reasonable probability of a different outcome within the meaning of *Brady* and *Strickler* based on any alleged withholding of evidence related to this party.    Because evidence of Petitioner's alibi would have been within Petitioner's own knowledge, it can reasonably be said that Petitioner always knew where he was on the night the victim was abducted and subsequently killed.    Information from the prosecution has never been required to investigate or substantiate that fact.    *See Harris v. Kuba*, 486 F.3d 1010 (7th Cir. 2007) (reasoning that evidence is suppressed only if the evidence was not otherwise available to the defendant through the exercise of due diligence and "Harris knew where he was (and was not) at the time" and therefore, "Harris's own alibi was not concealed from him and is therefore not properly a claim under *Brady*."); *United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005) (addressing a defendant's claim that the prosecutor violated *Brady* by failing to produce a pair of pants that the defendant had worn and in which the firearm was recovered, the Seventh Circuit found the claim to be without merit, reasoning that *Brady* deals with the concealment of exculpatory evidence unknown to the defendant and because "Lee was aware of his own pants," the claim was not properly one under *Brady*).

While Petitioner appears to vaguely allege within his third proposition that the Ada Police Department's possession of a letter he wrote to his attorney prevented him from developing his alibi (Dkt. 123-5), as Respondent has previously argued, the notion of a party was always present in this

---

[11](Dkt. 79-32; Dkt. 80-1).

case, as it was mentioned in Petitioner's confession as well as at preliminary hearing.[12] As Petitioner

concedes, the prosecutorial itself also contains a reference to this party (Dkt. 123, at 65 (citing Ex.

43, prosecutorial bates 142).[13]   Petitioner has never claimed that his counsel Mr. Butner lacked

access to the prosecutorial, as it is undisputed this was available to the defense.   Moreover, it is

undisputed that George Butner represented Petitioner all along, from preliminary hearing through

the re-trial in 1988.[14]   Therefore, Petitioner would have had ample opportunity over the course of

several years to present evidence of his alleged alibi to his defense counsel.   Petitioner even said in

his confession that he and Ward had been at a party (P/H Tr. III 664).[15]   Moreover, Detective Dennis

---

[12]The party was actually the second alibi given to the police by co-defendant Ward.   Mr. Ward
originally claimed that he and Petitioner had been fishing on April 28, 1984.   He said that he and
Petitioner had driven his mother's car and gone fishing on a pond right off of Richardson Loop.   He
claimed they fished until almost sundown and then drove the car back to his mother's house.   Ward
said that he walked to Petitioner's house and spent the night with Petitioner (P/H Tr. III 486).
However, when Ward was later confronted with that earlier statement, he said he did not remember
what he told police earlier but that he realized what he said was not the truth and that he went fishing
on Friday, April 27.   Ward gave another account of what happened on April 28, in which he stated
that he went to Collins Lumber in his mother's car to get some plumbing supplies, and worked all
day plumbing.   He claimed that he got through somewhere around 9:00 p.m., took a shower, and
walked over to Jeanette Roberts' house at 509 ½ South Townsend, where Gordon Calhoun was
having a keg party.   Ward said that he spent the night at Mr. Calhoun's and never left the party (P/H
Tr. III 493).

[13](Dkt. 79-32, at 142).

[14]As discussed more fully below in Part III(C), Petitioner clearly knew what was in the letter as he
wrote the letter.   Therefore, it is clear that nothing was suppressed from the defense in regards to
Petitioner's own knowledge of the party.

[15]The transcripts of the preliminary hearing and 1988 trial in this case were previously filed with this
Court conventionally (Dkt. 113).   Relevant pages of the transcripts cited herein are attached hereto
as Exhibit 17.   For the Court's convenience, Respondent will cite the relevant transcript pages using
the same abbreviations as Petitioner with the preliminary hearing transcript cited (P/H Tr. [vol.] _)
and the transcript of Petitioner's re-trial in 1988 cited (N/T [date] _) (see Dkt. 123, at 7).
Respondent is also conventionally filing the transcript of Petitioner's joint trial with co-defendant
Ward, which was held September 9 through 25, 1985, simultaneously with this Brief in Support of

Smith testified that Petitioner told him: "Okay, I'm telling you the truth this time. Me and Tommy were at a party on South Townsend . . . we met a guy named Odell Titsworth and we left with him and went riding around" (P/H Tr. V 969).

As this was information that would have been within Petitioner's knowledge at the time of his trial, Petitioner cannot realistically claim that this information was suppressed by the State within the meaning of *Brady* and *Strickler*. By the time that Petitioner agreed to be resentenced for the murder in 1995, the OSBI materials upon which Petitioner relies had already been provided to his counsel. Thus, Petitioner – while still represented – had access to all of it by the time he accepted his sentence. To the extent Petitioner relies upon anything within the 860 pages of OSBI documents – material to which he has had access since at least 1992 – such proof fails to establish a reasonable probability of a different outcome. Nothing prevented Petitioner from using anything within those documents for the two decades it took him to file an application for post-conviction relief in the state court except for the will to do so.

In short, Petitioner has failed to show a reasonable probability of a different outcome at trial if he had presented further evidence regarding this party. *Strickler*, 527 U.S. at 296. Petitioner would know best where he was the night of April 28, 1984, and he would be in the best position of identifying witnesses to that effect had it been true that he was present at a party for the whole night. Thus, additional evidence of Petitioner's presence at the party would have been more likely to have corroborated his confession than refute it. Petitioner repeatedly claims that his confession was not corroborated, yet he seeks to rely on a party mentioned within his confession as proof of his innocence. Moreover, the party in question occurred within the same town where the victim was

Motion to Dismiss. Respondent will cite this transcript using Petitioner's abbreviation (J/T).

abducted, and it would not be "miraculous" as Petitioner claims (Dkt. 123, at 66 n.22) for Petitioner to have spent some time at the party but also commit the crimes.[16]   *Compare Snow v. Sirmons*, 474 F.3d 693, 712-713 (10th Cir. 2007) (in a case where the defense sought to shift the blame to the defendant's brother, the State's failure to disclose police notes from a witness's interview did not violate *Brady* where there was not a reasonable probability that the result of the proceeding would have been different; the information seemed to provide more support to the brother's account than to the defendant's account).   Therefore, Petitioner has not shown materiality under *Brady* or prejudice with respect to his alibi claim stemming from any alleged withholding of *Brady* material.

---

[16]Indeed, Petitioner's account as introduced at preliminary hearing shows just how mundane, as opposed to miraculous, it would have been for Petitioner to attend the party but also commit the crime (P/H Tr. III 664) ("Okay. After the party, got in Odell's truck. Went out from north of town. As we was going to McAnally's, we stopped there at the apartments and decided to smoke some pot and get high and everything, and we drank some. Then when we got – we planned it out before we got there. And then, when we got there, Odell set it up for us and everything. He took her out of the store, brought her to the truck."). While Odell Titsworth's involvement is a red herring, and the evidence shows that it was actually Tommy Ward who took the victim out of the store, this is otherwise a very plausible and rational explanation for how Petitioner could have attended the party, left the party after it ended (but kept partying), gone to McAnally's, and participated in the crime. *See Trissell v. State*, 737 P.2d 1228, 1229 (Okla. Crim. App. 1987) ("In the present case, both appellant and his mother testified that he was in his room watching television when the burglary occurred. However, since the house in which appellant was staying was only one and one-half (1 ½) blocks from the victim's house, appellant failed to show that with ordinary exertion he could not have reached the place where the crime was committed so as to have participated in the commission thereof."); *Baxter v. State*, 364 P.2d 705, 708 (Okla. Crim. App. 1961) ("'To entitle the defense of alibi to consideration, the evidence must be such as to show that at the very time of the commission of the crime charged the accused was at another place so far away or under such circumstance that he could not, with ordinary exertion, have reached the place where the crime was committed so as to have participated in the commission thereof; and, in a criminal prosecution unless the evidence fills this requirement of the law, no instruction on the subject of alibi is necessary to be given by the trial court.'" (quoting *Giles v. State*, 104 P.2d 975 (Okla. Crim. App. 1940))). Furthermore, Petitioner has not really addressed the aspect of his confession wherein he admitted that the party came to an end. However, Petitioner's very plausible explanation of an after-party of sorts where he continued to ingest marijuana and alcohol at a *different* apartment complex belies Petitioner's present claim that he remained in one place for the entire night.

*Strickler*, 527 U.S. at 296.

## b.  Alleged Harassment of Mrs. Haraway by Unknown Man/Alternate Suspects

Petitioner has also alleged that Mrs. Haraway was being harassed by someone else.  Petitioner points to phone calls that Mrs. Haraway allegedly received at work that made her feel uncomfortable. As Respondent previously pointed out, Petitioner does not discount the possibility that he or his co-defendant Ward could have been responsible for the harassing phone calls.  As will be discussed more fully below in the discussion of Petitioner's "actual innocence" claim, a report from a witness who recently came forward indicates that Petitioner and Ward were indeed responsible for harassing Mrs. Haraway in the days prior to her death.

As a starting point for analysis with respect to Petitioner's *Brady* claim, there is no indication that evidence of alleged harassment was suppressed from Petitioner, at least prior to his re-trial in 1988.  As discussed in the State's Response to Petitioner's Application for Post-Conviction Relief, Petitioner's trial counsel was aware before Petitioner's second jury trial that the victim had received disturbing phone calls at McAnally's; he was also aware that the victim had expressed a desire to obtain a gun.  In Petitioner's post-conviction Exhibit 22 (Dkt. 79-1), counsel's investigator reported to George Butner concerning an interview with Anthony W. Johnson:

> Johnson admitted . . . that one week before Harraway's [sic] disappearance, he was in McAnaly's [sic] convenience store when Harraway [sic] asked him where she could buy a gun.  Harraway [sic] referenced the need for a gun with some funny phone calls she had recently been receiving.  Haraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing.

(Dkt. 79-1, p. 4).  This report is dated May 19, 1988, prior to Petitioner's 1988 jury trial.  The statement James Watts provided to Lloyd Bond, (Dkt. 84-13), a year later, adds nothing to what

38

defense counsel learned from his investigator.   Furthermore, Darlene Adams' affidavit (Dkt. 78-2) does not add any weight to this claim, portraying as it does the victim's general uneasiness of working at the store. This is nothing different than what Anthony Johnson related to the defense.

Therefore, because the "funny phone calls" were known to defense counsel, it cannot be said that this evidence was in any way suppressed, and Petitioner has failed to meet the first two parts of the *Brady* test.   Moreover, Petitioner has not shown that if he had Watts and Adams and other witnesses testify about the victim getting obscene calls, it would have created a reasonable probability that his conviction or sentence would have been different.   Clearly this anonymous evidence, which was incapable of exculpating anyone, would not have exculpated two co-defendants who both confessed to raping and murdering Mrs. Haraway.   *Strickler*, 527 U.S. at 296.   Therefore, Petitioner has failed to show the existence of a material *Brady* violation with respect to this claim.

Likewise, Petitioner has failed to show a reasonable probability of a different outcome based on alleged withholding of information regarding other suspects.   Petitioner's allegations seem to center around the person of Floyd Degraw (Dkt. 123, at 82-87), but the mere fact that Mr. Degraw was questioned about this case does not indicate that he was a viable alternate suspect.   Mr. Degraw denied murdering the victim, and there has never been any proof that Mr. Degraw ever visited the town of Ada in his entire life.   Moreover, as the existing record makes clear, Mr. Degraw's name appeared in a local newspaper at the time that the investigation was ongoing, and therefore, this evidence was not suppressed from the defense, nor was it material (Dkt. 79-6, 79-7, 79-8).[17] *Strickler*, 527 U.S. at 296.   Petitioner's attempt to point the finger at still other individuals falls even farther from the mark of proving materiality within the meaning of *Brady*.   Had trial counsel

---

[17] For the Court's convenience, these articles have been attached hereto as Exhibit 6.

attempted to present a defense so unfocused and scattershot that it sought to point the blame at anyone and everyone but the people who confessed to the crimes, the jury would have seen that defense for exactly what it was and disregarded it.

### c. Eyewitness Identification "Recantation."

Petitioner also alleges that the only eyewitness who identified him recanted his identification (Dkt. 123, at 31).  Petitioner attempts to weave the recently produced Ada police reports into this previously raised claim by asserting, "From his first interviews with the Ada police to his testimony at the preliminary hearing and trial, he [Jim Moyer] was not consistent." (Dkt. 123, at 31, citing Dkt. 123-21).  However, even if Jim Moyer's account changed over time, and even if the Ada police reports provided further evidence of that, Petitioner has not shown materiality within the meaning of *Brady* and *Strickler* in light of what actually happened at trial.  Although this witness, Jim Moyer, testified at Petitioner's preliminary hearing that Petitioner was the man with Ward at JP's, he was decidedly less sure of that identification at Petitioner's trial.  According to Petitioner, Moyer later "clarified his position" regarding his identification **during state post-conviction proceedings**, and this amounts to a recantation that makes a difference in his case (Dkt. 123, at 34).  Petitioner omits highly relevant facts that show why that is not so, but most importantly for this discussion regarding cause and prejudice, the witness's recantation during the post-conviction process is not *Brady* material.

