## THE UNITED STATES DISTRICT COURT FOR
## EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| **KARL FONTENOT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. CIV 16-069-JHP-KEW** |
| | ) | |
| **JOE ALLBAUGH, WARDEN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION AND ORDER

This matter is before the Court on Respondent's Motion to Dismiss Second Amended Habeas Corpus Petition filed pursuant to 28 U.S.C. § 2254 (Dkt.#s 123, 147).[1] Petitioner filed a response to the motion on May 14, 2019 (Dkt.# 150).

Petitioner's case is one of three the United States District Court for the Eastern District of Oklahoma has found to involve a dream confession of dubious validity.[2] The players in this case, Pontotoc County District Attorney William Peterson, Ada Police Detective Dennis Smith, and Oklahoma State Bureau of Investigation Agent Gary Rogers, were all involved in these suspect confessions and were all involved in Petitioner's case.

---

[1] Respondent was ordered to respond to the Second Amended Petition on February 14, 2019. (Dkt.# 118). Pursuant to Rule 5(a) of the Rules Governing Section 2254 Cases Respondent was not required to answer the petition unless ordered to do so by the court. **Once the Respondent was ordered to respond, the Respondent was required to address all allegations in the Second Amended Petition. "The answer must address the allegations in the petition. In addition, it must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations." *Id.* at 5(b)."** (emphasis added).

[2] See Second Amended Petition for Writ of Habeas Corpus, Dkt.# 123, Ex.# 61. ("This is at least the third murder conviction in Pontotoc County, Oklahoma, from 1985 through 1988 which was based upon an alleged "dream confession" and circumstantial evidence which resulted in the death penalty. *See Fontenot v. State*, 742 P.2d 31 (Okla. Crim. App. 1987)(appeal after new trial, 881 P.2d 69 (Okla. Crim. App. 1994); *Ward v. State*, 755 P.2d 123 (Okla. Crim. App. 1988); *State ex rel. Peterson v. Ward*, 707 P.2d 1217 (Okla. Crim. App. 1985); *See also* Robert Mayer, *The Dreams of Ada*, 37-38 (1987); *Williamson v. Reynolds*, 904 F.Supp. 1529 (ED OK 1995).

The prosecution has acknowledged that Petitioner's confession lacked any corroborating evidence. Besides the confession, there was no direct or circumstantial evidence connecting Petitioner to this crime. Further, despite three court orders, the Pontotoc County District Attorney's Office, numerous law enforcement agencies, and Respondent have repeatedly failed to disclose documents relevant to Mr. Fontenot's case for over twenty-five years. At the same time, Respondent both in state post-conviction and in these proceedings argues laches as an affirmative defense to Mr. Fontenot's assertions of actual innocence and numerous constitutional violations. The audacity of that argument in the face of newly "discovered" Ada Police Reports is astounding.

The investigation into Mr. Fontenot's case has revealed both documents and witness statements that prove an alibi defense, and substantiate proof of the ineptness of the police investigation. The newly discovered evidence undermines the prosecutor's case and provides solid proof of Mr. Fontenot's probable innocence. **"Probable innocence" is established if Mr. Fontenot presents "new facts [that] raise[] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial…"** *Schlup v. Delo*, 513 U.S. 298, 317 (1995) (emphasis added). To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327; see also *House v. Bell*, 547 U.S. 518, 538 (2006)( a federal court presented with *Schlup* claim "must make" 'a probabilistic determination about what reasonable, properly instructed jurors would do.'"). Once a federal court makes such a finding, a gateway claim of innocence exists removing any procedural obstacles allowing the substantive review of Mr. Fontenot's claims. *See House,* 547 U.S. at 536-537; *Case v. Hatch*, 731 F.3d 1015, 1036 (10th Cir. 2013). The evidence presented in Mr. Fontenot's Second Amended Petition establishes his probable innocence and merits the removal of any procedural hurdles.

Petitioner, a prisoner currently incarcerated at North Fork Correctional Facility in Sayre, Oklahoma, is challenging his convictions in Hughes County District Court Case No. CF-88-43 for First Degree Murder, Robbery with a Dangerous Weapon, and Kidnapping.

He sets forth the following grounds for relief:

I.    Newly discovered evidence establishes that Mr. Fontenot is innocent, satisfying the gateway requirements of *Schlup v. Delo*, 513 U.S. 298 (1995).

II.    Mr. Fontenot's Fourteenth Amendment rights were violated when the Pontotoc County District Attorney's Office withheld evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

III.    Mr. Fontenot's Sixth and Fourteenth Amendment fundamental right to counsel was violated by the Ada Police Department's interference with attorney-client privilege.

IV.    Mr. Fontenot's Sixth Amendment right to effective assistance of counsel was violated when his trial counsel failed to investigate the case and present viable evidence supporting his innocence.

V.    Mr. Fontenot's Sixth Amendment right to effective assistance of appellate counsel was violated when his appellate counsel failed to present viable constitutional claims in Mr. Fontenot's direct appeal proceedings.

VI.    Mr. Fontenot's due process rights were violated due to police misconduct when taking a false confession and the prosecution knowingly introduced false testimony during his trial in violation of the Fifth and Fourteenth Amendment to the U.S. Constitution.

VII.    The evidence was insufficient to convict Mr. Fontenot because the State failed to show the existence of the corpus delicti of the charged crimes outside of the confession and failed to establish the trustworthiness of the confession in violation of the Fourteenth Amendment.

VIII.    The State's injection of inadmissible hearsay from the extrajudicial confession of Mr. Ward in Mr. Fontenot's trial violated his constitutional right of confrontation.

IX.    Mr. Fontenot's Fourteenth Amendment due process rights were violated due to the police misconduct that permeated the investigation into Mrs. Haraway's disappearance.

Respondent has filed a motion to dismiss the Second Amended Petition as barred by the statute of limitations set forth in 28 U.S.C. § 2244(d), and the state bar of laches. (Dkt.# 147). Respondent also asserts the Second Amended Petition includes unexhausted claims, rendering it a mixed petition. *Id*. Petitioner responds he has established the actual innocence gateway removing the procedural

impairments, and all of his claims should be deemed exhausted. (Dkt.# 150).

## PROCEDURAL HISTORY[3]

On April 24, 1984, Donna Denice Haraway was last seen at McAnally's convenience store in Ada, Oklahoma. A few customers arrived to find the store empty and called emergency services. Several law enforcement agencies responded to the scene including the Ada Police Department ("APD"), and the Pontotoc County Sheriff's Office. Later, the Oklahoma State Bureau of Investigation joined the local agencies in the investigation.

On October 12, 1984, with Mrs. Haraway still missing, the police contacted Thomas Ward in Norman, Oklahoma, and interviewed him for more than two hours. (PH Tr. 506). Mr. Ward denied any involvement or knowledge of what happened to Mrs. Haraway. ( Tr. 1336). Mr. Ward returned to the Oklahoma State Bureau of Investigation to take a polygraph test the next day. After nine hours of interrogation, police videotaped Mr. Ward give a statement in which he described being with Odell Titsworth and Karl Fontenot the night of Mrs. Haraway's disappearance. Mr. Ward also stated the three robbed McAnally's, kidnapped Mrs. Haraway, raped, and stabbed her to death. Based solely on Mr. Ward's confession, police arrested Mr. Fontenot the next day. Mr. Fontenot was interrogated and confessed in similar fashion as Mr. Ward.

---

[3] There are several records cites within this Opinion and Order. Abbreviations to the various court records, hearings, and trials will be as follows:

OR: Original trial court record
P/H: Preliminary Hearing Transcript (there was only one preliminary hearing held in this case even after remand from the OCCA).
J/T date and page: Joint trial of Thomas Ward and Karl Fontenot in 1986.
N/T date and page: Fontenot's trial held over several days in 1988.
Ward N/T date and page: Thomas Ward's trial held over several days in 1989.
State's Exhibit : State exhibits from Mr. Fontenot's trial.

The Court also takes judicial notice of the public records of the Oklahoma State Courts Network at http://www.oscn.net. *See Pace v. Addison*, No. CIV-14-0750-HE, 2014 WL 5780744, at *1 n.1 (W.D. Okla. Nov. 5, 2014).

Nineteen days later, the Pontotoc District Attorney's Office filed charges against Mr. Fontenot and Mr. Ward in Case No. CRF-84-183 including Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; Count III, First-Degree Rape; and Count IV, First-Degree (Malice Aforethought) Murder. (O.R. 112). On November 8, 1984, the State filed a Bill of Particulars against each defendant alleging the following aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. (O.R. 591, 592). Mr. Fontenot was appointed counsel on November 29, 1984, 42 days after his arrest. (O.R. 30).

The Pontotoc District Court held a joint preliminary hearing on February 4, 1985. Mr. Fontenot and Ward were bound over for trial on Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; and Count IV, Murder in the First Degree. (O.R. 592-A-592-B). The magistrate found insufficient evidence to order either defendant to trial on Count III, First- Degree Rape. (P/H 1047). The State appealed to the District Court to reinstate Count III, but was overruled. (Tr. 26-27). The State appealed the ruling to the Oklahoma Court of Criminal Appeals. On September 6, 1985, while the State's appeal on the rape charge was pending, the State dismissed the rape charge and amended the Information to allege Count I, Robbery with a Dangerous Weapon; Count II, Kidnapping; and Count III, First Degree (Malice Aforethought) Murder, and proceeded to trial. (O.R. 475).

Both Mr. Fontenot and Mr. Ward were convicted on all counts in a jury trial held on September 24, 1985. The trial court sentenced both to twenty years imprisonment on Count I, and ten years imprisonment on Count II. During the penalty phase of the trial, the jury found the existence of the three aggravating circumstances and no mitigation.  Mr. Fontenot and Mr.

Ward were sentenced to death. An appeal was timely filed for both men in the Oklahoma Court of Criminal Appeals.

During the pendency of the appeal, a man found a skull in Hughes County, Oklahoma, which initiated a search of the area. Eighteen months after Mrs. Haraway's disappearance, her skeletal remains were recovered after several searches of the area. The medical examiner found a bullet hole in the back of her skull was the only evidence of a probable cause of death. (N/T 6/9/1988 at 130). The medical examiner also found no evidence of any stabbing or burning of the remains. (N/T 6/14/1988 at 134, 136). The Oklahoma Court of Criminal Appeals reversed both the conviction and sentence over *Bruton* violations in *Fontenot v. State*, 742 P.2d 31 (Okla. 1987); See *Bruton v. United States*, 391 U.S. 123 (1968).

Following remand, Mr. Fontenot was tried in Hughes County, Oklahoma, after a change of venue motion was granted by the trial court. On June 7, 1988, the State filed an Amended Information alleging Counts I, II, and III, Robbery with a Dangerous Weapon, Kidnapping and Murder in the First Degree (malice aforethought), respectively, adding to Count IV the cause of death by gunshot. (O.R.II 76.) Another preliminary hearing was not held. Mr. Fontenot's jury trial started on June 7, 1988, in Hughes County District Court. (N/T 6/6/1988 at 1). On June 14, 1988, Mr. Fontenot was convicted on all counts. (N/T 7/8/1988 at 104; O.R. II at 165, 166, 167). The jury assessed punishments of twenty (20) and ten (10) years imprisonment on Counts I and II respectively. (O.R.II at 65, 166). Following the penalty phase, the jury found the existence of the three alleged aggravating circumstances and on June 14, 1988, set Mr. Fontenot's punishment at death. (O.R II at 168, 169). Judgment and sentence in accordance with the jury's verdicts were imposed on July 8, 1988. Mr. Fontenot filed a timely notice of appeal to the Oklahoma Court of Criminal Appeals.

Mr. Ward was tried in Pottawattamie County on the same charges almost a year after Mr.

Fontenot was convicted. Before the same trial court, Mr. Ward's trial began on May 31, 1989, and concluded on June 16, 1989. The jury found Mr. Ward guilty on all charges. However, the jury imposed a sentence of life imprisonment with the possibility of parole.

On June 8, 1994, the Oklahoma Court of Criminal Appeals affirmed Mr. Fontenot's convictions, but overturned his death sentence due to a life without the possibility of parole jury instruction being omitted during the penalty phase. *Fontenot v. State*, 881 P.2d 69 (Okla. 1994). The Court remanded Mr. Fontenot's case for resentencing. Mr. Fontenot was subsequently sentenced to life imprisonment without the possibility of parole.

An Application for Post-Conviction Relief was filed in the District Court of Pontotoc County on July 24, 2013. After requesting additional time to respond, the State filed its response on September 17, 2014. Without an evidentiary hearing, the district court issued its post-conviction findings on December 31, 2014, denying relief based on the Respondent's assertion of Laches. Mr. Fontenot timely filed an appeal to the Oklahoma Court of Criminal Appeals on March 2, 2015. He raised all claims from his state post-conviction proceedings and challenged the laches decision. On November 2, 2015, the Oklahoma Court of Criminal Appeals affirmed the state post-conviction court's order denying relief finding the application was barred by laches. Mr. Fontenot filed a Petition for Writ of Habeas Corpus seeking relief from his state court convictions.(Dkt.# 4).

Since Mr. Fontenot filed his initial Petition, he has engaged in discovery, served several subpoenas, and conducted depositions. The Court authorized discovery, including production and review of the Pontotoc County District Attorney's files. (Dkt.# 24, 44). During the process, Mr. Fontenot's counsel served a subpoena on the Ada Police Department and in response their organization stated no documents existed. Within the District Attorney's files, counsel discovered reports never disclosed to prior defense counsel. Based upon that discovery, Mr. Fontenot's

counsel was allowed to file an Amended Petition.(Dkt.# 77).

Shockingly, thereafter, **additional documents** were produced by Respondent and the Ada Police Department, **but not to Mr. Fontenot**. Pursuant to Thomas Ward's subpoena during state post-conviction proceedings, Respondent received Ada Police Reports. These documents were not immediately turned over to Mr. Fontenot's counsel. Once Mr. Fontenot's counsel discovered this, they requested the records which were subsequently disclosed. Based upon these events, this Court permitted Mr. Fontenot to file the instant Second Amended Petition. (Dkt.# 123).

## STATEMENT OF FACTS

On April 28, 1984, Donna Denice Haraway was employed as a convenience store clerk at McAnally's gas station and store in Ada, Oklahoma. Testimony presented at both of Mr. Fontenot's trials explained that Mrs. Haraway walked out of the store with a white male. They both got into a pickup truck and drove away. What exactly happened to Mrs. Haraway in the days and months after her disappearance remained a mystery until her remains were found in Gerty, Oklahoma, more than a year and a half after her disappearance. (Dkt.#123, Ex.# 44). Police found her skeletal remains spread across a large area that required several searches to locate. *Id.* The Oklahoma Medical Examiner's Office determined the cause of death was a gunshot wound to her head. Marks found on her ribs were found to be caused by animals instead of stab wounds. *Id.*

APD Detective Dennis Smith, and OSBI Agent Gary Rogers headed the investigation into Mrs. Haraway's disappearance. Along with these two officers, APD Detective Mike Baskins handled key parts of the investigation, and was responsible for the McAnally's crime scene. From the period of late April until October 1984, OSBI and APD investigated many alternate suspects and leads. Sometime in late September or October, Detectives Smith and Baskins interviewed Jeff Miller who provided information gleaned from other individuals that implicated Thomas Ward and Karl Fontenot. Based on this uncorroborated conversation, police sought out Thomas Ward

and then, Mr. Fontenot as their suspects.

The case against Mr. Fontenot rests primarily on his confession given in October 1984. In his confession, Mr. Fontenot states that he, along with Odell Titsworth, and Tommy Ward robbed McAnally's, kidnapped and murdered Mrs. Haraway before burning her body. After extensive investigation into various areas around Pontotoc County, Oklahoma, the OSBI and APD were unable to locate Mrs. Haraway's remains or any physical evidence corroborating Mr. Fontenot's confession. In fact, not one detail of Mr. Fontenot's confession could ever be corroborated with any evidence in the case.

Along with the confessions, the Pontotoc County District Attorney's case included three witnesses who arrived at McAnally's after Mrs. Haraway's disappearance. These three men testified as to what they witnessed upon arriving at the store. The witnesses said a man and a woman exited the front door and got in a pickup that was parked about 10 feet away, parallel to the door, facing east. (N/T 6/10/1988 at 60). The man had one arm around her waist. (N/T 6/9/1988 at 66) The pickup was light-colored, "late model, late '60s, early '70s," with an intact tailgate, "greenish, gray" with primered spots and "gray primer." (N/T 6/10/1988 at 40-41, 47, 59). Not realizing anything was amiss, one of the witnesses entered the store finding it empty. Soon afterwards, witnesses called the Ada police after finding the cash register open and all of Mrs. Haraway's belongings, including her purse and school books, still in the store.

While attempting to secure McAnally's, law enforcement received reports of two men who had been at a nearby convenience store earlier in the evening. Karen Wise, the convenience store clerk at J.P. 's Pak-To-Go ("J.P.'s"), a half mile west of McAnally's, and James Paschal, a customer at J.P. 's, told police of two men who were in the store between 7 p.m. and 8:30 p.m. Ms. Wise said the men made her nervous. Both Ms. Wise and Mr. Paschal described the pickup seen with the men at J.P. 's as a "red primered truck ... mostly red primer ... [with] grey primered

spots," and an "older model" Chevrolet of uniform color with a tailgate that was either missing or painted a different color. (N/T 6/9/1988 at 193, 214, 225).

Ms. Wise positively identified Mr. Ward as one of the men she saw in J.P.' s. *Id.* at 185; (State's Exhibit #s 5 and 51). The second man seen by Ms. Wise at J.P. 's was 6 feet to 6 feet and 2 inches tall, white male, sandy brown hair. (State's Exhibit # 5). However, Mr. Fontenot's height is 5'9." Neither Ms. Wise nor Mr. Paschal identified Mr. Fontenot as the second man. Ms. Wise testified that the second man she had seen on April 28, 1984, had lighter hair than Mr. Fontenot and that Mr. Fontenot was shorter than the man she had seen. (N/T 6/9/1988 at 194-195). Ms. Wise also testified that she had seen a man staring at her apartment while Mr. Fontenot was incarcerated, and she believed this man resembled the second man at J.P. 's with Mr. Ward. (P/H 1063, N/T 6/9/1988 at 197-199). Ms. Wise said this same man was a spectator at the preliminary hearing. (PH Tr. 161; F-85-769; Tr. 968-969, 981-982, 984-985; N/T 6/9/1988 at 200-202).

Several other witnesses testified about pickup trucks seen that night having a similar description as the one seen at McAnally's and J.P.'s. However, the crux of the District Attorney's case rested on the confession and an identification by Jim Moyer, a customer in McAnally's that night.

Based on this testimony, Mr. Fontenot was convicted in both trials and sentenced to death. His death sentence was overturned after the second trial resulting in a re-sentencing to life without the possibility of parole.[4]

_____

4. The Oklahoma Court of Criminal Appeals (OCCA) set forth facts surrounding Mrs. Haraway's abduction and murder in the appeal of Mr. Fontenot's first trial. *Fontenot v. State*, 742 P.2d 31, 32 (Okla. Crim. App. 1987). The OCCA's factual findings are entitled to a presumption of correctness. 28 U.S.C. Section 2254(e)(1). The facts as set forth by the OCCA are consistent with the above recitation and have been given a presumption of correctness by this Court:

> Donna Denise (sic) Haraway was abducted after being robbed at the convenience store where she was working on April 28, 1984, in Ada, Oklahoma. [Fontenot] and Tommy Ward were tried for the crimes during September, 1985. In October of 1984, Tommy Ward made a statement to law enforcement officers which inculpated Fontenot, an individual named Odell Titsworth, and to a slighter degree, himself. Fontenot and Titsworth were arrested as a result and Fontenot gave a different

Disturbingly, the recent discovery of Ada Police Department reports contain evidence that may have changed the trial of Mr. Fontenot dramatically, including confidential letters written by Mr. Fontenot to his trial attorney, George Butner. In these letters, he provides names of people to corroborate his alibi. Additionally, he recanted his confession and detailed police attempts to make him confess while in custody. Other newly discovered exculpatory reports include a previously undisclosed handwritten report taken from Gene Whelchel about his description of the men he had seen in McAnally's. (Dkt.# 123, Ex.# 96). The report was made on April 30, 1984, two days after Mrs. Haraway went missing. It provides extremely detailed descriptions of the men, down to Suspect #2 having muscular arms, a narrow waist, and larger shoulders. He describes acne scars on Suspect #2. He describes Suspect #1 as a "neat looking guy" with an athletic build and probably right handed. These details were never provided to defense counsel and would have been essential in cross examining Mr. Whelchel and other witnesses.

Also, recently provided to defense counsel was an interview with James Boardman, an employee with the Ada newspaper. (Dkt.# 123, Ex.# 93). Mr. Boardman was in McAnally's store

---

statement substantially in agreement with Ward's except that it more clearly inculpated Ward. In each [of] Ward's and Fontenot's statements, the instigator and ringleader in the criminal acts was said to be Titsworth. However, Titsworth was eliminated as a suspect within a few days of his arrest because of clear proof the police had that he had not been an accomplice.

According to the statements of Ward and Fontenot, Haraway was robbed of approximately $150.00, abducted, and taken to the grounds behind a power plant in Ada where she was raped. According to [Fontenot's] version, she was then taken to an abandoned house behind the plant where Titsworth stabbed her to death. She was then burned along with the house. When Haraway's remains were found in Hughes County, there was no evidence of charring or of stab wounds, and there was a single bullet wound to the skull.

The evidence at trial revealed that two men, one of whom was positively identified as Tommy Ward, played pool at J.P.'s convenience store in Ada, Oklahoma from about 7:00 p.m. until about 8:30 p.m. the evening of April 28, 1984. Around 8:30 p.m., the two men left the store. Shortly thereafter, Tommy Ward was seen leaving with Haraway from the convenience store where she worked which was across the road and a quarter of a mile away from J.P.'s. Fontenot was said to resemble the man with Ward at J.P.'s, but could not be identified as having sandy brown hair and being six foot to six foot 2 inches tall. Fontenot had dark brown hair and was several inches shorter than the description given. One witness went so far as to tell a detective and a private investigator, and attempted to tell the District Attorney, without success, that Fontenot was not the man he saw in J.P.'s. Other than the statements given by Ward and Fontenot, there was no other evidence linking [Fontenot] to the crimes.

at 5 p.m. on April 28, 1984, and encountered two men that in his opinion were "acting funny." He saw Mrs. Haraway there. Ada police officers went back to Mr. Boardman after Mr. Fontenot was arrested in October 1984 and he could not identify Mr. Fontenot as one of the men he saw. Additionally, two witnesses whose names were written on the McAnally's register tape, provided almost the exact information to the Ada Police that they did to post conviction investigators when they provided their affidavits. (Dkt.# 123, Ex.# 94).

I.   **MR. FONTENOT QUALIFIES FOR SUNBTANTIVE REVIEW UNDER BOTH THE ACTUAL INNOCENCE AND CAUSE AND PREJUDICE EXCEPTIONS**

   **A.  Statute of Limitations**

Respondent alleges the Second Amended Petition is barred by the statute of limitations, pursuant to the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), codified at 28 U.S.C. Section 2244(d). According to 28 U.S.C. § 2244(d)(1) a state petitioner challenging his felony conviction must file his Petition for Writ of Habeas Corpus prior to the lapse of the one-year statute of limitations. However, the U.S. Supreme Court has found this statute of limitations may be waived upon a credible finding of actual innocence. *McQuiggin v. Perkins*, 569 U.S.383, 133 S.Ct. 1924, 1935, 185 L.Ed.2d 1019 (2013).

Further, numerous jurisdictions, including the Tenth Circuit Court of Appeals have found that to prevent a manifest injustice of continuing to incarcerate one who is actually innocent, a number of procedural defects will be waived. *See Kuhlmann v. Wilson*, 477 U.S. 436, 454 (1986)(allowing successive petitions with rejected constitutional claims); *McClesky v. Zant*, 499 U.S. 467, 494-495 (1991)(excusing "abusive petition" exception in federal habeas); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11- 12(1992)(actual innocence trumps failure to develop facts in state court); *Lopez v. Trani*, 628 F.3d 1228, 1230-31 (10th Cir. 2010)(actual innocence is an

exception to procedural barriers in a petitioner's case including statute of limitations); *see also Lee v. Lampert*, 653 F.3d 929, 932 (9th Cir. 2011) (allowing actual innocence cases to receive substantive review despite being time-barred); *Souter v. Jones*, 395 F.3d 577, 602 (6th Cir. 2005); *San Martin v. McNeil*, 633 F.3d 1257, 1267-68 (11th Cir. 2011); *Jones v. State*, 591 So.2d 911, 915-16 (Fla. 1991) (permitting actual innocence based on new evidence in a writ of error *coram nobis*); *In re Clark*, 855 P.2d 729, 760 (Cal. 1993)(claims of factual innocence based on newly discovered evidence permitted at any time regardless of delay or failure to raise claim previously); *Summerville v. Warden*, 229 Conn. 397, 244 (Conn. 1994)(allowing state habeas corpus petition on newly discovered evidence of innocence even with other procedural problems); *People v. Washington*, 171 Ill. 2d 475, 489 (Ill. 1996)(procedural due process allows newly discovered evidence of innocence at any time); *Ex parte Elizondo*, 947 S.W.2d 202, 205 (Tex. Crim. App. 1996)(permitting a claim of actual innocence action in the interest justice); *State ex rel Amrine v. Roper*, 102 S.W.3d 541, 547 (Mo. 2003)(permitting actual innocence to be raised in state habeas corpus proceedings outside of the normal post-conviction avenue); *State v. Armstrong*, 2005 WI 119 (WI 2005)(state supreme court could use its inherent power to remedy a miscarriage of justice); *Montoya v. Ulibarri*, 142 N.M. 89,97 (N.M. 2007)(allowing actual innocence claims in state habeas petition as an act of fundamental fairness). While Mr. Fontenot is filing his habeas corpus petition beyond the one-year statute of limitations, he claims he is actually innocent of his convictions and the failure to file timely was through no fault of his own.[5]

---

[5] Petitioner's convictions became final before the enactment of the AEDPA. Therefore, the statute of limitations commenced on the AEDPA's enactment date of April 24, 1996 and expired on April 24, 1997. *See Serrano v. Williams*, 383 F.3d 1181, 1183 (10th Cir. 2004). Because his habeas corpus petition was not filed until February 24, 2016, this action is time-barred under 28 U.S.C. Section 2244(d)(1)(A). (Dkt.# 4). Further, pursuant to 28 U.S.C. Section 2244(d)(2), the statute of limitations is tolled while a properly-filed application for post-conviction relief or other collateral review of the judgment at issue is pending. On July 24, 2013, Petitioner filed an application for post-conviction relief in Pontotoc County Case No. CRF-1984-183. (Dkt.# 99-2). The post-conviction application was denied by the state district court on December 31, 2014. (Dkt.# 99-8). On October 29, 2015, the OCCA entered an Order Granting Motion to [Allow] Associate Counsel

An unexplained delay in presenting new evidence may bear on a determination of whether a petitioner has made the requisite showing to overcome the statute of limitations. However, in the instant case Mr. Fontenot did not "sit on" newly discovered evidence for over twenty years before raising these claims in state post-conviction or federal habeas corpus as the State suggests. See *infra* at 62-118. While records were disclosed to the Oklahoma Indigent Defense Services (OIDS) at some point after the December 1992 Oklahoma Court of Criminal Appeals ("OCCA") order, there is no evidence that Mr. Fontenot personally knew of their existence. Further, he had no means by which he could have developed these records had he known. He could not investigate them, find witnesses mentioned in them, obtain affidavits and supporting evidence, and submit it all to a court. Given that Mr. Fontenot is learning disabled, it makes the possibility of this occurring even more remote, if not impossible.

Further, these records were not disclosed until after his second direct appeal was almost finished. His appellate counsel's opening brief had been filed and there was no means for further factual development at that point. When the OCCA affirmed his conviction, but overturned his sentence, there was no means to develop these documents to challenge the underlying conviction. Attorney Mark Barrett, who represented Thomas Ward, Mr. Fontenot's co-defendant, removed Mr. Fontenot's files, including the OSBI reports from the OIDS office without any authorization or release from Mr. Fontenot. Mr. Barrett claims to have been representing both Mr. Ward and Mr. Fontenot, but only filed a state post-conviction brief for Mr. Ward in October 2017. Mr. Barrett never filed a  state application

and Affirming Denial of Post-Conviction Relief in Case No. PC-2015-76. (Dkt.# 99-10). Petitioner filed a petition for writ of habeas corpus in this Court on February 24, 2016. (Dkt.# 4). Because he did not file his post-conviction proceedings until after the one-year limitations period had expired, he is not eligible for statutory tolling. *See May v. Workman*, 339 F.3d 1236, 1237 (10th Cir. 2003).

for Mr. Fontenot. Mr. Barrett's representation of both Mr. Ward and Mr. Fontenot represents a conflict which Mr. Fontenot raised, and Respondent questioned, during post-conviction proceedings. Those questions remained unresolved at the time of the state court's order denying the post conviction application.

Respondent also argues that Mr. Fontenot's filing of a "Reply and Motion for Summary Judgment" precludes any additional factual development in the instant federal habeas corpus proceedings. (Dkt.# 148). However, a summary judgment motion is not a waiver of any further factual development, it is a pleading that alleges there are certain issues that can be decided based on the known evidence at the time. Fed.R.Civ.P. 56. When facts are unavailable to a non-movant, the court may "allow time to obtain affidavits or declarations or to take discovery." Fed.R.Civ.P. 56(d). Further, if a court denies the motion, it does not necessarily end the litigation. Instead, the case may continue with further factual development, including a possible evidentiary hearing, or trial. Fed.R.Civ.P. 56(g). Similarly, in post-conviction proceedings, a summary judgment motion does not preclude any further factual development. It merely suggests to the state court that there are certain issues that may be decided based on the evidence before the court at that point in time.

In this case, it appears there was there was never any waiver of additional factual development beyond the motion for summary judgment. At the last hearing in state court, both parties sought additional factual development beyond the motion based on two grounds: a prior discovery agreement and a potential evidentiary hearing for both sides. (Dkt.# 105, Ex.# 1, Minute order). After that, Respondent had actually requested more time for discovery and in an Agreed Motion for Extension of Time asked for an extension to respond.(Dkt.# 105, Ex.# 2, Agreed Motion).

Further, the Post Conviction Findings issued by the state court do not reach the

substantive merits or address the facts of an of Mr. Fontenot's claims. (Dkt.# 99, Ex.# 8). The Court simply found: "Claim of actual innocence, ineffective assistance of counsel, prosecutorial misconduct and *Brady* violation could have been submitted much earlier…[s]imply, too much time has elapsed due to Petitioner's own inaction." *Id.* Discovery was ongoing when the trial court's post conviction findings were entered. However, neither Mr. Fontenot, nor the Court were aware of the lack of full disclosure by the Pontotoc County District Attorney's Office that demonstrated Mr. Fontenot did not unduly delay asserting his constitutional claims. Further, there was no review of whether or not Mr. Fontenot's actual innocence in and of itself merited relief under state law. In fact, following the filings cited above, "there were no further hearings before the state court abruptly filed the two-page order denying relief on New Year's Eve 2014, the day before the state judge retired." (Dkt.# 105, at 4). Because the state court never ruled on the motion for summary judgment, the State's reliance on it is misplaced.

Mr. Fontenot's actual innocence is discussed *infra* pp. 17-48.


### B. Procedural Default

Respondent also argues that the petition is procedurally barred by the OCCA's application of laches. Courts may not consider claims that have been procedurally defaulted on adequate and independent state procedural grounds "unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Byrd v. Workman*, 645 F.3d 1159, 1167 (10th Cir. 2011). Specifically, Respondent contends that because the Oklahoma Courts found Mr. Fontenot had "forfeited [the] right [to have his post-conviction claims heard] **through his own inaction**" he should be procedurally

barred from pursuing them now. (Dkt.# 148, Exhibit # 10, at 3-4)(emphasis added).

Mr. Fontenot, however, again contends that all procedural bars have been removed because his case fits within the "actual innocence" gateway exception that would permit federal habeas review of his alleged procedurally defaulted claims, and his alleged "*Brady* error" serves as the "cause and prejudice" sufficient to serve the same function. Mr. Fontenot also contends Respondent cannot assert laches as an affirmative defense for undue delay when their own actions continue to subvert his ability to litigate his claims in a timely manner.

Like the time bar applied in statute of limitation cases, in general, absent a showing of cause and prejudice, a habeas court will not entertain a claim that has been defaulted in state court because of a procedural state court bar. *See Dretke v. Haley*, 541 U.S. 386, 388 (2004). However, there are several narrow, but critical, exceptions to this general rule. First, the Court requires that the rule must be adequate and independent – that is, it was firmly established, regularly followed, and consistently applied at the time of the alleged default. *Ford v. Georgia*, 498 U.S. 411 (1991). Second, there is "a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense." *Id.*; *see Schlup v. Delo*, 513 U.S. 298 (1995); *House v. Bell*, 547 U.S. 518 (2006). Third, there is an exception in claims of *Brady* error, where the elements of the substantive claim itself mirror the cause and prejudice inquiry and proof of one is necessarily proof of the other. *See Banks v. Dretke*, 540 U.S. 668 (2004). Mr. Fontenot qualifies for substantive review under both the actual innocence and the cause and prejudice exceptions.

### C. Actual Innocence

As explained above, Mr. Fontenot's actual innocence can equitably toll the AEDPA's statute of limitations. *Miller v. Marr,* 141 F.3d 976, 978 (10th Cir. 1998). "Actual innocence, if

proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar…[or] expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). The purpose of the procedural actual innocence standard is to prevent a manifest injustice of the continued incarceration of one who is actually innocent. When asserting actual innocence in federal habeas corpus, a petitioner must present newly discovered evidence that a jury did not consider during their deliberations. *See Schlup*, 513 U.S. at 327. Specifically, newly discovered evidence consisting of "trustworthy eyewitness accounts" and "critical physical evidence" provide the factual basis for the gateway claim. *Schlup v. Delo*, 513 U.S. 298, 324 (1995); *see also Cummings v. Sirmons*, 506 F.3d 1211,1223-1224 (10th Cir. 2007); *O'Boyle v. Ortiz*, 242 Fed. Appx. 529, 530-531 (10th Cir. 2007)(discussing that petitioner must demonstrate the newly discovered evidence was not available at trial); *Sistrunk v. Armenakis*, 292 F.3d 669, 673 n. 4 (9th Cir. 2002); *Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997). Once an actual innocence gateway is established, any procedural defects in Mr. Fontenot's constitutional claims are removed permitting this Court to evaluate each claim on its merits. *See Schlup,* 513 at 315. The significance of the evidence presented below casts grave doubt on the validity of Mr. Fontenot's convictions.

Once the factual grounds of actual innocence are present, a federal court's review must assess whether "the petitioner [has shown] that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup* 513 at 327; *see also House v. Bell*, 547 U.S. 518, 528 (2006). The Supreme Court instructs federal courts to examine the strength of the prosecution's case at trial when weighing the significance of all newly discovered evidence. *See House*, 547 U.S. at 539-553 (assessing newly discovered evidence within the state's theory of the case at trial). The State's theory of the case shows what evidence is significant to the jury's determination of guilt. More importantly, the state's theory of the case demonstrates the strength

of the case against a defendant.

The Pontotoc County District Attorney's Office tried Mr. Fontenot twice for the robbery, kidnapping, and murder of Donna Denice Haraway. In both trials, the prosecution's case against Mr. Fontenot rested on his confession regarding the robbery of McAnally's, the kidnapping of Mrs. Haraway from the store, and her subsequent murder.( N/T 6/14/1988 at 34-36). During trial, the prosecution acknowledged the plethora of inconsistencies between his confession and all the other evidence found in the case. A key discrepancy was Mr. Titsworth's non-involvement in the crime, although he was identified by both Mr. Ward and Mr. Fontenot in their confessions as being present during the alleged murder:

> Well, what does Officer Rogers, and Officer Smith, and Officer Baskins say? It is not unusual to have them tell you part lies. I ask you to consider ladies and gentlemen, first of all, Odell Titsorth[sic] was not there. Therefore, part of the story had to be a lie. Anytime he said Odell Titsworth [sic] did anything, the rest of the story had to be a lie, because Tommy and him, one of them had to do it, what Odell, what they said Odell did. So, of course, it is going to appear there are some lies, and some mistruths and it is not going to match exactly to the facts as told by the Defendant.

(N/T 6/14/1988 at 94). Evidence showed Mr. Fontenot was unable to describe, or identify Mr. Titsworth when asked to do so by law enforcement. ( J/T at 2074-75; P/H 968, 994-95). Both Ada Police Detectives Smith and Baskins admitted that nothing in Mr. Fontenot's confession was corroborated by their investigation. ( P/H 546-547; N/T 6/10/1988 at 178-179). Once Mrs. Haraway's remains were found, the medical examiner's report further disproved the confession by showing the cause of death to be a gunshot wound to the head and refuting that there were any knife-marks on her ribs. (Dkt.# 123, Ex.# 46).

In addition to the confession, the prosecution relied on two witnesses who identified Mr. Fontenot as being both at McAnally's and hanging around J.P.'s convenience store. (N/T 6/14/1988 at 21, 70-71). Those witnesses were James "Jim" Moyer (see *infra* at 33-37)

and Karen Wise (see *infra* at 37-40). This was the crux of the evidence brought against

Mr. Fontenot to obtain his conviction.

The remainder of the evidence presented against Mr. Fontenot focused on his guilt by

association with his co-defendant, Tommy Ward. Much of the prosecution's opening statement,

closing argument, and rebuttal focused on Mr. Fontenot's guilt by association with his co-

defendant. ( N/T 6/8/1988 at 31-35; N/T 6/14/1988 at 17-19, 35-36, 70, 79). Instead of direct

evidence inculpating Mr. Fontenot, the prosecution asked the jury to infer his guilt, based on Mr.

Ward's guilt. In fact, much of the State's case focused on the witnesses who saw Mr. Ward in

J.P.'s, or McAnally's, (N/T 6/14/1988 at 20-21, 27). Mr. Ward's possible possession of the knife,

*Id.* at 17, and his family's access to a grey pickup truck. *Id.*

During Mr. Fontenot's second trial, the prosecution recounted the testimony of several

witnesses who had given statements to law enforcement **that were never provided to Mr.**

**Fontenot's defense counsel**. Specifically, those witnesses were Janet Weldon (aka Lyon), who

was Mrs. Haraway's mother; James Watt, who was Mrs. Haraway's co-worker at McAnally's; Richard

Holkum, an Ada Police Officer; and Karen Wise, the sales clerk at J.P.'s convenience store. Without

these witnesses' prior statements to police, defense counsel was unable to cross examine the

prosecution witnesses about critical evidence that either exonerated Mr. Fontenot, or impeached the

testimony of various police officers. While defense counsel presented some evidence challenging the

confession, he could not provide evidence establishing Mr. Fontenot's innocence, or the inherent

weaknesses in the police investigation.

All the evidence presented at trial must be evaluated along with the newly discovery

evidence presented herein. *See House,* 547 U.S. at 537-538. The federal court must conduct a

cumulative assessment of the prosecution's evidence at trial, along with the newly discovered

evidence when considering whether actual innocence is proven.

Our review in this case addresses the merits of the *Schlup* inquiry, based on a fully developed record, and with respect to that inquiry *Schlup* makes plain that the habeas court must consider "'all the evidence,'" old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial."

*Id.*

The investigation into Mr. Fontenot's case has revealed both documents and witness statements that prove an alibi defense, and substantiate proof of the ineptness of the police investigation. The newly discovered evidence undermines the prosecutor's weak case and provides  proof of Mr. Fontenot's probable innocence. As noted *supra* at p. 2, **"Probable innocence" is established if Mr. Fontenot presents "new facts [that] raise[] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial…"** *Schlup v. Delo*, at 317 (emphasis added). To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id*. at 327; see also *House v. Bell*, 547 U.S. 518, 538 (2006)( a federal court presented with a *Schlup* claim "must make" 'a probabilistic determination about what reasonable, properly instructed jurors would do.'"). Once a federal court makes such a finding, a gateway claim of innocence exists removing any procedural obstacles allowing the substantive review of Mr. Fontenot's claims. *See House,* 547 U.S. at 536-537; *Case v. Hatch*, 731 F.3d 1015, 1036 (10th Cir. 2013). The evidence presented in Mr. Fontenot's Second Amended Petition puts the entirety of his case in a different light meriting the removal of any procedural hurdles.

Some of the new evidence presented includes evidence that Mrs. Haraway was being harassed and stalked by a man in the weeks and months leading up to her disappearance. The sole eyewitness, Jim Moyer, placing Mr. Fontenot in McAnally's recanted his identification. Karen Wise, the convenience store clerk at J.P.'s was pressured by both the police and prosecution to change her description of the men she saw at her store to fit the police theory

of the crime.

Further, a medical examiner's report withheld by the prosecution shows not only a mishandling of the crime scene - a pattern in this case - but more importantly shows that Mrs. Haraway possibly gave birth to a child sometime before her death (a striking fact given she had told a friend she was pregnant at the time of her abduction). The totality of this newly discovered evidence establishes Mr. Fontenot's probable innocence. After a cumulative assessment, it is evident to this Court that, "more likely than not, no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327.

### 1. Newly Discovered Evidence Establishes Mr. Fontenot's Alibi.

Investigators knew Mr. Fontenot had told them he was elsewhere when Mrs. Haraway was abducted. Within the Oklahoma State Bureau of Investigation (OSBI) records are documents corroborating Mr. Fontenot's whereabouts the night of April 28, 1984. The defense never got these documents. The facts show Mr. Fontenot agreed to submit to a polygraph examination on October 21, 1984. Within the OSBI prosecutorial[6] submitted to the Pontotoc County District Attorney's Office is a report of Mr. Fontenot's conversation with OSBI Agent Rusty Featherstone. (Dkt.# 123, Ex.# 43, prosecutorial bates 142-143). During that conversation, Agent Rusty Featherstone reported the following:

> During the pretest interview, FONTENOT indicated he has never been in the McAnally's convenience store nor even having driven by it. He has never seen DONNA DENICE HARAWAY before and does not believe he would recognize a picture of her if shown it now, although he recalls seeing a picture of a girl when she was first reported missing . . . FONTENOT recalls on the evening of Saturday, April 28, 1984, he went to the apartment of GORDON CALHOUN, arriving there at approximately dark or shortly after the kegs arrived. CALHOUN lives adjacent to ROBERTSES, where FONTENOT was currently staying. At the party FONTENOT recalls drinking and doing marijuana and then returning to the ROBERTS apartment where he slept on the floor all night. He believes he returned to the apartment between 2330 and 2400 hours that night. . ."

---

[6] The prosecutorial is a report created by the OSBI agents and given to the Pontotoc County District Attorney to review for charging decisions and prosecution. It does not contain the entirety of the investigative documents from law enforcement.

*Id.* [7] Later in the statement, Agent Featherstone stated that Mr. Fontenot mentioned a man named Bruce who was also at the party along with a Michael Shane Lindsay. *Id.*

During the post-conviction investigation, it was determined the Bruce mentioned was Bruce DePrater who acknowledged being at the party and seeing Mr. Fontenot there the whole evening. (Dkt.# 123, Ex.# 8). Interestingly, Agent Featherstone found Mr. Fontenot's polygraph results were inconclusive but bordering on deceptive. (Dkt.# 123, Ex.# 44 at 605, 628)(explaining that the examiner cannot make definitive determinations on whether Mr. Fontenot was truthful or deceptive on questions about the disposal of Mrs. Haraway's body and whether he stuck her with a knife).

Mr. Fontenot also made a handwritten statement on October 21, 1984, recanting his confession. In his letter, he said he had simply agreed with the story OSBI Gary Rogers told him and lied on the video. (Ex.# 44 at 626). He explained that he had never been to McAnally's or ever met Mrs. Haraway, and reaffirmed his presence at the party. (Dkt.# 123, Ex.# 44 at 625-627).

What is significant is that both the OSBI and Ada Police Department had proof of this party based upon several witness reports, dispatch records, and police reports. However, this evidence was never provided to the defense. Ada Police radio logs show several calls made in response to a loud party held at Gordon Calhoun's apartment. One of the officers who responded to this call, Ada Police Officer Larry Scott wrote a report specifically mentioning the "Gordon Calhoun" party and warning the revelers to keep it down or go to court. (Dkt.# 123, Ex.# 43, prosecutorial bates 98).

---

[7] When Mr. Fontenot attempted to explain his whereabouts to Detective Smith and Agent Rogers, they interpreted it as confirmation of whatever Jeff Miller told them over the summer. They failed to independently assess whether the party occurred as Mr. Fontenot stated rather than as confirmation of Mr. Miller's version of what occurred. Counsel for Mr. Fontenot represents that " If they did investigate it, those documents have never been disclosed to any defense counsel including undersigned counsel." (Dkt.# 77, pg. 21, n.4).

Other witnesses who knew about the party at Mr. Calhoun's apartment testified at Mr. Ward's trial, but not at Mr. Fontenot's. One of these witnesses, Stacey Shelton, not only remembered the events of that night, but remembered some of the other people present. Stacey Shelton attended the party at Gordon Calhoun's apartment. She testified at Mr. Ward's trial [8] about the party and others who attended:

> Q Did you have occasion to attend a party at Gordon Calhoun's apartment on April 28th, 1984?
>
> A Yes, sir. It was the graduation party for my younger brother, Bruce.
>
> Q And how did you come to go to that party?
>
> A I was at a club called LaFraqua that night and I had seen my younger brother there, and Gordon, and they told me that they were having a party at his apartment and asked if wanted to come.
>
> Q. Now, do you recall who went to that party with you?
>
> A Yes, sir. My roommate, Laura Ingram, my boy -- a boy I knew who I ended up, I ended up dating for two years, that was our first date, and Lyndel Gibson and his roommate. I don't recall his name. I'm sorry, it wasn't his roommate, it was a friend.
>
> Q And did you see anyone at the party that you knew?
>
> A My brother, Bruce, was there, Gordon was there, my next-door neighbors from my home in Konawa were there, Chris and Eric Thompson. And of course, I knew Laura and Lyndel and was familiar with the friend that Lyndel brought.
>
> Q Now, have you seen a lady in the hall today known as Janette Roberts?
>
> A Yes. They called her "Red". She was at that party, yes.
>
> Q. You saw her at the party also?
>
> A. Yes, I did.
>
> Q. Now, do you recall about what time you got to the party?
>
> A. It was late. The club didn't close until midnight, and I want to say that that is

[8] Mr. Ward's trial took place in 1989, after Mr. Fontenot's trial and conviction on June 8-14, 1988.

about the time we went, around that time, somewhere. I knew that it was late.

Q. All right. Did you see the Defendant, Tommy Ward, at that party?

A. I can't say positively that I did, no. There were probably twenty to twenty-five people there and, like I said, the only ones I knew were about six or seven people.

Q. All right. Now at the time of the first trial of this case, who were you working for?

A. A radio station in Ada, KADA Radio.

Q. And what were you doing for them?

A. I was a news anchor and reporter.

Q. And did you attend that trial?

A. Yes, sir, I did.

Q. And did anything happen in that trial to surprise you?

A. Yes, sir. I viewed a videotape where Mr. Ward was talking to some detectives and he told them that the night that Denice Haraway was taken, he was at a party and he started describing in minute detail about the party. He told of my little brother playing the electric guitar and Gordon was playing on the drum set and of two guys from Konawa asleep in the bedroom and also told of the police coming about 1:00 o'clock in the morning telling us to quiet down. And the minute I saw that, I knew that he had been there to know that.

Q. Now, did you know who these people from Konowa were?

A. Yes. They were Chris and Eric Thompson. I grew up next door to them.

Q. Now, did you see them asleep at that party?

A. Yes, sir, I did.

Q. And where were they asleep?

A. In the bedroom. One was on the bed and one was on the floor.

(Ward Vol. 10, at 193-195). Ms. Shelton had told the police and prosecution that she was at the party and knew who was there. Instead of notifying George Butner, counsel for Mr. Fontenot, of evidence supporting Mr. Fontenot's alibi, the prosecution's reaction to her information was to

pressure her to recant.

As I was watched the video, I realized that Ward was referring to a party I had attended at Gordon Calhoun's house. My brother, Bruce DePrater, was from Konawa and had been playing the guitar and Gordon had been playing the drums. Ward has also eluded to the fact that there were two other boys from Konawa at the party who were passed out on a bed. Those two boys were my childhood neighbors, Chris and Eric Thompson. I remembered them being at the party and indeed, they were passed out on a bed in an adjacent room to the living room.

I also remember Janette Blood being at the party with several of her friends. At the time, I did not know who she was or her name, but, I remembered her specifically because after I remarked that everyone needed to lower the noise because of the warning from the police, she came up to me and yelled in my face. She was easy to remember because of her flaming red hair and missing teeth. It was only at the trial, when she testified that I learned her name.

I specifically remember the night of the party as Saturday, April 28, 1984. First, my brother had invited me to the party after seeing me with my roommate Laura Ingram, and my date, Lyndel Gibson, at a local dance club. All three of us went to the party with the intent of only staying for a short while. It was the first time I had gone out with Lyndel, who I ended up dating for the next two years. It was the one and only time I went to Calhoun's house. I kept a calendar, almost like a diary, of everything I did. I wrote it in my calendar the following day. Also, during that time, I never went out on Friday nights because I worked on Saturday mornings and liked to go to bed early.

The police should have been aware of the date of the party since they arrived at the house a couple times to quiet the party. However, the police would not have been aware of everyone at the party. I know this because my friend, Laura and I were hidden in a different part of the house when the officers arrived and never interacted directly with them. After watching the video of Tommy Ward describing the April 28, 1984, party, I left the courtroom and approached Dennis Smith. I told him that there was no way Ward would know details about the party unless he was there. Smith told me that anyone could have told him about the party. I argued with him that Ward would not have known all the details that he spoke about if someone had just told him about it. He said to me, "I don't want to hear it," and turned and walked away.

**I later informed Mike Baskins about the accuracy of Ward's description of the party that night. I insisted that Ward and Fontenot couldn't have committed the crime since they were at the party that night. Baskins argued with me concerning the validity of the alibi, claiming that police logs showed that the party actually took place on a Friday night. I knew that could not have been correct and several years later, I discovered that the police log actually showed that the party was, in fact, on Saturday night.**

At the second trial of the defendants, I testified for the defense, verifying that

Tommy Ward's details matched what I had seen at the party.

**After testifying at the trial, I was confronted by Bill Peterson who brought me into an office he and Chris Ross were using within the courthouse. Once I was there, Peterson told me I was to get back on the stand and recant my testimony. I told him I wouldn't do it because I had told the truth. He made me stay in the office for about half an hour and then came back in with what he told me were trial transcripts. He ordered me to read them. I did and then he yelled at me saying that I was lying because, he said, the transcripts didn't match my testimony. Again, he demanded that I return to the stand to recant my previous testimony and again, I refused telling him that while not everything I testified to was in the transcript he showed me, that I clearly remembered what took place that night and I clearly remembered seeing the tape sometime during the preliminary hearing or trial, although I could not recall exactly which one.**

Peterson was extremely volatile during the course of this confrontation. He slammed his fist on the desk. He slammed the transcript on the desk. He was red faced and yelling almost to the point of spitting. He insisted over and over again that I go "back on the stand and testify that everything you said was wrong."

Because I refused, he told me I was not to leave his office until I agreed to recant. I stayed in the office for several more hours while the trial continued. He would come into the office during breaks and again demand that I retake the stand, which I refused to do. At the end of the day, he let me go, but told me I was to return every day until I agreed to recant. He told me he was going to recall me and rip my testimony to shreds and although I returned each day of the trial and was made to sit on a bench in the hallway until the trial concluded, he never recalled me, and I refused to go on the stand of my own accord and recant.

Peterson left me with the impression that if I did not remain in his office the first day or return the following days that I would be jailed. I missed several days of work because of it.

I interpreted all of the foregoing actions by Peterson as intimidating, although I continued to stand by my testimony.

(Dkt.# 123, Ex.# 12) (emphasis added). While Ms. Shelton could not remember specifically Mr. Fontenot being at the party, her knowledge of who else was present provided new evidence supporting Mr. Fontenot's alibi. Specifically, she named her brother, Bruce DePrater, and Eric and Chris Thompson as being at Mr. Calhoun's apartment.

When interviewed, Mr. DePrater not only remembered the party but knew Mr. Fontenot:

27

Sometime prior to this party, I recall traveling to Texas with Gordon Calhoun to purchase one or two kegs of beer, and probably some cases of beer. The alcohol content for beer sold in Texas was higher than that of beer sold in Oklahoma, making 'Texas Beer' more desirable.

I recall Eric and Chris Thompson, from Konawa attended this party. I recall that Eric Thompson had passed out early that night; but, during the daylight hours I witnessed an incident between Eric Thompson and Karl Fontenot while they were both standing around talking at Gordon Calhoun's party. Karl Fontenot was refilling a beer can from the keg's spout and joking to Eric that he (Karl) was only having one beer.

Later that same night, probably around 11 pm or shortly thereafter, I recall planning a trip to La Fragua, a college bar in Ada, with Chris Thompson. Chris and I wanted to visit the bar and invite women to come back to Gordon's keg party. On the way out, I recall mentioning this plan to Karl Fontenot, who responded by making an inappropriate gesture involving the tugging upward on his belt, while commenting verbally that he and Tommy had already been with an older woman that evening.

At La Fragua that night, I recall seeing my sister Stacy Deprater. She was with her friend Laura Ingram and on a date with Lyndel Gibson. Surprisingly, my sister Stacy and her friend and date came back to Gordon Calhoun's party that night, after La Fragua closed at midnight.

Later that same night, after my sister and her friends had gotten to Gordon Calhoun's party, I recall playing guitar while Gordon played his drums. While we were both playing loudly, someone announced that a police officer was coming up the stairs to Gordon's apartment.

Almost simultaneously, I recall Karl Fontenot running by me telling me to follow him, that he knew a good place to hide. I had no reason to hide, and to this day, I don't know why I followed Karl Fontenot into this strange hiding place, but I did. Karl showed me a hidden passageway, which seemingly connected Gordon Calhoun's kitchen with his neighbor Janette's apartment. This passageway was hidden behind Gordon's refrigerator. That is where Karl and I stayed until the police officer left.

I believe each of these incidents occurred on the same night, during the same party at Gordon Calhoun's apartment sometime during the spring of 1984.

(Dkt.# 123, Ex.# 8). Along with Mr. DePrater, Eric Thompson also remembers Mr. Fontenot being at the party that evening. (Dkt.# 123, Ex.# 9). Such information was crucial to Mr. Fontenot's defense at trial because it established his whereabouts for the night; precluding the belief he was involved in Mrs. Haraway's abduction.

Mr. Fontenot recanted his confession shortly after he gave it.(Dkt.# 123, Ex.# 44 at 626). More importantly, in both his interview for the polygraph and afterwards he provides as much information as he can about a party he attended six months prior. Given that the videotape confession of Mr. Fontenot only contains the confession and not the interrogation that occurred beforehand, his statements providing his whereabouts to law enforcement are critical new evidence. The prosecution failed to disclose these documents to Mr. Fontenot's trial attorney, George Butner.

The OSBI records that were withheld from defense counsel document Mr. Fontenot's alibi and his recantation and are important for two reasons. First, these documents provide independent corroboration of any conversations between Mr. Fontenot and his trial counsel. Given that he never testified at any hearing, these documents would impeach Agent Rogers' and Detective Dennis Smith's testimony about the veracity of the confession. Both law enforcement officers admitted that nothing in the confession could be substantiated. Therefore, OSBI reports reflect that Mr. Fontenot denied any involvement and told officers about the party with specific names of people in attendance shows substantial flaws in their investigation.

Second, these reports provide new investigative leads defense counsel could have followed. Had Mr. Fontenot's defense been given this information, they could have investigated the people who attended Mr. Calhoun's party the night of April 28th. These people remember seeing Mr. Fontenot from the very early part of the evening until much later into the night. Their accounts clearly show that at no time did Mr. Fontenot leave to participate in whatever transpired with Mrs. Haraway. Affidavits from party-goers, Eric Thompson, Bruce DePrater, and Stacey Shelton along with police reports from Janette Blood place Mr. Fontenot at the party for the entirety of the night.

## 2. Donna Denice Haraway was being Harassed by an Unknown Man.

The Pontotoc County District Attorney maintains it did not have most of the OSBI and other law enforcement records made during the investigation into Mrs. Haraway's disappearance and murder. Amongst those records not turned over to the prosecution or defense counsel include OSBI reports about witness accounts to police detailing Mrs. Haraway's statements to them about how she received obscene telephone calls during her shifts while working at McAnally's. According to a co-worker, these calls had stopped for a period in the early months of 1984, but began again in the weeks leading up to her disappearance. (Dkt.# 123, Ex.# 62). Mrs. Haraway told the witness that the male caller telephoned the store during her shifts in the evenings from Thursday to Sunday. *Id.*

Mrs. Haraway's mother, Janet Lyon, also told police that her daughter had told her about the calls and said that she feared these calls and did not like working at McAnally's. These calls, greatly distressed Mrs. Haraway, her family, and co-workers.

> According to Janet, Donna told her on the phone she hated working at the store because it did not have an alarm and a lot of weirdo's come in and out of the store. She told Janet that she was going to look for another job because she felt uneasy working at the store alone at night. She told Janet that the phone calls had started again but didn't go into the whole story. **Janet said that earlier Donna had been receiving calls at work from a man that said he was going to come out to the store some night and wait outside while she was working. She said that Donna was upset because she had asked for the night off and a guy refused to work, and she had to work anyway.**

(Dkt.# 123, Ex.# 43, prosecutorial bates 20, 109)(emphasis added). OSBI Agents received similar information from the store manager, Monroe Atkeson, about a conversation he had with Steve Haraway, Mrs. Haraway's husband.

Mrs. Haraway's husband, Steve, also told police about the harassing phone calls his wife received. On the night of her disappearance, the police spoke with Steve Haraway who told them: "Steve received a phone call from the police who told him that his wife was missing. He knew of no one that Donna was having problems with at the store, other than she had received two to three

obscene phone calls at the store. The last phone call was two or three weeks prior to her disappearance." (Dkt.# 123, Ex.# 43, prosecutorial bates 20).

OSBI Agents received similar information from the store manager, Mr. Atkeson when agents interviewed him on April 30, 1984. He recounted a conversation with Steve Haraway about a Vietnam Veteran that had been harassing Mrs. Haraway. (Dkt.# 123, Ex.# 44, OSBI 0006). She received several obscene telephone calls during her shifts. *Id.* Mr. Atkeson told police he had seen the veteran that Steve spoke of who was described as a white male, six feet, 190 pounds, black hair, brown eyes, mustache, light complexion, who usually drove a white Chevrolet Chevette and bought a soft drink. *Id.* Mr. Atkeson believed that the veteran attended a rehabilitation school in Okmulgee. *Id.*

James D. Watts, a co-worker of Mrs. Haraway's from McAnally's had also given police a statement about the obscene phone calls that Mrs. Haraway had received, a statement that likewise was not produced to the defense. Mr. Watts gave a statement to Pontotoc County District Attorney's Office investigator Lloyd Bond on July 25, 1985. Mr. Watt explained that "Denice had told me of some obscene phone [calls] she had received at the store for a while, these calls upset her a great deal. She could not recognize the voice over the phone. The calls stopped about one month before she disappeared." (Dkt.# 123, Ex.# 62).

Other individuals were not interviewed by police who had knowledge about the impact these calls had on Mrs. Haraway. Anthony Johnson, a frequent customer at McAnally's, remembered a conversation he had with Mrs. Haraway a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Haraway's disappearance he was in the McAnally's convenience store when Haraway asked him where she could buy a gun. Haraway referenced the need for a gun with some funny calls she had recently been receiving. Haraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any

ex-boyfriends that could be making these calls and said that in Johnson's opinion, she knew who was making the calls but did not seem to want to indicate who it was.

(Dkt.# 123, Ex.# 22). Further, just two days before Mrs. Haraway went missing, she spoke with Darlene Adams, another customer at McAnally's. Mrs. Haraway explained she was afraid of working nights at the store, but her schedule would not be changed. (Dkt.# 123, Ex.# 1).

It is unclear whether the Ada police or the OSBI ever investigated who was making these calls to McAnally's. No telephone records were obtained of incoming calls to the convenience store according to the disclosed OSBI reports. No witnesses were interviewed regarding men who may have hung around the store or watched Mrs. Haraway in the months and weeks leading up to her disappearance. Obviously, whomever was making these calls knew her work schedule because the telephone calls occurred only during her shifts. (Dkt.# 123, Ex.#s 15 & 44, OSBI 0006). The man making these calls targeted Mrs. Haraway and had been doing so for an extended period of time before her abduction. *Id.*

This newly discovered evidence was not presented to either of Mr. Fontenot's juries because the prosecution failed to disclose it to defense counsel. Beyond the failure to disclose, this evidence illustrates the defects in the police investigation into Mrs. Haraway's disappearance. This evidence should have been investigated in 1984, given this evidence was willingly provided by those closest to Mrs. Haraway either on the night of her disappearance, or within a day or so of it. This is not a situation where only one person made a comment about a few suspicious telephone calls. Instead, numerous people including her husband, manager, co-worker, customers, and mother were aware of this conduct and recognized its obvious relevance to the case. They immediately shared this information with police in the hopes that it would assist in their investigation into her mysterious disappearance. Instead, the police ignored it and

the prosecution withheld it from Mr. Fontenot's defense.

### 3. The Only Eyewitness Who Identified Mr. Fontenot Recants His Identification.

Jim Moyer is the only witness who placed Mr. Fontenot in McAnally's the night of Mrs. Haraway's disappearance. Mr. Moyer's account of that night changed over time. From his first interviews with the Ada Police to his testimony at the preliminary hearing and trial, he was not consistent. ( Dkt.# 123, Ex.# 102). He testified that he saw both Tommy Ward and Mr. Fontenot in McAnally's shortly before Mrs. Haraway's disappearance. (P/H at 213-214). He testified that while talking to Mrs. Haraway during his purchase of cigarettes, he saw two men walking into the store; one man with dark hair while the other one was blond. (P/H at 218-220). However, this testimony is not what he originally told police in 1984. He was interviewed twice by Ada Police. The first time was on April 30, 1984, by Ada Police Officer Barrett:

> MOYER advised he went to McAnally's at 7:30 p.m., Saturday, 4-28-84. A pickup pulled in faceing [sic] the building between the door and the ice machine. A dark- haired guy came in the store first, then a blond haired guy came in later. MOYER left approximately one minute after they came in. The pickup was about a 67-69 Chevrolet, light gray, rough looking. MOYER glanced at the tag but cannot remember it. The pickup may have had a trailer hitch on it.

(Dkt.# 123, Ex.# 102). His second interview with Ada Police Officers D.W. Barret and Fox, he told a completely different story.

> On 11-6-84 Dets Barrett and Fox went to Martins Phillip 66 station on Arlington and talked to Jim Moyer. Mr. Moyer said he went to McAnally's on Arlington about 7:30 p.m. on 4-28-84. Mr. Moyer said there was a dark haired male at the back of the store, but he did not get a very good look at him. While Moyer was at the counter talking with Denice Haraway a second male came in the door and walked past him. This person he described as being blond headed and of average height and weight. Moyer said he stayed in the store only a minute or two after the second subj. came in. As he was leaving he saw a pickup parked into to the curb facing the store. He only knew it was prior to a 1971 model and was a Ford or a Chevy. Moyer looked at the picture

lineups and said the pictures that most resembled the men he saw was #1 in the Ward folder and #2 in the Titsworth folder.

(Dkt.# 123, Ex.# 102). These Ada Police Reports should have been made available to defense counsel during pretrial proceedings in both 1984-1985, and prior to Mr. Fontenot's second trial in 1988. As such, it is a *Brady* violation for failure to disclose impeachment evidence and prior inconsistent statements. Further, this report was just made available in the instant proceedings in 2019.

Not only was the sequence of events from the men being in the store different than his testimony, but he was not shown Mr. Fontenot's photospread. **As the prosecution relied upon him to put Mr. Fontenot in the store, it is interesting that he was not asked to identify him during his interview.** Mr. Moyer's account of his time in McAnally's is widely inconsistent from his original interview, through his preliminary hearing and trial testimony.

Mr. Moyer identified Mr. Fontenot in the courtroom as the dark-haired man who walked towards the back of the store. (N/T 6/9/1988 at 16). But during cross examination, Mr. Moyer admitted doubts about his identification of Mr. Fontenot.

> Q. All right. You have had an opportunity at Preliminary Hearing to stand next to and look at the height of Karl Fontenot, didn't you?
>
> A. Yes.
>
> Q. And as I recall that, Mr. Fontenot was two to three inches shorter than you were. Is that correct?
>
> A. Yes.
>
> Q. Okay. so, if you were, in fact, five ten, Mr. Fontenot would be five seven to five eight. Is that correct?
>
> A. Yes.
>
> Q. Okay. And, in fact, then to be taller than you, he would have to have heels on his boots about three to four inches tall, but even to reach a six- foot height, the

composite reflects he would have to have five to seven inch boots then. Is that correct?

A. To match that height, yes.

Q. And after you came up here to Preliminary Hearing, had an opportunity to look at the height of Mr. Fontenot, had an opportunity to look around the courtroom, sometime after the Preliminary Hearing you became convinced that Karl Fontenot was not the man, didn't you?

A. I became confused about it.

Q. You became so confused or convinced that you attempted to contact the District Attorney's Office and say that Karl Fontenot was not the second man, didn't you?

A. At a time, yes.

Q. Okay. All right. In fact, you tried to get a hold of the District Attorney all summer to tell him that, didn't you?

A. Yes.

Q. Okay. The District Attorney wouldn't return your telephone calls would he?

A. Well, I never left my name.

Q. Okay. so, you just called the District Attorney's Office for a couple of months during the summer and never left your name. Is that right?

A. Yes.

Q. All right. You believed, Mr. Moyer, that there was someone sitting in the back of the courtroom that was more familiar to you that evening as being in McAnally's on April 28th, 1984, didn't you?

A. Yes.

Q. Okay. And you did that because of the fact that this gentlemen was wearing boots, you saw those out in the hall, didn't you?

A. Yes.

Q. His hair was longer than Mr. Fontenot's?

A. Yes.

Q. He was much taller than Mr. Fontenot?

A. Yes.

Q. Okay. And, in fact, you became convinced that that was, in fact, the second man, didn't you?

A. Well, I don't know if I was convinced about it.

(N/T 6/9/1988 at 24-26). His doubts make sense in the context of his initial interview where he was never asked to identify Mr. Fontenot and his time of actually viewing either man in the store was seconds at most. However, Mr. Moyer clarified his position from Mr. Fontenot's trial in 1988. When interviewed during post-conviction he now asserts:

> While at the courthouse testifying in the preliminary hearing, I saw a man in the back of the courtroom I had seen before. I also saw him downstairs, where I had been waiting to testify. I also saw this man speak to Tommy Ward during the preliminary hearing. It came to me that this was the same man I had seen in McAnally's with Tommy Ward. He looked more familiar to me. I was no longer one hundred percent sure about my identification of Karl Fontenot.

> After that, I tried to call Mr. Peterson, the District Attorney, to tell him I was no longer one hundred percent sure that Karl Fontenot was the man I had seen in McAnally's that night. In fact, I was leaning more in the direction of Steve Bevel, the man I saw at the courthouse. While I was never able to speak with Mr. Peterson, I did speak with someone else in the district attorney's office. I told this person of my concern. This person said to me, "It was not him (Bevel)."

> After that, I was afraid to change my story. I felt pressure from both sides. I overheard the lawyers argue about the content of the story I had given to Richard Kerner, an investigator working for Mr. Wyatt, while I was on the stand. On one hand, I felt betrayed by Mr. Kerner, as he tape-recorded our conversation without my consent. On the other hand, I felt like it was Steve Bevel that I had seen with Tommy Ward that night. I felt conflicted. I chose to then state that I was confused about the identity of the man with Tommy Ward.

> **I am now convinced that my assessment, at the time of the preliminary hearing, that Steve Bevel was the man with Tommy Ward, was correct. I am confident that Karl Fontenot was not the man I saw at McAnally's. The man I saw at McAnally's was definitely taller than Karl Fontenot and had much more intimidating look about him. At this time, I am about 95% sure that it was Steve Bevel, not Karl Fontenot, that I saw in McAnally's on April 28, 1984.**

(Dkt.# 123, Ex.# 14)(emphasis added).

When Mr. Moyer told the prosecution he was unsure about his identification of Mr. Fontenot, he was told he was wrong in his identification of Mr. Bevel. *See also* Ward Vol. 3 p. 97-99 ,"Not positive about the dark- haired person." Mr. Moyer's uncertainty as to whom he saw in McAnally's with Mr. Ward casts further doubt of Mr. Fontenot's involvement in this crime. Without Mr. Moyer's identification, no evidence places Mr. Fontenot in McAnally's besides the false confession.

### 4. Law Enforcement Pressured Karen Wise to Change Her Account of What Transpired in J.P.'s Convenience Store.

Karen Wise was a crucial witness not only for the investigation into Mrs. Haraway's disappearance, but for the prosecution of Mr. Fontenot. After going to McAnally's in response to the initial report that Mrs. Haraway was gone, Ada Police Detective Mike Baskins travelled to J.P.'s to inquire about the men who had been reported as rowdy earlier in the evening. When Detective Baskins arrived, Ms. Wise told him how two men were in the store that night harassing her. Both men came up to the counter several times to get change for the video game machines and buy alcohol.(N/T 6/8/1988 at 161-162). She described the two men as follows: a blond male 5'8" tall dressed in a white t-shirt and jeans with his hair parted in the middle. The second man was a bit shorter than the blond with dark, shoulder length hair also dressed in a t-shirt and jeans. (*Id.* at 165-166). Law enforcement, with no indication that the men seen in J.P.'s were connected in any way with McAnally's, decided to construct composites of the two men from Ms. Wise's description. *Id.* at 167; *see also* (Dkt.# 123, Ex.#s 76-77). These composites became the suspects for the crux of law enforcement's investigation.

However, despite the composites and descriptions, Ms. Wise never identified Mr. Fontenot as one of the men she saw at J.P.'s on April 28, 1984.( N/T 6/8/1988 at 177 & 193-194). Mr. Fontenot was both shorter and had lighter hair than the man accompanying Mr. Ward.

Further, when shown Mr. Fontenot's line-up, she was unable to identify him. (Dkt.# 123, Ex.# 43, prosecutorial bates 138, 0377). While the Ada Police Detective Dennis Smith testified that Ms. Wise called him after the line-up and identified Mr. Fontenot, there was no police report supporting the subsequent identification.

Creating more doubt is Ms. Wise's affidavit that she saw four men in J.P.'s on April 28, 1984, rather than two men that became the center of the prosecution's theory of the case.

That evening, after reports that Denice Haraway was missing, I was interviewed by the police. They asked me to help them construct composite drawings of two young men who were in J.P's that night. At first, I didn't want to help with the drawings. I told police that just because they were in J.P's didn't mean they had hurt Ms. Haraway or taken her anywhere. I said they were just kids.

Another reason I didn't want to help with the drawings at first was that there were four men who were at J.P.'s at the same time. The police wanted drawings of only two men. I told police that there were two other men present, **but police insisted that there were only two men**.

I was particularly nervous because of two other men in the store that evening. I knew them. They were in the store that night during approximately the same time as the men who were later reported to be Tommy Ward and Karl Fontenot. I told police - on April 28, 1984 - that there were four men hanging out around the store for an extended period of time, instead of two. I told police that I recognized two of the men and knew their names and did not know the names of the other two.

**Prior to the first trial (the trial at which Tommy Ward and Karl Fontenot were tried together), I met with Bill Peterson, at his request, to discuss the case with him in preparation for my testimony. l told Bill Peterson that the other two men were in J.P's at the same time as the two persons in the sketches. I told him I was afraid of the other two men because of the way they were behaving in the store. Bill Peterson said he already had the "ones who did it." I told him the names of the two men I knew were in the store. Those two men were Bubba Daggs and Jim Bob Howard. Bill Peterson said that Jim Bob Howard couldn't have committed the murder because he "didn't have the I.Q. of a grub worm."**

**Bill Peterson said that I couldn't bring up in Court that Jim Bob Howard and Bubba Daggs were with the other two men. He said it couldn't be mentioned because it wasn't relevant. I was not at all comforted by that because I didn't**

**think Peterson had all of the people that might have been involved.**

**It bothers me that I couldn't discuss the other two men, because I don't think all of the truth came out. I never mentioned to the defense directly anything about the other two men, except to the extent my June 8, 1988 testimony made reference to them. (See paragraph 10). I got the impression from law enforcement that I wasn't supposed to talk about the other two men. It was not until a number of years after all the trials were over that I finally mentioned the other two men to representatives of Ward and Fontenot.**

(Dkt.# 123, Ex.# 13) (emphasis added). The police investigation focused on the wrong suspects from the beginning in both number and description. That four rambunctious men were in J.P.'s on a Saturday night is in no way relevant to the events of McAnally's where eyewitnesses repeatedly told police they saw one man walking out of the store with Mrs. Haraway. (N/T 6/9/1988 at 38, 40, 47-48, 51, 59-60). Like Mr. Moyer's experience, when Ms. Wise tried to clarify what she saw to prosecutors, she was pressured to change her story to conform to what the State sought to present. This pattern of police and prosecutorial misconduct permeated the case against Mr. Fontenot.

Ms. Wise shared her frustrations over the improper tactics of law enforcement. She told her best friend, Vickie Jenkins, what she truly saw and her interactions with the state:

> She advised that Wise was sure Ward was in J.P.'s this evening along with three other males. Wise said Ward kept watching her all the while he was in the store which made Wise uneasy. Jenkins believes that another J.P.'s employee, one Jack W. Paschall, East of City, telephone 436-1611, pointed out the suspect truck to Wise. **Jenkins further related that Wise was upset about the composite drawings because the police just weren't doing them right. She did not know what was being done wrong with these drawings. Jenkins and the owner of J.P.'s related that Wise was very upset with the Ada Police over this investigation because they have harassed her over and over and made promises to her that were broken.** Jenkins knew nothing about Wise saying that the two guys she observed coming into the store after Ward was arrested.

(Dkt.# 123, Ex.#s 23 and 3 at 2, 10-11) (emphasis added). Both Ms. Wise and Ms. Jenkins further substantiate the improper actions of law enforcement in dealing with witnesses in this case. Like Ms. Shelton and Mr. Moyer, Ms. Wise was pressured to conform her true account of what

transpired to an improbable theory with no connections to the facts and no evidentiary support. Instead of focusing on the facts and evidence gleaned from McAnally's, the actual crime scene, police almost immediately generated two suspects matching descriptions of two of the four individuals in J.P.'s with no evidence that these men were seen at the crime scene.

### 5. Numerous Inconsistent Statements about the Gray Primered Truck

The prosecution's theory of the case rested on both Mr. Ward and Mr. Fontenot forcing Mrs. Haraway into a gray primered pickup truck and driving off with her.( N/T 6/8/88 at 32-33). During closing arguments, the prosecution recounted several witnesses' testimony about seeing the gray pickup the night of April 28[.] ( N/T 6/14/88 at 17, 22, 27, 68, 75, 85, & 93-95). However, there was little consistency between witnesses as to what type of truck was seen. Specifically, there was considerable differences in the size, color, body type and tire size depending on the person questioned. Mr. Fontenot's defense counsel was unable to cross examine many prosecution witnesses about their inconsistent statements about what the gray pickup truck looked like.

The official OSBI description of the pickup was an early model "Chevy pickup truck w/light gray primer color, narrow bed w/oversized tires on rear; rear end was jacked up." (Dkt.# 123, Ex.# 44, OSBI 0004). This description was distributed to the FBI and numerous counties and states on April 29, 1984. *Id.* One problem with this description is that it did not provide the specific year of the pickup truck. For example, Chevrolet pickup body styles changed greatly from the early 60's to the 80's. (Dkt.# 123, Ex.#s 82-84). Because of the numerous types of Chevrolet pickups on the road during that time, and likely being driven in Ada during that time, specificity was critical to identifying the correct pickup seen by witnesses. Instead, there were conflicting reports of the pickup described by three witnesses who first saw the suspect and victim leave McAnally's.

Lenny Timmons described the truck as a green and gray, older Chevy pick-up that was not well maintained. (Dkt.# 123, Ex.# 44, OSBI 0842). Further, the rear wheels or tires were plain. *Id.* David Timmons thought the pickup was blue, rough, and had dents on the side. The rear bumper was white, possibly raised in the rear. (Dkt.# 123, Ex.# 44, OSBI 0851). Gene Whelchel said the pick-up was full sized and light colored. He suggested it might be an early 1970s model, but he was sure it was not a narrow bed. (Dkt.# 123, Ex.# 44, OSBI 0060). These three men reported seeing Mrs. Haraway get into the pick-up truck with a white male. (Dkt.# 123, Ex.# 44, OSBI 0061-0063). However, their descriptions not only conflict with each other but with the official description used by OSBI. See Dkt.# 123, Ex.# 21, explaining the difficulties encoding memories for various events.

The prosecution's theory relied on other witnesses who supposedly saw the same pickup truck driving around town the night of Mrs. Haraway's disappearance. OSBI reports state that James Moyer, described the pickup truck as light gray, rough looking, a 1967 to 1969 Chevy pickup. (Ex.# 44, OSBI 0245; Ex.# 82). However, his trial testimony was not nearly as specific.

Q. Okay. And did you see what kind of vehicle these two people drove up in?

A. Yes. It was a Chevy pickup, gray primered.

Q. Okay. And do you have any way of knowing what year it was?

A. I'm not too good on years on Chevy pickups. It was . . .

Q. Okay. That's fine. Do you recall whether it was a painted pickup or a primered pickup?

A. It was primered. It was a flat color, not a glossy color.

Q. Okay. It was a gray primered Chevrolet pickup?

A. Yes, sir.

(N/T 6/9/1988 at 16). Because they had not been given Mr. Moyer's statement to police, defense

counsel was unable to cross examine Mr. Moyer on his inconsistent statements concerning the truck, which was a critical part of the prosecution's case.

The descriptions of the pickup truck from J.P.'s employees conflict with those from McAnally's witnesses. For example, Karen Wise told the police the truck was an older model, short bed, with maybe a step side, "light color spots" on the driver's side door and bed, with a darker color – possibly reddish brown primer on it. Most of the pick-up was "primered." (Dkt.# 213, Ex.# 44, OSBI 0058-0059; Ex.#s 82 and 83, examples of possible truck body styles). The truck had wide back tires and possibly a loud exhaust. *Id.* At trial, she testified:

Q. And do you recall how these two individuals arrived at your store, how they got there?

A. I didn't really realize until the customers kind of let up some, until I saw what cars was still there. There was a pickup truck parked out front.

Q. And do you recall the color of it?

A. It was red and gray primered colored.

Q. Okay. The entire driver's side or just from the door back or from the back door back or –

A. Well, all I can basically remember is from the driver's side door back, because that was where it was real spotty, it was some red and some gray and that is the only reason I remember that.

(N/T. 6/8/1988 at 162). As in Mr. Moyer's testimony, Ms. Wise's police report varies in details that would have aided a jury in assessing whether these people were talking about the same truck.

Jack Paschal, who was in J.P.'s that evening, saw the men in the back of the store. He also described the pick-up truck. He told police it was an older model, maybe a mid-60's to early 70s Chevy with primer paint on it. (Dkt.# 123, Ex.# 43 at 10, 63). He thought the tailgate was either bent badly or missing. *Id.* His trial testimony is mostly consistent with the description provided to the police including his inability to make out the truck's color due to the lighting at the store.

(N/T 6/8/88 at 214-215). However, it does not coincide with the description provided by OSBI, or McAnally witnesses.

The conflicting accounts of the pickup truck are critical evidence casting doubt on whether these prosecution witnesses saw the same truck, or many trucks that happen to look alike. The prosecution's theory of the case focused on a gray primered truck being used in the abduction. If the defense had the opportunity to point out the numerous police reports of these witnesses providing conflicting descriptions of the truck, it would have cast significant doubt on whether the truck was used at all since it was never located.

As exhibit numbers 82-84, attached to the Second Amended Petition illustrate, Chevrolet manufactured several body styles, cab sizes, and bed sizes from the 60's up to the early 80's. (Dkt.# 123, Ex.#s 82-84). At no time did law enforcement show these witnesses pictures of trucks to make sure they identified the correct model. Failure to glean cohesion in a crucial piece of evidence in the police's investigation demonstrates another example of the poor quality of the police investigation in this case. There was no connection between a truck seen at McAnally's and the one seen at J.P.'s earlier that evening. Yet, the lead detectives and prosecution insisted that such a connection existed regardless of the numerous versions of what the truck looked like. Had a jury known about the high number of inconsistencies in truck descriptions, it would have created doubt as to the prosecution's witnesses who later testified they saw several men in grey pickup trucks near the power plant. *(*N/T 6/8/1988 at 33-35). Jurors could also conclude that alternate suspects may have had more motive to commit this crime than Mr. Fontenot, who had no interaction with the police until October of 1984.

### 6. Undisclosed Portions of the Medical Examiner's File

The skeletal remains of Donna Denice Haraway were found in Gerty, Oklahoma in January 1986, while Mr. Fontenot's initial direct appeal was pending. (Dkt.# 123, Ex.# 46, at 1). The

location where the body was found is on the opposite side of the county from where Mr. Fontenot confessed to leaving the body. Further, how the bones were found, ultimate determination of the cause and manner of death did not match any details of his confession. The State's theory, based solely on Mr. Fontenot's confession, argued that Mrs. Haraway was robbed, kidnapped, and murdered with a knife.( N/T 6/8/1988 at 33-35). She was supposedly stabbed numerous times, her remains were burned and left at a power station west of Ada.( J/T 2593-94, 2735-36, 2742-43). However, both the location of her remains and the medical examiner's report disproved his confession. A full review of the medical examiner's report documents the cause of death as a single gunshot wound to the head. (Dkt.# 123, Ex#. 46, at. 1, 3, 12, 40). There were no knife wounds on any of the bones uncovered at the Gerty crime scene. (Dkt.# 123, Ex.# 46, at 20, 36, 40).

While certain parts of the medical examiner's file were released to Mr. Fontenot's initial direct appeal counsel, the full 43-page report was not. (Dkt.# 123, Ex.# s 46, 11). Specifically, two key pages of the report were not provided despite the fact the trial court ordered full disclosure of the ME's Report.(Dkt.# 123, Ex.# 59). The initial page not disclosed describes the improper procedure followed by OSBI agents and other law enforcement personnel who were tasked to properly document and preserve evidence from the Gerty crime scene.

1-21-86  1650 I returned a call to Hughes County District Attorney Bill Peterson concerning some bones that were found. Mr. Peterson didn't know anything, about the discovery but they are thought to be the remains of a missing store clerk -- Donna Hariway.[sic] **No ME was notified**. He stated that the OSBI was notified out of McAlister.[sic] That some people from the OKC office had come down. [sic]

OSBI Lab people out of OKC did photo the scene and they just had a field day picking up bones. **No diagrams.** The OSBI agent out of McAlester never showed up at the scene. Mr. Peterson believes that the bones are en route to OKC but didn't know for sure. The sheriff didn't know where the bones were but thought that the OSBI had them. Notified the OSBI in OKC & spoke with Rick Spense. He didn't have the bones but thought that the lab man David Dixon had them. I spoke with the Sheriff Orvall Rose who didn't know where they were.  Finally the OSBI found them in their lab and delivered them at 2040 by Ann Reed. Come to find out the bones were found by a trapper.

Several problems with this case:
#1 No one notified a county medical examiner which would've been more than happy to go to the scene.
#2 Since no one notified a medical examiner or the DA they had no legal authority to remove the body.
#3 This is Tulsa's jurisdiction so therefore the remains should've been transported to Tulsa.
#4 If this is not Donna Haraway, they've screwed up the crime scene.
#5 No one seems to give a "shit" and provide OCME with any information on Ms. Haraway.

(Dkt.# 123, Ex.# 46, at 10) (emphasis added).

The incompetence in processing and handling the Gerty crime scene is a critical failure by law enforcement given that very little physical evidence was found besides the skeletal remains. It continues a pattern of general disregard, or lack of professional capacity demonstrated by the police involved in this case from the initial call at McAnally's to the Gerty crime scene. [9] (Dkt.# 123, Ex.# 20). More importantly, no evidence of the flowered blouse described in Mr. Fontenot's confession was found at the scene further discrediting Mr. Fontenot's already weak and baseless confession. Due to the improper processing of the Gerty crime scene, it cannot be determined if Mrs. Haraway was murdered at this location, or her body was taken there.

Further, no bullet or casing was found potentially leading to the actual perpetrator. The medical examiner investigator's report detailing the careless and unprofessional scene processing was withheld from the defense. The investigator opined that any ability to determine what happened to Mrs. Haraway was lost by virtue of law enforcement's incompetence. Such inept police work coincides with the processing of the scene at McAnally's where evidence was destroyed rather than collected. (N/T 6/9/1985 at 103-110-111; J/T 1259-1240, 1422-23, 1439,

---

[9] The police failed to properly secure McAnally's after Mrs. Haraway's disappearance. They allowed customers to continue to use the store and allowed access Mr. Atkeson, the owner, to wipe down the counter and dispose of trash destroying valuable evidence. (N/T 6/10/1988 at 156; JT p. 1239-1240, 1422-23, 1439, 1441, 1447-48). Further, Ada police officers failed to follow up on witnesses who called in about what they saw in the store prior to Mrs. Haraway's disappearance.

1441, 1447-1448).

Another part of the original medical examiner's file not disclosed was the forensic anthropology report about the skeletal remains evaluated by Dr. Richard McWilliams.[10] His report indicates that the skeletal remains are of a woman who gave birth. There is no evidence that Mrs. Haraway had given birth at any time before her abduction.

> Skeletal remains examined this date revealed partial skeletal remains of an Indian white female less than 35 years of age and more likely 25 years of age. Marks on the pelvis indicated she had given birth to at least one child.

> INJURIES:

>> 1. Bullet entrance wound at the left lambdoidal suture and exit wound at the right coronal suture.

>> 2. A scalloped cut wound on the superior rim of the left 6th or 7th rib.

(Dkt.# 123, Ex.# 46, at 12). As documented in Mr. Fontenot's Second Amended Complaint, Dr. McWilliams, a forensic anthropologist, wrote a text book regarding the evaluation of human bones for the purposes of identification. (Dkt.# 123, Ex.# 25). *Forensic Anthropology: The Structure, Morphology, and Variation of Human Bone and Dentition*, Mahmoud El-Najjar and K. Richard McWilliams, (1978). Per both doctors' research, the evaluation of skeletal remains permit not only the determination of gender, but whether a woman has experienced childbirth.

> Another kind of pitting occurring in the innominate is parturition or postpubic pits. This is one or usually more deep pits found on the posterior surface of the pubic bone roughly parallel to the edge of the pubic symphysis. Angel (1969) and Stewart (1957, 1970) agree that these pits are associated with childbirth trauma and therefore are diagnostic of female pelvis.

> Nemeskeri (1972) has published a five-stage scheme for estimation of the number of pregnancies a female has experienced. The method is based upon observed degenerative changes in pubic symphyses in adult female innominates which are assumed to be attributable to pregnancy. Nemeskeri observed that the number of pregnancies he attributed to each stage remained to be verified by control investigation in autopsy material.

---

[10] The ME's Office states that all photographs, x-rays, bench notes, and any further documentation other that the report itself is missing pertaining to Denice Haraway's case.

*Id.* at 81-82. Further, Petitioner states that "according to the Smithsonian Institute, the back pelvic bones would show marks where the ligaments tore during natural childbirth. *See* Smithsonian Nation Museum of Natural History, http://anthropology.si.edu/writteninbone/difficult_births.html (last visited 2013)." Anthropologists consistently evaluate the pelvic bones not only to ascertain gender, but to tell more about the skeletal remains of the person. *Id.*

This previously undisclosed evidence is a startling revelation in this case. If Mrs. Haraway was three months pregnant at the time of her abduction, which the evidence indicated, then it was impossible for Mr. Fontenot to have killed Mrs. Haraway on April 28, 1984. Such information is crucial not only in determining what caused her death but, equally important, what happened to her prior to her death. Combined with the newly obtained evidence showing that the APD and OSBI mishandled the evidence collection at both crime scenes, it is apparent that law enforcement deprived Mr. Fontenot of the ability to argue an alternate suspect and motive for Mrs. Haraway's abduction and murder.

That Mrs. Haraway's pelvic bones showed indications of natural childbirth is newly discovered evidence of innocence. Her friends and family are adamant that she did not have a child prior to her disappearance. However, shortly before her disappearance, Mrs. Haraway informed Karen Wise, convenience store clerk at J.P.'s, that she was three months pregnant. (Dkt.# 123, Ex.# 2). Ms. Wise shared this information with her best friend, Vickie Blevins. (Dkt.# 123, Ex.# 2). Given the evidence of natural childbirth from the marks on her pelvis, it is possible Mrs. Haraway had a child sometime before her skeletal remains were found in Gerty, Oklahoma over a year and a half after her disappearance and months after Mr. Fontenot was in custody.

Such evidence undermines the state's entire theory as to the motive of Mrs. Haraway's kidnapping and what happened to her in the months leading up to her death. The

State's failure to disclose the entirety of the medical examiner's report deprived the defense of meaningful avenues of investigation regarding the motive of Mrs. Haraway's abductor along with impeachment evidence regarding the processing of the Gerty crime scene. Had a jury been presented with such evidence, there is a reasonable probability of a different result due to the weakness in the prosecution's theory of the case.

"The miscarriage of justice exception …survived the AEDPA's passage." *McQuiggin v. Perkins*, 569 U.S. at 393. "A prisoner's proof of actual innocence may provide a gateway for federal habeas review of a procedurally defaulted claim of constitutional error." *House*, 547 U.S. at 537-538. Accordingly, the Court finds Mr. Fontenot has overcome all procedural bars as "[s]ensitivity to the injustice of incarcerating an innocent individual should not abate when the impediment is AEDPA's statute of limitations." *McQuiggin v. Perkins*, 569 U.S. at 393.

## II.      EXHAUSTION OF STATE COURT REMEDIES

Respondent alleges Petitioner's Second Amended Petition contains three claims that have not been presented to the state courts, rendering it a "mixed petition" containing unexhausted claims. Specifically, the Respondent contends Mr. Fontenot did not raise the claims of; (1) ineffective assistance of appellate counsel [11]; (2) the imposition of the bar of laches by the State

---

[11]. Respondent argues that Mr. Fontenot's claim of ineffective assistance of appellate counsel is unexhausted. However, the Court finds Mr. Fontenot fairly presented this claim in both his amended and state post-conviction petition and his opening brief to the Oklahoma Court of Criminal Appeals. Thus, Mr. Fontenot presented the substance of the constitutional claim in state court. *See Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006). The state court is not obligated to rule on the claim for it to be rendered exhausted. A petitioner is only required to submit the constitutional basis and facts to the state court in order to satisfy the exhaustion requirement. Further, a simple reading of the state amended application for post-conviction relief shows that the ineffective assistance of appellate counsel was fairly raised in the petition, as the petition clearly asserts that appellate counsel was ineffective for failing to investigate and use the evidence asserted as the basis for the ineffective assistance of trial counsel claim. Mr. Fontenot's counsel alleged in the Amended Brief  in Support of Application for Post Conviction Relief that Mr. Fontenot's Sixth Amendment right to effective assistance of counsel was violated when his trial counsel failed to investigate the case and present viable evidence supporting his innocence. (Dkt.# 99, Exhibit #2 at 59). After discussing the many errors committed during the trial counsel continued, "It is the defense counsel's duty to investigate all aspects of the State's case including physical evidence introduced at trial… Further, appellate counsel, likewise should have pursued this evidence in building a defense for Mr. Fontenot. *Id*. at 69. Supporting exhibits from appellate counsel were attached to the claim. Finally, the Court finds this claim is also considered exhausted because Mr. Fontenot has satisfied the "miscarriage of justice exception" by establishing his actual innocence. See infra.

Courts did not prevent Petitioner from fully developing his actual innocence, *Brady*, or any other federal claim in the state courts, and (3) *Brady* claim based on newly discovered evidence presented in the instant case. The Court finds, however, that Mr. Fontenot's Second Amended Petition can be reviewed on the merits due to the futility of exhaustion, Fed.R.Civ.P.15(b) and (c), and Fed.R.Civ.P. 60(b) and 60(d).

### A. Futility

According to 28 U.S.C., Section 2254 (c ), constitutional claims must be fairly presented to the state court prior to being raised in a federal habeas corpus petition. *See Picard v. Connor*, 404 U.S. 270, 277-278 (1971); *Rose v. Lundy*, 455 U.S. 509 (1982). Although interests of federalism and comity create a presumption in favor of requiring a petitioner to exhaust available state remedies, the failure to exhaust is not an absolute bar to federal jurisdiction over a habeas petition. *See Granberry v. Greer*, 481 U.S. 129, 141 (1987)(failure to exhaust does not deprive appellate court of jurisdiction to consider merits of habeas corpus application); *Harris v. Champion*, 15 F.3d 1538, 1554-55 (10th Cir. 1994)(exhaustion is based on principles of comity; exhaustion is not jurisdictional). Courts recognize it is futile for a petitioner to return to state post-conviction when state courts fail to provide substantive review of constitutional claims. *See Bear v. Boone*, 173 F.3d 782, 785 (10th Cir. 1999).

If a state routinely imposes a procedural bar on those claims which are being exhausted, the exhaustion requirement may be bypassed. *See Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) ("An exception is made only if there is no opportunity to obtain redress in state court, or if the corrective process is so clearly deficient as to render futile any effort to obtain relief."); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Harris v. Reed*, 489 U.S. 255, 269 (1989) concurring opinion. Okla. Stat. tit. 22, Section 1086 delineates when successor post-conviction applications

are permitted.

> All grounds for relief available to an applicant under this act must be raised in his original, supplemental, or amended petition. Any ground not so raised, or knowingly, voluntarily, and intelligently waived in this proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted **which for sufficient reason was not asserted or was adequately raised in the prior application.** (emphasis added).

Oklahoma's successor state post-conviction process is ineffective in providing any hope of substantive review of Mr. Fontenot's constitutional claims. As discussed *infra,* Mr. Fontenot has alleged sufficient reasons either for not asserting these claims, or proving they were adequately raised in the prior application.

Mr. Fontenot asserts it would be futile to proceed with a state post-conviction action because the claims would be procedurally barred based upon the consistent pattern and practice of the OCCA. The Court agrees the claims that Respondent asserts Mr. Fontenot needs to exhaust would be procedurally barred in a successor application. *See Johnson v. State*, 823 P.2d 370, 372 (Okla. Crim. App. 1991); *Moore v. State*, 889 P.2d 1253 (Okla. Crim. App. 1995). Therefore, the Court finds a return to state court is futile, and federal habeas relief is available. 28 U.S.C., Section 2254(b)(1)(B)(ii).

Specifically, if Mr. Fontenot returned to state post conviction on a successor action to exhaust his claims, those claims would be procedurally barred based upon a consistent pattern and practice of the Oklahoma Court of Criminal Appeals ("OCCA"). In fact, Mr. Fontenot's Post Conviction Application in which he already raised both a *Brady* violation and an ineffective assistance of appellate counsel claim, was denied based upon laches. In a 2 page order, the state court, without discussion, while discovery was ongoing, and without ruling on the pending summary judgment motion, denied Mr. Fontenot's application for post conviction relief. (Dkt.#

99, Exhibit # 8). The court stated, "Simply too much time has elapsed due to Petitioner's own inaction." *Id.* This two page order is dated December 31, 2014, the day before the state court judge retired. Now, approximately 4 ½ years later, Mr. Fontenot is still receiving evidence from the State in the instant litigation.

Mr. Fontenot contends the futility is further illustrated by the habeas litigation of Petitioner Beverly Moore's actual innocence claim in the Western District of Oklahoma in *Beverly Michelle Moore v. Warden Millicent Newton-Embry*, Western District Court Case No. CIV-09-985-C; (Dkt.# 148, Respondent's Br. at 85). The federal district court found that Ms. Moore established the actual innocence gateway but was concerned about her unexhausted constitutional claims. She consequently filed a second state post conviction petition in the state district court.

**After almost six years of litigating her unexhausted claims**, the state district court found all of Ms. Moore's claims procedurally barred. During this process, Ms. Moore repeatedly requested that the federal court find the state post-conviction proceeding inadequate to provide any substantive review of her constitutional claims. The unnecessary delay in the state evidentiary hearing process due to the decisions to bifurcate based on the elements of each constitutional claim, scheduling issues, and transcript complications demonstrates the failings of the state process to promptly handle successor claims. Based on the similarity of Mr. Fontenot's claims and Ms. Moore's, Mr. Fontenot would face the same procedural bar imposition by the OCCA.

When the highest state court can be counted on to impose a procedural bar, exhaustion is futile. *See Goodwin v. Oklahoma*, 923 F.3d 156, 157 (10th Cir. 1991)(exhaustion is not required "where the state's highest court has recently decided the precise legal issue petitioner seeks to raise in his federal habeas petition."); *Richie v. Simmons*, 563 F.Supp. 2d 1250, 1274 (ND OK 2008)(finding that an ineffective assistance of counsel claim concerning undiscovered statements would be procedurally defaulted by state courts concerning exhaustion); *Rojem v. State*, 925 P.2d

70 (Okla.Crim.App. 1996); *See e.g., Granberry v. Greer*, n. 8 , *citing Marino v. Ragen*, 332 U.S. 561, 564 (1947)(Rutledge, J., concurring)(exhaustion should not be required "whenever it may become clear that the alleged state remedy is nothing but a procedural morass offering no substantial hope of relief." ).

Even in capital cases where new evidence is found in federal habeas proceedings establishing a *Brady* violation, a return to state court in a successor petition results in the imposition of a procedural bar. In *Douglas v. Workman*, the OCCA denied both Mr. Powell's and Mr. Douglas' successor applications on strictly procedural grounds, holding that the claims were barred by Rule 9.7(G)(3), Rules of the Court of Criminal Appeals, 22 Okla.Stat. Ch. 18 app'x (2003), which requires successive post-conviction petitions to be filed "sixty (60) days from the date the previously unavailable legal or factual basis serving as the basis of the claim for the new issue is ….discovered." *Douglas v. Workman*, 560 F.3d 1156, 1167-68, 1171-72 (10th Cir. 2009). There is no basis to find that the state court has any available means for substantive review through a successive state application.

Further, as Mr. Fontenot has argued his actual innocence, it constitutes a manifest injustice for him to return to state court thereby delaying his right to substantive review of his wrongful conviction. The failure to totally exhaust his state remedies does not divest this Court of jurisdiction over the merits of Mr. Fontenot's constitutional claims. *See Granberry v. Greer*, 481 U.S. 129, 131 (1987). In determining whether the "interests of justice" warrant requiring Mr. Fontenot to pursue additional state remedies, the Court considers the interests of comity and federalism. *Granberry*, 481 U.S. at 134, *Harris v. Champion*, 15 F.3d 1538, 1555-57 (10th Cir. 1994)(holding that excessive delays in the state system in resolving claims for relief justified the federal court excusing the prisoner from having to exhaust the state remedies). Similarly, this case presents unusual circumstances, or circumstances of peculiar urgency that warrant the federal

court taking action. *Granberry*, 481 U.S. at 134; *Harris v. Champion*, 48 F.3d 1127, 1133 (10th Cir. 1995)(noting that the federal court should determine whether "the interests of comity will be better served by hearing the merits of the claims); *see also, Granberry v. Greer* at 134, citing *Ex Parte Hawk*, 321 U.S. 114, 117 (1944)("this Court reiterated that comity was the basis for the exhaustion doctrine: **'it is a principle controlling all habeas corpus petitions to the federal courts, that those courts will interfere with the administration of justice in the state courts only 'in rare cases where exceptional circumstances of peculiar urgency are shown to exist.'"** (emphasis added). The entire basis for this Court entertaining this mixed petition at all is due to the continued behavior by state actors in failing to abide by numerous court orders and subpoenas to disclose records.

The Tenth Circuit has stated that a petitioner able to satisfy the "miscarriage of justice" standard could be excused from the habeas exhaustion requirement. *See Gradiz v. Gonzales*, 490 F.3d 1206, 1209 (10th Cir. 2007)(looking to habeas law to carve the exception to statutory exhaustion requirement under the Immigration and Nationality Act). The Seventh Circuit has also determined that "actual innocence" is a ground upon which a federal court can relax the total exhaustion requirement. *Milone v. Camp*, 22 F.3d 693, 699-701 (7th Cir. 1994). Moreover, it should be noted that the exhaustion rule and the procedural default rule both serve the same general purposes of principles of comity and federalism. *See e.g. Edwards v. Carpenter*, 529 U.S. 446 (2000), and there is no question actual innocence serves as a narrow exception to the procedural default rules. *House v. Bell*, 547 U.S. 518, 536-67 (2006); *Schlup,* 513 U.S. 298 (2005). In fact, "[i]f petitioner is actually innocent of the crime for which he was convicted, it may be a 'fundamental miscarriage of justice' for a federal court not to entertain his constitutional claims." *Milone v.Camp*, 22 F.3d at 700. Because Mr. Fontenot satisfies the "miscarriage of justice" exception by establishing his actual innocence, he has established the unique and

compelling circumstances sufficient to warrant being excused from having to return to state court.

### B. Federal Rule of Civil Procedure 15

In *Banks v. Dretke*, 540 U.S. 668, 704 (2004), the United States Supreme Court found Fed.R.Civ.P. 15(b) applicable in federal habeas proceedings. Fed.R.Civ.P. 15(b)(2) provides that "when an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move –at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue." Further, Fed.R.Civ.P. 15(c)(1) provides that an amendment to a pleading relates back to the date of the original pleading when …the amendment asserts a claim or defense that arose out the conduct, transaction, or occurrence set out ---**or attempted to be set out**—in the original pleading.' (emphasis added).

In the instant case, Mr. Fontenot presented his *Brady* claim both to the state district court and the OCCA in his request for post conviction relief. See further discussion *Brady* claim *infra* at pp. 62-118). However, On January 31, 2019, over four and half years from the initial state court order, and two years from the federal subpoena authorized by this Court, Mr, Fontenot's counsel became aware the Ada Police Department had released police reports to counsel for Thomas Ward, Mr. Fontenot's co-defendant pursuant to a joint discovery motion. Respondent was served with the Ward subpoenas requesting discovery from various law enforcement agencies, including the Ada Police Department. **After decades of discovery requests by Mr. Fontenot, and years after the instant litigation began in this court, over 300 pages of police reports were disclosed by the City Attorney of Ada to Ward's counsel and Respondent on January 4, 2019. At no time did Respondent or the City Attorney for Ada contact Mr. Fontenot's counsel regarding the discovery of the Ada Police Reports.** Laches is an equity defense based upon the premise

that the undo delay penalizes the state. However, unclean hands negate an assertion of laches as the Respondent's actions contributed to the malfeasance or severe wrongdoing regarding the claims at issue.

Mr. Fontenot's counsel, and this Court were extremely surprised to learn of the "discovery" of the Ada Police Department Reports since Mr. Fontenot had served this Court's subpoena to the Ada Police Department in February 2017 and received nothing in response. (Dkt.# 114, Ex.# 3). Further, counsel for Respondent was aware of the 2017 subpoenas because he had been provided copies of them by Mr. Fontenot's counsel.

Respondent did not forward the 300 pages of new discovery to Mr. Fontenot's counsel until contacted by him; nearly a month after receiving the documents himself. It is important to note that Respondent's attorney is counsel in both the instant case and in Mr. Ward's state post-conviction proceedings. As such, he agreed to discovery in Mr. Ward's case in much the same manner as he did in Mr. Fontenot's case. (Dkt.# 114, Ex.# 5). Further, he knew a state court subpoena had been issued to the Ada Police Department in late November 2018. *Id*. Yet, counsel did not notify opposing counsel, or this Court of the Ada Police Department's disregard of this Court's subpoena. Instead, Mr. Fontenot's counsel learned of the undisclosed documents' existence from Mr. Ward's counsel.

A repeated pattern of failing to comply with court orders and subpoenas has plagued the State for over three decades, and resulted in the necessity of the Second Amended Petition. During state post-conviction, Mr. Fontenot requested the very records from the Ada Police Department that are now at issue. Post-conviction counsel was told the records did not exist. (Dkt.# 150, Ex.# 5). Mr. Fontenot again sought these records in the instant federal habeas corpus proceedings. The City of Ada Attorney informed counsel there were no records. (Dkt.# 150, Ex.# 6).

The nondisclosure is a direct violation of this Court's subpoena to the Ada Police

Department and the state court order which focused on these very documents. (Dkt.# 114, Ex.#s 1, 2). In his March 17, 2017, response to this Court's subpoena, the Ada City Attorney stated that, "I inquired of Chief Miller regarding the requested documents and he has informed me that the City of Ada Police Department no longer has any of the documents requested. (Dkt.# 150, Ex.3). The Ada Police Department had similarly told counsel in Mr. Fontenot's state post-conviction proceedings that there were no records to be produced. That the police department has now "found" records for Mr. Fontenot's co-counsel that were "unavailable" in the instant and prior proceedings is troubling. "A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Banks v. Dretke*, 540 U.S. at 696.

A claim keeps its exhausted status so long as the newly developed facts do not fundamentally alter the claim reviewed by the state courts. *See generally, Vasquez v. Hillery*, 474 U.S. 253, 260 (1986). This Court finds these new documents provide supplemental evidence and do not fundamentally alter Mr. Fontenot's *Brady* claim already considered by the state courts. Further, pursuant to Fed.R.Civ.P. 15(c)(1), these documents relate back to Mr. Fontenot's original *Brady* claim as they "arose out of the conduct, transaction, [and] occurrence set out --- or attempted to be set out—in the original pleading." *Id.*

Finally, the Tenth Circuit Court of Appeals has also concluded that there are circumstances a claim raised in an initial habeas petition can be supplemented. *Douglas v. Workman*, 560 F.3d 1156, 1187 (10th Cir. 2009). In such instances, defendants are not subject to the exhaustion requirements of the AEDPA.

In reaching this conclusion, we note the AEDPA itself 'does not define the terms 'second or successive.'" *United States v. Lopez*, 534 F.3d 1027, 1033 (9th Cir. 2008), *reh'g granted*, 301 Fed.Appx. 587, 588 (9th Cir. 2008); *see also Panetti v. Quarterman*, 551 U.S. 930 (2007)(noting that "[t]he phrase 'second or successive' is not self-defining," but "takes its full meaning from

[the Supreme Court's] case law, including decisions predating the enactment of [AEDPA]"); *United States v. Scott*, 124 F.3d 1328, 1329 (10th Cir. 1997)(noting AEDPA "does not define what is meant by 'second or successive'"). And "[t]he [Supreme] Court has declined to interpret 'second or successive' as referring to all Section 2254 applications filed second or successively *in time*, even when the later filings address a state-court judgment already challenged in a prior Section 2254 application. *Panetti,* 127 S.Ct. at 2853 (emphasis added). In deciding whether a pleading should be deemed a second or successive pleading subject to 28 U.S.C. Section 2244(b)'s restrictions, the Supreme Court instead looks to the purposes of AEDPA, which are "to further the principles of comity, finality, and federalism." *Id.* at 2854 (quotation marks omitted). The Court has further indicated that "[t]hese purposes, and the practical effects of our holdings, should be considered when interpreting AEDPA. **This is particularly so when petitioners run the risk under the proposed interpretation of forever losing their opportunity for any federal review…"** *Id.* **(quotation marks omitted)(addressing a situation where petitioners might forever lose review of their unexhausted federal habeas claims). The Court has, thus, "resisted an interpretation of the statute that would produce troublesome results, create procedural anomalies, and close our doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent.** *Id.* **(quotation omitted);** *see also Castro v. United States***, 540 U.S. 375, 380-81 (2003).**

*Id. at* 1187-1188 (emphasis added).

In *Douglas* the Tenth Circuit Court of Appeals was specifically addressing a claim of prosecutorial misconduct which the defendant had raised in his initial habeas petition. Defendant was allowed to supplement his previously asserted prosecutorial misconduct claim with his newly discovered *Brady* allegations, which involved proven willful misconduct by the prosecutor. The defendant in *Douglas* discovered the existence of an agreement between a key witness and the prosecutor which the "State not only suppressed [ ] by presenting false, uncorrected testimony denying the existence of any deal between the prosecutor and Smith, it also relied heavily on the lack of any deal in vouching for the credibility of [the witness]. The denial of the opportunity to impeach [the witness] on the evidence clearly prejudiced [the defendant]. *Id*. at 1187.

The Court concluded that *Brady* requires disclosure of tacit agreements between the prosecutor and a witness. *Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009). In light of the materiality and prejudice caused by such agreements the Court found it was appropriate to treat the defendant's *Brady* claim as a supplement to his prosecutorial misconduct claim first

raised in his initial habeas petition. "The threat of incorrect jury verdicts is further increased by tacit agreements, because when testifying, a witness whose agreement is tacit, rather than explicit, can state the he has not received any promises or benefits in exchange for his testimony …Likewise the prosecutor can argue to the jury that the witness is testifying disinterestedly, which artificially increases the witness's credibility –artificially, that is, because the premise of the argument is false." *Id*. at 1186-1187 citing *Bell v. Bell*, 512 F.3d 223, 244-45 (6th Cir. 2008).

As will be discussed *infra* at pp. 102-108, the prosecutor in this case, as in the *Douglas* case, is alleged to have had a tacit agreement with a key witness, Terri Holland (formerly Terri McCartney), who testified against Mr. Fontenot in his preliminary hearing and joint trial. She claimed to have heard Mr. Fontenot speak about his involvement in Mrs. Haraway's abduction and murder. (P/H 888-931). Ms. Holland also testified there was no deal between her and the prosecutor, which testimony was never corrected by the prosecution. Ms. Holland was specifically asked, "Were there any deals made by you and the District Attorney's Office, any agreements, any considerations, any agreements not to file or proceed on an "after former" charge against you?" (PH at 896). Ms. Holland answered , "No." *Id.*

Ms. Holland had a history of being a snitch. At the same time she claimed to have heard Mr. Fontenot confess, she also claimed to have heard Ron Williamson make incriminating comments about his involvement in Debbie Carter's murder. Her testimony in the *Williamson* case proved to be false. *See Williamson v. Reynolds*, 904 F.Supp. 1529 (E.D. OK 1995). In fact, the same District Attorney's Office used her testimony in both Mr. Williamson's and Mr. Fontenot's cases.

Ms. Holland was interviewed by Pontotoc County District Attorney Investigator Lloyd Bond and Pontotoc County Sheriff Deputy Tom Turner. (P/H 883-884, 897-898). Deputy Turner's interview report was included in the OSBI reports that Mr. Fontenot's counsel obtained

in the instant case, which were not a part of the prosecutorial report and had not been given to the defense. (Dkt.# 123, Ex.# 44 at 282-289). Ms. Holland's statement as recounted by Deputy Turner in his report has numerous inconsistencies with her preliminary hearing and trial testimony. Although the prosecutorial table of contents references Ms. Holland's videotaped statements, the State divulged no such videotape statement to defense counsel.

Because of Ms. Holland's history as a snitch, her testimony was used by the prosecution to bolster an uncorroborated confession. She was placed in a cell near Mr. Fontenot for this very purpose. As part of the newly produced *Brady* material provided to this Court is an affidavit from Ms. Holland's husband who represents Ms. Holland (now deceased) committed perjury when she testified in Mr. Fontenot's preliminary hearing and joint trial. He states that because of an agreement she had with the prosecutor; that if she testified against Mr. Fontenot, he would be released from jail and they could marry. *See infra* at 108. Furthermore, Mr. Holland's charges and plea agreement were found in the Pontotoc County District Attorney's file made available during the instant proceedings. (Dkt.# 86 at 30-31). These documents support Mr. Holland's statement of the benefits received and the timing of when he received them.

As in the *Douglas* case, the prosecutor in Mr. Fontenot's case also acted willfully, and not just negligently or inadvertently. His conduct warrants special condemnation and justifies permitting Mr. Fontenot to supplement his habeas petition. "It has long been established that the prosecutor's deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with the rudimentary demands of justice." *Id*. at 1190, citing *Banks v. Dretke*, 540 U.S. 668, 694 (2004)(quoting *Giglio*, 405 U.S. at 153).

### C. Fraud on the Court

The prosecutor's knowing use of false testimony involves, not "just" prosecutorial

misconduct, but "more importantly … [the] corruption of the truth seeking function of the trial process." *Douglas v. Workman*, 560 F.3d at 1191 citing *United States v. Agurs*, 427 U.S. 97, 104 (1976). Further, it was the prosecutor's conduct in this case in taking affirmative action, after Mr. Fontenot's trial, to conceal the tacit agreement made in exchange for Terri Holland's testimony that prevented Mr. Fontenot from discovering the *Brady* claim in time to assert that claim originally in his first habeas petition. In light of these circumstances, it is appropriate to treat this newly discovered evidence as a supplement to Mr. Fontenot's original *Brady* claim, instead of requiring exhaustion. To hold otherwise, "would be to allow the government to profit from its own egregious conduct." *Id*. at 1193. There continue to be disclosures of exculpatory and impeachment evidence starting with Mr. Fontenot's second appellate process and continuing through these proceedings**.**

"The prosecutor's conduct at issue here, then, is akin to a fraud on the federal habeas courts; that is, the prosecutor took affirmative actions to conceal his tacit agreement with the state's key witness until it was too late, procedurally, for [the defendant] to use that undisclosed agreement successfully to challenge his capital conviction." *Id.* In other circumstances, the Supreme Court has noted that fraud on a federal habeas court might exempt a petitioner from meeting the strict limitations AEDPA places on second and successive requests for habeas relief. *Douglas v. Workman*, 560 F.3d at 1193. Additionally, as discussed *supra,* the State in this case flagrantly disregarded the federal subpoena issued by this Court. At the very least, new evidence has been presented which is over 30 years old, the subject of numerous State and Federal court orders, and was withheld from Mr. Fontenot and the Courts. The newly discovered evidence recently discovered by the City of Ada was not divulged to this Court by the State.

While the fraud on the court cases may, or may not apply directly to the circumstances of this case, they lend support to this Court's decision to treat Mr. Fontenot's *Brady* claim as part of

his initial request for habeas relief. See *Douglas v. Workman*, 560 F.3d at 1193. "Where a prisoner can show that the state purposefully withheld exculpatory evidence, that prisoner should not be forced to bear the burden of section 2244, which is meant to protect against the prisoner himself withholding such information or intentionally prolonging the litigation. *Id.* citing *Workman v. Bell*, 227 F.3d 331, 335 (6th Cir. 2000). Further,

> fraud upon the court calls into question the very legitimacy of a judgment. That characterization of the situation which arises when the prosecution fails to reveal exculpatory evidence to the defense would seem to satisfy, at least in spirit, the requirement of section 2244. The difference between questions of fraud upon the court and ordinary newly-discovered evidence situations is that an allegation of fraud upon the court casts a dark shadow over the prosecution's intentions. The situation suggests that a judgment may have been reached with the assistance of a prosecutor who may not have had the intention of finding the true perpetrator. Such a judgment is inherently unreliable, and therefore satisfies the requirements of section 2244 in spirit. *Id.* Moreover, [p]rosecutors are subject to constraints and responsibilities that don't apply to other lawyers. While lawyers representing private parties may --- indeed, must ----do everything ethically permissible to advance their client's interests, lawyers representing the government in criminal cases serve truth and justice first. The prosecutor's job isn't just to win fairly, staying well within the rules. As Justice Douglas once warned, "[t]he function of the prosecutor under the Federal Constitution is not to tack as many skins of victims as possible to the wall. His function is to vindicate the right of people as expressed in the laws and give those accused of crime a fair trial.

*Douglas v. Workman*, 560 F.3d at 1194, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 648-49 (1974)(Douglas, J. dissenting).

For similar reasons, in this case, which involves fraud perpetrated on Mr. Fontenot and this Court, Mr. Fontenot is permitted to supplement his *Brady* claim with all the newly discovered evidence produced in the instant case. *See also, United States v. Smiley*, 553 F.3d 1137, 1144 (8th Cir. 2009), where the court agreed that defendant's fraud on the court motion was not a second or successive petition and "reasoned that the fact the case involved a criminal sentencing process, rather than a civil proceeding such as in *Hazel-Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238 (1944) was inconsequential, …and as such, is not a second or successive 2255 motion." The Supreme Court, as long ago as *Mooney v. Hologan* 294 U.S. 103, 112 (1935), stated that deliberate deception of a court by the presentation of false evidence is incompatible with "rudimentary

demands of justice." This was reaffirmed in *Pyle v. Kansas*, 317 U.S. 213 (1942).

The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *(*Napue v. Illinois, 360 U.S. 264, 269 (1959). Tampering with the administration of justice in the manner indisputably alleged here involves far more than an inquiry to a single litigant." It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud."

*Hazel-Atlas*, 322 U.S. at 246.

III. **MR. FONTENOT'S FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED WHEN THE PONTOTOC COUNTY DISTRICT ATTORNEY'S OFFICE WITHELD EVIDENCE IN VIOLATION OF** *BRADY V. MARYLAND*.

The Due Process Clause of the Fourteenth Amendment requires prosecutors to disclose to the defense all evidence favorable to the accused concerning guilt and penalty. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). This duty extends to, " all stages of the judicial process." *Pennsylvania v. Ritchie*, 480 U.S. 39, 60, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987); *see also Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997). There are three elements of a *Brady* violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) *quoting Strickler*, 527 U.S. at 281-82 (1999). Due process also places upon the prosecutor a corresponding duty to correct false or misleading evidence that is harmful to the defendant. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

A prosecutor has an independent obligation to locate *Brady* materials within the possession of law enforcement.

Third, the "prosecution" for Brady purposes encompasses not only the individual prosecutor handling the case, **but also extends to the prosecutor's entire office**, .

. . as well as law enforcement personnel and other arms of the state . . . to the text of the note involved in investigative aspects of a particular criminal venture. Logically, then, it follows that because """**investigative officers are part of the prosecution, the taint on the trial is no less if they, rather than the prosecutors, were guilty of nondisclosure.**"'

*Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d 801, 824 (10th Cir. 1995); *see also United States v. Buchanan*, 891 F.2d 1436, 1442 (10th Cir. 1989)(discussing the failure on the part of law enforcement to disclose *Brady* materials falls upon the prosecutor).

The prosecution's failure to disclose police reports of alternate suspects with connections to the victim is a *Brady* violation as that evidence is potentially exculpatory, impeachment of the quality of a police investigation, and aids a defense investigation. *See Smith*, 50 F.3d. 801 at 829-830; *see also Bowen v. Maynard*, 799 F.2d 593, 612-13 (10th Cir. 1986). Given that multiple police agencies often investigate a criminal matter, it is incumbent upon the prosecutor to ensure that *Brady* materials are obtained for disclosure to defense counsel in accordance with the Fourteenth Amendment. *See Smith* at 824; *see also United States v. Thornton*, 1 F.3d 149, 158 (3d Cir. 1993), holding that prosecutors are obligated to conduct a "thorough inquiry" of police for *Brady* materials); *United States v. Osorio*, 929 F.2d 753, 762 (1st Cir. 1991); *see generally Tiscareno v. Anderson,* 639 F.3d 1016, 1022 (10th Cir. 2011) (discussing other state actors who worked on a criminal matter that would fall within *Brady's* obligations).

The U.S. Supreme Court holds that a prosecutor fails his *Brady* obligation when he does not obtain exculpatory, impeachment evidence that aids a defense during the pretrial process and disclose to the defense. *See U.S. v. Bagley*, 473 U.S. 667, 675 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995); *Williams v. Whitley*, 940 F.2d 132 (5th Cir. 1991); *United States v. Brooks*, 296 U.S. App. D.C. 219, 966 F.2d 1500, 1500-04 (D.C. Cir. 1992) holding a prosecution's duty to learn of *Brady* evidence includes files of the police department's homicide and internal affairs divisions). That a state court rule or law excused a prosecutor from having to

disclose any evidence to defense counsel does not supersede that prosecutor's obligations under the United States Constitution.

A prosecutor who adopts an open-file policy of disclosure does not remove his obligations under the Due Process Clause of the Fourteenth Amendment.

> We certainly do not criticize the prosecution's use of the open file policy. We recognize that this practice may increase the efficiency and the fairness of the criminal process. We merely note that, if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.

*Strickler v. Greene*, 527 U.S. 263, 283 fn. 23; *see also Banks v. Dretke*, 540 U.S. 668, 693 (2004) (defense counsel may rely on the prosecution's assertion that *Brady* evidence will be disclosed). Therefore, if a prosecutor utilized an open-file policy, the defense and courts will rely on that assertion as an assurance that all exculpatory, impeachment, and evidence that aids the defense will be within the file. That reliance extends to a defendant's post-conviction counsel. *See Strickler*, 527 at 284.

The prosecution is obligated to disclose impeachment evidence as well. For evidence to be considered material, it does not have to "reflec[t] upon the culpability of the defendant. Exculpatory evidence includes impeachment evidence that is material to the case against the accused." *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). Impeachment evidence is evidence that can be used to challenge the credibility of a prosecution witness or that can be used to challenge the prosecution's case. *Bagley*, 473 U.S. at 676 (*Brady*'s disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness). There is no distinction between exculpatory and impeachment evidence under the Due Process Clause of the Fourteenth Amendment. *See Kyles*, 514 U.S. at 433.

Evidence is material under *Brady* when it could "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler v. Greene*, 527 U.S. at 290. "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 at 434, *quoting Bagley*, 473 U.S. at 678. Withheld evidence is material whenever it would have affected the course of the defense investigation, or the strategy defense counsel would have employed at trial. *See Bagley*, 473 U.S. at 683; *United States v. Perdomo*, 929 F.2d 967, 97 (3d Cir. 1991) "[T]he *Bagley* inquiry requires consideration of the totality of the circumstances, including possible effects of nondisclosure on the defense's trial preparation." *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992); *see also Smith*, 50 F.3d at 827 (*Brady* violation found when withheld evidence affected defense preparation or presentation).

In determining the merits of Mr. Fontenot's claim under *Brady*, "[t]he question is not whether [Mr. Fontenot] would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 437. The Court should not evaluate the evidence item-by-item, but in terms of its cumulative effect on the fairness of the trial. *Id.* at 436. For Mr. Fontenot to be entitled to a new trial, he only has to meet the standard ----- whether it would have affected the judgment of the jury.

In this case, *Brady's* materiality prong is satisfied by the fact that the prosecution withheld evidence on several key points. Had Mr. Fontenot's defense counsel been provided the evidence presented below, he could have shown an alibi defense clearly establishing his whereabouts when Mrs. Haraway disappeared. Further, substantial impeachment and exculpatory evidence suppressed or ignored by the prosecution would have certainly affected the jury's judgment of guilt on all the charges.

**A.     The Pontotoc District Attorney's Office Did Not Disclose *Brady v. Maryland* material as a Matter of Policy.**

The Pontotoc County District Attorney's Office had a pattern and practice of not divulging documents gathered from a variety of law enforcement agencies. This pattern began during Mr. Fontenot's 1985 pretrial proceedings, his 1987 retrial proceedings, his 1992 resentencing, his 2014 post-conviction proceedings, and has continued throughout the current proceedings. Despite assurances of open file policies, or full compliance with *Brady v. Maryland* made by both Mr. Peterson and Mr. Ross, documents that were and continue to be exculpatory, impeachment, and aid defense counsel remained in their custody.[12] (Dkt.# 123, Ex.#s 78 at 14, 37; Ex.# 79 at 21, 25, 52-53). Despite the prosecution's claim of ignorance about the police investigation and reports, the DA's investigator, Lloyd Bond assisted in the investigation of the disappearance of Mrs. Haraway alongside Ada Police Detectives Smith and Baskins.( Dkt.# 123, Ex.#s 62, 88). Because of the prosecution's alleged "hands off" approach to obtaining *Brady* materials, the likelihood that *Brady* materials would not be made available to defense counsel was all but assured.

The practice of the District Attorney's Office was to rely wholly on a "prosecutorial" when engaged in the charging and prosecution of a defendant. A prosecutorial was compiled through an OSBI regional office located in McAlester, OK. According to OSBI Agent Gary Rogers, all his interviews and reports, and reports from other agencies, were sent directly to the regional office and stored there. (Dkt.# 123, Ex.# 80, at 10). He explained how his regional

---

[12] The entirety of the Pontotoc County District Attorney's Office file concerning the prosecution of Mr. Fontenot, and his co-defendant, Mr. Ward, was copied pursuant to a federal subpoena. Within that file were Ada Police Reports and DA investigative files of witness statements and reports along with other documents that should have been made available to either Mr. Fontenot's or Mr. Ward's defense attorneys prior to trial.

supervisor edited and compiled the reports that became the prosecutorial. *Id.* at 10-11.

Once completed, it was sent directly from the regional office to the District Attorney's Office. *Id.* Mr. Peterson testified that the prosecutorial was the only document he used to charge Mr. Fontenot. (Dkt.# 123, Ex.# 78, at 15).

The District Attorney's reliance on law enforcement bringing files to them rather than pursuing information to ensure their compliance created a culture where volumes of documents were never seen by prosecutors, or if they were, they were pushed aside as irrelevant to the case they were building against Mr. Fontenot despite evidence to the contrary. (Dkt. 123*,* Ex.# 78, at 4-5). What resulted was a haphazard investigation where evidence in police custody was destroyed, interviews were mishandled, and proper police procedure was neglected. The consistent thread in Mr. Fontenot's collateral proceedings has been that OSBI conducted the investigation and whatever documentation was gathered was housed by OSBI. The OSBI compiled a "prosecutorial" summary of police reports, witness interviews, and relevant evidence on the suspect(s) they believed were involved in the criminal offense.(Dkt.# 213, Ex.# 78, at 10-12).

Even more egregious was the pattern of not disclosing the prosecutorial or any other discovery to defense counsel.(Dkt.# 123*,* Ex.# 78, at 48-49). This pattern and practice resulted in a systemic due process violation of Mr. Fontenot's constitutional rights. *See Miller-El v. Cockrell*, 537 U.S. 322 (2003)(explaining how the use of policy and practice of the prosecution to strike minority jurors supports a Batson constitutional violation), *Connick v. Thompson*, 131 S.Ct. 1350 (2011)(holding that deliberate indifference to the need for *Brady* training could result in a 42 USC § 1983). The only disclosures made to defense counsel during trial were court ordered and extremely limited in nature.

After repeated requests for Ada Police Reports and to the other law enforcement agencies to disclose their parts of the investigation, their reports were nevertheless, not made available. However, they did exist. ( Dkt.# 123, Ex.# 87). While not every document may be material to Mr. Fontenot, it illustrates that there were in fact separate files by the DA's investigator and the Ada Police Department within their custody during the trials. Those specifically pertaining to Mr. Fontenot will be discussed below.

### 1. Pontotoc District Attorney's failure to ensure *Brady* materials were obtained from law enforcement.

The OSBI and Ada Police Department conducted the investigation into Mrs. Haraway's disappearance and murder. The two primary law enforcement officers responsible were OSBI Agent Gary Rogers and Ada Police Detective Dennis Smith.[13] The Ada Police Department and OSBI kept separate files of all interviews conducted, evidence collected, and other aspects of the investigations, OSBI Agent Rogers was ultimately responsible for the case. (Dkt.# 123, Ex.# 53, at 33); (P/H p. 533-36, 947-948). The preparation of the prosecutorial was done by OSBI Agents. (Dkt.# 213, Ex.# 80, at 11-12, 19-20). The prosecutorial was comprised of the relevant police reports, witness statements, and documents that the OSBI administration deemed relevant for the district attorney's review. (Dkt.# 123, Ex.# 55, at 13, 56). These documents were edited and culled internally by other OSBI supervisors prior to the final prosecutorial report's release to the district attorney's office. (Dkt.# 123, Ex.# 29, at 968-978). Based on the evidence presented in the prosecutorial, and only that evidence, would the district attorney pursue charges. (Dkt.# 123, Ex.# 55, at 13, 56).The prosecutorial generated by OSBI from the police investigation into the abduction and homicide of Donna Denice Haraway consisted of approximately 146 pages. (Dkt.# 123, Ex.#

---

[13] These two officers led the investigation into the Debbie Carter homicide which occurred prior to Mrs. Haraway's abduction from McAnally's.

43). However, discovery has revealed there were hundreds of police reports from the various law enforcement agencies that investigated the case that were not included in the prosecutorial by the OSBI, and ultimately not available to Mr. Fontenot's defense counsel.

Pontotoc County District Attorney Peterson testified that he relied solely on OSBI Agent Roger's prosecutorial report to charge and prosecute Mr. Fontenot. (Dkt.# 123, Ex.# 78, at 11-12). His reliance on the prosecutorial would not be problematic if he had ensured his officers provided him with the evidence necessary for his compliance with his *Brady* obligations. In a prior deposition taken on this very issue, Mr. Peterson admitted understanding his obligations under *Brady* and its progeny, but failed to actively pursue such evidence from the various law enforcement agencies investigating cases in his jurisdiction.[14] (Dkt.# 123, Ex.# 55, at 142-143). Mr. Peterson took very little active measures to ensure evidence that must be disclosed to defense, was, in fact, given to him by his law enforcement agencies so that he could comply with his constitutional obligations.

Q. And isn't it your responsibility as the prosecutor to make sure that exculpatory evidence is disclosed to you from police?

A. Well, I would hope that they would do that.

Q. Well, in your 20 or so years as a prosecutor in Ada, haven't you tried to direct, first, Ada police officials about the need to disclose exculpatory material?

**A. They are aware that they need to give me all the evidence in a case. All of it, not just portions of it, but, all of it.**

Q. How have you communicated ---

A. Exculpatory –

Q. How have you communicated that to the Ada police?

A. I've told them over and over again.

Q. Have you had training courses?

A. I haven't given them training courses.

---

[14] The depositions referenced were taken from the Ron Williamson and Dennis Fritz civil suit.

Q. Have you directed anybody to give them training courses?

A. No, sir.

(Dkt.# 123, Ex.# 54, at 351-352, and Ex.# 53, at 214-216) (emphasis added). Mr. Peterson recognized his obligation to obtain evidence but made no effort to receive the material, or to inform law enforcement of its obligations to turn over evidence. Similar to the facts in the Williamson and Fritz case, the defense was denied critical evidence that was exculpatory or impeaching while it remained in the custody of law enforcement. There is no proof this crucial evidence was ever made available to Mr. Fontenot's trial counsel. Rather, Mr. Peterson fought to keep such evidence from ever being given to defense counsel during either the joint or separate trials of Mr. Ward and Mr. Fontenot.

Further, Mr. Peterson's own understanding of what evidence must be disclosed was dubious at best. His misunderstanding of his obligation to disclose exculpatory and impeachment evidence hampered not only the actions of his office but led to his willful ignorance of evidence that challenged the state's case. "Exculpatory evidence is . . . all fact-based, whether it is exculpatory or not, and it has to be material." (Dkt.# 123, Ex#. 54, at 371, 368). Mr. Peterson's failure to grasp that exculpatory evidence shows that defendant did not commit the crime, and is material to the case at hand, is the clearest indication of his ability to discern what evidence should be disclosed. Further, it demonstrates his inability to properly instruct not only those assistant district attorneys assisting him in the prosecution of Mr. Fontenot, but to direct the police officers' compliance in giving him "all the evidence in the case."

Mr. Peterson attempted to satisfy his disclosure obligations by instituting an open file policy within the Pontotoc County District Attorney's Office. Under that policy, all documentation that was not work product was available for defense counsel to review pretrial. (Dkt.# 123, Ex.# 78, at 14-15, 90). As the Haraway investigation concluded, the only

documentation the prosecution had was the prosecutorial. (Dkt.# 123, Ex.# 78, at 11-12, and Ex.# 79, at 11-12). Thus, the prosecutor's file was devoid of volumes of relevant and exculpatory evidence that police had gathered – in effect the open file was empty. An open file policy is a good step towards ensuring compliance under *Brady* and its progeny, but it does not absolve a prosecutor's obligation to turn over exculpatory, impeachment evidence that aids a defense investigation. *See Kyles*, 514, U.S. at 421 ("and we hold that the prosecutor remains responsible for gauging that effect regardless of any failure by the police to bring favorable evidence to the prosecutor's attention"). Once alerted to the specific needs and requests of defense counsel, the district attorney is on notice that such evidence is necessary for a defendant's case. *See Bagley*, 473 U.S. at 682; (Dkt.# 123, Ex.# 81 pg. 12-15). However, the Pontotoc County District Attorney's Office never even asked the Ada Police Department or the OSBI whether they had obtained all the law enforcement reports.

### 2. Lack of training of law enforcement to understand what evidence constituted *Brady* material.

Similarly to the lapse in understanding demonstrated by the Pontotoc County District Attorney's Office, both OSBI and the APD lacked any training of what evidence obtained during a police investigation must be disclosed. Under the custom, policy, and practice of the Ada Police Department, the captain determined who was assigned to handle a specific investigation. (Dkt.# 123, Ex.# 51, at 71). The captain supervised the other investigator on the case, but no one directly supervised his work on a case. It is the responsibility of the lead investigator to determine what reports to include in the prosecutorial report or case report, which is sent to the district attorney's office. (Dkt.#23, Ex.#s 51, at 71; Ex.# 18, at 52). However, officers within the department did not understand what evidence they were required to provide the district attorney or when it must be disclosed.

The Ada Police Department did not have its own internal training program in the 1980s based on APD Assistant Chief Richard Carson's testimony. (Dkt.#123, Ex.# 49, at. 10-11). Police officers did not receive any training on exculpatory evidence. *Id.* (Dkt.# 123, Ex.# 49, at 68). Carson did not know of any training programs on exculpatory evidence (Dkt.# 123, Ex# 49, at 68). Even decades later, there are no internal training programs in the Ada Police Department that address exculpatory evidence. (Dkt.# 123, Ex.# 49, at 68; Ex.# 18, at 51-52). He further explained the lack of training or systematic way to ensure such evidence ever made its way to the Pontotoc County District Attorney's Office. (Dkt.# 123, Ex.# 48, at 67-69).

Ada Police Department Chief Fox[15] explained that it was APD policy to give total discretion to the detectives, or any individual officer to determine what information to turn over to the district attorney. (Dkt.# 123, Ex.# 48, at 59-60); *see also* (Dkt.# 123, Ex.# 65, at 79-81). However, when asked what exculpatory evidence meant, Chief Fox said he was unfamiliar with the term "exculpatory evidence." He said there was no policy in the Ada Police Department regarding evidence favorable to a defendant that might indicate innocence. (Dkt.# 123, Ex.# 48, at 67, 76). The current director of training, Carl Allen, a director of training for police officers, stated in his deposition that he was familiar with the term "exculpatory evidence," but that the meaning of it "elude[d] him right now." (Dkt.# 123, Ex.#50, at 30-310). Further, he could recall no internal training in the Ada police department on exculpatory evidence being covered in the mandated, statewide law enforcement training (CLEET). (Dkt.# 123, Ex.# 50, at 31; Ex.# 18, at 52)

While the Ada Police Department obviously lacked any institutional training or organizational structure to ensure that exculpatory evidence made its way to the prosecution, OSBI's policy did little to ensure its compliance with *Brady*. Agent Rogers understood that any

---

[15] Chief Fox assisted in the investigation of Tommy Ward also. (Dkt.# 123, Ex.# 88).

evidence uncovered that was beneficial to a defendant should be turned over. (Dkt.# 123, Ex.# 52, at 92). However, OSBI's mandate that all reports and evidence come from its central repository limited his ability to give information directly to Mr. Peterson.

> Q In other words, it was -- as far as you understood it, it was the custom, policy, and practice of the OSBI that you only give the prosecutor the documents in the prosecutorial report, going through the regional office?
>
> A That's correct, yes, sir.
>
> Q And if you were to give them any other document, you would route that through the regional office the way you did the prosecutorial summary?
>
> A Yes, sir.
>
> Q And did you deviate in your personal custom, policy, or practice and give Mr. Peterson, in the course of this investigation, any documents other than the ones that went through the regional office, which include this prosecutorial summary?
>
> A None that I recall, sir.
>
> Q And did you ever tell Mr. Peterson that you had a practice of tape-recording witness interviews and then erasing them?
>
> A No, sir.

(Dkt.# 123, Ex.# 52, at 90-91). Even when confronted with exculpatory evidence, Agent Rogers did not deviate to disclose this to the prosecutor unless the prosecutor specifically sought such evidence from the OSBI repository. (Dkt.# 123, Ex.# 52, at 96). However, even if Agent Rogers did want to provide evidence beneficial to a defendant in his prosecutorial report, his immediate supervisor had wide latitude to edit his reports before providing them to Mr. Peterson.

> Q. And you were the person that made the decision as to what you were going to include in the prosecutorial summary . . . documents sent over the course of time to the regional office and were in the OSBI file.
>
> A. Well, I'll have to clarify that to a degree. My supervisor, B.G. Jones would have quite a bit of input, as far as what would be included and what is not, as far as when you put the prosecutorial together.

Q. And between you and Mr. Jones, you would decide what to put in and what not to put in.

A. Well, the bottom line, sometimes was Mr. Jones would either include or exclude stuff that I may or may not think should be in the report.

Q. Well, before the prosecutorial summary was submitted, did you review it?

A. Yes, sir. I believe I did.

Q. And would it be your ordinary practice to review it, not just in this case, but in any case?

A. Yes, sir.

Q. And it you found that certain reports or interviews in the prosecutorial report left out information that might be exculpatory, beneficial to a defendant, you would make sure that they got put in.

A. If I was aware of it.

(Dkt.# 123, Ex.# 52., at 212, 213). The lack of any organizational structure or policy ensuring the proper disclosure of exculpatory and impeachment evidence from the APD and OSBI to the Pontotoc County District Attorney's Office resulted in systemic *Brady* violations not only in Mr. Fontenot's case but others as well. The misunderstanding of the law and its requirements demonstrated by the Pontotoc County District Attorney made certain that vital evidence favorable to the defense would never be disclosed in accordance with state and federal law.

Documents uncovered after Mr. Fontenot's convictions and direct appeals show exculpatory, impeachment, and other evidence which would have furthered his defense and investigation were never turned over to defense counsel prior to trial. Over 860 pages of police reports, witness statements, criminology reports, and polygraphs – all detailing the investigation into the events leading to Mrs. Haraway's murder – weren't disclosed until years after trial. (Dkt.# 123, Ex.# 44). Of the 860 pages of OSBI, APD, and various other law enforcement reports

within the State's custody, the Pontotoc County District Attorney's Office relied only on the 160 pages of the prosecutorial. (Dkt.# 123, Ex.# 43). In January 2014, an additional 263 pages of OSBI reports were disclosed pursuant to an agreement between post-conviction counsel and the Oklahoma Attorney General's Office.[16] Of these additional reports, approximately forty-five were never disclosed either at the time of trial or under the OCCA's order.[17] In May 2017, the Pontotoc County District Attorney's entire file was disclosed pursuant to a federal subpoena. Within those files were DA investigative reports along with Ada Police Reports that should have been disclosed. (Dkt.# 123, Ex.#s 85 – 90). More recently, on February 6, 2019, hundreds of pages of Ada Police Reports were disclosed for the first time based on a state court subpoena from Thomas Ward's state post-conviction litigation.

The fact that long withheld law enforcement documentation pertaining to the investigation of Denice Haraway's disappearance and murder continues to surface clearly demonstrates that all the necessary records related to this case were not disclosed during post- conviction proceedings. This has continued through the instant action. Because *Brady* violations are evaluated cumulatively based on all undisclosed evidence and the evidence presented at trial,

the continual failure of the state to fully disclose all exculpatory and impeachment evidence that aids the defense makes it difficult for Mr. Fontenot to fully articulate the actual prejudice he suffered due to the State's actions. *See Kyles v. Whitley*, 514 U.S. 419, 421 (1995).

---

[16] The 263 pages of discovery were disclosed to post conviction counsel pursuant to an agreement between the parties concerning Mr. Fontenot's post conviction request for discovery filed in October 2013. Specifically, Mr. Fontenot sought disclosure of documents mentioned in the original OSBI Reports that were not included. According to these OSBI reports, these investigative reports were witness statements, taped recordings, or other reports from key witnesses in the State's investigation leading to the arrest and prosecution of Mr. Fontenot. While some of these documents were duplicates of some of the information provided in the original 860 pages of material, there were several new or altered documents that had never been disclosed to any defense attorney for Mr. Fontenot. The post conviction discovery remained unsolved at the time the post conviction court denied Mr. Fontenot's application based on laches.

[17] The Oklahoma Court of Criminal Appeals ordered the full disclosure of all OSBI records to Mr. Fontenot's second direct appeal counsel during the pendency of that appeal. Clearly, OSBI did not fully comply with that order as further reports were only given to post-conviction counsel in 2014, and again in 2019.

The State's failure to properly gather and disclose such crucial information in a timely fashion continues to derogate Mr. Fontenot's state and federal constitutional rights to substantive due process. The police or prosecution had most, if not all, of this evidence prior to Mr. Fontenot's first trial in 1985. All the while, the defense filed discovery requests and the trial court ordered the production of exculpatory evidence that the prosecutor never delivered. Even after the Oklahoma Court of Criminal Appeals ordered the full disclosure of all OSBI records in the Haraway case, files referenced in the investigate reports show non-compliance with the Court's order. (Ex.#s 38 & 59). This blatant disregard for court precedent and ordered discovery has continued throughout Mr. Fontenot's case and demonstrates a clear pattern of police and prosecutorial misconduct that requires reversal of his conviction.

### B. Mr. Fontenot's Defense Counsel Repeatedly Requested Exculpatory, Impeachment Evidence

George Butner represented Mr. Fontenot throughout both of his trials. During the pretrial proceedings in both cases, he filed numerous discovery motions and made requests on the record for discovery of police and interview reports within the possession of the APD and OSBI. Mr. Butner specifically alerted the prosecution to the following pieces of evidence he required:

1) The identities of alternate suspects. (Dkt.# 123, Ex.# 72).

**2) All statements of witnesses in the case. (Dkt.# 123, Ex.# 73).**

3) Production of witnesses and how the investigation led to Ward and Fontenot. (P/H p. 769).

**4) Statements of Jeff Miller. (P/H pp. 496, 502-208, 710-712).**

5) Criminal records of any prosecution witness. (Dkt.# 123, Ex.# 74).

6) Exculpatory evidence. (Dkt.# 123, Ex.# 74).

7) Any and all medical, forensic, or chemical report made, or completed in the future, regarding the angle and location of purported or actual knife wound upon the remains of Donna Denice Haraway, regarding the location and comparison of any fibers or hairs located upon either the remains or the clothing of Donna Denice Haraway, regarding the caliber

76

of the projectile which did or may have caused the bullet wound to the back of the skull of Donna Denice Haraway, in the now or future control or possession of any Federal, State, County, or Municipal governmental agency, or any agent or member thereof. (Dkt.# 123, Ex.# 72).

8) **Written or taped statements of any witness concerning any alternate suspects or those providing information involving the investigation of Donna Denice Haraway.** (Dkt.# 123, Ex.# 72).

9) Moyer's statement not disclosed. (P/H at 246-247).

10) The criminal record of any person the State intends to call as a witness in its case-in-chief or in rebuttal. (Ex.# 75).

11) Any sworn statements that the State has in its file regarding this particular case. (Dkt.# 123, Ex. #75).

**12)** All information of whatever form, source or nature, which tends to **exculpate the Defendant either through an indication of his innocence or through the potential impeachment of any state witness, and all information of whatever form, source or nature which might lead to evidence which tends to exculpate the Defendant whether by indicating his innocence or impeaching the credibility of any potential state's witness, and all information which may become of benefit to the Defendant in preparing or presenting the merits of his defense of innocence at trial. This request includes all facts and information of whatever form, source or nature which the District Attorney or his assistants or the police and sheriff's departments has or knows about, which is or may be calculated to become of benefit to the Defendant either on the merits of the case or on the question of the credibility of witnesses.**

(Dkt.# 123, Ex.# 75) (emphasis added).

Mr. Butner repeatedly requested discovery from the Pontotoc County District Attorney's Office for disclosure of evidence necessary to formulate a viable defense against the serious charges his client faced. Instead, Bill Peterson, Pontotoc County District Attorney made scant disclosures and stonewalled against providing any evidence to defense counsel in both trials.(P/H at 82-89, 96-99; N/T 406, 502-503, & 769-771). This left defense counsel clearly lacking evidence he was entitled to have acquired.

The requested evidence would have been extremely helpful, fitting within the defense's theory of the case and would have been used if provided. At the very least, the information gleaned

from these police reports would have aided in providing witnesses relevant to Mr. Fontenot's alibi, establish that alternate suspects had both motive and opportunity to kidnap Mrs. Haraway, and that because of an apparent stalker -- Mrs. Haraway feared being at McAnally's. These viable defense theories would have created reasonable doubt in the minds of the jury had not the prosecution wrongfully tipped the scales in its own favor. "When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."

*U.S. v. Agurs*, 427 U.S. 97, 107 (1976). As the Supreme Court explained further,

> The more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist, and to make pretrial and trial decisions on the basis of this assumption . . . **[T]he reviewing court may consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case.**

*Bagley*, 473 U.S. at 682-83 (emphasis added); *see also Davis v. Cline*, 277 Fed.Appx. 833, 839-840 (10th Cir. 2008). Because the prosecution either thwarted or failed to disclose evidence that it requested, Mr. Butner's reliance on those assertions was reasonable given the circumstances. *See Banks*, 540 U.S. at 693.

The prosecution's willful ignorance and refusal to seek out evidence that the defense notified him was important only heightens the violation. "The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith,) the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 437-438-9 (citations omitted). Whether anyone in the Pontotoc County District Attorney's Office knew about the evidence within the custody of the OSBI, APD,

or Pontotoc Sheriff's Office[18] or any agency assisting in the Haraway investigation, their obligation was evident and based firmly in the law: Locate the evidence and disclose to defense. Mr. Peterson and his staff failed to do so which resulted in numerous *Brady* violations.

### C.    Material Evidence Was Withheld from Mr. Fontenot's Defense Counsel

The Pontotoc County Prosecutor's Office failed to disclose both exculpatory, and impeachment evidence that aided the defense from various sources. Those agencies include its own files, the OSBI's, the ME's Office, the Pontotoc County Sheriff's Office files, and the Ada Police Department files. A consistent pattern has been the constant drip of documents during the course of appellate review, post-conviction, and federal habeas corpus. Because *Brady* claims are evaluated cumulatively, the failure of the Pontotoc County District Attorney's Office and Respondent to ensure the complete disclosure of these documents as mandated by the Fourteenth Amendment resulted in the state post-conviction proceedings not being the full and fair proceedings contemplated by the AEDPA. *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9-10 (1992).

The APD reports were fist uncovered during the disclosure of the Pontotoc County District Attorney's Offices files pursuant to this Court's subpoena. (Dkt.# 123, Ex.# 87). These files were demonstrated a consistent pattern and practice of state actors failing to review their files and disclose documents they had a continuing obligation to disclose. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987); *Douglas v. Workman*, 560 F.3d 1156, 1173 (10th Cir. 2004) *citing Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997).

In February 2019, despite both a state court order and a subpoena issued by this Court,

---

[18] Counsel represents that neither they, nor appellate or trial counsel received any police reports from the APD, Pontotoc County Sheriff's Office, or the Oklahoma Highway Patrol, prior to the filing of the instant Second Amended Petition.

hundreds of additional pages of Ada Police Reports were "discovered" pursuant to Thomas Ward's state court subpoena. This set of police reports contains numerous documents that are both exculpatory and impeachment evidence against the prosecution's witnesses at trial. As Mr. Fontenot pled previously and continues to assert, the totality of these documents eviscerate the Prosecution's theory of the case making it untenable that Mrs. Haraway disappeared in the manner suggested and further support Mr. Fontenot's assertions that he was not present at McAnally's because he was at a party. There is no doubt that this evidence, had it been disclosed would have been instrumental in establishing a viable defense for Mr. Fontenot showing a reasonable probability of a different result.

### 1. OSBI and Ada Police Department Reports establishing Mr. Fontenot's alibi

OSBI reports establish that Mr. Fontenot was at a party the night of April 28, 1984, during the time the police and prosecution believed that Mrs. Haraway disappeared. According to the prosecution's theory, Mrs. Haraway left from McAnally's with a White male between 8:30 pm and 8:45 pm. (N/T 6/14/88 at 25-26). Evidence was admitted that the first APD officer arrived close to 9 pm. (N/T 6/9/88 at 86). The prosecution's theory was that Mr. Fontenot and his co-defendant were with Mrs. Haraway from the time Mrs. Haraway was taken until they supposedly killed her later that evening. (N/T 6/3/88 at 51-55; 6/14/88 at 35-36).

However, Mr. Fontenot told OSBI agents that he attended a party the night of Mrs. Haraway's disappearance. This statement was not divulged to the defense by the prosecution prior to any of his trials. Mr. Fontenot was arrested on October 19, 1984, and polygraphed by OSBI Agent Rusty Featherstone. When asked where Mr. Fontenot was on the night in question, Mr. Fontenot explained:

> He went to the apartment of Gordon Calhoun, arriving there at approximately dark or shortly after the kegs arrived. Calhoun lives adjacent to the ROBERTS, where

FONTENOT was currently staying. At the party, FONTENOT recalls drinking and doing marijuana and then returning to the ROBERTS apartment where he slept on the floor all night. He believes he returned to the apartment between 2330 and 2400 hours that night and recalled that later that night Tommy Ward also ended up spending the night at the ROBERTS apartment.

(Dkt.# 123, Ex.# 43, prosecutorial bates 142).[19]

Furthermore, because the entirety of Mr. Fontenot's interrogation was not recorded, there is no indication of what exculpatory evidence he provided prior to the video camera being turned on. Any statement made by him in which he refutes the confession was paramount to the defense. Likewise, on October 21, 1984, in a handwritten statement, Mr. Fontenot recanted his confession. In his letter, which he gave to law enforcement, Mr. Fontenot said he had agreed with the story OSBI Gary Rogers told him and had lied on the video. (Dkt.# 123, Ex.# 44 at 626). He explained that he had never been to McAnally's or ever met Mrs. Haraway, and reaffirmed his presence at the party. (Dkt.# 123, Ex.# 44 at 625-627).

This undisclosed evidence would aid a defense theory that Mr. Fontenot was innocent, pressured to confess, and fed key details by the police. Defense counsel requested such evidence several times prior to trial. (Dkt.# 123, Ex.#s 73-75). Had these documents been disclosed, defense counsel could have interviewed Agent Featherstone and questioned him about Mr. Fontenot's statements prior to polygraph examination.[20] Mr. Fontenot's recantation within days of his confession and that the handwritten note was in OSBI's custody drastically undercut the reliability of the confession and would have aided defense counsel in proving Mr. Fontenot's confession was false. (Dkt.# 123, Ex.# 44 at 626); (N/T 6/14/88 at 51-62).

---

[19] At the very minimum, the prosecution was obligated to turn over any statements made by a defendant to his counsel. The State did disclose Mr. Fontenot's recorded confession, but not his prior alibi statement. The statement clearly is exculpatory under *Brady*. "If the exculpatory evidence 'creates a reasonable doubt' as to the defendant's culpability, it will be held to be material." *United States v. Starusko*, 729 F.2d 256 260 (3d Cir. 1984) *quoting United States v. Agurs*, 427 U.S. 97, 112, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976).

[20] According to Agent Featherstone, Mr. Fontenot's polygraph was inconclusive but bordering on deceptive. (Dkt.# 123, Ex.# 44 at 605, 628).

Additionally, the statement would have been essential impeachment evidence to use in cross examining Detective Smith and Agent Rogers about their interrogation, investigation, and lack of any corroborating evidence of the confession. This violation was compounded by the fact that this was not the only evidence placing Mr. Fontenot in another location when the crime occurred. Both OSBI and Ada Police Department were aware of this party that Mr. Fontenot was at when Mrs. Haraway disappeared based upon several witness reports, dispatch records, and police reports. Instead of investigating the information, the prosecution and police withheld the information from the defense.

Janette Roberts also confirmed Mr. Fontenot's presence at the party. (Dkt.# 123, E(x.# 44, OSBI 0139). Had police looked at the radio dispatch logs for April 28th, they would have seen the neighbor complaints about the loud party at the Calhoun residence. (Dkt.# 123, Ex.#s 41, 42, & 89). Calls came in at 9:20 pm[21] and 12:40 am about the loud music. *Id.* One of the officers who responded to the second call, Ada Police Officer Larry Scott,[22] wrote a report specifically mentioning "Gordon Calhoun" party and warning the revelers to keep it down or go to court. (Ex.# 43, at 98, 89). This report was also not provided to defense counsel.[23]

Further, Stacey Shelton, (AKA Deprater-Brashier) testified at Mr. Ward's trial, that she had attended Mr. Calhoun's party. She told Ada Police Chief, and Detectives Dennis Smith and Mike Baskins that she knew of the party and knew the people who attended the party. (Ex.# 12). They disregarded her information, failed to take a formal statement, did not investigate further

---

[21] The radio dispatch log shows the call to McAnally's occurred at 8:50 pm. (Dkt.# 123, Ex.# 41.)

[22] While Officer Scott testified in Ward's trial on June 13, 1989, he did not testify in Mr. Fontenot's trial.

[23] While the State focused on Mr. Fontenot's ability to both be at the Calhoun party and participate in Mrs. Haraway's abduction and murder, this theory becomes inconceivable given that no witness identified him at either McAnally's or J.P.'s, he had no access to a truck, and people remember him being at the party for the entire night. The prosecution lacks any evidence to the contrary besides the dubious confession.

into her account, and did not inform Mr. Fontenot's counsel about the information.

When Ms. Shelton explained her knowledge of the party, Mr. Peterson not only failed to inform the defense about this crucial fact, he threatened Ms. Shelton and held her against her will in an attempt to get her to recant her testimony after she testified in Mr. Ward's trial. (Dkt.# 123, Ex.# 12). While Ms. Shelton acknowledged she did not know many people at the party, she did list people she knew who attended. *Id.* Amongst those people were Bruce DePrater and Eric Thompson who also recall Mr. Fontenot's attendance at the party and provided essential details to prove Mr. Fontenot was there during the evening Mrs. Haraway was kidnapped and murdered. (Dkt.# 123, Ex.# 95).

An alibi irrefutably shows a defendant could not commit a crime because he was elsewhere when the crime was committed. This is critical evidence for a defense attorney, and Mr. Fontenot's defense attorney acknowledged he would have presented it if he had known of it. "I was trying to pursue that at trial, that some other dude did it, and anything that would have pointed me in any direction other than Karl, I would have appreciated it." (Dkt.# 123, Ex.# 81 pg. 35).

In summary, Mr. Fontenot told police of his whereabouts during his interrogation at OSBI. Police collected several statements from witnesses able to corroborate Mr. Fontenot's whereabouts. Yet this evidence was not included in the prosecutorial. The only conclusion is that the exculpatory alibi evidence was intentionally kept from the prosecution's knowledge as Mr. Peterson considered charging Mr. Fontenot.

The party attendees, whom police knew and had identified, had no impetus to lie and could have been interviewed by defense counsel and later testified about the timing of this party, who else was present, and whether Mr. Fontenot was present the entire night. These essential witnesses remember seeing Mr. Fontenot from the very early part of the evening until much later into the

night. This makes it impossible for him to be involved in Mrs. Haraway's disappearance. Their accounts – willfully kept from the defense -- clearly show that at no time did Mr. Fontenot leave to participate in whatever transpired with Mrs. Haraway. Affidavits from party-goers, Eric Thompson, Bruce DePrater, and Stacey Shelton along with police reports from Janette Blood place Mr. Fontenot at the party for the entirety of the night.

### 2. People at McAnally's the night of Mrs. Haraway's Disappearance

According to the prosecution's opening statement in Mr. Fontenot's 1988 trial, both Thomas Ward and Mr. Fontenot drove to McAnally's in a grey pickup truck, robbed the store, abducted Mrs. Haraway and then drove away.( N/T 6/81988 at 35). The witnesses to these events were Gene Whechel and his nephews David and Lenny Timmons.( N/T 6/91988 at 34-69). However, in the Ward trial, Lenny Timmons mentions that there were other people coming to the store while they were there.( Ward N/T 6/21989 p. 160).

In response to Mrs. Haraway's disappearance, Ada Police Detective Dennis Smith asked people who shopped in McAnally's the night of Mrs. Haraway's disappearance to contact the APD. (Dkt.# 123, Ex.# 28). Police theorized the last purchase before Mrs. Haraway's disappearance was a tallboy beer.[24] (Dkt.# 123, Ex.# 44, OSBI 0496). In response to the APD request, numerous people contacted the police department to explain their purchases and the time they were in the store. Police  interviewed many of those people who provided numerous details of people, cars, and trucks around McAnally's on April 28, 1984.(Dkt.# 123, Ex.#s 93, 94 and

---

[24] The register tape from the day's purchases was collected by Detective Baskins and placed into evidence by the state at all three trials. (J/T 1160 State's Exhibit 16; N/T 6/9/1988 at 197 State's Exhibit 60; Ward N/T 6/12/1989 at 6, State's Ex.# 60). While the entire roll was placed into evidence, it is unclear whether it was ever unrolled during the trial by any of Mr. Fontenot's attorneys during trial, or direct appeal. It was ineffective assistance of counsel for defense counsel not to examine the entire roll.

99). These reports refute the prosecution's theory that Mrs. Haraway left the store with Mr. Ward and Mr. Fontenot as the Timmons bothers and Gene Whechel went into the store.

Found in the most recent Ada Police Department reports recently produced was a report by Carrie McClure who says she saw Mrs. Haraway at the store on April 28 around 8-8:30 p.m. (Dkt.# 123, Ex.# 103). She was interviewed by Ada Police, but her name was never turned over to Mr. Fontenot. She says that based on her contact with Ada Police that she thinks she was the last person to see Mrs. Haraway at the store before her disappearance. Other witnesses provided more detailed information calling into question the District Attorney's case.

Jimmy Simpson told Ada Police Officer D.W. Barrett that he was in the store when no clerk was at the counter.

> Jimmy parked ten or fifteen feet west of the Ice box. Jimmy went into the store and there was no one there. Jimmy went to the pop box and got a coke and walked to the back of the store to the door going to the back room and said "there is someone up front." No one ever came out of the back room so, Jimmy left the store. There was a car possibly a GM w/gr at the gas pumps with three or four people around it. There was a pickup on the east side of the store with a man in the driver side and a woman next to him. It was dark, and Jimmy could not identify them. Jimmy did not see a car on the east side of the building (Haraway's vehicle). Jimmy saw a man standing outside the store as he want in [sic] he thought was Odell Titsworth. Jimmy had gone to school with Titsworth at Byng several years earlier. Jimmy was unable to pick Titsworth out of a picture lineup.

(Dkt.# 123, Ex.# 100). Officer Barrett assumed Mr. Simpson arrived while Timmons and Whechel waited for the police. However, this conflicts with their accounts that the man and woman in the pickup truck drove away when they were in the store. Other witnesses mention this pickup truck being at the store along with many other men around the time of Mrs. Haraway's disappearance. Mr. Simpson's account would impeach the state's theory of the case and the focus of their investigation.

Also interviewed by police was James Boardman, an Ada newspaper employee. In another

85

report taken by Ada Police Officer Barrett, he reported:

> A few days after Denice Haraway disappeared Mr. Boardman called the police
> dept. and advised he was at McAnally's store on Arlington about 5 pm on
> 4-28-84. There were two men in the store that in his opinion were acting funny.
> Subj #1 6 ft. brn hair, brn shirt, blue jeans.
> Subj #2 6 ft. blond hair, blue plaid flannel shirt.
> He thought they were in a light-colored pickup. Boardman was pretty sure Denice
> was wearing a blue short sleeve t shirt.
> Around the first of November 1984, James Boardman came to the police dept. and
> was shown a picture lineup. Boardman picked #1 out of the Ward folder and
> could not identify anyone from the Fontenot and Titsworth folders. Agent Rogers
> and Lloyd Bond were present at this lineup.

(Dkt.# 123, Ex.# 93). Mr. Boardman's interview report is exculpatory evidence for Mr. Fontenot.

OSBI Agent Rogers thought Mr. Boardman's account was significant enough that he asked him

to view photospreads of all three suspects after Mr. Fontenot had been arrested. After the

description originally provided, he could not identify Mr. Fontenot as being at the store. Further,

Pontotoc County District Attorney investigator Lloyd Bond's presence makes it much more likely

that District Attorney Peterson or Ross were aware of this witness and his report. Mr. Boardman's

report should have been disclosed as exculpatory evidence. Mr. Butner could have interviewed

and called him as a witness refuting not only the confession but establishing other witnesses who

could not place him there. It also deprived the defense of arguing inconsistent factual accounts as

to what happened at the convenience store.

Another witness police interviewed was Duney Alford who came to the store close in time

to Mrs. Haraway' disappearance. He told police

> On 11-28-84, I talked with Duney Alford by telephone about the Haraway case.
> Duney said that on the day she was taken, he had went to McAnalley's (sic)
> to get some soap. He pulled up to the front of the store and got out and went
> inside. He said there was a guy standing by the front door on the inside of the
> store. Duney spoke to him but the guy did not speak back. Duney said about
> the only thing he remembers about the guy was that he was dark haired, kind
> of slick downed, and that his hair was parted on the side. Duney said that when
> he walked outside the store he noticed a pickup parked on the outside of the
> store and that he remembers that it was a chalky gray color. He said that he

> knows Donna Haraway because he shopped at the store and she worked there. Duney said as far as he can remember Donna Haraway was wearing blue jeans and a light blue pull over blouse that day.

(Dkt.# 123, Ex.# 101). These witnesses provide significant insight into the people coming into and out of the store. Several people remember seeing the pickup truck at the store for a much longer period from what the prosecutors presented. The fact that the pickup was there refutes the theory that the events at J.P.'s convenience store had anything to do with those at McAnally's. Therefore, these reports should have been made available for Mr. Fontenot's defense counsel to raise the reasonable doubt that whomever was involved was at the store for much longer than police believed. Additionally, the description of the men and other people around the store create more doubt as to whom may have been involved, and their motive. None of these witnesses place Mr. Fontenot at the crime scene.

Beyond the list of people directly interviewed in the fall of 1984, were various other people Police Detectives noted on April 28, 1984 while at the store. However, he wrote the names, times, and contact information on the register tape for only 5 people, the last of whom was Gene Whechel. (Dkt.# 123, Ex.# 32-38). Each of these people discussed with the APD what they witnessed in McAnally's. None of these reports were disclosed to defense counsel. Richard Holkum, John McKinnis, Gary Haney and Guy Keyes provided evidence that was patently exculpatory and impeachment evidence. Police never followed up on this evidence which provided critical information as to an alternate suspect in a grey pickup truck, Mrs. Haraway's frame of mind that evening, and the thoroughness of the police investigation in the hours after she was reported missing.

### a. Richard Holkum

Richard Holkum was an off-duty Ada police officer who had visited McAnally's on the

night of April 28th. Notations on the McAnally's register tape show his purchases occurring between 7:45 pm to 8:00 pm, thirty minutes before Mrs. Haraway supposedly walked out of the store with an unknown man.( N/T 6/9/1988 p. 34-35, 67-68). The crux of his trial testimony focused solely on the clothing he saw Mrs. Haraway wearing the night of her disappearance. (N/T 6/9/1988 p.143-145). Further, he testified that he told lead Detectives Dennis Smith and Mike Baskins immediately about being in the store that evening after he learned of the abduction.( N/T 6/9/1988 p. 144).

The clothing description was not all that Mr. Holkum witnessed in McAnally's. The omitted details he recalls reveal he gave his fellow Ada police officers significant information about the pick-up truck Mrs. Haraway supposedly left in thirty minutes later.

That night, I recall stopping at McAnally's when it was still barely light out. I parked my vehicle, near the west corner of the building. I believe I bought a six-pack of beer, a loaf of bread and maybe some other things. I knew Denice Haraway and spoke to her inside McAnally's that night. There was no one else in the store when I stopped at McAnally's, however, one woman did step in and laid a penny on the counter, telling Denice that she had given her too much change back for a previous gas purchase. Both Denice and I thought that was odd, for the woman to bring back a penny.

Everything in the store, including Denice, seemed normal. I did not detect any tension or anything wrong. While standing at the counter making small talk with Denice, **I recall seeing two vehicles sitting on the eastern edge of the pavement outside, just to the east of the gas pumps. These vehicles were parked parallel with the driver's side facing each other and the drivers were apparently talking. One vehicle was a green Ford Torino or Mercury Montego. The other vehicle was a Chevy or GMC pickup truck painted primer gray. This pick-up had a straight, conventional bed. I believe these vehicles were still parked next to each other when I left McAnally's to drive home.**

Based on my own memory, and knowing that civil twilight ended at 7:36pm that night, I believe I was probably at McAnally's somewhere between 7:30pm and 7:45pm. The next morning, April 29, 1984, I first heard about the disappearance of Denice Haraway when I got to work.

That day, I approached Det Dennis Smith and Det Mike Baskins about my visit to McAnally's the night before. Neither Smith nor Baskins were interested in talking to me about the Haraway disappearance. Neither formally interviewed me about

what I saw or when I was there. My recollection of both of these detectives was that they were not interested in talking to me about my visit to McAnally's. I remember thinking that they "just blew me off."

Sometime later that day or that week, Det. Smith or Det. Baskins showed me the register tape from McAnally's and asked me if I could ID my purchase on the tape. I recall that this tape only had the prices, which made it difficult for me to find my purchases. I'm not sure if I ever found my purchase at McAnally's that night. I recall that both detectives were very condescending toward me for not being able to immediately identify my purchases from the Saturday night.

I recall some time right before the trial of Tommy Ward and Karl Fontenot, OSBI Agent Gary Rogers informally interviewed me about my stop at McAnally's on 4/28/1984. **I recall that he was mainly interested in my recollection of what Denice Haraway was wearing that night. I don't believe he took down any information about the two vehicles I saw sitting outside the building.**

(Dkt.# 123, Ex.# 6) (emphasis added).

Mr. Holkum's description of a gray-primered pickup truck parked in the exact location other witnesses testified to seeing it when Mrs. Haraway departed was remarkable. The State's theory was that whomever left the store with Mrs. Haraway got into a gray-primered pick-up truck and drove off when David Timmons entered the store that night at approximately 8:30 pm based on testimony and the dispatch logs.( N/T.6/15/1988 at 39). That Mr. Holkum saw a truck remarkably similar in appearance to that described by the Timmons brothers and Gene Whelchel at the store for at least half an hour before Mrs. Haraway's disappearance changes the motive for the abduction and suggests an alternate suspect(s). Because she was fearful about working the night shift given the obscene and harassing phone calls, it creates a reasonable doubt as to Mr. Fontenot's involvement. Such evidence would have been something police and defense counsel should have pursued. That the truck was driven by one man is also interesting because, clearly, it was not two people as police and prosecution theorized and argued in their case against Mr. Fontenot. Further, the total lack of interest in the eyewitness testimony of a fellow law enforcement officer shown by the lead detectives would have been important impeachment on the quality of

the investigation. His treatment and testimony about the APD bolsters the proof of a lack of training to investigate the serious crimes facing the officers.(Dkt.# 123, Ex.#s 53, at 10, 12). (Detective Smith discussing his level of training and the intuitiveness of police investigation).

### b. John McKinnis

Mr. McKinnis grew up in Ada, Oklahoma, and frequented McAnally's convenience store. The register tape documents him in the store between 7:50 pm to 8:00 pm on April 28th.[25] (Dkt. # 123, Ex.# 35). Mr. McKinnis recalled his visit in stark detail.

> In April of 1984, I was 22 years old and I lived in a trailer about 7 miles east of Ada, Oklahoma. I worked in the oil field business for an Ada company. I often stopped at McAnally's on East Arlington, which was on the eastern edge of town. From my many stops at McAnally's I became familiar with Donna Denice Haraway, who worked behind the counter in that store at night. I recalled Haraway as being a happy and nice looking woman with a bubbly personality. Whenever I stopped at McAnally's it was enjoyable to see her behind the counter. I knew she was teaching, or studying to be a teacher. I was not aware that she was married.

> On the night of April 28, 1984, a Saturday night, I stopped at McAnally's on my way home and purchased a couple of items and paid with a twenty dollar bill. I lived about 10 minutes east of McAnally's. I know that I got home that night sometime after 8 pm, between 8 pm and 8:10pm.

> While watching the local TV news that night, I learned that Denice Haraway had disappeared while working at McAnally's. **I recalled that when I had stopped in at McAnally's earlier that night, there was a man I did not recognize standing behind the counter a few feet from Haraway. He appeared to be someone Haraway knew, an acquaintance, like a boyfriend or a husband or someone like that. He appeared to be unhappy, or concerned about something. Denice Haraway appeared to be her normal, happy self.**
> **I also recalled the lone vehicle parked in front of McAnally's when I drove up, presumably belonging to the man I saw behind the counter. It was a 1978 Chevy pick-up truck, light colored, maybe white, with gray primer spots painted on the body. I immediately wondered if this man I saw behind the counter might have had something to do with Haraway's disappearance. I called the Ada Police.**

---

[25] To the extent that the register tape was shown to defense counsel, Mr. Butner's failure to follow-up on such leads is a violation of the Sixth Amendment right to effective assistance of counsel.

The dispatcher, or whoever I talked to said someone would call me back. Sometime later that night, I received a call, apparently from a police investigator at McAnally's. I believe I spoke to Mike Baskin. As I described my visit to McAnally's a few hours earlier, and was able to determine the probable time of that visit as being between 7:50pm and 8 pm, this police officer, said to me, "Here you are. I'm looking at the cash register tape (at McAnally's) and see your purchase right here with the twenty dollar bill." I described to this police officer, Mike Baskin, the man I saw behind the counter with Haraway during my visit. This man was bigger than me, standing about 5'10' to 6'1", 210 lbs., with light colored hair, not very long. This man was about my age or a little older, about 22 to 25 years old. He wore a white t-shirt, and some type of work pants, maybe khaki or blue jeans. This man looked clean, not rough-looking. He was not dirty, but appeared to have been out working that day. He looked more like a construction worker, than a college student.

**I also described the truck that I saw parked outside McAnally's to the police officer, Baskin. I knew it was a 1978 or maybe 1977 model, because it was the new body style, which had changed for Chevy pick-ups around 1975 or 1976. I told him that this truck had a short, conventional bed with lots of primer paint prep spots. I recall that either during that call with Police Officer Baskin, or on a call back to him later that night or the next day, this officer told me that what I had seen wasn't relevant to their investigation into Haraway's disappearance. I recall the police officer telling me that the guy I saw behind the counter, was someone police knew. I recall him saying specifically, "Oh yeah, we know who that was."**

I recall being told that whatever happened to Haraway happened later in the evening, so that anything I saw was not relevant to their investigation. After that last phone call with the police officer, after that weekend, no one with the Ada Police or any other police agency ever contacted me regarding Denice Haraway. I never spoke to any police officer or investigator face-to-face, only by phone.

**I knew both Tommy Ward and Karl Fontenot by face, from growing up in Ada. That man I saw standing with Denice behind the counter at McAnally's about 8 pm on April 28, 1984, was neither Tommy Ward nor Karl Fontenot.** At the time I believe I could have identified that person by his photograph. I never spoke to anyone else about the Haraway case in an official capacity, until recently, when I spoke to Dan Grothaus, an investigator with the Oklahoma Innocence Project. He showed me a photo of what he believes is the register tape from McAnally's on April 28, 1984. The photo of that register tape shows my name and phone number hand-written next to a purchase of $2.61, paid for with a twenty dollar bill.

I was able to tell Mr. Grothaus what I told that police officer that night. It was fairly easy for me to remember that conversation with the police officer that Saturday night, because I was so concerned about Haraway's disappearance, and wondered what significance this man I saw behind the counter might have played in her disappearance.

(Dkt.# 123, Ex. # 5)(emphasis added).

Ada police interviewed Mr. McKinnis the day after Mrs. Haraway was reported missing. The sparse notes from the police could have been followed up on in much the same manner as was done in state post-conviction proceedings. Mr. McKinnis' detailed account of the man he saw behind the counter with Mrs. Haraway is exculpatory evidence that defense counsel should have given to the defense to present to the jury. (Ex.# 81, at 35). This man was seen talking to another individual in a Torino type car when police officer Holkum stopped. **Mr. McKinnis, who grew up with Mr. Fontenot in Ada, stated Mr. Fontenot was not the man behind the counter with Mrs. Haraway**. Considering Mr. McKinnis' information in conjunction with the new evidence about Mrs. Haraway's potential stalker presents a very different picture of the abduction and the motive.

Further, whoever Mr. McKinnis saw stayed at the store for a much longer period than suggested during Mr. Fontenot's trial. The longer this man stayed around McAnally's decreases the likelihood that it could be Mr. Fontenot. Evidence such as this strengthens Mr. Fontenot's alibi defense and dovetails with the fact that other testimony proved the abductor's description does not match with Mr. Fontenot's.

Additionally, Mr. McKinnis' discussions with Detective Mike Baskins were extremely important both to impeach the thoroughness of the investigation and to establish an alternate suspect with whom the APD seemed familiar with. First, Mr. McKinnis provided a clear description of a man in the store standing next to Mrs. Haraway. While Detective Baskins told Mr. McKinnis that the police were aware of that individual, there are no disclosed police reports that identify whom this man was, how the APD knew him, what his connection with Mrs. Haraway was, why he was behind the counter that night, and why he was eliminated as a person

of interest.[26]

Another interesting flaw involves the lack of follow-up investigation into those who stopped in the store. Based on several witness accounts, the APD failed to document leads from witnesses who called the police. From the prosecution's theory of the case, it made no sense to ignore those present in McAnally's shortly before Mrs. Haraway disappeared.( N/T 6/14/1988 p. 25-26).[27] Since the APD stated they were aware of the individual identified to have been with Mrs. Haraway, his identity should have been disclosed to defense counsel as either a potential witness, or a suspect, what his conversation with Mrs. Haraway was about, and if he owned the pickup truck seen by Officer Holkum and Mr. McKinnis. The APD's continued apathy toward vital evidence was a pattern that permeated several murder investigations and displayed the agency's inability to properly handle cases of this magnitude. (Dkt.# 123, Ex.#s 46 & 61).

Further, Mr. McKinnis' interview with police continued their leads into the gray- primered pickup truck that Mrs. Haraway departed in with an unknown White male. Officer Holkum and Mr. McKinnis describe a Chevy pickup truck that conflicts with the description provided by David and Lenny Timmons, and their uncle, Gene Whelchel. In those witnesses' statements to OSBI (also withheld from counsel), the men describe the pickup as being "late 60's – 70's," "'72 pickup possible dull dark blue with grey primer spots and a conventional straight bed," and "light colored full size pick-up possibly early '70's, not a narrow bed." (Ex.#44, OSBI 0060- 0063). The fact that the truck was seen at the store as early as forty-five minutes before Mrs. Haraway's abduction, changes the profile of who may have taken her. Clearly, that person could not have been Mr.

_____

[26] The haphazard way the police investigation transpired is important to Mr. Fontenot's defense because of the six month delay in making an arrest, the specious information that led to his arrest, and the cumulative evidence establishing both an alternative motive and suspect from the crime scene.

[27] "Ladies and gentlemen, around 8:30 on April 28th, 1984, death drove up in front of McAnally's in a gray primered Chevrolet pickup, parked facing east in the drive …"

Fontenot since he did not have access to such a truck and Mr. McKinnis who was a long-time acquaintance, said Mr. Fontenot was not the man behind the counter.

Law enforcement's failure to investigate the witness accounts they had in hand demonstrates a consistent pattern of failing to develop evidence. *See Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir. 1986)(explaining that a *Brady* violation may occur because, "A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible Brady violation."); *see also Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985).

### c. Gary Haney & Guy Keys

Both Gary Haney and Guy Keys contacted police in response to Detective Dennis Smith's request for information carried in local television and newspapers. Mr. Haney states he was in McAnally's with his son about 8 p.m. and stayed about ten to twelve minutes. (Dkt.# 123, Ex.# 4). He said nothing unusual transpired during their time in the store. *Id.* The register tape does not give a time for his arrival at the store. His purchase which took place after both Officer Holkum and Mr. McKinnis. (Dkt.# 123, Ex.# 35). Mr. Keys also recalled being in the store on that day and telling the police the same facts. (Ex.# 7). He is noted as arriving at McAnally's at 8:25 pm. (Dkt.# 123, Ex.# 32). For both gentlemen, no police reports document how they had responded to Detective Smith's request for information, what, if any details they provided the APD, and whether that information was developed by police in some meaningful fashion.

The timing of Mr. Key's visit to McAnally's is critical because it is five minutes before David and Lenny Timmons arrived at McAnally's with their uncle. **If their account of arriving close to 8:30 pm is true, then three other purchases must have been made in quick succession to allow for the last transaction of a tallboy beer.** (Dkt.# 123, Ex.# 33) (highlighted in yellow)(emphasis added).

Other evidence casts doubt regarding the timing of Mrs. Haraway's disappearance. Witnesses who arrived at McAnally's only to find it empty prior to the Timmons' arrival. A family coming to get gas entered the store to find that Mrs. Haraway was not there. (Dkt.# 123, Ex.# 56). Such witness accounts place further doubt about when precisely Mrs. Haraway went missing and the circumstances surrounding her disappearance. Establishing the timing of Mrs. Haraway's departure from the convenience store is essential to proving to the jury that Mr. Fontenot was at a party with numerous people during this timeframe.

Whether the APD received other calls which may have filled in the missing transactions is unknown since no reports concerning who was in the store were provided to defense counsel. This information would have been extremely helpful to narrow down the time when Mrs. Haraway went missing. That supported Mr. Fontenot's alibi, the possible people who had motive to abduct her, and the pickup truck present around the store for thirty minutes prior to her abduction. None of this evidence was ever presented at any of Mr. Fontenot's trials, apparently was not given to the prosecution via the OSBI prosecutorial, was not provided in post-conviction, and continues to be withheld from Mr. Fontenot's counsel.

### d. Gene Whelchel

The last notation on the register tape lists a transaction with Gene Whelchel at 9:00 pm. (Ex.# 37). Mr. Whelchel testified that he arrived at McAnally's around 8:30 pm. (N/T 6/9/1988). After realizing there was no clerk in the store, he called the owner of the store, the manager, and the Ada Police.( N/T 6/9/1988 p. 63). The dispatch logs from the APD show the call at 8:50 pm. (Dkt.# 123, Ex.# 41). The police responded to the scene shortly thereafter.( N/T 6/9/1985 p. 85-86). After the initial APD patrol arrived, Detective Mike Baskins arrived at McAnally's to start the investigation. (P/H p. 462, 464). At the time the APD and the Detectives arrived, the crime scene should have been secured to preserve evidence, e.g. fingerprints, cigarette butts, beer cans,

Mrs. Haraway's purse, all of which were found on the counter.(N/T 6/9/1985 p. 103-110-111; J/T 1259-1240, 1422-23, 1439, 1441, 1447-1448). Instead, the police failed to secure the crime scene. (Dkt.# 123, Ex.# 20). At the very minimum, had defense counsel known about the 9:00 p.m. transaction, numerous lines of cross-examination and impeachment would have been pursued not only for law enforcement, but for Mr. Whelchel and the Timmons brothers, the prosecution's sole eyewitnesses. Police malfeasance that caused loss or degradation of evidence was something defense counsel was entitled to use to investigate and pursue through direct and cross examination. *See Kyles*, 514 U.S. at 445 (discussing how evidence can be material if its disclosure helps defense counsel attack the thoroughness of law enforcement investigations).

Challenging the timing of events and the convenience store evidence was a key issue to Mr. Fontenot's defense. Uncertainty about the timing casts further doubt on Mr. Fontenot's confession and the quality of the police investigation. Specifically, defense counsel could have asked Mr. Whelchel why his purchase was rung up **after** the police arrived **and by whom**. Mr. Butner could have asked Monroe Atkeson, McAnally's manager, who was there when police arrived, whether he rung up the transaction, and if he knew any details of the sales that night.

Defense counsel would have examined witnesses about the names, dates, and purchases from the register tape from Mr. Whelchel and the Timmons brothers to probe the accuracy of their accounts. Further, the defense would have had the information necessary to cross examine detectives about proper procedure for securing the crime scene and why the procedure was not followed during a robbery and abduction. The continued pattern by the APD of failing to properly document witness contacts and other crucial evidence underscores the lack of credibility and reliability of their investigation and casts significant doubt about their ability to properly determine what happened at McAnally's.

Additionally, knowing the accounts of people in McAnally's in the moments leading up

to Mrs. Haraway's disappearance supports Mr. Fontenot's undisclosed alibi in two regards:

First, it would have been of utmost importance to the defense to inquire if anyone saw Mr. Fontenot at the store. The withheld reports provide more people who were interviewed, shown lineups, and did not inculpate Mr. Fontenot. They provide descriptions of men seen in the store which support the possibility that either the man was known to Mrs. Haraway, or it could have been someone stalking her beforehand. Without the benefits of the reports, defense counsel was deprived of the opportunity of developing these defenses. Second, it provides a profile of a suspect who did commit this crime. At least two witnesses who did not testify saw the primered truck at McAnally's. These witnesses also remember a gray pickup truck being at McAnally's for much longer than the prosecution asserts. The truck did not belong to Mrs. Haraway nor anyone who was employed at the store. Whomever owned the truck either abducted Mrs. Haraway, or had knowledge of what transpired in the store. In either situation, the police failed to investigate this obvious lead and deprived Mr. Butner of the opportunity to do the same for his client.

### 3. Floyd DeGraw

Shortly after Mrs. Haraway's disappearance, the APD focused their attention on a suspect arrested in Texas for assaulting another woman named Donna.(Dkt.# 123, Ex.# 24). Police mentioned to the press that Floyd DeGraw was a possible suspect in the Haraway case. (Dkt.# 123, Ex.# 26) This was the extent of information given by law enforcement into Mr. DeGraw's potential involvement. However, the APD and OSBI extensively investigated Mr. DeGraw. Their investigation took place from shortly after April 28th until after December 1984, two months after Mr. Fontenot was charged with Mrs. Haraway's abduction and murder. (Ex.# 44, OSBI 0747-0750, 0751, 0754-0759). What is unclear is why these agencies, so focused in finding Mrs. Haraway, stopped investigating Mr. DeGraw when his statements and behavior continued to implicate himself in her abduction.

Mr. DeGraw came to the attention of Pontotoc County law enforcement as a suspect when he was arrested in Amarillo, Texas on May 3, 1984, for raping Donna Ellis and leaving her naked in a field. (Dkt.# 123, Ex.# 24). Mr. DeGraw had several other prior convictions including serving three years for malicious wounding and is currently serving life imprisonment for stabbing a woman to death. Dkt.# 123, (Ex.#s 44, OSBI 0014 & 47). When arrested in Amarillo, police searched his car. Prior to Mr. DeGraw's arrest, someone had apparently removed the back seat. When the car was searched, police found jewelry and other belongings of women from several Oklahoma cities along with a stolen driver's license from a woman in Ada. (Ex.# 24, at 16-18). Police also found pornographic materials depicting violence against women. (OSBI 0713- 0722). While in custody in Texas, Detective Dennis Smith relayed information to OSBI Agent Gary Davis who was tasked with interviewing Mr. DeGraw for the OSBI. (Dkt.# 123, Ex.# 44, OSBI 0014). Agent Davis took along an OSBI criminalist to document and examine the contents of Mr. DeGraw's car.

OSBI Reports show Mr. DeGraw had told agents he left Detroit in a friend's car heading west sometime in April 1984. *Id.* During his drive, he picked up a hitchhiker, Jeffrey Johnson, and they journeyed to visit Johnson's friend in Memphis, Tennessee. *Id.* While in Memphis, they stayed several hours at Gordon Elliott's house before continuing west on April 27th. *Id.* When asked if the men drove through Oklahoma, specifically stopping in Ada, Oklahoma, DeGraw was adamant that he slept through his entire drive through the state; if they had stopped, it was not in Ada. (Dkt.# 123, Ex.# 44, OSBI 0027). However, most, if not all of Mr. DeGraw's story turned out to be a lie as shown by OSBI's later investigation.

Not only did the OSBI send agents to interview Mr. DeGraw and search his car, a polygraph examination was arranged. On May 10, 1984, Mr. DeGraw was polygraphed by Amarillo Detective Jimmy Stevens. During the examination, Detective Stevens asked several

questions pertaining to the Haraway case.

> Concerning the kidnapping of the girl in Ada, Oklahoma, do you intend to be truthful about?" DeGraw was very deceptive on this question. Also, on question #6, which was "About ten days ago did you participate in a kidnapping in Ada, Oklahoma? Lieutenant Stevens stated that DeGraw was deceptive in this. Also, question #10 which was, "Have you ever seen the girl whose pictures is on the wall in front of you now?", was deceptive, but other questions that were asked, the response was very flat, and Lieutenant Stevens felt that overall DeGraw was not involved in the kidnapping of this girl from Ada.

(Dkt.# 123, Ex.# 44, OSBI 0024).

Reports show Detective Lieutenant Stevens had invited the OSBI to evaluate the polygraph data for themselves. However, the results, if any, of OSBI's assessment of the polygraph are unknown to defense because it was not included in the disclosed OSBI reports. Further, OSBI files do not contain either the raw data received from Amarillo Police, or any other parts of their investigation. (Dkt.# 123, Ex.# 24, at 16-18). Whatever the OSBI's opinion of Mr. DeGraw, this did not end their investigation or eliminate him as a suspect.

OSBI Agent Davis, along with the Amarillo police, showed Mr. DeGraw pictures of Denice Haraway during their interrogation. While police pointed out numerous inconsistencies in his story about traveling from Detroit, Mr. Degraw claimed the reason he had problems with questions related to Mrs. Haraway was because his cousin was kidnapped and raped when he was twelve. (Dkt.# 123, Ex.# 44, OSBI 0024). Mr. DeGraw also stated that his sister looked like Mrs. Haraway. *Id.* When pressed further about Mrs. Haraway,

> At one time during the conversation and as Agent Davis put the picture of the victim from Ada before DeGraw, DeGraw held his head in his hands and appeared about to break down, but after recomposing himself, lifted his head with his eyes very red and stated that he did not know anything about the woman who was abducted in Ada, but hoped we would find her alive. DeGraw then became irritable, pacing the floor, saying he did not want to answer any more questions and continued doing this while Agent Davis continued talking. DeGraw then insisted on being taken back to his cell and not answering any more questions. . .

(Ex.# 44, OSBI 0027). Mr. DeGraw admitted stealing money for his journey and discussed a

robbery which had occurred several years prior. (Ex.# 44, OSBI 0025). He also discussed his institutionalization for mental health issues including his tendency to, "fly off the handle." (Ex.# 44, OSBI 0026).

Agent Davis investigated Mr. DeGraw's story and quickly found several untruths. He obtained court files from Missouri showing that Jeff Johnson who Mr. DeGraw claimed to have travelled with was incarcerated on murder charges when he was supposedly traveling with Mr. DeGraw. (Dkt.# 123, Ex.# 45). Agent Davis reached out to the Calloway Police Department in Missouri for Jeffrey Johnson's murder investigation file.(Dkt.# 123, Ex.# 85). The first page of notes detail that the file was mailed to Agent Davis on May 22nd. *Id.*

Also, Gordon Elliott, who was supposedly Johnson's longtime friend, spoke more familiarly with Mr. DeGraw after his arrest in Texas. (Ex.# 44, OSBI 0021 & 0023). OSBI recorded the call between Elliott and Mr. DeGraw regarding the Haraway case, but that tape, or a transcript of the conversation was not provided to defense counsel and has yet to be disclosed. (Dkt.# 123, Ex.# 44, OSBI 0023). Very little of Mr. DeGraw's story checked out once investigated by OSBI. These discrepancies in Mr. DeGraw's version of events were troubling given his past violence towards women, his lies to police about his activities in Oklahoma, the drivers license of a woman from Ada, the timing of the rape in Amarillo, and his incriminating statements and conduct when interviewed by OSBI.

Why and if OSBI and Ada PD eliminated DeGraw as a suspect remains a mystery given his story was completely fabricated. His acknowledged deception during the polygraph, emotional breakdown when questioned further about Haraway, his proximity to Ada, mental health issues, and his consistent violence towards women made Mr. DeGraw a likely suspect. His booking photograph shows a striking similarity to the composite drawings released by police. (Dkt.# 123, Ex.#s 24, at 23; 76; & 77).

Mr. DeGraw would certainly have been a prime target for a defense attorney. It is unclear why the police investigation into DeGraw stopped when his story as to who he traveled with proved to be a complete fabrication. Defense counsel was entitled to know the extent to which the OSBI and APD investigated DeGraw in the week after Mrs. Haraway's disappearance. Investigators continued to generate reports even after Mr. Fontenot was charged with her abduction and murder. (Dkt.# 123, Ex.# 44, at 0747-0750, 0751, 0754-0759). The withheld evidence not only provided a viable alternative suspect for the defense, but it was ripe ground for impeachment of law enforcement, based upon their failure to fully explore Mr. DeGraw's lies or to competently explain why he was apparently cleared as a suspect. The prosecution's willful failure to disclose this valuable evidence to the defense is a serious violation of the trust placed in the prosecutor by the judicial system.

The failure of the district attorney to disclose such important exculpatory evidence is a violation of Mr. Fontenot's constitutional rights. *See Kyle*, 514 at 446 (finding the cross examination into flaws in the police investigation a viable avenue regarding *Brady* evidence); *see also Bowen v. Maynard*, 799 F.2d 593, 612 (10th Cir. Okla. 1986) (granting habeas relief because withheld evidence of a different suspect created a "reasonable doubt" and "in the hands of the defense, it could have been used to uncover other leads and defense theories and to discredit the police investigation of the murders"); *Smith v. Secretary of N.M. Dep't of Corrections*, 50 F.3d. 801, 830 (10th Cir. 1995)(failure to disclose alternate suspect police report was a *Brady* violation because, "it dramatically altered and limited the effectiveness of Mr. Smith's defense at trial. . .would have been useful in 'discrediting the caliber of the investigation or the decision to charge the defendant'"). The fact that the State continues to withhold taped conversations between DeGraw and Elliott, polygraph data, and other evidence pertaining to the DeGraw investigation continues to deprive Mr. Fontenot of his Fourteenth Amendment constitutional rights.

### 4. Withheld interview reports and taped statements of Jeff Miller and Terri Holland (McCarthy)

The OSBI prosecutorial contains a table of contents. It details the evidence collected during the investigation. This table was not previously provided to the defense. (Dkt.# 123, Ex.# 43, at 7- 8). Included in the list is all physical evidence supporting the OSBI's case against Mr. Fontenot and his codefendant, Tommy Ward. This table of contents reveals three specific items that were not disclosed to defense counsel:

1. The audio recorded interview of Jeffrey Miller;

2. The video tape interview of Jeffrey Miller and;

3. The audio tape of Terri Holland.

Jeff Miller was the person Detective Smith testified had given police the information that led to both Mr. Ward and Mr. Fontenot being questioned and later arrested. (P/H at 502). Detective Smith testified that Mr. Miller provided information against O'Dell Titsworth prior to October 12, 1984, in a statement to police. (P/H at 710).

Given that Mr. Titsworth could not have been involved in any crimes related to Mrs. Haraway's death because he was in police custody at the time, any statements made by Mr. Miller were suspect. Whatever Mr. Miller said became the catalyst for the law enforcement investigation against Mr. Fontenot. However, it is unknown exactly what Jeff Miller said to the Ada Police because no report or, statements detailing what Mr. Miller said, have ever been disclosed to the defense even though the police have acknowledged possessing such information. Jeff Miller never testified at any hearing or trial about what information he provided inculpating Mr. Fontenot. Further, it is unclear what investigation, other than the interrogations of Mr. Fontenot and Mr. Ward, that law enforcement conducted to verify any of the information Mr. Miller provided.

The police investigation into what happened to Mrs. Haraway had stalled prior to

whatever information Mr. Miller provided. The police investigation rested completely on whatever information Mr. Miller provided to Detectives Baskins and Smith. The State opposed any action to disclose the information gleaned from Mr. Miller based on the work product doctrine.[28] ( P/H at 765-771).

The disclosure of Mr. Miller's statements and recordings were specifically and repeatedly requested by defense counsel. (P/H at 496, 501-508, 710-712)**.** Mr. Butner sought to understand why, after six months, the police focused on Mr. Ward which led them to Mr. Fontenot.

A.    We interviewed everyone and then we had some additional information that came in.

Q.    From whom?

A.    Jeff Miller.

Q.    When did that come in, approximately?

A.    Prior to October 12th, I'm not sure of the exact date.

Q.    Who is Jeff Miller?

A.    He lives here in Ada, that's about all I know about him.

Q.    Did you interview Mr. Miller?

A.    Yes, we did.

Q.    Where?

A.     In the Police Department.

Q.    The District Attorney has advised that he is not among the list of witnesses in this case. Did you feel his information in this case was pertinent, that it was informative and useful?

---

[28] The work product doctrine does not excuse a prosecutor's obligation to disclose *Brady* materials. *See generally Castleberry v. Crisp*, 414 F. Supp. 945 (N.D. OK 1976). While a prosecutor's thoughts and impressions are protected, if there is exculpatory or impeachment evidence, that must be disclosed to a defendant prior to trial. *See United States v. Armstrong, 517 U.S. 456, 474-75, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996)* (Breyer, J., concurring in part and concurring in the judgment) (presupposing *Brady* overrides work-product doctrine)

A.    Yes.

Q.    Do you have knowledge as to why he's not being used as a witness?

A.    No, I don't.

Q.    And it's from his statement that you went back to Ward, is that correct?

A.    Well, it's from his – what he told us, but the information that he had was from someone else.

Q.    From whom?

A.    Several people I ---

Q.    Let me have their names please.

A.    I can't think of them right off.

Ada Police Detective Mike Baskins. (P/H 1/14/85 at 501-502).

Defense counsel repeatedly requested Mr. Miller's statements, or the people he mentioned leading to Mr. Ward and Mr. Fontenot. *Id.* However, the district attorney fought any disclosure of this evidence. "Judge, Mr. Wyatt doesn't have any right to any more discovery than he had before, and by standing up here and saying "they may be exculpatory" has nothing to do with whether they are or not. And this police officer does not have to turn him over -- what he's trying to find out, Judge, is [work] product, and he can't do that through this mechanism or through a motion for discovery or anything else." *Id.* at 503. The trial court did order the disclosure of any of the names Jeff Miller provided to police or his statements to police.

Terri (McCarthy) Holland testified during the preliminary hearing about hearing both Mr. Fontenot and Mr. Ward confess to participating in the murder of Mrs. Haraway. She told a jail trustee of her conversation with Mr. Fontenot. (P/H at 878-879). Afterwards, DA investigator Lloyd Bond came to interview them concerning her statement. *Id.* at 883-884. Ms. Holland was serving three years for hot checks. *Id.* at 888-889. She claimed to have heard Mr. Fontenot's

incriminating statements while being held at the Pontotoc County Jail. Strategically, she had been placed by the Pontotoc County Sheriff in a cell across from him for nine days. *Id.* at 901.

A. Yeah, I hollered at Karl. Well, see, Ron Scott told us not to talk to each other.

Q. And who is Ron Scott?

A. The jailer.

Q. Okay.

A. The head jailer over there.

Q. And he told you not to talk to each other, is that correct?

A. Right. So, when he left the room and locked the big door, the first thing I do was holler at Karl. Well, at first he wouldn't answer me, and I guess it was about ten minutes and he hollered at me, and he wanted a cigarette. And as the conversation went, I asked him what he was in there for, and he told me.

Q. What did he tell you he was in for?

A. he told me that they – He asked me if I knew Donna Haraway; and I told him no, I didn't. And it just went from there, he told me about what had happened.

Q. Would you tell the Court what he told you, please.

A. He told me that him and Odell and Tommy went to the store; that Tommy and Odell went in and got her; they took her out to an old house; there Odell raped her and then Tommy; she run from Tommy; Tommy caught her. In the process, somehow, he cut her down the arm and bit her on the titty, and Odell stabbed her to death, he killed her; then Karl raped her. Uh – yeah, they kicked her off in a rotty part of the floor and poured gasoline on her and burned her.

*Id.* at 890-891.[29] During her cross examination, she acknowledged being interviewed by deputy Tom Turner and videotaped by OSBI Agent Rogers a month after hearing Mr. Fontenot's supposed confession. *Id.* at 897-898. Mr. Butner requested access to her videotape statement to

---

[29] Ms. Holland's cell was across from Mr. Fontenot's even though he was moved to a juvenile section at one point. (P/H 854, 872, 890-891). She then admitted she was trustee allowing her access to other area of the jail. *Id.* at 891.

which both Mr. Peterson and Mr. Ross objected. *Id.* at 907-908.[30] The trial court overruled the

defense request for the video. *Id.*

After the trial court found probable cause to hold Mr. Fontenot over for trial, Ms. Holland

testified during the joint trial. (J/T. at 1824). Ms. Holland admitted getting married in between the

preliminary hearing and her trial testimony on September 18, 1985. (J/T. at 1823). Her trial

testimony was consistent with her preliminary hearing testimony. (J/T at 1823-1854). However,

the district attorney still had not, and has never divulged the videotape or any police reports

concerning Ms. Holland's statements about the jailhouse confession.

Ms. Holland was a known snitch[31] who had previously served the district attorney in

---

[30] Belying the DA's office statement of open file discovery and disclosure, they fought any release of information concerning witnesses. Regarding Ms. Holland, who had a history of providing such testimony, Mr. Peterson stated: MR. PETERSON: First of all, Your Honor -- May, we approach the bench? They're entitled to sworn statements of the Defendant. Okay? Sworn statements of any witness, that they're getting right now; and any statements by the Defendant to law enforcement. Now, I fail to see where this woman is a law enforcement officer. (P/H 907-908).

Mr. Ross countered a defense counsel request for inconsistent statements:

MR. ROSS: Your Honor, in that these are right along the line of a prior written statement, they don't have a right to see that. If there's an inconsistency -- only if we bring out an inconsistency, do they have a right to view it. We have not done that with Ms. McCartney. I don't think they have a right to see the video tape until after the Defendants have been bound over for hearing. *Id.* at 909.

[31] When she came forward claiming to have heard Mr. Fontenot confess, she also heard Ron Williamson confess at the same time. The United States District Court found this problematic in Mr. Williamson's habeas corpus litigation. (pgs. 33-35, 61-62). During the Williamson & Fritz 42 USC §1983 civil litigation, Bill Peterson, Pontotoc County District Attorney at the time of these trials, was asked about Terri Holland's testimony in other cases and the Haraway murder was discussed:
"Q All right. Did you know Terri Holland before this case?
A I knew of her.
Q Had you ever put her on as a witness before?
A Boy, I think she's-- as I'm sitting here, my memory is that she's testified, that I know of, in two different cases, two homicides.
Q All right. One was the Haraway case?
A Yes.
Q That's the book that was called-- written about it called "The Dreams of Ada"?
A Yeah. That's a book that was written about his idea of what the case was yeah.
Q And the Haraway murder case, Dennis Smith and Gary Rogers were also lead investigators?
A They were part of the investigative team, yes.
Q And were there also confessions in that case from some of the defendants that involved their statements that they dreamed about the crime?
A No, sir. That's not how it happened at all.
Q Were there any such statements from defendants?
A There was videotaped statements of both Fritz and -- excuse me -- Fontenot and Ward making statements that

another case in which she had claimed to have heard similar incriminating comments from another inmate. (Dkt.# 123, Ex.# 61) (discussing her testimony in the Williamson case where she supposedly overheard him confess to a murder).

A written version of her statement to Deputy Turner was included in the 860 plus pages of OSBI Reports. (Dkt.# 123, Ex.# 44 at 282-289). Again, none of these documents had been provided to the defense until long after all trials and well into the post-conviction process. The withheld statement was taken on November 6, 1984, and contradicts several statements made by Ms. Holland during her preliminary hearing testimony and trial testimony. *Id*. at 282. She interweaved conversations with Mr. Ward, Mr. Titsworth, and Mr. Fontenot while also explaining how all of this was relayed to other officers or jail personnel. *Id*. One commonality in Ms. Holland's withheld report was the inconsistency in the statements she attributes to Mr. Fontenot.

Because the District Attorney failed to turn over this statement, Mr. Butner was unable to impeach Ms. Holland's inconsistent testimony during the preliminary hearing and joint trial. (P/H. at 888-927). Just as important, it is unknown what transpired during the taped statement that could have further undermined her credibility, or shed light on the benefits received for her testimony. Her conduct in this case mirrors her testimony in the Williamson-Fritz wrongful

---

were very incriminatory, and at the end of Mr. Ward's statement, Mike-- excuse me—Dennis Smith asked him the question, "is there anything else you would like to add to this?" And he said, "It all seems like a dream now."
Q Okay. Now—
A So there's where we get "Dreams of Ada."
Q So other than the Haraway case and this case, was there any other time that you had used Terri Holland as a witness?
A Not to my memory.
Q And in both cases you used her as a jailhouse informant?
A. She happened to be in the jail at the same time these people, all these people were in jail. Yeah.
Q. All right. Now I'm showing you page ---
A She was not the entire case against Tommy Ward and Karl Fontenot."
(Peterson Vol II, p. 360-362; Rogers Vol II, p. 415 similar testimony).

convictions. Ms. Holland received substantial benefits for her role in assisting the district attorney. It appears Ms. Holland also got rewarded for her testimony by the prosecutor in this case, though it has never been admitted by the prosecution. Randy Holland, Ms. Holland's husband during the time of Mr. Fontenot's trial, explained the extent of her deals for her testimony:

> I was formerly married to Terri Holland, now deceased. Terri and I got married while I was an inmate at the Pontotoc County Jail, on September 4, 1985.

> I was facing up to forty years, but Terri made a deal with Bill Peterson, the district attorney in Pontotoc County. She agreed to testify for him in the state's case against Tommy Ward and Karl Fontenot. In exchange for her testimony, I was to receive seven years on my pending case and we were given permission to marry while I was in jail.

> I only found out about the deal Terri made with Bill Peterson when Terri and I got into an argument. We were living near the dam on Ft. Gibson Lake, in about 1992. This was a very intense argument, and she let me know at that time what she had done for me.

(Dkt.# 123, Ex.#s 10, 86). Clearly, any benefits conferred on a witness for the state, must be disclosed to defense counsel. *See U.S. v. Bagley*, 473 U.S. 667 (1985); *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009). The State only used Ms. Holland as a witness during the preliminary hearing, However, this does not remove the constitutional obligation to disclose impeachment evidence.

### 5. OSBI Reports of Mrs. Haraway's Fear of Being Stalked.

Several withheld interview reports indicate Mrs. Haraway was scared about working at McAnally's not only due to the clientele, but more importantly because of the harassing telephone calls she received during her shifts. Whomever this man was making these harassing calls knew her work schedule. Many of Mrs. Haraway's friends, family, and co-workers knew this, and told police, but the prosecution disclosed none of their statements to the defense.

James Watt, a co-worker, explained that Mrs. Haraway told him these calls had stopped for a period in the early months of 1984, but began again in the weeks leading up to her

disappearance. (Dkt.# 123, Ex.#s 15 & 62). Mrs. Haraway only worked at McAnally's in the evenings from Thursday to Sunday. (Dkt.# 123, Ex.# 15). All the witnesses agreed that these calls, always from a man, greatly distressed her, her family, and her co-workers. Mrs. Haraway's sister, Janet, stated the fact that Mrs. Haraway was afraid of someone and did not like to work at McAnally's.

> According to Janet, Donna told her on the phone she hated working at the store because it did not have an alarm and a lot of weirdo's come in and out of the store. She told Janet that she was going to look for another job because she felt uneasy working at the store alone at night. **She told Janet that the phone calls had started again but didn't go into the whole story. Janet said that earlier Donna had been receiving calls at work from a man that said he was going to come out to the store some night and wait outside while he was working. She said that Donna was upset because she had asked for the night off and a guy refused to work, and she had to work anyway.**

(Dkt.# 123, Ex.# 43, prosecutorial bates 20, 109) (emphasis added). This information was also relayed to police by the store manager, Monroe Atkeson, about a conversation he had with Steve Haraway, the victim's husband.

> Steve told Atkeson that a Vietnam Veteran had been harassing Donna and Donna had received several obscene telephone calls. Atkeson had seen the veteran that Steve spoke of and Atkeson described the veteran as a white male, six feet, 190 pounds, black hair, brown eyes, mustache, light complexion, usually drove a white Chevrolet Chevette and bought a soft drink. Atkeson believed that the veteran attended a rehabilitation school in Okmulgee.

(Dkt.# 123, Ex.# 44, OSBI 0006). The police also spoke with Steve Haraway who confirmed the calls his wife received while working at McAnally's. "Steve received a phone call from the police who told him that his wife was missing. He knew of no one that Donna was having problems with at the store, other than she had received two to three obscene phone calls at the store. The last phone call was two or three weeks prior to her disappearance." (Dkt.# 123, Ex.# 43, prosecutorial bates 20). Clearly, the people closest to Mrs. Haraway were aware of a potential threat that continued for months and weeks prior to April 28th.

Another withheld document was a report from co-worker James D. Watts who testified for the State at Mr. Fontenot's trial. In an interview with the Pontotoc County Sheriff's Office on July 25, 1985, Mr. Watt explained that "Denice had told me of some obscene phone calls she had received at the store for a while, these calls upset her a great deal. She could not recognize the voice over the phone and the calls stopped about one month before she disappeared." (Dkt.# 123, Ex.# 62).[32]

The State did not turn over any of these vital reports to the defense. Information related to potential suspects falls within the evidence a prosecutor must disclose to defense counsel. *See Kyles*, 514 U.S. at 446 (evidence of alternative suspects allows the defense to attack "the reliability of the investigation" if it shows that investigators were less than energetic in exploring other potential suspects . . . After all, a "common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant . . .."); *Trammell v. McKune*, 485 F.3d 546, 552 (10th Cir. 2007) (suppressing evidence of alternative suspects "could also have been used to cast doubt on police officers' decision to focus their attention . . . on [the defendant] rather than" the other suspects).

Had reports from OSBI and the Sheriff's office been disclosed, they would have aided Mr. Fontenot's defense to investigate alternate suspects who had intent along with motive and opportunity to harm Mrs. Haraway. It is obvious from these statements that a likely suspect existed that had been stalking Ms. Haraway for months, and provided a much more likely suspect than Mr. Fontenot.

These statements tied in with the interview report of Anthony Johnson. Mr. Johnson, a

---

[32]The duplicate version found in the District Attorney's files pursuant to this Court's subpoena shows notes from one of the trials illustrating the prosecution's awareness of this document despite his statements to the contrary. (Dkt.# 123, Ex.# 78 at 50-51).

frequent customer at McAnally's, remembered a conversation he had with Mrs. Haraway a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Haraway's disappearance he was in the McAnally's convenience store when Haraway asked him where she could buy a gun. Haraway referenced the need for a gun with some funny calls she had recently been receiving. Haraway said she didn't really know who was making the calls, and that the caller never really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making these calls and said that Johnson was of the opinion that she knew who was making the calls but did not seem to want to indicate who it was.

(Dkt.# 123, Ex.# 22). Mrs. Haraway was so afraid of the stalker that she wanted a gun to keep at the store as protection. With such evidence, the defense could have pursed other witnesses who would have known of Mrs. Haraway's fears and potentially identified the alternate suspect. Further, just two days before Mrs. Haraway went missing, she spoke with Darlene Adams, another customer at McAnally's. Mrs. Haraway explained to Ms. Adams she was afraid working at night at the store, but her schedule would not be changed.[33] (Dkt.# 123, Ex.# 3).

The State failed in two regards concerning this information. First, this evidence should have been investigated in 1984, particularly because this information came from those closest to Mrs. Haraway. This is not a situation where only one person made a side comment about a few weird telephone calls. Instead, numerous people, including her husband, manager, co-worker, customers, and mother were aware of this conduct. They immediately shared this information with police in the hopes that it would assist in their investigation into her mysterious disappearance. Instead, the police ignored it completely. At the time, it would have been possible

---

[33] Another line of inquiry could have been to Monroe Atkeson, McAnally's store manager, about his awareness of Mrs. Haraway's fear about working in the store. Mr. Butner could have cross-examined him about the obscene phone calls during her shift, or why he refused to change her schedule given her statements about the strange men in the store.

for law enforcement to pull McAnally's telephone records to see who called the store. Further, OSBI and APD could have cross-referenced callers with customers.

Second, despite their obligations, the police or prosecution kept this critical information from defense counsel. This evidence should have been disclosed because it clearly points to another person who watched and threatened the victim and could have generated additional exculpatory evidence if investigated. *See Bowen*, 799 F.2d at 613.

### D.    Prejudice from The Non-Disclosure of Exculpatory Evidence

No one in Mr. Fontenot's defense had access to the OSBI or APD reports showing any of the new witnesses accounts from McAnally's, alternate suspects—including Floyd DeGraw, witnesses supporting Mr. Fontenot's alibi, the stalker of Mrs. Haraway, and the reports of Jeff Miller's statements and Terri Holland's deal. Despite both trial and appellate counsel's repeated requests and attempts to gain access to such crucial information, exculpatory and vital impeachment evidence was squelched. The withheld evidence clearly fell within the gambit of the defense discovery pleadings and would have been vital to a defense.

Mr. Fontenot's trial counsel, George Butner, received none of the evidence discussed above as "newly discovered evidence of innocence" or "*Brady*" material. During his deposition, he explained the flaws in the District Attorney's open file policy and law enforcement's withholding of evidence from the defense.

> You-- you go in. You sit down. I -- I want everything you've got. I want your discovery. And if they -- if they mean that they're -- you're (sic) going to give you the case file and let you go through it, then that's -- if the policy, the open file policy, is appropriate, all of the things from 8 law enforcement should, in fact, be in it, but we have discovered in other cases that not everything from law enforcement is available and it seems to be more likely than not something that may be classified as a *Brady – Brady* matter, because I'm -- I'm only speculating, but I figure that law enforcement, if they went out and talked to George Butner about the Donna Denice Haraway killing and I was in Zambia at the time, that it -- it was not disclosed, okay. I mean, I just don't think that the law enforcement gathered everything that they did to allow proper examination in the open file policy by

defense counsel.

(Dkt.# 123, Ex.# 81 at 44).

> And Mr. Peterson's position was that law enforcement was the integral part of his being district attorney. Keep law enforcement happy, he stays with it a long time. And, so, he -- I don't think -- to be perfectly honest with you, my opinion is that he did not exercise appropriate professional supervision in requiring law enforcement to get him the appropriate stuff. I mean – and Bill takes a lot of heat for this, but I think they try it like the law enforcement officers want it tried and so law enforcement officers sometimes just give him what they think he needs and so --

*Id.* at 16. Further, in his statement, Mr. Butner explained that he did not receive the OSBI reports during his representation of Mr. Fontenot. As is now clear, these files were not in the District Attorney's open file by their own admission.

> I represented Karl Fontenot from late 1984 through 1988, for Karl's first and second trials. I did not represent Karl during his appeals. I handled all pre-trial and trial matters for both trials including the preliminary hearing. During the scope of my representation, I filed numerous pretrial motions requesting discovery and disclosures of records, physical evidence, investigation reports, witness statements, records, and other evidence pertaining to the disappearance and homicide of Donna Denice Haraway. Additionally, I made numerous motions on the record during the preliminary hearing and at various points in the trial asking for access to evidence, police reports, and other evidence within the custody of law enforcement and Pontotoc District Attorney's Office. In most cases, these requests were denied.

> Tiffany Murphy, Director of the Oklahoma Innocence Project, provided me with 860 pages of Oklahoma State Bureau of Investigation reports (OSBI) of their investigation of Donna Denice Haraway's disappearance, Central Office of the Chief Medical Examiner's file, and photographs of McAnally's register tape from 4/28/1984. **After reviewing these materials, I did not receive any of the OSBI Reports from the Pontotoc District Attorney's Office or from OSBI prior to either of Mr. Fontenot's trials. Additionally, I do not believe I received the whole 44 pages of ME's Office files. While I know the McAnally's register tape was admitted at trial as a state's exhibit, I received no police reports about the names, telephone numbers, and times of the men mentioned on the tape regarding any interviews related to the events of April 28, 1984.**

> **During both trials, my main focus was proving Mr. Fontenot's innocence. Any evidence which would support proving his innocence was paramount. Evidence that the law enforcement investigation strongly considered alternate suspects for Ms. Haraway's abduction and murder would have been evidence**

**that fit in the defense's innocence case. I was unaware of the extensive investigation done into Floyd DeGraw by Ada Police Detective Dennis Smith, OSBI Agents Gary Rogers and Gary Davis. I did not know he was poly-graphed by Agent Davis and that DeGraw showed indications of deception when asked about Ms. Haraway. Further, when DeGraw was interrogated by Davis and Texas law enforcement, he grew agitated when asked about Mrs. Haraway and abruptly ended the interview. Police reports related to DeGraw's investigation, his rape conviction in Texas, and the possessions of belonging from Oklahoma women would have been extremely important to Mr. Fontenot's case.**

**Further, I was unaware that Ms. Haraway received obscene phone calls while at work during the months and weeks leading up to her disappearance. I never saw reports from various people like Monroe Atkeson, Janet Lyons, James David Watts and others describing Ms. Haraway's great concern about a man making obscene phone calls only while she worked at McAnally's. Janet's report providing the names of all of Ms. Haraway's ex-boyfriends would have been extremely helpful to determine if they were the source of these calls or had motive to cause her harm. Also, Janet's comment that Ms. Haraway hated working at McAnally is because it did not have an alarm, her knowledge that the obscene phone calls continued to occur, and the bizarre people who came into the store at night would have been helpful to establish Karl's innocence. These OSBI reports would have been extremely helpful to further the defense investigation into alternate suspects or people around McAnally's who were watching Ms. Haraway.**

**I was unaware of the numerous OSBI reports supporting Mr. Fontenot's alibi of attending Gordon Calhoun's party during the time Mrs. Haraway went missing. Impeachment evidence from the OSBI reports regarding Gordon Calhoun's interview that the party could have been the weekend of April 27th or 28th was vital. This information ·would have helped substantiate Karl's alibi during the time Ms. Haraway disappeared. Janette Roberts' report about the party and Karl's attendance was important because I would have called her to testify during the defense case-in-chief. I was unaware that Ada Police Officer Larry Scott responded to one of the dispatch calls listed on the state's radio log exhibit. Officer Scott's police report about responding to Gordon Calhoun's party supported the alibi that the police were aware of the party. Finally, I was not provided Karl's poly-graphed statement where he admits being at the party. Such evidence would have been extremely useful to build a viable defense that Karl had nothing to do with Mrs. Haraway's disappearance and homicide.**

(Dkt.# 123, Ex.# 16)(emphasis added).

The impact this evidence would have had on either of Mr. Fontenot's trials or how Mr.

Butner would have utilized such evidence is incalculable. (P/H. at 496, 502-503, 769; J/T at 1816-1817);( Dkt.# 123, Ex.# 81). Instead, defense counsel during both trials lacked the necessary evidence to provide not only a viable defense to the state's charges, but an alternative theory of the crime, several alternate suspects, along with impeachment evidence for many of the State's witnesses. It is evident, in the absence of such exculpatory evidence, Mr. Fontenot did not, "receive[] a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

The egregious conduct by the State extends beyond the trial through Mr. Fontenot's direct appeal when the state discovered the remains of the victim. Appellate counsel properly sought discovery of relevant evidence including the medical examiner's reports, police reports, crime scene information, and other related evidence. (Ex.#s 57 & 58). Although the trial court granted her access to such evidence; the State continued to withhold the full medical examiner's report, photographs of the crime scene and other relevant evidence that would assist in the appeal. (Dkt.# 123, Ex.# 59).

> During my representation of Mr. Fontenot in his first direct appeal, skeletal remains later identified as Donna Denice Haraway were discovered on approximately January 20 or 21, 1986, near Gerty in Hughes County, Oklahoma. Due to the timing of this discovery and the unique circumstances of the case, and in anticipation of filing a motion for new trial based on newly discovered evidence, I filed a Motion to Disclose and Produce in Pontotoc County District Court on January 30, 1986, regarding the discovery of the remains, the condition of the remains and the Hughes County crime scene, and any interviews, reports, or investigations in connection therewith. I further requested all material which was exculpatory or favorable to Mr. Fontenot, which might be used to impeach prosecution witnesses who had testified at his trial, or which might lead to the discovery of same. At a hearing on this motion conducted March 3, 1986, I made a supplemental discovery request asking for all statements placing or tending to place any other suspect or suspects at or near the location of the discovery of Ms. Haraway's remains.

> On March 3, 1986, the Pontotoc County District Court entered an Order granting all of my discovery requests excepting only oral statements never reduced to writing. In granting my motion, the district court ordered, inter alia, that reports, medical examiner findings and photographs pertaining to the discovery of the

remains, the examination of the remains, the analysis of the remains and any other physical evidence uncovered at the crime scene be produced. Based upon this Order the Pontotoc County District Attorney's Office disclosed to me two pages of Oklahoma State Bureau of Investigation (OSBI) Criminalistics Examination Reports and three pages of reports from the Office of the Chief Medical Examiner for the State of Oklahoma. These five documents were appended to the Motion for New Trial on Newly Discovered Evidence I filed with the Oklahoma Court of Criminal Appeals on August 8, 1986. These five documents were the entirety of the records disclosed to me by the State.

In the fall of 2012, Tiffany Murphy contacted me regarding the Oklahoma Innocence Project's (OIP) review of Mr. Fontenot's case. We discussed what law enforcement reports and records were disclosed to me in connection with the above-described discovery proceedings. Ms. Murphy questioned me concerning approximately 860 pages of Bates stamped OSBI reports, which I did not recall ever having seen. In March of 2013, I reviewed approximately 860 pages of Bates-stamped OSBI reports, apparently obtained by OIDS after I left employment there. **After I reviewed these documents, I confirmed to Ms. Murphy that I do not recall ever having seen them before, although I had seen the two OSBI documents and three medical examiner documents described in the previous paragraph when they were disclosed to me by the Pontotoc County District Attorney's office but without Bates stamps on them. In April of 2013, the OIP sent me additional police reports, witness statements and other documents for my review to ascertain whether they were disclosed to me during my representation of Mr. Fontenot.**

**During litigation of Mr. Fontenot's direct appeal and his motion for new trial based on newly discovered evidence, my main focus was his innocence. To that end, any evidence which would support proving his innocence was paramount. Evidence that law enforcement strongly considered alternate suspects for Ms. Haraway's abduction and murder would have fit into the defense's case for innocence.**

(Dkt.# 123, Ex.# 11)(emphasis added). Neither counsel for Mr. Fontenot was required to continue to seek such evidence. *Banks v. Dretke*, 540 U.S. 668, 695 (2004) (holding that defense counsel is not required to scavenge for evidence the State was obligated to disclose). Instead they are entitled to rely on the prosecution to do its job in meeting its constitutional obligations to disclose such evidence. "Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed Brady material when the prosecution represents that all such material has been disclosed. As we observed in *Strickler*, defense counsel has no 'procedural obligation to assert

constitutional error on the basis of mere suspicion that some prosecutorial misstep may have occurred.'" *Id.* at 695-696.

This Court's evaluation of Mr. Fontenot's *Brady* claim rests on whether the evidence puts the case within an entirely different light concerning the evidence presented at trial and that which was impermissibly withheld. When evaluating the evidence withheld, the Court must conduct a cumulative evaluation of the evidence.

> While the definition of *Bagley* materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. **But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.**

*Kyles v. Whitley*, 514 U.S. at 437 (emphasis added). A cumulative assessment of the evidence presented places clear doubt on an already weak case against Mr. Fontenot. *Id.* at 436. There was no physical evidence connecting him to McAnally's, Mrs. Haraway, or her abduction and murder.

Further, the only witness who claims he saw Mr. Fontenot at McAnally's, on the night in question, tried to recant his identification at Mr. Fontenot's second trial and has affirmatively done so now. (Dkt.# 123, Ex.# 14). The evidence of Mr. Fontenot's presence at Gordon Calhoun's party for the entirety of the night, and the investigative leads of that evidence, clearly reveal a reasonable probability of a different result had this evidence been made available. The only evidence remaining is Mr. Fontenot's confession; a confession which lacks factual support and caused the State's own detectives to doubt its veracity as of the preliminary hearing.[34] The State's failure to

---

[34] Q. Okay, And so you didn't believe anything they had said previously, did you? You didn't believe that, did you?

disclose these records and its resistance to disclosing the remainder of the outstanding evidence resulted in a Fourteenth Amendment Due Process violation.

IV. **MR. FONTENOT'S SIXTH AND FOURTEENTH AMENDMENT FUNDAMENTAL RIGHT TO COUNSEL WAS VIOLATED BY THE ADA POLICE DEPARTMENT'S INTERFERENCE WITH ATTORNEY-CLIENT PRIVLEGE.**

The attorney-client privilege is the bedrock of any attorney's ability to ensure honest and open communication between lawyer and client. The Oklahoma Rules of Professional Conduct Rule 1.6 mandate the confidentiality of information between a lawyer and client. The comments to Rule 1.6 explain the importance of this rule as

> [2] A fundamental principle in the client-lawyer relationship is that, in the absence of the client's informed consent, the lawyer must not reveal information relating to the representation. See Rule 1.0(e) for the definition of informed consent. This contributes to the trust that is the hallmark of the client-lawyer relationship. The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter. The lawyer needs this information to represent the client effectively and, if necessary, to advise the client to refrain from wrongful conduct. Almost without exception, clients come to lawyers in order to determine their rights and what is, in the complex

---

A I believed part of it.
Q You believed part of it, but you don't believe all of it. What part do you believe? What parts do you believe?
A Well, I believe that they're the ones that did kidnap her.
Q Okay. But you didn't believe the part about Odell Titsworth, you proved that to be wrong, didn't you?
A That's correct.
Q. Didn't believe the part about the pickup, you proved that to be wrong, didn't you?
A Yes.
Q And you didn't believe the part about where the body is, because you went and looked. You don't believe that, do you?
A No, sir,
Q So you want this Judge to pick and choose what you're picking and choosing, is that right? What to believe, is that right? Now, Detective, I didn't hear the response, was there a response?
A (No audible response)
P/H p. 538-539 (George Butner cross examination of Detective Mike Baskins).

maze of law and regulations deemed to be legal and correct. Based upon experience, lawyers know that almost all clients follow the advice given, and the law is upheld.

The Supreme Court recognized that interference by the state in a defense counsel's privileged communications with their client can unduly impair the effectiveness of that counsel under the Sixth Amendment. *See Weatherford v. Bursey*, 429 U.S. 545, 554 (1977).

For a petitioner to establish a *per se* violation of the right to counsel, he must show an, "intentional prosecution intrusion [] lack[s] a legitimate purpose." *Shillinger v. Haworth*, 70 F.3d 1132, 1140 (10th Cir. 1995). The Tenth Circuit Court of Appeals found that a fundamental denial of counsel occurred when, "its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed." *Shillinger*, 70 F.3d at 1142. Other Circuit Courts of Appeal have found similar grounds for *per se* Sixth and Fourteenth Amendment violations where the prosecution retained records and memorandums about trial strategy from privileged information from the defense. See e.g. U.S. v. Danielson, 325 F.3d 1054 (9th Cir. 2003); *U.S. v. Chaves*, 902 F.3d 259 (4th Cir. 1990); *U.S. v. Mastoianni*, 749 F.2d 900, 904-908 (1st Cir. 1984)(Sixth Amendment violation analyzed when an informant attended defense meetings and law enforcement debriefed him).

The Ada Police Department violated Mr. Fontenot's Sixth Amendment fundamental right to counsel when they seized letters he wrote to his defense counsel. Found in the Ada police reports, and only recently disclosed, were original letters written by Mr. Fontenot addressed to his defense attorney "George" Butner. From other

documents discussed in the Second Amended Petition, Mr. Fontenot was incarcerated by the Pontotoc County Sheriff. While in custody, his only means to communicate with counsel were visits and letters. Mr. Fontenot wrote these letters while in custody awaiting trial. In those letters, he asked questions about past legal visits, frustrations about the delay in his trial, questions as to his absence from Thomas Ward's court hearing, and most significantly, leads and witnesses who could testify about his innocence and alibi. (Dkt.# 123, Ex.# 95). One of the people Mr. Fontenot discussed was his ex-girlfriend, Dottie Edwards, who he dated around April 28, 1984.

The Ada Police Department interviewed Dorothy Edwards on November 27, 1984, after Mr. Fontenot was in custody. The interview conducted by Ada Police Officer D.W. Barrett consisted of the following:

> Det. Barrett talked to Dorothy Edwards by telephone on 11-27-84 at 8:00 P.M. while she was at work. She said she dated Karl Fontenot about three or four times around the first of May 1984. She said they went in her Ford Torino. When they went to the River they went in Jannette's pickup. Jannette and Mike Roberts, she and Karl and Tommy Ward all went to the river together. Dorothy said she dated Karl two and a half or three weeks at the most. She said one of the reasons she stopped dating Karl was when he told her that the OSBI had come and talked to him about Denice Haraway. She said she talked to Karl right after he talked to the OSBI. Karl told her he was not in on it and had no knowledge of it. Dorothy does not remember if she was dating Karl on 4-28-84. She did go with him while he was living with Janette. She moved to Perry the last part of May 1984. Dorothy said she never saw Karl or Tommy in a pickup other than Jannette's. She said she went to school with Brian Cox, but didn't know if he owns a pickup. She has heard of Odell Titsworth but does not know him. She went to school at Ada High with his sister Kathy. Dorothy said she didn't know of a Ronald Tisdale. She said she did not go to any parties at Jannette's.

> Dorothy said she met Karl through Jannette when she worked at Taco Tico. She said he seemed friendly, he had his own problems, his parents were dead and he was still copeing [sic] with that, he was down because he couldn't find a job, she said, "he was just a sweet guy."

> Dorothy said she went to school with Tommy Ward and never liked him. She tried not to go around Karl if Tommy was there. She was round him

the day they went to the river, but she did not like him at all.

(Dkt.# 123, Ex.# 92).[35] Ms. Edwards' report demonstrates the police intercepted original letters from Mr. Fontenot to his attorney, retained them, and investigated based on those letters. These letters, beyond being the critical thread of communication between Mr. Fontenot and his counsel, would have provided helpful information to Mr. Butner Mr. Butner could have used these letters to prepare for trial and gained insight into Mr. Fontenot's behavior which could have helped his mitigation against the death penalty. Along with Ms. Edwards, Mr. Fontenot tried to give counsel a list of people who could confirm he was at Janette's on April 28, 1984, i.e. witnesses crucial to his alibi. These people included: Jannette Blood Roberts, Amy Blood, Bruce Self, Johnny Duck Konawa, Gordon Calhoun, Joe Youngblood, and Regina Youngblood. (Dkt.# 123, Ex.# 95). Although OSBI interviewed some of these people, these reports were not disclosed to defense counsel.

Mr. Fontenot expected these letters to be seen or delivered only to Mr. Butner. However, these letters were never mailed or delivered to Mr. Butner. Mr. Butner has reviewed these letters and states he was never made aware of them prior to either trial. (Dkt.# 123, Ex.# 98). Further, Terri Hull, who represented Mr. Fontenot during the first direct appeal and was counsel when Ms. Haraway's remains were found, also confirmed that she never saw these letters. (Dkt.# 123, Ex.# 97). There can be no legitimate reason why the Pontotoc County Sheriff's Office did not deliver these letters to Mr. Butner, or, more significantly, how these letters diverted to the custody of the Ada Police Department. *See U.S. v. Shreck*, 2006 U.S. Dist. LEXIS 33158, 17 (ND OK

---

[35] Ada police officers went to interview Mr. Fontenot shortly after 4-28-84, but he did not speak with them because he had to go to work. ( N/T 6/10/1988 at 160-161). He was not interviewed again until he confessed in October 1984. *Id*. at 59-63.

2006)(discussing per se violations of the Sixth Amendment where there are "affirmative actions on the part of the government which comprised the attorney-client relationship.") It is now evident that police investigated several of the witnesses Mr. Fontenot had tried to tell his attorney about as a means to undercut his alibi defense. Not only did they commit the egregious act of withholding of exculpatory and impeachment evidence that was favorable to Mr. Fontenot's defense, they denied him even the ability to ensure his attorney knew of this evidence.

A fundamental violation under the Sixth Amendment occurs when, "[t]here are circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *U.S. v. Cronic*, 466 U.S. 648, 658 (9184). When law enforcement interferes with the attorney-client relationship in a criminal context, that interference may result in a fundamental violation per se. Here, Ada Police officers gained possession of original letters from Mr. Fontenot, investigated the witnesses he mentioned, and withheld evidence helpful to his defense. By keeping the original letters, it crippled the privileged relationship between Mr. Fontenot and Mr. Butner.

The Court finds the actions of the Pontotoc County Sheriff and the Ada Police were not legitimate, and further finds proof of prejudice to substantiate a Sixth Amendment violation. Mr. Fontenot has met his burden to prove "a realistic possibility of injury or benefit to the State." *Rodriguez v. Zavaras*, 42 F.Supp. 29, 1059, 1084 (DC Co. 1999) *quoting Schillinger*, 20 F.3d at 1142. The prejudice occurred when the use of confidential letters from Mr. Fontenot to his counsel affected the attorney-client relationship.

Amazingly, these stolen letters reveal key information about an affirmative

defense to murder, mitigating evidence to the death penalty and other useful information both through the trial and penalty phases.

As mentioned above, defense counsel never saw these letters. Mr. Butner did not have evidence proving Mr. Fontenot's alibi. (Dkt.# 123, Ex.# 81 at 34-37). The argument that everything mentioned in these letters could have been relayed in a visit is without merit given the lack of any defense presented at trial, the failure of Mr. Butner to call any of the witnesses mentioned by Mr. Fontenot during the trial, or appellate counsel seeing any indication in Mr. Butner's files of interviews with the people mentioned in the letters. And Respondent's argument that there is no violation of attorney-client privilege because the letters were not used against Mr. Fontenot, misses the point. These were private communications between a defense counsel and his client about Mr. Fontenot's thoughts and ideas about **his defense**. In the letters, Mr. Fontenot discusses witnesses, strategy, and his thoughts about Mr. Butner and the process. Mr. Butner stated that he never saw these letters and Ms. Hull who had Mr. Butner's files for the appellate process echoed not seeing these communications. *See* Dkt.# 123, Ex.#s 97 & 98. Such actions by the Ada Police Department, "impair[ed] the accused enjoyment of the Sixth Amendment guarantee by disabling his counsel from full assisting and representing him. *Schillinger v. Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995).

Respondent's assertions of conversations between Mr. Butner and Mr. Fontenot before the trial court regarding whether Mr. Fontenot took the stand and other communications does not alleviate the possession of privileged correspondence hidden from counsel.[36] If Mr. Fontenot chose to communicate with his counsel via letters, that's

---

[36] During his deposition, Mr. Butner explained some of the problems he ran into while talking with Mr. Fontenot. (Dkt.#85, Ex.#9 at 27. Mr. Butner agreed that Mr. Fontenot was limited intellectually and said, "It was his personality too, because he

his right to do so and that communication is protected under the rules of professional conduct and the Constitution. The number of times Mr. Fontenot and Mr. Butner discussed their defense and the manner in which they chose to do so is privileged from opposing counsel which included law enforcement. The Ada Police Department's confiscation of Mr. Fontenot's privileged letters did not involve jail security or any legitimate law enforcement function. Such actions violated Mr. Fontenot's fundamental right to counsel.

The importance of this rule is evident by the *per se* violation under the Sixth Amendment. Despite what other communications occurred or did not occur, there is no plausible explanation or justification for keeping such correspondence from defense counsel. As the case law presented in the Second Amended Petition establishes, there is a per se violation when there is an "intentional prosecution intrusion[] lack[s] a legitimate purpose. *Shillinger*, 70 F.3d at 1140.

Conversely, the benefit to the prosecution and law enforcement is overwhelming – they presented defense counsel from knowing about helpful witnesses. And their actions foreclosed a fair trial by interviewing these people themselves and failing to disclose those interviews. Such a violation of attorney-client privilege strikes at the heart of the right to effective assistance of counsel guaranteed by the Sixth Amendment. The interference by the State in the most sacred relationship is an unconscionable and prejudicial infringement of Mr. Fontenot's right to counsel.

---

was not, at that time, forward. I mean, he was reserved and – would not- he was not bubbling over with information…[S]pecifics to Mr. Fontenot, a specific was not in his vocabulary. He was a young person and a  - what happened two days ago in Karl's life, he in all probability, could not remember or could not recall…I'm not sure Karl grasped at that time the gravity and the – and the issues because he was  - he was a little quiet. "

### V.    MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS VIOLATED WHEN HIS TRIAL COUNSEL FAILED TO INVESTIGATE THE CASE AND PRESENT VIABLE EVIDENCE SUPPORTING HIS INNOCENCE

A trial counsel's function "is to make the adversarial testing process work in the particular case." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). To prevail on a claim of ineffective assistance of counsel, a convicted defendant must show that counsel's representation fell below an objective standard of reasonableness, and that the deficient performance prejudiced the defendant, *Strickland*, 466 U.S. at 693, 104 S.Ct. 2067 and thus create a "reasonable probability" of a different result. *Id.* at 694. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2001).

Deficient performance is "measured against an objective standard of reasonableness under prevailing professional norms." *Rompilla*, 545 U.S. at 380. Courts "long have referred" to the American Bar Association standards on the performance of counsel "as guides to determining what is reasonable." *Id.*; *Wiggins*, 539 U.S. at 524; *Strickland*, 466 U.S. at 688. [T]he American Bar Association Standards for Criminal Justice in circulation at the time of [Mr. Fontenot's] trial describe the obligation in circumstances such as those in the instant case:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. **The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty**.

ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.)(emphasis added); *see also Rompilla*, 466 U.S. at 400. Counsel's performance fell below an objective standard of reasonableness in this case for several reasons. First, counsel failed to present evidence showing Mr. Fontenot's innocence of the charged actions when his co-defendant made statements

exculpating him of the crime. Second, counsel neglected to investigate evidence showing that Mrs. Haraway was being stalked by someone familiar to her. Finally, defense counsel failed to impeach numerous State witnesses about their inconsistent statements.

> ### a. Trial Counsel Was Ineffective for Failing to Introduce Tommy Ward's Sworn Statement Made During the Preliminary Hearing Exculpating Mr. Fontenot from Involvement in Mrs. Haraway's Case

On January 5, 1984, Tommy Ward testified in a closed hearing about his involvement in Mrs. Haraway's disappearance. This hearing took place in the middle of the only preliminary hearing in this case. Different from Mr. Ward's confession in October 2014, this testimony occurred under oath with both defense counsel present along with several representatives for the prosecution and law enforcement. Specifically, the trial judge, court reporter, Don Wyatt, Mr. Ward's defense counsel, George Butner, Mr. Fontenot's defense counsel, Bill Peterson and Chris Ross for the District Attorney's Office, Ada Detectives Dennis Smith and Mike Baskins, and several members of the Pontotoc County Sheriff's Office. (Dkt.# 123, Ex.# 60 at 27).

Mr. Ward's statement consisted of the following:

**Defendant:** And then we went from there [J.P.'s] to McAnally's.

**Mr. Wyatt**: You stopped at McAnally's?

**Defendant**: Uh-huh.

**Mr. Wyatt**: Did you go in?

**Defendant**: Yeah.

**Mr. Wyatt**: Did Discus – or Ashley go in?

**Defendant**: yeah.

**Mr. Wyatt**: Why did you stop there?

**Defendant:** To get a beer.

**Mr. Wyatt**: What happened when you got inside?

**Defendant:** I walked back towards the back to get a beer, and Marty started talking to Donna (Denice Haraway), and—

**Mr. Wyatt**: Did Marty know Donna?

**Defendant:** Yeah.

**Mr. Wyatt**: How long had he known her?

**Defendant**: I don't know.

**Mr. Wyatt**: But they knew each other?

**Defendant**: Yeah. They, you know, acquainted each other when he come in.

**Mr. Wyatt**: What happened?

**Defendant**: He started flirting with her and she told him that he was married – I mean she was married. And then after she told him that she was married he goes, "You must not be happily married because if you was happily married you wouldn't have to be working." And then he started hinting around to her about saying, "Well, if you marry me, and everything, you wouldn't have to do nothing, like this or anything."

**Mr. Wyatt**: Okay. Now, where were you when this conversation took place?

**Defendant**: I was getting ready to walk on back towards the back. And then I was kind of listening to them, you know, because I thought it was kind of funny, you know, after her saying that she was already married and everything, and then – so then I went on back to the back and then when I come on back up to the front he bent over the counter and kissed her. And then he walked out the door. And then I walked on up and payed [sic] for the beer. Then after I payed [sic] for the beer she come around the counter and went out the door and I walked out behind her. And then I walked out to the pickup, and then she – when I opened the door she goes, she was talking to Marty, and she goes, "Are you serious about what you're talking about?" And he goes, "Yeah." And so, she jumped in the pickup with him. And then we drove from there to my house, and that's when he let me out. It was about 9:00 when I got back to my house.

(Dkt.# 123, Ex.# 60). Mr. Ward said he made this statement under oath because he felt it would help his case and the police investigation into this case. *Id.* at 6. He testified that Mr. Fontenot did not participate in these events, or have knowledge that they occurred. *Id.* at 25. In fact, Mr. Ward

only told Mr. Fontenot about these events the morning of the hearing.[37] *Id.* at 36. Further, Mr. Ward testified the only reasons he implicated O'Dell Titsworth and Karl Fontenot in his October 1984 confession is because of Detective Smith's suggestion of what to say.[38] *Id.* at 27.

Mr. Ward's testimony coincided with details from the crime scene. He explained his purchase of a beer in the cooler at McAnally's, drinking some of it and leaving it on the counter after Mr. Ashley and Mrs. Haraway exited the store. *Id.* at 30. The last transaction on the McAnally's register tape shows $.80 for a Tallboy beer. (Dkt.# 123, Ex.# 34); (Dkt.# 123, Ex.# 43, prosecutorial bates 22), (Dkt.# 123, Ex.# 44, OSBI 0495). According to his statement, the cigarette Lenny Timmons saw in the store belonged to Mr. Ward. (Dkt.# 123, Ex.# 60 at 30); (J/T at 1089). All three, Mr. Ashley, Mr. Ward, and Mrs. Haraway, drove away in a gray, Chevy pickup truck that belonged to Mr. Ashley. (J/T at 1682).

Lenny Timmons testified that he entered McAnally's around 8:30 pm on April 28, 1984. He described passing a man and woman leaving the store, getting into a pickup truck, and driving away. (N/T 6-9-88 at 34). At the time, he paid little attention to the couple until he realized the store clerk was missing. After alerting his brother, David, and uncle, Gene Whelchel, they continued to search the store before calling police. All three men described a man climbing into the pick-up truck with a woman they believed to be Mrs. Haraway. (P/H at 269-270, 308-313; N/T 6-9-88 p. 38, 47-48, 56). During Mr. Ward's statement, he explained that he was the man walking

---

[37] Mr. Ward's statement would have been admissible during Mr. Fontenot's trial under Okla. Stat. tit. 12 § 2408(B)(3) given that any statement made by Mr. Ward placing himself at McAnally's around the time of Ms. Haraway disappeared is clearly against his penal interest. To the extent that Mr. Butner failed to prove Mr. Ward was unavailable to testify is part of his ineffectiveness in failing to present this evidence.

[38] In Mr. Fontenot's recantation letter, he too stated that Detective Smith suggested much of the story in his confession. *See* Dkt.# 123, Ex.# 44 at 626.

Mrs. Haraway out of the store that evening. (Ex.# 60, at 9).

After Mr. Ward's statement, the police interviewed Marty Ashley and several other people Mr. Ward mentioned. Many of these people testified during the joint trial but not in Mr. Fontenot's trial.[39] As the pattern continues to reveal, these interviews were not disclosed at either trial, or through post-conviction proceedings. The sole exception was the taped statement of Marty Ashley found during post-conviction.[40] (Dkt.# 123, Ex.# 66). Detective Smith, along with Chief of Police Fox, interviewed Mr. Ashley at the Paul's Valley Police Station on January 10, 1985, the day after Mr. Ward's testimony. The police asked him his whereabouts on April 28, 1984, to which he said he did not know. *Id.*

On cross examination during the joint trial, Mr. Ashley admitted that the police interviewed him only one time, even after telling them he could not remember where he was on April 28, 1984.[41] (Dkt.# 123, Ex.# 66; J/T 1678). Mr. Ashley, along with his girlfriend Theresa Mantzke, acknowledged living in Ada at the time of Mrs. Haraway's disappearance, but moving to Ardmore very early in May 1984. (J/T at 1720). She also could not recount where Mr. Ashley was on April 28, 1984, but he was not with her. (J/T at 1724). The police failed to inquire whether Mr. Ashley owned or had access to a pickup truck… which he in fact did. (J/T at 658, 1682).

The undisclosed interviews took place on the days following Mr. Ward's testimony and

---

[39] These people include Marty Ashley, Shelly Mantzke, Theresa Mantzke, Jackie Mantzke, and Jay Dicus. (J/T 1646-1742).

[40] The Ada Police interviewed Marty Ashley, Jay Dicus, Shelly Mantzke, Theresa Mantzke, and Jackie Mantzke to investigate all or part of Mr. Ward's testimony. Many of these individuals testified for the prosecution during the joint trial and Mr. Butner attempted to examine them without the benefit of knowing what prior statements they made to police. (N/T 9-17-1985 at 1646-1740).

[41] The police took a photograph of Marty Ashley during their interview. (Dkt.# 123, Ex.#s 39,40). It is unknown whether police received any calls as to whether Mr. Ashley resembled the composite drawing or if they showed any other witnesses Mr. Ashley's photograph.

were conducted by Ada Police Detective Mike Baskins, Ada Police Detective Dennis Smith, and DA Investigator Lloyd Bond. (Ex.# 88). These reports were individual interviews with little purpose other than to disprove Mr. Ward's testimony. There is no investigation into the discrepancies provided by Mr. Ashley and his girlfriend's testimony, or into where Mr. Ashley was when Mr. Ward said Mr. Ashley drove off with Mrs. Haraway. Detective Baskins interviewed Anthony Norman at the Ada Police Department about his knowledge of "Tommy Ward and Jackie Mantzke." (Dkt.# 123, Ex.# 88). Mr. Norman provided character evidence about Mr. Ward and said he did not remember Mr. Ashley being at the Mantzke household when Mr. Norman was there. *Id.* Detective Baskins concluded his report by stating, "Tommy did not seem sure about his answers. He had to think before answering questions. He answered slowly and would not definitely commit himself to questions." *Id.* Clearly, the police investigation was committed to its theory of the case despite the weaknesses and contradictory evidence that continued to emerge.

Mr. Ward's statement should have been used by Mr. Fontenot's defense counsel during his trial. Clearly, this statement would have been admissible under Title 12 § 2804(B)(3) Admission Against Penal Interest.[42] *See generally Funkhouser v. State*, 1987 OK CR 44; 734 P.2d 815 (OK 1987)(outlining the procedure for declaring a witness unavailable and explaining that there is no confrontation clause issue when there has been an opportunity to cross-examine the witness); *see also Britt v. State*, 1986 OK CR 99; 721 P.2d 812 (Ok. 1986). The fact that Mr. Butner failed to try to admit the statement into evidence, establish that Mr. Ward was unavailable to testify in Mr. Fontenot's trial, given that his own trial was scheduled after Mr. Ward's.

---

[42] The State introduced Mr. Ward's statement against him during his separate trial in 1989, through Detective Dennis Smith who was present and could testify as to what occurred during the hearing. (Ward Vol. 6 p. 127-132). Since, Detective Smith testified in Mr. Fontenot's trial, defense counsel had the opportunity to introduce such crucial exculpatory evidence in similar fashion.

Further, this was evidence that strongly supported the defense's case. The fact that Mr. Butner repeatedly requested in discovery motions, in motions in limine, and on the record his desire for exculpatory evidence and any evidence showing Mr. Fontenot's lack of knowledge exacerbates his ineffectiveness on this issue. Defense counsel knew Marty Ashley had no alibi, his girlfriend was adamant he was not with her the day of the kidnapping, and both moved out of Ada days after Mrs. Haraway disappeared. Not only does this evidence corroborate Mr. Ward's statement, it creates reasonable doubt as to Mr. Fontenot's participation in the crimes against Mrs. Haraway. (Dkt.# 123, Ex.# 81, at 35-36). What better evidence to present but Mr. Fontenot's co-defendant explaining not only that his client was unaware of his criminal actions, but that Mr. Fontenot was only told about such criminal activity the morning of January 9, 1985. There could be no strategic or tactical reason for such ineffective actions that deprived Mr. Fontenot of valuable evidence showing his innocence. Mr. Butner concedes his ineffectiveness for failing to present this evidence:

> During the preliminary hearing, Tommy Ward made a sworn statement during a closed hearing. I was present at the hearing along with Mr. Wyatt, counsel for Mr. Mr. Ward, Pontotoc County District Attorney Bill Peterson, Assistant District Attorney Chris Ross, and law enforcement. Mr. Ward gave a detailed statement about being present at J.P.'s convenience store and McAnally's with Marty Ashley. Mr. Ward stated that Mr. Fontenot was not present having nothing to do with the events of April 28, 1984. This statement was very helpful to Mr. Fontenot's case because it proved crucial evidence from his co-defendant that he had no involvement in Mrs. Haraway's disappearance. **While I used this statement in Mr. Fontenot's joint trial with Tommy Ward, I did not introduce it into evidence during Mr. Fontenot's second trial. I had no strategic reason for not using it. It clearly fit within my trial strategy to show Mr. Fontenot had nothing to do with Mrs. Haraway's homicide.**

(Dkt.# 123, Ex.# 16) (emphasis added); (Dkt.# 123, Ex.# 81). Mr. Butner's performance was deficient for failing to include this exculpatory piece of evidence during his trial.

In determining whether a defendant has been prejudiced by his trial counsel's deficient performance, a court must consider whether a defendant has suffered actual prejudice from his

attorney's actions. Similar to *Brady*'s materiality standard, a defendant must establish those deficiencies were prejudicial, defined as errors that collectively "undermine confidence in the outcome," and thus create a "reasonable probability" of a different result, *Strickland*, 466 U.S at 694. As a court assesses whether a defendant suffered prejudice, it must assess the totality of the evidence before the factfinder. *Id.* at 695. Given the absence of any independent physical evidence connecting Mr. Fontenot to the crimes against Mrs. Haraway, a cumulative evaluation of the evidence not presented to the jury including: the exculpatory statements by the co- defendant, along with the *Brady* materials not presented during trial including the alibi testimony, would have impacted the jury's deliberation and verdict. Failure to introduce Mr. Ward's statement resulted in ineffective assistance of counsel in violation of Mr. Fontenot's Sixth Amendment rights.

### b. Trial Counsel Was Ineffective for Failing to Investigate Evidence of Denice Haraway Being Stalked and Evidence Establishing a Different Motive for the Crime.

#### i. Defense investigation reports showing Denice Haraway's fear of obscene phone calls she received.

The trial court granted limited funds for investigation for Mr. Fontenot's second trial. Richard Kerner, who assisted Mr. Wyatt during the investigation for Tommy Ward and worked for Mr. Butner prior to trial stated that during the course of his investigation, he found an important witness who would have provided not only an alternate motivation for the abduction of Mrs. Haraway, but potential alternate suspects as well. Mr. Kerner interviewed Anthony Johnson, a frequent customer at McAnally's. Mr. Johnson remembered a conversation he had with Mrs. Haraway a week before her disappearance.

> Johnson is a co-worker with Tommy Ward's sister, Tricia Wolf in an Ada, Oklahoma plant. Johnson admitted to this investigator that one week before Haraway's disappearance he was in the McAnally's convenience store when Haraway asked him where she could buy a gun. **Harraway [sic] referenced the need for a gun with some funny calls she had recently been receiving. Haraway said she didn't really know who was making the calls, and that the caller never**

**really said anything, just did some heavy breathing on the phone. Johnson asked Haraway if she had any ex-boyfriends that could be making these calls and said that Johnson was of the opinion that she knew who was making the calls but did not seem to want to indicate who it was.**

(Dkt.# 123, Ex.# 22)(emphasis added). Defense counsel submitted a subpoena for Mr. Johnson's appearance for Mr. Fontenot's trial, but it was never served. (Ex.# 71). Clearly Mr. Johnson was a witness that defense counsel sought to present during Mr. Fontenot's defense-in-chief, but Mr. Johnson never testified. There was no strategic or tactical reason not to present such evidence showing that Mrs. Haraway not only received obscene phone calls and that someone was watching and harassing her over a longer period of time prior to her disappearance, but also demonstrating her fear of this individual to the degree she inquired about buying a gun. Not only should Mr. Johnson have testified at trial, but defense counsel should have pursued such leads further. The failure to do so resulted in ineffective assistance of counsel for failing to call Mr. Johnson as a witness and for not developing such evidence.

The cumulative effect of this evidence demonstrates actual prejudice. The totality of the evidence not presented to a jury paints a picture of alternate suspects having motive to harm Mrs. Haraway. Given the weakness of the prosecution's case against Mr. Fontenot, the impact of the unknown and unpresented evidence is immense.

### ii. Register tape showing witnesses who were in McAnally's in short proximity to her disappearance

Detective Dennis Smith made numerous requests for people who were in McAnally's the night of Denice's disappearance to contact the APD with information about the time they were in the store and the purchases made. (Dkt.# 123, Ex.# 27). In response to the APD request, at least four people contacted the police department to explain what purchases they made and what time they recalled being in the store. Their names, times, and, on occasion, contact information was included on the register tape. (Dkt.# 123, Ex.#s 32-38). The State introduced the register tape into

evidence at both trials and it was available to Mr. Fontenot's first direct appeal counsel. (J/T at 1160); (States's Ex.# 16); (N/T 6/9/1988 at 197); (State's Trial Ex.# 60). That neither defense counsel, at trial or on appeal, reviewed the entirety of the register tape was ineffective performance.

Defense counsel's obligation to evaluate and investigate not only the factual witnesses the prosecution intended to call at trial, but also the physical evidence supporting the case, is a basic tenant of providing effective assistance of counsel. "Apart from any formal processes of discovery that are available, prosecutors and law enforcement officers have in their possession facts that defense counsel must know. Prosecutors will often reveal facts freely in the hope of inducing a guilty plea. If defense counsel can secure information known to the prosecutor, it will obviously facilitate investigation." ABA Standards for Criminal Justice 4-4.1 Commentary (2d ed. 1982 Supp.). Counsel's failure to fully evaluate the State's evidence introduced at trial resulted in crucial evidence which challenged the State's theory of the case going undeveloped.

Not only was the testimony as to what the four people witnessed in the store that night extremely helpful, but the timing of their purchases along with the other transactions establish a very narrow window in which Mrs. Haraway could have disappeared. (Dkt.# 123, Ex.#s 67 & 68). The State's theory rested largely on the testimony of David and Lenny Timmons and Gene Whelchel to establish the man and woman walking out of McAnally's were Mr. Ward and Mrs. Haraway. (P/H at 349, 351, 3680; N/T 6/14/1988 at 26-28). All three men describe seeing only one man in the truck. (N/T 6/9/1988at 38, 40, 47-48, 51, 59-60). The description they provided resembled Mr. Ward. (P/H at 341). Had the defense utilized the information gleaned from the register tape, exculpatory evidence would have been presented to the jury. First, the witnesses would have narrowed down the window of her disappearance based on Mr. Keyes' transaction at 8:25 pm and the four purchases immediately after his. Additionally, it lent credence to Mr. Ward's

statement of kidnapping Mrs. Haraway with Mr. Ashley.

In the alternative, defense counsel could have used the information presented by Mr. Haney of a man seen in McAnally's behind the counter with Mrs. Haraway. The gray primered truck described by several witnesses was in the McAnally's parking lot at least thirty minutes before Mrs. Haraway's abduction. (Dkt.# 123, Ex.#s 6 & 4). However, this evidence was not developed by the defense. This evidence considered cumulatively with the records impermissibly withheld by the State presents a viable defense that the man harassing Mrs. Haraway for months and weeks leading up to April 28th, was involved in her disappearance. *See supra* Claim II; *Williams v.Taylor*, 529 U.S. 362, 399, 120 S. Ct. 1495, 1516, 146 L. Ed. 2d 389, 421 (2000) (holding that a cumulative review of ineffective assistance of counsel claims requires both evidence presented at trial and not presented); *Wiggins v. Smith*, 539 U.S. 510, 538, 123 S. Ct. 2527, 2544, 156 L. Ed.2d 471, 495 (2003); *Rompilla v. Beard*, 545 U.S. 374, 393, 125 S. Ct. 2456, 2469, 162 L. Ed. 2d 360, 379 (2005).

Finally, defense counsel could have interviewed Gene Whelchel about the 9:00 pm transaction. An investigator could have inquired who rang up the purchase, what the purchase was, and why the crime scene was not immediately closed down upon the arrival of Officer Harvey Philips and Detective Mike Baskins at approximately 8:55 pm. (Dkt.# 123, Ex.# 41). (dispatch was logged at 8:50 pm). This line of investigation could establish how vital evidence was lost due to improper police procedure. (J/T at 1239-1240, 1422-23, 1439, 1441, 1447-48). Defense counsel could have impeached Mr. Whelchel about the timing of events, inquired more specifically as to those present in McAnally's after his initial call, and whether the State's timing was off given the details provided on the register tape. Evidence presented at trial showed the police failed to close the store to process the scene as other customers bought gas and items from the store.( N/T 6/9/1985 at 92-93). Since it is clear the police seized the register tape, their documentation of the

timing of transactions goes to the thoroughness of their investigation. Solidifying the timing of the only eyewitness accounts and the immediate actions of the police in response to this evidence was crucial for the defense. The defense's failure to pursue this evidence deprived Mr. Fontenot of numerous means to challenge the State's case.

It is the defense counsel's duty to investigate all aspects of the State's case including the physical evidence introduced in trial. "The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense," it is an obligation set forth in the ABA Standards regarding the baseline of representation a defense attorney must provide his client. *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). Defense counsel failed to investigate viable leads and build such evidence into a defense he sought to pursue. (Ex.# 16). Further, appellate counsel, likewise, should have pursued this evidence in building a defense for Mr. Fontenot. (Dkt.# 123, Ex.# 11). It is not enough that the defense reviewed this evidence in court, but prior to the proceedings.

Defense counsel's failure to investigate Mr. Fontenot's case due to limited funding does not negate his constitutional obligation. *See Hinton v. Alabama*, 134 S.Ct. 1081, 1088-1089 (2014) (ineffective assistance of counsel was found when defense counsel failed to ask for further investigative funds for an expert). This Court must determine the impact of the absence of this evidence on the totality of his case. "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins v. Smith*, 539 U.S 510, 527 (2003).

All the evidence mentioned was available to defense counsel prior to trial, but none of it was presented to the jury. Had it been, there is a reasonable probability of a different result due to the weakness of the State's case against Mr. Fontenot. *See Strickland*, 466 U.S. at 694. The

prosecution's case rested on Mr. Fontenot's confession which did not coincide with any evidence they presented, including the cause of Mrs. Haraway's death, the location of her remains, and the details of how he supposedly killed her. (Dkt.# 123, Ex.#s 18, 45, & 68). Further, the sole eyewitness at McAnally's who places Mr. Fontenot at the scene recanted his testimony after the preliminary hearing and attempted to tell the State the same. (J /T at 1042, 1051-52, 1056-1057); (Dkt.# 123, Ex.#14). But for defense counsel's failure to challenge the evidence the State presented, Mr. Fontenot would not have been convicted of these crimes. The failure to investigate this evidence deprived Mr. Fontenot of his Sixth Amendment right to effective assistance of counsel.

VI.    **MR. FONTENOT'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WAS VIOLATED WHEN HIS APPELLATE COUNSEL FAILED TO PRESENT VIABLE CONSTITUTIONAL CLAIMS IN MR. FONTENOT'S DIRECT APPEAL PROCEEDINGS**

The claims and factual allegations set forth in Petitioner's Second Amended Petition also establish Mr. Fontenot received ineffective assistance of appellate counsel. Under *Strickland v. Washington*, 466 U.S. 668 (1984) counsel provides ineffective assistance whenever (1) counsel's performance is deficient, i.e., that the attorney's performance fell below "an objective standard of reasonableness," *Id.* at 688; and (2) those deficiencies were prejudicial, defined as errors that collective "undermine confidence in the outcome," and thus create a "reasonable probability" of a different result, *Id.* at 694. *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2001).

Mr. Fontenot suffered ineffective assistance of counsel on direct appeal because appellate counsel failed to raise substantial and cognizable state and federal constitutional issues, and failed to raise all available grounds, on his direct appeal to the Oklahoma Court of Criminal Appeals.

There was no strategic or tactical reason for not presenting these claims in Mr. Fontenot's second direct appeal brief. Had appellate counsel raised these issues, it is likely that the Oklahoma Court of Criminal Appeals would have reversed his conviction and ordered a new trial. Because appellate counsel failed to raise substantial and cognizable constitutional claims Mr. Fontenot was deprived of appellate review of the constitutional errors inherent in his trial, and the reliability of the judgment and sentence.

VII. **MR. FONTENOT'S DUE PROCESS RIGHTS WERE VIOLATED DUE TO POLICE MISCONDUCT WHEN TAKING A FALSE CONFESSION AND THE PROSECUTION KNOWINLY INTRODUCED FALSE TESTIMONY DURING HIS TRIAL IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.**

### a. Police Misconduct in The Interrogations of Mr. Fontenot

On October 19, 1984, at the OSBI office in Ada, Oklahoma, detectives videotaped Mr. Fontenot's "confession" to the murder of Denice Haraway. However, before the video machine was turned on, Agent Gary Rogers and Detective Dennis Smith conducted a one hour and forty-five-minute interrogation that was not included on the videotape. (P/H. at 960-61; J/T at 2034, 2047). Prior to the interrogation, Detective Smith acknowledged that Mr. Rogers read Mr. Fontenot his rights, but no *Miranda* form was ever presented to him, nor did Mr. Fontenot ever sign a form.( P/H at 956-957); *Miranda v. Arizona*, 384 U.S. 436 (1966). Although Mr. Fontenot's interrogators deny ever having threatened or coerced him,[43] it is indisputable that during the time prior to turning on the video recorder, the interrogators supplied Mr. Fontenot with the information that Tommy Ward had confessed to the murder of Mrs. Haraway and inculpated Mr. Fontenot in his confession.[44] ( P/H at 960). Even though. Mr. Fontenot denied knowing anything about Mrs.

---

[43] This statement is dubious at best given the other witnesses who admit being pressured to alter their accounts: Stacy Shelton, Karen Wise, and Jim Moyer.

[44] Mr. Ward's confession was the product of hours of interrogation. After police repeatedly insisted it was in Mr.

Haraway's disappearance, or what Mr. Ward's confession involved, both interrogators ignored his

denials and continued to tell him he knew about the crimes. (P/H at 961-962). Agent Rogers and

Detective Smith began feeding Mr. Fontenot information about the crime to aid in his confession.

> A. Well before his story changed, I think Agent Rogers mentioned to him that we knew that he and Tommy Ward and Odell Titsworth were at a party on South Townsend.
>
> Q. Okay.
>
> A. And we knew that they had left the party and where they had gone.
>
> Q. Okay. All right. What else did you tell him, or Agent Rogers tell him?
>
> A. I think that was basically the extent of it and ---
>
> Q. Was the name Odell Titsworth mentioned prior to Agent Rogers mentioning it?
>
> A. I don't think so.

(P/H. at 964);( Dkt.# 123, Ex.# 44 at 626).  Giving Mr. Fontenot details of Mr. Ward's confession

could have ingrained information in Mr. Fontenot's mind that became part of his confession.[45]

The confession included several facts that could not be corroborated with any evidence.

According to his confession, Mr. Fontenot attended a party with his co-defendant, Tommy Ward,

and Odell Titsworth.[46](Dkt.# 123, Ex.#s 19 & 69). The three men drove to McAnally's in Mr.

Titsworth's truck, where they abducted Denice Haraway and subsequently took her out behind a

power plant in Ada. The three men took turns raping the victim before transporting her in Mr.

Titsworth's truck to a house off of a country road near the power plant. At the house, Mrs. Haraway

---

Ward's self-interest to admit to the murder of Denice Haraway, even after he denied any involvement, he told police that he had a dream about the murder. Mr. Ward's description of the dream was considered a confession by police, but was not corroborated by any credible evidence.

[45] False confessions occurred in 13% of the 1,730 known exonerations in this country. *See* https://www.law.umich.edu/special/exoneration/Pages/about.aspx .

[46] It is interesting that police disclosed the videotaped confession to Mr. Butner, but failed to include the polygraphed and handwritten statement where Mr. Fontenot detailed being at a party and people he was present with.

was stabbed to death, and burned. (Dkt.# 123, Ex.# 69, at 1-21). Mr. Fontenot did not know Mr. Titsworth prior to being shown his picture and presenting Mr. Titsworth to Mr. Fontenot's jail cell. (P/H at 968, 994-995).

After investigating these claims, police knew that nothing in Mr. Fontenot's confession could be verified. First, the police eliminated Mr. Titsworth as a suspect due to his broken arm on the night in question. Furthermore, neither Mr. Titsworth nor his family owned a truck like the one described in Karl's statement. (P/H at 965). Further, the medical examiner's report established that Mrs. Haraway was not stabbed, but died from a single gunshot wound to the head. (Dkt.# 123, Ex.# 46, at 1, 3, 12, 40). Mrs. Haraway's body was found a county over from where Mr. Fontenot had said it would be found. Finally, the house Mr. Fontenot claimed had been burned with Mrs. Haraway's body inside had in fact been burned a year before the murder occurred. (P/H at 977). These discrepancies, along with the fact that the details of Mr. Fontenot's confession changed several times before the police recorded it, leaves questions about how such a confession could be made, much less considered reliable.(P/H at 973-74, 1372, 1420-1421). Most importantly, Mr. Fontenot recanted his confession shortly after giving it -- but that evidence was withheld from his defense attorney. ( Dkt.# 123, Ex.# 44, at 626).

Police interrogations, by their very nature are coercive. However, police are trained to investigate a case before interrogating suspects to ensure only the strongest suspects are subjected to the process. As noted by counsel for Mr. Fontenot:

> There are three important decision points in the interrogation process to analyze when trying to understand the causes of a false confession. The first decision point is the police decision to classify someone as a suspect. This is important because police only *interrogate* individuals whom they first classify as suspects; police *interview* witnesses and victims. There is a big difference between interrogation and interviewing: unlike interviewing, an interrogation is accusatory, involves the application of specialized psychological interrogation techniques, and the ultimate purpose of an interrogation is to get an incriminating statement from someone whom police believe to be guilty of the crime. **False confessions only occur when police misclassify an innocent suspect as guilty and then subject him to a custodial**

**interrogation. This is one reason why interrogation training manuals implore detectives to adequately investigate their cases before subjecting any potential suspect to an accusatorial interrogation.**[47]

The second important decision point in the process occurs when the police interrogate the suspect. As mentioned above, the goal of police interrogation is to elicit a voluntary incriminating statement from the suspect by moving him from denial to admission. To accomplish this, police use psychologically persuasive, manipulative and deceptive interrogation techniques. As described in detail in the previous section, police interrogators use these techniques to accuse the suspect of committing a crime, persuade him that he is caught and that the case evidence overwhelmingly establishes his guilt, and then induce him to confess by suggesting it is the best course of action for him. **Properly trained police interrogators do not use physically or psychologically coercive techniques because they may result in involuntary and/or unreliable incriminating statements, admissions and/or confessions.**

To understand how and why police-induced false confessions occur, one must first understand how interrogation is intended to influence and manipulate a suspect's perceptions, reasoning and decision-making. **Police interrogation is designed for the guilty, not the innocent. Police are trained only to interrogate suspects whom they believe to be guilty,[48] and the purpose of interrogation of suspects unlike the interviewing of witnesses or victims is to elicit an incriminating statement, admission and/or confession that confirms the interrogator's belief in the suspect's guilt and assists the state in prosecuting the suspect.** Because police expect the suspect to deny his guilt, interrogation is intended to break down the suspect's resistance and move him to admission. As discussed above, police typically achieve this by accusing a suspect of committing the crime, attacking the suspect's alibi, cutting off a suspect's denials and confronting the suspect with seemingly irrefutable (whether real or non-existent) evidence of his guilt. The point of these techniques is to break down a suspect's confidence in his denials by convincing him that he is caught, that no one will believe his assertions of innocence, and that objective evidence of his guilt is so overwhelming that it will inevitably lead to his arrest and conviction regardless of what he says or does during interrogation.

---

[47] Fred Inbau, John Reid and Joseph Buckley (1986). CRIMINAL INTERROGATION AND CONFESSIONS, Third Edition (Baltimore, MD: Williams & Wilkins) at 3 ("Prior to the interrogation, and preferably before any contact with the suspect, become thoroughly familiar with all the known facts and circumstances of the case."). *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 18 ("One basic principle to which there must be full adherence is that the interrogation of suspects should follow, and not precede, an investigation conducted to the full extent permissible by the allowable time and circumstances of the particular case. The authors suggest, therefore, that a good guideline to follow is "investigate before you interrogate.").

[48] *See also* Fred Inbau, John Reid, Joseph Buckley and Brian Jayne (2013). CRIMINAL INTERROGATION AND CONFESSIONS, 5th Edition (Burlington, MA: Jones & Bartlett Learning) at 187 ("These nine steps are presented in the context of the interrogation of suspects whose guilt seems definite or reasonably certain"). For empirical support for this observation, *see* Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

(Dkt.# 123, Ex.# 19, at 11) (emphasis added).

Here, Detective Smith admitted Mr. Fontenot was unknown to the police prior to his arrest.( P/H at 948). He had never been involved in any crimes or interrogated prior to the events of October 19, 1984. (J/T at 1607-1608). The only reason Mr. Fontenot was arrested and subjected to this interrogation is because Mr. Ward mentioned him during his interrogation the day before based on a suspect lead provided by Jeff Miller. Prior to being arrested, no other individual provided any inculpatory evidence connecting Mr. Fontenot to Mrs. Haraway other than Mr. Ward. Law enforcement is trained to conduct a thorough investigation into the suspects prior to commencing the interrogation to ensure the evidence given is valid. (Dkt.# 123, Ex.# 19).

> The purpose of evaluating the fit between a suspect's post-admission narrative and the underlying crime facts and derivative crime evidence is to test the suspect's actual knowledge of the crime. **If the suspect's post-admission narrative corroborates details only the police know, leads to new or previously undiscovered evidence of guilt, explains apparent crime fact anomalies and is corroborated by independent facts and evidence, then the suspect's post-admission narrative objectively demonstrates that he possesses the actual knowledge that would be known only by the true perpetrator and therefore is strong evidence of guilt.**

(Dkt.# 123, Ex.# 19, at 15-16).

No investigation was done into the possibility of Mr. Fontenot being involved other than police taking as true Mr. Ward's confession the prior day. Such lax police investigation before the interrogations led to the corrupted investigation which followed in the days and weeks after these confessions where nothing either defendant said could be verified.

> If the suspect is innocent, the detective can use the suspect's post-admission narrative to establish his lack of knowledge and thus demonstrate his likely or certain innocence. **Whereas a guilty suspect can corroborate his admission because of his actual knowledge of the crime, the innocent suspect cannot. The more information the interrogator seeks, the more frequently and clearly an innocent suspect will demonstrate his ignorance of the crime. His answers will turn out either to be wrong, to defy evaluation, or to be of no value for discriminating between guilt and innocence.** Assuming that neither the

142

> investigator nor the media have contaminated the suspect by transferring information about the crime facts, or that the extent of contamination is known, the likelihood that his answers will be correct should be no better than chance. Absent contamination, the only time an innocent person will contribute correct information is when he makes an unlucky guess. The likelihood of an unlucky guess diminishes as the number of possible answers to an investigator's questions grows large. If, however, his answers about missing evidence are proven wrong, he cannot supply verifiable information that should be known to the perpetrator, and he inaccurately describes verifiable crime facts, then the post-admission narrative provides evidence of innocence.

*Id.* at 19-20 (emphasis added.). At every turn, law enforcement uncovered absolutely no evidence from the "confession." Mr. Fontenot described Mr. Titsworth as 5'10" to 5'11' and weighing approximately 140-150 pounds. He said his hair length was just below his ears and Mr. Titsworth had no distinguishing marks or tattoos. (J/T at 2074-75). In actuality, Mr. Titsworth's hair fell to mid-waist, he weighed 170 lbs. and had sleeve tattoos from his shoulders to his wrists, tattoos along his back, stomach and both legs. Further, the Ada police broke Mr. Titsworth's arm during his arrest two days prior to Mrs. Haraway's disappearance. (P/H at 792-793, 795797, 838). When Mr. Fontenot was shown pictures of Mr. Titsworth, he was unable to identify him. (P/H at 968, 994-995).

Police interrogated Mr. Titsworth along with seizing his mother's truck. After the police searched the truck and after Mr. Titsworth's repeated denials and verification of his broken arm, they realized neither he nor his property had anything to do with the crime. (P/H. at 520, 522). Police repeatedly tried to locate Mrs. Haraway's remains at the power plant and surrounding areas with no success despite seventy-five to eighty people being involved in the search. (P/H at 599-600); (N/T 6/10/1988 at 83-85, 89-90).

During the preliminary hearing, defense counsel asked Detective Baskins if he was able to corroborate any parts of Mr. Fontenot's confession.

Q. Has he told you anything that you have been able to ascertain is the truth? You personally?

A. No.

Q. No fact in his statement, you have been able to prove right or wrong have you?

A. No.

Q. To the best of your knowledge, Detective Baskins, has any statement that Karl Fontenot made to you been – any fact, at all, been proven true or false? Any fact?

A. To me personally, no.

Q. Now, what about Tommy Ward? Any fact that Tommy Ward has told you, have you proven or disproven any fact that he's told you?

A. The ones he's told me personally, disproved.

Q. So the ones he's told you personally and the facts about this case and the statements he's made, no facts have you been able to prove. Is that right?

A. That he's made to me personally?

Q. Yes, sir.

A. That's correct.

(P/H at 546-547). Detective Baskins attempted to locate the crime scene based on the claims in Mr. Ward's and Mr. Fontenot's confessions. He received a series of telephone calls from Agent Rogers and Detective Smith on possible locations based on the "evidence" given in the confessions. However, after numerous searches, only animal bones were recovered.( N/T 6/10/1988, at 169). In the totality of their investigation, the police lacked any physical evidence or eyewitness accounts to support Mr. Fontenot's confession. *Id.* at 178-179.

Due to the inability of law enforcement to support his confession with any meaningful evidence, they resorted to several improper actions to garner viable evidence from Mr. Fontenot. After the confession, but before he was arraigned, Detectives Smith and Baskins **took a sack of human bones to his cell** to coerce Mr. Fontenot to tell them the whereabouts of the victim's

body.( N/T. 6/10/1988 at 172) (emphasis added). Police showed Mr. Fontenot a human skull stating that they had found Mrs. Haraway, and wanted to find the rest of her remains so that her family could proceed with giving her a Christian burial. (P/H at 537, 559, 981-82). These bones were obtained from a science lab at East Central University in Ada and used improperly as a tool to intimidate Mr. Fontenot. (P/H at 975-76).

Although this tactic was used after a confession had already been obtained, it is illustrative of the coercion surrounding Mr. Fontenot's confession and the desperation of the police. The actions of the Ada Police and OSBI agents involved in the interrogations of Mr. Fontenot engaged in police misconduct in violation of known police procedure and Mr. Fontenot's constitutional rights.

### B.     Mr. Fontenot's Confession Is False and Unreliable.

Based on the detective's own admissions, there is no reliable information provided in Mr. Fontenot's confession. Police did not learn one detail as to what occurred to Mrs. Haraway on the night of April 28, 1984, that they did not already know. No new leads were developed, or witnesses found. Every attempt by the Ada police and OSBI to substantiate Mr. Fontenot's confession resulted in dead ends. Instead of acknowledging that Mr. Fontenot did not know anything about the case, police and the prosecution continued to blindly pursue a defendant with no involvement in these crimes.

Dr. Richard Leo, a renowned psychologist who studies interrogations and confessions has reviewed the evidence in Mr. Fontenot's case concerning the validity and reliability of Mr. Fontenot's confession:

> In my professional opinion, Karl Fontenot's confession statement to abducting, raping, murdering, and burning the body of Denice Haraway with Tommy Ward and Odell Titsworth contains *numerous* and *substantial* indicia of unreliability and no – zero – corresponding indicia of reliability. Karl Fontenot's confession statement possesses all of the hallmarks of a false and unreliable confession in spades. In the thousands of confessions I have analyzed in the last three

145

decades, I have rarely seen a post-admission narrative that is so thoroughly contradicted by the underlying crime facts, that fails so completely to demonstrate the lack of any personal knowledge of the crime facts, and that contains so many alleged crime scene details that were not merely erroneous but physically impossible and provably false. In my professional opinion, Karl Fontenot's confession statement is almost certainly, if not certainly, false.

The numerous and substantial indicia of unreliability include:

1)    Karl Fontenot's confession statement contains the wrong method of killing: Fontenot confessed that Haraway was stabbed to death when, in fact, she was murdered by a single gunshot to the head. There is no evidence that Fontenot ever owned a gun. Significantly, Fontenot's confession statement did not mention that Haraway (whose body had not been discovered until more than a year after the murder) had been shot in the head or even that a gun was involved in the crime. Additionally, there is no evidence that Haraway was ever stabbed nor is there any evidence that she was raped or that her body was burned, contrary to Fontenot's confession statement.

2)    In Fontenot's confession statement, the body had been burned in an abandoned house near the power plant and then Titsworth, Ward and Fontenot burned down the house. Not only is there no evidence that Haraway's body was burned, but the abandoned house had been torn down and burned in June 1983 – 10 months before the murder of Denice Haraway in April 1984 – and so did not exist at the time of the crime. It was therefore physically impossible for Fontenot, Ward and Titsworth to have burned down the house in April 1984 because it no longer existed at that time. Nor had there been any fire reported on that property on April 28, 1984.

3)    Fontenot's confession statement claims that Odell Titsworth physically forced Haraway to get into a pick-up truck, carried Haraway, raped her, stabbed her, and set her on fire. Because Titsworth's arm had been broken by the Ada Police Department on April 26, 1984 (two days before the murder of Denice Haraway on April 28, 1984), he had a very painful spiral fracture that would have made it impossible for him to have physically forced Haraway to get into a truck and thereafter carry Haraway and put her over a fence, much less rape, stab or set her on fire. Indeed, Titsworth was eventually cleared of the crime altogether, making his presence in Fontenot's confession statement a major red flag for a false confession. Fontenot makes no mention of Titsworth's injury in his confession.

4)    Remarkably, Fontenot could neither correctly describe nor even identify Titsworth. Fontenot described Titsworth as 5'10-5"11, 140-150 lbs., with black hair below his ears, and as having no tattoos or distinguishing marks. In fact, Titsworth was 170 lbs., had hair down to the middle of his waist, and was covered in visible tattoos on both arms and both legs. Obviously, Fontenot did not know who Odell Titsworth was. Not surprisingly, Fontenot could not identify pictures of Titsworth shown to him by police nor could he identify Titsworth in person when Titsworth was brought to Fontenot's jail cell and standing right in front of him, though Titsworth would have been easily recognizable to anyone who had ever seen him up close because of his numerous visible tattoos. In

addition, Fontenot's confession statement claimed that Odell Titsworth's pick-up truck had been used to kidnap and transport Denice Haraway to the crime scene, but Titsworth did not own a pick-up truck. A pickup truck owned by Titsworth's mother was searched and no evidence was found implicating Fontenot or Titsworth.

5) As occurs in so many false confessions to murder, Fontenot could not identify the location of the crime or lead police to Denice Haraway's body, which was found over a year after Fontenot's confession statement in a different county in a completely different direction than his confession states.

6) Fontenot's confession statement contains an erroneous description of the time of the day in which the crime occurred. Fontenot's confession statement stated that it was almost dark when Denice Haraway had been kidnapped, but that would have occurred around 8:30 p.m. when it had already been dark for some time.

7) As in so many multiple false confession cases,[49] Fontenot's confession statement to the murder of Denice Haraway contradicts, on numerous details, Tommy Ward's statement a day earlier, which itself led to Fontenot's arrest and interrogation. The two confession statements contradict one another regarding the number of perpetrators who allegedly raped Denice Haraway (even though there is no evidence that she was even raped); whether she was stabbed by her assailant(s) (even though there is no evidence that she was stabbed) as well as the number and location the alleged stab wounds; whether she was able to temporarily break free of her assailant(s); how she died; when she died; and where the assailant(s) disposed of her body.

8) Other than Tommy Ward's discredited, factually false confession, there is no evidence at all linking Karl Fontenot to the murder of Denice Haraway. Only one witness identified him as being present at McAnally's on April 28, 1984, when Donna Denice Haraway left the store. That witness, who underwent hypnosis prior to the preliminary hearing, recanted his identification of Fontenot at trial. Additionally, Fontenot did not match the eyewitness descriptions that led to the composite picture posted by Ada police following Ms. Haraway's disappearance.

Without the assistance of information related to him by Agent Rogers and Detective Smith, nothing Mr. Fontenot said was reliable. Knowing how susceptible Mr. Fontenot was to suggestion in an interrogation makes it understandable why he would agree with information given to him by the police.

---

[49] *See* Steven Drizin and Richard A. Leo (2004). "The Problem of False Confessions in the Post-DNA world. *North Carolina Law Review*, 82, 891-1007.

Mr. Fontenot was particularly susceptible to making a false confession. The Supreme Court recognizes that a suspect's mental incapacities could render a confession involuntary if obtained because of "persistent and protracted questioning," and furthermore that "the use of a confession obtained under such circumstances is a denial of due process and the judgment of conviction must be reversed." *Ward v. Texas*, 316 U.S. 547, 555 (1942).

A psychological evaluation of Mr. Fontenot performed by Dr. Joel Dreyer, M.D. around the time of trial indicates that he has "an abnormally low intelligence" and, at the time of the interrogation, was "suffering from Post-Traumatic Stress Disorder," related to guilt associated with the death of his mother.[50] These psychological infirmities made Karl particularly vulnerable to police coercion.[51] In Dr. Dreyer's medical opinion, Mr. Fontenot's guilt over his mother's death is ultimately responsible for his willingness to accept blame for the murder of the victim in this case. According to Dr. Dreyer, "[Fontenot] believes in his own mind in some talion law, an eye for an eye, a tooth for a tooth, that even though he never met Denice Haraway and had never been at McAnally's East Confectionery, that he was willing to take the rap for her murder and willing to repeat....the story given to him from the dream of Tommy Ward." *See* (Dkt.# 123, Ex.#s 63 & 64, at 3).

Additionally, Dr. Sandra Petrick, a psychiatrist at Eastern State Hospital, evaluated Mr. Fontenot in order to determine his competency to stand trial. Dr. Petrick determined that Mr. Fontenot had great difficulty in understanding legal terminology along with the adversarial nature of criminal proceedings.( N/T 6/13/1988 at 30-31, 36). Of particular importance is Dr.

---

[50] In 1984, Mr. Fontenot witnessed the death of his mother as she was hit by a car while walking across a 4-lane highway in order to join Mr. Fontenot inside of a restaurant. Mr. Fontenot was inside the restaurant attempting to make a phone call for assistance with their broken-down vehicle.

[51] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

Petrick's opinion from her report that "[Fontenot] did not understand the implications of his confession." Specifically, he referred to his confession as a "confessment" and said he did not know he was admitting that he did something. (N/T 6/13/1988 at 33).

Under the standard outlined in *Crawford v. State*, 840 P.2d 627 (Ok 1992), and *Malloy v. Hogan*, 378 U.S. 1 (1964), Mr. Fontenot's confession was neither the product of free, nor unconstrained choice.

> In addition, as discussed above, there were several factors present in this case that elevated the risk of eliciting a false and unreliable confession from Mr. Fontenot. These included Mr. Fontenot's abnormally low I.Q., which suggests he would have been highly suggestible, compliant and easily manipulated into making or agreeing to a false confession; and the interrogation pressure and high-end inducements he describes occurring during the largely unrecorded interrogation, that if he had been capable of repairing the car, or making the phone call more quickly, his mother never would've felt the need to come help him inside the restaurant, and would therefore, be alive.

> In addition to these mental instabilities, Mr. Fontenot lived in poverty from birth to adolescence with an alcoholic father, and then with strangers who picked him up off the street after his mother's death, which, as substantial social science research has demonstrated, are known to lead to false and unreliable confessions.[52]

(Dkt.# 123, Ex.# 19). Because Mr. Fontenot's psychological conditions rendered him incapable of reasoning the way a mentally healthy interrogation subject would have, his ability to voluntarily provide a statement to police in the face of their insistence on his guilt, should not be considered trustworthy.

### C. The Pontotoc County District Attorney Office Knowingly Admitted False Testimony during Mr. Fontenot's Trial.

The prosecution, as a representative of the people, must zealously prosecute cases while also

---

[52] Richard A. Leo (2008). POLICE INTERROGATION AND AMERICAN JUSTICE (Harvard University Press).

upholding justice. *See Berger v. U.S*, 295 U.S. 78 (1935). In that endeavor, the prosecution must not present evidence it knows to be false but must ensure that the record is corrected when a prosecutor learns the evidence is false. *See Napue v. Illinois*, 360 U.S. 264 (1959). The reason is to ensure a fair verdict from the factfinder, whether judge or jury; one worthy of reliability and finality. "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. . . . That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.' " *Id.* at 269-270. The district attorney's obligation is to ensure the evidence presented has indicia of reliability. The source of that evidence is irrelevant if the evidence is wrong, even if that evidence is a confession.

The ABA Standards for Criminal Justice advise prosecutors to ensure the evidence presented at trial is worthy of reliability and credibility.

Standard 3-5.6 Presentation of Evidence

(a) A prosecutor should not knowingly offer false evidence, whether by documents, tangible evidence, or the testimony of witnesses, or fail to seek withdrawal thereof upon discovery of its falsity.

ABA Standards for Criminal Justice (Prosecution Function) 3-5.6; *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)( It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured. Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation).

After Agent Rogers presented the prosecutorial to Mr. Peterson, he was obligated to vet the case and determine whether charges should be brought and what those charges should be.

The absence of any corroboration for Mr. Fontenot's confession should have alerted him of the serious flaws in this case. Instead, Mr. Peterson continued to pursue charges against Mr. Fontenot in the absence of evidence. Even after his sole eyewitness to Mr. Fontenot's involvement recanted his testimony **after the preliminary hearing**, he continued to move forward knowing that evidence against Mr. Fontenot rested largely on his guilt by association with Mr. Ward. ( N/T 6/9/1988 at 24-26); (Dkt.# 123, Ex.# 14). The sole evidence the State presented was Mr. Fontenot's false confession knowing it was not substantiated in any way.

The State's continued presentation of Mr. Fontenot's confession, in the absence of any corroboration, when all the evidence presented conflicted with that confession was not only a violation of the prosecution's professional obligation, but violated Mr. Fontenot's constitutional rights. Mr. Fontenot's confession failed to inform law enforcement where Mrs. Haraway's remains were located, or what might have happened to her. Instead, a year and a half after the confession, her remains were found in a completely different location with a cause of death different from what Mr. Fontenot described in his confession. (Dkt.# 123, Ex.#s 17, 46). The discovery of Mrs. Haraway's remains betray any shred of validity Mr. Fontenot's confession retained. However, instead of dismissing the case, Mr. Peterson remained staunch. "When asked if the discovery of the body would affect Ward's and Fontenot's conviction, Peterson said, 'Why would it? We convicted them without a body and now we have one.'" (Dkt.# 123, Ex. # 70).

The State's comments, in a vacuum, would seem innocuous, but given the extent to which the undisclosed evidence provided a viable defense for Mr. Fontenot, presented alternate suspects, and revealed other key pieces of evidence, it shows the lengths the state went to present false evidence under the guise of a valid "confession" "[D]eliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (internal quotations omitted). The

actions of the State resulted in the presentation of evidence the police knew to be false at the preliminary hearing. It is unconscionable that a prosecutor, with numerous years of experience, failed to grasp the importance of a confession of a defendant with no connection to the victim, or the case.

Further, as discussed *supra,* the State also utilized the statement of the jailhouse snitch, Terri Holland (McCartney), and denied any deal had taken place in exchange for her testimony. This is extremely probative in light of the new evidence presented which includes the affidavit of her husband and court documents proving otherwise.

VIII. **THE EVIDENCE WAS INSUFFICIENT TO CONVICT MR. FONTENOT BECAUSE THE STATE FAILED TO SHOW THE EXISTENCE OF THE CORPUS DELICTI OF THE CHARGED CRIMES OUTSIDE OF THE CONFESSION AND FAILED TO ESTABLISH THE TRUSTWORTHINESS OF THE CONFESSION IN VIOLATION OF THE FOURTEENTH AMENDMENT.**

Exclusionary rules relating to criminal confessions find their basis in a single premise, insulation of the adversary system of jurisprudence from introduction of false and unreliable evidence. Such false testimony, when undetected, can only result in a fraud upon society -- conviction of the innocent and freedom for the guilty.

Note, Voluntary False Confessions: A Neglected Area in Criminal Administration, 28 Ind.L.J. 374 (1953).

Despite vast inconsistencies between Mr. Fontenot's confession and the evidence, the prosecution tried desperately to force the evidence to fit Mr. Fontenot's story; claiming in essence that it would be inconceivable for any person to confess to crimes he had not committed. In closing argument, the prosecutor contended:

I ask, you, ladies and gentlemen, when you are deciding who to believe and who not to believe I ask you to consider, first of all, is it reasonable to believe that you could convince a man in fifteen minutes to confess to a crime like this? Now, we are not talking about any crime here, we are not talking cutting tires or whatever. We are talking robbery, kidnapping and murder. Could you confess, get a man to confess to that, especially a murder so heinous and brutal and cruel where he his

saying - could you get a man to say, well, she was screaming help and crying and begging and there wasn't no one there to help her, we weren't going for what she was saying. Could you get someone to say that if they really hadn't done that? In fifteen minutes?

I don't care how stupid, stupidity is not a lack of morality. A stupid person would still know he was saying bad things about himself. Could you get a man to do that?

(N/T 6/14/1988 at 73-74).

Yet, false confessions are not new to legal history. As stated in *Smith v. United States*, 348 U.S. 147, 153, 75 S.Ct. 194, 197 (1954), the "experience of the courts, the police and the medical profession recounts a number of false confessions voluntarily made." *See also* Note, *Corroboration of Confessions in the Theft by Receiving Context: Is Proof of Theft Enough*, 44 Ark.L.R. 805 (1991); Ayling, *Corroborating Confessions: An Empirical Analysis of Legal Safeguard Against False Confessions*, 1984 Wisconsin L.R. 1121; Note, *Voluntary False Confessions, supra*, 28 Ind.L.J. 374 (1953).

Among the reasons legal scholars and courts cite for false confessions are psychological factors including two substantiated by the evidence in this case: guilt feelings over unrelated acts and a desire for notoriety. Ayling, *Corroborating Confessions*, *supra* at 1158-59; *Voluntary False Confessions*, *supra*, at 379-382.

Psychiatrist Joel Dreyer, who examined Mr. Fontenot before retrial, found that Mr. Fontenot felt extreme personal guilt over the death of his mother who just a few years before his confession died in an auto-pedestrian accident as she crossed a four-lane highway to find him. A teenage Mr. Fontenot watched helplessly as his mother came to find him and was hit and killed by a car.[53]( N/T 6/13/1988 at 193-94). Dr. Dreyer's testimony was that "he [Mr. Fontenot] felt

---

[53] Dr. Dreyer related that Mr. Fontenot's mother bad been involved in a minor traffic accident and had sent Karl across the highway to telephone for assistance, but "[h]e didn't have any money when he got there and be couldn't figure out how to call the police . . . So he had taken so long talking to the people in that little restaurant, that finally his mother crossed that four-lane highway to find out what he was doing."( N/T 6/13/1988 at 193-94).

responsible for her death and feels he should take the responsibility for this other person's death, for the death of his mother..." (N/T 6/13/1988 at 193-94).

Dr. Dreyer also noted Mr. Fontenot:

> ... saw this as an opportunity to be important, to have notoriety, to have a claim, to be written up, to be in the papers, to have friends, to have people interested in him. And so he did like a lot of people do, all the way from the Son of Sam to other people who go and say, 'I'm the Son of Sam.' but only one was the Son of Sam. Those other hundred and eleven couldn't have all been the Son of Sam. He is like those hundred and eleven people, willing to gain some claim (sic), because he is not bright and because he was just wandering the street.

(N/T 6/13/1988 at 199).[54]

Other evidence showed Mr. Fontenot sought attention and often made false claims. Gordon Calhoun, who testified for the State that Mr. Fontenot claimed to know something about Haraway's disappearance, agreed Mr. Fontenot "kind of likes spinning yarns and, that is how he got his attention." (N/T 6/9/1988 at 145-146, 149). Mr. Calhoun did not believe Mr. Fontenot's claims about Mrs. Haraway's disappearance. *Id.* at 151. He agreed Mr. Fontenot "would downright lie to you if he thought it would get your attention." *Id.* at 154.

The development of legal safeguards to ensure the reliability of confessions relates directly to the very real experiences of the judiciary with false confessors to crimes, even to crimes that never occurred. The fact that Mr. Fontenot confessed to a crime does not make his confession a reliable one, for false confessions to real crimes are just as likely as those to imaginary ones. *See Corroboration of Confessions*, *supra*, at 832. The goal of the legal

---

[54] Dr. Dreyer testified: " . . . he was a vagrant, he was like a bum in a way, I mean be was wandering the streets. First of all his dad bad left him six years before his mother left him and his dad left him to go somewhere and he hadn't had contact with him since. His dad was a proverbial ubiguitous [sic] alcoholic and his mom then, of course, died in this pedestrian auto accident. And so he is just wandering the streets and doing some pot and drinking some booze and talking to some people and doing what he has to do, primarily drinking from time to time, not doing too much with his life and wandering the streets, not knowing what this world is going to hold for him and feeling responsible for his mother's death and thinking death for himself and suicide." (N/T 6/13/1988 at 199).

safeguards for confessions is not just to protect the confessor from unjust imprisonment, but to ensure that society is protected from the actual wrongdoer. *Voluntary False Confessions*, *supra*, at 374.

A.    **The State's Failure to Sufficiently Prove the Corpus Delicti of the Charged Crimes Independent of the Confession Requires Reversal.**

The State, before extracting confessions from Mr. Ward and Mr. Fontenot, had little accurate information about what happened to Mrs. Haraway. She had been missing for six months and the State presumed she had been the victim of foul play despite its inability to locate her remains or to properly secure the scene of Mrs. Haraway's disappearance. The State's evidence before Mr. Ward's October 18, 1984, confession, consisted of a description of varying pickup trucks, a composite drawing of the man with whom Mrs. Haraway had been seen leaving McAnally's, and descriptions of two men who had aroused the suspicion of a clerk at a completely different convenience store shortly before Mrs. Haraway's disappearance.[55] **Although police denied they had a clothing description before the confessions, evidence showed that APD Detectives Smith and Baskins were given the description of a blouse a day or two after she disappeared - the same description that was incorporated first into Mr. Ward's and then into Mr. Fontenot's confessions six months later**. (N/T 6/10/1988 at 144); (N/T 6/13/1988 at 116)(emphasis added).

In *State ex.rel. Peterson v. Ward*, 707 P.2d 1217 (Okl.Cr.1985), the Oklahoma Court of Criminal Appeals stated:

It is a fundamental rule of law in this jurisdiction, and most others, that "no criminal conviction can be based upon a defendant's extrajudicial confession or admission, although otherwise admissible, unless there is other evidence tending to establish the **corpus delicti**." We have defined corpus delicti "as the substantial and fundamental fact or facts necessary to the commission of a crime, and means when

---

[55] This is the evidence made available to Mr. Fontenot's defense counsel. As discussed previously, the police had much more evidence at their disposal that they ignored.

applied to any particular offense, the actual commission by someone of particular offense charged."

*Id.*, 707 P.2d at 1219; *see also Opper v. U.S.*, 348 U.S. 84 (1954).

Here, the State failed to sufficiently show independent evidence of the corpus delicti of the charged crimes of kidnapping and first-degree murder in order to admit of Mr. Fontenot's confessions into evidence.

The elements of kidnapping given to the jury were: 1) unlawful; 2) forcible seizure and confinement; 3) of another; 4) with intent to confine secretly; 5) against the person's will. (O.R.II, at 161) The evidence showed Mrs. Haraway calmly left the convenience store accompanied by a man with his arm around her waist. She said nothing to a bystander entering the store as she was leaving. She indicated no distress and the customer was in the store about ten minutes before he realized the clerk was gone. Although the State claimed circumstantial evidence showed it was out of character for Mrs. Haraway to leave the store unattended and disappear, the objective evidence was that she left the store with a man without protest to available rescuers. The evidence outside of Mr. Fontenot's confession failed to show Mrs. Haraway was taken unlawfully, by force or against her will, and thus the corpus delicti of the crime of kidnapping was not established outside the confession.

Ordinarily, the discovery of Mrs. Haraway's remains with a bullet hole in the skull would suffice to show the corpus delicti of murder. *See Goforth v. State*, 644 P.2d 114 (Ok. 1982) (the corpus delicti of a murder may be shown by evidence that a body was found under circumstances indicating a violent death). The only evidence indicating a violent death caused by the acts of another in this case was a bullet hole in the skull. However, the medical examiner testified that he could not determine whether the bullet wound was inflicted before or after Mrs. Haraway's death. (N/T 6/9/1988 at 132). When Mr. Fontenot sought a new trial while awaiting a decision on appeal after the 1985 trial, the State contended the bullet was not the cause of death, but was merely a

post-mortem injury:

> The State maintains its trial theory that Denice Haraway died due to extensive stab wounds. Moreover, the skeletal remains would not adequately reflect stab wounds to an individual's body. As the remains were found approximately 1-1/2 years after her death, the areas of the stab wounds were long ago decomposed. This is not to say that the incised-type injuries to the ribs could not be evidence of animal activity. It would be highly unlikely that a body exposed to the elements for any length of time would not exhibit some type of animal activity. Further, the evidence of a gunshot wound to the head does not dispel the State's theory of death. In a newspaper clipping attached to the defendant's appeal brief, it is stated that a man came across the skeletal remains while hunting in the woods. It is not unreasonable to theorize that the bullet wound to the skull came from a hunter's bullet.

(F-85-769, Brief of Appellee in Response to Mr. Fontenot's Motion for New Trial on Newly Discovered Evidence, at 5).

The State failed to show the corpus delicti of murder, because, as the State previously argued, and the medical examiner's testimony substantiates, the evidence failed to show an unnatural cause of death. No stab wounds were found, and the evidence of the gunshot wound would not definitively be determined to be the cause of death. (N/T 6/9/1988 at 130). In a case on-point with Mr. Fontenot's, the Oklahoma Court of Criminal Appeals reversed and dismissed a first-degree murder conviction where there was no evidence of stabbing as the cause of death even though the defendant had confessed to stabbing the victim (and, unlike Mr. Fontenot had accurately told the police where the body was located). *Thornburgh v. State*, 815 P.2d 186 (Ok. 1991). The State's failure to independently show the corpus delicti of murder in this case likewise requires reversal of Mr. Fontenot's conviction. In order to find that the gunshot wound adequately established the corpus delicti of murder, one must find Mr. Fontenot's confession materially false and insufficiently corroborated by independent evidence to support his convictions. In order to find that the stabbing adequately established the corpus delicti of murder, one must disregard all independent evidence and rely solely on Mr. Fontenot's confession.

**B.     The State Failed to Establish Through "Substantial Independent Evidence"**

157

**the Trustworthiness of Mr. Fontenot's Confession; The Confession Was Patently Unreliable and Thus Inadmissible**

Even if this Court determines the evidence was sufficient to show the corpus delicti of the crimes alleged, Mr. Fontenot's confession lacked any independent indicia of reliability or trustworthiness. The United States Supreme Court, in *Opper v. United States*, 348 U.S. 84, 75 S.Ct. 158 (1954), stated:

> It is necessary, therefore, to require the Government to introduce substantial independent evidence which would tend to establish the trustworthiness of the statement. Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense.

348 U.S. at 93, 75 S.Ct. at 164, adopted by Oklahoma in *Jones v. State*, 555 P.2d 63, 68 (Ok. 1976). The *Opper* standard requires a confession actually have some resemblance to the known facts of the crime to show that the confession is trustworthy.

In *Williamson v. State*, 812 P.2d 384 (Ok. 1991), *cert. denied*, 112 S.Ct. 1592 (1992), the Oklahoma Court of Criminal Appeals found that "factual errors and omissions" do not necessarily render a confession unreliable. The OCCA recited the discrepancies in the Williamson confession as:

> Specifically, these errors and omissions are that the decedent had a washcloth in her mouth and not her panties, and that a lid to a catsup bottle and not a coke bottle was discovered inside her rectum, and that no mention was made of the ligature, the writing on the wall or the presence of another person.

*Id.* at 397. Relying on the language in *Opper* that it was "sufficient if the corroboration supports the essential facts admitted sufficiently to justify a jury inference of their truth," the Oklahoma Court of Criminal Appeals found that the essential facts of the murder described by Williamson were sufficiently consistent with the physical evidence found at the crime scene, despite the minor inconsistencies described above. *Id., quoting Opper*, 348 U.S. at 93, 75 S.Ct. at 164.

Here, the chasm between Mr. Fontenot's confession and the known facts of the case are hardly minor. The State alleged the kidnapping was accomplished by force or fear, yet the

witnesses seeing Mrs. Haraway leave the convenience store saw no weapon or any apparent distress or signs of struggle. The prosecution alleged the murder was committed by repeated stabbing and by gunshot, yet they could offer no independent evidence that a stabbing had occurred and no evidence linking Mr. Fontenot or his codefendant to a firearm. The confession said Mrs. Haraway was stabbed; she had a bullet hole in her skull. The confession is replete with other factual errors, not the least of which include Mr. Fontenot' s naming of Mr. Titsworth. The police proved irrefutably Mr. Titsworth had not been involved.

The other contradictions between the evidence and the confession are the location of the body in another county rather than where Mr. Fontenot claimed; the evidence of death from a gunshot wound, which the State even contended was post-mortem, while no evidence supported Mr. Fontenot's claim of stabbing the victim; no evidence of rape described by Mr. Fontenot; and evidence that the body was not burned, which was contrary to Mr. Fontenot's story.

The only "facts" in the confessions supported by independent evidence were those known to the police and public before the confessions. Mr. Fontenot correctly described using an older-model pickup truck, which had been widely publicized as the perpetrator's vehicle. Mr. Fontenot knew about how much money had been taken from the convenience store in the alleged robbery, an amount that was published within days of Mrs. Haraway's disappearance. The blouse description was given to police by Mr. Ward the day before Mr. Fontenot was interrogated, but also had been given to investigating officers long before their interviews with either Ward or Mr. Fontenot. Even this description is disputed by the evidence subsequently discovered at the site where Mrs. Haraway's remains were found.

As detailed in Petitioner's Response Brief, the following portions of Mr. Fontenot's confession and subsequent statements were factually disproved, primarily by the State's own evidence at trial.

| Mr. Fontenot's Statement<br>October 19, 1984 | Evidence<br>June 7-14, 1988 |
|---|---|
| 1. Mr. Fontenot knew Odell Titsworth and was at a party with Titsworth and Tommy Ward on the evening of April 28, 1984. (Ex.# 69 at 690). | 1. Mr. Fontenot had never seen Odell Titsworth until police brought Mr. Titsworth to his cell after the confession; Mr. Fontenot could not identify Mr. Titsworth in a photographic lineup or in person. (N/T 6/13/1988 at 86-88). |
| 2. Mr. Fontenot described Mr. Titsworth as 5 feet 10 to 11 inches tall, weighing around 140 to 150 pounds, with black hair just below his ears and having no tattoos or distinguishing marks about him. Mr. Fontenot's description of Mr. Titsworth was markedly incorrect. (Ex.# 69 at 689). | 2. In April 1984, Odell Titsworth had hair down to the middle of his waist, weighed 175 pounds, and had very noticeable tattoos covering both harms from the wrists to the shoulders, inside and out, on his back, his stomach, and up and down both legs. On April 28, 1984, his arm was in a cast, having been broken by the Ada Police Department on April 26, 1984. (P/H at 792-796, 795-97, 838);(N/T 6/13/1988 at 81-82); (N/T 6/10/1988 at 184-85);(N/T 6/14/1988 at 88-89). |
| 3. Odell Titsworth was a participant in robbing, kidnapping, raping and stabbing Mrs. Haraway. The lock-blade knife and the pickup truck used in the commission of the crimes belonged to Mr. Titsworth. (Ex.# 69 at 664, 676-678). | 3. The police eliminated Odell Titsworth from being in any way involved in the Mr. Haraway case. Mr. Titsworth's truck was searched and no evidence relating to this case was found. The State presented evidence to show that Mr. Ward owned a lockblade Buck knife, but the actual weapon was never recovered. (N/T 6/10/1988 at 23-24). |
| 4. After the party, the trio "went out from north of town." (Ex.# 69 at 664). | 4. Ada has two McAnally's convenience stores, one north, and one east. N/T 6/9/1988 at 91 Haraway disappeared from the McAnally's in east Ada. |

5. Mr. Titsworth went into McAnally's and brought Mrs. Haraway out to the pickup truck while Mr. Fontenot and Ward waited outside by the gas pumps. Mr. Fontenot and Mr. Ward got into the truck after Mrs. Haraway was forced in. (Ex.# 69 at 664)

5. Eyewitnesses at the convenience store when Mrs. Haraway left saw only one man with Mrs. Haraway and no others standing outside the truck. This man's description did not remotely match Odell Titsworth.( N/T 6/9/1988 at 34-68).

6. Four people drove away in the pickup to the power plant (west of McAnally's). (Ex.# 69 at 664-665)

6. Eyewitnesses at McAnally's saw only one man with Mrs. Haraway, no other person around or near the pickup and no other person in the store. Mary Scroggins reported seeing a gray pickup with three persons in it speeding toward the power plant on night of Mrs. Haraway's disappearance, but could identify any of them. (N/T 6/9/1988 at 80).

7. It was "almost dark" twenty minutes after the rapes began. (Ex.# 69 at 673).

7. Mr. Whechel testified it was dark when he arrived at the McAnally's at 8:30 p.m. and saw Mrs. Haraway leaving. (N/T 6/9/1988 at 64).

8. Mr. Titsworth stabbed Mrs. Haraway to death, stabbing her in the chest "[h]ard enough to get the full blade in. (Ex.# 69 at 682).

8. There was no evidence of stabbing and no indication of nick marks or broken ribs that would signify a stabbing.( N/T 6/8/1988 at 134). Further, the State's evidence showed the only apparent cause of death was a gunshot wound and Mr. Fontenot never mentioned a gun in his confession or in subsequent statements.

9. Mrs. Haraway was placed in a rotted out hole in the floor of a house behind the power plant, gasoline poured on her and the house set afire. (Ex.# 688).

9. The house located near the power station had been completely torn down to its concrete foundation and burned by its owner in June of 1983, ten months before Mrs. Haraway disappeared. There was no fire reported on the owner's property on April 28, 1984. Mrs. Haraway's remains were found in a brushy countryside area near Gerty, Oklahoma. Her body had not been burned. (N/T 6/14/1988 at 136).

On January 20, 1986, physical evidence was discovered substantially disproving Mr. Fontenot's confession. A farmer setting traps near Gerty, Oklahoma, east of Ada in adjacent Hughes County, found what appeared to be a human skull. A subsequent search of the area uncovered human remains that were identified as those of Mrs. Haraway. The medical examiner found no evidence indicating Mrs. Haraway had been stabbed,[56] but a bullet hole was found in the back of the skull. Mr. Fontenot had never mentioned the use of a firearm in his confessions. The body had not been burned. (N/T 6/13/1988 at 136).

The State contended the blouse description in the confession was corroborated by the evidence that Mrs. Haraway had such a blouse and testimony describing her clothing before she disappeared. But this "corroboration" must be viewed considering evidence that police had previously been given the description of this blouse; the suggestive interrogation techniques used with Mr. Ward and most likely with Mr. Fontenot; **and the evidence of red and gold earrings and the back of a red and white shirt found near Mrs. Haraway's remains** (State's Trial Exhibits #s 19, 20, 22F)(emphasis added).

The State had no real theory of this case and certainly no evidence until obtaining the confessions of Mr. Ward and Mr. Fontenot. Rather than showing the reliability of Mr. Fontenot's statement, the State's evidence showed its unreliability and untrustworthiness. Uncorroborated and untrustworthy confessions are not competent evidence. *Opper*, 348 U.S. at 93, 75 S. Ct. at 164.

---

[56] The testimony was that since the only remains of Mrs. Haraway were skeletonized, it would have been possible for her to have been stabbed, and the bones not reflect it. *See Thornburgh v. State*, 815 P.2d 186 (Ok. 1991).

**C.    No Rational Trier of Fact Could Find Mr. Fontenot's Guilt Beyond a Reasonable Doubt on the Evidence at Trial, even if the Confession is Deemed Properly Admitted**

At the close of the State's case, Mr. Fontenot moved for a directed verdict of acquittal because of insufficient corroboration of the confession and the failure of the State to prove each element of the charged crimes beyond a reasonable doubt. The motion was overruled.(N/T 6/13/1988 at 127). The motion was renewed after the defense case and was overruled.( N/T 6/14/1988 at 11).

Outside of the false confession, no evidence linked Mr. Fontenot to Mrs. Haraway's disappearance. At trial, not one witness identified Mr. Fontenot as being at McAnally's on April 28, 1984. Although Ms. Wise and Mr. Moyer identified his co-defendant Mr. Ward, neither could identify Mr. Fontenot as Mr. Ward's companion. Both saw a man in the courtroom at the preliminary hearing who was more familiar to them as that man than Mr. Fontenot. (N/T 6/8/1988 at 194-95, 197-99);( N/T 6/9/1988 at 26).

Likewise, the police had no physical evidence placing Mr. Fontenot at McAnally's on April 28, 1984. Significantly, the crime scene at McAnally's went unpreserved despite the presence of an Ada police officer and detective shortly after Mrs. Haraway' s disappearance.  (N/T 6/9/1988 at 92-93). Fingerprints from the counter, cash register and the glass doors of McAnally's, as well as a still-burning cigarette (Mrs. Haraway did not smoke) were destroyed because the manager wanted to clean up the store. (N/T 6/9/1988 at 92-93). Police investigated numerous individuals who looked like the composites and at least 28 pickup trucks like those reported seen at J.P. 's and McAnally's in the six months between Mrs. Haraway's disappearance and Mr. Fontenot's arrest, but they found nothing. (N/T 6/14/1988 at 30-33).

Likewise, there was no evidence of Mr. Fontenot in the area where Mrs. Haraway's remains were found.

Detective Smith testified:

Q. . . . there is absolutely no physical evidence whatsoever to tell us what happened at the scene, nothing, right? I mean, you can't tell who did what, when and where or anything. Is that correct?

A. **Well, to me the strongest evidence is the confession.**

Q. Okay. Fine. Okay. Other than the statements of Karl Fontenot, okay, as to what transpired at the scene, do you have any other physical evidence?

A. From the scene?

Q. Yes. And we - The Jury has already seen the remains of Donna Denice Haraway. Okay. All right. But, at the scene, I'm talking about what was said, what happened, you have no other, you have no physical evidence. All we have is, according to you, Karl's statement. Right?

A. And the body.

(N/T 6/10/1988 at 106-107). Compare this with OSBI Agent Gary Roger's testimony at Mr. Fontenot's first trial, before the body was found:

Q. Aside from these two statements [Ward's and Fontenot's] do you have any proof, separate from these statements, that Donna Denice Haraway was kidnapped, raped or murdered? Aside from these statements?

A. We have proof that she has not been seen or heard from in a year and a half.

Q. All right. So, basically if we say -- if we take the statements aside, the only thing you can prove is Donna Haraway is gone?

A. That's correct.

(J/T 86-769 Tr. 2048-85).

Federal constitutional law requires as a matter of due process that any criminal conviction stand only upon proof beyond a reasonable doubt as to each and every essential element of the crime or crimes charged. U.S. Const. Amend XIV; *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct.

164

2781 (1979); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068 (1970). Speculation and guesswork are fundamentally antagonistic to the constitutional requirement of proof beyond a reasonable doubt, and a conviction cannot stand where the evidence establishes no more than speculation or suspicion. *Hager v. State*, 612 P.2d 1369 (Ok. 1980). Yet, the mere issuance of an instruction charging the jury with its duty to find proof beyond a reasonable doubt is not enough. As the United States Supreme Court stated in *Jackson v. Virginia*, 443 U.S. at 316-17, 99 S.Ct. at 2788:

> The *Winship* doctrine requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A 'reasonable doubt,' at a minimum, is one based upon 'reason.' Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, . . . .

The U.S. and Oklahoma Constitution's guarantee that no person shall be deprived of liberty or life without due process of the law, encompassing the right to be free from convictions except upon proof beyond a reasonable doubt of guilt. Fourteenth Amendment; Okla.Const. Art.II, §7; *Young v. State*, 89 OK. 395, 208 P.2d 1141 (1949). The federal and state constitutions are in accord on the requirement of proof beyond a reasonable doubt and on the test to be applied when examining the record for absence or existence of such proof. The test for determining whether proof is sufficient to support a criminal conviction is whether, in the light most favorable to the State, a rational trier of fact could find guilt beyond a reasonable doubt. *Jackson v. Virginia, supra*; *Spuehler v. State*, 709 P.2d 202 (Ok. 1985).

In the light most favorable to the State, the evidence at trial established beyond a reasonable doubt that Mrs. Haraway disappeared on April 28, 1984, and was found dead on January 20, 1986. Beyond these basic facts, the evidence introduced to establish the cause of death, criminal agency and the identity of the person responsible for her death was unreliable, contradictory, uncorroborated, or simply nonexistent. None of the eyewitnesses identified Mr. Fontenot as the

man who left the store with Mrs. Haraway, and they saw only one man with her in the truck as they left. None of the physical evidence, including the body, linked Mr. Fontenot to Mrs. Haraway's disappearance or death. At best, the evidence established Mrs. Haraway died from a gunshot wound to the head or was struck by a stray bullet after she died from unknown causes. In either case, there was no independent evidence tending to suggest she was raped, stabbed or burned, or ever taken to any location other than where her remains were found.

No rational juror who was able to set aside the tragedy of Mrs. Haraway's death could find beyond a reasonable doubt that Mr. Fontenot should be convicted on his own words. Given the uncontroverted evidence of Mr. Fontenot's mental and psychological impairments, the material discrepancies between the physical evidence and the story Mr. Fontenot told the police; the absence of evidence to corroborate his version of the events; and the circumstances surrounding his coerced confession, no reasonable juror would have convicted Mr. Fontenot.

IX.   **THE STATE'S INJECTION OF INADMISSIBLE HEARSAY FROM THE EXTRAJUDICIAL CONFESSION OF MR. WARD IN MR. FONTENOT'S TRIAL VIOLATED HIS CONSTITUTIONAL RIGHT OF CONFRONTATION**

In its opinion reversing Mr. Fontenot's previous convictions for these crimes, the Oklahoma Court of Criminal Appeals (OCCA) held it was reversible error for the trial court to admit the inculpatory statements of the non-testifying co-defendant at the joint trial of Mr. Fontenot and Mr. Ward. *Fontenot v. State*, 742 P.2d 31, 32 (Ok. 1987). The OCCA found Mr. Fontenot's Sixth Amendment right to confront the witnesses against him was damaged beyond repair by the admission of the non-testifying co-defendant's statement. *Id.* Further, the appellate court found that Mr. Ward's statement "did not have sufficient indicia of reliability as it relates to Mr. Fontenot to overcome the presumption of unreliability to permit its direct admission .... " *Id.; see also Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056 (1986).

Yet, at retrial the State injected key portions of the codefendant's extrajudicial statements into the evidence presented at trial for the purpose of corroborating Mr. Fontenot's confession. The State then inferred and argued Mr. Fontenot's guilt from this inadmissible evidence. Mr. Fontenot was not given the opportunity to confront Mr. Ward to test the truthfulness of his extrajudicial statements. The denial of the fundamental right of confrontation, the prejudicial weight of the particular portions of the co-defendant's statements used by the State, and the weakness of the State's case without the improper corroboration of Mr. Fontenot's statement require reversal of these convictions. U.S. Const., amends. VI and XIV, Okla. Const., Art. II, §7, *Douglas v. Alabama*, 380 U.S. 415, 420, 85 S.Ct. 1074, 1077 (1965).

The State did not introduce the entirety of Mr. Ward's statements, which includes Mr. Ward's preliminary hearing testimony -- but injected cherry-picked inculpatory information gathered from his statements. Most prejudicial was the hearsay testimony of Detective Smith, who stated that Mr. Ward's description of a blouse purportedly worn by Mrs. Haraway matched the description given in Mr. Fontenot's confession, and placed the two together at the crime scene. From Detective Smith and OSBI Agent Gary Rogers, the jury learned Mr. Ward confessed and described details of the crime in a similar fashion to Mr. Fontenot.

Both Detective Smith and Agent Rogers were specifically admonished not to repeat anything told him by Mr. Fontenot's co-defendant. (N/T 6/10/1988 at 52); (N/T 6/13/1988 at 19-20). Nonetheless, Detective Smith made the following statements:

Q. [Defense Counsel] You had a description of the blouse prior to interviewing Karl Fontenot?

A. [Smith] **From Tommy Ward**.

(N/T 6/10/1988 at 116) (emphasis added). Defense counsel did not invite the reference to Mr. Ward, but asked a question to which an answer of "yes" or "no" was necessary. The cross-

examination was not to establish from whom Detective Smith learned the blouse description, but that he had been given a similar blouse description by Richard Holkum[57] within days of Mrs. Haraway's disappearance.

**The importance - and prejudice - of Mr. Ward's extrajudicial statements regarding the blouse was elicited by the State on re-direct examination:**

> **Q. And I believe you started to testify it was more important for another reason and that was because it matched Tommy Ward's description.**
>
> A. Yes, it did. The two descriptions of the blouse were very close and that is what made it important. If one of them said, well, she had a light-colored blouse with flowers on it and the other one had said, well, she had a striped blouse on, then the importance of the blouse would not be an issue. **But, they both described the blouse nearly identically, close enough that you knew, or we would know that they had seen it**. We didn't place the importance on it until later, much later after they were arrested, in fact.

*Id.* at 132 (emphasis added). **Other hearsay testimony improperly admitted told jurors Mr. Ward confessed, implicated Mr. Fontenot, and gave similar details about the crime as had Mr. Fontenot. Detective Smith's additional references to the plurality of confessions and their content inculpated Mr. Fontenot:**

> Q. What did Agent Rogers tell him exactly or you tell him exactly in order for him [Fontenot] to stop denying that he was involved?
>
> A. What he said was: "Karl, we have already talked to Tommy and we have a confession from him."
>
> Q. Okay. And did you go on and tell him that we knew that he was involved, we wanted him to tell the truth and give you a statement?
>
> A. That is ... usually what we tell people that we are interrogating, yes.

> *Id.* at 104; and

> Q. [Butner] The pickup was in Ada and was driven by Tommy Ward .... and Karl Fontenot. You never saw that personally?

[57] See *supra* at 87-90 detailing the totality of Mr. Holkum's statements to Detective Smith and that the exculpatory evidence was withheld from defense counsel.

A. No, Tommy Ward said that.

*Id.* at 146; and

Q. [Butner]: Detective Smith, I'm not talking about the confessions. I'm asking you, would, in fact, the ease with which an article of clothing came off a body due to animal activity, wouldn't that have some effect as to how long it lasted, if you know or have an opinion?

A. Well, in the confessions they said the clothes were taken off and it was my opinion that they weren't even on.

*Id.* at 153.

Agent Rogers, purportedly testifying about the actions taken as a result of Mr. Ward's confession, injected information showing correlations with Mr. Fontenot's confession. After he was admonished not to state anything told him by Mr. Ward, (N/T 6/13/1988 at 19-20), he related that during his conversation with Mr. Ward, Agent Rogers had directed Detective Baskin to search a power plant located off Richardson Loop west of Ada for Mrs. Haraway's remains. Another call directed Detective Baskin to a burned-out house and a third directed him even further west from the power station to Sandy Creek to locate "a concrete citron or bunker, ... basically a large hole in the ground that had concrete walls." (Tr. At 20-21). This testimony assured jurors that Mr. Ward's statements corroborated those of Mr. Fontenot concerning crimes at the power plant and attempts to dispose of the body.

The testimony of Detective Smith and Agent Rogers about portions of Mr. Ward's extrajudicial statements was hearsay and offered to prove the truth of the matter asserted, i.e., that the confessions of Mr. Fontenot and Mr. Ward corroborated each other, and that the only explanation for this was their guilt. The prosecution succeeded in doing indirectly what the OCCA had rule it could not do directly - using Mr. Ward's confession to inculpate Mr. Fontenot in this crime.

It is well settled that the hearsay rule does not preclude testimony to show that a statement was made or that certain actions resulted from a conversation with a third person. *Greer v. State*, 763 P.2d 106 (Ok. 1988); *Thompson v. State*, 705 P.2d 188 (Ok. 1985); *Godwin v. State*, 625 P.2d 1262 (Ok. 1981). *Garcia v. State*, 639 P.2d 88 (Ok. 1981); *Dunagan v. State*, 734 P.2d 291 (Ok. 1987). However, in *Washington v. State*, 568 P.2d 301 (Ok. 1977), the Oklahoma Court of Criminal Appeals held that the State cannot circumvent the hearsay rule and effectively place into evidence the inculpatory substance of a conversation with a third party through the ruse of relating the information in terms of the actions resulting from the conversation. In *Washington, supra*, 568 P.2d at 311 a police officer had spoken with a young boy who was a witness to a crime. The police officer testified that after his conversation with the boy, he directed his investigation at the defendant. The Oklahoma Court of Criminal Appeals stated:

> The recitation of the preceding cases makes it apparent that it is permissible for an officer to testify that he received information from a third party which led to the defendant's arrest; provided, however, that the information received shows that the arrest was for a crime other than the one charged or provided that the information received was just a description of the criminal and not an extrajudicial identification of the defendant as the perpetrator of the crime charged.

*Id.* In *Washington*, had the officer repeated the boy's statement that the defendant had committed the crime, this would have been inadmissible hearsay. The court found evidence is no less inadmissible hearsay when the jury is made aware of the substance of the third-party statement through indirect testimony.

The same is true here. The prosecution elicited sufficient testimony to tie together the statements of Mr. Fontenot and Mr. Ward as if they contained the same inculpatory information, i.e., that Mr. Ward, too, claimed Mr. Fontenot was guilty of the offenses charged. Detective Smith's testimony that Mr. Ward had given a description of the blouse "very close" to Mr. Fontenot's was a clear signal to the jury that Mr. Ward's confession corroborated that of Mr.

170

Fontenot and inculpated Mr. Fontenot. (N/T 6/10/1988 at 132). The prosecution drew direct inferences of Mr. Fontenot's guilt through this testimony. Detective Smith testified:

> The two descriptions of the blouse were very close and that is what made it important. If one of them said, well, she had a light-colored blouse with flowers on it and the other one had said, well, she had a striped blouse on, then the importance of the blouse would not be an issue. But, **they both described the blouse nearly identically, close enough that you knew, or we would know that they had seen it.**

(N/T 6/10/1988 at 132) (emphasis added). Prosecutor Ross contended in closing argument:

> Mr. Butner, Mr. Smith, Mr. Rogers, Mr. Gridner (sic), have all agreed that it would be impossible for someone to make up that description of the blouse. Doubly impossible for two, and that leaves us with only one alternative, and that is that this Defendant was there, just like he confessed he was.

(N/T 6/14/1988 at 79).

Significantly, had the prosecution presented Mr. Ward as a witness to testify concerning his statements and had Mr. Fontenot been afforded his constitutionally guaranteed right of confrontation, this evidence could have been tested. After Mr. Fontenot's conviction, Mr. Ward was tried again for the same crimes and testified. His testimony revealed the following:

> Q. Did anybody tell you what the Haraway girl was supposed to be wearing when she disappeared?
>
> A. Yes, sir. Dennis Smith did.
>
> Q. What did he tell you?
>
> A. Well, they told me that she either had a white blouse with blue roses on it or a red and white striped shirt.
>
> Q. And did he tell you which one to select or to –
>
> A. No.
>
> Q. -- put in your statement?
>
> A. No, I just took a guess. And at that time, when I guessed, saying the white shirt with blue roses, he kept on trying to - which I thought that he was trying to get me to change my mind and say a white shirt with red stripes -- a white -- yea, a white

shirt with red stripes on it.

Q. What did you think would happen when they checked this all out and found out the things you were telling them weren't true?

A. Like I said before, I thought that they would run me out for lying to them.

(Ward-90-17 Tr. at 139-140).

The introduction of portions of Mr. Ward's statements circumvented the Court's ruling in *Fontenot v. State*, 742 P.2d 31, 32 (Ok. 1987), where the Oklahoma Court of Criminal Appeals found the introduction of Mr. Ward's confession violated Mr. Fontenot's constitutional right to confront his accusers. Had Mr. Ward testified about his confession, Mr. Fontenot could have cross-examined him about his repudiations of that statement. He could have cross examined him on the preliminary hearing testimony he had given exculpating Mr. Fontenot. The State used the most damning portions of Mr. Ward's confession to show similarities to Mr. Fontenot's statement and convince the jury to reach the conclusion both were guilty.

Before Detective Smith's testimony, defense counsel objected to any reference to statements made by Mr. Ward and Detective Smith. Police were warned by the trial court not to repeat anything they had heard from Mr. Ward. (N/T 6/10/1988 at 52). Before cross-examination, defense counsel requested Detective Smith be admonished again. *Id.* at 94-95. The same was done with Agent Rogers. (N/T 6/13/1988 at 19-20). As these admonitions repeatedly were ignored, additional objections would have exacerbated the damage by calling attention to the prejudicial hearsay. Defense counsel was left in the untenable position of focusing the jury's attention on the issue of the matching descriptions by objecting. Although generally a contemporaneous objection is necessary to preserve error, 12 O.S. 1981, §2104(A)(l), the Evidence Code provides for review of "plain errors affecting substantial rights" when no objection is made. 12 O.S. 1991, §2104(D). Defense counsel did everything he could reasonably do to prevent the errors from occurring ahead

of time, and all attorneys, relevant witnesses, and the trial court were clearly on notice of his objections to any testimony relating to the substance of Mr. Ward's extrajudicial statements.

Mr. Fontenot's objections to the admission of Ward's statements and the admonitions specifically warning witnesses not to relate Mr. Ward's statements preserved this error. The denial of Mr. Fontenot's constitutional right of confrontation was "plain error" and affected "substantial rights," and thus is subject to review. 12 O.S., 1991, §2104(D); *McCall v. State*, 539 P.2d 418 (Ok. 1975). As the United States Supreme Court has said:

> This case cannot be characterized as one where the prejudice in the denial of the right of cross-examination constituted a mere minor lapse. The alleged statements [extrajudicial confession of separately tried, nontestifying accomplice] clearly bore on a fundamental part of the State's case against petitioner.

*Douglas v. Alabama*, 380 U.S. 415, 420 (1965)

The denial of Mr. Fontenot's constitutional right of confrontation was fundamental error leading to conviction and not subject to waiver. *Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985). The prejudice of ignoring the appellate court's holding in *Fontenot v. State*, 742 P.2d 31, 32 (Ok. 1987), is that the only arguable evidence of guilt independent of Mr. Fontenot's confession was the blouse description. Absent Mr. Ward's live testimony, this "evidence" was already greatly weakened by the fact that no such blouse material was found with the remains; that the police insisted on denying they had been given a similar blouse description long in advance of the confessions despite the fact they clearly had; and that a different shirt found with the remains in fact matched the earrings Mrs. Haraway wore. These problematic facts demonstrate why it was so important for the State to inject Mr. Ward's extrajudicial statements concerning the blouse as "corroboration" at every opportunity, as well as the impact Mr. Ward's statements must have had on the jury. The "corroborative" value of Ward's statements and the impact they must have had on Mr. Fontenot's jury would have been greatly diminished, if not destroyed, by Mr. Ward's live

testimony - which we now know would have disputed the veracity of his description and explained how he came to give that description. Mr. Ward's explanation at his retrial was consistent with statements he made to his attorney long in advance of the discovery of Mrs. Haraway's remains and consistent with the existence of a red and white striped shirt having been found with her remains, while no evidence of the described blouse was found. Mr. Ward ultimately received a life sentence while Mr. Fontenot was sentenced to death[58] for convictions of the same crimes.

X.    **MR. FONTENOT'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT WAS VIOALTED DUE TO THE POLICE MISCONDUCT THAT PERMEATED THE INVESTIGATION INTO MRS. HARAWAY'S DISAPPERANCE**

a.    **The Ada Police Department's Complete Lack of Training to Handle Major Crimes Resulted in an Incompetent Police Investigation.**

The Ada Police Department (APD) is the sole law enforcement agency responsible for investigating crimes in the City of Ada. As such, officers are required to be trained on the preservation of evidence, witness interviewing, report drafting and other investigative procedures to ensure the proper handling of criminal activity within their jurisdiction. Because they are the only agency investigating major crimes in Ada, their failure to follow proper protocol resulted in the ineffective evaluation and collection of evidence. At the time of Mrs. Haraway's abduction and through the investigation of her case, the APD lacked the requisite training to properly secure potential evidence and evaluate the evidence collected in the case.

The only substantial training in investigative techniques by the lead APD detective, Dennis Smith, was inadequate on-the-job training. Detective Smith testified police officers were

---

[58] Mr. Fontenot's death sentence was overturned on his second direct appeal. He was later resentenced to life imprisonment without the possibility of parole.

"intuitively investigators" and got investigative experience through investigating traffic stops and domestic abuse cases, (Dkt.# 123, Ex.# 53, at 10, 12), and that personally, he "received on-the-job training, which was probably the most beneficial." (Dkt.# 123, Ex.# 53, at 12). Prior to Mrs. Haraway's abduction, Detective Smith had only been involved with two homicide investigations in his numerous years on the police force. *Id.* at 126. One of them remained unsolved during the investigation of the Haraway case.[59]

OSBI's involvement in the Haraway case came only at the request of the local police agency, APD. (Dkt.# 123, Ex.# 43, prosecutorial bates 3). While OSBI's documentation of the investigation does show more thorough reporting than the APD, there are still questions concerning the Haraway investigation that remain unclear. It is evident both agencies received numerous witness reports in close proximity to the crime providing information of alternate suspects and former boyfriends who many have had a hand in Mrs. Haraway's disappearance. APD's and OSBI's inability to pursue such leads, vet the information, and make reasonable investigative decisions is clear from the actions of both agencies in this case.

### b. The Ada Police Department's Primary Function Was To Investigate The Disappearance of Denice Haraway and They Failed That Role Because They Did Not Collect Information from Readily Available Witnesses

Starting from the first call to emergency services, the police failed to properly preserve the crime scene, evaluate evidence, and follow investigative leads. When law enforcement fails in this endeavor, it places the district attorney in a precarious position of evaluating evidence without a full understanding of crucial facts of the crime. *See Brady v. Dill,* 187 F.3d 104, 114 (1st Cir. 1999) (A valuable role and standard police function is to provide information to the prosecutor and the courts). Detectives in this case failed to properly preserve evidence creating a ripple effect limiting the

---

[59] The second homicide investigation involved Debbie Carter's murder which occurred in 1983. Ronald Williamson and Dennis Fritz were convicted of that murder, then later exonerated.

investigative avenues detectives could consider and develop further.

The Court has admonished police behavior that relies on flimsy information. When witnesses are readily available for interviews, physical evidence is available, and medical diagnosis is forthcoming, yet the police do not conduct appropriate interviews, inspect the evidence for signs of the crime, or wait for preliminary reports from the medical technician, the Tenth Circuit Court of Appeals has concluded the police failed to conduct an investigation. *See Cortez v. McCauley*, 478 F.3d 1108, 1117-18 (10th Cir. 2007).

The investigation of reported crime is the statutory and jurisdictional province of various local, state, and federal law enforcement agencies (Sullivan, 1977). The specific agencies responding to a criminal complaint, and ultimately in charge, depend on which laws have been reported to be broken and where. Whichever agency takes charge of a criminal complaint, they have the legal authority to respond to the scene, interview witnesses and suspects, collect evidence, and make arrests.

Any responding law enforcement agency also has a professional duty of care. This refers to the professional and legal obligation to be competent custodians of any victims that are encountered; any criminal investigations that are initiated; any evidence that supports or refutes allegations of criminal activity against accused suspects; and any suspects that they take into custody (see Bopp and Schultz, 1972; Gross, 1924; Hansen and Culley, 1973; Kappeler, 2006; SATF, 2009; and Savino and Turvey, 2011). Very often this duty of care is a matter of explicit statute and agency policy, wherein law enforcement officers are not allowed to turn a blind eye to crime and must respond to protect life and property. Very often it is also made part of the formal oath they take when being sworn in. If an agency, or its officers and investigators, do not hold or perceive a professional duty of care to their community, then they are not fit to serve it (Gross, 1924); let alone respond to criminal complaints and assume the responsibilities associated with the collection and testing of physical evidence.

The primary responsibilities of law enforcement, when responding to a criminal complaint, include (adapted from basic criminal investigation and crime scene processing guidelines found in Gross, 1924; O'Connell and Soderman, 1936; Rau, 2000; Snyder, 1944; Wade, 1999; and Weston and Wells, 1974):

    i.   Protect themselves; call for back-up when needed.
   ii.   Establish who is involved.
  iii.   Ensure that everyone involved is safe.
  iv.   Get medical assistance for those that need it.
   v.   Determine what happened.
  vi.   Establish who made the complaint and what it is about.
 vii.   Identify any witnesses.

viii.   Seek out, identify, collect, and protect any physical evidence.
 ix.    Ensure the objective forensic examination of all relevant evidence.
  x.    Determine whether or not a crime has taken place.
 xi.    Identify any legitimate criminal suspects.
 xii.   Establish whether probable cause exists for an arrest.
xiii.   Arrest any criminal perpetrators.

These tactical issues also reflect an ethical responsibility. Investigators may not assume what happened based on the statements of one party. They may not assume that any crime has actually occurred until the facts have been established by a thorough investigation. They must be sufficiently educated to understand what the elements of each crime are and what probable cause is. They must also impartially place the cuffs on anyone they determine has broken the law. For example, as explained in Bryden and Lengnick (1997; pp. 1230- 1231):

> As with all crimes, the police decide whether a reported rape actually occurred, and attempt to determine who committed it. If they want the case to go forward, they "found" the complaint and transmit the file to the prosecutor's office ... The police must investigate, a task that cannot easily be combined with offering the emotional support that the victim needs. The detective presumably wishes to avoid an injustice to a wrongly accused individual. In addition, for reasons of professional pride, he does his best to avoid looking naive by falling for a story that turns out to be false.

Meeting these responsibilities is best accomplished with a thorough, diligent, and comprehensive investigation. By comprehensive investigation, the examiner means a detailed review of the complainant and their statements; the careful consideration of witness and suspect statements; and the diligent collection and examination of any physical evidence. All of this must be attended prior to making final determinations regarding whether a crime has been committed and whether probable cause exists to arrest any suspects. See generally Bopp and Schultz (1972); Gross (1924); Kappeler (2006); Leonard (1969); O'Connell and Soderman (1936); Sullivan (1977); Savino and Turvey (20 11 ); and Weston and Wells (1974).

(Dkt.# 123, Ex.# 20, at 2-3). The investigation conducted by the APD and OSBI failed to follow even the basic duty of care owed in the disappearance and murder of Mrs. Haraway. Such disregard at the beginning of the investigation allowed valuable information to be destroyed or completely ignored, including potentially exculpatory evidence for Mr. Fontenot.

When Mr. Whelchel contacted APD at approximately 8:50 p.m. on April 28th, 1984, Ada Police Officer Harvey Philips responded first shortly followed by Detective Baskins.(N/T

6/9/1988 at 86, 91). Upon Officer Phillips arrival, he neglected to close the store to preserve the scene, "because there were several people that had already been in the store and I don't know how many had been there before they got there." *Id.* at 93. When Detective Baskins arrived, he observed "there was Sergeant Phillips, who was the sergeant on duty at the time. He was there, the manager of the store was there, and there were a couple of other people there, there was a lady there and some children."[60] ( N/T 6/10/1988 at 156). Clearly, the crime scene had not been secured for the police to properly evaluate the evidence.

Both officers acknowledge that a cigarette in the ashtray, a beer on the counter, and Mrs. Haraway's purse were not properly preserved as evidence. *Id.*; (J/T at 1239-1240, 1422-23, 1439, 1441, 1447-48). This allowed for evidence to be mishandled, misplaced, or destroyed entirely. Consequently, valuable information that could have led to the actual perpetrator was lost forever. ( N/T 6/9/1988 at 87-93, 102-103); (N/T 6/10/1988 at 155-157).

The failure to preserve this evidence deprived the defense of viable evidence, but equally important, it limited what evidence the police possessed to determine what happened to Mrs. Haraway. J.D. Watts, the store clerk who was on duty prior to Mrs. Haraway's shift returned to the store at the behest of Mr. Atkeson, the store manager. When he arrived, he noted the following:

> When I arrived at McAnally's later that **night I recall seeing a lot of police, more than I could count. I recall seeing Ada police, Pontotoc County Sheriff's Deputies and Oklahoma Highway Patrolman. Inside the store, I recall seeing police officers standing at the counter and looking at the register tape. I remember hearing one of those officers saying that the last purchase made on the register tape was a tallboy can of beer.**

(Dkt.# 123, Ex.# 15). (*emphasis added*). Not only did the APD not properly secure the scene, their

---

[60] As a continuing pattern of non-disclosure, the APD never turned over or made known the list of people who were in McAnally's that evening, what they witnessed, or if they also saw a grey truck.

allowance of numerous other officers inside the store demonstrates a blatant disregard for proper police procedure. Further, the failure for all of these officers to document their involvement in the investigation continues to show a failure to properly record the investigation and those taking part in it.

Detective Baskins collected the McAnally's register tape while at the store, receiving telephone calls from customers that very evening. As presented earlier, Officer Richard Holkum, John McKinnis, Gary Haney and Guy Keys all provided information crucial to the investigation of Mrs. Haraway's abduction, but were disregarded. These witnesses explain seeing a pickup truck believed possibly to be involved at the scene thirty minutes before Mrs. Haraway's disappearance. (Dkt.# 123, Ex.#s 5, 6). Mr. McKinnis provided evidence showing a man in the store behind the counter with Mrs. Haraway. (Dkt.# 123, Ex.# 5). However, not only did the APD and OSBI never document their interviews, they never followed up on these leads. Police found no signs of forced entry, a physical confrontation or any obvious signs of violence. (J/T at 1087-1088, 115-116-, 1135, 1139, 1143). With no indication of violence, the possibility that Mrs. Haraway may have been familiar with her abductor was clearly a possibility based not only on Mr. McKinnis' interview, but also the harassing telephone calls made repeatedly to Mrs. Haraway while she was on duty. This was all evidence the police received by their own request. They sought out witnesses who made purchases in the store; those witnesses responded. They asked family members about anything odd involving Mrs. Haraway; they gave numerous reports of harassing behavior from an unknown assailant. Either these leads were blatantly ignored by APD and OSBI whose duty it was to accurately investigate the case, or they lacked training, which created an inability to recognize the obvious evidentiary value of that evidence. Whatever the excuse, the failings of the Ada Police Department and the OSBI to collect, preserve and evaluate the evidence generated in the hours following Mrs. Haraway's disappearance violated Mr. Fontenot's right to a fair trial with a reliable

result.

The Ada Police Department investigators turned a blind eye to many important pieces of evidence, relying instead on witness statements that fit their theory of the case while disregarding much stronger evidence of alternate suspects. This caused the police department to only look at limited facts and witness statements as opposed to getting all the facts and statements from witnesses and letting that define the scope of the investigation. "[A]n officer may not choose to ignore information that has been offered to him or her…Nor may the officer conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts." *Kingsland v. City of Miami*, 369 F.3d 1210, 1219 (11th Cir. 2004). This reliance on limited information is the type of investigation which resulted in a misguided investigation. *See generally Kyles v. Whitley*, 514 U.S. at 445.

### c. Police Misconduct Involving Witness Interviews Resulted in Descriptions of the Suspects That Have No Relevance to The Disappearance of Mrs. Haraway

The police created a profile of two suspects within four hours of Ms. Haraway's disappearance without a proper evaluation of the facts in the case. (Dkt.# 123, Ex.# 41). The police then focused on Karen Wise's description of two men, even though she was not present at McAnally's. Ms. Wise worked at J.P.'s, another convenience store down the road from McAnally's, and did notice four patrons that evening who made her feel uncomfortable. ( N/T 6/8/1988 at 163); (Dkt.# 123, Ex.# 13). However, at no time during the evening of April 28, 1984, did Ms. Wise visit McAnally's where Ms. Haraway worked. It is unclear how the police learned of the four men in J.P.'s or why they focused on Ms. Wise's account as the basis of the two suspects, that later became two composites, when Ms. Wise saw four men in her store that night. *Id.* Ms. Wise admitted police pressure caused her to change her account to conform with evidence with no connection to the crime. *Id.*

This pattern of pressuring witnesses to change their statements to match the police's hypothesis was a common theme and caused truthful information to get lost in the process. James Moyer, the sole eyewitness placing Mr. Fontenot in McAnally's, recounted his attempts to alert the State of his uncertainty of his identification only to be told he too was incorrect. (Dkt.# 123, Ex. 14). Stacey Shelton went to Detective Baskins to explain how she knew about the party held at Gordon Calhoun's apartment was correct because she was there. (Ward Vol. 10 p. 93-195); (Dkt.# 123, Ex. #12). Instead of investigating her account, she was disregarded as a complication to the State's case. *Id.* Such improper handling of witnesses includes Mr. Fontenot himself, who gave a false confession after being told not only that his alibi was wrong, but that Mr. Ward had implicated him in the crime with Odell Titsworth. Such action by the police handling this case demonstrates a disregard not only for the proper development of factual information in a criminal investigation, but a blatant abuse of power for those witnesses who do voice concerns.

### d. Law Enforcement Failed to Investigate Leads from other Jurisdictions

Throughout the investigation into Mrs. Haraway's disappearance, both the Ada Police Department and the OSBI interviewed numerous people regarding alternate suspects, potential leads, and other vital information related to the case. Maintaining proper documentation of these various contacts and their substantive interviews was paramount to discern what happened. However, the report writing and records keeping by both the OSBI and APD was flawed throughout the investigation of this case. Contained within OSBI reports are numerous leads for alternate suspects fitting the composite sketch description with little to no documentation as to what happened to these potential leads. It is unclear why certain suspects were or were not interviewed, or why a person was eliminated as a suspect.

For example, agents interviewed Jerry East and several of his family members to ascertain whether he was in Ada around the time of Mrs. Haraway's disappearance. (Dkt.# 123, Ex.# 29, at

1104-1106). The report states Mr. East was arrested for burglary in Ada in May 1983 and was on probation at the time Mrs. Haraway disappeared. *Id.* When asked his whereabouts on April 28th, he claimed he was with his sister and her family at the lake. *Id.* The Agent's notes on the interview states, "EAST is very poor in remembering times and dates. EAST matches the description of the number two suspect in the Haraway disappearance being fair complexed [sic] with blond hair and green eyes. EAST also has a small amount of acne around his face.

However, EAST's hair is cut, left long in the back and the front in the middle of the ear. It is light blond in color." *Id.* OSBI continued to investigate Mr. East as a potential suspect before dropping the investigation for no clear reason provided in any reports. This pattern continues for numerous other potential suspects.

Police from Beaumont, Texas, contacted the OSBI concerning three Caucasian men arrested for attempting to steal a woman's purse from her car and then attempting to run over the owners when they were caught.

> On June 29, 1984, Detective Barrow, Beaumount Police Department . . . advised Deputy Insp., Roberts his department had taking into custody on June 28, 1984 at 1935 hours a while male who resembled one of the suspects in the composite. The suspect and the two other individuals attempted to steal a purse from a car, but the owners caught the subjects. Subjects then attempted to run over the owners. The subjects were in a '70's blue Chevrolet pickup with primer spots, bearing Oklahoma License ATF1975, which was impounded by Beaumount P.D. Before Det. Barrow could check the pick-up for evidence the pick-up and subjects were released.

(Dkt.# 123, Ex.# 44, OSBI 0125). The full names and dates of birth were provided for all three suspects: Denver Russell Davis, Daryl Patrick Robins, and Christopher Lynn Hammock. *Id.* Photographs of these three men were provided along with their criminal histories which included robbery, burglary, larceny, dangerous drugs, and assault.[61] (Dkt.# 123, Ex.# 29, p. 1149-1160).

---

[61] The photographs of these three suspects were disclosed in the January 2014 discovery during the state post-conviction for the first time.

For all the vital information provided by the Beaumont Police Department on these three criminals who fit not only the description, but a truck strikingly similar to the one seen by the only eyewitnesses,[62] nothing was done by either OSBI or the APD to follow-up on this lead. These men obviously had ties to Oklahoma, including working within the state. (Dkt.# 123, Ex.#s 33 & 44, OSBI 0125). It would have been relatively easy to track the license number to find out whether these men, or one of them, was involved in Mrs. Haraway's disappearance. Yet inexplicably, no further investigation is shown as to what transpired with this information.

Further, OSBI received information regarding two men arrested in Tulsa for attempting to rob and kidnap a female convenience store clerk in a very similar manner to the description in the Haraway case. Not only were these two men arrested in August 1984, three months after Mrs. Haraway's disappearance, but they also matched the composite description used by police.

> During the early morning hours of August 9, 1984, ORVEL REEVES drove a silver, 1984 Datsun passenger car to a Circle "K" Convenience Store in Tulsa. DENNIS REEVES entered the store, robbed the female clerk at knife point and then abducted the clerk from the store. A Tulsa Police Department Patrolman was sitting across the street from the store and saw DENNIS REEVES walk out of the store arm and arm with the female clerk. The patrolman became suspicious and followed the car a short distance, then stopped it. As the patrolman was approaching the car, the female convenience store clerk alerted the patrolman to the fact that she had been robbed and abducted. Patrolman then took DENNIS and ORVEL REEVES into custody.

(Dkt.# 123, Ex.# 29, at 1111). Tulsa County prosecuted and convicted both men for these events resulting in fifteen-year prison sentences. (Dkt.# 123, Ex.# 30). Because they remained in custody, OSBI Agent Gary Rogers, or APD Detective Dennis Smith, could have interviewed these men given that the facts of this robbery/kidnapping mirror those described in Mrs. Haraway's case. However, no further follow-up, witness interviews, or police reports provided demonstrate whether anyone developed such

---

[62] David Timmons described the primered truck he saw as blue in color. (Dkt.# 123, Ex.# 44, OSBI 0851).

a critical lead in this investigation. These three examples are not anomalies but a consistent pattern of a lax and incompetent investigation that repeatedly ignored assistance of various jurisdictions. The OSBI reports disclosed pursuant to the OCCA's order and those recently released continue to provide additional alternate suspects and viable leads that were dropped by law enforcement. Given the singular role that law enforcement plays in investigating criminal activity, the failure of those leading the investigation into what happened to Denice Haraway utterly failed in their obligation and resulted in numerous alternate suspects being ignored in favor of "suspects" who not only had alibis, but no motive for these crimes.

### e. Law Enforcement Failed to Properly Preserve Evidence Connected with The Crime After Mrs. Haraway's Remains Were Found

Given that law enforcement are the only agencies that may collect physical evidence, the proper storage and cataloging of that evidence is paramount. However, the OSBI and APD failed to conduct a proper search of the Gerty crime scene where Denice Haraway's remains were discovered. Allen Tatum found the skull while laying traps on his property.( N/T 6/08/1988 at 37-38). He then contacted the police who began searching for other bones over the course of a few days. (N/T 06/08/1988 at 40-44). However, the search conducted by several OSBI agents did not provide a comprehensive list of what bones were found, the exact location of those bones, what other items may have been found with the bones, and the area description of where the bones were uncovered. (Dkt.# 123, Ex.# 44, OSBI 0185-0201, 0203-0204, 0211-0212); (Dkt.# 123, Ex.# 29 at 0932-0933, 0936- 0951, 1124-1145).

The investigative and forensic efforts of law enforcement at the location where Haraway's remains were found (West of Gerty, off a county road; Monday, January 20th, 1986) were inadequate rising to the level of abandonment. This prevented the recognition, preservation, collection, and testing specific items of evidence, as well as an untold volume of evidence that would have been missed. This is based on at least the following facts and evidence:

A. The First Officer on site did not secure crime scene or provide for scene integrity in any reasonable or effective fashion. This is standard practice even when remains have been in place for extended periods of time, to prevent further evidence loss, damage, or obliteration (Chisum and Turvey, 2011 ).

   • No security tape deployed.
   • No security log kept re: personnel/witnesses/ patrons entering and exiting the scene.

B. It is unclear from the record whether scene was "processed" on 1120/86 or 1121186

C. Scene photos lacked sufficient quantity, quality, context and measurements.

D. Some bones appeared to be improperly piled together for photos, and were then packaged together in a sack.

E. There is no written investigative or forensic report on who found what or where at the scene.

F. There is no scene diagram.

G. There was no directed or deliberate forensic excavation for other evidence concealed by brush or beneath soil.

H. According to a supplemental MEs report, some victim bones and a watch were found in a rat's nest by a farmer some 30' away from the original site on 1-30-96. There is no evidence that the watch put under a clear chain of custody or submitted for forensic analysis (e.g., fingerprinting; now DNA testing).

I. Additionally, there is no evidence that anyone in authority investigated or confirmed whether the watch or the earrings found with these remains actually belonged to the victim.

J. The ME's office was not notified; bones were therefore removed without proper legal authority by the police, the OSBI and the Sheriff's Department.

K. The scene was vacated and left unsecured before investigators returned on 1/24/86: the OSBI, the prosecutor, the sheriff and the ME went out there and found more bones.

L. In late February of 1986, law enforcement investigators returned to search this scene with both ECU college students and victim family members. Either group being involved with formal search efforts at this scene is highly inappropriate.

M. There were, in effect, multiple searches on multiples dates by multiples agencies with no reports of search activity or chain of custody regarding evidence collected.

N. Based on a review of the documentation, it is likely that evidence still exists at that location, to include more bones and perhaps even the victim's engagement ring, which was not recovered.

(Dkt.# 123, Ex.# 20). Without this information, it was impossible for trial counsel, appellate, or post- conviction counsel to properly understand exactly what happened to Mrs. Haraway prior to her death. These difficulties did not only impact the defense, but the ability of the Medical Examiner's Office to properly evaluate and identify the remains they were provided. The ME's Office investigator noted the poor investigation and evidence collection destroyed any ability of that office to fully understand what happened to Mrs. Haraway.

1-21-86, 1650 I returned a call to Hughes County District Attorney Bill Peterson concerning some bones that were found. Mr. Peterson didn't know anything, about the discovery but they are thought to be the remains of a missing store clerk -- Donna Hariway.[sic] No ME was notified. He stated that the OSBI was notified out of McAlister.[sic] That some people from the OKC office had come down. OSBI Lab people out of OKC did photo. **The scene and they just had a field day picking up bones. No diagrams. The OSBI agent out of McAlister never showed up at the scene. Mr. Peterson believes that the bones are en route to OKC but didn't know for sure.** The sheriff didn't know where the bones were but thought that the OSBI had them. Notified the OSBI in OKC & spoke with Rick Spense. He didn't have the bones but thought that the lab man David Dixon had them. I spoke with the Sheriff Orvall Rose who didn't know where they were. Finally, the OSBI found them in their lab and delivered them at 2040 by Ann Reed. Come to find out the bones were found by a trapper.

(Dkt.# 123, Ex.# 46, at 10) (emphasis added). Because no systematic approach was taken to properly collect evidence, not all of the viable evidence related to the case was uncovered in the January 1986 search. Instead, family members, university students, friends of the victim, and unrelated people found critical evidence and brought it to police during a much larger search conducted at the end of February that same year. (N/T 6/08/1988, at 82-95). These searches also occurred without proper evidence collecting practices clearly showing the lack of a proper search done by police in January 1986. Further, yet other people found evidence missed by the OSBI and APD. Shelia Desoto and her daughter, Sandi Mantzke found a grey sweatshirt at the Gerty

crime scene.

> Several months after Karl Fontenot and Tommy Ward were convicted of Denice Haraway's murder, I saw news reports that Denice Haraway's remains had been found in an isolated location near Gerty, Okla. Those remains were discovered on Jan 21, 1986.
>
> Several weeks later, mom's sister, Hazel Faulkner, was visiting from Texas. She was interested in the [sic] the Denice Haraway case. On Friday, March 7, 1986, I went with my Aunt Hazel Faulkner and my mom, Sheila Desoto, and drove over to Gerty to look at the site where Denice Haraway's remains had been discovered. We were there out of curiosity. After viewing the trial, this was just one more fact which didn't make sense. We were walking around this site when we literally stumbled over three large flat rocks, which appeared to have been placed carefully over a large cloth object. We carefully removed the rocks, and found a nearly intact gray sweatshirt with a hood and a zippered front. We placed this sweatshirt into a paper sack in order to preserve any possible evidence. We thought this might have been the sweatshirt worn by Denice Haraway the night she disappeared.
>
> We also took photographs of the sweatshirt and where we found this sweatshirt. Copies of those photographs are attached. By the time we got to a payphone it was late on Friday afternoon. We called, but were unable to reach Dennis Smith or Gary Rodgers. We put the paper bag with the sweatshirt into the trunk of my mom's car where it stayed all weekend.
>
> On Monday, March 10, 1986, my mom and I personally handed this gray sweatshirt to Ada Police Chief Gray in his office. Chief Gray told us he would put this sweatshirt with the other evidence related to the Denice Haraway case, in the property room. No investigators, including Dennis Smith and Gary Rogers has ever interviewed me or asked me where or how we found that sweatshirt.

(Dkt.# 123, Ex.# 31).

The problem with the failure to collect, document, and store the evidence related to the Gerty crime scene and what has transpired to that evidence is that crucial information which explains what happened on April 28th is lost. Further, records pertaining to the evaluation of this evidence are also missing. Dr. Fred Jordan, a former Medical Examiner who knew of the evaluation conducted by Drs. Glass and Balding have explained it was the M.E.'s practice at the time to photograph all remains given to them along with x-raying any bones. (Dkt.# 123, Ex.# 36) This was standard practice for the office who handled the bones and evidence brought to them

from the Gerty crime scene. However, none of this evidence can now be found. Such evidence is crucial to the understanding of the events that transpired from the time Mrs. Haraway left McAnally's on April 28, 1984, until her skeletal remains were discovered almost a year and a half later. The fact that almost every state agency who investigated, analyzed, or prosecuted this case have lost the evidence and documentation in this case not only deprives Mr. Fontenot of his ability to properly prove his innocence, it makes it almost impossible to answer the question, "What happened?" The inept handling of reports, evidence, and all other vital documentation from this case clearly falls within a known pattern of police misconduct that the lead detectives and agents working on this case were known to commit.

The failure to properly train officers with the Ada Police Department to investigate a case resulted numerous errors. If the police investigating this case had collected available evidence, investigated leads of other potential suspects, listened to witnesses even if their information was contrary to APD's theory of the case, and followed up on the information people were giving them, it is likely Mr. Fontenot would have never been convicted. Regardless of how "intuitive" a detective is, the detective is still duty bound to build a case not on gut feeling, but on evidence. Additionally, the detective is duty bound to consider all available evidence instead of only considering evidence his intuition tells him is important. Finally, the detective must make all evidence available to the prosecution, so a proper assessment of discoverable materials can be timely made pretrial. Based on the numerous constitutional violations that occurred in this case, it is clear Mr. Fontenot did not receive a fair trial to which he was entitled both under the laws of the state of Oklahoma and the U.S. Constitution.

## CONCLUSION

The United States and Oklahoma Constitution's guarantee that no person shall be deprived of liberty or life without due process of the law, encompassing the right to be free

from convictions except upon proof beyond a reasonable doubt of guilt. Fourteenth Amendment; Okla. Const. Art.II, Section 7. The federal and state constitutions are in accord on the requirement of proof beyond a reasonable doubt and on the test to be applied when examining the record for absence or existence of such proof. The test for determining whether proof is sufficient to support a criminal conviction is whether, in the light most favorable to the State, a rational trier of fact could find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316-17 (1979).

In the light most favorable to the State, the evidence at trial established beyond a reasonable doubt that Mrs. Haraway disappeared on April 28, 1984, and was found dead on January 20, 1986. Beyond these basis facts, the evidence introduced to establish the cause of death, criminal agency and the identity of the person responsible for her death was unreliable, contradictory, uncorroborated or simply nonexistent. None of the eyewitnesses identified Mr. Fontenot as the man who left the store with Mrs. Haraway, and they saw only one man with her in the truck as they left. None of the physical evidence, including the body, linked Mr. Fontenot to Mrs. Haraway's disappearance or death. At best, the evidence established Mrs. Haraway died from a gunshot wound to the head, or was struck by a stray bullet after she died from unknown causes. In either case, there was no independent evidence suggesting she was raped, stabbed or burned, or ever taken to any location other than where her remains were found. The Court finds no rational juror who was able to set aside the tragedy of Mrs. Haraway's death could find beyond a reasonable doubt that Mr. Fontenot should be convicted based solely on his unsubstantiated confession. Given the uncontroverted evidence of Petitioner's mental and psychological impairments; the material discrepancies between the physical evidence and the story the Petitioner told the police; the absence of evidence to corroborate his version of the events; and the circumstances surrounding his coerced confession, the Court finds no reasonable

juror would have convicted the Petitioner.

**ACCORDINGLY**, this Court finds Petitioner has established the actual innocence gateway removing the procedural impairments from his Second Amended Petition for Writ of Habeas Corpus, and all his claims are deemed exhausted. Respondent's Motion to Dismiss Second Amended Petition is **DENIED.** Mr. Fontenot's Second Amended Writ of Habeas Corpus is **GRANTED** and it shall issue, unless within one hundred twenty (120) days of the entry of this Order the State grants Petitioner a new trial or, in the alternative, orders his permanent release from custody.

**IT IS SO ORDERED this 21st day of August, 2019**

James H. Payne
United States District Judge
Eastern District of Oklahoma