As the Tenth Circuit Court of Appeals cautioned in *Case v. Hatch*, "recanted testimony is notoriously unreliable, 'easy to find but difficult to confirm or refute:  witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial.'" *Case v. Hatch*, 731 F.3d 1015, 1044 (10th Cir. 2013) (citing *Carriger v. Stewart*, 132 F.3d 463, 483

(9th Cir. 1997) and *In re Davis*, 565 F.3d 810, 825 (11th Cir. 2009)). The *Davis* court, cited by the Court of Appeals, reasoned: "[W]e repeatedly have noted that recantations are viewed with extreme suspicion by the courts . . . because . . . recantation testimony upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Davis*, 565 F.3d at 825. That unreliability is illustrated here.

As Petitioner admits, Moyer had "doubts about his identification of [Petitioner]" before the jury (Dkt. 123, at 32). Moyer testified on cross-examination at Petitioner's 1988 trial that he "[did not] know if [he] was convinced about [whether Petitioner was the man with Ward]" (N/T 6/9/1988, 26). The new evidence which Petitioner points to is an affidavit which Moyer provided twenty-four years later as well as three Ada police reports wherein Moyer described a dark-haired man, a blond-haired man, and a gray pickup, and identified an individual out of the Ward folder and an individual out of the Titsworth folder (Dkt. 123-21).

The problem with claiming that this is *Brady* material is that Moyer's "uncertainty" in his identification of Petitioner was on full display at the 1988 trial. Moyer admitted he had become "confused" about the second man he saw with Ward after seeing Petitioner during the preliminary hearing (N/T 6/9/1988, 25). Defense counsel also elicited from Moyer, just as Moyer states in his affidavit, that this uncertainty prompted him to call the District Attorney's office to report his concern (N/T 6/9/1988, 25-26). Mr. Moyer's uncertainty at trial caused Bill Peterson to have to point out during closing argument that Mr. Moyer became unsure of Mr. Fontenot's identification and explained that to the jury (N/T 6/14/1988, 21). Ultimately, Mr. Moyer's testimony was helpful in that he described men matching Petitioner's and Ward's descriptions within the store, and that

they drove an old, gray primered pickup. The OCCA found these consistent descriptions to be one of the nine ways in which Fontenot's confession was corroborated. *Fontenot*, 881 P.2d at 78. The recently produced Ada police reports do not cast doubt on the consistent descriptions given by Mr. Moyer, in fact they show at least his descriptions to be consistent. Thus, Petitioner has not shown a reasonable probability of a different outcome at trial based on the production of Moyer's early police report. *Strickler*, 527 U.S. at 296.

The problem with Mr. Moyer's more recent affidavit–beyond the fact that an affidavit produced for the defense cannot be *Brady* material–is that it establishes nothing that was not already known in 1988 at the time of Petitioner's re-trial. It bears repeating, Mr. Moyer's confusion was on full display at the trial (N/T 6/9/1988, 25-26). However, contrary to what Mr. Moyer now claims, on redirect examination at the 1988 trial, Moyer testified that he did not believe at that time that the District Attorney was trying to avoid his calls in any way (N/T 6/9/1988, 32-33). In fact, there is no mention – as Moyer now seems to recall – of having spoken to anyone in that office and having been advised that the person he now believes he saw with Ward nearly a quarter century after-the-fact "was not him." (Dkt. 123, at 34). Nor is there any sense of the type of "betrayal" Mr. Moyer now seems to feel over the matter; Moyer testified that he simply did not reach anyone at the District Attorney's office (N/T 6/9/1988, 32-33).

Mr. Moyer's affidavit is not a "recantation," as he clearly had doubts about Petitioner's identification which he expressed to the jury at trial and apparently still holds them today.

### d. Karen Wise Testimony and Affidavit.

Petitioner has also claimed that law enforcement pressured Karen Wise to change her account of what happened. However, this does not amount to new and reliable evidence creating a

42

reasonable probability of a different outcome at trial within the meaning of *Brady* and *Strickler*. Once again, this is simply not *Brady* evidence. Wise's affidavit was produced in 2009, four years before Petitioner filed his state post-conviction application but over two decades after the trial in this case. Petitioner has admitted through his use of transcript citations from his 1988 trial that it was already known that Wise "never identified [Petitioner] as one of the men she saw at JP's on April 28, 1984" (Dkt. 123, at 35 (citing N/T 6/8/1988, 177, 193-194). That Wise now apparently desires to further embellish her testimony does not change the most important aspect of it. Wise stated in her affidavit that as of 2009 she could not identify Petitioner as one of the men, but as Petitioner concedes, she testified to the same facts at Petitioner's 1988 trial (Dkt. 123, at 35) ("Wise never identified [Petitioner] as one of the men she saw at JP's on April 28, 1984"). The jury had this basic information but convicted Petitioner anyway. Therefore, assuming *arguendo* that anything in Wise's affidavit could be said to be suppressed by the State (rather than simply produced belatedly by Petitioner), Petitioner has failed to show a reasonable probability of a different outcome at trial based on Karen Wise's post-trial embellishments made at the behest of Petitioner's investigators. *Strickler*, 527 U.S. at 296.

Petitioner also baldly asserts that "[a]s in Moyer's testimony, Ms. Wise's police report varies in details that would have aided a jury in assessing whether these people were talking about the same truck." (Dkt. 123, at 40). Assuming *arguendo* that Petitioner is referring to a police report recently produced by the Ada police department, Petitioner fails to make that clear and fails to explain what details in Ms. Wise's police report would have been helpful in making that assessment. Thus, Petitioner fails to show a reasonable probability of a different outcome if Ms. Wise's police report had been used to question the description of the pickup truck. *Strickler*, 527 U.S. at 296.

43

### e.  Gray-Primered Truck – Inconsistent Statements.

Petitioner has also pointed to "inconsistent statements" regarding the truck into which Haraway was seen getting with her apparent killers as new and reliable evidence of his innocence. Petitioner's citations to the transcripts of Petitioner's trials betray any inconsistency in this area as anything new, let alone anything that has been suppressed by the State within the meaning of *Brady*. Even so, such information does not demonstrate any reasonable probability that someone else besides Petitioner must have been one of Haraway's murderers. *Strickler*, 527 U.S. at 296.  Again, this is not newly discovered evidence, and Petitioner proves it by referring to the inconsistent **testimony** about the truck that was presented to his jury in 1988.

Furthermore, Respondent would point out that two facts about the truck were confirmed repeatedly: it was an older model Chevy, and it was gray primered (N/T 6/8/1988, 193, 214, 225; N/T 6/14/1988, 25).  Defendant even concedes that "[t]he gray primered truck" was "described by several witnesses . . . in the McAnally's parking lot . . . ."  (Dkt. 123, at 118).  Whatever minor inconsistencies there may have been regarding the truck, it is undisputed that Mrs. Haraway was driven away from the store in just such a truck.

### f.  Alleged "Undisclosed" Portions of Medical Examiner Report – Claim That Victim Had Given Birth.

Petitioner has also claimed that the Medical Examiner's report was improperly withheld from him.  Nothing about the Medical Examiner's report or findings is new evidence, let alone has Petitioner demonstrated any suppression of this evidence by the State.  Petitioner's trial counsel personally met with Dr. Balding in 1988 prior to Petitioner's second trial and reviewed the Medical Examiner's file; thus, all of this information was available to Petitioner (and his counsel) at that

44

time.   Moreover, Petitioner's direct appeal counsel also took the same course, and prior to Petitioner's re-trial.   Finally, Petitioner had access to information collected by the Medical Examiner long before his agreement to a life sentence in 1995, nearly a decade after the first documented disclosure of the Medical Examiner's file to Petitioner's trial counsel in 1986.   Thus, nothing about the Medical Examiner's file was "undisclosed," nor was it "newly discovered evidence."

Terry Hull's 2013 affidavit amply demonstrates the problem with Petitioner having waited so long to bring his claims forward.   Hull claimed in 2013 that she did not see portions of the Medical Examiner's report (Exhibit 15).   However, the contemporaneous notes taken by Dr. Balding in 1986 and other correspondence from that time indicate that Hull not only saw the entire file, but that she took notes about it and personally visited with Dr. Balding about the issues and conclusions which were drawn in Petitioner's case (Exhibit 5).   That Ms. Hull mentioned nothing in her affidavit about having visited the Medical Examiner's office or her perusal of the entire file concerning the Haraway murder, in spite of the fact that all these things clearly took place, illustrates well why such late-timed affidavits are not reliable vehicles for the facts.   All in all, these records show a high degree of cooperation between Fontenot's defense and the Medical Examiner's office back in 1986, which belies Petitioner's repeated suggestions that such medical evidence was withheld from the defense (Exhibit 5).   The first two prongs of *Brady* are not met, and Petitioner has not shown cause.

And once again, Petitioner has not shown a reasonable probability of a different outcome of his trial within the meaning of *Brady* and *Strickler*.   Petitioner has made the outlandish claim that Haraway was three months pregnant at the time of her disappearance, and that notches on her pelvis showed that she had given birth before she died.   It appears that Petitioner is suggesting the theory that the victim was held captive for months, gave birth, and only then was she killed.   As Respondent

45

has previously noted, this theory does not account for the baby to which Haraway allegedly gave birth, and it begs the obvious question as to whatever happened to this child as there is no evidence he or she ever existed.   Certainly, no fetal or infant remains were ever recovered with Mrs. Haraway's body.   Most importantly, Petitioner has conceded that it is impossible to present the specific findings because, due to the long lapse of time, certain X-rays and other documents have been lost (Dkt. 123, at 44 n.9).[18]   Therefore, just as such an allegation does not show Petitioner's "actual innocence," likewise, Petitioner has failed to show a reasonable probability of a different outcome if such a theory had been presented at his trial when even now, Petitioner admits that such a wild theory is incapable of proof. *Strickler*, 527 U.S. at 296.

### g.  The Forty-Five (45) Pages From 2014.

Petitioner also attempts to show a *Brady* violation through 263 pages of OSBI documents that were released to both parties in 2014; of those, Petitioner claims never to have previously seen forty-five (45) pages of reports included therein (Dkt. 123, at 59).   This continuing turnover of material in his case, Petitioner argues, revives his stale claims, and demonstrates a *Brady* violation sufficient for him to overcome Oklahoma's procedural bars.  It does not.

---

[18]Petitioner's proof of an alleged pregnancy is weakened even further, to the extent Petitioner attempts to prove it through unreliable hearsay.  Petitioner claims that the victim "informed Karen Wise, convenience store clerk at JP's, that she was three months pregnant" (Dkt. 123, at 45).  What Petitioner does not say is that this "proof," comes from the affidavit of Vickey Jenkins [Blevins] signed in 2013 (Dkt. 78-3, p. 2).  According to Ms. Jenkins, she "recall[s] [her] friend Karen Wise telling [her] that Denice Haraway had told her right before Haraway disappeared that Denice was 3 months pregnant" (Dkt. 78-3, p. 2).  There is no mention of Haraway's alleged pregnancy in the extensive affidavit Wise signed in this case in 2009, which would have been an important detail if it was true (*see* Dkt. 78-14, pp. 2-4).  And – it should not be forgotten – Wise has recanted her testimony from the earlier trials.

It is difficult to extract from Petitioner's arguments the precise evidence upon which his claims are based; they are often blended with information based upon the OSBI materials ordered released in 1992.[19]   Respondent will therefore address the contentions Petitioner has clearly made in the instant petition based upon information within the forty-five (45) pages (Dkt. 29-8).

Petitioner complains about not receiving reports and information about alternate suspects. Mainly, Petitioner sees no compelling reason why some of these leads and suspects were dropped. First, Petitioner points to a man called "Jerry East," who was arrested for burglary, could not account for his whereabouts the night of the crime, and "matched" the description of one of the suspects except that his hair was the wrong length (Dkt. 123, at 165).   Another lead Petitioner believes was compelling came from Beaumont, Texas, where three Caucasian men (instead of two) were stealing purses, but one of the suspects "resembled" one of the suspects in this case.   Although they were driving a truck with Oklahoma plates, the truck only had patches of primer, and was not covered in primer as was the description made in this case (Dkt. 123, at 165-166).   It was well known that law enforcement was seeking leads in this case (even from the community) from the beginning (Exhibit 6).   Thus, the fact alternate leads were being pursued was certainly no secret and not something suppressed.

Petitioner next points to information about other suspects, only the photos of whom he lacked until 2014; hence, the rest of the material about which he speaks was available since 1992 (*see* Dkt. 123, at 166).   Other suspects, Petitioner contends, were relevant to his case because they committed similar crimes in *Tulsa* (Dkt. 123, at 167).   Petitioner's major, if not only, argument regarding this

---

[19] Petitioner has not attached as an exhibit his "amended state post-conviction application filed on April 18, 2014."

information is that he sees no legitimate reason why law enforcement decided not to continue following these leads.  There is actually a very good reason that Petitioner does not appear to want to contemplate:  Petitioner and Ward credibly confessed to the crimes, and Fontenot's confession was corroborated in nine different ways.  *Fontenot*, 881 P.2d at 78.

Therefore, Petitioner has failed to show a reasonable probability of a different outcome based upon these forty-five pages of additional material made available in 2014.  *Strickler*, 527 U.S. at 296.

### h.  Ada police reports

**Duney Alford and Carrie McClure**

The Respondent has already addressed many aspects of the recently produced Ada police reports, including additional reports regarding Jim Moyer, which do not make a material difference under *Brady*, given what Mr. Moyer's actual testimony was and his failure to identify Petitioner at trial, which Petitioner's jury heard.   Petitioner has also relied upon other reports such as Duney Alford's report and Carrie McClure's report (Dkt. 123-20; Dkt. 123-22).  Petitioner alleges that these witnesses provide insight into the people coming in and out of the store, and that some remember seeing a pickup parked there for a much longer period than the prosecution presented.   Carrie McClure recounted "an old beat up car parked outside when she left the store" and thought there was a couple in the car with some kids.  Mr. Alford saw a pickup but did not give a timeline.  He just said that he went to the store on the day Mrs. Haraway was taken.   These witnesses are simply not material within the meaning of *Brady* and *Strickler*.   Their testimony would not have made a material difference in this case.  Frankly it is to be expected that other individuals were coming in and out of the store all that day; it was a convenience store.  It is also to be expected that both cars and pickups would be present at a gas station.  The fact that witnesses might have seen other pickup trucks at the

48

gas station that day did not make any of those other trucks *the* pickup truck.

Whereas Ms. McClure saw Mrs. Haraway just before the kidnapping, it appears that Jimmy Simpson went into the store just after she was taken, as he found nobody there. Defendant block quotes Mr. Simpson's report to highlight the fact that a GM *car* was at the gas pumps with three or four people around it, and another pickup was nearby with one man and one woman. However, Mr. Simpson clearly came at a time when no employee was at the store (Dkt. 123-19). As Petitioner acknowledges, Mr. Simpson arrived while the Timmons brothers and Mr. Whelchel were already waiting for the police. Mrs. Haraway would have been long gone by that point. There is no evidence that the kidnappers hung around McAnally's after taking Mrs. Haraway. There is no impeachment value to Mr. Simpson's after the fact report.[20]

**James Boardman**

Petitioner also highlights Ada police reports regarding James Boardman (Dkt. 123-2, at 10). Respondent respectfully submits that Mr. Boardman's report is of limited value because according to that report, "he was at the McAnally store on Arlington about 5 pm on 4-28-84 . . . ." (Dkt. 123-2, at 10). That was over three hours before Mrs. Haraway disappeared. The report goes on to note that Mr. Boardman "picked #1 out of the Ward's folder and could not identify anyone from the Fontenot and Titsworth folders." (Dkt. 123-2, at 10). The report also adds this interesting detail, that Mr. Boardman was an "employee of Ada news." (Dkt. 123-2, at 10). It stands to reason that a *journalist* recounting events "a few days after" the disappearance is going to know the difference between 5:00

---

[20]Another odd detail about Mr. Simpson's report is that he reported seeing a man he thought was Odell Titsworth standing outside the store (Dkt. 123, at 69). Petitioner otherwise goes to great lengths in his Second Amended Petition to show Titsworth's lack of involvement in the crime (*see, e.g.*, Dkt. 123, at 87 ("Given that Titsworth could not have been involved in any crimes related to Mrs. Haraway's death because he was in police custody . . . .").

p.m. and approximately 8:30 p.m. There is a marked difference in the amount of daylight in April between those two times. Therefore, the evidence that Mr. Boardman provided might have had some slight inculpatory value towards Mr. Ward, especially if Mr. Ward denied ever going to McAnally's. However, Mr. Boardman's description is at best neutral towards Petitioner because even if the person with Ward at 5:00 p.m. was not Petitioner, that says nothing about who was with Ward at 8:30 p.m. Respondent acknowledges from the previous discussion Petitioner's theory that the pickup may have been at McAnally's for slightly longer than the prosecution's theory of the case suggested. But certainly, Petitioner is not claiming that Ward and his partner in crime stayed at the convenience store for *three and a half hours* before finally committing the robbery and kidnapping.

Because Mr. Boardman's timeline is so far off, it is not exculpatory evidence, it does not refute Petitioner's confession, and it would not have provided an alternate factual account as to what happened at the convenience store. There is no reasonable probability of a different outcome at trial based on Boardman's report. *Strickler*, 527 U.S. at 296.

### i. Richard Holkum

Defendant acknowledges that Officer Holkum was a known witness who testified at his re-trial in 1988, concerning the victim's clothing description (Dkt. 123, at 72). Petitioner appears to claim that the police were only interested in his clothing description and in when his purchases were made, according to the register tape. Petitioner cites a lengthy portion of Holkum's 2013 affidavit (Dkt. 123, at 72-73). Petitioner claims that Officer Holkum was in McAnally's between 7:30 p.m. and 7:45 p.m., that Mrs. Haraway "seemed normal" at the time, and that he saw the drivers of a green Ford Torino and a primer gray Chevy or GMC pickup truck talking near the gas pumps.

Petitioner claims that Detective Dennis Smith and Detective Mike Baskin were not interested

50

in talking with Officer Holkum about the disappearance the next morning. However, it seems untenable that Ada police officers would have been disinterested in talking about the Haraway disappearance the day after it happened, and indeed, the rest of the record before this Court tends to show the very opposite of that assertion. If these officers appeared to show disinterest, it was likely because Officer Holkum's timeline was off. Albeit, it was not as off as Mr. Boardman's timeline as shown above, but it was still off by at least forty-five minutes. And just because Officer Holkum saw the driver of a Chevy or GMC pickup between 7:30 and 7:45, there is no reason to believe that it was *the* pickup, especially where the driver was apparently having a normal conversation with a fellow driver, and there was no suggestion that either driver acted suspicious. Moreover, even if Petitioner could make the gigantic leap of showing that it was the same pickup as Mrs. Haraway was taken away in forty-five minutes later, that would have no impact upon the motive, as Petitioner claims (Dkt. 123, at 74). It is unclear what Petitioner even means by making such an assertion. The motive was obviously to kidnap Mrs. Haraway and to steal property. That has never changed, and Holkum's account alters nothing.

In addition to all these problems with the timeline and Petitioner's arguments, Officer Holkum's affidavit is simply not *Brady* evidence. Its presence within Petitioner's *Brady* discussion actually makes little sense as it does not appear that any report by Officer Holkum was ever withheld from Petitioner's defense counsel. Petitioner does not cite to any Ada police report in support of his subproposition regarding Holkum. On the contrary, in the portion of Officer Holkum's affidavit quoted by Petitioner, Holkum states that neither Detective Dennis Smith nor Detective Mike Baskin "formally interviewed [him] about what [he] saw or when [he] was there." (Dkt. 123, at 73). Moreover, Holkum is not even sure that he ever found his purchase on the register tape he was

51

shown (Dkt. 123, at 73). Based on these assertions, it does not appear that there was any report of an interview with Holkum that was withheld from the defense within the meaning of *Brady*, and obviously, the 2013 affidavit is not *Brady* material. Petitioner's *Brady* claim thus fails with respect to Officer Holkum.

### j. John McKinnis

Defendant also offers up the 2013 affidavit of John McKinnis as another alleged *Brady* violation, citing a long block quote from that affidavit (Dkt. 123, at 74-76). Again, this is not a *Brady* violation as there is no evidence of any report about Mr. McKinnis withheld from the defense.

Moreover, several aspects of Mr. McKinnis' affidavit show its lack of relevance in identifying the perpetrator. If Mr. McKinnis lived ten minutes east of McAnally's and got home between 8:00 and 8:10 p.m., Mr. McKinnis' timeline is just as off as Officer Holkum's timeline.

Petitioner attempts to show the relevance of Mr. McKinnis' account through the following assertion: "Considering Mr. McKinnis' information in conjunction with the new evidence about Mrs. Haraway's potential stalker presents a very different picture of the abduction and the motive for it." (Dkt. 123, at 77). Petitioner ends the paragraph there and does not explain how that is so. If the man allegedly behind the counter with Mrs. Haraway sometime before 8:00 p.m. was really the person who had been stalking her, harassing her, and making obscene phone calls, why would Mr. McKinnis also report that "Denice Haraway appeared to be her normal, happy self." (Dkt. 123, at 75). If the man reported by Mr. McKinnis in 2013 actually existed, he was either an acquaintance of Mrs. Haraway or her stalker. That Petitioner attempts to have it both ways, by insinuating that maybe Mrs. Haraway ran off with this acquaintance she knew who looked like a construction worker, or maybe he was the person harassing her and putting her in fear at work even though she

appeared normal and happy while in his presence, shows the lack of materiality of Mr. McKinnis' claim.

These are not the only facts about Mr. McKinnis' account that do not add up. Contrary to every other witness in this case who described an older model pickup, McKinnis describes a 1977 or 1978 truck with a *new* body style, a truck made after the body style changed around 1975 or 1976 (Dkt. 123, at 75). In this regard, it must be noted that a 1978 pickup would have seemed a lot newer in the year 1984 than it might seem today. This description shows that if this truck belonged to the man in question, it could not have been the older model truck in which Mrs. Haraway was taken, as recounted by the Timmons brothers and Gene Whelchel. Mr. McKinnis' description of someone who looked like a construction worker, who was "clean" in spite of the fact that he appeared to have been working that day, also appears to be incongruous.

Not only do the claims made by McKinnis fail the materiality prong of *Brady* for the reasons stated above, there is also no evidence of improper withholding of this information from the defense. McKinnis claims he told a dispatcher the information and that he talked to Detective Baskin at some point. However, Petitioner has not pointed to any report allegedly withheld from him concerning Mr. McKinnis. In fact, Petitioner admits that there are no such reports (Dkt. 123, at 77). While Petitioner nevertheless attempts to dovetail this into his *Brady* claim by alleging the lack of a follow-up investigation, it appears that Mr. McKinnis was simply one more witness, like Officer Holkum and especially James Boardman, who was in McAnally's too early to provide any useful insight into the kidnapping of Mrs. Haraway around 8:30 p.m.

### k. Gary Haney and Guy Keys

Petitioner further points to police reports made by Gary Haney and Guy Keys who responded

53

to Detective Dennis Smith's request for information carried in local television and newspapers. Mr. Haney was in the store with his son at 8:00 p.m. and stayed ten to twelve minutes, and nothing unusual transpired. Petitioner concedes these individuals were in the store *after* Officer Holkum and Mr. McKinnis (Dkt. 123, at 79 (citing Ex. 35)). Mr. Keys was apparently in the store the same day and told police the same facts. He allegedly arrived at 8:25 p.m. Petitioner alleges that no police reports document how these men responded to Detective Smith's request for information, or what details they provided. Petitioner impliedly concedes, then, that there was no *Brady* violation. The police cannot be held responsible for turning over information they did not have.

It is interesting to note, however, that these men, Mr. Haney especially, account for nothing unusual happening in McAnally's between about 8:00 and 8:25 p.m. This would appear to further undercut any claim that Mrs. Haraway left with the man allegedly seen by Mr. McKinnis before 8:00 p.m. If anything, Haney and Keys appear to strengthen the State's timeline and show that Mrs. Haraway was working right up until the time she was kidnapped around 8:30. While Haney and Keys may unfortunately have been some of the last people to see Mrs. Haraway alive before she was taken, there is nothing about this evidence suggesting a reasonable probability of a different outcome at trial within the meaning of *Brady* and *Strickler* where neither individual reported anything that would help identify the perpetrators.

### l. Gene Whelchel

Petitioner also posits that material information was withheld regarding Mr. Whelchel, the person who called the owner of the store, the manager, and the Ada police when he realized that Mrs. Haraway was missing (Dkt. 123, at 80-82). Upon closer inspection, however, it appears that Petitioner's main claim of materiality with respect to Mr. Whelchel is that a transaction was rung up

54

at 9:00 p.m., *after* these calls had already been made. Petitioner seems to believe that knowledge of this transaction would have opened up a whole possible line of defense inquiry about securing the crime scene, and that not knowing about this transaction cost him a viable defense (Dkt. 123, at 80) ("At the very minimum, had defense counsel known about the 9:00 pm transaction, numerous lines of cross-examination and impeachment would have been pursued not only for law enforcement but for Mr. Whelchel and the Timmons brothers, the prosecution's sole eyewitnesses."). However, it would seem based on a review of the record before this Court that the defense was on notice about the 9:00 p.m. transaction. Elsewhere in his second amended habeas petition, Petitioner admits:

> The register tape from the day's purchases was collected by Detective Baskins [sic] and placed into evidence by the state at all three trials. ... While the entire roll was placed into evidence, it is unclear whether it was ever unrolled during the trial by any of [Petitioner's] attorneys during trial or direct appeal. It was ineffectiveness for defense counsel not to examine the entire roll . . . .

(Dkt. 123, at 68-69 and n.23). The register tape is presently in the record before this Court as Petitioner's Exhibit 37 (Dkt. 79-26). That document clearly reflects the notation, "Gene Whelchel 9:00." Therefore, the register tape clearly was never "withheld" from the defense within the meaning of *Brady*. There was no suppression of the register tape or its contents within the meaning of *Strickler*, 527 U.S. at 281-282. Petitioner's inclusion of a piece of evidence which he concedes was admitted at all three trials under the subheading, "Material Evidence Was Withheld from [Petitioner's] Defense Counsel," and his ineffective assistance claim based on this same piece of evidence, truly begs the question. It appears that Petitioner is simply including within his *Brady* claims evidence that was in no way withheld from the defense, and which the defense was certainly aware of by the time of Petitioner's re-trial in 1988.

Just as Petitioner has failed to show the evidence was suppressed within the meaning of *Brady* and *Strickler*, Petitioner also fails to meet the third prong of the test. It is helpful at this point to recall the standard for materiality under *Brady* set forth above. Petitioner must show a reasonable probability that his conviction or sentence would have been different had the evidence been disclosed. *Strickler*, 527 U.S. at 296. Even assuming, for the sake of argument, that no sale should have been allowed at McAnally's after the abduction, Petitioner has failed to show a reasonable probability of a different outcome based upon the fact that such a sale did occur at 9:00 p.m. A decision made by store employees to go ahead and complete a sale does not show that the *police* mishandled the scene. It does not show State action. Moreover, given the undisputed fact that the call to police was made before that final purchase at 9:00 p.m., it is clearly not material to the timeline of the abduction. Once again, Petitioner has failed to show materiality within the meaning of *Brady* and *Strickler*. He has not shown a reasonable probability of a different outcome because, if such an attack on the police investigation had been attempted at trial, the jury would have seen it for the irrelevant red herring that it was.

### m. Jeff Miller and Terri Holland (McCarthy)

Petitioner also alleges that the OSBI's prosecutorial contained a table of contents of evidence collected during the investigation, which allegedly included items not provided to the defense. He alleges that these included an audio recorded interview with Jeffrey Miller, a video taped interview of Jeffrey Miller, and an audio tape of Terri Holland. Citing the preliminary hearing testimony of Detective Baskin, Petitioner alleges that the "trial court did order [sic] the disclosure of any of the names Jeff Miller provided to police or his statements to police." (Dkt. 123, at 89).

56

Reviewing the portion of preliminary hearing testimony in question, Detective Baskin related that he interviewed a man in his twenties named Jeff Miller, he did not know why Mr. Miller was not being used as a witness, and from what Mr. Miller told him, his information came from several people (P/H Tr. III 501-502).  After some discussion of the work product doctrine, the trial court did not shut down Petitioner's inquiry but told Petitioner's counsel, "You can make that motion after preliminary hearing."  (P/H Tr. III 503).  Petitioner does not here indicate whether he followed up on the court's invitation to file that motion or not.  However, the defense clearly had access to the name of Jeff Miller and could have attempted to follow up with Mr. Miller personally to learn his sources of information.  Even if the tapes were unavailable, Petitioner has failed to show that Jeff Miller himself was unavailable and beyond the reach of the defense's investigator.  It was not as though Jeff Miller was a confidential informant.

Moreover, while the prosecutor's invocation of the work-product doctrine at the preliminary hearing stage might be debatable, there is nothing in the record which suggests that the recordings of Jeff Miller, or the list of names that Miller allegedly relied upon, would have been exculpatory to Petitioner in any way.  On the contrary, as discussed elsewhere in this brief, Petitioner made various admissions about his knowledge of the crime to different people.  This was the likely basis for Jeff Miller's knowledge, knowledge that proved reliable after both Petitioner and Ward confessed to committing the crimes.  It is reasonable that if Mr. Miller based his knowledge entirely upon what others had told him about Petitioner, the prosecutor may have concluded that the hearsay problem would be too great to allow for admission of Mr. Miller's testimony in a court proceeding, especially where the reliable confessions of Ward and Petitioner were available.  This may well be why Miller himself was not a witness.

Petitioner has failed to show a reasonable probability that his conviction or sentence would have been different had the additional Miller materials been disclosed and therefore, he cannot show materiality within the meaning of *Brady*. *Strickler*, 527 U.S. at 296.

Petitioner also makes a similar claim regarding an alleged recording of Ms. Holland. Petitioner notes that Ms. Holland testified during the preliminary hearing and the joint trial of Petitioner and Ward that Petitioner admitted killing the victim when they were in jail together (Dkt. 123, at 89-90). Petitioner now alleges that Ms. Holland got rewarded for her testimony, though he admits his only proof is an affidavit from Randy Holland (Dkt. 123, at 92-93).

However, as Petitioner impliedly concedes that Ms. Holland did not testify at his retrial in 1988, Petitioner clearly cannot show any prejudice with respect to his present conviction. That is, Petitioner cannot show a reasonable probability of a different outcome at his 1988 re-trial based on an alleged, unproven failure to turn over impeachment evidence against a witness who was not ultimately used to convict Petitioner at his re-trial. *Strickler*, 527 U.S. at 296.

Petitioner cannot show any prejudice by focusing on the preliminary hearing either. The preliminary hearing took place in January 1985, whereas Randy Holland admits he did not even marry Terri Holland until much later in the year, September 4, 1985. Therefore, her alleged motive to offer testimony to help Mr. Holland did not exist at the time of her preliminary hearing testimony.

**Conclusion**

In summary, Petitioner never exhausted his *Brady* claims as "cause" in State court (choosing instead to blame counsel Mark Barrett for his inordinate delay in beginning to seek relief). Petitioner has relied on *Brady* repeatedly, and could have raised *Brady* as his cause in state court without the recently produced Ada police reports, as the overwhelming majority of his *Brady* claims are still

based upon the 860 page OSBI report turned over in the early 1990s. (In some cases, as in the example of the register tape, or varying descriptions of the pickup truck, Petitioner even relies upon evidence presented at the trials in support of his *Brady* claims).

Nevertheless, even when viewed on the merits, Petitioner has failed to show that any of the allegedly suppressed evidence was material within the meaning of *Brady*, as he has failed to show a reasonable probability of a different outcome at his trial based on any of this evidence, whether considered separately or altogether. *Strickler*, 527 U.S. at 296. Therefore, even if Petitioner's reliance on *Brady* as his "cause" is deemed exhausted, Petitioner has still failed to show prejudice sufficient to overcome the procedural bars.

**C.     Petitioner has not sufficiently proved his "actual innocence" to overcome application of the time bar and the State's procedural bar.**

Petitioner has also alleged his actual innocence in order to sidestep the procedural bars and time bar applicable to his habeas petition. In fact, Petitioner devotes his first proposition to the claim that he is actually innocent. In this brief, Respondent has discussed Petitioner's *Brady* claims as cause first because it is easier for a petitioner to show a *Brady* claim than to show his actual innocence. Indeed, the prejudice prong of *Brady* is similar to the prejudice prong of *Strickland*. Respondent has demonstrated above that Petitioner has not shown a reasonable probability of a different outcome at trial based on any of the information which became available to him after trial. Actual innocence, on the other hand, is a much more difficult showing for a habeas petitioner to make. Petitioner has pointed blame in multiple different directions, and even his Second Amended Petition for Writ of Habeas Corpus lacks any unifying theory for why this Court should believe that some other individual committed this crime. In short, Petitioner's habeas petition fails to coalesce

59

around any one person or group of perpetrators as the likely murderer. While Petitioner throws suspicion at certain individuals like Mr. Degraw, or an unidentified man seen in McAnally's thirty minutes before Mrs. Haraway was taken, or even people in Beaumont, Texas, Petitioner still has nothing more than suspicion to offer. That is in spite of receiving the maximum amount of discovery in his collateral proceedings. This is a problem for Petitioner given the fact that there is no DNA evidence exonerating Petitioner,[21] nor any hint of another individual besides co-defendant Ward ever confessing to the crimes against Mrs. Haraway.

The United States Supreme Court has held that claims which are time-barred under the AEDPA may nonetheless be reviewed by a habeas court upon a credible showing of "actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 390-394 (2013). While the *Perkins* Court held that a petitioner alleging actual innocence to overcome the time bar is not absolutely required to show diligence, nevertheless, the Court explained that timing is an important factor in assessing the credibility of a petitioner's claim:

> While we reject the State's argument that habeas petitioners who assert convincing actual-innocence claims must prove diligence to cross a federal court's threshold, we hold that the Sixth Circuit erred to the extent that it eliminated timing as a factor relevant in evaluating the reliability of a petitioner's proof of innocence. To

---

[21] There was an agreed order for DNA testing in 2009 (Exhibit 19). While no DNA evidence was apparently found as a result of that order in the material tested, this agreed order between the State and Petitioner's counsel at the time, Mark Barrett, shows that there has in fact always been a high level of cooperation between the State and Petitioner's defense team. The agreed order came at a time when no case was pending before the state court. Moreover, according to an inventory prepared during Petitioner's later post-conviction proceeding on January 6, 2014, and presented to Pontotoc County District Judge Thomas Landrith, two representatives of the Oklahoma Innocence Project requested to look at the items in question and were allowed to inspect and photograph the items in the presence of Assistant Chief Jeff Crosby and District Attorney Chris Ross (Exhibit 20). The fact of such cooperation between the State and Petitioner's attorneys, both old and new, paints a very different and more accurate picture than Petitioner's frequent claims of egregious misconduct.

> invoke the miscarriage of justice exception to AEDPA's statute of
> limitations, we repeat, a petitioner "must show that it is more likely
> than not that no reasonable juror would have convicted him in the
> light of the new evidence." Unexplained delay in presenting new
> evidence bears on the determination whether the petitioner has made
> the requisite showing . . . . As we stated in *Schlup*, "[a] court may
> consider how the timing of the submission and the likely credibility
> of [a petitioner's] affiants bear on the probable reliability of . . .
> evidence [of actual innocence].

*Perkins*, 569 U.S. at 399 (citing *Schlup v. Delo*, 513 U.S. 298, 327, 332 (1995)) (alterations in the

original). Applying *Perkins*, the Tenth Circuit Court of Appeals has refused to shield petitioners

from the consideration of diligence with respect to the reliability of actual innocence claims. *Doe*

*v. Jones*, 762 F.3d 1174, 1183 (2014).

Furthermore, as both *Schlup* and *Perkins* make clear, "[c]ases involving a fundamental

miscarriage of justice 'are extraordinary instances when a constitutional violation probably has

caused the conviction of one innocent of the crime.'" *Gilbert v. Scott*, 941 F.2d 1065, 1068 n.2 (10th

Cir. 1991) (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991), and citing *Murray*, 477 U.S. at

496)); *see also Herrera v. Collins*, 506 U.S. 390, 403-404 (1993); *Larson v. Leyba*, 507 F.3d 1230,

1232 (10th Cir. 2007). The Court of Appeals has explained this "very narrow exception" of "actual

innocence" that would permit habeas review of otherwise procedurally barred claims:

> The petitioner must supplement his habeas claim with a colorable
> showing of factual innocence. Such a showing does not in itself
> entitle the petitioner to relief but instead serves as a "gateway" that
> then entitles the petitioner to consideration of the merits of his claims.
> In this context, factual innocence means that "it is more likely than
> not that no reasonable juror would have found petitioner guilty
> beyond a reasonable doubt."

*Demarest*, 130 F.3d at 941-42 (citations omitted). In *Schlup*, the case primarily relied upon by

Petitioner, the Supreme Court held that "to be credible [a claim of actual innocence requires] new

reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . ." *Schlup*, 513 U.S. at 324. Petitioner must present "'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Perkins*, 569 U.S. at 400 (quoting *Schlup*, 513 U.S. at 316). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324; *see also House v. Bell*, 547 U.S. 518, 538 (2006) (reasoning, "[t]he *Schlup* standard is demanding and permits review only in the 'extraordinary case'").

In *Frost v. Pryor*, 749 F.3d 1212 (10th 2014), the Tenth Circuit Court of Appeals explained the demanding standard a petitioner must meet to demonstrate actual innocence:

> To make a credible showing of actual innocence, a "petitioner must 'support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" This new evidence "must be sufficient to 'show that it is more likely than not that no reasonable juror would have convicted the petitioner in the light of the new evidence.'" This standard is "demanding and permits review only in the extraordinary case."

*Frost*, 749 F.3d at 1231-32 (internal citations omitted). Further, the new evidence must "affirmatively demonstrate[ ] [the petitioner's] innocence," rather than simply "undermine the finding of guilt against him." *Phillips v. Ferguson*, 182 F.3d 769, 774 (10th Cir. 1999). *See McElhaney v. Bear*, Case No. 17-7026, 700 Fed. Appx. 872, 875 (10th Cir. Aug. 17, 2017) (unpublished)[22] ("[P]risoners asserting innocence . . . must establish that, in light of new evidence,

---

[22]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'").

Thus, "[s]imply maintaining one's innocence, or even casting some doubt on witness credibility, does not necessarily satisfy this standard." *Frost*, 749 F.3d at 1232; *Bousley v. United States*, 523 U.S. 614, 623 (1998) (explaining that "actual innocence" must be based upon new evidence of "factual innocence, not mere legal insufficiency"); *see also Prost v. Anderson*, 636 F.3d 578, 600 (10th Cir. 2011). Hence, it is not enough to simply show the weight of the evidence at trial might have been different or viewed more in Petitioner's favor in some respects. Petitioner must prove – with new evidence – a greater likelihood that *no* reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 324. For its part, the Supreme Court has emphasized that "tenable actual-innocence gateway pleas are rare." *Perkins*, 569 U.S. at 411.

For largely the same reasons that Petitioner has not shown a reasonable probability of a different outcome at trial within the meaning of *Brady* and *Strickler* based on evidence which Petitioner claims is new, Petitioner has also failed to "affirmatively demonstrate" his innocence in this case. *Phillips*, 182 F.3d at 774. While the *Perkins* Court reaffirmed the existence of the actual innocence gateway, as noted above, the Court also warned, "Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing [of actual innocence]." *Perkins*, 569 U.S. at 399. Thus, Petitioner's lack of diligence in bringing his "actual innocence" gateway claim forward is a relevant factor in determining the credibility of his overall claim. *Doe*, 762 F.3d at 1182-83 (citing *Perkins*). Petitioner cannot blame his delay between 1995 and 2013 in beginning to seek collateral relief on a handful of additional reports which were produced after he already filed a petition alleging his actual innocence based on what was available

63

to him since 1992.

Against the backdrop of Petitioner's pre-trial confession, Petitioner has identified several categories of what he believes to be evidence of his actual innocence.  Respondent has addressed all of these categories in the *Brady* discussion above.  However, none of this evidence is "new" or "reliable" within the meaning of *Perkins*, *Schlup*, *House*, or *Frost*.  Both the Supreme Court and the Tenth Circuit Court of Appeals have made clear that the proffered evidence of "actual innocence" for these purposes must be "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence . . . ." *Schlup*, 513 U.S. at 324; *Frost*, 749 F.3d at 1231-32; *see also Perkins*, 569 U.S. at 394-395 ("The miscarriage of justice exception, we underscore applies to a severely confined category: cases in which *new evidence* shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" (quoting *Schlup*, 513 U.S. at 329 (emphasis added; brackets in original)).  "Newly discovered" evidence in this context means "relevant evidence that was either excluded or unavailable at trial." *Schlup*, 513 U.S. at 327-28.  Such evidence does not include "facts that would have been known . . . at the time of trial." *United States v. Foy*, Case No. 13-3157, Fed. Appx. 828, 832-33 (10th Cir. Sep. 30, 2013)[23] (unpublished) (affidavit by co-conspirator allegedly exonerating petitioner was not "newly discovered evidence" because "the nature and extent of his relationship" with petitioner would have been known to petitioner at the time of trial); *Johnson v. Medina*, Case No. 13-1324, 547 Fed. Appx. 880, 885 (10th Cir. Dec. 4, 2013)[24] (unpublished) (finding petitioner's pre-guilty-plea knowledge of

[23]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

[24]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

discrepancies in DNA evidence and potential alternative suspects at the time of trial failed to make newly-fashioned allegations on those same subjects "newly discovered evidence" for actual innocence gateway purposes). Thus, if the information alleged to be "new" was or could have been within the defendant's knowledge at the time of trial, it is not "newly discovered evidence" within the realm of *Perkins* and *Schlup*. As such, information contained in early Ada police reports or in letters written by Petitioner before his preliminary hearing are not "newly discovered evidence" demonstrating his actual innocence.

Indeed, Petitioner received the "860 pages" of OSBI documents in 1992 pursuant to an Order of the Oklahoma Court of Criminal Appeals while his second direct appeal was pending (Exhibit 11; Exhibit 12). The OSBI documents gained in 1992 were received after a December 1, 1992, request for an Order by the Oklahoma Court of Criminal Appeals by Petitioner's direct appellate counsel, Cindy Brown Danner (Exhibit 12). Furthermore, Petitioner conceded during his state post-conviction proceedings that his direct appeal counsel took custody of this material (Exhibit 4, attached Exhibit 1). Petitioner has largely relied on the "prosecutorial" and the "OSBI" in support of his allegations. That information was included within the 860 pages of OSBI material that he received in 1992. In fact, the state district court found that Petitioner had access to the Medical Examiner's report since 1986 and had access to the 860 pages of OSBI documents since 1992, and the record before this Court supports that finding.

As even a cursory perusal of the subheadings in Petitioner's "actual innocence" proposition reveals, his actual innocence claim relies upon this material available since 1986 and 1992 and not upon material later disclosed pursuant to agreement during the state post-conviction proceedings in 2013, or material recently produced in 2019. Petitioner has identified several categories of what he

65

believes to be proof of his actual innocence, but none of the evidence touted by Petitioner is truly "new" or "reliable" evidence within the meaning of *Perkins*, *Schlup*, *House*, or *Frost*. Most of Petitioner's claims rely upon what he believes to be recantations or merely inconsistent evidence, such as descriptions of the pickup truck. And, as already noted, none of what Petitioner offers is "new" and/or "reliable" under the correct standard, thus removing it entirely from the sphere of evidence the law considers compelling enough to permit a habeas petitioner to break through firmly-rooted procedural default rules. What matters is that this information has been available to Petitioner for many years.

Conspicuously absent from Petitioner's allegations that there is new reliable evidence establishing his actual innocence is any accurate indication of when any of this evidence exactly became "new" to him, much less a coherent explanation as to how it meets the standard he must meet to have his claims reviewed in this Court. Because Petitioner apparently believes, mistakenly, that all evidence is new – no matter how it relates to his trials or when he personally gained access to it – the task falls upon Respondent to set forth as clearly as can be gleaned from this record when the information upon which Petitioner relies came into his hands. It falls into four (4) rough categories: the "860 pages" of OSBI documents; the Medical Examiner's Report/File; evidence regarding alternate suspects; and evidence obtained from the Ada Police Department. Petitioner also supports his "actual innocence" gateway claim with *testimony* from his previous trial proceedings and affidavits from witnesses who testified during his 1988 trial.

As far as Respondent can discern, though it is not his burden to demonstrate, Petitioner received the "860 pages" of OSBI documents in 1992 pursuant to an Order of the OCCA while his second direct appeal was pending (Exhibits 11-12). The OSBI documents gained in 1992 were

66

received after a December 1, 1992, request for an Order by the OCCA by Petitioner's direct appellate counsel, Cindy Brown Danner (Exhibit 12).  Thus, it is a recorded fact, provided by Petitioner during state post-conviction proceedings, that his direct appeal counsel did take custody of this material (*see* Exhibit 4; attached Exhibit 1).  In his argument supporting why he has established "the gateway requirements of *Schlup v. Delo*," Petitioner often cites to the "prosecutorial" and "OSBI" followed by Bates stamped page numbers.   Although Petitioner makes no clear or consistent distinction between the two, information in the "prosecutorial" is included within the "860 pages" of OSBI material that he received in 1992.  As Respondent has shown above, factual findings regarding Petitioner's receipt of the Medical Examiner's report (that Petitioner has had access to it "since 1986") and the "860 pages" of OSBI documents (that Petitioner has had possession of them since 1992) were made by the state post-conviction court; those findings are entitled to deference pursuant to 28 U.S.C. § 2254(e)(1) (Exhibit 8, at 2).  Importantly, Petitioner's "actual innocence" gateway claim relies solely upon this, and other, information.  It does *not* rely upon any material gained from the "263 pages of discovery" disclosed pursuant to agreement during state post-conviction proceedings in 2013 (*see* Amended Pet., 58 n.12 & Exhibits 85-90).  As Petitioner has obviously found nothing therein to support his claim of "actual innocence," anything about that event is irrelevant to whether he has satisfied the exceptionally stringent requirements to open the gateway for habeas review of his procedurally barred and defaulted claims.

Petitioner has attempted some minimal reliance on the Ada Police reports produced in 2019 in support of his actual innocence proposition (Dkt. 123, at 31) ("From his first interviews with the Ada police to his testimony at the preliminary hearing and trial, he [Mr. Moyer] was not consistent"); (Dkt. 123, at 32) ("Not only was the sequence of events from the men in the store different from his

testimony, but he was not shown [Petitioner's] photo spread.  As the prosecution relied upon him [Moyer] to put [Petitioner] in the store, it is interesting that he was not asked to identify him during his interview.  Mr. Moyer's account of his time in McAnally [sic] is widely inconsistent from his original interview, through his preliminary hearing and trial testimony."; (Dkt. 123, at 40) ("As in Mr. Moyer's testimony, Ms. Wise's police report varies in details that would have aided a jury in assessing whether these people were talking about the same truck.").  However, just as Respondent showed above that there was no *Brady* violation based upon these police reports, given their lack of materiality in light of the testimony which the jury actually heard from Moyer and Wise, Petitioner also cannot meet the narrow, actual innocence exception based upon these old police reports.

Therefore, the facts supporting Petitioner's "actual innocence" gateway claim still overwhelmingly fall within the following contours: information from the Medical Examiner that Petitioner and his attorneys had as early as 1986, OSBI material Petitioner and his counsel received in 1992 and continued to possess up until and including the moment he voluntarily and intelligently decided to have the state trial court sentence him for the Haraway murder in 1995, and testimony from his 1988 trial and/or affidavits related to that trial testimony.  Petitioner has not made a colorable showing of actual innocence based on any of this material, whether considered separately or cumulatively, especially when Petitioner's claim is considered against the backdrop of Petitioner's corroborated confession.  *Demarest*, 130 F.3d at 941-42.  Recall again, the OCCA found that Petitioner's confession to the murder of Ms. Haraway was trustworthy and corroborated in nine separate ways.  *Fontenot*, 881 P.2d at 86.  Those nine separate points of corroboration belie Petitioner's claim that his confession was not corroborated, or that it was somehow false or fed to

Petitioner by the police.[25]

First, the OCCA found it significant that Petitioner made two extrajudicial, post-crime statements in addition to confessing to the police.[26]  He told a friend [Gordon Calhoun] that he knew facts about the Haraway abduction–specifically the perpetrator's identity.  And while he was awaiting trial in the county jail, a fellow inmate [Leonard Martin] overheard him saying, "I knew we'd get caught." *Fontenot*, 881 P.2d at 78.  (N/T 6/8/1988, 145-146; N/T 6/10/1988, 205).

Second, the Court found that three witnesses [David Timmons, Linny Timmons, Gene

---

[25]Petitioner claims that "it is indisputable that during the time prior to turning on the video recorder, the interrogators supplied [Petitioner] with the information that Tommy Ward had confessed to the murder of Mrs. Haraway and inculpated [Petitioner] in his confession." (Dkt. 123, at 122).  In making that assertion, however, Petitioner flatly ignores the evidence in the record indicating that he had discussions with Ward about what to say prior to ever being arrested.  Detective Smith testified at preliminary hearing that Petitioner told him that Ward had told Petitioner to tell Ward's dream.  Ward told Petitioner that if the police questioned him about the Haraway case, he should tell them that it was a dream (P/H Tr. V 975).  This was corroborated by defense counsel Mr. Butner during an in camera hearing during the joint trial wherein Mr. Butner discussed with Petitioner that he was "going to have to show that there was some collaboration between you and Tommy Ward in reference to a statement between April 28th and October the 19th." (J/T VIII 1813).  Mr. Butner made it even more clear:  "I've got to go into your conversations with Tommy Ward." (J/T VIII 1814).  Thus, the record shows that Ward and Petitioner clearly had discussions in advance about what to say in the event they were questioned by the police.  Innocent people do not have any need to hold such discussions.  Only guilty individuals get together in advance and collaborate on a story to tell the police in the event they are questioned.

[26]While the OCCA focused on admissions which Petitioner made to people other than the police, and the OCCA was specifically examining testimony from Petitioner's second trial, it is worth noting for purposes of Petitioner's actual innocence claim that Petitioner made other very incriminating admissions in the presence of law enforcement after his confession (P/H Tr. V 1012-1015).  At preliminary hearing, Detective Dennis Smith testified that sometime during a court appearance in November 1984, following his arrest, Petitioner made a statement, not in response to questioning, that he was guilty of "robbery, rape, kidnapping and abducting." (P/H Tr. V 1014).  When Detective Smith was asked what he understood Petitioner to mean by the term "abducting," Detective Smith replied, "I took it to mean that abducting to him meant having sex with a dead person." (P/H Tr. V 1014).  Thus, in addition to Petitioner's confession, the record is replete with instances where Petitioner made incriminating admissions both to law enforcement and lay witnesses which are inconsistent with Petitioner's present claim of actual innocence.

Whelchel] saw Mrs. Haraway leaving the convenience store with a man on the day she disappeared. They saw the man take her to an old, gray primered Chevy pick-up, which Petitioner described. They saw her enter from the passenger side with the man following, as Petitioner described. *Fontenot*, 881 P.2d at 78.

Third, an insurance agent [Wayne Gridner] testified he insured a gray primered Chevy for its owner, Ward's brother [Joel Ward]. A witness who knew both co-defendants [J.T. McConnell] testified they were friends and saw them riding around together in the Chevy pickup. *Fontenot*, 881 P.2d at 78.

Fourth, one witness [Jim Moyer] who entered McAnally's just before the abduction testified that he had seen two men generally matching Fontenot's and Ward's descriptions inside the store. The two men were driving an old, gray primered pickup. One of them acted as if he wanted the witness to leave. *Fontenot*, 881 P.2d at 78. Note that the OCCA did not say that Moyer identified Petitioner, but he did provide a description matching Petitioner. As previously discussed, that has not changed, in spite of Moyer's different accounts over time.

Fifth, another witness [Karen Wise] who worked just 1/4 mile down the road at another convenience store testified about having seen two men matching Ward and Fontenot's descriptions in her store earlier on the evening of the abduction. She described the truck they drove as red and gray primered. They were watching her and she felt uncomfortable. They left around 8:30 or 9:00 p.m. and headed towards McAnally's. In spite of Ms. Wise's affidavit, or her claim to having seen four men instead of two, Petitioner has not overcome the corroborative value of this evidence, in spite of his repeated efforts. *Fontenot*, 881 P.2d at 78.

Sixth, the manager of McAnally's [Monroe Atkinson] testified that $167 was taken from the store.   Petitioner stated in his confession that they had taken about $150 during the robbery. *Fontenot*, 881 P.2d at 79.

Seventh, the blouse Mrs. Haraway wore on the evening of her abduction buttoned up the front and had lace around the collar and cuffs.   Petitioner said in his confession that she had worn a blouse with ruffles around the sleeves and elastic in the sleeves. *Fontenot*, 881 P.2d at 79.

Eighth, the shoes found with Mrs. Haraway's remains were soft-soled, canvas shoes.   Mrs. Haraway's husband characterized these shoes as "tennis" shoes.   However, Petitioner gave a more accurate description of the shoes, specifically describing them as "soft-soled" shoes and stating they were not tennis shoes.   The OCCA found it significant that "[d]uring oral argument . . . [Petitioner's] appellate counsel stated that information about Mrs. Haraway's shoes had not been made public prior to his confession." *Fontenot*, 881 P.2d at 79 and n.12.

Ninth and most generally, there was considerable testimony describing Mrs. Haraway's life: her somewhat recent marriage to Steve Haraway; her eager anticipation of a teaching degree; her overall happiness and contentment; and her dedication to her job responsibilities.   This corroborated Petitioner's statement that Mrs. Haraway did not willingly leave McAnally's but was abducted. *Fontenot*, 881 P.2d at 79.[27]

---

[27]Petitioner suggests at one point in the Second Amended Petition that the police reports make it "untenable that Mrs. Haraway disappeared in the manner suggested . . . ."  (Dkt. 123, at 64).  If Petitioner is suggesting that it is untenable that Mrs. Haraway was taken against her will from the gas station where she worked sometime after 8:30 p.m., driven away by two men in an older model Chevy pickup with gray primer paint, and ultimately murdered with her body left in a field, Petitioner's claim is patently contrary to all the evidence in this case.

The Court also went on to note the fact that Petitioner admitted to a rape during the course of his confession, which was admitted as part of the *res gestae*. *Fontenot*, 881 P.2d at 83. While the rape could not be corroborated due to the advanced state of decomposition of the victim's body when it was found, it is simply incredible that someone would admit to such a fact if it were not true, when it certainly would have been possible to make a confession to participating in the murder without admitting to such a heinous detail. Petitioner could have described it as a robbery gone bad, but instead he included this detail about his own actions.

Petitioner attempts to attack certain of the corroborative factors set forth above, particularly to the extent the OCCA found the confession to be corroborated through the testimony of Wise and Moyer. But Petitioner's actual innocence claim ignores other inconvenient details, such as the fact that Ward and Petitioner were known to travel together in a gray primered Chevy pickup insured by Ward's brother, or the fact that Petitioner could accurately identify the approximate amount of money stolen in the robbery, or the fact that Petitioner could describe the victim's shoes better than her own husband could. And while Petitioner attempts to rely upon Gordon Calhoun as an alibi witness, Petitioner does not explain why he told Mr. Calhoun he knew the perpetrator's identity or why he made similar incriminating admissions to several other people.

**New evidence that Petitioner and Ward were the individuals responsible for harassing Mrs. Haraway.**

Though it is not Respondent's burden to disprove Petitioner's actual innocence claim, Respondent must nevertheless point out some evidence which recently became available. Further undercutting Petitioner's claim of actual innocence, a new witness has come forward who offers some additional insight tending to indicate that Petitioner and his co-defendant were the ones

responsible for the harassment of Mrs. Haraway.  In an interview which took place on February 28,

2019, an individual named Ferlin Traylor recounted the following:

> Traylor . . . explained that two or three days before the female clerk disappeared from the Convenience Store, (CS) he stopped in that CS to purchase a "pop" right around closing time, 10:00-10:30 PM. (Traylor said back then CS's closed for the night).  Traylor stopped at this CS because it was the only CS on the east side of Ada.  The store is now an artificial limb and brace store.  The outside looks the same today as it did in 1984.  Traylor cannot remember where he had been that night, perhaps to visit family on that side of Ada.  Traylor said he had not been to a bar; he was headed back home.  Traylor lived between Calvin and Holdenville.  At that time, in 1984, Traylor worked in the oil field.

> Traylor pulled into the CS's parking lot and parked next to the only other vehicle in the parking lot.  Traylor believed this was a newer model, two toned Chevrolet pick-up truck.  Traylor observed a dark headed white male sitting in the driver's seat.  The pick-up truck was just to Traylor's right (the west), only a few feet away.

> Traylor entered the CS, with his wife still in their car parked beside the pick-up truck.  Traylor walked past the CS's clerk, a young white female with dark hair and a medium complexion around 5'2" to 5'3["] in height, "or maybe a little taller".  She looked at Traylor.  Traylor thought to himself that the female clerk looked scared.  Traylor went to his right, the west side of the CS, and approached the refrigerated cases which contained the pop.  Traylor noticed another individual in the CS described as a white male with dark hair with an average build.  This individual was in the middle of the store by the south wall.  As Traylor walked to the refrigerated cases containing the pop, the other individual walked away from Traylor.

> Traylor got his pop and walked back toward the female clerk.  When he approached the female clerk to pay, she said "please don't leave me."  Traylor asked her to repeat herself and she again said "please don't leave me."  Now the female clerk was shaking and started to cry.  Traylor asked the female clerk why she did not want him to leave.  The female clerk said she thinks they are trying to take her.  Traylor asked her why she thought that.  The female clerk replied that they, (the two men) had been in the store and would not buy anything and wouldn't leave.  The female clerk was talking loud enough for

73

the other individual in the CS to hear what was being said. The other individual began walking to exit the store. The individual went out of his way not to walk by Traylor, exited the CS, and got into the passenger side of the parked pick-up truck.

Traylor was now concerned for his wife's safety. The two white males in the pick-up truck were just feet away from Traylor's wife in their car. Traylor went outside and got his wife out of their car to stay with him inside the CS.

Traylor now moved to the CS's entrance on the north side of the store and started to watch the two white males in the pick-up truck. Traylor said they were around ten feet away. Traylor stared directly into the two men's face [sic]. After staring at the two men for a few minutes the pick-up truck backed out of the CS's parking lot. Traylor believed that the two white males were debating whether they could "get away with it or if they should leave". Traylor cannot remember which direction the pick-up truck went. Traylor believes the two men in the pick-up truck were young, between 20 and 30 years of age. Traylor never saw the driver outside of the pick-up truck.

The female clerk put the cash register money in a bag, locked the doors and left for the night. Traylor said he and his wife stayed less than 15 minutes with the female clerk. Traylor followed the female clerk to her car, which was parked on the east end of the parking lot. Traylor does not remember what kind of car the female clerk was driving. After the female clerk got in her car and left, Traylor and his wife left the parking lot. Sometime in Traylor's conversation with the female clerk that night, she told Traylor she had called the police. The police never showed up to the CS while Traylor was there that night.

Two or three days later, the disappearance of the female clerk was all over the news and in the newspaper. Traylor said it was a big deal; that kind of thing did not happen in Ada. The newspaper ran an artist sketch of who was believed to be the key suspects to the female clerk's disappearance. Traylor said he could tell nothing from the artist sketch. The newspaper later ran photos of two white males who were now believed to be responsible for the female clerk's disappearance. When Traylor saw the photos in the newspaper, he knew law enforcement had the correct individuals responsible for the disappearance of the CS's female clerk. He knew these two individuals were the two men he had seen at the CS two or three

74

nights before the female clerk went missing.

Traylor said he remembers this incident so well because he realized that he gave the CS's female clerk two or three more days of life.

Traylor has never read any books or publications concerning this matter; nor has he followed this matter throughout the years. Traylor had no idea Netflix aired a documentary concerning this matter. Traylor has never viewed the Netflix documentary.

(Exhibit 21).

Two things about Mr. Traylor's account ring true. First, Mr. Traylor accurately described the fact that Mrs. Haraway was being harassed at the convenience store and was in fear for her safety in the days before her abduction. That would be a difficult fact for Petitioner to deny given the fact that he relies upon the existence of such harassment and fear as proof of his actual innocence. Moreover, Mr. Traylor would have very little reason to know that Petitioner has relied so heavily on this alleged harassment in his collateral proceedings, particularly in this Court. Second, Mr. Traylor remembered the incident because he realized that he gave the clerk two or three more days of life.

Petitioner has not demonstrated his actual innocence in this Court, and Mr. Traylor offers further proof disproving Petitioner's actual innocence claim.

**Conclusion**

Petitioner has failed to present new, reliable evidence demonstrating his actual innocence within the meaning of *Schlup* and *Perkins*. Just as Petitioner has failed to show a reasonable probability of a different outcome at trial within the meaning of *Brady*, he has also failed to meet the even higher standard for demonstrating a fundamental miscarriage of justice. Therefore, Petitioner's actual innocence claim must also fail.

75

## III.   THE SECOND AMENDED PETITION CONTAINS UNEXHAUSTED CLAIMS RENDERING IT A "MIXED" PETITION.

In addition to the other inadequacies in the instant petition previously discussed, there is another procedural problem.  The Second Amended Petition is a "mixed petition," that is, it contains one or more claims that were not properly exhausted in the state courts.  There are three main issues which prevent Petitioner's Second Amended Petition from being fully exhausted.  First, Petitioner's claim of ineffective assistance of appellate counsel – his fifth ground for relief – has still never been properly presented to the state courts (Dkt. 123, at 120).   Second, to the extent Petitioner contends that the imposition of the laches bar prevented him from developing any of his federal claims, he never presented that argument to the state courts either.   Third, Petitioner's third proposition is a brand new claim.  Because it is based upon material produced in 2019, it merits additional discussion.   While Respondent does not waive exhaustion of Petitioner's third proposition, Respondent believes it is a claim that can be denied on the merits at this time.

Under 28 U.S.C. § 2254(b)(1):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

Petitioner makes no claim in these proceedings that there were no state corrective measures available to him, nor does he argue any circumstances that rendered any available process ineffective at protecting his federal rights.  Petitioner instead merely complains that the state process that he used for some of his claims did not grant him his desired result, and he asks this forum to change that outcome.

76

"A threshold question that must be addressed in every habeas case is that of exhaustion." *Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994). Petitioner bears the burden of showing state court remedies have been exhausted as required by 28 U.S.C. § 2254(b). *See Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011); *Olson v. McKune*, 9 F.3d 95, 95 (10th Cir. 1993); *Clonce v. Presley*, 640 F.2d 271, 273 (10th Cir. 1981); *Bond v. Oklahoma*, 546 F.2d 1369, 1377 (10th Cir. 1976). A claim has been exhausted when it has been "fairly presented" to the state courts. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Brown v. Shanks*, 185 F.3d 1122, 1124 (10th Cir. 1999) (internal quotation marks omitted) ("The exhaustion requirement is satisfied if the issues have been properly presented to the highest state court, either by direct review of the conviction or in a post-conviction attack."). "Fair presentation" requires more than presenting "all the facts necessary to support the federal claim" to the state court or articulating a "somewhat similar state-law claim." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (citing *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)). A petitioner need not "invoke 'talismanic language' or cite 'book and verse on the federal constitution.'" *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (quoting *Nichols v. Sullivan*, 867 F.2d 1250, 1252 (10th Cir. 1989). But he may not assert entirely different arguments from those raised before the state court. *Bland*, 459 F.3d at 1011. "[T]he crucial inquiry is whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." *Prendergast*, 699 F.3d at 1184 (quoting *Picard*, 404 U.S. at 278). "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief" filed in that court to be made aware of the federal claim. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).

Petitioner's ability to exhaust his claims is particularly important here considering the highly unusual circumstances of this federal habeas petition: Petitioner has been granted an unprecedented amount of discovery prior to ever filing his Amended Petition, or for that matter his Second Amended Petition, and without ever having made a showing of how the state courts interfered with his ability to develop his claims or how the imposition of the state laches bar prevented him from doing so. For these additional reasons, the presence of apparently exhausted and clearly unexhausted claims, this Court may not grant the petition and it must be dismissed.

"The exhaustion requirement is designed to avoid the 'unseemly' result of a federal court 'upset[ting] a state court conviction without' first according the state courts an 'opportunity to . . . correct a constitutional violation." *Davila v. Davis*, __ U.S. __, 137 S. Ct. 2058, 2064 (2017) (quoting *Rose v. Lundy*, 455 U.S. 509, 518 (1982)). Furthermore, 28 U.S.C. § 2254(b)(3) provides: "A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." For exhaustion purposes, it is not sufficient merely that Petitioner has been through the state courts, "rather he must have given the state's highest court a 'fair opportunity' to address his claims." *Picard*, 404 U.S. at 275-276. *See also Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994) (holding that fair presentation requires that the federal issue be "properly presented to the highest state court, either by direct review or in a postconviction attack"). As the United States Supreme Court held in *Harrington v. Richter*, 562 U.S. 86, 103 (2011), "[u]nder the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court." *Richter*, 562 U.S. at 103 (citing 28 U.S.C. § 2254(b)). The Court reasoned that the deference provision of 28 U.S.C. § 2254(d), "complements the exhaustion requirement and the

78

doctrine of procedural bar to ensure that *state proceedings are the central process,* not just a preliminary step for a later federal habeas corpus proceeding." *Richter*, 562 U.S. at 103 (emphasis added). Ordinarily, a federal court presented with a habeas petition containing any unexhausted claims must dismiss the petition. *Rose*, 455 U.S. at 510; *Harris v. Champion*, 48 F.3d 1127, 1131 (10th Cir. 1995). The Tenth Circuit has held that a petitioner can meet the exhaustion requirement if at the time of filing the habeas petition, there are no available state avenues of redress available to the petitioner. *Miranda v. Cooper*, 967 F.2d 392, 398 (10th Cir. 1992). However, "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c). Petitioner has raised at least two grounds for relief, and one apparent claim/argument underlying all of his claims, that were never presented to the state courts. Because Petitioner has an available mechanism for having those claims heard via successive state court post-conviction proceedings, they are not exhausted; hence, this is a "mixed petition" that must be dismissed.

## A.      Non-Exhaustion of Ground Five – Ineffective Assistance of Appellate Counsel.

Petitioner's fifth ground for relief – ineffective assistance of appellate counsel – is not exhausted. In state post-conviction proceedings, Petitioner raised only a claim of ineffective assistance of trial counsel (Exhibit 2, at 15). The only reference Petitioner made to the possibility of appellate counsel ineffectiveness was one word: "that neither defense counsel, at trial or *appeal*, reviewed the entirety of the register tape was ineffective" (Exhibit 2, at 67) (emphasis added). Petitioner, in fact, titled his Proposition III on post-conviction review in the following manner:

> [Petitioner's] Sixth Amendment right to Effective Assistance of
> Counsel Was Violated Whin His *Trial* Counsel Failed to Investigated
> [sic] the Case and Present Viable Evidence Supporting His
> Innocence.

(Exhibit 2, at 59) (emphasis added). And both of Petitioner's subpropositions referred only to "Trial

Counsel" (*see* Exhibit 2, at 61, 65). There was nothing in Petitioner's state court filings that "fairly

presented" a claim of ineffective assistance of appellate counsel. Just as Baldwin's generic

"ineffective assistance of appellate counsel" language failed to adequately distinguish between a

state- and federal-based claim, Petitioner's sterile references to appellate counsel without any

concomitant argument failed to fairly advise the state courts that he was properly raising a federal

claim of ineffective assistance of counsel. *Baldwin*, 541 U.S. at 33; *see also Glossip v. Trammell*,

Case No. 10-6244, 530 Fed. Appx. 708, 720, n.1 (10th Cir. Jul. 25, 2013)[28] (unpublished) (finding

use of the word "due process" in state court brief, but omitting any specific claim of ineffective

assistance of appellate counsel, was insufficient to allege a violation of a federal right to effective

assistance of appellate counsel). A state court must "be alerted to the fact that [a prisoner is]

asserting claims under the United States Constitution." *Duncan v. Henry*, 513 U.S. 364, 365-66

(1995) (*per curiam*).

For the foregoing reasons, Petitioner's attempted claim of ineffective assistance of appellate

counsel in ground five is unexhausted.

**B.      Imposition of the Bar of Laches by the State Courts Did Not Prevent Petitioner From
         Fully Developing His Actual Innocence, *Brady*, or Any Other Federal Claim In the
         State Courts.**

To the extent Petitioner claims that the imposition of laches or a "*Brady* violation" in the

---

[28]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth
Circuit Court of Appeals Rule 32.1.

state courts was the reason he was unable to fully develop his federal claims, that too is unexhausted. Petitioner nowhere informed the state courts that discovery was an ongoing issue, nor did he complain that imposition of the laches bar curtailed his discovery. Petitioner, in fact, told the state courts the opposite: that no issue of fact remained to be developed and his issues could be decided on the briefs (Exhibit 4). Petitioner must either admit in this forum that any and all discovery and need for a hearing necessary to resolve his claims was fully completed at the time he filed his motion for summary judgment in the state district court and that no federal right was impaired in the process (and thus exhausted to that extent), or concede that any complaint here built upon such an argument was never presented to the state courts. He may not have it both ways. If it is the latter (that Petitioner was somehow denied a full and fair opportunity to develop his federal claims in the state courts by the imposition of laches), any claims built upon that argument are not yet exhausted because Petitioner has identified no federal right that was violated through the imposition of laches. *See*, *e.g.*, *Duncan*, 513 U.S. at 366 ("If a habeas petitioner wishes to claim that a[ ] . . . ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."). In a similar way, as pointed out above, Petitioner never argued in the state courts – as he does here – that alleged "*Brady* violations" were part of the reason (in addition to his "actual innocence") that he should have his claims reviewed despite a procedural bar; instead, Petitioner claimed it was a conflict of interest that arose from an attorney who now represents Ward.

After the State filed its Response to Petitioner's Application for Post Conviction Relief in Pontotoc County District Court Case No. CRF-1984-183, on September 17, 2014, Petitioner filed a Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment on October

8, 2014.  In that supporting brief, Petitioner informed the Pontotoc County District Court:

> [Petitioner] also submits this brief establishing that he is entitled to summary judgment relief as there exists no genuine issue of material fact between both parties and he is entitled to judgment as a matter of law.  *See* O.S. § 1083.  Based upon the following arguments, it is evident from Respondent's statements both within pleadings and in the public forum, there exists no conflict regarding the claims presented in both [Petitioner's] initial and amended briefs for post-conviction relief and in the State's response.  Therefore, only legal issues remain which is within the complete purview of this Court.

(Exhibit 4, at 1).  Petitioner did not allege that his *Brady* claim was "cause" to overcome the State's asserted procedural bar of laches.  Instead, Petitioner alleged conflict of interest with one of his former attorneys, stating unambiguously:  "To be clear, [Petitioner] does not assert the conflict of interest claim as a substantive constitutional violation, but rather to overcome Respondent's assertion of the laches defense."  (Exhibit 4, at 9).  However, regarding Petitioner's substantive *Brady* claim, Petitioner alleged "[Petitioner] is entitled to summary judgment relief on his *Brady* claim as Respondent has not proved these records were disclosed prior to [Petitioner's] trial and he is entitled to relief as a matter of law" (Exhibit 4, at 10).  Petitioner concluded his supporting brief with the claim, "He is entitled to relief as a matter of law" (Exhibit 4, at 23).  Thus, Petitioner argued in state court that his *Brady* claims should be decided based upon the existing factual record.

The District Court of Pontotoc County subsequently issued its Post Conviction Findings on December 31, 2014.  Answering the question, "Is an evidentiary hearing necessary," the district court answered "No" and explained, parenthetically, "Petitioner having stipulated to have decision heard on briefs and motions and responses" (Exhibit 8, at 1).  The court went on to find that Petitioner had possession of the 860 pages of OSBI documents since 1992 and access to the Medical Examiner report since 1986, and that Petitioner's claims of actual innocence, ineffective assistance of counsel,

prosecutorial misconduct, and *Brady* violations could have been submitted much earlier. Thus, it found that too much time had elapsed due to Petitioner's own inaction (Exhibit 8, at 2).

A few months later, when Petitioner filed his Brief in Support of Petition in Error of Application for Post-Conviction Relief (hereinafter referred to as Post-Conviction Brief of Appellant), Petitioner scarcely acknowledged the Motion for Summary Judgment which he had urged so strenuously in the District Court of Pontotoc County. Petitioner summarized the procedural history of the post-conviction case as follows: "After requesting additional time to respond the State filed its response on September 17, 2014. Without a hearing the district court issued its Post-Conviction Findings on December 31, 2014, denying relief based on the State's assertion of Laches. [Petitioner] now appeals the denial of post-conviction relief" (Exhibit 9, at 2). Petitioner only acknowledged that he filed a Motion and Brief for Summary Judgment down in footnote 2 on page 10 of his post-conviction appellate brief. Petitioner complained in that footnote that the post-conviction court did not hold an evidentiary hearing, while failing to acknowledge his assertion made to the district court that "there exists no genuine issue of material fact" (*see* Exhibit 4, at 1).

Petitioner claimed in the state courts that he overcame Oklahoma's laches bar by showing his "actual innocence" and an alleged conflict of interest by Ward's attorney Barrett; in this Court, Petitioner argues he has overcome the state procedural bar by showing his "actual innocence" and alleged *Brady* violations. These are two completely different claims based upon separate sets of facts, the latter of which was never fairly presented to the Oklahoma courts. Within his state post-conviction brief, Petitioner did argue that under *Perkins*, 133 S. Ct. at 1935, a claim of actual innocence can overcome the doctrine of laches (Exhibit 9, at 6). However, while Petitioner raised a substantive claim pursuant to *Brady v. Maryland*, Petitioner never argued to the state court that

83

there is Supreme Court law holding that "there is an exception [to application of a state procedural bar] in claims of *Brady* error" as he does in the instant Second Amended Petition (Dkt. 123, at 16). While Petitioner did cite *Banks v. Dretke*, 540 U.S. 668, 691 (2004) to the State court as he was setting out the elements of a *Brady* claim ("Petitioner must clearly show that the evidence was suppressed by the State"), Petitioner never gave the OCCA the opportunity to consider whether *Brady* was a recognized exception to the doctrine of laches which prevented the imposition of laches. Petitioner instead focused on his claims of "actual innocence" and the conflict of interest he believes Mr. Barrett operated under as the means by which his procedural bars were pierced.

Moreover, Petitioner never explained to the OCCA why the district court was incorrect to apply the doctrine of laches in light of his admission that "there exists no genuine issue of material fact" and that only legal issues remained (Exhibit 4, at 1). In other words, Petitioner did not complain to the OCCA, as he does now on federal habeas review, that the district court's issuance of its Post Conviction Findings prematurely cut off discovery. Petitioner would have been hard pressed to make this argument, considering his strong assertion in the district court that there was no genuine issue of material fact and that only legal issues remained. Simply put, if Petitioner believed that there was still a genuine issue of material fact, he should not have represented otherwise to the district court. But the conundrum which Petitioner created for himself by filing the Motion for Summary Judgment asserting there was no genuine issue of material fact did not relieve Petitioner of his burden of complaining to the OCCA that discovery was prematurely cut off or that laches somehow obstructed his ability to develop legal claims, or for that matter, his burden of explaining how the district court had somehow misconstrued the assertions made in his Motion for Summary Judgment.

Petitioner's assertion that there was no genuine issue of material fact and that the state district court should go ahead and rule on his post-conviction application based on the briefs and responses presents a serious problem for him. This is because under the AEDPA, state proceedings are "the central process, not just a preliminary step for a later federal habeas corpus proceeding." *Richter*, 562 U.S. at 183. Apparently based upon representations regarding the circumstances surrounding the imposition of the state bar of laches, Petitioner seems to have persuaded this Court that he was denied the opportunity to fully develop legal claims, and he has been granted subpoenas (nearly all of which were under seal and without notice to Respondent) and depositions of witnesses. Respondent continues to object to the initial granting of discovery in this federal habeas case and the apparent suspension of Rule 6 of the Rules Governing Section 2254 Proceedings, as well as any "new" evidence discovered as a result of that discovery.

An instructive case is *Beverly Michelle Moore v. Warden Millicent Newton-Embry*, Western District Court Case No. CIV-09-985-C. In that case, the Western District Court held an evidentiary hearing, and both the Magistrate Judge and the District Court concluded that Petitioner had met the "actual innocence" gateway to overcome the time bar of the AEDPA. *Moore v. Embry*, Case No. CIV-09-985-C, 2011 WL 5143080 (W.D. Okla. Sept. 7, 2011) (Bacharach, M.J.), Order Adopting Report & Recommendation, 2011 WL 5156836 (W.D. Okla. Oct. 28, 2010)). Subsequently, the state filed a Motion to Dismiss for Failure to Exhaust State Remedies. Although the Magistrate Judge recommended the State's objection be overruled, the Western District Court declined to adopt the Magistrate Judge's recommendation that exhaustion would be futile with respect to evidence which had been adduced in a federal evidentiary hearing in light of Oklahoma's prohibition of filing second and subsequent post-conviction proceedings in non-capital cases. The Western District Court

reasoned:

> Setting aside, for now, the correctness of Judge Bacharach's findings, the Court instead focuses on the substantial newfound evidence developed in federal court regarding the Petitioner's actual innocence, the state attorneys' persistence that this matter be presented in state court before continuing with federal habeas proceedings, and the importance of comity and federalism. Considering these factors, the Court concludes that the state courts should be given an opportunity to address this matter in the first instance. *See Granberry v. Greer*, 481 U.S. 129, 134-35 (1987) ("If . . . the case presents an issue on which an unresolved question of fact or of state law might have an important bearing, both comity and judicial efficiency may make it appropriate for the court to insist on complete exhaustion to make sure that it may ultimately review the issue on a fully informed basis.").

*Beverly Michelle Moore v. Warden Millicent Newton-Embry*, Western District Court Case No. CIV-09-985-C, at 2-3 (Order) (Cauthron, D.J.) (W.D. Okla. April 6, 2012)[29] (unpublished and attached as Exhibit 16).

Just as in *Moore*, if there is any unresolved question of fact in this case based upon Petitioner's assertion that the state courts ruled before discovery in State court was complete (in spite of his insistence that there was no genuine issue of material fact) or if there is an unresolved question of law (whether a *Brady* claim is sufficient to overcome the State's procedural bar of laches), both comity and judicial efficiency make it appropriate to insist on complete exhaustion in state court. *Granberry v. Greer*, 481 U.S. 129, 134-35 (1987).

As Petitioner's Second Amended Petition stands now, based as it is in part on unexhausted evidence, this Court cannot grant relief on this Second Amended Petition. As the Tenth Circuit Court of Appeals reasoned in *Moore v. Schoeman*, 288 F.3d 1231 (10th Cir. 2002):

---

[29] Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

> The plain language of § 2254(b)(2), as well as its legislative history and prior case law, point to a conclusion that a district court faced with a habeas petition containing unexhausted claims may either (1) dismiss the entire petition without prejudice in order to permit exhaustion of state remedies, or (2) deny the entire petition on the merits.

*Moore*, 288 F.3d at 1235.   While a denial of the Second Amended Petition would certainly be appropriate based on the fact it is time-barred, contains procedurally defaulted claims, and Petitioner has failed to demonstrate a fundamental miscarriage of justice, if this Court is not prepared to deny the Second Amended Petition based on the procedural defects present in this case without further consideration of Petitioner's actual innocence claim, then Petitioner must go back and fully exhaust the alleged "newfound evidence" adduced in the federal habeas proceedings. Respondent affirmatively does not waive the issue of exhaustion with respect to any evidence adduced for the first time in federal habeas proceedings that has not been presented to the OCCA, which would include the four depositions conducted in this case.[30] 28 U.S.C. § 2254(b)(3).   Like the Respondent in *Moore*, Respondent in this case is persistent that there must be total exhaustion of state court remedies, and that state court proceedings must remain "the central process, not just a preliminary step for a later federal habeas corpus proceeding." *Richter*, 562 U.S. at 183.

In addition to the other impediments to this Court reviewing the Second Amended Petition explained above, review is prohibited because it contains unexhausted claims; thus, it must be dismissed. *Rose*, 455 U.S. at 510; *Harris*, 48 F.3d at 1131.

---

[30]Notably, those depositions could never be considered *Brady* material as they were not "withheld" from Petitioner.   They were entirely the product of discovery granted during Petitioner's federal habeas corpus proceedings, and the highly unusual fact that discovery was allowed to Petitioner in this case before Respondent was allowed to file his initial responsive pleading.

**C.      Petitioner's third proposition is unexhausted but lacks merit.**

As alluded to in the Introduction to this brief, Petitioner's third proposition must be considered separately.   While Petitioner has added bits and pieces of argument to his *Brady* and actual innocence claims based upon the recently produced Ada police reports, Petitioner's third proposition is wholly new, claiming that his Sixth and Fourteenth Amendment right to counsel was violated by the Ada Police Department's alleged interference with the attorney-client privilege.   This claim has not been exhausted in State court.   Respondent does, however, acknowledge that the factual underpinning for this issue became available to Petitioner in early 2019, as a result of a subpoena served by co-defendant Ward.

Because Respondent's previously pending Motion to Dismiss Habeas Corpus Petition and Supporting Brief alleged that Petitioner had raised unexhausted claims, including ineffective assistance of appellate counsel, and Petitioner has never made any effort to cure that defect in state court, Respondent still maintains that exhaustion in state court would be the most appropriate course for Petitioner's third proposition.   However, given the procedural history of the case, and the entirely speculative nature of the claims raised in Petitioner's third proposition, Respondent believes this is a situation where the circumstances might warrant a determination on the merits rather than dismissal pending exhaustion.   *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").   *See Cannon v. Mullin*, 383 F.3d 1152, 1159 (10th Cir. 2004) ("When questions of procedural bar are problematic . . . and the substantive claim can be disposed of readily, a federal court may exercise its discretion to bypass the procedural issues and reject a habeas claim on the merits."); *Miranda v. Cooper*, 967 F.2d 392, 400 (10th Cir. 1992)

(reasoning, "it is appropriate for a federal appellate court to address the merits of unexhausted 2254 federal habeas corpus claims if they obviously fail to raise a colorable federal claim, and if the interests of justice would be better served by addressing the merits of the habeas petition"). *See also Watson v. Howard*, No. 04-6074, 123 Fed. Appx. 910, 914 (10th Cir. Feb. 17, 2005)[31] (unpublished) (if a claim involves Oklahoma's procedural bar rule and it is easily disposed of on the merits, a district court may exercise its discretion to do so (citing *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000)).

In this case, the existence of a letter written to "George" (Dkt. 123-5) is insufficient to show that the Ada Police Department interfered with the attorney-client privilege. There is no evidence that this letter was ever used against Petitioner. It was not an exhibit at trial, and nothing about this letter prevented Petitioner from telling George Butner what he knew during the long period of time that Mr. Butner represented Petitioner starting at preliminary hearing and all the way through Petitioner's second trial. Because all of the information in Dkt. 123-5 was apparently written by Petitioner, it was within Petitioner's own personal knowledge and could have been communicated to Mr. Butner at any time before either the first or second trial if Petitioner believed it necessary and relevant to his defense. *See United States v. Cronic*, 466 U.S. 648, 658 (1984) ("Absent some effect of the challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.").

Indeed, there has been no allegation in this case of poor communication between trial counsel and client. On the contrary, the record reveals that Mr. Butner and Petitioner spoke frequently in

---

[31]Unpublished decision cited for persuasive value only pursuant to Fed. R. App. P. 32.1 and Tenth Circuit Court of Appeals Rule 32.1.

regards to the major strategic decisions to be made in this case. At Petitioner's first trial, Mr. Butner made the following remark: "[Petitioner], we're in chambers, and you and I have discussed this case numerously since November, 1984, on numerous occasions. Of course, we've discussed the defense of it on numerous occasions, and we've discussed even you taking the stand on numerous occasions; isn't that correct?" Petitioner stated, "That's right." (J/T XI 2530). Likewise, there was a similar discussion had during Petitioner's re-trial on June 14, 1988, concerning whether Petitioner would testify in his own defense. After previously suggesting that Petitioner would testify, Mr. Butner changed his advice to state that Petitioner would not testify. Mr. Butner made the following remarks:

> I requested this in camera hearing. [Petitioner] and I, as the Court knows, had an in camera hearing yesterday in reference to his testifying. We discussed it. In fact, [Petitioner], we have talked to the psychiatrist about your testimony, your brother, Dennis Corbin, in reference to your testifying. Last night I spent about forty-five minutes with your Appellate Counsel, Terrie Hull [sic], in reference to your testifying. **You and I have discussed it nearly daily for the last three or four years that we have been involved in this.**
> After much thought and deliberation, [Petitioner], **in fact you and I discussed it this morning** about 8:15 or 8:30, prior to even coming up here today. It is my opinion, based upon a couple of things, one is the testimony yesterday in reference to the psychiatrist. Number two, I still got stuck in my craw, this Court of Criminal Appeals decision and I am convinced that if you go on the stand, that you will, in fact, waive any objection to the testimony in reference to the rape. I have told you that, we have discussed this, [Petitioner], from every angle, haven't we?

(Dkt. 113-22, at 4) (emphasis added). Petitioner admitted that was true (Dkt. 113-122, at 5) ("Yes."). There is absolutely no reason to doubt Mr. Butner's assertions in open court that he talked with Petitioner about this case "nearly daily for the last three or four years" and Petitioner certainly did not deny the truth of that statement. Therefore, Petitioner had opportunity after opportunity after opportunity over a multi-year period to tell Mr. Butner everything within his own knowledge which

90

he believed might be helpful in his defense.   Moreover, it appears that Petitioner took those opportunities, and frequently discussed the defense of his case with trial counsel.

Moreover, the suggestion that the State somehow used the letter to track down and question Petitioner's witnesses is pure speculation.   Petitioner cites as an example the fact that the Ada Police Department interviewed Dorothy Edwards, someone he dated, on November 27, 1984 (Dkt. 123, at 105).   However, the letters and papers included in Dkt. 123-5 appear to have been written after Petitioner was in custody for some time, with one date indicating "5-30-85."   (Dkt. 123-5, at 19). It is likely that the police would have wanted to interview Petitioner's friends, girlfriends, and close associates regardless of any letter.

Ultimately, it is impossible to tell how this letter came to be placed with the Ada Police reports, or when that even happened.   It does not appear that Petitioner was in the custody of the Ada Police Department when he wrote these documents, which undercuts Petitioner's claim that the police department interfered with anything.   As Respondent previously noted, this is a symptom of the laches problem.   There is likely nobody who can explain how this grouping of letters ever came to be stored by the Ada Police Department.   The letters do not appear to have been folded or marked legal mail, which might explain the lack of delivery.   Moreover, Petitioner elsewhere notes in his petition that he once gave a letter to law enforcement, in which he claimed that he just agreed with the story OSBI agent Gary Rogers told him.   That letter is in the record before this Court (Dkt. 123, at 5; Dkt. 82-6, at 625-627).   It is possible that just as Petitioner provided that letter to the police, he might have provided other letters to the police, even if he initially addressed those letters to someone else.

However these letters came to be placed with the police reports, federal courts have declined to grant relief even where deliberate interference has been shown. *See Howell v. Trammell*, 728 F.3d 1202, 1222 (10th Cir. 2013) ("[S]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right."); *Rodriguez v. Zavares*, 42 F. Supp. 2d 1059, 1086-1087 (D. Colo. 1999) (reasoning that the prison official's actions in interfering with and monitoring the defendant's relationship with his counsel did not prejudice the defendant's ability to litigate and thus did not deprive him of his right to counsel, absent any allegation that the prosecutor received information from the monitoring or that the state received any benefit from the interference, and absent any showing how such interference burdened counsel's performance). In this case, there is no evidence that the letters were ever used to Petitioner's prejudice, nor is there any suggestion in this record that Petitioner was otherwise prevented from communicating with his trial counsel George Butner during Mr. Butner's years-long representation of Petitioner (Dkt. 113-22, at 4-5). Petitioner's attempts to make up for the lack of demonstrable prejudice through rampant speculation must be rejected.

For the foregoing reasons, Petitioner's third proposition is unexhausted and if this Court finds merit in the idea that Petitioner's second amended habeas petition already contains an unexhausted claim (particularly ineffective assistance of appellate counsel), Petitioner should exhaust this claim in state court in a successive habeas petition, wherein Petitioner can plead the fact that the letters were produced in 2019 in spite of prior attempts at discovery. However, recognizing that the procedural issue is complicated by the existence of prior subpoenas in this case, Respondent, while not waiving the requirement of total exhaustion, asserts that this is a claim which can be denied on the merits because Petitioner has failed to demonstrate through this letter that his attorney-client

92

privilege was actually curtailed.

## **CONCLUSION**

The petitioner has failed to file the instant petition within the one-year period of limitations pursuant to 28 U.S.C. § 2244(d)(1).  All of Petitioner's claims are also barred by the independent and adequate state procedural bar of laches.  Petitioner has failed to present any evidence which affirmatively demonstrates his actual innocence, nor has he shown a reasonable probability of a different outcome at trial based on any of his alleged *Brady* evidence.

Moreover, Petitioner's Second Amended Petition contains at least two unexhausted propositions, plus an unexhausted "cause", which claims are based on evidence and legal arguments never before presented to the state court.  Because the procedural issues surrounding Petitioner's third proposition are difficult, but the underlying claim is based upon pure speculation, Respondent asserts that this   claim, though unexhausted, might be more readily denied on the merits.  Therefore, for the foregoing reasons Respondent respectfully asks this Court to dismiss the instant Petition for Writ of Habeas Corpus.

Respectfully submitted,

MIKE HUNTER
ATTORNEY GENERAL OF OKLAHOMA

s/ MATTHEW D. HAIRE
MATTHEW D. HAIRE, OBA #14916
ASSISTANT ATTORNEY GENERAL
313 NE 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 Fax
Service email:  fhc.docket@oag.ok.gov

s/ THEODORE M. PEEPER
THEODORE M. PEEPER, O.B.A. #19909
ASSISTANT ATTORNEY GENERAL
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
(405) 522-4534 (Fax)
Service email: fhc.docket@oag.state.ok.us

**ATTORNEYS FOR RESPONDENT**

**CERTIFICATE OF SERVICE**

I hereby certify that on the 29th day of April, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Robert Ridenour, OBA # 16038
Assistant Federal Defender
One West Third Street, Ste. 1225
Tulsa, OK 74103

Tiffany R. Murphy, Arkansas Bar # 2015057
790 N. Cliffside Drive
Fayetteville, AR 72701

s/ MATTHEW D. HAIRE
s/ THEODORE M. PEEPER

94